
Page 1

```
[ 1]            IN THE UNITED STATES DISTRICT COURT
                 IN AND FOR DISTRICT OF DELAWARE
[ 2]
[ 3]   WILLIE DAVIS, JR.,              )
       NATHANIEL BRIDDELL,             )
[ 4]   GEORGE W. FEDDIMAN,             )
       JOSEPH GARRISON,                )
[ 5]   ROY H. WALTERS,                 )
       ALL SIMILARLY-SITUATED CURRENT  )
[ 6]   AND FORMER EMPLOYEES OF         )
       MOUNTAIRE FARMS, INC.,          )
[ 7]   MOUNTAIRE FARMS OF DELMARVA,    )
       INC., and MOUNTAIRE FARMS       )
[ 8]   OF DELAWARE, INC.,              )
                    Plaintiffs,        )
[ 9]         -vs-                      )   C.A. No. 04-0414-KAJ
[10]   MOUNTAIRE FARMS, INC.,          )
       MOUNTAIRE FARMS OF              )
[11]   DELMARVA, INC., and             )
       MOUNTAIRE FARMS OF              )
[12]   DELAWARE, INC., all Delaware    )
       corporations,                   )
[13]               Defendants.         )
                                 - - - - - -
[14]         Deposition of ROY H. WALTERS, taken before
       Pamela C. Washington, Registered Professional Reporter
[15]   and Notary Public, at the law offices of Young,
       Conaway, Stargatt & Taylor, 110 West Pine Street,
[16]   Georgetown, Delaware, on February 15, 2005, beginning
       at 10:00 a.m.
[17]                         - - - - - -
[18]   APPEARANCES:
[19]       On behalf of the Plaintiffs:
             Margolis Edelstein
[20]         BY:  JEFFREY K. MARTIN, ESQ.
             and KERI WILLIAMS, ESQ.
[21]         1509 Gilpin Avenue
             Wilmington, Delaware 19806
[22]
           On behalf of the Defendant:
[23]         Shawe Rosenthal
             BY:  ARTHUR M. BREWER, ESQ.
[24]         and  LAURA A. PIERSON SCHEINBERG, ESQ.
             20 South Charles Street,  11th Floor
[25]         Baltimore, Maryland  21201
```

Page 2

```
[ 1]                       I-N-D-E-X
[ 2]   Witness:
           ROY H. WALTERS
[ 3]         Examination by Mr. Brewer  ..........   3
             Examination by Mr. Martin  ..........  182
[ 4]         Further examination by Mr. Brewer ....  186
[ 5]
[ 6]
[ 7]
[ 8]
[ 9]
[10]   CERTIFICATE OF COURT REPORTER ............... 189
```

Page 3

[1] WHEREUPON:

[2] ROY WALTERS,

[3] having first been duly sworn by the court reporter,

[4] thereupon testified upon his oath as follows:

[5] BY MR. BREWER:

[6] Q  Hi, Mr. Walters, we've known each other

[7] for a long time, but for the record, I'll introduce

[8] myself, I'm Art Brewer.

[9] We have a standard stipulation with the

[10] only caveat to that is if you wish to read your

[11] deposition before you sign it, that will be your call.

[12] I'm going to ask you a number of

[13] questions here; have you ever been deposed before,

[14] sir?

[15] A  No.

[16] Q  Okay.  You understand that you're under

[17] oath today, and that you have an obligation to tell

[18] the truth?

[19] A  Yes.

[20] Q  Okay.  This is informal, as you can

[21] see, but it's important that you understand that this

[22] has the same force and effect as testimony in a

[23] courtroom for a judge or jury.

[24] A  Yes.

[25] Q  The court reporter is going to be

Page 4

[1] taking down your answers to my questions, as you can

[2] see.  I'd like you to understand that at trial, I'll

[3] have an opportunity to bring to the attention of the

[4] judge or jury any conflicts in your testimony today

[5] from any testimony you may give later on.

[6] A  Yes.

[7] Q  Okay.  If there is any question that I

[8] ask you that you don't understand, please don't answer

[9] it; just ask me to explain it so that you do

[10] understand the question, okay?

[11] A  I'll agree.

[12] Q  Okay.  Because if you answer a

[13] question, we're all going to assume that you

[14] understood what I asked you, okay?

[15] A  I understand that.

[16] Q  All right, good.  Sir, do you have any

[17] physical or mental problems which would interfere with

[18] your ability to answer my questions today?

