3

Westlaw

Not Reported in F.Supp.2d        Page 1
2004 WL 1586552 (E.D.La.)
(Cite as: 2004 WL 1586552 (E.D.La.))

©

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
Eric JOHNSON
v.
HOME TEAM PRODUCTIONS, INC.
**No. Civ.A. 03-2775.**

July 15, 2004.
Alisa Ann Coe, Suzanne E. Coe, Coe & Coe, Attorneys at Law, LLC, New Orleans, LA, for Plaintiff.

Ellis B. Murov, Deutsch, Kerrigan & Stiles, Bernard Marcus, Lehmann Norman & Marcus, LC, New Orleans, LA, for Defendant.

MCNAMARA, J.

*1 Presently before the court are the following motions filed by Defendant, Home Team Productions, Inc.:

(1) "Motion for Partial Summary Judgment" (Doc. No. 17) and

(2) "Second Motion for Summary Judgment" (Doc. No. 25).

Plaintiff, Eric Johnson filed memoranda in opposition. The motion, set for hearing on Wednesday, June 23, 2004, are before the court on briefs, without oral argument. Now, having reviewed the memoranda of counsel and the applicable law, the court finds that there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law.

*I. Background*
Home Team Productions, Inc. is engaged in constructing and installing structures, sets and exhibits for conventions, meetings, concerts and other performances. (*See* Affidavit of Tague Richardson, the President and Chief Executive Officer of Home Team Productions, Inc., attached to Defendant's Motion for Partial Summary Judgment).

Plaintiff became employed by Home Productions in September 1998, and was paid on an hourly basis making $9 per hour. (Plaintiff's Dep. at 6). [FN1] Plaintiff had skills in carpentry, basic electricity and basic plumbing; as an hourly employee, he "didn't have much more than a laborer's responsibilities" and was told what to do by James McEvoy. (*Id.* at 8, 12).

> FN1. Mr. Richardson (the owner and president of Home Team) testified that Plaintiff never complained to him about being paid on an hourly basis. (Richardson Dep. at 29). And there is *no* issue in this case whether overtime should have been paid to *either* Plaintiff when he was an hourly employee *or* to any other hourly employee employed by Home Team.

In approximately March 1999, Plaintiff was reclassified as a salaried manager, making a gross weekly salary of $400 per week. (*Id.* at 9). In approximately July-August 1999, his salary was raised to $480 per week, and in January 2000, it was raised again to $580 per week. (*Id.* at 9-10).

As a salaried employee, Plaintiff described that responsibilities were "to assist more in the planning of an event, and in choosing crews to accomplish whatever was the requirements for the event. And [he] assisted McEvoy in the hiring of people." (*Id.* at 12). With Plaintiff assuming these duties, McEvoy became primarily the planner and designer

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 2

2004 WL 1586552 (E.D.La.)

**(Cite as: 2004 WL 1586552 (E.D.La.))**

of the stages and sets that the company built, and he also was occupied with sales. (*Id.* at 16, 20). However, Plaintiff explained that:
> There were times when there were more jobs that I had to bounce back and forth from job to job to supervise. If the work load got heavy, McEvoy would come out into the field and assist.

(*Id.* at 20).

Tague Richardson, the owner and president of Home Team, explained his role and that of Plaintiff and McEvoy as follows:
> [M]y obligations are to major events that I design and manage, such as the New Orleans Jazz and Heritage Festival and the Essence Music Festival....
> And I would go to Home Team on a daily basis. But my management of the daily functions of the company were left to Johnson and McEvoy, and they consulted with me from time to time on things. But it was--it was mostly them that decided what happened daily.

(Richardson Dep. at 21).

As to Plaintiff's role in the company, Mr. Richardson further explained that Plaintiff was a "field manager" and

*2 basically he would receive the work orders that were created by McEvoy or [Hamauei]. And then he would decide what the materials were with McEvoy, to some extent, what the materials and the ways, the method the job was going to be installed.
> And then Johnson would take that and figure out the manpower involved, the equipment needed, the timing, the departure ... He would meet on the job with the clients, get the lowdown on what was to be done and than manage the process.

(Richardson Dep. at 24-25).

Alexa Hamauei, who worked as Home Team's office manager, verified that:
> During my employment for [Home Team], the day-to-day managers and operators of the Company were Eric Johnson and Jim "Trap" McEvoy. McEvoy had been working longer than, and was senior to, Johnson, who became a manager in 1999. McEvoy spent most of his time in the office. He designed stages and exhibits, but he also supervised work crews in the field. Eric Johnson worked mostly in the field, and was responsible, chiefly, for working the crews, selecting the personnel for the crews, and checking on their work in the field. Both McEvoy and Johnson also, from time-to-time, worked with their hands.

