22a

Garrison - Brewer

1       Q    Is there any other writing on this page

2  that is not your writing?

3       A    No.

4       Q    Okay.  The next page, it says this is

5  Mr. Heath again?

6       A    Yes, it is.

7       Q    Well, is all of the writing on this

8  page yours?

9       A    Yes, besides the circle, I don't think

10  I circled it.

11       Q    I was going to ask you --

12       A    I can't recall that I circled it, no.

13       Q    Okay.  And the violation is because he

14  was late for work, missed one load?

15       A    Yes.

16       Q    Okay.  Let's just for a second go back

17  to Mr. Smith on the very first page; I believe you

18  testified -- and if you didn't, correct me now,

19  please -- that you circled the second warning here?

20       A    No, I didn't say that.

21       Q    Okay, did you circle that?

22       A    No, I didn't.

23       Q    Okay.  Do you have any idea who would?

24       A    No, I didn't.

25       Q    How about the next page, first warning?

Garrison - Brewer

```
 1              A    I can ask.
 2              Q    So even if you could spare him, you
 3    can't assign him over there?
 4              A    No.
 5              Q    Okay.  Can you ever require the
 6    catchers in your crew to work more than eight hours in
 7    a day?
 8              A    Can you be more specific?
 9              Q    I tell you what, not at this time.  Let
10    me try to make myself more clear because I want you to
11    understand the questions.
12              A    Excuse me.
13              Q    Sure.
14              A    I do understand the question.
15              Q    Oh, okay.
16              A    But what I'm saying by being more
17    specific, it's not an eight-hour job.
18              Q    No, I understand that.
19              A    Okay.
20              Q    But if you want somebody to work beyond
21    what they would normally work, my question is can you
22    require people to do that?  Do you have the authority
23    to do that?
24              A    I have authority for to get my job done
25    that day; it may be more than eight hours.
```

FIRST STATE REPORTING SERVICE
Pamela C. Washingt
P.O. Box 99                    Milford, .  ..... .....

A00418

Garrison - Brewer

1    like you to do, please, is to take a look at page 9 of

2    the document.  And, by the way, when you get there --

3    go ahead, I'll let you get there first.

4           A    I'm there.  Yes.

5           Q    The title of the document says

6    Agreement between Mountaire of Delmarva, Selbyville,

7    and the International Brotherhood of Teamsters Local

8    355.

9           A    Yes.

10          Q    And it has an effective date of

11   December 16, `01, through December 18, `04?

12          A    Yes.

13          Q    And if you look at the back of the

14   document, hold on to page 9 for me, if you would, look

15   near the back of the document, the next to last page.

16          A    Yes.

17          Q    It says Schedule B.

18          A    Yes.

19          Q    And it talks about catchers.

20          A    Yes.

21          Q    Those are the catchers that would have

22   been in your crew?  Let me maybe try to state it

23   another way.  We talked earlier that the catchers who

24   worked in your crew --

25          A    Yes.

Garrison - Brewer

1          Q     -- were members of a labor union.

2          A     Yes.

3          Q     The Teamsters Local 355 --

4          A     Yes.

5          Q     -- this group?  Are the catchers that

6    are listed or the catcher job classification that's

7    listed in Schedule B, would those be some of the

8    catchers who worked for you?

9          A     Yes.

10         Q     In other words, this contract covers

11   the catchers?

12         A     Oh, yes, yes.

13         Q     It covers catchers, that's what I'm

14   trying to get at.

15         A     Yes, okay.

16         Q     It also covers the forklift operators?

17         A     Yes.

18         Q     And it also covers live haul truck

19   drivers?

20         A     Yes.

21         Q     Okay.  Now go back to page 9, if you

22   would, for me, and look at Article 10, Section 1.

23         A     Yes.

24         Q     This talks about a complaint of

25   grievance or a dispute which arises out of the

A00420

Garrison - Brewer

1    application or performance of the provisions of this

2    contract.  Do you see where I am?

3              A    Yes.

4              Q    Shall, in the first instance, be taken

5    up with the aggrieved employee or employees, who shall

6    first take the matter up with the shop steward.

7              A    Yes.

8              Q    Who in turn will take the grievance up

9    to the foreman in charge.  If one of your crew members

10   had a grievance or a complaint about this contract

11   being followed, would that person take that grievance

12   up with you, in the first place, or with the shop

13   stewart?

14             A    He would mention it to me, yes.

15             Q    Okay, okay, you are the person covered

16   in the first step of the grievance procedure which is

17   set out in the contract, okay, thank you.

18             A    Yes.

19             MR. BREWER:  Now, I'd like this packet

20   marked as Number 7.

21             (Garrison Exhibit 7, marked for

22   identification.)

23   BY MR. BREWER:

24             Q    Mr. Garrison, in front of you is a

25   document marked Exhibit 7 to your deposition.

134

Garrison - Brewer

1          A    Yes.

2          Q    If I go down on the lower left-hand

3    portion of the page, I see names written with numbers.

4          A    Yes.

5          Q    And again is that the drivers?

6          A    Yes, it is.

7          Q    And the amount of birds on each truck?

8          A    Yes.

9          Q    And again, on the lower right-hand

10   portion of the page, I see names written.

11         A    Yeah.

12         Q    Are those also the names of your

13   catchers?

14         A    Yes.

15         Q    Okay.  Now, what I would like you to

16   try to explain to me, please, is if you look at the

17   first page that you had, your crew caught 38,600

18   birds, right?

19         A    Yes.

20         Q    And on the second, at the Char-Lee

21   farm, they caught 52,101 birds, correct?

