**23a**

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

1    Q    She would give you money?

2    A    Yes.

3    Q    And you would give that money to the catcher?

4    A    To the catcher.

5    Q    As he requested.  Okay.  How about Cindy

6  Chatterton; do you know her?

7    A    I can't recall her, no.

8    Q    If I tell you she works in payroll, does that help

9  you?

10   A    I probably seen her, but I can't recall Cindy, no.

11   Q    You don't recall a Cindy?

12   A    I don't recall a Cindy, no.

13   Q    Okay.  Let's see.  We talked about Donna Mumford.

14  Was there anybody else in payroll that you might have talked

15  to or dealt with?

16   A    Yes.

17   Q    Who would that be?

18   A    I think Kim.  Kim Clark, I think that's her name.

19  Kim, yes.

20   Q    And why would you talk to Ms. Clark?

21   A    Same reason, same thing.

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 84

```
 1     Q    For the --

 2     A    Petty cash.

 3     Q    -- petty cash?

 4     A    Yes.

 5     Q    If one of your catchers -- by the way, who pays

 6  the catchers?

 7     A    Who pays the catchers?

 8     Q    Uh-huh.

 9     A    Mountaire.

10     Q    Okay.  And they're paid by check?

11     A    Yes.

12     Q    Who delivers the check to the catchers?

13     A    It varies.  I do at times.  And at times, the

14  dispatcher.

15     Q    Or you do sometimes?

16     A    Yes.

17     Q    How often would you say you do that?

18     A    Most of the time, a couple weeks out of the month

19  when we're on the earlier shift.

20     Q    So about half the time, two weeks out of a month?

21     A    Yes.
```

A00501

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 86

1    don't turn one in, she'll call me.

2        Q    Okay.

3        A    Mostly just about the daily time sheets.

4        Q    So your conversations with her are about daily

5    time sheets?

6        A    Yes.

7        Q    Anything else?

8        A    Yes.  We talk about something else.

9        Q    Okay.  What is that?

10       A    Family, just general conversations.

11       Q    Personal type business?

12       A    Yes.

13       Q    But with respect to your dealings with her at

14   work, it just only deals with time sheets, nothing else?

15       A    That's all I can recall -- that's all I can recall

16   right now, most of the time sheets, yes.

17       Q    That's fine.  During the course of a -- if -- let

18   me put the question this way.  You can authorize your crew

19   to work overtime, can't you?

20       A    Can I authorize my crew to work overtime?

21       Q    You've got a number of houses that have to be

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 87

1    caught during the course of the week, you're going to get

2    those houses caught whether it involves overtime or not?

3        A    I have to see if our catch total is -- caught for

4    each day.  If that goes over, yes.

5            (Deposition Exhibit No. 1 marked.)

6            MR. BREWER:  Okay.  This is, I guess, Exhibit 1

7    to Mr. Gibbs' deposition.

8            MR. MARTIN:  Let's go off the record for a

9    moment.

10           (Off the record.)

11   BY MR. BREWER:

12       Q    Mr. Gibbs, there's a document in front of you.

13   It's been marked as Exhibit 1.  I'd like you to take a look

14   at this first page.  It says, request for a vacation or

15   floating holiday; do you see that?

16       A    Yes.

17       Q    And there's a man by the name of Herman Jernigan?

18       A    Jernigan.

19       Q    Is he a catcher?

20       A    Yes.

21       Q    He did he work for your crew?

A00503

Page 88

1    A    Yes.

2    Q    Is he still working on your crew?

3    A    Yes.

4    Q    And he has requested a floating holiday?

5    A    Yes.

6    Q    And you have approved this?

7    A    Yes.

8    Q    That's your signature down there in the supervisor

9  approved, that's you?

10    A    Yes.

11    Q    And the writing that appears in section two, is

12  that your writing?  Do you see where I'm referring to?

13    A    The date hired?

14    Q    No.  It says, section two, halfway down the page.

15    A    Yes.

16    Q    The writing below that, is that all your writing?

17        MR. MARTIN:  Wait a minute.  Maybe we're looking

18    at something different.

19        THE WITNESS:  There's no writing on this.

20        MR. MARTIN:  I see no writing on minc either.  I

21    have an 81 in the upper right corner.  Do you have

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

```
 1    that?

 2            MR. BREWER:  Yes.

 3            MR. LYNCH:  Are you talking about writing in

 4    section two or everything below section two?

 5            MR. BREWER:  Section two and below.  That's what

 6    I'm referring to.

 7            MR. MARTIN:  There is a section two and a

 8    section three.  And the only thing noted in section two

 9    is the date of hire that's written in, correct?

10            MR. BREWER:  Correct.

11            MR. MARTIN:  So are you asking whether that's

12    his writing?

13 BY MR. BREWER:

14    Q    Yes.  Do you understand what I'm asking you, sir?

15    A    Yes.  I'm trying to think.  I'm not sure.

16    Q    You're not sure if that's your writing or not?

17    A    I'm not sure if that's my writing or not.

18    Q    How about the signature, is that your signature?

19    A    Yes.  I think that's -- yes.

20    Q    And did you check the box approved?

21    A    Yes.
```

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 90

1      Q    The next page is talking about the same

2   individual, Mr. Jernigan?

3      A    Yes.

4      Q    And he's requesting -- see if I'm reading this

5   right, three weeks' vacation but he only wants money?

6      A    Yes.

7      Q    In other words, he'll work the three weeks but he

8   wants three weeks of pay?

