**26**

1

```
            1        IN THE UNITED STATES DISTRICT COURT

            2        IN AND FOR THE DISTRICT OF DELAWARE

            3   WILLIE DAVIS, JR.,                    )CA No 04-0414-KAJ
                NATHANIEL BRIDDELL,                   )
            4   GEORGE W. FEDDIMAN,                   )
                JOSEPH GARRISON,                      )
            5   LARRY E. GIBBS,                       )
                ROY H. WALTERS,                       )
            6                                         )
                ALL SIMILARLY-SITUATED CURRENT AND    )
            7   FORMER EMMPOYEES OF MOUNTAIRE         )
                FARMS, INC., MOUNTAIRE FARMS OF       )
            8   DELMARVA, INC., and MOUNTAIRE FARMS   )
                OF DELAWARE, INC.,                    )
            9                                         )
                        Plaintiffs,                   )
           10                                         )
                        v.                            )
           11                                         )
                MOUNTAIRE FARMS, INC.,                )
           12   MOUNTAIRE FARMS OF DELMARVA, INC.,    )
                and MOUNTAIRE FARMS OF                )
           13   DELAWARE, INC., all Delaware          )
                corporations,                         )
           14                                         )
                        Defendants.                   )
           15

           16                    .. .. .. .. .. ..

           17          Deposition of NATHANIEL BRIDDELL, taken

           18   pursuant to notice, on Thursday, January 27, 2005 at

           19   10:00 a.m. at Young, Conaway, Stargatt & Taylor,

           20   Georgetown, Delaware, reported by Lorena J. Hartnett,

           21   a Registered Professional Reporter and Notary Public.

           22                    .. .. .. .. .. ..

           23

           24
```

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

A00551

41

```
1        Q.      Uh-huh.

2        A.      I got a sister who is a housewife in

3   Salisbury, and one sister works at Home Depot in

4   Salisbury.

5        Q.      Okay, thank you.  What is the highest

6   level of education, sir, that you obtained?

7        A.      I completed the twelfth grade.

8        Q.      Okay, high school graduation?

9        A.      Yes.

10       Q.      What high school, please?

11       A.      Worcester Junior-Senior High School,

12   Newark, Maryland.

13       O.      Where was it, please?

14       A.      Newark, Maryland.

15       Q.      Newark, Maryland.  Do you attend

16   church regularly?

17       A.      No.

18       Q.      And I think we asked, I asked you this

19   question quickly before, but there is no -- You

20   don't have any mental problems that would

21   interfere with your deposition?

22       A.      No.

23       Q.      Okay.  When did you first become

24   employed by the company, if you can tell me?
```

A00552

42

| | |
|---|---|
| 1 | A.    11/5/83. |
| 2 | Q.    And what position were you hired for? |
| 3 | A.    Truck driver. |
| 4 | Q.    What kind of truck driver? |
| 5 | A.    Beg your pardon? |
| 6 | Q.    What kind of truck driver? |
| 7 | A.    Live haul. |
| 8 | Q.    So did you have a CDL at that time? |
| 9 | A.    I had a Maryland Class A at that time. |
| 10 | Q.    Okay, and the CDL came later, as I |
| 11 | recall? |
| 12 | A.    Yes. |
| 13 | Q.    Okay, and just briefly tell us what |
| 14 | you did as a live haul truck driver? |
| 15 | A.    Came in at night, weighed out a truck |
| 16 | on Mountaire scales, and wherever was scheduled |
| 17 | for me to go, that's where I went to receive a |
| 18 | load of chickens and transport them back to the |
| 19 | processing plant. |
| 20 | Q.    And which processing plant was that? |
| 21 | A.    It was Mountaire Poultry in |
| 22 | Selbyville, Delaware. |
| 23 | Q.    Okay, and is that the location that |
| 24 | you were first employed by? |

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

A00553

43

A.    Yes.

Q.    And you are still employed at that location?

A.    Yes.

Q.    Who was your supervisor at the time?

A.    At that time it was Don Hopkins, Donald Hopkins.

Q.    Okay.  When did you become a crew leader, sir?

A.    September of '89.

Q.    And did you consider that to be a promotion?

A.    Yes.

Q.    And who was your supervisor at that time?

A.    Doug Lynch.

Q.    Okay, can you tell me how you, how it is you became promoted to a crew leader's position?

A.    Being a truck driver, I knew a lot of the employees, and Charles Showell was getting ready to retire, and I spoke with Mr. Showell and I spoke with Mr. Lynch, and they decided to put me as crew leader.

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

44

1          Q.    Okay, great.  Now, as a crew leader,

2   your primary role was to manage the crew that was

3   catching chickens?

4          A.    Yes, to the best of my knowledge.

5          Q.    Okay.  How many employees were on your

6   crew?

7          A.    Seven.

8          Q.    Okay.

9          A.    Seven chicken catchers, one forklift

10  driver, and at that time three truck drivers.

11         Q.    The three drivers were also part of

12  your crew?

13         A.    Yes.

14         Q.    Okay, so that was seven catchers, one

15  forklift driver, and three drivers.  And the

16  drivers we are referring to, again, are live haul

17  drivers?

18         A.    Yes.

19         Q.    The employees who worked in your crew

20  from 1989 till the time that you left -- By the

21  way, you probably told me, but I didn't write it

22  down.  When did you stop becoming a crew leader?

23         A.    April '03.

24         Q.    April of '03?

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00555**

45

1        A.    Yes.

2        Q.    When you were a crew leader, did

3   people, catchers who worked for you, they were

4   covered by a union contract?

5        A.    Yes.

6        Q.    Okay, and do you know which union?

7        A.    Local 355.

8        Q.    Of the Teamsters?

9        A.    Teamsters.

10       Q.    Okay.  And has that been true from '89

11   through April of '03?

12       A.    Could you --

13       O.    Sure.  For all the time that you were

14   a crew leader, were they covered by, were they

15   represented by the Local 355?

16       A.    Yes.

17       Q.    Okay, now, from the time you have been

18   a crew leader, and I am talking about from 1989

19   through April of '03, that's the period of time

20   that I am going to be referring to, did you have

21   new catchers come onto your crew from time to

22   time?

23       A.    Yes.

24       Q.    And were you responsible for making

A00556

46

```
 1    sure they were trained properly?

 2         A.    Yes.

 3         Q.    Did you ever select any of these

 4    catchers to come onto your crew?

 5         A.    Yes.

 6         Q.    Okay, who did you select?

 7         A.    Zarina Bagwell.

 8         Q.    Okay.  Now, I understand the period of

 9    time I am asking was a long time, so --

10         A.    Yes.

11         Q.    -- I wouldn't expect you to have

12    perfect recall.  Anybody else that you can think

13    of?

14         A.    Can you ask me that question again?

15         Q.    Sure, from September of '89, again

16    this is the timeframe, until April of '03, my

17    question is did you select any employees to

18    become part of your crew?

19              You have mentioned Mr. Bagwell, and I

20    guess my question is anybody else you can

21    remember?

22         A.    Yes, Warren Purnell.

23         Q.    Okay.

24         A.    Leroy Taylor.  Lawn Howell.
```

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00557**

47

1    Q.    Is that Howell?

2    A.    Howell, H-O-W-E-L-L.

3    Q.    Okay, thank you.

4    A.    That's about it, as far as I can

5    remember.

6    Q.    Okay.  There may have been more, but

7    you just can't remember?

8    A.    I am sure.

9    Q.    Okay, that's fine.  Let me ask you

10   this:  This is a document.  I don't have -- You

11   have copies of these.

12        This is a document, sir, that has been

13   introduced as an exhibit to Mr. Garrison's

14   deposition.  It's Garrison Exhibit 2.  Okay, do

15   you see that?  I am just going to keep that in

16   front of you so I can ask you a couple questions

17   about this document.

18        Okay, it talks about, in roman numeral

19   two on page one, the crew leader's general

20   duties, and I am just going to go through some of

21   these.

22        MR. MARTIN:  Excuse me for a moment.

23        Did you ask whether he was familiar with it,

24        the document?

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

A00558

48

```
 1              MR. BREWER:  Oh, no, I am sure you
 2         are.
 3  BY MR. BREWER:
 4         Q.    Are you familiar with this document?
 5         A.    This is an old document, yes.
 6         Q.    Okay.  And I am looking at the second
 7    roman numeral, roman numeral two.  It says
 8    general crew leader's general duties.
 9              The first one it says is you are
10    supposed to arrive at the farm at the correct
11    time.  Is that one of the responsibilities as a
12    crew leader that you had?
13         A.    Yes.
14         Q.    It also talks about how the house is
15    to be divided.  Is it your responsibility to make
16    sure that that occurred?
17         A.    Yes.
18         Q.    Now, I would imagine, depending on the
19    house, that sometimes there might have been more
20    sections?
21         A.    Correct.
22         Q.    And sometimes there would have been
23    less sections?
24         A.    Yes.
```

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

49

Q.    Okay, and you would make that

determination as to whether it should be more or

less than four --

A.    Yes.

Q.    -- as the crew leader?  Okay.  It

talks about instructing the catchers on the

number of birds to be placed in each compartment.

