27

ORIGINAL    1

```
 1              IN THE UNITED STATES DISTRICT COURT
                IN AND FOR DISTRICT OF DELAWARE
 2

 3   WILLIE DAVIS, JR.,                 )
     NATHANIEL BRIDDELL,                )
 4   GEORGE W. FEDDIMAN,                )
     JOSEPH GARRISON,                   )
 5   LARRY E. GIBBS,                    )
     ROY H. WALTERS,                    )
 6                                      )
     ALL SIMILARLY SITUATED CURRENT )
 7   AND FORMER EMPLOYEES OF            )
     MOUNTAIRE FARMS, INC.,             )
 8   MOUNTAIRE FARMS OF DELMARVA,       )
     INC., and MOUNTAIRE FARMS OF       )
 9   DELAWARE, INC.,                    )
                     Plaintiffs,        )
10        -vs-                          )   C.A. No. 04-0414
                                        )
11   MOUNTAIRE FARMS, INC.,             )
     MOUNTAIRE FARMS OF                 )
12   DELMARVA, INC., and                )
     MOUNTAIRE FARMS OF                 )
13   DELAWARE, INC., all Delaware       )
     corporations,                      )
14                     Defendants.      )
                                  - - - - - - -
15         Deposition of GEORGE FEDDIMAN, taken before
     Pamela C. Washington, Registered Professional Reporter
16   and Notary Public, at the law offices of Young,
     Conaway, Stargatt & Taylor, 110 West Pine Street,
17   Georgetown, DE, on February 1, 2005, beginning at
     10:00 a.m.
18
     APPEARANCES:
19        On behalf of the Plaintiffs:
              Margolis Edelstein
20            BY:  JEFFREY K. MARTIN, ESQ.
              and  KERI L. WILLIAMS, ESQ.
21            1509 Gilpin Avenue
              Wilmington, Delaware 19806
22
          On behalf of the Defendants:
23            Shawe & Rosenthal
              BY:  ARTHUR M. BREWER, ESQ.
24            20 South Charles Street
              Baltimore, Maryland  21201
25
```

FIRST STATE REPORTING SERVICE        (302) 424-4541
                    Pamela C. Washington, RPR
     P.O. Box 99              Milford, Delaw

22

Feddiman - Brewer

1          A    What crew?

2          Q    No, I'm sorry.  The certification to

3    operate a forklift, where did you get that?

4          A    From Mountaire.

5          Q    From Mountaire?

6          A    Through my supervisors.

7          Q    And who was your supervisor?

8          A    Doug Lynch and David Nuse.

9          Q    I may have asked you this and, if I

10    did, please forgive me:  When did you first begin

11    working for Mountaire?

12          A    May the 9th.

13          Q    Of what year?

14          A    I think it was `94.

15          Q    `94?  Prior to that, is that when you

16    worked for Cargill?

17          A    No.  I worked to Berlin to Hudson Food.

18          Q    Okay.  So this is Mountaire starting in

19    `94, and how long had you worked at Hudson?

20          A    Two years.

21          Q    So that would be --

22          A    The rest of the time was spent at

23    Paramount, Cargill, and Allen's.

24          Q    So, let's see, if I have this

25    approximately right, it would be approximately May of

FIRST STATE REPORTING SERVICE        (302) 424-4541
                    Pamela C. Washington, RPP
        P.O. Box 99              Milford, Delaw

**A00635**

Feddiman - Brewer

1   Mountaire to go someplace else and then come back to

2   Mountaire?

3           A    No.

4           Q    When did you first become a crew

5   leader?

6           A    I don't even know the exact date that

7   it was, but I know I got -- I sent the lawyer the copy

8   that I got from down to payroll.  I know it was nine

9   months, anyway.

10          Q    All right, I'll take a look at that.

11          A    From the time I started until the time

12  I ended.

13          Q    And when you were a crew leader, can

14  you tell me how you were paid?

15          A    I was paid by the thousand.

16          Q    So for every thousand chickens that

17  your crew caught, you received a certain amount of

18  money?

19          A    Yes.

20          Q    For every thousand chickens that were

21  caught?

22          A    Uh-huh.

23          MR. MARTIN:  Yes?

24          THE WITNESS:  Yes.

25

30

Feddiman - Brewer

1  working with the other crews, who would fill in for

2  him?

3          A    When I started, he started working with

4  me all the time.

5          Q    Okay.  So the period of time then that

6  you're the crew chief this nine months, Mr. Morris is

7  on your crew?

