28

```
                                                              COPY   1

 1            IN THE UNITED STATES DISTRICT COURT
                 IN AND FOR DISTRICT OF DELAWARE
 2

 3    WILLIE DAVIS, JR.,                )
      NATHANIEL BRIDDELL,               )
 4    GEORGE W. FEDDIMAN,               )
      JOSEPH GARRISON,                  )
 5    LARRY E. GIBBS,                   )
      ROY H. WALTERS,                   )
 6                                      )
      ALL SIMILARLY SITUATED CURRENT    )
 7    AND FORMER EMPLOYEES OF           )
      MOUNTAIRE FARMS, INC.,            )
 8    MOUNTAIRE FARMS OF DELMARVA,      )
      INC., and MOUNTAIRE FARMS OF      )
 9    DELAWARE, INC.,                   )
                     Plaintiffs,        )
10           -vs-                       )  C.A. No. 04-0414
                                        )
11    MOUNTAIRE FARMS, INC.,            )
      MOUNTAIRE FARMS OF                )
12    DELMARVA, INC., and               )
      MOUNTAIRE FARMS OF                )
13    DELAWARE, INC., all Delaware      )
      corporations,                     )
14                    Defendants.       )
                             - - - - - -
15           Deposition of PHILLIP OWEN, taken before
      Pamela C. Washington, Registered Professional Reporter
16    and Notary Public, at the law offices of Young,
      Conaway, Stargatt & Taylor, 110 West Pine Street,
17    Georgetown, DE, on February 1, 2005, beginning at 1:00
      p.m.
18
      APPEARANCES:
19         On behalf of the Plaintiffs:
              Margolis Edelstein
20            BY: JEFFREY K. MARTIN, ESQ.
              and  KERI L. WILLIAMS, ESQ.
21            1509 Gilpin Avenue
              Wilmington, Delaware 19806
22
           On behalf of the Defendants:
23            Shawe & Rosenthal
              BY: ARTHUR M. BREWER, ESQ.
24            20 South Charles Street
              Baltimore, Maryland  21201
25
```

FIRST STATE REPORTING SERVICE            (302)
                                  Pamela C. Washington, RPI
P.O. Box 99                       Milford, Delawa:

Owen - Martin

23

```
 1        Q    And what's he do in the remainder of
 2   the time?
 3        A    He's servicing and supporting the other
 4   locations that I mentioned, the feed mills,
 5   hatcheries, the plant, coming in on third shift to
 6   look at sanitation, conducting training, a number of
 7   different responsibilities.
 8        Q    Okay.  Let me go back to February of
 9   '04, a year ago, when you became aware through one
10   source or another that there may be a lawsuit from
11   crew leaders regarding overtime.  I think you told me
12   before that you had spoken with Doug Lynch about this
13   situation; do you recall what you spoke with Doug
14   about?
15        A    I do not recall specifically what I
16   talked about with Doug.
17        Q    Do you recall whether Doug had any
18   knowledge or information of this impending lawsuit?
19        A    I do not recall.  My sense, and there's
20   no -- sense is that he had heard the same things, but
21   nothing specific that I recall.
22        Q    Do you recall whether you became aware
23   of this potential action in early or late February of
24   '04?
25        A    I would say early, early '04.
```

