**29a**

Walters - Brewer

| | | |
|---|---|---|
| 1 | A | He was a catcher in my crew. |
| 2 | Q | All right.  He is also requesting a day |

3  off?

| | | |
|---|---|---|
| 4 | A | Yes. |
| 5 | Q | And is that your signature? |
| 6 | A | Yes. |
| 7 | Q | And the box isn't checked, did you |

8  approve that?

| | | |
|---|---|---|
| 9 | A | Yes. |
| 10 | Q | Okay.  Mr. Antonio Walters, is this |

11  your son we talked about earlier?

| | | |
|---|---|---|
| 12 | A | Yes. |
| 13 | Q | And he is requesting money only for a |

14  calendar day?

| | | |
|---|---|---|
| 15 | A | Yes. |
| 16 | Q | Is that your signature? |
| 17 | A | No. |
| 18 | Q | Okay.  Did you approve that he could |

19  get money only?

| | | |
|---|---|---|
| 20 | A | No. |
| 21 | Q | Mr. Steven -- |
| 22 | A | Abney. |
| 23 | Q | -- Abney, okay; do you know Mr. Abney? |
| 24 | A | Yes. |
| 25 | Q | How do you know him? |

81

Walters - Brewer

1          A     He was a catcher in my crew.

2          Q     And he's requesting a day off, but he

3     wants just the money?

4          A     Yes.

5          Q     Is that your signature?

6          A     Yes.

7          Q     And did you approve or disapprove of

8     this?

9          A     Approve.

10          Q     Mr. Abney again, requesting some

11     vacation but he only wants money?

12          A     Yes.

13          Q     And is that your signature?

14          A     Yes.

15          Q     And did you approve this or disapprove

16     it?

17          A     Approved.

18          Q     Mr. Abney again, requesting -- well,

19     whatever it is, he's just asking money, he's got

20     personal days and floating days and things like that

21     down there, is that your signature?

22          A     Yes.

23          Q     Did you approve this or disapprove it?

24          A     I approved it.

25          Q     Okay.  Keith Lofland, it appears?

Walters - Brewer

```
 1          A    Uh-huh.

 2          Q    Do you know Mr. Lofland?

 3          A    Yes.

 4          Q    How do you know him?

 5          A    He was a catcher in my crew.

 6          Q    He is requesting a floating holiday, is

 7   that your signature?

 8          A    Yes.

 9          Q    The box isn't checked; did you approve

10   that?

11          A    Yes, I approved it, yes.

12          Q    Thomas Majors, do you know Mr. Majors?

13          A    Yes.

14          Q    How do you know him?

15          A    He was a catcher in my crew.

16          Q    Okay, he's requesting vacation but he

17   only wants money?

18          A    Yes.

19          Q    And did you approve that?

20          A    Yes.

21          Q    That's your signature?  Mr. Majors

22   again requesting more money for an anniversary date

23   and a calendar day, I guess; is that your signature?

24          A    Yes.

25          Q    And did you approve this or disapprove
```

A00743

Walters - Brewer

```
 1   it?
 2           A     I approved it.
 3           Q     Mr. Majors again, he wants money only
 4   for it looks like the date of January 12th; is that
 5   your signature?
 6           A     Yes.
 7           Q     And did you approve this?
 8           A     Yes.
 9           Q     Thomas Majors again, he's requesting
10   full days for one week, is that your signature?
11           A     Yes.
12           Q     And did you approve this or disapprove?
13           A     I approved it.
14           Q     Thank you.  Daniel Miller, do you know
15   Mr. Miller?
16           A     Yes.
17           Q     How do you know him?
18           A     He was a catcher in my crew.
19           Q     And he's requesting a day's pay of
20   money only?
21           A     Yes.
22           Q     And is that your signature?
23           A     Yes.
24           Q     I see you approved that, is that
25   correct?
```

FIRST STATE REPORTING SERVICE          (302) 424-4541
                Pamela C. Washington, RPR
        P.O. Box 99                  Milford,

**A00744**

Walters - Brewer

1       A    Yes.

2       Q    Okay.  And Mr. Miller again, this looks

3   like the same copy of the one we just looked at.  Go

4   to Mr. Miller again, he's requesting a day's pay, an

5   additional day's pay, for money only, is that right?

6       A    Yes.

7       Q    Is that your signature approving this?

8       A    Yes.

9       Q    Mr. Miller again, is that your

10  signature?

11      A    No.

12      Q    He wanted money only, did you approve

13  or disapprove?

14      A    I didn't approve.

15      Q    You didn't approve?

16      A    No.

17      Q    It says approved, but that's not your

18  signature?

19      A    It's not my signature.

20      Q    So you knew nothing about this, all

21  right.  How about Sylvester Mitchell, is it?

22      A    Yes.

23      Q    Do you know Mr. Mitchell?

24      A    Yes.

25      Q    How do you know him?

Walters - Brewer

1      A     He was a catcher in my crew.

2      Q     And he wants five weeks, money only?

3      A     Yes.

4      Q     Is that your signature?

5      A     Yes.

6      Q     You approved that?

7      A     Yes.

8      Q     All right.  The next page, and this is

9   where they may become a little detached, I don't

10  know -- well, let's see what he has.  Should be a

11  Mr. Gregory Williams.

12     A     Yes.

13     Q     Do you know Mr. Williams?

14     A     Yes.

15     Q     And how do you know him?

16     A     He was a catcher in my crew.

17     Q     And he wants money only for a day?

18     A     Yes.

19     Q     And is that your signature approving

20  this?

21     A     Yes.

22     Q     William Young is the next one; do you

23  know Mr. Young?

24     A     Yes.

25     Q     How do you know him?

A00746

Walters - Brewer

```
 1          A    He was a catcher in my crew.

 2          Q    And he wants a week's worth of pay but

 3  doesn't want the time off, am I correct in that?

 4          A    Yes.

 5          Q    And is that your signature approving

 6  this?

 7          A    Yes.

 8          Q    I have Mr. Isaiah Daniels, we mentioned

 9  earlier?

10          A    Yes.

11          Q    He's a member of your crew, I believe?

12          A    Yes.

13          Q    He is asking for vacation from the 27th

14  of August, `04, through September 1, `04.

15          A    Yes.

16          Q    Is that your signature approving his

17  vacation?

18          A    Yes.

19          Q    The next one, the copy is a little

20  light, but it appears to be a Jasper Smith, do you

21  know Mr. Smith?

22          A    Yes.

23          Q    How do you know him?

24          A    He was a catcher in my crew.

25          Q    And he's requesting an extended period
```

Walters - Brewer

1    of time -- well, he's requesting I guess July 20th,

2    `04; can you make out the signature on the bottom of

3    that?  The copying is faint, I understand that.

4         A    I'm going to say yes, because of the

5    date.

6         Q    Did you approve this?

7         A    Yes.

8         Q    Leon Tucker, I believe we mentioned him

9    before, he's a member of your crew, isn't he?

10        A    Yes.

11        Q    And he wants a floating holiday off; is

12   that your signature approving his request?

13        A    Yes.

14        Q    And last, we have an Arthur Fosque, and

15   I think we mentioned his name before also?

16        A    Yes.

17        Q    He's a member of your crew, I believe,

18   right?

