**32**

COPY                    1

```
 1              IN THE UNITED STATES DISTRICT COURT
                IN AND FOR THE DISTRICT OF DELAWARE
 2

 3   WILLIE DAVIS, JR.               )
     NATHANIEL BRIDDELL,             )
 4   GEORGE W. FEDDIMAN,             )
     JOSEPH GARRISON,                )
 5   LARRY E. GIBBS,                 )
     ROY H. WALTERS,                 )
 6   ALL SIMILARLY-SITUATED CURRENT  )
     AND FORMER EMPLOYEES OF         )
 7   MOUNTAIRE FARMS, INC.,          )
     MOUNTAIRE FARMS OF DELMARVA,    )
 8   INC., and MOUNTAIRE FARMS OF    )
     DELAWARE, INC.,                 )
 9                 Plaintiffs,       )
        -vs-                         )   C.A. No. 04-0414
10                                   )
     MOUNTAIRE FARMS, INC.,          )
11   MOUNTAIRE FARMS OF              )
     DELMARVA, INC., and             )
12   MOUNTAIRE FARMS OF DELAWARE,    )
     INC., all Delaware corporations )
13                 Defendants.       )
                                - - - - - - -
14           Deposition of WILLIAM DOUGLAS LYNCH, taken
     before Pamela C. Washington, Registered Professional
15   Reporter and Notary Public, at the law offices of
     Young, Conaway, Stargatt & Taylor, 110 West Pine
16   Street, Georgetown, Delaware, on March 15, 2005,
     beginning at 11:30 a.m.  - - - - - - -
17

18   APPEARANCES:

19        On behalf of the Plaintiffs:
             Margolis Edelstein
20           BY:  JEFFREY K. MARTIN, ESQ.
             and  KERI WILLIAMS, ESQ.
21           1509 Gilpin AVenue
             Wilmington, Delaware 19806
22
          On behalf of the Defendant:
23           Shawe & Rosenthal
             BY:  ARTHUR M. BREWER, ESQ.
24           and  LAURA PIERSON SCHEINBERG, ESQ.
             20 South Charles Street
25           Baltimore, Maryland 21201
```

5

Lynch - Martin

1          A     Thank you.

2          Q     And I also remind you that over the

3    course of the lunch break or during the course of this

4    deposition, under Delaware rules any conversations you

5    have with counsel will be subject to examination later

6    on in the deposition --

7          A     Yes.

8          Q     -- okay?  Now, as I understand it, you

9    are employed by Mountaire, correct?

10         A     Yes.

11         Q     And how long have you been employed by

12   Mountaire?

13         A     18 years.

14         Q     What is your current job title?

15         A     Live haul manager.

16         Q     How long have you been live haul

17   manager?

18         A     Actually, since 1988.  So really I

19   guess it should have been 17 years.

20         Q     And that's when you joined the company?

21         A     Yes, June of 1988.

22         Q     All right.  And you joined as the live

23   haul manager?

24         A     Yes.

25         Q     Okay, and you continued in that

Lynch - Martin

```
 1          A     Could be, yes.

 2          Q     Okay.  In your position as live haul

 3   manager, do you directly supervise any individuals?

 4          A     Yes.

 5          Q     Who would they be?

 6          A     The assistant live haul manager, David

 7   Nuse.

 8          Q     Okay.  Anyone else?

 9          A     My administrative assistant, Susie

10   McColley.

11          Q     Okay.  And how long has she been your

12   administrative assistant?

13          A     10 years.

14          Q     Anyone else?

15          A     I have three dispatchers that report to

16   me the.

17          Q     Anyone else?

18          A     Basically truck drivers report to me,

19   it's approximately 16 of those guys.

20          Q     Do crew leaders report to you?

21          A     Not directly.

22          Q     To whom do the crew leaders report?

23          A     David Nuse.

24          Q     And to whom do you report?

25          A     Mr. Brown.  Everett Brown.
```

A00826

Lynch - Martin

1  lawsuit or a litigation, and asked him, you know, what

2  it was about, was there anything that we could talk

3  about, something we could, you know, deal with in the

4  company, deal with within the company.  What the basis

5  was for the lawsuit.

6          Q    Do you recall what his response was?

7          A    I believe he said for back pay.

8          Q    Did you make any suggestion that the

9  company could take care of that?

10          A    No, sir.

11          Q    No?

12          A    No.

13          Q    Did you make any suggestion as to

14  whether he should file a lawsuit?

15          A    No, sir.

16          Q    All right, it's 12:15, our agreed-upon

17  time; why don't we take some time for lunch and get

18  back and try to finish this up.

19               (Whereupon, a luncheon recess was

20  taken.)

21  BY MR. MARTIN:

22          Q    Mr. Lynch, we left off when I was

23  talking to you about the conversation that you had

24  with Mr. Garrison at a farm, and you recalled having

25  talked to him about the overtime issue, is that

Lynch - Martin

1  correct?

2          A    He didn't specifically mention

3  overtime.

4          Q    Okay.

5          A    I just asked him if he knew anything

6  about the lawsuit or what's going on, and he basically

7  said -- I said, "What's it concerning?"  And he said,

8  "It's back pay".  I said, "What do you mean by back

9  pay?"  He said, "Back pay".

10          Q    Can you give me an idea where the farm

11  was, where you were when you had this conversation?

12          A    It was on a farm, I don't recall which

13  farm, it was early morning.

14          Q    Okay.  Do you recall when you had this

15  conversation with him?

16          A    Not exactly, but it was probably

17  sometime in February, `04.

18          Q    Okay.  Now, you mentioned I think in

19  your testimony right before lunch that you had heard

20  some rumors about a pending lawsuit, is that correct?

21          A    Well, I really hadn't heard of any

22  rumors.  Actually, the first I heard of it actually I

23  believe was from Mr. Owens.

24          Q    And was that in February of `04 as

25  well?

Lynch - Martin

1    A    No.

2    Q    Who is it that drafted it?

3    A    It would be a guess, but I think it was

4  Al Z, Al Zlotorzynski.

5    Q    We'll just call him Al Z.

6    A    Yes.

7    Q    And what was his position at the time?

8    A    He was HR representative, HR manager.

9    Q    So he was not in your chain of command,

10 is that correct?

11    A    No, sir.

12    Q    Okay.  What involvement, if any, did

13 you have with regard to the issuance of that final

14 warning?

15    A    Probably had some phone conversation

16 between Al Z. and possibly Phil Owens, and just

17 stating what Al had actually found out at a farm or

18 talking with some catchers.

19    Q    What was it that Al found?

20    A    Well, Al visits the farm occasionally,

21 he likes to do it weekly with David Nuse.  And just

22 talking in general, generalities with the crews, you

23 know, how are things going or whatever, and somehow in

24 his conversation one of the guys, either a crew leader

25 or a catcher, and I'm not sure who, mentioned to him

Lynch - Martin

```
 1  that they weren't taking lunch.
 2         Q    Do you know whether this final warning
 3  was in any way prompted by the at this point rumors of
 4  a legal action by the crew leaders?
 5         A    No.
 6         Q    No, it was not related?
 7         A    No, it was not related.
 8         Q    Do you recall whether at the time this
 9  was issued, and it's dated 3-2-04, do you recall
10  whether there was any notice, formal notice, that
11  Mountaire had of any pending legal action?
12         A    I believe there was a formal notice
13  from you, late February.
14         Q    Is there any paperwork that might be
15  associated with this final warning?  And what I'm
16  referring to would be possibly a note from Al Z. upon
17  visiting farms and noting that there might have been a
18  problem with the lunch period for the catchers?
19         A    Not that I'm aware of.  It's all
20  verbal.
21         Q    It was all verbal, and the only thing
22  that you're aware of is this final warning that you
23  have just pointed to?
24         A    Yes.
25         Q    Okay.  You have heard testimony from
```

43

Lynch - Martin

1    various people, including Mr. Davis, this morning --

2             A    Yes.

3             Q    -- that he was at the Doyle's

4    restaurant and saw a vehicle that he identified to be

5    a Mountaire vehicle, circling the parking lot, is that

6    correct?

