# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WILLIE DAVIS, JR., et al.,     )
                      )
         Plaintiff,     )     Civil Action No. 04-414-KAJ
      v.          )
                      )
MOUNTAIRE FARMS, INC., et al.  )
                      )
        Defendants.     )
_____)

## OPENING BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Matthew F. Boyer (Del. Bar No. 2564)
CONNOLLY BOVE LODGE & HUTZ, LLP
The Nemours Building
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE  19899
(302) 884-6585

Arthur M. Brewer (admitted Pro Hac Vice)
Laura A. Pierson Scheinberg
SHAWE & ROSENTHAL, LLP
Sun Life Building, 11th Floor
20 S. Charles Street
Baltimore, MD  21201
Telephone: (410) 752-1040
Facsimile: (410) 752-8861

DATED:  May 3, 2005

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ................................................................................. iii

NATURE AND STAGE OF PROCEEDINGS ..................................................... 1

SUMMARY OF ARGUMENT .............................................................................. 2

STATEMENT OF UNDISPUTED FACTS ........................................................... 4

   A.   Background of Plaintiffs and Other Relevant Mountaire Management ................ 4

   B.   Background on the Chicken Catcher Business ......................................... 5

   C.   Recruiting, Hiring, and Staffing the Crew ............................................ 6

   D.   Training Crew ....................................................................................... 9

   E.   Transporting Crew ............................................................................... 9

   F.   Crew Leaders Directing the Work of Their Crew ................................. 9

      1.   General Responsibilities ................................................................. 9

      2.   Crew Leaders Exercise Discretion in Each Step of the Chicken Catching Process ................................................................................. 12

   G.   Ensuring Safety of the Crew and Grower's Property ........................... 14

   H.   Completing Management Paperwork ................................................... 16

   I.   Addressing Grievances ....................................................................... 17

   J.   Authority to Discipline Crew Up To and Including Termination ......... 18

   K.   Approving Time Off ........................................................................... 19

   L.   Other Supervisory Duties .................................................................... 20

   M.   Wages and Benefits ............................................................................ 24

   N.   Plaintiffs' Classification Under The FLSA ......................................... 26

   O.   Plaintiffs' Retaliation Claims ............................................................. 28

i

ARGUMENT ..................................................................................................... 32

A.  Standards for Summary Judgment ........................................................ 32

B.  Plaintiffs' Job Responsibilities At All Times Relevant Fell Within The Executive Exemption Of The FLSA, 29 U.S.C. § 213(a) ..................................... 32

   1.  The FLSA's Executive Exemption ................................................. 33

     a.  The Exemption Generally. ...................................................... 33

     b.  The Crew Leader's Primary Duty is Management. ..................... 34

       (i)  The Relative Importance of Exempt Duties of Crew Leaders as Compared With Other Types of Duties. .................................... 35

       (ii)  The Amount Of Time Spent By Crew Leaders Performing Exempt Work And Frequency With Which Employees Exercise Discretion. ... 38

       (iii)  Crew Leaders are Free of Direct Supervision While Out on the Farms. .............................................................. 44

       (iv)  The Crew Leaders' Salaries are In Line with Management as Opposed to Wages Paid to Their Crews. ................................. 45

   2.  The Crew Leaders' Primary Duties Involve Management. ................. 47

   3.  Plaintiffs' Self Assessments Demonstrate That They Perceived Themselves as Supervisors. ...................................................... 49

C.  Plaintiffs Cannot Establish A Claim Under the Delaware Wage Payment and Collection Law. ...................................................................... 50

D.  Plaintiffs Cannot Establish That They Were Retaliated Against ................ 51

CONCLUSION ................................................................................................ 56

# TABLE OF AUTHORITIES

Anderson v. Liberty Lobby, Inc.,
   *477 U.S. 242 (D. Del. 1989)* ............................................................................ *32*

Baldwin v. Trailer Inns Inc.,
   266 F.3d 1104 (9th Cir.. 2001) ............................................................... 35,39,43,45,46

Blackie v. State of Maine,
   75 F.3d 716 (1st Cir. 1996) ........................................................................... 54

Brock v. Casey Truck Sales, Inc.,
   *839 F.2d 872 (2d Cir. 1988)* .......................................................................... *51*

Celotex Corp. v Catrett,
   *477 U.S. 317 (1986 )* .................................................................................... *32*

Cobb v Finest Foods Inc.,
   755 F.2d 1148 (4th Cir. 1985 ) ..................................................................... 46

Cononie v. Allegheny General Hospital,
   C.A. No. 01-2024, 2002 WL 181357 (3d Cir. Pa. Feb. 5, 2002) ............................ 55

*DeNovellis v. Shalala,*
   135 F.3d 58 (1st Cir. 1998) ........................................................................... 54

*Donovan v. Burger King Corp.,*
   672 F.2d 221 (1st Cir. 1982) ...................................................................... 41,43

*Donovan v. Burger King Corp.,*
   675 F.2d 516 (2d Cir. 1982) ................................................................. 35,39,43,42

*East v. Bullocks Inc.,*
   34 F. Supp. 2d 1176 (D. Ariz. 1998) ............................................................... 44

Fuentes v. Perskie
   957 F.2d 1070 (3d Cir. 1994) ......................................................................... 55

*Gray v. York Newspapers, Inc.*
   957 F.2d 1070 (3d Cir. 1992) ......................................................................... 32

Guthrie v. Lady Jane Collieries, Inc.,
   722 F.2d 1141 (3d Cir. 1984) ......................................................................... 37

Haines v. Southern Retailers,
   939 F.Supp. 441 (E.D. Va. 1996) ................................................................. 36,44

Harris v. Mercy Healthy Corporation,
   C.A. No. 97-7802, 2000 WL 1130098 (E.D.Pa. Aug. 9, 2000). ............................. 54

In Re: Food Lion, Inc. v. McLawhon,
   151 F.3d 1029 (4th Cir. 1998) ........................................................................ 43

*Jalil v. Avdel Corp.,*
    873 F.2d 872 (1st Cir. 1998) .................................................................................. 54

*Johnson v. Home Team Productions, Inc.,*
    C.A. No. 03-2775, 2004 WL 1586552 (E.D.La. July 15, 2004) ...................................... 35,46,47

Jones v. Virginia Oil Company, Incorporated,
    C.A. No. 02-1631, 2003 WL 21699882 (4th Cir. Va. July 23, 2003) ........................... 36,44, 45

Kastor v. Sam's Wholesale Club,
    475 U.S. 574 (1986) ................................................................................................... 36

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.
    475 U.S. 574 (1986) ................................................................................................... 32

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973) ................................................................................................... 51

*Murray v. Stuckley's Inc.,*
    939 F.2d 614 (8th Cir. 1991) ...................................................................................... 43

*Olson v. General Elec. Aerospace,*
    101 F.3d 947 (3d Cir. 1996) ....................................................................................... 32

*Roberts v. National Autotec,*
    192 F. Supp.2d 672 (N.D. Tex. 2002) .......................................................................... 36

Robinson v. City of Pittsburgh,
    120 F.3d 1286 (3d Cir. 1997) ..................................................................................... 54

*Sturn v. TOC Retail Inc.,*
    864 F. Supp. 1346 (M.D. Ga. 1994) ............................................................................ 40

*Thomas v. Jones Resturants, Inc.,*
    64 F. Supp. 2d. 1214 (M.D. Al. 1999) .......................................................................... 44

*W.C. Kelly, III v. Adroit Inc.,*
    480 F. Supp. 392 (E.D.Tenn. 1979) ............................................................................. 37,46

*STATUTES*

29 U.S.C. §§ 207 ............................................................................................................ 1,33

29 U.S.C. §§ 213 ......................................................................................................... 2,32,33

29 U.S.C. §§ 215 ............................................................................................................ 1,32

29 U.S.C.A. §§ 215 ........................................................................................................ 51


RULES

Fed. R. Civ. P. 56. .......................................................................................................... 32


REGULATIONS

29 C.F.R. § 541.214. ....................................................................................................... 32


*OTHER AUTHORITIES*

Fed. R. Civ. P. 56 ........................................................................................................... 32

## NATURE AND STAGE OF PROCEEDINGS

The Plaintiffs filed a three count Complaint against Mountaire Farms Inc., Mountaire Farms of Delmarva Inc., and Mountaire Farms of Delaware Inc. (hereinafter collectively referred to as "Mountaire") alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 207 and 215(a) (2) and the Delaware Wage Payment and Collection Act ("Wage Act"), 19 Del. C. § 1101 et seq. The Plaintiffs claim that Mountaire failed to pay them overtime while they were employed as Crew Leaders. Plaintiffs also allege retaliation for filing this lawsuit.

As discussed more fully below, Crew Leaders are executive employees within the meaning of the FLSA and, therefore, have no right to overtime under the FLSA or the Wage Act. The Plaintiffs have also failed to offer any evidence of retaliation.

## SUMMARY OF ARGUMENT

The undisputed record evidence reflects that Plaintiffs' duties as Crew Leaders meet the criteria for the "executive exemption" under the FLSA. 29 U.S.C. § 213(a). Thus, Plaintiffs' FLSA claim for overtime fails. Moreover, Plaintiffs' Delaware Wage Act claim is wholly dependent on their FLSA claim and thus fails as well.

The Plaintiffs, as Crew Leaders, were responsible for the management of their respective Crews. Their primary duties included selecting and training their crews; directing their work; maintaining managerial records which are used to compute the wages of the crew; appraising the productivity and efficiency of crew members for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary up to and including termination. They also planned the crew work, determined the techniques to be used, and apportioned the work among the crew members.

The duties set out above are managerial functions as defined by the Federal Department of Labor's interpretative regulations, 29 CFR § 541.102, and applicable case law. *Donovan v. Burger King Corp.*, 672 F.2d 221 (1st Cir. 1982) ("*Burger King I*"); *Donovan v. Burger King Corp.*, 675 F.2d 516 (2d Cir. 1982) ("*Burger King II*"); *Murray, et al. v. Stuckey's Inc.*, 939 F.2d 614, 619 (8th Cir. 1991); *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104 (9th Cir. 2001); *East v. Bullocks Inc.*, 34 F. Supp. 2d 1176 (D. Ariz. 1998); *Haines v. Southern Retailers*, 939 F. Supp. 441 (E.D. Va. 1996); *Sturm v. TOC Retail Inc.*, 864 F. Supp. 1346 (M.D. Ga. 1994).

The Plaintiffs fail to offer any evidence that would, as a matter of law, constitute grounds for a retaliation claim. Accordingly, and for the reasons set forth in detail below, Mountaire respectfully requests that summary judgment be granted in its favor.

## STATEMENT OF UNDISPUTED FACTS

### A.     Background of Plaintiffs and Other Relevant Mountaire Management

Defendant Mountaire is engaged in the business of processing poultry for retail customers. The Company has plants in Selbyville and Millsboro, Delaware and in North Carolina. Mr. Douglas Lynch is the Live Haul Manager for the Mountaire Selbyville Plant where the Plaintiffs are/were employed. A00825/Lynch 5. Mr. Lynch has been employed by Mountaire for seventeen (17) years. He supervises David Nuse, the Assistant Live Haul Manager. A00826/Lynch 32. The Crew Leaders, the position at issue, report directly to Mr. Nuse. A00826/Lynch 32.

