# TAB 7

ORIGINAL

1

```
         IN THE UNITED STATES DISTRICT COURT
           IN AND FOR DISTRICT OF DELAWARE


WILLIE DAVIS, JR.,                    )
NATHANIEL BRIDDELL,                   )
GEORGE W. FEDDIMAN,                   )
JOSEPH GARRISON,                      )
ROY H. WALTERS,                       )
ALL SIMILARLY-SITUATED CURRENT        )
AND FORMER EMPLOYEES OF               )
MOUNTAIRE FARMS, INC.,                )
MOUNTAIRE FARMS OF DELMARVA,          )
INC., and MOUNTAIRE FARMS             )
OF DELAWARE, INC.,                    )
            Plaintiffs,               )
      -vs-                            )  C.A. No. 04-0414-KAJ
                                      )
MOUNTAIRE FARMS, INC.,                )
MOUNTAIRE FARMS OF                    )
DELMARVA, INC., and                   )
MOUNTAIRE FARMS OF                    )
DELAWARE, INC., all Delaware          )
corporations,                         )
            Defendants.               )
```

         Deposition of ROY H. WALTERS, taken before
Pamela C. Washington, Registered Professional Reporter
and Notary Public, at the law offices of Young,
Conaway, Stargatt & Taylor, 110 West Pine Street,
Georgetown, Delaware, on February 15, 2005, beginning
at 10:00 a.m.

APPEARANCES:

    On behalf of the Plaintiffs:
       Margolis Edelstein
       BY:  JEFFREY K. MARTIN, ESQ.
       and  KERI WILLIAMS, ESQ.
       1509 Gilpin Avenue
       Wilmington, Delaware  19806

    On behalf of the Defendant:
       Shawe Rosenthal
       BY:  ARTHUR M. BREWER, ESQ.
       and  LAURA A. PIERSON SCHEINBERG, ESQ.
       20 South Charles Street,    11th Floor
       Baltimore, Maryland  21201

FIRST STATE REPORTING SERVICE              (302) 424-4541
                          Pamela C. Washington, RPR
P.O. Box 99                        Milford, Delaware  19963

1  Q Just the training that you mentioned?

2  A Yes.

3  Q Did your son consider that to be a
4 promotion?

5  A I couldn't relate to that one.

6  Q You couldn't relate to that?  I know,
7 because you didn't --

8  A No.

9  Q All right, all right.  Let's take a
10 look at this would be Number 2, I guess, to
11 Mr. Walters' deposition.

12  (Walters Exhibit 2, marked for
13 identification.)

14 BY MR. BREWER:

15  Q Mr. Walters, this has been marked as
16 Exhibit 2 to your deposition, this is an employee
17 warning notice --

18  A Uh-huh.

19  Q -- to a Mr. Leon Tucker.

20  A Yes.

21  Q And I believe we have identified him as
22 being a member of your crew?

23  A Yes.

24  Q Do you recognize the writing on this
25 page?

```
1      A    Yes.
2      Q    Whose writing is it?
3      A    Mine.
4      Q    Okay. Company policy, this is your
5  writing, it says "Call if not working"?
6      A    Yes.
7      Q    And we had just discussed something
8  like this; he did not call and didn't show up for
9  work, I see, is that correct?
10     A    That's correct.
11     Q    And you gave him three days off as a
12 final warning?
13     A    Yes.
14     Q    That's your signature?
15     A    Yes.
16     Q    Okay. Mr. Richard Satchell, I believe
17 he's also one of the gentlemen we mentioned as being
18 on your crew --
19     A    Yes.
20     Q    -- as a catcher?
21     A    Yes.
22     Q    And again, the company policy, it says,
23 "Call if not working. No time to find someone; call
24 late after 10 p.m." and the violation was he called in
25 too late?
```

Walters - Brewer

```
 1         A    Yes.
 2         Q    And you gave him one day off?
 3         A    Yes.
 4         Q    And is that your signature?
 5         A    Yes.
 6         Q    Mr. Leon Tucker, I think we have
already identified him as being a member of your crew?
 8         A    Yes.
 9         Q    Again, the writing on this document is
yours?
11         A    Yes.
12         Q    And this is his third violation?
13         A    Yes.
14         Q    And is that your signature?
15         A    Yes.
16         Q    Again, on company policy it says, "Call
supervisor if not working," that is your writing?
18         A    Yes.
19         Q    That means he should have called you?
20         A    Yes.
21         Q    The next one is an Edward Massey, I
don't know that we have mentioned his name; do you
know him?
24         A    Yes.
25         Q    How do you know him?
```

