# TAB 9

COPY

```
                IN THE UNITED STATES DISTRICT COURT
                IN AND FOR THE DISTRICT OF DELAWARE


WILLIE DAVIS, JR.                       )
NATHANIEL BRIDDELL,                     )
GEORGE W. FEDDIMAN,                     )
JOSEPH GARRISON,                        )
LARRY E. GIBBS,                         )
ROY H. WALTERS,                         )
ALL SIMILARLY-SITUATED CURRENT          )
AND FORMER EMPLOYEES OF                 )
MOUNTAIRE FARMS, INC.,                  )
MOUNTAIRE FARMS OF DELMARVA,            )
INC., and MOUNTAIRE FARMS OF            )
DELAWARE, INC.,                         )
                Plaintiffs,             )
        -vs-                            )   C.A. No. 04-0414
                                        )
MOUNTAIRE FARMS, INC.,                  )
MOUNTAIRE FARMS OF                      )
DELMARVA, INC., and                     )
MOUNTAIRE FARMS OF DELAWARE,            )
INC., all Delaware corporations)
                Defendants.             )
```

        Deposition of WILLIAM DOUGLAS LYNCH, taken before Pamela C. Washington, Registered Professional Reporter and Notary Public, at the law offices of Young, Conaway, Stargatt & Taylor, 110 West Pine Street, Georgetown, Delaware, on March 15, 2005, beginning at 11:30 a.m.

APPEARANCES:

    On behalf of the Plaintiffs:
        Margolis Edelstein
        BY:  JEFFREY K. MARTIN, ESQ.
        and  KERI WILLIAMS, ESQ.
        1509 Gilpin Avenue
        Wilmington, Delaware 19806

    On behalf of the Defendant:
        Shawe & Rosenthal
        BY:  ARTHUR M. BREWER, ESQ.
        and  LAURA PIERSON SCHEINBERG, ESQ.
        20 South Charles Street
        Baltimore, Maryland 21201

Lynch - Martin

43

1  various people, including Mr. Davis, this morning --
2      A    Yes.
3      Q    -- that he was at the Doyle's
4  restaurant and saw a vehicle that he identified to be
5  a Mountaire vehicle, circling the parking lot, is that
6  correct?
7      A    Yes.
8      Q    Do you know anything about this?
9      A    No.
10     Q    Do you know whether your vehicle was
11 used to circle the parking lot while the crew leaders
12 were meeting with their counsel?
13     A    My personal vehicle?
14     Q    Yes.
15     A    No, it wasn't.
16     Q    Okay.  Is your vehicle a take-home
17 vehicle?
18     A    Yes.
19     Q    What days of the week do you work?
20     A    Generally Monday through Friday.
21     Q    Do you work Saturdays?
22     A    When we work, yes.
23     Q    Only when, what, the plant is open?
24     A    Yes.
25     Q    And how often is the plant open?

44

Lynch - Martin

1  A   Approximately six to eight Saturdays
2  per year.
3  Q   And other than that, you would not work
4  Saturdays, correct?
5  A   Occasionally, I will.
6  Q   Okay.
7  A   Occasionally, I have some people doing
8  some work there on Saturdays, and I'll go down there
9  and see how things are going; not frequently, though.
10 Q   Did you have any knowledge that the
11 crew leaders were meeting at Doyle's restaurant?
12 A   No.
13 Q   Let me restate that in terms of the
14 timing, because obviously now you do have that
15 information --
16 A   Yes.
17 Q   -- having sat here at depositions. But
18 back in the winter and spring of 2004, did you have
19 any knowledge that the crew leaders met at Doyle's
20 restaurant?
21 A   Not that I recall.
22 Q   Okay. I'd like to stay on one
23 particular subject, but I want to try to bounce around
24 here and try to finish up as much as I can. Let me
25 ask you about the vehicles that the crew leaders use

FIRST STATE REPORTING SERVICE      (302)
Pamela C. Washington, RP
P.O. Box 99                Milford, Delaware  19963

