## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WILLIE DAVIS, JR.,<br>NATHANIEL BRIDDELL,<br>JOSEPH GARRISON,<br>LARRY E. GIBBS,<br>ROY H. WALTERS,<br><br>ALL SIMILARLY-SITUATED CURRENT<br>AND FORMER EMLOYEES OF<br>MOUNTAIRE FARMS, INC.,<br>MOUNTAIRE FARMS OF<br>DELMARVA, INC., and MOUNTAIRE<br>FARMS    OF DELAWARE, INC.,<br><br>     Plaintiffs,<br><br>     v.<br><br>MOUNTAIRE FARMS, INC.,<br>MOUNTAIRE FARMS OF<br>DELMARVA, INC., and<br>MOUNTAIRE FARMS OF<br>DELAWARE, INC., all Delaware corporations,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) C.A. NO. 04-0414-KAJ<br>)<br>) JURY TRIAL DEMANDED<br>)<br>) COLLECTIVE ACTION<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

## PLAINTIFFS' ANSWERING BRIEF
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

MARGOLIS EDELSTEIN
Jeffrey K. Martin, Esquire (#2407)
Keri L. Morris, Esquire (#4656)
1509 Gilpin Avenue
Wilmington, Delaware 19806
302-777-4680
Attorneys for Plaintiffs

# TABLE OF CONTENTS

**Document**                                                                                    **Page No.**

TABLE OF CASES …………………………………………………………..…   iv

NATURE AND STAGE OF PROCEEDINGS ………………………………..…...   1

SUMMARY OF ARGUMENT ……………………………………………….…...   3

STATEMENT OF MATERIAL FACTS ……………………………………….….....   4

ARGUMENT …………………………………………………………………....…   11

A.    STANDARS FOR SUMMARY JUDGMENT …………………........   11

B.    PLAINTIFFS' JOB RESPONSIBILITIES DID NOT FALL
      WITHIN THE EXECUTIVE EXEMPTION OF THE FLSA,
      29 U.S.C. § 213(A)………………………………..……………………   12

      1.  THE FLSA'S EXECUTIVE EXEMPTION ……………………...   13

          a.    PLAINTIFFS' PRIMARY DUTY WAS NOT THE
                MANAGEMENT OF THE ENTERPRISE ………………   14

          b.    PLAINTIFFS' SUGGESTIONS AND
                RECOMMENDATIONS AS TO THE HIRING,
                FIRING, ADVANCEMENT, PROMOTION OR ANY
                OTHER CHANGE IN STATUS OF EMPLOYEES
                WERE NOT GIVEN PARTICULAR WEIGHT ………….   15

C.    DEFENDANT'S RELIANCE ON THE US DOL AUDIT IS NOT
      DISPOSITIVE AS TO THE EXEMPT STATUS OF THE CREW
      LEADERS ……………………………………..…………………………....…   17

D.    PLAINTIFFS HAVE SATISFIED THEIR BURDEN FOR THEIR
      CLAIM UNDER THE DELAWARE WAGE PAYMENT AND
      COLLECTION ACT ………………………………………………………..   18

E.    PLAINTIFFS HAVE ESTABLISHED THAT THEY WERE
      RETALIATED AGAINST …………………………………………………   19

      1.  PLAINTIFFS PARTICIPATED IN PROTECTED ACTIVITY
          UNDER THE FLSA ……………………………………………   19

      2.  DEFENDANT SUBJECTED PLAINTIFFS TO AN ADVERSE
          EMPLOYMENT ACTION ………………………………………   19

**Document**                                                              **Page No.**

   3.  THERE IS A CAUSAL LINK BETWEEN THE PROTECTED
      ACTIVITY AND THE ADVERSE EMPLOYMENT
      ACTION ………………………………………………….………..  21

CONCLUSION …………………………………………………………………….  22

## TABLE OF CASES

| Case Name | Page No. |
|---|---|
| Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) | 11 |
| Blackie v. Maine, 75 F.3d 716 (1st Cir. 1996) | 19 |
| Brock v. Richardson, 812 F.2d 121 (3d.Cir. 1987) | 19 |
| Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 761 (1998) | 20 |
| DiGregorio v. Temple University, 1983 U.S. Dist. LEXIS 13243 (E.D. Pa September 3, 1983) | 15 |
| Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) | 11 |
| Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 86 S. Ct. 737, 15 L.Ed.2d 694 (1966) | 12 |
| Lafate v. Chase Manhattan Bank (USA), 123 F. Supp. 2d 773, 778 (D. Del. 2000) | 20 |
| Lowman v. State of Delaware Department of Corrections, 2003 U.S. Dist. LEXIS 2579 (D. Del. February 21, 2003) | 20 |
| Marshall v. R&M Erectors, Inc., 429 F.Supp. 771 (D. Del. 1977) | 13 |
| Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986) | 11 |
| Morgan v. Future Ford Sales, 830 F.Supp. 807, 1 WH Cases2d 995 (D. Del. 1993) | 21 |
| Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995) | 11 |
| Reeves v. International Tel. & Tel. Corp., 357 F. Supp. 295, 302-03, 21 WH Cases 40 (W.D. La. 1973) | 12 |
| Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997) | 20 |
| Shaner v. Synthes, 204 F.3d 494, 503 (3d Cir. 2000) | 20 |
| Torre v. Casio, Inc., 42 F. 3d 825, 831 (3d Cir. 1994) | 20 |

