# EXHIBIT A

1 of 1 DOCUMENT

John DiGregorio, et al., Plaintiffs, v. Temple University, Defendant.

No. 79-3221.

United States District Court for the Eastern District of Pennsylvania.

*1983 U.S. Dist. LEXIS 13243; 101 Lab. Cas. (CCH) P34,570; 26 Wage & Hour Cas. (BNA) 1184*

September 30, 1983

**CORE TERMS:** overtime, duty, athletic department, hours worked, salary, overtime compensation, athletic, intercollegiate, payroll, primary duty, non-exempt, football, athletes, job description, distributing, supervision, managerial, performing, regular, Fair Labor Standards Act, liquidated damages, manager, reconditioning, predecessor, regularly, assigned, budget, team, reasonable grounds, willful

**COUNSEL:** [*1]

Neil Goldstein, (Gafni and Goldstein), Philadelphia, Pennsylvania, for Plaintiffs.

Richard Strouse, (Clover, Knox & Coval), Willow Grove, Pennsylvania, Theodore J. Martineau, Philadelphia, Pennsylvania, for Defendant.

**OPINIONBY:**

SHAPIRO

**OPINION:**

,330 SHAPIRO, J.: This is an action by the Equipment Manager of the Temple University Athletic Department to recover overtime compensation under the Fair Labor Standards Act of 1938 (FSLA), *29 U.S.C. § 201*-219 (1982). Jurisdiction is predicated upon *29 U.S.C. § 216*(b) and *28 U.S.C. § 1337*. Following a bench trial, findings of fact and conclusions of law pursuant to *Fed.R.Civ.P. 52(a)* follow:

Findings of Fact

1. Plaintiff, John DiGregorio, has been employed by Temple University since April 26, 1971 (6), and has held the position of Equipment Manager in the Athletic Department of Temple University (Temple or defendant) from July, 1971 through the present (7-8).

2. Defendant, Temple University, is an institution of higher learning organized under the laws of the Commonwealth of Pennsylvania and is a state-related institution within the meaning of the laws of the Commonwealth of Pennsylvania.

3. The equipment operation is [*2] a recognized subdivision of the Temple University Athletic Department. The equipment operation is responsible for meeting the equipment needs of the Athletic Department, including distributing, maintaining, laundering, reconditioning and storing equipment, and servicing all of Temple's intercollegiate athletic teams and visiting intercollegiate athletic teams.

4. For all periods of time which are relevant to the within Complaint, plaintiff has been employed as Equipment Manager and, together with three Assistant Equipment Managers at Temple, has provided services to Temple in connection with its intercollegiate athletic programs both at the main campus of the University and at the Temple University Stadium Complex (9-10, 42; 45), all of which are located within the City and County of Philadelphia, Pennsylvania. In addition, plaintiff has also rendered services in connection with the intercollegiate athletic program of defendant by attending football camp every summer since 1971 (8-11,

Case 1:04-cv-00414-SLR   Document 51-2   Filed 05/23/2005   Page 3 of 9

Page 2
1983 U.S. Dist. LEXIS 13243, *; 101 Lab. Cas. (CCH) P34,570;
26 Wage & Hour Cas. (BNA) 1184

13-14) and by making trips to other college and university campuses for athletic events, both within and without the Commonwealth of Pennsylvania, and outside the United States as well (15; 16-17; [*3] 20; 27; 212).

5. The responsibilities of Assistant Equipment Manager include the duties of maintaining, distributing, collecting and reconditioning uniforms and equipment utilized by the athletes involved in the various intercollegiate athletic programs of Temple (P-8; 215-220; 253-254; 262-268; 8/23/82-190). In addition, an Assistant Equipment Manager must service athletes' lockers which includes the removal of dirty clothes, distribution of clean clothes, towels and other equipment and obtaining the laundering of such equipment. In addition, an Assistant ,331 Equipment Manager has the responsibility of "servicing the window," (24) which includes distributing equipment to athletes according to the sport and the individual. Assistant Equipment Managers also pick up equipment or refreshments as needed (297-298; 232), and some travel with the teams to games at places other than Temple facilities. (300; 285; 258; 8/23/82-192).

