IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

WILLIE DAVIS, JR.,                                 )
NATHANIEL BRIDDELL,                                )
JOSEPH GARRISON,                                   )
LARRY E. GIBBS,                                    )
ROY H. WALTERS,                                    )
                                                   )
ALL SIMILARLY-SITUATED CURRENT                     ) C.A. NO. 04-0414-KAJ
AND FORMER EMLOYEES OF                             )
MOUNTAIRE FARMS, INC.,                             ) JURY TRIAL DEMANDED
MOUNTAIRE FARMS OF                                 )
DELMARVA, INC., and MOUNTAIRE                       ) COLLECTIVE ACTION
FARMS      OF DELAWARE, INC.,                      )
                                                   )
        Plaintiffs,                                )
                                                   )
            v.                                     )
                                                   )
MOUNTAIRE FARMS, INC.,                             )
MOUNTAIRE FARMS OF                                 )
DELMARVA, INC., and                                )
MOUNTAIRE FARMS OF                                 )
DELAWARE, INC., all Delaware corporations,  )
                                                   )
        Defendants.                                )

---

## APPENDIX SUPPORTING PLAINTIFFS' ANSWERING BRIEF TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

MARGOLIS EDELSTEIN
Jeffrey K. Martin, Esquire (#2407)
Keri L. Morris, Esquire (#4656)
1509 Gilpin Avenue
Wilmington, Delaware 19806
302-777-4680
Attorneys for Plaintiffs

Dated: May 23, 2005

## TABLE OF CONTENTS

**Document**                                                                 **Tab No.**

Defendant's Answer and Affirmative Defenses to Plaintiff's Complaint,
dated July 9, 2004 (B0001-B0008) ...................................................     1

Letter from Plaintiff's Counsel, Jeffrey K. Martin, Esquire to Mr. Phillip Owen,
Mountaire Farms, dated February 27, 2004 (B0009-B0010 ........................     2

Excerpts from the Deposition Transcript of Plaintiff,
Nathaniel Briddell, (B0011-B0022) ...................................…..……...     3

Excerpts from the Deposition Transcript of Plaintiff,
Willie Davis, Junior (B0023-B0029) ...................................…..……...     4

Excerpts from the Deposition Transcript of Plaintiff,
Joseph Garrison, (B0030-B0045) ...................................….…………...     5

Excerpts from the Deposition Transcript of Plaintiff,
Larry E. Gibbs, (B0046-B0058) ...................................……...............     6

Excerpts from the Deposition Transcript of William Douglas Lynch,
(B0059-B0066) ...................................……..................................     7

Excerpts from the Deposition Transcript of Phillip Owen,
(B0067-B0073) ...................................………..............................     8

Excerpts from the Deposition Transcript of Plaintiff,
Roy Walters, (B0074-B0086) ...................................………….....     9

Affidavits of Plaintiffs, Davis, Briddell, Garrison, Gibbs, and Walters,
Dated May 1, 2005, (B0087-B0095) ...................................……………     10

U. S. Department of Labor Audit of Mountaire's NC Plant,
Dated March 21, 2001, (B0096-B0113) ...................................………     11

Farm Ticket, Garrison Exhibit 1, (B0114) ...................................……     12

Mountaire Live Haul Guidelines, Garrison Exhibit 2, (B0115-B0118) ............     13

Final Warning, Gibbs Exhibit 6, (B0119) ...................................……     14

Final Warning, Walters Exhibit 7, (B01120) ...................................…     15

Collective Bargaining Agreement, Garrison Exhibit 6, (B0121-B0142) ..........     16

# TAB 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WILLIE DAVIS, JR., *et al.*,　　　　*

　　　　　　　　　　　　　　　*

　　　　　　Plaintiff,　　　　*　　Civil Action No. 04-414-KAJ

　　v.　　　　　　　　　*

　　　　　　　　　　　　　*

MOUNTAIRE FARMS, INC., *et al.* *

　　　　　　　　　　　　　*

　　　　　Defendants.　　　　*

　　　　　　　　　　　　　/

### DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES
### TO PLAINTIFFS' COMPLAINT

Defendants, Mountaire Farms, Inc., Mountaire Farms of Delmarva, Inc. and

Mountaire Farms of Delaware, Inc., by and through their undersigned attorneys, submit

their Answer and Affirmative Defenses to Plaintiffs' Complaint and state as follows:

### INTRODUCTION

1.　　The Defendants admit the allegations contained in Paragraph 1 of the

Complaint only insofar as it pertains to the residences and employment of the Plaintiffs.

2.　　The Defendants admit the allegations contained in Paragraph 2 of the

Complaint.

3.　　The Defendants admit the allegations contained in Paragraph 3 of the

Complaint.

4.　　The Defendants admit the allegations contained in Paragraph 4 of the

Complaint.

5.　　The Defendants admit the allegations contained in Paragraph 5 of the

Complaint.

6. The Defendants admit the allegations contained in Paragraph 6 of the Complaint.

7. The Defendants admit the allegations contained in Paragraph 7 of the Complaint.

8. The Defendants admit the allegations contained in Paragraph 8 of the Complaint.

9. The Defendants admit the allegations contained in Paragraph 9 of the Complaint.

10. The Defendants admit the allegations contained in Paragraph 10 of the Complaint.

11. The Defendants admit the allegations contained in Paragraph 11 of the Complaint.

12. The Defendants deny the allegations contained in Paragraph 12 of the Complaint.

13. The Defendants admit the allegations contained in Paragraph 13 of the Complaint.

14. The Defendants admit the allegations contained in Paragraph 14 of the Complaint.

15. The Defendants admit the allegations contained in Paragraph 15 of the Complaint.

16. The Defendants admit the allegations contained in Paragraph 16 of the Complaint.

17.     The Defendants deny the allegations contained in Paragraph 17 of the Complaint.

18.     The Defendants deny the allegations contained in Paragraph 18 of the Complaint.

19.     The Defendants admit the allegations contained in Paragraph 19 of the Complaint.

20.     The Defendants admit the allegations contained in Paragraph 20 of the Complaint.

21.     The Defendants deny the allegations contained in Paragraph 21 of the Complaint.

22.     The Defendants deny the allegations contained in Paragraph 22 of the Complaint.

23.     The Defendants admit the allegations contained in Paragraph 23 of the Complaint.

24.     The Defendants deny the allegations contained in Paragraph 24 of the Complaint.

25.     The Defendants deny the allegations contained in Paragraph 25 of the Complaint.

26.     The Defendants deny the allegations contained in Paragraph 26 of the Complaint.

27.    The Defendants deny the allegations contained in Paragraph 27 of the Complaint.

28.    The Defendants deny the allegations contained in Paragraph 28 of the Complaint.

29.    The Defendants deny the allegations contained in Paragraph 29 of the Complaint.

30.    The Defendants deny the allegations contained in Paragraph 30 of the Complaint.

31.    The Defendants deny the allegations contained in Paragraph 31 of the Complaint.

32.    The Defendants deny the allegations contained in Paragraph 32 of the Complaint as stated.  By way of further answer, the Defendants aver that, in exchange for the payment to each of the Plaintiffs of an automobile allowance of $12,500 per year in lieu of providing a company vehicle, the Plaintiffs agree to use their own automobiles to pick up, transport and/or return home various personnel, to leave their automobiles for company use if they are out sick or are on vacation, to be responsible for maintenance and repairs to the vehicles, and to provide insurance coverage up to $1,000,000.00 to cover Defendants' employees in the event of accident on company time.

33.    The Defendants deny the allegations contained in Paragraph 33 of the Complaint.

34.    The Defendants deny the allegations contained in Paragraph 34 of the Complaint.

4

35. The Defendants deny the allegations contained in Paragraph 35 of the Complaint.

36. The Defendants deny the allegations contained in Paragraph 36 of the Complaint.

37. The Defendants deny the allegations contained in Paragraph 37 of the Complaint.

38. The Defendants deny the allegations contained in Paragraph 38 of the Complaint.

39. The Defendants deny the allegations contained in Paragraph 39 of the Complaint.

40. The Defendants deny the allegations contained in Paragraph 40 of the Complaint.

## COUNT I
## VIOLATION OF THE FAIR LABOR STANDARDS ACT

41. The Defendants repeat, reallege and incorporate herein by reference each and all of its responses set forth in paragraphs 1 through 40 above.

42. The Defendants deny the allegations contained in Paragraph 42 of the Complaint.

43. The Defendants deny the allegations contained in Paragraph 43 of the Complaint.

## COUNT II
## VIOLATION OF THE WAGE PAYMENT AND COLLECTION ACT

5

44.    The Defendants repeat, reallege and incorporate herein by reference each and all of its responses set forth in paragraphs 1 through 43 above.

45.    The Defendants deny the allegations contained in Paragraph 45 of the Complaint.

46.    The Defendants deny the allegations contained in Paragraph 46 of the Complaint.

## COUNT III
## RETALIATION

47.    The Defendants repeat, reallege and incorporate herein by reference each and all of its responses set forth in paragraphs 1 through 46 above.

48.    The Defendants deny the allegations contained in Paragraph 48 of the Complaint.

49.    The Defendants deny the allegations contained in Paragraph 49 of the Complaint.

## AFFIRMATIVE DEFENSES TO COMPLAINT

WHEREFORE, having answered in full, Defendants state below the following affirmative defenses:

### FIRST AFFIRMATIVE DEFENSE

The Plaintiffs are exempt from the overtime provisions of the Fair Labor Standards Act pursuant to the requirements of the executive exemption.

### SECOND AFFIRMATIVE DEFENSE

The Plaintiffs exercise a sufficient amount of supervisory authority as to be exempt by the Fair Labor Standards Act.

6

**B0006**

### THIRD AFFIRMATIVE DEFENSE

The Defendants have not engaged in any conduct or course of conduct which would amount to a willful violation of the Fair Labor Standards Act.

### FOURTH AFFIRMATIVE DEFENSE

The Plaintiffs and each of them respectively receive an automobile allowance of $12,500 per year.

### RESERVATION OF RIGHTS

Defendants reserve the right to assert any and all additional affirmative defenses that may be determined during the course of discovery.

Matthew F. Boyer (Del. Bar. No. 2564)
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
(302)-884-6585
*Attorneys for Defendants*
*Mountaire Farms, Inc.*


Arthur M. Brewer
Shawe & Rosenthal, LLP
20 S. Charles Street, 11th Floor
Baltimore, MD 21201
(410)-752-1040
*Attorneys for Defendants*
*Mountaire Farms, Inc.*

DATED: July 9, 2004

7

## CERTIFICATE OF SERVICE

This is to certify that on July 9, 2004, a copy of the Defendants' Answer and

Affirmative Defenses was served by first class mail, postage prepaid, upon:

> Jeffrey K. Martin, Esquire
> 1509 Gilpin Avenue
> Wilmington, DE 19806

Matthew F. Boyer

344346_1.DOC

# TAB 2

# JEFFREY K. MARTIN, P.A.

1509 GILPIN AVENUE
WILMINGTON, DE 19806
(302) 777-4680
Facsimile (302) 777-4682

JEFFREY K. MARTIN, ESQ.
MEMBER OF DE, PA & NJ BARS
Email: jmartin@jkmpa.com

TIMOTHY A. DILLON, ESQ.
MEMBER OF DE, PA & NJ BARS
Email: tdillon@jkmpa.com

February 27, 2004

**Personal & Confidential**

Mr. Phillip Owen
Human Resource Department
Mountaire Farms
P.O. Box 710
Selbyville, DE 19975-0710

RE:    **Overtime Request for Various Supervisors**

Dear Mr. Owen:

Please be advised that this office represents a number of individuals who are employed by Mountaire Farms in Selbyville. I have met with each of these individuals and believe that each person is entitled to retroactive overtime pay for the last three years. Under the FLSA, none of these individuals may be categorized as an "exempt employee" and therefore, we are making this demand for overtime compensation.

Most of these individuals have worked in the capacity of a crew leader. They are compensated by Mountaire for the time that the farm opens and have not been paid for any compensation for the significant amount of time that has taken each of these employees to pick up and deliver home the catchers necessary to perform the work at the farm. They have been improperly denied payment for this time. Notwithstanding that some of them may now be salaried employees, each clearly should be compensated for overtime under the FLSA.

Please direct this letter to the appropriate person in your company with whom I may be able to present and discuss each of the claims. My clients are understandably anxious to resolve this matter as soon as possible. If we are unable to resolve this matter immediately, we have been authorized to file a Complaint in the U.S. District Court for the District of Delaware. In such a complaint, we will be seeking a doubling of the overtime due and owing to each of these employees, the costs of the litigation, as well as attorney's fees.

Please be advised that under the FLSA and pertinent federal and state employment laws, it is contrary to law for the employer to punish or, in any other way, retaliate against any of these employees for the claims made against your company.

Mr. Phillip Owen
February 27, 2004
Page 2

I look forward to hearing from you or a representative of your company.

Very truly yours,

JEFFREY K. MARTIN

JKM:cab
cc: Client(s)

TAB 3

1

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

WILLIE DAVIS, JR.,                    ) CA No 04-0414-KAJ
NATHANIEL BRIDDELL,                   )
GEORGE W. FEDDIMAN,                   )
JOSEPH GARRISON,                      )
LARRY E. GIBBS,                       )
ROY H. WALTERS,                       )
                                      )
ALL SIMILARLY-SITUATED CURRENT AND    )
FORMER EMMPOYEES OF MOUNTAIRE         )
FARMS, INC., MOUNTAIRE FARMS OF       )
DELMARVA, INC., and MOUNTAIRE FARMS   )
OF DELAWARE, INC.,                    )
                                      )
          Plaintiffs,                 )
                                      )
          v.                          )
                                      )
MOUNTAIRE FARMS, INC.,                )
MOUNTAIRE FARMS OF DELMARVA, INC.,    )
and MOUNTAIRE FARMS OF                )
DELAWARE, INC., all Delaware          )
corporations,                         )
                                      )
          Defendants.                 )

.. .. .. .. .. ..

        Deposition of NATHANIEL BRIDDELL, taken

pursuant to notice, on Thursday, January 27, 2005 at

10:00 a.m. at Young, Conaway, Stargatt & Taylor,

Georgetown, Delaware, reported by Lorena J. Hartnett,

a Registered Professional Reporter and Notary Public.

.. .. .. .. .. ..

B0011

Page 2

APPEARANCES:

JEFFREY MARTIN, ESQUIRE
KERRI L. WILLIAMS, ESQUIRE
Margolis, Edelstein
1509 Gilpin Avenue
Wilmington, DE  19806
        Attorney for the Plaintiffs

ARTHUR M. BREWER, ESQUIRE
Shawe & Rosenthal, LLP
Sun Life Building, 11th Floor
20 South Charles Street
Baltimore, MD  21201
        Attorney for the Defendants

ALSO PRESENT:  Phil Owen and Doug Lynch

Page 3

TABLE OF CONTENTS

TESTIMONY OF NATHANIEL BRIDDELL:

Direct Examination by Mr. Brewer . . . . . . . . 3

Certificate of Reporter  . . . . . . . . . . . .155

INDEX TO EXHIBITS

Page 4

        NATHANIEL BRIDDELL,
HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
DIRECT EXAMINATION ON BEHALF OF THE DEFENDANT
        MR. BREWER: Mr. Briddell, you and I
have met.  I am Art Brewer, and I represent
Mountaire in the case that you and some
other crew leaders have filed against the
company.  I just have a couple of
preliminary questions for you.
        By the way, I assume we will have the
same standards, the stipulations that we
have had in the other two depositions?
        MR. MARTIN: Yes, sir.
        MR. BREWER: Okay.
BY MR. BREWER:
    Q.  Have you ever been deposed before?
    A.  Opposed?
    Q.  Deposed, like this, have you ever had
your deposition taken before?
    A.  Yes.
    Q.  Okay, can you tell me in what case?
    A.  A divorce case.
    Q.  A divorce case?
    A.  Yes.

Page 5

    Q.  And whose divorce were you deposed in?
    A.  Mine.
    Q.  Oh, your own divorce.  Okay, and how
long ago was that?
    A.  12/17/04.
    Q.  Okay, having been deposed before, then
I assume you understand that you are under oath
today and have an obligation to tell the truth?
    A.  True.
    Q.  Okay.  This is informal, as I am sure
the deposition that you gave in December of '04
was informal, but you realize that it has the
same significance and force as if you were giving
testimony before a judge in a courtroom?
    A.  Yes.
    Q.  I will be asking you a series of
questions, and the court reporter, as you can
see, will be taking down the questions that I
ask, also the answers that you give to my
questions.
        At trial I will have an opportunity to
bring to the attention of the judge or the jury
any changes in your testimony from today and
testimony that you may give in this trial.  Do

Page 6

you understand that, sir?
    A.  Yes.
    Q.  I am going to ask that you not answer
any questions that I ask you if you don't
understand them.
        It's my job to make myself clear to
you, so if you don't understand the question I
have asked, don't answer it, just tell me that
you don't understand it, and I will be more than
happy to try to rephrase it so that you do
understand it.
        You will also have to, as I am sure
you are familiar, having had a deposition taken
before, when I ask you a question, you will have
to answer, and a nod of the head isn't
sufficient.  You will have to answer yes or no.
Okay?  The court reporter can't take down a nod
of your head.
    A.  Yes.
    Q.  Okay, good.  Let me ask you this:  Are
there any physical problems or mental problems
that you have that would interfere with your
being able to answer my questions today?
    A.  No.

Page 7

    Q.  Are you on any medication today?
    A.  Yes.
    Q.  Can you tell me what the medication
is, please?
    A.  Glucophage and Glucotrol for diabetes.
    Q.  Okay.  The taking of that medication,
in your opinion, is not going to interfere with
your ability to answer my questions?
    A.  No.
    Q.  Okay.  The only other thing before we
get into it is to let you know that if there is a
time that you need a break for any reason, just
please let me know, and we will be more than
happy to break.  Okay?
    A.  I understand.
    Q.  Okay, can you tell me, please, how you
came to contact Mr. Martin?
    A.  Willie Davis, Jr..
    Q.  Willie Davis?
    A.  Junior.
    Q.  All right, I don't -- Can you
elaborate on that?
    A.  Yes, I got to know Mr. Martin through
Willie Davis, a coworker who was doing the same

Page 38

1  Maryland, 21822.
2      Q. Okay, and how long have you been
3  there?
4      A. Twenty months.
5      Q. Okay, and prior to that where did you
6  live, sir?
7      A. 9545 Honeysuckle Road, Berlin,
8  Maryland 21811.
9      Q. Okay, and how long did you live there?
10     A. Let's see. Twenty-five years.
11     Q. That's close enough. And how old are
12  you, sir, and what's your birth date?
13     A. I am 55 years old. My birth date is
14  12/19/49.
15     Q. 12/19/1949, okay. Your father's name,
16  please?
17     A. My father's name is Davison Spence,
18  Sr..
19     Q. And his last name is Spence?
20     A. Yes.
21     Q. And your last name is Briddell?
22     A. Briddell.
23     Q. Can you explain that, please, to me?
24     A. I still carried my mother's maiden

Page 39

1  name.
2      Q. Okay, and what was your father's
3  occupation?
4      A. My father worked -- A factory worker,
5  and he worked at an ice plant in Berlin, and most
6  of his life a factory worker.
7      Q. Okay. Is he alive or deceased?
8      A. He is alive.
9      Q. Okay, is he still working?
10     A. No.
11     Q. Okay, and your mother's maiden name is
12  Briddell, you say?
13     A. Briddell.
14     Q. Okay, and is she working? Does she
15  work?
16     A. Deceased. Deceased.
17     Q. Oh, I'm sorry. Thank you. Brothers
18  or sisters?
19     A. Yes.
20     Q. How many?
21     A. I have four brothers and five sisters.
22     Q. And can you tell me what -- Let's
23  start with your brothers. Can you tell me what
24  they do, if you know?

Page 40

1      A. Well, my oldest, my brother Darcy
2  Spence, he works at Mountaire and drives a school
3  bus.
4      Q. Drives a school bus for Mountaire?
5      A. No, no, no, he works at Mountaire and
6  drives a school bus.
7      Q. Oh, okay. What does he do at
8  Mountaire?
9      A. Sanitation.
10     Q. Okay, your next brother?
11     A. My next brother lives in Aldelphi,
12  Maryland.
13     Q. Okay, and what does he do?
14     A. I don't know.
15     Q. All right.
16     A. That's it. My other two brothers are
17  deceased.
18     Q. Okay, how about your sisters?
19     A. Yes, Wanda, she works for -- Gosh, she
20  is a seamstress is all I can say.
21     Q. Okay.
22     A. The next sister, Pojena, she teaches
23  school. I have a sister in North Carolina, and I
24  think she is a social worker, I think.

