TAB 6

# Transcript of the Testimony of
# Larry E. Gibbs

**Date:** January 20, 2005
**Volume:** 1

Printed On: January 31, 2005

Zeve Reporting & Videoconferencing
11032 Nicholas Lane
Suite A201
Berlin, Maryland  21811
Phone: (410)208-4566
Fax: (410)208-4767
Email: info@kathyzeve.com
Internet: www.zevereporting.com

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 1

```
 1                    UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF DELAWARE

 3

 4     WILLIE DAVIS, JR., et al.,        *

 5                                       *

 6                    Plaintiffs,        *

 7            v.                         *    Civil Action No.

 8     MOUNTAIRE FARMS, INC., et al.,    *    04-414

 9                                       *

10                    Defendants.        *

11              *      *      *      *      *      *      *

12

                      Georgetown, Delaware

13

14                    Thursday, January 20, 2005

15

       Deposition of:

16

                      LARRY E. GIBBS

17

               a witness, called for examination by Counsel for

18     Defendants, pursuant to notice, taken at the Law Offices of

       Young, Conaway, Stargatt & Taylor, 110 West Pine Street,

19     Georgetown, Delaware, commencing at 10:05 a.m., before Kathy

       A. Zeve, a Notary Public and Registered Professional

20     Reporter in and for the State of Delaware, when were present

       on behalf of the respective parties:

21
```

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 30

1   don't know what she works.
2      Q   But they don't work in the poultry industry?
3      A   No.
4      Q   Okay.  All right, sir.  Do you have any dependants
5   outside of your wife?
6      A   Yes, one daughter.
7      Q   Okay.  And how old is she?
8      A   Fifteen.
9      Q   Okay.  Is she in school?
10     A   Yes.
11     Q   Okay.  Is that the only other dependant outside of
12  your wife that you have is your daughter?
13     A   That is the only one.
14     Q   Okay.  Do you attend church on a regular basis,
15  sir?
16     A   No.
17     Q   Okay.  What is the highest level of education that
18  you've achieved?
19     A   Eleventh grade of high school.
20     Q   And what school was that at?
21     A   William C. Jason.

Page 31

1      Q   William C. Jason.  How would I classify that, is
2   that a high school or middle school?
3      A   It was a high school.  It's Delaware Tech now in
4   Georgetown.
5      Q   Okay.  I know where that is, that was a high
6   school.  Let me ask you this.  Do you have any
7   certifications or licenses like for a forklift or a CDL
8   license or anything like that?
9      A   No.
10     Q   Okay.  And I believe you told me that your mental
11  health is good, and there's no issue there that would impact
12  on your testimony here today?
13     A   No.
14     Q   Okay.  When were you first employed with the
15  company, sir?
16     A   May 9th, 1994.
17     Q   Okay.  5/9, you said, the 9th May?
18     A   The 9th of May, 1994.
19     Q   Okay.  And prior to work -- coming to work for
20  Mountaire, where did you work?
21     A   Hudson Food.

Page 32

1      Q   Hudson, okay.  And how long did you work there?
2      A   For three years.
3      Q   And what job did you have there?
4      A   I was a crew leader there.
5      Q   You were a crew leader for Hudson.  And prior to
6   Hudson?
7      A   Allen's.
8      Q   Allen's where?
9      A   In Harbeson, Delaware.
10     Q   In Harbeson?
11     A   Uh-huh.
12     Q   Okay.  And what job did you have there?
13     A   Crew leader also.  I was a crew leader there.
14     Q   And how long were you there?
15     A   Seventeen years.
16     Q   Okay.  Can you tell me why you left Allen's and
17  went to Hudson?
18     A   For better pay.
19     Q   Okay.  So you were a crew leader at Allen's of
20  Harbeson and also a crew leader at Hudson.  Did you -- when
21  Hudson was bought out by Tyson, did you work for Tyson at

Page 33

1   all?
2      A   No.
3      Q   That happened -- you left Hudson to come to
4   Mountaire?
5      A   Yes.
6      Q   Okay.  When you were at Hudson as a crew leader,
7   were you, if you know, employed by Hudson or were you
8   considered an independent contractor?
9      A   Independent contractor.
10     Q   Okay.  So you while you were at Hudson, were used
11  on a contract basis?
12     A   Yes.
13     Q   How many people did you have in your crew when you
14  were at Hudson?
15     A   Oh, I had eight catchers at Hudson, I think, yes,
16  eight.
17     Q   You did not, while you were at Hudson, receive any
18  benefits from the company, did you?
19     A   No.
20     Q   And by that I mean, any medical insurance, paid
21  holidays, paid vacation or anything like that, did you?

9 (Pages 30 to 33)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 34

1    A   No.
2    Q   Nothing like that. And while you were at Allen's
3  in Harbeson for those 17 years, how many people did you have
4  in your crew roughly?
5    A   Nine.
6    Q   About nine, okay. And you were considered a
7  contractor at Allen's also, weren't you?
8    A   Yes. Yes.
9    Q   And from Allen's, you didn't receive any benefits,
10  any medical insurance or paid holidays or paid vacation or
11  anything along those lines, did you?
12    A   No.
13    Q   Okay. And you were in charge of the crews that
14  you had at Hudson and at Allen's?
15    A   Yes.
16    Q   Okay. Since you've become employed with Mountaire
17  in '94, have you had any break in service?
18    A   No.
19    Q   Okay. When you first came to Mountaire, did you
20  come to them as a crew leader?
21    A   Yes.

Page 35

1    Q   Mr. Gibbs, your job as a crew leader at Mountaire,
2  are you basically responsible for managing that crew?
3    A   I'm not sure what mean.
4    Q   Okay. Are you the person in charge of the crew?
5  I'll put it that way.
6    A   Yes.
7    Q   Okay. Similar to the way you were in charge of
8  the crew when you worked for Hudson and Allen's, it was your
9  crew and you told them where to go and what to do and things
10  like that?
11    A   Yes.
12    Q   How many employees are in your crew now at
13  Mountaire?
14    A   Eight.
15    Q   You have eight?
16    A   Yes.
17    Q   Does that include the forklift operator?
18    A   No, it doesn't.
19    Q   So eight plus a forklift. Okay. When you worked
20  at Hudson, the catchers who worked for you were not
21  unionized, were they?

Page 36

1    A   No.
2    Q   And the same is also true of Allen's, isn't it?
3    A   (Witness nods.)
4    Q   Now, at Mountaire the employees are unionized, are
5  they not?
6    A   Yes.
7    Q   Okay. And they're covered by a union contract?
8    A   Yes.
9    Q   And that contract does not apply to you, does it?
10    A   No.
11    Q   Okay. The forklift operator, who is the forklift
12  operator who's in your crew now?
13    A   George Feddiman.
14    Q   George Feddiman. The same Mr. Feddiman who's
15  listed as a Plaintiff in this lawsuit?
16    A   Yes.
17    Q   And how long has Mr. Feddiman been your forklift
18  operator approximately?
19    A   Twenty years.
20    Q   He's been the forklift operator on your crew for
21  20 years?

Page 37

1    A   Yes.
2    Q   Just to be clear, when I asked you about meetings
3  that you had with Mr. Martin and so forth, you mentioned
4  that he was there. Was Mr. Feddiman ever a crew leader?
5    A   Yes.
6    Q   Okay. When, if you know, did he stop becoming a
7  crew leader?
8    A   I don't know.
9    Q   Okay. Is he related to you in any way?
10    A   He's my brother.
11    Q   Mr. Feddiman's your brother?
12    A   Yes.
13    Q   Okay. So now, can you tell me why he has a
14  different last name, I guess, would be my first question?
15    A   No.
16    Q   You don't know why he has a different last name
17  than you do?
18    A   Yes. He has my -- my mother's last name is
19  Feddiman. My father is Gibbs.
20    Q   And he chose your mother's last name for his name?
21    A   He didn't, no.

10 (Pages 34 to 37)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 50

1    Q    He's a catcher?
2    A    Yeah.
3    Q    Okay. All right. Now, when you're on the farm,
4  whatever farm it happens to be and you're there with your
5  crew, you're the one who basically directs that crew; isn't
6  that correct?
7    A    Yes.
8    Q    Okay. When you first get to a farm, depending on
9  the type of house it is, you're the guy who figures out how
10  we're going to catch the chickens in this house, correct?
11    A    Yes.
12    Q    Okay. And there are a lot of different techniques
13  that can be used in catching chickens; isn't that true?
14    A    There's a few, yes.
15    Q    And that will depend on the house to some extent?
16    A    It may also depend on the size of the bird to some
17  extent. Yes.
18    Q    And you are the one who's involved in deciding how
19  we're going to go about catching the chickens in this
20  particular house depending on those circumstances?
21    A    Yes.

Page 51

1    Q    Do you have as a crew leader any responsibility
2  for the safety of your crew?
3    A    Yes.
4    Q    Okay. Tell me what that responsibility entails.
5    A    Just making sure all the equipment and stuff
6  inside the chicken house that we catching is out of the way.
7    Q    This is for the safety of your people?
8    A    Yes.
9    Q    So you're responsible for making sure that that's
10  taken care of?
11    A    (Witness nods.)
12    Q    And how do you fulfill that responsibility?
13    A    I can't all the time.
14    Q    I'm sorry. I didn't understand your answer.
15    A    You say, how do I fulfill it?
16    Q    Yeah. How do you go about saying what you just
17  told me? I have to look out for the safety of my people,
18  that's your responsibility. And you have to make sure the
19  equipment is out of the way. You said that's one of the
20  ways you look out for their safety. I just want to know,
21  how do you do that? Do you go inside the house and look

Page 52

1  around, what do you do?
2    A    Yes, I do.
3    Q    Do you talk to the farmer at all?
4    A    Yes.
5    Q    So that's how you fulfill that responsibility by
6  personally observing things?
7    A    (Witness nods.)
8    Q    And if -- I didn't mean to cut you off. If you
9  see something that you don't think is appropriate, what do
10  you do?
11    A    Try to fix it.
12    Q    Okay.
13    A    Or make it safe for the catchers or get it out of
14  the way, a foreign object and stuff.
15    Q    Okay. That's what I would expect. You are
16  also -- have some responsibility with respect to the
17  property, don't you?
18    A    Yes.
19    Q    You're responsible for making sure your people
20  work in such a way as to not damage the farm?
21    A    Yes.

Page 53

1         MR. BREWER: I'll tell you, it's a few minutes
2  early, but this might be a good time to take a break.
3  Why don't we take about a five- or ten-minute break and
4  come back.
5         MR. MARTIN: Okay.
6         (Off the record.)
7  BY MR. BREWER:
8    Q    Mr. Gibbs, when you left Hudson Foods, did you and
9  your entire crew come to work for Mountaire?
10    A    Yes.
11    Q    Okay. Thank you. Sir, I'm going to show you an
12  exhibit to Mr. Garrison's deposition. It's Garrison Exhibit
13  No. 1. I'll give you that. This is an exhibit to
14  Mr. Garrison's deposition. Do you recognize this document?
15    A    Yes.
16    Q    Okay. Tell me what it is.
17    A    It's a -- we call it a farm ticket which the crew
18  leaders fill out.
19    Q    Okay. So you would fill this out?
20    A    Yes.
21    Q    And up at the top, I see it says, date. Would you

14 (Pages 50 to 53)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 54

1  fill the date in?
2      A    Yes.
3      Q    And where it says, lot number, would you fill that
4  in?
5      A    No.
6      Q    How about load number?
7      A    No.
8      Q    Grower, would you fill that information in?
9      A    Yes.
10     Q    Houses, would you fill that information in?
11     A    Yes.
12     Q    And the time started, what time is that?
13     A    The time started on loading the chickens, loading
14  the trailer.
15     Q    Loading the chickens?
16     A    Yes.
17     Q    Into the cages?
18     A    Yes.
19     Q    The time you start?
20     A    Yes.
21     Q    And who fills that in?

Page 55

1      A    The crew leaders.
2      Q    So you would fill that in?
3      A    I would, yes.
4      Q    How about time finished?
5      A    I would fill than in also.
6      Q    And when do you enter the time finished, what time
7  is that?
8      A    When the chickens are finished loaded on that
9  particular trailer or load.
10     Q    On that particular load?
11     A    Yes.
12     Q    So every time there's another load coming in, you
13  fill out another ticket?
14     A    Yes.
15     Q    Okay. So if it took four or five live haul trucks
16  to empty a house, you would fill out four or five of these
17  tickets?
18     A    Yes.
19     Q    Now, is the -- does the time started change, then?
20     A    Does the time start and change?
21     Q    Yes.

Page 56

1      A    On each load, you mean?
2      Q    Yes.
3      A    Yes.
4      Q    So, for example, if you started working at
5  midnight, the first load you would write in the time you
6  started it being midnight?
7      A    Yes.
8      Q    And if you finished the first load at 1:30 in the
9  morning, you would then write in 1:30?
10     A    Yes.
11     Q    And then the second trailer comes, and you would
12  write in 1:30 at time started?
13     A    Yes.
14     Q    And when you finished until you go through the
15  entire thing. So that's your responsibility to fill that
16  out?
17     A    Yes.
18     Q    Temperature, who fills that out?
19     A    I don't know who fills that out.
20     Q    You don't, though?
21     A    No, I don't.

Page 57

1      Q    Number of doors?
2      A    I fill that out.
3      Q    Okay. And then do you fill out a total?
4      A    Yes.
5      Q    And do you fill out the average weight?
6      A    No.
7      Q    Okay. Let's go down below the line where there's
8  a series of boxes, yes and no. It says, sign present. Who
9  fills that out?
10     A    I do.
11     Q    And when it says, sign present, what does that
12  mean?
13     A    That's a sign with the grower name on it. It's
14  because a lane sign -- end of the lane to the chicken
15  houses.
16     Q    So if I were a grower, it would say Brewer's farm;
17  is that what you mean?
18     A    Yes.
19     Q    And you would check whether the sign was up or
20  not?
21     A    Yes.

15 (Pages 54 to 57)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 58

1  Q   Okay.  And if it's not up, what do you do?
2  A   I mark the no box.
3  Q   And what happens when you mark the no box?
4  A   The serviceman, I think, would be notified, and
5  they would put a sign out there.
6  Q   So you're responsible for letting the company know
7  whether the sign is up or not?
8  A   Yes.  By filling this out, they would know that,
9  yes.
10  Q   How about grower present; do you fill that out?
11  A   Yes.
12  Q   What does that mean?
13  A   Whether the grower was present when we were
14  catching the chickens.
15  Q   Does that mean he was present actually watching
16  you?  If you came at midnight at night and the grower's
17  asleep, how would you check that box?
18  A   I would check no, then, if he wasn't there.
19  Q   So when the grower is present, the grower is
20  physically there watching you catch?
21  A   Just when I arrive on the farm.  The grower

Page 59

1  doesn't stay the entire time, but just when we arrive on the
2  farm if he's present.
3  Q   So if he's present, then you check that?
4  A   Yes.
5  Q   DAFs prior to catch.  What's a DAF, for the
6  record?
7  A   That would be dead at farm.  That would be the
8  dead bird -- dead chickens inside the chicken house before
9  we started working.
10  Q   And who checks that box?
11  A   Really, at times I don't even check that box
12  myself.  I don't, I used to, but I don't check that anymore.
13  Q   When you used to check it --
14  A   I checked it myself.
15  Q   Okay.  And when you did check it, how would you go
16  about determining whether there were dead chickens at the
17  farm?
18  A   By walking through the chicken house before we
19  started catching the birds.
20  Q   So you would walk through the house?
21  A   Yes.

Page 60

1  Q   And what would you be looking for?
2  A   Dead birds.
3  Q   And any particular number, just to see if there
4  were any at all?  That's what you were looking at?
5  A   Mostly I would just check to see was there a large
6  amount.  More than average, I would say.
7  Q   Okay.  What would you say would be the average?
8  A   I would look at the mortality charts and see how
9  many they grow.  It would be losing -- like if they was
10  losing ten, if it was a lot more than ten before I started
11  catching, I would mark yes.
12  Q   And would you have a mortality chart with you?
13  A   No.
14  Q   How would you know what the mortality chart said?
15  A   It's placed somewhere inside the chicken house.
16  Q   Okay.  So when you arrive at the farm, do you go
17  to look for the mortality chart?
18  A   At times.  Not all the time.
19  Q   Okay.  Now, you said -- when you were checking
20  this box -- I'm trying to understand your procedure.  You
21  would go in yourself, you would walk around the house, see

Page 61

1  how many dead chickens there were, and then look at the
2  mortality chart to see if it was more than you would expect?
3  A   Yes.
4  Q   That's what you would do?
5  A   Yes.
6  Q   And then you would check this box?
7  A   Yes.
8  Q   And you said you don't check this box any longer,
9  correct?
10  A   Correct.
11  Q   Why not?
12  A   No reason.
13  Q   You just decided you didn't need to check it
14  anymore?
15  A   Yes.
16  Q   Okay.  The next box says, firefan used.  Do you
17  check that box?
18  A   Yes.
19  Q   Okay.  And who decides whether a firefan should be
20  used?
21  A   We use it all the time now year round if -- in

16 (Pages 58 to 61)

B0052

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 62

1  conventional houses. Houses that are not tunneled, we used
2  it. So automatically if there's no tunnel house, we use a
3  firefan.
4     Q  Who decides to use it? The crew leader does,
5  doesn't he?
6     A  Oh, yes.
7     Q  Okay.
8     A  I decide to use them, yes.
9     Q  That's fine. Chickens watered. Who checks that
10  box?
11    A  I check that box.
12    Q  And how do you decide whether the chickens -- how
13  do you decide whether to check the box yes or no?
14    A  If the chickens -- this only happened during the
15  summer months.
16    Q  Okay.
17    A  And if the chickens are watered, I mark yes. If
18  not, I mark no.
19    Q  How do you know that they have been watered is my
20  question?
21    A  The truck driver does it. Eventually I see him

Page 63

1  doing it.
2     Q  So the watering of the chickens that this box
3  refers to is after the chickens have been put in the cages
4  and loaded onto the truck?
5     A  Yes, that's correct.
6     Q  Okay. Who tells the driver to water the chickens?
7     A  Crew leaders.
8     Q  Okay. The next box says feeders up, do you check
9  that box?
10    A  Yes.
11    Q  And how do you decide whether to check yes or no?
12    A  If the feeders are raised so the chickens can't
13  eat the feed, I mark, yes. If they're still down where the
14  chickens are still feeding, I mark, no.
15    Q  And you fill that out by going into the house?
16    A  Yes.
17    Q  And looking to see whether the feeders are up or
18  down?
19    A  Yes.
20    Q  How about waters up, how do you decide which box
21  to check there?

Page 64

1     A  Same procedure. Going in the house and looking,
2  seeing if the water is up.
3     Q  Stoves up?
4     A  Same way.
5     Q  Again, you go into the house and you're observing.
6  So when you're going into the house, you're looking to see
7  if the feeders are up, if the water is up, if the stoves are
8  up?
9     A  Yes.
10    Q  Okay. And then you -- depending on what you find,
11  you check whatever box is appropriate?
12    A  Yes.
13    Q  The next item is farm damage, do you check that
14  box?
15    A  If there's farm damage, yes.
16    Q  Tell me, please, how you decide whether to check
17  the box yes or no, whether there's farm damage or not.
18    A  Most of the -- most of the farm damage is done by
19  the forklift operators, and he tells me if there's any
20  damage -- if he hit, like, a pole or running into the
21  chicken house. If he does, then I mark there's farm damage,

Page 65

1  I mark, yes.
2     Q  Before you start to catch, do you take a look at
3  the chicken house to see if there's any damage that's
4  already there?
5     A  No.
6     Q  You don't?
7     A  I don't inspect thoroughly, but most of the time
8  if there's damage, I can see it mostly. If there's damage,
9  I can see it most of the time.
10    Q  So before you start, you'll take a quick look at
11  the house to see if there's any damage done already?
12    A  When I'm walking through, yes, I'll be looking for
13  damage. Yes.
14    Q  Okay. And then if you see no damage, do you check
15  the box no?
16    A  Most of the time, I just leave that space empty
17  too. I don't mark yes or no. Unless there's farm damage.
18  If there's no farm damage, I don't mark no most of the time.
19    Q  Why did you decide not to check this box?
20    A  I don't know. Just --
21    Q  Okay. But you decided not to check it?

