1

```
 1              IN THE UNITED STATES DISTRICT COURT
                IN AND FOR DISTRICT OF DELAWARE
 2

 3   WILLIE DAVIS, JR.,                )
     NATHANIEL BRIDDELL,               )
 4   GEORGE W. FEDDIMAN,               )
     JOSEPH GARRISON,                  )
 5   LARRY E. GIBBS,                   )
     ROY H. WALTERS,                   )
 6                                     )
     ALL SIMILARLY SITUATED CURRENT    )
 7   AND FORMER EMPLOYEES OF           )
     MOUNTAIRE FARMS, INC.,            )
 8   MOUNTAIRE FARMS OF DELMARVA,      )
     INC., and MOUNTAIRE FARMS OF      )
 9   DELAWARE, INC.,                   )
                       Plaintiffs,     )
10        -vs-                         )   C.A. No. 04-0414
                                       )
11   MOUNTAIRE FARMS, INC.,            )
     MOUNTAIRE FARMS OF                )
12   DELMARVA, INC., and               )
     MOUNTAIRE FARMS OF                )
13   DELAWARE, INC., all Delaware      )
     corporations,                     )
14                     Defendants.     )
                                      - - - - - - -
15             Deposition of PHILLIP OWEN, taken before
     Pamela C. Washington, Registered Professional Reporter
16   and Notary Public, at the law offices of Young,
     Conaway, Stargatt & Taylor, 110 West Pine Street,
17   Georgetown, DE, on February 1, 2005, beginning at 1:00
     p.m.
18
     APPEARANCES:
19       On behalf of the Plaintiffs:
             Margolis Edelstein
20           BY:  JEFFREY K. MARTIN, ESQ.
             and  KERI L. WILLIAMS, ESQ.
21           1509 Gilpin Avenue
             Wilmington, Delaware 19806
22
         On behalf of the Defendants:
23           Shawe & Rosenthal
             BY:  ARTHUR M. BREWER, ESQ.
24           20 South Charles Street
             Baltimore, Maryland  21201
25
```

FIRST STATE REPORTING SERVICE           (302) 424-4541
                         Pamela C. Washington, RPR
P.O. Box 99              Milford, Delaware  19963

Page 51

[1] A    I'm going to have to say I don't have a
[2] thorough understanding of the reasoning. If there was
[3] an initiating event, it occurred before my time, and I
[4] don't have a clear understanding of the initiating
[5] mechanism.
[6]     Q    What is the company's position, if you
[7] know, as to the status of the crew leaders before they
[8] became salaried?
[9]     A    Could you repeat the question so I
[10] can --
[11]     Q    Sure.
[12]         MR. MARTIN: Pam, please read it back.
[13]         (Whereupon, the last question of the
[14] record was read.)
[15]         THE WITNESS: The status of the crew
[16] leaders with respect to exempt or nonexempt?
[17] BY MR. MARTIN:
[18]     Q    Yes.
[19]     A    That they were nonexempt prior to
[20] becoming salaried, made exempt.
[21]     Q    They were nonexempt?
[22]     A    They were nonexempt prior to June of
[23] '03, I believe it was -- '02, I'm sorry.
[24]     Q    Who was your predecessor, if you know?
[25]     A    His name is Dave Tanner.

Page 52

[1]     Q    And he was the HR director?
[2]     A    Correct.
[3]     Q    Is he still with the company?
[4]     A    He's no longer with the company.
[5]     Q    And do you know when he was HR
[6] director?
[7]     A    I can't be certain. I know
[8] approximately when he transitioned out of the
[9] position.
[10]     Q    When was that?
[11]     A    I would say in December of -- or
[12] November of '03. And I heard that he was with the
[13] company about five years prior to that time; could
[14] have been longer, I'm not sure.
[15]     Q    Did you have the advantage of looking
[16] at some of his notes with regard to some of the issues
[17] that had occurred?
[18]     A    Yes.
[19]     Q    Were you aware of any issues before
[20] February of 2004 as to the crew leader's request for
[21] overtime?
[22]     A    No, I was not.
[23]     Q    Given what you just told me, that the
[24] company believes that the crew leaders were nonexempt
[25] before June of 2002 or whenever they became salaried,

Page 53

[1] why is it that they were not paid overtime?
[2]     A    I don't know that I'm -- let me hear
[3] your question again, could you please repeat the
[4] question? I'm not certain I have understood the
[5] question.
[6]     Q    I understand the company's position is
[7] that before the crew leaders became salaried in or
[8] around June of 2002, they were nonexempt.
[9]     A    Correct.
[10]     Q    Why is it that they were not eligible
[11] for and paid overtime before that time?
[12]     A    Prior to June of '02?
[13]     Q    Yes.
[14]     A    I don't know that -- I don't know the
[15] answer. I don't know the answer.
[16]     Q    Does that concern you at all?
[17]     A    Not particularly. I guess I have spent
[18] most of my time looking at the issue of overtime with
[19] respect to being exempt; I have not looked at the
[20] issue of -- and I -- of nonpayment of overtime in a
[21] nonexempt status.
[22]     Q    All right. I understand the company's
[23] position through your testimony, but let me try to
[24] understand. Please explain to me how it is that they
[25] can become exempt just by virtue of being salaried.

