# IN THE UNITED STATED DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WILLIE DAVIS, JR., NATHANIEL    *
BRIDDELL, GEORGE W. FEDDIMAN,    *
JOSEPH GARISON, LARRY E. GIBBS,    *
ROY H. WALTERS, and ALL    *
SIMILARLY-SITUATED CURRENT    *
AND FORMER EMPLOYEES OF    *
MOUNTAIRE FARMS, INC.,    *
MOUNTAIRE FARMS OF DELMARVA    *
INC., and MOUNTAIRE FARMS OF    *
DELAWARE, INC.,    *
       Plaintiffs,    *     Civil Action No. 04-414 – KAJ
          v.    *
   *
MOUNTAIRE FARMS, INC., a Delaware    *
Corporation, MOUNTAIRE FARMS OF    *
DELMARVA, a Delaware Corporation,    *
and MOUNTAIRE FARMS OF    *
DELAWARE, INC., a Delaware    *
Corporation,    *
       Defendants.    *

## APPENDIX TO THE OPENING BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Matthew F. Boyer (Del. Bar No. 2564)
CONNOLLY BOVE LODGE & HUTZ, LLP
The Nemours Building
1220 Market Street
P. O. Box 2207
Wilmington, DE 19899
(302) 884-6585

Arthur M. Brewer (admitted *Pro Hac Vice*)
Laura A. Pierson Scheinberg (*Pro Hac Vice* pending)
SHAWE & ROSENTHAL, LLP
Sun Life Building, 11th Floor
20 S. Charles Street
Baltimore, MD 21201
(410) 752-1040

DATED: September 15, 2006

## TABLE OF EXHIBITS

| PAGE | TITLE | TAB |
|------|-------|-----|
| A001-004 | Excerpts from Joseph Garrison's Deposition Transcript – January 15, 2005 | 1 |
| A005-007 | Excerpts from Larry Gibbs' Deposition Transcript – January 20, 2005 | 2 |
| A008-010 | Excerpts from Nathaniel Briddell's Deposition Transcript – January 27, 2005 | 3 |
| A011-013 | Excerpts from George Feddiman's Deposition Transcript – February 1, 2005 | 4 |
| A014-016 | Excerpts from Roy Walters' Deposition Transcript – February 15, 2005 | 5 |
| A017-024 | Excerpts from Willie Davis' Deposition Transcript – March 15, 2005 | 6 |
| A025-026 | Stipulation of Dismissal with Prejudice of George W. Feddiman – April 18, 2005 | 7 |
| A027-043 | United States District Court for the District of Delaware Memorandum of Opinion – June 28, 2005 | 8 |
| A044-059 | United States Court of Appeals for the Third Circuit Opinion of the Court – July 19, 2006 | 9 |

# EXHIBIT 1

```
1              IN THE UNITED STATES DISTRICT COURT
               IN AND FOR THE DISTRICT OF DELAWARE
2

3    WILLIE DAVIS, JR.,                 )
     NATHANIEL BRIDDELL,                )
4    GEORGE W. FEDDIMAN,                )
     JOSEPH GARRISON,                   )
5              Plaintiffs,              )
        -vs-                            )   C.A. No. 04-0414
6                                       )
     MOUNTAIRE FARMS, INC.,             )
7    MOUNTAIRE FARMS OF                 )
     DELMARVA, INC., and               )
8    MOUNTAIRE FARMS OF                 )
               Defendants.             )
9                              -  -  -  -  -  -
```

10          Deposition of JOSEPH GARRISON, taken before

11   Pamela C. Washington, Registered Professional Reporter

12   and Notary Public, at the law offices of Young,

13   Conaway, Stargatt & Taylor, 110 West Pine Street,

14   Georgetown, Delaware, on January 14, 2005, beginning

15   at 10:00 a.m.

16                         -  -  -  -  -  -

17   APPEARANCES:

18         On behalf of the Plaintiffs:
              Margolis Edelstein
19            BY:  JEFFREY K. MARTIN
              and   KERI L. WILLIAMS, ESQ.
20            1509 Gilpin Avenue
              Wilmington, Delaware 19806
21
           On behalf of the Defendants:
22            Shawe Rosenthal
              BY:  ARTHUR M. BREWER, ESQ.
23            and   LAURA A. PIERSON SCHEINBERG, ESQ.
              20 South Charles Street   11th Floor
24            Baltimore, Maryland  21201

25                                              **A 001**

           FIRST STATE REPORTING SERVICE      (302) 424-4541
                       Pamela C. Washington, RPR
             P.O. Box 99          Milford, Delaware  19963
```

Garrison - Brewer

1        Q    At Mountaire?  When did you receive

2   that certification?

3        A    I guess its been like three years ago,

4   somewhere like that.

5        Q    How long have you worked for Mountaire?

6        A    Eight years.

7        Q    Eight years?

8        A    Eight.  I think it was eight.  Or

9   seven, I believe it -- it was going on eight, it was

10  going on eight.

11       Q    It was going on eight?

12       A    Yeah.

13       Q    And when you first became employed with

14  Mountaire, what job did you have?

15       A    I was catcher, I was a catcher.

16       Q    You were a catcher?  Approximately how

17  long after you became a catcher did you receive your

18  forklift certification?

19       A    After I was a catcher, I was -- after I

20  was a catcher, a senior catcher, I was a crew leader.

21       Q    Let me see if I understand what you're

22  telling me.  You were hired as a catcher?

23       A    Right.

24       Q    And then you went right from a catcher

25  to a crew leader?                              A 002

Garrison - Brewer

1          A      Yes.

2          Q      But you did receive a certification for

3    forklift operator?

4          A      After I be a crew leader, then I

5    started learning how to drive forklift, then I receive

6    a forklift license.

7          Q      Okay.  So you were a catcher, then you

8    became a crew leader, and you got your certification

9    for forklift after you became a crew leader?

10         A      Yes.

11         Q      Are you sure of that?

12         A      Yes.

13         Q      Okay.  I believe I asked you a series

14   of questions earlier, but just to be sure that I'm

15   understanding it, there's nothing about your current

16   state of physical health that's going to be a problem

17   with your deposition here today?

18         A      No.

19         Q      No?

20         A      No, it's not.

21         Q      All right.  Are you or have you been

22   under any treatment with a physician or a medical

23   health care provider in the last five years?

24         A      What do you mean?  Say that again one

25   more time.

**A 003**

Garrison - Brewer

```
 1    resigned?

 2            A    What do you mean breaks?

 3            Q    Well, in other words, were you employed

 4    for Mountaire continuously for the eight years?

 5            A    Yes.

 6            Q    You didn't --

 7            A    I didn't, no.

 8            Q    You didn't leave and then come back or

 9    anything else?

10            A    No.

11            Q    So you were continuously employed?

12            A    Yes.

13            Q    Okay.  And I believe you told me, just

14    to be sure, when about did you become a crew leader?

15            A    It was -- let me see.  I believe it was

16    in `99, 1999.

17            Q    Okay.  That's about six years ago then?

18            A    Uh-huh.

19            Q    When you became a crew leader, did you

20    consider that to be a promotion?

21            A    Yes.

22            Q    Now, you became a crew leader, you just

23    told me, in 1999, okay, I'll just make that note.

