C

# SHAWE
# ROSENTHAL LLP

20 S. Charles Street
11th Floor
Baltimore, MD 21201
P: 410-752-1040
F: 410-752-8861

shawe.com

**Arthur M. Brewer**
brewer@shawe.com
410-843-3466

**Laura A. Pierson Scheinberg**
lap@shawe.com
410-843-3459

May 18, 2006

Ms. Marcia M. Waldron
Clerk
United States Courts of Appeals - Third Circuit
21400 United States Courthouse
601 Market Street
Philadelphia, PA 19106-1790

Re:    **Davis, et al. v. Mountaire Farms, Inc., et al.**
       **Docket No. 05-3982**

Dear Ms. Waldron:

Appellees Mountaire Farms, Inc., Mountaire Farms of Delmarva, Inc., and Mountaire Farms Delaware, Inc., (hereinafter collectively referred to as "Mountaire" or the "Company") submits this brief pursuant to Court's letter of May 4, 2006. That letter directed the parties to address whether, and which, of Plaintiffs' actions with respect to the employees they supervised effected a "change of status" of the those employees, as that term is used in 29 C.F.R. § 541.100(a)(4).

Ms. Marcia M. Waldron
May 18, 2006
Page 2

SHAWE
ROSENTHAL LLP

## I.    INTRODUCTION

The relevant FLSA Regulations[1] state that:

> (a)    The term "employee employed in a bona fide executive capacity" in  section 13(a)(1) of the Act shall mean any employee:
>      (4)    Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

Section 541.105 provides guidance regarding whether an employee's suggestions

or recommendations are given "particular weight:"

> To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the

---

[1]  Since this case was filed on June 18, 2004 and encompasses a statutory period of before and after the Department of Labor issued revised FLSA regulations, both the former and current regulations would be applicable to this case.  The following legal argument is analyzed under the current FLSA regulations because they are more restrictive then the former regulations. As noted in the legislative history to the current regulations "Although this new requirement may exclude a few employees from the executive exemption, the Department has determined that it will have a minimal impact on employers."  Since the Crew Leaders satisfy the new regulations, it follows that they would meet the executive exemption under the former regulations.  A0773-76/former FLSA Regulations.

Ms. Marcia M. Waldron
May 18, 2006
Page 3



> employee's suggestions and recommendations are relied
> upon. Generally, an executive's suggestions and
> recommendations must pertain to employees whom the
> executive customarily and regularly directs. It does not
> include an occasional suggestion with regard to the
> change in status of a co-worker. An employee's
> suggestions and recommendations may still be deemed to
> have particular weight even if a higher level manager's
> recommendation has more importance and even if the
> employee does not have authority to make the ultimate
> decision as to the employee's change in status.

29 C.F.R. § 541.105.

Applying these regulations to the facts of this case shows, we submit, that

the Crew Leaders have the authority to recruit, hire, and staff their Crews.  The

Crew Leaders have the authority to discipline employees and to effectively

recommend the termination of crew members.  Further, the Crew Leaders have the

authority to promote members of their Crews.  The Crew Leaders are also

responsible for addressing the grievances of their Crew members pursuant to

Article 10 of the Collective Bargaining Agreement in effect between the Appellee

and the International Brotherhood of Teamsters, Local 355.  Taken together, there

is overwhelming record evidence to support a finding that the Crew Leaders are

employed in a bone fide executive capacity as set forth in 29 U.S.C. § 213(a)(4).

Ms. Marcia M. Waldron
May 18, 2006
Page 4



SHAWE
ROSENTHAL LLP

The caselaw, reviewed in detail below, further supports the finding that the Crew Leaders are "employed in a bona fide executive capacity."

## II.    RELEVANT FACTS

### A.    Authority to Recruit, Hire, and Staff Their Crew

As Discussed in Appellee's Answering Brief, the Crew Leaders are responsible for staffing and maintaining a full crew.[2] A0807/Garrison. 56. This includes recruiting Catchers and recommending them to the Company for hire. A0807/Garrison 56; A1264/Lynch 49; A0978/Briddell 46. Mr. Gibbs brought his entire Crew from his previous employer to work at Mountaire and also stated that he had recommended others for hire. A0896, 914/Gibbs 53, 78.

Mountaire Human Resources is not involved in the recruiting and hiring of Chicken Catchers. A1265-66/Lynch 50-51. The Company does not advertise for this position. A1266/Lynch 51. Similarly, Plant Manager Mr. Lynch and Assistant Plant Manager Mr. Nuse are not involved in the selection of the

---

[2] Many of the Crew Leaders have their relatives working for them. For example, Donald Garrison is Plaintiff Joe Garrison's brother and works on his Crew. Antonio Walters is a relative of Plaintiff Roy Walters and works on his Crew as a forklift operator. James Gibbs and George Feddiman are Plaintiff Larry Gibbs' brothers and worked on Mr. Gibbs' Crew. A0817/Garrison 67; A1108/Walters 20; A0881-82, 887, 892/Gibbs 28-29, 37, 49.

Ms. Marcia M. Waldron
May 18, 2006
Page 5



Catchers; recruitment of the Crew is exclusively the responsibility of the Crew Leader. A1268/Lynch 53.

