IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WILLIE DAVIS, JR., | : | |
| NATHANIEL BRIDDELL, | : | |
| JOSEPH GARRISON, | : | C.A. NO. |
| LARRY E. GIBBS, | : | |
| ROY H. WALTERS, | : | JURY TRIAL DEMANDED |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MOUNTAIRE FARMS OF | : | |
| DELAWARE, INC., | : | |
| | : | |
| Defendant. | : | |

## AFFIDAVIT OF ROY H. WALTERS

| | |
|---|---|
| STATE OF DELAWARE | : |
| | :    SS. |
| COUNTY OF NEW CASTLE | : |

I, Roy H. Walters, having been duly sworn, depose and say as follows:

1. It was not a part of my job duties when I was a crew leader to hire or fire employees or to make any recommendations as to their employment status.

2. If there were times that I advised Doug Lynch about the possibility of hiring a catcher, it was because someone I knew needed a job.

3. I was never required to recruit people to be employed by Mountaire Farms.

4. If someone I knew wanted a job I would have them complete an application and/or send that person to Doug Lynch.

5. The total number of people who I had complete an application or sent to Doug

Lynch is very minimal.

ROY H. WALTERS

SWORN TO AND SUBSCRIBED before me, a Notary Public, for the State and

County aforesaid, this 1st day of May, 2005.

NOTARY PUBLIC

ANTHONY J. IANNINI
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 30, 2007

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

WILLIE DAVIS, JR.,                          :
NATHANIEL BRIDDELL,                         :
JOSEPH GARRISON,                            :        C.A. NO.
LARRY E. GIBBS,                             :
ROY H. WALTERS,                             :        JURY TRIAL DEMANDED
                                            :
        Plaintiffs,                         :
                                            :
             v.                             :
                                            :
MOUNTAIRE FARMS OF                          :
DELAWARE, INC.,                             :
                                            :
        Defendant.                          :

## AFFIDAVIT OF LARRY E. GIBBS

STATE OF DELAWARE              :
                              :        SS.
COUNTY OF NEW CASTLE           :

        I, Larry E. Gibbs, having been duly sworn, depose and say as follows:

1.      It was not a part of my job duties when I was a crew leader to hire or fire
        employees or to make any recommendations as to their employment status.

2.      If there were times that I advised Doug Lynch about the possibility of hiring a
        catcher, it was because someone I knew needed a job.

3.      I was never required to recruit people to be employed by Mountaire Farms.

4.      If someone I knew wanted a job I would have them complete an application
        and/or send that person to Doug Lynch.

5.      The total number of people who I had complete an application or sent to Doug

A-0062

Lynch is very minimal.

_____
LARRY E. GIBBS

SWORN TO AND SUBSCRIBED before me, a Notary Public, for the State and

County aforesaid, this 1st day of May, 2005.

_____
NOTARY PUBLIC

ANTHONY J. IANNINI
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 30, 2007

A-0063

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

WILLIE DAVIS, JR.,                    :
NATHANIEL BRIDDELL,                   :
JOSEPH GARRISON,                      :        C.A. NO.
LARRY E. GIBBS,                       :
ROY H. WALTERS,                       :        JURY TRIAL DEMANDED
                                      :
        Plaintiffs,                   :
                                      :
              v.                      :
                                      :
MOUNTAIRE FARMS OF                    :
DELAWARE, INC.,                       :
                                      :
        Defendant.                    :

## AFFIDAVIT OF JOSEPH GARRISON

STATE OF DELAWARE                     :
                                      :        SS.
COUNTY OF NEW CASTLE                  :

I, Joseph Garrison., having been duly sworn, depose and say as follows:

1.      It was not a part of my job duties when I was a crew leader to hire or fire

        employees or to make any recommendations as to their employment status.

2.      If there were times that I advised Doug Lynch about the possibility of hiring a

        catcher, it was because someone I knew needed a job.

3.      I was never required to recruit people to be employed by Mountaire Farms.

4.      If someone I knew wanted a job I would have them complete an application

        and/or send that person to Doug Lynch.

5.      The total number of people who I had complete an application or sent to Doug

**A-0064**

Lynch is very minimal.

_____
JOSEPH GARRISON

SWORN TO AND SUBSCRIBED before me, a Notary Public, for the State and

County aforesaid, this 1st day of May, 2005.

_____
NOTARY PUBLIC

ANTHONY J. IANNINI
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 30, 2007

A-0065

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WILLIE DAVIS, JR., | : | |
| NATHANIEL BRIDDELL, | : | |
| JOSEPH GARRISON, | : | C.A. NO. |
| LARRY E. GIBBS, | : | |
| ROY H. WALTERS, | : | JURY TRIAL DEMANDED |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MOUNTAIRE FARMS OF | : | |
| DELAWARE, INC., | : | |
| | : | |
| Defendant. | : | |

## AFFIDAVIT OF NATHANIEL BRIDDELL

| | | |
|---|---|---|
| STATE OF DELAWARE | : | |
| | : | SS. |
| COUNTY OF NEW CASTLE | : | |

I, Nathaniel Briddell, having been duly sworn, depose and say as follows:

1.    It was not a part of my job duties when I was a crew leader to hire or fire employees or to make any recommendations as to their employment status.

2.    If there were times that I advised Doug Lynch about the possibility of hiring a catcher, it was because someone I knew needed a job.

3.    I was never required to recruit people to be employed by Mountaire Farms.

4.    If someone I knew wanted a job I would have them complete an application and/or send that person to Doug Lynch.

A-0066

5.    The total number of people who I had complete an application or sent to

Doug Lynch is very minimal.

_Nathaniel Briddell_
NATHANIEL BRIDDELL

SWORN TO AND SUBSCRIBED before me, a Notary Public, for the State and

County aforesaid, this 1st day of May, 2005.

_Anthony J. Iannini_
NOTARY PUBLIC

ANTHONY J. IANNINI
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 30, 2007

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

WILLIE DAVIS, JR.,                     :
NATHANIEL BRIDDELL,                    :
JOSEPH GARRISON,                       :     C.A. NO.
LARRY E. GIBBS,                        :
ROY H. WALTERS,                        :     JURY TRIAL DEMANDED
                                       :
        Plaintiffs,                    :
                                       :
           v.                          :
                                       :
MOUNTAIRE FARMS OF                     :
DELAWARE, INC.,                        :
                                       :
        Defendant.                     :

## AFFIDAVIT OF WILLIE DAVIS, JR.

STATE OF DELAWARE               :
                                :     SS.
COUNTY OF NEW CASTLE            :

    I, Willie Davis, Jr., having been duly sworn, depose and say as follows:

1.    It was not a part of my job duties when I was a crew leader to hire or fire
      employees or to make any recommendations as to their employment status.

2.    If there were times that I advised Doug Lynch about the possibility of hiring a
      catcher, it was because someone I knew needed a job.

3.    I was never required to recruit people to be employed by Mountaire Farms.

4.    If someone I knew wanted a job I would have them complete an application
      and/or send that person to Doug Lynch.

5.    The total number of people who I had complete an application or sent to Doug

A-0068

Lynch is very minimal.

_____
WILLIE DAVIS, JR.

SWORN TO AND SUBSCRIBED before me, a Notary Public, for the State and

County aforesaid, this 1st day of May, 2005.

_____
NOTARY PUBLIC

ANTHONY J. IANNINI
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 30, 2007

**A-0069**

Page 1

[1]         IN THE UNITED STATES DISTRICT COURT
            IN AND FOR DISTRICT OF DELAWARE
[2]

[3]    WILLIE DAVIS, JR.,              )
       NATHANIEL BRIDDELL,            )
[4]    GEORGE W. FEDDIMAN,            )
       JOSEPH GARRISON,               )
[5]    ROY H. WALTERS,                )
       ALL SIMILARLY-SITUATED CURRENT )
[6]    AND FORMER EMPLOYEES OF        )
       MOUNTAIRE FARMS, INC.,         )
[7]    MOUNTAIRE FARMS OF DELMARVA,   )
       INC., and MOUNTAIRE FARMS      )
[8]    OF DELAWARE, INC.,             )
                       Plaintiffs,    )
[9]        -vs-                       )  C.A. No. 04-0414-KAJ
[10]   MOUNTAIRE FARMS, INC.,         )
       MOUNTAIRE FARMS OF            )
[11]   DELMARVA, INC., and            )
       MOUNTAIRE FARMS OF            )
[12]   DELAWARE, INC., all Delaware   )
       corporations,                  )
[13]                   Defendants.    )
                                    - - - - - -
[14]        Deposition of ROY H. WALTERS, taken before
       Pamela C. Washington, Registered Professional Reporter
[15]   and Notary Public, at the law offices of Young,
       Conaway, Stargatt & Taylor, 110 West Pine Street,
[16]   Georgetown, Delaware, on February 15, 2005, beginning
       at 10:00 a.m.
[17]                                 - - - - - -
[18]   APPEARANCES:

[19]       On behalf of the Plaintiffs:
               Margolis Edelstein
[20]           BY:  JEFFREY K. MARTIN, ESQ.
               and  KERI WILLIAMS, ESQ.
[21]           1509 Gilpin Avenue
               Wilmington, Delaware 19806
[22]
           On behalf of the Defendant:
[23]           Shawe Rosenthal
               BY:  ARTHUR M. BREWER, ESQ.
[24]           and  LAURA A. PIERSON SCHEINBERG, ESQ.
               20 South Charles Street,   11th Floor
[25]           Baltimore, Maryland  21201

Page 2

[1]                          I-N-D-E-X

[2]    Witness:
           ROY H. WALTERS
[3]        Examination by Mr. Brewer   ...........    3
           Examination by Mr. Martin  ...........  182
           Further examination by Mr. Brewer ....  186
[4]

[5]

[6]

[7]

[8]

[9]

[10]   CERTIFICATE OF COURT REPORTER ................  189

Page 3

[1]    WHEREUPON:

[2]                   ROY WALTERS,

[3]    having first been duly sworn by the court reporter,

[4]    thereupon testified upon his oath as follows:

[5]    BY MR. BREWER:

[6]        Q    Hi, Mr. Walters, we've known each other

[7]    for a long time, but for the record, I'll introduce

[8]    myself, I'm Art Brewer.

[9]             We have a standard stipulation with the

[10]   only caveat to that is if you wish to read your

[11]   deposition before you sign it, that will be your call.

[12]            I'm going to ask you a number of

[13]   questions here; have you ever been deposed before,

[14]   sir?

[15]       A    No.

[16]       Q    Okay.  You understand that you're under

[17]   oath today, and that you have an obligation to tell

[18]   the truth?

[19]       A    Yes.

[20]       Q    Okay.  This is informal, as you can

[21]   see, but it's important that you understand that this

[22]   has the same force and effect as testimony in a

[23]   courtroom for a judge or jury.

[24]       A    Yes.

[25]       Q    The court reporter is going to be

Page 4

[1]    taking down your answers to my questions, as you can

[2]    see.  I'd like you to understand that at trial, I'll

[3]    have an opportunity to bring to the attention of the

[4]    judge or jury any conflicts in your testimony today

[5]    from any testimony you may give later on.

[6]        A    Yes.

[7]        Q    Okay.  If there is any question that I

[8]    ask you that you don't understand, please don't answer

[9]    it; just ask me to explain it so that you do

[10]   understand the question, okay?

[11]       A    I'll agree.

[12]       Q    Okay.  Because if you answer a

[13]   question, we're all going to assume that you

[14]   understood what I asked you, okay?

[15]       A    I understand that.

[16]       Q    All right, good.  Sir, do you have any

[17]   physical or mental problems which would interfere with

[18]   your ability to answer my questions today?

[19]       A    No.

[20]       Q    Are you on any medication at all today?

[21]       A    Blood pressure.

[22]       Q    Okay.  And that's the only medication

[23]   you're on, is for your blood pressure?

[24]       A    Yes.

[25]       Q    Do you feel that that will interfere

A-0070

Page 17

[ 1]     A   My wife, my daughter.

[ 2]     Q   Okay. Let me ask you this, sir: Did

[ 3]  you, since this lawsuit was filed, attempt to get

[ 4]  statements from anybody to support your claims here?

[ 5]     A   No.

[ 6]     Q   Have you ever been involved in prior

[ 7]  litigation, any lawsuits --

[ 8]     A   No.

[ 9]     Q   -- at all, either criminal or civil?

[10]     A   No.

[11]     Q   No? All right. Have you ever been

[12]  asked to appear as a witness in a lawsuit filed by

[13]  somebody else?

[14]     A   No.

[15]     Q   I believe you gave your name to the

[16]  court reporter; have you ever gone by any other name?

[17]     A   No.

[18]     Q   What is your present address, sir?

[19]     A   RD 1, Box 184, Dagsboro, Delaware.

[20]     Q   And how long have you lived there?

[21]     A   Approximately 31 years.

[22]     Q   Okay. How old are you, sir?

[23]     A   59.

[24]     Q   59. Birth date, please?

[25]     A   7-25-45.

Page 18

[ 1]     Q   Thank you. And I gather from what you

[ 2]  have just discussed before that you are married?

[ 3]     A   Yes.

[ 4]     Q   What is your wife's name?

[ 5]     A   Frances.

[ 6]     Q   And how long have you been married?

[ 7]     A   34 years.

[ 8]     Q   Is she employed outside the home?

[ 9]     A   No.

[10]     Q   Do you have any brothers or sisters?

[11]     A   Yes.

[12]     Q   Can you tell me how many of each?

[13]     A   Three sisters and a brother.

[14]     Q   Okay. What does your brother do for a

[15]  living?

[16]     A   My brother's in the Armed Forces.

[17]     Q   Which branch?

[18]     A   The Army.

[19]     Q   How about your sisters?

[20]     A   I'm not exactly sure. As far as

[21]  working, they just housewives.

[22]     Q   Oh, okay. Do they live in the area?

[23]     A   No.

[24]     Q   Where do they live?

[25]     A   Florida, North Carolina.

Page 19

[ 1]     Q   I believe you mentioned you have a

[ 2]  daughter?

[ 3]     A   Yes.

[ 4]     Q   Do you have any other children outside

[ 5]  of the daughter that you referred to?

[ 6]     A   I have other kids also, I have three

[ 7]  daughters.

[ 8]     Q   Okay.

[ 9]     A   And a son.

[10]     Q   And where do they live?

[11]     A   Oh, one in Virginia.

[12]     Q   Which would that be?

[13]     A   That's the oldest one.

[14]     Q   And that is the boy or girl?

[15]     A   Girl.

[16]     Q   Girl, okay.

[17]     A   Stephanie, she stays in Delaware. And

[18]  Lenise, she stays home with me.

[19]     Q   Okay. And how old is the daughter who

[20]  is with you?

[21]     A   15.

[22]     Q   And your son?

[23]     A   Antonio.

[24]     Q   And where is he, sir?

[25]     A   Delaware.

Page 20

[ 1]     Q   And what does he do?

[ 2]     A   He work for Mountaire.

[ 3]     Q   He works for Mountaire?

[ 4]     A   Uh-huh.

[ 5]     Q   And what does he do for Mountaire?

[ 6]     A   Forklift operator.

[ 7]     Q   And he has the same last name as you?

[ 8]     A   Yes.

[ 9]     Q   Is he on your crew?

[10]     A   Yes.

[11]     Q   Do you attend church regularly, sir?

[12]     A   Yes.

[13]     Q   Okay, which church is that?

[14]     A   Christ Church.

[15]     Q   Where is that?

[16]     A   Millsboro.

[17]     Q   And what is the highest level of

[18]  education you received, sir?

[19]     A   10 years.

[20]     Q   Why did you leave school at that point,

[21]  if you can tell me?

[22]     A   Family. Family problems.

[23]     Q   Oh, I'm sorry, okay. Family problems

[24]  such as you needed to go to work?

[25]     A   Yes.

Page 21

[ 1]     Q    Okay.  Do you have any training,
[ 2]  certifications to operate any equipment?
[ 3]     A    I'm a professional truck driver.
[ 4]     Q    And does that mean you have a CDL,
[ 5]  commercial driver's license?
[ 6]     A    Yes.
[ 7]     Q    When did you get that?
[ 8]     A    Pardon?
[ 9]     Q    When did you get that?
[10]     A    I have always had chauffeur license and
[11]  up to the point of CDLs.
[12]     Q    Okay.  So you had a chauffeur's license
[13]  before CDLs came out, and then you had a CDL?
[14]     A    Yes.
[15]     Q    Can you operate any other equipment?
[16]     A    Yes.
[17]     Q    What's that?
[18]     A    Forklift.
[19]     Q    And where did you get that
[20]  certification?
[21]     A    Draper King Cole.
[22]     Q    Are they still in business, by the way?
[23]     A    No.
[24]     Q    I didn't think so.  Harry Bonk, wasn't
[25]  it?

Page 22

[ 1]     A    Yeah.
[ 2]     Q    Okay.  That's where you received your
[ 3]  forklift certification?
[ 4]     A    Yes.
[ 5]     Q    Okay, and approximately when was that?
[ 6]     A    1965.
[ 7]     Q    Okay.  Your mental health for the last
[ 8]  10 years has been good, I assume?
[ 9]     A    Yes.
[10]     Q    And I know you had some surgery for
[11]  your knee replacement, but outside of that, your
[12]  physical health has been good also?
[13]     A    Yes.
[14]     Q    Outside of the knee replacement
[15]  surgery, did you have any other surgical problems?
[16]     A    No.
[17]     Q    No?  Okay.  When did you first become
[18]  employed with Mountaire?
[19]     A    September 1982.
[20]     Q    And what position did you start out at?
[21]     A    Truck driver.
[22]     Q    When you say truck driver, what kind of
[23]  truck were you driving?
[24]     A    Live haul.
[25]     Q    Okay.  And tell me what your job duties

Page 23

[ 1]  were as a live haul truck driver.
[ 2]     A    Go to the farms, get loaded, bring them
[ 3]  back to the plant.
[ 4]     Q    Again, what location?
[ 5]     A    Selbyville.
[ 6]     Q    Okay.  Who was your supervisor at the
[ 7]  time?
[ 8]     A    Oliver Hitchens.
[ 9]     Q    I'm sorry, I didn't --
[10]     A    Oliver Hitchens.
[11]     Q    Oliver Hitchens?
[12]     A    Uh-huh.
[13]     Q    Okay.  And were you assigned to a
[14]  particular crew?
[15]     A    Yes.
[16]     Q    The person in charge of the crew that
[17]  you were assigned, who was that?
[18]     A    Donald Morris.
[19]     Q    And as a truck driver working for
[20]  Mountaire, were you a member of a labor organization,
[21]  a union?
[22]     A    Yes.
[23]     Q    Okay, what union?
[24]     A    Local 355.
[25]     Q    That's the Teamster's local, Local 355?

Page 24

[ 1]     A    Teamster's, yes.
[ 2]     Q    And you were a member of that local
[ 3]  from the time you first started in '82?
[ 4]     A    Yes.
[ 5]     Q    Okay.  How long were you driving a
[ 6]  truck as a live haul driver?
[ 7]     A    Can you rephrase what you mean how
[ 8]  long?
[ 9]     Q    Sure.  You started in '82 driving a
[10]  truck; did there come a time when you had another
[11]  position?
[12]     A    Yes.
[13]     Q    What was that?
[14]     A    Forklift operator.
[15]     Q    Okay, and when did you get that
[16]  position?
[17]     A    1990.
[18]     Q    1990, that's close enough.  And you
[19]  were a forklift operator?
[20]     A    Uh-huh.
[21]     Q    Did you consider that a promotion?
[22]     A    No.
[23]     Q    Did you make more money as a forklift
[24]  operator than you did as a truck driver?
[25]     A    Yes.

A-0072

Page 25

[ 1]    Q    But you didn't consider it a promotion?

[ 2]    A    No.

[ 3]    Q    Okay, tell me why.

[ 4]    A    I was asked to do a favor.

[ 5]    Q    Okay.

[ 6]    A    I was asked to fill in as a forklift

[ 7]    operator until someone was found for that position.

[ 8]    Q    Okay, and how long did you fill in?

[ 9]    A    Eight years.

[10]    Q    Well, did you come to think the job was

[11]    yours, after a while?

[12]    A    Not really, not when I asked to be

[13]    transferred back to the original position as truck

[14]    driver.

[15]    Q    Okay, so you preferred to drive a truck

[16]    as opposed to operate the forklift?

[17]    A    Yes.

[18]    Q    Okay.  And you operated the forklift,

[19]    as you said, for eight years?

[20]    A    Uh-huh.

[21]    MR. MARTIN:  Yes?

[22]    THE WITNESS:  Yes.

[23]    BY MR. BREWER:

[24]    Q    So that's approximately 1998, okay.

[25]    What happened to you in 1998?

Page 26

[ 1]    A    I was transferred back to driving

[ 2]    truck.

[ 3]    Q    So the favor finally ended?

[ 4]    A    Yes.

[ 5]    Q    Okay.  During this time when you were a

[ 6]    forklift operator, did you have any position with

[ 7]    Local 355?

[ 8]    A    Yes.

[ 9]    Q    What was that?

[10]    A    Union steward.

[11]    Q    Okay.  Also referred to as a shop

[12]    steward?

[13]    A    Yes.

[14]    Q    When did you become a shop steward?

[15]    A    1983.

[16]    Q    1983, so while you were a truck driver?

[17]    A    Yes.

[18]    Q    And how long did you hold that

[19]    position?

[20]    A    Through 2001.

[21]    Q    Through 2001?

[22]    A    Uh-huh.

[23]    MR. MARTIN:  Yes?

[24]    THE WITNESS:  Yes.

[25]

Page 27

[ 1]    BY MR. BREWER:

[ 2]    Q    Tell me why you left the position in

[ 3]    2001.

[ 4]    A    I was promoted.

[ 5]    Q    To what?

[ 6]    A    Crew leader.