[19] A  No.

[20] Q  Are you on any medication at all today?

[21] A  Blood pressure.

[22] Q  Okay.  And that's

[23] you're on, is for your blood pr

[24] A  Yes.

[25] Q  Do you feel that

EXHIBIT F

Page 29

[1]   Q   Okay. And did you have any
[2] responsibility with respect to making sure they knew
[3] how to go about catching chickens?
[4]   A   I don't understand that one.
[5]   Q   Okay. When a new catcher comes in to
[6] your crew, okay, do you have any responsibility to
[7] make sure he knows what he's doing?
[8]   A   No.
[9]   Q   No?
[10]   A   No.
[11]   Q   He just comes onto your crew and you
[12] just turn him loose?
[13]   A   He's ordered by the company.
[14]   Q   He's ordered by the company?
[15]   A   He's -- he's hired by Mountaire, he's
[16] placed by Mountaire. I have no control over the
[17] placement in the crew; they evaluate the man, they
[18] hire the man, they place the man.
[19]   Q   You have some input into who gets
[20] hired, though, don't you?
[21]   A   No.
[22]   Q   How about Mr. George Drummond, are you
[23] telling me you had no input into him getting hired at
[24] all?
[25]   A   No. Only to tell him to go to the

Page 30

[1] plant and get signed up, and go through the company's
[2] procedure.
[3]   Q   Right. So you told Mr. Drummond -- how
[4] did you come to get to Mr. Drummond?
[5]   A   Mr. Drummond asked me as a crew leader
[6] how he could get a job with Mountaire, and I informed
[7] him of the position that he had to go through in order
[8] to get a job, that's all.
[9]   Q   So you told him, "Gosh, sure. Go to
[10] there and get --"
[11]   A   I didn't say sure.
[12]   Q   What did you say to Mr. Drummond?
[13]   A   I said, "Mr. Drummond, you have to go
[14] through company policy to work for Mountaire."
[15]   Q   Okay. And do you know what that policy
[16] is?
[17]   A   You have to go through the channels, go
[18] through personnel, drug tests -- what's the other
[19] part? TB test. I'm not fully familiar with all of
[20] the stuff that a man --
[21]   Q   So you don't know what goes on in human
[22] resources?
[23]   A   No.
[24]   Q   But you told him if he wanted a job, he
[25] could go to human resources?

Page 31

[1]   A   Like anyone else.
[2]   Q   And he did?
[3]   A   I assume, yes.
[4]   Q   Well, and he's working for you, isn't
[5] he?
[6]   A   Yes.
[7]   Q   And how about Leon Tucker, didn't
[8] Isaiah Daniels refer him to you?
[9]   A   No, he referred him to Mountaire.
[10]   Q   He referred him to Mountaire?
[11]   A   Yes.
[12]   Q   Okay. So then you don't have any
[13] impact at all then as to who gets hired at all?
[14]   A   No.
[15]   Q   Okay. You can discipline people,
[16] though?
[17]   A   Yes.
[18]   Q   And you have, haven't you?
[19]   A   To a point, according to the work.
[20] That's company policy that they allow me to follow.
[21]   Q   So now this new catcher who comes to
[22] your crew, who you don't do anything with, right? He
[23] just walks into your crew and introduces himself and
[24] says, "Hi, I'm John." And you say, "Fine, John. I'm
[25] Roy," and he just goes to work, you don't have

Page 32

[1] anything to do with his training?
[2]   A   No.
[3]   Q   If he does something wrong, you can
[4] write him up, can't you?
[5]   A   Yes.
[6]   Q   Okay. How does he know not to do
[7] something wrong?
[8]   A   I consider the experience that he place
[9] toward the company when they consider him. That's,
[10] you know, that's entirely up to the company; the man
[11] goes in the company and said, "I'm a chicken catcher,"
[12] then how do they know that he's a chicken catcher?
[13] They hire him and --
[14]   Q   How do you know he's a chicken catcher?
[15]   A   I don't.
[16]   Q   You don't?
[17]   A   I don't.
[18]   Q   And, yet, when you don't know, there's
[19] nothing you do to make sure that he --
[20]   A   I inform my supervisor.
[21]   Q   Let me just ask the question, rephrase
[22] the question. When a new person comes to your crew
[23] as a catcher, you don't know whether he's a catcher,
[24] if I understood your answer, correct?
[25]   A   Yes.