(Alexa Hamauei Affidavit, Defendant's Exhibit G, p. 2).

Plaintiff testified that when he was out supervising a crew, he would often perform physical labor with the crew to get the job done. (*Id.* at 21). Indeed, Plaintiff testified that he spent the "majority" of his day performing "physical labor." (*Id.* at 68).

Plaintiff (along with James McEvoy and Tague Richardson) also had the authority to hire and fire full-time employees who worked directly for the company on an hourly basis. (*Id.* at 12, 23). Two hourly-paid employees who worked ful-time for Home Team were Chris Carter and Mauricio Tabares. Carter and Tabares reported to Plaintiff or McEvoy, and while they also directed the work crews they did not have the authority to hire or fire. (*Id.* at 21-23).

Plaintiff also hired temporary employees from temporary labor agencies whenever additional help was required. (*Id.* at 14). These temporary employees were paid on an hourly basis through the agency, which in turn charged Home Team. (*Id.* at 14). However, either Plaintiff or McEvoy set the starting hourly rate. (*Id.* at 55).

The president and owner of Home Team, Tague Richardson, testified:
> A. [O]nce Johnson learned the ropes and become more of a field manager, he was directly involved with hiring.
> Q. Did you direct Eric Johnson and Jim McEvoy as to how to pay the regular employees?
> A. No.
> Q. How did they determine how to treat people that worked under their direction?
> A. Ask them.
> Q. So there was no direction that you gave,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                         Page 3
2004 WL 1586552 (E.D.La.)
**(Cite as: 2004 WL 1586552 (E.D.La.))**

correct?
A. They were hands-on on a daily basis.

\* \* \*

A. [W]ere there any times that you would veto or ... override requests from Johnson or McEvoy as to the people that they wanted to hire or how they wanted to pay them?
*3 A. No.
(Richardson Dep. at 16-17, 35-36).

Plaintiff actually exercised his authority to fire or discharge employees on several occasions. (*Id.* at 32-37; *see also* McEvoy Dep. at 20; and untraversed Affidavits of David Ricca, Alexander Smith, Kimberly Hamauei, Chris Carter & Alexa Hamauei, attached as Defendant's Exhibits C, D, E, F & G).

As a salaried employee, Plaintiff had use of an office desk and computer. (Plaintiff's Dep. at 17). From time to time, Plaintiff issued memo's to employees regarding company policies or plans (*Id.* at 51 & Attachment 1), as well as memo's reprimanding the employees he supervised. (*Id.* at 54-55, 60-61 & Attachment 4). Plaintiff also participated in drafting the 12/29/99 revision of the company's written "Polices and Procedures." (*Id.* at 53-54 & Attachment 3). He also reviewed the time sheets of the hourly employees he supervised for accuracy. (*Id.* at 38-40). And he would decide when to send a crew home if work was slow. (*Id.* at 64-65).

Plaintiff ordered company materials and was given a credit card to pay for materials. (*Id.* at 24). Plaintiff also believes that he used the credit card to purchase personal items for which the company would be reimbursed. (*Id.* at 25). Plaintiff also met with established and prospective clients to discuss logistics, scheduling and requirements that they would have for their jobs. (*Id.* at 56; Richardson Dep. at 25; Kimberly Hamauei Affidavit, Defendant's Ex. E, p. 4).

At one point during his employment with Home Teams, Plaintiff also was made the general manager of Home Team's ice rink located in City Park. In this capacity, he performed physical labor, but he also generally supervised employees, and he hired people at least in the construction of the rink. (*See* Kimberly Hamauei Affidavit, Defendant's Ex. E, pp. 3-4; Alexa Hamauei Affidavit, Defendant's Ex. G, p. 4; and Plaintiff's Dep. at 41-46). And on one occasion, Plaintiff was the lead man on an out-of-town tour [FN2] and "was responsible for making sure that everything got built," and deciding how much man power was needed for the job. (Plaintiff's Dep. at 47-49; Kimberly Hamauei Affidavit, Defendant's Ex. E, pp. 3).

> FN2. This out-of-town tour was the Acura Tour, which required a crew on and off for three to four months working on as many as eight locations, including the Northwest Pacific Coast. Plaintiff selected three Home Team rank and file employees for this tour. He planned ahead of time how many people he would need for each Acura exhibit and, by telephone from the New Orleans office, he would usually order four to eight temporary employees from a temporary agency at the site. (*See* untraversed Affidavit of Kimberly Hamauei, Defendant's Ex. E at p. 3).