22         A    Yes.

23         Q    The mileage from wherever it's

24   measured, which I understand you don't know, is 18

25   miles on the first page, correct?

FIRST STATE REPORTING SERVICE
                    Pamela C. Washingt
     P.O. Box 99              Milford,

**A00422**

Garrison - Brewer

1        A     Yes.

2        Q     And Harry's the driver who was broken

3   down?

4        A     Right.

5        Q     Okay, thank you, that clears that up

6   for me.  I think we're done with this.   Okay.

7             The catchers get paid by the thousand,

8   do they not; it's a piece-work basis?

9        A     Yes.

10       Q     That's what the contract, the previous

11  exhibit we talked about, shows?

12       A     Yes.

13       Q     You as a crew leader, you got paid a

14  salary, did you not?

15       A     Yes, I did.

16       Q     Okay.  Do you know approximately how

17  much a catcher makes during the course of the year?

18       A     Be specific for me.

19       Q     All right.  How much would a catcher

20  who's basically working every day and so forth and so

21  on, how much would they normally expect to make during

22  the course of a year, do you have any idea?  I mean

23  you were a catcher, that's why I'm asking.

24       A     Maybe 20,000 a year.

25       Q     Okay.

174

Garrison - Brewer

```
 1          A      Roughly.

 2          Q      And as a crew chief, sir, how much did

 3   you make?

 4          A      Roughly 40, 35.

 5          Q      Okay, I mean we have the records to

 6   show, I'm just asking you approximately.  I believe

 7   you mentioned that you filled out the time sheets for

 8   the catchers --

 9          A      Yes.

10          Q      -- correct?  Every day?

11          A      Yes.

12          Q      Catchers on your crew, you filled that

13   out every day?

14          A      Yes.

15          Q      Did you fill out any time sheet for

16   yourself?

17          A      We was getting paid by the thousand.

18   When I had to catch, yes, I did.

19          Q      No, no, when you became salary --

20          A      Oh, no, no.

21          Q      -- there was no time record kept of

22   your time?

23          A      No, I didn't do it.

24          Q      No, right.  And do you know of any

25   record that was kept of your time?
```

FIRST STATE REPORTING SERVICE
                 Pamela C. Washingto
      P.O. Box 99              Milford, L......

**A00424**

Garrison - Brewer

1          Q     Well, no, but I mean when you received

2    this memo --

3          A     Yeah, I understand, yes.

4          Q     -- you understand that the company

5    didn't want you catching or operating the forklift?

6          A     Yes.

7          Q     Right.

8              MR. MARTIN:  I'm going to object to the

9    form of that question as stated.  But go ahead.

10   BY MR. BREWER:

11         Q     And if you weren't doing these things,

12   you'd obviously have more time available to you to be

13   doing the things that we talked about earlier, making

14   sure the birds are being caught properly, and pens

15   were going right, and the growers, and all of those

16   things, correct?

17         A     Let me say this:  It was my job, my

18   responsibility to get the chickens in the plant.

19         Q     That's correct.

20         A     That was part of my job.

21         Q     We understand that.

22         A     And so that's what I was doing.

23         Q     Correct.  But my point is when you got

24   this memo, you were told that they didn't want you to

25   be doing these things so that you could have more time

Garrison - Brewer

1    to get that job done, get the chickens to the plant?

2           A    The job got done even if I was doing

3    these things.

4           Q    Okay.  The employees who worked for

5    you, the catchers, they don't evaluate themselves like

6    you did, do they?

7           A    No.

8           Q    Okay.  Do you evaluate them at all?

9           A    No, I don't.

10          Q    Okay.

11              MR. BREWER:  Let me give you this.

12              (Garrison Exhibit 9, marked for

13    identification.)

14   BY MR. BREWER:

15          Q    The document in front of you, sir,

16   which is Number 9 --

17          A    Yes.

18          Q    -- Exhibit 9 to your deposition, have

19   you seen this before?

20          A    Yes, I have.

21          Q    If you look at the bottom of one of the

22   pages, it will talk about salary benefits,

23   orientation.

24          A    Yes.

25          Q    Does this list, without going through

Garrison - Brewer

1            MR. BREWER:  Let's have this marked as

2    Number 10.

3            (Garrison Exhibit 10, marked for

4    identification.)

5    BY MR. BREWER:

6        Q    Just take a look at that and tell me if

7    you have ever seen that before.  Do you know what this

8    is?

9        A    No, I haven't.

10       Q    If I told you that this was the

11   benefits that the members of Local Union 355 had,

12   including your crew members, would there be any reason

13   for you to disagree with me?

14       A    I didn't see one of them, I haven't

15   seen one of them.

16       Q    I understand you haven't seen this, I

17   understand.

18       A    No, I would remember if I did.

19       Q    But if I suggest to you that these are

20   the benefits that the members, the crew, the

21   catchers --

22       A    Yes.

23       Q    -- the people that work for you had as

24   part of 355, would you have any reason to disbelieve

25   me?

Garrison - Brewer

1          MR. MARTIN:  I'm going to object to

2     that question.  He has already stated he is not

3     familiar with this document.

4          MR. BREWER:  Okay, that's fine, that's

5     fair enough.

6     BY MR. BREWER:

7          Q    Next, sir, let's go to this document,

8     this may be the best thing to do here.

9          MR. BREWER:  This is a document that we

10    have prepared, make this Number 11.

11          (Garrison Exhibit 11, marked for

12    identification.)