9      A    Yes.

10      Q    And you approved that?

11      A    Yes.

12      Q    And that is your signature?

13      A    Yes.

14      Q    Now, going to section two, to make it clear, where

15   it says, date of hire, in section two, is that your writing

16   or no?

17      A    I'm still not sure if it's mine or someone in

18   human resources filled that out.  I'm not sure.

19           MR. BREWER:  If you can't tell whether it's your

20        own writing, that's fine.  Why don't we take a few

21        minutes and go off the record.

Zeve Reporting & Videoconferencing
(410)208-4566  Fax(410)208-4767

A00506

Page 91

1          (Off the record.)

2          MR. BREWER:  I believe Mr. Martin had suggested

3     on the record that Gibbs Exhibit Number 1 be looked at

4     by the deponent off the record so as to expedite the

5     deposition, and I think what we can agree to that.

6          The questions that I'm going to be asking on all

7     of these documents, sir, is, these are requests for

8     either vacation or floating holidays made by the people

9     that you supervised, and you are approving their time

10    off, whether it be for to receive vacation or a

11    holiday, or whether it is to receive pay and instead of

12    the actual time off, but pay for the time off, okay?

13    That's the question.  That's what I'm going to be

14    asking you to look at over the lunch break to see if

15    all of these things that are listed here, okay, are

16    things that you approved.

17         MR. MARTIN:  If I may, while we were talking,

18    Mr. Gibbs was looking through this, not at my request,

19    and it looks like he went through each page.  I don't

20    know if he's completed that review now.  But perhaps we

21    can ask him whether he has reviewed these and can

A00507

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 92

1       answer those questions that you put to him.  If not, he

2       can certainly take a lunch break.  But it may help

3       expedite the process.

4    BY MR. BREWER:

5       Q    Had you had an opportunity to go through all of

6    those?

7       A    Yes, I did.

8       Q    And did you approve all of the requests that are

9    in here?

10      A    Yes.

11      Q    For either time off or vacation or pay, okay?

12      A    Yes.

13      Q    Okay.  That solves that.  And maybe just one other

14   question before we break for lunch.  Do you approve time off

15   for members of your crew?

16      A    Yes.

17      Q    Okay.  So if one needs to leave early to go to a

18   doctor, you would approve that or not?

19      A    Yes.

20           MR. BREWER:  Okay.  I think at this point we can

21      break for lunch.

A00508

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 94

1      Q    So we might have somebody off on Monday, then

2    another person off on Tuesday?

3      A    Yes.

4      Q    And who decides who is off on Monday, who on

5    Tuesday, and so forth?

6      A    I do.

7      Q    Okay.  If someone is scheduled off, but another

8    crew member doesn't show up or is not there when you go to

9    pick him up, tell me what, if anything, you do then.

10     A    You mean the one is not his scheduled day off, the

11   catcher that show up --

12     Q    Right.

13     A    -- that's when I call another crew leader and see

14   does he have a man off.  I start there.

15     Q    Okay.  The fellow who's scheduled off that day, do

16   you call him up and ask him to come to work?

17     A    At times, yes.

18     Q    I'm sorry?  I'm going to -- I'm going to ask you

19   to repeat the answer.

20     A    At times, yes.

21     Q    Okay.  So you can either ask another crew leader

A00509

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

1    or ask the fellow who's off to come to work because you're

2    going to be short?

3        A    Yes.

4        Q    If somebody is going to be absent, do they have to

5    let you know?

6        A    They are supposed to, yes.

7        Q    Okay.  And tell me what happens if they don't let

8    you know.

9        A    Then they'll get a warning, a write-up.

10       Q    From you?

11       A    Yes.

12       Q    Okay.  Let me see.  While you're on a farm

13   catching, do the catchers get a paid break?

14       A    Only the lunch break.

15       Q    That's not paid, is it?

16       A    They get paid per thousand.  So if they're not

17   catching any chickens, no, they're not getting paid.

18       Q    Okay.  So -- and how long is lunch?

19       A    Half an hour.

20       Q    When they take that half an hour, they're not paid

21   for that time because they're taking lunch?

Page 96

1    A    No.

2    Q    Okay.  Do you mean -- let me ask the question

3    again.  When the catchers take their half an hour -- and by

4    the way, who decides when that half an hour is?

5    A    Most of the time they do mostly because, like I

6    say, a lot of times we take our lunch break while we're

7    moving from one farm to the next.

8    Q    Okay.  So that's most of the time when you take

9    your breaks, when you're going from one farm to the next?

10    A    When we have two jobs to go on, yes.

11    Q    Okay.  Then let me see if I understand it.  You

12    finish a job at one farm, and on your way to the next farm,

13    you would stop someplace, take half an hour and have lunch?

14    A    Yes.

15    Q    When the catchers take that half an hour for

16    lunch, they don't receive pay for that, do they?

17    A    I'm not sure.

18    Q    You're not sure?

19    A    I'm not sure, no.

20    Q    Okay.  Let me take a second here.  Maybe this can

21    help you.  We'll come to it.  Okay.  If you're just going to

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 97

1    be on farm, you're not going to have to travel to another,

2    do they receive a half an hour lunch break?

3        A    Yes, they do.

4        Q    And who decides when that is?

5        A    A lot of times, like we have to wait on the driver

6    to return to the farm, so we take our lunch break while

7    we're waiting.

8        Q    You basically decide that?

9        A    Yes.

10       Q    That's a good time to take a break, so we'll break

11   now?