Was that one of the responsibilities you had as a

crew leader?

A.    Yes.

Q.    And I think when they refer to each

compartment, that's also known as the hole, isn't

it?

A.    Yes.

Q.    All right.  The next item down talks

about catching birds in place at night and how

you are supposed to move them.  Was it your

responsibility for making sure that this

occurred?

A.    Yes.

Q.    And again, based on my experience in

the industry, that didn't always happen, did it?

A.    No.

Q.    And, if it didn't happen, it was your

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

A00560

50

1  decision, based on what the house and the

2  circumstances you were confronted with, to change

3  it?

4      A.    Depending.

5      Q.    Right, exactly, depending on the kind

6  of house you are in and what circumstances you

7  found when you got there?

8      A.    Right.

9      Q.    Right.  It talks about the

10  responsibility of a crew leader to continue to

11  observe the uncaught birds to prevent smothers?

12      A.    Yes.

13      Q.    Was that one of your responsibilities?

14      A.    Yes.

15      Q.    Make sure that the cages are air

16  stacked uniformly on a trailer?

17      A.    Yes.

18      Q.    Now, let's talk about that for just a

19  second.  When we are talking about correctly air

20  stacking them on the trailer, who stacks the

21  cages on the trailer?

22      A.    The forklift driver.

23      Q.    Okay, and he is loading that trailer

24  for transportation back to the plant?

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00561**

51

1      A.    Yes.

2      Q.    And, obviously, what's on that truck

3  is live chickens.  When it says appropriately air

4  stack them, can you explain what that means?

5      A.    They each -- Two cages are stacked

6  where air can go through, through the houses.

7      Q.    And you would have to make sure that

8  the forklift driver was stacking those cages

9  correctly?

10     A.    Well, he had to, because there is

11 devices on the trailer that says he have to or it

12 won't go on there properly.

13     Q.    Okay.  But it could be off one of the

14 devices, and you would have to make sure that it

15 was correctly put on?

16     A.    Right.

17     Q.    And that's so that -- Part of the

18 reason is so that the birds can continue to

19 breathe, isn't it?

20     A.    Yes.

21     Q.    Okay, the next item, it talks about in

22 the summer making sure that the fans are left

23 hanging and so forth.  Was that one of your

24 responsibilities when you were a crew leader?

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

A00562

52

1      A.    Yes.

2      Q.    Okay, and did that change from time to

3    time?  I mean, depending on the house, you might

4    have to change that?

5      A.    Yes.

6      Q.    And that was your call to make that

7    change?

8      A.    Well, I got notification from my

9    manager as to what to do.

10     Q.    Okay.  You would be responsible for

11   making sure that the fans were taken down and

12   stabilized?

13     A.    Yes.

14     Q.    Okay, and how they were stabilized was

15   up to you?

16     A.    No.

17     Q.    Okay.  Tell me how you stabilize a

18   fan?

19     A.    Doug would tell me how to do it.  He

20   would put on the order or call us in and say

21   well, you are going to this farm, this should be

22   done this way, or sometime he would come out

23   there and say the fans should be turned this way

24   or that way.

53

1     Q.     And you never made that decision

2   yourself?

3          A.     Sure, at times, yes.

4          Q.     I guess that's what I meant, is you

5   would make it?

6          A.     Not all the time.

7          Q.     Okay, but some of the time?

8          A.     (Nodding head)

9               MR. MARTIN:  Yes?

10         A.     Yes.

11         Q.     You were responsible for filling out

12   the farm ticket accurately?

13         A.     Yes.

14         Q.     Okay, and you were also responsible

15   for checking with the drivers to make sure that

16   the loads are secure?

17         A.     Yes.

18         Q.     Item three, roman numeral number

19   three, talks about various catching methods.

20         A.     Number?

21         Q.     Yeah, roman numeral, on page two of

22   the document that you have --

23         A.     Okay.

24         Q.     -- it talks about night catching.

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

A00564

54

```
1         A.    Okay.

2         Q.    Do you see that?  And then it talks

3    about day catching.

4         A.    Yes.

5         Q.    And it takes about N's or A-frame

6    houses and so forth.  Is it your responsibility

7    to make sure that these guidelines were followed?

8         A.    Yes.

9         Q.    Okay.  And again, during this period

10   of time that you were a crew leader, I would

11   assume that you could not always follow these

12   guidelines exactly the way they were because of

13   changes in houses and stuff?

14        A.    Yes.

15        Q.    And if, in your view, it couldn't be

16   done exactly the way it's set out here, you would

17   make that change --

18        A.    Yes.

19        Q.    -- to get it done?  Okay, and that's

20   true for the day methods and night methods?

21        A.    Uh-huh.

22        Q.    How about tunnel ventilation, is that

23   same also true there?  There are some guidelines

24   here that you are responsible for?
```

55

1          A.    Yes.

2          Q.    And, again, it wasn't always possible

3    to do this, to follow this precisely?

4          A.    Yes.

5          Q.    And if it had to be deviated from, you

6    could deviate or you could do something different

7    than what it says here, based on what you found

8    in the house?

9          A.    Yes.

10               MR. BREWER:   All right.  And that

11               speaks to this whole notion of tunnel

12               ventilation.  Okay, I want to take a few

13               minutes.

14               MR. MARTIN:   Sure.

15                    (A recess was taken.)

16   BY MR. BREWER:

17          Q.    Mr. Briddell, I am going to show you a

18   document that is marked as Exhibit Number 1 to

19   Mr. Garrison's deposition.  You have a copy of

20   that?

21               MR. MARTIN:   Yes, sir.

22          Q.    And I am going to ask you to take a

23   look at that and tell me if you are familiar with

24   that document?

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

56

1       A.    Yes, I am, sir.

2       Q.    Okay, and what is this?

3       A.    It's a form we had to give to each

4   driver as he left the chicken farm.

5       Q.    Okay.  And it says, up at the top, it

6   says grower.  Do you see where it says grower?

7       A.    Yes.

8       Q.    Who fills in that line?

9       A.    Crew leader.

10       Q.    Okay.  And it says the houses, and

11   there are various dots.  Who fills in that

12   information?

13       A.    Crew leader.

14       Q.    And that would be, for example, if you

15   were going to the Brewer farm --

16       A.    Yes.

17       Q.    -- it would say to catch house number

18   two and number six?

19       A.    That's right.

20       Q.    And that's what you would fill in?

21       A.    Yes.

22       Q.    Okay.  And the time started, who fills

23   that information?

24       A.    Crew leader.

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00567**

57

```
 1          Q.    And the time finished?

 2          A.    Crew leader.

 3          Q.    Now, when you were talking about, if

 4    you remember earlier, the journal that you said

 5    you had and those documents, is this the kind of

 6    document that you are referring to?

 7          A.    Yes.

 8          Q.    Okay.  There is a space, and it says

 9    truck.  What information gets put in there?

10          A.    The number of the truck that the

11    driver is driving.

12          Q.    The number of the truck?

13          A.    Yes.

14          Q.    Each truck has its own number?

15          A.    Yes.

16          Q.    And that's different than its license

17    plate?

18          A.    Yes.

19          Q.    Okay, and who fills that information

20    in?

21          A.    Crew leader.

22          Q.    How about it says trailer, who fills

23    that information in?

24          A.    Crew leader.
```

58

1          Q.    And what would you write in there?

2          A.    The number of the trailer, not the

3    license plate, the number of the trailer.

4          Q.    So each truck is numbered and each

5    trailer is numbered, and you write down the

6    number of the truck and the number of the

7    trailer?

8          A.    Yes.

9          Q.    How about the driver?

10         A.    Put the driver's name down.

11         Q.    And who writes that in?

12         A.    Crew leader.

13         Q.    And it says N-O, period, which I

14   assume stands for number of doors?

15         A.    Yes.

16         Q.    And the information that's required

17   there, who puts that in?

18         A.    Crew leader.

19         Q.    All right.  Let's go down to under the

20   first line to the latter part of the document.

21   There is a question that says, "Sign present, yes

22   or no."  Who fills in that box?

23         A.    Crew leader.

24         Q.    And what does that mean, sign present?

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

A00569

59

1   What do you look for to fill that in?

2        A.    Every farm has an identification sign

3   at the end of its driveway or somewhere on the

4   chicken house to identify the farm.

5        Q.    So, again, if you were talking about

6   Brewer's farm, there would be a sign out there in

7   front of the house that would say Brewer's farm?

8        A.    With a Mountaire logo on it.

9        Q.    And it's the crew leader's

10  responsibility to see that that is there?

11       A.    Yes.

12       Q.    And, if it is, the box yes is checked,

13  and, if it's not, the box no is checked?

14       A.    Yes.

15       Q.    "Grower present," who fills that

16  information out?

17       A.    Crew leader.

18       Q.    And how do you decide whether to check

19  the box yes or no?

20       A.    Well, if you see the grower there

21  doing what was said the grower would do there, if

22  he is out there doing that prior to catching, you

23  would see him and you would have to --

24       Q.    Okay, when you say doing that, you are

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

A00570

60

1    referring to Garrison Exhibit 2 where it says

2    grower's responsibilities?