8          A    Yes.

9          Q    Okay.  Let me show you what has been

10 marked as an Exhibit 2 to Mr. Garrison's deposition.

11 If you look about half way down on the first page, it

12 says crew leader's general duties.  Do you see where

13 I'm referring to, sir?

14         A    Yes.

15         Q    Now, again, the time frame that I'm

16 interested in here is the time that you were a crew

17 leader, okay?

18         A    Okay.

19         Q    This talks about a general duty of a

20 crew leader to arrive at the farm on time, was that

21 one of your responsibilities?

22         A    Yes.

23         Q    It also talks about an in item dividing

24 the house into equal sections before the catching

25 process, was that one of your responsibilities?

Feddiman - Brewer

```
 1          A    When I went to do it, I had a house
 2    man.
 3          Q    When you say a house man, that was --
 4          A    I had a man that took care of that.
 5          Q    -- that was a member of your crew?
 6          A    Yes.
 7          Q    He was a catcher?
 8          A    Yes.
 9          Q    So you assigned somebody as a house man
10    to do this?
11          A    Yes.
12          Q    All right.  But this was your
13    responsibility as the crew leader?
14          A    To put the curtains up was my
15    responsibility.
16          Q    Right.  But you had a house man; was it
17    the same man all the time?
18          A    Yes.
19          Q    So you instructed him to take care of
20    what it discusses in item B?
21          A    Yes.
22          Q    Now, it isn't always possible to divide
23    the house into four equal sections, is it?
24          A    I had approximately eight curtains.
25    No, it's not always possible for to divide it in four
```

FIRST STATE REPORTING SERVICE      (302) 424-4541
                    Pamela C. Washington, R⎺⎺
        P.O. Box 99            Milford, Delaw.

**A00638**

Feddiman - Brewer

1    equal sections.

2         Q    When you would get out to a house, I

3    would assume you would take a look around at it and

4    decide how you're going to set the house up, tell your

5    house man how to do it and --

6         A    No.  What we did, we moved -- we moved

7    the curtains.  We catch so much and move them until we

8    get to the end of the house.

9         Q    Okay.  And would the house man be the

10   one who's moving the curtains?

11        A    Most time I helped Little -- I call him

12   Little -- I helped him to move them.

13        Q    Any of the other catchers help?

14        A    Not very often.

15        Q    You're also responsible for telling the

16   catchers how many chickens go into each compartment in

17   the cage?

18        A    Yes.

19        Q    When it talks about in item D catching

20   all birds in place at night, never move them into less

21   than 70 percent of the normal floor space, was that

22   one of your responsibilities?

23        A    We do what we call drive over.  Then we

24   walk through them, make sure they're not on the walls,

25   they'll smother.

FIRST STATE REPORTING SERVICE      (302) 424-4541
Pamela C. Washington, ᴘᴘᴘ
P.O. Box 99              Milford, Dela

33

Feddiman - Brewer

1      Q    Right.  But sometimes you'd have to
2  move the birds into a smaller floor space?
3      A    I don't understand what you're saying.
4      Q    These are guidelines, and in this item
5  what we're talking about is your responsibilities as a
6  crew leader, but it wasn't always possible to follow
7  these things exactly the same way?
8      A    No, no.
9      Q    And you would be responsible for
10  deciding how you're going to go about catching the
11  chickens in this particular house?
12      A    Yes.
13      Q    Okay.  You mentioned earlier you would
14  tell your house man how you wanted it done?
15      A    Yes.  Most time, the house man pretty
16  well know, but me and him would be together on that.
17      Q    Okay.  Let's take a look at Item E, it
18  talks about observing the uncaught birds to prevent
19  smothers; that was also a responsibility that you had?
20  I'm sorry, I'm on the next page, sir, the top, Item E.
21      A    Item E?
22      Q    Yes.
23      A    Yes.
24      Q    And the next one, Item F talks about
25  making sure the cages were stacked uniformly on the

FIRST STATE REPORTING SERVICE      (302) 424-4541
                 Pamela C. Washington, RI
       P.O. Box 99              Milford, Delawe

**A00640**

Feddiman - Brewer

1   trailer, that was also one of your responsibilities?

2        A   No.

3        Q   It was not your responsibility?

4        A   No.  That's the forklift driver

5   responsibility and the truck driver.

6        Q   Well, that's true, but the forklift

7   operator is a member of your crew?