Owen - Martin

24

```
 1         Q    Do you recall that I wrote you a letter
 2   at the end of February --
 3         A    Yes, sir.
 4         Q    -- advising you of the potential claim?
 5         A    Yes, sir.
 6         Q    So you had been aware sometime before
 7   that, maybe two or three weeks before you received
 8   that letter?
 9         A    Correct, yes.  Maybe as much as a
10   month, but not much longer than that.
11         Q    All right.  Now, let me take you back
12   to early to mid February of 2004.  As you became aware
13   of this potential of a claim, did you have any
14   concerns about such a claim?
15         A    Well, my concerns would be, number one,
16   that the employees had not used formal channels
17   available to them through the company to voice their
18   concern, that was a concern to me.  No one had come to
19   me or anyone that I knew specifically with these
20   concerns, that is a major concern for me.
21         Q    If someone had come to you, what would
22   you have done?
23         A    Well, I would have listened and asked
24   questions, and tried to get a handle on the nature of
25   the concerns, and then tried to find out if it was
```

```
 1  some coaching or guidance that occurs, but it's the
 2  crew leader's responsibility to maintain discipline
 3  and order in the work group.
 4       Q    Can a crew leader discipline a catcher
 5  without any intervention from either Doug Lynch or
 6  Dave Nuse?
 7       A    Yes.
 8       Q    In what sense?
 9       A    If they want to issue a -- if they want
10  to have an informal discussion about work performance,
11  they can do that.  If they want to issue a verbal
12  warning, they can do that.  If they want to issue a
13  formal warning, they can do that.  And hopefully with
14  a suspension, there is discussion with their boss or
15  with human resources before there's time off the job
16  for corrective action, but they can do that.
17       Q    They can do that unilaterally without
18  the intervention of Dave Nuse or Doug Lynch?
19       A    They can.
20       Q    In other words, before some type of
21  corrective action is taken, Dave Nuse or Doug Lynch
22  does not have to sign off on it?
23       A    No.
24       Q    They do not?
25       A    I wouldn't expect them to, either.
```

48

Owen - Martin

1     Q    Before being suspended, for example,
2  Dave or Doug would not have to sign off on that?
3     A    Not in my opinion. And let me give you
4  an example why that would be so, especially if it's an
5  off-shift kind of occurrence or incident that might
6  happen, I would expect the crew leader to take the
7  initiative to send the employee home if it was
8  something, you know, egregious.
9          For instance, getting in a fight with
10 another employee, the crew leader might say, "I want
11 you to go home and then we'll come back tomorrow and
12 talk about it." And that would be certainly something
13 I'd expect the crew leader to do without talking with
14 Dave or Doug. Or in the case that they couldn't get
15 ahold of Dave or Doug, I would expect them to take
16 that step.
17    Q    Can a forklift operator or a truck
18 driver recommend hiring another employee?
19    A    Absolutely, he would say to the crew
20 leader.
21    Q    So it's your understanding that that
22 all has to go through the crew leader?
23    A    Yes.
24    Q    How about the grievance process, what
25 is your understanding, if any, as to the role of the

FIRST STATE REPORTING SERVICE    (302)
                          Pamela C. Washington, R.
P.O. Box 99              Milford, Delaw.

A00673

```
                                                            49
                        Owen - Martin
 1   crew leader in the grievance process?
 2       A    Well, the crew leader is the management
 3   representative to address informal or formal
 4   grievances.  They would be presented with grievances,
 5   they would investigate grievances, and they would
 6   provide answers to grievances at the first step.
 7       Q    When the grievance is filed, does it go
 8   through the crew leader?
 9       A    Yes.
10       Q    How so?
11       A    If the Union representative is unable
12   to work out the problem informally, he can formally
13   write up a grievance and present it to the crew
14   leader.
15            And it becomes the crew leader's
16   responsibilities to sign and accept and, you know,
17   process the homework behind the grievance, to write it
18   up, where did the problem come from, and insure that
19   Dave and/or Doug and possibly Al Z. or myself know
20   where this -- we don't get very many grievances, first
21   of all.  But they do go through the crew leader when
22   that occurs.
23       Q    You said Union representative, are you
24   talking about shop steward?
25       A    Yes.
```

```
                                                           63
                         Owen - Martin
```

1  for a difference in salary increase, that's all I
2  meant.
3          Q    All right.  If a catcher is not pulling
4  his weight, can a crew leader terminate him?
5          A    Yes.
6          Q    Have you had any experience where a
7  crew leader has terminated a catcher during your
8  watch?
9          A    Not during my watch.
10         Q    Do you know the last time a crew leader
11 terminated a catcher?
12         A    I do not know.  That would be before my
13 time.
14         Q    Now, you're aware of the allegation in
15 the complaint about the Mountaire vehicle that circled
16 the parking lot at the Doyle's restaurant?
17         A    Yes, sir.
18         Q    Was that your vehicle?
19         A    No, sir, it was not.
20         Q    Do you know of anyone who was driving
21 over there at the time of the meeting?
22         A    I do not.
23         Q    Do you have a Mountaire vehicle?
24         A    No, sir, I don't.
25         Q    Okay, does Mr. Lynch have a Mountaire

```
           FIRST STATE REPORTING SERVICE      (302)
                          Pamela C. Washington, 1
           P.O. Box 99              Milford, Dela
```