19        A    Yes.

20        Q    And he's also requesting a day off; is

21   that your signature approving it?

22        A    Yes, it is.

23        Q    Okay, thanks.  All right, now, let me

24   ask you this, Mr. Walters:  If an employee wants to

25   take a day off, one of your catchers, without pay,

A00748

89

Walters - Brewer

1      A     Yes.

2      Q     -- you didn't do that by yourself?

3      A     No.

4      Q     What did you do?

5      A     I signed these papers.

6      Q     You signed the papers?

7      A     I approved his vacation, I approved his

8  days off, but it all goes back to personnel whether he

9  gets it or not.

10     Q     Oh, do you know anybody who you

11 approved that they didn't get the time?

12     A     None that's came back to me, no.

13     Q     Okay, thank you.  So you sign the

14 approval and then it goes to the office?

15     A     Yes.

16     Q     That's the last you see of it?

17     A     Yes.

18     Q     And then if the guy doesn't show up, he

19 gets his vacation?

20     A     I assume.

21     Q     Well, you don't write him up, do you?

22     A     No.

23     Q     Okay.  And the reason you don't write

24 him up is because you approved he could have time off?

25     A     Yes.

A00749

Walters - Brewer

```
 1          Q     Right, okay.  Tell me what happens, if
 2   you know, if somebody on your crew gets hurt; what is
 3   your responsibility there?
 4          A     If someone on my crew gets hurt,
 5   according to how bad it is, I send him in to plant to
 6   the nurse.  If he has to go immediately, then I take
 7   him myself if possible, or I dial 911 and they go to
 8   the hospital or something, send him if it's a real bad
 9   case, for which I haven't had one.
10          Q     Well, that's good.  But that's what
11   would happen if somebody on the crew gets hurt, you
12   will either take a look at it and decide whether he's
13   going to go to the plant nurse --
14          A     Yes.
15          Q     -- or whether you will call 911?
16          A     Yes.
17          Q     Or try to take him someplace yourself
18   if you can?
19          A     Yes.
20          Q     Okay.  Do you report that injury to
21   anybody?
22          A     Yes.
23          Q     Who do you report it to?
24          A     I report it to my supervisor.
25          Q     Who is?
```

Walters - Brewer

1        A    Doug Lynch.

2        Q    Let's go back to that fellow who wanted

3    a day off, says, "I need next Thursday off, I don't

4    expect to get paid for it," and everything else, and

5    you tell the fellah it's okay.

6        A    Uh-huh.

7             MR. MARTIN:  Yes?

8             THE WITNESS:  Yes.

9    BY MR. BREWER:

10       Q    You do have to try to remember that.

11   Do you report that to anybody?

12       A    No.

13       Q    The forklift operator that is your son,

14   Antonio?

15       A    Yes.

16       Q    Is he the only forklift operator you

17   have had since you have been a crew leader?

18       A    No.

19       Q    Who was your forklift operator before

20   him?

21       A    Walt Brown.  Walter Brown.

22       Q    Oh, is that the Mr. Brown whose

23   signature we saw back here earlier?

24       A    Yes, yes.

25       Q    So he was the forklift operator?

Walters - Brewer

```
 1           Q     Just the training that you mentioned?
 2           A     Yes.
 3           Q     Did your son consider that to be a
 4   promotion?
 5           A     I couldn't relate to that one.
 6           Q     You couldn't relate to that?  I know,
 7   because you didn't --
 8           A     No.
 9           Q     All right, all right.  Let's take a
10   look at this would be Number 2, I guess, to
11   Mr. Walters' deposition.
12                 (Walters Exhibit 2, marked for
13   identification.)
14   BY MR. BREWER:
15           Q     Mr. Walters, this has been marked as
16   Exhibit 2 to your deposition, this is an employee
17   warning notice --
18           A     Uh-huh.
19           Q     -- to a Mr. Leon Tucker.
20           A     Yes.
21           Q     And I believe we have identified him as
22   being a member of your crew?
23           A     Yes.
24           Q     Do you recognize the writing on this
25   page?
```

Walters - Brewer

```
 1          A    Yes.

 2          Q    Whose writing is it?

 3          A    Mine.

 4          Q    Okay.  Company policy, this is your

 5   writing, it says "Call if not working"?

 6          A    Yes.

 7          Q    And we had just discussed something

 8   like this; he did not call and didn't show up for

 9   work, I see, is that correct?

10          A    That's correct.

11          Q    And you gave him three days off as a

12   final warning?

13          A    Yes.

14          Q    That's your signature?

15          A    Yes.

16          Q    Okay.  Mr. Richard Satchell, I believe

17   he's also one of the gentlemen we mentioned as being

18   on your crew --

19          A    Yes.

20          Q    -- as a catcher?

21          A    Yes.

22          Q    And again, the company policy, it says,

23   "Call if not working.  No time to find someone; call

24   late after 10 p.m." and the violation was he called in

25   too late?
```

Walters - Brewer

1      A    Yes.

2      Q    And you gave him one day off?

3      A    Yes.

4      Q    And is that your signature?

5      A    Yes.

6      Q    Mr. Leon Tucker, I think we have

7    already identified him as being a member of your crew?

8      A    Yes.

9      Q    Again, the writing on this document is

10   yours?

11     A    Yes.

12     Q    And this is his third violation?

13     A    Yes.

14     Q    And is that your signature?

15     A    Yes.

16     Q    Again, on company policy it says, "Call

17   supervisor if not working," that is your writing?

18     A    Yes.

19     Q    That means he should have called you?

20     A    Yes.

21     Q    The next one is an Edward Massey, I

22   don't know that we have mentioned his name; do you

23   know him?

24     A    Yes.

25     Q    How do you know him?

Walters - Brewer

```
 1              A     He was a catcher on my crew.

 2              Q     Okay.  And again it says, "Call

 3    supervisor if not working," is that your writing?

 4              A     Yes.

 5              Q     And the supervisor you're referring to

 6    is you?

 7              A     Yes.

 8              Q     This is his second violation?

 9              A     Yes.

10              Q     That's your signature?

11              A     Yes.

12              Q     And the date?

13              A     Yes.

14              Q     Okay.  Mr. Tucker, we have already

15    identified him and, again, the company policy violated

16    is "Notify supervisor if not working," that's you,

17    you're referring to?

18              A     Yes.

19              Q     And the violation, it says, "Did not

20    notify supervisor that he was not working," and,

21    again, the supervisor is you?

22              A     Yes.

23              Q     And he's given a day off --

24              A     Yes.

25              Q     -- by you?
```

Walters - Brewer

```
 1          A     Yes.

 2          Q     He signed this and you signed it?

 3          A     Yes.

 4          Q     Okay.  And the last one is a Bernie

 5    Johnson?

 6          A     Yes.

 7          Q     His name is not familiar to me; do you

 8    know him?

 9          A     Yes.

10          Q     How do you know him?

11          A     He was a catcher in my crew.

12          Q     Okay.  And the company policy, it says,

13    "Notify supervisor if not working."  That is you that

14    he should have notified?

15          A     Yes.

16          Q     And the violation is, "Said he was

17    driving to farm but did not show."  Okay, and he's

18    given an oral warning?

19          A     Yes.

20          Q     And then it says, "None taking at this

21    time," is that your writing?

22          A     Yes.

23          Q     And that's your signature on the

24    bottom?

25          A     Yes.
```