7             A    Yes.

8             Q    Do you know anything about this?

9             A    No.

10            Q    Do you know whether your vehicle was

11   used to circle the parking lot while the crew leaders

12   were meeting with their counsel?

13            A    My personal vehicle?

14            Q    Yes.

15            A    No, it wasn't.

16            Q    Okay.  Is your vehicle a take-home

17   vehicle?

18            A    Yes.

19            Q    What days of the week do you work?

20            A    Generally Monday through Friday.

21            Q    Do you work Saturdays?

22            A    When we work, yes.

23            Q    Only when, what, the plant is open?

24            A    Yes.

25            Q    And how often is the plant open?

44

Lynch - Martin

1    A    Approximately six to eight Saturdays
2    per year.
3    Q    And other than that, you would not work
4    Saturdays, correct?
5    A    Occasionally, I will.
6    Q    Okay.
7    A    Occasionally, I have some people doing
8    some work there on Saturdays, and I'll go down there
9    and see how things are going; not frequently, though.
10    Q    Did you have any knowledge that the
11    crew leaders were meeting at Doyle's restaurant?
12    A    No.
13    Q    Let me restate that in terms of the
14    timing, because obviously now you do have that
15    information --
16    A    Yes.
17    Q    -- having sat here at depositions.  But
18    back in the winter and spring of 2004, did you have
19    any knowledge that the crew leaders met at Doyle's
20    restaurant?
21    A    Not that I recall.
22    Q    Okay.  I'd like to stay on one
23    particular subject, but I want to try to bounce around
24    here and try to finish up as much as I can.  Let me
25    ask you about the vehicles that the crew leaders use

Lynch - Martin

1    for the performance of their work as crew leaders,

2    okay?

3           A    Yes.

4           Q    You're aware that each crew leader has

5    usually a van for that purpose --

6           A    Yes.

7           Q    -- correct?  And do you know how long

8    that has been the policy of Mountaire?

9           A    Ever since I have been there, over 17

10   years.

11          Q    If a crew leader is not working for a

12   week, let's assume for example that the crew leader is

13   taking vacation --

14          A    Okay.

15          Q    -- what happens to that van?

16          A    Generally, they leave the van there;

17   the individual that's taking his place uses his van.

18          Q    Is that company policy?

19          A    No, sir.

20          Q    It's not company policy?

21          A    No, sir.  It's voluntary.

22          Q    As I understand it, this van belongs to

23   the crew leader and the crew leader could take that

24   van on vacation?

25          A    That's correct.

FIRST STATE REPORTING SERVICE        (302)
Pamela C. Washington, RP
P.O. Box 99           Milford, Delawa__  _____

A00833

Lynch - Martin

```
 1          Q      And do you know whether that's ever
 2   happened?
 3          A      Not that I recall.
 4          Q      So I think I understand your answer,
 5   and please tell me if I am wrong, it's your
 6   understanding that when crew leaders do leave, they
 7   allow their vans to be used by the crew leaders who
 8   may be substituting for them?
 9          A      Yes.
10          Q      But there's no policy to that effect?
11          A      No.
12          Q      Nothing that requires the crew leaders
13   to leave their vans?
14          A      No.
15          Q      What was your understanding, if any, as
16   to how the crew leaders were paid up until June or
17   July of 2002?
18          A      They were paid on a piece rate, per
19   thousand rate.
20          Q      And had they been paid on this piece
21   rate per thousand from the time you started as the
22   live haul manager?
23          A      Yes.
24          Q      What is your understanding, if any, as
25   to the reason why that changed in June or July of
```

FIRST STATE REPORTING SERVICE        (302) ·
Pamela C. Washington, RPI
P.O. Box 99                Milford, Delaware  ₁₉₅₆₃

**A00834**

Lynch - Martin

1    2002?

2            A    I wasn't given a reason.

3            Q    So you were not part of the decision

4    process in terms of changing that?

5            A    No, sir.

6            Q    Do you know who in the company made

7    those decisions?

8            A    Probably at that time it was Mr. John

9    Wise.

10           Q    And what was his position?

11           A    He was the acting director of

12   processing operations.

13           Q    Why do you believe that Mr. Wise may

14   have been involved in this decision?

15           A    I'm not sure, but he came from North

16   Carolina, he was filling in after Mike Sebach left, I

17   talked about Mike Sebach earlier.  When Mike Sebach

18   left, Mr. Wise filled in, he was the acting processing

19   operations manager in North Carolina, came to

20   Selbyville.

21                And I can't verify this but I heard

22   rumors that there was a DOL audit, Department of Labor

23   audit, in North Carolina and it was a suggestion from

24   the DOL that crew leaders should be exempt employees,

25   and I assumed that he brought that with him.

Lynch - Martin

```
 1          Q     All right.  Was it your understanding

 2    that up until that time of the change-over that the

 3    crew leaders were non-exempt employees?

 4          A     I'm not sure how they were classified;

 5    they were supervising.

 6          Q     All right, let's talk about the duties

 7    of the crew leaders.  And let me try to understand if

 8    the duties and job responsibilities have changed any

 9    from the time before they were called exempt in June

10    or July of 2002 and current?

11          A     Job duties, have they changed?

12          Q     Yes.

13          A     No.

14          Q     You joined the company in 1988 as live

15    haul manager, is that correct?

16          A     Yes.

17          Q     Have there been any significant changes

18    in the job duties and responsibilities in the crew

19    leaders between 1988 and 2002?

20          A     No.

21          Q     Now, you mentioned a moment ago, I

22    think you said words to the effect that they

23    supervise --

24          A     That's what I consider them.

25          Q     -- is that correct?
```

Lynch - Martin

```
 1        A     Yes.

 2        Q     And what do you mean by that?

 3        A     Manage the crew, supervise the crew on

 4   the farm, make sure the job's getting done properly,

 5   efficiently.

 6        Q     All right, well, let's talk about some

 7   of the details that I'm sure you're familiar with

 8   after having sat through six depositions of the

 9   plaintiffs.  Do the crew leaders have the ability to

10   hire their crew?

11        A     Yes.

12        Q     All right.  And how is it that they can

13   hire the crew?

14        A     They do the recruiting, they bring

15   the -- they recruit catchers, they send them in to go

16   through the hiring process.

17        Q     Is there some type of a policy or

18   procedure with regard to the recruiting of catchers?

19        A     Just it's part of their job

20   description.

21        Q     It's part of their job description?

22        A     Yes; recruit, maintain a catching crew.

23   To me, that's their primary responsibility.

24        Q     Is what?

25        A     To maintain the catching crew, maintain
```

FIRST STATE REPORTING SERVICE        (302
                    Pamela C. Washington,
        P.O. Box 99        Milford, Delaware  19963

Lynch - Martin

1    and organize the catching crew, the group of people,

2    catchers.

3             Q    And so that means to you that if they

4    lost one or two, that the crew leaders are responsible

5    for hiring replacements?

6             A    Yes.

7             Q    And what is the process by which the

8    crew leader can hire somebody for his crew?

9             A    Like I said, he recruits the catcher,

10   in other words, either from talking to another crew

11   leader or talking to another crew leader from another

12   company, another catcher gets a suggestion from

13   another -- you know, someone's looking for a job, he

14   recruits those people.  And then he sends them in to

15   the processing plant to go through the hiring process,

16   which is generally drug testing, TB testing, medical

17   questionnaire.

18            Q    Just so that I'm clear on this, let's

19   say a crew leader like Roy Walters, for example, just

20   to give a real live example of a crew leader, was

21   going to lose a catcher; it's your testimony that it

22   would be Roy's responsibilities to find a replacement?

23            A    Yes.

24            Q    Okay.  Now, you have a human resources

25   group within the plant, do you not?

Lynch - Martin

1      A    Yes, we do.

2      Q    In fact, Mr. Owen, your colleague right

3   there, is in charge of that, correct?