Plaintiff Joseph Garrison was initially hired as a catcher. A00367/Garrison 23. Mr. Garrison was promoted to Crew Leader in 1999 – a position he held until he resigned in July 2004. A00367-69/Garrison 23-24, 26.

Plaintiff Roy Walters first became employed by Mountaire in September 1982 as a Live Haul Truck Driver. He became a Forklift Operator in 1990, and was later transferred back to a Live Haul Truck Driver in 1998. A00685-687/Walters 22, 24-25. In 2001, Mr. Walters was promoted to a Crew Leader, a position he still occupies. A00688-689/Walters 26-27.

Plaintiff Nathaniel Briddell began his employment at Mountaire in 1983 as a Live Haul Truck Driver. A00552-553/Briddell 41-42. He was promoted to Crew Leader in 1989. A00554/Briddell 43. Mr. Briddell has not worked as a Crew Leader since April 2003 but remains employed with Mountaire. A00555/Briddell 44.

Plaintiff Willie Davis was hired by Mountaire in April 2000 or 2001 as a full time Crew Leader. A00804-805/Davis18, 21. About a year later, Mr. Davis' Crew was laid

off and he was offered the position of Relief Crew Leader. He filled in for the other Crew Leaders when they were not able to work. A00806-809/Davis 22-25. Mr. Davis resigned in December 2003. A00821/Davis 42.

Plaintiff Larry Gibbs was hired by Mountaire in May 1994 as a Crew Leader and remains employed as a Crew Leader. A00465-466-42/Gibbs 31, 34.

Plaintiff George Feddiman was hired by Mountaire in May 1994 as a Catcher and worked on the Crew of Plaintiff Larry Gibbs, his brother. A00635/Feddiman 22. Mr. Feddiman worked as a Crew Leader for nine (9) months and stopped working in that position in April 2001. A00636, 666/Feddiman 26, 64.

### B.    Background on the Chicken Catcher Business

Mountaire contracts with over 300 farmers to grow chickens. The farmers are referred to as "Growers." A00874/Lynch 98.

Mountaire employs eight (8) Crew Leaders and approximately fifty-six (56) Chicken Catchers who catch the chickens on the Growers' farms. A00840/Lynch 52.

A Chicken Catching Crew consists of one (1) Crew Leader, seven (7) to eight (8) Catchers and one (1) Forklift Operator. A00467/Gibbs 35; A00810/Davis 27. The Crew Leaders supervise the Forklift Drivers and Catchers in the catching process. A00392/Garrison 53.

The Catchers and the Forklift Operators are represented by Teamsters Local 355 for the purposes of collective bargaining. Their terms and conditions of employment are covered by a collective bargaining agreement. A00371-372, 419-420, A00099-120/Garrison 28-29, 122-123, Garrison Ex. 6; A00468/Gibbs 36. The Live Haul Truck

5

Drivers are also represented by the Union. A00420, A00099-120/Garrison 123, Garrison Ex. 6; A00556/Briddell 45; A00468/Gibbs 36.

The Crew Leaders are supervisory employees and are not covered by the Teamsters contract. A00099-120/Garrison Ex. 6.

Chicken Catchers are paid on a piece-rate basis negotiated with the Teamsters Union. A00767-768/Walters 131-132. Crew Leaders are salaried and are paid considerably more than Catchers. A00423-424/Garrison 173-174, Garrison Ex. 6.

**C.    Recruiting, Hiring, and Staffing the Crew**

The Crew Leaders are responsible for staffing and maintaining a full crew. A00395/Garrison 56. This includes recruiting Catchers and recommending them to the Company for hire. A00396/Garrison 56; A00837/Lynch 49; A00557/Briddell 46. Mr. Gibbs brought his entire Crew from his previous employer to work at Mountaire and also stated that he recommended others for hire. A00478, 496/Gibbs 53, 78.

Mountaire Human Resources is not involved in the recruiting and hiring of Chicken Catchers. A00838-839/Lynch 50-51. The Company does not advertise for this position. A00839/Lynch 51. Similarly, Messrs. Lynch and Nuse are not involved in the selection of the Catchers; recruitment of the Crew is the responsibility of the Crew Leader exclusively. A00841/Lynch 53.

Thus, if a Crew Leader lost one (1) or two (2) of his Catchers, it is the Crew Leader's job to recruit replacements. A00838/Lynch 50. Crew Leaders typically recruit by word of mouth by talking to other Mountaire Crew Leaders, or Crew Leaders from other companies. A Crew Leader may also hear of Catchers looking for work through other Catchers, Forklift Operators and/or Live Haul Drivers on their Crew. All of the

recommendations for hire are filtered through the Crew Leaders. A00838/Lynch 50; A00673/Owen 48.

Once a Crew Leader has found a Catcher that that the Crew Leader would like to hire, the Crew Leader sends the person to the Medical Department at the Selbyville plant for drug testing, TB testing, and for the completion of a standard medical questionnaire. A00838, 842, 843/Lynch 50, 54-55. If the potential Catcher successfully completes these tests and has valid identification, that person is generally hired. The only exception is if the individual worked for Mountaire in the past and did not have a good work record. In that circumstance, the Company may decline the Crew Leader's recommendation. A00395-396/Garrison 56-57; A00838, 841, 844-845/Lynch 50, 53, 57-58. Mr. Garrison explained that he would approach Mr. Lynch and inform him that he needed another person for his crew and tell him: "I [would] like you [to] look to hire this guy. And he asked me just bring him in, get him signed up." A00397/Garrison 58. Mr. Briddell named several people that he recruited to work on his Crew. A00556-558/Briddell 45-47.

As stated above, there are typically seven (7) or eight (8) people to a Crew. A00371/Garrison 28; A00690/Walters 28; A00555, 297/Briddell 44, 68. Catchers work with the same Crew unless they are filling in on another Crew that may be short-handed. A00393/Garrison. 54. When possible, Crew Leaders carry eight (8) men to fill in when someone takes a break or is not present for the shift. A00371, 139/Garrison 28, 198. The Crew Leaders utilize their eighth man in different ways. Mr. Walters and Mr. Briddell, for example, put their Crews on a rotation and assign the extra person a day off.

A00695/Walters 34; A00580-581/Briddell 70-71. This decision is exclusively up to the Crew Leader.

When a Crew becomes short-handed (has less than seven (7) Catchers) the Crew Leaders can work with each other to determine if there is an extra person available from another Crew to work on the Crew that is short-handed. A00394, 398/Garrison 55, 59; A00721-724/Walters 60-63; A00582-584, 330/Briddell 72-74, 102; A00497/Gibbs 79; A00655/Feddiman 49. Mr. Garrison explained, "I would get up with the Crew Leader…And I would ask him could I use somebody on his Crew, if they were available. And he would get back up with me and let me know whether they are [available to send another Catcher from their Crew] or not." A00398-399/Garrison 59-60. If the Crew Leader had an extra person, the Crew Leader would decide who to select from his Crew to send to the other Crew Leader's Crew. A00399/Garrison 60.

There are times, however, when there are less than seven (7) people to a Crew, and a Catcher is not available from another Crew. In this instance, the Crew will have to catch the chickens short-handed. A00371, 394/Garrison 28, 55.

Crew Leaders have the authority to require their Crew to work short-handed (they receive additional compensation called "short pay"). Crew Leaders also have the authority to require their Crews to work overtime. A00418/Garrison 120; A00757/Walters 101; A00615/Briddell 110; A00503/Gibbs 87. Mr. Garrison testified, "I have authority to get my job done that day; it may be more than eight hours." A00418/Garrison 120. The Crew Leader can also decide who to ask from his Crew to work a double shift, if necessary. A00399-400/Garrison 60-61; A00498/Gibbs 80.

### D.    Training Crew

The Crew Leader is responsible for training the members of his Crew. A00882/Lynch 106; A00556-557, 581/Briddell 45-46, 71; A00470/Gibbs 44; A00373/Garrison 30. The Crew Leader has discretion to train the Catcher himself or to assign him to another Catcher to train. A00887/Lynch. 115. The Crew Leader, however, is ultimately responsible for ensuring that the new Catcher is appropriately trained. A00887/Lynch 115. Mr. Garrison trained the new Catchers himself. He testified: "I get down and show them how to catch, how to use their hands, how to pick up the chickens and how to put them in the cage. A00373/Garrison 30. Mr. Walters, on the other hand, testified that he does not train the new catchers himself. He assigns that task to the other Crew Members. When asked why, Mr. Walters explained, "they [the Crew] have to work with him [the New Catcher]; I don't." A00694/Walters 33.

The Crew Leaders are also responsible for ensuring that the Forklift Operator is properly trained. A00882/Lynch 106.

### E.    Transporting Crew

Crew Leaders begin their day by picking up some of their Crew members and transporting them to the farm that the Crew is scheduled to work on that day. A00370/Garrison 27; A00613/Briddell 107. Similarly, at the end of the day, the Crew Leaders transport the Catchers home.

### F.    Crew Leaders Directing the Work of Their Crew

#### 1.    General Responsibilities

Crew Leaders are responsible for directing and observing their Crews during the catching process. A00475, 518/Gibbs 50, 103; A00878/Lynch 102. They manage and

supervise the Crew on the farm to make sure that the chickens are caught according to Mountaire's procedures in an efficient manner. A00837/Lynch 49; A00555/Briddell 44; A00467, 473, 496/Gibbs 35, 48, 78. Mr. Lynch explained, "He's the leader out there [on the farm]." A00879/Lynch 103.

Crew Leaders are also responsible for overseeing their Crew's productivity to ensure that each Catcher is "doing their part." A00884/Lynch 108.

Mountaire has Live Haul Guidelines which generally describe the Grower's responsibilities, the Crew Leaders' general duties, catching methods, tunnel ventilation, and tunnel ventilation procedures. A00889-894/Garrison Ex. 2. The Crew Leader's general duties are described as follows:

a. Arrive on the farm at the correct time.
b. Divide the house into a minimum of 4 equal sections immediately before the catching process starts. These sections can be divided into smaller sections as you work down the house with catch curtains.
c. Instruct catchers on the exact number of birds to be placed in each cage compartment.
d. Catch all birds in place at night and never move birds into less than 70% of the normal floor space. In walk-out houses never use less than 50% of the available floor space.
e. Continually observe the uncaught birds and prevent any smothers.
f. Make sure that the forklift operator air stacks the cages are uniformly on the trailer.
g. During the summer make sure all fans are left hanging until all birds have been caught from that area. Fans that are taken down should be placed on the floor and stabilized. These fans should be blowing in the same direction as the hanging fans.
h. Don't load more than the specified number per door without permission.
i. Fill out every farm ticket accurately and send every ticket with the driver.
j. Check with the driver that the load is secure and send the load back to the plant immediately.