FIRST STATE REPORTING SERVICE     (302) 424-4541
                Pamela C. Washington, RPR
P.O. Box 99                  Milford, Delaware 19963

Walters - Brewer
98

1  A    He was a catcher on my crew.
2  Q    Okay. And again it says, "Call
3  supervisor if not working," is that your writing?
4  A    Yes.
5  Q    And the supervisor you're referring to
6  is you?
7  A    Yes.
8  Q    This is his second violation?
9  A    Yes.
10 Q    That's your signature?
11 A    Yes.
12 Q    And the date?
13 A    Yes.
14 Q    Okay. Mr. Tucker, we have already
15 identified him and, again, the company policy violated
16 is "Notify supervisor if not working," that's you,
17 you're referring to?
18 A    Yes.
19 Q    And the violation, it says, "Did not
20 notify supervisor that he was not working," and,
21 again, the supervisor is you?
22 A    Yes.
23 Q    And he's given a day off --
24 A    Yes.
25 Q    -- by you?

FIRST STATE REPORTING SERVICE       (302) 424-4541
                Pamela C. Washington, RPR
P.O. Box 99                   Milford, D᠎  ᠎  ᠎ ᠎᠎᠎᠎

99
Walters - Brewer

1   A   Yes.
2   Q   He signed this and you signed it?
3   A   Yes.
4   Q   Okay. And the last one is a Bernie
5   Johnson?
6   A   Yes.
7   Q   His name is not familiar to me; do you
8   know him?
9   A   Yes.
10  Q   How do you know him?
11  A   He was a catcher in my crew.
12  Q   Okay. And the company policy, it says,
13  "Notify supervisor if not working." That is you that
14  he should have notified?
15  A   Yes.
16  Q   And the violation is, "Said he was
17  driving to farm but did not show." Okay, and he's
18  given an oral warning?
19  A   Yes.
20  Q   And then it says, "None taking at this
21  time," is that your writing?
22  A   Yes.
23  Q   And that's your signature on the
24  bottom?
25  A   Yes.

FIRST STATE REPORTING SERVICE        (302) 424-4541
                      Pamela C. Washington, RPR
P.O. Box 99                  Milford,

1  sheet broken down for each day of the week." Are the
2  time sheets that are being referred to here the time
3  sheets that you kept for the crew?
4       A    Yes.
5       Q    They were not time sheets that you were
6  required to keep for your hours, were they?
7       A    No.
8       Q    Let's go to paragraph 26, which is on
9  the next page. And it talks about in essence here a
10 corporate policy or practice of making partial-day
11 deductions from your salary. Since you have been on
12 salary, have you ever had your pay docked for taking
13 part of a day off?
14      A    No.
15      Q    Okay.
16      A    Never took a day off.
17      Q    Okay. When you were off, though, on
18 disability, we had that information in there already.
19      A    Yes.
20      Q    So you have never needed to take a part
21 of a day off, like today when you need to leave at
22 3:15 to get your children?
23      A    I haven't got paid yet, don't know
24 whether I'm going to get docked or not.
25      Q    So this is then from the time you

1  became a salaried crew leader until today, you have
2  never taken part of a day off?
3       A    No.
4       Q    Well, if you're not docked for today,
5  you wouldn't have been docked for a part of a day,
6  were you?
7       A    Yes.
8       Q    No, the answer is no, you wouldn't have
9  been docked part of the day?
10      A    Okay, okay, if you say that one.
11      Q    Well, I'm telling you when you get your
12 paycheck on Friday, you can certainly communicate with
13 Mr. Martin and let him know whether you have had part
14 of the day taken off.
15      A    Can't I call you?
16      Q    No, no, you can't.  Not now, anyway.
17 Maybe later.  Paragraph 27 talks about having your pay
18 reduced because of the quantity of work performed; has
19 your pay ever been docked, as far as you know, because
20 the quantity of your work wasn't up to par?
21      A    No.
22      Q    Okay.  You said you didn't take any
23 time off, so the last part of this charging time off
24 from normal working hours against vacation or sick
25 time, that's not happened to you?