1    A    Yes.
2    Q    And what do you mean by that?
3    A    Manage the crew, supervise the crew on
4 the farm, make sure the job's getting done properly,
5 efficiently.
6    Q    All right, well, let's talk about some
7 of the details that I'm sure you're familiar with
8 after having sat through six depositions of the
9 plaintiffs. Do the crew leaders have the ability to
10 hire their crew?
11   A    Yes.
12   Q    All right. And how is it that they can
13 hire the crew?
14   A    They do the recruiting, they bring
15 the -- they recruit catchers, they send them in to go
16 through the hiring process.
17   Q    Is there some type of a policy or
18 procedure with regard to the recruiting of catchers?
19   A    Just it's part of their job
20 description.
21   Q    It's part of their job description?
22   A    Yes; recruit, maintain a catching crew.
23 To me, that's their primary responsibility.
24   Q    Is what?
25   A    To maintain the catching crew, maintain

```
 1  and organize the catching crew, the group of people,
 2  catchers.
 3          Q    And so that means to you that if they
 4  lost one or two, that the crew leaders are responsible
 5  for hiring replacements?
 6          A    Yes.
 7          Q    And what is the process by which the
 8  crew leader can hire somebody for his crew?
 9          A    Like I said, he recruits the catcher,
10  in other words, either from talking to another crew
11  leader or talking to another crew leader from another
12  company, another catcher gets a suggestion from
13  another -- you know, someone's looking for a job, he
14  recruits those people.  And then he sends them in to
15  the processing plant to go through the hiring process,
16  which is generally drug testing, TB testing, medical
17  questionnaire.
18          Q    Just so that I'm clear on this, let's
19  say a crew leader like Roy Walters, for example, just
20  to give a real live example of a crew leader, was
21  going to lose a catcher; it's your testimony that it
22  would be Roy's responsibilities to find a replacement?
23          A    Yes.
24          Q    Okay.  Now, you have a human resources
25  group within the plant, do you not?
```

Lynch - Martin
51

1   A   Yes, we do.
2   Q   In fact, Mr. Owen, your colleague right
3   there, is in charge of that, correct?
4   A   Yes.
5   Q   Is it your testimony that Mr. Owen or
6   the company through Mr. Owen or somebody else does not
7   actually go out and advertise for catchers?
8   A   They do not.
9   Q   They do not? Other than through the
10  crew leader, are there any other sources for
11  recruiting a catcher?
12  A   Not that I'm aware of. We have just
13  never needed the human resources department to do
14  that. Like I say, the crew leaders, they know all the
15  crew leaders from our company, they know all the crew
16  leaders from other companies, and its just always
17  been -- it's a verbal thing, communication, and they
18  have always been successful in recruiting someone; we
19  have not needed HR.
20  Q   Okay. But other than HR --
21  A   Yes.
22  Q   -- do I understand correctly that you
23  don't have any sources for referral of these
24  prospective catchers other than through the crew
25  leaders themselves?

FIRST STATE REPORTING SERVICE      (302
        Pamela C. Washington,
P.O. Box 99        Milford, Delaware

Lynch - Martin                                              53

1    A    The crew leader.
2    Q    All right.  You have testified that the
3  crew leader has the responsibilities of going and
4  recruiting a new or prospective person, correct?
5    A    Yes.
6    Q    And then I think I understood your
7  testimony that person is referred in to the plant or
8  the facility?
9    A    Yes.
10   Q    And then there is a process of drug
11 testing?
12   A    Yes.
13   Q    What other type of screening methods
14 are there?
15   A    TB, TB testing, drug testing, and I
16 think there's a pretty extensive medical questionnaire
17 they have to fill out and answer questions.  Besides
18 that, unless you're an immigrant, then there's just
19 the I-9 testing or the green cards or whatever.
20   Q    All right, what do you mean by I-9
21 testing?
22   A    Green cards; identification.  Valid
23 identification to be in the country.
24   Q    Producing the I-9?
25   A    Yes.