**Statutes & Regulations**

Delaware Wage Payment and Collection Act, 19 Del. C. § 1101 *et seq.* ..........    1

Delaware Wage Payment and Collection Act, 19 Del. C. § 1102 ....................    18

Delaware Wage Payment and Collection Act, 19 Del. C. §§ 1103(b)
and 1113(c) ……………………………………………………………………..    18

Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ………………………………1, 12

Fair Labor Standards Act, 29 U.S.C. §213(a)(1) ……………………………………1, 12

Fair Labor Standards Act, 29 U.S.C. §215(a)(3) ……………………………………..    19

Fair Labor Standards Act, 29 U.S.C. §259 …………………………………………..    17

29 C.F.R. § 541.1 ……………………………………………………………………    13

29 C.F.R. § 541.103 *et seq*……………………………………………………………..    1

29 C.F.R. § 541.105 …………………………………………………………………    15

29 C.F.R. § 541.700(a) ………………………………………………………………    14

**Rules**

Fed. R. Civ. P. 56(c) ………………………………………………………………..    11

## NATURE AND STAGE OF PROCEEDINGS

On June 18, 2004, Willie Davis, Jr., Nathaniel Briddell, Joseph Garrison, Larry E. Gibbs, and Roy H. Walters (hereinafter "Plaintiffs"), filed a three-count Complaint against Defendants Mountaire Farms, Inc., Mountaire Farms of Delmarva, Inc., and Mountaire Farms of Delaware, Inc. (hereinafter collectively referred to as "Defendant"), alleging claims for unpaid overtime compensation under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (hereinafter "FLSA"), as well as the applicable United States Department of Labor Regulations, including 29 C.F.R. § 541.103 *et seq.*[1], and the Delaware Wage Payment and Collection Act, 19 Del. C. § 1101 *et seq.* Plaintiffs claim they are entitled to overtime compensation for hours each of them worked in excess of forty (40) hours per week during their employment with Defendant as crew leaders. Plaintiffs also seek attorneys' fees and costs, as well as liquidated damages.

Plaintiffs seek summary judgment on their FLSA claim on the basis that Plaintiffs were not exempt from the overtime compensation requirement because they were not employed in a bona fide executive capacity pursuant to 29 U.S.C. §213(a)(1). Plaintiffs were not employed in an executive capacity because their suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change in status of employees were not given particular weight.

Plaintiffs also seek summary judgment on their claim under the Delaware Wage Payment and Collection Act. Since Plaintiffs were not employed in a bona fide executive capacity, they were, in fact, entitled to overtime compensation, which they did not receive. Therefore, Plaintiffs did not receive all the wages they were due.

---

[1] On April 20, 2004, the U.S. Department of Labor proposed regulations redefining some of the exemptions for executive employees. The proposed regulations took effect on August 23, 2004. Plaintiffs' suit was initiated on June 18, 2004. Any references to the FLSA's regulations in this Opening Brief refer to the regulations in effect when Plaintiffs filed suit.

Finally, Plaintiffs seek summary judgment on their retaliation claim under the FLSA. Plaintiffs engaged in protected activity under the FLSA, of which Defendant was made aware; Plaintiffs were then subjected to an adverse employment action, to wit, intimidation in the form of threats to their employment, which occurred contemporaneous to the protected activity.

On May 2, 2005, Plaintiffs and Defendant filed Cross-Motions for Summary Judgment. This is Plaintiffs' Answering Brief in opposition to Defendant's Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

A.    STANDARDS FOR SUMMARY JUDGMENT

B.    PLAINTIFFS' JOB RESPONSIBILITIES DID NOT FALL WITHIN THE EXECUTIVE EXEMPTION OF THE FLSA, 29 U.S.C. § 213(A)

      1.    THE FLSA'S EXECUTIVE EXEMPTION

            a.    PLAINTIFFS' PRIMARY DUTY WAS NOT THE MANAGEMENT OF THE ENTERPRISE

            b.    PLAINTIFFS' SUGGESTIONS AND RECOMMENDATIONS AS TO THE HIRING, FIRING, ADVANCEMENT, PROMOTION OR ANY OTHER CHANGE IN STATUS OF EMPLOYEES WERE NOT GIVEN PARTICULAR WEIGHT