6. The responsibilities of Equipment Manager include the duties of maintaining, distributing, collecting and reconditioning uniforms and equipment utilized by the athletes involved in the various intercollegiate athletic programs of Temple [*4] (P-2; 20-23; 25; 29; 44-45; 8/23 -- 82-190; 193). In addition, the Equipment Manager must service athletes' lockers which includes the removal of dirty clothes, distribution of clean clothes, towels and other equipment and obtaining the laundering of such equipment (27; 28; 9-10; 23; 1341 8/23/82-188). The Equipment Manager has the responsibility of "servicing the window," which includes distributing equipment to individual atahletes according to the sport and the individual (24; 198). More than eighty (80%) percent of the time of the Equipment Manager is and was regularly spent in performing the same functions as are or were performed by Assistant Equipment Managers during the respective seasons and with relation to the appropriate athletes in the intercollegiate athletic program at Temple (124).

7. During all relevant periods herein, the Equipment Manager had no authority with regard to the hiring (48; 213; 253; 282; P-22; 8/23/82-187; 206) or firing (50; 49; 167; 220; 124-127; 127-129), of Assistant Equipment Managers or other employees of defendant. Both the Equipment Manager and the Assistant Equipment Managers were assigned to travel with the respective athletic teams to [*5] interstate or intrastate athletic competitions, and to accompany and secure equipment required for the participation of Temple athletes in those programs. During such out-of-state or out-of-city assignments, the responsibilities of the Temple Equipment Manager and Assistant Equipment Manager; were identical (8-10; 12; 217; 219-220; 8/23/82-192; 195; 197).

8. In the absence of Assistant Equipment Managers assigned to particular locations in the Temple athletic program, the Equipment Manager was and is required to fill in for that individual and perform all relevant functions including laundry, inventory, repair and reconditioning of equipment, and necessary related duties (P-4; 41-42; 47; 219-220). The plaintiff customarily and regularly directs the work of the three Assistant Equipment Managers and the work of a varying number of part-time employees in the equipment operation. This chiefly consists of assigning employees to work locations and coordinating the work load.

9. During all relevant periods of time herein involved, plaintiff DiGregorio has had no involvement in the formulation of the budget of the Athletic Department (376; 144), nor in the decision to purchase [*6] equipment (51-52; 53; 58; 60-62). From February, 1978, he was assigned the responsibility for preparing schedules for the three Assistant Equipment Managers (40), which schedules were fixed under the specific direction and control of the Head of the Athletic Department and without discretionary decisions by plaintiff DeGregorio (41-42; 47-48; 196-197). DiGregorio has never exercised nor possessed any authority with regard to recommending salary increases (8/23/82-143-144), discipline (48-49; 8/23/82-76; 127), or evaluations (48) of any of the Assistant Equipment Managers with whom he works.

10. At all times pertinent to this litigation, Temple maintained in its files job descriptions for the Assistant Equipment Manager position which clearly stated that the job classification involved was "non-exempt" under the Fair Labor Standards Act (P-8). Although prepared in 1974, it was not signed and approved by the Director of Athletics, Ernest Casale, until April 30, 1980 (P-8).

11. Prior to and after the employment of plaintiff Equipment Manager, Temple employed individuals both as Assistant Equipment Managers and as Equipment Manager who were carried on defendant's Physical Plant [*7] Department payroll; this made the costs of the Athletic Department appear to be less ,332 (P-17a; 17c; 332). The persons who were employed in the position of Assistant Equipment Managers carried on the Physical Plant payroll were John Stelacio, Joseph Menns, Raymond Ford and as Equipment Manager, James P. Leavey (P-17a; 17c; P-16a-e).

12. Beginning in 1971 the payroll of the equipment operation was transferred from the Physical Plant Department to the Athletic Department on an attrition basis; that is, as an equipment operation employee quit,

1983 U.S. Dist. LEXIS 13243, *; 101 Lab. Cas. (CCH) P34,570;
26 Wage & Hour Cas. (BNA) 1184

was terminated or retired, his replacement was put on the payroll of the Athletic Department. DeGregorio was the first and only Equipment Manager to be placed on the Athletic Department's payroll since the transfer of control began.

13. Leavey and Menns continued to be employed after DiGregorio was hired in 1971. Leavey received overtime compensation for hours worked in excess of 40 hours per week until his resignation in the fall of 1971. Menns received overtime compensation for hours worked in excess of 40 hours per week until October 1973, when he was placed on the Athletic Department payroll on a monthly salary (P-17c; [*8] P-16e-1-10), but his duties did not change from those which he regularly performed while on the Physical Plant payroll.

14. DiGregorio, when he replaced Jim Leavey as Equipment Manager, and Assistant Equipment Managers Conway, Dillow and Jones were all hired on monthly salaries, with no added compensation for time worked in excess of 40 hours per week (7; 335-336; 366). Since July, 1976, DiGregorio had been compensated on a salary basis at a rate of more than $250 per week. His salary has been at least thirty-three (33%) percent higher than the salaries paid to the Assistant Equipment Managers.