Page 41

1      Q. Uh-huh.
2      A. I got a sister who is a housewife in
3  Salisbury, and one sister works at Home Depot in
4  Salisbury.
5      Q. Okay, thank you. What is the highest
6  level of education, sir, that you obtained?
7      A. I completed the twelfth grade.
8      Q. Okay, high school graduation?
9      A. Yes.
10     Q. What high school, please?
11     A. Worcester Junior-Senior High School,
12  Newark, Maryland.
13     Q. Where was it, please?
14     A. Newark, Maryland.
15     Q. Newark, Maryland. Do you attend
16  church regularly?
17     A. No.
18     Q. And I think we asked, I asked you this
19  question quickly before, but there is no -- You
20  don't have any mental problems that would
21  interfere with your deposition?
22     A. No.
23     Q. Okay. When did you first become
24  employed by the company, if you can tell me?

Page 42

1      A. 11/5/83.
2      Q. And what position were you hired for?
3      A. Truck driver.
4      Q. What kind of truck driver?
5      A. Beg your pardon?
6      Q. What kind of truck driver?
7      A. Live haul.
8      Q. So did you have a CDL at that time?
9      A. I had a Maryland Class A at that time.
10     Q. Okay, and the CDL came later, as I
11  recall?
12     A. Yes.
13     Q. Okay, and just briefly tell us what
14  you did as a live haul truck driver?
15     A. Came in at night, weighed out a truck
16  on Mountaire scales, and wherever was scheduled
17  for me to go, that's where I went to receive a
18  load of chickens and transport them back to the
19  processing plant.
20     Q. And which processing plant was that?
21     A. It was Mountaire Poultry in
22  Selbyville, Delaware.
23     Q. Okay, and is that the location that
24  you were first employed by?

Page 43

1      A. Yes.
2      Q. And you are still employed at that
3  location?
4      A. Yes.
5      Q. Who was your supervisor at the time?
6      A. At that time it was Don Hopkins,
7  Donald Hopkins.
8      Q. Okay. When did you become a crew
9  leader, sir?
10     A. September of '89.
11     Q. And did you consider that to be a
12  promotion?
13     A. Yes.
14     Q. And who was your supervisor at that
15  time?
16     A. Doug Lynch.
17     Q. Okay, can you tell me how you, how it
18  is you became promoted to a crew leader's
19  position?
20     A. Being a truck driver, I knew a lot of
21  the employees, and Charles Showell was getting
22  ready to retire, and I spoke with Mr. Showell and
23  I spoke with Mr. Lynch, and they decided to put
24  me as crew leader.

Page 44

1    Q. Okay, great. Now, as a crew leader,
2    your primary role was to manage the crew that was
3    catching chickens?
4    A. Yes, to the best of my knowledge.
5    Q. Okay. How many employees were on your
6    crew?
7    A. Seven.
8    Q. Okay.
9    A. Seven chicken catchers, one forklift
10   driver, and at that time three truck drivers.
11   Q. The three drivers were also part of
12   your crew?
13   A. Yes.
14   Q. Okay, so that was seven catchers, one
15   forklift driver, and three drivers. And the
16   drivers we are referring to, again, are live haul
17   drivers?
18   A. Yes.
19   Q. The employees who worked in your crew
20   from 1989 till the time that you left -- By the
21   way, you probably told me, but I didn't write it
22   down. When did you stop becoming a crew leader?
23   A. April '03.
24   Q. April of '03?

Page 45

1    A. Yes.
2    Q. When you were a crew leader, did
3    people, catchers who worked for you, they were
4    covered by a union contract?
5    A. Yes.
6    Q. Okay, and do you know which union?
7    A. Local 355.
8    Q. Of the Teamsters?
9    A. Teamsters.
10   Q. Okay. And has that been true from '89
11   through April of '03?
12   A. Could you --
13   Q. Sure. For all the time that you were
14   a crew leader, were they covered by, were they
15   represented by the Local 355?
16   A. Yes.
17   Q. Okay, now, from the time you have been
18   a crew leader, and I am talking about from 1989
19   through April of '03, that's the period of time
20   that I am going to be referring to, did you have
21   new catchers come onto your crew from time to
22   time?
23   A. Yes.
24   Q. And were you responsible for making

Page 46

1    sure they were trained properly?
2    A. Yes.
3    Q. Did you ever select any of these
4    catchers to come onto your crew?
5    A. Yes.
6    Q. Okay, who did you select?
7    A. Zarina Bagwell.
8    Q. Okay. Now, I understand the period of
9    time I am asking was a long time, so --
10   A. Yes.
11   Q. -- I wouldn't expect you to have
12   perfect recall. Anybody else that you can think
13   of?
14   A. Can you ask me that question again?
15   Q. Sure, from September of '89, again
16   this is the timeframe, until April of '03, my
17   question is did you select any employees to
18   become part of your crew?
19   You have mentioned Mr. Bagwell, and I
20   guess my question is anybody else you can
21   remember?
22   A. Yes, Warren Purnell.
23   Q. Okay.
24   A. Leroy Taylor. Lawn Howell.

Page 47

1    Q. Is that Howell?
2    A. Howell, H-O-W-E-L-L.
3    Q. Okay, thank you.
4    A. That's about it, as far as I can
5    remember.
6    Q. Okay. There may have been more, but
7    you just can't remember?
8    A. I am sure.
9    Q. Okay, that's fine. Let me ask you
10   this: This is a document. I don't have -- You
11   have copies of these.
12   This is a document, sir, that has been
13   introduced as an exhibit to Mr. Garrison's
14   deposition. It's Garrison Exhibit 2. Okay, do
15   you see that? I am just going to keep that in
16   front of you so I can ask you a couple questions
17   about this document.
18   Okay, it talks about, in roman numeral
19   two on page one, the crew leader's general
20   duties, and I am just going to go through some of
21   these.
22   MR. MARTIN: Excuse me for a moment.
23   Did you ask whether he was familiar with it,
24   the document?

Page 48

1    MR. BREWER: Oh, no, I am sure you
2    are.
3    BY MR. BREWER:
4    Q. Are you familiar with this document?
5    A. This is an old document, yes.
6    Q. Okay. And I am looking at the second
7    roman numeral, roman numeral two. It says
8    general crew leader's general duties.
9    The first one it says is you are
10   supposed to arrive at the farm at the correct
11   time. Is that one of the responsibilities as a
12   crew leader that you had?
13   A. Yes.
14   Q. It also talks about how the house is
15   to be divided. Is it your responsibility to make
16   sure that that occurred?
17   A. Yes.
18   Q. Now, I would imagine, depending on the
19   house, that sometimes there might have been more
20   sections?
21   A. Correct.
22   Q. And sometimes there would have been
23   less sections?
24   A. Yes.

Page 49

1    Q. Okay, and you would make that
2    determination as to whether it should be more or
3    less than four --
4    A. Yes.
5    Q. -- as the crew leader? Okay. It
6    talks about instructing the catchers on the
7    number of birds to be placed in each compartment.
8    Was that one of the responsibilities you had as a
9    crew leader?
10   A. Yes.
11   Q. And I think when they refer to each
12   compartment, that's also known as the hole, isn't
13   it?
14   A. Yes.
15   Q. All right. The next item down talks
16   about catching birds in place at night and how
17   you are supposed to move them. Was it your
18   responsibility for making sure that this
19   occurred?
20   A. Yes.
21   Q. And again, based on my experience in
22   the industry, that didn't always happen, did it?
23   A. No.
24   Q. And, if it didn't happen, it was your

Page 50

1  decision, based on what the house and the
2  circumstances you were confronted with, to change
3  it?
4      A.  Depending.
5      Q.  Right, exactly, depending on the kind
6  of house you are in and what circumstances you
7  found when you got there?
8      A.  Right.
9      Q.  Right.  It talks about the
10 responsibility of a crew leader to continue to
11 observe the uncaught birds to prevent smothers?
12     A.  Yes.
13     Q.  Was that one of your responsibilities?
14     A.  Yes.
15     Q.  Make sure that the cages are air
16 stacked uniformly on a trailer?
17     A.  Yes.
18     Q.  Now, let's talk about that for just a
19 second.  When we are talking about correctly air
20 stacking them on the trailer, who stacks the
21 cages on the trailer?
22     A.  The forklift driver.
23     Q.  Okay, and he is loading that trailer
24 for transportation back to the plant?

Page 51

1      A.  Yes.
2      Q.  And, obviously, what's on that truck
3  is live chickens.  When it says appropriately air
4  stack them, can you explain what that means?
5      A.  They each -- Two cages are stacked
6  where air can go through, through the houses.
7      Q.  And you would have to make sure that
8  the forklift driver was stacking those cages
9  correctly?
10     A.  Well, he had to, because there is
11 devices on the trailer that says he have to or it
12 won't go on there properly.
13     Q.  Okay.  But it could be off one of the
14 devices, and you would have to make sure that it
15 was correctly put on?
16     A.  Right.
17     Q.  And that's so that -- Part of the
18 reason is so that the birds can continue to
19 breathe, isn't it?
20     A.  Yes.
21     Q.  Okay, the next item, it talks about in
22 the summer making sure that the fans are left
23 hanging and so forth.  Was that one of your
24 responsibilities when you were a crew leader?

Page 52

1      A.  Yes.
2      Q.  Okay, and did that change from time to
3  time?  I mean, depending on the house, you might
4  have to change that?
5      A.  Yes.
6      Q.  And that was your call to make that
7  change?
8      A.  Well, I got notification from my
9  manager as to what to do.
10     Q.  Okay.  You would be responsible for
11 making sure that the fans were taken down and
12 stabilized?
13     A.  Yes.
14     Q.  Okay, and how they were stabilized was
15 up to you?
16     A.  No.
17     Q.  Okay.  Tell me how you stabilize a
18 fan?
19     A.  Doug would tell me how to do it.  He
20 would put on the order or call us in and say
21 well, you are going to this farm, this should be
22 done this way, or sometime he would come out
23 there and say the fans should be turned this way
24 or that way.

Page 53

1      Q.  And you never made that decision
2  yourself?
3      A.  Sure, at times, yes.
4      Q.  I guess that's what I meant, is you
5  would make it?
6      A.  Not all the time.
7      Q.  Okay, but some of the time?
8      A.  (Nodding head)
9          MR. MARTIN:  Yes?
10     A.  Yes.
11     Q.  You were responsible for filling out
12 the farm ticket accurately?
13     A.  Yes.
14     Q.  Okay, and you were also responsible
15 for checking with the drivers to make sure that
16 the loads are secure?
17     A.  Yes.
18     Q.  Item three, roman numeral number
19 three, talks about various catching methods.
20     A.  Number?
21     Q.  Yeah, roman numeral, on page two of
22 the document that you have --
23     A.  Okay.
24     Q.  -- it talks about night catching.

Page 54

1      A.  Okay.
2      Q.  Do you see that?  And then it talks
3  about day catching.
4      A.  Yes.
5      Q.  And it takes about N's or A-frame
6  houses and so forth.  Is it your responsibility
7  to make sure that these guidelines were followed?
8      A.  Yes.
9      Q.  Okay.  And again, during this period
10 of time that you were a crew leader, I would
11 assume that you could not always follow these
12 guidelines exactly the way they were because of
13 changes in houses and stuff?
14     A.  Yes.
15     Q.  And if, in your view, it couldn't be
16 done exactly the way it's set out here, you would
17 make that change --
18     A.  Yes.
19     Q.  -- to get it done?  Okay, and that's
20 true for the day methods and night methods?
21     A.  Uh-huh.
22     Q.  How about tunnel ventilation, is that
23 same also true there?  There are some guidelines
24 here that you are responsible for?

Page 55

1      A.  Yes.
2      Q.  And, again, it wasn't always possible
3  to do this, to follow this precisely?
4      A.  Yes.
5      Q.  And if it had to be deviated from, you
6  could deviate or you could do something different
7  than what it says here, based on what you found
8  in the house?
9      A.  Yes.
10         MR. BREWER:  All right.  And that
11 speaks to this whole notion of tunnel
12 ventilation.  Okay, I want to take a few
13 minutes.
14         MR. MARTIN:  Sure.
15         (A recess was taken.)
16 BY MR. BREWER:
17     Q.  Mr. Briddell, I am going to show you a
18 document that is marked as Exhibit Number 1 to
19 Mr. Garrison's deposition.  You have a copy of
20 that?
21         MR. MARTIN:  Yes, sir.
22     Q.  And I want to ask you to take a
23 look at that and tell me if you are familiar with
24 that document?

Page 56

1  A. Yes, I am, sir.
2  Q. Okay, and what is this?
3  A. It's a form we had to give to each
4  driver as he left the chicken yard.
5  Q. Okay. And it says, up at the top, it
6  says grower. Do you see where it says grower?
7  A. Yes.
8  Q. Who fills in that line?
9  A. Crew leader.
10  Q. Okay. And it says the houses, and
11  there are various dots. Who fills in that
12  information?
13  A. Crew leader.
14  Q. And that would be, for example, if you
15  were going to the Brewer farm --
16  A. Yes.
17  Q. -- it would say to catch house number
18  two and number six?
19  A. That's right.
20  Q. And that's what you would fill in?
21  A. Yes.
22  Q. Okay. And the time started, who fills
23  that information?
24  A. Crew leader.

Page 57

1  Q. And the time finished?
2  A. Crew leader.
3  Q. Now, when you were talking about, if
4  you remember earlier, the journal that you said
5  you had and those documents, is this the kind of
6  document that you are referring to?
7  A. Yes.
8  Q. Okay. There is a space, and it says
9  truck. What information gets put in there?
10  A. The number of the truck that the
11  driver is driving.
12  Q. The number of the truck?
13  A. Yes.
14  Q. Each truck has its own number?
15  A. Yes.
16  Q. And that's different than its license
17  plate?
18  A. Yes.
19  Q. Okay, and who fills that information
20  in?
21  A. Crew leader.
22  Q. How about it says trailer, who fills
23  that information in?
24  A. Crew leader.

Page 58

1  Q. And what would you write in there?
2  A. The number of the trailer, not the
3  license plate, the number of the trailer.
4  Q. So each truck is numbered and each
5  trailer is numbered, and you write down the
6  number of the truck and the number of the
7  trailer?
8  A. Yes.
9  Q. How about the driver?
10  A. Put the driver's name down.
11  Q. And who writes that in?
12  A. Crew leader.
13  Q. And it says N-O, period, which I
14  assume stands for number of doors?
15  A. Yes.
16  Q. And the information that's required
17  there, who puts that in?
18  A. Crew leader.
19  Q. All right. Let's go down to under the
20  first line to the latter part of the document.
21  There is a question that says, "Sign present, yes
22  or no." Who fills in that box?
23  A. Crew leader.
24  Q. And what does that mean, sign present?

Page 59

1  What do you look for to fill that in?
2  A. Every farm has an identification sign
3  at the end of its driveway or somewhere on the
4  chicken house to identify the farm.
5  Q. So, again, if you were talking about
6  Brewer's farm, there would be a sign out there in
7  front of the house that would say Brewer's farm?
8  A. With a Mountaire logo on it.
9  Q. And it's the crew leader's
10  responsibility to see that that is there?
11  A. Yes.
12  Q. And, if it is, the box yes is checked,
13  and, if it's not, the box no is checked?
14  A. Yes.
15  Q. "Grower present," who fills that
16  information out?
17  A. Crew leader.
18  Q. And how do you decide whether to check
19  the box yes or no?
20  A. Well, if you see the grower there
21  doing what was said the grower would do there, if
22  he is out there doing that prior to catching, you
23  would see him and you would have to --
24  Q. Okay, when you say doing that, you are

Page 60

1  referring to Garrison Exhibit 2 where it says
2  grower's responsibilities?
3  A. Yes.
4  Q. Okay. Now, suppose when you arrived
5  there at night the grower is asleep, I mean he is
6  just asleep, how do you check that? Do you check
7  that he is present or not?
8  A. Not.
9  Q. Okay. DAF's prior to catch. What is
10  a DAF?
11  A. Dead chickens.
12  Q. Dead at farm, is that what that stands
13  for?
14  A. Uh-huh.
15  MR. MARTIN: Yes?
16  A. Yes.
17  Q. And who fills that box out?
18  A. Crew leader.
19  Q. How do you go about deciding whether
20  to check yes or no?
21  A. If you go down through the chicken
22  house and you see all these dead chickens laying
23  around, you know how to check yes or no.
24  Q. Okay, so, in other words, you walk in

Page 61

1  the house, the crew leader walks in the house and
2  looks around and sees if there is a lot of dead
3  chickens or one or two?
4  A. Right.
5  Q. And, depending on the amount of
6  chickens that are dead, you would decide whether
7  to check out yes --
8  A. Or no.
9  Q. -- or no. Okay, "fire fan used," who
10  fills that information out?
11  A. Crew leader.
12  Q. And tell me what that means. How do
13  you decide whether to check that box yes or no?
14  A. Well, we have documentation when you
15  use the fire fan and how to use it, and it's up
16  to the crew leader, according to the weather, as
17  to whether to use the fire fan, when I was a crew
18  leader. I don't know how they do it now.
19  Q. Okay, that's fine. And, depending on
20  how that was used, you would check the box?
21  A. Yes.
22  Q. "Chickens watered," what does that
23  mean?
24  A. That means if the driver is putting

Page 62

1  water on chickens on a very hot day, all over
2  85 degrees, I think it is. It was when I was
3  crew leader.
4      Q. Okay. And whose responsibility is it
5  to water the chickens?
6      A. Truck driver.
7      Q. If he is not doing it, can the crew
8  leader tell him to do it?
9      A. Yes.
10     Q. And who fills that out? Who fills
11 that box out?
12     A. Crew leader.
13     Q. "Feeders up," what does that mean?
14     A. If the grower has the feeder up prior
15 to catch time.
16     Q. Okay, and if he doesn't, you check the
17 no box?
18     A. Yes.
19     Q. And what do you do?
20     A. If it's not up?
21     Q. Yes.
22     A. Do it myself, if the equipment is
23 there to do it with.
24     Q. All right, and if it's not there?

Page 63

1      A. You have to call Doug or Nuse.
2      Q. Do you ever get in touch with the
3  grower?
4      A. Sometimes you have to call the
5  processing plant, and the processing plant will
6  call people, and sometimes they still don't get
7  them. Sometimes we do.
8      Q. Well, if you arrived on a farm and the
9  feeders were not up but the grower was present,
10 could you tell the grower to get the feeders up?
11     A. No.
12     Q. You couldn't?
13     A. No.
14     Q. Okay. How about the water up?
15     A. It applies the same thing as the
16 feeder.
17     Q. Okay, so if you arrive and the water
18 is not up and the grower is present, you can't
19 tell the grower to get the water up?
20     A. No, that's his equipment.
21     Q. Okay, how about stoves up?
22     A. Grower's responsibility.
23     Q. Okay, but who checks the box?
24     A. I do.