17 (Pages 62 to 65)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 70

1  you mentioned that something will -- somebody will come out
2  and somehow straighten out the entrance and the litter
3  condition, okay, if I understood you correctly?
4      A   Not right then.  Later.
5      Q   Later?
6      A   Maybe possibly, yes.
7      Q   Right.  That's later.  And who is it, if you know,
8  that comes out and does that?
9      A   David Nuse -- when I find the situation
10 unacceptable, I call our assistant live haul manager, and
11 David Nuse comes out, and it's his responsibility then.
12     Q   So your responsibility is to let David Nuse
13 know --
14     A   Yes.
15     Q   -- when you see these things that are
16 unacceptable, and you do that?
17     A   Yes.
18     Q   All right.  Take a look at this next document
19 which is Exhibit 2.  This is Exhibit 2 to Mr. Garrison's
20 deposition.  I want to ask you a couple questions.  Let me
21 ask you this about the crew.  Who determines the size of the

Page 71

1  crew?
2      A   Mountaire.
3      Q   Okay.  And I think you testified, just to be sure,
4  you have eight catchers on your crew and one forklift
5  operator; am I remembering that correctly?
6      A   Yes.
7      Q   Thanks.  Okay.  Take a look at this document, and
8  look under item number two, Roman numeral two, and it talks
9  about the crew leader's general duties.  The first one is to
10 arrive on the farm at the correct time.  Would you agree
11 that's a responsibility that you, as a crew leader, have, to
12 be on time?
13     A   Yes.
14     Q   Second one talks about dividing the house, and --
15 into four sections, and then talks about various other
16 combinations that you might do.  Is that your responsibility
17 as a crew leader to make sure that the house is set up to
18 catch the right way?
19     A   Yes.
20     Q   And I think you mentioned when you had a new
21 crew -- when you had a new catcher on your crew, one of the

Page 72

1  things that you would tell that person was how to set up the
2  house?
3      A   Yes.
4      Q   So it's up to you to decide how to set up the
5  house to catch?
6      A   Yes.
7      Q   You also tell the catchers the number of birds to
8  be placed in each cage in the compartment?
9      A   Yes.
10     Q   When catching the birds at night and the movement
11 here, is that your responsibility to make sure that this
12 guideline is carried out?
13     A   Yes.
14     Q   Okay.  It talks about observing uncaught birds and
15 to prevent smothers; is that also your responsibility?
16     A   Yes.
17     Q   So as the crew is catching the birds in the house,
18 one of the things you're responsible for is watching them
19 making sure the uncaught birds don't smother themselves?
20     A   And we have one of the catchers, we call him the
21 house man.  It's also his duty, too, to make sure that --

Page 73

1      Q   Okay.  Who is your house man?
2      A   My catchers rotate.  All of them take turns being
3  a house man.
4      Q   So you're ultimately responsible, but you have
5  somebody else that you delegate that or you give that
6  authority to, to watch also?
7      A   Yes.
8      Q   Making sure the cages are stacked uniformly on the
9  trailer, is that also one of your responsibilities?
10     A   Myself and the truck drivers also.
11     Q   Okay.  But you have a responsibility to make sure
12 that's done?
13     A   Yes.
14     Q   And if it's not, can you tell the truck driver he
15 has to change something?
16     A   Tell the forklift operator.
17     Q   You tell the forklift operator.  You instruct him
18 to make the change.
19     A   Yes.
20     Q   Okay.  Item G talks about in the summer, making
21 sure that the fans are left hanging until the birds have

19 (Pages 70 to 73)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 74

1    been caught. Again, is that a responsibility that you have?
2    A    Yes.
3    Q    Okay. Not loading more than the specified number
4    of chickens per door?
5    A    That also, yes.
6    Q    So if some of the catchers are putting more
7    chickens in a hole than they should, it's your
8    responsibility to say, stop, that's too many?
9    A    Yes.
10    Q    And, of course, we went over filling out the farm
11    ticket. You already talked about that. And then it talks
12    about checking with the driver to make sure the load is
13    secure, that's one of your responsibilities also?
14    A    Yes.
15    Q    If we go down to item three, this talks about
16    various catching methods. There's listed in item A, a night
17    method. In item B, there's a day catching method. Take a
18    look at those, if you would, and tell me if it's your
19    responsibility to make sure what is written here you take
20    care of.
21    A    Yes. That's my responsibility also, yes.

Page 75

1    Q    Okay. Now, some of these things that are listed
2    here, I mean, they are -- let's talk about general duties --
3    may change depending on the house and the time of the year
4    and the number of birds and things like that. So, for
5    example, where it says in item C, it says, the house should
6    be divided into a minimum of four large pens. You might
7    decide that there is fine; isn't that true?
8    A    Yes.
9    Q    So it's up to you to make those calls. Okay.
10    A    Yes.
11    Q    Tunnel ventilation, again, is that the
12    responsibility of the crew leader and your responsibility?
13    A    In conventional houses, yes.
14    Q    Okay. Now, we go back to Roman numeral three on
15    this exhibit, and you'll see tunnel houses. Do you see
16    that? I think you need to turn the page. Next page. And
17    the page after that. Next page. There you go. See tunnel
18    houses?
19    A    Yes.
20    Q    Take a look at those things there and tell me if
21    that's your responsibility to make sure that these things

Page 76

1    occur as they should.
2        MR. MARTIN: Let's make sure we're on the same
3    page. Are you referring to Roman numeral three under
4    that?
5        MR. BREWER: That's correct.
6        MR. MARTIN: I think he's on the page before
7    that.
8        MR. BREWER: I think he's on --
9        MR. MARTIN: Let me direct him to the right
10    page, then.
11        MR. BREWER: Sure.
12        MR. MARTIN: This is what you're referring to
13    here, Mr. Brewer.
14    BY MR. BREWER:
15    Q    Roman numeral three says, tunnel houses. That's
16    where I want you to take a look at.
17    A    Yes.
18    Q    Okay. And you have discretion in some cases here
19    to follow this or not follow that. That would be up to you
20    to decide?
21    A    Yes.

Page 77

1    Q    Is the same also true of the two little things
2    that are mentioned here about walk-out houses?
3    A    Yes.
4    Q    Okay. Thank you. You have -- let me take a look
5    at this for just a second. You are, as a crew leader,
6    responsible for making sure that the chickens that your crew
7    catches get to the plant on time?
8    A    Yes.
9    Q    And I think we just went through this, but you are
10    responsible for making sure that those procedures and
11    guidelines that we just went through are followed?
12    A    Yes.
13    Q    Okay. You also have a role with respect to
14    maintaining a good relationship with the grower, don't you?
15    A    Yes.
16    Q    Okay. And I think we mentioned the safety of your
17    crew, you have responsibility for that also?
18    A    Yes.
19    Q    Okay. You are basically, then, when you're out
20    there catching, you're the one who's directing the crew?
21    A    Yes.

20 (Pages 74 to 77)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 78

1    Q    Directing -- okay.  All right.  From time to time,
2    new catchers have come on to your crew?
3    A    Yes.
4    Q    Okay.  Have you ever suggested to anybody at
5    Mountaire that they hire a particular person as a catcher?
6    A    Yes.
7    Q    Okay.  Who, if you can remember?
8    A    The last one was Arthur, Arthur Belfield.
9    Q    And was he hired?
10   A    Yes.
11   Q    Okay.  And without -- and I don't mean to stretch
12   your memory, but have there been others like Mr. Belfield
13   that you recommended the company hire?
14   A    That's it.  I think I said maybe two or three.
15   Q    Okay.  And were they hired?
16   A    I think all but one, I think.
17   Q    Okay.
18   A    I think two out of the three, yes, I think they
19   were hired.
20   Q    Who was it -- do you remember the person who
21   wasn't?

Page 79

1    A    No, I can't remember him.
2    Q    Okay.  There are other crew leaders employed at
3    Mountaire, we know, right?
4    A    Yes.
5    Q    Have other crew leaders asked you if you could
6    spare a member of your crew to come work on their crew
7    because they were short?
8    A    Yes.
9    Q    Okay.  And when they've asked that, what have you
10   done?
11   A    If I have a catcher available, I let him go catch
12   with that crew leader.
13   Q    So you would tell someone from your crew to go
14   work for somebody's crew, for example, Mr. Garrison's crew,
15   if he needed it?
16   A    It would be up to him.  I would ask him, would he
17   want to go work with Mr. Garrison or whoever.  Then that
18   would be up to him whether he would go catch with that crew
19   or not.
20   Q    Okay.  If you asked every one of the catchers and
21   they all said, no, what would you do?

Page 80

1    A    Nothing.
2    Q    You would leave Mr. Garrison without a catcher?
3    A    That's all I could do.
4    Q    Okay.
5    A    I tell him to contact Mr. Lynch or someone.
6    Q    Have you ever asked any of the other crew leaders
7    to supply you with a catcher?
8    A    Yes.
9    Q    And have they done so?
10   A    At times, yes.
11   Q    Do some catchers work a double shift from time to
12   time?
13   A    Yes.
14   Q    And how does that occur?
15   A    Like if -- if one of the catchers are working on
16   the first shift, and if I'm on, like, the third or fourth
17   shift, he would work with the first shift and then come work
18   on my shift also.
19   Q    Okay.  And, again, that's only if he wants to?
20   A    That's correct.
21   Q    Let me ask you this question.  Do you know Donna

Page 81

1    Mumford?
2    A    Donald Mumford?
3    Q    Uh-huh.  He works for Mountaire.
4    A    You said Donald Mumford?
5    Q    Donna.  I'm sorry.
6    A    Donna.  Yes.  I have met her before, yes.
7    Q    Do you have occasion to talk to her at all?
8    A    No, not anymore.
9    Q    I'm sorry.  Not anymore?
10   A    Not anymore, no.
11   Q    So there was a time when you did?
12   A    (Witness nods.)
13   Q    What would you talk to her about?
14   A    Like, if one of my catchers had a problem with
15   the -- like say, a W-2 tax forms or something, then I would
16   ask Donna to help them out -- to help them.
17   Q    All right.  When you say W-2 form, you mean if the
18   catcher did not get a W-2 form, he would come to you and you
19   would talk to Donna about that?
20   A    Yeah, something like that.
21   Q    Any other occasion?

21 (Pages 78 to 81)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 94

1  Q   So we might have somebody off on Monday, then
2  another person off on Tuesday?
3  A   Yes.
4  Q   And who decides who is off on Monday, who on
5  Tuesday, and so forth?
6  A   I do.
7  Q   Okay.  If someone is scheduled off, but another
8  crew member doesn't show up or is not there when you go to
9  pick him up, tell me what, if anything, you do then.
10  A   You mean the one is not his scheduled day off, the
11  catcher that show up --
12  Q   Right.
13  A   -- that's when I call another crew leader and see
14  does he have a man off.  I start there.
15  Q   Okay.  The fellow who's scheduled off that day, do
16  you call him up and ask him to come to work?
17  A   At times, yes.
18  Q   I'm sorry?  I'm going to -- I'm going to ask you
19  to repeat the answer.
20  A   At times, yes.
21  Q   Okay.  So you can either ask another crew leader

Page 95

1  or ask the fellow who's off to come to work because you're
2  going to be short?
3  A   Yes.
4  Q   If somebody is going to be absent, do they have to
5  let you know?
6  A   They are supposed to, yes.
7  Q   Okay.  And tell me what happens if they don't let
8  you know.
9  A   Then they'll get a warning, a write-up.
10  Q   From you?
11  A   Yes.
12  Q   Okay.  Let me see.  While you're on a farm
13  catching, do the catchers get a paid break?
14  A   Only the lunch break.
15  Q   That's not paid, is it?
16  A   They get paid per thousand.  So if they're not
17  catching any chickens, no, they're not getting paid.
18  Q   Okay.  So -- and how long is lunch?
19  A   Half an hour.
20  Q   When they take that half an hour, they're not paid
21  for that time because they're taking lunch?

Page 96

1  A   No.
2  Q   Okay.  Do you mean -- let me ask the question
3  again.  When the catchers take their half an hour -- and by
4  the way, who decides when that half an hour is?
5  A   Most of the time they do mostly because, like I
6  say, a lot of times we take our lunch break while we're
7  moving from one farm to the next.
8  Q   Okay.  So that's most of the time when you take
9  your breaks, when you're going from one farm to the next?
10  A   When we have two jobs to go on, yes.
11  Q   Okay.  Then let me see if I understand it.  You
12  finish a job at one farm, and on your way to the next farm,
13  you would stop someplace, take half an hour and have lunch?
14  A   Yes.
15  Q   When the catchers take that half an hour for
16  lunch, they don't receive pay for that, do they?
17  A   I'm not sure.
18  Q   You're not sure?
19  A   I'm not sure, no.
20  Q   Okay.  Let me take a second here.  Maybe this can
21  help you.  We'll come to it.  Okay.  If you're just going to

Page 97

1  be on farm, you're not going to have to travel to another,
2  do they receive a half an hour lunch break?
3  A   Yes, they do.
4  Q   And who decides when that is?
5  A   A lot of times, like we have to wait on the driver
6  to return to the farm, so we take our lunch break while
7  we're waiting.
8  Q   You basically decide that?
9  A   Yes.
10  Q   That's a good time to take a break, so we'll break
11  now?
12  A   Yes.
13  Q   Okay.  How about paid breaks, do they get paid
14  breaks while they're catching, get out of the house, go
15  outside and sit down, rest a minute, smoke a cigarette or
16  something?
17  A   No.
18  Q   So they just -- everybody works right through?
19  A   When you say a -- paid breaks, I'm not sure
20  whether they're getting paid for it or not.  But sure, if
21  they want to take a break, sometimes they get a little

25 (Pages 94 to 97)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 110

1    Q    While -- well, you say this is not your writing,
2  you do agree with these things?
3    A    I agree with it, yes.
4    Q    That's fine. I'm going to show you what has been
5  marked as Exhibit No. 6 to Mr. Garrison's deposition. Turn
6  to page nine of the document, please.
7    A    The pages aren't numbered.
8    Q    Page nine. They're numbered at the bottom. Okay.
9  Are you there? Just hold that page for a second. I'll try
10  to compete with the siren here. The document is a -- an
11  agreement between Mountaire in Selbyville and Teamster's
12  Local 355. If you just hold that page and look at the front
13  cover, that's what the document purports to be.
14    A    Uh-huh. Yes.
15    Q    And this is the contract that covers the catching
16  crew, your crew?
17    A    Yes.
18    Q    Okay. And if you go back, now, to page nine where
19  you had your finger, the -- first, if you look under number
20  one; do you see where I am?
21    A    Yes.

Page 111

1    Q    Okay. It talks about a grievance being a dispute
2  over the interpretation, among other things, of this
3  contract. And it says, the employee, which in your case
4  would be a catcher or catchers, would take the matter up
5  with the shop steward who would in turn take the grievance
6  up to the foreman in charge. So if a member of your crew
7  had a grievance regarding the contract, the first thing they
8  do is take it up with you; is that correct?
9    A    With their contract?
10    Q    Yeah. This contract applies to the catchers, the
11  men who work for you?
12    A    Yes.
13    Q    This says, if they have a grievance or a dispute
14  arising out of an interpretation of this document, that they
15  take it up with the shop steward and the shop steward then
16  comes to you -- to the foreman in charge. And in the case
17  of a member of your crew, the foreman in charge would be
18  you; would it not?
19    A    Yes.
20        (Deposition Exhibit No. 3 marked.)
21  BY MR. BREWER:

Page 112

1    Q    Okay. I'm going to have -- I guess this would be
2  3. This will be No. 3. Mr. Gibbs, the document that is in
3  front of you has been marked as Exhibit 3 to your
4  deposition. This information came to us through your
5  attorney. And I'd like you to tell me what this is.
6    A    This is a record that I kept of time -- from the
7  time I pick my first catcher up until I dropped the last
8  catcher off.
9    Q    Okay. Who prepared this form?
10    A    The form?
11    Q    Yes.
12    A    My daughter prepared the form.
13    Q    Your daughter did?
14    A    Yes.
15    Q    And is that true for all of the pages I see after
16  this, she prepared this form?
17    A    Yes.
18    Q    Okay. Now, what it says on top, it says, first
19  catcher picked up, and then it says, first catcher dropped
20  off. You said, last catcher dropped off. Should this be
21  like the last catcher dropped off?

Page 113

1    A    It should be -- because the first catcher I pick
2  up is the last catcher that I drop off. So the first
3  catcher is the last catcher that I drop off.
4    Q    So if I'm interpreting this correctly, the first
5  catcher you picked up, if we look at page 1 on the 23rd, you
6  picked up the first catcher at 11:40 a.m.
7    A    Correct.
8    Q    And then that first catcher you dropped off at
9  10:00 p.m., but he was also the last catcher dropped off?
10    A    Yes, that's correct.
11    Q    So that's how this should be interpreted?
12        MR. MARTIN: Excuse me. The record actually
13    says 10:10 p.m.
14        MR. BREWER: I didn't say anything about --
15        MR. MARTIN: You said 10:00. I'm just trying to
16    correct your --
17  BY MR. BREWER:
18    Q    Excuse me. 10:10 p.m. And how is it that you
19  told your daughter to prepare this form for you?
20    A    Because I wanted to keep a record of my time, my
21  hours.

29 (Pages 110 to 113)

# TAB 7

Page 1

[ 1]                    IN THE UNITED STATES DISTRICT COURT
                       IN AND FOR THE DISTRICT OF DELAWARE
[ 2]

[ 3]   WILLIE DAVIS, JR.,                    )
       NATHANIEL BRIDDELL,                    )
[ 4]   GEORGE W. FEDDIMAN,                    )
       JOSEPH GARRISON,                       )
[ 5]   LARRY E. GIBBS,                        )
       ROY H. WALTERS,                        )
[ 6]   ALL SIMILARLY-SITUATED CURRENT         )
       AND FORMER EMPLOYEES OF                )
[ 7]   MOUNTAIRE FARMS, INC.,                 )
       MOUNTAIRE FARMS OF DELMARVA,           )
[ 8]   INC., and MOUNTAIRE FARMS OF           )
       DELAWARE, INC.,                        )
[ 9]              Plaintiffs,                  )
          -vs-                                 )    C.A. No. 04-0414
[10]                                           )
       MOUNTAIRE FARMS, INC.,                 )
[11]   MOUNTAIRE FARMS OF                     )
       DELMARVA, INC., and                    )
[12]   MOUNTAIRE FARMS OF DELAWARE,           )
       INC., all Delaware corporations)
[13]              Defendants.                 )
                                   - - - - - - -
[14]          Deposition of WILLIAM DOUGLAS LYNCH, taken
       before Pamela C. Washington, Registered Professional
[15]   Reporter and Notary Public, at the law offices of
       Young, Conaway, Stargatt & Taylor, 110 West Pine
[16]   Street, Georgetown, Delaware, on March 15, 2005,
       beginning at 11:30 a.m.        - - - - - -
[17]

[18]   APPEARANCES:

[19]       On behalf of the Plaintiffs:
             Margolis Edelstein
[20]         BY: JEFFREY K. MARTIN, ESQ.
             and  KERI WILLIAMS, ESQ.
[21]         1509 Gilpin Avenue
             Wilmington, Delaware 19806
[22]
           On behalf of the Defendant:
[23]         Shawe & Rosenthal
             BY: ARTHUR M. BREWER, ESQ.
[24]         and  LAURA PIERSON SCHEINBERG, ESQ.
             20 South Charles Street
[25]         Baltimore, Maryland  21201

---

Page 2

                                              I-N-D-E-X

[ 2]   Witness:
                    WILLIAM DOUGLAS LYNCH
[ 3]         Examination by Mr. Martin ........... 3
             Examination by Mr. Brewer .......... 111
[ 4]

[ 5]

[ 6]

[ 7]

[ 8]

[ 9]   CERTIFICATE OF COURT REPORTER ................ 117
[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

---

Page 3

[ 1]   WHEREUPON:

[ 2]                    WILLIAM DOUGLAS LYNCH,

[ 3]   having first been duly sworn by the court reporter,

[ 4]   thereupon testified upon his oath as follows:

[ 5]   BY MR. MARTIN:

[ 6]        Q    Please state your full name for the

[ 7]   record.