Page 54

[1]     A    I don't know that I have a really good
[2] answer for you, because everything did occur prior to
[3] my getting here. But I guess I could say that, you
[4] know, a position can be reclassified in looking at the
[5] responsibilities, and positions do change and
[6] responsibilities over time.
[7]     Q    All right.
[8]     A    And that may well have been the
[9] mechanism; I don't know that to be true.
[10]     Q    Do you have any understanding at all as
[11] to how their job responsibilities may have changed
[12] from the nonexempt days to the exempt days?
[13]     A    Well, this is probably more
[14] philosophical than anything but, you know, once upon a
[15] time, they were independent contractors, and I don't
[16] know how much that played into the evolution, they
[17] became company employees, and I haven't tracked that.
[18] But, you know, there's an evolution of sorts.
[19]     Q    Do you believe they should still be
[20] independent contractors?
[21]         MR. BREWER: I'm going to object.
[22]         THE WITNESS: I would say no. I think
[23] it's the best of all worlds if they're company
[24] employees.
[25]

Page 111

[1] Q Well, I mean what is your
[2] understanding, if any, as to the process by which the
[3] disciplinary form is written up by the crew leader and
[4] submitted to the plant?
[5] A Well, in my estimation, everything that
[6] is on the document should be from the crew leader.
[7] And it says at the bottom Human Resources manager's
[8] signature, and that's the only thing that should be
[9] written by someone else, in my opinion. But this
[10] is -- you know, I can't answer how the circle got
[11] there.
[12] Q I understand that. But this one does
[13] not have a signature by the HR manager's signature,
[14] correct?
[15] A Right.
[16] Q Is it your understanding that that
[17] normally must occur?
[18] A I'm not sure. I'm not sure of the --
[19] of what the usual process is with live haul and with
[20] respect to -- most of these are before my time. In
[21] fact, all of these are.
[22] Q Well, let me ask you what the process
[23] is now, then, to the best of your understanding. If
[24] the disciplinary is written up by a crew leader, does
[25] someone from HR sign off on it?

Page 112

[1] A I don't know. I should know but I
[2] don't know.
[3] Q All right. Let me just finish up here.
[4] We noted that there was a change in status from
[5] nonexempt to exempt according to Mountaire in June of
[6] 2002.
[7] A Correct.
[8] Q And I recognize that you were not yet
[9] employed at Mountaire, but you have the access to the
[10] HR files and the other files, correct?
[11] A Yes, yes, yes, I do. Yes, I do.
[12] Q Were you aware of any type of analysis
[13] that was undertaken by the company to support the
[14] change from one to the other?
[15] A I am not. I don't -- I know of no such
[16] analysis.
[17] Q All right. Now, let me ask you kind of
[18] a catch-all question, and that is you have testified
[19] that there were various memos written between you and
[20] Mr. Brown, and you and Al Z --
[21] A Yes.
[22] Q -- all of which you are going to
[23] produce, subject to any exceptions by your counsel.
[24] Are there any other memos or any other writings with
[25] regard to this issue as to the crew leader entitlement

Page 113

[1] to overtime pay that you're aware of, other than any
[2] communications with Mr. Brewer that are there?
[3] A I know of no written communications on
[4] this subject.
[5] Q Other than what we have specified?
[6] A Yes, sir, other than what's been
[7] specified.
[8] MR. MARTIN: Thank you, sir, that's all
[9] the questions I have.
[10] BY MR. BREWER:
[11] Q Mr. Owen, I have a few questions for
[12] you. Let's just start with I believe it was Garrison
[13] Exhibit 1, which is the farm ticket.
[14] A Yes.
[15] Q You were asked a question about
[16] checking the box about sign present.
[17] A Yes.
[18] Q And I believe you were also asked
[19] whether anybody could do that, and your answer was
[20] yes?
[21] A Yeah, okay, yes.
[22] Q All right. But it is the crew leader's
[23] responsibility to do it, isn't it?
[24] A Absolutely, it is, yes.
[25] Q Now, looking at Exhibit Number 1, which