24    Would you tell us as a crew leader what you do?

25            A    Yes.  Well, I picked up the help, I
```

# EXHIBIT 2

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 1

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF DELAWARE

3

4    WILLIE DAVIS, JR., et al.,          *

5                                        *

6                    Plaintiffs,         *

7            v.                          *    Civil Action No.

8    MOUNTAIRE FARMS, INC., et al.,      *    04-414

9                                        *

10                   Defendants.         *

11              *      *      *      *      *      *      *

12

                     Georgetown, Delaware

13

14                   Thursday, January 20, 2005

15

     Deposition of:

16

                     LARRY E. GIBBS

17

            a witness, called for examination by Counsel for

18   Defendants, pursuant to notice, taken at the Law Offices of
     Young, Conaway, Stargatt & Taylor, 110 West Pine Street,

19   Georgetown, Delaware, commencing at 10:05 a.m., before Kathy
     A. Zeve, a Notary Public and Registered Professional

20   Reporter in and for the State of Delaware, when were present
     on behalf of the respective parties:

21

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 31

1       Q      William C. Jason.  How would I classify that, is

2    that a high school or middle school?

3       A      It was a high school.  It's Delaware Tech now in

4    Georgetown.

5       Q      Okay.  I know where that is, that was a high

6    school.  Let me ask you this.  Do you have any

7    certifications or licenses like for a forklift or a CDL

8    license or anything like that?

9       A      No.

10      Q      Okay.  And I believe you told me that your mental

11   health is good, and there's no issue there that would impact

12   on your testimony here today?

13      A      No.

14      Q      Okay.  When were you first employed with the

15   company, sir?

16      A      May 9th, 1994.

17      Q      Okay.  5/9, you said, the 9th May?

18      A      The 9th of May, 1994.

19      Q      Okay.  And prior to work -- coming to work for

20   Mountaire, where did you work?

21      A      Hudson Food.

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 34

1        A     No.

2        Q     Nothing like that.  And while you were at Allen's

3   in Harbeson for those 17 years, how many people did you have

4   in your crew roughly?

5        A     Nine.

6        Q     About nine, okay.  And you were considered a

7   contractor at Allen's also, weren't you?

8        A     Yes.  Yes.

9        Q     And from Allen's, you didn't receive any benefits,

10  any medical insurance or paid holidays or paid vacation or

11  anything along those lines, did you?

12       A     No.

13       Q     Okay.  And you were in charge of the crews that

14  you had at Hudson and at Allen's?

15       A     Yes.

16       Q     Okay.  Since you've become employed with Mountaire

17  in '94, have you had any break in service?

18       A     No.

19       Q     Okay.  When you first came to Mountaire, did you

20  come to them as a crew leader?

21       A     Yes.

**A 007**

# EXHIBIT 3

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            IN AND FOR THE DISTRICT OF DELAWARE

 3    WILLIE DAVIS, JR.,              )CA No 04-0414-KAJ
      NATHANIEL BRIDDELL,            )
 4    GEORGE W. FEDDIMAN,            )
      JOSEPH GARRISON,               )
 5    LARRY E. GIBBS,                )
      ROY H. WALTERS,                )
 6                                   )
      ALL SIMILARLY-SITUATED CURRENT AND )
 7    FORMER EMMPOYEES OF MOUNTAIRE )
      FARMS, INC., MOUNTAIRE FARMS OF )
 8    DELMARVA, INC., and MOUNTAIRE FARMS )
      OF DELAWARE, INC.,             )
 9                                   )
               Plaintiffs,           )
10                                   )
               v.                    )
11                                   )
      MOUNTAIRE FARMS, INC.,         )
12    MOUNTAIRE FARMS OF DELMARVA, INC., )
      and MOUNTAIRE FARMS OF         )
13    DELAWARE, INC., all Delaware   )
      corporations,                  )
14                                   )
               Defendants.           )
15

16                  .. .. .. .. .. ..

17            Deposition of NATHANIEL BRIDDELL, taken

18    pursuant to notice, on Thursday, January 27, 2005 at

19    10:00 a.m. at Young, Conaway, Stargatt & Taylor,

20    Georgetown, Delaware, reported by Lorena J. Hartnett,

21    a Registered Professional Reporter and Notary Public.

22                  .. .. .. .. .. ..

23

24
```

1          A.     Yes.

2          Q.     And you are still employed at that

3     location?

4          A.     Yes.

5          Q.     Who was your supervisor at the time?

6          A.     At that time it was Don Hopkins,

7     Donald Hopkins.

8          Q.     Okay.  When did you become a crew

9     leader, sir?

10         A.     September of '89.

11         Q.     And did you consider that to be a

12     promotion?

13         A.     Yes.

14         Q.     And who was your supervisor at that

15     time?

16         A.     Doug Lynch.

17         Q.     Okay, can you tell me how you, how it

18     is you became promoted to a crew leader's

19     position?

20         A.     Being a truck driver, I knew a lot of

21     the employees, and Charles Showell was getting

22     ready to retire, and I spoke with Mr. Showell and

23     I spoke with Mr. Lynch, and they decided to put

24     me as crew leader.

1          Q.    Okay, great.  Now, as a crew leader,

2     your primary role was to manage the crew that was

3     catching chickens?

4          A.    Yes, to the best of my knowledge.

5          Q.    Okay.  How many employees were on your

6     crew?

7          A.    Seven.

8          Q.    Okay.

9          A.    Seven chicken catchers, one forklift

10     driver, and at that time three truck drivers.

11          Q.    The three drivers were also part of

12     your crew?

13          A.    Yes.

14          Q.    Okay, so that was seven catchers, one

15     forklift driver, and three drivers.  And the

16     drivers we are referring to, again, are live haul

17     drivers?

18          A.    Yes.

19          Q.    The employees who worked in your crew

20     from 1989 till the time that you left -- By the

21     way, you probably told me, but I didn't write it

22     down.  When did you stop becoming a crew leader?

23          A.    April '03.

24          Q.    April of '03?

A 010

LORENA J. HARTNETT, R.P.R.
(302) 426-1007 or 736-3661

# EXHIBIT 4

ORIGINAL                                    1

```
 1           IN THE UNITED STATES DISTRICT COURT
                 IN AND FOR DISTRICT OF DELAWARE
 2

 3   WILLIE DAVIS, JR.,                    )
     NATHANIEL BRIDDELL,                   )
 4   GEORGE W. FEDDIMAN,                   )
     JOSEPH GARRISON,                      )
 5   LARRY E. GIBBS,                       )
     ROY H. WALTERS,                       )
 6                                         )
     ALL SIMILARLY SITUATED CURRENT )
 7   AND FORMER EMPLOYEES OF               )
     MOUNTAIRE FARMS, INC.,               )
 8   MOUNTAIRE FARMS OF DELMARVA,         )
     INC., and MOUNTAIRE FARMS OF         )
 9   DELAWARE, INC.,                      )
                     Plaintiffs,          )
10      -vs-                              )   C.A. No. 04-0414
                                          )
11   MOUNTAIRE FARMS, INC.,               )
     MOUNTAIRE FARMS OF                   )
12   DELMARVA, INC., and                  )
     MOUNTAIRE FARMS OF                   )
13   DELAWARE, INC., all Delaware         )
     corporations,                        )
14                   Defendants.          )
                                   - - - - - -
15           Deposition of GEORGE FEDDIMAN, taken before
     Pamela C. Washington, Registered Professional Reporter
16   and Notary Public, at the law offices of Young,
     Conaway, Stargatt & Taylor, 110 West Pine Street,
17   Georgetown, DE, on February 1, 2005, beginning at
     10:00 a.m.
18
     APPEARANCES:
19       On behalf of the Plaintiffs:
             Margolis Edelstein
20           BY:  JEFFREY K. MARTIN, ESQ.
             and  KERI L. WILLIAMS, ESQ.
21           1509 Gilpin Avenue
             Wilmington, Delaware 19806
22
         On behalf of the Defendants:
23           Shawe & Rosenthal
             BY:  ARTHUR M. BREWER, ESQ.
24           20 South Charles Street
             Baltimore, Maryland  21201
25
```

                                        **A 011**

Feddiman - Brewer

1    Mountaire to go someplace else and then come back to

2    Mountaire?

3            A    No.

4            Q    When did you first become a crew

5    leader?

6            A    I don't even know the exact date that

7    it was, but I know I got -- I sent the lawyer the copy

8    that I got from down to payroll.  I know it was nine

9    months, anyway.

10           Q    All right, I'll take a look at that.

11           A    From the time I started until the time

12   I ended.

13           Q    And when you were a crew leader, can

14   you tell me how you were paid?

15           A    I was paid by the thousand.

16           Q    So for every thousand chickens that

17   your crew caught, you received a certain amount of

18   money?

19           A    Yes.

20           Q    For every thousand chickens that were

21   caught?

22           A    Uh-huh.

23           MR. MARTIN:  Yes?

24           THE WITNESS:  Yes.

25
                                        A 012

1   had an opportunity to review the record provided this

2   morning by Mountaire in the form of George Feddiman

3   Exhibit Number 1, plus we have gotten some other

4   verbal reports from Mountaire.

5                    It appears that Mr. Feddiman stopped

6   working as a crew leader sometime of April of 2001.

7   If that is the case, then we submit that he would not

8   properly be a party plaintiff in this matter because

9   of the two-to-three-year look-back period.

10                   As such, we would ask for the partial

11  dismissal of this matter, specifically dismissing

12  Mr. Feddiman as a party plaintiff, and we would ask

13  that the dismissal be without prejudice, subject to

14  Mr. Feddiman going back and finding any records to

15  show that the representations here this morning were

16  inaccurate.

17                   And I have specifically asked

18  Mr. Feddiman that should he find any records to

19  suggest that he served as a crew leader any time after

20  June 18 of 2001, that he should contact me

21  immediately.

22                   MR. BREWER:  That's an accurate

23  representation of our off-the-record discussions.  And

24  the defendant does not object to the dismissal without

25  prejudice of Mr. Feddiman at this time.