If a Crew Leader loses one (1) or two (2) of his men, it is his job to recruit replacements. A1265/Lynch 50. Crew Leaders typically recruit by word of mouth by talking to other Mountaire Crew Leaders or Crew Leaders from other companies. A Crew Leader may also hear of Catchers looking for work through other Catchers, Forklift Operators and/or Live Haul Drivers. All of the recommendations for hire are filtered through the Crew Leaders. A1265/Lynch 50; A1096/Owen 48.[3]

Once a Crew Leader has found a Catcher that he would like to hire, he sends the person to the Medical Department at the Selbyville plant for drug testing, TB testing, and for the completion of a standard medical questionnaire. A1265, 1269-70/Lynch 50, 54-55. If the potential Catcher successfully completes these tests and has valid identification, he is hired. The only exception is if the individual worked for Mountaire in the past and did not have a good work record. In that circumstance, the Company may decline the Crew Leader's recommendation.

---

[3] Phil Owen is the Director of Human Resources.

Ms. Marcia M. Waldron
May 18, 2006
Page 6



A0807-08/Garrison 56-57; A1265, 1268, 1271-72/Lynch 50, 53, 57-58.  Mr.

Garrison explained that he approached Mr. Lynch and informed him that he needed

another man for his crew.  He would tell him: "I [would] like you [to] look to hire

this guy. And he asked me just bring him in, get him signed up."  A0809/Garrison

58.  Mr. Briddell named several people that he recruited to work on his Crew.[4]

A0977-79/Briddell 45-47.

There are typically seven (7) or eight (8) men on a Crew.  A0783/Garrison

28; A1114/Walters 28; A0976, 1000/Briddell 44, 68.  Catchers work with the same

Crew unless they are filling in on another Crew that may be short-handed.

A0805/Garrison. 54.  When possible, Crew Leaders carry eight (8) men to fill in

when someone is taking a break or is not present for the shift.  A0783,

852/Garrison 28, 198.  The Crew Leaders utilize their eighth man in different

ways.  Mr. Walters and Mr. Briddell, for example, put their Crews on a rotation

and assign the extra man a day off.  A1119/Walters 34; A1001-2/Briddell 70-71.

This decision is exclusively up to the Crew Leader.

---

[4] Mr. Walters testified that he did not have the authority to recommend catchers for
hire.  At his deposition, however, he admitted that he recommended Mr.
Drummond for hire.  A1115-17/Walters 29-31.

Ms. Marcia M. Waldron
May 18, 2006
Page 7



When a Crew becomes short-handed (has less than seven (7) Catchers) the

Crew Leaders can work with each other to determine if there is an extra man

available from another Crew to work on the Crew that is short-handed. A0807,

810/Garrison 56, 59; A1145-48/Walters 60-63; A1003-5, 1033/Briddell 72-74,

102; A0915/Gibbs 79; A1077/Feddiman 49. Mr. Garrison explained, "I would get

up with the Crew Leader…And I would ask him could I use somebody on his

Crew, if they were available. And he would get back up with me and let me know

whether they are [available to send another Catcher from their Crew] or not."

A0810-811/Garrison 59-60. If the Crew Leader had an extra man, the Crew

Leader would decide who to select from his Crew to send to the other Crew

Leader's Crew. A0811/Garrison 60.

There are times, however, when there are less than seven (7) men to a Crew,

and a Catcher is not available from another Crew. In this instance, the Crew will

have to catch the chickens short-handed. A0783, 806/Garrison 28, 55.

Crew Leaders have the authority to require their Crew to work short-handed (they

receive additional compensation called short pay). Crew Leaders also have the

authority to require their Crews to work overtime. A0830/Garrison 120;

Ms. Marcia M. Waldron
May 18, 2006
Page 8



A1181/Walters 101; A1036/Briddell 110; A0921/Gibbs 87.  Mr. Garrison testified,

"I have authority to get my job done that day; it may be more than eight hours."

A0830/Garrison 120.  The Crew Leader can also decide who to ask from his Crew

to work a double shift, if necessary.  A0811-12/Garrison 60-61; A0916/Gibbs 80.

Thus, the Crew Leaders' recommendations regarding the hiring for their Crews are

given "particular weight" within the meaning of 29 U.S.C. § 213(a)(4).

Additionally their authority to recruit and staff their Crews along with their

authority to require their Crews to work short handed and overtime supports the

finding that the Crew Leaders are "employed in a bona fide executive capacity."

**B.    Authority to Promote Crew Members**

The Crew Leaders also have the authority to recommend a member of their

Crew for promotion.  A0889-90/Gibbs 45-46.  For example, Mr. Gibbs

recommended the promotion of one of his Catchers, Mr. Walters, to become the

forklift operator.  A0889-90/Gibbs 45-46.

**C.    Authority to Discipline Crew Up To and Including Termination**

Under Mountaire's progressive disciplinary policy, employees are given

multiple opportunities to improve and correct their performance.  The disciplinary

Ms. Marcia M. Waldron
May 18, 2006
Page 9



procedure begins with the Supervisor (in this instance the Crew Leader) giving the

employee an oral warning, then a first written warning, second written and third

written or final warning, which can result in termination. A1278-79/Lynch 64-65.