[ 7]    Q    Crew leader?  Who promoted you to crew

[ 8]    leader?

[ 9]    A    Mr. Doug Lynch.

[10]    Q    Okay.  And why did you have to leave

[11]    the shop steward position when you were promoted to a

[12]    crew leader?

[13]    A    You're no longer under the Union when

[14]    you transfer out of the Union's position.  Being a

[15]    crew leader, you're non-Union.

[16]    Q    A member of management?

[17]    A    Yeah.

[18]    Q    Okay.  That was yes, sir, I'm sorry?

[19]    A    Yes.

[20]    Q    Okay, all right.  Do you need some more

[21]    water?

[22]    A    No, I'm fine.

[23]    Q    Okay.  As a crew leader, your primary

[24]    duty was basically to manage the crew that you had?

[25]    A    If that's the word you want to use.

Page 28

[ 1]    Q    If that's the word I want to use?

[ 2]    Well, I don't want to put any words in your mouth.

[ 3]    We'll get into that in more detail later on.

[ 4]    How many people were on the crew when

[ 5]    you became a crew leader in 2001?

[ 6]    A    Eight.

[ 7]    Q    There were eight on your crew.  And did

[ 8]    you have a forklift operator assigned to you?

[ 9]    A    It was one of the eight.

[10]    Q    That was one of the eight?  So you have

[11]    seven members, which is seven catchers then?

[12]    A    Yes.

[13]    Q    And you had drivers assigned to you,

[14]    live haul drivers?

[15]    A    According to the shift that you worked.

[16]    Q    Right.  But there were drivers, the

[17]    same drivers that you would basically see?

[18]    A    Yes.

[19]    Q    Okay.  You have been a crew leader

[20]    since 2001; from 2001 until today, have you ever had

[21]    new catchers put to your crew?

[22]    A    Could you --

[23]    Q    Have you ever had new catchers assigned

[24]    to your crew?

[25]    A    Yes.

A-0073

Page 29

[ 1]    Q    Okay. And did you have any
[ 2] responsibility with respect to making sure they knew
[ 3] how to go about catching chickens?
[ 4]    A    I don't understand that one.
[ 5]    Q    Okay. When a new catcher comes in to
[ 6] your crew, okay, do you have any responsibility to
[ 7] make sure he knows what he's doing?
[ 8]    A    No.
[ 9]    Q    No?
[10]    A    No.
[11]    Q    He just comes onto your crew and you
[12] just turn him loose?
[13]    A    He's ordered by the company.
[14]    Q    He's ordered by the company?
[15]    A    He's -- he's hired by Mountaire, he's
[16] placed by Mountaire. I have no control over the
[17] placement in the crew; they evaluate the man, they
[18] hire the man, they place the man.
[19]    Q    You have some input into who gets
[20] hired, though, don't you?
[21]    A    No.
[22]    Q    How about Mr. George Drummond, are you
[23] telling me you had no input into him getting hired at
[24] all?
[25]    A    No. Only to tell him to go to the

Page 30

[ 1] plant and get signed up, and go through the company's
[ 2] procedure.
[ 3]    Q    Right. So you told Mr. Drummond -- how
[ 4] did you come to get to Mr. Drummond?
[ 5]    A    Mr. Drummond asked me as a crew leader
[ 6] how he could get a job with Mountaire, and I informed
[ 7] him of the position that he had to go through in order
[ 8] to get a job, that's all.
[ 9]    Q    So you told him, "Gosh, sure. Go to
[10] there and get --"
[11]    A    I didn't say sure.
[12]    Q    What did you say to Mr. Drummond?
[13]    A    I said, "Mr. Drummond, you have to go
[14] through company policy to work for Mountaire."
[15]    Q    Okay. And do you know what that policy
[16] is?
[17]    A    You have to go through the channels, go
[18] through personnel, drug tests -- what's the other
[19] part? TB test. I'm not fully familiar with all of
[20] the stuff that a man --
[21]    Q    So you don't know what goes on in human
[22] resources?
[23]    A    No.
[24]    Q    But you told him if he wanted a job, he
[25] could go to human resources?

Page 31

[ 1]    A    Like anyone else.
[ 2]    Q    And he did?
[ 3]    A    I assume, yes.
[ 4]    Q    Well, and he's working for you, isn't
[ 5] he?
[ 6]    A    Yes.
[ 7]    Q    And how about Leon Tucker, didn't
[ 8] Isaiah Daniels refer him to you?
[ 9]    A    No, he referred him to Mountaire.
[10]    Q    He referred him to Mountaire?
[11]    A    Yes.
[12]    Q    Okay. So then you don't have any
[13] impact at all then as to who gets hired at all?
[14]    A    No.
[15]    Q    Okay. You can discipline people,
[16] though?
[17]    A    Yes.
[18]    Q    And you have, haven't you?
[19]    A    To a point, according to the work.
[20] That's company policy that they allow me to follow.
[21]    Q    So now this new catcher who comes to
[22] your crew, who you don't do anything with, right? He
[23] just walks into your crew and introduces himself and
[24] says, "Hi, I'm John." And you say, "Fine, John. I'm
[25] Roy," and he just goes to work, you don't have

Page 32

[ 1] anything to do with his training?
[ 2]    A    No.
[ 3]    Q    If he does something wrong, you can
[ 4] write him up, can't you?
[ 5]    A    Yes.
[ 6]    Q    Okay. How does he know not to do
[ 7] something wrong?
[ 8]    A    I consider the experience that he place
[ 9] toward the company when they consider him. That's,
[10] you know, that's entirely up to the company; the man
[11] goes in the company and said, "I'm a chicken catcher,"
[12] then how do they know that he's a chicken catcher?
[13] They hire him and --
[14]    Q    How do you know he's a chicken catcher?
[15]    A    I don't.
[16]    Q    You don't?
[17]    A    I don't.
[18]    Q    And, yet, when you don't know, there's
[19] nothing you do to make sure that he --
[20]    A    I inform my supervisor.
[21]    Q    Let me just ask the question, rephrase
[22] the question. When a new person comes to your crew
[23] as a catcher, you don't know whether he's a catcher,
[24] if I understood your answer, correct?
[25]    A    Yes.

A-0074

Page 33

[1]    Q    All right. But, yet, you do nothing to
[2] see if he does know anything about catching chickens,
[3] is that your --
[4]    A    I have to see if he know how to do the
[5] job.
[6]    Q    Okay. Now, if you see that he doesn't
[7] know how to do the job, do you tell him how to go
[8] about doing it the right way?
[9]    A    No, not really. I let the rest of the
[10] crew do that.
[11]    Q    So that's your decision, you let the
[12] rest of the crew tell him how to go about doing what
[13] he's doing?
[14]    A    It's not my decision. They have to
[15] work with him; I don't.
[16]    Q    Okay. You carry just a total of seven
[17] catchers?
[18]    A    No.
[19]    Q    How many catchers do you carry?
[20]    A    Accordingly sometime eight.
[21]    Q    Okay. When you have eight catchers, do
[22] you work them all the same day --
[23]    A    No.
[24]    Q    -- the same week? Some of the other
[25] crew chiefs said they rotate people on a day off, is

Page 34

[1] that what you do also?
[2]    A    Yes.
[3]    Q    Okay. How do you go about deciding
[4] which catcher is going to be off which day, when you
[5] have eight catchers?
[6]    A    You write the name down and begin one,
[7] two, three, four, five, six.
[8]    Q    Okay. So you write the names down, and
[9] number one might be off Monday, number two might be
[10] off Tuesday, number three might be off Wednesday --
[11]    A    Yes.
[12]    Q    -- and you decide how to do that?
[13] Okay. Do we have Davis Number 2, I guess it is?
[14]        MR. MARTIN: Garrison Number 2.
[15]        MR. BREWER: Garrison 2, I'm sorry,
[16] yes.
[17] BY MR. BREWER:
[18]    Q    Mr. Walters, I'm going to show you a
[19] document that's been introduced to Mr. Garrison's
[20] deposition as Exhibit Number 2 to his deposition, and
[21] these are the live haul guidelines, have you seen
[22] these before?
[23]    A    Yes.
[24]    Q    Okay. Let's go down, it talks about
[25] crew leaders general duties, okay? It says here

Page 35

[1] arrive at the farm at the correct time; is that a duty
[2] of the crew chief, crew leader?
[3]    A    Yes.
[4]    Q    Okay. It then talks about how the
[5] house should be divided into a minimum of four equal
[6] sections before the catching process starts; is that
[7] also one of your responsibilities?
[8]    A    Yes.
[9]    Q    It also says they can be divided into
[10] smaller sections, depending on how the house is set up
[11] and so forth; is that one of your responsibilities?
[12]    A    Yes.
[13]    Q    Okay. It's true, isn't it, that
[14] sometimes you have to divide the house only into maybe
[15] three parts?
[16]    A    Yes.
[17]    Q    Okay. And that's a decision that you
[18] would make based on your experience as to how you're
[19] going to go about catching this?
[20]    A    Yes.
[21]    Q    You tell the catchers how many birds to
[22] be placed in each compartment?
[23]    A    Yes.
[24]    Q    Or each hole, as it's referred to?
[25]    A    Yes.

Page 36

[1]    Q    Okay. And when you're catching birds
[2] at night, it talks about not moving the birds into
[3] less than 70 percent of the normal floor space; is
[4] that one of your normal responsibilities, to make sure
[5] this is followed?
[6]    A    Yes.
[7]    Q    But sometimes that can't be done, can
[8] it?
[9]    A    No.
[10]    Q    And so you would then have the birds
[11] into less than 70 percent?
[12]    A    Yes.
[13]    Q    Sure. And that would be your call,
[14] your decision to make?
[15]    A    Yes.
[16]    Q    Okay. Page 2 of this exhibit, it says
[17] that crew leader's responsibility is to continually
[18] observe the uncaught birds and prevent smothers --
[19]    A    Yes.
[20]    Q    -- is that a responsibility? And by
[21] smothers, we're meaning having the chickens pile on
[22] top of one another and die, is that what we're talking
[23] about?
[24]    A    Yes.
[25]    Q    Okay. It says you're supposed to make

A-0075

Page 37

[ 1]  sure that the cages are stacked uniformily on the
[ 2]  trailer.
[ 3]      A    They don't have to be.
[ 4]      Q    They don't have to be?
[ 5]      A    No.  The trailers is already situated
[ 6]  for separation.
[ 7]      Q    But it says they are, so it's a
[ 8]  responsibility of the crew leader to make sure they're
[ 9]  stacked uniformily?
[10]      A    Yes, okay.
[11]      Q    Okay?
[12]      A    Yes.
[13]      Q    And the cages that we're talking about
[14]  are the cages that the catchers put the chickens into?
[15]      A    Yes.
[16]      Q    And those cages are then taken by the
[17]  forklift operator and placed on the back of a flatbed
[18]  trailer?
[19]      A    Yes.
[20]      Q    And that's the responsibility here, to
[21]  make sure they're stacked uniformily, that's one of
[22]  your responsibilities as a crew leader?
[23]      A    Yes.
[24]      Q    Okay.  The next item in item G on page
[25]  2 of this exhibit speaks to in the summer, making sure

Page 38

[ 1]  the fans are left hanging; is that a responsibility
[ 2]  that the crew leader has?
[ 3]      A    Yes.
[ 4]      Q    And fans that are taken down should be
[ 5]  placed on the floor, fans should be blowing in the
[ 6]  same direction; is that your responsibility to make
[ 7]  sure that happens?
[ 8]      A    Yes.
[ 9]      Q    Okay.  And did you tell catchers to
[10]  make sure that this occurs?
[11]      A    Yes.
[12]      Q    It talks about in the next item H,
[13]  about not loading any more than a specific number of
[14]  birds without permission; is that your responsibility,
[15]  to make sure that the catchers don't put more birds in
[16]  a particular compartment than they should?
[17]      A    That is something you don't have
[18]  control over.
[19]      Q    But this is --
[20]      A    Once you tell the men how many to put
[21]  to the door, you cannot stand and watch what is put to
[22]  the door.  So that might be a responsibility, but it's
[23]  a responsibility that can't be -- it can't be done.
[24]      Q    Well, don't you observe them from time
[25]  to time catching the birds, and making sure?

Page 39

[ 1]      A    Sure.
[ 2]      Q    Okay.  So if somebody were putting more
[ 3]  in at that time, would you say something?
[ 4]      A    If I observed them, yes.
[ 5]      Q    Sure, okay.  But what you're basically
[ 6]  saying is you can't always observe --
[ 7]      A    You can't always catch that.
[ 8]      Q    But if you can observe a catcher
[ 9]  putting in more than they should, you can tell them to
[10]  stop that?
[11]      A    Yes.
[12]      Q    Okay.  It talks about filling out farm
[13]  tickets, we'll get to that in a second.  The next item
[14]  it says check with the driver to make sure the load
[15]  is secure and sent back to the plant, is that one of
[16]  your responsibilities?
[17]      A    Yes.
[18]      Q    Now, let's see if we can move through
[19]  this.  Roman Numeral III on page 2 of this exhibit
[20]  speaks to various catching methods, there is night
[21]  catching; is it your responsibility to make sure that
[22]  the methods described here in night catching are
[23]  followed?
[24]      A    Yes.
[25]      Q    And if there's going to be a deviation

Page 40

[ 1]  from this, you can deviate from this, depending on the
[ 2]  type of the house and the size of the birds and things
[ 3]  like that, can't you?
[ 4]      A    Up to a point.  If it had to be any
[ 5]  type of serious deviation, I must contact my
[ 6]  supervisor.
[ 7]      Q    All right.  But it says, for example,
[ 8]  under A, "Night catching: 1, Drive-ins, birds should
[ 9]  be caught in place as much as possible.  If moving is
[10]  required, no less than 70 percent of the available
[11]  floor space should be used."  You could use 50
[12]  percent, couldn't you?
[13]      A    Yes.
[14]      Q    Sure.  The day catching, it talks about
[15]  drive-in or A-frame houses, and there are a series of
[16]  things that are listed here, talks about houses being
[17]  caught on the inside; that's your responsibility, to
[18]  make sure that the catchers follow this?
[19]      A    Yes.
[20]      Q    Okay.  Fire fans should be placed at
[21]  the end of the house; is that your responsibility to
[22]  make sure that that happens?
[23]      A    If at all possible, yes.
[24]      Q    And if it's not there, can you tell the
[25]  catchers to position it at the end of the house like

Page 41

[1] the guidelines say?

[2]     A    Excuse me for a minute. Certain

[3] things, you don't understand about catching chickens.

[4]     Q    Well, I can't say that I have caught

[5] chickens, and I'm sure that's true.

[6]     A    I'd like to take you to a chicken farm,

[7] just off the record.

[8]     Q    Well, I tell you what, maybe one day

[9] we'll do that.

[10]     A    It's not always possible.

[11]     Q    All right, that's fine, it may not be

[12] possible, and if it's not possible, then you make that

[13] decision?

[14]     A    Yes, I have to.

[15]     Q    Yeah. If it is possible, but it isn't

[16] done, you can tell a catcher to put this at the end of

[17] the house, like the instruction says, correct?

[18]     A    The catchers can't do that; it's the

[19] forklift responsibility.

[20]     Q    Okay, well, then you can tell the

[21] forklift person to do that?

[22]     A    Providing he don't get stuck down on

[23] the other end, trying to do so.

[24]     Q    Oh, I understand that, I understand

[25] that. So the person who is responsible, you can tell

Page 42

[1] them to do it if it hasn't been done?

[2]     A    Yes.

[3]     Q    Okay. Item c, under day catching, the

[4] small c, to be clear for the record, talks about

[5] dividing the house and so forth and placing curtains

[6] and all of that, you see that?

[7]     A    Yes.

[8]     Q    That's your responsibility to make sure

[9] that's done?

[10]     A    Yes.

[11]     Q    As a practical matter, it can't always

[12] be done the way this says, correct?

[13]     A    Correct.

[14]     Q    And if it can't be done that way, it's

[15] your decision to get it done the best way it can be

[16] done, making sure that you don't kill the birds?

[17]     A    Yes.

[18]     Q    Okay. Small item d talks about when

[19] working both sides of the houses, the pens should

[20] contain approximately one cage of birds; sometimes it

[21] contains more, doesn't it?

[22]     A    Yes.

[23]     Q    Okay. And that would be your call,

[24] your decision?

[25]     A    Yes.

Page 43

[1]     Q    All right. We can take a look and go

[2] down here, maybe you can do this so that we can try to

[3] get you out on time, items e through h, talking about

[4] fans blowing in the same direction, so forth and so

[5] on, are these your responsibilities as a crew leader?

[6]     A    Yes.

[7]     Q    Okay. You make sure that the birds are

[8] watered, or wet thoroughly if it's above 80 degrees?

[9]     A    Yes.

[10]     Q    And who does that?

[11]     A    Truck driver.

[12]     Q    Okay. And you will tell the truck

[13] driver to make sure the birds get watered when it's 80

[14] degrees or more?

[15]     A    Yes.

[16]     Q    Okay. And it talks about walk-out or

[17] shed houses, I'm not sure what a shed house is but,

[18] again, it's item 2, a through f, would you agree that

[19] those are your responsibilities as a crew leader?

[20]     A    Yes.

[21]     Q    Okay. And if there is any deviation

[22] required, you can make whatever changes you think are

[23] appropriate in order to get the job done?

[24]     A    Yes.

[25]     Q    Okay. Roman Numeral 4 which appears on

Page 44

[1] page 3 talks about tunnel ventilation; could you take

[2] a look at that and tell me if the responsibilities

[3] that are listed there are the crew leader's in fact

[4] responsibilities that you have?

[5]     A    As a crew leader, yes.

[6]     Q    Okay. And again, if there are any

[7] changes that are required or deviations from these

[8] responsibilities, you can make that decision based on

[9] your experience?

[10]     A    Yes.

[11]     Q    If we continue along, we have tunnel

[12] ventilation procedures and, again, what I'd just ask

[13] you to do, since it's only two pages, if you just take

[14] a quick look at the two pages and tell me if those are

[15] responsibilities that you have as a crew leader?

[16]     A    Yes.

[17]     Q    And, again, if there's deviation, you

[18] can make that decision to deviate, depending on what

[19] you see with the house on a particular house when you

[20] get there?

[21]     A    Yes.

[22]     Q    Okay. Mr. Walters, I'm going show you

[23] another exhibit, this is Exhibit Number 1 to

[24] Mr. Garrison's deposition. You know Mr. Garrison, by

[25] the way, do you not?

A-0077

Page 45

[ 1]    A    Yes.

[ 2]    Q    Okay. This is called a farm ticket,

have you seen this before?

[ 4]    A    Yes.

[ 5]    Q    I'd like to go over some of the

information that's on this ticket. The upper

right-hand corner I see a date, who fills that in?

[ 8]    A    I do.

[ 9]    Q    You do as a crew leader?

[10]    A    Yes.

[11]    Q    So you put whatever date it is?

[12]    A    Yes.

[13]    Q    There's a lot number, who fills that

[14] in?

[15]    A    The scales.

[16]    Q    Scales? And there is a load number,

[17] who fills that in?

[18]    A    Scales.

[19]    Q    The people at the scale house?

[20]    A    Yes.

[21]    Q    Okay. There's a place for the grower,

[22] the name of the grower, I would assume --

[23]    A    Yes.

[24]    Q    -- or the farmer, also called the

[25] farmer, and who fills that in?

Page 46

[ 1]    A    I do.

[ 2]    Q    It talks about houses, and there are a

[ 3] series of blanks, who puts the information in there?

[ 4]    A    I do.

[ 5]    Q    Just for purposes of clarification for

[ 6] the record, a farmer may have five houses and you

[ 7] would be told to catch house one and four, so would

[ 8] you put one and four in there?

[ 9]    A    You put whatever house that you

[10] catching the load out of.

[11]    Q    Okay, fine. Time started, who fills

[12] that in?

[13]    A    I do.

[14]    Q    And that's the time that you start

[15] catching the chickens at the farm?

[16]    A    Time you start loading the truck.

[17]    Q    Time you start loading the truck? And

[18] time finished, what is that?

[19]    A    Time finished loading the truck.

[20]    Q    And so this is done for each truck

[21] then?

[22]    A    Yes.

[23]    Q    Okay. And there is a temperature, who

[24] fills that in?

[25]    A    Scales.

Page 47

[ 1]    Q    Scales fills that in? There's a

[ 2] notation for a truck, who fills that information in?

[ 3]    A    I do.

[ 4]    Q    And we have had other testimony before,

[ 5] each truck is numbered?

[ 6]    A    Yes.

[ 7]    Q    And the number is not the license plate

[ 8] number, it's just a number that the company assigns to

[ 9] the truck?

[10]    A    Yes.

[11]    Q    And the same is also true for the

[12] trailer?

[13]    A    Yes.

[14]    Q    And who fills in the information for

[15] the driver?

[16]    A    His name, I do.

[17]    Q    Okay. So you're putting in the truck

[18] number, the trailer number, and the driver's name?

[19]    A    Yes.

[20]    Q    The number of doors, who fills that

[21] information in?

[22]    A    I do.

[23]    Q    And then there's a total and an average

[24] weight, who fills that in?

[25]    A    I fill in the total of birds. The

Page 48

[ 1] average weight is done scale.

[ 2]    Q    Okay. Now, going down to the second

[ 3] part of the form, it says sign present, and there are

[ 4] two boxes; who fills that out?

[ 5]    A    I do.

[ 6]    Q    And when it says sign present, what

[ 7] does that mean?

[ 8]    A    Is the sign present for the directions

[ 9] to the farm, is it present at the driveway.

[10]    Q    Okay. So that would be the Walters

[11] Farm, when I drive up I can see a sign that says the

[12] Walters Farm?

[13]    A    Yes.

[14]    Q    And one of your jobs is to make sure

[15] that's up?