In July-August 1999, Plaintiff's salary was increased to $480 per week and then in approximately January 2000, his salary was increased to $580 per week. (*Id.* at 9-10). In addition to his salary, Plaintiff occasionally received performance bonuses and supplemental pay for traveling shows; he was entitled to and/or received fringe benefits such as paid sick time and vacation time, holidays, and participation in the company's health and hospitalization insurance plan, life insurance plan, savings plan and profit sharing plan; and he was also not docked for coming to work late, leaving early or taking naps on the job. (*Id.* at 10, 25-28, 30, 51-53; Richardson Dep. at 36; *also see* Alexa Hamauei Affidavit, Defendant's Ex. G, p. 2-3 & attachments thereto).

*4 Plaintiff voluntarily ended his employment with Home Team on or about October 24, 2001. Almost two years later, on October 3, 2003, Plaintiff filed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

this lawsuit against Home Team under the Fair Labor Standards Act, 29 U.S.C. 201 *et seq.* (FSLA), for failure to pay Plaintiff for his overtime work. Plaintiff also alleges that Defendant's failure to pay overtime was "willful and knowing." (Complaint, Doc. No. 1, ¶¶ 22 & 23).

In its motions for summary judgment now before the court, Defendant argues that: (1) Plaintiff qualifies as an *exempt* "executive" or "administrative" employee not entitled to overtime compensation under the FSLA; and (2) a two-year, rather than a three-year, statute of limitations is applicable in this case because there was no "willful" violation of the FSLA.

*II. Legal Analysis*
*A. Was Plaintiff an executive and/or administrative employee exempt from the FSLA's overtime provisions?*

"The decision whether an employee is exempt from the FSLA's overtime compensation provisions under 29 U.S.C. § 213(a)(1), is primarily a question of fact.... However, the ultimate decision whether the employee is exempt from the FSLA's overtime compensation provisions is a question of law." [FN3] *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 330-31 (5th Cir.2000).

> FN3. At first blush, this language appears contradictory. However, as further discussed, the court first makes findings of historical fact, and then applying the applicable law to those findings, the court determines as a matter of law whether the employee is exempt. (*See* text, p. 9, *infra* ).

The FSLA requires employers to pay overtime compensation to employees who work more than 40 hours per regular workweek. 29 U.S.C. 207. However, the FSLA excludes from this requirement those employees working in a bona fide "executive" or "administrative" capacity. 29 U.S.C. 213(a)(1); *Lott*, 203 F.3d at 331.

"The [section] 13(a)(1) exemptions are 'construed narrowly against the employer seeking to asset them,' and the employer bears the burden of proving that employees are exempt." *Dalheim v. KDFW-TV,* 918 F.2d 1220, 1224 (5th Cir.1990) (notations omitted).

The Fifth Circuit instructs that in deciding whether an employee is exempt under 29 U.S.C. 213(a)(1), the court must:
(1) assert findings of historical fact, which include such findings as whether the employer controlled the number of hours the employee worked;
(2) make inferences from the facts in applying the regulations and interpretations promulgated under 29 U.S.C. 213(a)(1); and
(3) make the ultimate determination of whether an employee was exempt.
*Lott*, 203 F.3d at 331.

Under 29 C.F.R. 541.0 *et seq.*, the Secretary of Labor has defined the terms "executive" and "administrative," setting out "short" tests for determining whether or not an employee earning more than $250 per week is entitled to exempt status under either an "executive" or "administrative" capacity. *Lott*, 320 F.3d at 331; *see also* 29 C.F.R. § 541.1(f) (setting forth "short test" for executive capacity); and 29 C.F.R. § 541.2(f) (setting forth "short test" for administrative capacity".

1. Executive Exemption
*5 The "short test" for the executive exemption, consistently applied by the Fifth Circuit, requires the employer to prove that:
(1) the employee was compensated on a salary basis of not less than $250 per week;
(2) the employee was *primarily* responsible for the *management* of [the enterprise in which the employee is employed or] of a customarily recognized department or subdivision thereof; and
(3) the employee customarily and regularly directed the work of two or more employees.
*Id.* at 332, *citing* 29 C.F.R. 541.1(f) (emphasis added).

Here, it is undisputed that beginning in March

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                              Page 5
2004 WL 1586552 (E.D.La.)
**(Cite as: 2004 WL 1586552 (E.D.La.))**

1999, Plaintiff was compensated on a salary basis of *over $250 per week*, and Home Team did not control the number of hours he worked. [FN4] It is further undisputed that as a salaried employee, Plaintiff customarily and regularly directed the work of *two or more employees* (at least from March 1999). He also exercised substantial supervisory functions over the work crews, but (according to Plaintiff and McEvoy) Plaintiff spent the majority of his day performing physical labor. Thus, whether Plaintiff qualifies as a bona fide executive turns on whether his primary duty was management.