13    BY MR. MARTIN:

14          Q    This is a document we prepared, and I'm

15    going to try to go through this with you.  If you can

16    answer the questions, that's fine; if you can't, just

17    let me know that you can't.

18          A    Yes.

19          Q    Catchers who worked for you --

20          A    Yes.

21          Q    -- over on the left-hand column of this

22    document it talks about their vacation, one week after

23    one year, two weeks after three years, and so forth.

24          A    Yes.

25          Q    Does that seem accurate to you?

FIRST STATE REPORTING SERVICE
                    Pamela C. Washingt
        P.O. Box 99              Milford, ____.

185

Garrison - Brewer

1          A    Yes.

2          Q    All right.  And the salaried, it's two

3    weeks after one year, three weeks after five, is that

4    accurate when you were salaried, is that the vacation

5    you were entitled to --

6          A    No.

7          Q    -- as a crew leader?

8          A    No.

9          Q    It's not?

10         A    No.

11         Q    All right.  LTD, which stands for

12   long-term disability --

13         A    Yes.

14         Q    -- it's one-half of the salary for five

15   years for the hourly people, and after 90 days for the

16   salaried people it's 60 percent of the salary until

17   age 65 until totally disabled; were you aware that was

18   a benefit you had?

19         A    I can't quote on that, I don't know.  I

20   mean just -- I don't know.

21         Q    Well, let's do the same thing on STD,

22   which is short-term disability; you have no idea what

23   your benefit was --

24         A    No.

25         Q    -- as a salaried crew leader?

FIRST STATE REPORTING SERVICE          (
                    Pamela C. Washington
          P.O. Box 99              Milford, De...

Garrison - Brewer

```
 1          Q     I'm sorry, I put the document away,
 2   what are you referring to, sir?
 3          A     For the salary thing, it says three
 4   weeks.
 5          Q     I'm sorry, salaried for what now?
 6          A     For the salary thing, it says three
 7   weeks for five years, yeah.
 8          Q     So the vacation then that's listed here
 9   for the salaried is correct?
10          A     Salary, right, yeah.
11          Q     Okay.  And the vacation for the hourly
12   that's listed there is correct?
13          A     Yes.
14          Q     Okay, thanks for clearing that up.
15          A     I'm sorry.
16          Q     That's all right.  Let's see, you also
17   receive as a crew leader an allowance for the van --
18          A     Yes.
19          Q     -- for your van, isn't that true?
20          A     Yes.
21          Q     And how much did you get for that?
22          A     It will be 235.
23          O     $235?
24          A     Yes.
25          Q     How often did you get that?
```

Garrison - Brewer

```
 1           A    Once a week.

 2           Q    So you get $235 a week for your van?

 3           A    Yes.

 4           Q    For 52 weeks of the year?

 5           A    Yes.

 6           Q    And what was that supposed to cover?

 7           A    It's supposed to cover my fuel and my

 8   expenses.

 9           Q    And your expenses?

10           A    Yes.

11           Q    For maintaining the vehicle?

12           A    Yes.

13           MR. BREWER:  Can I have the next

14   document which is 12 marked for identification?

15           (Garrison Exhibit 12, marked for

16   identification.)

17   BY MR. BREWER:

18           Q    Now again, sir, what I'd ask you to do

19   is just take a look at this.  I'm going to go through

20   a couple of things and if you know the answer, please

21   tell me; if you don't konw, you can just tell me you

22   don't know.

23           A    Okay.

24           Q    This memo was dated, by the way, in the

25   upper right-hand corner March 27, `01 --
```

Garrison - Brewer

1  crew leader's vacation, was based on your 52 week

2  average?

3          A    Yes.

4          Q    Okay.  They weren't paid on an hourly

5  basis?

6          A    No.

7          Q    Holidays for the crew leaders were

8  calculated at $15 per hour for eight-hour days?

9          A    Yes.

10         Q    Okay, a crew leader did not receive

11 catching pay when working with a short crew, correct?

12         A    Yes.

13         Q    The catchers are eligible for overtime

14 pay?

15         A    Yes.

16         Q    And of course the crew leaders were

17 not.  It says crew leaders are to list daily catcher

18 names and head count on daily time sheets, is that

19 what you were referring to earlier when we --

20         A    Yes.

21         Q    -- mentioned those gentlemen, that's

22 what you were supposed to do?

23         A    Yes.

24         Q    It says crew leaders are eligible for

25 monthly and an annual bonus, is that correct?

191

Garrison - Brewer

1           A    Yes.

2           Q    You were eligible for that, weren't

3    you?

4           A    Yes.

5           Q    And the catchers who worked for you

6    were not, were they?

7           A    No.

8           Q    The rest deals with the live haul

9    drivers and the forklift drivers, we don't need to get

10   into those.

11

12              MR. BREWER:  Mark this, please.

13              (Garrison Exhibit 13, marked for

14   identification.)

15   BY MR. BREWER:

16          Q    Mr. Garrison, this is a level of

17   benefit levels --

18          A    Yes.

19          Q    -- that have been given, bonus levels

20   that have been given to crew chiefs --

21          A    Yes.

22          Q    -- which we already know the catchers

23   are not entitled to.  If you go up at the top of the

24   year 2001, I see Joseph Garrison is listed.

25          A    Yes.

**A00433**

Garrison - Brewer

1        Q      And you earned a performance bonus of

2    $309.05 for that month?

3        A      Yes.

4        Q      And so that we can sort of expedite

5    this, since I'm told the office closes at 3:00 here,

6    if we go out through the year, we'll see that you

7    earned in 2001 a total of $2,282.98 for your year-end

8    bonus in that year, correct?