12       A    Yes.

13       Q    Okay.  How about paid breaks, do they get paid

14   breaks while they're catching, get out of the house, go

15   outside and sit down, rest a minute, smoke a cigarette or

16   something?

17       A    No.

18       Q    So they just -- everybody works right through?

19       A    When you say a -- paid breaks, I'm not sure

20   whether they're getting paid for it or not.  But sure, if

21   they want to take a break, sometimes they get a little

Zeve Reporting & Videoconferencing
(410)208-4566  Fax(410)208-4767

A00512

Page 98

1    overheated, might have a ache or pain, yes, they can have a

2    break.

3        Q    You can tell them, okay, fine, go outside?

4        A    Yes.

5        Q    And you're not sure whether they get paid for that

6    or not?

7        A    I'm not sure.

8        Q    Okay.  Let me just ask a very general question.

9    Since you've been the crew leader, you've testified that you

10   warned people if they didn't call you or didn't show up?

11       A    Yes.

12       Q    And for any other reasons?

13       A    I can't think of any other reason right now, no.

14            (Deposition Exhibit No. 2 marked.)

15   BY MR. BREWER:

16       Q    Okay.  Let me have this marked as Gibbs 2, please.

17            Mr. Gibbs, I'm going to show you a document which

18   has been marked for identification as Exhibit No. 2 to your

19   deposition.  Do you see that?  This is a performance

20   evaluation for yourself.  Have you seen this before?

21       A    Yes.

Page 99

1      Q      Okay.  And, in fact, if we go to page four of the

2   document, that's your signature?

3      A      Yes.

4      Q      Okay.  Going to the next page, this is annual

5   objectives.  It says, third quarter, the fiscal year '02,

6   fiscal year '03.  Have you seen this before?

7      A      This actual sheet, no, I haven't seen this before.

8      Q      Okay.  Let's go to the next page.  And, again, it

9   says, performance evaluation self-assessment at the top.  Do

10  you see that?

11     A      Yes.

12     Q      Is that your writing on the top part of this page?

13     A      No.

14     Q      No.  Okay.  Do you know whose writing it is?

15     A      No, I don't.

16     Q      Okay.  Let's go to the next page.  I see writing

17  on the right-hand side of the page along with some numbers.

18  Do you see that?

19     A      Yes.

20     Q      Do you know whose writing that is?

21     A      Yes.  That's my writing.

A00514

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

1    Q    This is your writing, okay.  And this is -- the

2  writing that appears there is your evaluation of yourself as

3  a crew leader?

4    A    Yes.

5    Q    Let's look at the first area.  It says, commitment

6  to quality.  And you've written produces quality product by

7  maintaining working guidelines and regulations?

8    A    Yes.

9    Q    Okay.  What do you mean by that?

10    A    I mean, just -- some of the stuff we went over

11  earlier about how to set the chicken house up so getting the

12  chickens caught so there won't be many DOA and bruises.

13    Q    In other words, what you're saying is you're

14  following -- making sure the guidelines are followed by your

15  crew and everything else in order to achieve those

16  objectives?

17    A    Yes.

18    Q    That's what that means?

19    A    Yes.

20    Q    The next topic says, internal and external

21  customer satisfaction.  And I believe you wrote works well

A00515

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 101

1    with growers, drivers and others respectful of their

2    concerns and needs.  Would you explain to me what that

3    means?

4        A    It means I get along with mostly all growers and

5    truck drivers, and I work well with them.

6        Q    Well, when you say respectful of their concerns,

7    what do you mean by that?

8        A    Just working with the drivers.  A lot of drivers,

9    some of them got a lot of different attitudes and stuff, and

10   being respectful of some of them, and try to set the truck

11   in the right position so whatever -- so it won't annoy them.

12       Q    That's one of your responsibilities?

13       A    Yes.

14       Q    And that's what you meant by that?

15       A    Yes.

16       Q    Okay.  The next item, it says, planning, and you

17   write, do well at organizing and planning to get what needs

18   to be done.  What do you mean by that?

19       A    I mean setting up my schedule so I leave home on

20   time and have all my catchers picked up on time so we can be

21   on the job on time.

A00516

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 102

1    Q    And also planning how to catch the house and do

2    those other things?

3    A    Same, yes.

4    Q    Make sure the crew does what needs to be done?

5    A    Yes.

6    Q    And make sure the forklift operator places the

7    cage properly and things that we've talked about?

8    A    Yes.

9    Q    Make sure the driver in the summer waters the

10   chickens?

11   A    Yes.

12   Q    Okay.  And do you -- when you're organizing your

13   planning, do you write any of this down or do you just do it

14   in your head?

15   A    Just -- mostly just do it in my head.

16   Q    All right.  The next topic says, initiative.  And

17   you write encourages and delegate work in a respectful

18   manner.  Would you explain what you mean by that?

19   A    I mean, like when I have to tell one of my

20   catchers, do something, I do it in a respectful way.  I

21   don't be hollering and cursing at them.  And they seem to

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 103

1    get a lot done that way by being respectful and getting

2    along with them.

3        Q    When you say, and delegate work, what work are you

4    talking about delegating?

5        A    Oh, like, chicken catchers, a different one might

6    not take the equipment off from the truck this day, and

7    things like that, telling them which one of them to take the

8    pens off or --

9        Q    Okay.

10       A    -- have them set up the house or something.

11       Q    Somebody might be better at taking the cages off

12   the truck than another member of your crew?

13       A    Taking the catch pens off the truck.

14       Q    Taking the catch pens off?

15       A    Yes.

16       Q    And so you would tell that person to take those

17   pens off because he does it better than somebody else?