3        A.    Yes.

4        Q.    Okay.  Now, suppose when you arrived

5    there at night the grower is asleep, I mean he is

6    just asleep, how do you check that?  Do you check

7    that he is present or not?

8        A.    Not.

9        Q.    Okay.  DAF's prior to catch.  What is

10   a DAF?

11       A.    Dead chickens.

12       Q.    Dead at farm, is that what that stands

13   for?

14       A.    Uh-huh.

15             MR. MARTIN:  Yes?

16       A.    Yes.

17       Q.    And who fills that box out?

18       A.    Crew leader.

19       Q.    How do you go about deciding whether

20   to check yes or no?

21       A.    If you go down through the chicken

22   house and you see all these dead chickens laying

23   around, you know how to check it yes or no.

24       Q.    Okay, so, in other words, you walk in

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00571**

61

1    the house, the crew leader walks in the house and

2    looks around and sees if there is a lot of dead

3    chickens or one or two?

4        A.    Right.

5        Q.    And, depending on the amount of

6    chickens that are dead, you would decide whether

7    to check out yes --

8        A.    Or no.

9        Q.    -- or no.  Okay, "fire fan used," who

10   fills that information out?

11       A.    Crew leader.

12       Q.    And tell me what that means.  How do

13   you decide whether to check that box yes or no?

14       A.    Well, we have documentation when you

15   use the fire fan and how to use it, and it's up

16   to the crew leader, according to the weather, as

17   to whether to use the fire fan, when I was a crew

18   leader.  I don't know how they do it now.

19       Q.    Okay, that's fine.  And, depending on

20   how that was used, you would check the box?

21       A.    Yes.

22       Q.    "Chickens watered," what does that

23   mean?

24       A.    That means if the driver is putting

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00572**

1  water on chickens on a very hot day, all over

2  85 degrees, I think it is.  It was when I was

3  crew leader.

4       Q.    Okay.  And whose responsibility is it

5  to water the chickens?

6       A.    Truck driver.

7       Q.    If he is not doing it, can the crew

8  leader tell him to do it?

9       A.    Yes.

10      Q.    And who fills that out?  Who fills

11  that box out?

12      A.    Crew leader.

13      Q.    "Feeders up," what does that mean?

14      A.    If the grower has the feeder up prior

15  to catch time.

16      Q.    Okay, and if he doesn't, you check the

17  no box?

18      A.    Yes.

19      Q.    And what do you do?

20      A.    If it's not up?

21      Q.    Yes.

22      A.    Do it myself, if the equipment is

23  there to do it with.

24      Q.    All right, and if it's not there?

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

A00573

63

```
 1        A.    You have to call Doug or Nuse.
 2        Q.    Do you ever get in touch with the
 3   grower?
 4        A.    Sometimes you have to call the
 5   processing plant, and the processing plant will
 6   call people, and sometimes they still don't get
 7   them.  Sometimes we do.
 8        Q.    Well, if you arrived on a farm and the
 9   feeders were not up but the grower was present,
10   could you tell the grower to get the feeders up?
11        A.    No.
12        Q.    You couldn't?
13        A.    No.
14        Q.    Okay.  How about the water up?
15        A.    It applies the same thing as the
16   feeder.
17        Q.    Okay, so if you arrive and the water
18   is not up and the grower is present, you can't
19   tell the grower to get the water up?
20        A.    No, that's his equipment.
21        Q.    Okay, how about stoves up?
22        A.    Grower's responsibility.
23        Q.    Okay, but who checks the box?
24        A.    I do.
```

64

1          Q.      "Farm damage, yes or no," how do you

2     decide -- Who fills that out, first of all?

3          A.      I do, the crew leader.

4          Q.      Okay.  And how do you know what box to

5     check?

6          A.      If I see my forklift driver or

7     catchers break something.

8          Q.      Okay, well, let's assume -- When you

9     first get to the farm --

10         A.      Yes.

11         Q.      -- when you walk around the house to

12    see if there were any DAF's, stuff like that, do

13    you take a look at the houses and everything else

14    to make sure that they are --

15         A.      Yes.

16         Q.      Okay, and if you see damage at the

17    point before anybody started working, you would

18    check the box that there was farm damage?

19         A.      No, I would write it down on a

20    separate piece of paper.

21         Q.      Okay, and what would you do with that

22    piece of paper?

23         A.      At the end of the day, if I didn't see

24    my forklift driver catch or break anything, I

A00575

1  would mark no, we didn't do it.

2      Q.    All right, but you would have a

3  separate piece of paper which noted the fact that

4  there was damage there before you started?

5      A.    Yes.

6      Q.    Okay.  The next box, moving to the

7  right, it says "The drive entrance, acceptable or

8  unacceptable."  Who checks that box?

9      A.    Crew leader.

10      Q.    How do you know, how do you decide

11  whether to check the accept box or the unaccept

12  box?

13      A.    Well, we get the information from our

14  manager, and he would tell us or ask us what to

15  look for, and then I would have to determine it

16  from there.

17      Q.    What would your manager tell you?

18      A.    If the drive entrance is level, enough

19  footage for the trucks to get in and out, things

20  of that sort.

21      Q.    All right.  Does the manager tell you

22  this for every farm that you go to?

23      A.    He would basically tell us what to

24  expect or --

66

```
 1          Q.    You have to be -- I'm sorry, I didn't

 2    mean to interrupt you.

 3          A.    He would tell us what to look for.

 4          Q.    Okay, but after being a crew leader

 5    for awhile, you came to know what to look for?

 6          A.    Right.

 7          Q.    And, depending on whether it was

 8    level, whether it was potholes in it, or whether

 9    there was enough room to put the truck in, you

10    would make a determination as to whether the

11    drive entrance was acceptable or unacceptable?

12          A.    Yes.

13          Q.    And you would check that box?

14          A.    Yes.

15          Q.    How about the house entrances, who

16    would fill that out?

17          A.    Again, I would get information from my

18    manager as to what to do and what not to do, what

19    to look for, what not to look for, and then I

20    would have to determine or sometimes get my

21    manager out.

22          Q.    Okay, but after being a crew leader

23    for awhile, you generally know what is an

24    acceptable house entrance and what isn't, don't
```

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00577**

67

1      you?

2             A.     Yes.

3             Q.     And you would then make a decision

4      based on what you saw and based on your

5      experience as to what box to check?

6             A.     Yes.

7             Q.     Okay, "roads loading area," what does

8      that mean?

9             A.     That's a loading zone.  That's a

10     loading zone, so many footage, I forget now, as

11     to where the truck is supposed to be and where

12     the forklift is supposed to be to run around to

13     load it.

14            Q.     Okay, and who fills that box out?

15            A.     Crew leader.

16            Q.     And this has "Explain."  What, if

17     anything, would you write in that box?

18            A.     If there wasn't enough room to load a

19     truck and we had to get onto the grower's lawn or

20     into his crop field or something like that,

21     somewhere we are not supposed to be, you got to

22     call your manager or let him know, or when you

23     got done that day let him know.

24            Q.     And you would fill that information

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00578**

68

1    in?

2        A.    Yes.

3        Q.    Okay. "Leader condition," what does

4    that refer to, please?

5        A.    Houses not ventilated properly, such

6    as wet houses, too tight, too dry.

7        Q.    And who fills that out?

8        A.    Crew leader.

9        Q.    And how do you know whether to say

10   that's acceptable or unacceptable?

11       A.    Whether the forklift can run in there

12   properly or not, if the forklift is in there

13   getting stuck or the catchers are walking through

14   mud when they are not supposed to.

15       Q.    Okay, so you would observe that and

16   then, based on what you observed, you would

17   decide whether it's acceptable or unacceptable?

18       A.    Yes.

19       Q.    Okay, let's see. You mentioned on

20   your crew you carried seven catchers. Did you

21   ever have more than seven?

22       A.    At times.

23       Q.    How many more did you have?

24       A.    Sometimes we would carry more than --

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00579**

1  catchers, did you ever give one catcher a day

2  off?

3      A.    Depending on whether they wanted that

4  day off or not, or whether they wanted to set out

5  a load, or whether each man wanted to get in a

6  load to make up for it.

7      Q.    And how about somebody who basically

8  said I would like next Tuesday off?

9      A.    If they asked for next Tuesday off?

10     Q.    Right.

11     A.    Could you repeat your question?

12     Q.    Let me rephrase the question this way:

13 When you had eight catchers, Mr. Gibbs talked

14 about he would give one man off on Monday,

15 another man off on Tuesday, another man off on

16 Wednesday.

17     A.    Yes.

18     Q.    He would rotate days, and I want to

19 know if you did the same thing.

20     A.    Yes, let me correct that.  I did carry

21 catchers and there were people who would have a

22 day off.

23     Q.    And you would decide the day off,

24 whether somebody had Monday, somebody had

71

1    Tuesday, somebody had Wednesday?

2         A.    Yes.

3         Q.    And that's why you had eight catchers.

4    Okay.  Now, you also mentioned that -- Did you

5    ever have nine catchers?