8        A   Yes, but that's his responsibility to

9   load them cages, and it's the truck driver's

10   responsibility to see that -- to see that he don't

11   leave the yard with the cages not loaded like they

12   should be so they won't fall off.

13        Q   So are you saying to me that you had no

14   responsibility to make sure that the cages were

15   stacked properly on the trailer?

16        A   If the truck driver came to me and said

17   he was having a problem with the forklift driver to

18   straighten them up, then I would come in.  But the

19   forklift driver responsibility to load the cages on

20   the truck, not the crew leader.

21        Q   No, maybe I'm not making -- I

22   understand that, I understand the forklift operator

23   does that, he's the one that picks up the cages and

24   takes them out of the house and puts them on the

25   trailer.

FIRST STATE REPORTING SERVICE    (302) 424-4541
Pamela C. Washington,
P.O. Box 99        Milford, Dela

35

Feddiman - Brewer

1        A    Yes.

2        Q    That's his job, that's not your job as

3   a crew leader, I understand that.  But my question is

4   as a crew leader, did you have a responsibility to

5   make sure that the forklift operator was doing his job

6   properly?

7        A    Yes.

8        Q    Okay, that's all I was after.  Item G

9   talks about the summer, making sure the fans are left

10  hanging until the birds have been caught and so forth;

11  is that one of your responsibilities?

12       A    Yes.

13       Q    Okay.  And Item H talks about not

14  putting any more than the specified number of chickens

15  per door; that means in the cage, does it not?

16       A    Yes, especially hot weather.

17       Q    Right.  Fill out the farm ticket?

18       A    Yes.

19       Q    And check with the driver to make sure

20  the load is secured?

21       A    Yes.

22       Q    Okay, maybe we can move on.  Take a

23  look at it talks about various catching methods here,

24  it talks about night catching and then it talks about

25  day catching with A-frame houses; would you say that

37

Feddiman - Brewer

1          MR. MARTIN:  I'm going to object to the

2    form of the question.

3          THE WITNESS:  The catchers pretty well

4    know where to put the birds at without a crew leader

5    telling them every -- what we call a house man, he

6    pretty well knows just as much as the crew leader do.

7    But we run them to the front of the house when we got

8    walk-outs.

9    BY MR. BREWER:

10         Q    And that's what this talks about in

11   walk-outs here?

12         A    Yes.

13         Q    Okay.  But that was one of the

14   responsibilities, you would make sure this is done the

15   way it's supposed to be done?

16         A    Yes.

17         Q    Then we talk about day catching, down

18   here talks about Ins or A-frame houses, talks about

19   how they should be caught; were you responsible for

20   making sure that these things happened?

21         A    Yes.

22         Q    And that includes I mean the fire fans

23   and Items A, B, C, D, and they go all the way down on

24   the next page, Item H, these were things that you were

25   responsible for?

Feddiman - Brewer

1      A    Yes.

2      Q    It talks about walk-out or shed houses,

3  these are different kind of houses that a farmer might

4  have or grower?

5      A    Yes.

6      Q    And this talks about what your

7  responsibilities are to make sure those birds are

8  caught that way; were these your responsibilities?

9      A    Yes.

10     Q    The next item on this document talks

11  about tunnel ventilation in Roman Numeral IV; was it

12  your responsibility to make sure that what is said

13  here was followed?

14     A    The crew leader and the grower, yes.

15     Q    Okay.  The next part of the thing on

16  the next to the last two pages talk about tunnel

17  ventilation procedures, talks about conventional

18  houses that are 400 feet or least, and then it talks

19  about houses that are 400 feet long; were you

20  responsible for making sure that these directives were

21  followed by your crew?

22     A    Yes.

23     Q    Okay.  Mr. Feddiman, I'm going to show

24  you a document that was marked as Exhibit Number 1 to

25  Mr. Garrison's deposition, and ask you if you have

Feddiman - Brewer

1    seen that before?

2         A    Yes.

3         Q    Is this the farm ticket you referred to

4    earlier that you looked at?

5         A    Yes.

6         Q    Okay.  Let's go through this.  At the

7    top of the document, there's a date, who fills that

8    in?

9         A    Most time, I did.

10        Q    Okay.  And there is a lot number, who

11   fills that in?

12        A    Very seldom I fill the lot.

13        Q    Okay.  How about the load number?

14        A    Yes.

15        Q    Would you fill that in?

16        A    Yes.

17        Q    And when it says load number, what does

18   that mean?