1  it?
2        A    Of the document, prior to its being
3  issued, so it must have been right about the start of
4  March or the end of February.
5        Q    Did you have anything to do with the
6  issuance of that document?
7        A    Yes, I did.
8        Q    And what did you do? What did you have
9  to do with it?
10       A    Discussed the need for this
11 circumstance with Al Z., Doug and Dave.
12       Q    All right, what do you mean by the need
13 for the circumstance?
14       A    Prior to my coming on board, there had
15 been a number of requests made to the crew leaders to
16 assure that the catchers were taking scheduled lunch,
17 30-minute lunch. And that derived in part due to a
18 previous lawsuit from catchers having to do with
19 taking lunch.
20            So in Al Z.'s visits and discussions
21 with Dave Nuse, there was no consistency in taking
22 lunch. And it had been talked about, there had been
23 documents issued, requesting each crew take 30-minute
24 lunch. And after a while, you get to the point where
25 you have talked and talked and talked and talked, and

FIRST STATE REPORTING SERVICE      (30
                    Pamela C. Washington,
P.O. Box 99         Milford, Del.

A00676

Owen - Martin

1    it was over a year probably, year-and-a-half, close to
2    two years that this had been under discussion, and
3    this was to make sure that everyone took a lunch, 30
4    minutes, to make sure it would happen.
5        Q    Now, the timing of that was late
6    February, early March --
7        A    Yes, sir.
8        Q    -- of '04 --
9        A    Yes, sir.
10       Q    -- right?  Did that have anything to do
11   with the fact that I called you and wrote to you in
12   late February of '04?
13       A    Had nothing whatsoever to do with your
14   telephone call, it was totally independent.
15       Q    That's captioned Final Warning, do you
16   see that?
17       A    Yes.
18       Q    Does that suggest that some other type
19   of warning was issued prior to that?
20       A    It suggests there were prior warnings,
21   yes.
22       Q    Are you aware of the prior warnings?
23       A    As of this date in March, I had seen
24   nothing in writing, had only heard of verbal warnings.
25   I have seen a document since then that puts it in

FIRST STATE REPORTING SERVICE        (302) ___-____
                    Pamela C. Washington, R
P.O. Box 99                    Milford, Delaw

Owen - Martin

67

```
 1  writing.
 2       Q    A document dated what?
 3       A    It's -- I'm not sure, not exactly sure
 4  of the date.  It might have been a year or two prior
 5  to this, but it was to reinforce the lawsuit
 6  settlement and the need to take lunches with all the
 7  catchers.
 8       Q    And to whom was that final warning
 9  issued?
10       A    This final warning is issued to the
11  crew leaders.
12       Q    Was it issued to all crew leaders?
13       A    Yes.
14       Q    Now, that particular one that you have
15  in front of you was issued to Larry Gibbs?
16       A    Correct.
17       Q    Did you have any reason to believe that
18  Larry Gibbs was not mandating a lunch time for the
19  catchers?
20       A    No.
21       Q    Did you have any reason to believe that
22  any of the crew leaders were not complying with this
23  requirement?
24       A    Let's see, could you tell me the
25  question again, please?
```

FIRST STATE REPORTING SERVICE        (30;
                Pamela C. Washington,
P.O. Box 99           Milford, Dela......