FIRST STATE REPORTING SERVICE        (302) 424-4541
              Pamela C. Washington, RPR
      P.O. Box 99            Milford,

A00756

Walters - Brewer

1    Q    And you can take however much -- I mean
2  whatever time it takes to get them done, you can do,
3  correct, you can take --
4    A    Once the orders are given, then the
5  company expect the chickens to be caught.
6    Q    That's correct, that's right.
7    A    So, time ...
8    Q    When you receive the work, the farms
9  that you're supposed to go to --
10   A    Yes.
11   Q    -- all right, you're supposed to get
12 that done --
13   A    Yes.
14   Q    -- that day?
15   A    Yes.
16   Q    Okay.  And if during the course of the
17 week that requires overtime to be worked by the
18 crew --
19   A    Yes.
20   Q    -- that's okay?
21   A    Yes.
22   Q    Okay.  And you can authorize that
23 yourself, can you not?
24   A    I don't understand authorize.
25   Q    All right.  You just go through your

Walters - Brewer

1          A    No, I don't.

2          Q    Okay.  If you did this, if you did what

3    you were supposed to do, what the contract says to do,

4    who would you have taken it up with?

5          A    Doug Lynch.

6          Q    Well, he's not foreman in charge of a

7    crew, is he?

8          A    No, you take it up with the foreman of

9    the live haul; live haul foreman, not the crew leader.

10         Q    Okay, that's what you think this says?

11         A    Yes.

12         Q    Okay, that's fine.  But you never did

13   that either, you just went right to the Union reps?

14         A    Yeah, I let him contact the company.

15         Q    Okay.  Let me show you what will be

16   marked as Exhibit 3, I guess.

17              (Walters Exhibit 3, marked for

18   identification.)

19   BY MR. BREWER:

20         Q    This document is a series of pages, and

21   they're all basically a receipt from petty cash, the

22   title of the document says Received of Petty Cash.

23   Take a look at the first one, I see it's a Mr. Thomas

24   Major.

25         A    Yes.

Walters - Brewer

1          Q     Is that the same Mr. Major who is a

2    catcher for you?

3          A     Yes.

4          Q     Okay.  And he's requesting that he be

5    given $200?

6          A     Yes.

7          Q     Is that your signature where it says

8    approved by?

9          A     Yes.

10         Q     So you approved that he could get $200

11   from petty cash?

12         A     Yes, yes.

13         Q     How does Mr. Major get the money?

14   What's the process that's followed?

15         A     Well, when there was a petty cash, this

16   slip here was taken to the petty cash I'm going to say

17   clerk, and she had the money.  He signed the slip, he

18   received the money.

19         Q     Did you ever get the money from petty

20   cash and give it to any members on your crew?

21         A     No.

22         Q     You never did that?

23         A     No.

24         Q     Okay.  By the way, when your people get

25   paid, when do they get paid?

A00759

Walters - Brewer

```
 1          A       Fridays.

 2          Q       Fridays?  Who gives them their

 3   paychecks?

 4          A       They're passed out the through the

 5   scale room.

 6          Q       Okay.  Do you pass out a paycheck at

 7   all?

 8          A       Yes, yes.

 9          Q       Okay.  And how often do you pass them

10   out?

11          A       Accordingly to when they are received.

12   Sometimes they're Friday morning and I'll pick the

13   checks up before I pick the help up so that they can

14   have a time before they go to work in order to cash

15   them.

16          Q       All right.  Other times, it's given out

17   at the scale house?

18          A       Generally.

19          Q       Okay, thank you.  So let's talk about

20   this Mr. Major.  He obviously has to come to you

21   because you're approving it; so Mr. Major would have

22   come to you and asked for you to approve a request for

23   him to get $200 from petty cash?

24          A       Yes.

25          Q       Would he have had this document, this
```

Walters - Brewer

```
 1   receipt, with him?

 2           A    No.

 3           Q    No?  Who had this receipt?

 4           A    We had -- we had books of petty cash

 5   slips.

 6           Q    So you as a crew leader had a book --

 7           A    Yes.

 8           Q    -- of receipts like this?

 9           A    Yes.

10           Q    So when he would have come to ask you

11   for this, is this writing all yours or is some of it

12   his?

13           A    The social security number, date, name,

14   my signature, and the $200.

15           Q    Okay, that's your writing?

16           A    Yes.

17           Q    So he would have come to you,

18   requesting $200 from petty cash; you would have had

19   the receipt, you would have filled it out and you

20   would have approved it?

21           A    Yes.

22           Q    Then would you have given the receipt

23   to him?

24           A    Yes.

25           Q    And then he's the one who took it to
```

Walters - Brewer

```
 1    wherever?

 2              A    Yes.

 3              Q    And do you know where wherever is, is

 4    that accounting or --

 5              A    I don't know the lady's name that was

 6    in the petty cash.

 7              Q    That's all right, that's fine.  Let's

 8    take a look at the next one, this is a Mr. Daniel

 9    Miller, do you know Mr. Miller?

10              A    Yes.

11              Q    How do you know him?

12              A    He was a catcher in my crew.

13              Q    And again, he's requesting $11?

14              A    Yes.

15              Q    Seems to be a rather small amount but,

16    nonetheless, would the same process have been

17    followed; he would have come to you, asked you for

18    $11?

19              A    Yes.

20              Q    You would have approved it, that is

21    your signature?

22              A    Yes.

23              Q    And he would have then gone to the

24    petty cash and received his money?

25              A    Yes.
```

FIRST STATE REPORTING SERVICE        (302) 424-4541
                    Pamela C. Washi:
        P.O. Box 99              Milforc           63

A00762

Walters - Brewer

1      Q     Take a look at the next one,

2  Mr. Harvey, William Harvey, do you know Mr. Harvey?

3      A     Yes.  Okay, yes.

4      Q     How do you know him?

5      A     He was a catcher in my crew.

6      Q     And this is occurring on the same day

7  as Mr. Miller?

8      A     Yes.

9      Q     And they both make a notation of short

10 hand pay, what does that mean?

11     A     They worked short handed, they worked

12 with six men instead of seven.

13     Q     Okay.  And they're requesting

14 additional pay because they did that?

15     A     It's not exactly additional pay.  It's

16 pay that is calculated for the amount of chickens that

17 was caught short handed.

18     Q     Okay.  Who did those calculations?

19     A     I did.

20     Q     And would you have notified Mr. Miller

21 and Mr. Harvey, for example, that they're entitled to

22 this $11?

23     A     Yes.

24     Q     Okay.  And so they wouldn't have come

25 then to you to ask for the $11; you would have known

Walters - Brewer

1    that they were entitled to this, done the arithmetic

2    to figure out how much, and filled this out and

3    approved it, gave it to them so they could get their

4    $11?

5              A    Yes.

6              Q    Okay.

7              A    Under company policy.

8              Q    Sure.  Isaiah Daniels, this is the same

9    day, and this is short handed pay, so what we just

10   described for the other two gentlemen applies here?