4      A    Yes.

5      Q    Is it your testimony that Mr. Owen or

6   the company through Mr. Owen or somebody else does not

7   actually go out and advertise for catchers?

8      A    They do not.

9      Q    They do not?  Other than through the

10  crew leader, are there any other sources for

11  recruiting a catcher?

12     A    Not that I'm aware of.  We have just

13  never needed the human resources department to do

14  that.  Like I say, the crew leaders, they know all the

15  crew leaders from our company, they know all the crew

16  leaders from other companies, and its just always

17  been -- it's a verbal thing, communication, and they

18  have always been successful in recruiting someone; we

19  have not needed HR.

20     Q    Okay.  But other than HR --

21     A    Yes.

22     Q    -- do I understand correctly that you

23  don't have any sources for referral of these

24  prospective catchers other than through the crew

25  leaders themselves?

Lynch - Martin

1    A    That's all I'm aware of.

2    Q    Any idea today, as you're sitting here,

3    how many catchers you have under your control?  And I

4    realize that's not directly, but down through the

5    hierarchy, how many catchers are there currently?

6    A    There's probably about 56 catchers.

7    Q    Okay.  What kind of turn-over did you

8    have on catchers last year, if you can give us an

9    approximation?

10    A    I don't know.  Very minimal.

11    Q    Minimal?

12    A    I'd say pretty minimal, yes.

13    Q    Less than five?

14    A    That would be a guess.

15    Q    All right, well, I'd like you to

16    approximate as best you can, if you know.

17    A    I'd say five to ten.

18    Q    Okay.  Now, to what extent, if any, are

19    you personally involved in the selection of new

20    catchers?

21    A    I'm not.

22    Q    How about Dave Nuse?

23    A    He's not.

24    Q    Who is involved in the selection

25    process?

53

Lynch - Martin

1           A      The crew leader.

2           Q      All right.  You have testified that the

3    crew leader has the responsibilities of going and

4    recruiting a new or prospective person, correct?

5           A      Yes.

6           Q      And then I think I understood your

7    testimony that person is referred in to the plant or

8    the facility?

9           A      Yes.

10          Q      And then there is a process of drug

11   testing?

12          A      Yes.

13          Q      What other type of screening methods

14   are there?

15          A      TB, TB testing, drug testing, and I

16   think there's a pretty extensive medical questionnaire

17   they have to fill out and answer questions.  Besides

18   that, unless you're an immigrant, then there's just

19   the I-9 testing or the green cards or whatever.

20          Q      All right, what do you mean by I-9

21   testing?

22          A      Green cards; identification.  Valid

23   identification to be in the country.

24          Q      Producing the I-9?

25          A      Yes.

54

Lynch - Martin

1    Q    Okay.  Now, who is it in the plant that

2  coordinates the testing that you have just described,

3  the medical testing, the TB testing, the drug testing?

4    A    The medical facility.

5    Q    Okay.  Let's assume that this person

6  passed each of those the forms of screening.

7    A    Yes.

8    Q    What happens to the person at that

9  point?

10    A    They generally get hired.

11    Q    All right, and who makes that hiring

12  decision?

13    A    It happens in HR, I guess.

14    Q    I'm sorry?

15    A    HR.

16    Q    HR?

17    A    Human resources.

18    Q    Okay.  Is the crew leader involved in

19  that?

20    A    Well, he made the job offer, the job

21  bid.  That's just to the extent that he is, you know,

22  he's telling the medical facility and HR that he's

23  making a job offer to this employee and, providing

24  they pass all the testing, he wants them to be hired.

25    Q    And the job offer, so in other words,

Lynch - Martin

1   if the person was successful in the screenings that

2   you have indicated, that person would automatically

3   have the position?

4           A    Yes.

5           Q    All right.  Well, I don't understand

6   then the role of human resources.

7           A    Well, I say Mr. Owens doesn't usually

8   get involved.  What happens is those guys go to

9   medical, and they start with the medical

10  questionnaire, and then they do the TB testing, they

11  do the drug screen.  The employee's required to return

12  back in two days to read the TB test to see if it's

13  positive or negative.

14              If everything's okay in that point,

15  they're sent over to another desk, so to speak, which

16  is the human resources people, and they continue the

17  process of hiring, like making an ID, getting them

18  what they call signed up, signing up for their tax

19  withholdings, signing up for their union, if they are

20  in fact a union employee or going to be a union

21  employee.  That's the process.  Once they got their

22  ID, they're pretty much an employee and they start to

23  work.

24          Q    You have heard the testimony from

25  perhaps four to six of the plaintiffs who testified

57

Lynch - Martin

1      A      The only time I have any involvement

2  with a catcher being hired is if in fact a catcher

3  called me directly, which happens occasionally.  In

4  other words, a human resource person may have a

5  catcher call in that's looking for a job, they may

6  refer that call to me.

7      Q      Okay.  How often does that happen?

8      A      Not very often; once, twice a year,

9  perhaps.

10     Q      All right.  And then what's your

11 involvement at that point?

12     A      I'll talk to that individual on the

13 telephone, and he will ask me if we need any catchers.

14 And I'll say, "I'm not sure if we do or not, I'll talk

15 with my crew leaders and see if anyone needs any help.

16 if in fact they do, I'll have one of those guys call

17 you."

18     Q      Okay.  So you have no knowledge or

19 recollection of any times when a crew leader may have

20 recommended someone to be hired and they were not

21 hired if they passed their tests, is that correct?

22     A      There may have been an incident where a

23 crew leader corresponded with me, talked to me about

24 an individual that they wanted to hire that had worked

25 with the company before, and actually had been

1    terminated from the company.

2            Q       And are you recalling a specific

3    instance when you are testifying?

4            A       A specific individual.

5            Q       You are?

6            A       Yes.

7            Q       And who was that individual?

8            A       Name is Wardell Foreman.

9            Q       Okay, and he was on Mr. Walters' crew?

10           A       He may have been, I'm not sure what

11   crew.

12           Q       And what is it that you recall about

13   his --

14           A       He called me and said he -- you know,

15   Wardell had called him and wanted to come to work for

16   us as a catcher.

17           Q       And who was this that called you?

18           A       I'm thinking it -- I'm thinking it was

19   Roy, Roy Walters.

20           Q       Okay.

21           A       And I just suggested to him that, you

22   know, "this individual has worked here before and, you

23   know, we had a lot of problems with absenteeism of

24   this individual.  And, you know, I'm suggesting to you

25   that it's probably not in the best interest of the

Lynch - Martin

1  company to have him working here, but you make the

2  decision."

3           Q     So was Mr. Foreman hired or not?

4           A     No.

5           Q     But you left it to Mr. Walters to make

6  that ultimate decision?

7           A     Yes.

8           Q     Now, do the crew leaders have any

9  authority to terminate any of their catchers?

10          A     Yes.

11          Q     And what authority do they have?

12          A     They can terminate an individual.

13          Q     Okay.  Do you recall any instances in

14  the last three or four years where a crew leader has

15  terminated a catcher?

16          A     Yes.

17          Q     Okay, how many circumstances do you

18  recall?

19          A     Two.

20          Q     And who are the crew leaders?

21          A     Joe Garrison.

22          Q     And who was the catcher?

23          A     Clarence Heath.

24          Q     And was that Joe's decision to

25  terminate Mr. Heath?

60

Lynch - Martin

1    A    Yes.

2    Q    Did he have to clear that with anyone

3  else?

4    A    He went through human resources.

5    Q    Who is it that issued the termination

6  of Mr. Heath?

7    A    Joe went to human resources and said

8  that he wanted to terminate Clarence Heath; he

9  discussed it with Al Z; I'm assuming that Joe made the

10  decision.

11    Q    All right, you're assuming, but you

12  don't know for sure?

13    A    I don't know for sure.

14    Q    All right.  What was the other instance

15  of termination by a crew leader that you recall?

16    A    It's probably been more than three

17  years ago.

18    Q    Who was that?

19    A    Nathaniel Briddell was the crew leader.

20    Q    And who was the catcher?

21    A    Charles Hitchens.

22    Q    Can you give us some idea as to how

23  many years ago it was?  You think it was more than

24  three?