After the Plaintiffs reviewed this document in their depositions, they confirmed that these are all the Crew Leaders' responsibilities. A00388-392/Garrison 49-53; A00696-700/Walters 35-39; A00559-566/Briddell 48-55; A00811-812/Davis 28-29;

A00489-492/Gibbs 71-74; A00637-642/Feddiman 30-35.  It is also the Crew Leader's responsibility to ensure that the Crew adheres to Mountaire's Standard Operation Procedures as discussed in Garrison Ex. 2 (A00889-894), which include the catching methods to be used during the night and day, tunnel ventilation, etc.  A00388-392/Garrison 49-53; A00700-705/Walters 39-44; A00492-495/Gibbs 74-77; A00643-644.  Mr. Walters made repeated comments when reviewing the Guidelines that it could not always be done the way it was described in the Guidelines and admitted repeatedly that it was within his discretion to deviate from these procedures when he deemed it necessary.  A00700-705/Walters 39-44.  This was confirmed by Messrs. Briddell and Gibbs.  A00559-566/Briddell 48-55; A00493/Gibbs 75.

It is not the Crew Leader's job to catch the chickens.  Mr. Walters testified that since he has become a Crew Leader he has not caught chickens with his Crew. A00782/Walters 147.

On November 1, 2000, Mr. Lynch issued a Memo to all Crew Leaders to enforce this point.  The Memo explained that Crew Leaders would not receive additional pay for performing their Crew's responsibilities noting, "You should make every effort possible to be fully staffed everyday.  It will be acceptable to pay short hand pay to the catchers." A00067/Garrison Ex. 8.  Messrs. Garrison and Gibbs testified that they understood this Memo to mean that Mountaire did not want its Crew Leaders catching chickens or operating forklifts, so that they would have more time available to better oversee and supervise their Crews.  A00425-426/Garrison 180-181; A00500/Gibbs 133.

Crew Leaders are also responsible for identifying problems that their Crews may encounter and determine how to respond.  A00771-772/Walters 135-136.  Problems that

Mr. Walters identified included wet houses, bad loading areas, sick chickens and other problems that occur during the catching process. A00771-772/Walters 135-136. Mr. Gibbs testified that "In certain situations at work, I have to—just don't jump up and do something dumb. I try to take my time and make—try to make the right decision…like a truck getting stuck at times. Forklift not starting, fire fan not starting…." A00519/Gibbs 104.

### 2. Crew Leaders Exercise Discretion in Each Step of the Chicken Catching Process

Once the Crew Leader has picked up his Crew, he describes the work schedule for the day, the location of the farm at which they will be working, the number of birds to be caught, the size of the birds, and the type of house they will be catching in, etc. A00868-869/Lynch 92-93. This meeting can take place in the Crew Leader's van, at a convenience store, when they arrive on the farm, etc. at the Crew Leaders discretion.

One of the Crew Leaders' most important responsibilities is to maintain a good relationship with the Growers and generally to keep the Growers happy. A00395/Garrison 56; A00872-873/Lynch 96-97; A00717, 771/Walters 56, 135; A00585/Briddell 75; A00495/Gibbs 77. When a Crew Leader arrives on the farm, the Crew Leader must determine if the Grower is present, and if the Grower is, the Crew Leader discusses any concerns the Grower or Crew Leader may have regarding the chickens that are to be caught. A00872/Lynch 96.

Upon arrival on the farm, depending on the type of house, the Crew Leaders determine what method their Crew will employ in catching the chickens. A00402/Garrison 63; A00874/Lynch 98; A00475/Gibbs 50. There are several different kinds of chicken houses with different structures and dimensions that require utilizing

different methods to catch the chickens. A00401-402/Garrison 62-63; A00779/Walters 143; A00475/Gibbs 50. Mr. Walters explained that "chickens have to be worked different" in the different houses and the methods are different between night and day catching. A00780-781/Walters 144-145.

There are three basic structural houses, referred to as (1) multi story houses (double decker houses), (2) A-frames and (3) shed type houses. Within these types of houses, there are further structural differences such as A-frame, multi-story, shed type pole houses, A-frame clear span (no poles) houses, and A-frame and shed type walk-out houses (narrow houses where the Crew's machinery cannot fit inside the house). The Crew Leaders determine the method of catching chickens based on the structure and condition of the types of houses their Crews are catching in on a particular day. A00402-403/Garrison 63-64; A00779/Walters 143; A00875-876/Lynch 99-100.

After the Crew Leader determines the catching method, the Crew Leader will assign and direct responsibilities within his Crew to set up the chicken house for catching. A00374/Garrison 31; A00473/Gibbs 48; A00886/Lynch 101.

The feeders have to be out of the way (also described as "up") in a house before the chickens can be caught. A00383/Garrison 42. If the feeders are not up and are empty (and the chickens have not recently been feeding), the Crew Leader must locate the Grower and ask the Grower to put the feeders up so that the Crew can safely catch the chickens. A00383/Garrison 42.

The stoves that keep the chickens warm in the winter also must be up so that the Crew can safely catch the chickens. If the stoves are not up, the Crew Leader must locate the Grower and ask the Grower to put the stoves up. A00384/Garrison 43.

If the Crew Leader decides to use a fire fan on a particular job, the Crew also sets it up at the end of the chicken house. A00487/Gibbs 62. The fire fan is mostly used during the summer months to help cool the chickens and the men when they are catching. A00374/Garrison 31. Fire fans are also used during the winter to remove dust from a chicken house. A00374/Garrison 31.

The Crew next brings in pens to divide the house into sections so that the chickens can be more easily caught. A00376/Garrison 34. Crew Leaders decide whether to use a fire fan and decide where to put the pens. A00375, 377/Garrison 32, 35.

The Crew Leader decides when his Crew will take breaks. A00409/Garrison 109; A00725/Walters 64; A00474, 511-512/Gibbs 49, 96-97.

The Crew Leader is responsible for watching out for the Live Haul Truck Drivers when they arrive on the farm. The Live Haul Drivers transport the chickens that are caught back to the processing plant. A00370/Garrison. 27. The Crew Leader is responsible for instructing the Drivers where to position the trucks so the Forklift Operator can load the cages of chickens onto the trailers. A00403/Garrison 64; A00587/Briddell 77; A00879/Lynch 103-104. The Crew Leader is also responsible for ensuring that the Forklift Operator loads the trailer correctly and that the Live Haul Truck Driver waters the chickens, if necessary, to keep them cool.

In short, the Crew Leaders are ultimately responsible for getting the birds from the farm to the plant for processing in a timely and efficient manner. A00724/Walters 63.

**G.      Ensuring Safety of the Crew and Grower's Property**

The Crew Leaders are also responsible for the safety of their Crews. A00611, 618/Briddell 101, 114; A00476/Gibbs 51; A00656/Feddiman 53. When the Crew arrives

14

at the farm, the Crew Leader is responsible for making observations around the farm and the chicken house and reporting any potential hazards to his Crew and to the Grower. A00477/Gibbs 52; A00881/Lynch 105; A00778-779/Walters 142-143.  For example, a Crew Leader is expected to point out any hazardous condition, such as a hole that someone might step in, any long hanging equipment, or wet conditions in the chicken house, so the Crew is aware.  A00881-882/Lynch 105-106.  Mr. Walters testified that safety was his number one priority as a Crew Leader.  A00779/Walters 143.  Mr. Gibbs explained that if he sees something that may be a safety hazard on the farm he tries to "fix it...or make it safe for the catchers or get it out of the way, a foreign object and stuff."  A00477/Gibbs 52.

   In the event that a Crew member is injured while catching, the Crew Leaders decide how to handle the situation.    A00408/Garrison 106;  A00750/Walters 90; A00611/Briddell 101.  The Crew Leaders assess the severity of the Crew member's injury and decide whether to send the Crew Member back to the plant with the Live Haul Driver to see the Company nurse, whether to take the Crew Member to the hospital, whether to send the Crew Member home for the day, or whether to call an ambulance. A00408/Garrison 106; A00750/Walters 90; A00611/Briddell 101.

   The Crew Leaders also are responsible for ensuring the safety of the Grower's property and for checking for farm damage prior to starting work.  A00477/Gibbs 52. The Crew Leader reports any damage to the Grower and notes any farm damage on a Farm Ticket to notify the plant.   A00377, 84/Garrison 35, 44;  A00716/Walters 55; A00870-871/Lynch 94-95.

## H.     Completing Management Paperwork

The Crew Leader is responsible for completing the Farm Ticket.   A00378, 888/Garrison 36, Garrison. Ex 1; A00706-720/Walters 45-59; A00567-579/Briddell 56-68; A00478-487/Gibbs 53-62; A00812/Davis 29; A00645-655/Feddiman 39-49.   The Farm Ticket tracks pertinent information in a centralized fashion.   This information includes whether the Grower's sign is present on the farm, whether the Grower is present when the Crew arrives, how many houses were involved to catch chickens at a particular farm, whether there were any dead chickens present in the house before the Crew started catching, whether a fire fan was used, whether the chickens were watered (the Crew Leader is responsible for directing the drivers to water the chickens to make them cool enough to transport during the summer months), whether the chicken feeders and stoves were up in the house, etc.   A00478-487/Gibbs 53-62; A00379-384/Garrison 37, 39- 43; A00706-720/Walters 45-59.

The Crew Leader also notes the condition of the entrance to the farm on the Farm Ticket, the litter condition of the chicken house and the condition of the roads and loading area (where the forklift operator loads the chickens onto the Live Haul truck). A00386-387/Garrison 46-47.

The Crew Leader is responsible for determining and noting on the Farm Ticket the condition of the chickens at the time they are caught.   Once the Farm Ticket is completed, the Crew Leader submits it to the scale house so that any issues that the Crew Leader may have identified at a particular farm can be addressed.   A00488/Gibbs 70.

The Crew Leader is responsible for completing Time Off Request Forms and time reports for his Crew and is ultimately responsible for their accuracy.   A00880/Lynch 104.

Additionally, the Crew Leader is responsible for adjusting the head count on the Crew's time sheets if, for example, one of the Catchers had to sit out and was not involved in catching a particular flock. A00883/Lynch 107.

### I.    Addressing Grievances

Pursuant to Article 10, Section 1 of the Collective Bargaining Agreement:

> Any complaint, grievance or dispute arising out of the interpretation, application or performance of the provisions of this Agreement shall, in the first instance, be taken up with the aggrieved employee or employees, who shall first take the matter up with the shop steward, who in turn will take the grievance up with the foreman in charge...

With respect to any complaint, grievance or dispute the Crew may have, the Crew Leader is the "foreman in charge" to whom the Crew members are to make their complaints. A00420-421, 99-120/Garrison 123-124, Garrison Ex. 6; A00674/Owen 49; A00616-617/Briddell 112-113; A00521/Gibbs 111.

Mr. Owen explained the Crew Leader's responsibility:

> the Crew Leader is the management representative to address informal or formal grievances. They would be presented with grievances, they would investigate grievances, and they would provide answers to grievances at the first step...And it becomes the Crew Leader's responsibilities to sign and accept and, you know, process the homework behind the grievance, to write it up...A00674/Owen 49.

The Crew Leader is responsible for managing any conflicts or disagreements among the members of his Crew. A00880, 61/Lynch 104,108; A00773-774/Walters 137-138. In response to a disagreement, the Crew Leader could, for example, change the Crew's job duties so that the men experiencing conflict would not work as closely together. A00884-885/Lynch 108-109. Mr. Walters testified that some of his Catchers

17

were not getting along and he sat down with them and had a discussion with them about their "attitudes." A00773-774/Walters 137-138.

The Crew Leader is also responsible for managing complaints from his Crew regarding the physical conditions of the farm and complaints regarding appropriate supplies. A00885/Lynch 109.