Walters - Brewer

168

1 conversation?

2   A   Not that I know of at the time, no.

3   Q   Okay.  Outside of this conversation
4 with Mr. Lynch, were there any other conversations
5 about this being harassed?

6   A   No.

7   Q   So no one else had a conversation with
8 you about this?

9   A   No.

10   Q   Okay.  Do you consider the conversation
11 you had with Mr. Lynch for harassment?

12   A   No.

13   Q   Okay.  Go to paragraph 36.  This says,
14 "Many of the plaintiffs have been cornered by various
15 management personnel and questioned individually
16 regarding their discussions with counsel and the
17 nature of this action."  Have you been cornered by
18 anybody from management?

19   A   No.

20   Q   Outside of Mr. Lynch's question to you,
21 have you been questioned by anybody from management
22 about this lawsuit?

23   A   No.

24   Q   Okay.  The next paragraph is 37, it
25 talks about apparently a meeting between the

FIRST STATE REPORTING SERVICE        (302) 424-4541
                         Pamela C. Washington
P.O. Box 99              Milford, D

Walters - Brewer

169

```
 1   plaintiffs and counsel, Mr. Martin on a Saturday
 2   morning, and that plaintiffs recognized vehicle or
 3   vehicles owned by the defendant upper management
 4   personnel circling the parking lot of a diner; do you
 5   know anything about that?
 6        A    Yes.
 7        Q    Okay, tell me what you know about that,
 8   what did you see?
 9        A    Just a vehicle from Mountaire.
10        Q    Who was driving it?
11        A    Could not recognize who was driving it.
12        Q    And what did you see?  What did this
13   vehicle from Mountaire do?
14        A    It circled the parking lot as we were
15   standing out.
16        Q    So it drove into the parking lot?
17        A    Yes.
18        Q    And then drove back out of the parking
19   lot?
20        A    Yes.
21        Q    And was that it?
22        A    Yes.
23        Q    Okay, you couldn't see who was driving?
24        A    No.
25        Q    Okay.  And the diner that is being,
```

FIRST STATE REPORTING SERVICE        (302) 424-4541
                 Pamela C. Washington
P.O. Box 99                    Milford,

```
 1   him?
 2        A    Let me see now, I don't want to lie.
 3        Q    Do you recall?
 4        A    No.
 5        Q    Do you recall who the identity was that
 6   that person related to you?
 7        A    No, I can't name position, position,
 8   position.  The gentleman that is in charge of farm
 9   problems, that's the best of my recollection at the
10   time.  That's -- the gentleman related back to me was
11   his position that he took care of things that go wrong
12   as far as live haul was concerned.
13        Q    All right.  Now, you're not referring
14   to Mr. Lynch?
15        A    No.
16        Q    And you're not referring to Mr. Owen?
17        A    No.
18        Q    Do you know whether this gentleman may
19   have worked for either one of these gentlemen?
20        A    Not that I can put a yes to.
21        Q    Okay.  All right.  Now, let me direct
22   your attention to Exhibit 7, if you could put that in
23   front of you again, please.  Please take a moment,
24   however much time you need, to read through that.
25        A    Uh-huh.  Yes, I understand it.
```

FIRST STATE REPORTING SERVICE         (302) 424-4541
                  Pamela C. Washington, RPR
P.O. Box 99                       Milford, Delaware  19963

1   then the person driving the car probably wasn't
2   working either, was he?
3           MR. MARTIN:  Objection.
4           THE WITNESS:  I wouldn't know the
5   answer to that.
6   BY MR. BREWER:
7       Q   You wouldn't know the answer to that
8   either?
9       A   No.
10      Q   Okay.  Did you feel harassed by the
11  fact that this guy drove through the parking lot and
12  came out the other end?
13      A   Not personally, no.
14      Q   Okay.  And you're sure it was a
15  Mountaire car?
16      A   Yes.
17      Q   Let's go through the warning that you
18  got.  You're aware that the catchers filed a lawsuit
19  against the company, are you not?
20      A   Yes.
21      Q   Okay.  In fact, I met with you and a
22  number of other crew leaders about that, didn't I?
23      A   Yes.
24      Q   Sure.  And you know the reason that
25  they had filed the lawsuit was that they were working