FIRST STATE REPORTING SERVICE       (302)
                        Pamela C. Washington, R
P.O. Box 99              Milford, Delaware  19963

59

Lynch - Martin

1  company to have him working here, but you make the
2  decision."
3      Q    So was Mr. Foreman hired or not?
4      A    No.
5      Q    But you left it to Mr. Walters to make
6  that ultimate decision?
7      A    Yes.
8      Q    Now, do the crew leaders have any
9  authority to terminate any of their catchers?
10     A    Yes.
11     Q    And what authority do they have?
12     A    They can terminate an individual.
13     Q    Okay.  Do you recall any instances in
14 the last three or four years where a crew leader has
15 terminated a catcher?
16     A    Yes.
17     Q    Okay, how many circumstances do you
18 recall?
19     A    Two.
20     Q    And who are the crew leaders?
21     A    Joe Garrison.
22     Q    And who was the catcher?
23     A    Clarence Heath.
24     Q    And was that Joe's decision to
25 terminate Mr. Heath?

Lynch - Martin

60

1  A Yes.

2  Q Did he have to clear that with anyone
3 else?

4  A He went through human resources.

5  Q Who is it that issued the termination
6 of Mr. Heath?

7  A Joe went to human resources and said
8 that he wanted to terminate Clarence Heath; he
9 discussed it with Al Z; I'm assuming that Joe made the
10 decision.

11  Q All right, you're assuming, but you
12 don't know for sure?

13  A I don't know for sure.

14  Q All right.  What was the other instance
15 of termination by a crew leader that you recall?

16  A It's probably been more than three
17 years ago.

18  Q Who was that?

19  A Nathaniel Briddell was the crew leader.

20  Q And who was the catcher?

21  A Charles Hitchens.

22  Q Can you give us some idea as to how
23 many years ago it was?  You think it was more than
24 three?

25  A I think it was more than three.

61

Lynch - Martin

1   Q   Okay. What do you recall of those
2   circumstances?
3   A   Just that Binkie -- that Nathaniel was
4   having issues with Charles Hitchens, I think it was
5   mostly absentee problems, it was a reoccurring
6   problem. And he had done the progressive discipline
7   on the individual, the write-ups, oral, written, so
8   on, so forth, and he terminated the individual, and
9   the guy filed a grievance.
10  Q   Was he reinstated?
11  A   No, sir.
12  Q   Were you involved in that?
13  A   I went to the arbitration.
14  Q   All right. But let me go back to the
15  initial termination; were you involved in that
16  termination?
17  A   No more than just having discussions
18  with Binkie.
19  Q   And what kind of discussions did you
20  have with Binkie?
21  A   He was just telling me the issues that
22  he was having with Charles, absenteeism, you know, go
23  to pick him up and he wouldn't be there, not showing
24  up for consecutive days. And as we talked just, you
25  know, as we're talking, we're just suggesting, "Just

FIRST STATE REPORTING SERVICE    (302)
                          Pamela C. Washington, R
P.O. Box 99               Milford, Delaw___  ____

62

Lynch - Martin

1  make sure that we do our progressive discipline with
2  the individual."
3      Q    I'm sorry, that's what you said to him,
4  make sure --
5      A    Yeah.
6      Q    -- make sure the progressive --
7      A    Make sure we follow procedures.
8      Q    Okay. And when it came to the decision
9  to actually terminate him, did you have discussions
10 with Binkie at that point as well?
11     A    He told me he was going to do it, he
12 said, "I'm sick of him, I'm going to let him go."
13     Q    And what did you say?
14     A    "Okay, as long as you follow the
15 procedures."
16     Q    Why do you think he spoke to you?
17     A    Just to let me know what's going on,
18 just communications.
19     Q    But you gave him the okay to fire him?
20          MR. BREWER: Objection, that's not his
21 testimony.
22          THE WITNESS: It's his decision, yes.
23 BY MR. MARTIN:
24     Q    I know you can't say precisely when
25 this occurred, it was more than three years ago; do