C.    DEFENDANT'S RELIANCE ON THE US DOL AUDIT IS NOT DISPOSITIVE AS TO THE EXEMPT STATUS OF THE CREW LEADERS

D.    PLAINTIFFS HAVE SATISFIED THEIR BURDEN FOR THEIR CLAIM UNDER THE DELAWARE WAGE PAYMENT AND COLLECTION ACT

E.    PLAINTIFFS HAVE ESTABLISHED THAT THEY WERE RETALIATED AGAINST

      1.    PLAINTIFFS PARTICIPATED IN PROTECTED ACTIVITY UNDER THE FLSA

      2.    DEFENDANT SUBJECTED PLAINTIFFS TO AN ADVERSE EMPLOYMENT ACTION

      3.    THERE IS A CAUSAL LINK BETWEEN THE PROTECTED ACTIVITY AND THE ADVERSE EMPLOYMENT ACTION

## STATEMENT OF MATERIAL FACTS

### A.    Background of Plaintiffs and Defendant

Defendant is a Delaware corporation that, by and through its employees, including Plaintiffs, is engaged in the production, processing and distribution of poultry products for consumers. (B0003). Mr. Phillip Owen is the Human Resources Director for the Selbyville Plant, a position that he began on December 28, 2003. (B0069, Page 11). Mr. Douglas Lynch is the Live Haul Manager for the Selbyville Plant where Plaintiffs are/were employed. (B0060, Page 5). David Nuse is the Assistant Live Haul Manager and reports to Mr. Lynch. (B0061, Page 32). The crew leaders report directly to Mr. Nuse. (B0061, Page 32).

Plaintiff Joseph Garrison was employed by Defendant for eight (8) years continuously. (B0031, Page 23; B0032, Pages 25-26). Garrison was hired as a catcher and then became a crew leader in 1999. He resigned from the company in 2004. (B0032, Page 26).

Plaintiff Roy Walters is currently employed by Defendant in the capacity of crew leader. He began the position of crew leader in 2001. (B0075, Pages 26-27).

Plaintiff Nathaniel Briddell is currently employed by Defendant; however, he has not worked in the capacity of crew leader since April 2003. (B0013, Page 43 - B0014, Page 44).

Plaintiff Willie Davis was hired by Defendant in April 2000 or 2001 as a full time crew leader. (B0025, Page 18; B0026, Page 21). Approximately one year later, he was offered the position of relief crew leader, which was accepted and he filled in for other crew leaders when they were out. (B0026, Page 22-B0027, Page 25). Mr. Davis resigned in December 2003. (B0029, Page 42).

Plaintiff Larry Gibbs remains employed by Defendant as a crew leader, a position he has held since May 1994. (B0048, Page 31; B0049, Page 34).

4

### B.    Background on the Chicken Catcher Business

Defendant has approximately 300 farms that the crew leaders could potentially travel to in order to catch chickens.  (B0066, Page 98).   Each crew leader has a crew, which consists of one (1) crew leader, seven (7) to eight (8) catchers and one (1) forklift driver.  (B0035, Page 53; B0049, Page 35; B0028, Page 27).  The crew leader's duties and job responsibilities are detailed in Defendant's Live Haul Guidelines.  (B0115-B0118).

### C.    Recruiting, Hiring, and Staffing the Crew

The crew leaders are responsible for maintaining a full crew.  (B0035, Page 56).  There are times when a catcher from one crew will work with another crew or a particular crew will catch short-handed.  (B0035, Page 55).  If this occurs, the crew leader contacts the dispatcher or his supervisor to inform him that he [the crew leader] needs a man to assist with the catching of the chickens.  If no one is available, the crew leader would simply catch short-handed.  (B0035, Page 55).

As crew leaders, Plaintiffs had no power to hire or fire employees.  The crew leader does not have any control over the placement of the crew.  (B0076, Page 29).  In fact, the only input a crew leader has is to tell an individual or individuals who are interested in employment with Mountaire, to contact the Defendant's plant or management personnel.  Plaintiffs had no say as to whether or not any individual(s) would actually be hired.  (B0076, Pages 29-31).  The job duties and/or responsibilities of Plaintiffs in this matter did not include the hiring of chicken catchers or any other employee for Defendant.  If one of Plaintiffs knew of an individual who was interested in obtaining employment, he would send the potential candidate to the plant or directly to the supervisor, Doug Lynch.  Plaintiffs were not required to interview the potential employee nor did they review any application or paperwork that was submitted to Defendant.

The extent of Plaintiffs' involvement was to send the potential employee to the plant or to Doug Lynch. (B0087-0095).