15. The record demonstrates that the plaintiff and the Assistant Equipment Managers all worked overtime during the high points of the respective athletic seasons. Thus, every late August through December, all four have shown large numbers of overtime hours because of football, including summer camp, practice season and football games both at home and away (P-2a-3f; 3aa-3ff; 41-42; 200).

16. While no other sport required as much overtime as football, other sports programs overlapped through April of every academic year and required regular amounts of overtime for basketball, soccer, [*9] baseball, swimming, gymnastics and wrestling events, both at home and away. The regular work day from December 1 to Cherry and White Day was 8-6:30 Monday through Friday, plus time required for any weekend games played at home (28; 16-18; 57).

17. The practice of the Athletic Department prior to 1971 was to use student managers during summer camp for football and for games away from Temple. After 1971, the Equipment Manager and an Assistant manager would attend summer camp for football and would travel with the equipment to athletic events held away from Temple.

18. No compensatory time off was provided to plaintiff for any time worked in excess of 40 hours per week from the time of his hire by Temple through the present (96-97).

19. In the spring of 1977, the American Federation of State, County and Municipal Employees ("AFSCME") won a Pennsylvania Labor Relations Board election to represent the employees in a bargaining unit composed of approximately 400 non-supervisory, non-managerial main campus employees. DiGregorio was held not eligible to vote in the AFSCME election because both Temple and AFSCME deemed him to be a supervisor within the meaning of the appropriate [*10] Pennsylvania statute, the Pennsylvania Public Employe Relations Act. Because DiGregorio has never been included in the AFSCME bargaining unit, his salary and fringe benefit increases always have been unilaterally set by Temple.

20. In June, 1978, AFSCME filed a grievance claiming that DiGregorio was performing bargaining unit work which should have been performed by one of the assistant equipment managers.

21. Prior to the certification of AFSCME, DiGregorio never presented any formal claims to the Athletic Department for overtime wages.

,333 22. In February, 1978, defendant Temple agreed as a result of a union grievance that Conway, Dillow and Jones were non-exempt employees entitled to overtime compensation for hours worked in excess of 40 hours per week and, accordingly, began to compensate them for all hours worked in excess of 40 hours per week after February, 1978 (517). The Department of Labor also advised Temple they were non-exempt and entitled to overtime in June, 1979 (515-517).

23. Defendant Temple did not maintain records of hours worked for the period 1971 through 1978 for DiGregorio or Conway, Dillow or Jones. After 1978 DiGregorio was directed [*11] to turn in weekly statements of hours worked by the Assistant Equipment Managers (131). In February, 1978, Ernie Casale directed plaintiff not to report his actual hours worked (122). His hours were only to be recorded as 8 hours per day, 5 days per week (122). He signed an inaccurate statement of hours for 1980-1981 under protest (123). In 1980, Gavin White, Associate Director of Athletics directed plaintiff to turn in a log of his daily activities. Although plaintiff maintained a weekly log and turned it in to Gavin White, Temple did not produce it at trial and White did not consult it to see if his chart (D-3) showing time spent by DiGregorio on supervision was accurate; the chart was compiled solely from White's memory on the basis of no more than 5-10 minutes in the equipment room on a daily basis (8/23/82-117-118; 93; 80-82; 100). Despite the pendency of a union grievance on behalf of plaintiff for overtime in 1979, and a pending claim with

Case 1:04-cv-00414-SLR    Document 51-2    Filed 05/23/2005    Page 5 of 9

Page 4
1983 U.S. Dist. LEXIS 13243, *; 101 Lab. Cas. (CCH) P34,570;
26 Wage & Hour Cas. (BNA) 1184

the Department of Labor, Temple kept no hourly records on DiGregorio in 1979 or 1980 (492; 539; P-21).

24. Plaintiff DiGregorio during all relevant periods of time herein has performed functions identical to those of Conway, Dillow [*12] and Jones. More than eighty (80%) percent of his time has been devoted to performing functions which are the same as those performed by the Assistant Equipment Managers (493). The job performed by DiGregorio as reflected in the job description issued to him in 1971 is the same job performed by his predecessor Equipment Manager Jim Leavey (P-2; 426; 8/23/82-70-71). However, DiGregorio, also traveled with the football team (207-208).

25. DiGregorio performs the same functions that his predecessor, James P. Leavey, performed; Leavey while employed as Equipment Manager was paid overtime compensation for hours worked in excess of 40 hours per week until the time of his retirement in October, 1971 (8/23/82-70-71; P-16a).