Page 64

1      Q. "Farm damage, yes or no," how do you
2  decide -- Who fills that out, first of all?
3      A. I do, the crew leader.
4      Q. Okay. And how do you know what box to
5  check?
6      A. If I see my forklift driver or
7  catchers break something.
8      Q. Okay, well, let's assume -- When you
9  first get to the farm --
10     A. Yes.
11     Q. -- when you walk around the house to
12 see if there were any DAF's, stuff like that, do
13 you take a look at the houses and everything else
14 to make sure that they are --
15     A. Yes.
16     Q. Okay, and if you see damage at the
17 point before anybody started working, you would
18 check the box that there was farm damage?
19     A. No, I would write it down on a
20 separate piece of paper.
21     Q. Okay, and what would you do with that
22 piece of paper?
23     A. At the end of the day, if I didn't see
24 my forklift driver catch or break anything, I

Page 65

1  would mark no, we didn't do it.
2      Q. All right, but you would have a
3  separate piece of paper which noted the fact that
4  there was damage there before you started?
5      A. Yes.
6      Q. Okay. The next box, moving to the
7  right, it says "The drive entrance, acceptable or
8  unacceptable." Who checks that box?
9      A. Crew leader.
10     Q. How do you know, how do you decide
11 whether to check the accept box or the unaccept
12 box?
13     A. Well, we get the information from our
14 manager, and he would tell us or ask us what to
15 look for, and then I would have to determine it
16 from there.
17     Q. What would your manager tell you
18     A. If the drive entrance is level, enough
19 footage for the trucks to get in and out, things
20 of that sort.
21     Q. All right. Does the manager tell you
22 this for every farm that you go to?
23     A. He would basically tell us what to
24 expect or --

Page 66

1      Q. You have to be -- I'm sorry, I didn't
2  mean to interrupt you.
3      A. He would tell us what to look for.
4      Q. Okay, but after being a crew leader
5  for awhile, you came to know what to look for?
6      A. Right.
7      Q. And, depending on whether it was
8  level, whether it was potholes in it, or whether
9  there was enough room to put the truck in, you
10 would make a determination as to whether the
11 drive entrance was acceptable or unacceptable?
12     A. Yes.
13     Q. And you would check that box?
14     A. Yes.
15     Q. How about the house entrances, who
16 would fill that out?
17     A. Again, I would get information from my
18 manager as to what to do and what not to do, what
19 to look for, what not to look for, and then I
20 would have to determine or sometimes get my
21 manager out.
22     Q. Okay, but after being a crew leader
23 for awhile, you generally know what is an
24 acceptable house entrance and what isn't, don't

Page 67

1  you?
2      A. Yes.
3      Q. And you would then make a decision
4  based on what you saw and based on your
5  experience as to what box to check?
6      A. Yes.
7      Q. Okay, "roads loading area," what does
8  that mean?
9      A. That's a loading zone. That's a
10 loading zone, so many footage, I forget now, as
11 to where the truck is supposed to be and where
12 the forklift is supposed to be to run around to
13 load it.
14     Q. Okay, and who fills that box out?
15     A. Crew leader.
16     Q. And this has "Explain." What, if
17 anything, would you write in that box?
18     A. If there wasn't enough room to load a
19 truck and we had to get onto the grower's lawn or
20 into his crop field or something like that,
21 somewhere we are not supposed to be, you got to
22 call your manager or let him know, or when you
23 got done that day let him know.
24     Q. And you would fill that information

Page 68

1   in?
2       A.  Yes.
3       Q.  Okay.  "Leader condition," what does
4   that refer to, please?
5       A.  Houses not ventilated properly, such
6   as wet houses, too tight, too dry.
7       Q.  And who fills that out?
8       A.  Crew leader.
9       Q.  And how do you know whether to say
10  that's acceptable or unacceptable?
11      A.  Whether the forklift can run in there
12  properly or not, if the forklift is in there
13  getting stuck or the catchers are walking through
14  mud when they are not supposed to.
15      Q.  Okay, so you would observe that and
16  then, based on what you observed, you would
17  decide whether it's acceptable or unacceptable?
18      A.  Yes.
19      Q.  Okay, let's see.  You mentioned on
20  your crew you carried seven catchers.  Did you
21  ever have more than seven?
22      A.  At times.
23      Q.  How many more did you have?
24      A.  Sometimes we would carry more than --

Page 69

1   We would carry catchers in the summertimes when
2   catchers were scarce and the work was harder and
3   the weather was hotter, the company would send
4   out unexperienced Mexicans and they would send
5   out three or four at a time.
6       Q.  Okay, and they would be on your crew?
7       A.  Every crew out there that needed them.
8       Q.  Well, I am just talking about your
9   crews, basically --
10      A.  Yes.
11      Q.  -- because those are the ones that you
12  would know about, yours.
13      A.  Yes.
14      Q.  Okay, so let's begin.  You normally
15  had seven catchers.  Now, are you saying in the
16  summer --
17      A.  Mostly in the summer, you know.
18      Q.  All right, well, let me ask you this:
19  Did you ever carry eight catchers?
20      A.  Yes.
21      Q.  Okay, and why would you carry the
22  extra catcher?
23      A.  If you had an unexperienced catcher.
24      Q.  Okay.  And when you carried eight

Page 70

1   catchers, did you ever give one catcher a day
2   off?
3       A.  Depending on whether they wanted that
4   day off or not, or whether they wanted to set out
5   a load, or whether each man wanted to get in a
6   load to make up for it.
7       Q.  And how about somebody who basically
8   said I would like next Tuesday off?
9       A.  If they asked for next Tuesday off?
10      Q.  Right.
11      A.  Could you repeat your question?
12      Q.  Let me rephrase the question this way:
13  When you had eight catchers, Mr. Gibbs talked
14  about he would give one man off on Monday,
15  another man off on Tuesday, another man off on
16  Wednesday.
17      A.  Yes.
18      Q.  He would rotate days, and I want to
19  know if you did the same thing.
20      A.  Yes, let me correct that.  I did carry
21  catchers and there were people who would have a
22  day off.
23      Q.  And you would decide the day off,
24  whether somebody had Monday, somebody had

Page 71

1   Tuesday, somebody had Wednesday?
2       A.  Yes.
3       Q.  And that's why you had eight catchers.
4   Okay.  Now, you also mentioned that -- Did you
5   ever have nine catchers?
6       A.  Yes, during the summer.
7       Q.  And these are the people that you said
8   coming from the plant who were inexperienced?
9       A.  Yes, who would fill in for people that
10  was out that couldn't make it that day.
11      Q.  Okay.  And if these people hadn't
12  caught before, you would sort of tell them what
13  to do?
14      A.  I would try to teach them.
15      Q.  Yeah, sure, that's what I mean.  Okay.
16  Did you ever take over another crew leader's crew
17  when that person was on vacation?
18      A.  Yes.  No, I am not going to say on
19  vacation.  I am going to say it was some kind of
20  problem and my crew was working and we fell short
21  a crew leader, yes, I have done that.
22      Q.  Okay.  And how many times would you
23  say you did that, approximately?  Again, I
24  understand it's a difficult question.

Page 72

1       A.  All I can say is it was several times.
2       Q.  Several times?
3       A.  Yes.
4       Q.  Again, would that be several times a
5   year?
6       A.  Over a period of time.
7       Q.  Over a period of time?  Over this
8   period of time that we are talking about, which
9   is from '89 through '03?
10      A.  Yes.
11      Q.  Okay.  Let me ask you do catchers ever
12  change crews on a sort of a temporary basis?
13      A.  Yes.
14      Q.  Okay, and did people in your crew
15  change crews on a temporary basis from time to
16  time?
17      A.  Yes.
18      Q.  Okay.  Explain to me how that
19  happened.
20      A.  When the chicken catchers, when I was
21  crew chief --
22      Q.  Right.
23      A.  -- from time to time we would fall
24  short, one crew or another would fall short, and

Page 73

1   we would have catchers voluntarily go to another
2   crew or ask to go to another crew, yes.
3       Q.  And did anybody on your crew ever ask
4   to go to another crew?
5       A.  From time to time.
6       Q.  And would you approve that?
7       A.  It wasn't for me to approve.  It was
8   for that catcher or my manager to approve.
9       Q.  Well, let me ask the question this
10  way:  Let's assume you had seven catchers on your
11  crew.  And that's what you need to catch;
12  correct?
13      A.  Yes.
14      Q.  And one of those catchers said, "I
15  want to go to Mr. Garrison's crew."
16      A.  After I got my work done.
17      Q.  But I am talking about while your work
18  is being done.
19      A.  No, no, because that would leave me
20  short.
21      Q.  That's right.  That's my point.
22  That's my point.
23      A.  Uh-huh.
24      Q.  So if he wanted to go to

Page 74

1    Mr. Garrison's crew while you were still working,
2    you would tell him no?
3        A. If he was assigned to my crew, no.
4        Q. You would tell him no?
5        A. Right.
6        Q. Okay, that's fair enough. Now, after
7    your work was finished, if he wanted to go, you
8    would --
9        A. Yes.
10       Q. -- say fine, I assume, and you would
11   let him go?
12       A. Yes.
13       Q. Because your work is done; right?
14       A. Right, but Doug still had to know
15   about it.
16       Q. Oh, I am not saying he didn't have to
17   know about it, but I am saying you could let him
18   go, you could say, "Fine, we are finished. You
19   can now go work for Mr. Garrison," and then you
20   would tell Doug about it?
21       A. But I couldn't say no, he couldn't go.
22       Q. Okay, unless you were still working?
23       A. Right.
24       Q. Then you could. Okay, let's see. Let

Page 75

1    me ask you a couple of questions here.
2            I think we have already talked about
3    the fact that as a crew leader you make sure the
4    catchers, drivers and the forklift operators
5    follow those guidelines that we talked about?
6        A. Yes.
7        Q. You also interact with the grower,
8    don't you, you talk to the grower?
9        A. Yes.
10       Q. And you are supposed to, as a crew
11   leader, keep a good relationship with the grower,
12   aren't you?
13       A. Yes.
14       Q. As a crew leader, if one of your
15   catchers did something that you told them not to
16   do, you were able to give them an oral warning or
17   a verbal warning?
18       A. Yes.
19       Q. Okay, and did you ever do that?
20       A. Yes.
21       Q. Okay. Did you ever have occasion,
22   when you were a crew leader, to deal with the
23   people in accounting?
24       A. Could you repeat that question?

Page 76

1        Q. One, when you were a crew leader, did
2    you ever have any occasion to deal with the
3    people in accounting?
4        A. Yes.
5        Q. Okay, can you tell me what would cause
6    you to deal with the people in accounting?
7        A. When I was crew leader, at the time
8    they had something called petty cash. If a
9    catcher worked that day, he would get partial
10   pay, and I would have to go to the accounting
11   office and deal with whoever was working on the,
12   at the accounting office on that desk that
13   handled that.
14       Q. All right. Let me make sure I
15   understand what you just told me. If somebody on
16   your crew wanted like advance, an advance in
17   pay --
18       A. Yes.
19       Q. -- they would come to you --
20       A. Come to me.
21       Q. -- and you would go to accounting --
22       A. Yes.
23       Q. -- to get the money, and then you
24   would give it back to them?

Page 77

1        A. At first, yes.
2        Q. Okay. Let me just see if I have
3    copies of these. Let me just take a minute. I
4    am going to need some copies.
5            (Mr. Owens out to get copies.)
6            While Mr. Owens is doing that, let me
7    ask you a couple of questions.
8            A crew leader also has some
9    responsibility to tell the driver how to position
10   the truck, where to position the truck so it
11   could be loaded?
12       A. Yes.
13       MR. BREWER: We will have this marked
14   as Briddell 1.
15            (The reporter marked Briddell
16            Exhibit 1.)
17       MR. BREWER: Sir, I have given you a
18   packet of documents. Before we get to that,
19   let's make this exhibit two to this
20   deposition.
21            (The reporter marked Briddell
22            Exhibit 2.)
23   BY MR. BREWER:
24       Q. Mr. Briddell, take a look at what's

Page 78

1    been marked as Exhibit 2.
2        A. Okay.
3        Q. This is what you were -- Is this what
4    you were referring to dealing with accounting?
5        A. Yes.
6        Q. I see there is a gentleman by the name
7    of Freddy Matthews?
8        A. Yes.
9        Q. Is he a catcher from your crew?
10       A. Yes.
11       Q. And what, he wanted $60?
12       A. Yes, he wanted advance pay.
13       Q. Okay, and you approved it? Is that
14   your signature there?
15       A. Yes, it is.
16       Q. And you are showing that Mr. Matthews
17   received that money, the $60?
18       A. Yes.
19       Q. And that was in July of 2002?
20       A. I don't remember.
21       Q. Okay, that's what the date says there.
22   Okay, can you tell me is that your writing where
23   it says 7/3/2002?
24       A. Yes.

Page 79

1        Q. That is your writing?
2        A. Yes.
3        Q. Okay.
4        MR. MARTIN: We are looking on the
5    front page; are we not?
6        MR. BREWER: Yes.
7        THE WITNESS: Yes.
8    BY MR. BREWER:
9        Q. All right, on page two, I can't
10   pronounce the person's last name. Do you know
11   who?
12       A. Collick.
13       Q. Mr. Collick?
14       A. Yeah.
15       Q. Do you know Mr. Collick?
16       A. Yes.
17       Q. How do you know him?
18       A. He worked on my chicken catching crew.
19       Q. And he is requesting an advance of
20   $50?
21       A. That's correct.
22       Q. And that's basically on the same day,
23   July 3 of 2002?
24       A. Yes.

Page 98

1  but it's not your signature?  Is that what you
2  are saying?
3      A.  Yes.
4      Q.  How about a Mr. Taylor?
5      A.  Yes.
6      Q.  Is that your signature at the bottom?
7      A.  Yes.
8      Q.  Okay, he wants a day off for money
9  only?
10     A.  Yes.
11     Q.  And, let's see, almost done here, a
12  Richard Foreman, do you know him?
13     A.  Yes.
14     Q.  How do you know him?
15     A.  One of my crew members.
16     Q.  And he is requesting vacation, and he
17  is also requesting a floating holiday?
18     A.  Yes.
19     Q.  And he is requesting only to be paid
20  for it, he will continue to work?  Am I correct
21  in that?
22     A.  Yes.
23     Q.  Is that your signature?
24     A.  No.

Page 99

1      Q.  That's not your signature?
2      A.  No.
3      Q.  All right, and Mr. Foreman again, is
4  that your signature at the bottom?
5      A.  No.
6      Q.  Okay.  Did you approve -- Do you know
7  about this?  Did you approve this?
8      A.  I don't remember.
9      Q.  Okay, how about the one before with
10 Mr. Foreman, do you remember that, it was in
11 February of '02?
12     A.  I don't remember.
13     Q.  Okay, that's fine.  Let me ask you
14 this question:  If a member of your crew wanted
15 to take a day off without pay, can he do that?
16     A.  Yes.
17     Q.  Okay, what does he have to do to do
18 that?
19     A.  If he notifies me, if it's not too
20 late and within reasonable time, some of these
21 times I would notify my manager --
22     Q.  Uh-huh.
23     A.  -- and we would try to work something
24 out about getting somebody to replace him, but he

Page 100

1  could take that day off.
2      Q.  He could take that day off.  Now, what
3  happens if he wants to take the day off and
4  doesn't tell you about it, just doesn't show up?
5      A.  He still don't get paid, and we follow
6  the same procedure as trying to get somebody.
7      Q.  Do you give him any disciplinary
8  action for not showing up?
9      A.  Yes, but I would sometimes give them a
10 verbal warning and notify my manager.
11     Q.  Okay.
12     A.  Whatever the case may be.
13     Q.  But if somebody asked for a day off
14 and you approved it, he wouldn't get a verbal
15 warning, would he?
16     A.  Could you repeat your question?
17     Q.  Sure.  If a member of your crew wants
18 to have a day off and doesn't want to be paid for
19 it, I want to take a day off without pay, I
20 notify you, you say okay, I don't get a verbal
21 warning then?
22     A.  No.
23     Q.  Okay.  The people who worked on your
24 crew, while we saw those in Garrison, in, I'm

Page 101

1  sorry, Briddell Exhibit Number 2, Number 1, I'm
2  sorry, you saw that a lot of people were
3  requesting to be paid instead of taking the time
4  off.  People in your crew did take vacation,
5  didn't they?
6      A.  Sometimes.
7      Q.  Okay, and did you approve their
8  vacation?
9      A.  If I had the help, yes.
10     Q.  Okay, and, if you didn't, you
11 wouldn't?
12     A.  No.
13     Q.  Can you tell me this:  What happens if
14 somebody who is working on your crew, when you
15 were a crew leader, if they got hurt?  What would
16 you do?
17     A.  I would follow company policy.  But
18 then, again, if I would be near a physician, I
19 would take them.  But the company wants you to
20 see that they get to the processing plant.  And,
21 if I could, I would get them to the processing
22 plant.
23     Q.  Okay.
24     A.  But if I was near a hospital, I would

Page 102

1  proceed to the hospital.
2      Q.  You would take the person to the
3  hospital to get treated?
4      A.  Yes.
5      Q.  Okay.  Could you also call 911 if
6  something happened at a farm?
7      A.  Yes.
8      Q.  Let's go back for just a second,
9  because I want to see if I understand how you
10 worked it on your crew.
11         If one of your catchers wanted a day
12 off without pay and you only had seven and you
13 didn't think you could spare him, did you ever
14 call another crew leader, like Mr. Gibbs or
15 Mr. Garrison, and say, "Listen, one of my guys
16 wants a day off tomorrow or the next day, do you
17 have somebody you can send me?"  Would anything
18 like that ever happen?
19     A.  Yes.
20     Q.  Okay.  And if they said, "Yeah, I have
21 somebody I could send you," you could say to the
22 guy, "Okay, you can have the day off."
23     A.  Yes.
24     Q.  And would it be the reverse?  Did it

Page 103

1  ever happen that you got a call from another crew
2  leader saying, "I have got a guy who would like a
3  day off, do you have somebody you could send me?"
4      A.  Yes.
5      Q.  And, if you could, you would?
6      A.  Yes.
7      Q.  Okay.  When you are out on the farm,
8  when you are catching, do catchers take a break?
9      A.  At times.
10     Q.  Okay.
11     A.  It wasn't a scheduled break.
12     Q.  Uh-huh, I understand that.  But I mean
13 if somebody is in there catching and all of a
14 sudden they need to stop, they have to go to the
15 bathroom --
16     A.  Yes.
17     Q.  -- they can take that break?
18     A.  Yes.
19     Q.  And they let you know that they are
20 doing that?
21     A.  Not all the time.
22     Q.  But they do sometimes?
23     A.  Yes.
24     Q.  Should they notify you that they are

**Page 104**

1 doing that?
2     A. Yes.
3     Q. Okay, and the same thing if somebody
4 wanted to have a smoke, same thing?
5     A. Yes.
6     Q. All right. The catchers receive a one
7 half hour lunch break; correct?
8     A. No.
9     Q. No?
10     A. No.
11     Q. They are supposed to, aren't they?
12     A. I don't know.
13     Q. You don't know?
14     A. No.
15     Q. Well, from the time that you were
16 catching in '89 until '03, did your people ever
17 take a lunch break?
18     A. Yes.
19     Q. When did they take their lunch break?
20     A. Whenever -- Say if I was catching
21 chickens in Crisfield --
22     Q. Uh-huh.
23     A. -- and my manager sent me three
24 trucks, it would take 45 minutes to load a truck.

**Page 105**

1 That first truck cannot travel from Crisfield to
2 Selbyville and back to Crisfield before they
3 catch the other two. That's when they would take
4 their lunch break or some lunch of sort.
5     Q. And who would tell them when to take
6 that break?
7     A. You took it on your own because they
8 didn't have nothing to work with. They didn't
9 have a truck there.
10     Q. Okay, I see, so there was nothing that
11 they could do?
12     A. There was nothing they could do.
13     Q. Normally the trucks are backed up,
14 aren't they, one waiting for another?
15     A. Starting off, yes, depending on how
16 far you are from the processing plant.
17     Q. Uh-huh.
18     A. And the working conditions.
19     Q. Okay. So, as long as there was a
20 truck there, they kept working?
21     A. Kept working.
22     Q. And when there wasn't a truck there
23 and they couldn't work, you are saying that's
24 when you told them to take lunch?

**Page 106**

1     A. The majority of the time.
2     Q. Okay. And is that how it worked from
3 all the time that you were a crew leader?
4     A. Basically, yes.
5     Q. Okay. Just to make sure that I
6 understand your testimony here, that is the only
7 half an hour -- Well, that's the only lunch break
8 your crew took?
9     A. Sometimes it could happen two or three
10 times a day, waiting on trucks, and that's when
11 they would eat.
12     Q. Okay.
13     A. Travel time, that's when they would
14 eat. Most of the time they would bring their
15 lunch. A lot of times they would bring their
16 lunch.
17     Q. Uh-huh. Well, when you began, when
18 you picked up your crew, you had an order that
19 you picked your people up in, didn't you?
20     A. Yes.
21     Q. And after you got pretty much all of
22 the crew together, let me ask you -- Let me
23 retract that statement and ask you this: Did any
24 members of your crew get themselves to the farms,

**Page 107**

1 transport themselves to the farms?
2     A. Yes.
3     Q. Okay, so how many people did you have
4 to pick up?
5     A. Six, probably six every day.
6     Q. Okay.
7     A. There was times when I picked up the
8 whole, down through the years.
9     Q. Okay, but mostly it was five or six?
10     A. Or seven.
11     Q. Five, six or seven?
12     A. Yeah.
13     Q. But seven was your entire crew?
14     A. Chicken catchers.
15     Q. Right. Okay, let's talk about when
16 you picked up the five -- After you got the five,
17 six or seven that you picked up and you are
18 traveling on the way to the farm, was it normal
19 to stop someplace to have a cup of coffee --
20     A. Yes.
21     Q. -- get cigarettes, get a sandwich --
22     A. Yes.
23     Q. -- do this, do that? And how long did
24 those stops take, approximately?