[ 8]        A    William Douglas Lynch.

[ 9]        Q    And what is your date of birth?

[10]        A    3-12-54.

[11]        Q    Happy birthday to you.

[12]        A    Saturday.

[13]             (Whereupon, there was a discussion held

[14]   off the record.)

[15]   BY MR. MARTIN:

[16]        Q    Now, Mr. Lynch, has your deposition

[17]   been taken before this date?

[18]        A    No.

[19]        Q    So this is the first time you have had

[20]   this process?

[21]        A    Yes.

[22]        Q    Okay.  You are, however, a veteran of

[23]   at least six depositions, are you not?

[24]        A    Yes.

[25]        Q    In fact, is it true that you have sat

---

Page 4

[ 1]   through the entire depositions of all six plaintiffs

[ 2]   in this matter?

[ 3]        A    Yes, I have.

[ 4]        Q    And also, for the record, we started

[ 5]   with six and we're down to five.

[ 6]        A    Yes.

[ 7]             MR. MARTIN:  Off the record.

[ 8]             (Whereupon, there was a discussion held

[ 9]   off the record.)

[10]   BY MR. MARTIN:

[11]        Q    Mr. Lynch, as you know, I'm going to be

[12]   asking you questions.  My intent will be to ask you

[13]   one question at a time; sometimes I may ask a couple

[14]   without trying to, and I'm sure your counsel will help

[15]   remind me if I'm doing that.  It's not my intent to

[16]   ask any trick questions.

[17]             Certainly if you do not understand my

[18]   question, please let me know and I'll be happy to

[19]   restate the question as best I can.  And if you need a

[20]   break, please feel free to say so.

[21]             We're starting at about 11:30 and it's

[22]   my assumption that we're going to probably stop the

[23]   deposition in approximately 45 minutes for a lunch

[24]   break.  If, however, you need time before that, please

[25]   say the word and I'll be happy to oblige, okay?

B0059

**Page 5**

[ 1]     A     Thank you.

[ 2]     Q     And I also remind you that over the

[ 3]  course of the lunch break or during the course of this

[ 4]  deposition, under Delaware rules any conversations you

[ 5]  have with counsel will be subject to examination later

[ 6]  on in the deposition --

[ 7]     A     Yes.

[ 8]     Q     -- okay?  Now, as I understand it, you

[ 9]  are employed by Mountaire, correct?

[10]     A     Yes.

[11]     Q     And how long have you been employed by

[12]  Mountaire?

[13]     A     18 years.

[14]     Q     What is your current job title?

[15]     A     Live haul manager.

[16]     Q     How long have you been live haul

[17]  manager?

[18]     A     Actually, since 1988.  So really I

[19]  guess it should have been 17 years.

[20]     Q     And that's when you joined the company?

[21]     A     Yes, June of 1988.

[22]     Q     All right.  And you joined as the live

[23]  haul manager?

[24]     A     Yes.

[25]     Q     Okay, and you continued in that

**Page 6**

[ 1]  position without interruption?

[ 2]     A     Yes, I have.

[ 3]     Q     Okay.  What is your educational

[ 4]  background?

[ 5]     A     Graduated from high school in 1972,

[ 6]  Pittsville High School.

[ 7]     Q     Pitts?

[ 8]     A     Pittsville.

[ 9]     Q     Okay, and where is Pittsville?

[10]     A     That's east of Salisbury.

[11]     Q     So it's in Maryland?

[12]     A     Yes, in Maryland.

[13]     Q     All right.

[14]     A     From high school, I went to college, I

[15]  went to the University of Delaware, southern branch,

[16]  better known as Del-Tech, from '74 to '76, and

[17]  graduated with an electronic's degree.  I went to work

[18]  for two years --

[19]     Q     When you say you graduated, did you

[20]  receive an Associate's degree --

[21]     A     Yes, I did.

[22]     Q     -- in electronics?

[23]     A     Yes.

[24]     Q     Okay.  And did you have an opportunity

[25]  to work in the electronics field after that?

**Page 7**

[ 1]     A     Yes, I did.

[ 2]     Q     Okay.  What did you do between

[ 3]  graduating high school in '72 and beginning at

[ 4]  Del-Tech in '74?

[ 5]     A     Actually I misstated that.  From high

[ 6]  school, I went to Del-Tech, started in '72, and I

[ 7]  graduated in '74.

[ 8]     Q     Okay.  And you went to Del-Tech full

[ 9]  time?

[10]     A     Yes.

[11]     Q     I'm sorry, and that was '74 that you

[12]  graduated from Del-Tech?

[13]     A     Yes, sir, I did.

[14]     Q     All right.  And where were you employed

[15]  after obtaining your Associate's degree from Del-Tech?

[16]     A     National Cash Register in Millsboro,

[17]  Delaware.

[18]     Q     How many years were you employed at

[19]  NCR?

[20]     A     Two years.

[21]     Q     In what capacity were you employed?

[22]     A     I was an electronic technician.

[23]     Q     Do you recall what your salary was?

[24]     A     Started around 10,000.

[25]     Q     10,000 annually?

**Page 8**

[ 1]     A     Yes.

[ 2]     Q     And what was your salary at the time

[ 3]  you left?

[ 4]     A     Probably 12,000.

[ 5]     Q     Why did you leave?

[ 6]     A     Go back to school.

[ 7]     Q     Did you go back to school?

[ 8]     A     Yes, I did.

[ 9]     Q     And where did you go?

[10]     A     Del-Tech.

[11]     Q     Del-Tech down here in Georgetown?

[12]     A     Yes.

[13]     Q     All right, did you go full time?

[14]     A     Yes.

[15]     Q     And how were you supporting yourself

[16]  during those years?

[17]     A     Part-time work.

[18]     Q     What kind of part-time work did you do?

[19]     A     Worked at the Salisbury Nursing Home.

[20]     Q     In what capacity?

[21]     A     In the kitchen, kitchen work; dish

[22]  washing, delivering food to the rooms.

[23]     Q     And what were your years of employment

[24]  at Salisbury Nursing Home?

[25]     A     Actually, probably during that whole

B0060

Page 29

[ 1]    Mr. Hopkins, he was with you, correct?

[ 2]        A    Yes.

[ 3]        Q    After that time and up until the

[ 4]    current time, what kind of further training have you

[ 5]    had to serve as live haul manager?

[ 6]        A    Just been to several management

[ 7]    seminars, OJT.

[ 8]        Q    On-the-job training?

[ 9]        A    Yes, sir.

[10]        Q    Okay.  Do you recall the subject of the

[11]    management seminars that you attended?

[12]        A    Not really, just management topics.

[13]        Q    You said that this was a promotion when

[14]    you arrived in 1988, correct?

[15]        A    I considered it to be, yes.

[16]        Q    Did you get a salary increase?

[17]        A    Yes.

[18]        Q    And what was your initial salary with

[19]    Mountaire, if you recall?

[20]        A    It's a guess, I'm going to guess 35- to

[21]    40-.

[22]        Q    Okay.  And what is your current salary

[23]    with Mountaire?

[24]        A    Over 60-.

[25]        Q    Can you be more specific when you say

Page 30

[ 1]    over 60-?

[ 2]        A    62- plus bonus.

[ 3]        Q    And the bonus that you refer to, is

[ 4]    that an annual bonus, a monthly bonus, or both?

[ 5]        A    Both.

[ 6]        Q    And is that based upon production at

[ 7]    the farms?

[ 8]        A    It's goals, yes.  Bonus goals, monthly

[ 9]    bonus goals that we have to achieve, and the annual's

[10]    based mostly on profitability from the company;

[11]    performance and profitability.

[12]        Q    Do you recall -- and this may be a

[13]    timely question now that it's tax time for this

[14]    year -- do you recall what the level of the bonuses

[15]    might have been or was for last year, 2004?

[16]        A    The level of bonus, annual?

[17]        Q    Annual and the monthly.

[18]        A    It would be a 15 percent monthly bonus,

[19]    I could achieve 15 percent if I met all my goals.

[20]        Q    15 percent of your salary?

[21]        A    My annual salary.

[22]        Q    Okay.  I'm sorry, if you achieve all of

[23]    your monthly goals?

[24]        A    Yes.

[25]        Q    Have you ever done that?

Page 31

[ 1]        A    No.

[ 2]        Q    No?  What does your monthly bonus

[ 3]    average?

[ 4]        A    This year, not so much.  Typically, I'm

[ 5]    going to say 2- to 3,000 a year.

[ 6]        Q    For the monthly?

[ 7]        A    Just for the month, monthly.

[ 8]        Q    Okay.  And now how about the annual?

[ 9]        A    This last year it was close to 30

[10]    percent of our annual.

[11]        Q    30 percent of the annual?

[12]        A    Yes.

[13]        Q    So that would be another $20,000 or so?

[14]        A    18-, 19-, Yes.

[15]        Q    Has your annual bonus been fairly

[16]    steady over the last several years?

[17]        A    Its not been that high.

[18]        Q    Last year was the highest?

[19]        A    Yeah.  Previous year, it was zero.

[20]        Q    How about the year before that?

[21]        A    Low 20s.  It's up and down.

[22]        Q    So last year, your approximate salary,

[23]    if you take 62- as a base, and 18- or 19- as the

[24]    annual, and 2- or 3-, would add up to approximately

[25]    84-, $85,000?

Page 32

[ 1]        A    Could be, yes.

[ 2]        Q    Okay.  In your position as live haul

[ 3]    manager, do you directly supervise any individuals?

[ 4]        A    Yes.

[ 5]        Q    Who would they be?

[ 6]        A    The assistant live haul manager, David

[ 7]    Nuse.

[ 8]        Q    Okay.  Anyone else?

[ 9]        A    My administrative assistant, Susie

[10]    McColley.

[11]        Q    Okay.  And how long has she been your

[12]    administrative assistant?

[13]        A    10 years.

[14]        Q    Anyone else?

[15]        A    I have three dispatchers that report to

[16]    me.

[17]        Q    Anyone else?

[18]        A    Basically truck drivers report to me,

[19]    it's approximately 16 of those guys.

[20]        Q    Do crew leaders report to you?

[21]        A    Not directly.

[22]        Q    To whom do the crew leaders report?

[23]        A    David Nuse.

[24]        Q    And to whom do you report?

[25]        A    Mr. Brown.  Everett Brown.

B0061

Page 41

[ 1]    A    No.

[ 2]    Q    Who is it that drafted it?

[ 3]    A    It would be a guess, but I think it was

[ 4]  Al Z, Al Zlotorzynski.

[ 5]    Q    We'll just call him Al Z.

[ 6]    A    Yes.

[ 7]    Q    And what was his position at the time?

[ 8]    A    He was HR representative, HR manager.

[ 9]    Q    So he was not in your chain of command,

[10]  is that correct?

[11]    A    No, sir.

[12]    Q    Okay.  What involvement, if any, did

[13]  you have with regard to the issuance of that final

[14]  warning?

[15]    A    Probably had some phone conversation

[16]  between Al Z. and possibly Phil Owens, and just

[17]  stating what Al had actually found out at a farm or

[18]  talking with some catchers.

[19]    Q    What was it that Al found?

[20]    A    Well, Al visits the farm occasionally,

[21]  he likes to do it weekly with David Nuse.  And just

[22]  talking in general, generalities with the crews, you

[23]  know, how are things going or whatever, and somehow in

[24]  his conversation one of the guys, either a crew leader

[25]  or a catcher, and I'm not sure who, mentioned to him

Page 42

[ 1]  that they weren't taking lunch.

[ 2]    Q    Do you know whether this final warning

[ 3]  was in any way prompted by the at this point rumors of

[ 4]  a legal action by the crew leaders?

[ 5]    A    No.

[ 6]    Q    No, it was not related?

[ 7]    A    No, it was not related.

[ 8]    Q    Do you recall whether at the time this

[ 9]  was issued, and it's dated 3-2-04, do you recall

[10]  whether there was any notice, formal notice, that

[11]  Mountaire had of any pending legal action?

[12]    A    I believe there was a formal notice

[13]  from you, late February.

[14]    Q    Is there any paperwork that might be

[15]  associated with this final warning?  And what I'm

[16]  referring to would be possibly a note from Al Z. upon

[17]  visiting farms and noting that there might have been a

[18]  problem with the lunch period for the catchers?

[19]    A    Not that I'm aware of.  It's all

[20]  verbal.

[21]    Q    It was all verbal, and the only thing

[22]  that you're aware of is this final warning that you

[23]  have just pointed to?

[24]    A    Yes.

[25]    Q    Okay.  You have heard testimony from

Page 43

[ 1]  various people, including Mr. Davis, this morning --

[ 2]    A    Yes.

[ 3]    Q    -- that he was at the Doyle's

[ 4]  restaurant and saw a vehicle that he identified to be

[ 5]  a Mountaire vehicle, circling the parking lot, is that

[ 6]  correct?

[ 7]    A    Yes.

[ 8]    Q    Do you know anything about this?

[ 9]    A    No.

[10]    Q    Do you know whether your vehicle was

[11]  used to circle the parking lot while the crew leaders

[12]  were meeting with their counsel?

[13]    A    My personal vehicle?

[14]    Q    Yes.

[15]    A    No, it wasn't.

[16]    Q    Okay.  Is your vehicle a take-home

[17]  vehicle?

[18]    A    Yes.

[19]    Q    What days of the week do you work?

[20]    A    Generally Monday through Friday.

[21]    Q    Do you work Saturdays?

[22]    A    When we work, yes.

[23]    Q    Only when, what, the plant is open?

[24]    A    Yes.

[25]    Q    And how often is the plant open?

Page 44

[ 1]    A    Approximately six to eight Saturdays

[ 2]  per year.

[ 3]    Q    And other than that, you would not work

[ 4]  Saturdays, correct?

[ 5]    A    Occasionally, I will.

[ 6]    Q    Okay.

[ 7]    A    Occasionally, I have some people doing

[ 8]  some work there on Saturdays, and I'll go down there

[ 9]  and see how things are going; not frequently, though.

[10]    Q    Did you have any knowledge that the

[11]  crew leaders were meeting at Doyle's restaurant?

[12]    A    No.

[13]    Q    Let me restate that in terms of the

[14]  timing, because obviously now you do have that

[15]  information --

[16]    A    Yes.

[17]    Q    -- having sat here at depositions.  But

[18]  back in the winter and spring of 2004, did you have

[19]  any knowledge that the crew leaders met at Doyle's

[20]  restaurant?

[21]    A    Not that I recall.

[22]    Q    Okay.  I'd like to stay on one

[23]  particular subject, but I want to try to bounce around

[24]  here and try to finish up as much as I can.  Let me

[25]  ask you about the vehicles that the crew leaders use

B0062

Page 73

[ 1]    Q    And what does she do with the form?

[ 2]    A    She may make a copy of it, again, and

[ 3]    put it in a file, the same crew leader file that the

[ 4]    disciplinary slips went in, and then she'll send it on

[ 5]    for processing.

[ 6]    Q    Does she ever sign in lieu of the crew

[ 7]    leader?

[ 8]    A    She may.  It may be a phone

[ 9]    conversation between those two.

[10]    Q    So you say she signs it, and then did

[11]    you say sends it for processing?

[12]    A    Yes.

[13]    Q    All right, and what do you mean by

[14]    that?

[15]    A    Typically she'll send it to the

[16]    accounts payable or the payroll, the payroll people.

[17]    Q    Okay.

[18]    A    And as of most recently, we have been

[19]    also sending -- they have been going through HR.

[20]    Q    All right, let's take the example that

[21]    a catcher asks for time off, and the person doesn't

[22]    have any time in the bank, so to speak.

[23]    A    Yes.

[24]    Q    But the crew leader does not know that;

[25]    have you ever had that situation?

Page 74

[ 1]    A    No, not that I'm aware of.

[ 2]    Q    Okay.

[ 3]    A    Generally what will happen is the crew

[ 4]    leader will call Susie, Susie keeps time records and

[ 5]    time off for all catchers.

[ 6]    Q    Okay.

[ 7]    A    We keep those time sheets in the

[ 8]    office, and they'll typically call in and ask her if

[ 9]    they have any time available.

[10]    Q    I see.  And then if time is available,

[11]    then it's a done deal, right?

[12]    A    It's a done deal.

[13]    Q    Okay.  So there really isn't any

[14]    decision process in this?

[15]    A    Well, yeah, I mean the crew leader has

[16]    to make a decision, he still has to keep his crew

[17]    staffed.  He can't, you know, give two or three people

[18]    off at once, or can't give a guy off if it's going to

[19]    make him be short-handed.

[20]    Q    Right.

[21]    A    Yeah, there's some decision making,

[22]    yes.

[23]    Q    But assuming the crew will be fully

[24]    staffed or will be staffed appropriately and the

[25]    catcher has time, then there's really no decision to

Page 75

[ 1]    be made, is that correct?

[ 2]    A    Well, the crew leader will, you know,

[ 3]    give the crew permission to take off; that's part of his

[ 4]    crew.

[ 5]    Q    Is it your testimony that the crew

[ 6]    leader has discretion to tell a catcher that he can

[ 7]    not take off, even if the crew is fully staffed?

[ 8]    A    He would have discretion, but he

[ 9]    wouldn't do that.

[10]    Q    Otherwise, he'd be subject to a

[11]    grievance, would he not be?

[12]    A    Perhaps.

[13]    Q    All right.  Let me ask you about

[14]    instances where a catcher needs a pay advancement;

[15]    there is a procedure in place for the pay advancement,

[16]    is there not?

[17]    A    No longer.

[18]    Q    No longer?

[19]    A    No.

[20]    Q    Okay.  When was that policy or

[21]    procedure changed?

[22]    A    I'm not sure.  More than two years ago,

[23]    I'd say.

[24]    Q    All right.  But for purposes of this

[25]    suit, during the times that are relevant, there were

Page 76

[ 1]    times when monies were requested by catchers, is that

[ 2]    correct?

[ 3]    A    Yes.

[ 4]    Q    And what I want to try to understand is

[ 5]    what discretion, if any, the crew leader had in

[ 6]    putting through such a request.

[ 7]    A    He had all the discretion; he filled

[ 8]    out the petty cash slip with the catcher's name,

[ 9]    Social Security number, signed it, and sent it to --

[10]    or took it to payroll.  Or possibly had the catcher go

[11]    to payroll with the petty cash slip with his signature

[12]    on it, authorizing the advance.

[13]    Q    Were there any limitations upon what

[14]    could be requested?

[15]    A    Yes, there were.

[16]    Q    And do you remember what the

[17]    limitations were?

[18]    A    No, I don't.

[19]    Q    Was it a certain dollar limitation or

[20]    certain number of days or --

[21]    A    Certain dollar, certain dollar amount.

[22]    Certain percentage of your weekly earnings, I don't

[23]    remember exactly what it was, no.

[24]    Q    We have gone I think about an hour by

[25]    my time, why don't we take a short break.  I'm sure

B0063

Page 81

[ 1]    coming in my office and basically just asking -- or

[ 2]    told him that I had heard some rumors that there may

[ 3]    be some litigation, a lawsuit, "Do you know anything

[ 4]    about it?  Do you plan on being a part of it?"  And he

[ 5]    said he basically didn't know anything about it, he

[ 6]    was just returning.

[ 7]            Talked to Mr. Terry Morris, the same

[ 8]    type of questions, you know, "Have you heard anything

[ 9]    about the lawsuit?"  He said he heard a little bit, he

[10]    heard there might be some meetings going on, wasn't

[11]    sure when the meetings might be taking place.

[12]        Q    Terry was not sure when the meetings

[13]    were taking place?