Page 114

[1] is this document here, the very top of the document
[2] where it says Crew Leader Job Analysis, March 10,
[3] 2004, it says responsibilities --
[4] A Yes.
[5] Q -- does it not? And then these are the
[6] responsibilities that were listed and that you and
[7] Mr. Martin just discussed?
[8] A Yes.
[9] Q These are responsibilities of the crew
[10] leader?
[11] A Yes.
[12] Q Okay. Let's go to this topic here, it
[13] says Assess Type of House, then it says semicolon Plan
[14] Load/Catch Approach. You were asked whether assessing
[15] the type of house was managerial, but it's the entire
[16] line, it says Assess Type of House; Plan/Catch
[17] Approach?
[18] A Yes.
[19] Q Okay. And that is the responsibility
[20] of the crew leader?
[21] A It is, yes.
[22] Q Okay, let's see. You talked about a
[23] Mr. Kendall?
[24] A Yes.
[25] Q He, if my note is correct, is on the

Page 1

[1]         IN THE UNITED STATES DISTRICT COURT
            IN AND FOR THE DISTRICT OF DELAWARE
[2]
[3]  WILLIE DAVIS, JR.              )
     NATHANIEL BRIDDELL,             )
[4]  GEORGE W. FEDDIMAN,             )
     JOSEPH GARRISON,                )
[5]  LARRY E. GIBBS,                 )
     ROY H. WALTERS,                 )
[6]  ALL SIMILARLY-SITUATED CURRENT  )
     AND FORMER EMPLOYEES OF         )
[7]  MOUNTAIRE FARMS, INC.,          )
     MOUNTAIRE FARMS OF DELMARVA,    )
[8]  INC., and MOUNTAIRE FARMS OF    )
     DELAWARE, INC.,                 )
[9]             Plaintiffs,          )
            -vs-                     )   C.A. No. 04-0414
[10]  MOUNTAIRE FARMS, INC.,          )
[11]  MOUNTAIRE FARMS OF              )
      DELMARVA, INC., and             )
[12]  MOUNTAIRE FARMS OF DELAWARE,    )
      INC., all Delaware corporations)
[13]           Defendants.            )
            - - - - - -
[14]     Deposition of WILLIAM DOUGLAS LYNCH, taken
     before Pamela C. Washington, Registered Professional
[15] Reporter and Notary Public, at the law offices of
     Young, Conaway, Stargatt & Taylor, 110 West Pine
[16] Street, Georgetown, Delaware, on March 15, 2005,
     beginning at 11:30 a.m.
[17]            - - - - - -
[18] APPEARANCES:
[19]     On behalf of the Plaintiffs:
           Margolis Edelstein
[20]       BY:  JEFFREY K. MARTIN, ESQ.
           and  KERI WILLIAMS, ESQ.
[21]       1509 Gilpin Avenue
           Wilmington, Delaware 19806
[22]
     On behalf of the Defendant:
[23]       Shawe & Rosenthal
           BY:  ARTHUR M. BREWER, ESQ.
[24]       and  LAURA PIERSON SCHEINBERG, ESQ.
           20 South Charles Street
[25]       Baltimore, Maryland  21201

Page 2

[1]                    I-N-D-E-X
[2]  Witness:
         WILLIAM DOUGLAS LYNCH
[3]          Examination by Mr. Martin ..........   3
             Examination by Mr. Brewer ..........  111
[4]
[5]
[6]
[7]
[8]
[9]
     CERTIFICATE OF COURT REPORTER ...............  117
[10]

Page 3

[1]  WHEREUPON:
[2]           WILLIAM DOUGLAS LYNCH,
[3]  having first been duly sworn by the court reporter,
[4]  thereupon testified upon his oath as follows:
[5]  BY MR. MARTIN:
[6]      Q    Please state your full name for the
[7]  record.
[8]      A    William Douglas Lynch.
[9]      Q    And what is your date of birth?
[10]     A    3-12-54.
[11]     Q    Happy birthday to you.
[12]     A    Saturday.
[13]          (Whereupon, there was a discussion held
[14] off the record.)
[15] BY MR. MARTIN:
[16]     Q    Now, Mr. Lynch, has your deposition
[17] been taken before this date?
[18]     A    No.
[19]     Q    So this is the first time you have had
[20] this process?
[21]     A    Yes.
[22]     Q    Okay.  You are, however, a veteran of
[23] at least six depositions, are you not?
[24]     A    Yes.
[25]     Q    In fact, is it true that you have sat