**A 013**

# EXHIBIT 5

1

ORIGINAL

```
 1          IN THE UNITED STATES DISTRICT COURT
            IN AND FOR DISTRICT OF DELAWARE
 2

 3   WILLIE DAVIS, JR.,              )
     NATHANIEL BRIDDELL,             )
 4   GEORGE W. FEDDIMAN,             )
     JOSEPH GARRISON,                )
 5   ROY H. WALTERS,                 )
     ALL SIMILARLY-SITUATED CURRENT  )
 6   AND FORMER EMPLOYEES OF         )
     MOUNTAIRE FARMS, INC.,          )
 7   MOUNTAIRE FARMS OF DELMARVA,    )
     INC., and MOUNTAIRE FARMS       )
 8   OF DELAWARE, INC.,              )
                    Plaintiffs,      )
 9       -vs-                        )   C.A. No. 04-0414-KAJ
                                     )
10   MOUNTAIRE FARMS, INC.,          )
     MOUNTAIRE FARMS OF              )
11   DELMARVA, INC., and             )
     MOUNTAIRE FARMS OF              )
12   DELAWARE, INC., all Delaware    )
     corporations,                   )
13                    Defendants.    )
                               - - - - - -
14          Deposition of ROY H. WALTERS, taken before
     Pamela C. Washington, Registered Professional Reporter
15   and Notary Public, at the law offices of Young,
     Conaway, Stargatt & Taylor, 110 West Pine Street,
16   Georgetown, Delaware, on February 15, 2005, beginning
     at 10:00 a.m.
17                             - - - - - - -

18   APPEARANCES:

19       On behalf of the Plaintiffs:
             Margolis Edelstein
20           BY:  JEFFREY K. MARTIN, ESQ.
             and  KERI WILLIAMS, ESQ.
21           1509 Gilpin Avenue
             Wilmington, Delaware 19806
22
         On behalf of the Defendant:
23           Shawe Rosenthal
             BY:  ARTHUR M. BREWER, ESQ.
24           and  LAURA A. PIERSON SCHEINBERG, ESQ.
             20 South Charles Street,   11th Floor
25           Baltimore, Maryland  21201
```

A 014

Walters - Brewer

```
 1              A      I was transferred back to driving

 2      truck.

 3              Q      So the favor finally ended?

 4              A      Yes.

 5              Q      Okay.  During this time when you were a

 6      forklift operator, did you have any position with

 7      Local 355?

 8              A      Yes.

 9              Q      What was that?

10              A      Union steward.

11              Q      Okay.  Also referred to as a shop

12      steward?

13              A      Yes.

14              Q      When did you become a shop steward?

15              A      1983.

16              Q      1983, so while you were a truck driver?

17              A      Yes.

18              Q      And how long did you hold that

19      position?

20              A      Through 2001.

21              Q      Through 2001?

22              A      Uh-huh.

23              MR. MARTIN:  Yes?

24              THE WITNESS:  Yes.

25                                              A 015
```

Walters - Brewer

1    BY MR. BREWER:

2            Q    Tell me why you left the position in

3    2001.

4            A    I was promoted.

5            Q    To what?

6            A    Crew leader.

7            Q    Crew leader?  Who promoted you to crew

8    leader?

9            A    Mr. Doug Lynch.

10           Q    Okay.  And why did you have to leave

11   the shop steward position when you were promoted to a

12   crew leader?

13           A    You're no longer under the Union when

14   you transfer out of the Union's position.  Being a

15   crew leader, you're non-Union.

16           Q    A member of management?

17           A    Yeah.

18           Q    Okay.  That was yes, sir, I'm sorry?

19           A    Yes.

20           Q    Okay, all right.  Do you need some more

21   water?

22           A    No, I'm fine.

23           Q    Okay.  As a crew leader, your primary

24   duty was basically to manage the crew that you had?

25           A    If that's the word you want to use.

A 016

# EXHIBIT 6

ORIGINAL[1]

```
 1              IN THE UNITED STATES DISTRICT COURT
               IN AND FOR THE DISTRICT OF DELAWARE
 2

 3   WILLIE DAVIS, JR.                    )
     NATHANIEL BRIDDELL,                  )
 4   GEORGE W. FEDDIMAN,                  )
     JOSEPH GARRISON,                     )
 5   LARRY E. GIBBS,                      )
     ROY H. WALTERS,                      )
 6   ALL SIMILARLY-SITUATED CURRENT )
     AND FORMER EMPLOYEES OF             )
 7   MOUNTAIRE FARMS, INC.,              )
     MOUNTAIRE FARMS OF DELMARVA,        )
 8   INC., and MOUNTAIRE FARMS OF        )
     DELAWARE, INC.,                     )
 9               Plaintiffs,             )
           -vs-                         )   C.A. No. 04-0414
10                                      )
     MOUNTAIRE FARMS, INC.,             )
11   MOUNTAIRE FARMS OF                 )
     DELMARVA, INC., and               )
12   MOUNTAIRE FARMS OF DELAWARE,       )
     INC., all Delaware corporations)
13               Defendants.            )
                              - - - - - - -
14            Deposition of WILLIE DAVIS, taken before
     Pamela C. Washington, Registered Professional Reporter
15   and Notary Public, at the law offices of Young,
     Conaway, Stargatt & Taylor, 110 West Pine Street,
16   Georgetown, Delaware, on March 15, 2005, beginning at
     10:00 a.m.
17                            - - - - - - -

18   APPEARANCES:

19        On behalf of the Plaintiffs:
               Margolis Edelstein
20             BY:  JEFFREY K. MARTIN, ESQ.
               and  KERI WILLIAMS, ESQ.
21             1509 Gilpin AVenue
               Wilmington, Delaware 19806
22
          On behalf of the Defendant:
23             Shawe & Rosenthal
               BY:  ARTHUR M. BREWER, ESQ.
24             and  LAURA PIERSON SCHEINBERG, ESQ.
               20 South Charles Street
25             Baltimore, Maryland  21201
```

A 017

Davis - Brewer

1  treatment with a physician or a mental health care

2  provider?

3           A      Not the mental health, no, sir.

4           Q      Physical?

5           A      Physical, yes.

6           Q      Okay, and what are you being treated

7  for, sir, if you don't mind my asking?

8           A      Degenerative heart condition --

9  degenerative heart condition.

10          Q      Okay.  Let's talk about your employment

11 with Mountaire; when did you first become employed

12 with Mountaire?

13          A      About April of -- it was either 2000 or

14 2001.

15          Q      Okay.  Prior to being employed with

16 Mountaire, for whom were you working?

17          A      I was independent weigh master for

18 Tyson Food.

19          Q      So you were a weigh master for Tyson

20 Foods?

21          A      Yes.

22          Q      And how long did you have that

23 position?

24          A      From 1997 until -- from the time that I

25 went to Mountaire.

A 018

Davis - Brewer

1          Q    All right, with whom?

2          A    German Trucking and -- what's the name

3    of the place -- Carolina Poultry, I was relief weigh

4    master for different crews over there to Carolina

5    Poultry in Federalsburg and Denton, Maryland.

6          Q    And when you weren't filling in as a

7    relief crew leader, what were you doing?

8          A    I was live haul truck driver.

9          Q    Okay.  Was that also true when you were

10   with Showell, were you also a relief crew leader

11   there?

12         A    I was relief crew leader for Perdue

13   when Perdue purchased Showell.  But when Showell

14   was -- I was at Showell Cooking Good, I was a live

15   haul truck driver.

16         Q    All right.  And you didn't fill in

17   for --

18         A    No, sir.

19         Q    Okay, I think that answers my

20   questions.  When you first became hired by Mountaire,

21   what position were you hired into?

22         A    As a crew leader.

23         Q    You were hired as a crew leader, okay.

24   And did there ever come a time when you worked for

25   Mountaire that you requested to go on a part-time

FIRST STATE REPORTING SERVICE    (302) ___-____
                    Pamela C. Washington, RPR
        P.O. Box 99              Milford, Delaware  19963

Davis - Brewer

1  basis?

2          A     The latter part of when they gave me --

3  when they laid my crew off, they offered me the

4  position of a part-time position, you know, as a crew

5  leader, and I accepted that.

6          Q     Okay.  So my question is did you

7  request to become part-time or not?

8          A     Well, when they told me they was laying

9  my crew off, I requested the part-time, you know, to

10  fill-in crew.

11          Q     Okay.  So it was because they were

12  laying your crew off that you made that request?

13          A     Yes.

14          Q     Okay.  And when you were operating as a

15  part-time crew, what time frame are we talking about?

16          A     Well, when they first laid me off, I

17  went in as a crew leader for about six -- five or six

18  months straight with no time off or anything like

19  that.

20          Q     Okay, I'm confused.  You testified that

21  you were laid off.

22          A     Yes.

23          Q     I thought you told me you --

24          A     As a full-time weigh master -- as a

25  full-time crew leader, I was laid off.  Then they

FIRST STATE REPORTING SERVICE     (302)     --
                    Pamela C. Washington, RPR
        P.O. Box 99              Milford, Delaware   19963

Davis - Brewer

1    brought me in as a relief crew leader.

2              Q      Okay.

3              A      And I had to fill in, you know, the

4    other crew leaders spot.

5              Q      That's what I'm interested in, when did

6    that occur?  When did you go from being a full-time

7    crew leader to a relief crew leader?

8              A      From the time that they laid me off.

9              Q      When was that?

10             A      I cannot recall direct the date, the

11   exact date.

12             Q      Can you give me a year, what year that

13   might have happened?

14             A      It was one year after I was there for

15   the full-time position.

16             Q      So a year after you became employed,

17   that's when you became a part-time crew leader?