As discussed in Appellee's Answering Brief, the Crew Leaders have the

authority to discipline their Crew and can effectively recommend termination of a

Crew member. A0822-29, 573-78/Garrison 110-117, Garrison Ex. 5; A1117,

1150, 1176/Walters 31; 65, 95; A1006, 1031/Briddell 75, 100; A0928/Gibbs 95;

A1279/Lynch 65. Crew Leaders have issued and signed written disciplinary

warnings. Examples in the record are from Crew Leader Garrison (7 warnings)

and Walters (6 warnings). A0573-78/Garrison Ex 5; A1176-80, 673-678/Walters

95-99, Walters Ex. 2.

In response to a question regarding whether a Crew Leader can unilaterally

discipline without the intervention of Mr. Nuse or Mr. Lynch and whether there

was a requirement that they sign off on it, Mr. Owen responded, "No, I wouldn't

expect them to, either." A1095/Owen 47.

Typically, Catchers quit before they are terminated. A1277/Lynch 63.

However, Crew Leader Joe Garrison recommended the termination of Catcher

Ms. Marcia M. Waldron
May 18, 2006
Page 10



Clarence Heath, and Heath was terminated. A1273-74/Lynch 59-60. Crew Leader

Briddell recommended the termination of Catcher Charles Hitchens, and Hitchens

was terminated. A1274-76/Lynch 60-62; A1035/Briddell 109.

Thus, as evident from the record, the Crew Leaders' recommendations as to

the termination of their crew members is given "particular weight" within the

meaning of 29 U.S.C. § 213(a)(4). Additionally the Crew Leaders can unilaterally

discipline their Crew without further input from the highest level of Mountaire

Management.

### D.    Addressing Grievances

Pursuant to Article 10, Section 1 of the Collective Bargaining Agreement:

> Any complaint, grievance or dispute arising out of
> the interpretation, application or performance of the
> provisions of this Agreement shall, in the first instance,
> be taken up with the aggrieved employee or employees,
> who shall first take the matter up with the shop steward,
> who in turn will take the grievance up with the foreman
> in charge...

With respect to any complaint, grievance or dispute the Crew may have, the

Crew Leader is the "foreman in charge" to whom the Crew members are to make

Ms. Marcia M. Waldron
May 18, 2006
Page 11



SHAWE
ROSENTHAL LLP

their complaints.  A0832-33, 491-513/Garrison 123-124, Garrison Ex. 6;

A1097/Owen 49; A1037-38/Briddell 112-113; A0939/Gibbs 111.

> Mr. Owen explained the Crew Leader's responsibility:

> The Crew Leader is the management representative to address
> informal or formal grievances.  They would be presented with
> grievances, they would investigate grievances, and they would
> provide answers to grievances at the first step...And it becomes the
> Crew Leader's responsibilities to sign and accept and, you know,
> process the homework behind the grievance, to write it
> up...A1097/Owen 49.

The Crew Leader is responsible for managing any conflicts or disagreements

among the members of his Crew.  A1307, 1311/Lynch 104,108; A1197-98/Walters

137-138.  In response to a disagreement, the Crew Leader could, for example,

change the Crew's job duties so that the men experiencing conflict would not work

as closely together.  A1311-12/Lynch 108-109.  Mr. Walters testified that some of

his Catchers were not getting along and he sat down with them and had a

discussion with them about their "attitudes."  A1197-98/Walters 137-138.

The Crew Leader is also responsible for managing complaints from his Crew

regarding the physical conditions of the farm and complaints regarding appropriate

supplies.  A1312/Lynch 109.

Ms. Marcia M. Waldron
May 18, 2006
Page 12



Thus, the Crew Leaders' authority to address the Crew members' grievances

constitute the authority to effect "any other change of status" as set forth in 29

U.S.C. § 213(a)(4).

## III.  LOWER COURT OPINION

The District Court Opinion was well-reasoned and, we submit, correctly

decided.  As Judge Jordon explained in his opinion:

> The question comes down to whether Defendants gave "particular
> weight" to Plaintiffs' suggestions and recommendations about hiring,
> firing, and discipline. The pertinent DOL regulations provide
> guidance on how to determine whether "particular weight" was given:
>
> > To determine whether an employee's suggestions and
> > recommendations are given "particular weight," factors
> > to be considered include, but are not limited to, whether
> > it is part of the employee's job duties to make such
> > suggestions and recommendations; the frequency with
> > which such suggestions and recommendations are made
> > or requested; and the frequency with which the
> > employee's suggestions and recommendations are relied
> > upon. Generally, an executive's suggestions and
> > recommendations must pertain to employees whom the
> > executive customarily and regularly directs. It does not
> > include an occasional suggestion with regard to the
> > change in status of a co-worker. An employee's
> > suggestions and recommendations may still be deemed to
> > have "particular weight" even if a higher level manager's
> > recommendation has more importance and even if the
> > employee does not have authority to make the ultimate

Ms. Marcia M. Waldron
May 18, 2006
Page 13



> decision as to the employee's change in status.  29 C.F.R.
> § 541.105 (emphasis added). (A0018-19).

Applying this analysis and citing to *Haines v. Southern Retailers*, 939 F. Supp.

441, 450 (E.D. Va. 1996), *Donovan v. Burger King Corp*, 672 F.2d 221, 226 (1st

Cir. 1982), and *Beauchamp v. Flex-n-gate LLC,* 357 F. Supp. 2d 1010, 1019 (ED.

Mich. 2005), the District Court correctly found the Crew Leaders to be "employed

in a bona fide executive capacity." Therefore, the Court concluded that no

overtime pay was owed to them.