[16]    A    No.

[17]    Q    Well, put it this way: If it's not up,

[18] you indicate that it's not up?

[19]    A    Correct, yes.

[20]    Q    And if it is up, you check the box that

[21] says it is up?

[22]    A    Yes.

[23]    Q    I don't mean that it's your job to put

[24] the thing in there yourself; it's your job to see

[25] whether it's up or not?

A-0078

Page 49

[ 1]    A    Yes.

[ 2]    Q    Okay.  The grower present, who checks

[ 3]  that box out?

[ 4]    A    I do.

[ 5]    Q    And what does that mean?

[ 6]    A    Is the grower present at the farm when

[ 7]  we arrive.

[ 8]    Q    All right, present, does that mean that

[ 9]  he is physically out there at the house, or does it

[10]  mean that he is inside, sleeping or watching TV, or

[11]  what does it mean?

[12]    A    It means that he's there at the farm,

[13]  present.

[14]    Q    To observe catching?

[15]    A    To do his part.

[16]    Q    To do his part, okay.  What is his

[17]  part?

[18]    A    That should be reflected within the

[19]  guidelines of company policy.

[20]    Q    You say the guidelines of company

[21]  policy, you're referring to Garrison Exhibit 2, I saw

[22]  you looking at that, where it says Growers

[23]  Responsibilities?

[24]    A    Yes.

[25]    Q    Okay.  Now, what happens if he doesn't

Page 50

[ 1]  do these things?

[ 2]    A    The job must get done.

[ 3]    Q    All right.  For example, one of the

[ 4]  grower's responsibilities I see here in Garrison

[ 5]  Exhibit 2, item b, is to pick up all dead birds

[ 6]  immediately prior to catching crews' arrival; if he

[ 7]  doesn't do that, who does that?

[ 8]    A    No one.

[ 9]    Q    Well, I guess they're not going

[10]  anywhere, so they just stay on the ground?

[11]    A    Yes.

[12]    Q    Okay.  Item c talks about raising and

[13]  securing all equipment to the maximum height at the

[14]  proper time; suppose he doesn't do that, who does

[15]  that?

[16]    A    We do.

[17]    Q    We being?

[18]    A    Crew.

[19]    Q    The crew?  Okay.  Let's go back to

[20]  Exhibit 1, if we may.  It says DAFs prior to catch,

[21]  DAF stands for dead at farm?

[22]    A    Yes.

[23]    Q    That's the number of chickens that are

[24]  dead at the farm?  And DAFs prior to catch, yes or no,

[25]  who checks that box?

Page 51

[ 1]    A    I do.

[ 2]    Q    How do you go about deciding whether to

[ 3]  check that box yes or no?

[ 4]    A    When I approach the farm, in order to

[ 5]  see which house we going to get, we walk in, in order

[ 6]  to prepare for work.  And if I observe that the farmer

[ 7]  hasn't picked up his birds as company policy say to,

[ 8]  then I write no.

[ 9]    Q    You say the birds, you mean the dead

[10]  birds?

[11]    A    Dead birds.

[12]    Q    Okay.  So if he's not picked it up,

[13]  would you check no, that he hasn't?

[14]    A    Yes.

[15]    Q    But if he has, you would check that?

[16]    A    Yes.

[17]    Q    Okay, thank you.  Fire fan used, who

[18]  checks that?

[19]    A    I do.

[20]    Q    What does that mean?

[21]    A    Did I use the fire fan.

[22]    Q    Okay.

[23]    A    Was the fire fan able to be used.

[24]    Q    All right.  And is it your decision as

[25]  to whether or not to use it?

Page 52

[ 1]    A    According to temperature.

[ 2]    Q    Okay.  So then you will let the company

[ 3]  know whether you used it or you didn't?

[ 4]    A    Yes.

[ 5]    Q    Okay.  Chickens watered, that's what we

[ 6]  talked about before with the driver watering the

[ 7]  chickens?

[ 8]    A    Yes.

[ 9]    Q    And you will check whether the driver

[10]  did what he was supposed to do or not?

[11]    A    Yes.

[12]    Q    And if he doesn't, I think we talked

[13]  about you will go ahead and tell him to water the

[14]  chickens?

[15]    A    Yes.

[16]    Q    Okay.  The feeders up, who checks that

[17]  box?

[18]    A    I do.

[19]    Q    That's one of the grower's

[20]  responsibilities?

[21]    A    Yes.

[22]    Q    Okay.  So if he's not done his job, you

[23]  will check no, that he didn't do it or he hasn't?

[24]    A    No, no, I wouldn't.  I would put no,

[25]  but then I would have to call the plant and inform my

Page 53

[ 1]  supervisor that this job wasn't done for which it's
[ 2]  supposed to be done a certain amount of hours prior
[ 3]  to.
[ 4]       Q    Okay.  So you will arrive at the farm
[ 5]  and if the feeders aren't up, and I think that's one
[ 6]  of the things we mentioned to before, it says raise
[ 7]  and secure all equipment to the height at the proper
[ 8]  time, the feeders, that would be one of the equipment?
[ 9]       A    Uh-huh, yes.
[10]       Q    So you get to the farm, and you see the
[11]  feeder isn't up, the grower is not there, as you said
[12]  before, you will direct the crew --
[13]       A    No.
[14]       Q    Well, maybe I misunderstood you.  You
[15]  said that if it's not done before, that you guys would
[16]  do it.
[17]       A    The waters.
[18]       Q    Oh, the waters, okay.
[19]       A    The waters.
[20]       Q    So it's not the feeders?
[21]       A    Not the feeders.
[22]       Q    Okay.  You're right, I don't know as
[23]  much about catching as you do, but I wouldn't expect
[24]  to.  So let's go to the waters; the waters are not up,
[25]  okay, you and the crew will raise the waters?

Page 54

[ 1]       A    Yes.
[ 2]       Q    Okay.  Now, when it comes to the
[ 3]  feeders, you will just call the plant and say the
[ 4]  feeders aren't up?
[ 5]       A    Yes.
[ 6]       Q    And what do you do, not catch the
[ 7]  house?
[ 8]       A    No.
[ 9]       Q    You don't catch the house?
[10]       A    We do not work until we're told to.
[11]       Q    Okay.  So then it's important for you
[12]  to know whether those feeders are up or not?
[13]       A    Yes.
[14]       Q    Okay.  How about stoves?
[15]       A    No control.
[16]       Q    No control, I don't understand that.
[17]       A    The farmer's responsibility, we have no
[18]  control over the stoves.
[19]       Q    But you're responsible for making sure,
[20]  for checking the box as to whether they are up or they
[21]  weren't up?
[22]       A    Yes.
[23]       Q    How about farm damage, who fills that
[24]  out?
[25]       A    I do.

Page 55

[ 1]       Q    How do you go about deciding whether
[ 2]  there's farm damage or not?
[ 3]       A    If there's any damage done by my
[ 4]  forklift driver or the crew, then I report it.
[ 5]       Q    Okay.  How do you know that the damage
[ 6]  that a farmer might report later wasn't done prior to
[ 7]  you guys getting there?
[ 8]       A    We don't.
[ 9]       Q    You don't?
[10]       A    No.
[11]       Q    So when you arrive, you don't take a
[12]  look at the house to see that everything's okay?
[13]       A    Only as much as possible.
[14]       Q    All right, I understand that.  I don't
[15]  mean that you go around and give it a full inspection,
[16]  but you take a look around the farm to see if there
[17]  is --
[18]       A    Oh, yes.
[19]       Q    -- see if there's anything obvious
[20]  there?
[21]       A    Yes.
[22]       Q    And if there is, do you make that
[23]  information known to the grower?
[24]       A    I make it known to my supervisor.
[25]       Q    Okay.  So you wouldn't say to the

Page 56

[ 1]  grower when you got there and say, "I see your pole
[ 2]  over there has been hit before"?
[ 3]       A    No.
[ 4]       Q    You just make a note of that; you
[ 5]  wouldn't say anything like that to the grower?
[ 6]       A    No, no.
[ 7]       Q    Okay.  But one of your jobs is to
[ 8]  maintain a good relationship with the grower, isn't
[ 9]  it?
[10]       A    Yes.
[11]       Q    So I'm curious as to why you wouldn't
[12]  say to the grower when you get out there, "By the way,
[13]  I see the pole has been, you know, been hit."
[14]       A    It's something he should already know,
[15]  so I need not have to tell him that his pole is
[16]  already broke.
[17]       Q    Well, I'm not talking about broken; I
[18]  mean if it were broken, everybody could see it.  But
[19]  somehow in some way damaged, so you don't get in a
[20]  controversy later on when he tries to blame you guys
[21]  for doing it, and you know you didn't --
[22]       A    No.
[23]       Q    -- you don't say anything to him?
[24]       A    No.
[25]       Q    Okay, if you don't, that's fine.  But

A-0080

Page 57

[ 1]  you do take a casual look around to see if there's any
[ 2]  damage and, if there is, you will check yes?
[ 3]       A    Yes, yes.
[ 4]       Q    And if your people do damage to the
[ 5]  farm, you will also check yes?
[ 6]       A    Yes.
[ 7]       Q    Okay.  Going to the second block of
[ 8]  boxes, it says the drive entrance accept or
[ 9]  unacceptable, who fills that out?
[10]       A    I do.
[11]       Q    And what are you looking for to
[12]  determine whether it's acceptable or nonacceptable?
[13]       A    The drop-offs.
[14]       Q    I'm sorry?
[15]       A    Mud.
[16]       Q    I'm sorry, drop-offs, I don't
[17]  understand what that term means.
[18]       A    See, cement pads at the end of houses
[19]  is not always level.
[20]       Q    I see.
[21]       A    So we call them drop-offs; when the
[22]  forklift have to bounce up on it, bounce off of it,
[23]  then we consider writing it up.
[24]       Q    You consider that to be unacceptable?
[25]       A    Yes.

Page 58

[ 1]       Q    Okay.  And you would check that out?
[ 2]       A    Yes.
[ 3]       Q    So that's your decision to make?
[ 4]       A    Yes.
[ 5]       Q    Okay.  House entrances, who fills that
[ 6]  out?
[ 7]       A    I do.
[ 8]       Q    And how do you go about deciding
[ 9]  whether it's acceptable or not?
[10]       A    The same reason, cement pad, moisture,
[11]  wet; loading conditions.
[12]       Q    Okay.  And based on your experience,
[13]  you decide whether it's acceptable or not, and then
[14]  you check the box accordingly?
[15]       A    Well, I check the box, yes.
[16]       Q    Okay.  Roads/loading area, what does
[17]  that mean?
[18]       A    Where the trucks are loaded by the
[19]  forklift, if it's not level, holes, muddy, it's hard
[20]  for the job to get done.
[21]       Q    Okay.  And who decides whether to check
[22]  acceptable or unacceptable?
[23]       A    You can check it.
[24]       Q    Who decides which box to check it?
[25]       A    I do.

Page 59

[ 1]       Q    And then you check whatever box you
[ 2]  think is appropriate?
[ 3]       A    Yes.
[ 4]       Q    Okay, litter condition, who checks
[ 5]  that?
[ 6]       A    I do.
[ 7]       Q    And based on what, your observation of
[ 8]  the house?
[ 9]       A    Yes.
[10]       Q    And you will decide whether it's
[11]  acceptable or unacceptable?
[12]       A    As far as the words are, yes.
[13]       Q    Well, that's the box that's supposed to
[14]  be checked?
[15]       A    Yes.
[16]       Q    And then it said bird condition, good,
[17]  fair or poor, who fills that box out?
[18]       A    Scales.
[19]       Q    Okay.  Let's go back to litter
[20]  condition for just a moment.  There's a line that says
[21]  explain; if you found the litter to be unacceptable,
[22]  would you write something in there?
[23]       A    Yes.
[24]       Q    And you'd write in what your
[25]  observation was of why it was unacceptable?

Page 60

[ 1]       A    Yes.
[ 2]       Q    Okay.  Let me ask you this:  Have you
[ 3]  ever filled in for another crew leader under another
[ 4]  crew?
[ 5]       A    No.
[ 6]       Q    Okay.  Has any crew leader ever filled
[ 7]  in for you?
[ 8]       A    Yes.
[ 9]       Q    Okay, who has filled in for you?
[10]       A    Willie Davis.
[11]       Q    Okay, anybody else?
[12]       A    Not crew leader, no.
[13]       Q    Okay.  Let me ask you this:  Have you
[14]  ever asked another crew leader to, because you might
[15]  be short, you may be down to six catchers and you
[16]  really can't catch with -- I mean you can catch with
[17]  six, but sometimes it's harder to do, have you ever
[18]  asked another crew leader to let you have one of their
[19]  catchers if they happen to have eight, for example?
[20]       A    Yes.
[21]       Q    Okay, and have they done so?
[22]       A    Yes.
[23]       Q    How about the reverse --
[24]       A    Yes.
[25]       Q    -- when you have been carrying eight,

A-0081

Page 61

[ 1]    have they asked you to assign a crew member?

[ 2]        A    Yes.

[ 3]        Q    Okay.  We have already talked about

[ 4]    hiring and, if I understand your testimony, you have

[ 5]    absolutely no input into that?

[ 6]        A    No.

[ 7]        Q    Okay.

[ 8]            MR. MARTIN:  Excuse me.  For the

[ 9]    clarity of the record, his response was no.

[10]            MR. BREWER:  Yes.

[11]            MR. MARTIN:  I mean you understand that

[12]    to mean no, he does not have any input into the

[13]    process?

[14]            MR. BREWER:  That's what I understood

[15]    it to be.

[16]            MR. MARTIN:  Okay.

[17]    BY MR. BREWER:

[18]        Q    That's what you meant to say, is it

[19]    not?

[20]        A    Yes.

[21]        Q    You have no input --

[22]        A    No input.

[23]        Q    -- into the hiring at all?

[24]        A    No.

[25]        Q    Okay.  It is your job to make sure your

Page 62

[ 1]    crews are staffed a hundred percent, though, isn't it?

[ 2]        A    Yes.

[ 3]        Q    Okay.  Now, let's just go back for when

[ 4]    you have asked other crew leaders to send you an extra

[ 5]    catcher if they had one because you were short; how

[ 6]    many times would you say since you have been a crew

[ 7]    leader has that happened?

[ 8]        A    A few times.

[ 9]        Q    Okay.  And how about the reverse of

[10]    that, you sending an extra crew leader to them because

[11]    they have been --

[12]            MR. MARTIN:  Excuse me, you said crew

[13]    leader.

[14]            THE WITNESS:  Catcher.

[15]            MR. MARTIN:  I think your question was

[16]    mistaken.

[17]    BY MR. BREWER:

[18]        Q    All right, well, for purposes of making

[19]    sure the record is clear, you testified before that

[20]    you would call up or get in touch with another crew

[21]    leader to see if he could assign you another catcher

[22]    because you happened to be short.

[23]        A    Yes.

[24]        Q    And my question is how many times has

[25]    that happened, and you said a few?

Page 63

[ 1]        A    A few.

[ 2]        Q    All right.  The reverse of that

[ 3]    question: How many times have you been asked by

[ 4]    another crew leader to send a catcher when you had an

[ 5]    extra one to their crew?

[ 6]        A    A few.

[ 7]        Q    A few, okay.  A few means different

[ 8]    things to different people; could you give me an

[ 9]    approximate number, estimate?

[10]        A    If you can give me an approximate time

[11]    limit.

[12]        Q    Yeah, from the time you have been a

[13]    crew leader.

[14]        A    I'm going to say 10, 12.

[15]        Q    Okay, that's fine, that's fine.  You

[16]    are responsible for getting the birds from the farm to

[17]    the plant on time, correct?  That's the crew leader's

[18]    responsibility?

[19]        A    Yes.

[20]        Q    And we have been through the

[21]    responsibilities here in Garrison Exhibit 2, and you

[22]    are responsible for making sure that the catchers and

[23]    the forklift operators and so forth follow these

[24]    procedures or any modifications that you make based on

[25]    your discretion?

Page 64

[ 1]        A    Yes.

[ 2]        Q    Let's see.  Let me just see this.

[ 3]    While you're on the farm, catching, the people take

[ 4]    breaks?  You take breaks?

[ 5]        A    Yes.

[ 6]        Q    Okay.  Who decides when to take a

[ 7]    break?

[ 8]        A    I do.

[ 9]        Q    The catchers are entitled to a

[10]    30-minute unpaid lunch, aren't they?

[11]        A    Yes.

[12]        Q    Who decides when that lunch period is

[13]    taken?

[14]        A    I do.

[15]        Q    When the live haul driver arrives at

[16]    the farm, you tell him how to position his truck or

[17]    where to position his truck to make the job go easier?

[18]        A    Forklift driver.

[19]        Q    The forklift driver does that?

[20]        A    Yes.

[21]        Q    Suppose there's a disagreement between

[22]    the driver and the forklift driver, who --

[23]        A    We don't have that.

[24]        Q    You don't have that?

[25]        A    No.

Page 65

[1]    Q    So that's never happened?

[2]    A    No.

[3]    Q    Okay. Let's see. You approve

[4]    vacations as the crew leader, do you not?

[5]    A    No.

[6]    Q    You do not approve vacations?

[7]    A    No.

[8]    Q    All right. You authorize advance pay

[9]    for catchers?

[10]   A    No.

[11]   Q    You don't? Okay. You are responsible

[12]   for maintaining discipline? I think we mentioned that

[13]   earlier and we'll go into that a little bit further.

[14]        MR. MARTIN: Is that a question?

[15]        MR. BREWER: Yes, it is a question.

[16]        THE WITNESS: Yes.

[17]   BY MR. BREWER:

[18]   Q    You are responsible for maintaining

[19]   discipline?

[20]   A    Yes.

[21]   Q    And I think we already talked about

[22]   you're responsible for planning the work as we just

[23]   went through this document being Garrison 2?

[24]   A    Yes.

[25]   Q    All right, let's see. I am going to

Page 66

[1]    show you, sir --

[2]        MR. MARTIN: Art, might this be a good

[3]    time to break? We're an hour into it, sounds like

[4]    we're in a transition period.

[5]        MR. BREWER: Yes, sure.

[6]        (Whereupon, a short recess was taken.)

[7]        (Walters Exhibit 1, marked for

[8]    identification.)

[9]    BY MR. BREWER:

[10]   Q    Mr. Walters, I'm going to give you a

[11]   document which has been marked as Exhibit Number 1 to

[12]   your deposition, and we're going to go through some of

[13]   these. The first page on this document bears the name

[14]   of an employee Syrus Bagwell, is that correct?

[15]   A    Syrinus.

[16]   Q    Syrinus Bagwell. And do you know

[17]   Mr. Bagwell?

[18]   A    Yes.

[19]   Q    How do you know him?

[20]   A    He's in my crew.

[21]   Q    And he is requesting a floating

[22]   holiday?

[23]   A    Yes.

[24]   Q    But he wants the money only?

[25]   A    Yes.

Page 67

[1]    Q    Does that mean that he will work the

[2]    day but wants to be paid an additional day's pay?

[3]    A    Yes.

[4]    Q    Okay. And at the bottom I see that you

[5]    have approved this, is that correct?

[6]    A    Yes.

[7]    Q    That's your signature on the box that

[8]    says approved?

[9]    A    No.

[10]   Q    That's not your signature?

[11]   A    No.

[12]   Q    Okay. How about the check mark in the

[13]   box that says approved?

[14]   A    No.

[15]   Q    That's not your signature either?

[16]   A    No.

[17]   Q    All right. Let's go to the next one, I

[18]   see a Walter Brown.

[19]   A    Yes.

[20]   Q    Do you know Mr. Brown?

[21]   A    Yes.

[22]   Q    How do you know him?

[23]   A    At one time, he was my forklift driver.

[24]   Q    All right. And he is requesting a

[25]   floating holiday but only wants money?

Page 68

[1]    A    Yes.

[2]    Q    And I see your signature where it says

[3]    approved; is that your signature?

[4]    A    No.

[5]    Q    Did you approve that he could get money

[6]    only?

[7]    A    No.

[8]    Q    You didn't?

[9]    A    No.

[10]   Q    And the one before with Mr. Bagwell,

[11]   you didn't approve that he could get money only?

[12]   A    No.

[13]   Q    Okay. Let's go to the next paper, is

[14]   that Brown? Walter -- I can't make out the last name,

[15]   can you?

[16]   A    Yes, it's Walter Brown.

[17]   Q    Brown, okay. And he is requesting some

[18]   time off, two weeks, is he not?

[19]   A    Are we on the same page, 3-28-03?

[20]   Q    I'm looking at, yes, 3-28-03.

[21]   A    Yes.

[22]   Q    He's requesting some vacation full days

[23]   and he's also requesting a day off?

[24]   A    Yes.

[25]   Q    And is that your signature at the

Page 69

[ 1]  bottom where it says approved?

[ 2]      A    Yes.

[ 3]      Q    Okay, so you approved his vacation and

[ 4]  the day off?

[ 5]      A    Yes.

[ 6]      Q    Okay. Next page is Mr. Brown again,

[ 7]  and he is requesting -- is this the same vacation he's

[ 8]  requesting again, 3-28-03? This is two copies of the

[ 9]  same document, I see. And that's your signature.

[10]          The next page is a Walter Brown, is

[11]  this the same Mr. Brown --

[12]      A    I'm assuming.

[13]      Q    -- who worked in your crew?

[14]      A    I'm assuming, yes.

[15]      Q    He's requesting a floating holiday?

[16]      A    Yes.

[17]      Q    And is that your signature where it

[18]  says supervisor's signatures?

[19]      A    Yes.

[20]      Q    And you approved that day off?

[21]      A    Yes.

[22]      Q    Okay. Isaiah Daniels, we mentioned

[23]  Mr. Daniels earlier; he's requesting a calendar day

[24]  off, money only, is that your signature?

[25]      A    No.