> FN4. Assuming arguendo that the three year statute of limitations applies to Plaintiff's FSLA claim (which Defendant denies, *see* Section B, *infra* pp. 24-27), the claim commenced on October 4, 2000 (as Plaintiff filed his Complaint on October 3, 2003). From October 3, 2000, until he quit his employment, Plaintiff was compensated at a salary of $580 per week. Thus, Plaintiff's salary well exceeds the upset salary of $250 per week for highly compensated employees.

At this summary judgment juncture, the court must give Plaintiff the benefit of all factual disputes and reasonable inferences in determining if Defendant has established that Plaintiff's "prime job duty" consisted of "managing" employees in the sense contemplated by the FSLA and 29 C.F.R. § 541.102(b). However, the mere existence of a scintilla of evidence in support of the non-moving Plaintiff is not sufficient; there must be sufficient evidence upon which a jury could reasonably find for Plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving Plaintiff, there is no genuine issue for trial. *Matsushita Electric Industrial Co., Ltd v Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Regarding "prime duty", the relevant Department of Labor regulation instructs:

A determination of whether an employee has management as his primary duty must be based on all the facts in a particular case. The amount of time spent in the performance of the managerial duties is a useful guide in determining whether management is the primary duty of an employee. [a] In the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time. Thus, an employee who spends over 50 percent of his time in management would have management as his primary duty. Time alone, however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if other pertinent factors support such a conclusion. Some of these pertinent factors are [b] the relative importance of the managerial duties as compared with other types of duties, [c] the frequency with which the employee exercises discretionary powers, [d] his relative freedom from supervision, and [e] the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor. For example, in some departments, or subdivisions of an establishment, an employee has broad responsibilities similar to those of the owner or manager of the establishment, but generally spends more than 50 percent of his time in production or sales work. While engaged is such work he supervises other employees, directs the work of warehouse and delivery men, approves advertising, orders merchandise, handles customer complaints, authorized payment of bills, or performs other management duties as the day-to-day operations require. He will be considered to have management as his primary duty....

*6 29 C.F.R. § 541.103 Primary duty.

The court now considers the time Plaintiff spent on management duties and the other pertinent factors set forth above.

*(a) Time spent on management duties*
Plaintiff claims that he spent the majority of his day

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                   Page 6
2004 WL 1586552 (E.D.La.)
**(Cite as: 2004 WL 1586552 (E.D.La.))**

performing physical labor. (*See* Plaintiff's Dep. at 68 & McEvoy Dep. at 16, wherein McEvoy states that 90% of the Plaintiff's work was physical). The court accepts on summary judgment Plaintiff's assertion, supported by the record, that he spent more than 50% of the time on manual labor which is plainly nonexempt work.

However, in determining the primary duty requirement, the percentage of time spent on nonexempt tasks while relevant is not alone dispositive. 29 C.F.R. § 541.103. Indeed, the Fifth Circuit has instructed that "an employee's 'primary duty' cannot be ascertained by applying a simple 'clock' standard that contrasts the amount of time each day an employee spends on exempt work." *Dalheim*, 918 F.2d at 1227.

Further, as set forth in the example described in the regulation, 29 C.F.R. § 541.103, quoted above, an employee can manage while performing other work, and that other work does not negate the conclusion that his primary duty is management. Thus, Plaintiff's time percentage arguments are not persuasive because, given the overall nature of Home Team's business and Plaintiff's job, Plaintiff's supervision of the work crews was accomplished simultaneously with the physical labor he performed with the work crews. [FN5]

> FN5. *Cf. Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1114 (9th Cir.2001)(in determining the primary duty of managers of a recreational vehicle park, the court reasoned that the executive exemption is not presumed to fail "merely because the proportion of time spent on exempt managerial tasks is less than fifty percent, where, as here, managerial duties are packaged in employment with non-managerial tasks, and the management function cannot readily and economically be separated from the nonexempt tasks"); *Murray v. Stuckey's*, 939 F.2d 614, 618 (8th Cir.1991)(that a manager spent up to 90% of his time on non-managerial duties was "not a controlling factor under the regulations"); and *Donovan v. Burger King Corp.,*, 672 F.2d 221, 226 (1st Cir.1992)(in concluding that Burger King assistant managers had management as their primary duty, the court reasoned that a "strict time division is somewhat misleading here: one can still be 'managing' if one is in charge, even while physically doing something else. The 50 percent rule seems better directed at situations where the employee's management and non-management functions are more clearly severable than they are here.").

McEvoy's testimony is telling in this regard:
Q. Did [Plaintiff Johnson] regularly perform physical labor?
A. Yes. That's the only way you can supervise around here. If you just watch, nothing gets done.
Q. Okay.
A. You have to lead by example.