9        A      Yes.

10       Q      And what is that based on, sir?  How do

11   you go about getting the bonus?

12       A      Based on your DOAs and your head count,

13   and farm damage.

14       Q      That's all?

15       A      Yes.

16       Q      Only those three?

17       A      Only those three.

18       Q      So if you were supposed to catch let's

19   say 30,000 chickens, and you were supposed to do that

20   in 7 hours and it took you 10 hours, that wouldn't

21   count?

22       A      No, got nothing to do with that.

23       Q      Just DOAs and everything else?

24       A      Yes.

25       Q      So it was your responsibility to make

Garrison - Brewer

1    sure those things didn't happen?

2            A    Yes.

3            Q    Now, the bonus, it says processing

4    level three, that benefit is for supervisory people,

5    isn't that right?

6            A    Yes.

7            Q    Okay.  Now, if we go to the next year,

8    in 2002 the bonus benefit that's available for

9    supervisory employees, your name is listed again.  And

10   for 2002, if I'm doing this correctly, I see that you

11   made $902.69 --

12           A    Yes.

13           Q    -- in the form of bonuses?  And then in

14   the year 2003, you received it looks like $1657?

15           A    Yes.

16           Q    Okay.  And, again, the same would be

17   for 2004, the bonus amounts are there.  So these are

18   bonuses that you received pursuant to the company's

19   bonus plans --

20           A    Yes.

21           Q    -- for salaried supervisory employees?

22           A    Yes.

23           Q    And you got that bonus?  The catchers

24   who worked for you did not get this, did they?

25           A    No.

FIRST STATE REPORTING SERVICE
                Pamela C. Washing
       P.O. Box 99            Milford,

Garrison - Brewer

1        Q    Now, in addition to these monthly
2   bonuses, you also got an annual bonus, did you not?
3        A    A yearly bonus, you're talking about?
4        Q    A yearly bonus, right.
5        A    Twice.
6        Q    But I mean you did get those bonuses?
7        A    Yes, I did.
8        Q    The annual bonus is basically based on
9   how the plant did, correct --
10       A    Yes.
11       Q    -- over the course of the year?
12       A    Yes.
13       Q    The monthly bonuses are based on what
14  you mentioned, the DOAs and things like that?
15       A    Yes.
16       Q    So in addition to these monthly
17  bonuses, you also got an annual bonus --
18       A    Yes.
19       Q    -- as a crew leader?
20       A    Yes.
21       Q    That's part of the supervisory benefit?
22       A    Yes.
23       Q    Supervisory bonus thing?
24       A    Yes.
25       Q    And you got that twice, you said?

195

Garrison - Brewer

1        A     Only twice.

2        Q     Only twice in four years; 50 percent.

3              (Garrison Exhibit 14, marked for

4    identification.)

5    BY MR. BREWER:

6        Q     On Number 14, you will see some writing

7    in the upper left-hand corner that was done before

8    this, that is my handwriting, just to clarify things.

9    Did you receive this memo, sir?

10       A     Yes, I did.

11       Q     And it's a mandatory meeting for all

12   management which says includes crew leaders, correct?

13       A     Yes.

14       Q     Did you attend that meeting?

15       A     Yes, I did.

16       Q     Okay.  The company has Christmas

17   parties, are you aware of that basically?

18       A     Yes.

19       Q     Do they have one for the hourly people?

20       A     No.

21       Q     No?  Did they have one for the salaried

22   people?

23       A     Yes.

24       Q     Have you been invited to a party?

25       A     Yes.

196

Garrison - Brewer

```
 1            Q     Have you gone?

 2            A     Yes.

 3            Q     You have?

 4                  (Garrison Exhibit 15, marked for

 5     identification.)

 6     BY MR. BREWER:

 7            Q     This is the 2003 supervisory Christmas

 8     dinner?

 9            A     Yes.

10            Q     Under Mr. Lynch, the Joe Garrison

11     that's reflected, is that you?

12            A     Yes, it is.

13            Q     Did you go to this Christmas party?

14            A     Yes, I did.

15            Q     Take a quick look at the names on the

16     list and see if you can tell me if there's anyone here

17     who is not a supervisor.

18            A     No.

19            Q     Okay.  The next page is the Christmas

20     dinner for 2002, which apparently was held at the

21     Holiday Inn in Ocean City.

22            A     Yes.

23            Q     It says 2002, it's 2001 I guess up

24     here.  Did you attend that meeting also?

25            A     Yes, I did.
```

FIRST STATE REPORTING SERVICE        (302) 424 4543
Pamela C. Washington,
P.O. Box 99                    Milford, Del

**A00438**

Garrison - Brewer

```
 1          Q     You went to that party?

 2          A     Yes.

 3          Q     The next page is a list for the 2001

 4   Christmas dinner invitation?

 5          A     Yes.

 6          Q     Again, under Mr. Lynch, your name, Joe

 7   Garrison, is that you?

 8          A     Yes, it is.

 9          Q     And did you go to that supervisory

10   Christmas party?

11          A     Yes, I did.

12          Q     Is there anybody here on this list that

13   you can tell me is not a salaried supervisor?

14          A     No, no.

15          Q     Okay.  Did you have a good time, by the

16   way?

17          A     Yes, I did.

18          Q     Good, all right.  Now --

19          MR. MARTIN:  Excuse me, I should have

20   had him plead the 5th in Mr. Lynch's presence here.

21   BY MR. BREWER:

22          Q     Okay, now, we have talked about this, I

23   just want to be sure:  On your crew, you have seven

24   catchers and a forklift operator?

25          A     Yes.
```

198

Garrison - Brewer

1          Q      You also carry sometimes an extra

2    catcher, do you not?