18       A    In certain situations, yes.

19       Q    The next item, it talks about decision-making and

20   problem solving.  And you write make sound and logical

21   decisions, solve problems effectively.  Is that what you

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 104

1   wrote?

2       A    Yes.

3       Q    Tell me what you mean by that.

4       A    In certain situations at work, I have to -- just

5   don't jump and do something dumb.  I try to take my time and

6   make -- try to make the right decision.

7       Q    What kind of problems would you be solving

8   effectively when you say solve problems effectively?  What

9   kind of problems are you referring to?

10      A    Oh, like a truck getting stuck at times.  Forklift

11  not starting, firefan not starting.

12      Q    Okay.  And how do you go about solving those

13  problems?

14      A    Most -- if it's critical, I call assistant live

15  haul manager, Dave Nuse or Doug.  And something, like I need

16  a wrecker, I might call a dispatcher and get them to call me

17  a wrecker or call a mechanic forklift.

18      Q    Would there be other problems that might occur as

19  you're catching in a house that you would have to solve

20  effectively?

21      A    There are, yes.

Zeve Reporting & Videoconferencing
(410)208-4566  Fax(410)208-4767

A00519

Page 105

1    Q    And is that what you mean by this also?

2    A    Yes.

3    Q    If you'll turn to the next page, sir, it says,

4    business success and results. And I believe you wrote meet

5    goal on DOAs, head count and farm damage. And that's a

6    responsibility that you, as a crew leader, had?

7    A    Yes.

8    Q    And I can't see the number here. It's a little

9    faxed off, but that's all right. The next topic is

10   leadership and influence. And you've written continue good

11   leadership and lead by example. Can you explain what you

12   mean by that? Are you referring to your crew, for example,

13   continued good leadership, that's who you're talking about

14   leading?

15   A    Yes. Mostly referring to my crew, yes.

16   Q    And leading by example. And how -- when you say,

17   continue good leadership, I assume that means that you think

18   you were doing a good job as being a crew leader?

19   A    Yes, I do.

20   Q    Okay. And you were leading by example?

21   A    Uh-huh.

Page 111

1     Q    Okay.  It talks about a grievance being a dispute

2  over the interpretation, among other things, of this

3  contract.  And it says, the employee, which in your case

4  would be a catcher or catchers, would take the matter up

5  with the shop steward who would in turn take the grievance

6  up to the foreman in charge.  So if a member of your crew

7  had a grievance regarding the contract, the first thing they

8  do is take it up with you; is that correct?

9     A    With their contract?

10    Q    Yeah.  This contract applies to the catchers, the

11 men who work for you?

12    A    Yes.

13    Q    This says, if they have a grievance or a dispute

14 arising out of an interpretation of this document, that they

15 take it up with the shop steward and the shop steward then

16 comes to you -- to the foreman in charge.  And in the case

17 of a member of your crew, the foreman in charge would be

18 you; would it not?

19    A    Yes.

20         (Deposition Exhibit No. 3 marked.)

21 BY MR. BREWER:

Page 133

```
 1              MR. BREWER:  Okay.

 2              MR. MARTIN:  Off the record.

 3          (Off the record.)

 4    BY MR. BREWER:

 5      Q    This is Exhibit 8, sir, to -- I'll give you the

 6    official one.  You don't want a copy.  This is Exhibit 8 to

 7    Mr. Garrison's deposition.  Have you seen this before?

 8      A    Yes.

 9      Q    And it's dated November 1 of 2000?

10      A    Yes.

11      Q    And it basically says that you're not going to

12    receive any additional pay for performing jobs such as

13    catching or forklift?

14      A    That's correct.

15      Q    And that's so you would have more time to

16    supervise your crew; isn't that true?

17      A    That's true.

18              MR. BREWER:  Okay.  All right.  Why don't we

19      take a few minutes right now.

20          (Break held.)

21          (Deposition Exhibit No. 5 marked.)
```

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 134

1    BY MR. BREWER:

2        Q    Sir, I'm going to show you Exhibit 9 and 10 to

3    Mr. Garrison's deposition.  You can have those in front of

4    you.  And I'm also going to have this marked 5.

5            Now, the first documents that you have, which is

6    No. 9 to Mr. Garrison's deposition, as you can see, is a

7    salaried benefit booklet.  That's No. 9.  The second one,

8    No. 10, is for the hourly people, which would be your crew

9    leader -- your crew, your catchers.  This is the benefit

10   plan that pertains to them.  And the other document that I

11   just gave you, which is No. 5 to your deposition, which is

12   this paper up here, sir, is a comparison of the benefits

13   that the salaried people -- and you are paid on a salary

14   basis; are you not?

15       A    Yes.

16       Q    The salaried people receive versus the benefits

17   that the hourly people, the catchers who work for you,

18   receive.  Let's just go through this quickly.  Vacation for

19   the salaried people, such as yourself, is listed under

20   salaried.  So they get two weeks after one year, three weeks

21   after five, four after 15.  So you are in this three week

A00523

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 135

1    area because you just -- I guess '94, you would be coming up

2    on 11 years, right?

3         A    Yes.

4         Q    Okay.  So right now you receive three weeks'

5    vacation, correct?

6         A    That's correct.

7         O    And when you receive your vacation, that's the

8    same check -- you get the same check when you're on vacation

9    as you got when you weren't on vacation?

10        A    Yes.

11        Q    The crew people who work for you have to wait

12   until ten years to get their third week of vacation.  You

13   know that to be true?