6         A.    Yes, during the summer.

7         Q.    And these are the people that you said

8    coming from the plant who were inexperienced?

9         A.    Yes, who would fill in for people that

10   was out that couldn't make it that day.

11        Q.    Okay.  And if these people hadn't

12   caught before, you would sort of tell them what

13   to do?

14        A.    I would try to teach them.

15        Q.    Yeah, sure, that's what I mean.  Okay.

16   Did you ever take over another crew leader's crew

17   when that person was on vacation?

18        A.    Yes.  No, I am not going to say on

19   vacation.  I am going to say it was some kind of

20   problem and my crew was working and we fell short

21   a crew leader, yes, I have done that.

22        Q.    Okay.  And how many times would you

23   say you did that, approximately?  Again, I

24   understand it's a difficult question.

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

A00581

72

1          A.     All I can say is it was several times.

2          Q.     Several times?

3          A.     Yes.

4          Q.     Again, would that be several times a

5     year?

6          A.     Over a period of time.

7          Q.     Over a period of time?  Over this

8     period of time that we are talking about, which

9     is from '89 through '03?

10          A.     Yes.

11          Q.     Okay.  Let me ask you do catchers ever

12     change crews on a sort of a temporary basis?

13          A.     Yes.

14          Q.     Okay, and did people in your crew

15     change crews on a temporary basis from time to

16     time?

17          A.     Yes.

18          Q.     Okay.  Explain to me how that

19     happened.

20          A.     When the chicken catchers, when I was

21     crew chief --

22          Q.     Right.

23          A.     -- from time to time we would fall

24     short, one crew or another would fall short, and

A00582

73

1    we would have catchers voluntarily go to another

2    crew or ask to go to another crew, yes.

3         Q.    And did anybody on your crew ever ask

4    to go to another crew?

5         A.    From time to time.

6         Q.    And would you approve that?

7         A.    It wasn't for me to approve.  It was

8    for that catcher or my manager to approve.

9         Q.    Well, let me ask the question this

10   way:  Let's assume you had seven catchers on your

11   crew.  And that's what you need to catch;

12   correct?

13        A.    Yes.

14        Q.    And one of those catchers said, "I

15   want to go to Mr. Garrison's crew."

16        A.    After I got my work done.

17        Q.    But I am talking about while your work

18   is being done.

19        A.    No, no, because that would leave me

20   short.

21        Q.    That's right.  That's my point.

22   That's my point.

23        A.    Uh-huh.

24        Q.    So if he wanted to go to

74

1    Mr. Garrison's crew while you were still working,

2    you would tell him no?

3        A.    If he was assigned to my crew, no.

4        Q.    You would tell him no?

5        A.    Right.

6        Q.    Okay, that's fair enough.  Now, after

7    your work was finished, if he wanted to go, you

8    would --

9        A.    Yes.

10       Q.    -- say fine, I assume, and you would

11   let him go?

12       A.    Yes.

13       Q.    Because your work is done; right?

14       A.    Right, but Doug still had to know

15   about it.

16       Q.    Oh, I am not saying he didn't have to

17   know about it, but I am saying you could let him

18   go, you could say, "Fine, we are finished.  You

19   can now go work for Mr. Garrison," and then you

20   would tell Doug about it?

21       A.    But I couldn't say no, he couldn't go.

22       Q.    Okay, unless you were still working?

23       A.    Right.

24       Q.    Then you could.  Okay, let's see.  Let

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00584**

75

1    me ask you a couple of questions here.

2              I think we have already talked about

3    the fact that as a crew leader you make sure the

4    catchers, drivers and the forklift operators

5    follow those guidelines that we talked about?

6         A.    Yes.

7         Q.    You also interact with the grower,

8    don't you, you talk to the grower?

9         A.    Yes.

10        Q.    And you are supposed to, as a crew

11   leader, keep a good relationship with the grower,

12   aren't you?

13        A.    Yes.

14        Q.    As a crew leader, if one of your

15   catchers did something that you told them not to

16   do, you were able to give them an oral warning or

17   a verbal warning?

18        A.    Yes.

19        Q.    Okay, and did you ever do that?

20        A.    Yes.

21        Q.    Okay.  Did you ever have occasion,

22   when you were a crew leader, to deal with the

23   people in accounting?

24        A.    Could you repeat that question?

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

A00585

1        Q.    One, when you were a crew leader, did

2    you ever have any occasion to deal with the

3    people in accounting?

4        A.    Yes.

5        Q.    Okay, can you tell me what would cause

6    you to deal with the people in accounting?

7        A.    When I was crew leader, at the time

8    they had something called petty cash.  If a

9    catcher worked that day, he would get partial

10   pay, and I would have to go to the accounting

11   office and deal with whoever was working on the,

12   at the accounting office on that desk that

13   handled that.

14       Q.    All right.  Let me make sure I

15   understand what you just told me.  If somebody on

16   your crew wanted like advance, an advance in

17   pay --

18       A.    Yes.

19       Q.    -- they would come to you --

20       A.    Come to me.

21       Q.    -- and you would go to accounting --

22       A.    Yes.

23       Q.    -- to get the money, and then you

24   would give it back to them?

A00586

77

1          A.     At first, yes.

2          Q.     Okay.  Let me just see if I have

3     copies of these.  Let me just take a minute.  I

4     am going to need some copies.

5                    (Mr. Owens out to get copies.)

6               While Mr. Owens is doing that, let me

7     ask you a couple of questions.

8               A crew leader also has some

9     responsibility to tell the driver how to position

10    the truck, where to position the truck so it

11    could be loaded?

12         A.    Yes.

13              MR. BREWER:  We will have this marked

14         as Briddell 1.

15                   (The reporter marked Briddell

16                   Exhibit 1.)

17              MR. BREWER:  Sir, I have given you a

18         packet of documents.  Before we get to that,

19         let's make this exhibit two to this

20         deposition.

21                   (The reporter marked Briddell

22                   Exhibit 2.)

23    BY MR. BREWER:

24         Q.    Mr. Briddell, take a look at what's

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00587**

78

1    been marked as Exhibit 2.

2         A.    Okay.

3         Q.    This is what you were -- Is this what

4    you were referring to dealing with accounting?

5         A.    Yes.

6         Q.    I see there is a gentleman by the name

7    of Freddy Matthews?

8         A.    Yes.

9         Q.    Is he a catcher from your crew?

10        A.    Yes.

11        Q.    And what, he wanted $60?

12        A.    Yes, he wanted advance pay.

13        Q.    Okay, and you approved it?  Is that

14   your signature there?

15        A.    Yes, it is.

16        Q.    And you are showing that Mr. Matthews

17   received that money, the $60?

18        A.    Yes.

19        Q.    And that was in July of 2002?

20        A.    I don't remember.

21        Q.    Okay, that's what the date says there.

22   Okay, can you tell me is that your writing where

23   it says 7/3/2002?

24        A.    Yes.

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

A00588

79

1    Q.    That is your writing?

2    A.    Yes.

3    Q.    Okay.

4         MR. MARTIN:  We are looking on the

5    front page; are we not?

6         MR. BREWER:  Yes.

7         THE WITNESS:  Yes.

8  BY MR. BREWER:

9    Q.    All right, on page two, I can't

10   pronounce the person's last name.  Do you know

11   who?

12   A.    Collick.

13   Q.    Mr. Collick?

14   A.    Yeah.

15   Q.    Do you know Mr. Collick?

16   A.    Yes.

17   Q.    How do you know him?

18   A.    He worked on my chicken catching crew.

19   Q.    And he is requesting an advance of

20   $50?

21   A.    That's correct.

22   Q.    And that's basically on the same day,

23   July 3 of 2002?

24   A.    Yes.

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00589**

80

```
 1          Q.     And I see you approved that?

 2          A.     Yes.

 3          Q.     And then gave him, counted the money

 4    and gave it to him?

 5          A.     Yes.

 6          Q.     Okay, next page is Mr. Purnell?

 7          A.     Yes.

 8          Q.     Was he a member of your crew?

 9          A.     Yes.

10          Q.     And he is requesting $60?

11          A.     Yes.

12          Q.     It looks like July 3, 2002 again?

13          A.     Yes.

14          Q.     And you are approving that?

15          A.     Yes.

16          Q.     Okay.  I see he didn't sign where it

17    says received.  Did he get the money?

18          A.     He signed on the wrong line.

19          Q.     Oh, I see, I see where he signed.

20    Okay, the next one I see is a Mr. --

21          A.     Gerald Fuchs.

22          Q.     Oh, is that Fuchs?

23          A.     Fuchs.

24          Q.     Fuchs, I see, and he is requesting
```

**A00590**

81

```
1    $190.
2         A.    Yes.
3         Q.    And you approved -- It says received
4    by you and approved by him?
5         A.    Yes.
6         Q.    Is it signed -- You guys signed in the
7    wrong boxes?  You didn't receive the money --
8         A.    Right.
9         Q.    -- and Mr. Fuchs didn't approve it,
10   did he?
11        A.    No.
12        Q.    You approved it?
13        A.    Yeah.
14        Q.    And he would receive it, okay.  The
15   next one I see is where Mr. -- is it Finney?
16        A.    Yes.
17        Q.    Is Mr. Finney one of your crew
18   members?
19        A.    Was.
20        Q.    Was, okay.  By the way, was Mr. Fuchs
21   one of your crew members?
22        A.    Part time.
23        Q.    Part time, okay.  And Mr. Finney
24   wanted $75?
```