19        A    One, two, three, four, how many loads

20   you caught.

21        Q    In other words, how many trucks?

22        A    Yes.

23        Q    Truck loads?

24        A    Yes, what number load it was; first

25   load, second load, third load.

Feddiman - Brewer

1          Q     Okay, thank you, that helps me out.

2    The grower, also referred to sometimes as the

3    farmer --

4          A     I did.

5          Q     -- you fill that in?

6          A     Yes.

7          Q     Houses, can you tell me who would fill

8    in that information?

9          A     I did.

10         Q     And what information would you fill in

11   there?

12         A     House 1, house 2, house 3.

13         Q     So the houses on the farms are

14   numbered?

15         A     Yes.

16         Q     And would you fill out which house you

17   were catching?

18         A     Yes.

19         Q     Okay.  And it says time started, who

20   would fill that in?

21         A     I never did.

22         Q     You never did?

23         A     No.

24         Q     You mentioned keeping a record of

25   members of your crew and how many birds they caught.

41

Feddiman - Brewer

1        A    Yes.

2        Q    Okay, that's not this document?

3        A    No.

4        Q    That's another document?  All right.

5    So you did not fill out time started?

6        A    No.

7        Q    How about time finished?

8        A    No.

9        Q    Truck, who would fill that out?

10       A    I think Larry and them hadn't been too

11   long started filling out all this.

12       Q    That's okay, I'm just interested in

13   that nine-month period that you were a crew leader.

14       A    Yes.

15       Q    That's all.  And you're telling me that

16   during the period of time that you were a crew

17   leader --

18       A    Yes.

19       Q    -- that you did not fill out time

20   started?

21       A    No.

22       Q    And you did not fill out time finished?

23       A    No.

24       Q    How about temperature?

25       A    No.

42

Feddiman - Brewer

1      Q      Truck?

2      A      Yes.

3      Q      What would you put in there?

4      A      Truck number.

5      Q      The number of the vehicle?

6      A      Yes.

7      Q      And when we talk about the number of

8  the vehicle, we're not talking about a license plate?

9      A      No.

10      Q      Okay.  And how about trailer?

11      A      Trailer number.

12      Q      Same thing with the trailer number?

13  How about driver?

14      A      Driver's name.

15      Q      Okay, would you fill that in?

16      A      Yes.

17      Q      Number of doors?

18      A      Yes.

19      Q      Yes what, you would fill that in?

20      A      Yes.

21      Q      Okay.  And then it would be the number

22  and then it says times per door?

23      A      Yes, how many birds you put to a door.

24      Q      And then you would multiply number of

25  birds per door, and that would equal a set number?

Feddiman - Brewer

1          A    Yes.

2          Q    There is a line here that says total,

3    who would fill that in?

4          A    I don't know who, I guess whoever works

5    in the scales.

6          Q    Okay, so you wouldn't fill that in?

7          A    No.

8          Q    How about average weight, would you

9    fill that in?

10          A    No.

11          Q    Let's go down to the next part of it.

12    It says sign present, and there are two boxes, yes or

13    no; who would fill that information in?

14          A    Well, I wasn't -- I never did.  Every

15    once in a while, if it was a place that I felt needed

16    some work correction done, I would fill in these

17    blocks here.

18          Q    Okay, that's fair.  But let's talk

19    about the instances where you felt something needed to

20    be done.  So they're talking about the sign present,

21    if the sign was not present, you would --

22          A    Yes.

23          Q    -- you would fill this out?

24          A    Yes.

25          Q    All right.  How about the grower

44

Feddiman - Brewer

1   present?

2       A    I don't know, I never did have to fill

3   that out because most of the time the grower was

4   present.

5       Q    Okay.  But if the grower weren't

6   present, would you fill it out?

7       A    No.

8       O    Okay, so you wouldn't fill it out,

9   whether he was there or not?

10      A    No.

11      Q    Okay.  DAFs prior to catch.

12      A    No.

13      Q    DAF stands for what, sir, do you know?

14      A    I don't even know what it stands for.

15      O    If I suggested the number of chickens

16  that are dead at the farm?

17      A    Probably, yes.

18      Q    Okay, does that sound right?

19      A    Yes.

20      Q    And you would never fill that out?

21      A    No.

22      Q    How about a fire fan used, would you

23  fill that out?

24      A    Stop a minute please.

25      Q    Sure, sure.

FIRST STATE REPORTING SERVICE    (302) 424-4541
Pamela C. Washington, RPD
P.O. Box 99              Milford, Delaw.