Owen - Martin

```
 1  was one or six, did you mean one crew leader --
 2       A    One crew leader --
 3       Q    -- or six crew leaders?
 4       A    -- or six crew leaders, yes; I didn't
 5  have that specific knowledge.
 6       Q    Who had that specific knowledge?
 7       A    I would say Al Z. and Dave Nuse.
 8       Q    But Al Z. reported to you, did he not?
 9       A    Yes.
10       Q    Why would you authorize that final
11  warning to somebody who was not violating this?
12       A    I don't know that he wasn't; I don't
13  know that he was.  But in order to be consistent,
14  sometimes you invite -- you communicate to the whole
15  crew, to a work group to make sure that everybody
16  knows they're on the same equal footing, so that we're
17  not accused of playing favorites or singling any
18  person out.  This is to try and be across the board
19  consistent.
20       Q    Now, you threatened the crew leaders
21  with termination, did you not?
22       A    I don't believe we would -- we
23  threatened with -- okay, this is not -- I don't know
24  if it's a threat, but it's a warning, yes.  It says,
25  "You will be terminated without further warnings."
```

FIRST STATE REPORTING SERVICE       (302)
                       Pamela C. Washington, RI
P.O. Box 99              Milford, Delawa

70

Owen - Martin

1      Q    And you're not sure whether that's a
2  threat?
3           MR. BREWER:  I'm going to object, the
4  document speaks for itself; his interpretation of it
5  is not relevant.
6  BY MR. MARTIN:
7      Q    You may answer.
8      A    The intent of the document is to make
9  very serious the requirement to have the lunches.  And
10 loss of one's employment is a serious situation.
11     Q    It's probable to believe that the crew
12 leaders receiving that would have felt that it was a
13 very serious situation?
14     A    If they weren't having lunches, they
15 might be concerned.  But those who were doing the
16 lunches, if there were crew leaders who did the lunch
17 situation, they didn't have a thing to worry about.
18     Q    So in other words, they could just tear
19 it up as if it never happened?
20     A    I don't know that I'd want to tear it
21 up per se.  But if I am, in my -- I'm the crew leader,
22 and I know that I'm having a daily scheduled 30-minute
23 lunch, this doesn't -- this is not a concern for me;
24 it's someone else's concern and it's not necessarily
25 mine because I'm already doing what I have been

FIRST STATE REPORTING SERVICE        (30
                Pamela C. Washington,
P.O. Box 99              Milford, Del

A00680

Owen - Martin
71

```
 1  requested to do.
 2       Q    And this was delivered to each of the
 3  crew leaders by Al Z.?
 4       A    Al Z. and Dave Nuse, yes.
 5       Q    Did they go together to deliver this?
 6       A    I'm not sure.
 7       Q    Did they go out to the farm to do that?
 8       A    I'm not sure; I believe so.
 9       Q    Well, at whose direction were they
10  acting?
11       A    Mine and Doug, in combination.
12       Q    You didn't give any specific direction
13  to what to do, how to relay the message?
14       A    Al and I discussed giving the warnings
15  out at the farm to the crew leaders, yes, it was to be
16  at the farm.
17       Q    And tell me about your discussion you
18  had.
19       A    I don't know that there were any
20  specifics, other than we have got to have people
21  taking lunch, it has been talked about for a long
22  period of time, and we had settled a lawsuit based on
23  the fact that people were going to have a paid lunch,
24  and it was -- it needed to be addressed. And it had
25  gone on for so long that it was a serious -- we saw it
```

FIRST STATE REPORTING SERVICE   (302)
Pamela C. Washington, R
P.O. Box 99          Milford, Delaw.

A00681

                                                                    72
                          Owen - Martin

1    as a very serious situation.
2         Q    Did you get any feedback from Al Z. or
3    Dave as to how the message was received?
4         A    Yes.
5         Q    And what was your feedback?
6         A    That everyone understood that they were
7    required to have the 30-minute lunch period for each
8    of their crews; there was no misunderstanding.
9         Q    No one reported feeling threatened by
10   the statement?
11        A    I didn't get that feedback.
12        Q    And when they delivered this message,
13   did they just hand this to the crew leader or did they
14   read this to them, if you know?
15        A    I do not know.  I would hope that there
16   was some discussion around the document prior to just
17   handing it out.
18        Q    How were you feeling about the crew
19   leaders at this time when this was handed out?
20        A    How was I feeling about them?
21        Q    Sure.
22             MR. BREWER:  I'm going object because I
23   don't understand that question or the relevance of it.
24             MR. MARTIN:  Well, relevance is
25   certainly not a sufficient objection, as you well