11             A    Yes.

12             Q    And Mr. Satchell, the same thing, short

13   handed pay on the same day?

14             A    Yes.

15             Q    Norman Manuel?

16             A    Yes.

17             Q    Do you know him, is he a member of your

18   crew?

19             A    Yes.

20             Q    And this is the same situation, short

21   handed pay?

22             A    Yes.

23             Q    And is it Coolridge Frazier?

24             A    Coolidge.

25             Q    Coolidge Frazier?

Walters - Brewer

```
 1          A    Yes.
 2          Q    And it's short handed pay on the same
 3   day?
 4          A    Yes.
 5          Q    So these people caught short, you did
 6   the arithmetic, did the slip, they went and got their
 7   money?
 8          A    Yes.
 9          Q    Let me just go off the record for a
10   minute to make a copy of something so everybody has
11   it.
12               (Whereupon, there was a discussion held
13   off the record.)
14               (Whereupon, a luncheon recess was
15   taken.)
16               MR. BREWER:  This would be Number 4.
17               (Walters Exhibit 4, marked for
18   identification.)
19   BY MR. BREWER:
20          Q    Mr. Walters, I'm showing you what's
21   been marked as Exhibit Number 4 to your deposition,
22   this is again a petty cash receipt.
23          A    Yes.
24          Q    Is that your signature on the bottom?
25          A    Yes.
```

FIRST STATE REPORTING SERVICE        (302) 424-4541
                     Pamela C. Washing
        P.O. Box 99              Milford,                    }

Walters - Brewer

1    these documents --

2              A    Yes.

3              Q    -- that you have kept to your attorney

4    so that he can in turn produce them to us.

5              A    Yes.

6              Q    Okay.  At any rate, for the week we

7    have in October, you started keeping these in January

8    of `05 -- I mean `04, I'm sorry?

9              A    Let's consider February.

10             Q    Let's consider February?

11             A    Yes.

12             Q    Would that have been the time that you

13   had a meeting with Mr. Martin and others?

14             A    No.

15             Q    It's before that meeting?

16             A    Yes.

17             Q    Okay.  Why did you start keeping --

18             A    Because of a comment that was made to

19   me when I came back to work.

20             Q    Comment that was made to you by whom?

21             A    By Doug Lynch.

22             Q    And what did Mr. Lynch say to you?

23             A    Mr. Lynch informed me of the situation

24   with Mr. Davis, and wanted to know if I was going to

25   go along with him on his suit.

Walters - Brewer

1    make sure that you can carry the chickens that you

2    supposed to carry on the trucks that you have to

3    receive.

4            Q    Right, okay.  I just have one more

5    question about these documents.  I have seen similar

6    documents from some of the other people who are part

7    of this lawsuit whose deposition I have taken --

8            A    Uh-huh.

9            Q    -- and their explanation for why the

10   first man pick up and the last man dropped off is

11   different from your's; you're sure that you did this

12   on your own?

13           A    Yes.

14           Q    Okay.  You didn't discuss it with

15   anybody else?

16           A    No.

17           Q    None of the other crew leaders?

18           A    No.

19           Q    Okay, that's fine.  Do you have a

20   general idea how much catchers make in the course of a

21   year, total amount of money, compensation?

22           A    No, I don't, sir.

23           Q    Do you know how they're paid?

24           A    Say that again please.

25           Q    Do you know how they're paid?

Walters - Brewer

1          A     Paid by Mountaire.

2          Q     No, how are they paid?  Are they paid

3   per chicken, per thousand?

4          A     They're paid per thousand.

5          Q     Per thousand?

6          A     Per thousand.

7          Q     And these people who work for you, you

8   have no idea really how much money they make at all?

9          A     No.

10         Q     Okay.  These time sheets that we just

11  went through, Exhibit 5, and the numbers that you had

12  on there, this is how the catchers in fact get paid,

13  don't they?

14         A     Yes.

15         Q     So you turn this in and that's how they

16  are paid?

17         A     No, it's a time sheet that's filled out

18  for each day.

19         Q     Well, that's what I'm talking about.

20  For example, on the first one you gave us bearing the

21  date of October 5 --

22         A     Okay.

23         Q     -- you have all the numbers, and the

24  numbers of the people who are on your crew, correct?

25         A     Yes.

133

Walters - Brewer

1        Q    So that's how the company knows how to

2   pay that crew, your crew, for catching this number of

3   birds this day?

4        A    That's correct, sir, yes.

5        Q    And they use this information that you

6   give to them --

7        A    From the time sheet, yes.

8        Q    -- to figure out how the catchers get

9   paid?

10       A    Yes.

11       Q    Right, okay.

12       MR. BREWER:  Lets go off the record a

13   minute.

14           (Whereupon, there was a discussion held

15   off the record.)

16           (Walters Exhibit 6, marked for

17   identification.)

18   BY MR. BREWER:

19       Q    Mr. Walters, please take a look at what

20   I had marked as Exhibit 6 to your deposition; do you

21   recognize this document?

22       A    Yes.

23       Q    Okay.  Go to the fifth page, and this

24   document is a performance evaluation self assessment,

25   is this your writing on this document?

Walters - Brewer

1        A     Yes, it is.

2        Q     Okay.  Let's go to page 2 of the self

3   assessment, and the first area was Commitment To

4   Quality, it says, "I have always been committed to

5   doing the best that Roy can do."

6        A     Yes.

7        Q     All right.  The second category, "Have

8   been able to communicate with customers to get the job

9   done."  Which customers are you referring to?

10       A     The farmers.

11       Q     The farmers.  So when we talked about

12  your interaction with the farmers, in addition to what

13  you told me before, what else would you be

14  communicating with the farmer?

15       A     According to the situations of where we

16  are, we sometimes has change of farm, change of

17  houses; we might be marked down to get house 1, the

18  farmer will come to me and say, "Well, Roy, we ran out

19  of feed in house 2, we'd like you to catch house 2

20  first," he done already called in the plant to notify

21  the plant for us to catch house 2, something like

22  that.

23            I have had farmers say that they had a

24  bad wet spot in the house, and to be on the lookout

25  for it, so I have communicated with him in order to

Walters - Brewer

1    get the job done.

2            Q    All right.  So when the farmer tells

3    you he's got a bad wet spot in the house, you thank

4    him for that, and instruct the crew how to go about

5    doing it so they can catch the chickens and stay out

6    of the wet spot as much as they can?

7            A    That's correct, yes.

8            Q    Okay, that's the kind of communication

9    you're talking about?

10           A    Yes.

11           Q    It says Planning, if I'm reading this,

12   it says, "Have been able to identify problems and

13   establish goals and priorities to accomplish results."

14   am I reading that correctly?

15           A    Yes.

16           Q    Tell me what you mean by that.

17           A    Just as it states.

18           Q    What problems did you identify, let me

19   ask it that way?

20           A    Wet houses, bad loading areas.

21           Q    Okay, what else?

22           A    Sick chickens.

23           Q    Sick chickens?

24           A    Yes.

25           Q    How do you know when they're sick?

Walters - Brewer

1      A      Generally you don't; the farmer knows,

2  he will tell you, if you can contact him.

3      Q      Okay.  So what other problems would you

4  identify when you wrote this?

5      A      Just general problems that happens

6  within the process of getting chickens.