25    A    I think it was more than three.

Lynch - Martin

1      Q    Okay.  What do you recall of those

2  circumstances?

3      A    Just that Binkie -- that Nathaniel was

4  having issues with Charles Hitchens, I think it was

5  mostly absentee problems, it was a reoccurring

6  problem.  And he had done the progressive discipline

7  on the individual, the write-ups, oral, written, so

8  on, so forth, and he terminated the individual, and

9  the guy filed a grievance.

10     Q    Was he reinstated?

11     A    No, sir.

12     Q    Were you involved in that?

13     A    I went to the arbitration.

14     Q    All right.  But let me go back to the

15  initial termination; were you involved in that

16  termination?

17     A    No more than just having discussions

18  with Binkie.

19     Q    And what kind of discussions did you

20  have with Binkie?

21     A    He was just telling me the issues that

22  he was having with Charles, absenteeism, you know, go

23  to pick him up and he wouldn't be there, not showing

24  up for consecutive days.  And as we talked just, you

25  know, as we're talking, we're just suggesting, "Just

Lynch - Martin

1   make sure that we do our progressive discipline with

2   the individual."

3       Q    I'm sorry, that's what you said to him,

4   make sure --

5       A    Yeah.

6       Q    -- make sure the progressive --

7       A    Make sure we follow procedures.

8       Q    Okay.  And when it came to the decision

9   to actually terminate him, did you have discussions

10  with Binkie at that point as well?

11      A    He told me he was going to do it, he

12  said, "I'm sick of him, I'm going to let him go."

13      Q    And what did you say?

14      A    "Okay, as long as you follow the

15  procedures."

16      Q    Why do you think he spoke to you?

17      A    Just to let me know what's going on,

18  just communications.

19      Q    But you gave him the okay to fire him?

20          MR. BREWER:  Objection, that's not his

21  testimony.

22          THE WITNESS:  It's his decision, yes.

23  BY MR. MARTIN:

24      O    I know you can't say precisely when

25  this occurred, it was more than three years ago; do

63

Lynch - Martin

1    you know whether it was more than five years ago?

2          A    It could have been.  I'm not exactly

3    sure of the date.

4          Q    All right.  But as I understand your

5    testimony, Mr. Lynch, as you sit here today, you can

6    recall two instances where a crew leader may have

7    terminated a catcher within the last five years,

8    correct?

9          A    Yes.

10          O    Okay.  Let me ask you, over that period

11    of time, let's take a 15-year period of time, how many

12    catchers have been terminated by the company?

13          A    I don't know.

14          Q    More than the two that you have

15    described?

16          A    I don't know.  I don't know the number.

17          Q    You can't tell me whether there were

18    more than two?

19          A    Typically, we don't terminate a lot of

20    catchers; they usually quit.  We don't have a lot of

21    turn-over as far as terminations, they usually just

22    quit.

23          Q    Now, let's talk about that the

24    progressive discipline policy that you referred to

25    just a moment ago; this is company policy?

64

Lynch - Martin

1       A      Yes.

2       Q      Does it apply to jobs other than

3   catchers?

4       A      Yes.

5       Q      Is it fair to say that this progressive

6   discipline is part of the policy for all the people

7   who report to you down through the ranks?

8       A      Yes.

9       Q      Okay.  And as I understand it -- well,

10  maybe I should ask you.  How many steps are there?  Is

11  there a verbal warning and then a written warning?

12      A      Uh-huh.

13      Q      Yes?

14      A      Yes.

15      Q      You have to say yes or no, that's why

16  I'm asking you.  Are they the various steps, verbal

17  warning --

18      A      It's just about a two-to-three-step

19  process, the way I understand it.

20      Q      Good; could you just elaborate on that

21  first?

22      A      Oral warning, first written, second

23  written, and third written could be termination, the

24  way I understand it.

25      Q      Okay.

65

Lynch - Martin

1        A    Suspension or termination.

2        Q    Now, you have seen as part of the

3    deposition exhibits in the depositions of the

4    plaintiffs various instances of progressive

5    discipline, correct?

6        A    Yes.

7        Q    And I just want to understand what the

8    process is in terms of the write-up that is done.  The

9    write-up is given to let's say crew leader to catcher

10   in this instance, the crew leader has these forms

11   available to him to use?

12       A    Yes.

13       Q    Okay.  I mean these are specific

14   company forms that are used, correct?

15       A    Yes.

16       Q    Okay.  And the forms are filled out by

17   the crew leader, if the crew leader sees some type of

18   infraction, and then given to the catcher, correct?

19       A    Yes.

20       Q    Now, is there just one original, or is

21   this done by way of copies that are given to other

22   people?

23       A    There's usually a copy made.

24       Q    A copy made, and where is the copy

25   sent?

FIRST STATE REPORTING SERVICE       (302)
Pamela C. Washington, RP
P.O. Box 99              Milford, Delaware  19963

A00852

Lynch - Martin

1        A    Kept in a file.  Each crew leader has a

2  file with all of his catchers, any information about

3  his catchers in that particular file.  The catcher

4  should also get a copy of it.

5        Q    Okay, all right.  Now, it is initially

6  written by the crew leader, given to the catcher, and

7  there's the request to --

8        A    He should sign it.

9        Q    Who?

10       A    He should sign it.

11       Q    The crew leader?

12       A    No, the catcher.

13       Q    Should the crew leader sign it as well?

14       A    Yes.

15       Q    Okay.  And then what is done with that

16  document?

17       A    Like I said, the document is usually

18  copied and copies put in the file, the crew leader's

19  file.

20       Q    And when you say the crew leader's

21  file, you're talking about the file belonging to the

22  crew leader that's kept with the crew leader or at his

23  home?

24       A    No, it's a file that's kept in the

25  administrative assistant's office.

67

Lynch - Martin

1       Q    And when you say administrative

2    assistant, you're talking about Susie?

3       A    Yes.

4       Q    Okay.  So in that office, there is

5    presumably a file for each crew leader?

6       A    Yes.

7       Q    Is there also a file for each catcher?

8       A    No.

9       Q    Okay.  And when the forms are written

10   out, do they have to go to the -- we can call this the

11   plant, can we not?

12      A    Yes.

13      Q    Is that where the administrative

14   assistant is?

15      A    Yes.

16      Q    All right.  Does anyone else take a

17   look at that form when it's sent in to the plant?

18      A    Susie will, Susie McColley, she'll be

19   filing the form.

20      Q    Does the form require any further

21   signatures?

22      A    It should, it should go to human

23   resources, but it doesn't always.

24      Q    Why not?

25      A    Just doesn't.

FIRST STATE REPORTING SERVICE        (302)
                    Pamela C. Washington, RF
        P.O. Box 99            Milford, Delaware  19963

68

Lynch - Martin

1      Q     I'm sorry?

2      A     It just doesn't.  It just doesn't.

3      Q     But the form on it says that it should

4   go to human resources and then be signed?

5            MR. BREWER:  You have to answer yes or

6   no.

7            THE WITNESS:  Yes.

8   BY MR. MARTIN:

9      Q     Let me show you what has been marked as

10  Joe Garrison Exhibit Number 5.

11     A     Okay.

12     Q     You're familiar with that document?

13     A     Just from the depositions.

14     Q     Sure.

15     A     Yes.

16     Q     And that's the type of warning notice

17  that --

18     A     The crew leader --

19     Q     Right.

20     A     Yes.

21     Q     Now, you see on there, it's in both

22  English and Spanish, I think, it is circled in this

23  case second?  Segunda I think means second.

24     A     Yes.

25     Q     Who is it that circles first, second or

FIRST STATE REPORTING SERVICE        (302)
                Pamela C. Washington, RP
       P.O. Box 99              Milford, Delaware  19963

**A00855**

Lynch - Martin

1    Q    And this is an example of another form,

2    a company form, that is given to the crew leader for

3    use in this work, correct?