### J.    Authority to Discipline Crew Up To and Including Termination

Under Mountaire's progressive disciplinary policy, employees are given multiple opportunities to improve and correct their performance. The disciplinary procedure begins with the Supervisor giving the employee an oral warning, then a first written warning, second written and third written or final warning, which can result in termination. A00851-852/Lynch 64-65.

The Crew Leaders have the authority to discipline their Crew and can effectively recommend termination of a Crew member. A00410-417, A00177-182/Garrison 110-117, Garrison Ex. 5; A00693, 726, 752/Walters 31; 65, 95; A00585, 610/Briddell 75, 100; A00510/Gibbs 95; A00852/Lynch 65. Crew Leaders have issued and signed written disciplinary warnings. Examples in the record are from Crew Leader Garrison (7 warnings) and Walters (6 warnings). A00177-182/Garrison Ex 5; A00752-756, A00271-276, 122/Walters 95-99, Walters Ex. 2.

In response to a question regarding whether a Crew Leader can unilaterally discipline without the intervention of Mr. Nuse or Mr. Lynch and whether there was a requirement that they sign off on it, Mr. Owen responded, "No, I wouldn't expect them to, either." A00672/Owen 47.

Typically, Catchers quit before they are terminated.  A00850/Lynch 63. However, Crew Leader Joe Garrison recommended the termination of Catcher Clarence Heath, and Heath was terminated.  A00846-847/Lynch 59-60.  Crew Leader Briddell recommended the termination of Catcher Charles Hitchens, and Hitchens was terminated. A00847-849/Lynch 60-62; A00614/Briddell 109.

### K.     Approving Time Off

Crew Leaders have the authority to grant time off for their Crew without additional review.  A00856-857/Lynch 71-72.  Similarly, the Crew Leader retains the discretion to deny a Catcher time off at all times. A00860/Lynch 75.

The Crew Leaders approve the vacations and/or vacation pay (referred to as "money only" on the forms) in lieu of time off for their Crews.  A00403-404, A00001-66, A00177/Garrison 64-65, Garrison Ex. 3; A00727-748/Walters 66-87 ; A00593-609, 137-176/Briddell 83-99, Briddell Ex. 1; A00812-816, 249-265/Davis 29-33, Davis Ex. 1; A00503-508, 285-365/Gibbs 87-92, Gibbs Ex. 1; A00658-665, A00068-80/Feddiman 56-63, Feddiman Ex. 1.

The Crew Leader decides whether to grant a Crew Member's request for time off, based on his staffing needs.  A00859/Lynch 74.  A Crew Leader would not, for example, give two (2) or three (3) of his Catchers off at once, because he would not be able to operate his Crew. A00510-520/Gibbs 94-05; A00859/Lynch 74; A00611/Briddell 101.

A Crew Leader also can authorize a member of his Crew to take the day off even when he does not have any vacation time.  A00406-407/Garrison 104-105; A00749, 751/Walters 89, 91; A00609/Briddell 99.

**L.    Other Supervisory Duties**

The Crew Leaders have the authority to recommend a member of their Crew for promotion. A00471-472/Gibbs 45-46. For example, Mr. Gibbs recommended the promotion of one of his Catchers, Mr. Walters, to become the forklift operator. A00471-472/Gibbs 45-46.

The Crew Leaders are also responsible for providing their Crews with performance updates. A00869/Lynch 93. Each week, Mountaire provides Crew Leaders performance updates (efficiency reports), which track how their Crews are performing. The Crew Leader is expected to use this information to monitor, improve and discuss any issues with his Crew. A00869-870/Lynch 93-94. The Crew Leaders receive bonuses that are, in part, based on these efficiency reports. They review the reports and highlight the areas that need improvement with their Crew. A00869-870/Lynch 93-94.

As representatives of management, Crew Leaders are also expected to discuss upcoming safety celebrations and report on the Plant's performance with their Crews. A00871/Lynch 95.

Crew Leaders are also required to attend periodic management meetings. A00437, 121/Garrison 195, Garrison Ex. 14; A00789/Walters 158.

Crew Leaders are responsible for obtaining, distributing, and monitoring the flow of materials, supplies, and tools. A00886/Lynch 110. Each week Crew Leaders obtain supplies for their Crews including gloves, masks, paper, and other supplies. They are responsible for ensuring that their Crews have the necessary supplies. They also ensure that the supplies are effectively and efficiently utilized. A00886/Lynch 110.

In the past, Mountaire had a policy allowing employees to request a certain percentage of their pay in advance of their scheduled pay date. A00860-861/Lynch 75-76; A00586-587/Briddell 76-77. The Crew Leaders had the discretion to decide whether to provide a member of their Crew with an advance. A00586-587/Briddell 76-77. If such an advance was granted, the Crew Leader would complete a petty cash slip and submit it to Payroll. A00860-861/Lynch 75-76; A00758-765, 122-128/Walters 105-112,Walters Ex. 3; A00586-593, 129-136/Briddell 76-83, Briddell Ex. 2; A00499-501/Gibbs 82-84; A00657/Feddiman 55. The Crew Leaders also had the authority to write petty cash slips for instances in which their Crew had to work short-handed and received short-hand pay. A00763/Walters 110.

As supervisors, the Crew Leaders complete their own self assessment as part of their performance appraisal. A00769-706, 277-284, 802, 669/Walters 133-145, Walters Ex. 6; The Crew Leaders' self assessment responses contain admissions, in Plaintiffs' own words, that they, in fact, viewed themselves as supervisors. The following is a list of the categories under which the Crew Leaders rated themselves along with their responses:

**Commitment to Quality**
- A.   Analyzes quality problems to determine root cause
- B.   Develops and implements plans to improve quality
- C.   Maintains systems to measure quality
- D.   Produces quality work consistently

Walters Comments:   "I have always been committed to doing the best that Roy can do"
Gibbs Comments:   "Produces quality product by maintaining working guidelines and regulations"
Garrison Comments:   "When I see the problems I solve them right a way"

**Internal and External Customer Satisfaction**
- A.   Understands customers' needs and serves others
- B.   Provides products and services which meet or exceed customers' requirements
- C.   Develops close customer relationships

21

   D.     Responds quickly to customer problems

Walters Comments:  "Have been able to communicate with customers to get the job done"

Gibbs Comments:  "Works well with growers, drivers, and others. Respectful of their concerns and needs"

Garrison Comments:  "I try to satisfy them the best way I know how and try to understand what they want done"

### Planning
  A.     Identifies tasks clearly
  B.     Establishes goals and priorities
  C.     Demonstrates good follow-up skills
  D.     Accomplishes results and objectives

Walters Comments:  "Have been able to identify problems, and establish goals and priorities to accomplish results"

Gibbs Comments:  "Do well at organizing and planning to get what needs to be done"

Garrison Comments:  "Some jobs you have to look at it and make good decisions in order to accomplish your goals."

### Initiative
  A.     Considers alternatives before deciding on the best way to proceed
  B.     Encourages and supports creativity and looks at "failures" as learning opportunities
  C.     Looks for ways to implement significant positive change
  D.     Fosters participation and supports prudent risk-taking

Walters Comments:  "My crew and I have made some changes as we have learned from our failures"

Gibbs Comments:  "Encourages and delegates work in a respectful manner"

Garrison Comments:  "The reason we try alternatives is because we are trying to find the best way to do it. If one way does not work, we keep trying alternatives until we find the best way."

## Decision Making and Problem Solving
  A.     Recognizes and defines the root cause of problems
  B.     Makes logical and timely decisions based upon facts and experience
  C.     Follows through with decisions
  D.     Demonstrates flexibility

Walters Comments:  "Have recognized problems and made decisions to accomplish results"

Gibbs Comments:  "Make sound and logical decisions to solve problems effectively"

Garrison Comments:  "First, in order to get down to the root of the problem, you have to ask questions about the problem in order to solve it."

**Business Success and Results**
A.      Gets things done
B.      Handles emergency situations
C.      Meets quality and safety standards
D.      Operates within budget, improves margin

<u>Walters Comments:</u>      "I consider I have done these things as a crew leader"
<u>Gibbs Comments:</u>       "Meet goal on DOA's head count and farm damage"
<u>Garrison Comments:</u>    "I'm a person that is always thinking of doing whatever I have to
do to in order to get it done; that's why I gave my self a 4."

**Leadership and influence**
A.      Creates and communicates a vision that motivates
B.      Empowers others to take action
C.      Leads by example (puts values into action)
D.      Recognizes and rewards contributions and milestones

<u>Walters Comments:</u>      "My crew understands what I, as a crew leader, want and we
together have tried to reach that goal"
<u>Gibbs Comments:</u>       "continue good leadership and lead by example"
<u>Garrison Comments:</u>    "Working together is one of the first things you need to do as a
Leader; seeing that the job gets done by helping them out."

**Communication**
A.      Listens attentively to others and demonstrates understanding
B.      Is accessible and approachable
C.      Encourages others to express their ideas and opinions
D.      Speaks and writes clearly and effectively; is constructive

<u>Walters Comments:</u>      "I consider I have done these things as a crew leader"
<u>Gibbs Comments:</u>       "Good listener and communicates well"
<u>Garrison Comments:</u>    "Communication has a lot to do with the job.  That is why I listen
to their ideas, but I will decide the best thing to do."

**Teamwork**
A.      Contributes to team objectives
B.      Builds productive work relationships
C.      Effectively manages conflict
D.      Balances team issues with self-interests

<u>Walters Comments:</u>      "With some help from my supervisor, there have been some
conflicts that needed to be look at"
<u>Gibbs Comments:</u>       "Have good productive work relationship with crew and
management"

<u>Garrison Comments</u>:  "Putting the men in the right job assignment, where everyone is comfortable and works as a team."

**Safety and Environment**
A.    Knows and follows safety and environmental rules and procedures
B.    Maintains good housekeeping and controls potential hazards
C.    Uses prescribed safety devices and protective equipment
D.    Participates in safety meetings and training

<u>Walters Comments</u>:  "Safety has always been a number one priority"
<u>Gibbs Comments</u>:    "Knows safety policies and rules work with crew to follow guidelines and procedures"
<u>Garrison Comments</u>: "staying alert, looking for unsafe hazards, makes a safe environment."

**Development Plan/Results Achieved**
<u>Walters Comments</u>:  "I wanted to have more team work with the men in my crew"/ "I have some 30 to 40% changes toward this plan"
<u>Gibbs Comments</u>:    Not Applicable
<u>Garrison Comments</u>: "To keep my DOA down and head count down and to have a consistent crew"/ "Improve my crew and my plan has been achieved."

**What specific skills do you want to focus on this coming year?**
<u>Walters Comments</u>:  "I want to focus on working the chickens to improve DOA's because each farm is not the same.
<u>Gibbs Comments</u>:    "I would like to focus on my leadership skills"
<u>Garrison Comments</u>: "I want to be able communicate with my Spanish workers."

**Looking ahead to next year's work, what do you believe should be your principle objectives and/or job responsibilities?**
<u>Walters Comments</u>:  "Making sure the job gets done right"
<u>Gibbs Comments</u>:    "Maintain a complete catching crew that produces below budget results"
<u>Garrison Comments</u>: "I do believe that I will achieve everything that I'm focusing on by working hard on it.  Meet safety standards; keep farm damages down; DOA down head count down."