### D. Transporting Crew

The crew leaders begin their day by picking up the members of their crew and transporting them to the farm that they are assigned to on that particular day. (B0032, Page 27; B0021, Page 107). At the end of the workday, the crew leaders must transport the catchers back home. This requirement adds several additional hours of work time onto the day of the crew leader.

### E. Crew Leaders Directing the Work of Their Crew

Crew Leaders are responsible for following the Live Haul Guidelines as dictated by Defendant. During their depositions, Plaintiffs each confirmed that the general duties listed were all the crew leaders' responsibilities. (B0034, Page 49-B0035, Page 53; B0077, Pages 37-39; B0014, Page 48-B0015, Page 55; B0028, Pages 28-29; B0054, Page 71-B0055, Page 74). Even though each Plaintiff confirmed these were their general duties, if there is to be a serious deviation from the guidelines, the crew leader must contact his supervisor. (B0077, Page 40). In addition, Mr. Briddell testified that, "Doug would tell [him] what to do. He [Doug] would put on the order or call us in and say you are going to this farm, this should be done this way, or sometime [sic] he would come out there ..." (B0015, Page 52).

### F. Ensuring the Safety of the Crew

If a crew member is injured on the job, the crew leader must follow company procedure in order to handle the situation. (B0083, Page 90: B0020, Page 101). Mr. Briddell testified that, if someone on his crew got hurt, he would "follow company policy. [The] company wants you

to see that they [catchers] get to the processing plant." (B0020, Page 101).  Furthermore, crew

leaders must report the injury to their supervisors.  (B0083, Pages 90, 91).

### G.    Completing Management Paperwork

The crew leader is responsible for completing the Farm Ticket.  (B0033, Page 36; B0114;

B0078, Page 45 - B0081, Page 59; B0016, Page 56-B00148, Page 68; B0050, Page 53 - B0053,

Page 62; B0028, Page 29).  Once the Farm Ticket is completed, the crew leader submits it to the

plant for further processing.

### H.    Addressing Grievances

The Collective Bargaining Agreement, specifically Article 10, Section 1 states:

> Any complaint, grievance or dispute arising out of the
> interpretation, application or performance of the provisions of this
> Agreement shall, in the first instance, be taken up with the
> aggrieved employee or employees, who shall first take the matter
> up with the shop steward, who in turn will take the grievance up
> with the foreman in charge …

(B0119).

Mr. Owen testified that a crew leader's responsibility with regard to addressing

grievances is as follows:

> the crew leader is the management representative to address
> informal and formal grievances.  They would be presented with
> grievances, they would investigate grievances, and they would
> provide answers to grievances at the first step…And it becomes the
> crew leader's responsibilities to sign and accept and, you know,
> process the homework behind the grievance, to write it up…

(B0071).

However, this was not what the crew leaders understood the process to be or what they

actually did.  Mr. Walters understood the foreman in charge to be Doug Lynch, the live haul

foreman – not the crew leader.  (B0086, Page 105).  Furthermore, the record does not support the

contention that the crew leaders would investigate the grievances or do the homework behind the

7

grievance. (B0085, Page 102 - B0086, Page 105; B0022, Pages 111-113; B0040, Pages 122-124; B0058, Page 111).

### I.    Authority to Discipline Crew

The record does support that the crew leaders have the authority to discipline their crewmembers. (B0037, Page 110 - B0039, Page 117; B0076, Page 31; B0082, Page 65; B0084, Page 95; B0019, Page 75; B0020, Page 100; B0057, Page 95). However, the crew leaders simply complete the paperwork; they do not indicate what level of discipline the crewmember is receiving. Mr. Garrison testified that he did not circle the level of discipline on the form and that he does not know who did circle it. (B0038, Page 116 - B0039, Page 118). Mr. Briddell would give the crewmember a verbal warning but would then notify his manager. (B0020, Page 100).

### J.    Other Supervisory Duties

Mr. Lynch testified that the crew leaders are/were responsible for providing their crew members with performance updates. (B0065, Page 93). However, none of Plaintiffs testified that they were responsible for evaluating their crew members' performance. Mr. Lynch also testified that, as representatives of management, crew leaders are expected to discuss upcoming safety celebrations and report on the Plant's performance with their crews. (B0065, Page 95). However, none of Plaintiffs testified to this statement.

It is not disputed that the Defendant previously had a policy allowing employees to request a certain percentage of their pay in advance of their scheduled pay date. (B0063, Pages 75-76; B0019, Pages 76-77). However, the record does not support that the crew leaders had the discretion to decide whether to provide a member of their crew with an advance. The crew leaders had to go through accounting; they could not unilaterally approve the advance. (B0019, Pages 76-77

8

### K.    Plaintiffs' Classification Under the FLSA

In Defendant's Opening Brief, it is stated, that as a result of a United States Department of Labor (DOL) audit of the Company's North Carolina plant and a suggestion from the DOL, that the crew leaders should be treated as salaried employees because they were exempt for overtime purposes under the FLSA. (Defendant's Opening Brief, Page 26).