26. In November, 1978, DiGregorio saw a copy of a Temple job description for his position which had the designation "non-exempt" for purposes of Fair Labor Standards ACt coverage (31). Plaintiff's job description prepared in 1971 but given to DiGregorio by his Union representative in December 1978(30-33), does not demonstrate managerial or executive functions that exempt him from the provisions of the Fair Labor Standards Act (P-2). P-1, dated February, 1978 [*13] (33-39) bears no designation for FLSA status but it was not provided to the plaintiff until June, 1979. DiGregorio testified that his duties did not change in 1978 from what they had been previously (P-2; 56). No job description for 1974 has been produced for DiGregorio which is similar to the description for Assistant Equipment Managers (P-8) or actually describes his regular work on a daily basis (P-2; 129-130).

27. In February, 1978, when Temple began to treat Conway, Dillow and Jones as non-exempt within the meaning of the Fair Labor Standards Act, DiGregorio was first assigned the responsibility of preparing a weekly schedule for them (131). DiGregorio had no discretion with regard to this scheduling of employees except to minimize the amount of overtime compensation (479-480) in accordance with the directions of the Head of the Athletic Department, Ernest Casale. DiGregorio was then required for the first time to submit the actual hours worked by plaintiffs Conway, Dillow and Jones to defendant (131).

28. DiGregorio was prohibited by defendant from submitting a record of the actual hours which he worked, but was required instead to submit his hours as 40 hours per [*14] week, even though the evidence shows that he worked regularly ,334 more than 40 hours per week (122). In February, 1978 when these changes in his job assignments were made, DiGregorio did not receive any increase in salary nor any change in his job description. His other duties continued as before. DiGregorio did not receive a new job description until June, 1979. (P-1; 39).

29. From and after February, 1978, DiGregorio continued to perform the same functions which he had performed from the time of his employment in 1971 and continues to perform the identical functions to the present. He still does not have any effective authority to recommend hiring, firing, disciplining or increase in salary of any of the employees with whom he work (P-1). Persons reporting sick call White's secretary or Casale's administrative assistant (204; 288). Even vacations are not subject to his approval and never were (59; 289; 301).

30. Temple has maintained no record of the actual hours worked by plaintiff DiGregorio from 1971 through the present. Plaintiff DiGregorio maintained contemporaneous logs of hours worked from which he has submitted summaries of the actual hours worked [*15] by him for the period 1976 through 1980 and an actual time log prepared for 1981-1982 (P-3a-3f; P-3aa-3ff). Based on all the testimony of plaintiff DiGregorio, and that of Messrs. Conway, Dillow, Jones and Ryan, together with a comparison of the actual records maintained by Temple for the predecessors in office of plaintiffs (P-16a-16e), the records maintained by DiGregorio showing actual time worked are reasonably accurate representations of the actual time worked by him on behalf of defendant for the periods in question.

31. Defendant Temple has not agreed that DiGregorio is entitled to be compensated for overtime work, despite the fact that his predecessor, James P. Leavey, when working in the same position, was compensated by defendant at the rate of time and a half for all hours worked in excess of 40 hours per week (P-16a).

32. Although plaintiffs and defendant had agreed to an average hourly overtime rate for purposes of calculation of damages, after a hearing held before this Court, on the basis of the actual records made available by the defendant, plaintiff was granted leave and has elected to utilize as his hourly rate for overtime compensation purposes, the actual [*16] overtime hourly rate calculated by defendant from records defendant submitted in February, 1982.

33. DiGregorio testified that he protested his lack of overtime to Casale in 1972 to which Casale responded that he could not pay him more because of the computer and because he was non-professional and if he was

Case 1:04-cv-00414-SLR   Document 51-2   Filed 05/23/2005   Page 6 of 9

Page 5
1983 U.S. Dist. LEXIS 13243, *; 101 Lab. Cas. (CCH) P34,570;
26 Wage & Hour Cas. (BNA) 1184

unhappy he should get another job (42-43). Casale did not deny this conversation (366). Casale said no one on yearly salary got overtime although he was provided $4,000 per year in his budget from 1971 until 1974 when the last of the equipment employees left the Physical Plant payroll (8/23/82-63). Casale claimed he got approval to move the Equipment Manager and Assistant Equipment Managers to the Athletic Department from Vice President Rhoads on the assumption that the total departmental budget for four Equipment Managers would equal the total salaries paid for those jobs in Physical Plant including overtime (422-24).