**Page 108**

1     A. Ten to 15 minutes.
2     Q. That's all? Did people ever eat there
3 at that point?
4     A. No.
5     Q. No? Okay. Then you would go to the
6 farm?
7     A. Yes.
8     Q. And when you would go from one farm to
9 another, did you ever -- It's normal to stop
10 again, isn't it, --
11     A. Yes.
12     Q. -- if a place is around? And how long
13 did those stops last generally?
14     A. Ten, 15 minutes.
15     Q. Ten, 15 minutes?
16     MR. BREWER: This would be a good time
17 for a break. It's three minutes of noon.
18 Your lawyer will tell you that during the
19 lunch break, obviously, you can chat about,
20 even she can chat about anything at all you
21 like except the deposition. Okay, so we
22 will take a break and see you back -- We
23 will take about an hour lunch break.
24       (A lunch recess was taken.)

**Page 109**

1 BY MR. BREWER:
2     Q. Okay, let's go. Mr. Briddell, let me
3 ask you this question, if I may: Could you
4 recommend the promotion of one of the catchers to
5 be a forklift operator?
6     A. No.
7     Q. You couldn't do that?
8     A. Could I? Oh, let me rephrase it. You
9 said could I recommend?
10     Q. Yes.
11     A. Yes, I could ask Doug about it, yes.
12     Q. We had talked earlier about your
13 giving some oral reprimands to people for various
14 reasons. Did you ever give anybody anything more
15 than an oral reprimand?
16     A. Yes.
17     Q. Okay, do you remember who, by any
18 chance?
19     A. Charles Hitchens.
20     Q. Okay. Do you remember when that was?
21     A. No.
22     Q. Okay. Anybody else you can think of?
23 And I understand -- Again, I understand I am
24 asking you to go back in time. There may have

Page 110

1  been others and you can't remember their names,
2  and that's fine.
3      A.  No.
4      Q.  You can't remember anybody else?
5      A.  No.
6      Q.  Let me ask you this question:  When
7  you finished one farm and you are assigned to go
8  to another farm, you have the authority to make
9  sure that the crew works to get all the chickens
10  caught that you are supposed to get caught that
11  day, don't you?
12      A.  Yes.
13      Q.  And if that involves overtime, you
14  have the right to make sure that they still get
15  caught; right?
16      A.  Yes.
17      Q.  Let me show you, this is Exhibit 6 to
18  Mr. Garrison's deposition.  You have a copy of
19  that, I believe.
20      MR. MARTIN:  Yep.
21      MR. BREWER:  And take a look at page
22  nine.  Off the record a moment.
23          (An off-the-record discussion
24          was held.)

Page 111

BY MR. BREWER:
1
2      Q.  We went off the record.  Let's go back
3  on.  Sir, I am showing you a document that's been
4  marked as Exhibit Number 6 to Mr. Garrison's
5  deposition, and you are at page nine of that
6  document?
7      A.  Yes.
8      Q.  First of all, do you recognize this
9  document?
10      A.  No.
11      Q.  Okay, look at the front cover.  Keep
12  that page you are at and just take a look at the
13  front cover.
14      A.  Yes, yes.
15      Q.  It's a union contract?
16      A.  Yes, uh-huh.
17      Q.  Okay, and right now you are a shop
18  steward for Local 355; are you not?
19      A.  Yes.
20      Q.  Okay, take a look at the first
21  paragraph under Article 10.  It says a complaint
22  or a grievance.  Do you see where I am?
23      A.  Yes, uh-huh.
24      Q.  So these would apply to people who

Page 112

1  were, for example, catchers, because when you
2  were a crew leader you weren't covered by this
3  contract, were you?
4      A.  No.
5      Q.  The catchers were, though?
6      A.  Yes.
7      Q.  All right.  So it says here a
8  complaint or a grievance arising out of this
9  interpretation, and so forth, shall in the first
10  instance be taken up between the aggrieved
11  employee, which, in your case, would be a
12  catcher, right --
13      A.  Uh-huh.
14      Q.  -- or catchers, who take the matter up
15  with the shop steward, and then the shop steward
16  takes the matter up with the foreman in charge;
17  right?
18      A.  Yes.
19      Q.  So if one of your catchers had a
20  grievance, they would take it up with the
21  steward, and then the steward, in fact, an
22  employee, would take it up with you as a crew
23  leader?
24      A.  They were supposed to.

Page 113

1      Q.  Yeah, they were supposed to.  That's
2  what this contract says they are?
3      A.  Yes.
4      Q.  All right, let's see.  You were
5  required to write down the time that your crew
6  started at a farm?
7      A.  Yes.
8      Q.  And you kept the time that the
9  catchers worked at the farm?
10      A.  Did I keep the time that the catchers
11  worked?  Are you pertaining to the time they
12  start until the time they end for that day?
13      Q.  Yes, from the time they start --
14      A.  Yes.
15      Q.  -- and the number of chickens they
16  caught and everything else?
17      A.  Yes.
18      Q.  Thank you.  Let me show you Exhibit
19  Number 8 to Mr. Garrison's deposition.  Have you
20  ever seen this before?
21      A.  I don't remember.
22      Q.  Okay.  You were a crew leader at this
23  time?
24      A.  Yes.

Page 114

1      Q.  Okay, so you may have gotten it and
2  you may not have; you just don't remember?
3      A.  I don't remember.
4      Q.  Okay, that's fine.  When you were a
5  crew leader and your crews were working at a
6  farm, did you have any responsibility for the
7  safety of the catchers, making sure that they
8  worked safely?
9      A.  Could you say that again?
10      Q.  Yeah, when you were a crew leader, did
11  you have any responsibility to make sure that the
12  catchers worked safely, that they did things in a
13  safe way?
14      A.  Yes.
15      Q.  Okay.  Now, let me show you what is
16  exhibit -- Oh, before I do that, let me ask you
17  this question:  When you went on salary, do you
18  remember when that was?
19      A.  No.
20      Q.  If I suggest to you it was June of
21  2002, would that seem correct to you?
22      A.  Yes.
23      Q.  All right, do you remember what salary
24  you were paid?

Page 115

1      A.  Per year?
2      Q.  Yes.
3      A.  Per week?
4      Q.  Per week, per year, what your salary
5  was?
6      A.  I would say 40,000, somewhere in that
7  neighborhood.
8      Q.  A week?
9      A.  No, a year.
10      Q.  Four-thousand a year?
11      A.  Forty-thousand.
12      Q.  Oh, 40,000 a year.  And do you
13  remember how much, when you were a catcher, how
14  much catchers made a year?
15      A.  Catchers made -- I don't remember.
16      Q.  Was it less than you?
17      A.  Yes.
18      MR. MARTIN:  I'm sorry, when you say
19  "less than you," you are talking about less
20  than a crew leader?
21      MR. BREWER:  Less than him, yes, less
22  than you as a crew leader.
23  BY MR. BREWER:
24      Q.  Did you ever have to account for your

# TAB 4

Page 1

[ 1]          IN THE UNITED STATES DISTRICT COURT
             IN AND FOR THE DISTRICT OF DELAWARE
[ 2]

[ 3]  WILLIE DAVIS, JR.,                  )
      NATHANIEL BRIDDELL,                 )
[ 4]  GEORGE W. FEDDIMAN,                 )
      JOSEPH GARRISON,                    )
[ 5]  LARRY E. GIBBS,                     )
      ROY H. WALTERS,                     )
[ 6]  ALL SIMILARLY-SITUATED CURRENT      )
      AND FORMER EMPLOYEES OF             )
[ 7]  MOUNTAIRE FARMS, INC.,              )
      MOUNTAIRE FARMS OF DELMARVA,        )
[ 8]  INC., and MOUNTAIRE FARMS OF        )
      DELAWARE, INC.,                     )
[ 9]               Plaintiffs,            )
                -vs-                      )  C.A. No. 04-0414
[10]                                      )
      MOUNTAIRE FARMS, INC.,              )
[11]  MOUNTAIRE FARMS OF                  )
      DELMARVA, INC., and                 )
[12]  MOUNTAIRE FARMS OF DELAWARE,        )
      INC., all Delaware corporations)
[13]               Defendants.      - - - - - -

[14]          Deposition of WILLIE DAVIS, taken before
      Pamela C. Washington, Registered Professional Reporter
[15]  and Notary Public, at the law offices of Young,
      Conaway, Stargatt & Taylor, 110 West Pine Street,
[16]  Georgetown, Delaware, on March 15, 2005, beginning at
      10:00 a.m.
[17]               - - - - - - -

[18]  APPEARANCES:

[19]          On behalf of the Plaintiffs:
                 Margolis Edelstein
[20]             BY:  JEFFREY K. MARTIN, ESQ.
                 and  KERI WILLIAMS, ESQ.
[21]             1509 Gilpin Avenue
                 Wilmington, Delaware 19806
[22]
                 On behalf of the Defendant:
[23]             Shawe & Rosenthal
                 BY:  ARTHUR M. BREWER, ESQ.
[24]             and  LAURA PIERSON SCHEINBERG, ESQ.
                 20 South Charles Street
[25]             Baltimore, Maryland  21201

---

Page 2

                                    I-N-D-E-X

[ 2]  Witness:
             WILLIE DAVIS
[ 3]         Examination by Mr. Brewer ..........   3

[ 4]

[ 5]

[ 6]

[ 7]

[ 8]

[ 9]  CERTIFICATE OF COURT REPORTER ...............  52

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

B0023

Page 3

[ 1]    WHEREUPON:

[ 2]                WILLIE DAVIS, JR.,

[ 3]    having first been duly sworn by the court reporter,

[ 4]    thereupon testified upon his oath as follows:

[ 5]                MR. MARTIN: Before we begin,

[ 6]    Mr. Brewer, let me advise you that Mr. Davis has some

[ 7]    type of a hearing impairment that he disclosed to me

[ 8]    this morning. He most times does not have trouble

[ 9]    hearing, but he needs to see your lips as you are

[10]    talking.

[11]                MR. BREWER: Okay.

[12]                MR. MARTIN: So if you can try not to

[13]    obscure your lips, not that you do. And I have asked

[14]    him to certainly let us know if he has any trouble

[15]    hearing what the question is.

[16]                MR. BREWER: Okay.

[17]    BY MR. BREWER:

[18]        Q    Should I try to keep my voice higher

[19]    than normal, would that help you?

[20]        A    Well, normal would be okay.

[21]        Q    Normal is okay?

[22]        A    Yes.

[23]        Q    Oh, all right. As long as I look to

[24]    you then?

[25]        A    Yes.

Page 4

[ 1]        Q    Okay.

[ 2]                MR. BREWER: Do we have the same

[ 3]    stipulation that we had in the other depositions?

[ 4]                MR. MARTIN: Yes, sir.

[ 5]                MR. BREWER: Okay.

[ 6]    BY MR. BREWER:

[ 7]        Q    Mr. Davis, I know you and I have met

[ 8]    before, but just for purposes of a formal

[ 9]    introduction, my name is Art Brewer, I'm an attorney

[10]    and I'm representing Mountaire in a case called Davis

[11]    and there are several other plaintiffs versus

[12]    Mountaire, okay?

[13]        A    Yes.

[14]        Q    Have you ever been deposed before, sir?

[15]        A    No, sir.

[16]        Q    Do you understand that you are under

[17]    oath today and have an obligation to tell the truth?

[18]        A    Yes, sir.

[19]        Q    Do you understand that while this is

[20]    informal, it has the same significance as if you were

[21]    in a courtroom, testifying?

[22]        A    Yes, sir.

[23]        Q    Okay. What's going to happen here is

[24]    I'm going to ask you a series of questions. The court

[25]    reporter who you see here to my right is going to take

Page 5

[ 1]    down my questions and your answers. At trial, I will

[ 2]    have an opportunity to bring to the attention of the

[ 3]    judge or the jury any changes in your testimony here

[ 4]    today and what you might later testify in court, do

[ 5]    you understand that?

[ 6]        A    Yes, sir.

[ 7]        Q    All right. If you do not understand a

[ 8]    question I ask or, as a result of what Mr. Martin

[ 9]    said, you can't hear me clearly, please ask me to

[10]    repeat the question or to rephrase the question, I'll

[11]    be happy to do that.

[12]        A    Yes, sir.

[13]        Q    If you answer a question, however, I'm

[14]    going to assume that you understood the question, do

[15]    you understand that, sir?

[16]        A    Yes, sir.

[17]        Q    All right. Sir, let me ask you, do you

[18]    have any physical or mental problems that would

[19]    interfere with your ability to answer my questions

[20]    here today?

[21]        A    No, sir.

[22]        Q    Are you on any medication today?

[23]        A    None that would impair me.

[24]        Q    None that would affect your ability to

[25]    understand my questions and to answer them?

Page 6

[ 1]        A    No, sir.

[ 2]        Q    All right. If at any time during the

[ 3]    proceedings here you need a break, just please let me

[ 4]    know. We have normally been taking a break

[ 5]    approximately after two hours, I believe -- after one

[ 6]    hour, okay; I thought it was two, seems like two, so

[ 7]    we'll do that. But in the meantime, if you need

[ 8]    another break earlier than that, just please let me

[ 9]    know, okay?

[10]        A    Yes, sir.

[11]        Q    All right. Can you tell me, please,

[12]    how you came to contact Mr. Martin?

[13]        A    I contacted him by lawyer referral, by

[14]    the lawyer referral.

[15]        Q    Is that a lawyer referral service?

[16]        A    Yes.

[17]        Q    Okay, who did you talk to there?

[18]        A    I don't recall the name of the person I

[19]    talked to but I know I told them the problems that I

[20]    thought I had, and they in turn contacted me back and

[21]    gave me Mr. Martin's phone number.

[22]        Q    All right. And did you subsequently

[23]    call Mr. Martin?

[24]        A    Yes, sir, I did.

[25]        Q    Can you tell me when, please?

B0024

Page 15

[ 1]    A    I have one daughter born in 1968, one
[ 2]   was born in '67, one was born in '74, and one was born
[ 3]   in '70.
[ 4]    Q    Okay.  Do they live in the area here?
[ 5]    A    Yes, sir.
[ 6]    Q    Okay.  How about your son?
[ 7]    A    My son live in -- right now at the
[ 8]   present, he's residing with me and his sister, one of
[ 9]   his sisters, over Delmar.
[10]    Q    Okay, so you have one of the daughters
[11]   and your son is living with you now?
[12]    A    No, sir; none of my daughters are
[13]   living with me.
[14]    Q    I'm sorry, I misunderstood you then.
[15]   So it's your son that's living with you?
[16]    A    I said part-time with me and then
[17]   part-time with his sister over to Delmar.
[18]    Q    Oh, I see, okay.  And how old is your
[19]   son?
[20]    A    My son was born in '69, December 5th.
[21]    Q    Okay.  Is your son employed?
[22]    A    Yes, sir, he is.
[23]    Q    Who is he employed by?
[24]    A    Mountaire of Millsboro.
[25]    Q    And what does he do?

Page 16

[ 1]    A    Feed truck driver, drives a feed truck.
[ 2]    Q    Feed truck?  Okay.  Do you know how
[ 3]   long he has been at Millsboro?
[ 4]    A    Not too long.  I think about a month or
[ 5]   so, a couple months, something like that.
[ 6]    Q    Oh, recently employed there?
[ 7]    A    Yes.
[ 8]    Q    Do you regularly attend church, sir?
[ 9]    A    No, sir, I do not.
[10]    Q    Okay.  What is your highest level of
[11]   education?
[12]    A    About a year-and-a-half almost, about a
[13]   year, little over a year-and-a-half of college.
[14]    Q    Okay.  And where is that, what college
[15]   was that?
[16]    A    Delaware Tech.
[17]    Q    Del-Tech?  Okay.  Do you have any
[18]   certifications or licenses to drive, like a CDL or a
[19]   forklift or anything along those lines?
[20]    A    Not now, no.  I did have but not now.
[21]    Q    When did you --
[22]    A    I have a driver's license.
[23]    Q    Okay.  Did you ever have a CDL?
[24]    A    Yes, I did.
[25]    Q    Okay.  And when did you have your CDL?

Page 17

[ 1]    A    Just I first acquired my CDLs in 1967
[ 2]   and up until 1990.
[ 3]    Q    Okay.  I'm not trying to trick you, but
[ 4]   CDLs didn't come into place until probably the very
[ 5]   late '80s.
[ 6]    A    Well, chauffer's license.
[ 7]    Q    You had a Class A chauffer's license?
[ 8]    A    Chauffer's license, and then they go
[ 9]   right over to CDL.
[10]    Q    So you had a Class A chauffer's license
[11]   and you got that, when did you say again, please?
[12]    A    My chauffer's license?
[13]    Q    Yes.
[14]    A    1967.
[15]    Q    1967, okay.  And then after the
[16]   chauffer's license you needed a CDL, you got that?
[17]    A    No, I did not.  I did not change over
[18]   to the CDL.
[19]    Q    Oh, you did not change over?
[20]    A    No, I did not.
[21]    Q    So you do not have a CDL?
[22]    A    No.
[23]    Q    Okay, how about a forklift license?
[24]    A    I was certified through Mountaire.
[25]    Q    Okay.  And you currently under any

Page 18

[ 1]   treatment with a physician or a mental health care
[ 2]   provider?
[ 3]    A    Not the mental health, no, sir.
[ 4]    Q    Physical?
[ 5]    A    Physical, yes.
[ 6]    Q    Okay, and what are you being treated
[ 7]   for, sir, if you don't mind my asking?
[ 8]    A    Degenerative heart condition --
[ 9]   degenerative heart condition.
[10]    Q    Okay.  Let's talk about your employment
[11]   with Mountaire; when did you first become employed
[12]   with Mountaire?
[13]    A    About April of -- it was either 2000 or
[14]   2001.
[15]    Q    Okay.  Prior to being employed with
[16]   Mountaire, for whom were you working?
[17]    A    I was independent weigh master for
[18]   Tyson Food.
[19]    Q    So you were a weigh master for Tyson
[20]   Foods?
[21]    A    Yes.
[22]    Q    And how long did you have that
[23]   position?
[24]    A    From 1997 until -- from the time that I
[25]   went to Mountaire.

B0025

Page 19

[ 1]    Q    Okay.  And prior to that, by whom were
[ 2] you employed?
[ 3]    A    I was working part-time for the --
[ 4] relief weigh master for Perdue at Showell Farms,
[ 5] Showell, Maryland.
[ 6]    Q    You were a relief weigh master?
[ 7]    A    Relief crew leader, yes.
[ 8]    Q    Relief crew leader, okay.  What did you
[ 9] do as a relief crew leader?
[10]    A    When some of the crew leaders would
[11] take off, I would take the crews out for them.
[12]    Q    Okay, so somebody wanted a day off,
[13] you'd fill in for that day?
[14]    A    Yes.
[15]    Q    Somebody took a week's vacation, you'd
[16] fill in for that week?
[17]    A    Something like that.
[18]    Q    And if no one was doing anything, you
[19] just didn't work?
[20]    A    No.
[21]    Q    Okay.  And how long did you do that for
[22] Perdue?
[23]    A    From the time that Perdue purchased
[24] Showell.
[25]    Q    Okay.

Page 20

[ 1]    A    And then up until I went to Tyson
[ 2] Foods.
[ 3]    Q    Okay.  So you went from Perdue when
[ 4] they purchased Showell to Tyson to Mountaire?
[ 5]    A    Yes.
[ 6]    Q    Prior to Perdue's acquisition of
[ 7] Showell what did you do?
[ 8]    A    I was a truck driver, live haul driver
[ 9] for Showell, Cooking Good.
[10]    Q    Okay, and how long were you employed by
[11] Showell?
[12]    A    Approximately three years.
[13]    Q    And you were a live haul driver for
[14] Showell?
[15]    A    Yes.
[16]    Q    Okay.  And prior to Showell?
[17]    A    I drove live haul for Perdue in
[18] Salisbury.
[19]    Q    So your first experience then as a
[20] weigh master, if you will, would have been at Perdue
[21] when you were a relief weigh master?
[22]    A    No, sir.
[23]    Q    Oh, all right.
[24]    A    My first weigh master experience began
[25] back in 1968.