[14]        A    At the time I talked -- first time I

[15]    talked to him, he wasn't.  He thought they were going

[16]    to be having some meetings.

[17]        Q    All right.  Anything else that first

[18]    time you talked to him?

[19]        A    And he pretty much said he was not

[20]    going to be a part of it.

[21]        Q    He was not going to be a part of it?

[22]        A    That's what he said.

[23]        Q    Did he tell you why?

[24]        A    No.

[25]        Q    Was there any reason that you're aware

Page 82

[ 1]    of that he would say he did not want to be a part of

[ 2]    it?

[ 3]        A    No.

[ 4]        Q    All right, I think you mentioned that

[ 5]    you talked to him a second time about this?

[ 6]        A    Probably sometime during this process.

[ 7]    We would talk, I don't know, one or two times a week;

[ 8]    I mean they always stop by my office.

[ 9]        Q    Who is they?

[10]        A    Crew leaders, crew leaders;

[11]    occasionally, not daily, just, you know,

[12]    spontaneously, periodically.  And of course I would

[13]    ask him still, you know, "Are there any issues that we

[14]    need to talk about?  What do you know?"  And he said

[15]    no, just that there's going to be a lawsuit and going

[16]    to have some meetings.

[17]        Q    Who told you there was going to be a

[18]    lawsuit and that there would be some meetings?

[19]        A    Terry, that's what he had heard.

[20]        Q    Okay.  And did Terry tell you where the

[21]    meetings were going to be?

[22]        A    No.

[23]        Q    Did Terry say he was going to attend?

[24]        A    Said that he just didn't plan to be a

[25]    part of the lawsuit.

Page 83

[ 1]        Q    Had Mountaire been part of any lawsuits

[ 2]    that you're aware of in the last 10 years?

[ 3]        A    Yes.

[ 4]        Q    Did they involve the catchers?

[ 5]        A    Yes.

[ 6]        Q    And what if anything changed as a

[ 7]    result of the litigation with the catchers?

[ 8]        A    They started receiving overtime pay for

[ 9]    over 40.

[10]        Q    Over 40 hours?

[11]        A    Started taking daily lunches.

[12]        Q    Did you have much turnover among

[13]    catchers during this litigation?

[14]        A    No.

[15]        Q    Were you aware of any type of

[16]    retaliation against any of the catchers as a result of

[17]    this litigation?

[18]        A    No.

[19]        Q    Are you aware of any retaliation

[20]    against any of the crew leaders based upon this

[21]    litigation?

[22]        A    No.

[23]        Q    This current litigation?

[24]        A    No.

[25]        Q    So would it be fair to say that most of

Page 84

[ 1]    the contact that you had with crew leaders after

[ 2]    learning of this proposed litigation was with Terry

[ 3]    Morris?

[ 4]        A    Mostly, and Francisco Serabia.

[ 5]        Q    What did Francisco tell you about this?

[ 6]        A    Pretty much the same thing, that he had

[ 7]    just heard that there was going to be a lawsuit and

[ 8]    there was going to be some meetings occurring; he

[ 9]    wasn't sure where the meetings were going to take

[10]    place; and that he wasn't -- he didn't want to be a

[11]    part of the lawsuit.

[12]        Q    Do you recall what month you had these

[13]    discussions with Mr. Serabia?

[14]        A    Late February, early March '04.

[15]        Q    All right, how many discussions did you

[16]    have with Mr. Serabia?

[17]        A    A few.

[18]        Q    Did you speak with any other crew

[19]    leaders?  About this, I should say.

[20]        A    Yeah, about that, yeah.  I talked about

[21]    Roy.  Not that I recall.

[22]        Q    Okay.  Now, what if anything did you do

[23]    within the office with regard to the crew leaders'

[24]    claims that were being made about overtime?

[25]        A    We had a meeting about it.

B0064

Page 93

[ 1]    A    They have a schedule, yes.

[ 2]    Q    All right, go ahead.

[ 3]    A    So that's what of what we mean by

[ 4]  describing the work schedule, the crew leaders

[ 5]  answering those questions that are asked to him by the

[ 6]  crew. Location, as I talked about.

[ 7]          Rolling meeting, all that actually

[ 8]  means is actually when they're in their van, it could

[ 9]  start occurring from the time he has all of his help

[10]  picked up, could happen at a store, it could happen

[11]  when they get to the farm, but basically the term

[12]  rolling meeting just means that they're actually

[13]  discussing issues while they're going to the farm;

[14]  again, you know, what they're going to be doing that

[15]  day, how many birds they're to be catching, what size

[16]  are the birds, what type house are we catching, just

[17]  discussing those issues, things that they want to

[18]  know.

[19]    Q    All right. The next item, provide

[20]  performance updates.

[21]    A    Yes.

[22]    Q    What does that mean?

[23]    A    Each week, crew leaders are given a few

[24]  sheets of paper which have performance updates. They

[25]  are on a bonus program as we have discussed before; on

Page 94

[ 1]  that bonus program, they have different categories

[ 2]  which include DOAs, which are dead on arrivals, farm

[ 3]  damage, the head count variances, efficiencies, each

[ 4]  week those numbers are compiled on each crew to let

[ 5]  them know how they're doing.

[ 6]          And they discuss those same issues with

[ 7]  their crew, either again during that rolling meeting

[ 8]  or it could be at a 5- or 10-minute point at the farm

[ 9]  during their lunch break, that's the performance

[10]  updates.

[11]    Q    Okay, numbers of birds dead, alive,

[12]  that type of thing?

[13]    A    Yes.

[14]    Q    Okay.

[15]    A    We like to have them all there alive

[16]  but, unfortunately, they don't all get there alive.

[17]    Q    Okay. And by the way, the farm

[18]  damage --

[19]    A    Yes.

[20]    Q    -- if there's damage at the farm, what

[21]  is the crew leader supposed to do about that?

[22]    A    He's supposed to report it.

[23]    Q    Report it to whom?

[24]    A    Report it to the contract grower,

[25]  number one. And then it should be on his farm ticket

Page 95

[ 1]  if there's any farm damage, it would be documented on

[ 2]  the farm ticket. And he should also report it to Dave

[ 3]  Nuse.

[ 4]    Q    Okay. And under what circumstances

[ 5]  does Dave Nuse take action?

[ 6]    A    It's his responsibility to visit the

[ 7]  farm and observe the damage, the extent of the damage,

[ 8]  make a determination of, you know, if we were at

[ 9]  fault, if we should be held accountable.

[10]    Q    Okay. I'm going back to the crew

[11]  leader job analysis, the next item was provide

[12]  information, business communication; I'm wondering if

[13]  that differs at all from provide performance updates?

[14]    A    Not much, really.

[15]    Q    Okay.

[16]    A    It's pretty redundant. Might be a

[17]  little bit more stuff, maybe, they might be discussing

[18]  an upcoming safety celebration or something. Maybe

[19]  the state of the business; occasionally we get a state

[20]  of the business report, how the company itself is

[21]  doing, which would be passed on to the crew leader, he

[22]  can discuss that with his people. But mostly it's

[23]  basically the same stuff.

[24]    Q    All right. And then the next is

[25]  interact with grower?

Page 96

[ 1]    A    Yes.

[ 2]    Q    What type of interaction is required of

[ 3]  the crew leader?

[ 4]    A    That's probably one of his most

[ 5]  important things that he should do on a farm.

[ 6]  Basically when he goes on the farm, he should look

[ 7]  that grower up and have discussions with the grower.

[ 8]          Normally, the grower is present and you

[ 9]  will see the grower there; not always, and it depends

[10]  on the grower himself. I mean certain growers, they

[11]  want you parking the trucks in certain places, they

[12]  don't want you obviously driving on their grass.

[13]          Some of the growers don't want you

[14]  adjusting their equipment, you know, they want to do

[15]  all that stuff themselves. Again, the loading areas,

[16]  again, any farm damage they might have definitely

[17]  needs -- the grower needs to know that we did that,

[18]  the contract grower. Those kind of issues,

[19]  interacting with the grower.

[20]    Q    Okay. Is there any type of discretion

[21]  that's involved in interaction with the grower?

[22]    A    Can you say that another way?

[23]    Q    Well, from listening to your response,

[24]  you said it was a matter of listening to what the

[25]  grower wants the company to do, make sure you don't

B0065

Page 97

[ 1]    drive over the grass, and do things in accordance with
[ 2]    what the grower wants --
[ 3]        A    Yes.
[ 4]        Q    -- is that right?  So I mean it's just
[ 5]    a matter of keeping the grower happy, I guess?
[ 6]        A    It's his property.
[ 7]        Q    Right.
[ 8]        A    We need to respect it.
[ 9]        Q    Okay.
[10]        A    But, you know, yes.
[11]        Q    All right.  Next, it's interact with
[12]    the live haul manager.  Now, I guess I'm a little
[13]    confused in looking at this list, a list that you
[14]    compiled along with Dave Nuse, correct?
[15]        A    Yes.
[16]        Q    I don't see on here where it says
[17]    interact with the assistant live haul manager; do you
[18]    see that?
[19]        A    No.  I think it's a typo.
[20]        Q    You think this is a typo?
[21]        A    Uh-huh, live haul management.
[22]        Q    Management rather than -- okay.  And
[23]    that means just keep you and Dave informed as to
[24]    what's going on, fill out your farm ticket, that type
[25]    of thing?

Page 98

[ 1]        A    Discussions, communications, any
[ 2]    issues, you know, you're having with your equipment,
[ 3]    you know, supplies, farm conditions.  How are the
[ 4]    farms, you know, were they wet?  How was the drive
[ 5]    area?  Yeah, communications, feedback to us so we can
[ 6]    feed that information back to the people that are
[ 7]    responsible for those areas.
[ 8]        Q    All right.  The next one I want to
[ 9]    focus on is assess type of house.
[10]        A    Yes.
[11]        Q    Plan load and the catch approach.
[12]        A    Yes, sir.
[13]        Q    First of all, let me understand that or
[14]    let me ask you, how many farms does Mountaire
[15]    currently have?
[16]        A    Over 300.
[17]        Q    Okay.  And is there a lot of turnover
[18]    or fluctuation in the number of farms?
[19]        A    No.
[20]        Q    So isn't it fair to say that these
[21]    catchers and crew leaders have been to these farms
[22]    time and time again?
[23]        A    Well, not necessarily time and time
[24]    again but, yeah, they eventually will cycle around.
[25]    We have seven catching crews divided up between those

Page 99

[ 1]    300-plus farms so, yeah, I mean they'll see them, you
[ 2]    know, again.
[ 3]        Q    All right.
[ 4]        A    You know, it's not necessarily, you
[ 5]    know, numerous.
[ 6]        Q    All right.  But tell me what you mean
[ 7]    by assess the type of the house, plan load, catch
[ 8]    approach.
[ 9]        A    Well, when the crew leader pulls on the
[10]    farm, and he will know some of this information before
[11]    he gets to the farm if he's been to that farm before.
[12]    But if he hasn't, I mean we have several new farms
[13]    coming on board, too.
[14]            He makes a determination on what type
[15]    house we're going to be catching.  I mean we have
[16]    different types, we have what we call conventional
[17]    house, we have tunnel houses, A-frames, shed types,
[18]    all these are different type houses and he's --
[19]        Q    How many different type houses do you
[20]    have?
[21]        A    Four or five.
[22]        Q    Four or five?
[23]        A    What I call different, you know,
[24]    different in structure.
[25]        Q    Right.

Page 100

[ 1]        A    Which each one of those houses, you
[ 2]    have a different approach as far as the way you catch
[ 3]    those houses; they're not all caught the same.
[ 4]        Q    But let me just again ask maybe a dumb
[ 5]    question since I'm not a chicken catcher or a crew
[ 6]    leader.
[ 7]        A    Okay.
[ 8]        Q    At least as yet.  When you say assess
[ 9]    the house and the type of approach, do you catch all
[10]    A-frame houses the same?
[11]        A    No.
[12]        Q    Okay.
[13]        A    No.  Depends on if they have poles or
[14]    what they call clear span, no poles.  Clear span house
[15]    could be an A-type house but it would be caught
[16]    differently than a house that has poles in it or
[17]    posts.
[18]        Q    How many different methods are there of
[19]    catching houses?
[20]        A    Three or four.
[21]        Q    Okay.
[22]        A    What I would call different methods.
[23]        Q    I'm sorry?
[24]        A    Yeah.
[25]        Q    Different methods?

B0066

TAB 8

Page 1

[ 1]              IN THE UNITED STATES DISTRICT COURT
              IN AND FOR DISTRICT OF DELAWARE

[ 2]

[ 3]    WILLIE DAVIS, JR.,             )
        NATHANIEL BRIDDELL,            )
[ 4]    GEORGE W. FEDDIMAN,            )
        JOSEPH GARRISON,               )
[ 5]    LARRY E. GIBBS,                )
        ROY H. WALTERS,                )
[ 6]                                   )
        ALL SIMILARLY SITUATED CURRENT )
[ 7]    AND FORMER EMPLOYEES OF        )
        MOUNTAIRE FARMS, INC.,         )
[ 8]    MOUNTAIRE FARMS OF DELMARVA,   )
        INC., and MOUNTAIRE FARMS OF   )
[ 9]    DELAWARE, INC.,                )
                        Plaintiffs,    )
[10]         -vs-                      )   C.A. No. 04-0414
                                       )
[11]    MOUNTAIRE FARMS, INC.,         )
        MOUNTAIRE FARMS OF             )
[12]    DELMARVA, INC., and            )
        MOUNTAIRE FARMS OF             )
[13]    DELAWARE, INC., all Delaware   )
        corporations,                  )
[14]                     Defendants.   )
                              - - - - - -
[15]              Deposition of PHILLIP OWEN, taken before
        Pamela C. Washington, Registered Professional Reporter
[16]    and Notary Public, at the law offices of Young,
        Conaway, Stargatt & Taylor, 110 West Pine Street,
[17]    Georgetown, DE, on February 1, 2005, beginning at 1:00
        p.m.

[18]

[19]    APPEARANCES:
             On behalf of the Plaintiffs:
[20]             Margolis Edelstein
                 BY:  JEFFREY K. MARTIN, ESQ.
[21]             and  KERI L. WILLIAMS, ESQ.
                 1509 Gilpin Avenue
[22]             Wilmington, Delaware 19806

[23]         On behalf of the Defendants:
                 Shawe & Rosenthal
[24]             BY:  ARTHUR M. BREWER, ESQ.
                 20 South Charles Street
[25]             Baltimore, Maryland  21201

---

Page 2

[ 1]                          I-N-D-E-X

[ 2]    Witness:
             PHILLIP OWEN
[ 3]         Examination by Mr. Martin ..........    3
             Examination by Mr. Brewer ..........  113
[ 4]

[ 5]

[ 6]

[ 7]

[ 8]    CERTIFICATE OF COURT REPORTER ...............  115

[ 9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 3

[ 1]    WHEREUPON:

[ 2]                PHILLIP OWEN,

[ 3]    having first been duly sworn by the court reporter,

[ 4]    thereupon testified upon his oath as follows:

[ 5]    BY MR. MARTIN:

[ 6]        Q    Mr. Owen, my name is Jeff Martin, and I

[ 7]    represent now five present and former crew leaders at

[ 8]    Mountaire with regard to a lawsuit involving issues

[ 9]    revolving around overtime compensation.  Let me make

[10]    sure I have your correct spelling, is it one L or two

[11]    Ls in your name?

[12]        A    Two Ls.

[13]        Q    Two Ls and no S?

[14]        A    Correct.

[15]        Q    Okay, great.  And what is your current

[16]    address, please?

[17]        A    Current address, residence is 27501

[18]    Trotters Run, and that's in Salisbury, Maryland 21801.

[19]        Q    And for how long have you resided at

[20]    that address?

[21]        A    Since April, so its been about, what,

[22]    nine months now.

[23]        Q    Okay.  With whom do you reside there?

[24]        A    My wife, Nancy.

[25]        Q    Do you have any intentions of changing

Page 4

[ 1]    your address in the next year?

[ 2]        A    No.

[ 3]        Q    All right.  Tell me, please, what your

[ 4]    educational background is.

[ 5]        A    Educational background consists of high

[ 6]    school education in McHenry, Illinois, graduate of

[ 7]    Texas Christian University, Bachelor of Arts and

[ 8]    History.

[ 9]        Q    What year at TCU?

[10]        A    Year I graduated TCU, 1975.  And MBA

[11]    from University of Texas at Arlington, 1981.

[12]        Q    And what's your employment experience

[13]    been since your college education?

[14]        A    I will start with General Motors, that

[15]    was from 1977 to 1990, where I was a training and

[16]    development manager, labor relations representative,

[17]    cost accountant, and part-time hourly on the assembly

[18]    line.  And since that --

[19]        Q    And where was that located?

[20]        A    Arlington, Texas.

[21]        Q    All right.  And what was the position

[22]    you took after that?

[23]        A    After that, I became a management

[24]    consultant with Ronald W. Wallace Associates.

[25]        Q    Where were they located?

Page 5

[ 1]        A    In Arlington, Texas.

[ 2]        Q    What were the years that you served as

[ 3]    a management consultant?

[ 4]        A    It was about, let's see, 1990 to 1992.

[ 5]        Q    What type of services were you

[ 6]    providing?

[ 7]        A    Employee involvement processes, team

[ 8]    building, training.

[ 9]        Q    Why did you leave in '92?

[10]        A    What can we say?  The market for

[11]    consulting was low; needed work, needed to put bread

[12]    on the table for my family, regular paycheck.  So I

[13]    went to work for Hugh's Aircraft Corporation, actually

[14]    Hugh's Training, it's a subpart of Hugh's Aircraft,

[15]    that was in Arlington, Texas, as a project manager and

[16]    training consultant, and that was from '92 to '93.

[17]        Q    And why did you leave there?

[18]        A    I wanted to get married, and instead of

[19]    being on the road, have home life.  So I went to work

[20]    for Nabisco in Fairlawn, New Jersey in June of '93.  I

[21]    was with Nabisco until October '95, and I was a, let's

[22]    see, training -- let's see, human resource development

[23]    manager with Nabisco.

[24]        Q    What were your responsibilities with

[25]    Nabisco?

Page 6

[ 1]        A    It went from training and organization

[ 2]    development to union management relationships

[ 3]    improvement, technical training for hourly and skilled

[ 4]    trades people, and performance evaluations processes.

[ 5]        Q    Were the employees that you were

[ 6]    working with there located at the Fairlawn location?

[ 7]        A    Yes.

[ 8]        Q    How big is the Fairlawn location in

[ 9]    terms of number of employees?

[10]        A    About 1700 people.

[11]        Q    And you were not head of human

[12]    resources at that site --

[13]        A    Correct.

[14]        Q    -- is that correct?  Okay.  Why did you

[15]    leave Nabisco?

[16]        A    I had a better opportunity I felt like

[17]    with Nestles in Freehold, New Jersey.

[18]        Q    And what was your position there?

[19]        A    Training manager.

[20]        Q    Tell us what kind of training you did,

[21]    please.

[22]        A    It was training for hourly employees in

[23]    team work skills, orchestrated a technical training

[24]    curriculum for hourly and skilled trades people, did

[25]    team building for managers, and just a wide spectrum

B0068

Page 11

[1] joined Mountaire. So it was about six months, seven
[2] months.
[3]      Q    And how did you learn about the
[4] position at Mountaire?
[5]      A    Through a recruiting firm named Quinlin
[6] and Associates.
[7]      Q    What position did you apply for?
[8]      A    Human resources director.
[9]      Q    Is that the position that you accepted?
[10]     A    Yes, sir.
[11]     Q    And do you continue to serve as human
[12] resources director today?
[13]     A    Yes, sir.
[14]     Q    And your start date was when in
[15] December of 2003?
[16]     A    December 28th, '03.
[17]     Q    Now, let me try to understand the scope
[18] of your authority, if I may. Are you only responsible
[19] for the Selbyville plant?
[20]     A    Correct. There's some auxiliary
[21] activities, we support the sales organization, to some
[22] extent transportation, feed mill in Princess Anne,
[23] Frankford, those are -- so it's the Selbyville plant,
[24] that's kind of the Selbyville operational umbrella, if
[25] you will.