Page 4

[1]  through the entire depositions of all six plaintiffs
[2]  in this matter?
[3]      A    Yes, I have.
[4]      Q    And also, for the record, we started
[5]  with six and we're down to five.
[6]      A    Yes.
[7]          MR. MARTIN:  Off the record.
[8]          (Whereupon, there was a discussion held
[9]  off the record.)
[10] BY MR. MARTIN:
[11]     Q    Mr. Lynch, as you know, I'm going to be
[12] asking you questions.  My intent will be to ask you
[13] one question at a time; sometimes I may ask a couple
[14] without trying to, and I'm sure your counsel will help
[15] remind me if I'm doing that.  It's not my intent to
[16] ask any trick questions.
[17]          Certainly if you do not understand my
[18] question, please let me know and I'll be happy to
[19] restate the question as best I can.  And if you need a
[20] break, please feel free to say so.
[21]          We're starting at about 11:30 and it's
[22] my assumption that we're going to probably stop the
[23] deposition in approximately 45 minutes for a lunch
[24] break.  If, however, you need time before that, please
[25] say the word and I'll be happy to oblige, okay?

Lynch - Martin

Q   Okay. Now, who is it in the plant that coordinates the testing that you have just described, the medical testing, the TB testing, the drug testing?

A   The medical facility.

Q   Okay. Let's assume that this person passed each of those the forms of screening.

A   Yes.

Q   What happens to the person at that point?

A   They generally get hired.

Q   All right, and who makes that hiring decision?

A   It happens in HR, I guess.

Q   I'm sorry?

A   HR.

Q   HR?

A   Human resources.

Q   Okay. Is the crew leader involved in that?

A   Well, he made the job offer, the job bid. That's just to the extent that he is, you know, he's telling the medical facility and HR that he's making a job offer to this employee and, providing they pass all the testing, he wants them to be hired.

Q   And the job offer, so in other words,

Lynch - Martin
60

A   Yes.

Q   Did he have to clear that with anyone else?

A   He went through human resources.

Q   Who is it that issued the termination of Mr. Heath?

A   Joe went to human resources and said that he wanted to terminate Clarence Heath; he discussed it with Al Z; I'm assuming that Joe made the decision.

Q   All right, you're assuming, but you don't know for sure?

A   I don't know for sure.

Q   All right.  What was the other instance of termination by a crew leader that you recall?

A   It's probably been more than three years ago.

Q   Who was that?

A   Nathaniel Briddell was the crew leader.

Q   And who was the catcher?

A   Charles Hitchens.

Q   Can you give us some idea as to how many years ago it was?  You think it was more than three?

A   I think it was more than three.

employees. When I asked you about that hiring process, perhaps I didn't ask you about the interview by the crew leader; is that something that's done?

A    Sometimes. It's not really much of an interview process, it's usually, again, he's talking to one of his buddies, buddy knows a guy that's looking for a job, he's done a good job at Perdue.

Q    How often is an interview done by a crew leader?

A    Not often. I can't give you a number. I mean not an extensive interview.

Q    Okay. Provide for safety is the next category.

A    Yes.

Q    How does a crew leader provide for safety?

A    Again, when he pulls on the farm, he's responsible for making observations around the farm on the outside, looking for any type of a hole that someone might step in and twist his ankle. Any type of wet condition in the inside the chicken house, he's responsible for making the catchers aware of that wet position.

Any low hanging equipment in the house that might hit somebody in the face, it's his job to

methods, I don't know, maybe my note's incorrect.

    A    Method's okay.

    Q    Method's okay? So you're comfortable with that, that's fine. The last question I have is you were asked a question about a crew leader's responsibility about training a new catcher, and you said typically, as far as you know, they assign them to another catcher?

    A    Yes.

    Q    Is that how it normally works?

    A    Yes. Each crew leader has a lead person, a lead person that they feel more comfortable with within the catching crew, that they would probably assign that new individual to that person. That's probably the person that's been with the crew longer, possibly more experienced, just someone they feel more comfortable with, so he would assign them to that person. And then he would observe that training process to make sure things are occurring.

    Q    Okay, does he have to do it that way?

    A    Who?

    Q    The crew leader, does he have to do it that way?

    A    No, no; that's his decision.