18             A      Yes.

19             Q      Okay, one year after employment.  And

20   as a part-time crew leader, what was your schedule?

21             A      Pretty much the same as it was when I

22   was full time.  In other words, I didn't get any time

23   off.

24             Q      So you were working the same amount of

25   hours?

A 021

Davis - Brewer

1          A      Pretty much the same amount of hours.

2    In other words, I made the same -- almost the same

3    amount of money when I went -- when they put me on

4    part-time as I did a full-time, based on my W-2s.

5          Q      Did you ever become a relief crew

6    leader?

7          A      That was what I was supposed to have

8    been, relief crew leader. But we had one crew that --

9    one crew leader that was out, I think he was out

10   something like about six, seven months, something like

11   that, and I basically carried his crew out the whole

12   time.

13         Q      Who was that?

14         A      Roy Walters' crew.

15         Q      That's when he had his surgery for his

16   knees?

17         A      I think it was.

18         Q      During the time that you were a

19   part-time crew leader or a relief crew leader -- and I

20   understand we can use those terms interchangeably,

21   part-time crew leader is the same thing as a relief

22   crew leader?

23         A      Part-time relief is what they, you

24   know, had me down as relief crew leader.

25         Q      Okay. So when you're talking about

**A 022**

Davis - Brewer

1  being a part-time crew leader a year after you became

2  employed, it's the same as relief crew leader?

3           A    I don't know how they would classify

4  that but I know that, you know, they had me down as

5  relief crew leader.  I was supposed to have been

6  relief for the other crew leaders for when they wanted

7  to take off.

8           Q    Is that what happened approximately a

9  year after you started with the company?

10          A    Yes, sir.

11          Q    Okay, that's what I want to know, all

12  right.  Now, during that time that you were a relief

13  crew leader, did you ever just operate the forklift

14  for another crew?

15          A    I never operated -- just operated the

16  forklift for another crew.  I was working as the crew

17  leader, you know, taking the catchers to work, picking

18  them up, taking them home, and basically doing the

19  same thing as I done when I was a full-time crew

20  leader.

21          Q    Okay.  So what you're saying to me then

22  is during this period of time that were you a relief

23  crew leader, that you never operated the forklift?

24          A    A lot of times, yes, I did; I had to.

25          Q    But were you also the crew leader when

**A 023**

Davis - Brewer

1  When, by the way, did you quit working for Mountaire?

2  Do you remember when you quit?

3          A    Say that again.

4          Q    Do you remember when you quit for

5  Mountaire?  I'm sorry I meant to speak up.

6          A    It was the latter part of 2003.

7          Q    All right.  So does December of 2003

8  sound right?

9          A    Right around that, yes.

10          Q    Okay.

11          A    It was a little before Christmas -- no,

12  it was right at Christmastime.

13          Q    Right at Christmas?

14          A    Yes.

15          Q    Okay, so 12-25, approx, `03.  This

16  paragraph talks about when the company, the defendant,

17  learned of the plaintiffs', one of which would be you,

18  intention to seek counsel, that we retaliated against

19  plaintiffs by threatening them with termination of

20  their employment if they continued.

21                  MR. MARTIN:  Excuse me, could you --

22                  THE WITNESS:  I was not there.

23                  MR. MARTIN:  Could you mention that

24  paragraph, I may have missed the number?

25                  MR. BREWER:  Sure, paragraph 34

**A 024**

# EXHIBIT 7

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WILLIE DAVIS, JR., *et al.*,    *
                     *
        Plaintiffs,    *    Civil Action No. 04-0414-KAJ
    v.    *
                     *
MOUNTAIRE FARMS, INC., *et al.*    *
                     *
        Defendants.    *
                     *

## STIPULATION OF DISMISSAL WITH PREJUDICE
## OF GEORGE W. FEDDIMAN

      Defendant Mountaire Farms Inc. and Plaintiff George W. Feddiman, through undersigned

counsel, hereby stipulate to the dismissal with prejudice of George W. Feddiman as a plaintiff in

the above captioned matter pursuant to Fed. R. Civ. P. 41(a)(1)(ii).

MARGOLIS EDELSTEIN

_____
Jeffrey K. Martin, Esquire (DE #2407)
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680
Attorneys for Plaintiffs

CONNOLLY, BOVE, LODGE & HUTZ, LLP

_____
Matthew F. Boyer, Esquire (DE #2564)
The Nemours Building
1007 North Orange Street
P. O. Box 2207
Wilmington, DE 19899
(302) 884-6585

Arthur M. Brewer (*pro hac vice*)
SHAWE & ROSENTHAL, LLP
20 S. Charles Street
Baltimore, Maryland 21201

Attorneys for Defendant

Dated: April 18, 2005

      **SO ORDERED this _____ day of April, 2005.**

_____
**The Honorable Kent A. Jordan**

**A 025**

**Full docket text:**
SO ORDERED, re [39] Stipulation of Dismissal regarding Plaintiff George W. Feddiman. Signed by Judge Kent A. Jordan on 4/20/05. (rwc, )

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/13/2006 10:15:45 | | | |
| **PACER Login:** | sr0192 | **Client Code:** | mount-davis |
| **Description:** | History/Documents | **Search Criteria:** | 1:04-cv-00414-KAJ |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |

**A 026**

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2005 JUN 28  AM 10: 52

| | |
|---|---|
| WILLIE DAVIS, JR., NATHANIEL BRIDDELL, JOSEPH GARRISON, LARRY E. GIBBS, ROY H. WALTERS, and ALL SIMILARLY-SITUATED CURRENT AND FORMER EMPLOYEES OF MOUNTAIRE FARMS, INC., MOUNTAIRE FARMS OF DELMARVA, INC., and MOUNTAIRE FARMS OF DELAWARE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MOUNTAIRE FARMS, INC., a Delaware corporation, MOUNTAIRE FARMS OF DELMARVA, a Delaware corporation, and MOUNTAIRE FARMS OF DELAWARE, INC., a Delaware corporation, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )     Civil Action No. 04-414-KAJ |

## MEMORANDUM OPINION

———————————————

Jeffrey K. Martin, Esquire, Keri L. Morris, Esquire, Margolis Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware, 19806; Counsel for Plaintiffs.

Matthew F. Boyer, Esquire, Connolly Bove Lodge & Hutz, LLP, The Nemours Building, 1007 N. Orange Street, Wilmington, Delaware, 19899, Arthur M. Brewer, Esquire, Laura A. Pierson Scheinberg, Esquire, Shawe & Rosenthal, LLP, Sun Life Building, 20 S. Charles Street, Baltimore, Maryland, 21201; Counsel for Defendants.

———————————————

June 28, 2005
Wilmington, Delaware 19807

A 027



JORDAN, District Judge

## I.    Introduction

This suit was brought pursuant to the Fair Labor Standards Act (the "FLSA" or the "Act"), 29 U.S.C. § 201 *et. seq.* Presently before me is a Motion for Summary Judgment (Docket Item ["D.I."] 43; "Defendants' Motion") filed by Mountaire Farms, Inc., Mountaire Farms of Delmarva, Inc., and Mountaire Farms of Delaware, Inc. (collectively, "Defendants"). Also before me is a Motion for Summary Judgment (D.I. 41; "Plaintiffs' Motion") filed by Willie Davis, Jr., Nathaniel Briddell, Joseph Garrison, Larry E. Gibbs, and Roy H. Walters (collectively, "Plaintiffs").[1] For the reasons that follow, Defendants' Motion will be granted and Plaintiffs' Motion will be denied.

## II.    Background[2]

On June 21, 2004, Plaintiffs commenced this action filing a three count complaint asserting violations of the FLSA by Defendants for misclassifying Plaintiffs as exempt employees, failing to pay overtime, and retaliation;[3] the complaint also asserts a state-law claim under the Delaware Wage Payment and Collection Act ("Wage Act"), 19 Del. C. § 1101 *et seq.* (*See* D.I. 1.) The Defendants answered on July 9, 2004, denying liability. (D.I. 5. at ¶¶ 17-49.) On May 2, 2005, Plaintiffs and Defendants filed cross

---

[1]Plaintiffs also purport to represent "all similarly-situated current and former employees" of Mountaire Farms, Inc., Mountaire Farms of Delmarva, Inc., and Mountaire Farms of Delaware, Inc. (D.I. 1 at ¶ 1.)

[2]The following rendition of background information does not constitute findings of fact and is cast in the light most favorable to the Plaintiffs.

[3]The complaint alleges violations of "Sections 7 and 5(a)(2) of the FLSA, 29 U.S.C. §§ 207 and 215(a)(2) ..." (D.I. 1 at ¶ 42.), while Plaintiffs' Opening Brief refers to 29 U.S.C. §215(a)(3). (D.I. 42 at 15.)

A 028

motions for summary judgment on each count of the complaint. (D.I. 41; D.I. 43.) The issues presented are relatively straightforward: (1) whether, as crew leaders of chicken catchers at Defendants' farms, Plaintiffs fall within the FLSA's executive exemption and thus are not entitled to overtime pay, and (2) whether Defendants retaliated against Plaintiffs after Plaintiffs indicated that they intended to file this suit.