## IV.    CASELAW SUPPORTS THAT THE CREW LEADERS ARE EXEMPT UNDER THE FLSA.

As discussed in Appellee's Answering Brief, the caselaw makes clear that

discretion does not require final decision making authority.  "[T]he term

'discretion and independent judgment' … does not necessarily imply that the

decisions made by the employee must have a finality that goes with unlimited

authority and a complete absence of review."  29 C.F.R. § 541.207(e). *Scott*

*Scherer v. Compass Group USA, Inc.*, 340 F. Supp. 2d 942 (W.D. Wisc. 2004).

In *Haines v. Southern Retailers,* 939 F.Supp. 441 (E.D. Va. 1996), the Court

rejected the plaintiff's assertion that she lacked discretionary power and relative

Ms. Marcia M. Waldron
May 18, 2006
Page 14



freedom from supervision because "she was closely supervised...could not hire or fire without outside management's approval, she performed many of her duties pursuant to strict guidelines...she was not permitted to discipline employees without the approval of her supervisor, and she was subject to rigid supervision and regular visits by upper management." *Id.* at 879.

Where an employee's suggestions and recommendations as to the hiring, firing and other major decisions are given particular weight, they constitute management duties. *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1117 (9th Cir. 2001) (Court found that plaintiffs were executive employees relying, in part, on the fact that, in one instance, they recommended firing an assistant manager); *Beauchamp v. Flex-N-Gate, LLC*, 357 F.Supp.2d 1010, 1019 (E.D. Mich. 2005) (production supervisor qualifies for executive exemption despite limited authority to hire and fire); *Hays v. City of Pauls Valley,* 74 F.3d 1002,1007 (10th Cir. 1996) (employee qualified for the executive exemption where he kept financial records, made recommendations on hiring and firing, and was responsible for the general operation); *Debrecht v. Osceola County,* 243 F. Supp. 2d 1364 (M.D. Fla. 2003) (Battalion chiefs who gave input to Fire Chiefs regarding employee promotions

Ms. Marcia M. Waldron
May 18, 2006
Page 15



had management as their primary duty); *Ayres v. Balousek*, 2005 WL 2033527

(E.D.Mich 2005)(employee qualified for executive exemption where his deposition

testimony established that he could hire and fire the employees he supervised, and

issue discipline)[5]. In this case, the Crew Leaders similarly testified that they had

the authority to hire, promote, discipline, and terminate members of their Crews.

To the extent any of the Crew Leaders consulted with Mr. Lynch or Human

Resources regarding the hiring, promoting, disciplining or terminating members of

their Crew, it is undisputed that their suggestions and recommendations were given

particular weight, if not generally accepted, therefore, displacing any doubt that

they exercised the requisite discretionary powers.

Based on the foregoing the District Court correctly found,

> Viewing the record most favorably to the Plaintiffs, as I
> must while considering Defendants' motion for summary
> judgment, I nevertheless conclude that Plaintiffs' work as
> crew leaders satisfies the requirement of 29 C.F.R. §
> 541.100(a)(4). Thus, Plaintiffs, in their positions as crew
> leaders met all four of the regulatory prerequisites and
> were "employee[s] in a bona fide xecutive...capacity...."
> Therefore, no overtime pay is owed to them pursuant to
> the FLSA. 29 U.S.C. §2139(a)(1).

---

[5] For the Court's convenience the *Ayres* case is attached to this Letter Brief.

Ms. Marcia M. Waldron
May 18, 2006
Page 16

SHAWE
ROSENTHAL LLP

A-0020/Decision p. 14 FN 9.

## V.    CONCLUSION

We trust that this Letter Brief addresses the Court's concerns with respect to

the regulation codified in 29 C.F.R. §541.100(a)(4).  Based on the foregoing, for

the reasons fully briefed in Appellees' Answering Brief, and the Appellee's briefs

before the United States District Court, we respectfully request that the District

Court Decision be affirmed, the Appellants' appeal be denied, and costs awarded

to Appellee.

Sincerely,

SHAWE & ROSENTHAL, LLP

Arthur M. Brewer

Laura A. Pierson Scheinberg

AMB/kj

cc:    Matthew F. Boyer, Esq.
       Jeffrey K. Martin, Esq.

Westlaw.

Not Reported in F.Supp.2d                                                                                     Page 1

Not Reported in F.Supp.2d, 2005 WL 2033527 (E.D.Mich.), 36 Employee Benefits Cas. 2203
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents

United States District Court,E.D. Michigan,
Southern Division.
Kevin AYRES, Timothy Lang, Arthur Little, Larry
Puskar, and Jay Spencer, Plaintiffs,
v.
Ronald BALOUSEK, Defendant
v.
Jay SPENCER, Third-Party Defendant.
**No. 04-CV-71802.**

Aug. 22, 2005.

Charles Gottlieb, Lisa Taylor, Gottlieb & Goren,
Bingham Farms, MI, for Plaintiffs/Third-Party
Defendant.
David M. Davis, Mark D. Filak, Hardy, Lewis,
Birmingham, MI, for Defendant.

*OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT*
STEEH, J.