Page 70

[ 1]      Q    Okay, did you approve that he could get

[ 2]  money only?

[ 3]      A    No.

[ 4]      Q    Okay. Next page is Mr. Daniels again,

[ 5]  he is requesting a floating holiday off, is that

[ 6]  correct?

[ 7]      A    Yes.

[ 8]      Q    And is that your signature approving

[ 9]  it?

[10]      A    No.

[11]      Q    Did you approve that he could have the

[12]  day off?

[13]      A    No.

[14]      Q    So then he just was off and you didn't

[15]  know anything about it, is that what you're telling

[16]  me?

[17]      A    No, I'm not going to say I didn't know

[18]  about it, but I didn't sign this.

[19]      Q    All right. But my question is if you

[20]  didn't sign it, did you approve that he could take the

[21]  day off?

[22]      A    No.

[23]      Q    Okay. Let's go to Mr. Daniels again.

[24]  He's requesting some vacation from 8-29-03 to 9-4-03?

[25]      A    Yes.

Page 71

[ 1]      Q    And is that your signature approving

[ 2]  his vacation?

[ 3]      A    Yes.

[ 4]      Q    Okay. You knew about that one?

[ 5]      A    Yes.

[ 6]      Q    And you approved it, okay. Mr. Daniels

[ 7]  again, he's requesting a calendar day for money only?

[ 8]      A    Yes.

[ 9]      Q    And is that your signature approving

[10]  it?

[11]      A    No.

[12]      Q    Mr. Daniels again, requesting a

[13]  floating holiday, pay only, is that your signature

[14]  approving that?

[15]      A    Yes.

[16]      Q    Okay, you approved that one. How about

[17]  Mr. Daniels again, this is the same Mr. Daniels who is

[18]  a member of your crew?

[19]      A    Yes.

[20]      Q    Okay, he's asking for I guess it says

[21]  one week, take three days off but he only wants money;

[22]  am I interpreting that correctly?

[23]      A    Yes.

[24]      Q    Okay. Is that your signature approving

[25]  that?

Page 72

[ 1]      A    Yes.

[ 2]      Q    Okay. Mr. Daniels again, he wants a

[ 3]  calendar day off for money only?

[ 4]      A    Yes.

[ 5]      Q    Is that your signature approving that?

[ 6]      A    Yes.

[ 7]      Q    Arthur Fosque, am I pronouncing that

[ 8]  correctly?

[ 9]      A    Yes.

[10]      Q    Okay. And Mr. Fosque is requesting

[11]  vacation from September 15 through September 19, is

[12]  that correct?

[13]      A    Yes.

[14]      Q    Is that your signature approving his

[15]  vacation?

[16]      A    Yes.

[17]      Q    Mr. Fosque again -- by the way, did I

[18]  ask you if he was a member of your crew?

[19]      A    Yes.

[20]      Q    Is Mr. Fosque a member of your crew?

[21]      A    Yes.

[22]      Q    Thanks, okay. Next document says he

[23]  wants February 9 off, is that your signature approving

[24]  that?

[25]      A    Yes.

A-0084

Page 73

[ 1]    Q    Okay, so you gave him the day off.

[ 2]    Mr. Fosque again, floating holiday, okay, is that the

[ 3]    16th or the 11th, I'm not sure, looks like it could be

[ 4]    the 16th.

[ 5]        A    I'm not sure.

[ 6]        Q    Well, whichever day it is, he's

[ 7]    requesting for an anniversary date, is that your

[ 8]    signature approving that?

[ 9]        A    Yes.

[10]        Q    Mr. Fosque again, requesting another

[11]    day off, is that your signature approving that day

[12]    off?

[13]        A    Yes.

[14]        Q    Mr. Leonard, Roy Leonard, do you know

[15]    Mr. Leonard?

[16]        A    Yes.

[17]        Q    How do you know him?

[18]        A    I work with him.

[19]        Q    Was he a catcher on your crew?

[20]        A    No.

[21]        Q    What position did he have?

[22]        A    He was a catcher.

[23]        Q    But he wasn't on your crew?

[24]        A    No.

[25]        Q    Okay. He's asking for money only for

Page 74

[ 1]    it looks like two days off, and that is not your

[ 2]    signature I gather?

[ 3]        A    No.

[ 4]        Q    All right, he wasn't on your crew,

[ 5]    okay. Mr. Leonard again, anniversary day and a

[ 6]    date -- let me just take a look at this, make sure

[ 7]    it's not copies of the same thing. That's a copy of

[ 8]    the one we just looked at.

[ 9]            Mr. Richard Satchell, do you know him?

[10]        A    Yes.

[11]        Q    And how do you know him?

[12]        A    He was a member of my crew.

[13]        Q    A catcher?

[14]        A    Yes.

[15]        Q    And he's requesting an anniversary

[16]    date, it looks like for money only?

[17]        A    Yes.

[18]        Q    Is that your signature?

[19]        A    No.

[20]        Q    Okay. Did you approve that he could

[21]    have money only?

[22]        A    No.

[23]        Q    Mr. Satchell again, requesting three

[24]    weeks' pay on vacation; is that your signature at the

[25]    bottom?

Page 75

[ 1]        A    No.

[ 2]        Q    Did you approve that he could have

[ 3]    three weeks' pay?

[ 4]        A    No.

[ 5]        Q    Mr. Satchell again, is requesting money

[ 6]    only for full days, and it says checks for week of

[ 7]    June 7; is that your signature approving that?

[ 8]        A    Yes.

[ 9]        Q    So you approved that one. Let's go to

[10]    Mr. Satchell again, is that your signature at the

[11]    bottom?

[12]        A    No.

[13]        Q    Okay. Did you approve the money only

[14]    for Mr. Satchell on this day?

[15]        A    No.

[16]        Q    Mr. Satchell again, is that your

[17]    signature at the bottom?

[18]        A    No.

[19]        Q    Did you approve the floating holiday

[20]    for him?

[21]        A    No.

[22]        Q    He's requesting the day off, so he

[23]    didn't work this date and you didn't approve it?

[24]        A    I couldn't tell you, I wouldn't know.

[25]    I have to check into my records in order to find out

Page 76

[ 1]    whether he worked that day or not.

[ 2]        Q    What records would you check?

[ 3]        A    I check my orders. Each day of my

[ 4]    orders I write down, I write down the men that work, I

[ 5]    write down the men that don't.

[ 6]        Q    Okay. Those records that you refer to,

[ 7]    do they have a title of any kind or --

[ 8]        A    It's my orders, my daily orders.

[ 9]        Q    Your daily orders that you get from the

[10]    company?

[11]        A    Yes.

[12]        Q    Okay, and you maintain a copy of those?

[13]        A    I maintain them. I maintain them, the

[14]    original.

[15]        Q    Oh, okay, the daily records, okay. And

[16]    that's what they're called, daily records?

[17]        A    That's what I call them.

[18]        Q    Okay.

[19]        A    It's my daily orders.

[20]        Q    Daily orders, I'm sorry, daily orders.

[21]    And you keep them. So you don't know whether he

[22]    worked or not, you'd have to check?

[23]        A    Yes.

[24]        Q    All right. Next on Mr. Satchell, is

[25]    that your signature at the bottom?

A-0085

Page 77

[1]  A  Which one are we on here?
[2]  Q  I'm on the one that bears the date of
[3]  it looks like 5-23-03.
[4]  A  Yes.
[5]  Q  That's your signature at the bottom?
[6]  A  Yes.
[7]  Q  And he is requesting full days of pay,
[8]  it appears to me; is that what it looks like?  He
[9]  wants both checks?
[10]  A  Yeah, that's the way it looks.
[11]  Q  Okay, and you approved that?
[12]  A  Yes.
[13]  Q  Next, Jasper Smith, do you know Mr.
[14]  Smith?
[15]  A  Yes.
[16]  Q  How do you know him?
[17]  A  Member of my crew.
[18]  Q  Catcher?
[19]  A  Yes.
[20]  A  All right.  He is requesting it says
[21]  extended period, and then I see two weeks, okay, is
[22]  that your signature approving his request for time
[23]  off?
[24]  A  Yes.
[25]  Q  Okay.  And two weeks is what he wants,

Page 78

[1]  and that's what you let him have?
[2]  A  If personnel qualified it, yeah.
[3]  Q  Okay, but I mean he says extended
[4]  period, and the date requested July 20, '04, and I see
[5]  two weeks; that's what he wanted, was two weeks,
[6]  that's the extended period?
[7]  A  Yes.
[8]  Q  Okay.  Next document, is that your
[9]  signature at the bottom?
[10]  A  No.
[11]  Q  Okay, did you approve Mr. Smith having
[12]  money only for a calendar day?
[13]  A  No.
[14]  Q  Mason Tindley, do you know him?
[15]  A  Yes.
[16]  Q  Who is Mr. Tindley?
[17]  A  Catcher in my crew.
[18]  Q  And he's requesting four weeks of pay,
[19]  is that right?
[20]  A  Yes.
[21]  Q  And is that your signature, along with
[22]  that of Mr. Walter Brown at the bottom?
[23]  A  No.
[24]  Q  Is that Mr. Brown's signature?
[25]  A  Unknown.

Page 79

[1]  Q  What?
[2]  A  I could not tell you.
[3]  Q  Who is Mr. Brown?
[4]  A  Mr. Walter Brown, I'm assuming, as far
[5]  as the dates are concerned, this was when I was out on
[6]  medical, and possibly Mr. Brown was taking my place.
[7]  Q  Oh, I see.  That's right, I forgot you
[8]  were out on medical.  Let me just check the dates
[9]  here.  Yes, you didn't come back until the 18th, you
[10]  were out on leave, I see, okay.  Let's go to April
[11]  '04, is that your signature at the bottom?
[12]  A  Yes.
[13]  Q  And this is for Mr. Leon Tucker?
[14]  A  Yes.
[15]  Q  Who is Mr. Tucker?
[16]  A  Catcher in my crew.
[17]  Q  And he's requesting a day off, is that
[18]  correct?
[19]  A  Yes.
[20]  Q  And you're approving that?
[21]  A  Yes.
[22]  Q  All right.  Mr. West, Russell West, do
[23]  you know Mr. West?
[24]  A  Yes.
[25]  Q  Who is he?

Page 80

[1]  A  He was a catcher in my crew.
[2]  Q  All right.  He is also requesting a day
[3]  off?
[4]  A  Yes.
[5]  Q  And is that your signature?
[6]  A  Yes.
[7]  Q  And the box isn't checked, did you
[8]  approve that?
[9]  A  Yes.
[10]  Q  Okay.  Mr. Antonio Walters, is this
[11]  your son we talked about earlier?
[12]  A  Yes.
[13]  Q  And he is requesting money only for a
[14]  calendar day?
[15]  A  Yes.
[16]  Q  Is that your signature?
[17]  A  No.
[18]  Q  Okay.  Did you approve that he could
[19]  get money only?
[20]  A  No.
[21]  Q  Mr. Steven --
[22]  A  Abney.
[23]  Q  -- Abney, okay; do you know Mr. Abney?
[24]  A  Yes.
[25]  Q  How do you know him?

A-0086

Page 81

| | | |
|---|---|---|
| [ 1] | A | He was a catcher in my crew. |
| [ 2] | Q | And he's requesting a day off, but he |
| [ 3] | wants just the money? | |
| [ 4] | A | Yes. |
| [ 5] | Q | Is that your signature? |
| [ 6] | A | Yes. |
| [ 7] | Q | And did you approve or disapprove of |
| [ 8] | this? | |
| [ 9] | A | Approve. |
| [10] | Q | Mr. Abney again, requesting some |
| [11] | vacation but he only wants money? | |
| [12] | A | Yes. |
| [13] | Q | And is that your signature? |
| [14] | A | Yes. |
| [15] | Q | And did you approve this or disapprove |
| [16] | it? | |
| [17] | A | Approved. |
| [18] | Q | Mr. Abney again, requesting -- well, |
| [19] | whatever it is, he's just asking money, he's got | |
| [20] | personal days and floating days and things like that | |
| [21] | down there, is that your signature? | |
| [22] | A | Yes. |
| [23] | Q | Did you approve this or disapprove it? |
| [24] | A | I approved it. |
| [25] | Q | Okay. Keith Lofland, it appears? |

Page 82

| | | |
|---|---|---|
| [ 1] | A | Uh-huh. |
| [ 2] | Q | Do you know Mr. Lofland? |
| [ 3] | A | Yes. |
| [ 4] | Q | How do you know him? |
| [ 5] | A | He was a catcher in my crew. |
| [ 6] | Q | He is requesting a floating holiday, is |
| [ 7] | that your signature? | |
| [ 8] | A | Yes. |
| [ 9] | Q | The box isn't checked; did you approve |
| [10] | that? | |
| [11] | A | Yes, I approved it, yes. |
| [12] | Q | Thomas Majors, do you know Mr. Majors? |
| [13] | A | Yes. |
| [14] | Q | How do you know him? |
| [15] | A | He was a catcher in my crew. |
| [16] | Q | Okay, he's requesting vacation but he |
| [17] | only wants money? | |
| [18] | A | Yes. |
| [19] | Q | And did you approve that? |
| [20] | A | Yes. |
| [21] | Q | That's your signature? Mr. Majors |
| [22] | again requesting more money for an anniversary date | |
| [23] | and a calendar day, I guess; is that your signature? | |
| [24] | A | Yes. |
| [25] | Q | And did you approve this or disapprove |

Page 83

| | | |
|---|---|---|
| [ 1] | it? | |
| [ 2] | A | I approved it. |
| [ 3] | Q | Mr. Majors again, he wants money only |
| [ 4] | for it looks like the date of January 12th; is that | |
| [ 5] | your signature? | |
| [ 6] | A | Yes. |
| [ 7] | Q | And did you approve this? |
| [ 8] | A | Yes. |
| [ 9] | Q | Thomas Majors again, he's requesting |
| [10] | full days for one week, is that your signature? | |
| [11] | A | Yes. |
| [12] | Q | And did you approve this or disapprove? |
| [13] | A | I approved it. |
| [14] | Q | Thank you. Daniel Miller, do you know |
| [15] | Mr. Miller? | |
| [16] | A | Yes. |
| [17] | Q | How do you know him? |
| [18] | A | He was a catcher in my crew. |
| [19] | Q | And he's requesting a day's pay of |
| [20] | money only? | |
| [21] | A | Yes. |
| [22] | Q | And is that your signature? |
| [23] | A | Yes. |
| [24] | Q | I see you approved that, is that |
| [25] | correct? | |

Page 84

| | | |
|---|---|---|
| [ 1] | A | Yes. |
| [ 2] | Q | Okay. And Mr. Miller again, this looks |
| [ 3] | like the same copy of the one we just looked at. Go | |
| [ 4] | to Mr. Miller again, he's requesting a day's pay, an | |
| [ 5] | additional day's pay, for money only, is that right? | |
| [ 6] | A | Yes. |
| [ 7] | Q | Is that your signature approving this? |
| [ 8] | A | Yes. |
| [ 9] | Q | Mr. Miller again, is that your |
| [10] | signature? | |
| [11] | A | No. |
| [12] | Q | He wanted money only, did you approve |
| [13] | or disapprove? | |
| [14] | A | I didn't approve. |
| [15] | Q | You didn't approve? |
| [16] | A | No. |
| [17] | Q | It says approved, but that's not your |
| [18] | signature? | |
| [19] | A | It's not my signature. |
| [20] | Q | So you knew nothing about this, all |
| [21] | right. How about Sylvester Mitchell, is it? | |
| [22] | A | Yes. |
| [23] | Q | Do you know Mr. Mitchell? |
| [24] | A | Yes. |
| [25] | Q | How do you know him? |

A-0087

Page 85

[ 1]        A    He was a catcher in my crew.

[ 2]        Q    And he wants five weeks, money only?

[ 3]        A    Yes.

[ 4]        Q    Is that your signature?

[ 5]        A    Yes.

[ 6]        Q    You approved that?

[ 7]        A    Yes.

[ 8]        Q    All right. The next page, and this is

[ 9]    where they may become a little detached, I don't

[10]    know -- well, let's see what he has. Should be a

[11]    Mr. Gregory Williams.

[12]        A    Yes.

[13]        Q    Do you know Mr. Williams?

[14]        A    Yes.

[15]        Q    And how do you know him?

[16]        A    He was a catcher in my crew.

[17]        Q    And he wants money only for a day?

[18]        A    Yes.

[19]        Q    And is that your signature approving

[20]    this?

[21]        A    Yes.

[22]        Q    William Young is the next one; do you

[23]    know Mr. Young?

[24]        A    Yes.

[25]        Q    How do you know him?

Page 86

[ 1]        A    He was a catcher in my crew.

[ 2]        Q    And he wants a week's worth of pay but

[ 3]    doesn't want the time off, am I correct in that?

[ 4]        A    Yes.

[ 5]        Q    And is that your signature approving

[ 6]    this?

[ 7]        A    Yes.

[ 8]        Q    I have Mr. Isaiah Daniels, we mentioned

[ 9]    earlier?

[10]        A    Yes.

[11]        Q    He's a member of your crew, I believe?

[12]        A    Yes.

[13]        Q    He is asking for vacation from the 27th

[14]    of August, '04, through September 1, '04.

[15]        A    Yes.

[16]        Q    Is that your signature approving his

[17]    vacation?

[18]        A    Yes.

[19]        Q    The next one, the copy is a little

[20]    light, but it appears to be a Jasper Smith, do you

[21]    know Mr. Smith?

[22]        A    Yes.

[23]        Q    How do you know him?

[24]        A    He was a catcher in my crew.

[25]        Q    And he's requesting an extended period

Page 87

[ 1]    of time -- well, he's requesting I guess July 20th,

[ 2]    '04; can you make out the signature on the bottom of

[ 3]    that? The copying is faint, I understand that.

[ 4]        A    I'm going to say yes, because of the

[ 5]    date.

[ 6]        Q    Did you approve this?

[ 7]        A    Yes.

[ 8]        Q    Leon Tucker, I believe we mentioned him

[ 9]    before, he's a member of your crew, isn't he?

[10]        A    Yes.

[11]        Q    And he wants a floating holiday off; is

[12]    that your signature approving his request?

[13]        A    Yes.

[14]        Q    And last, we have an Arthur Fosque, and

[15]    I think we mentioned his name before also?

[16]        A    Yes.

[17]        Q    He's a member of your crew, I believe,

[18]    right?

[19]        A    Yes.

[20]        Q    And he's also requesting a day off; is

[21]    that your signature approving it?

[22]        A    Yes, it is.

[23]        Q    Okay, thanks. All right, now, let me

[24]    ask you this, Mr. Walters: If an employee wants to

[25]    take a day off, one of your catchers, without pay,

Page 88

[ 1]    just says, "I need to have next Thursday off and I

[ 2]    don't want to be paid for it," can he do that?

[ 3]        A    Yes.

[ 4]        Q    And does he come to you to ask if

[ 5]    that's okay with you?

[ 6]        A    Yes.

[ 7]        Q    And you can approve or disapprove that?

[ 8]        A    Yes.

[ 9]        Q    Okay. If he just doesn't show up, is

[10]    that okay?

[11]        A    No.

[12]        Q    When that happens, what if anything can

[13]    do you or do you do?

[14]        A    As far as company policy, I can write

[15]    him up.

[16]        Q    Okay. The document that we just went

[17]    through, we saw you're approving vacations, you are

[18]    approving some calendar days or anniversary days off,

[19]    you're also approving some days -- I understand there

[20]    were some you didn't recognize, you said it wasn't

[21]    your signature -- you do this on your own, do you not?

[22]        A    No.

[23]        Q    Okay, you don't? Let's talk about

[24]    vacation. When you granted the employees vacation

[25]    that I saw here --

Page 89

[ 1]    A    Yes.

[ 2]    Q    -- you didn't do that by yourself?

[ 3]    A    No.

[ 4]    Q    What did you do?

[ 5]    A    I signed these papers.

[ 6]    Q    You signed the papers?

[ 7]    A    I approved his vacation, I approved his

[ 8]  days off, but it all goes back to personnel whether he

[ 9]  gets it or not.

[10]    Q    Oh, do you know anybody who you

[11]  approved that they didn't get the time?

[12]    A    None that's came back to me, no.

[13]    Q    Okay, thank you.  So you sign the

[14]  approval and then it goes to the office?

[15]    A    Yes.

[16]    Q    That's the last you see of it?

[17]    A    Yes.

[18]    Q    And then if the guy doesn't show up, he

[19]  gets his vacation?

[20]    A    I assume.

[21]    Q    Well, you don't write him up, do you?

[22]    A    No.

[23]    Q    Okay.  And the reason you don't write

[24]  him up is because you approved he could have time off?

[25]    A    Yes.

Page 90

[ 1]    Q    Right, okay.  Tell me what happens, if

[ 2]  you know, if somebody on your crew gets hurt; what is

[ 3]  your responsibility there?

[ 4]    A    If someone on my crew gets hurt,

[ 5]  according to how bad it is, I send him in to plant to

[ 6]  the nurse.  If he has to go immediately, then I take

[ 7]  him myself if possible, or I dial 911 and they go to

[ 8]  the hospital or something, send him if it's a real bad

[ 9]  case, for which I haven't had one.

[10]    Q    Well, that's good.  But that's what

[11]  would happen if somebody on the crew gets hurt, you

[12]  will either take a look at it and decide whether he's

[13]  going to go to the plant nurse --

[14]    A    Yes.

[15]    Q    -- or whether you will call 911?

[16]    A    Yes.

[17]    Q    Or try to take him someplace yourself

[18]  if you can?

[19]    A    Yes.

[20]    Q    Okay.  Do you report that injury to

[21]  anybody?

[22]    A    Yes.

[23]    Q    Who do you report it to?

[24]    A    I report it to my supervisor.

[25]    Q    Who is?

Page 91

[ 1]    A    Doug Lynch.