* * *

Q. Did you ever make Mr. Richardson aware of the amount of physical labor that you or Eric [Plaintiff] were performing on the job?
A. It was obvious. That's the nature of the business, the nature of the work.
(McEvoy Dep. at 15-16, 21) (emphasis added). [FN6]

> FN6. McEvoy also pointed out that after Plaintiff became a salaried employee managing the work crews, the amount of physical labor that McEvoy performed decreased. (McEvoy Dep. at 23-24). Besides working with the crews, McEvoy had duties pertaining to sales, designing and planning. (*Id.* at 6).
> McEvoy also testified that about a year after Plaintiff became a salaried employee, Chris Carter came on board and Plaintiff did not have to go on every job. (*Id.* at 22). Carter was a first-line supervisor who worked under the supervision of Plaintiff and McEvoy. (Carter Affidavit, Defendant's Ex. F).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 1586552 (E.D.La.)

**(Cite as: 2004 WL 1586552 (E.D.La.))**

Page 7

Plaintiff also explained that in addition to having "input in the hiring and firing process, particularly of temporary employees,"

> [a]s one of the few Home Team workers out in the field, I had to make sure that all workers were doing a good job and getting their work done, because it was important to completing the tasks were assigned. We couldn't afford to have people out there not really working so workers not performing adequately in the field had to be let go or sent home ... Work in the field was pretty fluid and it required everyone to pitch in. Also, because so many of our employees were temps, I would often have to give them instructions on what to do.

(*See* Plaintiff's Supplemental Affidavit dated June 15, 2004, attached as Plaintiff's Exhibit D) (emphasis added).

Further, even Richardson, the president and owner of Home Team, (in addition to Plaintiff and McEvoy) worked as needed with the crews on job sites. (McEvoy Dep. at 6, Plaintiff's Dep. at 66-67).

*(b) Relative importance of managerial duties*

*7 The regulations describe "management" duties as:

> Interviewing, selecting, and training employees; setting and adjusting their-rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and discipline them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be uses or merchandise to be bought, stocked or sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.

29 C.F.R. § 541.102(b).

A number of Plaintiff's daily activities mirrored those described in this regulatory language. Plaintiff hired, selected, trained and fired employees. Besides the owner and president of Home Team, Tague Richardson, and the other manager, James McEvoy, no other employee besides Plaintiff could hire and fire employees. Plaintiff also reprimanded employees with memo's; he assisted in setting up the company's policies and procedures; he planned work schedules and verified the employees' time sheets for accuracy; he directed and supervised the work crews and there is no indication that the work crews were regularly supervised by anyone else except Plaintiff; he ordered tools and supplies; and he met with clients.

Again, it is true that, as manager, Plaintiff performed a substantial amount of manual labor. But that alone does not preclude a finding that Plaintiff's primary duty was management. "At least under the short tests, the employee's primary duty will usually be what [he] does that is of principal value to the employer, not the collateral tasks that [he] may also perform, even if they consume more than half her time." *Dalheim,* 918 F.2d at 1227.

Based on the testimony of Richardson, McEvoy, Alexa Hamauei and Kimberly Hamauei, the court concludes that Home Team (which was in the business of constructing and installing structures, sets and exhibits for conventions, meetings, concerts, etc.) could not have operated successfully unless Plaintiff performed his managerial/supervisory functions over the work crews. Thus, the principal value or most important work of Plaintiff was managerial, notwithstanding the fact that Plaintiff also preformed manual labor while supervising.

*(c) Frequency of exercise of discretionary powers*

Plaintiff frequently had the opportunity to exercise discretionary powers in managing and supervising the work crews. Plaintiff hired, reprimanded and fired employees; [FN7] he set the starting wages of the employees he hired and assisted in setting up the company's policies and procedures; he scheduled work time for the work crews depending on how work had to be performed; when work was slow, he sent the crew members home to get them off the clock; he reviewed the employees' time sheets for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 8
2004 WL 1586552 (E.D.La.)
**(Cite as: 2004 WL 1586552 (E.D.La.))**

accuracy; and he represented Home Team in discussions and negotiations with Home Team's clients. Such exercise of discretion was critical to the success of Home Team.

> FN7. In his Affidavit, Plaintiff states that Tague Richardson (the owner and president of Home Team) often overrode the decisions of McEvoy and himself regarding hiring and firing employees. (Plaintiff's Affidavit dated March 15, 2004, Plaintiff's Ex. A). However, Plaintiff only refers to the decision to fire Alexander Smith. (*Id.*). And the record is replete with other examples of Plaintiff's hiring and firing of employees that Mr. Richardson did not override. Further, in addition to hiring and firing temporary or low paid employees, Plaintiff also hired Mauricio Tabares, a first-line supervisor. (Plaintiff's Dep. at 13-15).