3          A      Yes.

4          Q      And the reason you carry the extra

5    catcher is so people can be given a day off?

6          A      Not a day off, but a break.

7          Q      A break?

8          A      Yes.

9          Q      When you say a break, what do you mean?

10         A      One guy might sit down, take a break.

11   You know, his hands hurt, sometimes their hands get

12   hurt.

13         Q      Oh, I see.

14         A      You know, and then he'll fill in.

15         Q      Okay.

16         A      That's all.

17         Q      And do you rotate, do you rotate that

18   person?

19         A      Yes.

20         Q      So, for example, on one day if I were a

21   member of your crew, I might be the extra man to be

22   used to rotate, and the next day it might be somebody

23   else?

24         A      Sometime I do it that way.

25         Q      How did you do it?

Garrison - Brewer

1          A      Got you.

2          Q      If you go to paragraph 26, please,

3   which is on the next page.

4          A      Yes.

5          Q      It speaks to, in paragraph 26th, it

6   says the defendant, which again is the company,

7   followed and enforced and continued to follow and

8   enforce a corporate policy and practice of partial day

9   deduction in that any partial time taken off from

10  normal working hours by any of the plaintiffs, such as

11  yourself, okay, other than established holidays was

12  deducted from their pay.  All right, let's stop at

13  that point.

14         A      All right.

15         Q      Can you tell me, this is a partial day,

16  this is if you're going to take off a half a day,

17  shall we say, okay?

18         A      Yes.

19         Q      You need to take off a half a day, and

20  it's not a holiday and it's not a sick day.

21         A      Right.

22         Q      Is it your testimony that you do not

23  receive your full salary for that week if you take

24  half a day off?

25         A      No.

Garrison - Brewer

```
1         Q    That's not your testimony?

2         A    No.

3         Q    You do receive your full salary if you

4    take a half a day off?

5         A    If I have to go to the doctor or

6    something like that, yes.

7         Q    You get your full salary?

8         A    Yes.

9         Q    Okay.  And if you have to do something

10   else, if it's not the doctor, if it's something else,

11   if you take any less than a full day off, your salary

12   for the week remains the same, does it not?  Your

13   paycheck for the two weeks that you get paid remains

14   the same?

15        A    Yes, yes.

16        Q    Thank you.  Okay.  Let's see, let's go

17   to the next one which would be paragraph 27 of the

18   Complaint.  This speaks to, and you can read it, I

19   won't read it into the record, it's part of the

20   record, this says that you would receive a reduction

21   in the amount of your compensation because of

22   violations in the quantity of the work performed.

23             Was your salary ever reduced because of

24   the quantity of the work you performed?

25        A    I'm trying to think.  What are you on,
```

Garrison - Brewer

1   forced to use your personal automobiles for pick-up,

2   transport, and so forth?

3            A    Yes.

4            Q    I'll let you take a minute and read

5   that, if you would, I just have a couple questions

6   about that.

7            A    Okay.

8            Q    Okay?  I think you mentioned to us you

9   received a payment every week for your vehicle which

10  covers your full expenses, correct?

11           A    Yes.

12           Q    And the last number you gave me was

13  what, I forget?

14           A    235.

15           Q    235?

16           A    Yes.

17           Q    Do you know if it's more now or not?

18           A    I'm not there.

19           Q    Well, I understand you're not, I was

20  just asking if you do know?

21           A    No, I don't know.

22           Q    The 235, when did you get that, in

23  2004?

24           A    Yes, I did.

25           Q    Was it somewhat less the year before?

FIRST STATE REPORTING SERVICE        (302) 424-4541
                     Pamela C. Washington. RPP
        P.O. Box 99                    Milford, D

A00443

Garrison - Brewer

1          A     I can't recall.  I know it was in 2004.

2          Q     What I'm trying to get at is it

3     increases?

4          A     Yes.

5          Q     It increases every year?

6          A     It increases not every year.

7          Q     Okay, not every year?

8          A     No.

9          Q     But it does increase, okay.  Now, when

10    it comes to the vehicle, who chooses what vehicle to

11    buy?  If you're going to go out and buy a vehicle that

12    you're going to use in work --

13         A     I do.

14         Q     -- you choose what vehicle you buy,

15    right?

16         A     Yes.

17         Q     The kind of vehicle you can buy, the

18    color?

19         A     Yes.

20         Q     You choose all that?

21         A     Yes.

22         Q     Whether you want leather or not,

23    whether you want automatic windows or roll up, all of

24    those decisions are made by you?

25         A     Yes.

FIRST STATE REPORTING SERVICE        (302) 424-4541
                    Pamela C. Washington. RPR
         P.O. Box 99              Milford, I

A00444

215

Garrison - Brewer

1          Q    And that's what you use?

2          A    Yes.

3          Q    Okay, that's fine.  Now, the next item,

4   and this is really just for purposes of the record,

5   the Complaint says -- and I don't expect you to know

6   anything about this; if you do, that's fine, if you

7   don't, that's also fine -- the Complaint says in

8   paragraph -- mark this.

9               (Garrison Exhibit 16, marked for

10  identification.)

11  BY MR. BREWER:

12         Q    The Complaint says that we were put on

13  notice by your counsel, Mr. Martin, by a letter dated

14  February 27, 2004 and, if I'm not mistaken, isn't

15  that close to the day that you wrote Mr. Martin's name

16  down on your time sheet?  The record will speak for

17  itself.  And it says we have continued such policies.