14        A    Yes.

15        Q    Because you approve the time off for vacation?

16        A    Yes.

17        Q    LTD, which stands for long-term disability, the

18   hourly people get half of their regular pay for five years,

19   but as a salaried person, you get -- after 90 days, you get

20   your first check -- you continue to get paid for 90 days,

21   and then after that, you get 60 percent of your salary until

A00524

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 136

1   age 65 if you're totally disabled; does that sound right to

2   you?

3        A    Yes.

4        Q    Okay.  STD, which is the next column, stands for

5   short-term disability.  Their maximum is $200 a week for 26

6   weeks.  And then you get your regular pay for 90 days if

7   you're employed over a year; does that sound correct?

8        A    Yes.

9        Q    And the rest of these -- just take a quick look.

10  I understand you may need to leave as quickly as you can.

11  Do these seem correct to you as to your benefits versus

12  those of the crew, the catchers, who work for you?

13       A    Yes, they do.

14       Q    Okay.  Let's go to -- this is Exhibit No. 12 to

15  Mr. Garrison's deposition.  I'll give that to you.  Have you

16  seen this before, sir?

17       A    Yes.

18       Q    Okay.  As to crew leaders, this memo is dated --

19  at the top it says, 3/27/01.  That's when it was issued.

20  You became -- you began receiving a salary in June of 2002;

21  isn't that right?

A00525

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

1      A    Yes.

2      Q    Okay.  This says that, as a crew leader, you are

3   eligible for monthly and annual bonuses.  Are you eligible

4   for those?

5      A    Yes.

6      Q    The catchers are not, are they?

7      A    No.

8      Q    Okay.  Let's take a look at Exhibit 13 to

9   Mr. Garrison's deposition, and that's this paper here.  You

10  have a lot of papers in front of you.  If you want to move

11  them around, you can.  I'm going to be asking you questions

12  on this Exhibit No. 13, this paper here.

13     A    Garrison 13.

14     Q    Yeah.  That's the one.  If you look at the top, I

15  see for the year 2001, Larry Gibbs, that's you, sir?

16     A    Yes.

17     Q    And that you received a bonus in that month of

18  November '00 of $107.93?

19     A    Yes, that's correct.

20     Q    And just to expedite this.  If we go across, we're

21  looking from November of 2000 through, in this document,

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 138

1    October of '01, underneath all of those months, there are

2    monies that are shown that you received with the exception

3    of one month, which was January of '01, and that was a bonus

4    that you earned, correct?

5         A    That's correct.

6         Q    And that year-to-date total at the end for you is

7    $2,190.45.  Does that sound like the bonus that you received

8    for that year?

9         A    Yes.

10        Q    Okay.  And that was your monthly bonus?

11        A    Yes.

12        Q    You also are entitled to an annual bonus on top of

13   that?

14        A    Yes.

15        Q    And the monthly bonus is based on your performance

16   as a crew leader?

17        A    That's correct.

18        Q    The better you and your crew perform, the more

19   money you stand to make?

20        A    Yes.

21        Q    If you don't perform well, then you're not going

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 139

1    to make so much in the bonus?

2        A    That's correct.

3        Q    But the crew doesn't get that bonus at all?

4        A    That's correct.

5        Q    Going down to the next year 2002, I see that,

6    again, we can go all the way across the column, for that

7    year you earned $2,090.69 in monthly bonuses; does that

8    sound right to you?

9        A    That sounds right.

10       Q    And the next year, you received $2,126.66; does

11   that sound right?

12       A    That sounds right, yes.

13       Q    And then in 2004 to date, it hasn't been

14   completed.  It ends in July of '04 on this document, but at

15   that time up to that point, you had received $1,740.23; does

16   that sound right?

17       A    Yes.

18       Q    If we go down to the very last block on the bottom

19   of the page, when I see you, Mr. Gibbs, it shows for 2001,

20   you see where it says, monthly, you received that?

21       A    Yes.

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 142

1      A    No, I didn't.

2      Q    But this was a meeting that you were invited to?

3      A    Yes.

4      O    Next exhibit is 15 to -- again, this is to

5  Mr. Garrison's deposition, sir.  Just take a look at that

6  for a minute.  The first page is a 2003 Christmas dinner

7  invitation list, which is, the supervisors have a Christmas

8  party every year, don't they, at Mountaire?

9      A    Yes.

10     Q    Do the hourly people have a Christmas party?

11     A    Not that I know.  Not that I know of, no.

12     Q    Okay.  I see that your name is listed here under

13  Mr. Lynch; is that you?

14     A    Yes.

15     Q    Okay.  Did you attend the Christmas party?

16     A    No.

17     Q    Okay.  Take a look at the people who are on this

18  list, and see if you can tell me if there's anybody there

19  who is not a supervisor, any of your crew people, any of

20  your catchers listed there?

21     A    No.

A00529

Page 143

1        Q    They're all supervisory people?

2        A    All besides Susie.

3        Q    Okay.  How about the next page?  It's the 2002

4   Christmas party.  Were you invited to that?

5        A    Yes.

6        Q    Did you go?

7        A    I never attended any of the Christmas parties, no.

8        Q    Any particular reason?

9        A    My wife doesn't care for going out like that too

10  much, so I didn't want to go without her.

11       Q    That's fine.

12       A    So I never attended one.

13       Q    And then the next to the last page is 2001.

14  Again, your name is listed as somebody who was invited to

15  the party?