82

```
 1          A.    Yes.

 2          Q.    And you approved that?

 3          A.    Yes.

 4          Q.    Okay.   Next I see Mr. Mike Filipe, is

 5     it, or Phillip.   Can you pronounce that last

 6     name?

 7          A.    Phillips.

 8          Q.    Phillips, okay, and he wants $95?

 9          A.    Yes.

10          Q.    And you approved that?

11          A.    Yes.

12          Q.    And I see 5/21/2002.   Is that the date

13     that you approved it?

14          A.    I guess.

15          Q.    Okay.   Next is a Mr. -- Is it Sturgis?

16          A.    Sturgis, Sturgis, yes.

17          Q.    And he wanted $125?

18          A.    Yes.

19          Q.    And you approved that?

20          A.    Yes.

21          Q.    And, lastly, we have Mr. -- Is it

22     Fuchs again, Fuchs, Mr. Fuchs wanting $67.   Is

23     that what he wants?   Are you looking at that last

24     page with me?
```

83

1    A.    Yes, uh-huh.

2    Q.    And it looks to be like $67?

3    A.    Yes.

4    Q.    And you approved that?

5    A.    Yes.

6    Q.    And you went and got the money and

7  gave it to him.  Okay, thanks.

8         All right, now, the next document that

9  I would like you to take a look at, let's take a

10  look at exhibit number one to your deposition,

11  sir.  Okay?

12    A.    Yes.

13    Q.    If you look at the first page, you see

14  there is an employee name of Richard Foreman?

15    A.    Yes.

16    Q.    Do you know Mr. Foreman?

17    A.    Yes.

18    Q.    How do you know him?

19    A.    He used to be one of my crew members.

20    Q.    And Mr. Foreman is requesting, if I am

21  reading this correctly, three weeks of vacation,

22  but he only wants the money for it?

23    A.    Yes.

24    Q.    Okay, and you approved that down near

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00593**

84

1    the bottom?

2        A.    Yes.

3        Q.    Where it says supervisor, the box

4    approved is checked?

5        A.    Yes.

6        Q.    That's your signature?

7        A.    Yes.

8        Q.    The next page is Mr. Foreman again,

9    and he is requesting a floating holiday but he

10   only wants -- Again, he doesn't want the day off

11   here, does he?

12       A.    Yes.

13       Q.    He just wants the money, doesn't he?

14       A.    Yes.

15       Q.    And you approved -- Did you approve

16   this or not?  I don't see a box checked.

17       A.    Yes, I approved it.

18       Q.    Okay.  Mr. Ray Leonard, do you know

19   Mr. Leonard?

20       A.    Yes, I do.

21       Q.    How did you know him?

22       A.    Working with him, a relative, but he

23   wasn't on my crew.

24       Q.    He wasn't on your crew?

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00594**

85

```
1        A.     No.

2        Q.     What did he do for the company, if you

3    know?

4        A.     Chicken catcher.

5        Q.     Oh, he was a catcher?

6        A.     Right.

7        Q.     But not on your crew?

8        A.     No.

9        Q.     Okay, and he wanted, he wants a

10   floating day, a calendar day, but money only?

11       A.     Yes.

12       Q.     And by money only, that means he

13   doesn't want the day off, he just wants to be

14   paid for the day and he will also work; correct?

15       A.     Right.

16       Q.     And you approved that?

17       A.     No, that's not my signature.

18       Q.     Okay.  And again Mr. -- I see

19   Mr. Leonard again.  Is that your signature at the

20   bottom approving it?

21       A.     No.

22       Q.     Okay.  Do you know whose that is?

23       A.     No.

24       Q.     Let's go to Mr. Purnell.  He is asking
```

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00595**

86

1      for vacation.   Do you know Mr. Purnell?

2          A.    Yes.

3          Q.    How do you know him?

4          A.    He was one of my crew members.

5          Q.    Okay, and he is asking for vacation?

6          A.    Yes.

7          Q.    And it looks like he wants two weeks

8      vacation, but again he wants to be paid for them

9      and he will continue to work?

10         A.    Yes.

11         Q.    And is that your signature?

12         A.    Yes.

13         Q.    Supervisor, okay, and you are

14     approving that?

15         A.    Yes.

16         Q.    Again, Mr. Purnell is requesting two

17     weeks of vacation for money only?   Do you see

18     where I am?

19         A.    Yes, I am with you.

20         Q.    And you approved that?

21         A.    Yes.

22         Q.    That's your signature?

23         A.    That's my signature.

24         Q.    Mr. Purnell again requesting a

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

A00596

1     personal day, money only, and is that your

2     signature?  Did you approve that?

3          A.     Yes.

4          Q.     Next, Mr. Purnell again, he is

5     requesting two weeks of vacation for money only.

6     Is that your signature approving that?

7          A.     No.

8          Q.     That's not your signature approving

9     that.  Okay.  Mr. Purnell again, requesting money

10    only for a floating holiday.  Did you approve

11    that, sir?

12         A.     Yes.

13         Q.     Okay, because I didn't see a box

14    checked.  That's why I asked.

15         A.     Right.  What's the date on that?

16    What's the --

17         Q.     I'm sorry, which page are you

18    referring to now?

19         A.     Warren Purnell.

20         Q.     What is the --

21         A.     It's 4/26, what is that, '93?

22         Q.     Yes, that's his date of hire.

23         A.     Okay, yes.

24         Q.     Okay.  Mr. Purnell again requesting an

88

1    anniversary day, money only, it looks like a

2    calendar and an anniversary, although I guess it

3    says both.  Did you approve that, sir?

4        A.    Yes.

5        Q.    Again with Mr. Purnell, is that your

6    signature on the bottom of this page?

7        A.    No.

8        Q.    You have no idea whose it is?

9        A.    No.

10        Q.    The next document, again dealing with

11    Mr. Purnell, he is requesting a floating holiday,

12    but he again just wants the money.  And did you

13    approve that?

14        A.    Yes.

15        Q.    Is that your signature?

16        A.    Yes, it's my signature.

17        Q.    Okay.  The next document is a Ricky

18    Sturgis, is it?

19        A.    Yes.

20        Q.    Do you know Mr. Sturgis?

21        A.    Yes.

22        Q.    How do you know him?

23        A.    He is one of my crew members.

24        Q.    Okay, and he is requesting a floating

A00598

89

1    holiday but he only wants money?

2        A.    Yes.

3        Q.    And is that your signature approving

4    it?

5        A.    Yes.

6        Q.    Mr. Sturgis again is requesting four

7    weeks of vacation, to be paid for it, and he will

8    continue to work those four weeks, I am

9    gathering, where it says money only; correct?

10       A.    That's correct.

11       Q.    And is that your signature approving

12   it?

13       A.    Yes.

14       Q.    Mr. Sturgis again is requesting a

15   floating holiday. Is that your signature

16   approving this?

17       A.    Yes.

18       Q.    Oh, I'm sorry, I shouldn't say

19   approving it.  I don't see a box checked.  Did

20   you approve it?

21       A.    My signature is there.

22       Q.    Okay.  Mr. Sturgis again, he wants

23   vacation all weeks due, he says, and he only

24   wants the money, and is that your signature at

A00599

90

1      the bottom approving that?

2          A.    Yes.

3          Q.    Mr. Sturgis again is requesting two

4      days off, the 20th and the 21st.  Do you see

5      that?

6          A.    Yes.

7          Q.    And is that your signature?

8          A.    Yes.

9          Q.    And did you approve it, because I

10     don't see a box checked?

11         A.    Yes.

12         Q.    You approved those two days off for

13     him.  The next one is a Mr. Tindley,

14     T-I-N-D-L-E-Y.  Is that how you say his name,

15     Tindley?

16         A.    Yes.

17         Q.    Do you know Mr. Tindley?

18         A.    Yes.

19         Q.    How do you know him?

20         A.    He is one of my crew members.

21         Q.    And he is requesting an anniversary

22     day, but he only wants the money for it; is that

23     right?

24         A.    Yes.

91

1        Q.    And is that your signature?

2        A.    No.

3        Q.    Mr. Tindley again, down at the bottom,

4    is that your signature?

5        A.    No.

6        Q.    Mr. Tindley again, is that your

7    signature?

8        A.    Yes.

9        Q.    And he is requesting some vacation, he

10   wants four weeks of vacation, but he only wants

11   the money.

12            Okay, Mr. Tindley again is requesting

13   an anniversary day.  He only wants the money; is

14   that right?

15       A.    Yes.

16       Q.    And is that your signature?

17       A.    No.

18       Q.    Okay.  The next page for Mr. Tindley,

19   four weeks vacation again.  Is that your

20   signature at the bottom?

21       A.    Yes.

22       Q.    And he again wants four weeks

23   vacation, he only wants the money.  And did you

24   approve that?