A00650

Feddiman - Brewer

1       A    When I took the job as crew leader, I

2  was told the main things to fill out on here, and

3  these weren't none of them.

4       Q    Okay, well, we'll just go through them

5  and that way I can find out what you filled out.

6       A    Yes.

7       Q    So you would not check the DAF box?

8       A    No.

9       Q    The dead at farm prior to catch, you

10 would not check that?

11      A    No.

12      Q    Okay.  How about the next one, whether

13 a fire fan was used?

14      A    No.

15      Q    How about if the chickens were watered?

16      A    No.

17      Q    Feeders up?

18      A    No.

19      Q    Waters up?

20      A    No.

21      Q    Stoves up?

22      A    No.

23      Q    How about farm damage?

24      A    I would turn that into Doug Lynch.

25      Q    Would you check this box?

Feddiman - Brewer

1      A    I would tell him that myself.

2      Q    Would you fill in the box?

3      A    No.

4      Q    Okay, so when you arrived at a farm,

5  would you look around the farm to see if there was any

6  damage that was already there?

7      A    No.

8      Q    How would you know to tell Mr. Lynch

9  that there was damage at the farm?

10     A    Mose time, any damage was inside the

11  house.  If the forklift driver did anything, any

12  damage, I would turn that in.

13     Q    But you wouldn't fill this out?  When

14  you say turn it in, how would you turn it in?

15     A    I try to do it verbally.

16     Q    You would do it verbally, and would you

17  tell Mr. Lynch?

18     A    I would tell the grower first to call

19  it in.

20     Q    All right.  Now, how would you know

21  whether your forklift operator was the one who did the

22  damage?

23     A    Well, when you be doing something a

24  long time, you pretty well know.  After 20 years'

25  experience, I pretty well know what's done happen when

FIRST STATE REPORTING SERVICE    (302) 424-4541
Pamela C. Washington, RPR
P.O. Box 99        Milford, Delaware

A00652

47

Feddiman - Brewer

1      I get to the farm.

2             Q    So you can tell whether it was there

3      before you started or after --

4             A    Yes.

5             Q    -- just by looking at it?

6             A    Even if a pole is broke in the house,

7      we can tell whether we did it that day or whether it

8      was done before we got there.

9             Q    I don't have your experience; can you

10     tell me how you tell that?

11            A    Well, Mr. Lynch knows, it will have

12     spider webs and different things in it if its been

13     done before.

14            Q    When you say spider webs, you're

15     talking about webs made by spiders?  That's not a term

16     that's used in the industry; you mean a regular spider

17     web that would I know?

18            A    Dust, different things.

19            Q    So just by looking at the seam, you

20     could tell --

21            A    Yes.

22            Q    -- whether or not it was done recently

23     or whether it was done --

24            A    I can go in a chicken house and tell

25     just by looking around whether something was done

48

Feddiman - Brewer

1    prior.

2         Q    Okay, that's fine.  All I wanted to

3    know is how you could do that, but now you have helped

4    me out; thanks.

5              Going to the second part of the form on

6    the right-hand side, it says drive entrance accept or

7    unaccept, would you check these boxes?

8         A    No.

9         Q    The house entrances, acceptable or

10   unacceptable, would you check those?

11        A    No.

12        Q    And roads, loading area, would you

13   check any of that?

14        A    No.  I turn all this in to -- I would

15   mention it to Doug if something's -- I still do it

16   today, if something's out of the way, I'll turn it in

17   and tell -- talk to him about it.

18        Q    So if the entrance to a particular farm

19   isn't satisfactory -- I'll use that form -- in your

20   view, would you tell Mr. Lynch, "You've got to do

21   something about that, the road coming in here is bumpy

22   or not wide enough," or something like that?

23        A    Well, I was blessed when I was running

24   the crew, I very seldom got to farms that needed all

25   these attentions.  But right now I don't have to do it

FIRST STATE REPORTING SERVICE    (302) 424-4541
Pamela C. Washington, RPR
P.O. Box 99              Milford, Delaw.

A00654

Feddiman - Brewer

1  because Larry takes care of it.

2          Q    Right, I understand that.  But that was

3  your responsibility when you were a crew leader, to do

4  that?

5          A    Yes.

6          Q    And you handled that by verbally

7  telling Mr. Lynch as opposed to checking the boxes, is

8  what I'm getting from what your testimony is?