7      Q      So whatever those problems were, then

8  it says here you establish goals and priorities to

9  accomplish results; what did you do to get around the

10  problems that you identified?

11      A      Just faced them forward.  Whatever the

12  problem was, you have to face them in order to get

13  around them.  Same way with being in a wet house; if

14  you start the house and you got half way the house and

15  it's wet, then you make the changes in order to get

16  around it.

17      Q      Okay.  So in other words, then, if I'm

18  using what you're telling me, you identify whatever

19  problems they were?

20      A      Yes.

21      Q      Some of which you identified, and I'm

22  sure there were some others, and whatever those

23  problems that you identified, you established goals

24  and priorities to get around to solve those problems?

25      A      Yes.

A00772

Walters - Brewer

1          Q     As the crew leader, that's what your

2    job was?

3          A     Yes.

4          Q     Okay.  Next one it talks about

5    initiative, and it says here, "My crew and I have made

6    some changes as we have to learn from our failures."

7    Okay, what do you mean by that, what was this

8    referring to?

9          A     Attitudes.

10          Q     Attitudes?

11          A     Yes.

12          Q     I'm not sure what that means.

13          A     Each man has an attitude, and each man

14    has to control his attitude in order to do the job.

15    And if two attitudes don't match, then you got a

16    confrontation.

17          Q     Okay.  So I don't mean to put words in

18    your mouth, were you having some morale problems on

19    your crew?

20          A     No, I don't.

21          Q     But you had people who had different

22    attitudes?

23          A     Yes.

24          Q     And it was interfering with getting the

25    job done?

Walters - Brewer

1    A    Yes.

2    Q    And you made changes, it says here?

3    A    Yes.

4    Q    What changes did you make?

5    A    We sat down and discuss them.

6    Q    Okay.

7    A    When we in the van, we sit down and we

8    talk about them.

9    Q    Give me an idea what you'd be talking

10   about.

11   A    How to get the job done efficiently in

12   order to keep a job with Mountaire.

13   Q    Okay.  But these were all related to

14   attitudes?  I mean I guess I don't want to testify for

15   you, I'm trying to understand what you're trying to

16   tell me here.

17   A    Mostly.  I'm going to say 80 percent.

18   Q    Okay.

19   A    80 percent, that's 80 percent of

20   dealing with it, you know.

21   Q    80 percent being the attitudes that you

22   were talking about?

23   A    Yes.

24   Q    Okay.

25   A    Yes.

Walters - Brewer

1          Q     Okay.  And were you working to get the

2     attitudes corrected so you can get the job done?

3          A     Yes.

4          Q     Now I notice you rated yourself a 2

5     here?

6          A     I am no different than anyone else.

7     Some people, you can talk to, to resolve situations,

8     and there's some that you can't.

9          Q     Okay.  And why are you giving yourself

10     a 2 as opposed to a higher number?

11          A     I had a problem with that myself.

12          Q     Okay, that explains it.  The next one

13     talks about, right here under Decision Making and

14     Problem Solving, "Have recognized problems and made

15     decisions to accomplish results."  What did you mean

16     when you wrote that?

17          A     Mostly the same thing.  The problems

18     that we have to encounter in order to do a job.  And

19     the decisions that we have made together, not just my

20     decision, but decisions that we have made as a crew,

21     not totally my decision as a crew leader, in order to

22     accomplish and get the results that we consider is

23     needed.

24          Q     You figure as a leader if you can bring

25     them along to your way of thinking or listen to what

Walters - Brewer

1    they have to say, that that's a good way to do things?

2            A    Up to a point.

3            Q    Right.  But I mean you're the final one

4    who makes the decisions as the crew leader?

5            A    I'm open for -- I'm open for

6    discussion.

7            Q    Sure.

8            A    You know, so, no, I'm not going to say

9    I make the final decision.  There has been men in my

10   crew that has made some good character references in

11   order to do the job, and I have took his word and done

12   it his way.

13           Q    And if you think that, that's what I'm

14   trying to get at, if somebody in your crew makes a

15   suggestion as how to get things done better, okay, you

16   can say, "Okay, we'll try that," is that what you're

17   basically telling me that's occurred?

18           A    Yes.

19           Q    There's nothing wrong with that, okay.

20   And that's what you mean that you have made the

21   decisions to accomplish the results?

22           A    Yes.

23           Q    That you made the decisions, okay.

24   Next area it says Business Success and Results, it

25   says, "I consider I have done these things as a crew

Walters - Brewer

1    leader." And under this, we have "Get things done.

2    Handle emergency situations.  Meets quality and safety

3    standards.  Operates within budget, improves margin."

4    And your comment here is that you thought you had done

5    these things.

6              Leadership and Influence is the next

7    category, it says, "My crew --" and I can't make out

8    the next word, and then it goes on, "understand what I

9    as a crew leader wants and we together have tried to

10   reach that goal."  So basically, let me ask the

11   question this way:  When you said that, what did you

12   mean?

13         A    The same thing I just said.

14         Q    So in other words, as the crew leader,

15   your crew understands what you wanted, and that you

16   worked together to try to reach that goal, you and the

17   crew were working together to try to reach the goal

18   because they understand what you want?

19         A    Yes.

20         Q    That's what you said, okay.

21   Communication, under this, there are four items that

22   are listed, one says "Listens attentively to others

23   and demonstrates understanding," and you basically say

24   you consider that you have done that as a crew leader,

25   am I right in that?

FIRST STATE REPORTING SERVICE      (302) 424-4541
                Pamela C. Washington, RPR
        P.O. Box 99            Milford, Delaware  19963

A00777

Walters - Brewer

1        A    Yes.

2        Q    "Is accessible and approachable," and

3 again you consider that you have done that as a crew

4 leader?

5        A    Yes.

6        Q    "Encourages others to express their

7 ideas and opinions," we just discussed that and,

8 again, you are telling us here that you consider that

9 you have done that?

10       A    Yes.

11       Q    And that you speak and write clearly

12 and efficiently -- I'm sorry, and effectively and is

13 constructive, and you think you have done that?

14       A    Yes.

15       Q    Team work, it says, "With some help

16 from supervisor, there have been some conflicts that

17 needed to be look at," what do you mean by that?

18       A    The attitudes.

19       Q    What we talked about before?

20       A    Yes.

21       Q    Okay.  Next one is Safety and

22 Environment, it says, "Safety has always been a number

23 one priority," what do you mean by that?

24       A    Safety.  You have old chicken farms

25 that has problems that has to be addressed before you

FIRST STATE REPORTING SERVICE   (302) 424-4541
Pamela C. Washington, RPR
P.O. Box 99      Milford      63

A00778

Walters - Brewer

1   catch the chickens or someone could get hurt.

2           Q    Because you're responsible for the

3   safety of your people?

4           A    Yes.

5           Q    And this is your number one priority?

6           A    Yes.

7           Q    And in fact, you give yourself a four

8   here?

9           A    Yes.

10          Q    On that, okay.  And in Development Plan

11  on page 4 of your self evaluation, you write, "I

12  wanted to have more team work with the mens in my

13  crew."  And Results Achieved, you say you have seen

14  some 30 to 40 percent change toward this plan; is that

15  a change to the better, I assume?