4    A    Yes.

5    Q    Okay.  And do I understand correctly

6    that the crew leader fills out the document,

7    requesting a certain amount of time off or money paid

8    in lieu of vacation time, is that correct?

9    A    Yes.

10    Q    All right.  And these forms, as I

11    understand it, are submitted to the plant, is that

12    right?

13    A    Yes.

14    Q    On the forms, there are signature lines

15    for the supervisor, the foreman, the superintendent,

16    and the plant manager, is that correct?

17    A    Yes.

18    Q    And is it the company policy to have

19    each of these individuals sign off on these forms upon

20    submission?

21    A    No.

22    Q    What is the policy or practice of

23    Mountaire in this regard?

24    A    In our department, the immediate

25    supervisor needs to sign off on it and that's all

Lynch - Martin

1   that's really required.

2           Q    Okay.  And who is the immediate

3   supervisor?

4           A    Crew leader.

5           Q    On the form that I'm looking at, under

6   supervisor it has foreman; in your department, who

7   would be considered the foreman?

8           A    I'm not sure we'd have one.

9           Q    How about superintendent?

10          A    Wouldn't have one.

11          Q    Plant manager?

12          A    No.

13          Q    You don't have a plant manager?

14          A    Well, we do; you said in my department.

15          Q    Right, okay.  I understand your

16   testimony that you only get the signature of the crew

17   leader on the vacation time, correct?

18          A    The immediate supervisor, yes.

19          Q    Okay.  And then as I understand, this

20   is given to the plant for some processing, is it not?

21          A    Yes.

22          Q    To whom is it given?

23          A    Generally, it goes to the

24   administrative assistant, live haul administrative

25   assistant again.

Lynch - Martin

1       Q    And what does she do with the form?

2       A    She may make a copy of it, again, and

3  put it in a file, the same crew leader file that the

4  disciplinary slips went in, and then she'll send it on

5  for processing.

6       Q    Does she ever sign in lieu of the crew

7  leader?

8       A    She may.  It may be a phone

9  conversation between those two.

10      Q    So you say she signs it, and then did

11  you say sends it for processing?

12      A    Yes.

13      Q    All right, and what do you mean by

14  that?

15      A    Typically she'll send it to the

16  accounts payable or the payroll, the payroll people.

17      Q    Okay.

18      A    And as of most recently, we have been

19  also sending -- they have been going through HR.

20      Q    All right, let's take the example that

21  a catcher asks for time off, and the person doesn't

22  have any time in the bank, so to speak.

23      A    Yes.

24      Q    But the crew leader does not know that;

25  have you ever had that situation?

Lynch - Martin

```
1        A    No, not that I'm aware of.

2        Q    Okay.

3        A    Generally what will happen is the crew

4   leader will call Susie, Susie keeps time records and

5   time off for all catchers.

6        Q    Okay.

7        A    We keep those time sheets in the

8   office, and they'll typically call in and ask her if

9   they have any time available.

10        Q    I see.  And then if time is available,

11   then it's a done deal, right?

12        A    It's a done deal.

13        Q    Okay.  So there really isn't any

14   decision process in this?

15        A    Well, yeah, I mean the crew leader has

16   to make a decision, he still has to keep his crew

17   staffed.  He can't, you know, give two or three people

18   off at once, or can't give a guy off if it's going to

19   make him be short-handed.

20        Q    Right.

21        A    Yeah, there's some decision making,

22   yes.

23        Q    But assuming the crew will be fully

24   staffed or will be staffed appropriately and the

25   catcher has time, then there's really no decision to
```

Lynch - Martin

1    be made, is that correct?

2            A    Well, the crew leader will, you know,

3    give him permission to take off; that's part of his

4    crew.

5            Q    Is it your testimony that the crew

6    leader has discretion to tell a catcher that he can

7    not take off, even if the crew is fully staffed?

8            A    He would have discretion, but he

9    wouldn't do that.

10           Q    Otherwise, he'd be subject to a

11   grievance, would he not be?

12           A    Perhaps.

13           Q    All right.  Let me ask you about

14   instances where a catcher needs a pay advancement;

15   there is a procedure in place for the pay advancement,

16   is there not?

17           A    No longer.

18           Q    No longer?

19           A    No.

20           Q    Okay.  When was that policy or

21   procedure changed?

22           A    I'm not sure.  More than two years ago,

23   I'd say.

24           Q    All right.  But for purposes of this

25   suit, during the times that are relevant, there were

Lynch - Martin

1    times when monies were requested by catchers, is that

2    correct?

3            A    Yes.

4            Q    And what I want to try to understand is

5    what discretion, if any, the crew leader had in

6    putting through such a request.

7            A    He had all the discretion; he filled

8    out the petty cash slip with the catcher's name,

9    Social Security number, signed it, and sent it to --

10   or took it to payroll.  Or possibly had the catcher go

11   to payroll with the petty cash slip with his signature

12   on it, authorizing the advance.

13           Q    Were there any limitations upon what

14   could be requested?

15           A    Yes, there were.

16           Q    And do you remember what the

17   limitations were?

18           A    No, I don't.

19           Q    Was it a certain dollar limitation or

20   certain number of days or --

21           A    Certain dollar, certain dollar amount.

22   Certain percentage of your weekly earnings, I don't

23   remember exactly what it was, no.

24           Q    We have gone I think about an hour by

25   my time, why don't we take a short break.  I'm sure

Lynch - Martin

1          A      Yes.

2          Q      Okay.

3          A      Well, I had initial conversation with

4     Phil when he called me on the phone and said he had

5     heard some rumors that there may be a possible

6     lawsuit, wanted to know if I had heard anything about

7     it. And I said no, I haven't.

8                 Shortly after that, I got on the phone

9     with Mr. Nuse, who's our field representative,

10    assistant live haul manager, and asked him if he had

11    heard anything about it. He said no, he had not. So

12    I asked him, I said, "Well, you know, I would like for

13    you to talk around and try to find out if we have some

14    issues and see if we can resolve those issues." He

15    said he would.

16         Q      I'm sorry, you asked Mr. Nuse to --

17         A      Talk around to the crew leaders, the

18    farm supervisors, to see if, you know, what's going on

19    or if there are other issues that need to be discussed

20    through management, through HR, whatever channels we

21    need to go through to address the issues, if there are

22    issues.

23         Q      And do you know whether he did this?

24         A      He did.

25         Q      Did he have any response to your

FIRST STATE REPORTING SERVICE        (302)
           Pamela C. Washington, R
P.O. Box 99                Milford, Delaw

A008G2

Lynch - Martin

1    request?

2         A    Mainly he came back and he wasn't

3    getting much response, seemed that most of the guys

4    didn't really know, or said they didn't know anything

5    about it, they weren't sure what what's going on.  He

6    couldn't really find out too much.

7         Q    Did you ask him to make any further

8    inquiries?

9         A    I asked him to continue to, you know,

10   keep talking and keep listening; if we have issues

11   with people, we need to address the issues.

12        Q    Did he come back with anything?

13        A    Not really.

14        Q    Not really is a no?

15        A    No.

16        Q    Okay.  How about you, did you make any

17   further inquiries?

18        A    I made a few, as I saw people.  You're

19   aware of the incident with Joe Garrison.  I also

20   talked with Roy Walters.

21        Q    All right, tell me about your

22   conversation with Roy Walters.

23        A    That basically happened in my office.

24   Actually, Roy was returning from knee surgery, and I

25   don't remember the exact date, I do remember him

81

Lynch - Martin

1  coming in my office and basically just asking -- or

2  told him that I had heard some rumors that there may

3  be some litigation, a lawsuit, "Do you know anything

4  about it?  Do you plan on being a part of it?"  And he

5  said he basically didn't know anything about it, he

6  was just returning.

7            Talked to Mr. Terry Morris, the same

8  type of questions, you know, "Have you heard anything

9  about the lawsuit?"  He said he heard a little bit, he

10  heard there might be some meetings going on, wasn't

11  sure when the meetings might be taking place.

12       Q    Terry was not sure when the meetings

13  were taking place?