A00232-239/Garrison Ex. 4; A00277-284/Walters Ex. 6; A00240-248/Gibbs Ex. 2.

**M.    Wages and Benefits**

In 2004, the average wages for the Crew Leaders was $41,636.  Other Mountaire front line supervisors, such as the Tray Pack Foreman, Water Treatment Manager,

Shipping/Cooler Foreman, Security Manager, and Quality Assurance Supervisor received an average wage of $38,244 in 2004. The Chicken Catchers were paid on a piece-rate basis and received on average $29,161.70 on an annual basis. A00887.1/Phillip Owen Affidavit 3.

The Crew Leaders receive Management benefits which are more favorable than the benefits that the Union represented employees receive. A00427-429/Garrison 183-185; A00523-525/Gibbs 134-136; A00549/Gibbs Ex. 5; A00789/Walters 153; A00616, 619, 550/Briddell 112, 121, Briddell Ex. 3. For example, the Crew Leaders receive more vacation time than their Crews, receive long-term disability insurance while their Crews do not, and receive better short-term disability coverage than their Crews. As supervisors, the Crew Leaders are also entitled to paid medical leave, unlike the non-supervisory employees. A00783/Walters 150. Mr. Walters, for example, received his full salary while he was out on medical leave for a month and a half to have his knee replaced. A00783/Walters 150. *See* A00549/Gibbs Ex. 5 for a full benefit comparison between the hourly, salaried and Union employees.

Crew Leaders are also eligible for monthly and annual bonuses. A00785-786/Walters 154-155. The monthly bonuses are based on the Crew Leader's performance, and the annual bonuses are based on the Company's performance. A00432-437, 270/Garrison 190-195, Garrison Ex. 13; A00786-788/Walters 155-157; A00620-625/Briddell 123-128; A00526-528/Gibbs 137-139. The Catchers are not eligible for these or similar bonuses. A00786/Walters 155; A00528/Gibbs 139.

Crew Leaders receive a $250 weekly vehicle allowance for the operation of their personal vans. A00533-536/Gibbs 148-151. The Crew Leader chooses which vehicle to

purchase, its options, color, etc.   A00430-431, 443-445/Garrison 187-188; 213-215; A00789, 794-795/Walters 154, 164-165; A00539-544/Gibbs 155-160.

Crew Leaders often voluntarily leave their vehicles for the Crew Leaders who fill-in for them while they are on vacation.  A00833/Lynch 45.

Crew Leaders are invited to the annual management Mountaire Christmas party. There is no similar party for the hourly employees.  A00437-439, 266-268/Garrison 195-197, Garrison Ex. 15; A00789-791/Walters 158-160; A00626-627/Briddell 129-130 ; A00817-818/Davis 38-39; A00529-530/Gibbs 142-143.

## N.    Plaintiffs' Classification Under The FLSA

Prior to June or July of 2002, the Crew Leaders were paid on a piece rate basis by the thousand chickens caught.  A00834/Lynch 46.  The Crew Leaders were converted from a piece rate to a salary basis in 2002 as result of a Department of Labor (DOL) audit of the Company's North Carolina plant and a suggestion from the DOL that the Crew Leaders be treated as salaried employees because they were exempt for overtime purposes under the Fair Labor Standards Act.  A00081-098/Department of Labor's Audit; A00835-836/Lynch 47-48.

Prior to receiving a copy of Plaintiffs' counsel's February 2004 letter, Mountaire was unaware that there was a concern among Crew Leaders regarding overtime pay. A00671/Owen 24.  Mr. Owen expressed surprise about the lawsuit,

> The employees [Crew Leaders] had not used formal channels available to them through the company to voice their concern... No one had come to me or anyone that I knew specifically with these concerns [regarding overtime pay].

A00671/Owen 24. Mr. Owen called Mr. Lynch to see if he had heard any rumors about a lawsuit. A00670/Owen 23. Mr. Owen further encouraged Mr. Lynch to talk to the Crew Leaders to see if there was anything that could be resolved within the Company.

In response to Mr. Owen's phone call, Mr. Lynch had a conversation with Mr. Garrison. Mr. Lynch mentioned that he heard a rumor about a potential lawsuit and asked him what it was about, and whether there was something Mountaire could do to deal with it within the Company. A00827/Lynch 38. Mr. Garrison said that the lawsuit was about backpay and they did not have any further discussion. A00827-828/Lynch 38-39. Mr. Lynch also talked to Crew Leaders Roy Walters, Francisco Serabia, and Terry Morris. Mr. Lynch similarly asked them if they knew anything about the potential lawsuit. A00863-864, 867/Lynch 80-82, 84; A00266/Walters 116. Mr. Walters testified that he did not feel harassed by the conversation. A00797-798/Walters 167-168.

In ¶ 23 of Plaintiffs' Complaint, Plaintiffs alleged that Mountaire required the Crew Leaders to "submit a daily time sheet broken down for each day of the week." All of the Plaintiffs testified, however, that they were required to submit time sheets only for their Crew, not their own time. A00628/Briddell 134; A00819/Davis 40; A00502, 532-533/Gibbs 86, 147-148.

In ¶ 26 of Plaintiff's Complaint the Plaintiffs alleged that Mountaire took a deduction from Plaintiffs' pay for:

> ...partial day deductions, in that any partial time taken off from normal working hours by any of Plaintiffs, other than established work holidays, is/was deducted from their pay, charged to their vacation or sick time or made up at times other than normal work hours.

27

However, when each Plaintiff was asked about the alleged deduction, each Plaintiff testified that no such deductions were made. A00441-442/Garrison 210-211; A00792-793/Walters 162-163; A00629/Briddell 135; A00820/Davis 41; A00537-538/Gibbs 153-154. In fact, Mr. Garrison testified that he was paid for a full day when he took a half day to go to the doctor. A00441-442/Garrison 210-211.

Paragraph 27 of Plaintiffs' Complaint alleges that the Crew Leaders received a reduction in pay based on the quantity of work they perform. The Plaintiffs' deposition testimonies fail to support this allegation. Mr. Walters, Mr. Gibbs, and Mr. Briddell all testified that they have never had their pay reduced as result of the quantity of the work they performed. A00793/Walters 163; A00630/Briddell 136; A00538/Gibbs 154.

### O.    Plaintiffs' Retaliation Claims

In April 2002, Mountaire was a defendant in a previous overtime class action lawsuit, Major, et al. v. Mountaire Farms, Inc., which involved the claim that Catchers were not provided with lunch breaks. This prior lawsuit was settled at significant cost to the Company. In response, Mountaire began mandating that all Catchers receive daily lunch breaks. A00866/Lynch 83.

After settling the lawsuit, Live Haul Management made a number of requests to the Crew Leaders to ensure that their Catchers were regularly taking thirty (30) minute lunch breaks. A00676/Owen 65; A00829-830/Lynch 41-42. Despite these reminders, Al Zlotorzynski, Human Resources Manager, discovered that there was no consistency among the Crews taking lunch. A00676/Owen 65; A00829-830/Lynch 41-42.

When Mr. Zlotorzynski discovered there was no consistency among the Crews taking lunch, he prepared a Final Warning for all Crew Leaders, including those not involved in this case.  A00678/Owen 67.  The Final Warning stated:

> You are being notified that if it is found that you worked your crew longer than 6 ½ hours without taking lunch, your employment will be terminated immediately upon Mountaire's awareness of the incident.  No further excuses will be accepted.  Once your crew has reached 6 ½ hours of work and they have not stopped for lunch they must stop for 30 continuous minutes for lunch.  This procedure was explained to all crew leaders by David Nuse and Al Z.  Your signature below means you fully understand the policy and not following the policy will be a willful and wanton disregard of the rules and you will be terminated without further warnings.

A00446-459/Garrison 216-229; A00269/Gibbs Ex. 6; A00802/Walters Ex. 7.    Mr. Garrison testified that Mr. Al Zlotorzynski "came out on the farm and issued me this letter, saying that if I don't make them guys sit down and take a half-hour lunch, I would be terminated."  A00447/Garrison 217.  Mr. Garrison also testified that he was aware that the Catchers had filed a previous lawsuit against Mountaire alleging that they were entitled to overtime compensation because they were not receiving a lunch break and the lawsuit was settled because it was determined that some of the Crew Leaders were not making their Crews take a lunch.  Mr. Garrison, Mr. Gibbs and Mr. Walters (who were the only Crew Leaders who remained employed with Mountaire as Crew Leaders) understood that the purpose of the warning was to make sure that all the Crew Leaders required their Crews to take lunch.  A00447-448/Garrison 217-218; A00796/Walters 166; A00531/Gibbs 144.

Phil Owen explained the reason for the final warning:

> "After a while, you get to the point where you have talked and talked and talked and talked, and it was over a year probably, year-

and-a-half, close to two years that this had been under discussion,
and this was to make sure that everyone took a lunch, 30 minutes,
to make sure it would happen." A00677/Owen 66.

Mr. Owen explained that it was unclear which Crew Leaders were giving their

Crews lunch and which were not, and, therefore, Human Resources decided to issue the

Final Warning to all Crew Leaders, "to make sure that everybody knows they're on the

same equal footing, so that we're not accused of playing favorites or singling any person

out." A00679/Owen 69.

When asked whether the Crew Leaders would have felt that receiving the final

warning was a serious situation, Mr. Owen responded, "If they weren't having lunches,

they might be concerned.  But those who were doing the lunches, if there were Crew

Leaders who did the lunch situation, they didn't have a thing to worry about."

A00680/Owen 70.

This Final Warning was not related to the filing of this lawsuit and there was no

feedback from the Crew Leaders that they felt that this warning was a threat or in any

way occasioned by this lawsuit.  A00830/Lynch 42; A00677, 682/Owen 66, 72.  Mr.

Walters testified that no one threatened him.  A00796/Walters 166.

Paragraphs 35 and 36 of Plaintiffs' Complaint alleges the Plaintiffs were

subjected to "verbal harassment," were "issued final warnings," were "threatened,"

"coerced," "intimidated," and "cornered by various management personnel and

questioned individually regarding their discussion with counsel and the nature of this

action." The deposition testimony of Plaintiffs does not support these allegations.  Mr.

Walters and Mr. Briddell testified, in fact, that they were not harassed, cornered, or

threatened by management.    A00798/Walters 168; A00631-632/Briddell 140-141; A00544-548/Gibbs 160-164.

In ¶ 37 of Plaintiffs' Complaint, Plaintiffs allege that someone from Mountaire management spied on them while they met with counsel at Doyles' restaurant on a Saturday morning.    Mr. Garrison testified that he recognized the gray vehicle of Mountaire Upper Management driving in and then out of the restaurant parking lot and that Mr. Owen, Human Resources Director, was driving.    A00460-461/Garrison 231-232; A00799/Walters 169.  Mr. Briddell and Mr. Davis testified that the vehicle was a tan Crown Victoria and that they knew it was a Mountaire car but could not see the person driving the car. A00633/Briddell 146; A00822/Davis 45.  Mr. Lynch testified that he had no knowledge about the Crew Leaders meeting their counsel at the restaurant and it was not his vehicle circling the parking lot. A00831-832/Lynch 43-44.