Furthermore, Mr. Owen testified that he was unaware of any concerns regarding overtime pay among the crew leaders. (B0071, Page 24). Mr. Owen further testified that the [crew leaders] had not used the formal channels available to them to voice their concerns. (B0070, Page 24).

### L.    Plaintiffs' Retaliation Claim

As stated in Defendant's Opening Brief in Support of its Motion for Summary Judgment, in April 2002, Mountaire was a defendant in a previous overtime class action lawsuit, Major et al. v. Mountaire Farms, Inc., which involved the claim that catchers were not provided with lunch breaks. The prior lawsuit was settled at significant cost to the Company. (Defendant's Opening Brief, Page 28). In response, Mountaire began mandating that all catchers receive daily lunch breaks. (B0064, Page 83).

According to Mr. Owen and Mr. Lynch, after the lawsuit was settled, the Live Haul Management group made a number of requests to the crew leaders to ensure that their catchers were regularly taking thirty (30) minute lunch breaks. (B0072, Page 65; B0062, Pages 41-42). According to Defendant's Opening Brief, despite the reminders, Al Zlotorzynski, Human Resources Manager, discovered that there was no consistency among the crews taking lunch. (Defendant's Opening Brief, Page 28). As a result, a "Final Warning" was issued to crew leaders, which stated:

You are being notified that if it is found that you worked your crew longer than 6 ½ hours without taking lunch, your employment will be terminated immediately upon Mountaire's awareness of the incident. No further excuses will be accepted. Once your crew has reached 6 ½ hours of work and they have not stopped for lunch they must stop for 30 continuous minutes for lunch. This procedure was explained to all crew leaders by David Nuse and Al Z. Your signature below means you fully understand the policy and not following the policy will be a willful and wanton disregard of the rules and you will be terminated without further warnings.

(B0041, Page 216 - B0045, Page 229; B0119; B0120).

As explained by Phil Owen, the reason for the "Final Warning" was:

After a while, you get to the point where you have talked and talked and talked and talked, and it was over a year probably, year and a half, close to two years that this had been under discussion, and this was to make sure that everyone took a lunch, 30 minutes, to make sure it would happen. (B0072).

According to Mr. Owen, it was Human Resources that decided to issue the Final Warning to the crew leaders, "to make sure that everybody knows they're on equal footing, so that we're not accused of playing favorites or singling any person out." (B0073).

10

# ARGUMENT

## A.    STANDARDS FOR SUMMARY JUDGMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered" where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome under the governing substantive law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A dispute over a material fact must be "genuine", i.e., the evidence is such "that a reasonable jury could return a verdict in favor of the non-moving party." Id. "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995).

To survive a motion for summary judgment, Defendant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

In the present matter, the current record which includes the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits establish that Plaintiffs' job duties and responsibilities do not meet all of the requirements of the executive employees exemption pursuant to the FLSA. Therefore, Plaintiffs are entitled to summary

11

judgment as a matter of law.  Furthermore, Defendant has the burden of proof to establish the exemption applies to its employees.  Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 86 S. Ct. 737, 15 L.Ed.2d 694 (1966).  Defendant has failed to satisfy its burden.

## B.    PLAINTIFFS' JOB RESPONSIBILITIES DID NOT FALL WITHIN THE EXECUTIVE EXEMPTION OF THE FLSA, 29 U.S.C. § 213(A)

A plaintiff alleging a wage violation of the FLSA must establish the following elements to meet his burden: (1) the existence of an employment relationship with the defendant; (2) evidence that the defendant is covered under the Act; (3) the defendant's constructive or actual knowledge of overtime worked or wage payments in violation of the Act; and (4) the performance of some work for which the employee was not properly compensated under the Act and the amount of such liability at least by a just and reasonable inference.  See Fair Labor Standards Act, 29 U.S.C. §201 et seq.

The exemptions pursuant to the FLSA must be applied on a case-by-case basis.  See Reeves v. International Tel. & Tel. Corp., 357 F. Supp. 295, 302-03, 21 WH Cases 40 (W.D. La. 1973) (exempt status of employee depends on individual duties, not on how employee is classified).  Simply because one employee is classified as an exempt employee does not automatically provide exempt status to all employees in that classification.  An employee's job title alone is insufficient to determine exempt or non-exempt status.