34. Casale testified that he did not learn of the FLSA until 1979 (336). He did not maintain hourly records on Digregorio because he was in a "meet and discuss" unit (369). He did not recall whom he spoke to in Personnel or when he was advised DiGregorio [*17] was exempt.

35. McGettigan, Director of Temple Compensation, was aware in June 1979 that the United States Department of Labor Wage and Hour Division was investigating DiGregorio's case. Temple was not notified by the DOL that there was no liability for the Equipment Manager; in five other areas under investigation it was so notified (539).

36. McGettigan testified that he could not explain why plaintiff's occupation description (P-1) lacked an FLSA designation (239; 245-46). On August 5, 1982, McGettigan stated that he had no personal knowledge of DiGregorio's job and was relying solely on the information furnished to him by Casale (537-39). ,335 Neither McGettigan nor Casale interviewed DiGregorio about his actual work although McGettigan stated that is the proper way in which to conduct a job audit (534).

37. The testimony of Casale and McGettigan concerning efforts to obtain the actual facts about DiGregorio's actual duties in 1978 or subsequently is not credible. No effort was undertaken to investigate or assess his actual duties. D-3, prepared by Gavin White after litigation had commenced and without any documentation prior to the preparation of the [*18] chart is not a credible document. In March, 1982, Casale called James Ryan to try to establish that DiGregorio had interviewed Ryan prior to his hiring; Ryan told him this was not so (8/23/82-197). Casale asked Ryan what John had done when the worked together and Ryan said it was the same work as Assistant Equipment Manager (8/23/82-197).

38. Plaintiff DiGregorio has had no overtime compensation paid to him. For the period September 1, 1976 through June 20, 1977 he worked 596.5 hours overtime subject to compensation at the rate of $9.59 per hour for a total of $5,720.44 (P-18c). For the period July 1, 1977 through June 30, 1978, he worked a total of 655.5 hours subject to overtime compensation at the rate of $10.17 per hour for a total of $6,666.44 (P-18C). From September 1, 1977 to June 30, 1978 plaintiff worked 553 hours overtime at $10.17 per hour for a total of $5,624.01 (P-18c). For the period July 1, 1978 through August 1, 1978, he worked a total of 123 hours overtime subject to compensation at the rate of $10.17 per hour for a total of $1,250.91 (P-18c). For the period September 1, 1978 through December 31, 1978, he worked a total of 218.5 overtime hours subject to [*19] compensation at the rate of $10.745 per hour for a total of $2,347.78 (P-18c). For the period January 1, 1979 through June 30, 1979 he worked a total of 98.5 hours overtime subject to compensation which should have been at the rate of $10.85 per hours for a total of $1,068.73 (P-18c). For the period July 1, 1979 through June 30, 1980 he worked a total of 554 hours overtime subject to compensation at the rate of $11.61 per hour for a total of $6,431.94 (P-18c). For the period September 1, 1980 through December 31, 1980 he worked a total of 34.5 hours overtime subject to compensation at the rate of $12.48 per hour for a total of $430.56 (P-18c). For the period January 1, 1981 through June 30, 1981 he worked a total of 103.25 hours overtime subject to compensation at the rate of $12.76 per hour for a total of $1,317.47 (P-18c). For the period July 1, 1981 through June 30, 1982 he worked a total of 379.5 hours overtime subject to compensation at the rate of $13.63 per hour for a total of $5,172.59 (P-18c). For the period September 1, 1976 through June 30, 1982, DiGregorio worked a total of 2763.25 hours overtime for which he received no compensation.

Discussion

The decision [*20] in this case is determine by the pertinent sections of the FLSA and the interpretive regulations issued by the Secretary of Labor. The defendant asserts, first, that plaintiff is a bona fide executive who is exempt from FLSA coverage. Second, even if the plaintiff is found to be non-exempt, defendant argues that the violation of the Act was not wilful, but one which was in good faith reasonable belief that there was no transgression of federal law. For the reasons stated herein, we reject these contentions.

The FLSA generally prescribes that employees be compensated for any time worked beyond forty (40) hours in any work week "at a rate not less than one and one-half time the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). But in invoking this exemption, Temple carries the burden of proving its applicability to the plaintiff. *Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190 (1966); Walling v. General Industries Co., 330 U.S. 545 (1947).* Moreover, the "exemptions are to be narrowly construed against employees seeking to assert

1983 U.S. Dist. LEXIS 13243, *; 101 Lab. Cas. (CCH) P34,570;
26 Wage & Hour Cas. (BNA) 1184

them and their application limited to those establishments plainly and unmistakeably within their terms and spirit." *Arnold* [*21] *v. Kanowsky, 361 U.S. 388, 392 (1960).*

,336 The phrase "employee employed in a bona fide executive . . . capacvity" is defined at *29 C.F.R. § 541.1(f)*:

The Term "employee employed in a bona fide executive . . . capacity" in section 13(a)(1) of the act shall mean any employee:

(f) Who is comensated for his services on a salary basis at a rate of not less than . . . $250.00 per week . . . and whose primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of work of two or more other employees therein, shall be deemed to meet all the requirements of this section.