Page 21

[ 1]    Q    All right, with whom?
[ 2]    A    German Trucking and -- what's the name
[ 3] of the place -- Carolina Poultry, I was relief weigh
[ 4] master for different crews over there to Carolina
[ 5] Poultry in Federalsburg and Denton, Maryland.
[ 6]    Q    And when you weren't filling in as a
[ 7] relief crew leader, what were you doing?
[ 8]    A    I was live haul truck driver.
[ 9]    Q    Okay.  Was that also true when you were
[10] with Showell, were you also a relief crew leader
[11] there?
[12]    A    I was relief crew leader for Perdue
[13] when Perdue purchased Showell.  But when Showell
[14] was -- I was at Showell Cooking Good, I was a live
[15] haul truck driver.
[16]    Q    All right.  And you didn't fill in
[17] for --
[18]    A    No, sir.
[19]    Q    Okay, I think that answers my
[20] questions.  When you first became hired by Mountaire,
[21] what position were you hired into?
[22]    A    As a crew leader.
[23]    Q    You were hired as a crew leader, okay.
[24] And did there ever come a time when you worked for
[25] Mountaire that you requested to go on a part-time

Page 22

[ 1] basis?
[ 2]    A    The latter part of when they gave me --
[ 3] when they laid my crew off, they offered me the
[ 4] position of a part-time position, you know, as a crew
[ 5] leader, and I accepted that.
[ 6]    Q    Okay.  So my question is did you
[ 7] request to become part-time or not?
[ 8]    A    Well, when they told me they was laying
[ 9] my crew off, I requested the part-time, you know, to
[10] fill-in crew.
[11]    Q    Okay.  So it was because they were
[12] laying your crew off that you made that request?
[13]    A    Yes.
[14]    Q    Okay.  And when you were operating as a
[15] part-time crew, what time frame are we talking about?
[16]    A    Well, when they first laid me off, I
[17] went in as a crew leader for about six -- five or six
[18] months straight with no time off or anything like
[19] that.
[20]    Q    Okay, I'm confused.  You testified that
[21] you were laid off.
[22]    A    Yes.
[23]    Q    I thought you told me you --
[24]    A    As a full-time weigh master -- as a
[25] full-time crew leader, I was laid off.  Then they

B0026

Page 23

[ 1]    brought me in as a relief crew leader.

[ 2]        Q    Okay.

[ 3]        A    And I had to fill in, you know, the

[ 4]    other crew leaders spot.

[ 5]        Q    That's what I'm interested in, when did

[ 6]    that occur?  When did you go from being a full-time

[ 7]    crew leader to a relief crew leader?

[ 8]        A    From the time that they laid me off.

[ 9]        Q    When was that?

[10]        A    I cannot recall direct the date, the

[11]    exact date.

[12]        Q    Can you give me a year, what year that

[13]    might have happened?

[14]        A    It was one year after I was there for

[15]    the full-time position.

[16]        Q    So a year after you became employed,

[17]    that's when you became a part-time crew leader?

[18]        A    Yes.

[19]        Q    Okay, one year after employment.  And

[20]    as a part-time crew leader, what was your schedule?

[21]        A    Pretty much the same as it was when I

[22]    was full time.  In other words, I didn't get any time

[23]    off.

[24]        Q    So you were working the same amount of

[25]    hours?

Page 24

[ 1]        A    Pretty much the same amount of hours.

[ 2]    In other words, I made the same -- almost the same

[ 3]    amount of money when I went -- when they put me on

[ 4]    part-time as I did a full-time, based on my W-2s.

[ 5]        Q    Did you ever become a relief crew

[ 6]    leader?

[ 7]        A    That was what I was supposed to have

[ 8]    been, relief crew leader.  But we had one crew that --

[ 9]    one crew leader that was out, I think he was out

[10]    something like about six, seven months, something like

[11]    that, and I basically carried his crew out the whole

[12]    time.

[13]        Q    Who was that?

[14]        A    Roy Walters' crew.

[15]        Q    That's when he had his surgery for his

[16]    knees?

[17]        A    I think it was.

[18]        Q    During the time that you were a

[19]    part-time crew leader or a relief crew leader -- and I

[20]    understand we can use those terms interchangeably,

[21]    part-time crew leader is the same thing as a relief

[22]    crew leader?

[23]        A    Part-time relief is what they, you

[24]    know, had me down as relief crew leader.

[25]        Q    Okay.  So when you're talking about

Page 25

[ 1]    being a part-time crew leader a year after you became

[ 2]    employed, it's the same as relief crew leader?

[ 3]        A    I don't know how they would classify

[ 4]    that but I know that, you know, they had me down as

[ 5]    relief crew leader.  I was supposed to have been

[ 6]    relief for the other crew leaders for when they wanted

[ 7]    to take off.

[ 8]        Q    Is that what happened approximately a

[ 9]    year after you started with the company?

[10]        A    Yes, sir.

[11]        Q    Okay, that's what I want to know, all

[12]    right.  Now, during that time that you were a relief

[13]    crew leader, did you ever just operate the forklift

[14]    for another crew?

[15]        A    I never operated -- just operated the

[16]    forklift for another crew.  I was working as the crew

[17]    leader, you know, taking the catchers to work, picking

[18]    them up, taking them home, and basically doing the

[19]    same thing as I done when I was a full-time crew

[20]    leader.

[21]        Q    Okay.  So what you're saying to me then

[22]    is during this period of time that were you a relief

[23]    crew leader, that you never operated the forklift?

[24]        A    A lot of times, yes, I did; I had to.

[25]        Q    But were you also the crew leader when

Page 26

[ 1]    you were operating the forklift?

[ 2]        A    Yes, sir.

[ 3]        Q    All right.  So there was never a time

[ 4]    then when you worked for another crew leader and all

[ 5]    you did was operate the forklift?

[ 6]        A    That was occasion that like if a

[ 7]    forklift operator did not show up, they would call me

[ 8]    in occasionally, you know, to operate the forklift a

[ 9]    little bit.

[10]        Q    And that's all you would do, you would

[11]    just operate the forklift?

[12]        A    Sometimes, but not -- it didn't happen

[13]    but about two or three times.

[14]        Q    Okay.  And that's two or three times

[15]    over what period of time, sir?

[16]        A    During the remainder of the time that I

[17]    was down there.

[18]        Q    Just so I'm getting a time frame, and I

[19]    want to be sure of this, you believe you were employed

[20]    in April of either 2000 or 2001?

[21]        A    Right; at this time, I cannot recall.

[22]        Q    All right, that's fine, I understand

[23]    that.  From whatever that time was, one year later is

[24]    when you became a relief crew leader?

[25]        A    Yeah, I had got a vacation, I got my

Page 27

[ 1] first vacation and then they -- then they put me in as

[ 2] relief crew leader, then I got my second vacation the

[ 3] next year. So I had two vacations while down there.

[ 4]     Q    Okay. But during this time that you

[ 5] were a relief crew leader, what I understood you to

[ 6] tell me is from that period of time until the time you

[ 7] left, that you only operated the forklift two or three

[ 8] times?

[ 9]     A    For another crew other than, you know,

[10] the crew that I was with.

[11]     Q    Right, for another crew, okay. When

[12] you were a crew leader, how many people were on your

[13] crew?

[14]     A    There was seven catchers.

[15]     Q    Okay, did you ever carry eight?

[16]     A    Occasionally, like if an extra man went

[17] along or something like that. But you only worked

[18] seven catchers at a time.

[19]     Q    Okay. And were you responsible for

[20] making sure they did what they were supposed to do?

[21]     A    We had to -- we had duties that we had

[22] to, you know, perform.

[23]     Q    Okay.

[24]     A    You know, to get the job done.

[25]     Q    Okay. Let me show you this document,

Page 28

[ 1] this is an Exhibit 2 to Mr. Garrison's deposition.

[ 2] What I'd like you to do, sir, is just -- we'll go off

[ 3] the record -- have you take a few moments to take a

[ 4] look at this. Do you see on the first page there's a

[ 5] Roman Numeral II, it says Crew Leaders General Duties?

[ 6]     A    Yes, sir.

[ 7]     Q    And it goes on? What I'd like you to

[ 8] do is just take a quick look at this -- well, take as

[ 9] much time as you want, it doesn't have to be a quick

[10] look, and tell me basically are these the

[11] responsibilities that you had as not only a crew

[12] leader, but also a relief crew leader, okay? Would

[13] you do that for me?

[14]     A    Yes, sir.

[15]     Q    Thank you.

[16]          (Whereupon, there was a discussion held

[17] off the record.)

[18] BY MR. BREWER:

[19]     Q    Are you finished, sir?

[20]     A    Yes.

[21]     Q    Mr. Davis, you indicated to me that you

[22] had an opportunity now to review Garrison Exhibit

[23] Number 2?

[24]     A    Yes.

[25]     Q    The Crew Leader General Duties that you

Page 29

[ 1] looked at, were those the general duties that you had

[ 2] when you were a crew leader?

[ 3]     A    Yes.

[ 4]     Q    And a part-time leader?

[ 5]     A    Yes.

[ 6]     Q    And, I'm sorry, and a relief crew

[ 7] leader?

[ 8]     A    Yes.

[ 9]     Q    Thanks. Let's move along here. I'm

[10] going to also show you, sir, Exhibit Number 1 to

[11] Mr. Garrison's situation; I'd ask you to do the same

[12] thing, take a quick look at this and, when you finish,

[13] let me know, please.

[14]     A    Yes, sir.

[15]     Q    When you were both a crew leader and a

[16] relief crew leader, was it your responsibility to fill

[17] out this form?

[18]     A    Yes, sir.

[19]     Q    Okay. And to make whatever notations

[20] were appropriate on it?

[21]     A    Yes, sir.

[22]     Q    Okay, thank you. I'm going to again,

[23] maybe to expedite things since I made a commitment to

[24] your counsel that we'd try to be done within a certain

[25] period of time, these are time off requests, this

Page 30

[ 1] would be Exhibit 1 to your deposition.

[ 2]          And, again, what I'd ask you to do,

[ 3] sir, if you don't mind, what I'd like you to do is

[ 4] this: Look at the name of the employee, what they're

[ 5] requesting, and tell me if that is your signature

[ 6] approving the request for either vacation or for time

[ 7] off.

[ 8]     A    Yes, sir.

[ 9]     Q    Would you mind taking a look off the

[10] record? We can go through each one individual; which

[11] would you prefer me to do?

[12]     A    It doesn't matter to me.

[13]     Q    We'll take a few seconds, go off the

[14] record, and take a look at these.

[15]          (Whereupon, there was a discussion held

[16] off the record.)

[17]          THE WITNESS: All of these are not my

[18] handwritten signature.

[19] BY MR. BREWER:

[20]     Q    Okay, maybe what we can do is can you

[21] tell me which ones are not? I'll tell you what, the

[22] first one I have is Mr. Fosque.

[23]     A    That's mine.

[24]     Q    That's your signature?

[25]     A    Yes.

B0028

Page 39

[ 1]        A    One of them, I went; the rest of them,

[ 2]    I didn't go.

[ 3]        Q    Okay. The ones that you went to, did

[ 4]    you see any people there who were not supervisory

[ 5]    people?

[ 6]        A    Yes, I did.

[ 7]        Q    Who did you see that wasn't a

[ 8]    supervisor?

[ 9]        A    The switch board operator, and some

[10]    more but right offhand I can't recall their names.

[11]        Q    Okay. Well, there are three

[12]    invitations here, one is for 2002, one is for 2003,

[13]    and one is for 2001; you went to one of them?

[14]        A    It was one of them that I went to. I

[15]    know the last one or two or something like that, I did

[16]    not go.

[17]        Q    Okay, do you remember being invited to

[18]    all three?

[19]        A    I do remember being invited to the

[20]    first one, yes.

[21]        Q    The first one, that would be in '01?

[22]        A    I guess it must have been '01, yes.

[23]        Q    Okay. But you don't remember being

[24]    invited to the second or the third?

[25]        A    I didn't -- if I was, you know, I

Page 40

[ 1]    didn't pay any attention.

[ 2]        Q    Okay. So you might have been, but you

[ 3]    just don't remember?

[ 4]        A    No.

[ 5]        Q    Okay.

[ 6]        A    I wasn't interested in it.

[ 7]        Q    Okay, that's fine. What I'm going to

[ 8]    ask you to do, sir, is look at the complaint in this

[ 9]    case. Let's see, what time is it? I'm almost

[10]    finished, so why don't we do this: This is the

[11]    complaint that was filed in this case, sir, that's

[12]    Number 16 for Mr. Garrison's deposition.

[13]        I'd ask you to go to page 3, number 23,

[14]    and that says that the defendant, being Mountaire,

[15]    followed and continues to follow a corporate policy

[16]    and/or practice that requires/required plaintiffs to

[17]    submit a daily time sheet broken down for each day of

[18]    the week, okay? Was the time sheet that's being

[19]    referred to here, if you know, the time sheet that you

[20]    kept for the catchers?

[21]        A    It was kept for the time that we would

[22]    start catching on the farm until the time that we

[23]    finished catching.

[24]        Q    Okay, and that was for the catchers'

[25]    time? You were maintaining the time that the catchers

Page 41

[ 1]    worked?

[ 2]        A    Pretty much so, yes.

[ 3]        Q    You weren't maintaining time that you

[ 4]    worked?

[ 5]        A    No.

[ 6]        Q    Okay. Go to the next page, please, and

[ 7]    look at paragraph 26. I'll let you take a minute and

[ 8]    read that. Just let me know when you have had a

[ 9]    chance to read it.

[10]        A    Yes.

[11]        Q    Okay. Did you ever take a half a day

[12]    or something less than a full day off from work from

[13]    the time you first became employed until the time you

[14]    quit?

[15]        A    From the time that I was employed to

[16]    the time I quit?

[17]        Q    Yes.

[18]        A    I was -- I had to go to the hospital

[19]    and I spent -- I was out of work there for about

[20]    pretty close to two weeks.

[21]        Q    Okay, that's a full day; did you ever

[22]    take any half days off?

[23]        A    No, no, no, sir.

[24]        Q    Okay, thank you. Can you take a look

[25]    at the next page? I'm sorry, the page after that.

Page 42

[ 1]    When, by the way, did you quit working for Mountaire?

[ 2]    Do you remember when you quit?

[ 3]        A    Say that again.

[ 4]        Q    Do you remember when you quit for

[ 5]    Mountaire? I'm sorry I meant to speak up.

[ 6]        A    It was the latter part of 2003.

[ 7]        Q    All right. So does December of 2003

[ 8]    sound right?

[ 9]        A    Right around that, yes.

[10]        Q    Okay.

[11]        A    It was a little before Christmas -- no,

[12]    it was right at Christmastime.

[13]        Q    Right at Christmas?

[14]        A    Yes.

[15]        Q    Okay, so 12-25, approx, '03. This

[16]    paragraph talks about when the company, the defendant,

[17]    learned of the plaintiffs', one of which would be you,

[18]    intention to seek counsel, that we retaliated against

[19]    plaintiffs by threatening them with termination of

[20]    their employment if they continued.

[21]        MR. MARTIN: Excuse me, could you --

[22]        THE WITNESS: I was not there.

[23]        MR. MARTIN: Could you mention that

[24]    paragraph, I may have missed the number?

[25]        MR. BREWER: Sure, paragraph 34.

B0029

# TAB 5

**Page 1**

[1]          IN THE UNITED STATES DISTRICT COURT
             IN AND FOR THE DISTRICT OF DELAWARE
[2]

[3]   WILLIE DAVIS, JR.,                    )
      NATHANIEL BRIDDELL,                   )
[4]   GEORGE W. FEDDIMAN,                   )
      JOSEPH GARRISON,                      )
[5]              Plaintiffs,                )
             -vs-                           )   C.A. No. 04-0414
[6]                                         )
      MOUNTAIRE FARMS, INC.,                )
[7]   MOUNTAIRE FARMS OF                    )
      DELMARVA, INC., and                   )
[8]   MOUNTAIRE FARMS OF                    )
                 Defendants.               )
[9]                 - - - - - - -

[10]          Deposition of JOSEPH GARRISON, taken before

[11]   Pamela C. Washington, Registered Professional Reporter

[12]   and Notary Public, at the law offices of Young,

[13]   Conaway, Stargatt & Taylor, 110 West Pine Street,

[14]   Georgetown, Delaware, on January 14, 2005, beginning

[15]   at 10:00 a.m.

[16]                   - - - - - -

[17]   APPEARANCES:

[18]          On behalf of the Plaintiffs:
                 Margolis Edelstein
[19]             BY:  JEFFREY K. MARTIN, ESQ.
                 and  KERI L. WILLIAMS, ESQ.
[20]             1509 Gilpin Avenue
                 Wilmington, Delaware 19806
[21]
              On behalf of the Defendants:
[22]             Shawe Rosenthal
                 BY:  ARTHUR M. BREWER, ESQ.
[23]             and  LAURA A. PIERSON SCHEINBERG, ESQ.
                 20 South Charles Street   11th Floor
[24]             Baltimore, Maryland 21201

[25]

**Page 2**

[1]                      I-N-D-E-X

[2]   Witness:
          JOSEPH GARRISON
[3]          Examination by Mr. Brewer ...............

[4]   Exhibits Marked
          Garrison Exhibit 1 ......................  3
[5]       Garrison Exhibit 2 ......................  4
          Garrison Exhibit 3 ......................  6
[6]       Garrison Exhibit 4 ......................  9
          Garrison Exhibit 5 ...................... 10
[7]       Garrison Exhibit 6 ...................... 12
          Garrison Exhibit 7 ...................... 12
[8]       Garrison Exhibit 8 ...................... 17
          Garrison Exhibit 9 ...................... 18
[9]       Garrison Exhibit 10 ..................... 18
          Garrison Exhibit 11 ..................... 18
[10]      Garrison Exhibit 12 ..................... 18
          Garrison Exhibit 13 ..................... 19
[11]      Garrison Exhibit 14 ..................... 19
          Garrison Exhibit 15 ..................... 19
[12]      Garrison Exhibit 16 ..................... 19
          Garrison Exhibit 17 ..................... 23
[13]

[14]

[15]
       CERTIFICATE OF COURT REPORTER ..................... 24
[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

**Page 3**

[1]   WHEREUPON:

[2]              JOSEPH GARRISON,

[3]   having first been duly sworn by the court reporter,

[4]   thereupon testified upon his oath as follows:

[5]              MR. BREWER:  You have noted the

[6]   appearances for the record, Madame Reporter?

[7]              THE COURT REPORTER:  Yes.

[8]              MR. BREWER:  We have the standard

[9]   stipulation with respect to --

[10]             MR. MARTIN:  In Delaware, we don't have

[11]   any standard stipulations, but I'll be glad to

[12]   stipulate --

[13]             MR. BREWER:  As to the form of the

[14]   question, would be the objections.

[15]             MR. MARTIN:  Yes.

[16]             MR. BREWER:  Okay, that's fine.

[17]   BY MR. BREWER:

[18]        Q    All right.  Mr. Garrison, have you ever

[19]   been deposed before?

[20]        A    Yes.

[21]        Q    You have?  Can you tell me when?

[22]        A    No, not proposed, no, I haven't,

[23]   not ...

[24]        Q    Deposed like having a deposition like

[25]   we're doing today.

**Page 4**

[1]        A    No, no, no.

[2]        Q    Have you ever done this before?

[3]        A    No, no.

[4]        Q    Okay, thank you.  You understand that

[5]   you are under oath today, and that you have an

[6]   obligation to tell the truth?

[7]        A    Yes.

[8]        Q    All right.  This is obviously informal,

[9]   but it has the same significance and force as if you

[10]   were with a judge in a courtroom, do you understand

[11]   that, sir?

[12]        A    Yes.

[13]        Q    Okay.  I'll be asking you a series of

[14]   questions; the court reporter, as you can see, will be

[15]   taking down your answers.  At trial, if it comes to

[16]   trial, I will have an opportunity to bring to the

[17]   attention of the judge or jury any changes or

[18]   conflicts in your testimony here today and any future

[19]   proceedings, do you understand that?

[20]        A    Yes.

[21]        Q    Okay.  I would basically ask you this,

[22]   and that is not to answer any question that I ask that

[23]   you do not understand.  If you don't understand a

[24]   question, please ask me to rephrase it or to restate

[25]   it, okay?

Page 21

[ 1]      Q    Okay.

[ 2]      A    Joseph Giddins.  Joseph Giddins.

[ 3]      Q    Giddins, okay.

[ 4]      A    He's 24.  And Yvonne Parker, she's

[ 5]  married.

[ 6]      Q    Okay, she's your daughter?

[ 7]      A    That's my daughter.

[ 8]      Q    Okay.

[ 9]      A    She's -- I'm trying to think how old

[10]  she is.