Page 12

[1]      Q    What about Millsboro?
[2]      A    Have no contact, no responsibility for
[3] Millsboro.
[4]      Q    What, if any, is the corporate
[5] relationship between the Millsboro plant and the
[6] Selbyville plant?
[7]      A    Nothing formal. On a networking basis,
[8] if they need some help or have some questions, they
[9] might give us a call. But formally, none.
[10]     Q    Do you have a common parent
[11] organization?
[12]     A    I would say that we are all part of the
[13] Mountaire corporate family, yes.
[14]     Q    When did you become aware of the
[15] request by various crew leaders for overtime
[16] compensation?
[17]     A    In February, '03.
[18]     Q    February, '04?
[19]     A    '04, correct, yes.
[20]     Q    You joined December 28, '03?
[21]     A    Yes, I'm sorry, yes, February '04.
[22]     Q    And how was it that you became aware of
[23] the issue?
[24]     A    There were some rumors, I guess you
[25] could say, about an impending lawsuit or complaint

Page 13

[1] from the crew leaders.
[2]      Q    And what did you do, if anything, about
[3] the rumors?
[4]      A    Well, the first thing that I did was to
[5] talk with Doug Lynch and with my human resource
[6] manager, Al.
[7]      Q    Excuse me, Mike, human resource
[8] manager, what's Mike's last name?
[9]      A    That's my, m-y, human resource manager.
[10]          MR. BREWER: He's saying my, not Mike.
[11]          MR. MARTIN: Okay, thank you.
[12]          THE WITNESS: Reports in to me.
[13] BY MR. MARTIN:
[14]     Q    I'm sorry, who is your HR manager?
[15]     A    Yes, Al -- stand by.
[16]     Q    Al Z.?
[17]     A    Yes.
[18]     Q    Can we just call him Al Z.?
[19]     A    Al Z. is fine.
[20]     Q    All right. He is your HR guy, so to
[21] speak?
[22]     A    Correct.
[23]     Q    All right. Go ahead, I'm sorry about
[24] that. You talked with Doug, Al Z.; anyone else?
[25]     A    When I met any of the crew leaders, I

Page 14

[1] would ask them open-ended questions about concerns or
[2] issues that they had.
[3]      Q    All right, can you be more specific,
[4] please?
[5]      A    I don't believe I can be more specific
[6] other than, "What kinds of concerns or issues might
[7] you have?" Didn't specifically mention overtime
[8] concerns with them in those discussions.
[9]      Q    And this is contact that you had --
[10]     A    Yes, sir.
[11]     Q    -- with the crew leaders?
[12]     A    Yes.
[13]     Q    Can you tell me which crew leaders?
[14]     A    Joe Garrison, Roy Walters, Terry
[15] Morris, Francisco Sarabia. That's the group I had
[16] some contact with.
[17]     Q    And where is it that you saw these crew
[18] leaders?
[19]     A    In the plant.
[20]     Q    In the plant?
[21]     A    Yes.
[22]     Q    What, if anything, did Joe Garrison say
[23] to you?
[24]     A    Joe was concerned about not having
[25] certain pieces of equipment, I think his complaint was

B0069

Page 23

[1]     Q    And what's he do in the remainder of

[2]  the time?

[3]     A    He's servicing and supporting the other

[4]  locations that I mentioned, the feed mills,

[5]  hatcheries, the plant, coming in on third shift to

[6]  look at sanitation, conducting training, a number of

[7]  different responsibilities.

[8]     Q    Okay.  Let me go back to February of

[9]  '04, a year ago, when you became aware through one

[10] source or another that there may be a lawsuit from

[11] crew leaders regarding overtime.  I think you told me

[12] before that you had spoken with Doug Lynch about this

[13] situation; do you recall what you spoke with Doug

[14] about?

[15]    A    I do not recall specifically what I

[16] talked about with Doug.

[17]    Q    Do you recall whether Doug had any

[18] knowledge or information of this impending lawsuit?

[19]    A    I do not recall.  My sense, and there's

[20] no -- sense is that he had heard the same things, but

[21] nothing specific that I recall.

[22]    Q    Do you recall whether you became aware

[23] of this potential action in early or late February of

[24] '04?

[25]    A    I would say early, early '04.

Page 24

[1]     Q    Do you recall that I wrote you a letter

[2]  at the end of February --

[3]     A    Yes, sir.

[4]     Q    -- advising you of the potential claim?

[5]     A    Yes, sir.

[6]     Q    So you had been aware sometime before

[7]  that, maybe two or three weeks before you received

[8]  that letter?

[9]     A    Correct, yes.  Maybe as much as a

[10] month, but not much longer than that.

[11]    Q    All right.  Now, let me take you back

[12] to early to mid February of 2004.  As you became aware

[13] of this potential of a claim, did you have any

[14] concerns about such a claim?

[15]    A    Well, my concerns would be, number one,

[16] that the employees had not used formal channels

[17] available to them through the company to voice their

[18] concern, that was a concern to me.  No one had come to

[19] me or anyone that I knew specifically with these

[20] concerns, that is a major concern for me.

[21]    Q    If someone had come to you, what would

[22] you have done?

[23]    A    Well, I would have listened and asked

[24] questions, and tried to get a handle on the nature of

[25] the concerns, and then tried to find out if it was

Page 25

[1]  something that was a wide-spread concern among the

[2]  group.

[3]          My role is to solve problems and listen

[4]  and learn from the employees, and I had difficulty

[5]  with not hearing about the situation before it grew.

[6]     Q    Did you have any idea as to why no one

[7]  went through formal channels, as you have described

[8]  them, with this issue?

[9]     A    Do I know why?

[10]    Q    Yes.

[11]    A    No, I have no idea.  Don't know.

[12]    Q    You don't know of any reason why they

[13] would not have come to you through the appropriate

[14] channels?

[15]    A    I do not.

[16]    Q    Tell me, if you can, what were the

[17] appropriate channels to address this claim.

[18]    A    To me, there's a chain of command that

[19] if there are issues, you would talk to your department

[20] manager or super -- immediate supervisor.

[21]    Q    All right, well, let's talk

[22] specifically about the crew leaders, if we can.

[23]    A    Yes.

[24]    Q    Department manager, who would that be?

[25]    A    Well, the first I would expect that

Page 26

[1]  they would talk with is Dave Nuse, who's their

[2]  supervisor.  And then Doug Lynch would be next in

[3]  command, who's the live haul manager.

[4]     Q    Let me ask you because I'm a little

[5]  confused about that status.  Doug Lynch, as you said,

[6]  is the live haul manager, correct?

[7]     A    Correct.

[8]     Q    And Dave is the assistant live haul

[9]  manager, is he not?

[10]    A    Yes.

[11]    Q    But, yet, you say that the crew leaders

[12] should report directly to Dave Nuse rather than to

[13] Doug Lynch?

[14]    A    Yes.

[15]    Q    I mean --

[16]    A    Doug is -- let's follow the chain of

[17] command.

[18]    Q    Sure.

[19]    A    Everett Brown is the director of

[20] live -- of the operation.  Doug Lynch is one of his

[21] direct reports, Doug is a member of his staff,

[22] responsible for live haul.  Dave Nuse reports in to

[23] Doug Lynch, he's the assistant live haul manager.  And

[24] the crew leaders report in to Dave Nuse.

[25]    Q    All right.

Page 47

[1] some coaching or guidance that occurs, but it's the
[2] crew leader's responsibility to maintain discipline
[3] and order in the work group.
[4]     Q    Can a crew leader discipline a catcher
[5] without any intervention from either Doug Lynch or
[6] Dave Nuse?
[7]     A    Yes.
[8]     Q    In what sense?
[9]     A    If they want to issue a -- if they want
[10] to have an informal discussion about work performance,
[11] they can do that.  If they want to issue a verbal
[12] warning, they can do that.  If they want to issue a
[13] formal warning, they can do that.  And hopefully with
[14] a suspension, there is discussion with their boss or
[15] with human resources before there's time off the job
[16] for corrective action, but they can do that.
[17]     Q    They can do that unilaterally without
[18] the intervention of Dave Nuse or Doug Lynch?
[19]     A    They can.
[20]     Q    In other words, before some type of
[21] corrective action is taken, Dave Nuse or Doug Lynch
[22] does not have to sign off on it?
[23]     A    No.
[24]     Q    They do not?
[25]     A    I wouldn't expect them to, either.

Page 48

[1]     Q    Before being suspended, for example,
[2] Dave or Doug would not have to sign off on that?
[3]     A    Not in my opinion.  And let me give you
[4] an example why that would be so, especially if it's an
[5] off-shift kind of occurrence or incident that might
[6] happen, I would expect the crew leader to take the
[7] initiative to send the employee home if it was
[8] something, you know, egregious.
[9]          For instance, getting in a fight with
[10] another employee, the crew leader might say, "I want
[11] you to go home and then we'll come back tomorrow and
[12] talk about it."  And that would be certainly something
[13] I'd expect the crew leader to do without talking with
[14] Dave or Doug.  Or in the case that they couldn't get
[15] ahold of Dave or Doug, I would expect them to take
[16] that step.
[17]     Q    Can a forklift operator or a truck
[18] driver recommend hiring another employee?
[19]     A    Absolutely, he would say to the crew
[20] leader.
[21]     Q    So it's your understanding that that
[22] all has to go through the crew leader?
[23]     A    Yes.
[24]     Q    How about the grievance process, what
[25] is your understanding, if any, as to the role of the

Page 49

[1] crew leader in the grievance process?
[2]     A    Well, the crew leader is the management
[3] representative to address informal or formal
[4] grievances.  They would be presented with grievances,
[5] they would investigate grievances, and they would
[6] provide answers to grievances at the first step.
[7]     Q    When the grievance is filed, does it go
[8] through the crew leader?
[9]     A    Yes.
[10]     Q    How so?
[11]     A    If the Union representative is unable
[12] to work out the problem informally, he can formally
[13] write up a grievance and present it to the crew
[14] leader.
[15]          And it becomes the crew leader's
[16] responsibilities to sign and accept and, you know,
[17] process the homework behind the grievance, to write it
[18] up, where did the problem come from, and insure that
[19] Dave and/or Doug and possibly Al Z. or myself know
[20] where this -- we don't get very many grievances, first
[21] of all.  But they do go through the crew leader when
[22] that occurs.
[23]     Q    You said Union representative, are you
[24] talking about shop steward?
[25]     A    Yes.

Page 50

[1]     Q    So when let's say a catcher files a
[2] grievance, to whom does he give that grievance?
[3]     A    Well, it would go to the crew leader.
[4]     Q    Are you sure?
[5]     A    The catcher works with the shop steward
[6] to write up the grievance, the grievance is presented
[7] to the crew leader.
[8]     Q    Are you sure it's the shop leader --
[9] not the shop leader --
[10]     A    Shop steward.
[11]     Q    -- the shop steward does not get the
[12] grievance?
[13]     A    The shop steward is the one that
[14] initiates the formal grievance.  Informally, he
[15] receives the grievance, but the formal construction of
[16] the grievance is done by the shop steward and
[17] presented to the crew leader.
[18]     Q    How often are grievances filed, to the
[19] best of your knowledge?
[20]     A    We might get two or three a year; it's
[21] a rare occurrence because problems are handled
[22] internally informally.
[23]     Q    Okay.  What is your understanding, if
[24] any, as to why Mountaire converted the crew leaders to
[25] salary in June or July of 2002?

Page 63

[ 1] for a difference in salary increase, that's all I
[ 2] meant.
[ 3]       Q   All right.  If a catcher is not pulling
[ 4] his weight, can a crew leader terminate him?
[ 5]       A   Yes.
[ 6]       Q   Have you had any experience where a
[ 7] crew leader has terminated a catcher during your
[ 8] watch?
[ 9]       A   Not during my watch.
[10]       Q   Do you know the last time a crew leader
[11] terminated a catcher?
[12]       A   I do not know.  That would be before my
[13] time.
[14]       Q   Now, you're aware of the allegation in
[15] the complaint about the Mountaire vehicle that circled
[16] the parking lot at the Doyle's restaurant?
[17]       A   Yes, sir.
[18]       Q   Was that your vehicle?
[19]       A   No, sir, it was not.
[20]       Q   Do you know of anyone who was driving
[21] over there at the time of the meeting?
[22]       A   I do not.
[23]       Q   Do you have a Mountaire vehicle?
[24]       A   No, sir, I don't.
[25]       Q   Okay, does Mr. Lynch have a Mountaire

Page 64

[ 1] vehicle?
[ 2]       A   Yes, sir, he does.
[ 3]       Q   And how would you describe that
[ 4] vehicle?
[ 5]       A   I'm not sure of the color, I believe
[ 6] it's gray.  I believe it's a Grand Marquis, Mercury.
[ 7] No, it's a Ford Crown Victoria, there, it just came
[ 8] back to me.
[ 9]       MR. BREWER:  Go outside and take a look
[10] at it.
[11]       THE WITNESS:  They're very close, close
[12] relatives.
[13]       MR. MARTIN:  Okay, I guess we're
[14] getting close to break time.  I'm sure I'll be able to
[15] finish up in this next segment.
[16]       MR. BREWER:  Good.
[17]       (Whereupon, a short recess was taken.)
[18] BY MR. MARTIN:
[19]       Q   Mr. Owen, let me show you what's been
[20] marked at Mr. Gibb's deposition Larry Gibbs 6, it's
[21] entitled Final Warning.
[22]       A   Yes, sir.
[23]       Q   Are you familiar with that document?
[24]       A   Yes, sir, I am.
[25]       Q   And when did you become familiar with

Page 65

[ 1] it?
[ 2]       A   Of the document, prior to its being
[ 3] issued, so it must have been right about the start of
[ 4] March or the end of February.
[ 5]       Q   Did you have anything to do with the
[ 6] issuance of that document?
[ 7]       A   Yes, I did.
[ 8]       Q   And what did you do?  What did you have
[ 9] to do with it?
[10]       A   Discussed the need for this
[11] circumstance with Al Z., Doug and Dave.
[12]       Q   All right, what do you mean by the need
[13] for the circumstance?
[14]       A   Prior to my coming on board, there had
[15] been a number of requests made to the crew leaders to
[16] assure that the catchers were taking scheduled lunch,
[17] 30-minute lunch.  And that derived in part due to a
[18] previous lawsuit from catchers having to do with
[19] taking lunch.
[20]       So in Al Z.'s visits and discussions
[21] with Dave Nuse, there was no consistency in taking
[22] lunch.  And it had been talked about, there had been
[23] documents issued, requesting each crew take 30-minute
[24] lunch.  And after a while, you get to the point where
[25] you have talked and talked and talked and talked, and

Page 66

[ 1] it was over a year probably, year-and-a-half, close to
[ 2] two years that this had been under discussion, and
[ 3] this was to make sure that everyone took a lunch, 30
[ 4] minutes, to make sure it would happen.
[ 5]       Q   Now, the timing of that was late
[ 6] February, early March --
[ 7]       A   Yes, sir.
[ 8]       Q   -- of '04 --
[ 9]       A   Yes, sir.
[10]       Q   -- right?  Did that have anything to do
[11] with the fact that I called you and wrote to you in
[12] late February of '04?
[13]       A   Had nothing whatsoever to do with your
[14] telephone call, it was totally independent.
[15]       Q   That's captioned Final Warning, do you
[16] see that?
[17]       A   Yes.
[18]       Q   Does that suggest that some other type
[19] of warning was issued prior to that?
[20]       A   It suggests there were prior warnings,
[21] yes.
[22]       Q   Are you aware of the prior warnings?
[23]       A   As of this date in March, I had seen
[24] nothing in writing, had only heard of verbal warnings.
[25] I have seen a document since then that puts it in

Page 67

[ 1]  writing.

[ 2]    Q    A document dated what?

[ 3]    A    It's -- I'm not sure, not exactly sure

[ 4]  of the date.  It might have been a year or two prior

[ 5]  to this, but it was to reinforce the lawsuit

[ 6]  settlement and the need to take lunches with all the

[ 7]  catchers.

[ 8]    Q    And to whom was that final warning

[ 9]  issued?

[10]    A    This final warning is issued to the

[11]  crew leaders.

[12]    Q    Was it issued to all crew leaders?

[13]    A    Yes.

[14]    Q    Now, that particular one that you have

[15]  in front of you was issued to Larry Gibbs?

[16]    A    Correct.

[17]    Q    Did you have any reason to believe that

[18]  Larry Gibbs was not mandating a lunch time for the

[19]  catchers?

[20]    A    No.

[21]    Q    Did you have any reason to believe that

[22]  any of the crew leaders were not complying with this

[23]  requirement?

[24]    A    Let's see, could you tell me the

[25]  question again, please?

Page 68

[ 1]    Q    Yeah, I'll try to.  I understand that

[ 2]  you didn't have any belief that Larry Gibbs was in

[ 3]  violation of the policy, correct?

[ 4]    A    No specific knowledge, correct.

[ 5]    Q    All right.  Did you have any specific

[ 6]  knowledge of any crew leaders who were violating this

[ 7]  policy?

[ 8]    A    I did not.  Al Z. probably had some

[ 9]  more specific knowledge than I did.  We felt like that

[10]  it was a situation where everyone needed to be

[11]  notified of the need for consistent, continuous,

[12]  30-minute lunch period.  If there were individuals

[13]  that were quote, unquote, violating not having a lunch

[14]  period, I don't know the names of those individuals.

[15]  But it seemed to be across the board, that was our

[16]  take.

[17]    Q    Wait a minute, it was across the board

[18]  that it was happening that all crew leaders were not

[19]  being consistent, is that right?

[20]    A    It was across the board that -- well,

[21]  okay, lunches were not being taken consistently; I

[22]  don't know if it was one or six, but it was wide

[23]  spread enough to where all the crew leaders required

[24]  the warning.

[25]    Q    When you said you don't know whether it

Page 69

[ 1]  was one or six, did you mean one crew leader --

[ 2]    A    One crew leader --

[ 3]    Q    -- or six crew leaders?

[ 4]    A    -- or six crew leaders, yes; I didn't

[ 5]  have that specific knowledge.

[ 6]    Q    Who had that specific knowledge?

[ 7]    A    I would say Al Z. and Dave Nuse.

[ 8]    Q    But Al Z. reported to you, did he not?

[ 9]    A    Yes.

[10]    Q    Why would you authorize that final

[11]  warning to somebody who was not violating this?

[12]    A    I don't know that he wasn't; I don't

[13]  know that he was.  But in order to be consistent,

[14]  sometimes you invite -- you communicate to the whole

[15]  crew, to a work group to make sure that everybody

[16]  knows they're on the same equal footing, so that we're

[17]  not accused of playing favorites or singling any

[18]  person out.  This is to try and be across the board

[19]  consistent.

[20]    Q    Now, you threatened the crew leaders

[21]  with termination, did you not?

[22]    A    I don't believe we would -- we

[23]  threatened with -- okay, this is not -- I don't know

[24]  if it's a threat, but it's a warning, yes.  It says,

[25]  "You will be terminated without further warnings."

Page 70

[ 1]    Q    And you're not sure whether that's a

[ 2]  threat?

[ 3]    MR. BREWER:  I'm going to object, the

[ 4]  document speaks for itself; his interpretation of it

[ 5]  is not relevant.

[ 6]  BY MR. MARTIN:

[ 7]    Q    You may answer.

[ 8]    A    The intent of the document is to make

[ 9]  very serious the requirement to have the lunches.  And

[10]  loss of one's employment is a serious situation.

[11]    Q    It's probable to believe that the crew

[12]  leaders receiving that would have felt that it was a

[13]  very serious situation?

[14]    A    If they weren't having lunches, they

[15]  might be concerned.  But those who were doing the

[16]  lunches, if there were crew leaders who did the lunch

[17]  situation, they didn't have a thing to worry about.

[18]    Q    So in other words, they could just tear

[19]  it up as if it never happened?