    Q    Okay, that's what I was concerned

FIRST STATE REPORTING SERVICE    (302)
Pamela C. Washington, RP
P.O. Box 99    Milford, Delaware

A00887

Page 1

[1]   IN THE UNITED STATES DISTRICT COURT
      IN AND FOR DISTRICT OF DELAWARE
[2]
[3]  WILLIE DAVIS, JR.,              )
     NATHANIEL BRIDDELL,             )
[4]  GEORGE W. FEDDIMAN,             )
     JOSEPH GARRISON,                )
[5]  ROY H. WALTERS,                 )
     ALL SIMILARLY-SITUATED CURRENT  )
[6]  AND FORMER EMPLOYEES OF         )
     MOUNTAIRE FARMS, INC.,          )
[7]  MOUNTAIRE FARMS OF DELMARVA,    )
     INC., and MOUNTAIRE FARMS       )
[8]  OF DELAWARE, INC.,              )
                Plaintiffs,          )
[9]         -vs-                     )  C.A. No. 04-0414-KAJ
                                     )
[10] MOUNTAIRE FARMS, INC.,          )
     MOUNTAIRE FARMS OF              )
[11] DELMARVA, INC., and             )
     MOUNTAIRE FARMS OF              )
[12] DELAWARE, INC., all Delaware    )
     corporations,                   )
[13]           Defendants.           )
                     - - - - - -
[14]       Deposition of ROY H. WALTERS, taken before
     Pamela C. Washington, Registered Professional Reporter
[15] and Notary Public, at the law offices of Young,
     Conaway, Stargatt & Taylor, 110 West Pine Street,
[16] Georgetown, Delaware, on February 15, 2005, beginning
     at 10:00 a.m.
[17]                 - - - - - -
[18] APPEARANCES:
[19]    On behalf of the Plaintiffs:
          Margolis Edelstein
[20]      BY:  JEFFREY K. MARTIN, ESQ.
          and  KERI WILLIAMS, ESQ.
[21]      1509 Gilpin Avenue
          Wilmington, Delaware 19806
[22]
        On behalf of the Defendant:
[23]      Shawe Rosenthal
          BY:  ARTHUR M. BREWER, ESQ.
[24]      and  LAURA A. PIERSON SCHEINBERG, ESQ.
          20 South Charles Street, 11th Floor
[25]      Baltimore, Maryland  21201

Page 2

[1]                  I-N-D-E-X
[2]  Witness:
        ROY H. WALTERS
[3]       Examination by Mr. Brewer   ..........   3
          Examination by Mr. Martin   ..........  182
[4]       Further examination by Mr. Brewer ....  186
[5]
[6]
[7]
[8]
[9]
[10] CERTIFICATE OF COURT REPORTER ............... 189

Page 3

[1]  WHEREUPON:
[2]              ROY WALTERS,
[3]  having first been duly sworn by the court reporter,
[4]  thereupon testified upon his oath as follows:
[5]  BY MR. BREWER:
[6]    Q    Hi, Mr. Walters, we've known each other
[7]  for a long time, but for the record, I'll introduce
[8]  myself, I'm Art Brewer.
[9]         We have a standard stipulation with the
[10] only caveat to that is if you wish to read your
[11] deposition before you sign it, that will be your call.
[12]        I'm going to ask you a number of
[13] questions here; have you ever been deposed before,
[14] sir?
[15]   A    No.
[16]   Q    Okay.  You understand that you're under
[17] oath today, and that you have an obligation to tell
[18] the truth?
[19]   A    Yes.
[20]   Q    Okay.  This is informal, as you can
[21] see, but it's important that you understand that this
[22] has the same force and effect as testimony in a
[23] courtroom for a judge or jury.
[24]   A    Yes.
[25]   Q    The court reporter is going to be

Page 4

[1]  taking down your answers to my questions, as you can
[2]  see.  I'd like you to understand that at trial, I'll
[3]  have an opportunity to bring to the attention of the
[4]  judge or jury any conflicts in your testimony today
[5]  from any testimony you may give later on.
[6]    A    Yes.
[7]    Q    Okay.  If there is any question that I
[8]  ask you that you don't understand, please don't answer
[9]  it; just ask me to explain it so that you do
[10] understand the question, okay?
[11]   A    I'll agree.
[12]   Q    Okay.  Because if you answer a
[13] question, we're all going to assume that you
[14] understood what I asked you, okay?
[15]   A    I understand that.
[16]   Q    All right, good.  Sir, do you have any
[17] physical or mental problems which would interfere with
[18] your ability to answer my questions today?
[19]   A    No.
[20]   Q    Are you on any medication at all today?
[21]   A    Blood pressure.
[22]   Q    Okay.  And that's the only medication
[23] you're on, is for your blood pressure?
[24]   A    Yes.
[25]   Q    Do you feel that that will interfere

1   Q   Okay. And did you have any
2   responsibility with respect to making sure they knew
3   how to go about catching chickens?
4   A   I don't understand that one.
5   Q   Okay. When a new catcher comes in to
6   your crew, okay, do you have any responsibility to
7   make sure he knows what he's doing?
8   A   No.
9   Q   No?
10  A   No.
11  Q   He just comes onto your crew and you
12  just turn him loose?
13  A   He's ordered by the company.
14  Q   He's ordered by the company?
15  A   He's -- he's hired by Mountaire, he's
16  placed by Mountaire. I have no control over the
17  placement in the crew; they evaluate the man, they
18  hire the man, they place the man.
19  Q   You have some input into who gets
20  hired, though, don't you?
21  A   No.
22  Q   How about Mr. George Drummond, are you
23  telling me you had no input into him getting hired at
24  all?
25  A   No. Only to tell him to go to the