Defendants are engaged in the business of producing, processing, and distributing poultry products for consumers. (D.I. 5 at ¶ 19.) Defendants contract with over 300 farmers (referred to as "Growers") to grow chickens. (*Id.* at B0065-66.) Plaintiffs are or were employed by Defendants.[4] (D.I. 5 at ¶ 20.) They worked as the leaders of chicken catching crews. (D.I. 52, Ex. 9 at B0075; Ex. 3 at B0013; Ex. 6 at B0049; D.I. 45, Ex. 22 at A00367; Ex. 31 at A00805-06.) A chicken catching crew consists of one crew leader, seven or eight catchers and one forklift operator. (*Id.*, Ex. 5, Garrison Dep., at B0035; Ex. 6, Gibbs Dep., at B0049; Ex. 4, Davis Dep., at B0028.) Defendants' human resource department is not involved in recruiting and hiring chicken catchers and does not advertise for chicken catcher positions. (D.I. 45, Ex. 32 at A00838-39.)

A crew leader supervises the catchers and the forklift driver in the catching process (D.I. 45, Ex. 22 at A00392), and is responsible for staffing and maintaining a full crew. (D.I. 52, Ex. 5 at B0035.) A crew leader is also responsible for properly training the members of his crew. (*Id.*, Ex. 32 at A00882; Ex. 26 at A00556-57, 581;

---

[4]As of the time the cross motions for summery judgment were filed, Plaintiffs Walters, Briddell, and Gibbs were still employed by Defendants. (D.I. 52, Ex. 9 at B0075; Ex. 3 at B0013; Ex. 6 at B0049.) Plaintiff Garrison and Davis resigned in 2004 and Dec. 2003 respectively. (D.I. 51 at 4.)

3

Ex. 22 at A00470, A00373.) A crew leader transports members of his crew to and from

the assigned farm each work day. (D.I. 52, Ex. 5 at B0032; Ex. 3 at B0021.) On the

farm, a crew leader directs and observes the catching process, and is responsible for

ensuring compliance with the Live Haul Guidelines, which generally describe the

Growers' responsibilities, the crew leaders' duties, and the catching methods and

ventilation procedures. (*Id.*, Ex. 13 at B0115-18.) (*See, e.g., id.*, Ex. 5 at B0034-35;

Ex. 9 at B0077; Ex. 3 at B0014-15.) The crew leader decides when the crew takes a

break. (D.I. 45, Ex. 22 at A00409; Ex. 23 at A00474, A00511-12; Ex. 29 at A00725.)

Furthermore, crew leaders are responsible for the safety of their crew (*id.*, Ex. 26 at

A00611, 618; Ex. 23 at A00476), and for completion of the "farm ticket," which tracks

information on the conditions and particularities of each farm. (D.I. 52, Ex. 12 at

B0114; Ex. 5 at B0033; Ex. 9 at B0078-81; Ex. 3 at B0016; Ex. 6 at B0050-53; Ex. 4 at

B0028.) Additionally, crew leaders have the authority to discipline their crew members.

(*Id.*, Ex. 5 at B0037-39; Ex. 9 at B0076, 82, 95; Ex. 3 at B0019-20; Ex. 6 at B0057.)

        In April 2002, Defendants were involved in a previous class action law suit which

was settled. (D.I. 46 at 28.) As a result of that suit, Defendants mandated that all

catchers be provided with daily lunch breaks. (D.I. 45, Ex. 32 at A00833.) A number of

reminders were given to the crew leaders to ensure that their catchers were taking a

thirty minute lunch break. (*Id.*, Ex. 28 at A00676; Ex. 32 at A00829-30.) Despite the

reminders, Al Zlotorzynski, the Human Resource Manager for Defendants, discovered

that there was no consistency among the crews in following the direction on lunch

breaks. (*Id.*, Ex. 32 at A00829-30.) A final warning (D.I. 52, Ex. 14 at B0019) was

issued to all crew leaders, including those not involved in this action, to reinforce the

importance of the lunch break. (D.I. 45, Ex. 28 at A00678.) While the warning stated

that "not following the policy will be a willful and wanton disregard of the rules and you

will be terminated without further warnings[,]" Plaintiffs Garrison, Gibbs, and Walters

(the only crew leaders who remained employed by Defendants when the present the

motions were filed) understood that the purpose of the warning was to ensure that all

crew leaders required their crews to take lunch. (*Id.*, Ex. 23 at A00531; Ex. 22 at

A00447-48; Ex. 29 at A00796.)

## III.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary

judgment if a court determines from its examination of "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,"

that there are no genuine issues of material fact and that the moving party is entitled to

judgment as a matter of law. Fed. R. Civ. P. 56(c). In determining whether there is a

triable issue of material fact, a court must review the evidence and construe all

inferences in the light most favorable to the non-moving party. *Goodman v. Mead*

*Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976). However, a court should not make

credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing*

*Prods., Inc.*, 530 U.S. 133, 150 (2000). To defeat a motion for summary judgment, the

non-moving party must "do more than simply show that there is some metaphysical

doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

475 U.S. 574, 586-87 (1986) (internal citation omitted). The non-moving party "must

set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P.

5

56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Inds. Co., Ltd.*, 475 U.S. at 587 (internal citation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III. Discussion

The parties agree on the operative facts regarding the duties of a crew leader but dispute whether the crew leaders' responsibilities fall within the executive exemptions of the FLSA, 29 U.S.C. § 213(A). More specifically, they dispute whether their "primary duty" was management and whether "particular weight" was given to their suggestions and recommendations as to the hiring and firing, advancement, promotion or any other change in status of employees.

## A. FLSA's Executive Exemption

Under the FLSA, an employer may not employ any worker "for a workweek longer than forty hours unless such employee receives compensation ... at a rate not less than one and one-half times the regular rate at which [the employee] is employed." 29 U.S.C. § 207(a)(1). However, the Act exempts "any employee in a bona fide executive ... capacity ... ." 29 U.S.C. § 213(a)(1). The regulations promulgated to give effect to the Act state four elements defining an "employee in a bona fide executive capacity."

> The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:

6

> (1) Compensated on a salary basis at a rate of not less than
> $455 per week ... exclusive of board, lodging or other
> facilities;
> (2) Whose primary duty is management of the enterprise in
> which the employee is employed or of a customarily
> recognized department or subdivision thereof;
> (3) Who customarily and regularly directs the work of two or
> more other employees; and
> (4) Who has the authority to hire or fire other employees or
> whose suggestions and recommendations as to the hiring,
> firing, advancement, promotion or any other change of
> status of other employees are given particular weight.

29 C.F.R. § 541.100. "An employer has the burden of establishing that the exemption

applies to its employee[s], and such exemptions are narrowly construed against the

employer." *Sansoucie v. Reproductive Associates,* Slip Op., 2005 WL 1075596 (D. Del.

2005) (*citing Idaho Sheet Metal Works, Inc. v. Wirtz,* 383 U.S. 190 (1966); *Mitchell v.*

*Kentucky Finance Co.,* 359 U.S. 290 (1959)).

Plaintiffs concede that they were compensated on a salary basis sufficient to

satisfy section (a)(1) of the regulation. (D.I. 51 at 13.) Further, Plaintiffs concede that

they customarily and regularly directed the work of two or more employees and,

therefore, section (a)(3) of the regulation is satisfied. (*Id.*) Thus, at issue is whether

their primary duty was management, as required by section (a)(2), and whether their

"hire or fire" suggestions were given sufficient weight to satisfy section (a)(4) of the

regulation.

### 1. Plaintiffs' Primary Duty is Management

Plaintiffs, in their Opening Brief in Support of Their Motion for Summary

Judgment, concede that they "were involved in the management of the enterprise ..."

because they had to ensure that the requisite number of chickens were caught, properly

7

loaded, transported and delivered to Defendants' processing plant. (D.I. 42 at 11.)

Plaintiffs assert, however, that management of the enterprise was not their primary

duty. (D.I. 51 at 14-15.) Defendants assert that Plaintiffs previously conceded that they

"were involved in the management of the enterprise ... " (D.I. 42 at 11) and that their

duties satisfied section (a)(2) and that, therefore, this issue is no longer in dispute.[5]

(D.I. 54 at 7.) Because Plaintiffs' earlier statements on this point are insufficient to

warrant judicial estoppel, I will consider the merits of Plaintiffs' allegations. Accepting

as uncontested that Plaintiffs were involved in management, the issue turns on whether

managerial tasks were the crew leaders' "primary duty."