### INTRODUCTION

*1 Plaintiffs are former long term employees of
Producers Color Service, Inc. ("PCS"), a company
that made television commercials for advertising
agencies. Defendant Ronald Balousek was the
owner and CEO of PCS. PCS ceased operations on
November 24, 2003, and all plaintiffs in this matter
were laid off or terminated by April 2004. They
complain of PCS' failure to make certain severance,
vacation/sick pay, and benefits payments they allege
it was required to pay, and have made claims under
ERISA, the Fair Labor Standards Act, and COBRA,
as well as state law claims alleging fraudulent
conveyance and violations of the Michigan Wage
and Fringe Benefits Act. Before the court are

defendant's motion for summary judgment and
plaintiffs' motion for partial summary judgment. For
the reasons that follow, defendant's motion will be
granted in its entirety and plaintiffs' motion will be
denied.

### BACKGROUND

Plaintiffs' former employer, PCS, was a provider of
advertising production services that ceased
operations on November 23, 2003. Plaintiffs are
five former long-term PCS employees: plaintiff
Kevin Ayres, a Telecini Operator, Colorist, and
Technical Artist, began work for PCS in 1975;
plaintiff Timothy Lang, the Facility and Stage
Manager, came on board in 1981; plaintiff Arthur
Little, a Stage Manager, began in 1978; plaintiff
Larry Puskar, a Senior Editor, started with PCS in
1980; and plaintiff Jay Spencer, Director of
Technology, began work for PCS in 1980.
Defendant Ronald Balousek was the owner,
president, and sole director of PCS, and he made
the decision to close the business. Plaintiff Ayres'
employment with PCS ended October 24, 2003;
Lang's, Puskar's, and Spencer's employment ended
when they were laid off on November 24, 2003; and
Little's employment with PCS came to an end on
April 2, 2004.

Plaintiffs' first amended complaint, filed July 15,
2004, is comprised of five counts. The first is made
under ERISA, alleging that defendant, as the
fiduciary for the PCS plans, breached unspecified
PCS severance, vacation, and sick day plans, which
provided for eight weeks severance pay upon
termination for employees hired before June 1,
1985, 20 days vacation pay for employees with over
20 years of service, and converted five sick days
into vacation days for eligible employees, causing
damages to all five plaintiffs. Count II, claiming
violations of Mich. Comp. Laws Ann. §§ 408.473,
475, asserts that defendant, the "employer" of the
plaintiffs, wrongly failed to pay all owing wages

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2

Not Reported in F.Supp.2d, 2005 WL 2033527 (E.D.Mich.), 36 Employee Benefits Cas. 2203
**(Cite as: Not Reported in F.Supp.2d)**

and fringe benefits. The third count makes a claim under the Fair Labor Standards Act, and alleges that plaintiffs Ayres, Lang and Puskar were wrongly classified as exempt employees, and are entitled to recovery of improperly withheld overtime compensation of one and one-half times their regular pay. Count IV alleges that defendant, as an " employer" and the Plan Administrator/Sponsor or fiduciary of the PCS healthcare plan, improperly failed to provide plaintiffs with written notice of the right to continue their healthcare coverage upon their termination. Finally, plaintiffs' fifth count is entitled "Fraudulent Conveyance," and asserts that " upon information and belief," defendant has been making mortgage payments on a residence in Birmingham, Michigan, which is titled only in defendant's spouse's name, and that such payments were made with "actual intent to hinder, delay or defraud creditors ... without receiving equivalent consideration," at a time when defendant was insolvent.

> FN1. Plaintiffs further and more specifically allege that defendant, wrongly deducting from Ayres' October 2003 pay " the sum of $596.20 for his portion of cost of healthcare medical benefits, and appropriating that sum, thereby causing the lapse of that coverage." First Amended Complaint, ¶ 41.

> FN2. Defendant's third party claim against plaintiff Jay Spencer concerning Lang's FLSA overtime claim, concerning which Spencer filed a motion for summary judgment, was voluntarily dismissed by counsel at oral argument.

**\*2** Defendant moves for summary judgment as to each of the claims summarized above. Plaintiffs also move for summary judgment as to counts II, III, and IV. The court's consideration of the parties' arguments and authorities, and its determination on the motions, is set forth below.

*STANDARD*

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward,* 241 F.3d 530, 532 (6th Cir.2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Cox v. Kentucky Dept. of Transp.,* 53 F.3d 146, 149 (6th Cir.1995).

The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." ' *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir.2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The evidence and all reasonable inferences therefrom must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Redding,* 241 F.3d at 532 (6th Cir.2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.,* 253 F.3d 900, 907 (6th Cir.2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 270, 88 S.Ct. 1575, 20

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 3

Not Reported in F.Supp.2d, 2005 WL 2033527 (E.D.Mich.), 36 Employee Benefits Cas. 2203
**(Cite as: Not Reported in F.Supp.2d)**

L.Ed.2d 569 (1968); *see also McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 800 (6ᵗʰ Cir.2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson,* 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean,* 224 F.3d at 800 (citing *Anderson,* 477 U.S. at 252).

### *ANALYSIS*

#### *Defendant's Motion for Summary Judgment*

#### *Count I (Entitled "ERISA-Severance, Vacation and Sick Day Benefits")*

*3 Regarding Count I, defendant argues that the policies at issue, concerning severance, vacation, and sick pay, are not "plans" governed by ERISA, that plaintiffs have no remedy under that statute, and that the claims must be dismissed. Defendant also asserts that during the plaintiffs' tenure with PCS, the PCS employee handbook was updated twice. When plaintiffs began their employment with PCS, a 1979 version was in effect. That handbook was updated in 1994, and again in 2003. The 2003 version removed the severance pay provision which had been contained in the earlier versions. Furthermore, each of the earlier handbooks had expressly reserved the right to make changes. For example, the 1994 Handbook, Exhibit B to defendant's Brief in Support of His Motion for Summary Judgment, stated that "[c]hanging conditions may make it necessary to revise, change or delete some or all of these policies. The company reserves the right to make such revisions, changes and/or deletions." The 1979 and 2003 versions contained nearly identical language.