[ 2]    Q    Let's go back to that fellow who wanted

[ 3]  a day off, says, "I need next Thursday off, I don't

[ 4]  expect to get paid for it," and everything else, and

[ 5]  you tell the fellah it's okay.

[ 6]    A    Uh-huh.

[ 7]    MR. MARTIN:  Yes?

[ 8]    THE WITNESS:  Yes.

[ 9]  BY MR. BREWER:

[10]    Q    You do have to try to remember that.

[11]  Do you report that to anybody?

[12]    A    No.

[13]    Q    The forklift operator that is your son,

[14]  Antonio?

[15]    A    Yes.

[16]    Q    Is he the only forklift operator you

[17]  have had since you have been a crew leader?

[18]    A    No.

[19]    Q    Who was your forklift operator before

[20]  him?

[21]    A    Walt Brown.  Walter Brown.

[22]    Q    Oh, is that the Mr. Brown whose

[23]  signature we saw back here earlier?

[24]    A    Yes, yes.

[25]    Q    So he was the forklift operator?

Page 92

[ 1]    A    Yes.

[ 2]    Q    When did your son become the forklift

[ 3]  operator on your crew?

[ 4]    A    I can't remember that one.  Exactly, I

[ 5]  can't remember.

[ 6]    Q    I don't need an exact date.  A year?

[ 7]    A    I'm going to say 2004.

[ 8]    Q    Okay.  So fairly recently?

[ 9]    A    Yeah.

[10]    Q    Within approximately a year?

[11]    A    Yeah.

[12]    Q    Okay.  How did he come to get the job?

[13]    A    Experience.

[14]    Q    What was he doing before he was your

[15]  forklift operator?

[16]    A    Catcher.

[17]    Q    He was a catcher?

[18]    A    Yes.

[19]    Q    Was he also on your crew?

[20]    A    No.

[21]    Q    All right, whose crew was he on?

[22]    A    Larry Gibbs'.

[23]    Q    He was on Larry Gibbs' crew?

[24]    A    Yes.

[25]    Q    And he got experience, how did he get

Page 93

[ 1]  the experience?

[ 2]      A    Training, on-the-job training.

[ 3]      Q    On-the-job training?

[ 4]      A    Uh-huh.

[ 5]      Q    Who gave him that on-the-job training?

[ 6]      A    Between Larry's forklift operator and

[ 7]  myself.

[ 8]      Q    Okay, between Larry's forklift

[ 9]  operator.  How could you be training him if he's not

[10]  on your crew?

[11]      A    We used to go down the plant on

[12]  Saturdays and get the forklift.

[13]      Q    Oh, I see, okay.

[14]      A    When he first started catching chickens

[15]  with Mountaire, I was a forklift operator.

[16]      Q    That's right.

[17]      A    And when we had to sit around and wait

[18]  on trucks, I informed him on how to operate a

[19]  forklift.

[20]      Q    Let me just see if I understand this

[21]  now.  You're a crew leader and you're --

[22]      A    Not at that time when I trained him.

[23]      Q    Oh, all right.  What period of time

[24]  were you then training your son to become a forklift

[25]  operator?

Page 94

[ 1]      A    When I was a forklift operator myself.

[ 2]      Q    So it's prior then to 2001?

[ 3]      A    Yes.

[ 4]      Q    You and he would go into the plant on a

[ 5]  Saturday?

[ 6]      A    Yes.

[ 7]      Q    And you would show him how to operate a

[ 8]  forklift?

[ 9]      A    Yes.

[10]      Q    Okay.  How long did that happen, did

[11]  that go on?

[12]      A    Possibly a year or more.

[13]      Q    Okay.  And then how is it he came to

[14]  become a forklift operator on your crew?  Did

[15]  Mr. Gibbs recommend him to you?

[16]      A    Experience.

[17]      Q    Okay.

[18]      A    Once the experience was known, then he

[19]  took the company test.

[20]      Q    All right.

[21]      A    He was qualified through the company,

[22]  and they placed him.

[23]      Q    Okay.  Did you have anything at all to

[24]  do with that?

[25]      A    No.

Page 95

[ 1]      Q    Just the training that you mentioned?

[ 2]      A    Yes.

[ 3]      Q    Did your son consider that to be a

[ 4]  promotion?

[ 5]      A    I couldn't relate to that one.

[ 6]      Q    You couldn't relate to that?  I know,

[ 7]  because you didn't --

[ 8]      A    No.

[ 9]      Q    All right, all right.  Let's take a

[10]  look at this would be Number 2, I guess, to

[11]  Mr. Walters' deposition.

[12]          (Walters Exhibit 2, marked for

[13]  identification.)

[14]  BY MR. BREWER:

[15]      Q    Mr. Walters, this has been marked as

[16]  Exhibit 2 to your deposition, this is an employee

[17]  warning notice --

[18]      A    Uh-huh.

[19]      Q    -- to a Mr. Leon Tucker.

[20]      A    Yes.

[21]      Q    And I believe we have identified him as

[22]  being a member of your crew?

[23]      A    Yes.

[24]      Q    Do you recognize the writing on this

[25]  page?

Page 96

[ 1]      A    Yes.

[ 2]      Q    Whose writing is it?

[ 3]      A    Mine.

[ 4]      Q    Okay.  Company policy, this is your

[ 5]  writing, it says "Call if not working"?

[ 6]      A    Yes.

[ 7]      Q    And we had just discussed something

[ 8]  like this; he did not call and didn't show up for

[ 9]  work, I see, is that correct?

[10]      A    That's correct.

[11]      Q    And you gave him three days off as a

[12]  final warning?

[13]      A    Yes.

[14]      Q    That's your signature?

[15]      A    Yes.

[16]      Q    Okay.  Mr. Richard Satchell, I believe

[17]  he's also one of the gentlemen we mentioned as being

[18]  on your crew --

[19]      A    Yes.

[20]      Q    -- as a catcher?

[21]      A    Yes.

[22]      Q    And again, the company policy, it says,

[23]  "Call if not working.  No time to find someone; call

[24]  late after 10 p.m." and the violation was he called in

[25]  too late?

Page 97

[ 1]    A    Yes.

[ 2]    Q    And you gave him one day off?

[ 3]    A    Yes.

[ 4]    Q    And is that your signature?

[ 5]    A    Yes.

[ 6]    Q    Mr. Leon Tucker, I think we have

[ 7]    already identified him as being a member of your crew?

[ 8]    A    Yes.

[ 9]    Q    Again, the writing on this document is

[10]    yours?

[11]    A    Yes.

[12]    Q    And this is his third violation?

[13]    A    Yes.

[14]    Q    And is that your signature?

[15]    A    Yes.

[16]    Q    Again, on company policy it says, "Call

[17]    supervisor if not working," that is your writing?

[18]    A    Yes.

[19]    Q    That means he should have called you?

[20]    A    Yes.

[21]    Q    The next one is an Edward Massey, I

[22]    don't know that we have mentioned his name; do you

[23]    know him?

[24]    A    Yes.

[25]    Q    How do you know him?

Page 98

[ 1]    A    He was a catcher on my crew.

[ 2]    Q    Okay. And again it says, "Call

[ 3]    supervisor if not working," is that your writing?

[ 4]    A    Yes.

[ 5]    Q    And the supervisor you're referring to

[ 6]    is you?

[ 7]    A    Yes.

[ 8]    Q    This is his second violation?

[ 9]    A    Yes.

[10]    Q    That's your signature?

[11]    A    Yes.

[12]    Q    And the date?

[13]    A    Yes.

[14]    Q    Okay. Mr. Tucker, we have already

[15]    identified him and, again, the company policy violated

[16]    is "Notify supervisor if not working," that's you,

[17]    you're referring to?

[18]    A    Yes.

[19]    Q    And the violation, it says, "Did not

[20]    notify supervisor that he was not working," and,

[21]    again, the supervisor is you?

[22]    A    Yes.

[23]    Q    And he's given a day off --

[24]    A    Yes.

[25]    Q    -- by you?

Page 99

[ 1]    A    Yes.

[ 2]    Q    He signed this and you signed it?

[ 3]    A    Yes.

[ 4]    Q    Okay. And the last one is a Bernie

[ 5]    Johnson?

[ 6]    A    Yes.

[ 7]    Q    His name is not familiar to me; do you

[ 8]    know him?

[ 9]    A    Yes.

[10]    Q    How do you know him?

[11]    A    He was a catcher in my crew.

[12]    Q    Okay. And the company policy, it says,

[13]    "Notify supervisor if not working." That is you that

[14]    he should have notified?

[15]    A    Yes.

[16]    Q    And the violation is, "Said he was

[17]    driving to farm but did not show." Okay, and he's

[18]    given an oral warning?

[19]    A    Yes.

[20]    Q    And then it says, "None taking at this

[21]    time," is that your writing?

[22]    A    Yes.

[23]    Q    And that's your signature on the

[24]    bottom?

[25]    A    Yes.

Page 100

[ 1]    Q    All right, thanks. When you are on the

[ 2]    farm, when you receive your day's work, you can take

[ 3]    whatever time you need to get the job done, can you

[ 4]    not?

[ 5]    A    No.

[ 6]    Q    You can't?

[ 7]    A    No.

[ 8]    Q    Or maybe let me see if I can rephrase

[ 9]    the question this way. If you're supposed to go to

[10]    two different farms in the course of a day, that

[11]    happens, doesn't it?

[12]    A    Yes.

[13]    Q    And at the first farm, you encounter

[14]    some problems so that you're running behind; you

[15]    finish that job, you get the chickens caught at that

[16]    farm?

[17]    A    Yes.

[18]    Q    You then go to the next farm, so you're

[19]    going to be late now, let's assume you're going to be

[20]    a couple of hours late --

[21]    A    Yes.

[22]    Q    -- okay? You still have to go to the

[23]    second farm and catch those chickens that you're

[24]    assigned, don't you?

[25]    A    Yes.

Page 101

[ 1]    Q    And you can take however much -- I mean
[ 2] whatever time it takes to get them done, you can do,
[ 3] correct, you can take --
[ 4]    A    Once the orders are given, then the
[ 5] company expect the chickens to be caught.
[ 6]    Q    That's correct, that's right.
[ 7]    A    So, time ...
[ 8]    Q    When you receive the work, the farms
[ 9] that you're supposed to go to --
[10]    A    Yes.
[11]    Q    -- all right, you're supposed to get
[12] that done --
[13]    A    Yes.
[14]    Q    -- that day?
[15]    A    Yes.
[16]    Q    Okay.  And if during the course of the
[17] week that requires overtime to be worked by the
[18] crew --
[19]    A    Yes.
[20]    Q    -- that's okay?
[21]    A    Yes.
[22]    Q    Okay.  And you can authorize that
[23] yourself, can you not?
[24]    A    I don't understand authorize.
[25]    Q    All right.  You just go through your

Page 102

[ 1] work each day, and if at the end of a given day or a
[ 2] given week its taken you 45 hours, shall we say, to
[ 3] catch the chickens that you were supposed to catch
[ 4] this week, that's what it takes?
[ 5]    A    Yes.
[ 6]    Q    Okay.  You don't have to call anybody
[ 7] up and say, you know, "We're at 40 hours, can I catch
[ 8] anymore?"
[ 9]    A    No.
[10]    Q    You just go ahead and do it?
[11]    A    Yes.
[12]    Q    Okay.  Now, this is Exhibit 6 to
[13] Mr. Garrison's deposition which is the agreement
[14] between Teamster's Local 355 and the company; you have
[15] seen this before?
[16]    A    Yes.
[17]    Q    Okay.  What I'd like you to do is to go
[18] to Article 10, which appears on page 9 of this
[19] exhibit, Section 1.  Just a quick look at that for me,
[20] if you would.
[21]    A    Article 10, Grievance?
[22]    Q    Grievance procedure, the first one
[23] under number 1 says a complaint, and then it talks
[24] about how you take the complaint up.
[25]    A    Um-hmm.

Page 103

[ 1]    Q    It's the aggrieved employee who first
[ 2] takes the matter up with the shop steward, that would
[ 3] have been you when you were shop steward, right?
[ 4]    A    Yes, that's correct.
[ 5]    Q    And then you in turn would take that up
[ 6] with the foreman, whoever the foreman would be?
[ 7]    A    Yes.
[ 8]    Q    Now, since you're a crew leader, if one
[ 9] of your catchers or forklift operators or a driver has
[10] a problem, the person that they come to in the first
[11] instance then is you?
[12]    A    No.
[13]    Q    All right, one of your catchers has a
[14] grievance, okay?
[15]    A    Yes.
[16]    Q    Tell me what he does.
[17]    A    He automatically knows that he's in the
[18] Union.
[19]    Q    Right.
[20]    A    He automatically knows that he contact
[21] his shop steward.
[22]    Q    Correct, okay, and who is that?
[23]    A    At the time -- who was it?
[24]    Q    That's okay.  It's Binky now, isn't it?
[25]    A    I think so.

Page 104

[ 1]    Q    Yeah, I think so.  Okay, so the catcher
[ 2] in your crew who's got a grievance --
[ 3]    A    Yes.
[ 4]    Q    -- is going to contact Binky?
[ 5]    A    Yes.
[ 6]    Q    Okay.  And who is Binky going to
[ 7] contact?
[ 8]    A    His representative, I'm assuming.
[ 9]    Q    When you say his representative --
[10]    A    The Union representative in order to
[11] follow through on the grievance.
[12]    Q    Well, that's in a later step.
[13]    A    Well, each one did different.  I did
[14] mine different; I contacted the Union man first, and
[15] then we contacted the company.
[16]    Q    So you never went to the supervisor,
[17] the first line supervisor?
[18]    A    No.  Not when I was a Union steward.
[19]    Q    Well, that's right, because that's what
[20] the contract says, is with the Union steward who in
[21] turn takes the grievance up with the foreman in
[22] charge, but you're saying you never did that?
[23]    A    No, no.
[24]    Q    Okay, and do you know whether Binky
[25] does that or not now?

A-0092

Page 105

[ 1]       A    No, I don't.

[ 2]       Q    Okay.  If you did this, if you did what

[ 3]   you were supposed to do, what the contract says to do,

[ 4]   who would you have taken it up with?

[ 5]       A    Doug Lynch.

[ 6]       Q    Well, he's not foreman in charge of a

[ 7]   crew, is he?

[ 8]       A    No, you take it up with the foreman of

[ 9]   the live haul; live haul foreman, not the crew leader.

[10]       Q    Okay, that's what you think this says?

[11]       A    Yes.

[12]       Q    Okay, that's fine.  But you never did

[13]   that either, you just went right to the Union reps?

[14]       A    Yeah, I let him contact the company.

[15]       Q    Okay.  Let me show you what will be

[16]   marked as Exhibit 3, I guess.

[17]            (Walters Exhibit 3, marked for

[18]   identification.)

[19]   BY MR. BREWER:

[20]       Q    This document is a series of pages, and

[21]   they're all basically a receipt from petty cash, the

[22]   title of the document says Received of Petty Cash.

[23]   Take a look at the first one, I see it's a Mr. Thomas

[24]   Major.

[25]       A    Yes.

Page 106

[ 1]       Q    Is that the same Mr. Major who is a

[ 2]   catcher for you?

[ 3]       A    Yes.

[ 4]       Q    Okay.  And he's requesting that he be

[ 5]   given $200?

[ 6]       A    Yes.

[ 7]       Q    Is that your signature where it says

[ 8]   approved by?

[ 9]       A    Yes.

[10]       Q    So you approved that he could get $200

[11]   from petty cash?

[12]       A    Yes, yes.

[13]       Q    How does Mr. Major get the money?

[14]   What's the process that's followed?

[15]       A    Well, when there was a petty cash, this

[16]   slip here was taken to the petty cash I'm going to say

[17]   clerk, and she had the money.  He signed the slip, he

[18]   received the money.

[19]       Q    Did you ever get the money from petty

[20]   cash and give it to any members on your crew?

[21]       A    No.

[22]       Q    You never did that?

[23]       A    No.

[24]       Q    Okay.  By the way, when your people get

[25]   paid, when do they get paid?

Page 107

[ 1]       A    Fridays.

[ 2]       Q    Fridays?  Who gives them their

[ 3]   paychecks?

[ 4]       A    They're passed out the through the

[ 5]   scale room.

[ 6]       Q    Okay.  Do you pass out a paycheck at

[ 7]   all?

[ 8]       A    Yes, yes.

[ 9]       Q    Okay.  And how often do you pass them

[10]   out?

[11]       A    Accordingly to when they are received.

[12]   Sometimes they're Friday morning and I'll pick the

[13]   checks up before I pick the help up so that they can

[14]   have a time before they go to work in order to cash

[15]   them.

[16]       Q    All right.  Other times, it's given out

[17]   at the scale house?

[18]       A    Generally.

[19]       Q    Okay, thank you.  So let's talk about

[20]   this Mr. Major.  He obviously has to come to you

[21]   because you're approving it; so Mr. Major would have

[22]   come to you and asked for you to approve a request for

[23]   him to get $200 from petty cash?

[24]       A    Yes.

[25]       Q    Would he have had this document, this

Page 108

[ 1]   receipt, with him?

[ 2]       A    No.

[ 3]       Q    No?  Who had this receipt?

[ 4]       A    We had -- we had books of petty cash

[ 5]   slips.

[ 6]       Q    So you as a crew leader had a book --

[ 7]       A    Yes.

[ 8]       Q    -- of receipts like this?

[ 9]       A    Yes.

[10]       Q    So when he would have come to ask you

[11]   for this, is this writing all yours or is some of it

[12]   his?

[13]       A    The social security number, date, name,

[14]   my signature, and the $200.

[15]       Q    Okay, that's your writing?

[16]       A    Yes.

[17]       Q    So he would have come to you,

[18]   requesting $200 from petty cash; you would have had

[19]   the receipt, you would have filled it out and you

[20]   would have approved it?

[21]       A    Yes.

[22]       Q    Then would you have given the receipt

[23]   to him?

[24]       A    Yes.

[25]       Q    And then he's the one who took it to

Page 109

[ 1]  wherever?

[ 2]      A    Yes.

[ 3]      Q    And do you know where wherever is, is

[ 4] that accounting or –

[ 5]      A    I don't know the lady's name that was

[ 6] in the petty cash.

[ 7]      Q    That's all right, that's fine.  Let's

[ 8] take a look at the next one, this is a Mr. Daniel

[ 9] Miller, do you know Mr. Miller?

[10]      A    Yes.

[11]      Q    How do you know him?

[12]      A    He was a catcher in my crew.

[13]      Q    And again, he's requesting $11?

[14]      A    Yes.

[15]      Q    Seems to be a rather small amount but,

[16] nonetheless, would the same process have been

[17] followed; he would have come to you, asked you for

[18] $11?

[19]      A    Yes.

[20]      Q    You would have approved it, that is

[21] your signature?

[22]      A    Yes.

[23]      Q    And he would have then gone to the

[24] petty cash and received his money?

[25]      A    Yes.

Page 110

[ 1]      Q    Take a look at the next one,

[ 2] Mr. Harvey, William Harvey, do you know Mr. Harvey?

[ 3]      A    Yes.  Okay, yes.

[ 4]      Q    How do you know him?

[ 5]      A    He was a catcher in my crew.

[ 6]      Q    And this is occurring on the same day

[ 7] as Mr. Miller?

[ 8]      A    Yes.

[ 9]      Q    And they both make a notation of short

[10] hand pay, what does that mean?

[11]      A    They worked short handed, they worked

[12] with six men instead of seven.

[13]      Q    Okay.  And they're requesting

[14] additional pay because they did that?

[15]      A    It's not exactly additional pay.  It's

[16] pay that is calculated for the amount of chickens that

[17] was caught short handed.

[18]      Q    Okay.  Who did those calculations?

[19]      A    I did.

[20]      Q    And would you have notified Mr. Miller

[21] and Mr. Harvey, for example, that they're entitled to

[22] this $11?

[23]      A    Yes.

[24]      Q    Okay.  And so they wouldn't have come

[25] then to you to ask for the $11; you would have known

Page 111

[ 1] that they were entitled to this, done the arithmetic

[ 2] to figure out how much, and filled this out and

[ 3] approved it, gave it to them so they could get their

[ 4] $11?

[ 5]      A    Yes.

[ 6]      Q    Okay.

[ 7]      A    Under company policy.

[ 8]      Q    Sure.  Isaiah Daniels, this is the same

[ 9] day, and this is short handed pay, so what we just

[10] described for the other two gentlemen applies here?

[11]      A    Yes.

[12]      Q    And Mr. Satchell, the same thing, short

[13] handed pay on the same day?

[14]      A    Yes.

[15]      Q    Norman Manuel?

[16]      A    Yes.

[17]      Q    Do you know him, is he a member of your

[18] crew?

[19]      A    Yes.

[20]      Q    And this is the same situation, short

[21] handed pay?

[22]      A    Yes.

[23]      Q    And is it Coolridge Frazier?

[24]      A    Coolidge.

[25]      Q    Coolidge Frazier?

Page 112

[ 1]      A    Yes.

[ 2]      Q    And it's short handed pay on the same

[ 3] day?

[ 4]      A    Yes.

[ 5]      Q    So these people caught short, you did

[ 6] the arithmetic, did the slip, they went and got their

[ 7] money?

[ 8]      A    Yes.

[ 9]      Q    Let me just go off the record for a

[10] minute to make a copy of something so everybody has

[11] it.

[12]           (Whereupon, there was a discussion held

[13] off the record.)

[14]           (Whereupon, a luncheon recess was

[15] taken.)

[16]           MR. BREWER:  This would be Number 4.

[17]           (Walters Exhibit 4, marked for

[18] identification.)

[19] BY MR. BREWER:

[20]      Q    Mr. Walters, I'm showing you what's

[21] been marked as Exhibit Number 4 to your deposition,

[22] this is again a petty cash receipt.