*(d) Relative freedom from supervision*
*8 That Plaintiff was relatively free from daily supervision by Home Team weighs heavily in favor of the exemption. Plaintiff was essentially on his own, and in charge, when he supervised the work crews. And while Richardson and McEvoy had some oversight of Plaintiff, it was not so rigorous as to undermine the undeniable fact that Plaintiff was substantially free from supervision.

*(e) Relationship between salary and wages of other employees*
For all times pertinent to this issue, Plaintiff's salary was $580 per week, regardless of the hours worked in excess of (*or less than*) the 40 hour workweek. [FN8] Regarding the wages of employees under Plaintiff's supervision, Kimberly Hamauei [FN9] attests that:

> FN8. In his Complaint, Plaintiff alleges that he "was not compensated in any form for the nearly 1400 hours of overtime he worked in 2000 or 2001." (Complaint, ¶ 11). However, there is no evidence in the record to establish how many hours Plaintiff worked as a salaried manager.

> FN9. Kimberly Hamauei started working part-time for Home Team in 1999, then she became an administrative assistant to Alexa Hamauei in August or September 2000, and ultimately a salesperson for Home Team in September 2001.

During Johnson's employment tenure, the company office was together with its warehouse in New Orleans. Johnson would bring in new hires into the office and tell me that he hired them. He instructed me what their starting salary was. Typically, he would introduce the new hire to me and tell me in his presence that he was going to start him out at so much, usually $7.00 per hour.

\* \* \*

Typically later on, he would instruct me that the man ... was a good worker and that Johnson was raising him, typically to $8.00 per hour. Thereafter, he would tell me that an employee was doing a good job and told me to raise his rate by $.25 or $.50 per hour.
(*See* Kimberly Hamauei Affidavit, Defendant's Exhibit E, pp. 2-3).

Regarding the labor cost of jobs, McEvoy testified that "[Richardson] had to keep people under $10 an hour, eight, nine. We weren't hiring people at $12 or $13 an hour." (McEvoy Dep. at 28).

Alexander Smith was hired by Home Team in July 1998, making $7.00 per hour. He worked under Plaintiff's supervision. As of March 2004, he was employed by Home Team, making $11.00 per hour. (*See* Smith Affidavit, Defendant's Exhibit D).

Chris Carter initially worked for Home Team from 1985 to 1995, when he voluntarily quit. He returned to work for Home Team in 1999, as a first-line supervisor, who worked primarily under the supervision and management of Plaintiff, and he was paid as an hourly employee at a rate of $12.00 or $13.00 per hour. In 2000, he went on a weekly salary for a short time, but then returned to an hourly pay rate.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2004 WL 1586552 (E.D.La.)  
(Cite as: 2004 WL 1586552 (E.D.La.))

Page 9

Plaintiff attests that the workers he supervised were making between $9 and $10 per hour and were paid a straight hourly wage for all the hours they worked, and "sometimes" their paychecks ended up higher than his, although he was putting in the same hours of work. (Plaintiff's Affidavit dated March 15, 2004, Plaintiff's Ex. A).

However, Plaintiff, as a salaried employee, received a paycheck every week and always got paid regardless of whether he worked or not (Richardson Dep. at 26-27, 29), while the hourly employees did not get paid if there was no work and they were off the clock (*Id.* at 29, Plaintiff's Dep. at 65). Further, Plaintiff received performance bonuses and fringe benefits (such as vacation/sick time, and eligibility and/or participation in the company's health and hospitalization plan, life insurance plan, savings plan and profit sharing). And there is no evidence in the record indicating that the hourly employees received or were entitled to such benefits. The court concludes that Plaintiff's salary (with fringe benefits) was sufficiently higher than the crew workers he supervised.

*9 Even, if on occasion, Plaintiff's salary was only marginally higher or even lower than some workers who worked in excess of forty hours, the court finds that when all of the other factors are considered, Plaintiff has failed to come forward with sufficient evidence to create a genuine issue of material fact to avoid the conclusion that Plaintiff's primary duty was management in the Home Team enterprise or management of the work crews that composed a recognized unit with a continuing and critical function in the Home Team organization. [FN10] Thus, Defendant is entitled to summary judgment on the executive exemption.

> FN10. *Cf. Guthrie v. Lady Jane Collieries, Inc.,* 722 F.2d 1141, 1144-47 (3d Cir.1983) (concluding under the short test that the primary duty of coal mine foremen was management because of their safety and supervisory responsibilities and their independence from regular supervision *despite* the fact that the foremen: (1) spent, on average, less than 50% of their time on management duties; (2) did not frequently exercise discretion; and (3) received a salary only marginally higher than that of the crew members).

2. Administrative Exemption  
The "short test" for the "administrative" exemption requires the employer to prove that: (1) the employee is compensated on a salary at a rate of not less than $250 per week; (2) the primary duty of the employee consists of office or nonmanual work directly related to management policies or general business operations of the employer or the employer's customers; and (3) the employee customarily and regularly exercises discretion and independent judgment. *Lott,* 203 F.3d at 331; *see also* 29 C.F.R. §§ 541.2(a) & 541.2(e)(2).