18  Have you seen this document that's in front of you

19  now?

20         A    No.

21         Q    I didn't expect you to see it, okay.

22  This is a letter from me to Mr. Martin, responding to

23  his letter of February 27.

24         A    Yes.

25         Q    Dated March 5.  Let's see.  Paragraph

FIRST STATE REPORTING SERVICE        (302) 424-4541
                Pamela C. Washington, RPR
        P.O. Box 99              Milford,

**A00445**

Garrison - Brewer

1    34 of the Complaint says that when the defendant

2    learned of plaintiff's intentions to seek counsel, we

3    immediately retaliated against plaintiffs, threatened

4    plaintiffs with termination of their employment if

5    they continued to pursue, okay?

6              A    Yes.

7              Q    Now, first of all, I want you to tell

8    me when this occurred; what time are we talking about

9    here?

10             A    I don't know what time.  You're on

11   paragraph 34, right?

12             Q    I'm on paragraph 34.  Mr. Martin wrote

13   a letter to the company on February 27th, I responded

14   on March 5.

15             A    I don't know exactly what time it was.

16             Q    Was it in February, can you tell me?

17   You may not be able to tell me the exact date, sir;

18   can you tell me the month?

19             A    I can't recall the month.

20             Q    You can't even recall the month?

21             A    No, I can't.

22             Q    Okay, all right.  Who is the one who

23   retaliated against you and threatened you with

24   termination?

25             A    Al Z.

FIRST STATE REPORTING SERVICE      (302) 424-4541
              Pamela C. Washington, RPR
    P.O. Box 99          Milford, Delaware   19963

Garrison - Brewer

```
 1          Q     Al Z.
 2                (Whereupon, there was a discussion held
 3    off the record.)
 4    BY MR. BREWER:
 5          Q     We're talking about Mr. Al Z. is the
 6    person who threatened you?
 7          A     Yes.
 8          Q     What did Mr. Al Z. say to you, sir?
 9          A     Well, he came out on the farm and
10    issued me this letter, saying that if I don't make
11    them guys sit down and take a half-hour lunch, I would
12    be terminated.
13          Q     And he did this after you filed the
14    lawsuit?
15          A     Yes.
16          Q     Well, let's talk about that for a
17    minute, Mr. Garrison.  You are aware, are you not,
18    that the catchers, the people who worked for you,
19    filed a lawsuit claiming that they were entitled to
20    some overtime compensation, correct?
21          A     Yes.
22          Q     You know that?
23          A     Yes.
24          Q     All right.  And you know the reason for
25    their claim was that the time sheet that you, as the
```

Garrison - Brewer

1    crew chief, crew leader, filled out, had an automatic

2    deduction of one-half an hour for lunch, right?

3            A    Yes.

4            Q    And as a practical matter, the people

5    weren't taking that half-an-hour for lunch, were they?

6            A    Yes.

7            Q    They were taking the half-hour for

8    lunch?

9            A    Well, yes, because if we waiting on a

10   truck, we still taking the half-hour lunch.

11           Q    Well, the lawsuit was settled on the

12   basis that the people were working through their lunch

13   and were never getting the half-hour paid lunch; are

14   you aware of that?

15           A    Yes, I am.

16           Q    You're aware of that?

17           A    Yes.

18           Q    And isn't that what Mr. Al Z. made sure

19   that you and every other crew leader understood, that

20   these people are in fact to take time off for one-half

21   hour for lunch, they're not to work through lunch?

22           A    I understood that.

23           Q    You understood that?

24           A    Yes, I did.

25           Q    All right.  So when Mr. Al Z. reminded

Garrison - Brewer

1   you of that, you took that as a threat because --

2         A    Yes, I did, because he said it -- the

3   reason why I took that as a threat because he said --

4   actually he told it on himself, he said it's not a

5   threat.  I mean it --

6         Q    Okay.

7         A    So that's telling me -- what it's

8   telling me?

9         Q    Well, I don't know.

10        A    Okay.  Good question.

11        Q    I don't know.  What it would tell you

12  and what it would tell me might be different things.

13  But you don't know when this is?

14        A    I can't recall the month, no, I can't.

15        Q    So you don't know if it was before the

16  lawsuit or after?

17        A    No; it was after the lawsuit, yes.

18        Q    It was after the lawsuit?

19        A    Yes.

20        Q    So this occurred then in June, after

21  June?

22        A    Approximately.

23             MR. MARTIN:  All right, let me

24  interpose an objection.

25             MR. BREWER:  Sure.

Garrison - Brewer

1          MR. MARTIN:  You keep mentioning the

2    lawsuit.  As you well understand, there was

3    correspondence prior to actually filing suit.

4          MR. BREWER:  Yes.

5          MR. MARTIN:  You and I understand that,

6    I'm not sure Mr. Garrison does.

7          MR. BREWER:  Okay, I'll be more than

8    happy to try to clear that up.

9    BY MR. BREWER:

10         Q    What your counsel is saying is that in

11   February, February 27th of `04, he wrote a letter to

12   the company saying that he thought that you were not

13   being properly compensated.

14              On March 5, I responded on behalf of

15   the company, saying you were being properly

16   compensated; you were supervisory and exempt under the

17   Fair Labor Standards Act, okay?  The lawsuit, this

18   litigation, was filed on June 18, 2004, okay?

19         A    Yes.

20         Q    My question to you, sir, is in a time

21   frame, you're claiming Mr. Al Z. threatened you --

22         A    Yes.

23         Q    -- with loss of your job, as it says in

24   this Complaint, okay?