16       A    Yes.

17       Q    But again, you didn't go because of ---

18       A    No.  I never attended any of them.

19            (Deposition Exhibit No. 6 marked.)

20  BY MR. BREWER:

21       Q    Okay.  That's fine.  Now, let me -- they have this

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 144

1    marked as No. 6 to Mr. Gibb's deposition.   Just take a look

2    at that one.

3         A    Okay.

4         Q    Do you recognize this?

5         A    Yes.

6         Q    And who issued this warning to you?

7         A    Alan Z. and David Nuse, the assistant live haul

8    manager.

9         Q    And why did you receive this warning?

10        A    Because they said they wanted to make sure that

11   the catchers were getting a half hour lunch break.

12        Q    And were the people in your crew not getting a

13   half an hour lunch break?

14        A    Years ago, we didn't take a lunch break, but --

15        Q    Let me ask you this.   Are you -- do you know that

16   the catchers had filed a lawsuit against Mountaire?

17        A    I knew that, yes.

18        Q    Okay.   And did you know that they were claiming

19   that they were working through their lunch period and not

20   being paid for it, that that was the basis of their case?

21        A    I didn't know that.

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 147

1    Q    If they didn't.  But you were giving them the half

2    an hour lunch?

3    A    I was.

4    Q    Do you know if the other crews were getting their

5    half an hour lunch?

6    A    I don't know.

7    Q    You have no idea?

8    A    No.

9    Q    Let's take a look at -- this is the complaint in

10   this case.  It's an exhibit to Mr. Garrison's deposition.

11   And what I would like to do is to go to paragraph 23 of the

12   complaint.  It's on the third page.  Do you see paragraph

13   23?

14   A    Yes.

15   Q    And what this says is that the company is

16   following and continues to follow a policy which requires

17   you, being the Plaintiff, to submit a daily time sheet

18   broken down for each day of the week.  Is the time sheet

19   that you're submitting for the time that your catchers work?

20   A    That's correct, yes.

21   Q    Is it not a time sheet for the hours that you

Zeve Reporting & Videoconferencing
(410)208-4566  Fax(410)208-4767

A00532

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 148

1    work, is it?

2        A    No.

3        Q    Okay.  Let's go to the next paragraph, and it says

4    that there's compensation -- you're only paid from the time

5    you start at the farm and you end at the farm.  But you're

6    being paid for all the time; are you not?  Your salary is

7    for everything that you do, picking up, going to the farm

8    and everything else, isn't it?

9        A    I don't know.

10       Q    Okay.  What is your salary for?

11       A    It doesn't include my vehicle, buying gas and

12   insurance.

13       Q    But you receive a separate check for that every

14   week, don't you?

15       A    I receive a separate check every week, yes.

16       Q    You receive a separate check.  How much is that

17   check?

18       A    Now it's 250.  Could I -- excuse me a minute.  I

19   think that's my daughter.

20            MR. MARTIN:  Let's go off the record.

21            (Off the record.)

A00533

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 149

1    BY MR. BREWER:

2        Q    Mr. Garrison, before we broke -- excuse me.

3    Mr. Gibbs, before we broke, we were talking about the monies

4    you receive for gas and stuff.  And that check is $250 now?

5        A    Yes.

6        Q    And that's -- you receive that every week?

7        A    Yes.

8        Q    And that's not in your payroll check, is it?

9        A    It's not in my payroll check, no.

10       Q    It's a separate check --

11       A    Yes.

12       Q    -- for that?  And what was it for 2004, if you

13   remember?

14       A    I think it was 235.

15       Q    And how about 2002?

16       A    I think it was the same, 235.

17       Q    Okay.  And that check that you receive -- and you

18   receive that every week?

19       A    Yes.

20       Q    Fifty-two weeks of the year?

21       A    Yes.

A00534

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 150

1    Q    Okay.  And that check is for your insurance on the

2    vehicle, your gas and maintenance and everything?

3    A    I don't understand.  Are you saying it's like

4    Mountaire give us money for our gas, insurance?

5    Q    That's what the $250 or 235 that we're talking

6    about last year is supposed to cover?

7    A    Yes.  But that's out of my -- before we went on

8    salary, that was deducted from our total pay each week.

9    Q    Okay.

10   A    That was really my money.

11   Q    That was before you went on salary.  That was

12   deducted?

13   A    Yes.

14   Q    Okay.  Since you went on salary, that's not

15   deducted from your pay, is it?

16   A    I'm not sure how they're doing it.

17   Q    Let me ask you this.  Your salary that you get

18   paid, you get paid once every two weeks?

19   A    Yes.

20   Q    You get a check, and that's your salary.  In

21   addition to that, every week you get another check?

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 151

```
 1      A    I do.

 2      Q    Which is not a payroll check, is it?

 3      A    No.

 4      Q    No.  And that's for the expenses that you incur

 5   with your vehicle; isn't that right?

 6      A    Yes.

 7      Q    Okay.  So in any given month, you receive two

 8   checks for your salary and four checks to maintain your

 9   vehicle at 250 bucks a pop, so it's a thousand dollars a

10   month?

11      A    Yes.

12      Q    Okay.  Now, you're saying before 2002, you didn't

13   receive that separate check?

14      A    No.  That's not what I'm saying.  We did receive

15   that separate check.

16      Q    Okay.

17      A    But it was deducted from -- the crew leaders were

18   getting paid the same as the catchers then per thousand.

19   And whatever the total was, they would deduct that expense

20   check from it.

21      Q    Okay.  I don't want you to misspeak.  You just
```

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 153

1    day?