92

1          A.    Yes.

2          Q.    Okay.  Mr. Robert Wise, is that your

3     signature?

4          A.    Yes.

5          Q.    And he is asking for a floating

6     holiday?

7          A.    Yes.

8          Q.    But only the money, okay.  Mr. Wise,

9     did you know Mr. Wise?

10         A.    Yes.

11         Q.    How do you know him?

12         A.    Crew member.

13         Q.    One of the members of your crew?

14         A.    Yes.

15         Q.    And Mr. Wise again is requesting a

16    week vacation?

17         A.    Yes.

18         Q.    But he only wants the money?

19         A.    Yes.

20         Q.    Is that your signature, sir?

21         A.    Yes.

22         Q.    And you approved it.  Mr. Finney, do

23    you know Mr. Finney?

24         A.    Yes.

93

1       Q.    And how do you know him?

2       A.    He was one of my crew members.

3       Q.    And he is requesting a, it looks like

4  a week's vacation, but he only wants the money.

5  Am I correct on that?

6       A.    That's correct.

7       Q.    And is that your signature?

8       A.    Yes.

9       Q.    Did you approve this or not?

10      A.    Yes.

11      Q.    You approved it?

12      A.    Yes.

13      Q.    Looking at Mr. Foreman, is that,

14  Bardel Foreman?

15      A.    Yes.

16      Q.    Do you know Mr. Foreman?

17      A.    Yes.

18      Q.    How do you know him?

19      A.    One of my crew members.

20      Q.    And he is requesting a week's

21  vacation?

22      A.    Yes.

23      Q.    And he only wants the money?

24      A.    Right.

A00603

94

1    Q.    And is that your signature?

2    A.    Yes.

3    Q.    Mr. Foreman again is requesting, it

4    looks to me, like a floating holiday, personal

5    day?

6    A.    Yes.

7    Q.    And he only wants the money?

8    A.    Yes.

9    Q.    Is that your signature?

10   A.    Yes.

11   Q.    And you approved that?

12   A.    Yes.

13   Q.    Mr. Foreman again is requesting

14   another day.  Is that your signature, sir?

15   A.    Yes.

16   Q.    And you approved that request?

17   A.    Yes.

18   Q.    Mr. Jackson, do you know Mr. Jackson?

19   A.    Yes.

20   Q.    How do you know him?

21   A.    He was one of my crew members.

22   Q.    And he is requesting a floating

23   holiday?

24   A.    Yes.

95

```
 1          Q.    He only wants the money, though?

 2          A.    Yes.

 3          Q.    And is that your signature?

 4          A.    Yes.

 5          Q.    Again, Mr. Jackson is asking for

 6   vacation, one week of vacation, but he only wants

 7   money?

 8          A.    Yes.

 9          Q.    Is that your signature?

10          A.    Yes.

11          Q.    You approved that.  Is this

12   Mr. Tarman, is that T-A-R-M-A-N?

13          A.    Jarman.

14          Q.    Jarman, J-A-R.  Do you know a

15   Mr. Jarman?

16          A.    Yes.

17          Q.    How do you know him?

18          A.    He is one of my crew members.

19          Q.    And he is requesting a day off, a

20   floating holiday, an anniversary holiday of some

21   type?

22          A.    Yes.

23          Q.    And he only wants the money?

24          A.    Yes.
```

A00605

96

Q.    Is that your signature?

A.    No.

Q.    Let's go to the next one with Mr. Jarman.  Is that your signature at the bottom?

A.    No.

Q.    Do you have any ideas whose that is?

A.    No.

Q.    All right, let's go to the next one, Mr. Matthews.  Is that your signature at the bottom?

A.    No.

Q.    I'm sorry, I didn't hear you, sir.

A.    No.

Q.    Okay, let's go to the next one with Mr. Matthews.  Is that your signature?

A.    No.

Q.    And Mr. Matthews again, is that your signature?

A.    Yes.

Q.    Okay, and do you know a Mr. Matthews?

A.    Yes.

Q.    How do you know him?

A.    He is another one of the crew members.

97

1      Q.    And he is requesting a day off, but he

2  only wants the money for it?

3      A.    Right, yes.

4      Q.    And you approved that?

5      A.    Yes.

6      Q.    How about Mr. Mitchell, is that your

7  signature at the bottom?

8      A.    No.

9      Q.    Okay.  And the next one is

10  Mr. Phillips.  Do you know Mr. Phillips?

11      A.    Phillips?

12      Q.    Phillips, yes.  It should be the page

13  after Mitchell.

14      A.    Matthews, Phillips, okay.

15      Q.    Do you know him?

16      A.    Yes.

17      Q.    How do you know him?

18      A.    Well, he was my forklift driver.

19      Q.    He was your forklift driver?

20      A.    At one time.

21      Q.    Okay, and he is requesting -- Is that

22  your signature, by the way, at the bottom?

23      A.    Approved, but not my signature.

24      Q.    You approved it?  Did you approve this

98

```
 1    but it's not your signature?  Is that what you

 2    are saying?

 3          A.    Yes.

 4          Q.    How about a Mr. Taylor?

 5          A.    Yes.

 6          Q.    Is that your signature at the bottom?

 7          A.    Yes.

 8          Q.    Okay, he wants a day off for money

 9    only?

10          A.    Yes.

11          Q.    And, let's see, almost done here, a

12    Richard Foreman, do you know him?

13          A.    Yes.

14          Q.    How do you know him?

15          A.    One of my crew members.

16          Q.    And he is requesting vacation, and he

17    is also requesting a floating holiday?

18          A.    Yes.

19          Q.    And he is requesting only to be paid

20    for it, he will continue to work?  Am I correct

21    in that?

22          A.    Yes.

23          Q.    Is that your signature?

24          A.    No.
```

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00608**

99

```
 1          Q.    That's not your signature?

 2          A.    No.

 3          Q.    All right, and Mr. Foreman again, is

 4    that your signature at the bottom?

 5          A.    No.

 6          Q.    Okay.  Did you approve -- Do you know

 7    about this?  Did you approve this?

 8          A.    I don't remember.

 9          Q.    Okay, how about the one before with

10    Mr. Foreman, do you remember that, it was in

11    February of '02?

12          A.    I don't remember.

13          Q.    Okay, that's fine.  Let me ask you

14    this question:  If a member of your crew wanted

15    to take a day off without pay, can he do that?

16          A.    Yes.

17          Q.    Okay, what does he have to do to do

18    that?

19          A.    If he notifies me, if it's not too

20    late and within reasonable time, some of these

21    times I would notify my manager --

22          Q.    Uh-huh.

23          A.    -- and we would try to work something

24    out about getting somebody to replace him, but he
```

100

1      could take that day off.

2      Q.     He could take that day off.  Now, what
3      happens if he wants to take the day off and
4      doesn't tell you about it, just doesn't show up?

5      A.     He still don't get paid, and we follow
6      the same procedure as trying to get somebody.

7      Q.     Do you give him any disciplinary
8      action for not showing up?

9      A.     Yes, but I would sometimes give them a
10     verbal warning and notify my manager.

11     Q.     Okay.

12     A.     Whatever the case may be.

13     Q.     But if somebody asked for a day off
14     and you approved it, he wouldn't get a verbal
15     warning, would he?

16     A.     Could you repeat your question?

17     Q.     Sure.  If a member of your crew wants
18     to have a day off and doesn't want to be paid for
19     it, I want to take a day off without pay, I
20     notify you, you say okay, I don't get a verbal
21     warning then?

22     A.     No.

23     Q.     Okay.  The people who worked on your
24     crew, while we saw these in Garrison, in, I'm

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

A00610

101

```
 1    sorry, Briddell Exhibit Number 2, Number 1, I'm

 2    sorry, you saw that a lot of people were

 3    requesting to be paid instead of taking the time

 4    off.  People in your crew did take vacation,

 5    didn't they?

 6         A.    Sometimes.

 7         Q.    Okay, and did you approve their

 8    vacation?

 9         A.    If I had the help, yes.

10         Q.    Okay, and, if you didn't, you

11    wouldn't?

12         A.    No.

13         Q.    Can you tell me this:  What happens if

14    somebody who is working on your crew, when you

15    were a crew leader, if they got hurt?  What would

16    you do?

17         A.    I would follow company policy.  But

18    then, again, if I would be near a physician, I

19    would take them.  But the company wants you to

20    see that they get to the processing plant.  And,

21    if I could, I would get them to the processing

22    plant.

23         Q.    Okay.

24         A.    But if I was near a hospital, I would
```

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00611**

102

1    proceed to the hospital.

2        Q.   You would take the person to the

3    hospital to get treated?

4        A.   Yes.

5        Q.   Okay.  Could you also call 911 if

6    something happened at a farm?

7        A.   Yes.

8        Q.   Let's go back for just a second,

9    because I want to see if I understand how you

10   worked it on your crew.

11        If one of your catchers wanted a day

12   off without pay and you only had seven and you

13   didn't think you could spare him, did you ever

14   call another crew leader, like Mr. Gibbs or

15   Mr. Garrison, and say, "Listen, one of my guys

16   wants a day off tomorrow or the next day, do you

17   have somebody you can send me?"  Would anything

18   like that ever happen?