9          A    Yes.

10          Q    Okay, that's fine, thanks.  All right.

11  I think you told me that when you became a crew

12  leader, you already had a crew, it was a hundred

13  percent staffed when you took it?

14          A    No, I didn't have no crew.  Oh, yeah, I

15  had a full crew.

16          Q    Right, okay, that's what I thought.

17  While you were a crew leader, did you ever send any of

18  your catchers over to help somebody out on another

19  crew who might have been short?

20          A    No.

21          Q    No?  Any of them ever send people,

22  catchers over to you because you were short?

23          A    Yes, I had them come to me, but the

24  crew I had didn't go to no one.

25          Q    All right.  So you had people come from

53

Feddiman - Brewer

1        Q      You never did that?

2        A      Charlie did it.

3        Q      Who is Charlie?

4        A      He was the lift driver.

5        Q      Okay.  And suppose the driver didn't

6   want to put the truck where Charlie said to put it?

7        A      I never had that problem when I was

8   running the crew.

9        Q      If that problem would have happened,

10  what would you do?

11       A      Then I would have told him where to put

12  it.

13       Q      Okay.  As a crew leader, again, this is

14  that short period of time that you were a crew leader,

15  did you have any obligations to make sure that your

16  catchers were doing things in a safe way?

17       A      Safety is always first with me.

18       Q      So that would have been a

19  responsibility that you would have had as a crew

20  leader, to make sure they're doing things in a safe

21  way?

22       A      Yes.

23       Q      Okay.  While you were a crew chief, a

24  crew leader, I should say, did any of your members of

25  your crew get hurt?

FIRST STATE REPORTING SERVICE      (302) 424-4541
                    Pamela C. Washington, RP
      P.O. Box 99              Milford, Delawa

Feddiman - Brewer

1          Q    We have a ritual of breaking about

2    every hour, and it's just about that time.  I have

3    these documents to go through that will probably take

4    a little time, so you want to take a few minutes now?

5                MR. MARTIN:  Sure.

6                (Whereupon, a short recess was taken.)

7    BY MR. BREWER:

8          Q    Mr. Feddiman, did you have any occasion

9    to interact or, let me put it this way, to talk to

10   anybody in accounting for any reason while you were a

11   crew leader?

12         A    In accounting?

13         Q    In accounting.

14         A    Yes.

15         Q    What would cause you to have to talk to

16   people in accounting?

17         A    We have to get a slip for the guys to

18   get money.

19         Q    When you say a slip for the guys to get

20   money, you mean somebody would want an advance on

21   their salary?

22         A    Something like an advance.

23         Q    And they would, what, come to you and

24   ask for that?

25         A    I had slips to fill out.

56

Feddiman - Brewer

1      Q      And would you take --

2      A      And Doug Lynch had to sign them.

3      Q      Okay.  Would you be able to go get the

4    money from accounting to give to the men who wanted

5    it?

6      A      Yes.

7      Q      And you would fill out a slip?

8      A      We had -- yeah.

9      Q      Okay.  Let me show you a document that

10   is going to be marked as Exhibit 1 to your deposition.

11           (Feddiman Exhibit 1, marked for

12   identification.)

13   BY MR. BREWER:

14     Q      Can you tell me what this is?

15     A      This is a slip for Roy Leonard's

16   vacation.

17     Q      And who is Mr. Leonard?

18     A      He was a catcher.

19     Q      Did he work on your crew?

20     A      Yes.

21     Q      And what is he asking for here?

22     A      He's asking for his money, he just

23   wanted his money, he wasn't going to take the days

24   off.

25     Q      All right, it says personal floating

FIRST STATE REPORTING SERVICE      (302) 424-4541
Pamela C. Washington, RPR
P.O. Box 99              Milford, Delaw.

A00658

Feddiman - Brewer

1    holiday/anniversary, he was looking for a day's pay?

2          A    I don't know if this is a day's pay or

3    a vacation.

4          Q    Okay.  But he's asking for --

5          A    Anyway, he just requested money only,

6    so I don't ...

7          Q    And when someone requests money only,

8    they want the pay for the time but they are also going

9    to continue to work, is that what that means?

10         A    Yes.

11         Q    And is that your signature where it

12    says supervisor's signature?

13         A    Yes.

14         Q    And the box isn't checked; did you

15    approve this or disapprove this, sir?

16         A    I approved it.

17         Q    Okay.  Next page is Mr. Leonard again,

18    and again he's requesting time off?