16          A    Yes.

17          Q    Okay.  So that you were successful in

18  getting those attitudes that you talked about

19  resolved?

20          A    Yes.

21          Q    The next item that's under that, you

22  write, "I want to focus on working the chickens for

23  improvement of DOAs as each farm is not the same,"

24  what do you mean by that?

25          A    If you were to go back to grower's

Walters - Brewer

1  responsibility.

2           Q    I'm sorry, growers, okay yes, okay,

3  fine.

4           A    Types of farms, catching methods,

5  daytime catching, nighttime catching, tunnel

6  ventilation, fans, fire fans, each farm is different

7  as it states here.  Some houses are 400 feet, some

8  houses are 5-; some houses are narrow, some houses are

9  walk-outs.

10          MR. MARTIN:  Let the record reflect

11  that Mr. Walters is referring to Joe Garrison Exhibit

12  Number 2.

13          MR. BREWER:  Okay, I understand that.

14  BY MR. BREWER:

15          Q    And what did you mean when you wrote

16  that you wanted to focus on working the chickens for

17  improvement in DOAs as each farm is different, what

18  did that mean, how did that relate to --

19          A    That mean that when we go to a

20  walk-out, the chickens have to be worked different,

21  they have to be penned up with pens; where you have a

22  tunnel house, a wide-span house, they don't have to

23  be.

24          Q    Okay.

25          A    There is a difference in the night and

Walters - Brewer

1    a difference in the day.

2         Q    Sure, all right.  And that's what you

3    wanted to do here?

4         A    Yes.

5         Q    Okay.  Looking ahead, the next item

6    down here says you want to make sure the job gets done

7    right, and that's your responsibility as a crew

8    leader?

9         A    Yes.

10         Q    And again, it says, "Helping to hire

11   good working mens that want to work," how were you

12   going to do that?

13         A    You lost me on that one.

14         Q    It's the last one on the document.

15         A    You want to know the truth?

16         Q    Yes.

17         A    I just wrote that in there to write

18   something.

19         Q    All right.  That's what we want, is the

20   truth.  Okay, fine.  Next, this is Exhibit Number 8 to

21   Mr. Garrison's deposition, Mr. Walters; have you seen

22   this document?

23         A    No.

24         Q    No, okay.  You became a crew leader in

25   2001 and this has got a 2000 date on it, so you have

147

Walters - Brewer

1    not catch chickens, no, not catch chickens.

2         Q    Let me just get the question so we're

3    all clear on this.  You became a crew leader in 2001?

4         A    Yes.

5         Q    Since being a crew leader in 2001, have

6    you caught chickens?

7         A    No.

8         Q    You have not.  How about operating a

9    forklift?

10        A    Yes.

11        Q    When you have operated the forklift,

12   have you received additional money in addition to what

13   you normally receive as a crew leader for doing that?

14        A    We were paid by the thousand.

15        Q    When you were paid by the thousand?

16        A    Yes.

17        Q    After you had been paid by -- that's

18   after this memo, because you became salaried in June

19   of `01?

20        A    Yes.

21        Q    Okay.  So you're saying to me that

22   while you were being paid by the thousand --

23        A    Yes.

24        Q    -- that when you operated the

25   forklift --

Walters - Brewer

1    as I recall, let me just see if my dates are correct,

2    you went into the hospital to have I believe it was a

3    knee replaced?

4            A    That's correct, yes.

5            Q    And I believe you left the company to

6    go in to have that procedure done on the 3rd of June

7    of 2003, does that sound right?

8            A    It should have been the 4th.

9            Q    Okay, so the 4th of June.  And that you

10   returned to the company on July 18th of `03?

11           A    Yes.

12           Q    During the time you were out, you

13   continued to receive your full salary, didn't you?

14           A    Yes.

15           Q    Okay.  Since you were a Union member

16   and a shop steward, if you were a forklift operator as

17   you had been for many years and a shop steward, you

18   would have got about 175 per week, wouldn't you have?

19           A    I couldn't answer that one.

20           Q    You don't know?

21           A    No.

22           Q    You say you're not familiar with the

23   benefits the Union people have?

24           A    No.

25           Q    You then went out again on the 9th of

153

Walters - Brewer

1    Q    You don't know the answer to that?

2    A    No.

3    Q    Well, is it no, you don't know the

4    answer; or no, it's not better?

5    A    No, I don't know that it's better.

6    Q    You don't know that it's better?

7    A    Yes.

8    Q    Okay.  How about life insurance, is

9    your life insurance better --

10   A    Yes.

11   Q    -- than the catchers --

12   A    Yes.

13   Q    -- and the hourly people?  How about

14   your dependent life coverage, is that better?

15   A    Yes.

16   Q    And vision care, is that better?

17   A    Yes.

18   Q    Okay.  And the catchers get paid every

19   week, don't they?

20   A    Yes.

21   Q    And the forklift operators?

22   A    Yes.

23   Q    And the drivers?

24   A    Yes.

25   Q    You get paid every two weeks, don't

154

Walters - Brewer

1   you?

2           A    Yes.

3           Q    Okay.  You also receive, do you not, an

4   allowance for use of your van?

5           A    Yes.

6           Q    And how often do you get that

7   allowance?

8           A    Every week.

9           Q    And that is over and above your salary

10  as a crew leader, isn't it?

11          A    It's not the same.  I receive a salary

12  check, I receive each week, expense check.

13          Q    And how much is that check that you

14  receive every week?

15          A    It's up now to 250.

16          Q    $250 per week?

17          A    Yes.

18          Q    For every week?

19          A    Yes.

20          Q    Including weeks that you're on

21  vacation?

22          A    Yes.

23          Q    Okay.  When you became a salaried crew

24  leader, you became eligible for bonuses, monthly and

25  annual bonuses?

A00785

Walters - Brewer

1          A    Yes.

2          Q    Okay.  You weren't eligible for those

3    bonuses when you were a forklift operator, were you?

4          A    No,

5          Q    And you didn't get any bonuses then,

6    did you?

7          A    No.

8          Q    A document again introduced into

9    Mr. Garrison's deposition as Exhibit 13 to his

10   deposition.  If we go to the top of the page for the

11   year 2001, which is the year that you became a crew

12   leader --

13         A    Yes.

14         Q    -- this document shows that you

15   received $319.54 for a December bonus, do you see

16   that?

17         A    Kind of, yeah.

18         Q    Kind of?

19         A    I need some specs here.

20              MR. MARTIN:  Do you need some --

21              THE WITNESS:  No, I'm pretty good here.

22   BY MR. BREWER:

23         Q    Believe me, I know that feeling all too

24   well.  There was no bonus in January, but there was

25   another $393.71 in February?  If you're having

Walters - Brewer

1   difficulty reading it --

2       A   No, I can read it.  Just recollecting.

3   I can't remember receiving this.

4       Q   Well, what the document shows, and

5   maybe we can move it quickly, it shows that in the

6   year 2001 when you became a crew chief, a crew leader,

7   you received a total of $1,690.45 in monthly bonuses,

8   does that sound about right to you?

9       A   I would have to look at my tax papers

10   to see, sir.

11       Q   Okay, that's fine.  In 2002, it shows

12   that you received $3968.05, correct?