14       A    At the time I talked -- first time I

15  talked to him, he wasn't.  He thought they were going

16  to be having some meetings.

17       Q    All right.  Anything else that first

18  time you talked to him?

19       A    And he pretty much said he was not

20  going to be a part of it.

21       Q    He was not going to be a part of it?

22       A    That's what he said.

23       Q    Did he tell you why?

24       A    No.

25       Q    Was there any reason that you're aware

Lynch - Martin

1  of that he would say he did not want to be a part of

2  it?

3          A     No.

4          Q     All right, I think you mentioned that

5  you talked to him a second time about this?

6          A     Probably sometime during this process.

7  We would talk, I don't know, one or two times a week;

8  I mean they always stop by my office.

9          Q     Who is they?

10         A     Crew leaders, crew leaders,

11 occasionally, not daily, just, you know,

12 spontaneously, periodically.  And of course I would

13 ask him still, you know, "Are there any issues that we

14 need to talk about?  What do you know?"  And he said

15 no, just that there's going to be a lawsuit and going

16 to have some meetings.

17         Q     Who told you there was going to be a

18 lawsuit and that there would be some meetings?

19         A     Terry, that's what he had heard.

20         Q     Okay.  And did Terry tell you where the

21 meetings were going to be?

22         A     No.

23         Q     Did Terry say he was going to attend?

24         A     Said that he just didn't plan to be a

25 part of the lawsuit.

Lynch - Martin

1       Q    Had Mountaire been part of any lawsuits

2   that you're aware of in the last 10 years?

3       A    Yes.

4       Q    Did they involve the catchers?

5       A    Yes.

6       Q    And what if anything changed as a

7   result of the litigation with the catchers?

8       A    They started receiving overtime pay for

9   over 40.

10      Q    Over 40 hours?

11      A    Started taking daily lunches.

12      Q    Did you have much turnover among

13  catchers during this litigation?

14      A    No.

15      Q    Were you aware of any type of

16  retaliation against any of the catchers as a result of

17  this litigation?

18      A    No.

19      Q    Are you aware of any retaliation

20  against any of the crew leaders based upon this

21  litigation?

22      A    No.

23      Q    This current litigation?

24      A    No.

25      Q    So would it be fair to say that most of

FIRST STATE REPORTING SERVICE    (302)
Pamela C. Washington, RP
P.O. Box 99          Milford, Delaware  19963

84

Lynch - Martin

1   the contact that you had with crew leaders after

2   learning of this proposed litigation was with Terry

3   Morris?

4           A    Mostly, and Francisco Serabia.

5           Q    What did Francisco tell you about this?

6           A    Pretty much the same thing, that he had

7   just heard that there was going to be a lawsuit and

8   there was going to be some meetings occurring; he

9   wasn't sure where the meetings were going to take

10  place; and that he wasn't -- he didn't want to be a

11  part of the lawsuit.

12          Q    Do you recall what month you had these

13  discussions with Mr. Serabia?

14          A    Late February, early March `04.

15          Q    All right, how many discussions did you

16  have with Mr. Serabia?

17          A    A few.

18          Q    Did you speak with any other crew

19  leaders?  About this, I should say.

20          A    Yeah, about that, yeah.  I talked about

21  Roy.  Not that I recall.

22          Q    Okay.  Now, what if anything did you do

23  within the office with regard to the crew leaders'

24  claims that were being made about overtime?

25          A    We had a meeting about it.

1    responsibilities of a crew leader?

2          A    Yes.

3          Q    All right, I'm going to ask you about,

4    as I said, a few, not all, of these categories because

5    I have some questions.  Let's go down to the first

6    managerial category, Describe work schedule, location,

7    rolling meeting; can you just tell me what you meant

8    by that category, please?

9          A    Well, the first part, describe work

10   schedule, each day when the crew leader picks up the

11   crew, some of the things that the crew want to know is

12   they want to know where they're going, what area, you

13   know, Crisfield, Pocomoke.  They want to know how many

14   birds they're catching.  They want to know what type

15   of house they're going to be catching in, whether it's

16   a single story, double -- or two story, whatever.

17         Q    By the way, all those items have been

18   already set by the company?

19         A    The guidelines?

20         Q    The company tells the crew leaders

21   where they're going on a particular day, right?

22         A    Yes.

23         Q    Okay.

24         A    Schedule.

25         Q    All right.

Lynch - Martin

1     A    They have a schedule, yes.

2     Q    All right, go ahead.

3     A    So that's kind of what we mean by

4   describing the work schedule, the crew leaders

5   answering those questions that are asked to him by the

6   crew.  Location, as I talked about.

7              Rolling meeting, all that actually

8   means is actually when they're in their van, it could

9   start occurring from the time he has all of his help

10  picked up, could happen at a store, it could happen

11  when they get to the farm, but basically the term

12  rolling meeting just means that they're actually

13  discussing issues while they're going to the farm;

14  again, you know, what they're going to be doing that

15  day, how many birds they're to be catching, what size

16  are the birds, what type house are we catching, just

17  discussing those issues, things that they want to

18  know.

19     Q    All right.  The next item, provide

20  performance updates.

21     A    Yes.

22     Q    What does that mean?

23     A    Each week, crew leaders are given a few

24  sheets of paper which have performance updates.  They

25  are on a bonus program as we have discussed before; on

Lynch - Martin

1  that bonus program, they have different categories
2  which include DOAs, which are dead on arrivals, farm
3  damage, the head count variances, efficiencies, each
4  week those numbers are compiled on each crew to let
5  them know how they're doing.
6          And they discuss those same issues with
7  their crew, either again during that rolling meeting
8  or it could be at a 5- or 10-minute point at the farm
9  during their lunch break, that's the performance
10  updates.
11          Q    Okay, numbers of birds dead, alive,
12  that type of thing?
13          A    Yes.
14          Q    Okay.
15          A    We like to have them all there alive
16  but, unfortunately, they don't all get there alive.
17          Q    Okay.  And by the way, the farm
18  damage --
19          A    Yes.
20          Q    -- if there's damage at the farm, what
21  is the crew leader supposed to do about that?
22          A    He's supposed to report it.
23          Q    Report it to whom?
24          A    Report it to the contract grower,
25  number one.  And then it should be on his farm ticket

Lynch - Martin

1   if there's any farm damage, it would be documented on

2   the farm ticket.  And he should also report it to Dave

3   Nuse.

4          Q    Okay.  And under what circumstances

5   does Dave Nuse take action?

6          A    It's his responsibility to visit the

7   farm and observe the damage, the extent of the damage,

8   make a determination of, you know, if we were at

9   fault, if we should be held accountable.

10         Q    Okay.  I'm going back to the crew

11  leader job analysis, the next item was provide

12  information, business communication; I'm wondering if

13  that differs at all from provide performance updates?

14         A    Not much, really.

15         Q    Okay.

16         A    It's pretty redundant.  Might be a

17  little bit more stuff, maybe, they might be discussing

18  an upcoming safety celebration or something.  Maybe

19  the state of the business; occasionally we get a state

20  of the business report, how the company itself is

21  doing, which would be passed on to the crew leader, he

22  can discuss that with his people.  But mostly it's

23  basically the same stuff.

24         Q    All right.  And then the next is

25  interact with grower?

FIRST STATE REPORTING SERVICE          (302)
                    Pamela C. Washington, RF
        P.O. Box 99              Milford, Delawa.. ...