When asked what Mr. Garrison thought the person driving the car had to do with this lawsuit he responded, "I don't know, good question." A00460/Garrison 231.  Mr. Walters testified that he did not feel harassed by this person driving through the parking lot. A00801/Walters 187.  Mr. Walters did not see who was driving, but said that it was not Mr. Owen. A00799-800/Walters 169, 184.

## ARGUMENT

### A.    Standards for Summary Judgment

A moving party is entitled to summary judgment if it can demonstrate that: (1) there is no genuine dispute as to any material fact; and (2) summary judgment is appropriate as a matter of law. Fed. R. Civ. P. 56. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Third Circuit has recognized, "[a] disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law. . . . Thus, while the facts must be viewed in the light most favorable to the nonmoving party and all inferences must be drawn in that party's favor, there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely colorable, ... or is not significantly probative, ... summary judgment may be granted." *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992) (citations and internal quotations omitted). Moreover, the evidence supplied by the nonmoving party must be more than "mere allegations." *Olson v. General Elec. Aerospace*, 101 F.3d 947, 951 (3d Cir. 1996).

### B.    Plaintiffs' Job Responsibilities At All Times Relevant Fell Within The Executive Exemption Of The FLSA, 29 U.S.C. § 213(a).

The Plaintiffs claim that they are not exempt under the FLSA and that they are entitled to overtime compensation for the hours worked in excess of forty (40). There is no dispute that, at times, Plaintiffs worked more than forty (40) hours during some of the weeks they were employed. Plaintiffs, however, are exempt because they are "executive employees" within the meaning of the Department of Labor regulations. *See* 29 C.F.R. § 541.214.

1.    **The FLSA's Executive Exemption**

    a.    **The Exemption Generally.**

The FLSA prohibits an employer from employing any worker "for a workweek longer than forty hours unless such employee receives compensation ... at a rate not less than one and one-half times the [worker's] regular rate" for the excess hours. 29 U.S.C. § 207(a) (1). The Act, however, exempts "any employee employed in a bona fide executive...capacity..." 29 U.S.C. § 213(a) (1).

FLSA Regulations state that:

(a)    The term "employee employed in a bona fide executive capacity" in section 13(a) (1) of the Act shall mean any employee:

    (1)    Compensated on a salary basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities;

    (2)    Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

    (3)    Who customarily and regularly directs the work of two or more other employees; and

    (4)    Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

In the case at bar, the Crew Leaders are compensated on a salary basis at a rate greater than $455 per week and, therefore, satisfy section (a) (1).

The Crew Leaders' primary duties involve management of the enterprise. Since this element is the most litigated portion of the regulation, it will be discussed more fully in section 2 below.

With respect to (a) (3), Crew Leaders are responsible for directing the work of the seven (7) to eight (8) Catchers and one (1) Forklift Operator in their Crew. The provisions of section (a) (3) are, therefore, met.

Additionally, with respect to section (a)(4) and as discussed more fully above, the Crew Leaders are responsible for staffing and maintaining a full Crew. This responsibility includes recruiting Catchers and recommending them for hire. The only time a Crew Leader's recommendation is not honored is when the individual failed the pre-employment testing or if the person worked for Mountaire in the past and had a poor prior work record. The Crew Leaders also have the authority to discipline employees up to, and including, termination. As discussed above, many of the Crew Leaders regularly disciplined members of their Crews and while Catchers typically quit before they were terminated, Crew Leaders have effectively recommended the termination of Catchers. Plaintiff Garrison terminated Clarence Heath and Plaintiff Briddell terminated Charles Hitchens. The Crew Leaders also have the authority to recommend a member of their Crew for promotion. Mr. Gibbs recommended that Mr. Walters be promoted from Catcher to Forklift Operator.

### b.     The Crew Leader's Primary Duty is Management.

Much of the litigation of section(a) (2) of the DOL's regulations surrounds the interpretation of the terms "primary duty" and "management." Primary duty is defined in 29 CFR §541.700(a) of the FLSA regulations as follows:

> To qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work. The term ``primary duty'' means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct

supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

Below is an analysis of the aforementioned factors. Specifically, the following is reviewed below: (1) relative importance of exempt duties of Crew Leaders as compared with other types of duties; (2) the amount of time spent performing exempt work and frequency with which Crew Leaders exercise discretion; (3) the Crew Leaders' freedom from direct supervision; and (4) the relationship between the Crew Leaders' salary and the wages paid to their Crews.

### (i)    The Relative Importance of Exempt Duties of Crew Leaders as Compared With Other Types of Duties.

In this case, the relative importance of each Crew Leaders' managerial duties as compared with other duties is overwhelming. It is undisputed that the Crew Leaders directed the work of eight (8) to nine (9) men on a regular basis while on the Farms. They are the only supervisors present on the Farms and are the primary contact with the Grower.

The employee's primary duty is what he does that is of principal value to the employer, not the collateral tasks that he may also perform. *Eric Johnson v. Home Team Productions, Inc.*, 2004 WL 1586552 *1, *7 (E.D. La. 2004). Where, as here, the employee's "principal value" is to direct the day-to-day operations of the Crew, even assuming arguendo that he performed a "substantial" amount of non-exempt work, the employee still has management as his primary duty. *Baldwin*, 266 F.3d at 1115 (the employees principal value to the employer was directing the day-to-day operations of the park even though they performed a substantial amount of manual labor); *Donovan v. Burger King Corp.*, 675 F.2d 516 (2d Cir. 1982) ("Burger King II") (the managers'

principal responsibility was managerial because their management functions were most important or critical to the crew and the crew could not operate successfully unless their assistant manager functions were performed). In *Roberts v. National Autotech*, 192 F. Supp 2d 672, 678-79 (N.D. Tex. 2002), the Court cited with approval the decision in *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 866-67 (N.D. Tex. 2001):

The plaintiff manager allegedly spent up to ninety percent of his time performing the same work as hourly employees and did not have final decision-making authority. The Court nevertheless found the plaintiff's "principal value" to the company was a manager, scheduling employees, developing work schedules, communicating direction to employees, and recommending discipline. He was ultimately responsible for the daily operation of his bakery department. The plaintiff argued that many of his responsibilities were performed by simply filling out standardized company forms, a task that hourly employees often performed as well, and that he did not have independent authority to act, without first receiving supervisory approval, with respect to several managerial tasks. The Court found "unpersuasive" the plaintiff's attempts to filter himself from exempt status. (emphasis added). *See also Haines*, 939 F. Supp. at 450 (E.D. Va. 1996) (Crew manager exempt despite spending majority of her time on non-exempt tasks because managerial tasks were so important that she "received praise or blame over whatever happened at the Crew, good or bad.") (emphasis added); *Jones v. Virginia Oil Co, Inc.*, C.A. No. 02-1631, 2003 WL 21699882 (4th Cir. July 23, 2003) (manager of Dairy Queen exempt because her managerial functions were critical to the success of the Dairy Queen because the restaurant could not successfully operate unless she performed her managerial functions, such as ordering inventory, hiring, training, scheduling employees,

and completing the daily paper work); *W.C. Kelly, III v. Adroit Inc.*, 480 F. Supp 392 (E.D. Tenn. 1979) (Court foreman was an executive employee and, therefore, not entitled to overtime compensation based, in part, on the fact that top management considered plaintiff's managerial role paramount to his non-managerial work). Similar to these cases, Mountaire management also considers the Crew Leaders' managerial role paramount to their non-managerial work. As Mr. Lynch testified, the Crew Leaders are the "leaders out there." A00879/Lynch 103.

In *Guthrie v. Lady Jane Collieries, Inc.*, 722 F2d 1141, 1144-1145 (3d Cir. 1984), the Court found that the coal mine foremen were exempt executives, in part, because their duties included overseeing the work done by the crews, assuring that the work complied with the plans, recognizing dangerous conditions, maintaining proper ventilation, controlling the workforce, giving out assignments to the crew, checking the equipment, training the crews and deciding whether a new crew member was trained sufficiently to begin work, and keeping records.

The Crew Leaders in this case perform each of these duties in directing their Crews. The Guthrie court rejected the plaintiffs' argument that the foremen were nonexempt because their primary responsibility was coal production and concluded that the foreman's safety and supervisory functions were "uniquely essential to the operation of the mine and to the extent that these functions are carried out simultaneously with the performance of nonexempt work, we are not persuaded that they must be regarded as non-managerial." *Id.* at 1145. The Mountaire Crew Leaders' primary duties are also safety and supervisory and are similarly "uniquely essential" to the operation of the

poultry processing. Without the Crew Leaders direction of their Crews, the Plant would not be able to function.

Thus, the relative importance of the Crew Leaders' exempt duties as compared with other types of duties supports a finding that the Crew Leaders have satisfied this factor.

**(ii)    The Amount Of Time Spent By Crew Leaders Performing Exempt Work And Frequency With Which Employees Exercise Discretion.**

Section 29 CFR §541.700(b) of the Regulations further addresses the importance of the amount of time spent performing exempt work:

The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

As fully described above, Plaintiffs spent a substantial amount of their work time on exempt tasks such as recruiting, hiring, staffing, and training their crew; directing their work and exercising their discretion in each step of the chicken catching process; ensuring the safety of the Crew and the Grower's property; maintaining management records for use in supervision; appraising their employees' productivity and efficiency for the purpose of recommending promotions; handling their complaints and grievances,

disciplining them when necessary up to, and including, termination; planning their employees' work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used; and approving time off. While Plaintiffs argue that time spent transporting the Crews is non-exempt, this is the only evidence of non-exempt work that the Crew Leaders regularly perform.

It is not the Crew Leaders duty to catch the chickens with his Crew. Mr. Walters testified that since he has become a Crew Leader he has not caught chickens with his Crew. Moreover, Mr. Lynch sent a memo explaining that Crew Leaders would not receive additional pay for performing their Crews' responsibilities, noting, "You should make every effort possible to be fully staffed everyday. It will be acceptable to pay short hand pay to the catchers" which was sent to remind Crew Leaders that their responsibilities were to supervise the Crew, not to catch chickens.

The Crew Leaders in this case frequently exercised discretionary powers in performing the managerial duties and responsibilities described above. The duties performed by the Crew Leaders, such as assigning employees to particular tasks, ensuring employees perform assigned tasks and representing management in dealing with employees constitute the exercise of discretionary powers. *Burger King II*, 675 F.2d at 521. *Baldwin*, 266 F.3d at 1115 (employees frequently had the opportunity to exercise discretionary powers in their management of the park because they managed the park without much participation or interference from the Employer, they supervised employees, they implemented corporate policies, they represented the employer as an on-

site representative, and the fact that they essentially ran the park handling problems as they arose and were therefore exempt as executives employees).

Some Crew Leaders testified that they had other members of their Crew train a new Catcher, while other Crew Leaders testified that they trained the employees themselves. Similarly in *Sturm*, 864 F. Supp at 1351, the Court rejected the plaintiffs' argument that since other employees trained new hires, they could not be classified as exempt, noting that "who did the 'actual' training of new hires is of less importance...than who was 'responsible' for seeing that it was in fact accomplished." The Sturm court concluded that the plaintiffs were "performing tasks whenever they ensured that the task of training new employee was accomplished." Id. It is undisputed in the case at bar that it was the Crew Leader's responsibility to ensure that the new employees received proper training and they completed training.