Plaintiffs have established the existence of an employment relationship with Defendant and that Defendant is covered under the Act.  (B0001-B0002).  Further, Plaintiffs have established that Defendant had constructive and actual knowledge of overtime worked. Defendant acquired this knowledge through the receipt of the daily log sheets which established that Plaintiffs worked additional hours outside the farm time because they were each required to pick up and drop off each of the catchers on their crews.  Finally, Plaintiffs established that they

12

performed work for which they were not properly compensated under the FLSA. Specifically, since Plaintiffs were required to pick up and drop off each catcher on their crews, this requirement added several additional compensable hours of work to Plaintiffs' workday. See Marshall v. R&M Erectors, Inc., 429 F.Supp. 771 (D. Del. 1977) (if an employee is required to report to a specified location where they must pick up employees, compensable time begins at the meeting place.). Since Plaintiffs were required to pick up each catcher on their crews at the catchers' homes, Plaintiffs' compensable time began as soon as they arrived at the first catcher's home. Therefore, Plaintiffs have satisfied the burden to establish that they were entitled to overtime compensation as a matter of law.

### 1.    THE FLSA'S EXECUTIVE EXEMPTION

Under the FLSA, an employee employed in a bona fide executive capacity shall mean any employee:

(a)    Who is compensated on a salary basis ...

(b)    Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and

(c)    Who customarily and regularly directs the work of two or more other employees therein; and

(d)    Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight;

29 C.F.R. § 541.1.

Plaintiffs' must concede that they were compensated on a salary basis thereby satisfying section (a) above. Further, Plaintiffs' must concede that they customarily and regularly directed the work of two or more other employees thereby satisfying section (c) above. As crew leaders, Plaintiffs were involved in the management of the enterprise since they were responsible for

making certain that the chicken catchers caught the requisite number of chickens and made the

appropriate arrangements to have the chickens that had been caught loaded onto the trucks so the

truck drivers could return to Defendant's plant. However, it does not appear that it was the

primary duty of the crew leaders. Further, Plaintiffs did not have the authority to hire or fire

employees and the few suggestions and/or recommendations made by Plaintiffs to Defendant

were done in accordance with a practice which required Plaintiffs to only refer potential

employees to Defendant to complete the appropriate paperwork. This certainly does not give

rise to the level of particular weight to make Plaintiffs exempt employees under the FLSA.

Simply stated, Plaintiffs were neither responsible for the recruitment of employees for

Defendant, nor were they involved in the interview process to actually hire employees for

Defendant. As a result, there is no factual issue to dispute the conclusion that Plaintiffs were not

employed in a bona fide executive capacity under the FLSA, and Plaintiffs are entitled to

summary judgment as a matter of law.

### a. PLAINTIFFS' PRIMARY DUTY WAS NOT THE MANAGEMENT OF THE ENTERPRISE

Primary duty is defined in the FLSA regulations as follows:

> To qualify for exemption under this part, an employee's "primary
> duty" must be the performance of exempt work. The term
> "primary duty" means the principal, main, major or most important
> duty that the employee performs. Determination of an employee's
> primary duty must be based on all the facts in a particular case,
> with the major emphasis on the character of the employee's job as
> a whole. Factors to consider when determining the primary duty of
> an employee include, but are not limited to, the relative importance
> of the exempt duties as compared with other types of duties; the
> amount of time spent performing exempt work; the employee's
> relative freedom from direct supervision; and the relationship
> between the employee's salary and the wages paid to other
> employees for the kind of nonexempt work performed by the
> employee.

29 C.F.R. 541.700(a).

14

In Defendant's Opening Brief in support of its motion for summary judgment, it relies on the notion that the crew leaders' managerial duties as compared with other duties is overwhelming. Although the crew leaders may be responsible for handling issues that may arise at the farms and may interact with the growers, if necessary, the crew leaders are only following company guidelines and needed to obtain higher supervisory approval for any deviation from the company guidelines. Lack of true managerial responsibility will distinguish those employees whose duties are managerial in nature or those that are simply following company guidelines which do not allow for the exercise of any independent judgment and/or discretion. See DiGregorio v. Temple University, 1983 U.S. Dist. LEXIS 13243 (E.D. Pa September 3, 1983).

      **b.**      **PLAINTIFFS' SUGGESTIONS AND RECOMMENDATIONS AS TO THE HIRING, FIRING, ADVANCEMENT, PROMOTION OR ANY OTHER CHANGE IN STATUS OF EMPLOYEES WERE NOT GIVEN PARTICULAR WEIGHT**

To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. 29 C.F.R. § 541.105.

The job duties and/or responsibilities of Plaintiffs in this matter did not include the hiring of chicken catchers or any other employee for Defendant. If one of Plaintiffs knew of an individual who was interested in obtaining employment, he would send the potential candidate to the plant or directly to the supervisor, Doug Lynch. Plaintiffs were not required to interview the potential employee nor did they review any application or paperwork that was submitted to

Defendant. The extent of Plaintiffs' involvement was to send the potential employee to the plant or to Doug Lynch.