This is known as the "short test". Employees earning more than $250.00 per week must satisfy the dual requirements of this test, their "primary duty" must be management and they must regularly direct the work of two or more employees. *See Donovan v. Burger King Corp., 672 F.2d 221, 223 (1st Cir. 1982); Marshall v. Western Union Telegraph Co., 621 F.2d 1246 (3d Cir. 1980).* Since we have found that the plaintiff earned more than $250.00 per week during [*22] the relevant period and regularly directed the work of at least two assistant managers, the issue is whether plaintiff's primary duty was management of executive in function.

Under the regulations,

A determination of whether an employee has management as his primary duty must be based on all the facts of a particular case. . . . Time alone . . . is not the sole test. . . . Other pertinent factors are the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the wages paid other employees for the kind of nonexempt work performed by the supervisor.
*29 C.F.R. § 541.103* While some of these factors weigh in favor of exemption, when the plaintiffs duties are functionally analyzed the defendant has not carried its burden of proof.

Section 541.103 offers as a "rule of thumb" or "useful guide" the proposition that "primary duty" means that the class of work occupies over fifty (50%) percent of an employee's time. But "time alone . . . is not the sole test," and the fifty (50%) percent rule must be considered in conjunction with the other [*23] factors enumerated in § 541.103. *Donovan v. Burger King Corp. supra 675 F.2d at 521. Snipes v. Paramount Liquor Co. of Missouri, 544 F. Supp. 563, 568 (W.D. Mo. 1982).* This is because "an employee can manage while performing other work, and that this other work does not negate the conclusion that his primary duty is management." *Donovan v. Burger King Corp., supra, 672 F.2d at 226.* Plaintiff's responsibilities included arranging for laundering, maintaining, distributing and reconditioning uniforms utilized in Temple's intercollegiate athletic programs as well as servicing the locker area and equipment window. Because we have found tha plaintiff spent more than eighty (80%) percent of his time performing these same menial tasks as the Assistant Managers, his remaining work load functions must be analyzed to determine if his duties were primarily managerial in nature.

The plaintiff's supervisory duties consisted of mainly coordinating assistance in the respective work locations and overseeing the equipment inventory. As equipment manager, he had no authority to hire assistants or other employees of the department, nor did he have authority to exercise or recommend [*24] salary increases or staff idscipline. He had no participation in the formulation of the budget of the athletic department or its equipment purchasing policies. Only since February, 1978, was he assigned the responsibility for preparing work schedules for the Assistant Managers. But the policy decisions concerning the schedules were made by the Head of the Athletic Department without participation by plaintiff. Plaintiff merely decided who would be at a particular location at a particular time; he could not grant vacation or sick leave or permit regular overtime affecting the budget. To the extent he was any different from the Assistant Managers, he was not a ,337 supervisor or executive but a coordinator. His duties were important but his activities were essentially the same as the others. The equipment department performed as a team, much like those players on the football roster. Plaintiff functioned as a middle linebacker in tandem with his assistants, "filling the hole" when there was a lapse in coverage. Although he was responsible for coordinating the "defense" as a middle linebacker would, this function was relatively unimportant when compared to his value [*25] "in the field." Thus, the plaintiff's non-management daily duties were of more value than the minor management functions he performed.

An analysis of the remaining factors listed in § 541.103 supports this conclusion. His exercise of discretionary power was relatively minor. He was free to go wherever he was needed, but otherwise spent most of his time carrying out the same duties as an assistant. And while his duties were generally performed without supervision, this follows from the nature of the work plaintiff was doing. It simply did not require

Case 1:04-cv-00414-SLR  Document 51-2  Filed 05/23/2005  Page 8 of 9

Page 7
1983 U.S. Dist. LEXIS 13243, *; 101 Lab. Cas. (CCH) P34,570;
26 Wage & Hour Cas. (BNA) 1184

supervision; neither did that of the Assistant Equipment Managers for the most part. To the extent supervision was exercised in fact, it was that of the administrators who were his superiors. Any decisions or judgments which would involve any policy change could only be made after consultation with them. *See Martin v. Penn Line Service, Inc., 416 F. Supp. 1387, 1390 (W.D. Pa. 1976)*. The final factor, the relationship between plaintiff's salary and that of an Assistant, is not significant in view of the foregoing discussion. The differentiation in salary can be attributed to the plaintiff's added responsibilities and seniority. [*26]