[11]      Q    Approximately, that's fine.

[12]      A    I'm going to say 28.

[13]      Q    Okay.

[14]      A    And Joann Richardson, she's 30.

[15]      Q    Also a daughter?

[16]      A    A daughter.  And Denita Giddins, she's

[17]  a daughter, she's approximately 32.

[18]      Q    Okay.  Sir, do you regularly attend a

[19]  church?

[20]      A    Yes.

[21]      Q    Which church, please?

[22]      A    Calvary Pentecostal in Bishopville,

[23]  Maryland.

[24]      Q    And do you attend that every week?

[25]      A    Yes.

Page 22

[ 1]          MR. MARTIN:  I'm going to object.

[ 2]  We're going way beyond -- I know that there's great

[ 3]  freedom in discovery, but church attendance is

[ 4]  certainly something that I cannot conceive would

[ 5]  provide any admissible evidence.

[ 6]  BY MR. BREWER:

[ 7]      Q    Your answer was what, sir?

[ 8]      A    Yes, Calvary Pentecostal.

[ 9]      Q    And you basically said you attended

[10]  every week, before the objection was filed?

[11]      A    Yes.

[12]      Q    Okay.  Have you discussed this case

[13]  with your pastor at all?

[14]      A    No.

[15]      Q    Okay.  Tell me what is your education?

[16]      A    Well, I went through 11th grade.

[17]      Q    Went through the 11th grade?  And when

[18]  did you complete the 11th grade?

[19]      A    I would say around '76, '77.

[20]      Q    Okay.  Have you received any training

[21]  or certifications for licenses such as forklifts?

[22]      A    Yes.

[23]      Q    And where did you receive the

[24]  certification for forklift?

[25]      A    At Mountaire.

Page 23

[ 1]      Q    At Mountaire?  When did you receive

[ 2]  that certification?

[ 3]      A    I guess its been like three years ago,

[ 4]  somewhere like that.

[ 5]      Q    How long have you worked for Mountaire?

[ 6]      A    Eight years.

[ 7]      Q    Eight years?

[ 8]      A    Eight.  I think it was eight.  Or

[ 9]  seven, I believe it -- it was going on eight, it was

[10]  going on eight.

[11]      Q    It was going on eight?

[12]      A    Yeah.

[13]      Q    And when you first became employed with

[14]  Mountaire, what job did you have?

[15]      A    I was catcher, I was a catcher.

[16]      Q    You were a catcher?  Approximately how

[17]  long after you became a catcher did you receive your

[18]  forklift certification?

[19]      A    After I was a catcher, I was -- after I

[20]  was a catcher, a senior catcher, I was a crew leader.

[21]      Q    Let me see if I understand what you're

[22]  telling me.  You were hired as a catcher?

[23]      A    Right.

[24]      Q    And then you went right from a catcher

[25]  to a crew leader?

Page 24

[ 1]      A    Yes.

[ 2]      Q    But you did receive a certification for

[ 3]  forklift operator?

[ 4]      A    After I be a crew leader, then I

[ 5]  started learning how to drive forklift, then I receive

[ 6]  a forklift license.

[ 7]      Q    Okay.  So you were a catcher, then you

[ 8]  became a crew leader, and you got your certification

[ 9]  for forklift after you became a crew leader?

[10]      A    Yes.

[11]      Q    Are you sure of that?

[12]      A    Yes.

[13]      Q    Okay.  I believe I asked you a series

[14]  of questions earlier, but just to be sure that I'm

[15]  understanding it, there's nothing about your current

[16]  state of physical health that's going to be a problem

[17]  with your deposition here today?

[18]      A    No.

[19]      Q    No?

[20]      A    No, it's not.

[21]      Q    All right.  Are you or have you been

[22]  under any treatment with a physician or a medical

[23]  health care provider in the last five years?

[24]      A    What do you mean?  Say that again one

[25]  more time.

B0031

Page 25

[ 1]     Q    Have you been under the care of a

[ 2]    physician or a health care provider --

[ 3]     A    No.

[ 4]     Q    -- in the last 5 years?

[ 5]     A    No.

[ 6]     Q    All right.  You became employed with

[ 7]    the company eight years ago?

[ 8]     A    Yes.

[ 9]     Q    And as a catcher.  Tell us for the

[10]    record, please, what you did as a catcher.

[11]     A    Catch chickens.

[12]     Q    Where?

[13]     A    Whatever I had to catch them at,

[14]    different farms.

[15]     Q    Okay.  How did you get from where you

[16]    were located to the farm?

[17]     A    From a crew leader that picked me up

[18]    from my house.

[19]     Q    And who was the crew leader that you

[20]    had when you first became employed?

[21]     A    Terry Morris.

[22]     Q    Terry Morris?

[23]     A    Yes.

[24]     Q    Were there any breaks in service with

[25]    the company from the time you first started until you

Page 26

[ 1]    resigned?

[ 2]     A    What do you mean breaks?

[ 3]     Q    Well, in other words, were you employed

[ 4]    for Mountaire continuously for the eight years?

[ 5]     A    Yes.

[ 6]     Q    You didn't --

[ 7]     A    I didn't, no.

[ 8]     Q    You didn't leave and then come back or

[ 9]    anything else?

[10]     A    No.

[11]     Q    So you were continuously employed?

[12]     A    Yes.

[13]     Q    Okay.  And I believe you told me, just

[14]    to be sure, when about did you become a crew leader?

[15]     A    It was -- let me see.  I believe it was

[16]    in '99, 1999.

[17]     Q    Okay.  That's about six years ago then?

[18]     A    Uh-huh.

[19]     Q    When you became a crew leader, did you

[20]    consider that to be a promotion?

[21]     A    Yes.

[22]     Q    Now, you became a crew leader, you just

[23]    told me, in 1999, okay, I'll just make that note.

[24]    Would you tell us as a crew leader what you do?

[25]     A    Yes.  Well, I picked up the help, I

Page 27

[ 1]    picked up the help, stopping to the store, took them

[ 2]    to the farm, got the house ready.  I had to watch out

[ 3]    for the drivers.

[ 4]     Q    Now you say drivers, which drivers are

[ 5]    we talking about?

[ 6]     A    Truck drivers.

[ 7]     Q    Employed by whom?

[ 8]     A    Mountaire.

[ 9]     Q    And how were those drivers, how do you

[10]    describe those drivers?

[11]     A    Okay, I had to watch how they parked,

[12]    watch how -- backing them up.

[13]     Q    Let me rephrase the question to make

[14]    myself clear.  When you say watch out for the drivers,

[15]    are you talking about the live haul drivers?

[16]     A    Yes.

[17]     Q    And for the record, I'll state that

[18]    live haul drivers are drivers who are employed by the

[19]    company who are CDL qualified who bring live chickens

[20]    that are caught on a farm to the plant for processing.

[21]     A    Right.

[22]     Q    If you have anything you'd like to add,

[23]    you may.

[24]             MR. MARTIN:  No, that's fine.

[25]

Page 28

[ 1]    BY MR. BREWER:

[ 2]     Q    All right.  How many people are on your

[ 3]    crew?

[ 4]     A    Seven.

[ 5]     Q    Seven?  Sometimes are there more?

[ 6]     A    Well, at times we carry an extra man,

[ 7]    eight.

[ 8]     Q    And sometimes are there less?

[ 9]     A    Yes.

[10]     Q    And why is there sometimes less?

[11]     A    Because maybe sometimes you be

[12]    short-handed.

[13]     Q    Okay.  Do you manage that crew to catch

[14]    the chickens?

[15]     A    Yes.

[16]     Q    All right.  The catchers that you

[17]    manage to catch the chickens, do you know if they're

[18]    covered by a contract with the union?

[19]     A    Yes.

[20]     Q    And that's referred to as a collective

[21]    bargaining agreement, is that term familiar to you?

[22]     A    I don't understand.

[23]     Q    The people who you manage, the catchers

[24]    that catch the chickens --

[25]     A    Yeah.

Page 33

[ 1]        A    Right.

[ 2]        Q    And then you will decide whether to use
[ 3] it or not?

[ 4]        A    Right.

[ 5]        Q    Let's see, what else do you do?  We
[ 6] have talked about the water, we have talked about
[ 7] using the fan; what else do you do prior to starting
[ 8] to catch chickens?

[ 9]        A    Then sometime I might have to fill in,
[10] you know.

[11]        Q    Well, I'm not interested in that at
[12] this point.  What I'm saying is if we have done just
[13] the two things that you have mentioned, you have come
[14] to the farm with the crew, okay, you have cranked up
[15] the water and you have decided whether or not you're
[16] going to use the fan, are we now ready to catch?

[17]        A    Yes.

[18]        Q    Don't we have to put pens in first?

[19]        A    Yeah, that's what I was saying a while
[20] ago, put in pens.

[21]        Q    So after we put the fan in, now we put
[22] pens in?

[23]        A    Pens in.

[24]        Q    Describe for the record what pens are.

[25]        A    Pens is something that you block the

Page 34

[ 1] chickens off with for to be able to catch them so they
[ 2] won't run, that's what calls pens.

[ 3]        Q    And that's also so they don't smother
[ 4] themselves?

[ 5]        A    Right.

[ 6]        Q    Okay.  Who puts the pens up?

[ 7]        A    Well, we all do it together, the men,
[ 8] sometime I do it.

[ 9]        Q    Okay.  Do you tell the men where to put
[10] them?

[11]        A    Yes.

[12]        Q    Okay.  And placing of the pens is going
[13] to change from house to house, isn't it?

[14]        A    Yes.

[15]        Q    Okay.  So who's the one who makes the
[16] decision how the pens should be placed in a particular
[17] house?

[18]        A    Well, the men put the pens on the
[19] forklift or on top of the cage to transport them to
[20] the next house.

[21]        Q    Okay, let me repeat the question.  You
[22] have gotten to the house, cranked up the water, put
[23] the fan in if you have needed it or not, now we're
[24] going to put the pens up.  You can put pens in a house
[25] in lots of different ways?

Page 35

[ 1]        A    Right.

[ 2]        Q    Who makes the decision as to where to
[ 3] put the pens?

[ 4]        A    I make the decision.

[ 5]        Q    Okay.  As a crew leader, you have
[ 6] responsibility for the safety of the people on your
[ 7] crew, don't you?

[ 8]        A    Yes.

[ 9]        Q    Okay.  And you also have responsibility
[10] for the safety of the property?

[11]        A    Yes.

[12]        Q    And the farmer's property?

[13]        A    Yes.

[14]        Q    Let me just have a minute, please.

[15]             MR. BREWER:  Would you mark this as
[16] exhibit 1?

[17]             (Garrison Exhibit 1, marked for
[18] identification.)

[19]             (Whereupon, there was a discussion held
[20] off the record.)

[21] BY MR. BREWER:

[22]        Q    Mr. Garrison, I'm showing you a
[23] document which has been marked as Exhibit 1 to your
[24] deposition; would you take a look at that for a moment
[25] and tell me what it is when you're finished reviewing

Page 36

[ 1] it?

[ 2]        A    Yes, it's a farm sheet, time sheet.

[ 3]        Q    Okay.

[ 4]        A    Farm ticket.

[ 5]        Q    All right.  And up at the top, it says
[ 6] the date?

[ 7]        A    Uh-huh.

[ 8]        Q    Who fills that in?

[ 9]        A    I do.

[10]        Q    The next thing appears to be lot
[11] number, what does that mean?

[12]        A    That means the lot of the farm.

[13]        Q    I'm sorry, it means what, sir?

[14]        A    The lot of the farm.

[15]        Q    Okay.  And who fills that in?

[16]        A    Dispatch.

[17]        Q    The dispatcher?  And it says load
[18] number, what does that refer to?

[19]        A    The load, I mean the number of the
[20] load.

[21]        Q    Okay, who fills that in?

[22]        A    Dispatcher.

[23]        Q    All right.  Next we see the grower and
[24] there's a space there, does that identify the farm
[25] that you're going to?

Page 49

[ 1]      A    Yes.

[ 2]      Q    Let's take a look at the crew leader's

[ 3]   general duties, and I'd like to review some of these

[ 4]   with you and see if you agree these are the general

[ 5]   duties.  It is your responsibility to arrive at the

[ 6]   farm on time with your crew?

[ 7]      MR. MARTIN:  He needs to just follow

[ 8]   where you are.

[ 9]   BY MR. BREWER:

[10]      Q    Okay, sure.  Where I am, let me -- if

[11]   you want to take a moment to review the document --

[12]      A    Go ahead, I got you.

[13]      Q    You got me?  All right, I'm on Roman

[14]   Numeral II where it says, "Crew leader general

[15]   duties," do you see that?

[16]      A    Uh-huh.

[17]      Q    The first item there is listed as it's

[18]   the responsibility of the crew leader to arrive at the

[19]   farm on time, and I assume that's with your crew?

[20]      A    Yes.

[21]      Q    That is a responsibility that the crew

[22]   leader has?

[23]      A    Yes.

[24]      Q    Okay.  It also talks about dividing the

[25]   house into a minimum of four equal sections?

Page 50

[ 1]      A    Yes.

[ 2]      Q    Deciding how to catch the chickens,

[ 3]   where to place the pens and stuff is the crew leader's

[ 4]   responsibility?

[ 5]      A    Yes.

[ 6]      Q    You're supposed to tell the catchers

[ 7]   the number of birds to be placed in each compartment?

[ 8]      A    Yes.

[ 9]      Q    That's your job, right?

[10]      A    Yes.

[11]      Q    You're also responsible for, as it says

[12]   in item D, to catching birds in place at night, never

[13]   move the birds into less than 70 percent of the normal

[14]   floor space; that changes, I would assume, from time

[15]   to time?

[16]      A    Excuse me.

[17]      Q    Sure.

[18]      A    I ain't never seen that before.

[19]      Q    You have never seen this document

[20]   before?

[21]      A    No.

[22]      Q    Okay.

[23]      A    Not that, no, I haven't.

[24]      Q    All right.

[25]      A    No.

Page 51

[ 1]      Q    Well, when it comes to catching the

[ 2]   birds, I think we talked about this a little bit

[ 3]   before --

[ 4]      A    Yes.

[ 5]      Q    -- that's your decision as to how to

[ 6]   set up the pens and how you're going to go about doing

[ 7]   it?

[ 8]      A    Yes.

[ 9]      Q    On page 2 of the document at the top,

[10]   item E, it says that a crew leader is to continually

[11]   observe the uncaught birds and prevent smothers; would

[12]   you agree that that's the responsibility of a crew

[13]   leader?

[14]      A    Yes.

[15]      Q    Do you also agree that making sure the

[16]   cages are air stacked uniformly on the trailer, is

[17]   that your responsibility?

[18]      A    Yes.

[19]      Q    And when you say on the trailer, that's

[20]   the live haul trailer that we were talking about

[21]   before?

[22]      A    Yes.

[23]      Q    So you make sure the forklift operator

[24]   is doing it the right way so they're air stacked

[25]   appropriately?

Page 52

[ 1]      A    Yes.

[ 2]      Q    Just for purposes again for the record,

[ 3]   when we're talking about smothers, we're talking about

[ 4]   chickens who have died --

[ 5]      A    Right.

[ 6]      Q    -- because they have piled on top of

[ 7]   each other and suffocated?

[ 8]      A    Yes.

[ 9]      Q    That's what smother refers to?

[10]      A    Yes.

[11]      Q    Item G talks about in the summer making

[12]   sure the fans are left hanging and so forth, you can

[13]   read that.

[14]      A    Uh-huh, yes.

[15]      Q    That's also a responsibility the crew

[16]   leader has?

[17]      A    Yes.

[18]      Q    Okay.  It's also the crew leader's

[19]   responsibility not to load more than the specified

[20]   number of chickens --

[21]      A    Yes.

[22]      Q    -- per hole or per cage?

[23]      A    Yes.

[24]      Q    All right.  Fill out the farm ticket

[25]   accurately, we just went through that; you agreed, I

B0034

Page 53

[ 1]    believe, that was your responsibility to perform?

[ 2]        A    Yes.

[ 3]        Q    And then you're supposed to check with

[ 4]    the driver to make sure his load is secure?

[ 5]        A    Yes.

[ 6]        Q    Okay. The document goes on to talk

[ 7]    about catching methods, talks about night catching,

[ 8]    day catching --

[ 9]        A    Yes.

[10]        Q    -- and so forth, tunnel ventilation and

[11]    all of those things --

[12]        A    Yes.

[13]        Q    -- these are all responsibilities the

[14]    crew leader has --

[15]        A    Yes.

[16]        Q    -- to make sure these things are done?

[17]        A    Yes.

[18]        Q    Okay, all right. Now, let me ask you a

[19]    couple of questions, Mr. Garrison. If I repeat

[20]    myself, please forgive me. You mentioned before I

[21]    think that you maintain a crew of seven catchers?

[22]        A    Yes.

[23]        Q    There's also a forklift driver

[24]    associated with the crew, isn't there?

[25]        A    I don't pick him up.

Page 54

[ 1]        Q    No, no, I'm not asking you that, but

[ 2]    he's part of the crew?

[ 3]        A    Yes, he is. Yes, he is.

[ 4]        Q    And the forklift driver gets to the

[ 5]    farm by himself?

[ 6]        A    Yes.

[ 7]        Q    So we have then seven catchers and a

[ 8]    forklift operator is on a normal catching crew?

[ 9]        A    Yes.

[10]        Q    Okay. How is it determined who is on

[11]    your crew?

[12]        A    I picks them up and I writes the names

[13]    down on my time sheet.

[14]        Q    All right. So in other words, you know

[15]    the people who are on your crew?

[16]        A    Yes.

[17]        Q    Okay. Are employees ever assigned to

[18]    your crew that are not normally on your crew?

[19]        A    Repeat that question again.

[20]        Q    Sure. You have a regular crew

[21]    generally?

[22]        A    Yes.

[23]        Q    Does there come a time when somebody

[24]    who's not on your crew gets assigned to your crew?

[25]        A    What do you mean assigned? Just using

Page 55

[ 1]    that person that day, is that what you mean?

[ 2]        Q    Someone who's not normally a member of

[ 3]    your crew, have you ever worked with people who are

[ 4]    not normally members of your crew?

[ 5]        A    Yes.

[ 6]        Q    And how does that happen?

[ 7]        A    If I need somebody, if I'm

[ 8]    short-handed, I can get up with the dispatcher and I

[ 9]    would let him know that I need a man. Or if not, I

[10]    can get up with my supervisor and let him know that I

[11]    need a man. And what they would do, they would send

[12]    somebody out there with -- for me and help me catch

[13]    the chickens.

[14]        Q    Okay. But sometimes you catch them

[15]    short?

[16]        A    Sometime I do.

[17]        Q    Okay. Now, let me ask you this: You

[18]    are responsible, we have Exhibit 2 there that you're

[19]    looking at, you're responsible for ensuring that the

[20]    catchers, drivers, and the forklift operators follow

[21]    the procedures that are outlined there?

[22]        A    Yes.

[23]        Q    Okay. And I think you have already

[24]    talked about how you interact with the growers if the

[25]    feeders aren't up, and so you're responsible for that?

Page 56

[ 1]        A    Yes.

[ 2]        Q    Okay. You're also responsible for

[ 3]    maintaining the full crew, aren't you?

[ 4]        A    Yes, I am.

[ 5]        Q    You also have responsibility for

[ 6]    maintaining a good relationship with the growers,

[ 7]    aren't you?

[ 8]        A    Yes.

[ 9]        Q    And you basically are telling the

[10]    catchers, we went through this, how to go about

[11]    setting up the house and catching them, and watching

[12]    for smothers and everything else, right?

[13]        A    Yes.

[14]        Q    Okay, that's fine. All right, now, who

[15]    hires the catchers?

[16]        A    Doug Lynch.

[17]        Q    Doug Lynch? Okay. Have you ever

[18]    recommended to Mr. Lynch that a catcher be hired?

[19]        A    Yes.

[20]        Q    And has the catcher been hired?

[21]        A    Sometime. Sometime he not.

[22]        Q    Can you give me the name of catchers

[23]    that you have recommended to Mr. Lynch who have not

[24]    been hired?

[25]        A    Yes.

Page 57

[ 1]     Q    Okay.

[ 2]     A    I'm trying to think.  I mean it's not

[ 3]  that many I know of right off.  I know the only thing

[ 4]  I know maybe one of them, one of them like Woodell

[ 5]  Foreman, I recommend him one time, but it's -- he's

[ 6]  just been there before and he just didn't hire him

[ 7]  back, that's all.