[20]    A    I don't know that I'd want to tear it

[21]  up per se.  But if I am, in my -- I'm the crew leader,

[22]  and I know that I'm having a daily scheduled 30-minute

[23]  lunch, this doesn't -- this is not a concern for me;

[24]  it's someone else's concern and it's not necessarily

[25]  mine because I'm already doing what I have been

TAB 9

Page 1

[1]            IN THE UNITED STATES DISTRICT COURT
               IN AND FOR DISTRICT OF DELAWARE

[2]

[3]   WILLIE DAVIS, JR.,                    )
      NATHANIEL BRIDDELL,                    )
[4]   GEORGE W. FEDDIMAN,                    )
      JOSEPH GARRISON,                       )
[5]   ROY H. WALTERS,                        )
      ALL SIMILARLY-SITUATED CURRENT         )
[6]   AND FORMER EMPLOYEES OF                 )
      MOUNTAIRE FARMS, INC.,                 )
[7]   MOUNTAIRE FARMS OF DELMARVA,            )
      INC., and MOUNTAIRE FARMS              )
[8]   OF DELAWARE, INC.,                      )
                       Plaintiffs,           )
[9]        -vs-                               )  C.A. No. 04-0414-KAJ

[10]  MOUNTAIRE FARMS, INC.,                 )
      MOUNTAIRE FARMS OF                      )
[11]  DELMARVA, INC., and                    )
      MOUNTAIRE FARMS OF                      )
[12]  DELAWARE, INC., all Delaware           )
      corporations,                          )
[13]                  Defendants.            )
                       - - - - - - -

[14]           Deposition of ROY H. WALTERS, taken before
[15]  Pamela C. Washington, Registered Professional Reporter
      and Notary Public, at the law offices of Young,
      Conaway, Stargatt & Taylor, 110 West Pine Street,
[16]  Georgetown, Delaware, on February 15, 2005, beginning
      at 10:00 a.m.
[17]                   - - - - - - -

[18]  APPEARANCES:

[19]       On behalf of the Plaintiffs:
           Margolis Edelstein
[20]       BY:  JEFFREY K. MARTIN, ESQ.
           and  KERI WILLIAMS, ESQ.
[21]       1509 Gilpin Avenue
           Wilmington, Delaware 19806
[22]
           On behalf of the Defendant:
[23]       Shawe Rosenthal
           BY:  ARTHUR M. BREWER, ESQ.
[24]       and  LAURA A. PIERSON SCHEINBERG, ESQ.
           20 South Charles Street,   11th Floor
[25]       Baltimore, Maryland  21201

Page 2

[1]                        I-N-D-E-X

[2]   Witness:
           ROY H. WALTERS
[3]        Examination by Mr. Brewer  ..........   3
           Examination by Mr. Martin  ..........  182
[4]        Further examination by Mr. Brewer  ....  186

[5]

[6]

[7]

[8]

[9]

[10]  CERTIFICATE OF COURT REPORTER ................  189

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 3

[1]   WHEREUPON:

[2]                    ROY WALTERS,

[3]   having first been duly sworn by the court reporter,

[4]   thereupon testified upon his oath as follows:

[5]   BY MR. BREWER:

[6]        Q    Hi, Mr. Walters, we've known each other

[7]   for a long time, but for the record, I'll introduce

[8]   myself, I'm Art Brewer.

[9]             We have a standard stipulation with the

[10]  only caveat to that is if you wish to read your

[11]  deposition before you sign it, that will be your call.

[12]             I'm going to ask you a number of

[13]  questions here; have you ever been deposed before,

[14]  sir?

[15]       A    No.

[16]       Q    Okay.  You understand that you're under

[17]  oath today, and that you have an obligation to tell

[18]  the truth?

[19]       A    Yes.

[20]       Q    Okay.  This is informal, as you can

[21]  see, but it's important that you understand that this

[22]  has the same force and effect as testimony in a

[23]  courtroom for a judge or jury.

[24]       A    Yes.

[25]       Q    The court reporter is going to be

Page 4

[1]   taking down your answers to my questions, as you can

[2]   see.  I'd like you to understand that at trial, I'll

[3]   have an opportunity to bring to the attention of the

[4]   judge or jury any conflicts in your testimony today

[5]   from any testimony you may give later on.

[6]        A    Yes.

[7]        Q    Okay.  If there is any question that I

[8]   ask you that you don't understand, please don't answer

[9]   it; just ask me to explain it so that you do

[10]  understand the question, okay?

[11]       A    I'll agree.

[12]       Q    Okay.  Because if you answer a

[13]  question, we're all going to assume that you

[14]  understood what I asked you, okay?

[15]       A    I understand that.

[16]       Q    All right, good.  Sir, do you have any

[17]  physical or mental problems which would interfere with

[18]  your ability to answer my questions today?

[19]       A    No.

[20]       Q    Are you on any medication at all today?

[21]       A    Blood pressure.

[22]       Q    Okay.  And that's the only medication

[23]  you're on, is for your blood pressure?

[24]       A    Yes.

[25]       Q    Do you feel that that will interfere

Page 25

[ 1]    Q   But you didn't consider it a promotion?

[ 2]    A   No.

[ 3]    Q   Okay, tell me why.

[ 4]    A   I was asked to do a favor.

[ 5]    Q   Okay.

[ 6]    A   I was asked to fill in as a forklift

[ 7] operator until someone was found for that position.

[ 8]    Q   Okay, and how long did you fill in?

[ 9]    A   Eight years.

[10]    Q   Well, did you come to think the job was

[11] yours, after a while?

[12]    A   Not really, not when I asked to be

[13] transferred back to the original position as truck

[14] driver.

[15]    Q   Okay, so you preferred to drive a truck

[16] as opposed to operate the forklift?

[17]    A   Yes.

[18]    Q   Okay. And you operated the forklift,

[19] as you said, for eight years?

[20]    A   Uh-huh.

[21]        MR. MARTIN: Yes?

[22]        THE WITNESS: Yes.

[23] BY MR. BREWER:

[24]    Q   So that's approximately 1998, okay.

[25] What happened to you in 1998?

Page 26

[ 1]    A   I was transferred back to driving

[ 2] truck.

[ 3]    Q   So the favor finally ended?

[ 4]    A   Yes.

[ 5]    Q   Okay. During this time when you were a

[ 6] forklift operator, did you have any position with

[ 7] Local 355?

[ 8]    A   Yes.

[ 9]    Q   What was that?

[10]    A   Union steward.

[11]    Q   Okay. Also referred to as a shop

[12] steward?

[13]    A   Yes.

[14]    Q   When did you become a shop steward?

[15]    A   1983.

[16]    Q   1983, so while you were a truck driver?

[17]    A   Yes.

[18]    Q   And how long did you hold that

[19] position?

[20]    A   Through 2001.

[21]    Q   Through 2001?

[22]    A   Uh-huh.

[23]        MR. MARTIN: Yes?

[24]        THE WITNESS: Yes.

[25]

Page 27

[ 1] BY MR. BREWER:

[ 2]    Q   Tell me why you left the position in

[ 3] 2001.

[ 4]    A   I was promoted.

[ 5]    Q   To what?

[ 6]    A   Crew leader.

[ 7]    Q   Crew leader? Who promoted you to crew

[ 8] leader?

[ 9]    A   Mr. Doug Lynch.

[10]    Q   Okay. And why did you have to leave

[11] the shop steward position when you were promoted to a

[12] crew leader?

[13]    A   You're no longer under the Union when

[14] you transfer out of the Union's position. Being a

[15] crew leader, you're non-Union.

[16]    Q   A member of management?

[17]    A   Yeah.

[18]    Q   Okay. That was yes, sir, I'm sorry?

[19]    A   Yes.

[20]    Q   Okay, all right. Do you need some more

[21] water?

[22]    A   No, I'm fine.

[23]    Q   Okay. As a crew leader, your primary

[24] duty was basically to manage the crew that you had?

[25]    A   If that's the word you want to use.

Page 28

[ 1]    Q   If that's the word I want to use?

[ 2] Well, I don't want to put any words in your mouth.

[ 3] We'll get into that in more detail later on.

[ 4]        How many people were on the crew when

[ 5] you became a crew leader in 2001?

[ 6]    A   Eight.

[ 7]    Q   There were eight on your crew. And did

[ 8] you have a forklift operator assigned to you?

[ 9]    A   It was one of the eight.

[10]    Q   That was one of the eight? So you have

[11] seven members, which is seven catchers then?

[12]    A   Yes.

[13]    Q   And you had drivers assigned to you,

[14] live haul drivers?

[15]    A   According to the shift that you worked.

[16]    Q   Right. But there were drivers, the

[17] same drivers that you would basically see?

[18]    A   Yes.

[19]    Q   Okay. You have been a crew leader

[20] since 2001; from 2001 until today, have you ever had

[21] new catchers put to your crew?

[22]    A   Could you --

[23]    Q   Have you ever had new catchers assigned

[24] to your crew?

[25]    A   Yes.

B0075

Page 29

[ 1]  Q   Okay.  And did you have any
[ 2]  responsibility with respect to making sure they knew
[ 3]  how to go about catching chickens?
[ 4]      A   I don't understand that one.
[ 5]      Q   Okay.  When a new catcher comes in to
[ 6]  your crew, okay, do you have any responsibility to
[ 7]  make sure he knows what he's doing?
[ 8]      A   No.
[ 9]      Q   No?
[10]      A   No.
[11]      Q   He just comes onto your crew and you
[12]  just turn him loose?
[13]      A   He's ordered by the company.
[14]      Q   He's ordered by the company?
[15]      A   He's -- he's hired by Mountaire, he's
[16]  placed by Mountaire.  I have no control over the
[17]  placement in the crew; they evaluate the man, they
[18]  hire the man, they place the man.
[19]      Q   You have some input into who gets
[20]  hired, though, don't you?
[21]      A   No.
[22]      Q   How about Mr. George Drummond, are you
[23]  telling me you had no input into him getting hired at
[24]  all?
[25]      A   No.  Only to tell him to go to the

Page 30

[ 1]  plant and get signed up, and go through the company's
[ 2]  procedure.
[ 3]      Q   Right.  So you told Mr. Drummond -- how
[ 4]  did you come to get to Mr. Drummond?
[ 5]      A   Mr. Drummond asked me as a crew leader
[ 6]  how he could get a job with Mountaire, and I informed
[ 7]  him of the position that he had to go through in order
[ 8]  to get a job, that's all.
[ 9]      Q   So you told him, "Gosh, sure.  Go to
[10]  there and get --"
[11]      A   I didn't say sure.
[12]      Q   What did you say to Mr. Drummond?
[13]      A   I said, "Mr. Drummond, you have to go
[14]  through company policy to work for Mountaire."
[15]      Q   Okay.  And do you know what that policy
[16]  is?
[17]      A   You have to go through the channels, go
[18]  through personnel, drug tests -- what's the other
[19]  part?  TB test.  I'm not fully familiar with all of
[20]  the stuff that a man --
[21]      Q   So you don't know what goes on in human
[22]  resources?
[23]      A   No.
[24]      Q   But you told him if he wanted a job, he
[25]  could go to human resources?

Page 31

[ 1]      A   Like anyone else.
[ 2]      Q   And he did?
[ 3]      A   I assume, yes.
[ 4]      Q   Well, and he's working for you, isn't
[ 5]  he?
[ 6]      A   Yes.
[ 7]      Q   And how about Leon Tucker, didn't
[ 8]  Isaiah Daniels refer him to you?
[ 9]      A   No, he referred him to Mountaire.
[10]      Q   He referred him to Mountaire?
[11]      A   Yes.
[12]      Q   Okay.  So then you don't have any
[13]  impact at all then as to who gets hired at all?
[14]      A   No.
[15]      Q   Okay.  You can discipline people,
[16]  though?
[17]      A   Yes.
[18]      Q   And you have, haven't you?
[19]      A   To a point, according to the work.
[20]  That's company policy that they allow me to follow.
[21]      Q   So now this new catcher who comes to
[22]  your crew, who you don't do anything with, right?  He
[23]  just walks into your crew and introduces himself and
[24]  says, "Hi, I'm John."  And you say, "Fine, John.  I'm
[25]  Roy," and he just goes to work, you don't have

Page 32

[ 1]  anything to do with his training?
[ 2]      A   No.
[ 3]      Q   If he does something wrong, you can
[ 4]  write him up, can't you?
[ 5]      A   Yes.
[ 6]      Q   Okay.  How does he know not to do
[ 7]  something wrong?
[ 8]      A   I consider the experience that he place
[ 9]  toward the company when they consider him.  That's,
[10]  you know, that's entirely up to the company; the man
[11]  goes in the company and said, "I'm a chicken catcher,"
[12]  then how do they know that he's a chicken catcher?
[13]  They hire him and --
[14]      Q   How do you know he's a chicken catcher?
[15]      A   I don't.
[16]      Q   You don't?
[17]      A   I don't.
[18]      Q   And, yet, when you don't know, there's
[19]  nothing you do to make sure that he --
[20]      A   I inform my supervisor.
[21]      Q   Let me just ask the question, rephrase
[22]  the question.  When a new person comes to your crew
[23]  as a catcher, you don't know whether he's a catcher,
[24]  if I understood your answer, correct?
[25]      A   Yes.

B0076

Page 37

[ 1] sure that the cages are stacked uniformly on the

[ 2] trailer.

[ 3]     A    They don't have to be.

[ 4]     Q    They don't have to be?

[ 5]     A    No. The trailers is already situated

[ 6] for separation.

[ 7]     Q    But it says they are, so it's a

[ 8] responsibility of the crew leader to make sure they're

[ 9] stacked uniformly?

[10]     A    Yes, okay.

[11]     Q    Okay?

[12]     A    Yes.

[13]     Q    And the cages that we're talking about

[14] are the cages that the catchers put the chickens into?

[15]     A    Yes.

[16]     Q    And those cages are then taken by the

[17] forklift operator and placed on the back of a flatbed

[18] trailer?

[19]     A    Yes.

[20]     Q    And that's the responsibility here, to

[21] make sure they're stacked uniformly, that's one of

[22] your responsibilities as a crew leader?

[23]     A    Yes.

[24]     Q    Okay. The next item in item G on page

[25] 2 of this exhibit speaks to in the summer, making sure

Page 38

[ 1] the fans are left hanging; is that a responsibility

[ 2] that the crew leader has?

[ 3]     A    Yes.

[ 4]     Q    And fans that are taken down should be

[ 5] placed on the floor, fans should be blowing in the

[ 6] same direction; is that your responsibility to make

[ 7] sure that happens?

[ 8]     A    Yes.

[ 9]     Q    Okay. And did you tell catchers to

[10] make sure that this occurs?

[11]     A    Yes.

[12]     Q    It talks about in the next item H,

[13] about not loading any more than a specific number of

[14] birds without permission; is that your responsibility,

[15] to make sure that the catchers don't put more birds in

[16] a particular compartment than they should?

[17]     A    That is something you don't have

[18] control over.

[19]     Q    But this is --

[20]     A    Once you tell the men how many to put

[21] to the door, you cannot stand and watch what is put to

[22] the door. So that might be a responsibility, but it's

[23] a responsibility that can't be -- it can't be done.

[24]     Q    Well, don't you observe them from time

[25] to time catching the birds, and making sure?

Page 39

[ 1]     A    Sure.

[ 2]     Q    Okay. So if somebody were putting more

[ 3] in at that time, would you say something?

[ 4]     A    If I observed them, yes.

[ 5]     Q    Sure, okay. But what you're basically

[ 6] saying is you can't always observe --

[ 7]     A    You can't always catch that.

[ 8]     Q    But if you can observe a catcher

[ 9] putting in more than they should, you can tell them to

[10] stop that?

[11]     A    Yes.

[12]     Q    Okay. It talks about filling out farm

[13] tickets, we'll get to that in a second. The next item

[14] it says is check with the driver to make sure the load

[15] is secure and sent back to the plant, is that one of

[16] your responsibilities?

[17]     A    Yes.

[18]     Q    Now, let's see if we can move through

[19] this. Roman Numeral III on page 2 of this exhibit

[20] speaks to various catching methods, there is night

[21] catching; is it your responsibility to make sure that

[22] the methods described here in night catching are

[23] followed?

[24]     A    Yes.

[25]     Q    And if there's going to be a deviation

Page 40

[ 1] from this, you can deviate from this, depending on the

[ 2] type of the house and the size of the birds and things

[ 3] like that, can't you?

[ 4]     A    Up to a point. If it had to be any

[ 5] type of serious deviation, I must contact my

[ 6] supervisor.

[ 7]     Q    All right. But it says, for example,

[ 8] under A, "Night catching: 1, Drive-ins, birds should

[ 9] be caught in place as much as possible. If moving is

[10] required, no less than 70 percent of the available

[11] floor space should be used." You could use 50

[12] percent, couldn't you?

[13]     A    Yes.

[14]     Q    Sure. The day catching, it talks about

[15] drive-in or A-frame houses, and there are a series of

[16] things that are listed here, talks about houses being

[17] caught on the inside; that's your responsibility, to

[18] make sure that the catchers follow this?

[19]     A    Yes.

[20]     Q    Okay. Fire fans should be placed at

[21] the end of the house; is that your responsibility to

[22] make sure that that happens?

[23]     A    If at all possible, yes.

[24]     Q    And if it's not there, can you tell the

[25] catchers to position it at the end of the house like

Page 45

[ 1]      A    Yes.

[ 2]      Q    Okay.  This is called a farm ticket,

have you seen this before?

[ 4]      A    Yes.

[ 5]      Q    I'd like to go over some of the

information that's on this ticket.  The upper

right-hand corner I see a date, who fills that in?

[ 8]      A    I do.

[ 9]      Q    You do as a crew leader?

[10]      A    Yes.

[11]      Q    So you put whatever date it is?

[12]      A    Yes.

[13]      Q    There's a lot number, who fills that

in?

[15]      A    The scales.

[16]      Q    Scales?  And there is a load number,

who fills that in?

[18]      A    Scales.

[19]      Q    The people at the scale house?

[20]      A    Yes.

[21]      Q    Okay.  There's a place for the grower,

the name of the grower, I would assume --

[23]      A    Yes.

[24]      Q    -- or the farmer, also called the

farmer, and who fills that in?

Page 46

[ 1]      A    I do.

[ 2]      Q    It talks about houses, and there are a

series of blanks, who puts the information in there?

[ 4]      A    I do.

[ 5]      Q    Just for purposes of clarification for

the record, a farmer may have five houses and you

would be told to catch house one and four, so would

you put one and four in there?

[ 9]      A    You put whatever house that you

catching the load out of.

[11]      Q    Okay, fine.  Time started, who fills

that in?

[13]      A    I do.

[14]      Q    And that's the time that you start

catching the chickens at the farm?

[16]      A    Time you start loading the truck.

[17]      Q    Time you start loading the truck?  And

time finished, what is that?

[19]      A    Time finished loading the truck.

[20]      Q    And so this is done for each truck

then?

[22]      A    Yes.

[23]      Q    Okay.  And there is a temperature, who

fills that in?

[25]      A    Scales.

Page 47

[ 1]      Q    Scales fills that in?  There's a

notation for a truck, who fills that information in?

[ 3]      A    I do.

[ 4]      Q    And we have had other testimony before,

each truck is numbered?

[ 6]      A    Yes.

[ 7]      Q    And the number is not the license plate

number, it's just a number that the company assigns to

the truck?

[10]      A    Yes.

[11]      Q    And the same is also true for the

trailer?

[13]      A    Yes.

[14]      Q    And who fills in the information for

the driver?

[16]      A    His name, I do.

[17]      Q    Okay.  So you're putting in the truck

number, the trailer number, and the driver's name?

[19]      A    Yes.

[20]      Q    The number of doors, who fills that

information in?

[22]      A    I do.

[23]      Q    And then there's a total and an average

weight, who fills that in?

[25]      A    I fill in the total of birds.  The

Page 48

average weight is done scale.

[ 2]      Q    Okay.  Now, going down to the second

part of the form, it says sign present, and there are

two boxes; who fills that out?

[ 5]      A    I do.

[ 6]      Q    And when it says sign present, what

does that mean?