Walters - Brewer                                             61

1   have they asked you to assign a crew member?
2           A    Yes.
3           Q    Okay.  We have already talked about
4   hiring and, if I understand your testimony, you have
5   absolutely no input into that?
6           A    No.
7           Q    Okay.
8           MR. MARTIN:  Excuse me.  For the
9   clarity of the record, his response was no.
10          MR. BREWER:  Yes.
11          MR. MARTIN:  I mean you understand that
12  to mean no, he does not have any input into the
13  process?
14          MR. BREWER:  That's what I understood
15  it to be.
16          MR. MARTIN:  Okay.
17  BY MR. BREWER:
18          Q    That's what you meant to say, is it
19  not?
20          A    Yes.
21          Q    You have no input --
22          A    No input.
23          Q    -- into the hiring at all?
24          A    No.
25          Q    Okay.  It is your job to make sure your

FIRST STATE REPORTING SERVICE          (302) 424-4541
                        Pamela C. Washington
         P.O. Box 99        Milfor
                                                      63

1

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WILLIE DAVIS, JR.,<br>NATHANIEL BRIDDELL,<br>GEORGE W. FEDDIMAN,<br>JOSEPH GARRISON,<br>LARRY E. GIBBS,<br>ROY H. WALTERS,<br><br>ALL SIMILARLY-SITUATED CURRENT AND<br>FORMER EMMPOYEES OF MOUNTAIRE<br>FARMS, INC., MOUNTAIRE FARMS OF<br>DELMARVA, INC., and MOUNTAIRE FARMS<br>OF DELAWARE, INC.,<br><br>         Plaintiffs,<br><br>         v.<br><br>MOUNTAIRE FARMS, INC.,<br>MOUNTAIRE FARMS OF DELMARVA, INC.,<br>and MOUNTAIRE FARMS OF<br>DELAWARE, INC., all Delaware<br>corporations,<br><br>         Defendants. | ) CA No 04-0414-KAJ<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

.. .. .. .. .. ..

Deposition of NATHANIEL BRIDDELL, taken pursuant to notice, on Thursday, January 27, 2005 at 10:00 a.m. at Young, Conaway, Stargatt & Taylor, Georgetown, Delaware, reported by Lorena J. Hartnett, a Registered Professional Reporter and Notary Public.

.. .. .. .. .. ..

1  sure they were trained properly?

2  A.  Yes.

3  Q.  Did you ever select any of these

4  catchers to come onto your crew?

5  A.  Yes.

6  Q.  Okay, who did you select?

7  A.  Zarina Bagwell.

8  Q.  Okay.  Now, I understand the period of

9  time I am asking was a long time, so --

10  A.  Yes.

11  Q.  -- I wouldn't expect you to have

12  perfect recall.  Anybody else that you can think

13  of?

14  A.  Can you ask me that question again?

15  Q.  Sure, from September of '89, again

16  this is the timeframe, until April of '03, my

17  question is did you select any employees to

18  become part of your crew?

19  You have mentioned Mr. Bagwell, and I

20  guess my question is anybody else you can

21  remember?

22  A.  Yes, Warren Purnell.

23  Q.  Okay.

24  A.  Leroy Taylor.  Lawn Howell.

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

```
 1  BY MR. BREWER:
 2       Q.   Okay, let's go.  Mr. Briddell, let me
 3  ask you this question, if I may:  Could you
 4  recommend the promotion of one of the catchers to
 5  be a forklift operator?
 6       A.   No.
 7       Q.   You couldn't do that?
 8       A.   Could I?  Oh, let me rephrase it.  You
 9  said could I recommend?
10       Q.   Yes.
11       A.   Yes, I could ask Doug about it, yes.
12       Q.   We had talked earlier about your
13  giving some oral reprimands to people for various
14  reasons.  Did you ever give anybody anything more
15  than an oral reprimand?
16       A.   Yes.
17       Q.   Okay, do you remember who, by any
18  chance?
19       A.   Charles Hitchens.
20       Q.   Okay.  Do you remember when that was?
21       A.   No.
22       Q.   Okay.  Anybody else you can think of?
23  And I understand -- Again, I understand I am
24  asking you to go back in time.  There may have
```