Under the FLSA regulations, "primary duty" is defined as follows:

> The term "primary duty" means the principal, main, major or
> most important duty that the employee performs.
> Determination of an employee's primary duty must be based
> on all the facts in a particular case, with the major emphasis
> on the character of the employee's job as a whole. Factors
> to consider when determining the primary duty of an
> employee include, but are not limited to, the relative
> importance of the exempt duties as compared with other
> types of duties; the amount of time spent performing exempt
> work; the employee's relative freedom from direct
> supervision; and the relationship between the employee's
> salary and the wages paid to other employees for the kind of
> nonexempt work performed by the employee.

29 C.F.R. § 541.700(a). To determine whether Plaintiffs' primary duty was

management, a court must consider the listed factors, along with any "facts unique to

this case ... ." See Baldwin v. Trailer Inns, Inc., 266 F.3d 1104, 1113-14 (9th Cir. 2001).

---

[5]"Judicial estoppel precludes a party from asserting contrary positions in the same or related proceedings." Saes Getters S.p.A. v. Ergenics, Inc., 816 F. Supp. 897, 990 n.5 (D.N.J. 1992),

Plaintiffs' only argument in support of their claim that management was not their "primary duty" is that, despite their responsibilities of handling issues at the farms and interacting with the Growers, the "crew leaders [were] only following company guidelines and needed to obtain higher supervisory approval for any deviation from the company guidelines." (D.I. 51 at 15.) Defendants counter that crew leaders have substantial discretion over each step in the chicken catching process and that, "while the [c]rew [l]eaders are responsible for ensuring that the [c]rew follows [Defendants'] Live Haul Guidelines, the Plaintiffs testified that the procedure could not always be followed and that it was within their discretion to deviate from these procedures when they deemed necessary." (D.I. 46 at 41-42.)

That Defendants have "well-defined policies, and that tasks are spelled out in great detail," is insufficient to negate the conclusion that the Plaintiffs' primary duty was management. See Donovan v. Burger King Corp., 672 F.2d 221, 223, 226 (1st Cir. 1982) (holding that the assistant managers' primary duty was management despite their tasks being "governed by highly detailed, step-by-step instructions contained in Burger King's [manual]"). Indeed, "ensuring that company policies are carried out constitutes the very essence of supervisory work." Id. at 226 (internal quotations omitted).

Here, Plaintiffs confirmed that Defendants' Live Haul Guidelines describe the crew leaders' responsibilities. (D.I. 45, Ex. 22 at A00388-92; Ex. 23 at A00489-92; Ex. 26 at A00559-66; Ex. 29 at A00696-700; Ex. 31 at A00811-12.) Plaintiff Walters described that it was within his discretion to deviate from the guidelines "up to a point," that it was not always possible to follow the guidelines exactly, and that he deviated from the procedures depending on the circumstances encountered on the farm. (Id.,

9

Ex. 29 at A00700-05.) Plaintiffs Briddell and Gibbs confirmed a crew leader's ability to deviate from the guidelines. (*Id.*, Ex. 23 at A00493; Ex. 26 at A00559-66.) A crew leader is "directing all the responsibilities on the farm ... " and is regarded "the leader out there [on the farm]." (*Id.*, Ex. 32 at A00878-79.) Thus the Plaintiffs' primary duty was management. *See, e.g., Baldwin*, 266 F.3d at 1116 (concluding that defendant's "employment meets the primary duty requirement because [defendant] had authority and discretion to manage the park on a day-to-day basis without supervision and control from [management]"); *Donovan*, 672 F.2d at 226 (holding assistant manager' primary duty is management despite performing non-exempt tasks); *Guthrie v. Lady Jane Collieries, Inc.*, 722 F.2d 1141, 1144-47 (3d Cir. 1983) (holding coal mine's foremen primary duty is management because of their independence from supervision and their safety and supervisory responsibilities).

Even if Plaintiffs were generally required to follow company policies and thus had diminished discretionary freedom, they fell within the accepted definition of employees whose primary duty is management. Therefore, section (a)(2) of the pertinent regulation is satisfied. 29 C.F.R. § 541.100(a)(2).

### 2. Plaintiffs' Input into Hiring and Firing

Plaintiffs contend that crew leaders are non-exempt under the FLSA because they lack the authority to hire or fire and that recommendations and suggestions made to Defendants were not given "particular weight" as required by section (a)(4). (D.I. 42 at 11.) Plaintiffs say that their job responsibilities did not include the hiring of chicken catchers and that their involvement with the hiring process was minimal because it was

10

limited to sending a potential candidate to a gentlemen named Lynch to go through

Defendants' hiring procedure. (D.I. 42 at 12.) Mr. Lynch is the Live Haul Manager for

the Mountaire Selbyville Plant where Plaintiffs are or were employed. (D.I. 52, Ex. 7 at

B0060.) Furthermore, Plaintiffs suggest that they "had no impact at all as to who was

hired by Defendant[s]," and that they did not have the authority to hire or fire or

recommend the promotion of a catcher to forklift driver. (D.I. 42 at 13.)

Defendants respond that those arguments are not supported by the facts in this

case.[6] (D.I. 49 at 6.) Plaintiff Garrison testified in his deposition that the crew leader is

responsible for staffing and maintaining a full crew, including suggesting new catchers

for hire to Mr. Lynch.[7] (D.I. 45, Ex. 22 at A00395.) Garrison, in need of additional crew

members, sent three people to Mr. Lynch telling him "I [would] like you [to] look to hire

this guy." (*Id.*, Ex. 22 at A00397.) Defendants declined to hire one of the suggested

individuals because the individual had worked for Defendants in the past and did not

maintain a good work record. (*Id.*, Ex. 32 at A00844-46.) Plaintiff Gibbs stated that he

brought his entire crew to work for Defendants when he was hired and that he also

---

[6]Defendants further suggest that the affidavits submitted by Plaintiffs in support
of their motion for summary judgment "do not square with their sworn deposition
testimony." (D.I. 49 at 7.) Plaintiffs almost exclusively cite to deposition testimony to
support their claims, but did file additional affidavits in support of their motion. (D.I. 42
at 12-13; *id.*, Ex. B.)

[7]Plaintiffs' affidavits in support of their motion for summary judgment states "[i]t
was not a part of my job duties ... to hire or fire employees ..., [and] I was never
required to recruit people ... ." (D.I. 42, Ex. B.) If previous, sworn testimony is
subsequently contradicted without explanation, it is permissible for a court to disregard
the later, contradictory testimony. *See Martin v. Merrell Dow Pharms., Inc.*, 851 F.2d
703, 706 (3d Cir. 1988) ("[T]he objectives of summary judgment would be seriously
impaired if the district court were not free to disregard the conflicting affidavit.").

suggested two or three other individuals to be hired, of whom all but one were actually hired. (*Id.*, Ex. 23 at A00478, A00496.) Gibbs also effectuated the promotion of a catcher to a forklift driver by affirming a catcher's performance upon an inquiry by Mr. Lynch. (*Id.*, Ex. 23 at A00471.) Plaintiff Briddell testified that he selected at least four individuals who joined his crew as catchers. (*Id.*, Ex. 26 at A00556-58.)

Even though catchers typically quit before they are terminated (*id.*, Ex. 32 at A00850), Garrison recommended that a catcher named Heath be terminated, and Heath was terminated. (*Id.* at A00846-47.) Briddell recommended the termination of a catcher named Hitchens, and Hitchens was terminated. (*Id.* at A00847-49; Ex. 26 at A00614.) Crew leaders also have the authority to discipline their crew members. (D.I. 52, Ex. 5 at B0037-39; Ex. 9 at B0076, B0082, B0095; Ex. 3 at B0019-20; Ex. 6 at B0057.) Plaintiffs Garrison and Walters each issued six disciplinary warnings.[8] (D.I. 45, Ex. 10 at A00177-82; Ex. 17 at A00270-75.) Defendants argue that the "imposition of disciplinary action" is equivalent to changing an employee's status. (D.I. 49 at 8.)

The question comes down to whether Defendants gave "particular weight" to Plaintiffs' suggestions and recommendations about hiring, firing, and discipline. The pertinent DOL regulations provide guidance on how to determine whether "particular weight" was given:

> To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such

---

[8]Defendants stated that Garrison issued seven warnings (D.I. 46 at 18), although the present record indicates that he only issued six. (D.I. 45, Ex. 10 at A00177-82.)

12

suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. *An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.*

29 C.F.R. § 541.105 (emphasis added).

In *Haines v. Southern Retailers*, 939 F. Supp. 441, 450 (E.D. Va. 1996), the plaintiff argued that her employment lacked discretionary powers because "she was closely supervised by senior management ...[,] could not hire or fire without outside management's approval ...[,] performed many of her duties pursuant to strict guidelines ...[,] was not permitted to discipline employees without the approval of her supervisor, and ... was subject to rigid supervision and regular visits by upper management." *Id.* The court rejected her argument, stating that employees in similar positions have been held "vested with enough discretionary power and freedom from supervision to qualify for the executive exemption," even if those employees have only limited ability to hire and fire and whose managerial duties are regulated by strict guidelines. *Id.; see also, Donovan*, 672 F.2d at 226; *Beauchamp v. Flex-n-gate LLC*, 357 F. Supp. 2d 1010, 1019 (E.D. Mich. 2005). The same is true for Plaintiffs in this case. *See* 939 F. Supp. at 451. In other words, "nothing in the governing regulations or relevant case law requires that a supervisor must have unfettered discretion in the performance of his

13

management duties in order to be deemed an executive."[9] *Beauchamp*, 357 F. Supp.2d at 1017 (holding that production supervisor qualifies for executive exemption despite limited authority to hire and fire because the defendant company was using a temporary worker agency as an initial source of new employees).