This claim must be dismissed. Not only had PCS changed the severance policy as of the distribution of the 2003 handbook, months before the earliest termination among the plaintiffs in October 2003, an action PCS had expressly reserved the right to take, there is ample authority for the proposition

stated by defendants: the severance policy under discussion here would not be governed by ERISA even if it had not been changed. As defendant argues, there is no evidence that the PCS severance program would have required "an ongoing administrative program to meet the employer's obligation." *Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1, 11-12, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). Unlike the plans examined in *Shahid v. Ford Motor Co.,* 76 F.3d 1404, 1401 (6ᵗʰ Cir.1996) and *Cassidy v. Akzo Noble Salt, Inc.,* 308 F.3d 613 (6ᵗʰ Cir.2002), where severance plans were found to be ERISA plans, the PCS plan simply gave eligible employees eight weeks' salary at the time of termination. It does not impose the kind of administrative burden that would bring it under the governance of ERISA. Rather, the severance contemplated by the 1979 and 1994 Handbooks required only a "simple" determination, such as the severance plan found not to be an ERISA plan in *Sherrod v. General Motors Corp.,* 33 F.3d 636, 638-39 (6ᵗʰ Cir.1994), cited by defendant. Plaintiffs' Count I, alleging entitlement to severance and unused vacation and sick pay under ERISA, thus will not survive defendant's motion.

> FN3. Nor would plaintiffs' claims to unused vacation and sick pay, which defendant argued were "payroll practices," specifically exempted from ERISA under 29 CFR § 2510.3-1(b). See also *Massachusetts v. Morash,* 490 U.S. 107, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989), cited by defendant. Plaintiffs did not contest this argument in their response brief, and in fact conceded it at oral argument.

#### *Count II (Entitled "Violation of MCL 408.473 and 408.475")*

Count II also alleges entitlement to severance, vacation, and sick pay, under the Michigan Wages and Fringe Benefits Act, Mich. Comp. Laws Ann. §§ 408.473 and 475. Specifically, plaintiffs assert that "[d]efendant was obligated to immediately pay employees who have been discharged all wages owed and due ... MCL 408.475," (First Amended

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2033527 (E.D.Mich.), 36 Employee Benefits Cas. 2203
**(Cite as: Not Reported in F.Supp.2d)**

Complaint, ¶ 18), and "[d]efendant was obligated to pay all fringe benefits due to employees in accordance with the terms set forth in a written policy ... MCL 408.473" (Id., ¶ 20). Defendant asserts judgment should enter for him on this count because Mich. Comp. Laws Ann. § 408.481(1) states that "[a]n employee who believes that his or her employer has violated this act may file a written complaint with the department within 12 months of the alleged violation," which plaintiffs did not do, thus not exhausting required administrative remedies.

> FN4. Defendant has made the general argument, applicable here, that plaintiffs cannot hold him liable as an individual, because their employer was PCS, citing *Cummings v. Steel Build Homes,* 313 Mich. 445, 21 N.W.2d 192 (1946). Although this is an alternative reason for dismissal of the claim, the court will address defendant's argument specifically addressing this count.

*4 If the plaintiffs could maintain this claim against an individual defendant, not their employer, the only disputed issue is whether seeking an administrative remedy as set forth in § 408.481, above, is permissive or mandatory. Defendant argues it is mandatory, and plaintiffs argue the word "may" clearly shows it is permissive. Defendant's authorities convince the court the section actually required plaintiffs to file a claim with the Michigan Department of Labor prior to filing a civil suit, which each plaintiff admits he did not do. Although plaintiffs argue because the "English [is] plain," the court should find plaintiffs were not required to exhaust administrative remedies, the case of *Cork v. Applebee's of Michigan, Inc.,* 239 Mich.App. 311, 608 N.W.2d 62 (2000), relied on by defendant, clearly shows that plaintiffs' claims under the WFBA must be dismissed for failure to exhaust administrative remedies. As shown in that case, and properly discussed by defendant in his brief, where a plaintiff alleges a separate common-law claim, in *conjunction* with an WFBA claim, WFBA claims not filed with the Michigan Department of Labor must be dismissed, whereas common-law claims

(such as breach of contract) would not be properly dismissed. *Id.* at 318, 608 N.W.2d 62. *See also Gyro Design Group, LLC v. O'Grady,* 2002 WL 31953818 *FN2 (unpublished), discussing *Cork v. Applebee's* holding. Plaintiffs have offered no authority which refutes this, nor has the court discovered such a case. Plaintiffs' WFBA claims are, therefore, dismissed.

*Count III (Entitled "Fair Labor Standards Act")*

This count originally stated an FLSA claim as to plaintiffs Lang, Ayres, and Puskar. However, the briefing on the motion for summary judgment makes it clear that only plaintiff Lang now asserts this claim. In it, he alleges that his employer's method of making overtime payments to him violated of the Fair Labor Standards Act, which requires 1 1/2 times an employee's regular rate for hours in excess of 40 per week. 29 U.S.C. § 207(a)(1).