[23]      A    Yes.

[24]      Q    Is that your signature on the bottom?

[25]      A    Yes.

A-0094

Page 113

[1]    Q    And this is an approval for a loan from
[2]    the company, I gather, by Mr. Daniel Miller --
[3]    A    Yes.
[4]    Q    -- in the amount of $80?
[5]    A    Yes.
[6]    Q    Who is Mr. Miller?
[7]    A    He was a catcher in my crew.
[8]    Q    Okay.  And he came to you I guess like
[9]    we discussed before, came to you and asked if you
[10]   would approve a loan, and you signed it and gave it to
[11]   him?
[12]   A    Yes.
[13]   Q    And then he got it done, okay, thanks.
[14]        (Walters Exhibit 5, marked for
[15]   identification.)
[16]   BY MR. BREWER:
[17]   Q    Let me show you what we have marked as
[18]   the next exhibit to your deposition.  Mr. Walters,
[19]   what has been marked as Exhibit 5 to your deposition
[20]   are documents that we received from your attorney in
[21]   response to a request that we made.
[22]   A    Yes.
[23]   Q    Do you recognize these documents?
[24]   A    Yes.
[25]   Q    Okay.  Whose handwriting appears on

Page 114

[1]    these documents?
[2]    A    Mine.
[3]    Q    Okay.  I note the documents that we
[4]    were given start on October 5, '04 and, by the way,
[5]    the bate stamps on these are O145 through O152, and
[6]    they go from the 5th of October in 2004 through the
[7]    8th of October in 2004.  On the first page, the one
[8]    that bears the date of October 5, 2004, I see a
[9]    notation of 10:05 pick up first man?
[10]   A    Yes.
[11]   Q    And 8:55 drop off last man?
[12]   A    Yes.
[13]   Q    Did you always make these kind of
[14]   notations on these driver's orders?
[15]   A    No.
[16]   Q    When did you start, October 5th?
[17]   A    No.
[18]   Q    Okay, tell me.
[19]   A    I started at the beginning of the year
[20]   on my return.
[21]   Q    You returned, let me just be sure, in
[22]   January of '04, correct?  January 19, to be exact?
[23]   A    Yes.
[24]   Q    All right.  So you started keeping
[25]   these records in January of '04?

Page 115

[1]    A    Yes.
[2]    Q    Okay.  These are the only records that
[3]    we received from your attorney; can you tell me why we
[4]    didn't get the others?
[5]    A    I just turned in the proceeding ones
[6]    for that year, for the time limit that you asked --
[7]    that they asked for.  They only asked to show the time
[8]    limit of a week, and I considered that was the week.
[9]        MR. BREWER:  Well, I don't know that I
[10]   have -- let's go off the record for a minute.
[11]       (Whereupon, there was a discussion held
[12]   off the record.)
[13]       MR. BREWER:  I don't know, do you have
[14]   a copy of our request for production in front of you?
[15]       MR. MARTIN:  I do not.
[16]   BY MR. BREWER:
[17]   Q    I'll have the record reflect that,
[18]   Mr. Walters, we had asked for you to produce to your
[19]   attorney all documents that identified or in any way
[20]   reflect the hours worked or pay received by plaintiff
[21]   from the defendants, and what you have given us, of
[22]   course, is this one week.
[23]   A    Yes.
[24]   Q    It is not limited to a week.  What I'm
[25]   going to request that you do is provide copies of all

Page 116

[1]    these documents --
[2]    A    Yes.
[3]    Q    -- that you have kept to your attorney
[4]    so that he can in turn produce them to us.
[5]    A    Yes.
[6]    Q    Okay.  At any rate, for the week we
[7]    have in October, you started keeping these in January
[8]    of '05 -- I mean '04, I'm sorry?
[9]    A    Let's consider February.
[10]   Q    Let's consider February?
[11]   A    Yes.
[12]   Q    Would that have been the time that you
[13]   had a meeting with Mr. Martin and others?
[14]   A    No.
[15]   Q    It's before that meeting?
[16]   A    Yes.
[17]   Q    Okay.  Why did you start keeping --
[18]   A    Because of a comment that was made to
[19]   me when I came back to work.
[20]   Q    Comment that was made to you by whom?
[21]   A    By Doug Lynch.
[22]   Q    And what did Mr. Lynch say to you?
[23]   A    Mr. Lynch informed me of the situation
[24]   with Mr. Davis, and wanted to know if I was going to
[25]   go along with him on his suit.

A-0095

Page 129

[1]        A    I come Dagsboro -- I mean Coverdale,

[2]    Millsboro, Dagsboro, Frankford, Selbyville, Berlin.

[3]        Q    Is Coverdale, I will say from my sense

[4]    of direction, north of Millsboro?

[5]        A    Yes.

[6]        Q    Oh, okay. So you're coming right down

[7]    113?

[8]        A    No, it's northwest. You go over to 13,

[9]    from 113 to 13 to Coverdale. Coverdale is 2 miles

[10]    south of Bridgeville.

[11]        Q    Oh, okay, I know where that is, all

[12]    right. So you go from there, then you come down to

[13]    Millsboro, Frankford, Dagsboro, and then you said

[14]    Selbyville, and Berlin?

[15]        A    Yes.

[16]        Q    And that's how you go. And you repeat

[17]    that dropping people off?

[18]        A    Yes.

[19]        Q    All right. Additional calculations

[20]    that I see on these various time sheets, again, all of

[21]    this is your computation?

[22]        A    Yes.

[23]        Q    And the notations there are the same, I

[24]    mean the numbers are going change, obviously, but it's

[25]    the number of chickens that were caught by the crew on

Page 130

[1]    a particular day?

[2]        A    Yes.

[3]        Q    If you look at page O150, I see some

[4]    numbers there, I don't know what they mean; can you

[5]    help me out?

[6]        A    Wait a minute.

[7]        Q    On the bottom.

[8]        MR. MARTIN: I'll help you.

[9]        MR. BREWER: Right there, that's the

[10]    one.

[11]        MR. MARTIN: I'm sorry, that's O148.

[12]    There we go.

[13]        THE WITNESS: Okay.

[14]    BY MR. BREWER:

[15]        Q    I see some numbers there; can you tell

[16]    me what they mean?

[17]        A    The same calculations as before.

[18]    23,100 would be the amount of birds at Ayres Lane,

[19]    approximately, after four trucks -- yes, four, yeah,

[20]    after four trucks; subtracted from that leave 4200, I

[21]    needed 18.6 pages to load them, 279.9 doors.

[22]        Q    Okay. And that's how you know how many

[23]    cages to get to the farm so you can take care of this

[24]    and get it done?

[25]        A    Well, it's something to calculate to

Page 131

[1]    make sure that you can carry the chickens that you

[2]    supposed to carry on the trucks that you have to

[3]    receive.

[4]        Q    Right, okay. I just have one more

[5]    question about these documents. I have seen similar

[6]    documents from some of the other people who are part

[7]    of this lawsuit whose deposition I have taken --

[8]        A    Uh-huh.

[9]        Q    -- and their explanation for why the

[10]    first man pick up and the last man dropped off is

[11]    different from your's; you're sure that you did this

[12]    on your own?

[13]        A    Yes.

[14]        Q    Okay. You didn't discuss it with

[15]    anybody else?

[16]        A    No.

[17]        Q    None of the other crew leaders?

[18]        A    No.

[19]        Q    Okay, that's fine. Do you have a

[20]    general idea how much catchers make in the course of a

[21]    year, total amount of money, compensation?

[22]        A    No, I don't, sir.

[23]        Q    Do you know how they're paid?

[24]        A    Say that again please.

[25]        Q    Do you know how they're paid?

Page 132

[1]        A    Paid by Mountaire.

[2]        Q    No, how are they paid? Are they paid

[3]    per chicken, per thousand?

[4]        A    They're paid per thousand.

[5]        Q    Per thousand?

[6]        A    Per thousand.

[7]        Q    And these people who work for you, you

[8]    have no idea really how much money they make at all?

[9]        A    No.

[10]        Q    Okay. These time sheets that we just

[11]    went through, Exhibit 5, and the numbers that you had

[12]    on there, this is how the catchers in fact get paid,

[13]    don't they?

[14]        A    Yes.

[15]        Q    So you turn this in and that's how they

[16]    are paid?

[17]        A    No, it's a time sheet that's filled out

[18]    for each day.

[19]        Q    Well, that's what I'm talking about.

[20]    For example, on the first one you gave us bearing the

[21]    date of October 5 --

[22]        A    Okay.

[23]        Q    -- you have all the numbers, and the

[24]    numbers of the people who are on your crew, correct?

[25]        A    Yes.

Page 133

[ 1]        Q    So that's how the company knows how to
[ 2]   pay that crew, your crew, for catching this number of
[ 3]   birds this day?
[ 4]        A    That's correct, sir, yes.
[ 5]        Q    And they use this information that you
[ 6]   give to them --
[ 7]        A    From the time sheet, yes.
[ 8]        Q    -- to figure out how the catchers get
[ 9]   paid?
[10]        A    Yes.
[11]        Q    Right, okay.
[12]             MR. BREWER:  Lets go off the record a
[13]   minute.
[14]             (Whereupon, there was a discussion held
[15]   off the record.)
[16]             (Walters Exhibit 6, marked for
[17]   identification.)
[18]   BY MR. BREWER:
[19]        Q    Mr. Walters, please take a look at what
[20]   I had marked as Exhibit 6 to your deposition; do you
[21]   recognize this document?
[22]        A    Yes.
[23]        Q    Okay.  Go to the fifth page, and this
[24]   document is a performance evaluation self assessment,
[25]   is this your writing on this document?

Page 134

[ 1]        A    Yes, it is.
[ 2]        Q    Okay.  Let's go to page 2 of the self
[ 3]   assessment, and the first area was Commitment To
[ 4]   Quality, it says, "I have always been committed to
[ 5]   doing the best that Roy can do."
[ 6]        A    Yes.
[ 7]        Q    All right.  The second category, "Have
[ 8]   been able to communicate with customers to get the job
[ 9]   done."  Which customers are you referring to?
[10]        A    The farmers.
[11]        Q    The farmers.  So when we talked about
[12]   your interaction with the farmers, in addition to what
[13]   you told me before, what else would you be
[14]   communicating with the farmer?
[15]        A    According to the situations of where we
[16]   are, we sometimes has change of farm, change of
[17]   houses; we might be marked down to get house 1, the
[18]   farmer will come to me and say, "Well, Roy, we ran out
[19]   of feed in house 2, we'd like you to catch house 2
[20]   first," he done already called in the plant to notify
[21]   the plant for us to catch house 2, something like
[22]   that.
[23]             I have had farmers say that they had a
[24]   bad wet spot in the house, and to be on the lookout
[25]   for it, so I have communicated with him in order to

Page 135

[ 1]   get the job done.
[ 2]        Q    All right.  So when the farmer tells
[ 3]   you he's got a bad wet spot in the house, you thank
[ 4]   him for that, and instruct the crew how to go about
[ 5]   doing it so they can catch the chickens and stay out
[ 6]   of the wet spot as much as they can?
[ 7]        A    That's correct, yes.
[ 8]        Q    Okay, that's the kind of communication
[ 9]   you're talking about?
[10]        A    Yes.
[11]        Q    It says Planning, if I'm reading this,
[12]   it says, "Have been able to identify problems and
[13]   establish goals and priorities to accomplish results."
[14]   am I reading that correctly?
[15]        A    Yes.
[16]        Q    Tell me what you mean by that.
[17]        A    Just as it states.
[18]        Q    What problems did you identify, let me
[19]   ask it that way?
[20]        A    Wet houses, bad loading areas.
[21]        Q    Okay, what else?
[22]        A    Sick chickens.
[23]        Q    Sick chickens?
[24]        A    Yes.
[25]        Q    How do you know when they're sick?

Page 136

[ 1]        A    Generally you don't; the farmer knows,
[ 2]   he will tell you, if you can contact him.
[ 3]        Q    Okay.  So what other problems would you
[ 4]   identify when you wrote this?
[ 5]        A    Just general problems that happens
[ 6]   within the process of getting chickens.
[ 7]        Q    So whatever those problems were, then
[ 8]   it says here you establish goals and priorities to
[ 9]   accomplish results; what did you do to get around the
[10]   problems that you identified?
[11]        A    Just faced them forward.  Whatever the
[12]   problem was, you have to face them in order to get
[13]   around them.  Same way with being in a wet house; if
[14]   you start the house and you got half way the house and
[15]   it's wet, then you make the changes in order to get
[16]   around it.
[17]        Q    Okay.  So in other words, then, if I'm
[18]   using what you're telling me, you identify whatever
[19]   problems they were?
[20]        A    Yes.
[21]        Q    Some of which you identified, and I'm
[22]   sure there were some others, and whatever those
[23]   problems that you identified, you established goals
[24]   and priorities to get around to solve those problems?
[25]        A    Yes.

Page 137

[1]  Q    As the crew leader, that's what your
[2]  job was?
[3]  A    Yes.
[4]  Q    Okay. Next one it talks about
[5]  initiative, and it says here, "My crew and I have made
[6]  some changes as we have to learn from our failures."
[7]  Okay, what do you mean by that, what was this
[8]  referring to?
[9]  A    Attitudes.
[10] Q    Attitudes?
[11] A    Yes.
[12] Q    I'm not sure what that means.
[13] A    Each man has an attitude, and each man
[14] has to control his attitude in order to do the job.
[15] And if two attitudes don't match, then you got a
[16] confrontation.
[17] Q    Okay. So I don't mean to put words in
[18] your mouth, were you having some morale problems on
[19] your crew?
[20] A    No, I don't.
[21] Q    But you had people who had different
[22] attitudes?
[23] A    Yes.
[24] Q    And it was interfering with getting the
[25] job done?

Page 138

[1]  A    Yes.
[2]  Q    And you made changes, it says here?
[3]  A    Yes.
[4]  Q    What changes did you make?
[5]  A    We sat down and discuss them.
[6]  Q    Okay.
[7]  A    When we in the van, we sit down and we
[8]  talk about them.
[9]  Q    Give me an idea what you'd be talking
[10] about.
[11] A    How to get the job done efficiently in
[12] order to keep a job with Mountaire.
[13] Q    Okay. But these were all related to
[14] attitudes? I mean I guess I don't want to testify for
[15] you, I'm trying to understand what you're trying to
[16] tell me here.
[17] A    Mostly. I'm going to say 80 percent.
[18] Q    Okay.
[19] A    80 percent, that's 80 percent of
[20] dealing with it, you know.
[21] Q    80 percent being the attitudes that you
[22] were talking about?
[23] A    Yes.
[24] Q    Okay.
[25] A    Yes.

Page 139

[1]  Q    Okay. And were you working to get the
[2]  attitudes corrected so you can get the job done?
[3]  A    Yes.
[4]  Q    Now I notice you rated yourself a 2
[5]  here?
[6]  A    I am no different than anyone else.
[7]  Some people, you can talk to, to resolve situations,
[8]  and there's some that you can't.
[9]  Q    Okay. And why are you giving yourself
[10] a 2 as opposed to a higher number?
[11] A    I had a problem with that myself.
[12] Q    Okay, that explains it. The next one
[13] talks about, right here under Decision Making and
[14] Problem Solving, "Have recognized problems and made
[15] decisions to accomplish results." What did you mean
[16] when you wrote that?
[17] A    Mostly the same thing. The problems
[18] that we have to encounter in order to do a job. And
[19] the decisions that we have made together, not just my
[20] decision, but decisions that we have made as a crew,
[21] not totally my decision as a crew leader, in order to
[22] accomplish and get the results that we consider is
[23] needed.
[24] Q    You figure as a leader if you can bring
[25] them along to your way of thinking or listen to what

Page 140

[1]  they have to say, that that's a good way to do things?
[2]  A    Up to a point.
[3]  Q    Right. But I mean you're the final one
[4]  who makes the decisions as the crew leader?
[5]  A    I'm open for -- I'm open for
[6]  discussion.
[7]  Q    Sure.
[8]  A    You know, so, no, I'm not going to say
[9]  I make the final decision. There has been men in my
[10] crew that has made some good character references in
[11] order to do the job, and I have took his word and done
[12] it his way.
[13] Q    And if you think that, that's what I'm
[14] trying to get at, if somebody in your crew makes a
[15] suggestion as how to get things done better, okay, you
[16] can say, "Okay, we'll try that," is that what you're
[17] basically telling me that's occurred?
[18] A    Yes.
[19] Q    There's nothing wrong with that, okay.
[20] And that's what you mean that you have made the
[21] decisions to accomplish the results?
[22] A    Yes.
[23] Q    That you made the decisions, okay.
[24] Next area it says Business Success and Results, it
[25] says, "I consider I have done these things as a crew

A-0098

Page 141

[1] leader." And under this, we have "Get things done.

[2] Handle emergency situations. Meets quality and safety

[3] standards. Operates within budget, improves margin."

[4] And your comment here is that you thought you had done

[5] these things.

[6]         Leadership and Influence is the next

[7] category, it says, "My crew --" and I can't make out

[8] the next word, and then it goes on, "understand what I

[9] as a crew leader wants and we together have tried to

[10] reach that goal." So basically, let me ask the

[11] question this way: When you said that, what did you

[12] mean?

[13]     A    The same thing I just said.

[14]     Q    So in other words, as the crew leader,

[15] your crew understands what you wanted, and that you

[16] worked together to try to reach that goal, you and the

[17] crew were working together to try to reach the goal

[18] because they understand what you want?

[19]     A    Yes.

[20]     Q    That's what you said, okay.

[21] Communication, under this, there are four items that

[22] are listed, one says "Listens attentively to others

[23] and demonstrates understanding," and you basically say

[24] you consider that you have done that as a crew leader,

[25] am I right in that?

Page 142

[1]     A    Yes.

[2]     Q    "Is accessible and approachable," and

[3] again you consider that you have done that as a crew

[4] leader?

[5]     A    Yes.

[6]     Q    "Encourages others to express their

[7] ideas and opinions," we just discussed that and,

[8] again, you are telling us here that you consider that

[9] you have done that?

[10]    A    Yes.

[11]    Q    And that you speak and write clearly

[12] and efficiently -- I'm sorry, and effectively and is

[13] constructive, and you think you have done that?

[14]    A    Yes.

[15]    Q    Team work, it says, "With some help

[16] from supervisor, there have been some conflicts that

[17] needed to be look at," what do you mean by that?

[18]    A    The attitudes.

[19]    Q    What we talked about before?

[20]    A    Yes.

[21]    Q    Okay. Next one is Safety and

[22] Environment, it says, "Safety has always been a number

[23] one priority," what do you mean by that?

[24]    A    Safety. You have old chicken farms

[25] that has problems that has to be addressed before you

Page 143

[1] catch the chickens or someone could get hurt.

[2]     Q    Because you're responsible for the

[3] safety of your people?

[4]     A    Yes.

[5]     Q    And this is your number one priority?

[6]     A    Yes.

[7]     Q    And in fact, you give yourself a four

[8] here?

[9]     A    Yes.

[10]    Q    On that, okay. And in Development Plan

[11] on page 4 of your self evaluation, you write, "I

[12] wanted to have more team work with the mens in my

[13] crew." And Results Achieved, you say you have seen

[14] some 30 to 40 percent change toward this plan; is that

[15] a change to the better, I assume?

[16]    A    Yes.

[17]    Q    Okay. So that you were successful in

[18] getting those attitudes that you talked about

[19] resolved?

[20]    A    Yes.

[21]    Q    The next item that's under that, you

[22] write, "I want to focus on working the chickens for

[23] improvement of DOAs as each farm is not the same,"

[24] what do you mean by that?

[25]    A    If you were to go back to grower's

Page 144

[1] responsibility.

[2]     Q    I'm sorry, growers, okay yes, okay,

[3] fine.

[4]     A    Types of farms, catching methods,

[5] daytime catching, nighttime catching, tunnel

[6] ventilation, fans, fire fans, each farm is different

[7] as it states here. Some farms are 400 feet, some

[8] houses are 5-; some houses are narrow, some houses are

[9] walk-outs.

[10]        MR. MARTIN: Let the record reflect

[11] that Mr. Walters is referring to Joe Garrison Exhibit

[12] Number 2.

[13]        MR. BREWER: Okay, I understand that.

[14] BY MR. BREWER:

[15]    Q    And what did you mean when you wrote

[16] that you wanted to focus on working the chickens for

[17] improvement in DOAs as each farm is different, what

[18] did that mean, how did that relate to --

[19]    A    That mean that when we go to a

[20] walk-out, the chickens have to be worked different,

[21] they have to be penned up with pens; where you have a

[22] tunnel house, a wide-span house, they don't have to

[23] be.

[24]    Q    Okay.

[25]    A    There is a difference in the night and

A-0099

Page 145

[ 1]  a difference in the day.

[ 2]      Q    Sure, all right.  And that's what you

[ 3]  wanted to do here?

[ 4]      A    Yes.

[ 5]      Q    Okay.  Looking ahead, the next item

[ 6]  down here says you want to make sure the job gets done

[ 7]  right, and that's your responsibility as a crew

[ 8]  leader?

[ 9]      A    Yes.

[10]      Q    And again, it says, "Helping to hire

[11]  good working mens that want to work," how were you

[12]  going to do that?

[13]      A    You lost me on that one.

[14]      Q    It's the last one on the document.

[15]      A    You want to know the truth?

[16]      Q    Yes.

[17]      A    I just wrote that in there to write

[18]  something.

[19]      Q    All right.  That's what we want, is the

[20]  truth.  Okay, fine.  Next, this is Exhibit Number 8 to

[21]  Mr. Garrison's deposition, Mr. Walters; have you seen

[22]  this document?

[23]      A    No.

[24]      Q    No, okay.  You became a crew leader in

[25]  2001 and this has got a 2000 date on it, so you have

Page 146

[ 1]  never seen this.