"As a general rule, an employee's 'primary duty' involves over 50% of the employee's work time. And yet, flexibility is appropriate when applying this rule, depending on the importance of the managerial duties as compared with other duties, frequency of exercise of discretionary power, freedom from supervision, and comparative wages." *Lott,* 203 F.3d at 331, citing *Smith v. City of Jackson,* 954 F.2d 296, 299 (5th Cir.1992) (*citing* 29 C.F.R. 541.103). [FN11]

> FN11. The court has previously discussed 29 C.F.R. § 541.103 (and the factors it sets forth) in its discussion of "executive" exemption. *See* text, *supra,* pp. 12-20.

"The exercise of discretion and independent judgment necessitates consideration and evaluation of alternative courses of conduct and taking action or making a decision after the various possibilities have been considered. 29 C.F.R. § 541.207(a)." *Id.* It must also relate to matters of consequence. *Id., citing* 29 C.F.R. § 541.207(b)-(c)(1). However, "final decision making authority over matters of consequence is unnecessary." *Lott,* 203 F.3d at 331 (citations omitted).

As the court previously found (in discussing the executive exemption), Plaintiff's primary responsibility (as of March 1999) was supervising

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 10
2004 WL 1586552 (E.D.La.)
**(Cite as: 2004 WL 1586552 (E.D.La.))**

work crews and this clearly constitutes nonmanual work directly related to management policies of Home Team. Further, even though the majority of Plaintiff's *time* was spent performing physical labor, "such a finding does not preclude the determination that [Plaintiff's] primary duties consisted of the administration of the general business operations of [Home Team], such that the administrative and supervisory duties performed by [Plaintiff] were of principal importance to [Home Team], as opposed to those collateral tasks which may have taken more than fifty percent of [his] time." *Lott,* 203 F.3d at 332. Particularly, when the nature of Home Team's business required Plaintiff to perform physical labor when he was supervising the work crews.

*10 "[N]otwithstanding the amount of time [Plaintiff] performed [manual labor or other nonexempt work], [his] primary duties directly related to and were important to both [Home Team's] management policies and its general business operations, and required the exercise of discretion and independent judgment." *Id* . Although he sometimes consulted with McEvoy and Tague, Plaintiff exercised sufficient discretion and independent judgment in the following: hiring and firing employees for the work crews assigned to build sets, stages, and other structures for Home team's clients; setting the starting wages of the employees he hired; deciding when and why to send the hourly-paid work crews home; reviewing the hourly employees' time sheets; sending memo's to employees regarding professional integrity; assisting in the drafting of the company's written policies and procedures; and speaking to clients regarding logistics, scheduling and job requirements.

Thus, based on the evidence of Plaintiff's administrative duties and supervisory duties, the court concludes that there is no genuine issue of material fact and Defendant is entitled to summary judgment on the administrative exemption. [FN12]

> FN12. *Compare Lott,* 203 F.3d 203 (5th Cir.2000), where the former office manager of an automobile dealer qualified for the administrative exemption from the FSLA's overtime requirement, but did not qualify for the executive exemption.

*B. Assuming Plaintiff was not exempt from the overtime provisions of the FSLA, was Defendant's failure to pay Plaintiff overtime "willful" entitling Plaintiff to a three year period of limitations on his FSLA claim?*

Under the FSLA,
> Every action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued....

29 U.S.C. § 255.

To prove a willful violation, Plaintiff must show that Home Team either knew or showed reckless disregard as to whether its conduct was prohibited by the FSLA. *McLaughlin v. Richard Shoe Co.,* 486 U.S. 128, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115 (1988); *Cox v. Brookshire Grocery Co.,* 919 F.2d 354, 356 (5 th Cir.1990). Home Team's "actions will only be deemed willful if they are proved so--and no presumption may circumvent the patent wilfulness requirement explicit in § 255." *Cox,* 919 F.2d at 356.

Here, Plaintiff has offered insufficient evidence to show that Mr. Richardson knew or showed reckless disregard that paying Plaintiff (who Defendant classified as a manager/supervisor) on a salary basis, without overtime, was prohibited by the FSLA. The owner and president of Home Teams, Tague Richardson, attests:
> It never occurred to me that Johnson was not exempt from overtime under the Fair Labor Standards Act. The first time I heard of even a claim that Johnson was entitled to overtime was several months after he quit his employment, when I received a letter from a lawyer which demanded that Johnson be pais more than $30,000 in overtime. Johnson never addressed his need or entitlement for overtime during his employment or ever complained about not getting premium pay for overtime.