25         A    Yes.

221

Garrison - Brewer

1          Q    It says when the defendant learned of

2    plaintiff's intentions to seek counsel, we immediately

3    retaliated and threatened plaintiffs; that's what this

4    says.

5          A    Yes.

6          Q    Okay.  Now I want you to tell me when

7    that was, because that's important.

8          A    Right off the hand, I don't know exact

9    time or month, I just don't know right offhand.

10          Q    So you can't tell me whether it was in

11    February?

12          A    I know it was said.

13          Q    Okay, but you can't tell me whether it

14    was February?

15          A    No, I can't.

16          Q    Or March?

17          A    No, I can't.

18          Q    Or April?

19          A    No, I can't.

20          Q    Or May, or June?

21          A    No.

22          Q    But you know it was threatened?

23          A    Yes.

24          Q    All right.  And where did that occur?

25          A    On the farm.

Garrison - Brewer

1      Q     Which farm?

2      A     I was to -- I'm trying to think of the

3   name of the farm.  I know where I was at.  What's the

4   name of that farm?  I can't think of the name of the

5   farm.  I know it's on a farm.

6      Q     You took Mr. Al Z.'s comments

7   seriously, did you not?

8      A     Yeah.

9      Q     I assume you did.

10     A     Of course.

11     Q     Yeah.  But you don't know when it

12  happened, and you can't tell me where it happened?

13     A     I can't think of the name of the farm.

14     Q     Okay.

15     A     I can carry you to the farm, but I

16  can't think of the name of the farm.

17     Q     But how many farms are there in --

18     A     I know that one, but I just can't think

19  of the name of the farm.  I know it was in Westover,

20  out there to the landfill, I can't think of the name

21  of the farm.

22     Q     So the location of the farm is where?

23     A     Is like you're going to the landfill

24  on -- I'm trying to think, it's --

25     Q     On Route 20?

Garrison - Brewer

```
 1          A     It's in Maryland.

 2          Q     In Maryland?

 3          A     I can't think of the name of the farm,

 4  man.

 5          Q     Okay.  Was anybody else present?

 6          A     David Nuse.

 7          Q     He was also present?

 8          A     Yes.

 9          Q     Did Mr. Nuse say anything to you?

10          A     No.

11          Q     He didn't say anything?

12          A     Al Z. done the talking.

13          Q     So it was just you, Mr. Nuse, and

14  Mr. Al Z.?

15          A     Yes.

16          Q     No one else was present?

17          A     No.

18          Q     Okay.  Did anybody else ever threaten

19  you with termination?

20          A     No.

21          Q     And this occurred only one time?

22          A     Yes.

23          Q     All right.  Did anybody threaten to

24  retaliate against you?  Because it says that they did.

25          A     Be -- can you be specific with that?
```

Garrison - Brewer

1       Q    Well, all I'm reading is what's been

2  alleged in the Complaint; it said we immediately

3  retaliated against you.  Did anything bad happen to

4  you after, has anything bad happened to you outside of

5  what you just told me?

6       A    No, not bad, no.  No.

7       Q    Okay.  So what we have then is the

8  threat that you have just described?

9       A    Yes.

10      Q    Okay.  Now, the next paragraph talks

11  about receiving the final warning before termination;

12  is that the warning that you referred to about making

13  sure that the catchers received a 30-minute lunch

14  break?

15      A    Yes.

16      Q    That's what that refers to?

17      A    Yes.

18      Q    So you and all other crew leaders were

19  given that same warning?

20      A    Yes.  Yes.

21      Q    At the same time?

22      A    That, I don't know.

23      Q    All right.  Let me ask you this:  After

24  the catcher lawsuit was disposed of, did the people on

25  your crew always take a half-an-hour for lunch, or did

FIRST STATE REPORTING SERVICE      (302) 424-4541
Pamela C. Washington, RPR
P.O. Box 99            Milford, Delaware  19963

225

Garrison - Brewer

1    they sometimes work through their lunch?

2         A    We always took a lunch.

3         Q    You always took a lunch?

4         A    Yes.

5         Q    Let me just ask this question this way,

6    Mr. Garrison, because this is interesting:  Is it your

7    testimony that the people on your crew from the time

8    you became a crew leader always took a half-an-hour

9    lunch each and every day they worked?

10             MR. MARTIN:  I'm going to object to the

11   question.  You can go ahead and answer, though.

12   BY MR. BREWER:

13        Q    That you never worked through lunch?

14        A    We always ate.

15        Q    Listen to my question.  Did you and

16   your crew always take one half hour out, stop working,

17   stop working for one-half hour, and eat lunch?

18        A    Yes, we did.

19        Q    Always?

20        A    We always ate.

21        Q    You always took the half-an-hour?  I'm

22   not saying you always ate.

23        A    We always -- it might have been 35

24   minutes, could have been 40 minutes, but we always

25   took a lunch.

Garrison - Brewer

1      Q     But you always took at least a

2  half-an-hour, maybe sometimes more, stopped working

3  and ate lunch?

4      A     Yes.

5      Q     And you never worked through lunch?

6            MR. MARTIN:  Same objection.

7  BY MR. BREWER:

8      Q     Okay.

9      A     It's according on -- it's according on

10  what shift that I'm on.  Because if I only have -- if

11  I'm on a 2:00 o'clock in the afternoon shift, if I

12  only have three loads, you know, you're done before

13  you even have lunch, so no on that deal.  It according

14  to what shift I was on.