2                    MR. MARTIN:   Object to the form of the question.

3                    THE WITNESS:   I never took a partial day off.

4    BY MR. BREWER:

5         Q    Okay.   Well, let me ask the question this way.   Is

6    the checks that you receive in your salary once every two

7    weeks, is that amount always the same?

8         A    Yes.

9         Q    Whether you're on vacation or not on vacation?

10        A    That's correct.   Yes, it is.

11        Q    Whether you've been sick or not sick?

12        A    Yes.

13        Q    And that's the same.   Okay.   And while you may not

14   have a present recollection of taking a half a day off, if

15   that did happen, your check was the same?

16                   MR. MARTIN:   Objection.

17                   THE WITNESS:   Like I said, I'm quite sure I

18        didn't take a partial day off.

19   BY MR. BREWER:

20        Q    I understand, Mr. Gibbs.   And I'm not trying to

21   trick you at all.   And I understand that you -- it's

Zeve Reporting & Videoconferencing
(410)208-4566  Fax(410)208-4767

A00537

Page 154

1    difficult for you to go back now in 2005 to think back to

2    2002 and did you ever take part of the day off.   I

3    understand that.   All I'm simply trying to suggest or to

4    find out is, if you did, you're basically telling me your

5    checks have been the same since you've been salaried?

6         A    Yes.

7         Q    If you take it off -- and I'm not saying you did,

8    maybe you didn't, but if you did, there was no change in

9    your check?

10        A    No.

11        Q    That's all.  Okay.  Let's see.  Let's go to

12    paragraph 27.  And what paragraph 27 says is that the

13    company has a policy, which has been described earlier,

14    where your paycheck would be reduced because of the quantity

15    or quality of the work performed -- or quantity, I should

16    say, of the work performed.  But you just basically said to

17    me that your checks are the same regardless?

18        A    They are.

19        Q    Okay.  Thanks.  Thanks.  Now we go to paragraph

20    32.  We've already had some discussion about this.  The

21    vehicle that you use in -- to pick up the people, that is

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 155

1    your vehicle; isn't it?

2       A    Yes, it is.

3       Q    It's titled in your name?

4       A    Yes.

5       O    And who picked out the vehicle?

6       A    I did.

7       Q    Okay.  And what kind of vehicle are you driving?

8       A    A '99 Ford van.

9       Q    Okay.  And where did you buy it?

10      A    I bought it from Terry Morris.

11      Q    Did anybody in the company tell you to go to Terry

12   Morris to buy it?

13      A    Yes.

14      Q    Who told you to go to Mr. Morris to buy the

15   vehicle?

16      A    Doug Lynch.

17      Q    He told you that's where to go?

18      A    Yes.

19      Q    Could you have gone anyplace else as far as you

20   know?

21      A    And buy a vehicle?

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 156

```
 1       Q    Yes.

 2       A    I could have, yes.

 3       Q    The vehicle that you owned before this one, where

 4   did you buy that one?

 5       A    From Mountaire also.

 6       Q    You bought the vehicle from Mountaire?

 7       A    Yes.

 8       Q    I'm confused.  I didn't know that Mountaire sold

 9   cars or vehicles.

10            MR. MARTIN:  Is that a question?

11   BY MR. BREWER:

12       Q    Yes.  When you said buy it from Mountaire --

13       A    Like when they, I guess, get a new fleet or

14   whatever, they sell the old ones, and I bought one of the

15   old ones.

16       Q    When was that?

17       A    1998.  I think it was January of '98.

18       Q    And then you bought another one a year later?

19            MR. MARTIN:  Objection.

20            THE WITNESS:  No.  I bought -- no, I didn't.

21   BY MR. BREWER:
```

A00540

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 157

1      Q    Okay.  Let me see if I can -- the questions I've

2  asked you -- what I understood you to say.  The vehicle that

3  you're now using you purchased in 1999?

4              MR. MARTIN:  Objection.

5              THE WITNESS:  No.

6  BY MR. BREWER:

7      Q    When did you purchase the vehicle that you're now

8  using?

9      A    2004.

10     Q    2004.  Where did you purchase that vehicle?

11     A    I just told you, Terry Morris.

12     Q    2004 you purchased the vehicle from Terry Morris

13  and that -- Mr. Lynch told you to go there?

14     A    Yes.

15     O    You could have gone other places, but you went

16  there?

17     A    That's correct.

18     Q    Prior to the vehicle that you just purchased in

19  2004, what kind of a vehicle were you driving?

20     A    A 1990 Chevy.

21     Q    A 1990 Chevy?

Zeve Reporting & Videoconferencing
(410)208-4566  Fax(410)208-4767

**A00541**

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 158

1      A    Chevy van, yes.

2      Q    And where did you get that vehicle?

3      A    I purchased that from Mountaire.

4      Q    Okay.  So you had the same vehicle from 1990 until

5    2004?

6            MR. MARTIN:  Objection.  Excuse me.  Because he

7      bought a 1990 Chevy van doesn't mean he purchased it in

8      1990.  And to the contrary, he's already testified that

9      he purchased it in January of '98.

10           MR. BREWER:  That's something that he can

11     explain to me.  It's not following through to me.

12           MR. MARTIN:  Okay.

13   BY MR. BREWER:

14     Q    You purchased the vehicle in '94?

15           MR. MARTIN:  Objection.

16   BY MR. BREWER:

17     Q    Maybe I'm not making myself clear.  You purchased

18     a vehicle in 2004; am I correct on that?  Did you purchase a

19     vehicle in 2004?