19        A.   Yes.

20        Q.   Okay.  And if they said, "Yeah, I have

21   somebody I could send you," you could say to the

22   guy, "Okay, you can have the day off."

23        A.   Yes.

24        Q.   And would it be the reverse?  Did it

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00612**

1    transport themselves to the farms?

2        A.    Yes.

3        Q.    Okay, so how many people did you have

4    to pick up?

5        A.    Six, probably six every day.

6        Q.    Okay.

7        A.    There was times when I picked up the

8    whole, down through the years.

9        Q.    Okay, but mostly it was five or six?

10       A.    Or seven.

11       Q.    Five, six or seven?

12       A.    Yeah.

13       Q.    But seven was your entire crew?

14       A.    Chicken catchers.

15       Q.    Right.  Okay, let's talk about when

16    you picked up the five -- After you got the five,

17    six or seven that you picked up and you are

18    traveling on the way to the farm, was it normal

19    to stop someplace to get a cup of coffee --

20       A.    Yes.

21       Q.    -- get cigarettes, get a sandwich --

22       A.    Yes.

23       Q.    -- do this, do that?  And how long did

24    those stops take, approximately?

BY MR. BREWER:

Q.   Okay, let's go.  Mr. Briddell, let me ask you this question, if I may:  Could you recommend the promotion of one of the catchers to be a forklift operator?

A.   No.

Q.   You couldn't do that?

A.   Could I?  Oh, let me rephrase it.  You said could I recommend?

Q.   Yes.

A.   Yes, I could ask Doug about it, yes.

Q.   We had talked earlier about your giving some oral reprimands to people for various reasons.  Did you ever give anybody anything more than an oral reprimand?

A.   Yes.

Q.   Okay, do you remember who, by any chance?

A.   Charles Hitchens.

Q.   Okay.  Do you remember when that was?

A.   No.

Q.   Okay.  Anybody else you can think of?  And I understand -- Again, I understand I am asking you to go back in time.  There may have

110

1    been others and you can't remember their names,

2    and that's fine.

3        A.    No.

4        Q.    You can't remember anybody else?

5        A.    No.

6        Q.    Let me ask you this question:  When

7    you finished one farm and you are assigned to go

8    to another farm, you have the authority to make

9    sure that the crew works to get all the chickens

10   caught that you are supposed to get caught that

11   day, don't you?

12       A.    Yes.

13       Q.    And if that involves overtime, you

14   have the right to make sure that they still get

15   caught; right?

16       A.    Yes.

17       Q.    Let me show you, this is Exhibit 6 to

18   Mr. Garrison's deposition.  You have a copy of

19   that, I believe.

20            MR. MARTIN:  Yep.

21            MR. BREWER:  And take a look at page

22       nine.  Off the record a moment.

23                (An off-the-record discussion

24                was held.)

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

A00615

112

1    were, for example, catchers, because when you

2    were a crew leader you weren't covered by this

3    contract, were you?

4        A.    No.

5        Q.    The catchers were, though?

6        A.    Yes.

7        Q.    All right.  So it says here a

8    complaint or a grievance arising out of this

9    interpretation, and so forth, shall in the first

10   instance be taken up between the aggrieved

11   employee, which, in your case, would be a

12   catcher, right --

13       A.    Uh-huh.

14       Q.    -- or catchers, who take the matter up

15   with the shop steward, and then the shop steward

16   takes the matter up with the foreman in charge;

17   right?

18       A.    Yes.

19       Q.    So if one of your catchers had a

20   grievance, they would take it up with the

21   steward, and then the steward, in fact, an

22   employee, would take it up with you as a crew

23   leader?

24       A.    They were supposed to.

113

Q.    Yeah, they were supposed to.  That's what this contract says they are?

A.    Yes.

Q.    All right, let's see.  You were required to write down the time that your crew started at a farm?

A.    Yes.

Q.    And you kept the time that the catchers worked at the farm?

A.    Did I keep the time that the catchers worked?  Are you pertaining to the time they start until the time they end for that day?

Q.    Yes, from the time they start --

A.    Yes.

Q.    -- and the number of chickens they caught and everything else?

A.    Yes.

Q.    Thank you.  Let me show you Exhibit Number 8 to Mr. Garrison's deposition.  Have you ever seen this before?

A.    I don't remember.

Q.    Okay.  You were a crew leader at this time?

A.    Yes.

114

Q.    Okay, so you may have gotten it and you may not have; you just don't remember?

A.    I don't remember.

Q.    Okay, that's fine.  When you were a crew leader and your crews were working at a farm, did you have any responsibility for the safety of the catchers, making sure that they worked safely?

A.    Could you say that again?

Q.    Yeah, when you were a crew leader, did you have any responsibility to make sure that the catchers worked safely, that they did things in a safe way?

A.    Yes.

Q.    Okay.  Now, let me show you what is exhibit -- Oh, before I do that, let me ask you this question:  When you went on salary, do you remember when that was?

A.    No.

Q.    If I suggest to you it was June of 2002, would that seem correct to you?

A.    Yes.

O.    All right, do you remember what salary you were paid?

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

A00618

121

1          A.     Uh-huh.  Wait a minute.

2          Q.     No, that's right, the paper that you

3     have there.

4          A.     I know.

5          Q.     Okay.

6          A.     Okay, go ahead.

7          Q.     Do the vacations look to be what you

8     recall salaried people getting and hourly people

9     getting, the 355 hourly people?

10               Let me try to maybe rephrase the

11    question this way:  After you have had 15 years

12    of service with the company, did you receive four

13    weeks of vacation?

14         A.     Yes.

15         Q.     Okay.  And it looks like you have to

16    be over 20 years to get four weeks if you are

17    hourly?

18         A.     Hourly, yes.

19         Q.     Okay, good.  That's fine.  This is

20    Exhibit Number 12 to Mr. Garrison's deposition.

21    Let me show you this.

22               MR. MARTIN:  Put these other things

23          away so we don't get confused here.

24    BY MR. BREWER:

123

1        A.    Yes.

2        Q.    Were the catchers eligible for

3   bonuses?

4        A.    No.

5        Q.    Let's take a look at Exhibit 13 to

6   Mr. Garrison's deposition.  If you look at the

7   top in the year 2001, it's Nathaniel Briddell.

8   Is that you, sir?

9        A.    Yes.

10        Q.    And this shows that in December of

11   2000 you received a $99.10 bonus; correct?  Do

12   you see where I am?

13        A.    Yes.

14        Q.    And you received a performance bonus

15   in January of '01 for $315.70?

16        A.    Say that again, now.

17        Q.    In January of '01 that you received a

18   performance bonus of $315.70?

19        A.    That's correct.

20        Q.    And you received another performance

21   bonus in February?

22        A.    Yes.

23        MR. MARTIN:  For the clarity of the

24        record, are you asking him whether this

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

124

```
 1          document says this or whether he recalls
 2          having received this?
 3   BY MR. BREWER:
 4          Q.    Well, we know the document says it.
 5          A.    Do I recall?
 6          Q.    Getting a bonus?
 7          A.    I recall getting a bonus, but I don't
 8   recall the amount.
 9          Q.    All right, well, there is an amount
10   listed here.  Does that amount seem to you to be
11   correct?
12          A.    I don't remember, sir.
13          Q.    You have no idea?
14          A.    No.
15          Q.    Any reason to think that this is not
16   correct?
17          A.    I just don't remember just what the
18   actual figure was.
19          Q.    I understand that.  My question is is
20   there any reason that you would think that the
21   figures that are listed here are not correct?
22          A.    I can't answer that question.  I
23   don't --
24          Q.    What do you mean you can't answer the
```

125

```
1    question?

2         A.    I don't know.  Figures do get juggled

3    around, and I don't know.

4         Q.    Figures do get juggled around?

5         A.    Yes, they do, sir.

6         Q.    So these figures could get juggled

7    around?  Is that what you are suggesting?

8         A.    Yes, they could, sir.

9         Q.    Who would juggle them around?

10        A.    I don't know everybody in the company.

11        Q.    Everybody in the company?

12        A.    I don't know everybody that works with

13   figures in the company.  I just don't remember

14   the figures.  I remember getting bonuses.

15        Q.    Sir, I understand that, and I

16   understand that going back to January of 2001 --

17        A.    Uh-huh.

18        Q.    -- is awhile ago.

19        A.    Yes.

20        Q.    Okay, and what I am asking you is not

21   if you remember receiving that.  You say you

22   don't.  That's fine.

23        A.    Right.

24        Q.    But I am saying that this document
```

A00622

126

1    says that's what you got.

2         A.    Yes.

3         Q.    And my question to you is is there any

4    reason that you can give me that we should not

5    believe that you got $315.70 as a performance

6    bonus?

7         A.    I just don't remember.

8         Q.    All right, that's not responsive.   I

9    am going to do it again.

10             It shows in the year 2001 you received

11    a total of $1,423 bonus.  Does that seem right to

12    you?