19         A    He's requesting money but he's working.

20         Q    Okay.  And is that your signature where

21    it says supervisor's signature?

22         A    Yes.

23         Q    Did you approve this or disapprove

24    this?

25         A    I approved it.

58

Feddiman - Brewer

1          Q     The next page, Mr. Leonard again, and

2     this time it looks like he's requesting vacation?

3          A     Yes.

4          Q     What I'm reading here, it says

5     date/dates requested, January 22nd, 2001 through

6     January 27, 2001, and then he wants all weeks' pay on

7     January 25, `01.

8          A     Yes.

9          Q     All right, so he wants the time off now

10    but he wants to get all his money for the pay on the

11    25th, if I'm understanding that correctly?

12         A     Yes.

13         Q     All right.  So he's going to take time

14    off now?

15         A     Well, he didn't take all the time off,

16    but he wanted all his money on that date.

17         Q     So he's not taking time off?

18         A     I don't remember whether he took off,

19    he didn't take all them weeks.

20         Q     Okay.

21         A     But he wanted -- he wanted his money at

22    that time.

23         Q     Okay.  Did he take some time off?

24         A     Yes.

25         Q     Okay.  And is that your signature where

FIRST STATE REPORTING SERVICE        (302) 424-4541
Pamela C. Washington, RPD
P.O. Box 99              Milford, Delaw.

A00660

Feddiman - Brewer

1    it says supervisor's signature?

2         A    Yes.

3         Q    And of course you checked the box

4    approved, okay.  Mr. Leonard again, requesting

5    vacation.  This might be a copy of the same -- it

6    appears to be a little different, but it's requesting

7    the same period of time?

8         A    Yes.

9         Q    Okay.  And it is the same date so it

10   appears to be a similar copy.  All right, let's go to

11   the next one with Mr. Leonard again, and he's

12   requesting again money only?

13        A    Yes.

14        Q    And it says supervisor's signature, is

15   that your signature?

16        A    Yes.

17        Q    Did you approve or disapprove of this,

18   sir?

19        A    Approved.

20        Q    Okay.  The next one is a Mason, is it

21   Tindley, T-i-n-d-l-e-y?

22        A    Yes.

23        Q    Who is Mr. Tindley?

24        A    He's a catcher.

25        Q    And was he on your crew?

60

Feddiman - Brewer

```
1           A     Yes.

2           Q     What is Mr. Tindley requesting?

3           A     He wants money only, a day off, too.

4           Q     Okay.  And is that your signature?

5           A     Yes.

6           Q     Did you approve or disapprove this,

7    sir?

8           A     Approved.

9           Q     The next sheet is Mr. Tindley again,

10   and what is he requesting here?

11          A     Money and a day off.

12          Q     Okay.  And that's your signature?

13          A     Yes.

14          Q     Is this approved or disapproved?

15          A     Yes.

16          Q     It's approved?

17          A     Approved.

18          Q     Okay.  The next page is a William, can

19   you make out that last name for me?

20          A     Jarmon.

21          Q     Jarmon, J-a-r-m-o-n?

22          A     Yes.

23          Q     Who is Mr. Jarmon?

24          A     He's a catcher.

25          Q     And was he on your crew?
```

61

Feddiman - Brewer

```
 1          A    Yes.

 2          Q    Okay.  And he is asking for money only

 3   for a day off?

 4          A    Yes.

 5          Q    But he just wants money, he will work

 6   the day?

 7          A    Yes.

 8          Q    Is that your signature?

 9          A    Yes.

10          Q    Was this approved or disapproved?

11          A    It was approved.

12          Q    Okay.  Mr. Jarmon again, he's asking

13   vacation?

14          A    Yes.

15          Q    He wants the money only?

16          A    Yes.

17          Q    And your signature?  Is that your

18   signature there, sir?

19          A    Yes.

20          Q    And of course you approved this.

21   Richard Parker, do you know Mr. Parker?

22          A    Yes.

23          Q    Who is he?

24          A    He's one of my catchers.

25          Q    One your catchers?
```

62

Feddiman - Brewer

1          A    One of, yes.

2          Q    And Mr. Parker is requesting a week's

3    worth of vacation --

4          A    Yes.

5          Q    -- on the dates indicated here?

6          A    Yes.

7          Q    Is that your signature where it says

8    supervisor's signature?

9          A    Yes.

10         Q    And the boxes aren't checked, so did

11    you approve or disapprove of this?