13       A   That is what I'm seeing, yes.

14       Q   And it also shows you being on a leave

15   of absence from June of `02 through October of `02?

16       A   Yes.

17       Q   Let's go down to `03.  I see this

18   document shows that you received $1,303.75 in bonuses

19   for that year, does that sound about right to you?

20       A   Yes.

21       Q   Okay.  Go down to the last block on the

22   bottom of the document, please.  It totals up your

23   monthly bonuses for 2001 in which we have already seen

24   were $1,690.45, it also shows you getting an annual

25   bonus of 4,284.56.

FIRST STATE REPORTING SERVICE     (302) 424-4541
Pamela C. Washington, RPR
P.O. Box 99       Milford,

Walters - Brewer

1       A    Yes.

2       Q    Does that sound right to you, sir?

3       A    Yes.

4       Q    The next year in 2002, you didn't

5 receive an annual bonus?

6       A    That's correct.

7       Q    And you didn't get one in `03, either?

8       A    Correct, yes.

9       Q    Okay.  But you will note here that the

10 annual bonus for 2002 was not gotten by anybody?

11       A    Yes.

12       Q    Do you know how the annual bonus is

13 computed or figured out?

14       A    Not really, no.

15       Q    Okay.  If I suggest it is basically how

16 well the company did that year, does that sound right

17 to you?

18       A    Yes.

19       Q    Okay.  No one got it that year.  And in

20 2003, you didn't get one and do you know why that was?

21       A    No.

22       Q    Okay, because there are only two people

23 who did get one.  And then of course mid-year through

24 2004, it shows a bonus 175 which we have already seen,

25 I believe.  Okay.

Walters - Brewer

 1              This, sir, is Exhibit Number 14 to

 2    Mr. Garrison's deposition that I'm showing you; have

 3    you seen this before?

 4          A    Yes.

 5          Q    Okay.  And this is a management meeting

 6    and included crew leaders?

 7          A    Yes.

 8          Q    Did you go to that meeting, sir?

 9          A    Yes.

10          Q    Okay.  What was discussed then?

11          A    I cannot remember.

12          Q    Were there other crew leaders there?

13          A    I'm considering yes.

14              MR. BREWER:  Off the record.

15              (Whereupon, there was a discussion held

16    off the record.)

17    BY MR. BREWER:

18          Q    Mr. Walters, this is Exhibit 15 to

19    Mr. Garrison's deposition that I'm showing you.  The

20    first page is a 2003 Christmas dinner invitation list;

21    if you look under Mr. Lynch, is that your name --

22    let's see, where are you here?  Roy Walters, you're

23    not listed.  You didn't go to this one?

24          A    No.

25          Q    Why?

A00789

Walters - Brewer

```
 1          A     My name is not on there.
 2          Q     How about 2001?  Look at the last page.
 3   Sure, we know why you weren't there, right?
 4          A     Yes.
 5          Q     And why was that, just so the record is
 6   clear?
 7          A     I was terminated.
 8          Q     Right.  `01, were you there?
 9          A     Yes.
10          Q     Did you go to the Christmas dinner?
11          A     I only went to one; I can't remember
12   whether it was `1 or `2.
13          Q     Okay.  But the people who go to this
14   Christmas dinner, these are all salaried people?
15          A     I make that assumption, yes.
16          Q     You didn't see any catchers there, did
17   you --
18          A     No.
19          Q     -- people from your crew that got
20   invited?
21          A     No.
22          Q     No forklift operators --
23          A     No.
24          Q     -- or live haul drivers?
25          A     No.
```

FIRST STATE REPORTING SERVICE        (302) 424-4541
                    Pamela C. Washington, RPR
     P.O. Box 99              Milford, Delaware   19963

A00790

Walters - Brewer

1          Q     No, okay, all right.

2                MR. BREWER:  This is a good place to

3    break.

4                (Whereupon, a short recess was taken.)

5    BY MR. BREWER:

6          Q     I just have a few more questions, I

7    think, Mr. Walters, to try to get you out on time.  By

8    the way, I'm still just a little curious, in 2001 when

9    you became a crew leader --

10         A     Yes.

11         Q     -- you mentioned to me, before you went

12   on salary --

13         A     Yes.

14         Q     -- that period of time, you had

15   operated the forklift and got paid for doing it?

16         A     Yes.

17         Q     Okay.  Is it true, sir, that you might

18   have operated the forklift but not put your name down

19   on it but, instead, put your son's name down on it as

20   being the forklift operator?

21         A     Not at that time, no.

22         Q     But the other forklift operator?

23         A     Say that again.

24         Q     All right, what I'm saying is that you

25   operated the forklift but didn't put your name down as

FIRST STATE REPORTING SERVICE     (302) 424-4541
Pamela C. Washington. RPR
P.O. Box 99                Milford,

A00791

162

Walters - Brewer

1    sheet broken down for each day of the week."  Are the

2    time sheets that are being referred to here the time

3    sheets that you kept for the crew?

4          A    Yes.

5          Q    They were not time sheets that you were

6    required to keep for your hours, were they?

7          A    No.

8          Q    Let's go to paragraph 26, which is on

9    the next page.  And it talks about in essence here a

10   corporate policy or practice of making partial-day

11   deductions from your salary.  Since you have been on

12   salary, have you ever had your pay docked for taking

13   part of a day off?

14         A    No.

15         Q    Okay.

16         A    Never took a day off.

17         Q    Okay.  When you were off, though, on

18   disability, we had that information in there already.

19         A    Yes.

20         Q    So you have never needed to take a part

21   of a day off, like today when you need to leave at

22   3:15 to get your children?

23         A    I haven't got paid yet, don't know

24   whether I'm going to get docked or not.

25         Q    So this is then from the time you

Walters - Brewer

1    became a salaried crew leader until today, you have

2    never taken part of a day off?

3            A    No.

4            Q    Well, if you're not docked for today,

5    you wouldn't have been docked for a part of a day,

6    were you?

7            A    Yes.

8            Q    No, the answer is no, you wouldn't have

9    been docked part of the day?

10            A    Okay, okay, if you say that one.

11            Q    Well, I'm telling you when you get your

12    paycheck on Friday, you can certainly communicate with

13    Mr. Martin and let him know whether you have had part

14    of the day taken off.

15            A    Can't I call you?

16            Q    No, no, you can't.  Not now, anyway.

17    Maybe later.  Paragraph 27 talks about having your pay

18    reduced because of the quantity of work performed; has

19    your pay ever been docked, as far as you know, because

20    the quantity of your work wasn't up to par?

21            A    No.

22            Q    Okay.  You said you didn't take any

23    time off, so the last part of this charging time off

24    from normal working hours against vacation or sick

25    time, that's not happened to you?