                        A00871

Lynch - Martin

```
 1           A      Yes.

 2           Q      What type of interaction is required of

 3    the crew leader?

 4           A      That's probably one of his most

 5    important things that he should do on a farm.

 6    Basically when he goes on the farm, he should look

 7    that grower up and have discussions with the grower.

 8                  Normally, the grower is present and you

 9    will see the grower there; not always, and it depends

10    on the grower himself.  I mean certain growers, they

11    want you parking the trucks in certain places, they

12    don't want you obviously driving on their grass.

13                  Some of the growers don't want you

14    adjusting their equipment, you know, they want to do

15    all that stuff themselves.  Again, the loading areas,

16    again, any farm damage they might have definitely

17    needs -- the grower needs to know that we did that,

18    the contract grower.  Those kind of issues,

19    interacting with the grower.

20           Q      Okay.  Is there any type of discretion

21    that's involved in interaction with the grower?

22           A      Can you say that another way?

23           Q      Well, from listening to your response,

24    you said it was a matter of listening to what the

25    grower wants the company to do, make sure you don't
```

FIRST STATE REPORTING SERVICE        (30:
                  Pamela C. Washington,
        P.O. Box 99              Milford, Delaware _____

**A00872**

Lynch - Martin

1   drive over the grass, and do things in accordance with

2   what the grower wants --

3           A    Yes.

4           Q    -- is that right?  So I mean it's just

5   a matter of keeping the grower happy, I guess?

6           A    It's his property.

7           Q    Right.

8           A    We need to respect it.

9           Q    Okay.

10          A    But, you know, yes.

11          Q    All right.  Next, it's interact with

12  the live haul manager.  Now, I guess I'm a little

13  confused in looking at this list, a list that you

14  compiled along with Dave Nuse, correct?

15          A    Yes.

16          Q    I don't see on here where it says

17  interact with the assistant live haul manager; do you

18  see that?

19          A    No.  I think it's a typo.

20          Q    You think this is a typo?

21          A    Uh-huh, live haul management.

22          Q    Management rather than -- okay.  And

23  that means just keep you and Dave informed as to

24  what's going on, fill out your farm ticket, that type

25  of thing?

Lynch - Martin

1      A    Discussions, communications, any

2  issues, you know, you're having with your equipment,

3  you know, supplies, farm conditions.  How are the

4  farms, you know, were they wet?  How was the drive

5  area?  Yeah, communications, feedback to us so we can

6  feed that information back to the people that are

7  responsible for those areas.

8      Q    All right.  The next one I want to

9  focus on is assess type of house.

10     A    Yes.

11     Q    Plan load and the catch approach.

12     A    Yes, sir.

13     Q    First of all, let me understand that or

14 let me ask you, how many farms does Mountaire

15 currently have?

16     A    Over 300.

17     O    Okay.  And is there a lot of turnover

18 or fluctuation in the number of farms?

19     A    No.

20     Q    So isn't it fair to say that these

21 catchers and crew leaders have been to these farms

22 time and time again?

23     A    Well, not necessarily time and time

24 again but, yeah, they eventually will cycle around.

25 We have seven catching crews divided up between those

Lynch - Martin

1   300-plus farms so, yeah, I mean they'll see them, you

2   know, again.

3           Q     All right.

4           A     You know, it's not necessarily, you

5   know, numerous.

6           Q     All right.  But tell me what you mean

7   by assess the type of the house, plan load, catch

8   approach.

9           A     Well, when the crew leader pulls on the

10  farm, and he will know some of this information before

11  he gets to the farm if he's been to that farm before.

12  But if he hasn't, I mean we have several new farms

13  coming on board, too.

14              He makes a determination on what type

15  house we're going to be catching.  I mean we have

16  different types, we have what we call conventional

17  house, we have tunnel houses, A-frames, shed types,

18  all these are different type houses and he's --

19          Q     How many different type houses do you

20  have?

21          A     Four or five.

22          Q     Four or five?

23          A     What I call different, you know,

24  different in structure.

25          Q     Right.

FIRST STATE REPORTING SERVICE        (302)
                Pamela C. Washington, RP
        P.O. Box 99              Milford, Delaware   19903

A00875

Lynch - Martin

1       A    Which each one of those houses, you

2   have a different approach as far as the way you catch

3   those houses; they're not all caught the same.

4       Q    But let me just again ask maybe a dumb

5   question since I'm not a chicken catcher or a crew

6   leader.

7       A    Okay.

8       Q    At least as yet.  When you say assess

9   the house and the type of approach, do you catch all

10  A-frame houses the same?

11      A    No.

12      Q    Okay.

13      A    No.  Depends on if they have poles or

14  what they call clear span, no poles.  Clear span house

15  could be an A-type house but it would be caught

16  differently than a house that has poles in it or

17  posts.

18      Q    How many different methods are there of

19  catching houses?

20      A    Three or four.

21      Q    Okay.

22      A    What I would call different methods.

23      Q    I'm sorry?

24      A    Yeah.

25      Q    Different methods?

FIRST STATE REPORTING SERVICE        (302
                Pamela C. Washington,
    P.O. Box 99              Milford, Dela

**A00876**

Lynch - Martin

1          A      Yes.

2          Q      Okay.  Next one, assign/direct

3   responsibilities.

4          A      Yes.  Assign/direct responsibilities.

5          Q      What do you mean by that?

6          A      Well, each crew, each one of those

7   catchers and a lot of times it's a team, it's a team

8   thing, they have certain responsibilities.  When a

9   crew leader pulls on the farm, once they get out of

10  the van, they start getting their clothing on, their

11  boots, and their mask, and their gloves, and get all

12  that stuff together.

13                 Then he has a couple individuals, two

14  catchers, that will go to the forklift trailer, okay?

15  And their job duty is to get the pens, the curtains,

16  the fan, the forklift, get all that stuff unloaded.

17                 Then he will have another couple

18  catchers go to the house itself, get the big end door

19  open, make sure that the equipment is cranked up.  You

20  have two more catchers go to the far end of the house

21  and make sure to get the end door open so we can set

22  what we call the fire fan in the house to create a

23  wind tunnel through the house.

24                 So each one of these catchers, and most

25  time it's a team, it's a pair of guys, they have

FIRST STATE REPORTING SERVICE       (302)
                Pamela C. Washington, R
        P.O. Box 99              Milford, Delaw.

A00877

Lynch - Martin

1   assignments that they need to do, and he determines

2   who these guys are.

3         Q    So they normally keep the same

4   assignments or do they rotate?

5         A    It could do a rotation.  Generally it's

6   the same, but there could be a rotation; it's

7   different kind of within each group.

8         Q    Okay.

9         A    It's just to expedite the job, you

10  know, everybody knows what they're supposed to do.

11        Q    All right.  Next is direct and observe

12  work force; what's involved with the crew leader for

13  that?

14        A    Again, the direction is part of what I

15  just talked about, you know, giving them direction.

16  He's observing them in the chicken house continuously;

17  one thing for quality.  If the bird -- I mean when we

18  put these birds in the cage, it's important that we

19  don't, you know, throw them in the cage; we want to

20  place them in the cage gently, we want to minimize

21  bruising and breakage, you see that in the grocery

22  store.

23             But he's directing all the

24  responsibilities on the farm, exactly what they do, as

25  far as whether or not we're going to use curtains

Lynch - Martin

1   today; if it's a dark-out house, how we're going to

2   catch that house, you know, he's the leader out there.

3           Q    All right.  Interface with the live

4   haul clerk, that's Susie?

5           A    Yes.

6           Q    And that's a matter of communicating to

7   her by telephone and by written memos?

8           A    Phone and personally.

9           Q    Okay.

10          A    They'll come in to the office.

11          Q    Okay.

12          A    Mostly by phone.

13          Q    Okay.  Giving her the slips for

14  vacation or something like that?

15          A    Exactly.

16          Q    Okay.

17          A    Time sheets, the biggest communication

18  is the time sheets.

19          Q    All right.  What's involved with the

20  next one, instructing the drivers how to position the

21  truck?

22          A    The same thing, it's the crew leader's

23  responsibility, when the truck pulls on the farm,

24  someone's got to be, you know, making the decisions

25  out there.  Otherwise, you know, the truck may go park

Lynch - Martin

1  on the farmer's grass, he might park in his front

2  yard, you know.  There's a certain area where the

3  truck needs to be parked.

4          The crew leader, again, is the leader,

5  supervisor out there, he tells the driver where to

6  park the forklift, in unison with the forklift driver,

7  I mean they talk some, too.  But if there is any

8  disagreement between the forklift driver and the

9  driver, the crew leader makes the ultimate decision.