The Crew Leaders are responsible for handling their Crew's complaints in the first step in the grievance process. They are also responsible for issuing discipline among their Crew including warnings, and effectively recommending employees for discharge. The Sturm court noted that this authority is inherently managerial because, "employees do not expect notice of termination to be delivered to them by a co-worker. They expect to learn of this type of news from their 'superior.'" *Sturm*, 864 F. Supp at 1351.

The undisputed evidence set forth above reflects that the Crew Leaders were always managing and supervising their Crews even when performing non-exempt work along side their Crews, and, therefore, exercised the requisite discretionary power to be exempt from overtime.

Even assuming arguendo that over 50% of the Crew Leader's time was spent performing non-exempt tasks, the relevant case law clarifies that "primary duty" does not mean 50% of the time and that an employee may have management as his primary duty even if he performs non-exempt functions more than 50% of the time.

The seminal case concerning the application of the executive exemption is *Burger King I*, 672 F.2d 221. *Burger King I* concerned the exempt status of assistant managers for several of the Company's crews who reported to a supervisory crew manager but also supervised several hourly employees.

The Burger King assistant managers scheduled employees, assigned work, oversaw product quality, and spoke with customers. They also trained employees, determined the quantity of food to be produced at any given time, and performed various record keeping, inventory, and cash reconciliation duties.    Many of the assistant managers' tasks were governed by highly detailed, step-by-step instructions contained in a corporate policy manual that permitted little or no variation. The assistant managers also spent a portion of their time performing many of the same tasks as hourly employees, such as taking orders, preparing food, and "expediting" orders, that is, filling the orders and handing them to the customers.    After a review of the facts and the Department of Labor regulations, the Court in Burger King I concluded that the assistant managers had management as their primary duty and thus qualified for the executive exemption.

In applying *Burger King I* to the facts of this case, the Crew Leaders assigned work, oversee product quality, and spoke with customers, who are the Growers. They also train employees and perform managerial record keeping.    While the Crew Leaders

are responsible for ensuring that the Crew follows Mountaire's Live Haul Guidelines, the Plaintiffs testified that the procedures could not always be followed and that it was within their discretion to deviate from these procedures when they deemed necessary. Thus, the Crew Leaders have more discretion than the Burger King Assistant Managers because they were not bound to highly detailed, step-by-step instructions contained in a corporate policy manual that permitted little or no variation. Additionally, while the Crew Leaders spend some time performing many of the tasks performed by their Crew, the assistant managers in Burger King spent significantly more of their time performing many of the same tasks as hourly employees, and the Court still concluded that the assistant managers had management as their primary duty. Additionally, unlike the Burger King assistant managers, the Crew Leaders direct the work of eight (8) to nine (9) men all day without supervision, they have the authority to hire and discipline, can recommend termination, address their Crew's grievances, and can approve time off. Thus, in applying Burger King I, the Crew Leaders have management as their primary duty and, therefore, qualify for the executive exemption.

In *Burger King II*, 675 F.2d 516, the Second Circuit Court of Appeals also concluded that assistant managers of the fast food chain were exempt executive employees. The Court concluded that the assistant managers had managerial responsibility as their "primary duty," despite the fact that over 50% of their time was spent engaged in non-managerial functions. Significantly, the Court found that the assistant managers' principal responsibility was managerial because their management functions were most important or critical to the restaurant and the restaurant could not operate successfully unless the assistant manager functions were performed. Similarly, in

this case the Crew Leader's functions are critical to Mountaire because the Company could not operate without a leader at the farms supervising the chicken catching process and ensuring that Mountaire's standard operating procedures were followed. In *Burger King II*, the court found that the assistant managers exercised discretionary power because they scheduled work for the employees, had the power to move employees to different tasks and represented management in dealing with the employees. In this case, Crew Leaders have the power to move employees and direct their work. They also represent management when dealing with both their Crews and Growers. The *Burger King II* Court concluded that the assistant managers were paid substantially higher wages than employees performing exclusively non-exempt work. *Id.* at 522. The Crew Leaders in this case make substantially more than the Crew, are eligible for bonuses that their Crews are not, and generally receive much more favorable benefits than the Crews. Like *Burger King I, Burger King II* supports that the Crew Leaders are executive employees.

Since the Burger King line of cases, many circuits have similarly concluded that managerial employees who are similarly engaged in non-managerial work over 50% of their time are, nonetheless, exempt as executive employees. *Baldwin*, 266 F.3d 1104 (Managers of a recreational vehicle park were exempt executives under the act despite the fact that they spent more than 50% of their time on nonexempt manual tasks); *In Re: Food Lion, Inc., et al. v. McLawhon, et al.,* 151 F.3d 1029 (4th Cir. 1998) (Assistant Manager for grocery crew chain who testified he spent only 5% of his time in managerial work, but did not contest the fact that he supervised other employees, was an exempt executive); *Murray, et al v. Stuckey's Inc.,* 939 F.2d 614, 619 (8th Cir. 1991) (Managers of road side crews were exempt executives under the Act, despite the fact that they spent

as much as 90 percent of their time on non-managerial duties, delegated discretionary functions to hourly employees and were actively supervised by regional managers. "Like other courts that have considered the question, we believe that the manager of a local crew in a modern multi-crew organization has management as his or her primary duty even though the discretion usually associated with management may be limited by the company's desire for standardization and uniformity"); *East v. Bullocks Inc.*, 34 F. Supp. 2d 1176 (D. Ariz. 1998) (Department Manager for large retail clothing Crew who testified she spent 50% of her time selling, 20% of her time managing others employees and 30% of her time merchandising, markdowns, floor moves and talking to buyers was an exempt executive); *Haines*, 939 F. Supp. 441 (Factual dispute over the percentage of time manager spent pursuing executive functions does not preclude summary judgment for the defendant, the five factor test used to determine the 'primary responsibility' of an employee is a 'weighing test' and the managers employment satisfies the overall test, even if a factual issue remains as to the one factor.); *Sturm*, 864 F. Supp. 1346 (Convenience Crew manager was exempt executive despite substantial amounts of non-managerial work performed).

Based on the foregoing, the amount of time spent by Crew Leaders performing exempt work and frequency with which the Crew Leaders exercise discretion support that this factor is satisfied in determining whether the Crew Leaders qualify for the executive exemption.

    **(iii)    Crew Leaders are Free of Direct Supervision While Out on the Farms.**

Crew Leaders are free from supervision out on the Farms. *Thomas v. Jones Restaurants, Inc.*, 64 F. Supp 2d 1205, 1214 (M.D. Al. 1999) (employees exempt and

found to be "relatively free from supervision" based on the fact that employees were responsible for the operation when her supervisor was not present and although her supervisor called ten (10) to fifteen (15) times a day and initially visited the restaurant every day). In *Jones v. Virginia Oil Company, Inc., supra,* the district manager stopped by the crew one (1) to four (4) times a week to "check on things," and he stayed anywhere from five minutes to all day and still was found to be exempt.

In this case there is no evidence of upper management visiting the farms on any kind of a regular basis. The Crew Leaders are the sole leaders on the farms. *See Baldwin,* 266 F.3d at 1115 (Court found overtime executive exemption applicable where employees were free from daily supervision, and there was no regular oversight from the employer). In Guthrie supra, the court noted that the fact that the foreman were "in charge" had the most weight in the determination of whether the foreman met the executive exemption noting that while there were higher authorities than the foreman at the mine, the foreman were essentially on their own when working underground for most of the day and were the persons on the property in highest authority about half the time. *Id.* at 1146.

The Mountaire Crew Leaders similarly are "in charge" of the Crew while at the farms, but unlike the foreman in Guthrie, Thomas, and Jones, the Crew Leaders worked independent of any supervision at the farms and are almost always the persons with the highest authority on the farms, confirming their exempt status as executive employees.

(iv)    **The Crew Leaders' Salaries are In Line with Management as Opposed to Wages Paid to Their Crews.**

There is no dispute in this case that the Crew Leaders satisfy the wage requirement of the applicable regulation. There is a significant disparity between the pay

received by the Crew Leaders and that of their subordinates. The Crew Leaders received an average annual salary of $41,636 in 2004 and they were also eligible for two (2) bonuses, one based on the performance of their respective Crews and the other based on the profitability of the Company. It is noteworthy that this amount is higher than other comparable supervisors at Mountaire who received an average annual salary of $38,244 in 2004. On the other hand, the Catchers were paid on a piece rate basis and received an average pay of $29,161.70 on an annual basis. Thus, the Crew Leaders' salaries were in line with other managerial employees at Mountaire as opposed to wages paid to their Crews.

The Court in *W.C. Kelly III.*, 480 F. Supp at 393, relied in substantial part on the fact that the foremen's salaries were more in line with managerial salaries when compared with the salaries of the hourly crew. *See also Baldwin*, 266 F.3d 1104 (the court found that Baldwin was an executive employee relying in part on the fact that there was a $500 difference between Baldwin's salary and the individuals he supervised and Baldwin was eligible for bonuses that the individuals he supervised were not), *Cobb v. Finest Foods Inc.*, 755 F.2d 1148, 1150 (4th Cir 1985) (the Court found the employee to be covered by the executive exemption in large part because his salary was comparable to that of defendant's other managerial employees and well above that received by the hourly employees).

Notably, Crew Leaders, as salaried employees, received a paycheck for a guaranteed sum, regardless of their work schedule or hours worked. On the other hand, Crews are paid on a piece rate basis without any guaranteed number of weekly hours or pay. *See Johnson v. Home Team Prod., Inc.*, C.A. No. 03-2775, 2004 WL 1586552, at *1,

*7 (E.D. La. July 15, 2004) (a factor to consider in evaluating the relationship between the manager's salary and the wages paid to the other employees include the guaranteed nature of the manager's pay).

In this case, Crew Leaders receive salaries in excess of other managers at the Company and substantially more than the Crew members. The Crew Leaders also receive several additional benefits which the Crews do not, such as two (2) bonuses discussed more fully above and paid sick time. Thus, this factor weighs in favor of the Crew Leaders' exempt status.

### 2. The Crew Leaders' Primary Duties Involve Management.

As set forth in section B(1)(a) above, the term "employee employed in a bona fide executive capacity" in section 13(a) (1) of the FLSA shall mean "any employee whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof." The term management as it is used in the FLSA regulations is defined in §541.102, as follows:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

The Crew Leaders exhibit most of the aforementioned indicia of management. For example, Crew Leaders are responsible for recruiting, hiring and staffing their Crews (*see* Section C, Statement of Facts—Recruiting, Hiring and Staffing the Crew); are responsible for training their Crews whether they do it themselves or assign the task to another Crew member (*see* Section D, Statement of Facts—Training the Crew); they maintain production records for use in supervision or control (*see* Section H, Statement of Facts—Completing Management Paperwork); Crew Leaders can recommend the promotion of a member of their Crew (*see* Section L, Statement of Facts—Other Supervisory Duties); are responsible for handling employee grievances and complaints (*see* Section I, Statement of Facts—Addressing Grievances); discipline employees up to and including termination (*see* Section J, Statement of Facts—Authority to Discipline Crew Up To and Including Termination); plan the work and determine the techniques to be used (*see* Section F(2), Statement of Facts—Crew Leaders Exercise Discretion in Each Step of the Chicken Catching Process); apportion the work among the Crew (*see* Section F, Statement of Facts—Crew Leaders Directing the Work of their Crews); determine the type of materials, supplies, machinery, equipment or tools to be used (*see* Section F(2), Statement of Facts); control the flow and distribution of materials, supplies and tools (*see* Section L, Statement of Facts); and provide for the safety and security of the employees and the Grower's property (*see* Section G, Statement of Facts).