Another factor of whether particular weight is given to the suggestions and recommendations of employees includes the frequency at which such suggestions and recommendations are made or requested and the frequency at which the employee's suggestions and recommendations are relied upon.

Plaintiffs provide no input into who is hired by Defendant. (B0076, Page 29). The extent of Plaintiffs' involvement was only to tell an individual (interested in a job) to go to the plant and get signed up and go through the Company's procedure. (B0076, Pages 29-30). Plaintiffs could also go to Doug Lynch and tell him that they needed another "guy" or that someone needed to be hired and whether Plaintiff knew of someone who needed a job. Lynch would respond by telling the crew leader to bring the potential employee in and get him signed up. The potential employee may begin employment or may not begin employment. The crew leaders have no further input in the hiring process. (B0036, Pages 58-59). Further, Plaintiffs only indicate to the potential employee that [they] have to go through company policy. There was never any indication that the potential employee had secured a position simply by speaking with a crew leader. (B0076, Page 30). Simply stated, Plaintiffs had no impact at all as to who was hired by Defendant. (B0076, Page 30). Furthermore, Plaintiffs did not believe they had the authority to hire or fire or to recommend the promotion of any individual. When asked whether a Plaintiff could recommend the promotion of one of the catchers to be a forklift driver, the response was, "Yes, I could ask Doug about it, yes." (B0021, Page 109). Furthermore, Plaintiffs knew that it was Doug Lynch who was responsible for hiring the chicken catchers or forklift drivers and not the crew leaders (B0035, Page 56).

Even though Plaintiffs may have occasionally sent some individual men to the plant to get signed up, these times were very minimal. (B0087-B0095). Even though the amount of men who were sent to the plant was minimal, sometimes individuals who were recommended were not even hired by Defendant (B0035, Page 56). Plaintiff Garrison recommended only three (3) individuals during his entire tenure as a crew leader with Defendant. (B0036, Page 58). Plaintiff Larry Gibbs recommended the hiring of only two (2) or three (3) individuals during his entire tenure as a crew leader (B0056, Page 78). Of the two (2) to three (3) potential chicken catchers that Gibbs advised to complete paperwork for employment with the Defendant, one (1) was not hired (B0056, Page 78).

Plaintiffs also were not involved in recommending chicken catchers for promotions. Plaintiff Garrison has never recommended to Defendant that a catcher be promoted to a forklift driver. (B0037). Plaintiff Gibbs does not recall ever recommending anyone for a promotion. He never even informed Doug Lynch that certain employees were doing a good job. Plaintiff Gibbs would respond to inquiries from Doug Lynch about current employees, but he never indicated that someone should be promoted.

## C.    DEFENDANT'S RELIANCE ON THE US DOL AUDIT IS NOT DISPOSITIVE AS TO THE EXEMPT STATUS OF THE CREW LEADERS

Defendant's reliance on the United States Department of Labor's audit is flawed. Plaintiffs acknowledge that Defendant's would have an absolute good faith defense against lawsuits brought by employees concerning the specific contents of the letter. Specifically, the absolute good faith defense in 29 U.S.C. §259 of the Portal-to-Portal Act states that:

> ...no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938 ... if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance

17

> on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (B) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged.

In order for Defendant's to assert the absolute good faith defense with respect to an opinion letter, the letter must be issued by the Administrator of the Wage and Hour Division of the DOL. Here, Defendant is relying on a verbal assertion made by a DOL representative regarding whether crew leaders were exempt from the overtime provisions of the FLSA. The document was not an opinion letter from the Administrator of the Wage and Hour Division, nor was the document even prepared by a representative of the DOL. The document specifically, states, that the DOL representatives would not put their conclusions in writing.

**D.    PLAINTIFFS HAVE SATISFIED THEIR BURDEN FOR THEIR CLAIM UNDER THE DELAWARE WAGE PAYMENT AND COLLECTION ACT**

Delaware's Wage Payment and Collection Act, specifically, 19 *Del.C.* §1102, requires the payment of all wages due on the regularly scheduled payday designated in advance by the employer. Failure to appropriately compensate employees on the regularly scheduled paydays entitles the aggrieved employee(s) to liquidated damages in an amount equal to the unpaid wages/overtime and attorneys' fees, costs of prosecution and costs of the present action. 19 *Del.C.* §§ 1103(b) and 1113(c).

Plaintiffs have established that they were non-exempt employees and therefore should have been compensated at one and one-half times their regular rate of pay for all hours worked in excess of forty (40) hours per week. Since Defendant failed to adequately compensate Plaintiffs, they are entitled to summary judgment as a matter of law on their Delaware Wage Payment and Collection Act claim.