The character, type and extent of the plaintiff's actual activities compels the conclusion that his "primary duty" was not managerial in nature. His supervisory capacity was *de minimus*, and did not extend beyond merely instructing and supervising the Assistant Manqagers in a limited sense. *Compare with, Kelly v. Adroit, Inc., 480 F. Supp. 392, 393 (E.D. Tenn. 1979)*. Moreover, the nature of the equipment department's operations required a sharp foreman rather than managerial supervision by a skilled employee. *Compare with, Walling v. General Industries Co., 330 U.S. 545, 549 (1946)*. Although the plaintiff may be said to have been "in charge" of the equipment department in a certain limited sense, the nature of the duties involved demonstrates that the person "in charge," in fact, was the Head of the Athletic Department. Plaintiff's lack of true managerial responsibility and the nature of the equipment department's operation distinguishes the cases relied upon by the defendant. *See, e.g., Donovan v. Burger King Corp., supra, 675 F.2d at 521-22*.

Section 6 of the Portal-to-Portal Act provides that an action for unpaid overtime compensation under the FLSA "may [*27] be commenced within two years after the cause of action accrued . . . except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued. . . ." *29 U.S.C. § 255(a)*. In support of its view that any violation was not willful within the meaning of § 255(a), the defendant asserts that it was not aware of its obligations under the FLSA and did not knowingly deprive the plaintiff of his right to overtime.

The Court of Appeals has set forth the relevant standard in interpreting the term "willful" as used in § 255(a).In *Wehr v. Burroughs Corp., 619 F.2d 276 (3d cir. 1980)*, the court addressed the meaning of a "willful violation" of the Age Discrimination in Employment Act of 1967 (ADEA), *29 U.S.C. § 621-34*. Noting that § 6(a) of the Portal-to-Portal Act, *29 U.S.C. P255(a)*, is specifically incorporated into the ADEA, *29 U.S.C. P626(c)(1)*, the court drew upon a case defining a willful violation of the FLSA to provide the governing standard under the ADEA. The court approved the definition in *Hodgson v. Hyatt, 318 F. Supp. 370, 392-93 (N.D. Fla. 1970)*:

[S]ince the Portal-to-Portal Act limitations apply to [*28] civil actions, the term "willful" which was added by the 1966 amendment must be construed in the civil sense.It therefore applies to violations which are *intentional, ,338 knowing or voluntary as distinguished from accidental and it is used to characterize conduct marked by careless disregard whether or not one has the right to act. U.S. v. Illinois Cent. R. Co., 303 U.S. 239, 243, 58 S.Ct. 533, 82 L.Ed. 773*.

*Wehr v. Burroughs Corp., supra, 619 F.2d at 283* (emphasis added)(footnote omitted). The court concluded that the term willful included actions taken in reckless disregard of the consequences. *Id. See also, Blackwell v. Sun Electric Corp., 696 F.2d 1176-1183-84 (6th Cir. 1983)*. Consistent with this interpretation, it has been stated that, "[T]here is no separate requirement that employers know that they have violated a specific provision of the [FLSA]. . . ." *Donovan v. Carls Drug Co., Inc., 703 F.2d 650, 652 (2d Cir. 1983)*. Accord *Marshall v. Union Pac. Motor Freight Co., 650 F.2d 1085, 1090 (9th Cir. 1981)*. Such a rule would encourage employers to remain ignorant of the FLSA rather than foster energetic compliance. Thus, neither the [*29] employer's good faith nor his ignorance of the governing statutes precludes a finding of willfullness. *See Donovan v. Carls Drug Co., Inc., supra, 703 F.2d at 652; Donovan v. Sebine Irrigation Co., Inc., 695 F.2d 190, 196 (5th Cir. 1983); Marshall v. Erin Food Services, Inc., 672 F.2d 229, 231 (1st Cir. 1982); Marshall v. Union Pac. Motor Freight Co., supra, 650 F.2d at 1092. Wehr v. Burroughs Corp., supra, 619 F.2d at 283 n. 15* (citing *Brennan v. Heard, 419 F.2d 1, 3 (5th Cir. 1974))*.