[ 8]     Q    Let me sort of zero in on this now a

[ 9]  little.  The time that I'm referring to about

[10]  referring somebody, that's only since you have been a

[11]  crew leader, I'm not interested in when you were a

[12]  catcher, okay?  So since you have been a crew leader,

[13]  you recommended Mr. Foreman?

[14]     A    At one time I have, yes.

[15]     Q    And he had worked at the company

[16]  previously?

[17]     A    Before, yes.

[18]     Q    And how did he come not to be employed

[19]  by the company, if you know?

[20]     A    Repeat that.

[21]     Q    Was he fired?

[22]     A    I don't know.

[23]     Q    But he worked before and Mr. Lynch said

[24]  no?

[25]     A    Right, yes.

Page 58

[ 1]     Q    How many people have you recommended to

[ 2]  Mr. Lynch be hired and he has hired them?

[ 3]     A    Rough guess, maybe three.

[ 4]     Q    Three?  Okay.  Three or four, something

[ 5]  like that?

[ 6]     A    Yes.

[ 7]          MR. MARTIN:  For the record, he said

[ 8]  three.

[ 9]          MR. BREWER:  He said three, all right.

[10]  BY MR. BREWER:

[11]     Q    Is it three, or could it be more?

[12]     A    No, definitely couldn't be more.

[13]     Q    How did you go about making that

[14]  recommendation to Mr. Lynch?

[15]     A    I just asked him that I probably needed

[16]  another man, and I like you look to hire this guy.

[17]     Q    Okay.

[18]     A    And he asked me just bring him in, get

[19]  him signed up.

[20]     Q    That's what he told you?

[21]     A    Yeah.

[22]     Q    So in the three cases that we have

[23]  talked about, you have needed a man, gone to Mr. Lynch

[24]  and said, "I need a man, and I have this fellow," and

[25]  you have given him a name, and he has said, "Okay,

Page 59

[ 1]  bring him in, sign him up"?

[ 2]     A    Uh-huh.  Yes.

[ 3]     Q    We tried to get some information on

[ 4]  this before, but let me try this a little bit

[ 5]  differently, Mr. Garrison.  If somebody in your crew

[ 6]  needs to have a day off, okay?

[ 7]     A    Yes.

[ 8]     Q    They need to have tomorrow or let's say

[ 9]  next Monday off?

[10]     A    Yes.

[11]     Q    And that would make you short a

[12]  catcher?

[13]     A    Yes.

[14]     Q    How do you go about getting that man's

[15]  position filled for the Monday, just for the one day?

[16]     A    I would probably try get somebody off

[17]  another crew.

[18]     Q    Okay.  Describe what you would do to

[19]  make that happen.

[20]     A    I would get up with the crew leader.

[21]     Q    The other crew leader?

[22]     A    Yes.  And I would ask him could I use

[23]  somebody on his crew, if they were available.  And he

[24]  would get back up with me and let me know whether they

[25]  are or not.

Page 60

[ 1]     Q    All right.

[ 2]     A    You know, sometime I be able to use

[ 3]  one, sometimes I can't.

[ 4]     Q    Okay.  And does it ever happen that a

[ 5]  crew leader, another crew leader comes to you and

[ 6]  says, "I need somebody; can you assign somebody to my

[ 7]  crew for Monday?"

[ 8]     A    Yes.

[ 9]     Q    All right.  And you will make the

[10]  decision as to whether you can or can't?

[11]     A    Yes.

[12]     Q    Do you decide which person you're going

[13]  to assign to the other fellah's crew?

[14]     A    Yes.

[15]     Q    Okay.  Do catchers sometimes work

[16]  double shifts?

[17]     A    Yes.

[18]     Q    Tell me how that happens.

[19]     A    It would have to be on the right shift

[20]  for to be able to do it.  What I'm saying is, okay --

[21]     Q    Take your time.

[22]     A    If a catcher on night shift, he would

[23]  be able to work with somebody on the 1:00 o'clock

[24]  shift the next day he be off, that's the only way you

[25]  can do it.

Page 109

[ 1]  believe you said --

[ 2]      A    Yes.

[ 3]      Q    -- have always been the same?

[ 4]      A    Yes.

[ 5]      Q    Okay, let's go to the next -- before we

[ 6]  get into the next area, when you are out there with

[ 7]  your crews, catching, do the employees get a time to

[ 8]  take a break?

[ 9]      A    Yes.

[10]      Q    All right.  Who decides who gets to

[11]  break when?

[12]      A    I do.

[13]      Q    Okay.  Do the employees get a lunch

[14]  period?

[15]      A    Yes.

[16]      Q    And who decides when that lunch period

[17]  is going to be taken?

[18]      A    I do.

[19]      Q    This would be not quite as long as the

[20]  other one, this will be Number 5, please.

[21]          (Garrison Exhibit 5, marked for

[22]  identification.)

[23]  BY MR. BREWER:

[24]      Q    Mr. Garrison, the court reporter has

[25]  given you what's been marked for identification as

Page 110

[ 1]  Exhibit Number 5 to your deposition.

[ 2]      A    Uh-huh.

[ 3]      Q    Can you tell me on the first page whose

[ 4]  handwriting this is?

[ 5]      A    Mine's.

[ 6]      Q    All right.  First of all, there's a

[ 7]  date and I believe the date is June 2nd, '03?

[ 8]      A    Yes, it is.

[ 9]      Q    What's the name of the person?

[10]      A    Jasper Smith.

[11]      Q    Who is Mr. Smith?

[12]      A    He was one of my workers.

[13]      Q    One of your catchers?

[14]      A    Yes, he was.

[15]      Q    On your crew?

[16]      A    Yes.

[17]      Q    And what does this document show?

[18]      A    I was saying that he should let me know

[19]  when he's going to take off or call.

[20]      Q    Okay.

[21]      A    That's what I was saying.

[22]      Q    You're giving him disciplinary action,

[23]  are you not?

[24]      A    Yes.

[25]      Q    If you go down just above the signature

Page 111

[ 1]  line, and I'll read this, it says, "I have read this

[ 2]  warning and understand the above violation.  I

[ 3]  understand that disregard of company policies could

[ 4]  result in disciplinary action up to and including

[ 5]  discharge."  And then it continues, but it continues

[ 6]  in Spanish.

[ 7]      A    Yes.

[ 8]      Q    So this is a disciplinary write-up that

[ 9]  you gave to Mr. Smith?

[10]      A    Yes.

[11]      Q    And the reason is it says here he was

[12]  not home when you went to pick him up and he did not

[13]  call you?

[14]      A    Yes.

[15]      Q    So if he's not going to be available,

[16]  he's supposed to call you?

[17]      A    Yes.

[18]      Q    And he did not?

[19]      A    Yes.

[20]      Q    That's a violation of the company

[21]  rules?

[22]      A    Yes, it is.

[23]      Q    Am I reading this correctly that this

[24]  is the second violation --

[25]      A    Yes.

Page 112

[ 1]      Q    -- you circled?  And Mr. Smith signed

[ 2]  it --

[ 3]      A    Yes.

[ 4]      Q    -- correct?  And that is your signature

[ 5]  where it says supervisor?

[ 6]      A    Yes.

[ 7]      Q    Okay.  Page 2 of this is Mr. Smith

[ 8]  again; is this the same Mr. Smith that was on your

[ 9]  crew?

[10]      A    Yes.

[11]      Q    All right.  And is this again a

[12]  disciplinary warning that you have given Mr. Smith?

[13]      A    Yes.

[14]      Q    And what did he do that he shouldn't

[15]  have done?

[16]      A    Repeat that question.

[17]      Q    What did Mr. Smith do that he shouldn't

[18]  have done?

[19]      A    Didn't work.

[20]      Q    Okay.  Well, this is your handwriting,

[21]  sir?

[22]      A    Yes.

[23]      Q    Does it say he should let you know when

[24]  he takes off or call?

[25]      A    Yes.

Page 113

[ 1]    Q    And he was not at home when you went to
[ 2]  pick him up?
[ 3]    A    Yes.
[ 4]    Q    And this is on May 30th of '03?
[ 5]    A    Yes.
[ 6]    Q    And the one we looked at before was
[ 7]  June 2nd of '03?
[ 8]    A    Yeah.
[ 9]    Q    So this was his first violation?
[10]    A    Yes.
[11]    Q    And the one on June 30th was his second
[12]  violation?
[13]    A    Yes.
[14]    Q    Now, going back to the next sheet, it's
[15]  dated May 29, '03.
[16]    A    Yes.
[17]    Q    This is your handwriting?
[18]    A    Yes, it is.
[19]    Q    And this is Mr. Smith again?
[20]    A    Yes.
[21]    Q    This is the same Mr. Smith that we have
[22]  talked about before in the other two documents?
[23]    A    Yes.
[24]    Q    What did he do here?
[25]    A    The same thing.

Page 114

[ 1]    Q    Okay.  And this was an oral warning,
[ 2]  though?
[ 3]    A    Yes.
[ 4]    Q    So you had first given him an oral
[ 5]  warning about discipline?
[ 6]    A    Yes.
[ 7]    Q    Then you had given him a second
[ 8]  warning?
[ 9]    A    Yes.
[10]    Q    A first warning and then a second
[11]  warning?
[12]    A    Yes.
[13]    Q    Okay.  Whatever happened to Mr. Smith?
[14]    A    Still work.
[15]    Q    Still working?  So you were able to
[16]  straighten him out?
[17]        MR. MARTIN:  Objection to the form of
[18]  the question.
[19]        MR. BREWER:  Okay.
[20]        THE WITNESS:  I mean --
[21]  BY MR. MARTIN:
[22]    Q    He's still working?
[23]    A    He still work, you know.
[24]    Q    When did you leave the company?
[25]    A    I left the company on my vacation.  I

Page 115

[ 1]  left sometime the last of -- I think it was sometime
[ 2]  in August.
[ 3]    Q    Of '04?
[ 4]    A    Yes.
[ 5]    Q    Okay.  So from the time of June 2nd,
[ 6]  '03 when you gave Mr. Smith his second warning, he
[ 7]  continued to work for you and your crew?
[ 8]    A    Yes.
[ 9]    Q    Okay.  And you didn't have any problems
[10]  with him about not calling in and being at home when
[11]  you picked him up?
[12]    A    No.
[13]    Q    Okay.  The next one is a Mr. Clarence
[14]  Heath.
[15]    A    Yes.
[16]    Q    And tell me what this document is.
[17]    A    Being work on time.
[18]    Q    Okay.  Is this your handwriting, sir,
[19]  on this page?
[20]    A    Yes, it is.
[21]    Q    And read what the violation is.
[22]    A    "Clarence was late for work.  He came
[23]  to the second stop but I told him that I did not need
[24]  him, we went -- that we were just about done.
[25]  Unexcused."

Page 116

[ 1]    Q    And I see the third is circled?
[ 2]    A    Yes.
[ 3]    Q    And did you circle that?
[ 4]    A    No, I didn't circle it.
[ 5]    Q    You didn't circle the number 3?
[ 6]    A    No.
[ 7]    Q    Do you know who did?
[ 8]    A    No, I don't.  I didn't circle it.
[ 9]    Q    But all the other writing on here is
[10]  yours except where it says employee's signature?
[11]    A    Yes.
[12]    Q    Okay.  And then I'm looking at another
[13]  document, it's again Mr. Heath; is this your
[14]  handwriting?
[15]    A    Yes, it is.
[16]    Q    Can you tell me what the violation
[17]  reads?
[18]    A    "Clarence did not work on the day
[19]  because he say he has something to do.  Unexcused."
[20]    Q    And I see second is circled?
[21]    A    Yes.
[22]    Q    Did you circle that?
[23]    A    No, I don't.  No, I didn't.
[24]    Q    Okay, do you have any idea who did?
[25]    A    No, I don't.

B0038

Page 117

[ 1]   Q   Is there any other writing on this page
[ 2]   that is not your writing?
[ 3]   A   No.
[ 4]   Q   Okay.  The next page, it says this is
[ 5]   Mr. Heath again?
[ 6]   A   Yes, it is.
[ 7]   Q   Well, is all of the writing on this
[ 8]   page yours?
[ 9]   A   Yes, besides the circle, I don't think
[10]   I circled it.
[11]   Q   I was going to ask you --
[12]   A   I can't recall that I circled it, no.
[13]   Q   Okay.  And the violation is because he
[14]   was late for work, missed one load?
[15]   A   Yes.
[16]   Q   Okay.  Let's just for a second go back
[17]   to Mr. Smith on the very first page; I believe you
[18]   testified -- and if you didn't, correct me now,
[19]   please -- that you circled the second warning here?
[20]   A   No, I didn't say that.
[21]   Q   Okay, did you circle that?
[22]   A   No, I didn't.
[23]   Q   Okay.  Do you have any idea who would?
[24]   A   No, I didn't.
[25]   Q   How about the next page, first warning?

Page 118

[ 1]   A   No.
[ 2]   Q   And the page after that, oral warning?
[ 3]   A   No.
[ 4]   Q   So the circles, you did not circle any
[ 5]   of the --
[ 6]   A   No, I didn't.
[ 7]   Q   Okay.  But all of the other writing,
[ 8]   with the exception of Mr. Smith's signature and the
[ 9]   date he wrote in, and with the exception of the
[10]   Mr. Heath's third warning the line where he refused to
[11]   sign 12-27-02, Willie Davis, with the exception of
[12]   those two things, all the writing on these documents
[13]   is yours?
[14]   A   Yes.
[15]   Q   Okay.  Let me ask you this question,
[16]   sir:  Have you ever assigned a member of your crew to
[17]   operate the forklift who was not a forklift operator?
[18]   A   No.
[19]   Q   No?  Did you have people on your crew,
[20]   when you were there, who where certified as forklift
[21]   operators?
[22]   A   No.
[23]   Q   You didn't have any?  Periodically, did
[24]   you have occasion to operate the forklift?
[25]   A   Yes, I did.

Page 119

[ 1]   Q   And approximately how many times
[ 2]   through the course of a month, would you say?
[ 3]   A   I don't know, very seldom, maybe two,
[ 4]   one, two.
[ 5]   Q   Very seldom?
[ 6]   A   Yes.
[ 7]   Q   All right.  If you have to catch more
[ 8]   houses, can you authorize the people in your crew to
[ 9]   work overtime?
[10]   A   Repeat that one more time.
[11]   Q   If you have to catch additional birds,
[12]   can you authorize the people in your crew to work
[13]   overtime?
[14]   A   Can you be more specific?
[15]   Q   Okay, let me try.  Shall we say after
[16]   you finished, and your crew has finished catching
[17]   the chickens that you have had to catch that day --
[18]   A   Right.
[19]   Q   -- if somebody asked you if you had
[20]   somebody, a member of your crew, a catcher, that they
[21]   needed help, could you assign a person to go over and
[22]   help the other crew leader?
[23]   A   I can ask.
[24]   Q   I thought we talked about -- well, you
[25]   can ask?

Page 120

[ 1]   A   I can ask.
[ 2]   Q   So even if you could spare him, you
[ 3]   can't assign him over there?
[ 4]   A   No.
[ 5]   Q   Okay.  Can you ever require the
[ 6]   catchers in your crew to work more than eight hours in
[ 7]   a day?
[ 8]   A   Can you be more specific?
[ 9]   Q   I tell you what, not at this time.  Let
[10]   me try to make myself more clear because I want you to
[11]   understand the questions.
[12]   A   Excuse me.
[13]   Q   Sure.
[14]   A   I do understand the question.
[15]   Q   Oh, okay.
[16]   A   But what I'm saying by being more
[17]   specific, it's not an eight-hour job.
[18]   Q   No, I understand that.
[19]   A   Okay.
[20]   Q   But if you want somebody to work beyond
[21]   what they would normally work, my question is can you
[22]   require people to do that?  Do you have the authority
[23]   to do that?
[24]   A   I have authority for to get my job done
[25]   that day; it may be more than eight hours.

B0039

Page 121

[1]    Q    Okay, I guess that's the answer to the
[2]    question.
[3]    A    Yes.
[4]    Q    So you have authority to get your job
[5]    done, however long it takes?
[6]    A    Right.
[7]    Q    Whatever the conditions that you find
[8]    yourself, that's what you were talking about the
[9]    initiative you'd take to make the decisions and
[10]   everything else?
[11]   A    Yes.
[12]   Q    Okay, thank you.
[13]   A    Yes.
[14]   Q    Let's go off the record a minute.
[15]        (Whereupon, there was a discussion held
[16]   off the record.)
[17]        (Whereupon, a short recess was taken.)
[18]        MR. BREWER:  If you will mark this.
[19]        (Garrison Exhibit 6, marked for
[20]   identification.)
[21]   BY MR. BREWER:
[22]   Q    Mr. Garrison, I'm handing you a
[23]   document which has been marked as Exhibit Number 6 --
[24]   A    Yes.
[25]   Q    -- to your deposition.  And what I'd

Page 122

[1]    like you to do, please, is to take a look at page 9 of
[2]    the document.  And, by the way, when you get there --
[3]    go ahead, I'll let you get there first.
[4]    A    I'm there.  Yes.
[5]    Q    The title of the document says
[6]    Agreement between Mountaire of Delmarva, Selbyville,
[7]    and the International Brotherhood of Teamsters Local
[8]    355.
[9]    A    Yes.
[10]   Q    And it has an effective date of
[11]   December 16, '01, through December 18, '04?
[12]   A    Yes.
[13]   Q    And if you look at the back of the
[14]   document, hold on to page 9 for me, if you would, look
[15]   near the back of the document, the next to last page.
[16]   A    Yes.
[17]   Q    It says Schedule B.
[18]   A    Yes.
[19]   Q    And it talks about catchers.
[20]   A    Yes.
[21]   Q    Those are the catchers that would have
[22]   been in your crew?  Let me maybe try to state it
[23]   another way.  We talked earlier that the catchers who
[24]   worked in your crew --
[25]   A    Yes.

Page 123

[1]    Q    -- were members of a labor union.
[2]    A    Yes.
[3]    Q    The Teamsters Local 355 --
[4]    A    Yes.
[5]    Q    -- this group?  Are the catchers that
[6]    are listed or the catcher job classification that's
[7]    listed in Schedule B, would those be some of the
[8]    catchers who worked for you?
[9]    A    Yes.
[10]   Q    In other words, this contract covers
[11]   the catchers?
[12]   A    Oh, yes, yes.
[13]   Q    It covers catchers, that's what I'm
[14]   trying to get at.
[15]   A    Yes, okay.
[16]   Q    It also covers the forklift operators?
[17]   A    Yes.
[18]   Q    And it also covers live haul truck
[19]   drivers?
[20]   A    Yes.
[21]   Q    Okay.  Now go back to page 9, if you
[22]   would, for me, and look at Article 10, Section 1.
[23]   A    Yes.
[24]   Q    This talks about a complaint of
[25]   grievance or a dispute which arises out of the

Page 124

[1]    application or performance of the provisions of this
[2]    contract.  Do you see where I am?
[3]    A    Yes.
[4]    Q    Shall, in the first instance, be taken
[5]    up with the aggrieved employee or employees, who shall
[6]    first take the matter up with the shop steward.
[7]    A    Yes.
[8]    Q    Who in turn will take the grievance up
[9]    to the foreman in charge.  If one of your crew members
[10]   had a grievance or a complaint about this contract
[11]   being followed, would that person take that grievance
[12]   up with you, in the first place, or with the shop
[13]   stewart?
[14]   A    He would mention it to me, yes.
[15]   Q    Okay, okay, you are the person covered
[16]   in the first step of the grievance procedure which is
[17]   set out in the contract, okay, thank you.
[18]   A    Yes.
[19]        MR. BREWER:  Now, I'd like this packet
[20]   marked as Number 7.
[21]        (Garrison Exhibit 7, marked for
[22]   identification.)
[23]   BY MR. BREWER:
[24]   Q    Mr. Garrison, in front of you is a
[25]   document marked Exhibit 7 to your deposition.

B0040

Page 213

[ 1] forced to use your personal automobiles for pick-up,

[ 2] transport, and so forth?

[ 3]     A    Yes.

[ 4]     Q    I'll let you take a minute and read

[ 5] that, if you would, I just have a couple questions

[ 6] about that.

[ 7]     A    Okay.

[ 8]     Q    Okay?  I think you mentioned to us you

[ 9] received a payment every week for your vehicle which

[10] covers your full expenses, correct?

[11]     A    Yes.

[12]     Q    And the last number you gave me was

[13] what, I forget?

[14]     A    235.

[15]     Q    235?

[16]     A    Yes.