[ 8]      A    Is the sign present for the directions

to the farm, is it present at the driveway.

[10]      Q    Okay.  So that would be the Walters

Farm, when I drive up I can see a sign that says the

Walters Farm?

[13]      A    Yes.

[14]      Q    And one of your jobs is to make sure

that's up?

[16]      A    No.

[17]      Q    Well, put it this way:  If it's not up,

you indicate that it's not up?

[19]      A    Correct, yes.

[20]      Q    And if it is up, you check the box that

says it is up?

[22]      A    Yes.

[23]      Q    I don't mean that it's your job to put

the thing in there yourself; it's your job to see

whether it's up or not?

B0078

Page 49

[ 1]     A    Yes.

[ 2]     Q    Okay. The grower present, who checks

[ 3] that box out?

[ 4]     A    I do.

[ 5]     Q    And what does that mean?

[ 6]     A    Is the grower present at the farm when

[ 7] we arrive.

[ 8]     Q    All right, present, does that mean that

[ 9] he is physically out there at the house, or does it

[10] mean that he is inside, sleeping or watching TV, or

[11] what does it mean?

[12]     A    It means that he's there at the farm,

[13] present.

[14]     Q    To observe catching?

[15]     A    To do his part.

[16]     Q    To do his part, okay. What is his

[17] part?

[18]     A    That should be reflected within the

[19] guidelines of company policy.

[20]     Q    You say the guidelines of company

[21] policy, you're referring to Garrison Exhibit 2, I saw

[22] you looking at that, where it says Growers

[23] Responsibilities?

[24]     A    Yes.

[25]     Q    Okay. Now, what happens if he doesn't

Page 50

[ 1] do these things?

[ 2]     A    The job must get done.

[ 3]     Q    All right. For example, one of the

[ 4] grower's responsibilities I see here in Garrison

[ 5] Exhibit 2, item b, is to pick up all dead birds

[ 6] immediately prior to catching crews' arrival; if he

[ 7] doesn't do that, who does that?

[ 8]     A    No one.

[ 9]     Q    Well, I guess they're not going

[10] anywhere, so they just stay on the ground?

[11]     A    Yes.

[12]     Q    Okay. Item c talks about raising and

[13] securing all equipment to the maximum height at the

[14] proper time; suppose he doesn't do that, who does

[15] that?

[16]     A    We do.

[17]     Q    We being?

[18]     A    Crew.

[19]     Q    The crew? Okay. Let's go back to

[20] Exhibit 1, if we may. It says DAFs prior to catch,

[21] DAF stands for dead at farm?

[22]     A    Yes.

[23]     Q    That's the number of chickens that are

[24] dead at the farm? And DAFs prior to catch, yes or no,

[25] who checks that box?

Page 51

[ 1]     A    I do.

[ 2]     Q    How do you go about deciding whether to

[ 3] check that box yes or no?

[ 4]     A    When I approach the farm, in order to

[ 5] see which house we going to get, we walk in, in order

[ 6] to prepare for work. And if I observe that the farmer

[ 7] hasn't picked up his birds as company policy say to,

[ 8] then I write no.

[ 9]     Q    You say the birds, you mean the dead

[10] birds?

[11]     A    Dead birds.

[12]     Q    Okay. So if he's not picked it up,

[13] would you check no, that he hasn't?

[14]     A    Yes.

[15]     Q    But if he has, you would check that?

[16]     A    Yes.

[17]     Q    Okay, thank you. Fire fan used, who

[18] checks that?

[19]     A    I do.

[20]     Q    What does that mean?

[21]     A    Did I use the fire fan.

[22]     Q    Okay.

[23]     A    Was the fire fan able to be used.

[24]     Q    All right. And is it your decision as

[25] to whether or not to use it?

Page 52

[ 1]     A    According to temperature.

[ 2]     Q    Okay. So then you will let the company

[ 3] know whether you used it or you didn't?

[ 4]     A    Yes.

[ 5]     Q    Okay. Chickens watered, that's what we

[ 6] talked about before with the driver watering the

[ 7] chickens?

[ 8]     A    Yes.

[ 9]     Q    And you will check whether the driver

[10] did what he was supposed to do or not?

[11]     A    Yes.

[12]     Q    And if he doesn't, I think we talked

[13] about you will go ahead and tell him to water the

[14] chickens?

[15]     A    Yes.

[16]     Q    Okay. The feeders up, who checks that

[17] box?

[18]     A    I do.

[19]     Q    That's one of the grower's

[20] responsibilities?

[21]     A    Yes.

[22]     Q    Okay. So if he's not done his job, you

[23] will check no, that he didn't do it or he hasn't?

[24]     A    No, no, I wouldn't. I would put no,

[25] but then I would have to call the plant and inform my

Page 53

[ 1] supervisor that this job wasn't done for which it's
[ 2] supposed to be done a certain amount of hours prior
[ 3] to.
[ 4]      Q    Okay.  So you will arrive at the farm
[ 5] and if the feeders aren't up, and I think that's one
[ 6] of the things we mentioned to before, it says raise
[ 7] and secure all equipment to the height at the proper
[ 8] time, the feeders, that would be one of the equipment?
[ 9]      A    Uh-huh, yes.
[10]      Q    So you get to the farm, and you see the
[11] feeder isn't up, the grower is not there, as you said
[12] before, you will direct the crew --
[13]      A    No.
[14]      Q    Well, maybe I misunderstood you.  You
[15] said that if it's not done before, that you guys would
[16] do it.
[17]      A    The waters.
[18]      Q    Oh, the waters, okay.
[19]      A    The waters.
[20]      Q    So it's not the feeders?
[21]      A    Not the feeders.
[22]      Q    Okay.  You're right, I don't know as
[23] much about catching as you do, but I wouldn't expect
[24] to.  So let's go to the waters; the waters are not up,
[25] okay, you and the crew will raise the waters?

Page 54

[ 1]      A    Yes.
[ 2]      Q    Okay.  Now, when it comes to the
[ 3] feeders, you will just call the plant and say the
[ 4] feeders aren't up?
[ 5]      A    Yes.
[ 6]      Q    And what do you do, not catch the
[ 7] house?
[ 8]      A    No.
[ 9]      Q    You don't catch the house?
[10]      A    We do not work until we're told to.
[11]      Q    Okay.  So then it's important for you
[12] to know whether those feeders are up or not?
[13]      A    Yes.
[14]      Q    Okay.  How about stoves?
[15]      A    No control.
[16]      Q    No control, I don't understand that.
[17]      A    The farmer's responsibility, we have no
[18] control over the stoves.
[19]      Q    But you're responsible for making sure,
[20] for checking the box as to whether they are up or they
[21] weren't up?
[22]      A    Yes.
[23]      Q    How about farm damage, who fills that
[24] out?
[25]      A    I do.

Page 55

[ 1]      Q    How do you go about deciding whether
[ 2] there's farm damage or not?
[ 3]      A    If there's any damage done by my
[ 4] forklift driver or the crew, then I report it.
[ 5]      Q    Okay.  How do you know that the damage
[ 6] that a farmer might report later wasn't done prior to
[ 7] you guys getting there?
[ 8]      A    We don't.
[ 9]      Q    You don't?
[10]      A    No.
[11]      Q    So when you arrive, you don't take a
[12] look at the house to see that everything's okay?
[13]      A    Only as much as possible.
[14]      Q    All right, I understand that.  I don't
[15] mean that you go around and give it a full inspection,
[16] but you take a look around the farm to see if there
[17] is --
[18]      A    Oh, yes.
[19]      Q    -- see if there's anything obvious
[20] there?
[21]      A    Yes.
[22]      Q    And if there is, do you make that
[23] information known to the grower?
[24]      A    I make it known to my supervisor.
[25]      Q    Okay.  So you wouldn't say to the

Page 56

[ 1] grower when you got there and say, "I see your pole
[ 2] over there has been hit before"?
[ 3]      A    No.
[ 4]      Q    You just make a note of that; you
[ 5] wouldn't say anything like that to the grower?
[ 6]      A    No, no.
[ 7]      Q    Okay.  But one of your jobs is to
[ 8] maintain a good relationship with the grower, isn't
[ 9] it?
[10]      A    Yes.
[11]      Q    So I'm curious as to why you wouldn't
[12] say to the grower when you get out there, "By the way,
[13] I see the pole has been, you know, been hit."
[14]      A    It's something he should already know,
[15] so I need not have to tell him that his pole is
[16] already broke.
[17]      Q    Well, I'm not talking about broken; I
[18] mean if it were broken, everybody could see it.  But
[19] somehow in some way damaged, so you don't get in a
[20] controversy later on when he tries to blame you guys
[21] for doing it, and you know you didn't --
[22]      A    No.
[23]      Q    -- you don't say anything to him?
[24]      A    No.
[25]      Q    Okay, if you don't, that's fine.  But

B0080

Page 57

[ 1]    you do take a casual look around to see if there's any

[ 2]    damage and, if there is, you will check yes?

[ 3]        A    Yes, yes.

[ 4]        Q    And if your people do damage to the

[ 5]    farm, you will also check yes?

[ 6]        A    Yes.

[ 7]        Q    Okay. Going to the second block of

[ 8]    boxes, it says the drive entrance accept or

[ 9]    unacceptable, who fills that out?

[10]        A    I do.

[11]        Q    And what are you looking for to

[12]    determine whether it's acceptable or nonacceptable?

[13]        A    The drop-offs.

[14]        Q    I'm sorry?

[15]        A    Mud.

[16]        Q    I'm sorry, drop-offs, I don't

[17]    understand what that term means.

[18]        A    See, cement pads at the end of houses

[19]    is not always level.

[20]        Q    I see.

[21]        A    So we call them drop-offs; when the

[22]    forklift have to bounce up on it, bounce off of it,

[23]    then we consider writing it up.

[24]        Q    You consider that to be unacceptable?

[25]        A    Yes.

Page 58

[ 1]        Q    Okay. And you would check that out?

[ 2]        A    Yes.

[ 3]        Q    So that's your decision to make?

[ 4]        A    Yes.

[ 5]        Q    Okay. House entrances, who fills that

[ 6]    out?

[ 7]        A    I do.

[ 8]        Q    And how do you go about deciding

[ 9]    whether it's acceptable or not?

[10]        A    The same reason, cement pad, moisture,

[11]    wet; loading conditions.

[12]        Q    Okay. And based on your experience,

[13]    you decide whether it's acceptable or not, and then

[14]    you check the box accordingly?

[15]        A    Well, I check the box, yes.

[16]        Q    Okay. Roads/loading area, what does

[17]    that mean?

[18]        A    Where the trucks are loaded by the

[19]    forklift, if it's not level, holes, muddy, it's hard

[20]    for the job to get done.

[21]        Q    Okay. And who decides whether to check

[22]    acceptable or unacceptable?

[23]        A    You can check it.

[24]        Q    Who decides which box to check it?

[25]        A    I do.

Page 59

[ 1]        Q    And then you check whatever box you

[ 2]    think is appropriate?

[ 3]        A    Yes.

[ 4]        Q    Okay, litter condition, who checks

[ 5]    that?

[ 6]        A    I do.

[ 7]        Q    And based on what, your observation of

[ 8]    the house?

[ 9]        A    Yes.

[10]        Q    And you will decide whether it's

[11]    acceptable or unacceptable?

[12]        A    As far as the words are, yes.

[13]        Q    Well, that's the box that's supposed to

[14]    be checked?

[15]        A    Yes.

[16]        Q    And then it said bird condition, good,

[17]    fair or poor, who fills that box out?

[18]        A    Scales.

[19]        Q    Okay. Let's go back to litter

[20]    condition for just a moment. There's a line that says

[21]    explain; if you found the litter to be unacceptable,

[22]    would you write something in there?

[23]        A    Yes.

[24]        Q    And you'd write in what your

[25]    observation was of why it was unacceptable?

Page 60

[ 1]        A    Yes.

[ 2]        Q    Okay. Let me ask you this: Have you

[ 3]    ever filled in for another crew leader under another

[ 4]    crew?

[ 5]        A    No.

[ 6]        Q    Okay. Has any crew leader ever filled

[ 7]    in for you?

[ 8]        A    Yes.

[ 9]        Q    Okay, who has filled in for you?

[10]        A    Willie Davis.

[11]        Q    Okay, anybody else?

[12]        A    Not crew leader, no.

[13]        Q    Okay. Let me ask you this: Have you

[14]    ever asked another crew leader to, because you might

[15]    be short, you may be down to six catchers and you

[16]    really can't catch with -- I mean you can catch with

[17]    six, but sometimes it's harder to do, have you ever

[18]    asked another crew leader to let you have one of their

[19]    catchers if they happen to have eight, for example?

[20]        A    Yes.

[21]        Q    Okay, and have they done so?

[22]        A    Yes.

[23]        Q    How about the reverse --

[24]        A    Yes.

[25]        Q    -- when you have been carrying eight,

Page 65

[ 1]    Q    So that's never happened?

[ 2]    A    No.

[ 3]    Q    Okay. Let's see. You approve

[ 4] vacations as the crew leader, do you not?

[ 5]    A    No.

[ 6]    Q    You do not approve vacations?

[ 7]    A    No.

[ 8]    Q    All right. You authorize advance pay

[ 9] for catchers?

[10]    A    No.

[11]    Q    You don't? Okay. You are responsible

[12] for maintaining discipline? I think we mentioned that

[13] earlier and we'll go into that a little bit further.

[14]         MR. MARTIN: Is that a question?

[15]         MR. BREWER: Yes, it is a question.

[16]         THE WITNESS: Yes.

[17] BY MR. BREWER:

[18]    Q    You are responsible for maintaining

[19] discipline?

[20]    A    Yes.

[21]    Q    And I think we already talked about

[22] you're responsible for planning the work as we just

[23] went through this document being Garrison 2?

[24]    A    Yes.

[25]    Q    All right, let's see. I am going to

Page 66

[ 1] show you, sir --

[ 2]         MR. MARTIN: Art, might this be a good

[ 3] time to break? We're an hour into it, sounds like

[ 4] we're in a transition period.

[ 5]         MR. BREWER: Yes, sure.

[ 6]         (Whereupon, a short recess was taken.)

[ 7]         (Walters Exhibit 1, marked for

[ 8] identification.)

[ 9] BY MR. BREWER:

[10]    Q    Mr. Walters, I'm going to give you a

[11] document which has been marked as Exhibit Number 1 to

[12] your deposition, and we're going to go through some of

[13] these. The first page on this document bears the name

[14] of an employee Syrus Bagwell, is that correct?

[15]    A    Syrinus.

[16]    Q    Syrinus Bagwell. And do you know

[17] Mr. Bagwell?

[18]    A    Yes.

[19]    Q    How do you know him?

[20]    A    He's in my crew.

[21]    Q    And he is requesting a floating

[22] holiday?

[23]    A    Yes.

[24]    Q    But he wants the money only?

[25]    A    Yes.

Page 67

[ 1]    Q    Does that mean that he will work the

[ 2] day but wants to be paid an additional day's pay?

[ 3]    A    Yes.

[ 4]    Q    Okay. And at the bottom I see that you

[ 5] have approved this, is that correct?

[ 6]    A    Yes.

[ 7]    Q    That's your signature on the box that

[ 8] says approved?

[ 9]    A    No.

[10]    Q    That's not your signature?

[11]    A    No.

[12]    Q    Okay. How about the check mark in the

[13] box that says approved?

[14]    A    No.

[15]    Q    That's not your signature either?

[16]    A    No.

[17]    Q    All right. Let's go to the next one, I

[18] see a Walter Brown.

[19]    A    Yes.

[20]    Q    Do you know Mr. Brown?

[21]    A    Yes.

[22]    Q    How do you know him?

[23]    A    At one time, he was my forklift driver.

[24]    Q    All right. And he is requesting a

[25] floating holiday but only wants money?

Page 68

[ 1]    A    Yes.

[ 2]    Q    And I see your signature where it says

[ 3] approved; is that your signature?

[ 4]    A    No.

[ 5]    Q    Did you approve that he could get money

[ 6] only?

[ 7]    A    No.

[ 8]    Q    You didn't?

[ 9]    A    No.

[10]    Q    And the one before with Mr. Bagwell,

[11] you didn't approve that he could get money only?

[12]    A    No.

[13]    Q    Okay. Let's go to the next paper, is

[14] that Brown? Walter -- I can't make out the last name,

[15] can you?

[16]    A    Yes, it's Walter Brown.

[17]    Q    Brown, okay. And he is requesting some

[18] time off, two weeks, is he not?

[19]    A    Are we on the same page, 3-28-03?

[20]    Q    I'm looking at, yes, 3-28-03.

[21]    A    Yes.

[22]    Q    He's requesting some vacation full days

[23] and he's also requesting a day off?

[24]    A    Yes.

[25]    Q    And is that your signature at the

B0082

Page 89

[1]    A    Yes.

[2]    Q    -- you didn't do that by yourself?

[3]    A    No.

[4]    Q    What did you do?

[5]    A    I signed these papers.

[6]    Q    You signed the papers?

[7]    A    I approved his vacation, I approved his

[8]    days off, but it all goes back to personnel whether he

[9]    gets it or not.

[10]    Q    Oh, do you know anybody who you

[11]    approved that they didn't get the time?

[12]    A    None that's came back to me, no.

[13]    Q    Okay, thank you.  So you sign the

[14]    approval and then it goes to the office?

[15]    A    Yes.

[16]    Q    That's the last you see of it?

[17]    A    Yes.

[18]    Q    And then if the guy doesn't show up, he

[19]    gets his vacation?

[20]    A    I assume.

[21]    Q    Well, you don't write him up, do you?

[22]    A    No.

[23]    Q    Okay.  And the reason you don't write

[24]    him up is because you approved he could have time off?

[25]    A    Yes.

Page 90

[1]    Q    Right, okay.  Tell me what happens, if

[2]    you know, if somebody on your crew gets hurt; what is

[3]    your responsibility there?

[4]    A    If someone on my crew gets hurt,

[5]    according to how bad it is, I send him in to plant to

[6]    the nurse.  If he has to go immediately, then I take

[7]    him myself if possible, or I dial 911 and they go to

[8]    the hospital or something, send him if it's a real bad

[9]    case, for which I haven't had one.

[10]    Q    Well, that's good.  But that's what

[11]    would happen if somebody on the crew gets hurt, you

[12]    will either take a look at it and decide whether he's

[13]    going to go to the plant nurse --

[14]    A    Yes.

[15]    Q    -- or whether you will call 911?

[16]    A    Yes.

[17]    Q    Or try to take him someplace yourself

[18]    if you can?

[19]    A    Yes.

[20]    Q    Okay.  Do you report that injury to

[21]    anybody?

[22]    A    Yes.

[23]    Q    Who do you report it to?

[24]    A    I report it to my supervisor.

[25]    Q    Who is?

Page 91

[1]    A    Doug Lynch.

[2]    Q    Let's go back to that fellow who wanted

[3]    a day off, says, "I need next Thursday off, I don't

[4]    expect to get paid for it," and everything else, and

[5]    you tell the fellah it's okay.

[6]    A    Uh-huh.

[7]        MR. MARTIN:  Yes?

[8]        THE WITNESS:  Yes.

[9]    BY MR. BREWER:

[10]    Q    You do have to try to remember that.

[11]    Do you report that to anybody?

[12]    A    No.

[13]    Q    The forklift operator that is your son,

[14]    Antonio?

[15]    A    Yes.

[16]    Q    Is he the only forklift operator you

[17]    have had since you have been a crew leader?

[18]    A    No.

[19]    Q    Who was your forklift operator before

[20]    him?

[21]    A    Walt Brown.  Walter Brown.

[22]    Q    Oh, is that the Mr. Brown whose

[23]    signature we saw back here earlier?

[24]    A    Yes, yes.

[25]    Q    So he was the forklift operator?

Page 92

[1]    A    Yes.

[2]    Q    When did your son become the forklift

[3]    operator on your crew?

[4]    A    I can't remember that one.  Exactly, I

[5]    can't remember.

[6]    Q    I don't need an exact date.  A year?