Page 1

[1]          IN THE UNITED STATES DISTRICT COURT
             IN AND FOR THE DISTRICT OF DELAWARE
[2]
[3]   WILLIE DAVIS, JR.,            )
      NATHANIEL BRIDDELL,           )
[4]   GEORGE W. FEDDIMAN,           )
      JOSEPH GARRISON,              )
[5]             Plaintiffs,         )
                -vs-                )  C.A. No. 04-0414
[6]                                 )
      MOUNTAIRE FARMS, INC.,        )
[7]   MOUNTAIRE FARMS OF            )
      DELMARVA, INC., and           )
[8]   MOUNTAIRE FARMS OF            )
                Defendants.         )
[9]                         - - - - - -

[10]       Deposition of JOSEPH GARRISON, taken before

[11]  Pamela C. Washington, Registered Professional Reporter

[12]  and Notary Public, at the law offices of Young,

[13]  Conaway, Stargatt & Taylor, 110 West Pine Street,

[14]  Georgetown, Delaware, on January 14, 2005, beginning

[15]  at 10:00 a.m.

[16]                         - - - - - -

[17]  APPEARANCES:

[18]       On behalf of the Plaintiffs:
             Margolis Edelstein
[19]         BY:  JEFFREY K. MARTIN
             and  KERI L. WILLIAMS, ESQ.
[20]         1509 Gilpin Avenue
             Wilmington, Delaware 19806
[21]
      On behalf of the Defendants:
[22]         Shawe Rosenthal
             BY:  ARTHUR M. BREWER, ESQ.
[23]         and  LAURA A. PIERSON SCHEINBERG, ESQ.
             20 South Charles Street   11th Floor
[24]         Baltimore, Maryland 21201
[25]

Page 2

[1]                      I-N-D-E-X

[2]   Witness:
         JOSEPH GARRISON
[3]         Examination by Mr. Brewer ............... 3

[4]   Exhibits Marked
         Garrison Exhibit 1 ....................... 35
[5]      Garrison Exhibit 2 ....................... 48
         Garrison Exhibit 3 ....................... 65
[6]      Garrison Exhibit 4 ....................... 91
         Garrison Exhibit 5 ....................... 109
[7]      Garrison Exhibit 6 ....................... 121
         Garrison Exhibit 7 ....................... 124
[8]      Garrison Exhibit 8 ....................... 178
         Garrison Exhibit 9 ....................... 181
[9]      Garrison Exhibit 10 ...................... 183
         Garrison Exhibit 11 ...................... 184
[10]     Garrison Exhibit 12 ...................... 188
         Garrison Exhibit 13 ...................... 191
[11]     Garrison Exhibit 14 ...................... 195
         Garrison Exhibit 15 ...................... 196
[12]     Garrison Exhibit 16 ...................... 199
         Garrison Exhibit 17 ...................... 233
[13]
[14]
[15]
[16]  CERTIFICATE OF COURT REPORTER ................. 241
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1]   WHEREUPON:

[2]            JOSEPH GARRISON,

[3]   having first been duly sworn by the court reporter,

[4]   thereupon testified upon his oath as follows:

[5]            MR. BREWER:  You have noted the

[6]   appearances for the record, Madame Reporter?

[7]            THE COURT REPORTER:  Yes.

[8]            MR. BREWER:  We have the standard

[9]   stipulation with respect to --

[10]           MR. MARTIN:  In Delaware, we don't have

[11]  any standard stipulations, but I'll be glad to

[12]  stipulate --

[13]           MR. BREWER:  As to the form of the

[14]  question, would be the objections.

[15]           MR. MARTIN:  Yes.

[16]           MR. BREWER:  Okay, that's fine.

[17]  BY MR. BREWER:

[18]       Q   All right. Mr. Garrison, have you ever

[19]  been deposed before?

[20]       A   Yes.

[21]       Q   You have? Can you tell me when?

[22]       A   No, not proposed, no, I haven't,

[23]  not ...

[24]       Q   Deposed like having a deposition like

[25]  we're doing today.

Page 4

[1]       A   No, no, no.

[2]       Q   Have you ever done this before?

[3]       A   No, no.

[4]       Q   Okay, thank you. You understand that

[5]   you are under oath today, and that you have an

[6]   obligation to tell the truth?

[7]       A   Yes.

[8]       Q   All right. This is obviously informal,

[9]   but it has the same significance and force as if you

[10]  were with a judge in a courtroom, do you understand

[11]  that, sir?

[12]       A   Yes.

[13]       Q   Okay. I'll be asking you a series of

[14]  questions; the court reporter, as you can see, will be

[15]  taking down your answers. At trial, if it comes to

[16]  trial, I will have an opportunity to bring to the

[17]  attention of the judge or jury any changes or

[18]  conflicts in your testimony here today and any future

[19]  proceedings, do you understand that?