Viewing the record most favorably to the Plaintiffs, as I must while considering Defendants' motion for summary judgment, I nevertheless conclude that Plaintiffs' work as crew leaders satisfies the requirement of 29 C.F.R. § 541.100(a)(4). Thus, Plaintiffs, in their positions as crew leaders met all four of the regulatory prerequisites and were "employee[s] in a bona fide executive ... capacity ... ." Therefore, no overtime pay is owed to them pursuant to the FLSA. 29 U.S.C. § 213(a)(1).

## B.    Plaintiffs do not have a claim under the Wage Act

Plaintiffs based their claim under Delaware's Wage Act, 19 Del. C. § 1101 *et seq.*, on the theory that they are non-exempt workers under the FLSA and, therefore, are entitled to overtime pay. (D.I. 51 at 18.) Because Plaintiffs have not established that they are non-exempt under the FLSA, their claim under the Wage Act must fail as well.

## C.    Plaintiffs' Retaliation Claim

Lastly, Plaintiffs assert that Defendants intentionally retaliated against them because, after Plaintiffs' attorney complained to Defendants in a letter about the alleged

---

[9]Plaintiffs fail to cite a single authority in support of their argument that Plaintiffs' suggestions and recommendations regarding hiring, firing, advancement, promotion or any other change in status of employees were not given "particular weight." (D.I. 42 at 11-14; D.I. 51 at 15-17.)

14

violations of the FLSA (D.I. 52, Ex. 2 at B0009), Defendants gave Plaintiffs a "final warning" threatening termination if they failed to provide thirty minute lunch breaks for their crews. (D.I. 42 at 14-17.)  Under the FLSA, it is unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding ... ."  29 U.S.C. § 215(a)(3).  To establish a *prima facie* case, Plaintiffs must show (1) that they engaged in a protected activity; (2) that they were thereafter subjected to an adverse employment action; and (3) that a causal link exists between the protected activity and the adverse action.  *Blackie v. Maine*, 75 F.3d 716, 722 (1st Cir. 1996); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989).  Plaintiffs may have satisfied the first requirement with the letter Plaintiffs' counsel sent to Defendants.  *See Brock v. Richardson*, 812 F.2d 121, 125 (3d Cir. 1987) (filing of an informal compliant is sufficient to establish that an employee is engaged in a protected activity under the FLSA).  However, Plaintiffs have not satisfied the remaining requirements.

To show that they have met the second and third requirements, Plaintiffs rely on the issuance of the lunch break warning as an adverse employment action.  The Supreme Court has defined an adverse employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  Plaintiffs must offer evidence that the employer's action had materially adverse effects on the

15

terms and conditions of their employment. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300-01 (3d Cir. 1997). "FLSA's ban on retaliating against an employee who engages in a protected activity is [not] the functional equivalent of a straightjacket which restrains an employer from responding on the basis of its business judgment ...," nor does "an employee [engaging in a protected activity] acquire immunity from the same risks that confront virtually every employee every day in every work place." *Blackie*, 75 F.3d at 723-24.

In this case, a final warning about lunch breaks was issued to all crew leaders, not just Plaintiffs. (D.I. 45, Ex. 28 at A00678.) Moreover, Plaintiffs Garrison, Gibbs, and Walters who remained employed by Defendants understood that the purpose of the warning was to ensure that all crew leaders required their crews to take lunch. (*Id.*, Ex. 23 at A00531; Ex. 22 at A00447-48; Ex. 29 at A00796.) While it is undisputed that the final warning was issued after Defendants had notice of Plaintiffs' allegations (D.I. 46 at 54), that does not prove causation. "[E]ven if timing alone can prove causation where the discharge follows only two days after the complaint, the mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Robinson*, 120 F.3d at 1302. Thus, Plaintiffs have failed to establish that they were subjected to an adverse employment action that materially altered the terms and conditions of their employment, and that the final warning was issued in response to Plaintiffs' complaint.

To defeat summary judgment when Defendants have offered a legitimate reason for their actions, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Plaintiffs have failed to meet that burden, and, therefore, Defendants are entitled to judgment as a matter of law.

## D.    Plaintiff's Summary Judgment Motion

Because Defendants' Motion will be granted, Plaintiffs' Motion will be denied.

## IV.    Conclusion

For the reasons set forth herein, Defendants' Motion (D.I. 43) will be granted and Plaintiffs' Motion (D.I. 41) will be denied. An appropriate order will follow.

A043

# EXHIBIT 9

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-3982

———

WILLIE DAVIS, JR.;
NATHANIEL BRIDDELL;
JOSEPH GARRISON;
LARRY E. GIBBS;
ROY H. WALTERS,

Appellants

v.

MOUNTAIRE FARMS, INC., a Delaware Corporation;
MOUNTAIRE FARMS OF DELMARVA, INC.,
a Delaware Corporation;
MOUNTAIRE FARMS DELAWARE, INC.,
a Delaware Corporation

———

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 04-cv-00414)
District Judge:  Honorable Kent Jordan

———

A044

Argued June 15, 2006
Before: FISHER, CHAGARES and
REAVLEY,* *Circuit Judges.*

(Filed July 20, 2006)

JEFFREY K. MARTIN (ARGUED)
Margolis Edelstein
1509 Gilpin Avenue
Wilmington, DE 19806
    *Attorney for Appellants*

ARTHUR M. BREWER (ARGUED)
Shawe & Rosenthal, LLP
Sun Life Building, 11th Floor
20 S. Charles Street
Baltimore, MD 21201
    *Attorney for Appellees*

———

OPINION OF THE COURT

———

———————————

*The Honorable Thomas M. Reavley, United States
Circuit Judge for the Fifth Circuit, sitting by designation.

2

REAVLEY, *Circuit Judge.*

Employees of a chicken processing company challenge the District Court's grant of summary judgment to their employer on the employees' claims for unpaid overtime compensation under the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. (FSLA), the court holding that the claimants qualified as exempt employees under the Act's Executive Exemption, 29 U.S.C. § 213(a)(1). We will reverse.

I.

Appellants are five "Crew Leaders" who are either currently or formerly employed by Mountaire Farms, Inc. ("Mountaire"). Crew Leaders are employed to supervise other employees known as "chicken catchers" who travel to various growers' farms to catch and crate chickens to be sent to the Mountaire processing plant. As part of their job responsibilities, the Crew Leaders are required to pick up each of seven or eight crew members (catchers and a forklift operator) at their respective homes, transport the crew to the farms where the chickens are harvested, and then transport the crew members back to their homes.

In addition to transporting the crew members, the Crew Leaders have certain other responsibilities for directing the crew's work including making sure that the crew arrives at a farm on time, checking in with the grower, checking the chicken "houses" for pre-catch dead birds and damage, dividing the houses into sections to facilitate the catching process, directing the placement of ventilation fans if needed, monitoring the catch

3

process to prevent any "smothers," checking that the proper number of birds are placed in each transport cage, ensuring that the cages are uniformly stacked in the live haul trucks, and filling out "farm tickets" to send with the live haul drivers.

Mountaire's written job description for crew leaders does not include hiring and firing, and the Crew Leaders testified that they did not have the authority to do either. The Crew Leaders occasionally issue disciplinary warning "write-up" forms to catchers for certain listed violations, e.g., failing to timely notify them that the catcher will not be working on a given day. Crew Leaders sign off on requests for holidays or for receipt of pay in lieu of vacation or holidays. They are also the first stop for any catcher wishing to report a grievance. The Crew Leaders are not tasked with ultimate decision making or action taking on any of these matters, as the write-ups, requests, and grievances are sent to Mountaire's administrative offices.

The Crew Leaders are salaried, but are subject to partial day deductions for partial time off from normal work hours with their vacation and holiday pay calculated based on an hourly rate. The Crew Leaders are required to use their own vehicles for crew transportation, but they are reimbursed for that use. The Crew Leader's testimony reflects that they are minimally educated and that they worked their way up to crew leader status from catcher or forklift operator positions.

The crew transportation part of the Crew Leader's responsibilities takes anywhere from two to six hours per day in addition to their work at the farms, often resulting in a work week exceeding forty hours. Mountaire has refused to pay any

4

overtime wages to the Crew Leaders because they claim that the Crew Leaders are "exempt" executive employees who are not entitled to overtime compensation. Prior to 2002, all Crew Leaders were hourly employees. The record contains a Department of Labor ("DOL") "audit review" dated March 21, 2001. The audit review, which was prepared by Mountaire based on oral statements of the DOL reviewers, notes that Crew Leaders (who were then still hourly paid) should be receiving overtime and that house-to-house travel is compensable for hours worked. Mountaire concedes that the Crew Leaders' duties and responsibilities did not change after they were switched to a salaried status.