Defendant asserts two grounds for dismissal of this claim. First, defendant argues that plaintiff Lang was exempt from the FLSA's overtime requirement, and second argues that Lang's long-term acceptance of the method of calculating the overtime was an implied agreement which bars the present claim. The court finds that the exemption from the FLSA's requirements applies to this case. Although plaintiff argues he was not a supervisory employee, or that if he was, he was a "working foreman" entitled to overtime for his work, it is clear that plaintiff's wages and responsibilities set him apart from those he supervised and exempted him from the overtime provisions of the FLSA.

As highlighted by defendant, plaintiff Lang's job description stated that he trained employees; wrote and conducted performance reviews; scheduled subordinates' work hours; coordinated vacation times; and represented goals and policies of management to subordinates. Lang agreed that was an accurate description. Lang deposition, p. 15. In fact, Lang agreed at deposition that he supervised two employees, delegated the tasks of his two subordinates on a daily basis, and could hire, fire, and discipline those subordinates. *Id.,* pp. 14-16,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 5

Not Reported in F.Supp.2d, 2005 WL 2033527 (E.D.Mich.), 36 Employee Benefits Cas. 2203
**(Cite as: Not Reported in F.Supp.2d)**

608 N.W.2d 62.

**\*5** Defendant cites to the recent case from this district of *Beauchamp v. Flex-N-Gate, LLC,* 357 F.Supp.2d 1010 (E.D.Mich.2005), where the plaintiff, earning a salary of "at least \$37,000 as a production supervisor," was found to be exempt from the overtime requirements of the FLSA. That case set out the applicable regulations: for the exemption to apply, the employee 1) must be paid a salary of not less than \$455 per week; 2) have the primary duty of management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; 3) customarily and regularly direct the work of two or more other employees; and 4) have the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a).

It is not disputed here that Lang's salary exceeded \$455 per week, and he concedes he could hire or fire the employees he supervised. Furthermore, he agreed that the job description contained in a 1992 evaluation, attached as Exhibit G to his response brief, was "pretty complete right there." That evaluation was in his former title of "Plant Facility Supervisor," and contained the description, following SCOPE OF POSITION:
The Plant Facility Supervisor ensures on a 24-hour basis the maintenance of a reliable operating environment for electronic equipment and the maintenance of an efficient and attractive physical plant and grounds through personal effort and supervision of departmental employees and outside contractors. Ensures compliance with building codes, safety standards and insurance regulations. Supervises special PCS construction projects, manages facility security program as security supervisor for the Defense Investigative Service.

The ensuing job description includes many duties under "1. Trains and supervises personnel, and 2. Coordinates departmental operations" which demonstrate the managerial nature of Lang's job with PCS. Furthermore, at deposition, Lang testified he could hire and fire the employees he supervised,

issue discipline, and negotiate and sign contracts with outside contractors to maintain the facilities. Lang deposition, pp. 22-23. It is clear that Lang was in charge of managing the PCS facilities, and that he enjoyed considerable discretion in doing so. It is therefore the court's determination that, despite the employer's heavy burden of proof on a motion for summary judgment on the FLSA exemption issue as described in *Martin v. Indiana Michigan Power Co.,* 381 F.3d 574, 578 (6th Cir.2004), there is no material question of fact as to any of the criteria in 29 C.F.R. § 541.100(a). Summary judgment is appropriate for defendant on this claim.

### *Count IV (Entitled "COBRA")*

Here, defendant requests dismissal of Count IV of the First Amended Complaint, which alleges violations of COBRA continuation coverage requirements. Defendant argues the claim must be dismissed, because he was neither the Plan Administrator nor-even if he were-was there any COBRA continuation or notice requirement once PCS stopped providing healthcare/dental coverage to any employees on October 1, 2003.

**\*6** A close reading of Count IV shows that plaintiffs are complaining of defendant's failure to "provide plaintiffs with written notice of the right to continue healthcare coverage upon termination of their employment or, in the alternative, notify the plan administrator of the termination of their employment." First Amended Complaint, ¶ 36. Plaintiffs assert that defendant is liable "in an amount up to \$100 per day from the 14[th] day after notice of plaintiffs' qualifying event," citing 29 U.S.C. § 1132(c)(1). Id., ¶ 38. Plaintiffs concede that "[e]ffective October 1, 2003, Blue Cross and Delta Dental cancelled the health and dental insurance coverage for plaintiffs because of nonpayment of premiums." Brief in support of Plaintiffs' Motion for Partial Summary Disposition, p. 16. Furthermore, plaintiffs' brief states that " D.R.S., the third-party administrator for the self-insurance portion of the Plan, stopped paying claims on September 24, 2003, when it exhausted the money PCS deposited with it." *Id.,* p. 17.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                  Page 6

Not Reported in F.Supp.2d, 2005 WL 2033527 (E.D.Mich.), 36 Employee Benefits Cas. 2203
**(Cite as: Not Reported in F.Supp.2d)**

The court agrees with the proposition advanced by defendant, citing *Klosterman v. Western General Management, Inc.,* 805 F.Supp. 570 (N.D.Ill.1992) and *Local 217, Hotel & Restaurant Employees Union v. MHM, Inc.,* 976 F.2d 805, 809-810 (2nd Cir.1992), that once a group health care plan is terminated, there is no obligation under COBRA to provide continuation coverage or give notice thereof. The language of COBRA itself demonstrates this, which requires that coverage extend from the date of a "qualifying event," such as termination of employment, until "not earlier than the earliest of the following," including "[t]he date on which the employer ceases to provide any group health plan to any employee." 29 U.S.C. § 1162(2)(B). This is eminently logical, as there would be no further coverage to continue. Therefore, whether or not the defendant could be considered a Plan Administrator responsible for issuance of notices and found personally liable under COBRA, there was no obligation to provide continuation coverage or send notices thereof once the plans were terminated.