[ 2]      Did you know when you became a crew

[ 3]  leader that you would not receive additional

[ 4]  compensation for catching or operating the forklift?

[ 5]      A    Repeat that please.

[ 6]      Q    When you became a crew leader in 2001,

[ 7]  did you understand that you would not receive

[ 8]  additional compensation for catching chickens or

[ 9]  operating a forklift?

[10]      A    No.

[11]      Q    You didn't know that?

[12]      A    No.

[13]      Q    Okay.  Have you ever done that?

[14]      A    Yes.

[15]      Q    And have you ever been paid for it --

[16]      A    Yes.

[17]      Q    -- since you have been a crew leader?

[18]      A    Yes.

[19]      Q    Just make sure, because we want to make

[20]  sure we're accurate here.  What you're testifying to

[21]  is after becoming a crew leader in 2001 --

[22]      A    Yes.

[23]      Q    -- you have caught chickens and been

[24]  paid for it, in addition to being the crew leader?

[25]      A    I drove a truck, I drove the forklift,

Page 147

[ 1]  not catch chickens, no, not catch chickens.

[ 2]      Q    Let me just get the question so we're

[ 3]  all clear on this.  You became a crew leader in 2001?

[ 4]      A    Yes.

[ 5]      Q    Since being a crew leader in 2001, have

[ 6]  you caught chickens?

[ 7]      A    No.

[ 8]      Q    You have not.  How about operating a

[ 9]  forklift?

[10]      A    Yes.

[11]      Q    When you have operated the forklift,

[12]  have you received additional money in addition to what

[13]  you normally receive as a crew leader for doing that?

[14]      A    We were paid by the thousand.

[15]      Q    When you were paid by the thousand?

[16]      A    Yes.

[17]      Q    After you had been paid by -- that's

[18]  after this memo, because you became salaried in June

[19]  of '01?

[20]      A    Yes.

[21]      Q    Okay.  So you're saying to me that

[22]  while you were being paid by the thousand --

[23]      A    Yes.

[24]      Q    -- that when you operated the

[25]  forklift --

Page 148

[ 1]      A    Yes.

[ 2]      Q    -- you got forklift pay in addition to

[ 3]  being paid as crew leader?

[ 4]      A    Yes.

[ 5]      Q    Great, okay.  After you became

[ 6]  salaried, did you receive additional compensation for

[ 7]  operating the forklift?

[ 8]      A    No.

[ 9]      Q    Okay.  Let's do this:  Let's put

[10]  documents Garrison 9 and 10.  This is Mr. Garrison

[11]  Exhibit Number 9, sir, and this is Mr. Garrison

[12]  Exhibit Number 10.

[13]      Garrison Exhibit Number 9 is the

[14]  benefit plan that is applicable to all salaried

[15]  employees of Mountaire, and Garrison Exhibit Number 10

[16]  is the one that is applicable to those like the

[17]  catchers and stuff like that who are 355 people.

[18]  That's members of Teamster's Local 355, so the record

[19]  is clear.

[20]      Do you have any sense, so that maybe we

[21]  can move along, are there any differences in the

[22]  benefits that you have when you became a crew leader

[23]  versus benefits that you had when you were a forklift

[24]  operator?

[25]      A    Yes.

Page 149

[ 1]       Q    Okay, can you tell me what you remember
[ 2]   about the change in benefits?
[ 3]       A    The different -- a different status
[ 4]   within the insurance.
[ 5]       Q    Okay, what do you mean by that?
[ 6]       A    I considered the -- was in the health
[ 7]   and welfare plan of plan 1.
[ 8]       Q    That's the Teamster's?
[ 9]       A    Considered -- yes.
[10]       Q    Okay, so that when you were a forklift
[11]   operator, you were in the Teamster's Health and
[12]   Welfare Plan 1?
[13]       A    Yes.
[14]       Q    Okay.
[15]       A    And as being non-Union, I went into the
[16]   company's insurance.
[17]       Q    The salaried --
[18]       A    Yes.
[19]       Q    The salaried plan?  Because the company
[20]   has a plan for non-salaried also, right, that you know
[21]   of?  Do you know about that?
[22]       A    No.
[23]       Q    So you went into the salaried plan?
[24]       A    Right.
[25]       Q    Okay.  And when you had your operation,

Page 150

[ 1]   as I recall, let me just see if my dates are correct,
[ 2]   you went into the hospital to have I believe it was a
[ 3]   knee replaced?
[ 4]       A    That's correct, yes.
[ 5]       Q    And I believe you left the company to
[ 6]   go in to have that procedure done on the 3rd of June
[ 7]   of 2003, does that sound right?
[ 8]       A    It should have been the 4th.
[ 9]       Q    Okay, so the 4th of June.  And that you
[10]   returned to the company on July 18th of '03?
[11]       A    Yes.
[12]       Q    During the time you were out, you
[13]   continued to receive your full salary, didn't you?
[14]       A    Yes.
[15]       Q    Okay.  Since you were a Union member
[16]   and a shop steward, if you were a forklift operator as
[17]   you had been for many years and a shop steward, you
[18]   would have got about 175 per week, wouldn't you have?
[19]       A    I couldn't answer that one.
[20]       Q    You don't know?
[21]       A    No.
[22]       Q    You say you're not familiar with the
[23]   benefits the Union people have?
[24]       A    No.
[25]       Q    You then went out again on the 9th of

Page 151

[ 1]   September in 2003?
[ 2]       A    Yes.
[ 3]       Q    And then were out through the 22nd of
[ 4]   October, 2003, approximately seven weeks?
[ 5]       A    I was terminated.
[ 6]       Q    You were out through the 22nd of
[ 7]   October, 2003 --
[ 8]       A    Yes.
[ 9]       Q    -- correct?  And during that period of
[10]   time from September 9 to October 22nd, you received
[11]   your full salary, didn't you?
[12]       A    No.
[13]       Q    You did not?
[14]       A    No.  The 15th was the last check that I
[15]   received in October.
[16]       Q    Okay.
[17]       A    I was informed October the 23rd that I
[18]   was terminated.
[19]       Q    And that was -- do you know why?
[20]       A    As said company policy.
[21]       Q    Company policy, because you had been
[22]   out for approximately 90 days?
[23]       A    Yes.
[24]       Q    Right.  But that policy applies to all
[25]   salaried people, doesn't it?

Page 152

[ 1]       A    I'm not sure of that, sir.
[ 2]       Q    You're not sure of that, okay.
[ 3]       A    No.
[ 4]       Q    If I suggest to you it does, do you
[ 5]   have any reason to disbelieve me?
[ 6]           MR. MARTIN:  Objection.
[ 7]           THE WITNESS:  I cannot answer that.
[ 8]   BY MR. BREWER:
[ 9]       Q    You can't answer the question, okay.
[10]   You were then rehired by the company, weren't you --
[11]       A    Yes.
[12]       Q    -- on January 19th, 2004?
[13]       A    Yes.
[14]       Q    And your service was restored?
[15]       A    Yes.
[16]       Q    Okay, and you're still under the salary
[17]   benefit plan?
[18]       A    Yes.
[19]       Q    I'm going to ask you a couple of
[20]   questions you may know the answer, if you do, fine; if
[21]   you don't, that's probably also fine.
[22]           But do you know if your vacation as a
[23]   salaried person at Mountaire is better than those of
[24]   the people who work for you?
[25]       A    Not ...

A-010i

Page 153

[ 1]    Q    You don't know the answer to that?

[ 2]    A    No.

[ 3]    Q    Well, is it no, you don't know the

[ 4]  answer; or no, it's not better?

[ 5]    A    No, I don't know that it's better.

[ 6]    Q    You don't know that it's better?

[ 7]    A    Yes.

[ 8]    Q    Okay. How about life insurance, is

[ 9]  your life insurance better --

[10]    A    Yes.

[11]    Q    -- than the catchers --

[12]    A    Yes.

[13]    Q    -- and the hourly people? How about

[14]  your dependent life coverage, is that better?

[15]    A    Yes.

[16]    Q    And vision care, is that better?

[17]    A    Yes.

[18]    Q    Okay. And the catchers get paid every

[19]  week, don't they?

[20]    A    Yes.

[21]    Q    And the forklift operators?

[22]    A    Yes.

[23]    Q    And the drivers?

[24]    A    Yes.

[25]    Q    You get paid every two weeks, don't

Page 154

[ 1]  you?

[ 2]    A    Yes.

[ 3]    Q    Okay. You also receive, do you not, an

[ 4]  allowance for use of your van?

[ 5]    A    Yes.

[ 6]    Q    And how often do you get that

[ 7]  allowance?

[ 8]    A    Every week.

[ 9]    Q    And that is over and above your salary

[10]  as a crew leader, isn't it?

[11]    A    It's not the same. I receive a salary

[12]  check, I receive each week, expense check.

[13]    Q    And how much is that check that you

[14]  receive every week?

[15]    A    It's up now to 250.

[16]    Q    $250 per week?

[17]    A    Yes.

[18]    Q    For every week?

[19]    A    Yes.

[20]    Q    Including weeks that you're on

[21]  vacation?

[22]    A    Yes.

[23]    Q    Okay. When you became a salaried crew

[24]  leader, you became eligible for bonuses, monthly and

[25]  annual bonuses?

Page 155

[ 1]    A    Yes.

[ 2]    Q    Okay. You weren't eligible for those

[ 3]  bonuses when you were a forklift operator, were you?

[ 4]    A    No.

[ 5]    Q    And you didn't get any bonuses then,

[ 6]  did you?

[ 7]    A    No.

[ 8]    Q    A document again introduced into

[ 9]  Mr. Garrison's deposition as Exhibit 13 to his

[10]  deposition. If we go to the top of the page for the

[11]  year 2001, which is the year that you became a crew

[12]  leader --

[13]    A    Yes.

[14]    Q    -- this document shows that you

[15]  received $319.54 for a December bonus, do you see

[16]  that?

[17]    A    Kind of, yeah.

[18]    Q    Kind of?

[19]    A    I need some specs here.

[20]        MR. MARTIN:  Do you need some --

[21]        THE WITNESS:  No, I'm pretty good here.

[22]  BY MR. BREWER:

[23]    Q    Believe me, I know that feeling all too

[24]  well. There was no bonus in January, but there was

[25]  another $393.71 in February? If you're having

Page 156

[ 1]  difficulty reading it --

[ 2]    A    No, I can read it. Just recollecting.

[ 3]  I can't remember receiving this.

[ 4]    Q    Well, what the document shows, and

[ 5]  maybe we can move it quickly, it shows that in the

[ 6]  year 2001 when you became a crew chief, a crew leader,

[ 7]  you received a total of $1,690.45 in monthly bonuses,

[ 8]  does that sound about right to you?

[ 9]    A    I would have to look at my tax papers

[10]  to see, sir.

[11]    Q    Okay, that's fine. In 2002, it shows

[12]  that you received $3968.05, correct?

[13]    A    That is what I'm seeing, yes.

[14]    Q    And it also shows you being on a leave

[15]  of absence from June of '02 through October of '02?

[16]    A    Yes.

[17]    Q    Let's go down to '03. I see this

[18]  document shows that you received $1,303.75 in bonuses

[19]  for that year, does that sound about right to you?

[20]    A    Yes.

[21]    Q    Okay. Go down to the last block on the

[22]  bottom of the document, please. It totals up your

[23]  monthly bonuses for 2001 in which we have already seen

[24]  were $1,690.45, it also shows you getting an annual

[25]  bonus of 4,284.56.

Page 157

[1]    A    Yes.

[2]    Q    Does that sound right to you, sir?

[3]    A    Yes.

[4]    Q    The next year in 2002, you didn't

[5] receive an annual bonus?

[6]    A    That's correct.

[7]    Q    And you didn't get one in '03, either?

[8]    A    Correct, yes.

[9]    Q    Okay. But you will note here that the

[10] annual bonus for 2002 was not gotten by anybody?

[11]    A    Yes.

[12]    Q    Do you know how the annual bonus is

[13] computed or figured out?

[14]    A    Not really, no.

[15]    Q    Okay. If I suggest it is basically how

[16] well the company did that year, does that sound right

[17] to you?

[18]    A    Yes.

[19]    Q    Okay. No one got it that year. And in

[20] 2003, you didn't get one and do you know why that was?

[21]    A    No.

[22]    Q    Okay, because there are only two people

[23] who did get one. And then of course mid-year through

[24] 2004, it shows a bonus 175 which we have already seen,

[25] I believe. Okay.

Page 158

[1]             This, sir, is Exhibit Number 14 to

[2] Mr. Garrison's deposition that I'm showing you; have

[3] you seen this before?

[4]    A    Yes.

[5]    Q    Okay. And this is a management meeting

[6] and included crew leaders?

[7]    A    Yes.

[8]    Q    Did you go to that meeting, sir?

[9]    A    Yes.

[10]    Q    Okay. What was discussed then?

[11]    A    I cannot remember.

[12]    Q    Were there other crew leaders there?

[13]    A    I'm considering yes.

[14]         MR. BREWER:  Off the record.

[15]         (Whereupon, there was a discussion held

[16] off the record.)

[17] BY MR. BREWER:

[18]    Q    Mr. Walters, this is Exhibit 15 to

[19] Mr. Garrison's deposition that I'm showing you. The

[20] first page is a 2003 Christmas dinner invitation list;

[21] if you look under Mr. Lynch, is that your name --

[22] let's see, where are you here?  Roy Walters, you're

[23] not listed. You didn't go to this one?

[24]    A    No.

[25]    Q    Why?

Page 159

[1]    A    My name is not on there.

[2]    Q    How about 2001? Look at the last page.

[3] Sure, we know why you weren't there, right?

[4]    A    Yes.

[5]    Q    And why was that, just so the record is

[6] clear?

[7]    A    I was terminated.

[8]    Q    Right. '01, were you there?

[9]    A    Yes.

[10]    Q    Did you go to the Christmas dinner?

[11]    A    I only went to one; I can't remember

[12] whether it was '1 or '2.

[13]    Q    Okay. But the people who go to this

[14] Christmas dinner, these are all salaried people?

[15]    A    I make that assumption, yes.

[16]    Q    You didn't see any catchers there, did

[17] you --

[18]    A    No.

[19]    Q    -- people from your crew that got

[20] invited?

[21]    A    No.

[22]    Q    No forklift operators --

[23]    A    No.

[24]    Q    -- or live haul drivers?

[25]    A    No.

Page 160

[1]    Q    No, okay, all right.

[2]         MR. BREWER:  This is a good place to

[3] break.

[4]         (Whereupon, a short recess was taken.)

[5] BY MR. BREWER:

[6]    Q    I just have a few more questions, I

[7] think, Mr. Walters, to try to get you out on time. By

[8] the way, I'm still just a little curious, in 2001 when

[9] you became a crew leader --

[10]    A    Yes.

[11]    Q    -- you mentioned to me, before you went

[12] on salary --

[13]    A    Yes.

[14]    Q    -- that period of time, you had

[15] operated the forklift and got paid for doing it?

[16]    A    Yes.

[17]    Q    Okay. Is it true, sir, that you might

[18] have operated the forklift but not put your name down

[19] on it but, instead, put your son's name down on it as

[20] being the forklift operator?

[21]    A    Not at that time, no.

[22]    Q    But the other forklift operator?

[23]    A    Say that again.

[24]    Q    All right, what I'm saying is that you

[25] operated the forklift but didn't put your name down as

A-0103

Page 161

[ 1]    being the forklift operator; rather, put down the
[ 2]    forklift operator who was assigned to your crew?
[ 3]        A    At the beginning, at the beginning of
[ 4]    my crew leadership, when I operated the forklift, then
[ 5]    I put my name down and I was paid.  Then I was
[ 6]    informed that I could not be paid, but in that time
[ 7]    within a time limit, that I cannot come up and say
[ 8]    date, date, I was paid I'm quite sure more than once
[ 9]    for operating the forklift.
[10]        Q    Can you, to the best of your ability,
[11]    and I understand I'm asking you to go back, but how
[12]    long after you became a crew leader did they tell you
[13]    that you weren't going to be paid for operating the
[14]    forklift?
[15]        A    Approximately 90 days or better.
[16]        Q    That's fine, that's close enough.  Sir,
[17]    let me give you what's been marked as Exhibit Number
[18]    16 to Mr. Garrison's deposition, and what I'm going to
[19]    ask you to do is go to page 3 and look at number 23.
[20]    See where I am?
[21]        A    Yes.
[22]        Q    Okay.  It says that, "At all relevant
[23]    times herein, defendant followed and continues to
[24]    follow a corporate policy and/or practice that
[25]    requires -- required plaintiffs to submit a daily time

Page 162

[ 1]    sheet broken down for each day of the week."  Are the
[ 2]    time sheets that are being referred to here the time
[ 3]    sheets that you kept for the crew?
[ 4]        A    Yes.
[ 5]        Q    They were not time sheets that you were
[ 6]    required to keep for your hours, were they?
[ 7]        A    No.
[ 8]        Q    Let's go to paragraph 26, which is on
[ 9]    the next page.  And it talks about in essence here a
[10]    corporate policy or practice of making partial-day
[11]    deductions from your salary.  Since you have been on
[12]    salary, have you ever had your pay docked for taking
[13]    part of a day off?
[14]        A    No.
[15]        Q    Okay.
[16]        A    Never took a day off.
[17]        Q    Okay.  When you were off, though, on
[18]    disability, we had that information in there already.
[19]        A    Yes.
[20]        Q    So you have never needed to take a part
[21]    of a day off, like today when you need to leave at
[22]    3:15 to get your children?
[23]        A    I haven't got paid yet, don't know
[24]    whether I'm going to get docked or not.
[25]        Q    So this is then from the time you

Page 163

[ 1]    became a salaried crew leader until today, you have
[ 2]    never taken part of a day off?
[ 3]        A    No.
[ 4]        Q    Well, if you're not docked for today,
[ 5]    you wouldn't have been docked for a part of a day,
[ 6]    were you?
[ 7]        A    Yes.
[ 8]        Q    No, the answer is no, you wouldn't have
[ 9]    been docked part of the day?
[10]        A    Okay, okay, if you say that one.
[11]        Q    Well, I'm telling you when you get your
[12]    paycheck on Friday, you can certainly communicate with
[13]    Mr. Martin and let him know whether you have had part
[14]    of the day taken off.
[15]        A    Can't I call you?
[16]        Q    No, no, you can't.  Not now, anyway.
[17]    Maybe later.  Paragraph 27 talks about having your pay
[18]    reduced because of the quantity of work performed; has
[19]    your pay ever been docked, as far as you know, because
[20]    the quantity of your work wasn't up to par?
[21]        A    No.
[22]        Q    Okay.  You said you didn't take any
[23]    time off, so the last part of this charging time off
[24]    from normal working hours against vacation or sick
[25]    time, that's not happened to you?

Page 164

[ 1]        A    No.
[ 2]        Q    Okay.  I think we already covered the
[ 3]    fact that -- when it comes to your van, I gather you
[ 4]    operate a van?
[ 5]        A    Yes.
[ 6]        Q    Who bought the van?
[ 7]        A    I did.
[ 8]        Q    Okay, where did you buy it?
[ 9]        A    Mountaire.
[10]        Q    You bought it from Mountaire?
[11]        A    Yes.
[12]        Q    And when did you do that?
[13]        A    The day that they promoted me to crew
[14]    leader, they made available to me a company van to do
[15]    the job.
[16]        Q    That you could --
[17]        A    That I could purchase.
[18]        Q    That you could buy?
[19]        A    That I could purchase.
[20]        Q    Did you have to purchase that van?
[21]        A    Yes.
[22]        Q    You had to?
[23]        A    I couldn't do the job without it.
[24]        Q    Well, you could have bought a van
[25]    someplace else, couldn't you?

Page 165

[1]     A    Sure, but not as cheap as the one they

[2]   sold me.

[3]     Q    Okay, but you could have?

[4]     A    Yes.

[5]     Q    Sure, all right.  And we have already

[6]   talked about this $250 check that you said you're

[7]   receiving, that's for compensation for use of your

[8]   vehicle?

[9]     A    Yes.

[10]    Q    Okay.  The next item which will be

[11]  Number 7, let me show you this.

[12]         (Walters Exhibit 7, marked for

[13]  identification.)

[14]  BY MR. BREWER:

[15]    Q    Have you seen this before, sir?

[16]    A    Yes.

[17]    Q    Okay.  I know the copy didn't come

[18]  through completely clear, but does that appear to be

[19]  your signature on the page?

[20]    A    Yes, it is.

[21]    Q    Okay.  Do you know why you received

[22]  this?

[23]    A    No.

[24]    Q    You don't?  Okay.  Were your people

[25]  consistently taking 30 minutes for lunch?

Page 166

[1]     A    Yes.

[2]     Q    I mean as a crew leader, you were

[3]   making sure they took their half-hour for lunch,

[4]   weren't you?

[5]     A    No.

[6]     Q    You weren't?

[7]     A    No.

[8]     Q    Okay.  But this is reminding you that

[9]   you must make sure --

[10]    A    Yes.

[11]    Q    -- that they take a half-hour unpaid

[12]  lunch?

[13]    A    Yes.

[14]    Q    Okay.  Go to paragraph 34 of the

[15]  complaint, please.  This paragraph says, "Furthermore,

[16]  when defendant learned of plaintiffs' intentions to

[17]  seek counsel, defendant immediately retaliated against

[18]  plaintiffs, threatening plaintiffs with termination if

[19]  they continued to pursue these issues with counsel."

[20]  Were you threatened with termination if you continued

[21]  to pursue this lawsuit?

[22]    A    No.

[23]    Q    Next paragraph it says, "Many of the

[24]  plaintiffs are receiving/have received verbal

[25]  harassment and/or issued final warnings before

Page 167

[1]   termination in an attempt to threaten plaintiffs or

[2]   intimidate them from filing this action."  Have you

[3]   been verbally harassed by anybody because of filing

[4]   this lawsuit, sir?