*11 (*See* Richardson Affidavit at p. 5, attached to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                            Page 11
2004 WL 1586552 (E.D.La.)
**(Cite as: 2004 WL 1586552 (E.D.La.))**

Defendant's Motion for Partial Summary Judgment) (emphasis added).

Further, Mr. Richardson testified:
> Q. During the time period of 1998 until 2001, were you ever informed by any agency that your company was not properly paying its employees or paying overtime for its employees?
> A. No.
> Q. During the time period between 1998 and 2001, did any employee, to your knowledge, ever complain about how their overtime was calculated?
> A. No.

(Richardson Dep. at 37).

On the other hand, Plaintiff attests that:
> As part of the proposed salary package, I was told that I would receive the "Standard Fringe Benefits Package." This package was never formally written or described to me. I received no vacation time, and took only 7 days of sick leave over the approximately 2 1/2 years I worked for Home Team on salary. I worked every holiday and never received the "profit sharing" that was promised to me. In fact, I am not sure that this program ever existed. I never asked about overtime while I worked at Home Team, because I believed I would be compensated with these benefits.

(Plaintiff's March 15, 2004, Affidavit at p. 2).

However, Plaintiff's denial of receiving or at least being entitled to vacation, sick leave, and "profit sharing" is contradicted by his own deposition testimony and the untraversed Affidavit of Alexa Hamauei. Further, Plaintiff admitted to discussing the disadvantages of the salary position on more than one occasion with Chris Carter (a first-line supervisor) who switched from being a salaried employee to an hourly-paid employee. (Plaintiff's March 15, 2004, Affidavit at p. 4). And Plaintiff still did not complain to Mr. Richardson about being on salary, and not receiving overtime.

James McEvoy testified that Mr. Richardson put Plaintiff on salary because, when Plaintiff was being paid on an hourly basis, Plaintiff was making too much money based on the hours he worked. (McEvoy Dep. at 8). McEvoy also testified that he had conversations with Mr. Richardson as to why Home Team was not paying the hourly employees premium pay for overtime, and Mr. Richardson said that he didn't know how to charge for overtime. (*Id.* at 9). However, such testimony is insufficient to show that Home Team "knew or should have known" that it was acting "in reckless disregard" of the FSLA when after making Plaintiff a "manager," it paid him a salary with fringe benefits, but not with overtime pay. Further, unlike hourly-paid employees, Plaintiff always received a paycheck even if there was little or no work.

The court concludes that no reasonable juror could find that Home Team's conduct in not paying Plaintiff overtime when he was a salaried manager was a "willful" violation of the FSLA. Therefore, Defendant is entitled to summary judgment on the applicability of the two-year, versus the three-year, statute of limitations.

*III. Conclusion*
\*12 For reasons set forth above,

IT IS ORDERED that Defendant's "Second Motion for Summary Judgment" (Doc. No. 25) be and is hereby GRANTED, entitling Defendant to judgment on the "executive" and "administrative" exempt status of Plaintiff;

IT IS FURTHER ORDERED, in the alternative, that Defendant's "Motion for Partial Summary Judgment" (Doc. No. 17) be and is hereby GRANTED, entitling Defendant to judgment on the applicability of the two-year statute of limitations; and

IT IS FURTHER ORDERED that Defendant's request for Rule 11 sanctions (contained on page 19 of its memorandum in support of its Second Motion for Summary Judgment) be and is hereby DENIED.

2004 WL 1586552 (E.D.La.)

**Motions, Pleadings and Filings (Back to top)**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 1586552 (E.D.La.)

**(Cite as: 2004 WL 1586552 (E.D.La.))**

Page 12

- 2004 WL 2478402 (Trial Motion, Memorandum and Affidavit) Defendant's Reply Memorandum in Support of Motion for Summary Judgment (Jun. 23, 2004)

- 2004 WL 2478400 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Plaintiff's Motion to Compel, Etc. (Jun. 22, 2004)

- 2004 WL 2478398 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Motion for Summary Judgment (Jun. 15, 2004)

- 2004 WL 2478396 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Motion for Partial Summary Judgment (Apr. 20, 2004)

- 2004 WL 2478395 (Trial Motion, Memorandum and Affidavit) Defendant's Opposition to Plaintiff's Motion to Continue Hearing on Defendant's Motion for Partial Summary Judgment (Mar. 10, 2004)

- 2003 WL 23862419 (Trial Pleading) Answer of Home Team Productions, Inc. (Nov. 06, 2003)

- 2003 WL 23862414 (Trial Pleading) Answer of Home Team Productions, Inc. (Oct. 20, 2003)

- 2003 WL 23862408 (Trial Pleading) Complaint (Oct. 03, 2003)

- 2:03CV02775 (Docket) (Oct. 03, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.