15            You asking me a question that's not

16  available because I could be on a different shift; and

17  if you on a different shift, if you don't got but like

18  four loads or five loads, the time you get them, it is

19  lunch.

20      Q     Okay.  Well, then, let me ask you this:

21  If you're telling me, which I understand you to be

22  telling me, that your people, with the exception of

23  the time you have just mentioned now, were always

24  taking 30 or 40 minutes lunch, and you were told if

25  the people don't take 30 or 40 minutes lunch you're

Garrison - Brewer

1   going to be terminated, why would that be threatening

2   to you?  Your people were taking their lunch.

3           A    Because it's a lawsuit that they did,

4   is that what you're saying?

5           Q    No, what I'm asking you is in paragraph

6   35 --

7           A    I know what you're saying.

8           Q    -- it says you received verbal

9   harassment and/or were issued a final warning before

10  termination in an attempt to threaten plaintiffs; I

11  want to ask you the final warning, is that the final

12  warning that you and all the other crew leaders got --

13          A    Yes.

14          Q    -- for making sure your people took

15  one-half-an-hour lunch?

16          A    Yes.

17          Q    That's the one we're referring to?

18          A    That's it.

19          Q    And crew leaders who were not part of

20  this lawsuit also got that letter, did they not?

21          A    Not --

22               MR. MARTIN:  I'm sorry, letter, what

23  letter?

24  BY MR. BREWER:

25          Q    The warning, the final warning.

FIRST STATE REPORTING SERVICE        (302) 424-4541
                    Pamela C. Washington, RPR
          P.O. Box 99              Milford, Delaware  19963

Garrison - Brewer

1      A    I got the letter.

2      Q    You got the letter?

3      A    Not the catchers.

4      Q    No, no, I'm saying the crew leaders --

5      A    Right.

6      Q    -- they all got them?

7      A    Yes.

8      Q    Even people who are not part of this

9    lawsuit that we're here today about?

10          MR. MARTIN:  Objection; he has no way

11    of knowing that.

12          THE WITNESS:  No, no, no.

13          MR. BREWER:  Well, he knows --

14          THE WITNESS:  No, no.

15    BY MR. BREWER:

16          Q    So you're telling me it's only the

17    people who are listed here that got that final

18    warning, is that your testimony?

19          A    All the crew leaders, yes, they did.

20          Q    All the crew leaders?

21          A    Yes.

22          Q    Okay.  I believe I was asking you about

23    the final warning.

24          A    Yes.

25          Q    And you said you felt threatened by it.

Garrison - Brewer

1    A  Uh-huh.

2    MR. MARTIN:  The answer is yes, right?

3    THE WITNESS:  Yes.

4 BY MR. BREWER:

5    Q  And my question is I don't understand

6 why you would have felt threatened if, as you tell me,

7 your people were always taking at least a half-an-hour

8 off for lunch.

9    A  Because how he was telling me, that's

10 how.  Ain't got nothing to do with my people, had

11 something to do with how he's telling me, his actions.

12    Q  All right.  Okay, let's move on.  The

13 next paragraph talks about many of the plaintiffs have

14 been cornered by management personnel and questioned

15 regarding their discussions with counsel, which would

16 be Mr. Martin; have you ever been cornered by anybody

17 from management?

18    A  No.

19    Q  No?

20    A  No.

21    Q  Okay, so it doesn't apply to you.  Next

22 paragraph says that apparently there was a meeting

23 between the plaintiffs and counsel on a Saturday

24 morning, and that plaintiffs recognized vehicle or

25 vehicles owned or operated by the defendant's upper

FIRST STATE REPORTING SERVICE  (302) 424-4541
Pamela C. Washington, RPR
P.O. Box 99  Milford, Delaware  19963

231

Garrison - Brewer

1       Q      What time?

2       A      I'm thinking it was 9:00 o'clock, I

3   think.

4       Q      Now, did you recognize a vehicle owned

5   by the defendant's upper management circling the

6   parking lot?

7       A      Yes.

8       Q      Did you see that?

9       A      Yes.

10      Q      Who was driving the vehicle?

11      A      Phil Owens.

12      Q      Phil Owens was driving the vehicle?

13      A      Yes.

14      Q      And you saw him circling in the parking

15  lot?

16      A      Yes.

17      Q      Now, what makes you think it was about

18  your lawsuit?

19      A      I don't know, good question.

20      Q      This is prior to Mr. Martin's letter,

21  isn't it?

22      A      Right.

23      Q      Mr. Owens had no idea anything was

24  going on?

25      A      I don't know that.

232

Garrison - Brewer

1          Q      Well, it's prior to Mr. Martin's
2    letter?
3          A      Yes.
4          Q      So what you see is Mr. Owens driving
5    around --
6          A      Yes.
7          Q      -- at a diner that is open to the
8    public?  People can come in there and have breakfast,
9    anybody?
10          A      Yes.
11          Q      Okay.  So what you see is him driving
12    around, and that's what you're referring to here?
13          A      Yes.
14          Q      You're sure it was Mr. Owens?
15          A      I think it was Mr. Owens, yes.
16          Q      Is that the only time that this is
17    referring to?
18          A      Yes.
19          Q      Okay.  What kind of car did you see
20    Mr. Owens driving?
21          A      I think it was a gray car.
22          Q      What kind?
23          A      Ford, Mountaire Ford.
24          Q      A gray Mountaire Ford?
25          A      Yes.

FIRST STATE REPORTING SERVICE        (302) 424-4541
                    Pamela C. Washington, RPR
        P.O. Box 99            Milford, Delaware  19963

**A00461**