20     A    Yes.

21     Q    Okay.  So you bought a vehicle in 2004?

Zeve Reporting & Videoconferencing
(410)208-4566 Fax(410)208-4767

Page 159

```
 1      A    Yes.

 2      Q    When is the time before that that you bought a

 3  vehicle, what year?

 4      A    1998.

 5      Q    1998?

 6      A    Yes.

 7      Q    Okay.  And that's the vehicle that you talked

 8  about purchasing from Mountaire?

 9      A    Yes.

10      Q    Okay.  When before 1998 did you purchase a

11  vehicle?

12      A    I can't remember.  I can't remember exactly when I

13  purchased the one before that.

14      Q    Okay.

15      A    I think it was -- I can't remember.  '94 I think.

16  I'm not sure.

17      Q    When you went to Mr. Morris to buy the vehicle,

18  did you have to buy any special kind of vehicle?  Did the

19  company tell you to buy a special kind of vehicle?

20      A    No, they didn't.

21      Q    Tell you what color to buy?
```

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 160

1       A     No.

2       Q     What equipment to have on it?

3       A     No.

4       Q     Leather seats, radios, that was up to you to

5    decide?

6       A     They told me not to --

7       Q     So whatever you bought, you bought because that's

8    what you wanted to buy?

9       A     Yes.

10      Q     Okay.  Now, you are responsible for maintaining

11   the vehicle and repairing it?

12      A     Yes.

13      Q     Okay.  And I think we've gone over this, but just

14   to be sure, we'll tie it up with this point here.  You are

15   receiving monies from the company every week to -- for those

16   expenses?

17      A     Yes.

18      Q     All right.  Let's go to -- I need my letter at

19   this point.  Final warning, we've covered that.  Let's go to

20   paragraph 36 of the complaint, sir.  Okay.  Paragraph 36

21   says, many of the Plaintiffs have been cornered by various

A00544

Page 161

1  management personnel and questioned individually regarding

2  their discussions with counsel and the nature of this

3  action.  Okay.  That's what it says.  Have you been cornered

4  by anybody from management?

5      A    I haven't been cornered, no.  I haven't been

6  cornered by anyone from management.

7      Q    Okay.  Have you been questioned by anybody from

8  management regarding your discussions with Mr. Martin?

9      A    I'm not -- I don't know exactly how to answer

10 that.

11     Q    Well, I'll see if I can rephrase it a little

12 differently.  I'm not sure I know how to.  This is

13 basically -- the claim here is that people from management,

14 and there are no names, so I can't give you a name because I

15 don't know the name, but the allegation here is that people

16 from management have questioned -- may have questioned you

17 individually about discussions you've had with your

18 attorney, Mr. Martin.  And I guess I want to know, has

19 anybody from management asked you about any discussions

20 you've had with Mr. Martin?

21     A    Not about discussions I had with Mr. Martin.

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 162

1      Q    Okay.  The next paragraph says that there was a --

2  you say not with Mr. Martin.  Did anybody question you

3  about -- anybody from management now, because I understand

4  you had conversations with Mr. Davis and others that we

5  talked about earlier.  Has anybody from management

6  questioned you about this lawsuit?

7      A    Yes.

8      Q    Who?

9      A    David Nuse.

10     Q    Okay.  And when did he question you about the

11  lawsuit?

12     A    I couldn't tell you.  I'm not sure what the date

13  was.  I'm not sure of the date.

14     Q    I don't need an exact date.  I understand that

15  would be difficult.  Would it be before, let's say -- do you

16  remember the time sheets that you were keeping that your

17  daughter drew up for you that started in February of '04?

18  Would it have been before you started keeping your time

19  sheets?

20     A    I think not because I think it was hot.  It was

21  during the summer months, I'm quite sure.

A00546

Page 163

```
1        Q    So it would have been, then, sometime after the

2   lawsuit was filed in June?

3        A    Yes.

4        Q    Okay.  And what did Mr. Nuse say to you?

5        A    Just asked me what was up with the lawsuit against

6   the company.

7        Q    Okay.  And what did you say?

8        A    I told him we're trying to get our overtime paid.

9        Q    Okay.  And what did Mr. Nuse say?

10       A    That was the end of the conversation.

11       Q    Okay.  So that's the entire conversation?

12       A    (Deponent nods.)

13       Q    Was anybody else present?

14       A    Yeah.  The catchers, forklift driver, yes, someone

15   else was present.

16       Q    So they were all in a group when he asked you this

17   question?

18       A    No, they were working.

19       Q    Was there anybody else who was part of the

20   conversation standing next to you or something?

21       A    No.
```

A00547

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 164

1       Q      So you were working.  I gather you were on a farm

2   when this occurred?

3       A      Yes.

4       Q      Do you remember what farm offhand?

5       A      Yes.  But I can't recall the name.  I have to look

6   in my records.  I can't recall the name, but I know where it

7   was at, yes.

8       Q      Okay.  I'm going to ask you to do that for me,

9   please.  Anybody else besides Mr. Nuse have a conversation

10  with you about this case?

11      A      Anybody besides Mr. Nuse?

12      Q      Anyone outside of him, that's right.

13      A      You mean from Mountaire?

14      Q      Yes, from management.

15      A      No.

16      Q      Mr. Nuse is the only one?

17      A      Yes.

18      Q      And how many times did Mr. Nuse and you discuss

19  this lawsuit, just that one time?

20      A      Yes.

21      Q      Okay.  The next paragraph in the complaint says

A00548