13         A.    That's 2000 what?

14         Q.    In the year 2001 --

15         A.    Uh-huh.

16         Q.    -- at the end of the year, it's the

17    last column on the right, it says year to date

18    earned, $1,423.60.

19         A.    I remember getting a bonus, yes.

20         Q.    Okay.  And if we go to the year 2002,

21    and rather than go month by month, we go to the

22    year end, it shows $345.92.  Does that seem right

23    to you?

24         A.    I do remember getting a bonus, sir.

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00623**

127

Q.    Okay.  In 2003 it shows $313.54.

A.    I do remember getting a bonus.

Q.    Okay.  Of course, in 2004 you are not listed because you weren't a crew leader then?

A.    Right.

Q.    All right, so you didn't get any bonuses in 2004 because you were back as an hourly employee?

A.    Right.

Q.    And hourly employees don't get these bonuses.  Now, in addition to getting a monthly bonus, you also got a bonus at the end of the year; right?

A.    Yes.

Q.    If you go down to the very last column, okay, it shows the bonuses that you got per month in 2001, which is that same number you looked at at the top.  That's the $1,423.60.

A.    Uh-huh.

Q.    It shows, in addition to that, you got another $4,425.97 as an annual bonus?

A.    I remember.

Q.    You remember that.  You remember that, okay.  In 2002, of course you got the monthly

128

1    bonuses that we just discussed, but you didn't

2    get an annual bonus?

3        A.    No.

4        Q.    And you got monthly bonuses in 2003

5    but no annual bonus, because you left being a

6    crew leader in, what, I think you said April of

7    2003?

8        A.    Yes.

9        Q.    Okay, so you wouldn't have been

10   eligible for those.

11              Okay, let me show you what has been

12   identified as Exhibit 14 to Mr. Garrison's

13   deposition.  Have you seen this before, sir?

14       A.    I don't remember seeing this.

15       Q.    You don't remember seeing this?

16       A.    No.

17       Q.    This talks about a management meeting

18   that was going to be held on a Saturday.  Do you

19   remember going to a meeting in February of 2003?

20       A.    No.

21       Q.    You didn't go?

22       A.    I don't remember going to that

23   meeting.

24       Q.    You don't remember going?

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00625**

129

1        A.    No.

2        Q.    But this was addressed to crew

3    leaders?

4        A.    Yes.

5        Q.    And you were a crew leader in January

6    of 2003?

7        A.    Yes.

8        Q.    Just to be sure, you don't have any

9    recollection of getting this or seeing this?

10       A.    No.

11       Q.    Let me show you what's been marked as

12   Exhibit 15 to Mr. Garrison's deposition.  This is

13   the Christmas invitation list for supervisors in

14   2003.

15       A.    Yes.

16       Q.    Under Doug Lynch your name is not

17   mentioned, is it?

18       A.    No.

19       Q.    Do you know why it wasn't here?

20       A.    This was from Christmas dinner 2003?

21   I was -- I don't know why I didn't receive this.

22       Q.    You were hourly.

23       A.    Yes, that's correct.

24       Q.    And this is for supervisors.  This

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00626**

130

1    Christmas dinner is for supervisors, isn't it?

2        A.    Yes.

3        Q.    The hourly people don't have a

4    Christmas dinner, do they?  The hourly people

5    don't have Christmas dinner, do they?

6        A.    Not the hourly.

7        Q.    Okay, if you look at the last page of

8    this exhibit, Christmas 2001, under Mr. Lynch

9    your name is listed there, isn't it?

10       A.    Yes, it is.

11       Q.    And that's because you were a crew

12   leader at the time?

13       A.    That's correct.

14       Q.    Did you go to the dinner?

15       A.    Yes.

16       Q.    Okay.  Were there any people at the

17   dinner who were not supervisors, as far as you

18   know?

19       A.    I don't remember.

20       Q.    You don't remember.  Before we move

21   into another area, can you -- I would just like

22   to know this, what you would identify as your

23   strengths as a crew leader?  What do you think

24   you did the best when you were a crew leader?

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00627**

134

1    continues to follow a corporate policy and/or

2    practice that requires/required plaintiffs to

3    submit a daily time sheet broken down for each

4    day of the week."

5                Were you required to keep a time sheet

6    of your time broken down for each day of the

7    week?

8         A.    At a point in time, yes, that I had to

9    turn in a time sheet ever day of each catcher.

10        Q.    Each catcher?

11        A.    Yes.

12        Q.    But it was for the catchers you were

13   keeping a time for?

14        A.    Yes.

15        Q.    You were not keeping a time for

16   yourself?

17        A.    No.

18        Q.    Okay, and you have never kept time for

19   yourself as a crew leader?

20        A.    No.

21        Q.    Go to the next paragraph, which is

22   Paragraph 26.  You can take a moment and read

23   that, if you want.

24                Okay, this basically says that the

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00628**

135

1    defendant, which is the company, follows a

2    practice of partial-day deductions, and it says

3    in that, "Any partial time taken off in working

4    hours by the plaintiffs," which is you, "was

5    deducted from their pay."

6         Were any deductions made from your pay

7    when you took less than one full day off?

8         A.    That depends.  Now, if I took off when

9    I got paid by the thousand --

10        Q.    Uh-huh.

11        A.    -- and I got somebody in my place, the

12   company did not pay.  I paid it out of my pocket.

13        Q.    Correct.  I am talking about -- Let's

14   talk about the times from June of '02 when you

15   became salary.  Okay?

16        A.    In June of '02?

17        Q.    In June of '02 when you first became

18   salaried until April of '03 when you stopped

19   being a crew leader?

20        A.    No.

21        Q.    There were no partial-day deductions

22   taken from your pay?

23        A.    No.

24        Q.    Okay.  Go to the next paragraph,

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00629**

136

```
 1    Paragraph 27.  You can take a moment, sir, and
 2    read that.  I just have a couple questions about
 3    that for you.
 4                Okay, what this paragraph basically
 5    says is that the defendants have a policy,
 6    defendants being the company, have a policy of
 7    again the partial-day deductions, which you said
 8    did not happen when you were salaried, whereby
 9    your pay was reduced because of violations in the
10    quantity of the work performed or directly
11    received a reduction in the amount of
12    compensation in the event they chose to charge
13    time off from normal hours.
14                Was your compensation reduced because
15    of violations of the quantity of work performed
16    at all?
17         A.    No.
18         Q.    When you were salaried, there
19    basically weren't any deductions taken from your
20    work or anything else, were there?
21         A.    No.
22         Q.    Take a look, sir, at that same
23    document and turn to Paragraph 32, please.  Let
24    me know when you are finished.
```

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00630**

1    Paragraph 34.  This says, "When the defendant,"

2    which is the company, "learned of plaintiff's

3    intention to seek counsel, defendant immediately

4    retaliated against plaintiffs, threatened them

5    with termination of employment if they continued

6    to pursue these issues."

7              Did anybody threaten you with

8    termination?

9         A.    No.

10        Q.    Did anybody retaliate against you,

11   sir?

12        A.    No.

13        Q.    Okay.  And I think I asked you, and

14   you said no one threatened you with termination

15   from employment?

16        A.    No.

17        Q.    Let's see.  Go to the next paragraph,

18   which I would like to read, Paragraph 36.  And

19   this says, "Many of the plaintiffs have been

20   cornered by various management personnel and

21   questioned individually regarding their

22   discussions with counsel and the nature of their

23   action."

24              Were you cornered by any member of

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

A00631

141

1    management about this lawsuit?

2        A.    Cornered me and questioned me?

3        Q.    Cornered?  Well, this is what it says.

4    It says, "Many of the plaintiffs have been

5    cornered."

6        A.    No, I don't remember being cornered.

7        Q.    By anybody from management?

8        A.    No.

9        Q.    It also says they questioned many of

10   the plaintiffs, and it may not be you, "Many of

11   the plaintiffs have been questioned individually

12   regarding their discussions with counsel."

13           Have you been questioned by any member

14   of management regarding your discussions with

15   Mr. Martin?

16       A.    Yes.

17       Q.    Who?

18       A.    David Nuse said, "I heard your name

19   was on the lawsuit."

20       Q.    Uh-huh.  Okay.

21       A.    "And you won't receive anything."

22   That's all I got on that.

23       Q.    David Nuse said, "I heard your name

24   was on the lawsuit."

146

```
1   owned and operated by the defendant's upper
2   management personnel circling the parking lot of
3   the diner at which they were assembled for a
4   meeting.
5              Can you tell me anything about that?
6        A.    Yes, I do remember seeing that company
7   vehicle.
8        Q.    Which vehicle did you see?
9        A.    I seen a tan Crown Victoria.
10       Q.    And whose car was that?
11       A.    I don't remember.  I can't recall.  I
12  did not see that person.
13       Q.    You did not see the person?
14       A.    No.
15       Q.    But you are sure it was a company car?
16       A.    I know it was.
17       Q.    And what occurred?  The car, it said,
18  circled?
19       A.    Just circled around the parking lot
20  real slow and drove on off.
21       Q.    So the car came into the parking lot?
22       A.    Yes, it did.
23       Q.    Circled around slowly and drove off?
24       A.    Yes.
```

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

**A00633**