12         A    Approved.

13         Q    The next page is Mr. Parker again, and

14    he's requesting a day off?

15         A    Yes.

16         Q    And he wants to take the day off?

17         A    Yes.

18         Q    Okay.  And is that your signature?

19         A    Yes.

20         Q    I don't see whether that was approved

21    or disapproved, can you tell me?

22         A    It was approved.

23         Q    Approved, all right.  Mr. Parker again,

24    he's requesting a day off but he wants money only?

25         A    Yes.

FIRST STATE REPORTING SERVICE      (302) 424-4541
                    Pamela C. Washington, ---
      P.O. Box 99              Milford, Del.


A00664

Feddiman - Brewer

| | | |
|---|---|---|
| 1 | Q | And is that your signature? |
| 2 | A | Yes. |
| 3 | Q | Did you approve or disapprove this? |
| 4 | A | Approved. |
| 5 | Q | And the last page is a Nathaniel White? |
| 6 | A | Yeah. |
| 7 | Q | Who is Mr. White? |
| 8 | A | He was one of the catchers. |
| 9 | Q | Was he in your crew? |
| 10 | A | Yes. |
| 11 | Q | And he's requesting money only for one |
| 12 | | day? |
| 13 | A | Yes. |
| 14 | Q | Is that your signature where it says |
| 15 | | supervisor's signature? |
| 16 | A | Yes. |
| 17 | Q | And you approved this, I see, okay. |

18        MR. MARTIN:  Can we go off the record

19 for a moment?

20        MR. BREWER:  Sure.

21        (Whereupon, there was a discussion held

22 off the record.)

23        (Whereupon, a luncheon recess was

24 taken.)

25        MR. MARTIN:  During our recess, we have

64

1   had an opportunity to review the record provided this

2   morning by Mountaire in the form of George Feddiman

3   Exhibit Number 1, plus we have gotten some other

4   verbal reports from Mountaire.

5          It appears that Mr. Feddiman stopped

6   working as a crew leader sometime of April of 2001.

7   If that is the case, then we submit that he would not

8   properly be a party plaintiff in this matter because

9   of the two-to-three-year look-back period.

10         As such, we would ask for the partial

11  dismissal of this matter, specifically dismissing

12  Mr. Feddiman as a party plaintiff, and we would ask

13  that the dismissal be without prejudice, subject to

14  Mr. Feddiman going back and finding any records to

15  show that the representations here this morning were

16  inaccurate.

17         And I have specifically asked

18  Mr. Feddiman that should he find any records to

19  suggest that he served as a crew leader any time after

20  June 18 of 2001, that he should contact me

21  immediately.

22         MR. BREWER:  That's an accurate

23  representation of our off-the-record discussions.  And

24  the defendant does not object to the dismissal without

25  prejudice of Mr. Feddiman at this time.

1          In the event additional documents are

2   presented which would change this matter, obviously we

3   would reserve the right to then reopen the deposition

4   and continue from where we left off.

5          MR. MARTIN:  If I may, since

6   Mr. Feddiman may now be in the status of a witness, I

7   would like to ask a few questions before concluding

8   his deposition today.

9          MR. BREWER:  Sure.

10  BY MR. MARTIN:

11         Q    Mr. Feddiman, as you know, you earlier

12  affirmed to tell the truth.  And we're going to

13  continue the deposition; this time, I'm going to be

14  asking you a few questions.  The same rules apply that

15  were given to you by Mr. Brewer.

16         Mr. Feddiman, were there any days when

17  you worked as a crew leader where you were not

18  compensated for working as a crew leader?

19         A    Sick day.

20         Q    A sick day?  Do you recall when that

21  was?

22         A    No, I don't recall the date.

23         Q    Can you tell us what happened on that

24  particular date?

25         A    Robert Morris picked up the help for

73

1    further.

2                MR. MARTIN:  Okay, that's the end of

3    the deposition.  Mr. Peddiman, you have the

4    opportunity to review the transcript and look for any

5    inaccuracies and alert us to any inaccuracies, or you

6    can waive your right to do that and trust the accuracy

7    of Miss Washington, our court reporter.  So that's up

8    to you at this point.

9                THE WITNESS:  I'll waive it.

10               MR. MARTIN:  You will waive it?

11               THE WITNESS:  Yes.

12               MR. MARTIN:  All right, sir, thank you

13   very much.

14               (Whereupon, presentation, reading, and

15   signature to the deposition were waived.)

16

17

18

19

20

21

22

23

24

25