164

Walters - Brewer

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Okay.  I think we already covered the |

fact that -- when it comes to your van, I gather you

operate a van?

| | | |
|---|---|---|
| 5 | A | Yes. |
| 6 | Q | Who bought the van? |
| 7 | A | I did. |
| 8 | Q | Okay, where did you buy it? |
| 9 | A | Mountaire. |
| 10 | Q | You bought it from Mountaire? |
| 11 | A | Yes. |
| 12 | Q | And when did you do that? |
| 13 | A | The day that they promoted me to crew |

leader, they made available to me a company van to do

the job.

| | | |
|---|---|---|
| 16 | Q | That you could -- |
| 17 | A | That I could purchase. |
| 18 | Q | That you could buy? |
| 19 | A | That I could purchase. |
| 20 | Q | Did you have to purchase that van? |
| 21 | A | Yes. |
| 22 | Q | You had to? |
| 23 | A | I couldn't do the job without it. |
| 24 | Q | Well, you could have bought a van |

someplace else, couldn't you?

A00794

Walters - Brewer

1        A    Sure, but not as cheap as the one they

2   sold me.

3        Q    Okay, but you could have?

4        A    Yes.

5        Q    Sure, all right.  And we have already

6   talked about this $250 check that you said you're

7   receiving, that's for compensation for use of your

8   vehicle?

9        A    Yes.

10       Q    Okay.  The next item which will be

11  Number 7, let me show you this.

12             (Walters Exhibit 7, marked for

13  identification.)

14  BY MR. BREWER:

15       Q    Have you seen this before, sir?

16       A    Yes.

17       Q    Okay.  I know the copy didn't come

18  through completely clear, but does that appear to be

19  your signature on the page?

20       A    Yes, it is.

21       Q    Okay.  Do you know why you received

22  this?

23       A    No.

24       Q    You don't?  Okay.  Were your people

25  consistently taking 30 minutes for lunch?

A00795

166

Walters - Brewer

1          A    Yes.

2          Q    I mean as a crew leader, you were

3   making sure they took their half-hour for lunch,

4   weren't you?

5          A    No.

6          Q    You weren't?

7          A    No.

8          Q    Okay.  But this is reminding you that

9   you must make sure --

10         A    Yes.

11         Q    -- that they take a half-hour unpaid

12  lunch?

13         A    Yes.

14         Q    Okay.  Go to paragraph 34 of the

15  complaint, please.  This paragraph says, "Furthermore,

16  when defendant learned of plaintiffs' intentions to

17  seek counsel, defendant immediately retaliated against

18  plaintiffs, threatening plaintiffs with termination if

19  they continued to pursue these issues with counsel."

20  Were you threatened with termination if you continued

21  to pursue this lawsuit?

22         A    No.

23         Q    Next paragraph it says, "Many of the

24  plaintiffs are receiving/have received verbal

25  harassment and/or issued final warnings before

Walters - Brewer

1    termination in an attempt to threaten plaintiffs or

2    intimidate them from filing this action."  Have you

3    been verbally harassed by anybody because of filing

4    this lawsuit, sir?

5            A    Was some comments made.

6            Q    By whom?

7            A    By Mr. Doug Lynch.

8            Q    And what comments did Mr. Lynch make to

9    you and where?

10           A    In his office, he wanted to know if I

11   was going to go along with Willie Davis within this

12   issue.

13           Q    Okay, when was that?

14           A    Approximately February of 2004.

15           Q    Was anybody else present?

16           A    No.

17           Q    And is that what Mr. Lynch said to you,

18   he was asking if you were going to go along with it?

19           A    Yes.

20           Q    And what did you respond?

21           A    I was just coming back from medical

22   leave, I didn't know anything about it.

23           Q    Is that what you told Mr. Lynch?

24           A    Yes.

25           Q    Okay.  Anything else said during that

Walters - Brewer

1  conversation?

2          A    Not that I know of at the time, no.

3          Q    Okay.  Outside of this conversation

4  with Mr. Lynch, were there any other conversations

5  about this being harassed?

6          A    No.

7          Q    So no one else had a conversation with

8  you about this?

9          A    No.

10          Q    Okay.  Do you consider the conversation

11  you had with Mr. Lynch for harassment?

12          A    No.

13          Q    Okay.  Go to paragraph 36.  This says,

14  "Many of the plaintiffs have been cornered by various

15  management personnel and questioned individually

16  regarding their discussions with counsel and the

17  nature of this action."  Have you been cornered by

18  anybody from management?

19          A    No.

20          Q    Outside of Mr. Lynch's question to you,

21  have you been questioned by anybody from management

22  about this lawsuit?

23          A    No.

24          Q    Okay.  The next paragraph is 37, it

25  talks about apparently a meeting between the

Walters - Brewer

1    plaintiffs and counsel, Mr. Martin on a Saturday

2    morning, and that plaintiffs recognized vehicle or

3    vehicles owned by the defendant upper management

4    personnel circling the parking lot of a diner; do you

5    know anything about that?

6            A    Yes.

7            Q    Okay, tell me what you know about that,

8    what did you see?

9            A    Just a vehicle from Mountaire.

10           Q    Who was driving it?

11           A    Could not recognize who was driving it.

12           Q    And what did you see?  What did this

13   vehicle from Mountaire do?

14           A    It circled the parking lot as we were

15   standing out.

16           Q    So it drove into the parking lot?

17           A    Yes.

18           Q    And then drove back out of the parking

19   lot?

20           A    Yes.

21           Q    And was that it?

22           A    Yes.

23           Q    Okay, you couldn't see who was driving?

24           A    No.

25           Q    Okay.  And the diner that is being

Walters - Martin

1  him?

2          A     Let me see now, I don't want to lie.

3          Q     Do you recall?

4          A     No.

5          Q     Do you recall who the identity was that

6  that person related to you?

7          A     No, I can't name position, position,

8  position.  The gentleman that is in charge of farm

9  problems, that's the best of my recollection at the

10  time.  That's -- the gentleman related back to me was

11  his position that he took care of things that go wrong

12  as far as live haul was concerned.

13          Q     All right.  Now, you're not referring

14  to Mr. Lynch?

15          A     No.

16          Q     And you're not referring to Mr. Owen?

17          A     No.

18          Q     Do you know whether this gentleman may

19  have worked for either one of these gentlemen?

20          A     Not that I can put a yes to.

21          Q     Okay.  All right.  Now, let me direct

22  your attention to Exhibit 7, if you could put that in

23  front of you again, please.  Please take a moment,

24  however much time you need, to read through that.

25          A     Uh-huh.  Yes, I understand it.

FIRST STATE REPORTING SERVICE        (302) 424-4541
                Pamela C. Washington, RPR
        P.O. Box 99              Milford, Delaware 19963

Walters - Brewer

```
 1   then the person driving the car probably wasn't

 2   working either, was he?

 3                  MR. MARTIN:  Objection.

 4                  THE WITNESS:  I wouldn't know the

 5   answer to that.

 6   BY MR. BREWER:

 7        Q    You wouldn't know the answer to that

 8   either?

 9        A    No.

10        Q    Okay.  Did you feel harassed by the

11   fact that this guy drove through the parking lot and

12   came out the other end?

13        A    Not personally, no.

14        Q    Okay.  And you're sure it was a

15   Mountaire car?

16        A    Yes.

17        Q    Let's go through the warning that you

18   got.  You're aware that the catchers filed a lawsuit

19   against the company, are you not?

20        A    Yes.

21        Q    Okay.  In fact, I met with you and a

22   number of other crew leaders about that, didn't I?

23        A    Yes.

24        Q    Sure.  And you know the reason that

25   they had filed the lawsuit was that they were working
```