10         Q    Okay, let me skip down several to where

11 we go down to authorize pay, completing documents.

12         A    Yes.

13         Q    What's that mean in parenthesis,

14 completing documents?

15         A    The only thing I would think of there

16 is most of the time documents, making sure the time

17 records they turn in is accurate, you know, got the

18 names, got the Social Security numbers, got accurate

19 times on it when they started, when they finished,

20 when they took their lunch.

21         The same thing with the vacation

22 requests, you know.  Any paper documents, farm ticket,

23 again, that's a document, make sure those things are

24 filled out accurately.

25         Q    Okay.  Next is interview and select new

Lynch - Martin

1  employees.  When I asked you about that hiring

2  process, perhaps I didn't ask you about the interview

3  by the crew leader; is that something that's done?

4       A    Sometimes.  It's not really much of an

5  interview process, it's usually, again, he's talking

6  to one of his buddies, buddy knows a guy that's

7  looking for a job, he's done a good job at Perdue.

8       Q    How often is an interview done by a

9  crew leader?

10      A    Not often.  I can't give you a number.

11 I mean not an extensive interview.

12      Q    Okay.  Provide for safety is the next

13 category.

14      A    Yes.

15      Q    How does a crew leader provide for

16 safety?

17      A    Again, when he pulls on the farm, he's

18 responsible for making observations around the farm on

19 the outside, looking for any type of a hole that

20 someone might step in and twist his ankle.  Any type

21 of wet condition in the inside the chicken house, he's

22 responsible for making the catchers aware of that wet

23 position.

24           Any low hanging equipment in the house

25 that might hit somebody in the face, it's his job to

Lynch - Martin

1  make the catchers aware of those hazards and keep them

2  safe.

3           Q     All right.  Monitoring quality?

4           A     That was what I was talking about as

5  far as the placement of the birds into the cages,

6  place them in the cages as gently as possible to

7  minimize bruising and breakage of legs and wings.

8           Q     All right.  Training employees, does

9  that mean training catchers?

10          A     It could.

11          Q     Who are the other employees, the

12  forklift operator?

13          A     Forklift operator, those would be the

14  two.

15          Q     Do you know how, as a practical matter,

16  how most catchers are trained?

17          A     Yes.

18          Q     And how is that?

19          A     By another catcher through the

20  direction of the crew leader.

21          Q     Okay, you state that it's by another

22  catcher?

23          A     Yes.

24          Q     All right.  Next, set and adjust pay

25  rates and hours; how is it that a crew leader sets and

Lynch - Martin

1   adjusts pay rates and hours?

2           A    He really can't adjust the pay rate

3   much, that's a union contract; pay rates are locked

4   in.

5           Q    All right, how does a crew leader

6   adjust hours?

7           A    Really doesn't adjust hours a lot.

8   It's really more head count that he would adjust;

9   those guys are paid on head count.  If for some reason

10  one of the catchers had to sit out, didn't catch the

11  entire flock, I mean he would -- that would be

12  reflected on the time sheet, so it's really -- it's

13  really adjusting head count.

14          But in the same respect, it can be

15  adjusting hours because if, you know, he's got someone

16  that needs a break, he can, you know, have the other

17  guys fill in for him or whatever.  But it's mostly an

18  adjustment of head count, because if the guy does take

19  a break, he still gets credit for the full day's

20  hours.  So it's really not hours, it's really head

21  count.

22          Q    Okay.  Direct work, isn't that the same

23  as above, direct and observe work force?

24          A    Yes.

25          Q    Maintain records, isn't that already

FIRST STATE REPORTING SERVICE      (302)
Pamela C. Washington, R
P.O. Box 99              Milford, Delaw....

A00883

Lynch - Martin

1    incorporated into what you have set forth here?

2         A    Yes.

3         Q    All right, assessing employee

4    productivity, that's already set forth above, was it

5    not?

6         A    Not sure that was.

7         Q    Well, we talked about provide

8    performance updates.

9         A    Yeah, but what we'd be talking about

10   more here as far as assessing employee productivity is

11   to make sure that each catcher's doing his part.

12   Catchers have a tendency to stray on the farms.

13        Q    Like chickens?

14        A    Yes.  You know, go take a bathroom

15   break and it takes an hour or something like that.  So

16   he's responsible to make sure everyone's doing their

17   part.

18        Q    Okay.  Handle employee complaints, what

19   type of complaints does the crew leader handle?

20        A    That would be mostly -- it possibly

21   could be with another employee.  Catchers, again, not

22   only do they stray, they talk a lot to each other back

23   and forth.  So, you know, a particular catcher may

24   have a problem with his buddy, you know, it's mostly

25   talk by agitation, so they would go to the crew leader

FIRST STATE REPORTING SERVICE        (302)
                    Pamela C. Washington, R
        P.O. Box 99              Milford, Delaw___ _____

**A00884**

Lynch - Martin

1    and tell them they were having a problem so he may

2    change the pairing up, he may move that individual

3    with another pair.

4              The only other complaints would be

5    physical complaints at the farm.  I'm talking about,

6    you know, the catching conditions, wet houses, you

7    know, high ammonia content, that kind of thing.

8              Usually there's not a problem with

9    supplies, I mean he could complain they wasn't getting

10   a change of gloves, you know, getting enough gloves,

11   those -- anything that's, you know, could be a

12   hinderance to the guys that's a complaint, they'd come

13   to him.

14        Q    Okay.  Maintain discipline, is that

15   anything different from what you have just described?

16        A    Not really, that's about the same.

17        Q    All right.  Plan work, isn't that the

18   same as above?

19        A    I'd say that's a little redundant, yes.

20        Q    Okay.  Implement and adjust work

21   techniques, is that something different from what you

22   have described?

23        A    It could be.  Work techniques haven't

24   changed a lot.  There are some new techniques coming

25   in, I mean there's automatic catching machines that

FIRST STATE REPORTING SERVICE        (30:
Pamela C. Washington,
P.O. Box 99              Milford, Dela....

A00885

Lynch - Martin

1  are coming around now that we're experimenting with

2  now a little bit which would change the technique

3  some.  That would be the main thing.  Besides that,

4  the catching technique hasn't changed a lot.

5          Q    In how many years?

6          A    Well, 17 years.

7          Q    Okay.

8          A    But it's changing.

9          Q    All right.  And then this last category

10  that I'm going to look at is obtain, distribute, and

11  monitor flow of materials, supplies and tools.

12          A    Yes.

13          Q    What do you mean by that?

14          A    Well, each week, the crew leader, he

15  gets supplies for his group which consists of gloves,

16  dust mask, paper, rolls of paper; he's responsible

17  each week for getting a supply of those and

18  distributing those to the catchers.  And just make

19  sure there's not a lot of waste, and they're utilized

20  effectively and efficiently.

21          Q    All right, so the crew leader gets

22  these supplies from the plant --

23          A    Yes.

24          Q    -- and just makes sure that all the

25  catchers are well stocked for the week?

FIRST STATE REPORTING SERVICE        (302)
Pamela C. Washington, RP
P.O. Box 99                Milford, Delaware

A00886

Lynch - Brewer

1    methods, I don't know, maybe my note's incorrect.

2         A    Method's okay.

3         Q    Method's okay?  So you're comfortable

4    with that, that's fine.  The last question I have is

5    you were asked a question about a crew leader's

6    responsibility about training a new catcher, and you

7    said typically, as far as you know, they assign them

8    to another catcher?

9         A    Yes.

10         Q    Is that how it normally works?

11         A    Yes.  Each crew leader has a lead

12    person, a lead person that they feel more comfortable

13    with within the catching crew, that they would

14    probably assign that new individual to that person.

15    That's probably the person that's been with the crew

16    longer, possibly more experienced, just someone they

17    feel more comfortable with, so he would assign them to

18    that person.  And then he would observe that training

19    process to make sure things are occurring.

20         Q    Okay, does he have to do it that way?

21         A    Who?

22         Q    The crew leader, does he have to do it

23    that way?

24         A    No, no; that's his decision.

25         Q    Okay, that's what I was concerned