In sum, the Crew Leaders satisfy the "primary duty is management" criterion of the FLSA.

48

### 3.     Plaintiffs' Self Assessments Demonstrate That They Perceived Themselves as Supervisors.

The Crew Leaders' self assessments contain admissions, in Plaintiffs' own words, that they, in fact, view themselves as supervisors.  While it is unwieldy to go through each example, as laid out fully in the Statement of Facts, the most significant admissions are discussed here.

Mr. Walters stated in the Planning Category, "Have been able to identify problems, and establish goals and priorities to accomplish results." Mr. Gibbs noted that he "Do well at organizing and planning to get what needs to be done." Mr. Garrison explained "Some jobs you have to look at it and make good decisions in order to accomplish your goals."   The Crew Leaders are essentially admitting that they are exercising their managerial discretion to organize, plan and direct the work of their Crews while making good decisions in order to get the job done. Under the heading "Initiative" Mr. Gibbs wrote that he, "Encourages and delegates work in a respectful manner."  The word "delegates" suggests that he is supervising the work of his Crew.

Under the heading "Decision Making and Problem Solving," Mr. Walters wrote, "have recognized problems and made decisions to accomplish results." Mr. Gibbs similarly commented, "make sound and logical decisions to solve problems effectively," and Mr. Garrison noted the exchange of information between him and his Crew, "first in order to get down to the root of the problem, you have to ask questions about the problem in order to solve it."  These statements highlight the Crew Leaders' need to make sound decisions and employ appropriate problem solving skills, which are inherently supervisory.

Under the heading "Leadership and influence" the Plaintiffs highlight the importance of working as a team and of leading by example. Specifically, Mr. Walters stated, "My crew understands what I, as a crew leader, want and together we have tried to reach that goal." Mr. Gibbs wrote his goal was to "continue good leadership and lead by example." Mr. Garrison explained, "Working together is one of the first things you need to do as a Leader; seeing that the job gets done by helping them out."

Under the heading "Communication" Mr. Garrison mentioned the importance of listening to the input of his Crew but commented that he was responsible for making the ultimate decision, "Communication has a lot to do with the job. That is why I listen to their ideas, but I will decide the best thing to do." Similarly in the "Teamwork" section, Mr. Garrison indicated that he found that his Crew worked best as a team when he put each Crew Member into the right job assignment: "Putting the men in the right job assignment, where everyone is comfortable and works has a team."

In fact, Mr. Gibbs's response to the question "What specific skills do you want to focus on this coming year?," is an outright admission that he viewed himself as a supervisor when Mr. Gibbs responded, "I would like to focus to my leadership skills." Thus, based on these statements alone, Plaintiffs have admitted, in their own words, that they are, in fact, supervisors.

### C. Plaintiffs Cannot Establish A Claim Under the Delaware Wage Payment and Collection Law.

The Plaintiffs have no claim under Delaware's Wage Act, 19 Del. C. § 1101 et seq., because the claim is based solely on the flawed theory that they were entitled to overtime pay under FLSA. The Wage Act creates no independent right to overtime and no separate definition of the Executive Exemption, but merely is a vehicle to enforce

claims to wages, including overtime, that are proven to be due.  As set forth above, the Plaintiffs are not due overtime wages because their job responsibilities at all times relevant were encompassed within the Executive Exemption of the FLSA.  Because the Plaintiffs cannot establish that overtime is due, they cannot establish non-payment of wages and thus have no claim under Delaware's Wage Act.

**D.    Plaintiffs Cannot Establish That They Were Retaliated Against**

Mountaire is also entitled to judgment as a matter of law on the Plaintiffs' claim for retaliation in violation of § 15(a) (3) of the FLSA, 29 U.S.C.A. § 215(a) (3).  Courts have applied the shifting burden framework first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) to evaluate certain claims under the FLSA.  *See e.g., Brock v. Casey Truck Sales, Inc.*, 839 F.2d 872, 876 (2d Cir.1988). Under this framework, the plaintiffs bear the initial burden of establishing a prima facie case and must show:

> (1)  that they engaged in a protected activity;
> (2)  that an adverse employment action was taken against them subsequent to or contemporaneously with such activity; and
> (3)  that a causal link exists between the protected activity and the adverse action.

*Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989); *Harris v. Mercy Health Corp.*, C.A. No. 97-7802, 2000 WL 1130098 (E.D. Pa. Aug. 9, 2000).

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate, non-retaliatory reason for the adverse employment action.  *Id.*  At this point the burden again shifts to the plaintiff to submit evidence from which a fact finder could reasonably disbelieve the employer's articulated reasons or find that such reasons were merely a pretext. *Id.* at * 7.

In support of their retaliation claim the Plaintiffs have asserted: (1) that Human Resources issued a Final Warning to all of the Crew Leaders requiring them to ensure that their Crews were taking lunch; (2) that Plaintiffs were subjected to "verbal harassment," were "issued finial warnings," were "threatened," "coerced," "intimidated," and "cornered by various management personnel and questioned individually regarding their discussion with counsel and the nature of this action;" and (3) that a Mountaire vehicle was spotted driving in and out of Doyle's public restaurant parking lot in order to spy on Plaintiffs. Each of these factual assertions is discussed below.

In April 2002, Mountaire was a defendant in a previous overtime collective action which involved the claim that Catchers were not provided with lunch breaks. This prior lawsuit was settled at a significant cost to the Company. Thus, when Al Zlotorzynski, Human Resources Manager, discovered that there was no consistency among the Crews taking lunch, he prepared a Final Warning for all Crew Leaders, including those not involved in this case. The three (3) Plaintiffs who remained as Crew Leaders at that time admitted that they were aware that the Catchers had filed a previous lawsuit and understood that the purpose of the warning was to make sure that all of the Crew Leaders were, in fact, providing a lunch break for their Crews. The Plaintiffs' own deposition testimony undermines the allegation that the warning was in response to their lawsuit. Additionally, the fact that all eight of the Crew Leaders (not just the three Plaintiffs) received a "Final Warning," including Crew Leaders who did not join in this lawsuit, demonstrated clearly that the warning was unrelated to this lawsuit.

Regarding Plaintiffs' claims that they were subjected to "verbal harassment," were "threatened," "coerced," "intimidated," and "cornered by various management

personnel and questioned individually regarding their discussion with counsel and the nature of this action" Plaintiffs' depositions contradict these allegations. Specifically, Mr. Walters and Mr. Briddell testified that they were not harassed, cornered, or threatened by management, and the other Plaintiffs failed to offer any evidence to support this claim.

The Plaintiffs' deposition testimony contradicts the allegation that someone from Mountaire management spied on the Plaintiffs by driving through the Doyles' restaurant parking lot while they met with counsel. Plaintiffs' deposition testimony varied greatly on who was driving the car and what kind of car it was. Assuming arguendo that someone from Mountaire management was driving a car through a public parking lot without stopping, this can hardly constitute retaliation as a matter of law. In fact, when asked what Mr. Garrison thought the person driving the car had to do with this lawsuit he responded, "I don't know, good question," and Mr. Walters testified that he did not feel harassed.

Thus, in looking at whether Plaintiffs established a prima facie case of retaliation, while Plaintiffs can establish that they satisfied the first element, that they engaged in a protected activity, they are unable to establish that they either suffered an adverse employment action or that a causal link existed between the protected activity and the adverse action.

Plaintiffs cannot establish that they suffered an adverse employment action. Even when viewing the facts most favorable to the Plaintiffs, there is no evidence of an adverse employment action. The Plaintiffs' reliance on the Final Warning as an adverse employment action is misplaced. The Court in *Harris*, 2000 WL 1130098, found that a

plaintiff offered no evidence, nor made the allegation that the "critical evaluation" given to him had any materially adverse effect on the terms and conditions of his employment, citing to *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300-1301 (3d Cir.1997). Similarly in this case, the Plaintiffs have not shown how the "Final Warning" had a material adverse effect on the terms and conditions of their employment.

Additionally, the fact that all of the eight (8) Crew Leaders received the same warning despite the fact that only three (3) of them are Plaintiffs, undermines Plaintiffs' theory of retaliation. *Blackie, et al. v. State Of Maine, et al.*, 75 F.3d 716, 723-724 (1st Cir. 1996) (explaining that an employee, "by engaging in a protected activity [under the FLSA], ...does not acquire immunity" from the same discipline to which his co-workers are subject); *DeNovellis v. Shalala*, 135 F.3d 58, 66 (1st Cir.1998) (denying relief to an employee despite a showing of personal animosity because the "animus did not cause [the employee] to be treated any differently than her similarly situated co-workers"). Further, as discussed more fully above, Plaintiffs admitted that they knew that the Final Warning was in response to the Catcher lawsuit and the fact that some of the Crews were not taking a lunch. Thus, while the timing of the Final Warning was after Defendants were on notice of Plaintiffs' claims, the Plaintiffs' admissions and the fact that all of the Crew Leaders received the same notice fail to support that the warning was, in fact, responsive to the Crew Leaders' protected activity.

To defeat summary judgment when a defendant has offered a legitimate reason for its action, the "plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely

than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Plaintiffs cannot show that discriminatory animus motivated Mountaire because they have failed to point to any evidence from which a reasonable factfinder could infer that Mountaire issued the Final Warning in response to the commencement of this lawsuit. *See Cononie v. Allegheny General Hospital*, C.A. No. 01-2024, 2002 WL 181357, at *2 (3d Cir. Feb. 5, 2002) (Defendants assertion that Plaintiff was fired for violating the hospital's confidentiality policy (which plaintiff admitted could lead to termination) constituted a legitimate, nondiscriminatory reason for termination, and therefore summary judgment was appropriate).

In order to withstand summary judgment, Plaintiffs need to present this Court with some evidence that "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' ... and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.' " *Fuentes*, 32 F.3d at 765. Plaintiffs cannot meet this standard. Mountaire was well within its rights to issue the Final Warning because of the potential liability the Company faced if it knowingly allowed the Crew Leaders to violate the FLSA. Thus, the retaliation claim must fail.

## CONCLUSION

As the foregoing demonstrates, there is no material dispute of fact at issue in this case and Mountaire is entitled to judgment as a matter of law. Accordingly, Mountaire respectfully requests that the Court grant summary judgment in its favor and dismiss Plaintiffs' claim with prejudice.

Respectfully submitted,

CONNOLLY BOVE LODGE & HUTZ, LLP

Matthew F. Boyer (Del. Bar No. 2564)
The Nemours Building
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE 19899
(302) 884-6585

Arthur M. Brewer (pro hac vice)
Laura A. Pierson Scheinberg
SHAWE & ROSENTHAL, LLP
Sun Life Building, 11th Floor
20 S. Charles Street
Baltimore, MD 21201
(410) 752-1040
Dated: May 2, 2005
CBLH: 394344

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of **Opening Brief In Support Of Defendants' Motion For Summary Judgment** was served electronically, on this May 3, 2005, to:

Jeffrey K. Martin, Esquire
1509 Gilpin Avenue
Wilmington, DE  19806

Matthew F. Boyer