E.   **PLAINTIFFS HAVE ESTABLISHED THAT THEY WERE RETALIATED AGAINST**

Section 215(a)(3) of the FLSA makes it unlawful for any person:

> To discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this [act], or has testified or is about to testify in any such proceeding ...

A plaintiff claiming retaliation under the FLSA must establish that: (1) he engaged in a statutorily protected activity; (2) the employer then subjects the employee to an adverse employment action; and (3) the adverse employment action is a reprisal for having engaged in the protected activity.  See Blackie v. Maine, 75 F.3d 716 (1st Cir. 1996).

### 1.   PLAINTIFFS PARTICIPATED IN PROTECTED ACTIVITY UNDER THE FLSA

According to the FLSA, a "protected activity" is any instance when an employee has:

> filed any complaint or instituted or caused to be instituted any proceeding under or related to this [act], or has testified or is about to testify in any such proceeding ...

29 U.S.C. § 215(a)(3).

Here, Plaintiffs engaged in a protected activity when their attorney sent a letter **A0009-0010** to Mr. Phil Owen, Human Resources Manager, and complained that Defendant was not properly compensating Plaintiffs for all hours that were worked.  See Brock v. Richardson, 812 F.2d 121 (3d.Cir. 1987) (an informal complaint is sufficient to bring an employee protection under the Act).  Plaintiffs have met their burden to establish that they engaged in protected activity under the FLSA.

### 2.   DEFENDANT SUBJECTED PLAINTIFFS TO AN ADVERSE EMPLOYMENT ACTION

An adverse employment action is an action that alters the employee's compensation, terms, conditions or privileges of employment, deprives him of employment opportunities or

adversely affects his status as an employee. See Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997). "Job termination, however, is not a requirement for a finding of adverse employment action - much less severe action can suffice." Lafate v. Chase Manhattan Bank (USA), 123 F. Supp. 2d 773, 778 (D. Del. 2000); Torre v. Casio, Inc., 42 F. 3d 825, 831 (3d Cir. 1994) (finding that a job transfer without loss of pay or benefits, may constitute an adverse job action). The United States Supreme Court has defined an adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 761 (1998).

When determining whether an adverse employment action has occurred, courts should not analyze the employer's acts in isolation, but instead should analyze all of the employer's acts collectively. See Shaner v. Synthes, 204 F.3d 494, 503 (3d Cir. 2000); see also Lafate, 123 F. Supp. 2d at 778; and Lowman v. State of Delaware Department of Corrections, 2003 U.S. Dist. LEXIS 2579 (D. Del. February 21, 2003) (holding that the multiple acts collectively can constitute an adverse employment action).

Simply put, Plaintiffs suffered an adverse employment action in their terms and conditions of employment and were deprived of future employment opportunities when Defendant threatened them with termination if they failed to provide their crews with the required 30-minute non-work period for a lunch break which each crew leader was already providing to the members of their crews. The Final Warning came approximately two years after the lack of providing the lunch break became a relevant issue and only days after Plaintiffs counsel sent Mr. Owen a letter regarding the failure to pay overtime compensation. Plaintiffs have established that they were subjected to an adverse employment action, i.e. having their jobs threatened if they failed to provide their crew members with the required break that they [the crew members] were already receiving.

20

### 3.    THERE IS A CAUSAL LINK BETWEEN THE PROTECTED ACTIVITY AND THE ADVERSE EMPLOYMENT ACTION

Determining whether there is a causal link between the protected activity and the adverse employment action is highly fact sensitive and timing is not the only factor to be considered. Generally, whether there is a causal link between the protected activity and the adverse employment action is often in dispute. A sufficient causal link may be established by showing that only a very brief period of time separated the assertion of statutory rights and the adverse employment action. Morgan v. Future Ford Sales, 830 F.Supp. 807, 1 WH Cases2d 995 (D. Del. 1993) (employee terminated 2 days after telling manager he contacted DOL establishes prima facie case where manager making termination decision knew of his activity).

In the present case, Plaintiffs complained to Mr. Phil Owen, through their counsel, that Defendant was not appropriately compensating them for all time worked, which generally exceeded forty (40) hours per week. In fact, shortly after Plaintiff's counsel notified Defendant of the alleged violations of the FLSA, Plaintiffs received a "Final Warning" that failure to provide their crews with a 30-minute non-work period would result in termination of their employment.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Honorable Court to

deny Defendants' Motion for Summary Judgment.

Respectfully submitted,

MARGOLIS EDELSTEIN

Keri L. Morris

Jeffrey K. Martin, Esquire (DE #2407)
Keri L. Morris, Esquire (DE #4656)
1509 Gilpin Avenue
Wilmington, DE  19806
(302) 777-4680
Attorneys for Plaintiffs

Dated: May 23, 2005