When measured against these standards, defendant's reckless disregard of the FLSA's overtime provisions establishes wilfullness. Temple classified the position of Assistant Equipment Manager as "non-exempt" from the FLSA. It also knew that plaintiff performed essentially the same function as an Assistant Equipment Manager. Moreover, plaintiff's predecessor was paid overtime compensation until his retirement. Plaintiff also has complained of lack of overtime pay since 1972; when Temple agreed that the Assistant Equipment Managers were covered by the FLSA it did not fairly consider the applicability of the FLSA to his job classification but made cosmetic attempts to prevent [*30] its application. When the Department of Labor began its investigation of Temple in 1979 and the plaintiff's immediate supervisor became aware of possible FLSA applicability, defendant failed to conduct any meaningful investigation of the actual nature of plaintiff's duties. Temple failed to maintain any records of hours worked per week by plaintiff from the beginning of his employment and

1983 U.S. Dist. LEXIS 13243, *; 101 Lab. Cas. (CCH) P34,570;
26 Wage & Hour Cas. (BNA) 1184

directed the plaintiff to complete inaccurate records when it began keeping records in 1978. The facts establish a reckless disregard of the likelihood that plaintiff was covered by the statutory provisions of the FLSA.

Although a closer question, these same factors serve to preclude a defense to the mandatory liquidated damages provision of *29 U.S.C. § 216*(b). Section 216(b) of the FLSA allows emplouees to recover "their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages." Section 260 provides, that:

If the employer shows to the satisfaction of the court that the act or ommission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], the court may, [*31] in its sound discretion, award no liquidated damamges . . .
*29 U.S.C. § 260.* Under the FLSA, liquidated damages are compensatory, not punitive in nature. Such damages serve to compensate employees for losses they might suffer by reason of not receiving their lawful wage at the time it was due. *Overnight Motor Co. v. Missel, 316 U.S. 572, 582-84 (1942).* In order to avoid the statutory liability for liquidated damages, the employer has the "plain and substantial burden of persuading the court by proof that his failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict." *Rothman v. Publicker Industries, 201 F.2d 618, 620 (3d Cir. 1953).* The Court of Appeals recently explained these dual requirements:

The good faith requirement of the Portal-to-Portal defense requires that the employer have an honest intention to ascertain and follow dictates of the ,339 Act. *Laffey supra, 567 F.2d at 464.* The additional requirement that the employer have reasonable grounds for believing that his conduct complies with the Act imposes an objective standard by which [*32] to judge the employer's behavior. *Id.* Moreover, an employer may noot rely on ignorance alone in meeting the objective test. *Barcellona v. Tiffany English Pub, 597 F.2d 464, 468-69 (5th Cir. 1979).*

*Marshall v. Brunner, 668 F.2d 748, 753 (3d Cir. 1982).* The defendant has not met his burden in this case.

The defendant urges that the inaction of the Department of Labor and the AFSCME designation of plaintiff as a supervisor establishes good faith. While the Department of Labor did conduct a general investigation of Temple, the result was inconclusive as to the plaintiff. The union agreed with Temple that plaintiff might be excluded from the collective bargaining unit and placed in a "meet and discuss" group. But the union's 1978 grievance claiming that plaintiff was performing bargaining unit work put the defendant on notice of the actual nature of the plaintiff's work. These factors are evidence of Temple's honest intention, but they are outweighed by defendant's failure to keep records of overtime and failure to conduct a reasonable investigation of plaintiff's duties to ensure good faith compliance with the FLSA. Knowing that plaintiff performed substantially the [*33] same work as the Assistant Equipment Managers, defendant cannot establish reasonable grounds for believing that it was complying with the Act.

Finally, the defendant challenges the extent of overtime claimed. The plaintiff has satisfied his burden of proof with regard to the amount of actual overtime hours. *See Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946).* Nevertheless, certain hours claimed are not compensable under the FLSA. Beginning December 3, 1978, plaintiff flew with the football team to Japan. Fifty-eight (58) hours claimed for that entire work week spent in Japan must be excluded under *29 U.S.C. § 213(f). See also,* 29 C.F.R. § 776.7(b), n. 20. Seven (7) hours from the following week must also be excluded because overnight travel outside of regular working hours is not compensable. *29 C.F.R. § 785.39.* For the same reason, nineteen (19) hours must be excluded from the hours claimed in 1977. In addition, one hour of meal time must be subtracted from the week of December 5, 1977. *29 C.F.R. § 785.19.*

The final calculation is as follows: [Chart Omitted.]

Therefore, plaintiff will be awarded actual damages in the amount of $29,505.04 [*34] and liquidated damages in the same amount for a total sum of $59,010.08.