[17]     Q    Do you know if it's more now or not?

[18]     A    I'm not there.

[19]     Q    Well, I understand you're not, I was

[20] just asking if you do know?

[21]     A    No, I don't know.

[22]     Q    The 235, when did you get that, in

[23] 2004?

[24]     A    Yes, I did.

[25]     Q    Was it somewhat less the year before?

Page 214

[ 1]     A    I can't recall.  I know it was in 2004.

[ 2]     Q    What I'm trying to get at is it

[ 3] increases?

[ 4]     A    Yes.

[ 5]     Q    It increases every year?

[ 6]     A    It increases not every year.

[ 7]     Q    Okay, not every year?

[ 8]     A    No.

[ 9]     Q    But it does increase, okay.  Now, when

[10] it comes to the vehicle, who chooses what vehicle to

[11] buy?  If you're going to go out and buy a vehicle that

[12] you're going to use in work --

[13]     A    I do.

[14]     Q    -- you choose what vehicle you buy,

[15] right?

[16]     A    Yes.

[17]     Q    The kind of vehicle you can buy, the

[18] color?

[19]     A    Yes.

[20]     Q    You choose all that?

[21]     A    Yes.

[22]     Q    Whether you want leather or not,

[23] whether you want automatic windows or roll up, all of

[24] those decisions are made by you?

[25]     A    Yes.

Page 215

[ 1]     Q    And that's what you use?

[ 2]     A    Yes.

[ 3]     Q    Okay, that's fine.  Now, the next item,

[ 4] and this is really just for purposes of the record,

[ 5] the Complaint says -- and I don't expect you to know

[ 6] anything about this; if you do, that's fine, if you

[ 7] don't, that's also fine -- the Complaint says in

[ 8] paragraph -- mark this.

[ 9]             (Garrison Exhibit 16, marked for

[10] identification.)

[11] BY MR. BREWER:

[12]     Q    The Complaint says that we were put on

[13] notice by your counsel, Mr. Martin, by a letter dated

[14] February 27, 2004 and, if I'm not mistaken, isn't

[15] that close to the day that you wrote Mr. Martin's name

[16] down on your time sheet?  The record will speak for

[17] itself.  And it says we have continued such policies.

[18] Have you seen this document that's in front of you

[19] now?

[20]     A    No.

[21]     Q    I didn't expect you to see it, okay.

[22] This is a letter from me to Mr. Martin, responding to

[23] his letter of February 27.

[24]     A    Yes.

[25]     Q    Dated March 5.  Let's see.  Paragraph

Page 216

[ 1] 34 of the Complaint says that when the defendant

[ 2] learned of plaintiff's intentions to seek counsel, we

[ 3] immediately retaliated against plaintiffs, threatened

[ 4] plaintiffs with termination of their employment if

[ 5] they continued to pursue, okay?

[ 6]     A    Yes.

[ 7]     Q    Now, first of all, I want you to tell

[ 8] me when this occurred; what time are we talking about

[ 9] here?

[10]     A    I don't know what time.  You're on

[11] paragraph 34, right?

[12]     Q    I'm on paragraph 34.  Mr. Martin wrote

[13] a letter to the company on February 27th, I responded

[14] on March 5.

[15]     A    I don't know exactly what time it was.

[16]     Q    Was it in February, can you tell me?

[17] You may not be able to tell me the exact date, sir;

[18] can you tell me the month?

[19]     A    I can't recall the month.

[20]     Q    You can't even recall the month?

[21]     A    No, I can't.

[22]     Q    Okay, all right.  Who is the one who

[23] retaliated against you and threatened you with

[24] termination?

[25]     A    Al Z.

B0041

Page 217

[1]     Q    Al Z.

[2]         (Whereupon, there was a discussion held

[3]  off the record.)

[4]  BY MR. BREWER:

[5]     Q    We're talking about Mr. Al Z. is the

[6]  person who threatened you?

[7]     A    Yes.

[8]     Q    What did Mr. Al Z. say to you, sir?

[9]     A    Well, he came out on the farm and

[10]  issued me this letter, saying that if I don't make

[11]  them guys sit down and take a half-hour lunch, I would

[12]  be terminated.

[13]     Q    And he did this after you filed the

[14]  lawsuit?

[15]     A    Yes.

[16]     Q    Well, let's talk about that for a

[17]  minute, Mr. Garrison.  You are aware, are you not,

[18]  that the catchers, the people who worked for you,

[19]  filed a lawsuit claiming that they were entitled to

[20]  some overtime compensation, correct?

[21]     A    Yes.

[22]     Q    You know that?

[23]     A    Yes.

[24]     Q    All right.  And you know the reason for

[25]  their claim was that the time sheet that you, as the

Page 218

[1]  crew chief, crew leader, filled out, had an automatic

[2]  deduction of one-half an hour for lunch, right?

[3]     A    Yes.

[4]     Q    And as a practical matter, the people

[5]  weren't taking that half-an-hour for lunch, were they?

[6]     A    Yes.

[7]     Q    They were taking the half-hour for

[8]  lunch?

[9]     A    Well, yes, because if we waiting on a

[10]  truck, we still taking the half-hour lunch.

[11]     Q    Well, the lawsuit was settled on the

[12]  basis that the people were working through their lunch

[13]  and were never getting the half-hour paid lunch; are

[14]  you aware of that?

[15]     A    Yes, I am.

[16]     Q    You're aware of that?

[17]     A    Yes.

[18]     Q    And isn't that what Mr. Al Z. made sure

[19]  that you and every other crew leader understood, that

[20]  these people are in fact to take time off for one-half

[21]  hour for lunch, they're not to work through lunch?

[22]     A    I understood that.

[23]     Q    You understood that?

[24]     A    Yes, I did.

[25]     Q    All right.  So when Mr. Al Z. reminded

Page 219

[1]  you of that, you took that as a threat because --

[2]     A    Yes, I did, because he said it -- the

[3]  reason why I took that as a threat because he said --

[4]  actually he told it on himself, he said it's not a

[5]  threat.  I mean it --

[6]     Q    Okay.

[7]     A    So that's telling me -- what it's

[8]  telling me?

[9]     Q    Well, I don't know.

[10]     A    Okay.  Good question.

[11]     Q    I don't know.  What it would tell you

[12]  and what it would tell me might be different things.

[13]  But you don't know when this is?

[14]     A    I can't recall the month, no, I can't.

[15]     Q    So you don't know if it was before the

[16]  lawsuit or after?

[17]     A    No; it was after the lawsuit, yes.

[18]     Q    It was after the lawsuit?

[19]     A    Yes.

[20]     Q    So this occurred then in June, after

[21]  June?

[22]     A    Approximately.

[23]         MR. MARTIN:  All right, let me

[24]  interpose an objection.

[25]         MR. BREWER:  Sure.

Page 220

[1]         MR. MARTIN:  You keep mentioning the

[2]  lawsuit.  As you well understand, there was

[3]  correspondence prior to actually filing suit.

[4]         MR. BREWER:  Yes.

[5]         MR. MARTIN:  You and I understand that,

[6]  I'm not sure Mr. Garrison does.

[7]         MR. BREWER:  Okay, I'll be more than

[8]  happy to try to clear that up.

[9]  BY MR. BREWER:

[10]     Q    What your counsel is saying is that in

[11]  February, February 27th of 'O4, he wrote a letter to

[12]  the company saying that he thought that you were not

[13]  being properly compensated.

[14]         On March 5, I responded on behalf of

[15]  the company, saying you were being properly

[16]  compensated; you were supervisory and exempt under the

[17]  Fair Labor Standards Act, okay?  The lawsuit, this

[18]  litigation, was filed on June 18, 2004, okay?

[19]     A    Yes.

[20]     Q    My question to you, sir, is in a time

[21]  frame, you're claiming Mr. Al Z. threatened you --

[22]     A    Yes.

[23]     Q    -- with loss of your job, as it says in

[24]  this Complaint, okay?

[25]     A    Yes.

B0042

Page 221

[ 1]    Q    It says when the defendant learned of
[ 2]    plaintiff's intentions to seek counsel, we immediately
[ 3]    retaliated and threatened plaintiffs; that's what this
[ 4]    says.
[ 5]        A    Yes.
[ 6]        Q    Okay.  Now I want you to tell me when
[ 7]    that was, because that's important.
[ 8]        A    Right off the hand, I don't know exact
[ 9]    time or month, I just don't know right offhand.
[10]        Q    So you can't tell me whether it was in
[11]    February?
[12]        A    I know it was said.
[13]        Q    Okay, but you can't tell me whether it
[14]    was February?
[15]        A    No, I can't.
[16]        Q    Or March?
[17]        A    No, I can't.
[18]        Q    Or April?
[19]        A    No, I can't.
[20]        Q    Or May, or June?
[21]        A    No.
[22]        Q    But you know it was threatened?
[23]        A    Yes.
[24]        Q    All right.  And where did that occur?
[25]        A    On the farm.

Page 222

[ 1]    Q    Which farm?
[ 2]    A    I was to -- I'm trying to think of the
[ 3]    name of the farm.  I know where I was at.  What's the
[ 4]    name of that farm?  I can't think of the name of the
[ 5]    farm.  I know it's on a farm.
[ 6]        Q    You took Mr. Al Z.'s comments
[ 7]    seriously, did you not?
[ 8]        A    Yeah.
[ 9]        Q    I assume you did.
[10]        A    Of course.
[11]        Q    Yeah.  But you don't know when it
[12]    happened, and you can't tell me where it happened?
[13]        A    I can't think of the name of the farm.
[14]        Q    Okay.
[15]        A    I can carry you to the farm, but I
[16]    can't think of the name of the farm.
[17]        Q    But how many farms are there in --
[18]        A    I know that one, but I just can't think
[19]    of the name of the farm.  I know it was in Westover,
[20]    out there to the landfill, I can't think of the name
[21]    of the farm.
[22]        Q    So the location of the farm is where?
[23]        A    Is like you're going to the landfill
[24]    on -- I'm trying to think, it's --
[25]        Q    On Route 20?

Page 223

[ 1]    A    It's in Maryland.
[ 2]    Q    In Maryland?
[ 3]    A    I can't think of the name of the farm,
[ 4]    man.
[ 5]        Q    Okay.  Was anybody else present?
[ 6]        A    David Nuse.
[ 7]        Q    He was also present?
[ 8]        A    Yes.
[ 9]        Q    Did Mr. Nuse say anything to you?
[10]        A    No.
[11]        Q    He didn't say anything?
[12]        A    Al Z. done the talking.
[13]        Q    So it was just you, Mr. Nuse, and
[14]    Mr. Al Z.?
[15]        A    Yes.
[16]        Q    No one else was present?
[17]        A    No.
[18]        Q    Okay.  Did anybody else ever threaten
[19]    you with termination?
[20]        A    No.
[21]        Q    And this occurred only one time?
[22]        A    Yes.
[23]        Q    All right.  Did anybody threaten to
[24]    retaliate against you?  Because it says that they did.
[25]        A    Be -- can you be specific with that?

Page 224

[ 1]    Q    Well, all I'm reading is what's been
[ 2]    alleged in the Complaint; it said we immediately
[ 3]    retaliated against you.  Did anything bad happen to
[ 4]    you after, has anything bad happened to you outside of
[ 5]    what you just told me?
[ 6]        A    No, not bad, no.  No.
[ 7]        Q    Okay.  So what we have then is the
[ 8]    threat that you have just described?
[ 9]        A    Yes.
[10]        Q    Okay.  Now, the next paragraph talks
[11]    about receiving the final warning before termination;
[12]    is that the warning that you referred to about making
[13]    sure that the catchers received a 30-minute lunch
[14]    break?
[15]        A    Yes.
[16]        Q    That's what that refers to?
[17]        A    Yes.
[18]        Q    So you and all other crew leaders were
[19]    given that same warning?
[20]        A    Yes.  Yes.
[21]        Q    At the same time?
[22]        A    That, I don't know.
[23]        Q    All right.  Let me ask you this:  After
[24]    the catcher lawsuit was disposed of, did the people on
[25]    your crew always take a half-an-hour for lunch, or did

B0043

Page 225

[ 1]  they sometimes work through their lunch?

[ 2]       A    We always took a lunch.

[ 3]       Q    You always took a lunch?

[ 4]       A    Yes.

[ 5]       Q    Let me just ask this question this way,

[ 6]  Mr. Garrison, because this is interesting:  Is it your

[ 7]  testimony that the people on your crew from the time

[ 8]  you became a crew leader always took a half-an-hour

[ 9]  lunch each and every day they worked?

[10]            MR. MARTIN:  I'm going to object to the

[11]  question.  You can go ahead and answer, though.

[12]  BY MR. BREWER:

[13]       Q    That you never worked through lunch?

[14]       A    We always ate.

[15]       Q    Listen to my question.  Did you and

[16]  your crew always take one-half hour out, stop working,

[17]  stop working for one-half hour, and eat lunch?

[18]       A    Yes, we did.

[19]       Q    Always?

[20]       A    We always ate.

[21]       Q    You always took the half-an-hour?  I'm

[22]  not saying you always ate.

[23]       A    We always -- it might have been 35

[24]  minutes, could have been 40 minutes, but we always

[25]  took a lunch.

Page 226

[ 1]       Q    But you always took at least a

[ 2]  half-an-hour, maybe sometimes more, stopped working

[ 3]  and ate lunch?

[ 4]       A    Yes.

[ 5]       Q    And you never worked through lunch?

[ 6]            MR. MARTIN:  Same objection.

[ 7]  BY MR. BREWER:

[ 8]       Q    Okay.

[ 9]       A    It's according on -- it's according on

[10]  what shift that I'm on.  Because if I only have -- if

[11]  I'm on a 2:00 o'clock in the afternoon shift, if I

[12]  only have three loads, you know, you're done before

[13]  you even have lunch, so no on that deal.  It according

[14]  to what shift I was on.

[15]            You asking me a question that's not

[16]  available because I could be on a different shift; and

[17]  if you on a different shift, if you don't got but like

[18]  four loads or five loads, the time you get them, it is

[19]  lunch.

[20]       Q    Okay.  Well, then, let me ask you this:

[21]  If you're telling me, which I understand you to be

[22]  telling me, that your people, with the exception of

[23]  the time you have just mentioned now, were always

[24]  taking 30 or 40 minutes lunch, and you were told if

[25]  the people don't take 30 or 40 minutes lunch you're

Page 227

[ 1]  going to be terminated, why would that be threatening

[ 2]  to you?  Your people were taking their lunch.

[ 3]       A    Because it's a lawsuit that they did,

[ 4]  is that what you're saying?

[ 5]       Q    No, what I'm asking you is in paragraph

[ 6]  35 --

[ 7]       A    I know what you're saying.

[ 8]       Q    -- it says you received verbal

[ 9]  harassment and/or were issued a final warning before

[10]  termination in an attempt to threaten plaintiffs; I

[11]  want to ask you the final warning, is that the final

[12]  warning that you and all the other crew leaders got --

[13]       A    Yes.

[14]       Q    -- for making sure your people took

[15]  one-half-an-hour lunch?

[16]       A    Yes.

[17]       Q    That's the one we're referring to?

[18]       A    That's it.

[19]       Q    And crew leaders who were not part of

[20]  this lawsuit also got that letter, did they not?

[21]       A    Not --

[22]            MR. MARTIN:  I'm sorry, letter, what

[23]  letter?

[24]  BY MR. BREWER:

[25]       Q    The warning, the final warning.

Page 228

[ 1]       A    I got the letter.

[ 2]       Q    You got the letter?

[ 3]       A    Not the catchers.

[ 4]       Q    No, no, I'm saying the crew leaders --

[ 5]       A    Right.

[ 6]       Q    -- they all got them?

[ 7]       A    Yes.

[ 8]       Q    Even people who are not part of this

[ 9]  lawsuit that we're here today about?

[10]            MR. MARTIN:  Objection; he has no way

[11]  of knowing that.

[12]            THE WITNESS:  No, no, no.

[13]            MR. BREWER:  Well, he knows --

[14]            THE WITNESS:  No, no.

[15]  BY MR. BREWER:

[16]       Q    So you're telling me it's only the

[17]  people who are listed here that got that final

[18]  warning, is that your testimony?

[19]       A    All the crew leaders, yes, they did.

[20]       Q    All the crew leaders?

[21]       A    Yes.

[22]       Q    Okay.  I believe I was asking you about

[23]  the final warning.

[24]       A    Yes.

[25]       Q    And you said you felt threatened by it.

B0044

Page 229

[ 1]         A    Uh-huh.

[ 2]         MR. MARTIN:  The answer is yes, right?

[ 3]         THE WITNESS:  Yes.

[ 4]  BY MR. BREWER:

[ 5]         Q    And my question is I don't understand

[ 6]  why you would have felt threatened if, as you tell me,

[ 7]  your people were always taking at least a half-an-hour

[ 8]  off for lunch.

[ 9]         A    Because how he was telling me, that's

[10]  how.  Ain't got nothing to do with my people, had

[11]  something to do with how he's telling me, his actions.

[12]         Q    All right.  Okay, let's move on.  The

[13]  next paragraph talks about many of the plaintiffs have

[14]  been cornered by management personnel and questioned

[15]  regarding their discussions with counsel, which would

[16]  be Mr. Martin; have you ever been cornered by anybody

[17]  from management?

[18]         A    No.

[19]         Q    No?

[20]         A    No.

[21]         Q    Okay, so it doesn't apply to you.  Next

[22]  paragraph says that apparently there was a meeting

[23]  between the plaintiffs and counsel on a Saturday

[24]  morning, and that plaintiffs recognized vehicle or

[25]  vehicles owned or operated by the defendant's upper

Page 230

[ 1]  management personnel circling in the parking lot of a

[ 2]  diner.

[ 3]         A    Yes.

[ 4]         Q    This is the meeting that you talked

[ 5]  about earlier --

[ 6]         A    Yes.

[ 7]         Q    -- with Mr. Martin?

[ 8]         A    Yes.

[ 9]         Q    And you were told to keep time sheets?

[10]         A    Yes.

[11]         Q    Okay.  And that's when you mentioned

[12]  the other gentlemen who were plaintiffs in this case

[13]  were also at that diner?

[14]         A    Yes.

[15]         Q    Where is this diner located?

[16]         A    Doyle's Restaurant.

[17]         Q    And where is that?

[18]         A    Selbyville.

[19]         Q    That's in Selbyville?

[20]         A    Yes.

[21]         Q    Okay, is it close to the plant?

[22]         A    Yes.

[23]         Q    Okay.  And when did you meet, in the

[24]  morning?

[25]         A    Yeah, Saturday morning.

Page 231

[ 1]         Q    What time?

[ 2]         A    I'm thinking it was 9:00 o'clock, I

[ 3]  think.

[ 4]         Q    Now, did you recognize a vehicle owned

[ 5]  by the defendant's upper management circling the

[ 6]  parking lot?

[ 7]         A    Yes.

[ 8]         Q    Did you see that?

[ 9]         A    Yes.

[10]         Q    Who was driving the vehicle?

[11]         A    Phil Owens.

[12]         Q    Phil Owens was driving the vehicle?

[13]         A    Yes.

[14]         Q    And you saw him circling in the parking

[15]  lot?

[16]         A    Yes.

[17]         Q    Now, what makes you think it was about

[18]  your lawsuit?

[19]         A    I don't know, good question.

[20]         Q    This is prior to Mr. Martin's letter,

[21]  isn't it?

[22]         A    Right.

[23]         Q    Mr. Owens had no idea anything was

[24]  going on?

[25]         A    I don't know that.

Page 232

[ 1]         Q    Well, it's prior to Mr. Martin's

[ 2]  letter?

[ 3]         A    Yes.

[ 4]         Q    So what you see is Mr. Owens driving

[ 5]  around --

[ 6]         A    Yes.

[ 7]         Q    -- at a diner that is open to the

[ 8]  public?  People can come in there and have breakfast,

[ 9]  anybody?

[10]         A    Yes.

[11]         Q    Okay.  So what you see is him driving

[12]  around, and that's what you're referring to here?

[13]         A    Yes.

[14]         Q    You're sure it was Mr. Owens?

[15]         A    I think it was Mr. Owens, yes.

[16]         Q    Is that the only time that this is

[17]  referring to?

[18]         A    Yes.

[19]         Q    Okay.  What kind of car did you see

[20]  Mr. Owens driving?

[21]         A    I think it was a gray car.

[22]         Q    What kind?

[23]         A    Ford, Mountaire Ford.

[24]         Q    A gray Mountaire Ford?

[25]         A    Yes.

B0045