[7]    A    I'm going to say 2004.

[8]    Q    Okay.  So fairly recently?

[9]    A    Yeah.

[10]    Q    Within approximately a year?

[11]    A    Yeah.

[12]    Q    Okay.  How did he come to get the job?

[13]    A    Experience.

[14]    Q    What was he doing before he was your

[15]    forklift operator?

[16]    A    Catcher.

[17]    Q    He was a catcher?

[18]    A    Yes.

[19]    Q    Was he also on your crew?

[20]    A    No.

[21]    Q    All right, whose crew was he on?

[22]    A    Larry Gibbs'.

[23]    Q    He was on Larry Gibbs' crew?

[24]    A    Yes.

[25]    Q    And he got experience, how did he get

B0083

Page 93

[ 1]    the experience?

[ 2]         A    Training, on-the-job training.

[ 3]         Q    On-the-job training?

[ 4]         A    Uh-huh.

[ 5]         Q    Who gave him that on-the-job training?

[ 6]         A    Between Larry's forklift operator and

[ 7]    myself.

[ 8]         Q    Okay, between Larry's forklift

[ 9]    operator. How could you be training him if he's not

[10]    on your crew?

[11]         A    We used to go down the plant on

[12]    Saturdays and get the forklift.

[13]         Q    Oh, I see, okay.

[14]         A    When he first started catching chickens

[15]    with Mountaire, I was a forklift operator.

[16]         Q    That's right.

[17]         A    And when we had to sit around and wait

[18]    on trucks, I informed him on how to operate a

[19]    forklift.

[20]         Q    Let me just see if I understand this

[21]    now. You're a crew leader and you're --

[22]         A    Not at that time when I trained him.

[23]         Q    Oh, all right. What period of time

[24]    were you then training your son to become a forklift

[25]    operator?

Page 94

[ 1]         A    When I was a forklift operator myself.

[ 2]         Q    So it's prior then to 2001?

[ 3]         A    Yes.

[ 4]         Q    You and he would go into the plant on a

[ 5]    Saturday?

[ 6]         A    Yes.

[ 7]         Q    And you would show him how to operate a

[ 8]    forklift?

[ 9]         A    Yes.

[10]         Q    Okay. How long did that happen, did

[11]    that go on?

[12]         A    Possibly a year or more.

[13]         Q    Okay. And then how is it he came to

[14]    become a forklift operator on your crew? Did

[15]    Mr. Gibbs recommend him to you?

[16]         A    Experience.

[17]         Q    Okay.

[18]         A    Once the experience was known, then he

[19]    took the company test.

[20]         Q    All right.

[21]         A    He was qualified through the company,

[22]    and they placed him.

[23]         Q    Okay. Did you have anything at all to

[24]    do with that?

[25]         A    No.

Page 95

[ 1]         Q    Just the training that you mentioned?

[ 2]         A    Yes.

[ 3]         Q    Did your son consider that to be a

[ 4]    promotion?

[ 5]         A    I couldn't relate to that one.

[ 6]         Q    You couldn't relate to that? I know,

[ 7]    because you didn't --

[ 8]         A    No.

[ 9]         Q    All right, all right. Let's take a

[10]    look at this would be Number 2, I guess, to

[11]    Mr. Walters' deposition.

[12]              (Walters Exhibit 2, marked for

[13]    identification.)

[14]    BY MR. BREWER:

[15]         Q    Mr. Walters, this has been marked as

[16]    Exhibit 2 to your deposition, this is an employee

[17]    warning notice --

[18]         A    Uh-huh.

[19]         Q    -- to a Mr. Leon Tucker.

[20]         A    Yes.

[21]         Q    And I believe we have identified him as

[22]    being a member of your crew?

[23]         A    Yes.

[24]         Q    Do you recognize the writing on this

[25]    page?

Page 96

[ 1]         A    Yes.

[ 2]         Q    Whose writing is it?

[ 3]         A    Mine.

[ 4]         Q    Okay. Company policy, this is your

[ 5]    writing, it says "Call if not working"?

[ 6]         A    Yes.

[ 7]         Q    And we had just discussed something

[ 8]    like this; he did not call and didn't show up for

[ 9]    work, I see, is that correct?

[10]         A    That's correct.

[11]         Q    And you gave him three days off as a

[12]    final warning?

[13]         A    Yes.

[14]         Q    That's your signature?

[15]         A    Yes.

[16]         Q    Okay. Mr. Richard Satchell, I believe

[17]    he's also one of the gentlemen we mentioned as being

[18]    on your crew --

[19]         A    Yes.

[20]         Q    -- as a catcher?

[21]         A    Yes.

[22]         Q    And again, the company policy, it says,

[23]    "Call if not working. No time to find someone; call

[24]    late after 10 p.m." and the violation was he called in

[25]    too late?

B0084

Page 101

[ 1]    Q    And you can take however much -- I mean
[ 2]  whatever time it takes to get them done, you can do,
[ 3]  correct, you can take --
[ 4]    A    Once the orders are given, then the
[ 5]  company expect the chickens to be caught.
[ 6]    Q    That's correct, that's right.
[ 7]    A    So, time ...
[ 8]    Q    When you receive the work, the farms
[ 9]  that you're supposed to go to --
[10]    A    Yes.
[11]    Q    -- all right, you're supposed to get
[12]  that done --
[13]    A    Yes.
[14]    Q    -- that day?
[15]    A    Yes.
[16]    Q    Okay.  And if during the course of the
[17]  week that requires overtime to be worked by the
[18]  crew --
[19]    A    Yes.
[20]    Q    -- that's okay?
[21]    A    Yes.
[22]    Q    Okay.  And you can authorize that
[23]  yourself, can you not?
[24]    A    I don't understand authorize.
[25]    Q    All right.  You just go through your

Page 102

[ 1]  work each day, and if at the end of a given day or a
[ 2]  given week its taken you 45 hours, shall we say, to
[ 3]  catch the chickens that you were supposed to catch
[ 4]  this week, that's what it takes?
[ 5]    A    Yes.
[ 6]    Q    Okay.  You don't have to call anybody
[ 7]  up and say, you know, "We're at 40 hours, can I catch
[ 8]  anymore?"
[ 9]    A    No.
[10]    Q    You just go ahead and do it?
[11]    A    Yes.
[12]    Q    Okay.  Now, this is Exhibit 6 to
[13]  Mr. Garrison's deposition which is the agreement
[14]  between Teamster's Local 355 and the company; you have
[15]  seen this before?
[16]    A    Yes.
[17]    Q    Okay.  What I'd like you to do is to go
[18]  to Article 10, which appears on page 9 of this
[19]  exhibit, Section 1.  Just a quick look at that for me,
[20]  if you would.
[21]    A    Article 10, Grievance?
[22]    Q    Grievance procedure, the first one
[23]  under number 1 says a complaint, and then it talks
[24]  about how you take the complaint up.
[25]    A    Um-hmm.

Page 103

[ 1]    Q    It's the aggrieved employee who first
[ 2]  takes the matter up with the shop steward, that would
[ 3]  have been you when you were shop steward, right?
[ 4]    A    Yes, that's correct.
[ 5]    Q    And then you in turn would take that up
[ 6]  with the foreman, whoever the foreman would be?
[ 7]    A    Yes.
[ 8]    Q    Now, since you're a crew leader, if one
[ 9]  of your catchers or forklift operators or a driver has
[10]  a problem, the person that they come to in the first
[11]  instance is you?
[12]    A    No.
[13]    Q    All right, one of your catchers has a
[14]  grievance, okay?
[15]    A    Yes.
[16]    Q    Tell me what he does.
[17]    A    He automatically knows that he's in the
[18]  Union.
[19]    Q    Right.
[20]    A    He automatically knows that he contact
[21]  his shop steward.
[22]    Q    Correct, okay, and who is that?
[23]    A    At the time -- who was it?
[24]    Q    That's okay.  It's Binky now, isn't it?
[25]    A    I think so.

Page 104

[ 1]    Q    Yeah, I think so.  Okay, so the catcher
[ 2]  in your crew who's got a grievance --
[ 3]    A    Yes.
[ 4]    Q    -- is going to contact Binky?
[ 5]    A    Yes.
[ 6]    Q    Okay.  And who is Binky going to
[ 7]  contact?
[ 8]    A    His representative, I'm assuming.
[ 9]    Q    When you say his representative --
[10]    A    The Union representative in order to
[11]  follow through on the grievance.
[12]    Q    Well, that's in a later step.
[13]    A    Well, each one did different.  I did
[14]  mine different; I contacted the Union man first, and
[15]  then we contacted the company.
[16]    Q    So you never went to the supervisor,
[17]  the first line supervisor?
[18]    A    No.  Not when I was a Union steward.
[19]    Q    Well, that's right, because that's what
[20]  the contract says, is with the Union steward who in
[21]  turn takes the grievance up with the foreman in
[22]  charge, but you're saying you never did that?
[23]    A    No, no.
[24]    Q    Okay, and do you know whether Binky
[25]  does that or not now?

Page 105

[ 1]        A    No, I don't.

[ 2]        Q    Okay.  If you did this, if you did what

[ 3]  you were supposed to do, what the contract says to do,

[ 4]  who would you have taken it up with?

[ 5]        A    Doug Lynch.

[ 6]        Q    Well, he's not foreman in charge of a

[ 7]  crew, is he?

[ 8]        A    No, you take it up with the foreman of

[ 9]  the live haul; live haul foreman, not the crew leader.

[10]        Q    Okay, that's what you think this says?

[11]        A    Yes.

[12]        Q    Okay, that's fine.  But you never did

[13]  that either, you just went right to the Union reps?

[14]        A    Yeah, I let him contact the company.

[15]        Q    Okay.  Let me show you what will be

[16]  marked as Exhibit 3, I guess.

[17]              (Walters Exhibit 3, marked for

[18]  identification.)

[19]  BY MR. BREWER:

[20]        Q    This document is a series of pages, and

[21]  they're all basically a receipt from petty cash, the

[22]  title of the document says Received of Petty Cash.

[23]  Take a look at the first one, I see it's a Mr. Thomas

[24]  Major.

[25]        A    Yes.

Page 106

[ 1]        Q    Is that the same Mr. Major who is a

[ 2]  catcher for you?

[ 3]        A    Yes.

[ 4]        Q    Okay.  And he's requesting that he be

[ 5]  given $200?

[ 6]        A    Yes.

[ 7]        Q    Is that your signature where it says

[ 8]  approved by?

[ 9]        A    Yes.

[10]        Q    So you approved that he could get $200

[11]  from petty cash?

[12]        A    Yes, yes.

[13]        Q    How does Mr. Major get the money?

[14]  What's the process that's followed?

[15]        A    Well, when there was a petty cash, this

[16]  slip here was taken to the petty cash I'm going to say

[17]  clerk, and she had the money.  He signed the slip, he

[18]  received the money.

[19]        Q    Did you ever get the money from petty

[20]  cash and give it to any members on your crew?

[21]        A    No.

[22]        Q    You never did that?

[23]        A    No.

[24]        Q    Okay.  By the way, when your people get

[25]  paid, when do they get paid?

Page 107

[ 1]        A    Fridays.

[ 2]        Q    Fridays?  Who gives them their

[ 3]  paychecks?

[ 4]        A    They're passed out the through the

[ 5]  scale room.

[ 6]        Q    Okay.  Do you pass out a paycheck at

[ 7]  all?

[ 8]        A    Yes, yes.

[ 9]        Q    Okay.  And how often do you pass them

[10]  out?

[11]        A    Accordingly to when they are received.

[12]  Sometimes they're Friday morning and I'll pick the

[13]  checks up before I pick the help up so that they can

[14]  have a time before they go to work in order to cash

[15]  them.

[16]        Q    All right.  Other times, it's given out

[17]  at the scale house?

[18]        A    Generally.

[19]        Q    Okay, thank you.  So let's talk about

[20]  this Mr. Major.  He obviously has to come to you

[21]  because you're approving it; so Mr. Major would have

[22]  come to you and asked for you to approve a request for

[23]  him to get $200 from petty cash?

[24]        A    Yes.

[25]        Q    Would he have had this document, this

Page 108

[ 1]  receipt, with him?

[ 2]        A    No.

[ 3]        Q    No?  Who had this receipt?

[ 4]        A    We had -- we had books of petty cash

[ 5]  slips.

[ 6]        Q    So you as a crew leader had a book --

[ 7]        A    Yes.

[ 8]        Q    -- of receipts like this?

[ 9]        A    Yes.

[10]        Q    So when he would have come to ask you

[11]  for this, is this writing all yours or is some of it

[12]  his?

[13]        A    The social security number, date, name,

[14]  my signature, and the $200.

[15]        Q    Okay, that's your writing?

[16]        A    Yes.

[17]        Q    So he would have come to you,

[18]  requesting $200 from petty cash; you would have had

[19]  the receipt, you would have filled it out and you

[20]  would have approved it?

[21]        A    Yes.

[22]        Q    Then would you have given the receipt

[23]  to him?

[24]        A    Yes.

[25]        Q    And then he's the one who took it to

TAB 10

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WILLIE DAVIS, JR., | : | |
| NATHANIEL BRIDDELL, | : | |
| JOSEPH GARRISON, | : | C.A. NO. |
| LARRY E. GIBBS, | : | |
| ROY H. WALTERS, | : | JURY TRIAL DEMANDED |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MOUNTAIRE FARMS OF | : | |
| DELAWARE, INC., | : | |
| | : | |
| Defendant. | : | |

### AFFIDAVIT OF WILLIE DAVIS, JR.

| | | |
|---|---|---|
| STATE OF DELAWARE | : | |
| | : | SS. |
| COUNTY OF NEW CASTLE | : | |

I, Willie Davis, Jr., having been duly sworn, depose and say as follows:

1.  It was not a part of my job duties when I was a crew leader to hire or fire employees or to make any recommendations as to their employment status.

2.  If there were times that I advised Doug Lynch about the possibility of hiring a catcher, it was because someone I knew needed a job.

3.  I was never required to recruit people to be employed by Mountaire Farms.

4.  If someone I knew wanted a job I would have them complete an application and/or send that person to Doug Lynch.

5.  The total number of people who I had complete an application or sent to Doug

Lynch is very minimal.

WILLIE DAVIS, JR.

SWORN TO AND SUBSCRIBED before me, a Notary Public, for the State and

County aforesaid, this 1st day of May, 2005.

NOTARY PUBLIC

ANTHONY J. IANNINI
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 30, 2007

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

WILLIE DAVIS, JR.,                    :
NATHANIEL BRIDDELL,                   :
JOSEPH GARRISON,                      :    C.A. NO.
LARRY E. GIBBS,                       :
ROY H. WALTERS,                       :    JURY TRIAL DEMANDED
                                      :
    Plaintiffs,                      :
                                      :
       v.                        :
                                      :
MOUNTAIRE FARMS OF                    :
DELAWARE, INC.,                       :
                                      :
    Defendant.                       :

## AFFIDAVIT OF NATHANIEL BRIDDELL

STATE OF DELAWARE              :
                               :    SS.
COUNTY OF NEW CASTLE           :

I, Nathaniel Briddell, having been duly sworn, depose and say as follows:

1.    It was not a part of my job duties when I was a crew leader to hire or fire employees or to make any recommendations as to their employment status.

2.    If there were times that I advised Doug Lynch about the possibility of hiring a catcher, it was because someone I knew needed a job.

3.    I was never required to recruit people to be employed by Mountaire Farms.

4.    If someone I knew wanted a job I would have them complete an application and/or send that person to Doug Lynch.

5.     The total number of people who I had complete an application or sent to

Doug Lynch is very minimal.

*Nathaniel Briddell*

NATHANIEL BRIDDELL

SWORN TO AND SUBSCRIBED before me, a Notary Public, for the State and

County aforesaid, this 1st day of May, 2005.

NOTARY PUBLIC

ANTHONY J. IANNINI
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 30, 2007

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WILLIE DAVIS, JR., | : | |
| NATHANIEL BRIDDELL, | : | |
| JOSEPH GARRISON, | : | C.A. NO. |
| LARRY E. GIBBS, | : | |
| ROY H. WALTERS, | : | JURY TRIAL DEMANDED |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MOUNTAIRE FARMS OF | : | |
| DELAWARE, INC., | : | |
| | : | |
| Defendant. | : | |

## AFFIDAVIT OF JOSEPH GARRISON

| | | |
|---|---|---|
| STATE OF DELAWARE | : | |
| | : | SS. |
| COUNTY OF NEW CASTLE | : | |

I, Joseph Garrison., having been duly sworn, depose and say as follows:

1.  It was not a part of my job duties when I was a crew leader to hire or fire employees or to make any recommendations as to their employment status.

2.  If there were times that I advised Doug Lynch about the possibility of hiring a catcher, it was because someone I knew needed a job.

3.  I was never required to recruit people to be employed by Mountaire Farms.

4.  If someone I knew wanted a job I would have them complete an application and/or send that person to Doug Lynch.

5.  The total number of people who I had complete an application or sent to Doug

Lynch is very minimal.

JOSEPH GARRISON

SWORN TO AND SUBSCRIBED before me, a Notary Public, for the State and

County aforesaid, this 1st day of May, 2005.

NOTARY PUBLIC

ANTHONY J. IANNINI
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 30, 2007

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

WILLIE DAVIS, JR.,                    :
NATHANIEL BRIDDELL,                   :
JOSEPH GARRISON,                      :    C.A. NO.
LARRY E. GIBBS,                       :
ROY H. WALTERS,                       :    JURY TRIAL DEMANDED
                                      :
        Plaintiffs,                   :
                                      :
          v.                          :
                                      :
MOUNTAIRE FARMS OF                    :
DELAWARE, INC.,                       :
                                      :
        Defendant.                    :

## AFFIDAVIT OF LARRY E. GIBBS

STATE OF DELAWARE                     :
                                      :    SS.
COUNTY OF NEW CASTLE                  :

I, Larry E. Gibbs, having been duly sworn, depose and say as follows:

1.    It was not a part of my job duties when I was a crew leader to hire or fire employees or to make any recommendations as to their employment status.

2.    If there were times that I advised Doug Lynch about the possibility of hiring a catcher, it was because someone I knew needed a job.

3.    I was never required to recruit people to be employed by Mountaire Farms.

4.    If someone I knew wanted a job I would have them complete an application and/or send that person to Doug Lynch.

5.    The total number of people who I had complete an application or sent to Doug

Lynch is very minimal.

_____
LARRY E. GIBBS

SWORN TO AND SUBSCRIBED before me, a Notary Public, for the State and

County aforesaid, this 1st day of May, 2005.

_____
NOTARY PUBLIC

ANTHONY J. IANNINI
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 30, 2007

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WILLIE DAVIS, JR., | : | |
| NATHANIEL BRIDDELL, | : | |
| JOSEPH GARRISON, | : | C.A. NO. |
| LARRY E. GIBBS, | : | |
| ROY H. WALTERS, | : | JURY TRIAL DEMANDED |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MOUNTAIRE FARMS OF | : | |
| DELAWARE, INC., | : | |
| | : | |
| Defendant. | : | |

## AFFIDAVIT OF ROY H. WALTERS

| | | |
|---|---|---|
| STATE OF DELAWARE | : | |
| | : | SS. |
| COUNTY OF NEW CASTLE | : | |

I, Roy H. Walters, having been duly sworn, depose and say as follows:

1.     It was not a part of my job duties when I was a crew leader to hire or fire employees or to make any recommendations as to their employment status.

2.     If there were times that I advised Doug Lynch about the possibility of hiring a catcher, it was because someone I knew needed a job.

3.     I was never required to recruit people to be employed by Mountaire Farms.

4.     If someone I knew wanted a job I would have them complete an application and/or send that person to Doug Lynch.

5.     The total number of people who I had complete an application or sent to Doug

Lynch is very minimal.

ROY H. WALTERS

SWORN TO AND SUBSCRIBED before me, a Notary Public, for the State and

County aforesaid, this 1st day of May, 2005.

NOTARY PUBLIC

ANTHONY J. IANNINI
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 30, 2007

B0095