[20]       A   Yes.

[21]       Q   Okay. I would basically ask you this,

[22]  and that is not to answer any question that I ask that

[23]  you do not understand. If you don't understand a

[24]  question, please ask me to rephrase it or to restate

[25]  it, okay?

Garrison - Brewer                                    56

```
 1       A    Yes.
 2       Q    Okay.  You're also responsible for
 3  maintaining the full crew, aren't you?
 4       A    Yes, I am.
 5       Q    You also have responsibility for
 6  maintaining a good relationship with the growers,
 7  aren't you?
 8       A    Yes.
 9       Q    And you basically are telling the
10  catchers, we went through this, how to go about
11  setting up the house and catching them, and watching
12  for smothers and everything else, right?
13       A    Yes.
14       Q    Okay, that's fine.  All right, now, who
15  hires the catchers?
16       A    Doug Lynch.
17       Q    Doug Lynch?  Okay.  Have you ever
18  recommended to Mr. Lynch that a catcher be hired?
19       A    Yes.
20       Q    And has the catcher been hired?
21       A    Sometime.  Sometime he not.
22       Q    Can you give me the name of catchers
23  that you have recommended to Mr. Lynch who have not
24  been hired?
25       A    Yes.
```

FIRST STATE REPORTING SERVICE        (302)
                        Pamela C. Washington, R
   P.O. Box 99              Milford, Delaw

```
                                                      58
                    Garrison - Brewer
```

1      Q    How many people have you recommended to
2 Mr. Lynch be hired and he has hired them?

3      A    Rough guess, maybe three.

4      Q    Three?  Okay.  Three or four, something
5 like that?

6      A    Yes.

7      MR. MARTIN:  For the record, he said
8 three.

9      MR. BREWER:  He said three, all right.
10 BY MR. BREWER:

11      Q    Is it three, or could it be more?

12      A    No, definitely couldn't be more.

13      Q    How did you go about making that
14 recommendation to Mr. Lynch?

15      A    I just asked him that I probably needed
16 another man, and I like you look to hire this guy.

17      Q    Okay.

18      A    And he asked me just bring him in, get
19 him signed up.

20      Q    That's what he told you?

21      A    Yeah.

22      Q    So in the three cases that we have
23 talked about, you have needed a man, gone to Mr. Lynch
24 and said, "I need a man, and I have this fellow," and
25 you have given him a name, and he has said, "Okay,

# Transcript of the Testimony of
# Larry E. Gibbs

**Date:** January 20, 2005
**Volume:** 1

Printed On: January 31, 2005

---

Zeve Reporting & Videoconferencing
11032 Nicholas Lane
Suite A201
Berlin, Maryland  21811
Phone: (410)208-4566
Fax: (410)208-4767
Email: info@kathyzeve.com
Internet: www.zevereporting.com

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 44

1  operator?

2   A   He was one of my catchers, and he -- and learned
3  how to operate the forklift. He got an opportunity when
4  Mr. Feddiman left.

5   Q   And did you recommend him for that job?

6   A   I can't remember.

7   Q   You say he got some training on the forklift. Who
8  provided the training?

9   A   I guess Mountaire did, or while we were working,
10 he would train.

11  Q   And who was responsible for watching all of his
12 training?

13  A   I was.

14  Q   Okay. So did you have any input into whether or
15 not he should get the job as a forklift operator?

16  A   No.

17  Q   You had none. If you thought he wasn't training
18 properly, wouldn't you say something to somebody?

19  A   I'm sorry. When you said, did I have any input?

20  Q   Yeah, into him becoming a forklift operator.

21  A   I don't understand.

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 78

1    Q    Directing -- okay.  All right.  From time to time,
2    new catchers have come on to your crew?
3    A    Yes.
4    Q    Okay.  Have you ever suggested to anybody at
5    Mountaire that they hire a particular person as a catcher?
6    A    Yes.
7    Q    Okay.  Who, if you can remember?
8    A    The last one was Arthur, Arthur Belfield.
9    Q    And was he hired?
10   A    Yes.
11   Q    Okay.  And without -- and I don't mean to stretch
12   your memory, but have there been others like Mr. Belfield
13   that you recommended the company hire?
14   A    That's it.  I think I said maybe two or three.
15   Q    Okay.  And were they hired?
16   A    I think all but one, I think.
17   Q    Okay.
18   A    I think two out of the three, yes, I think they
19   were hired.
20   Q    Who was it -- do you remember the person who
21   wasn't?

Zeve Reporting & Videoconferencing
(410)208-4566 Fax(410)208-4767