## II.

We review the District Court's grant of summary judgment de novo. Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004). Summary judgment is appropriate if there are no genuine issues of material fact presented and the moving party is entitled to judgment as a matter of law. Id. In determining whether a genuine issue of fact exists, we resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party. Id.

We construe FLSA exemptions narrowly against the employer. Madison v. Resources for Human Dev., Inc., 233 F.3d 175, 183 (3d Cir. 2000). The burden of proof to establish that its employees come within the scope of an overtime exemption is on the employer. Friedrich v. U.S. Computer Servs., 974 F.2d 409, 412 (3d Cir. 1992).

5

## III.

The FLSA provides generally that covered, nonexempt employees must receive not less than a stated minimum wage for all hours worked, and overtime premium pay for all hours worked over forty hours in a workweek. See 29 U.S.C. §§ 206(a)(1), 207(a)(1). Exemptions are made for certain "white collar" salaried employees.[1] Among the statutory exemptions from these requirements is the exemption contained at 29 U.S.C. § 213(a)(1) for persons employed in a bona fide executive capacity. This exemption, upon which Mountaire relies, is defined and explained in DOL regulations at 29 C.F.R. §§ 541.100 -.106 (2005).

The general rule for exemption of executive employees provides in relevant part that:

---

[1] See 29 C.F.R. § 541.3 (2005). ("The . . . exemptions and the regulations in this part do not apply to manual laborers or other 'blue collar' workers who perform work involving repetitive operations with their hands, physical skill and energy. Such nonexempt 'blue collar' employees gain the skills and knowledge required for performance of their routine manual and physical work through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction required for exempt learned professional employees such as medical doctors, architects and archeologists.").

6

(a)    The term "employee employed in a bona fide executive capacity" . . . shall mean any employee:

(1)    Compensated on a salary basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities;

(2)    Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3)    Who customarily and regularly directs the work of two or more other employees; and

(4)    Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other

7

> employees    are    given
> particular weight.

29 C.F.R. § 541.100 (2005).[2]

In dealing with all of the definitions issued since the enactment of the FLSA, courts have generally recognized that since the requisite characteristics of executive employment are stated in the conjunctive rather than the disjunctive, it is necessary, for an employee to be exempt as one employed in an "executive capacity," that the employee be shown to meet all of the administrative requirements for such exemption. See 131 A.L.R. FED. 1 § 2(a) (1996). There is no dispute on appeal that

---

[2]Both the parties and the District Court have proceeded on the assumption that this regulation applies to all the overtime at issue in this case. For purposes of this opinion, we will do the same. We note, however, that "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988). The new section 541.100 did not become effective until August 23, 2004. See Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122 (April 23, 2004). But much of the overtime at issue in this case accrued prior to that date, and appellants Nathaniel Briddell and Willie Davis may have left Mountaire in 2003. We commend this issue to the attention of the District Court on remand.

8

the Crew Leaders satisfy the first three prongs for the exemption. The sole issue in this case is whether the District Court wrongly decided that the fourth prong was also satisfied as a matter of law.

## IV.

The District Court found convincing Mountaire's contention that the responsibilities of the Crew Leader's included crew staffing and, thus, that the fourth prong of the executive exemption was satisfied. We do not believe that Mountaire has established satisfaction of this prong as a matter of law. We note that the case law on this issue is very fact specific and not consistent. The parties have, of course, cherry-picked the cases for their respective positions, but all can be factually distinguished and are not particularly helpful. The DOL regulations, however, do offer us some additional guidance, providing in relevant part that:

> To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and

9

regularly directs.    It does not include an occasional suggestion with regard to the change and status of a co-worker.    An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level management's recommendation has more importance and even if the employee does not have the authority to make the ultimate decision as to the employee's change in status.

29 C.F.R. § 541.105 (2005).

In this case, as noted above, the written duties for crew leaders do not include recruiting, hiring and firing of crew members. Testimony from the five Crew Leaders indicates that, in their thirty-plus years of combined service for Mountaire in a crew leader capacity, they collectively recommended only ten crew members for hire. All of these candidates were referred to Mountaire administrators for a screening and testing process. Some were hired, some were not.  Mountaire representatives testified that the Crew Leaders were required to "maintain a full crew at all times."  The Crew Leaders testified, however, that this merely meant that, if they were going to be short-handed on any given day or farm run, they would arrange to "borrow" a catcher or forklift operator from another crew by notifying Mountaire's dispatcher or contacting a fellow Crew Leader.

With respect to disciplinary warnings issued by the Crew Leaders, the record reflects that these were fairly sparse (for example, one of the Crew Leaders issued three warnings during his four-plus years in the post).  The record reflects that, during

10

the same thirty-plus years of combined service to Mountaire in a crew leader capacity, Mountaire showed the Crew Leaders collectively supported the termination of only two catchers for recurring absenteeism. The Crew Leaders disciplinary powers and freedoms thus appear quite limited.

We disagree with the suggestion of the District Court that the affidavit and deposition testimony of the Crew Leaders is contradictory, which would permit it to disregard the Leaders' averments by affidavit that their job responsibilities did not include recruiting, hiring, or firing. Review of the record reflects that the Crew Leaders consistently testified that they had no responsibility for recruiting catchers, no responsibility for making recommendations on the hiring or termination of individuals, and no power to hire or fire an employee, even within restricted guidelines. Rather, they had the limited power to borrow an employee from another crew when necessary and made only very limited referrals of potential catcher candidates to Mountaire. There are contradictions in the record evidence on this issue, but they lie between the testimony of the Crew Leaders and that of Mountaire, leaving material facts in dispute and precluding summary judgment.

## V.

Reviewing the record in the light most favorable to the Crew Leaders, we find that genuine issues of material fact remain as to whether the Crew Leaders were either responsible for hiring and firing or their recommendations on these issues were given "particular weight" such that they may fall under the executive exemption to the requirements of the FSLA.

11

Accordingly, we will reverse the District Court's grant of summary judgment in favor of Mountaire and remand for further proceedings.

12

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-3982

———

WILLIE DAVIS, JR.;
NATHANIEL BRIDDELL;
JOSEPH GARRISON;
LARRY E. GIBBS;
ROY H. WALTERS,

Appellants

v.

MOUNTAIRE FARMS, INC., a Delaware Corporation;
MOUNTAIRE FARMS OF DELMARVA, INC., a Delaware Corporation;
MOUNTAIRE FARMS DELAWARE, INC., a Delaware Corporation

———

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 04-cv-00414)
District Judge:  Honorable Kent Jordan

———

Argued June 15, 2006
Before:  FISHER, CHAGARES and REAVLEY,* *Circuit Judges.*

———

JUDGMENT

———

This cause came on to be considered on the record from the United States District Court for the District of Delaware and was argued on June 15, 2006.

———————————————

*The Honorable Thomas M. Reavley, United States Circuit Judge for the Fifth Circuit, sitting by designation.

On consideration whereof, it is now hereby ORDERED and ADJUDGED that the order of the District Court entered June 29, 2005, be and the same is hereby reversed and the case is remanded for further proceedings consistent with this opinion.

Costs taxed against Appellees.

Attest:

/s/ Marcia M. Waldron
DATED: July 19, 2006                    Clerk

2

**A057**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-3982

———

WILLIE DAVIS, JR.;
NATHANIEL BRIDDELL;
JOSEPH GARRISON;
LARRY E. GIBBS;
ROY H. WALTERS,

Appellants

v.

MOUNTAIRE FARMS, INC., a Delaware Corporation;
MOUNTAIRE FARMS OF DELMARVA, INC., a Delaware Corporation;
MOUNTAIRE FARMS DELAWARE, INC., a Delaware Corporation

———

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 04-cv-00414)
District Judge: Honorable Kent Jordan

———

Argued June 15, 2006
Before: FISHER, CHAGARES and REAVLEY,* *Circuit Judges.*

———

JUDGMENT

———

This cause came on to be considered on the record from the United States District Court for the District of Delaware and was argued on June 15, 2006.

———————————

*The Honorable Thomas M. Reavley, United States Circuit Judge for the Fifth Circuit, sitting by designation.

**A058**

On consideration whereof, it is now hereby ORDERED and ADJUDGED that the order of the District Court entered June 29, 2005, be and the same is hereby reversed and the case is remanded for further proceedings consistent with this opinion.

Costs taxed against Appellees.

Attest:

/s/ Marcia M. Waldron

DATED:  July 19, 2006                    Clerk

2

**A059**

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of Appendix to the

Opening Brief In Support of Defendants' Motion For Partial Summary Judgment was

served electronically, on this September 15, 2006, to:

Jeffrey K. Martin, Esquire
1509 Gilpin Avenue
Wilmington, DE  19806

/s/
_____
Matthew F. Boyer