> FN5. In the brief in support of Plaintiffs' Motion for Partial Summary Judgment, it is asserted that "PCS continued to withhold from plaintiffs' paychecks the employee portion of the health and dental insurance premiums during the period of October and November 2003, including the last paychecks," pointing to the plaintiffs' individual depositions. The court notes that these allegations are not contained in plaintiffs' Count IV, nor do plaintiffs make an argument that *COBRA* was violated on this basis. As defendant asserts, these claims would properly be brought under the Michigan Wage and Fringe Benefit Act, discussed above, which requires exhaustion of administrative remedies.

> FN6. Plaintiff Ayres is the only plaintiff to make specific claims under Count IV, COBRA, where it is alleged that Ayres received a notice under COBRA of health and dental benefits continuation coverage.

That October 31, 2003 notice received by Ayres is attached as Exhibit 14 to plaintiffs' brief, as is a copy of a check written by a Catherine Ayres, apparently in an attempt to continue dental coverage for one family member. Ayres asserts, in response to defendant's Motion for Summary Judgment, that he is entitled to a penalty of $110/ day under ERISA, 29 U.S.C. § 1132(c)(1), as a result of this misleading notice. However, the pertinent provision of that statute merely states that " [a]ny administrator (A) who fails to meet the requirements of paragraph (1) or (4) of section 1166 of this title ... with respect to a participant or beneficiary .... may be personally liable" for the penalty. Those provisions merely relate to the administrator's responsibilities upon the occurrence of a "qualifying event," and do not address a continuation notice sent after termination of a plan. Absent any argument or authority in support of this claim under COBRA, plaintiff Ayres' claims concerning the October 31, 2003 notice likewise do not survive defendant's motion.

*Count V (Entitled "Fraudulent Conveyance")*

This claim of fraudulent conveyance concerns mortgage payments made on a residence owned by defendant's spouse in Birmingham, Michigan. Specifically, plaintiffs assert that "[t]hose mortgage payments were contrary to MCL 566.34 because:

A. Made with actual intent to hinder, delay or defraud creditors;

B. Made without receiving equivalent consideration;

C. Defendant was insolvent when the mortgage payments were made ... (sic)" First Amended Complaint, ¶ 43.

Defendant's brief indicates agreement with the required elements for a claim of fraudulent conveyance, as listed by plaintiffs in their complaint, and asserts that plaintiffs have met none of the requirements. Indeed, the court agrees that in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7

Not Reported in F.Supp.2d, 2005 WL 2033527 (E.D.Mich.), 36 Employee Benefits Cas. 2203
**(Cite as: Not Reported in F.Supp.2d)**

response to defendant's motion, plaintiffs presented no substantive evidence that defendant was insolvent at the time he paid mortgage payments. Plaintiffs point to "financial statements" collected from defendant through discovery, and imply that because his listed assets added up to less than his liabilities, defendant was "insolvent." This simple assertion is simply insufficient to meet a required showing of insolvency. However, even if it were sufficient to survive summary judgment on that element, plaintiffs have not offered any evidence to demonstrate that they were creditors of defendant Balousek at the time the alleged payments were made. Finally, plaintiffs do not even address the question of whether defendant received equivalent consideration for the alleged mortgage payments. Plaintiffs certainly have raised no genuine issue of material fact as to defendant's potential liability under this claim, rendering summary judgment appropriate for defendant on this final count as well.

### CONCLUSION

*7 For the reasons stated above, the court hereby GRANTS defendant's motion for summary judgment, and DENIES plaintiffs' motion for partial summary judgment. Counts I, III, IV, and V of the complaint are hereby dismissed with prejudice. Count II is dismissed without prejudice.

IT IS SO ORDERED.

### CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record on August 22, 2005, by electronic and/or ordinary mail.

E.D.Mich.,2005.
Ayres v. Balousek
Not Reported in F.Supp.2d, 2005 WL 2033527 (E.D.Mich.), 36 Employee Benefits Cas. 2203

Briefs and Other Related Documents (Back to top)

• 2004 WL 2626954 (Trial Pleading) Answer to Third-Party Complaint Against Third-Party Defendant Jay Spencer (Sep. 2, 2004)
• 2004 WL 2629805 (Trial Pleading) Defendant Ronald Balousek's Answer to Plaintiff's First Amended Complaint and Jury Demand (Aug. 3, 2004)
• 2004 WL 2629812 (Trial Pleading) Third-Party Complaint Against Third-Party Defendant Jay Spencer (Aug. 3, 2004)
• 2004 WL 2629794 (Trial Pleading) Complaint and Jury Demand (May 13, 2004)
• 2:04cv71802 (Docket) (May. 13, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.