[5]     A    Was some comments made.

[6]     Q    By whom?

[7]     A    By Mr. Doug Lynch.

[8]     Q    And what comments did Mr. Lynch make to

[9]   you and where?

[10]    A    In his office, he wanted to know if I

[11]  was going to go along with Willie Davis within this

[12]  issue.

[13]    Q    Okay, when was that?

[14]    A    Approximately February of 2004.

[15]    Q    Was anybody else present?

[16]    A    No.

[17]    Q    And is that what Mr. Lynch said to you,

[18]  he was asking if you were going to go along with it?

[19]    A    Yes.

[20]    Q    And what did you respond?

[21]    A    I was just coming back from medical

[22]  leave, I didn't know anything about it.

[23]    Q    Is that what you told Mr. Lynch?

[24]    A    Yes.

[25]    Q    Okay.  Anything else said during that

Page 168

[1]   conversation?

[2]     A    Not that I know of at the time, no.

[3]     Q    Okay.  Outside of this conversation

[4]   with Mr. Lynch, were there any other conversations

[5]   about this being harassed?

[6]     A    No.

[7]     Q    So no one else had a conversation with

[8]   you about this?

[9]     A    No.

[10]    Q    Okay.  Do you consider the conversation

[11]  you had with Mr. Lynch for harassment?

[12]    A    No.

[13]    Q    Okay.  Go to paragraph 36.  This says,

[14]  "Many of the plaintiffs have been cornered by various

[15]  management personnel and questioned individually

[16]  regarding their discussions with counsel and the

[17]  nature of this action."  Have you been cornered by

[18]  anybody from management?

[19]    A    No.

[20]    Q    Outside of Mr. Lynch's question to you,

[21]  have you been questioned by anybody from management

[22]  about this lawsuit?

[23]    A    No.

[24]    Q    Okay.  The next paragraph is 37, it

[25]  talks about apparently a meeting between the

A-0105

Page 169

[ 1]  plaintiffs and counsel, Mr. Martin on a Saturday

[ 2]  morning, and that plaintiffs recognized vehicle or

[ 3]  vehicles owned by the defendant upper management

[ 4]  personnel circling the parking lot of a diner; do you

[ 5]  know anything about that?

[ 6]        A    Yes.

[ 7]        Q    Okay, tell me what you know about that,

[ 8]  what did you see?

[ 9]        A    Just a vehicle from Mountaire.

[10]        Q    Who was driving it?

[11]        A    Could not recognize who was driving it.

[12]        Q    And what did you see?  What did this

[13]  vehicle from Mountaire do?

[14]        A    It circled the parking lot as we were

[15]  standing out.

[16]        Q    So it drove into the parking lot?

[17]        A    Yes.

[18]        Q    And then drove back out of the parking

[19]  lot?

[20]        A    Yes.

[21]        Q    And was that it?

[22]        A    Yes.

[23]        Q    Okay, you couldn't see who was driving?

[24]        A    No.

[25]        Q    Okay.  And the diner that is being

Page 170

[ 1]  referred to here, what's the name of that diner?

[ 2]        A    Doyle's.

[ 3]        Q    Okay, and is that someplace that's open

[ 4]  to the public for --

[ 5]        A    Yes.

[ 6]        Q    -- meals --

[ 7]        A    Yes.

[ 8]        Q    -- breakfast, lunch, dinner?

[ 9]        A    Yes.

[10]             MR. BREWER:  Okay, let's take a look at

[11]  these.

[12]             (Walters Exhibit Number 8, marked for

[13]  identification.)

[14]  BY MR. BREWER:

[15]        Q    Mr. Walters, these are tax returns that

[16]  you were asked to submit to us and which your counsel

[17]  did.  I have got a couple of questions on these, if

[18]  you don't mind.  The first one is your tax return for

[19]  the year 2000; now at this time, you were a forklift

[20]  operator, is that correct?

[21]        A    Except for the last three months of the

[22]  year.

[23]        Q    I thought you became a crew leader in

[24]  '01?

[25]        A    I didn't calculate 2000; I considered I

Page 171

[ 1]  was still under the Union law at that time.

[ 2]        Q    Well, when did you become a crew

[ 3]  leader?

[ 4]        A    It should have been, according to my

[ 5]  papers here, between October and November of 2000.

[ 6]             MR. MARTIN:  Off the record a moment.

[ 7]             MR. BREWER:  Sure.

[ 8]             (Whereupon, there was a discussion held

[ 9]  off the record.)

[10]  BY MR. BREWER:

[11]        Q    The documents will obviously speak for

[12]  themselves.  The wages, tips, and salary you got,

[13]  according to this document, in 2000 were 32,999.61?

[14]        A    That's correct, yes.

[15]        Q    Now, at the bottom where you sign it,

[16]  you checked the box that said you're self employed;

[17]  when were you self employed?

[18]        A    That's not my check.

[19]        Q    That's not your check?

[20]        A    No, that's Miss Kay Tingle.

[21]        Q    Did you sign this document like this

[22]  and submit it to the Internal Revenue Service?

[23]  Because the one I have does not have your signature or

[24]  date.

[25]        A    No.

Page 172

[ 1]        Q    So this is not your formal tax return

[ 2]  then for the year 2000?

[ 3]        A    Yes, this is my tax paper, was done,

[ 4]  like I say, you see the name there, Miss Kay Tingle

[ 5]  and Associates, she did my taxes for me.

[ 6]        Q    And she's checking that you're self

[ 7]  employed?

[ 8]        A    Well, that's something that bypassed

[ 9]  me, I didn't know.

[10]        Q    Okay.  But you were not self employed?

[11]        A    No.

[12]        Q    Okay.  And the next part of your tax

[13]  return is profit or loss from a business, you see

[14]  that?  This is again for the year 2000, you see the

[15]  page I have?  It says Profit or Loss From Business.

[16]        A    Yeah, okay.

[17]        Q    Okay.  Now this lists your principle

[18]  business, it says poultry weighmaster, whose writing

[19]  is this?

[20]        A    Miss Kay Tingle's.

[21]        Q    How did she write that down?

[22]        A    I could not tell you, sir, I don't

[23]  know.

[24]        Q    When you go to Miss Tingle, when you

[25]  went to Miss Tingle, did you talk to her about what

A-0106

Page 181

[ 1]              (Whereupon, a short recess was taken.)
[ 2] BY MR. BREWER:
[ 3]      Q    I just have one or two more questions
[ 4] for you, Mr. Walters, and then I think we're going to
[ 5] be done.
[ 6]      A    Okay.
[ 7]      Q    Since you have been a crew leader, can
[ 8] you tell me what you think your strongest virtue is,
[ 9] if you will?  What are you best at as being a crew
[10] leader?
[11]      A    What am I best at?
[12]      Q    Yes.  What do you think you're best at
[13] in your job as a crew leader?
[14]      A    Wanting to get the job done.
[15]      Q    Wanting to or doing it?
[16]      A    Both.
[17]      Q    Okay.  So wanting to get the job done
[18] is you think probably your strongest point?
[19]      A    Yes.
[20]      Q    And then getting it done --
[21]      A    Yes.
[22]      Q    -- regardless of what it takes to get
[23] it done --
[24]      A    Yes.
[25]      Q    -- what problems you face or things

Page 182

[ 1] like that?
[ 2]      A    Yes.
[ 3]              MR. BREWER:  Okay, I don't believe I
[ 4] have any further questions for you, Mr. Walters.  I'd
[ 5] like to thank you for coming and thank you for your
[ 6] answers.
[ 7]              MR. MARTIN:  I have a few questions.
[ 8]              MR. BREWER:  Okay.
[ 9] BY MR. MARTIN:
[10]      Q    Roy, let me take you back to that
[11] parking lot at Doyle's when you observed a Mountaire
[12] vehicle circling the parking lot, is that correct?
[13]      A    Yes.
[14]      Q    How close were you to the vehicle in
[15] question when it came and circled the lot?
[16]      A    To do an estimate, I'm going to say
[17] anywhere from 45 to 60 feet from the vehicle.  I was
[18] standing in between two other vehicles when it came
[19] through.
[20]      Q    Do you know the name of the driver?
[21]      A    No.
[22]      Q    Do you know whether he was employed by
[23] Mountaire?
[24]      A    Not exactly, no.
[25]      Q    What do you mean by not exactly?

Page 183

[ 1]      A    He was dressed appropriately in a suit,
[ 2] I ain't going to say suit and tie; shirt and tie.
[ 3]      Q    What day of the week was this, do you
[ 4] remember?
[ 5]      A    Saturday.
[ 6]      Q    Was Mountaire open for business that
[ 7] day?
[ 8]      A    No.
[ 9]      Q    Did you make any type of identification
[10] of this person, maybe not by name, but by job title at
[11] Mountaire?
[12]              MR. BREWER:  I'm going to object, he
[13] already said he didn't know who the person was.
[14]              THE WITNESS:  Could you repeat that?
[15]              MR. MARTIN:  Yes.  Pam, could you read
[16] that back for me, please?
[17]              (Whereupon, the pertinent part of the
[18] record was read.)
[19]              THE WITNESS:  Only through the
[20] eyewitness of another gentleman that was there.
[21] BY MR. MARTIN:
[22]      Q    Okay.  To the best of your knowledge,
[23] somebody else identified this man?
[24]      A    Yes.
[25]      Q    Okay.  And who was that, who identified

Page 184

[ 1] him?
[ 2]      A    Let me see now, I don't want to lie.
[ 3]      Q    Do you recall?
[ 4]      A    No.
[ 5]      Q    Do you recall who the identity was that
[ 6] that person related to you?
[ 7]      A    No, I can't name position, position,
[ 8] position.  The gentleman that is in charge of farm
[ 9] problems, that's the best of my recollection at the
[10] time.  That's -- the gentleman related back to me was
[11] his position that he took care of things that go wrong
[12] as far as live haul was concerned.
[13]      Q    All right.  Now, you're not referring
[14] to Mr. Lynch?
[15]      A    No.
[16]      Q    And you're not referring to Mr. Owen?
[17]      A    No.
[18]      Q    Do you know whether this gentleman may
[19] have worked for either one of these gentlemen?
[20]      A    Not that I can put a yes to.
[21]      Q    Okay.  All right.  Now, let me direct
[22] your attention to Exhibit 7, if you could put that in
[23] front of you again, please.  Please take a moment,
[24] however much time you need, to read through that.
[25]      A    Uh-huh.  Yes, I understand it.

A-0107

Page 185

[ 1]     Q    All right. There's a mention of
[ 2] Mr. Nuse and Mr. Al Z., do you see that in this
[ 3] paragraph?
[ 4]     A    Yes.
[ 5]     Q    Were they the gentlemen who came and
[ 6] delivered this to you?
[ 7]     A    Yes.
[ 8]     Q    And up on the top it says Final
[ 9] Warning, do you see that?
[10]     A    Yes.
[11]     Q    Had you received any warning prior to
[12] this final warning?
[13]     A    No.
[14]     Q    This was your first warning?
[15]     A    Yes.
[16]     Q    And what was threatened if you violated
[17] this company policy?
[18]     A    As it state, that I could be
[19] terminated.
[20]     Q    Now, I know this copy is a little
[21] difficult to read, the signed portion --
[22]     A    Yes.
[23]     Q    -- where you have signed and the other
[24] two gentlemen have signed; are you able to make out
[25] the date maybe next to your name?

Page 186

[ 1]     A    3rd month, 2nd day, '04.
[ 2]     Q    Okay. Now, in terms of the timing of
[ 3] this final warning that was issued to you, was this
[ 4] before or after you or your attorneys put Mountaire on
[ 5] notice of your claim for overtime?
[ 6]     A    After.
[ 7]         MR. MARTIN:  Thank you, I have nothing
[ 8] further.
[ 9] BY MR. BREWER:
[10]     Q    In view of those questions, I have a
[11] few for you, Mr. Walters. The car you saw you said
[12] was at Doyle's was a car owned by Mountaire?
[13]     A    Yes.
[14]     Q    Okay. The people who have company cars
[15] can use them for their own personal business, can't
[16] they?
[17]     A    I can't give you a yes or no on that, I
[18] don't know.
[19]     Q    You don't know?
[20]     A    No.
[21]     Q    Well, let me ask you this:  The plant
[22] was not working on the Saturday that the car came
[23] through, you said that, you knew that?
[24]     A    Yes.
[25]     Q    Okay. If the plant wasn't working,

Page 187

[ 1] then the person driving the car probably wasn't
[ 2] working either, was he?
[ 3]         MR. MARTIN:  Objection.
[ 4]         THE WITNESS:  I wouldn't know the
[ 5] answer to that.
[ 6] BY MR. BREWER:
[ 7]     Q    You wouldn't know the answer to that
[ 8] either?
[ 9]     A    No.
[10]     Q    Okay. Did you feel harassed by the
[11] fact that this guy drove through the parking lot and
[12] came out the other end?
[13]     A    Not personally, no.
[14]     Q    Okay. And you're sure it was a
[15] Mountaire car?
[16]     A    Yes.
[17]     Q    Let's go through the warning that you
[18] got. You're aware that the catchers filed a lawsuit
[19] against the company, are you not?
[20]     A    Yes.
[21]     Q    Okay. In fact, I met with you and a
[22] number of other crew leaders about that, didn't I?
[23]     A    Yes.
[24]     Q    Sure. And you know the reason that
[25] they had filed the lawsuit was that they were working

Page 188

[ 1] through their lunch period but weren't being paid for
[ 2] it, isn't that true?
[ 3]     A    Somewhat. From my recollection of it,
[ 4] it could be, yes.
[ 5]     Q    Right, right. And you testified
[ 6] earlier that you weren't always making sure that your
[ 7] catchers got their 30-minute lunch period?
[ 8]     A    True, yes.
[ 9]     Q    And this was just a reminder to you and
[10] to all the crew leaders that these people had to get
[11] it, I mean there had just been a lawsuit over that?
[12]     A    Considerably, yes.
[13]     Q    Yes, okay.
[14]         MR. BREWER:  That's all. Thanks, I
[15] don't have anything further.
[16]         MR. MARTIN:  Nothing further.
[17]         (Whereupon, presentation, reading, and
[18] signature to the deposition were waived.)
[19]
[20]
[21]
[22]
[23]
[24]
[25]

A-0108

# EMPLOYEE WARNING NOTICE
## *NOTIFICACION DE ADVERTENCIA AL EMPLEADO*

DATE/ *FECHA:* 4 / 23 / 04

NAME/ *NOMBRE:* Leon Tucker

SOCIAL SECURITY NUMBER/ *NUMERO DE SEGURO SOCIAL:* 222 - 50 - 8800

DEPARTMENT/ *DEPARTAMENTO:* Line Haul

DATE OF HIRE/ *FECHA DE CONTRATACION:* ___ / ___ / ___

COMPANY POLICY/ *POLITICA DE LA COMPANIA:* call, if not working

VIOLATION/ *VIOLACION:* No call and no show

ACTION/ *ACCION:*    ORAL    1ST/ *PRIMERA*    2ND/ *SEGUNDA*    (FINAL)

3 days off

I have read this warning and understand the above violation. I understand that disregard of company policies could result in disciplinary action up to and including discharge./ *He leído la violación mencionada. Entiendo que faltar a las políticas de la compañía puede resultar en acción disciplinaria que podría indlcuir el despido.*

_____
Employee's Signature/ *Firma del empleado*

Cory Walters
_____
Supervisor/ Foreman Signature

_____
Human Resources Manager's Signature

Date/ *Fecha*

4-23-04
_____
Date

_____
Date

Walters
Ex. # 2
paw 2/15/05

A-0109

# EMPLOYEE WARNING NOTICE
## *NOTIFICACION DE ADVERTENCIA AL EMPLEADO*

DATE/ *FECHA:* 4 / 21 / 04

NAME/ *NOMBRE:* Richard Satchell

SOCIAL SECURITY NUMBER/ *NUMERO DE SEGURO SOCIAL:* 222 - 52 - 8559

DEPARTMENT/ *DEPARTAMENTO:* Line haul

DATE OF HIRE/ *FECHA DE CONTRATACION:* ___ / ___ /

COMPANY POLICY/ *POLITICA DE LA COMPANIA:* call, if not working - No time to fine someone call late after 10 P.m.

VIOLATION/ *VIOLACION:* Call to late

ACTION/ *ACCION:*    ORAL    1ST/ *PRIMERA*    (2ND/ *SEGUNDA*)    FINAL

one day off

I have read this warning and understand the above violation. I understand that disregard of company policies could result in disciplinary action up to and including discharge./ *He leído la violación mencionada. Entiendo que faltar a las políticas de la compañía puede resultar en acción disciplinaria que podría inclcuir el despido.*

Employee's Signature/ *Firma del empleado*

Date/ *Fecha*

Supervisor/ Foreman Signature

4-20-04
Date

Human Resources Manager's Signature

Date

A-0110

## EMPLOYEE WARNING NOTICE
## *NOTIFICACION DE ADVERTENCIA AL EMPLEADO*

NAME/ *NOMBRE:* Leon Tucker                DATE/ *FECHA:* 4 / 19 / 04

SOCIAL SECURITY NUMBER/ *NUMERO DE SEGURO SOCIAL:* 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

DEPARTMENT/ *DEPARTAMENTO:* Line Haul

DATE OF HIRE/ *FECHA DE CONTRATACION:* 21  1  03

COMPANY POLICY/ *POLITICA DE LA COMPANIA:* Call Supervisor
if not working

VIOLATION/ *VIOLACION:* 3rd Violation

ACTION/ *ACCION:*      ORAL      1ST/ *PRIMERA*      2ND/ *SEGUNDA*      FINAL

I have read this warning and understand the above violation. I understand that disregard of company policies could result in disciplinary action up to and including discharge./ *He leido la violación mencionada. Entiendo que faltar a las políticas de la compañía puede resultar en acción disciplinaria que podria indicuir el despido.*

Employee's Signature/ *Firma del empleado*

_____
Supervisor/ Foreman Signature

Date/ *Fecha*

_____
Date  4 19-04

_____
Human Resources Manager's Signature

_____
Date

A-0111

# EMPLOYEE WARNING NOTICE
## NOTIFICACION DE ADVERTENCIA AL EMPLEADO

DATE/ *FECHA:* 4 / 19 / 04

NAME/ *NOMBRE:* Edward Massey

SOCIAL SECURITY NUMBER/ *NUMERO DE SEGURO SOCIAL:* 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

DEPARTMENT/ *DEPARTAMENTO:* Line haul

DATE OF HIRE/ *FECHA DE CONTRATACION:* ___/___/___

COMPANY POLICY/ *POLITICA DE LA COMPANIA:* Call supervisor if not working

VIOLATION/ *VIOLACION:* Violation #2

ACTION/ *ACCION:*        ORAL        1ST/ *PRIMERA*        2ND/ *SEGUNDA*        FINAL

I have read this warning and understand the above violation. I understand that disregard of company policies could result in disciplinary action up to and including discharge./ *He leido la violación mencionada. Entiendo que faltar a las políticas de la compañía puede resultar en acción disciplinaria que podría indlcuir el despido.*

Employee's Signature/ *Firma del empleado*

Supervisor/ Foreman Signature

Date/ *Fecha*

4-19-04
Date

Human Resources Manager's Signature

Date

A-0112

# EMPLOYEE WARNING NOTICE
## NOTIFICACION DE ADVERTENCIA AL EMPLEADO

DATE/ FECHA: 2 / 13 / 04

NAME/ NOMBRE: Leon Tucker

SOCIAL SECURITY NUMBER/ NUMERO DE SEGURO SOCIAL: 222 - 50 - 8800

DEPARTMENT/ DEPARTAMENTO: Line haul

DATE OF HIRE/ FECHA DE CONTRATACION: 1 1 — 03

COMPANY POLICY/ POLITICA DE LA COMPANIA: Notify supervisor if not working

VIOLATION/ VIOLACION: Did not notify supervisor that he was not working 1-23-04 and 2-13-04

ACTION/ ACCION:    ORAL    1ST/ PRIMERA    2ND/ SEGUNDA    FINAL

1 day off    2-16-04

I have read this warning and understand the above violation.  I understand that disregard of company policies could result in disciplinary action up to and including discharge./ He leído la violación mencionada.  Entiendo que faltar a las políticas de la compañía puede resultar en acción disciplinaria que podría indicuir el despido.

Employee's Signature/ Firma del empleado

Date/ Fecha

Supervisor/ Foreman Signature

2 - 16 - 04
Date

Human Resources Manager's Signature

Date

A-0113

# EMPLOYEE WARNING NOTICE
## NOTIFICACION DE ADVERTENCIA AL EMPLEADO

DATE/ FECHA: 2 / 6 / 04

NAME/ NOMBRE: Bernie Johnson

SOCIAL SECURITY NUMBER/ NUMERO DE SEGURO SOCIAL: __ __ __

DEPARTMENT/ DEPARTAMENTO: Line haul

DATE OF HIRE/ FECHA DE CONTRATACION: ___/___/___

COMPANY POLICY/ POLITICA DE LA COMPANIA:
Notify Supervisor if not working

VIOLATION/ VIOLACION: said he was driving to
farm, but did not show

ACTION/ ACCION:    (ORAL)    1ST/ PRIMERA    2ND/ SEGUNDA    FINAL

none taking at this time

I have read this warning and understand the above violation. I understand that disregard of company policies could result in disciplinary action up to and including discharge./ He leido la violación mencionada. Entiendo que faltar a las políticas de la compañia puede resultar en acción disciplinaria que podría indlcuir el despido.

Employee's Signature/ Firma del empleado

Cory Watters

Supervisor/ Foreman Signature

Date/ Fecha
2-9-04
Date

Human Resources Manager's Signature

Date

A-0114