COPY

# Transcript of the Testimony of
# Larry E. Gibbs

**Date:** January 20, 2005
**Volume:** 1

Printed On: January 31, 2005

Zeve Reporting & Videoconferencing
11032 Nicholas Lane
Suite A201
Berlin, Maryland  21811
Phone: (410)208-4566
Fax: (410)208-4767
Email: info@kathyzeve.com
Internet: www.zevereporting.com

A-0115

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 1

1                 UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4    WILLIE DAVIS, JR., et al.,          *

5                                        *

6                 Plaintiffs,            *

7            v.                          *    Civil Action No.

8    MOUNTAIRE FARMS, INC., et al.,      *    04-414

9                                        *

10                Defendants.            *

11            *      *      *      *      *      *      *

12

                      Georgetown, Delaware

13

14                 Thursday, January 20, 2005

15

     Deposition of:

16

                   LARRY E. GIBBS

17

             a witness, called for examination by Counsel for

18   Defendants, pursuant to notice, taken at the Law Offices of

     Young, Conaway, Stargatt & Taylor, 110 West Pine Street,

19   Georgetown, Delaware, commencing at 10:05 a.m., before Kathy

     A. Zeve, a Notary Public and Registered Professional

20   Reporter in and for the State of Delaware, when were present

     on behalf of the respective parties:

21

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 26

1    A    She works at Wesley Day Care.
2    Q    Okay. And what does she do?
3    A    She's a child provider. She takes care of -- she
4    works in the day care.
5    Q    Child care for preschool type children?
6    A    Yes.
7    Q    Okay. That's fine. What did your father do, sir?
8    A    Sorry. I didn't hear you.
9    Q    What occupation did your father have?
10    A    None.
11    Q    None?
12    A    No. He's 85. He's retired. You said my father?
13    Q    That's great. Before he retired, what did he do?
14    A    He worked at Townsend. It was at Millsboro.
15    Q    The Townsend plant?
16    A    The Townsend plant in Millsboro.
17    Q    What did he do there?
18    A    He was a cleanup.
19    Q    On the sanitation crew?
20    A    Sanitation crew, yes.
21    Q    Do you have any brothers and sisters?

Page 27

1    A    Yes, I do.
2    Q    Can you tell me how many brothers you have?
3    A    Five.
4    Q    Okay. Are they all still alive?
5    A    Yes.
6    Q    Okay. What do -- what do they do?
7    A    All of them work in the poultry industry.
8    Q    Okay. Where do you fit? Are you the oldest, the
9    youngest or in the middle someplace?
10    A    I'm the fourth.
11    Q    You're the fourth?
12    A    The fourth, yeah.
13    Q    So then there are three other brothers who are
14    older than you. Are they still working in the poultry
15    industry?
16    A    Two brothers are older than me and two brothers
17    younger than me.
18    Q    That makes sense. The ones who are older than you
19    working in the poultry industry today --
20    A    Yes.
21    Q    -- where do they work?

Page 28

1    A    Mountaire.
2    Q    How about the brothers who are younger than you?
3    A    One of them works at Mountaire, the other two work
4    at Perdue.
5    Q    The other one, right?
6        MR. MARTIN: He said five he had brothers.
7    BY MR. BREWER:
8    Q    He's the middle one?
9    A    I have four brothers.
10    Q    The older two --
11    A    I'm sorry. I do have five brothers. Let's see.
12    I do have five brothers.
13    Q    Two work at -- the older two work at Mountaire?
14    A    Mountaire.
15    Q    You work at Mountaire, that's three, and the
16    younger two --
17    A    Work at Perdue.
18    Q    The brothers who work at Mountaire, what do they
19    do?
20    A    One operates the forklift, George.
21    Q    George is your brother?

Page 29

1    A    Yes.
2    Q    And he operates the forklift. He's on the
3    catching crew, then?
4    A    Yes.
5    Q    Whose crew's he on?
6    A    My crew.
7    Q    He's on your crew. How about the other brother
8    who works at Mountaire?
9    A    Is on my crew also.
10    Q    Okay. What's his first name?
11    A    James.
12    Q    Do you have any sisters?
13    A    I have five sisters.
14    Q    Okay. Are they employed?
15    A    One is decreased. Yes, the other four is
16    employed.
17    Q    Where do they work?
18    A    I'm not sure. I'm not sure. One of them works in
19    day care, I know.
20    Q    Okay.
21    A    One is an L.P.N. I have a sister in Wilmington, I

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 30

1   don't know what she works.
2   Q  But they don't work in the poultry industry?
3   A  No.
4   Q  Okay. All right, sir. Do you have any dependants
5   outside of your wife?
6   A  Yes, one daughter.
7   Q  Okay. And how old is she?
8   A  Fifteen.
9   Q  Okay. Is she in school?
10   A  Yes.
11   Q  Okay. Is that the only other dependant outside of
12   your wife that you have is your daughter?
13   A  That is the only one.
14   Q  Okay. Do you attend church on a regular basis,
15   sir?
16   A  No.
17   Q  Okay. What is the highest level of education that
18   you've achieved?
19   A  Eleventh grade of high school.
20   Q  And what school was that at?
21   A  William C. Jason.

Page 31

1   Q  William C. Jason. How would I classify that, is
2   that a high school or middle school?
3   A  It was a high school. It's Delaware Tech now in
4   Georgetown.
5   Q  Okay. I know where that is, that was a high
6   school. Let me ask you this. Do you have any
7   certifications or licenses like for a forklift or a CDL
8   license or anything like that?
9   A  No.
10   Q  Okay. And I believe you told me that your mental
11   health is good, and there's no issue there that would impact
12   on your testimony here today?
13   A  No.
14   Q  Okay. When were you first employed with the
15   company, sir?
16   A  May 9th, 1994.
17   Q  Okay. 5/9, you said, the 9th May?
18   A  The 9th of May, 1994.
19   Q  Okay. And prior to work -- coming to work for
20   Mountaire, where did you work?
21   A  Hudson Food.

Page 32

1   Q  Hudson, okay. And how long did you work there?
2   A  For three years.
3   Q  And what job did you have there?
4   A  I was a crew leader there.
5   Q  You were a crew leader for Hudson. And prior to
6   Hudson?
7   A  Allen's.
8   Q  Allen's where?
9   A  In Harbeson, Delaware.
10   Q  In Harbeson?
11   A  Uh-huh.
12   Q  Okay. And what job did you have there?
13   A  Crew leader also. I was a crew leader there.
14   Q  And how long were you there?
15   A  Seventeen years.
16   Q  Okay. Can you tell me why you left Allen's and
17   went to Hudson?
18   A  For better pay.
19   Q  Okay. So you were a crew leader at Allen's of
20   Harbeson and also a crew leader at Hudson. Did you -- when
21   Hudson was bought out by Tyson, did you work for Tyson at

Page 33

1   all?
2   A  No.
3   Q  That happened -- you left Hudson to come to
4   Mountaire?
5   A  Yes.
6   Q  Okay. When you were at Hudson as a crew leader,
7   were you, if you know, employed by Hudson or were you
8   considered an independent contractor?
9   A  Independent contractor.
10   Q  Okay. So you while you were at Hudson, were used
11   on a contract basis?
12   A  Yes.
13   Q  How many people did you have in your crew when you
14   were at Hudson?
15   A  Oh, I had eight catchers at Hudson, I think, yes,
16   eight.
17   Q  You did not, while you were at Hudson, receive any
18   benefits from the company, did you?
19   A  No.
20   Q  And by that I mean, any medical insurance, paid
21   holidays, paid vacation or anything like that, did you?

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 34

1    A    No.
2    Q    Nothing like that. And while you were at Allen's
3    in Harbeson for those 17 years, how many people did you have
4    in your crew roughly?
5    A    Nine.
6    Q    About nine, okay. And you were considered a
7    contractor at Allen's also, weren't you?
8    A    Yes. Yes.
9    Q    And from Allen's, you didn't receive any benefits,
10   any medical insurance or paid holidays or paid vacation or
11   anything along those lines, did you?
12   A    No.
13   Q    Okay. And you were in charge of the crews that
14   you had at Hudson and at Allen's?
15   A    Yes.
16   Q    Okay. Since you've become employed with Mountaire
17   in '94, have you had any break in service?
18   A    No.
19   Q    Okay. When you first came to Mountaire, did you
20   come to them as a crew leader?
21   A    Yes.

Page 35

1    Q    Mr. Gibbs, your job as a crew leader at Mountaire,
2    are you basically responsible for managing that crew?
3    A    I'm not sure what mean.
4    Q    Okay. Are you the person in charge of the crew?
5    I'll put it that way.
6    A    Yes.
7    Q    Okay. Similar to the way you were in charge of
8    the crew when you worked for Hudson and Allen's, it was your
9    crew and you told them where to go and what to do and things
10   like that?
11   A    Yes.
12   Q    How many employees are in your crew now at
13   Mountaire?
14   A    Eight.
15   Q    You have eight?
16   A    Yes.
17   Q    Does that include the forklift operator?
18   A    No, it doesn't.
19   Q    So eight plus a forklift. Okay. When you worked
20   at Hudson, the catchers who worked for you were not
21   unionized, were they?

Page 36

1    A    No.
2    Q    And the same is also true of Allen's, isn't it?
3    A    (Witness nods.)
4    Q    Now, at Mountaire the employees are unionized, are
5    they not?
6    A    Yes.
7    Q    Okay. And they're covered by a union contract?
8    A    Yes.
9    Q    And that contract does not apply to you, does it?
10   A    No.
11   Q    Okay. The forklift operator, who is the forklift
12   operator who's in your crew now?
13   A    George Feddiman.
14   Q    George Feddiman. The same Mr. Feddiman who's
15   listed as a Plaintiff in this lawsuit?
16   A    Yes.
17   Q    And how long has Mr. Feddiman been your forklift
18   operator approximately?
19   A    Twenty years.
20   Q    He's been the forklift operator on your crew for
21   20 years?

Page 37

1    A    Yes.
2    Q    Just to be clear, when I asked you about meetings
3    that you had with Mr. Martin and so forth, you mentioned
4    that he was there. Was Mr. Feddiman ever a crew leader?
5    A    Yes.
6    Q    Okay. When, if you know, did he stop becoming a
7    crew leader?
8    A    I don't know.
9    Q    Okay. Is he related to you in any way?
10   A    He's my brother.
11   Q    Mr. Feddiman's your brother?
12   A    Yes.
13   Q    Okay. So now, can you tell me why he has a
14   different last name, I guess, would be my first question?
15   A    No.
16   Q    You don't know why he has a different last name
17   than you do?
18   A    Yes. He has my -- my mother's last name is
19   Feddiman. My father is Gibbs.
20   Q    And he chose your mother's last name for his name?
21   A    He didn't, no.

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 42

1    Q    Yes.
2    A    Yes.
3    Q    Okay. Who was your forklift operator after
4    Mr. Feddiman left the second time?
5    A    Antonio Waters.
6    Q    Antonio, what, please?
7    A    Waters.
8    Q    And after Mr. Waters?
9    A    Mr. Feddiman came back.
10    Q    Mr. Feddiman came back. And did he leave a second
11    time?
12    A    No.
13    Q    So you started out with him as your forklift
14    operator, then there came a time when he left and Mr. Betey
15    came in?
16    A    Yes.
17    Q    Then there came a time when Mr. Betey left and
18    Mr. Feddiman came back?
19    A    Yes.
20    Q    And then we have Mr. Waters and Mr. Feddiman, and
21    Mr. Feddiman is still your forklift operator today?

Page 43

1    A    Yes.
2    Q    When Mr. Betey became a forklift operator, had he
3    been on your crew before?
4    A    No.
5    Q    He hadn't been on your crew?
6    A    No.
7    Q    Had he been a catcher before, if you know?
8    A    Not that I know, no.
9    Q    Had he been employed with Mountaire, if you know?
10    A    Yes.
11    Q    He had been employed with Mountaire, but you don't
12    know in what job?
13    A    Forklift operator.
14    Q    He had been a forklift operator?
15    A    Yes.
16    Q    But for another crew?
17    A    Yes.
18    Q    How about Mr. Walters, when he became a forklift
19    operator, had he been on your crew?
20    A    Yes.
21    Q    Okay. And how did he come to be a forklift

Page 44

1    operator?
2    A    He was one of my catchers, and he -- and learned
3    how to operate the forklift. He got an opportunity when
4    Mr. Feddiman left.
5    Q    And did you recommend him for that job?
6    A    I can't remember.
7    Q    You say he got some training on the forklift. Who
8    provided the training?
9    A    I guess Mountaire did, or while we were working,
10    he would train.
11    Q    And who was responsible for watching all of his
12    training?
13    A    I was.
14    Q    Okay. So did you have any input into whether or
15    not he should get the job as a forklift operator?
16    A    No.
17    Q    You had none. If you thought he wasn't training
18    properly, wouldn't you say something to somebody?
19    A    I'm sorry. When you said, did I have any input?
20    Q    Yeah, into him becoming a forklift operator.
21    A    I don't understand.

Page 45

1    Q    All right. Did you have a say in it? Did you say
2    to anybody in the company, Waters is doing a good job. This
3    guy ought to be a forklift operator?
4    A    No. I didn't say that.
5    Q    What did you say to anybody?
6    A    I was asked --
7    Q    Okay.
8    A    -- how was he doing.
9    Q    By whom?
10    A    I think Mr. Lynch asked me.
11    Q    And what did you say?
12    A    I said, he was doing well.
13    Q    Okay. So you advised Mr. Lynch based on the fact
14    that you were observing Mr. Waters that he was doing well?
15    A    Yes.
16    Q    Okay. And he subsequently became, then, a
17    forklift operator?
18    A    Yes.
19    Q    And a forklift operator is a step above a catcher,
20    isn't he?
21    A    His pay scale is, yes.

12 (Pages 42 to 45)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 46

1    Q    So it's pretty much considered a promotion, isn't
2    it?
3    A    I wouldn't say that.
4    Q    He's making more money?
5    A    (Witness nods.)
6    Q    And you wouldn't consider that a promotion?
7    A    If you say making more money is a promotion, then
8    I guess it would be.
9    Q    Okay.  Let's just cover a couple of things in your
10   position now as a crew leader and since you -- basically
11   since you started.  You are -- you have responsibilities,
12   and we just discussed some of them a little bit with respect
13   to training the people on your crew, isn't that true?  You
14   have to answer yes or no for the court reporter.
15          MR. MARTIN:  Objection.  He can answer yes or no
16   or say he doesn't understand the question.
17   BY MR. BREWER:
18   Q    I thought he was nodding his head.  He was shaking
19   his head, yes, and that's why I said what I said.
20   A    I was thinking, really.  I wasn't --
21   Q    I didn't mean to misinterpret your nodding.

Page 47

1    A    Okay.  Could you repeat the question?
2    Q    Sure.  You have responsibilities as a crew leader
3    for training the people on your crew; isn't that right?
4    A    I never had to train any people in my crew, so --
5    Q    Has your crew remained constantly intact since
6    1994, the same people all the time?
7    A    No.
8    Q    You've had new catchers come into your crew,
9    haven't you?
10   A    Yes.
11   Q    Okay.  Who taught them the ropes?
12   A    They were always experienced catchers.
13   Q    Okay.  So you had no -- didn't have to tell them
14   anything?
15   A    Of course, by being a crew leader, I have to tell
16   them something.  But not training them, no.
17   Q    When you say you had to tell them something, what
18   would you tell them?
19   A    Oh, explain that, please.
20   Q    I just want to know what you would tell a new
21   catcher who comes to your crew.  What do you tell the

Page 48

1    person?
2    A    Just our procedures and stuff.
3    Q    Such as what?
4    A    How to set the house up and prepare for the
5    catching and everything.
6    Q    Okay.  So you tell them how to set the house up.
7    And what else?
8    A    That's about it basically.  Besides catching and
9    keeping the chickens from smothering themselves and that
10   sorts.
11   Q    You tell them that, you tell them what they should
12   do to make sure that the chickens don't gather in a corner
13   and smother themselves, you tell them about that, correct?
14   A    If I can go back.  Like I said, all the catchers I
15   have have experience, been doing it for 20 some years, so
16   basically they know all the stuff.  I don't have to tell
17   them.
18   Q    But that may be.  But I guess what I'm trying to
19   find out is, when a new catcher is coming to your crew, what
20   do you say to him?
21          MR. MARTIN:  Objection.  Asked and answered.

Page 49

1    BY MR. BREWER:
2    Q    It hasn't been answered.  He's basically saying
3    they've all been experienced.  I need to know what you tell
4    these people when they first come to your crew.  That's all
5    I want to know.  You told me you tell them how to set the
6    house up.  You also told me you tell them how to move the
7    birds in such a way as they don't smoother themselves.  I
8    want to know what else?  That's all.
9    A    That's about it.
10   Q    Okay.  You tell them if they get half an hour for
11   lunch?
12   A    That too, yes.
13   Q    You tell them that.  Okay.  Excuse me a second.
14   Your brother, James, can you tell me, if you know, when he
15   started working for the company?
16   A    Hired the same time as I was, May 9th, 1994.
17   Q    So he came over with you and Mr. Feddiman and
18   James.  The three of you came over together?
19   A    Yes.
20   Q    And he was hired as a, what, did you say?
21   A    Catcher.

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 50

1    Q    He's a catcher?
2    A    Yeah.
3    Q    Okay. All right. Now, when you're on the farm,
4    whatever farm it happens to be and you're there with your
5    crew, you're the one who basically directs that crew; isn't
6    that correct?
7    A    Yes.
8    Q    Okay. When you first get to a farm, depending on
9    the type of house it is, you're the guy who figures out how
10   we're going to catch the chickens in this house, correct?
11   A    Yes.
12   Q    Okay. And there are a lot of different techniques
13   that can be used in catching chickens; isn't that true?
14   A    There's a few, yes.
15   Q    And that will depend on the house to some extent?
16   A    It may also depend on the size of the bird to some
17   extent. Yes.
18   Q    And you are the one who's involved in deciding how
19   we're going to go about catching the chickens in this
20   particular house depending on those circumstances?
21   A    Yes.

Page 51

1    Q    Do you have as a crew leader any responsibility
2    for the safety of your crew?
3    A    Yes.
4    Q    Okay. Tell me what that responsibility entails.
5    A    Just making sure all the equipment and stuff
6    inside the chicken house that we catching is out of the way.
7    Q    This is for the safety of your people?
8    A    Yes.
9    Q    So you're responsible for making sure that that's
10   taken care of?
11   A    (Witness nods.)
12   Q    And how do you fulfill that responsibility?
13   A    I can't all the time.
14   Q    I'm sorry. I didn't understand your answer.
15   A    You say, how do I fulfill it?
16   Q    Yeah. How do you go about saying what you just
17   told me? I have to look out for the safety of my people,
18   that's your responsibility. And you have to make sure the
19   equipment is out of the way. You said that's one of the
20   ways you look out for their safety. I just want to know,
21   how do you do that? Do you go inside the house and look

Page 52

1    around, what do you do?
2    A    Yes, I do.
3    Q    Do you talk to the farmer at all?
4    A    Yes.
5    Q    So that's how you fulfill that responsibility by
6    personally observing things?
7    A    (Witness nods.)
8    Q    And if -- I didn't mean to cut you off. If you
9    see something that you don't think is appropriate, what do
10   you do?
11   A    Try to fix it.
12   Q    Okay.
13   A    Or make it safe for the catchers or get it out of
14   the way, a foreign object and stuff.
15   Q    Okay. That's what I would expect. You are
16   also -- have some responsibility with respect to the
17   property, don't you?
18   A    Yes.
19   Q    You're responsible for making sure your people
20   work in such a way as to not damage the farm?
21   A    Yes.

Page 53

1         MR. BREWER: I'll tell you, it's a few minutes
2    early, but this might be a good time to take a break.
3    Why don't we take about a five- or ten-minute break and
4    come back.
5         MR. MARTIN: Okay.
6         (Off the record.)
7    BY MR. BREWER:
8    Q    Mr. Gibbs, when you left Hudson Foods, did you and
9    your entire crew come to work for Mountaire?
10   A    Yes.
11   Q    Okay. Thank you. Sir, I'm going to show you an
12   exhibit to Mr. Garrison's deposition. It's Garrison Exhibit
13   No. 1. I'll give you that. This is an exhibit to
14   Mr. Garrison's deposition. Do you recognize this document?
15   A    Yes.
16   Q    Okay. Tell me what it is.
17   A    It's a -- we call it a farm ticket which the crew
18   leaders fill out.
19   Q    Okay. So you would fill this out?
20   A    Yes.
21   Q    And up at the top, I see it says, date. Would you

14 (Pages 50 to 53)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 54

1 fill the date in?
2   A  Yes.
3   Q  And where it says, lot number, would you fill that
4 in?
5   A  No.
6   Q  How about load number?
7   A  No.
8   Q  Grower, would you fill that information in?
9   A  Yes.
10   Q  Houses, would you fill that information in?
11   A  Yes.
12   Q  And the time started, what time is that?
13   A  The time started on loading the chickens, loading
14 the trailer.
15   Q  Loading the chickens?
16   A  Yes.
17   Q  Into the cages?
18   A  Yes.
19   Q  The time you start?
20   A  Yes.
21   Q  And who fills that in?

Page 55

1   A  The crew leaders.
2   Q  So you would fill that in?
3   A  I would, yes.
4   Q  How about time finished?
5   A  I would fill that in also.
6   Q  And when do you enter the time finished, what time
7 is that?
8   A  When the chickens are finished loaded on that
9 particular trailer or load.
10   Q  On that particular load?
11   A  Yes.
12   Q  So every time there's another load coming in, you
13 fill out another ticket?
14   A  Yes.
15   Q  Okay. So if it took four or five live haul trucks
16 to empty a house, you would fill out four or five of these
17 tickets?
18   A  Yes.
19   Q  Now, is the -- does the time started change, then?
20   A  Does the time start and change?
21   Q  Yes.

Page 56

1   A  On each load, you mean?
2   Q  Yes.
3   A  Yes.
4   Q  So, for example, if you started working at
5 midnight, the first load you would write in the time you
6 started it being midnight?
7   A  Yes.
8   Q  And if you finished the first load at 1:30 in the
9 morning, you would then write in 1:30?
10   A  Yes.
11   Q  And then the second trailer comes, and you would
12 write in 1:30 at time started?
13   A  Yes.
14   Q  And when you finished until you go through the
15 entire thing. So that's your responsibility to fill that
16 out?
17   A  Yes.
18   Q  Temperature, who fills that out?
19   A  I don't know who fills that out.
20   Q  You don't, though?
21   A  No, I don't.

Page 57

1   Q  Number of doors?
2   A  I fill that out.
3   Q  Okay. And then do you fill out a total?
4   A  Yes.
5   Q  And do you fill out the average weight?
6   A  No.
7   Q  Okay. Let's go down below the line where there's
8 a series of boxes, yes and no. It says, sign present. Who
9 fills that out?
10   A  I do.
11   Q  And when it says, sign present, what does that
12 mean?
13   A  That's a sign with the grower name on it. It's
14 because a lane sign -- end of the lane to the chicken
15 houses.
16   Q  So if I were a grower, it would say Brewer's farm;
17 is that what you mean?
18   A  Yes.
19   Q  And you would check whether the sign was up or
20 not?
21   A  Yes.

15 (Pages 54 to 57)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 58

1   Q   Okay. And if it's not up, what do you do?
2   A   I mark the no box.
3   Q   And what happens when you mark the no box?
4   A   The serviceman, I think, would be notified, and
5   they would put a sign out there.
6   Q   So you're responsible for letting the company know
7   whether the sign is up or not?
8   A   Yes. By filling this out, they would know that,
9   yes.
10  Q   How about grower present; do you fill that out?
11  A   Yes.
12  Q   What does that mean?
13  A   Whether the grower was present when we were
14  catching the chickens.
15  Q   Does that mean he was present actually watching
16  you? If you came at midnight at night and the grower's
17  asleep, how would you check that box?
18  A   I would check no, then, if he wasn't there.
19  Q   So when the grower is present, the grower is
20  physically there watching you catch?
21  A   Just when I arrive on the farm. The grower

Page 59

1   doesn't stay the entire time, but just when we arrive on the
2   farm if he's present.
3   Q   So if he's present, then you check that?
4   A   Yes.
5   Q   DAFs prior to catch. What's a DAF, for the
6   record?
7   A   That would be dead at farm. That would be the
8   dead bird -- dead chickens inside the chicken house before
9   we started working.
10  Q   And who checks that box?
11  A   Really, at times I don't even check that box
12  myself. I don't, I used to, but I don't check that anymore.
13  Q   When you used to check it --
14  A   I checked it myself.
15  Q   Okay. And when you did check it, how would you go
16  about determining whether there were dead chickens at the
17  farm?
18  A   By walking through the chicken house before we
19  started catching the birds.
20  Q   So you would walk through the house?
21  A   Yes.

Page 60

1   Q   And what would you be looking for?
2   A   Dead birds.
3   Q   And any particular number, just to see if there
4   were any at all? That's what you were looking at?
5   A   Mostly I would just check to see was there a large
6   amount. More than average, I would say.
7   Q   Okay. What would you say would be the average?
8   A   I would look at the mortality charts and see how
9   many they grow. It would be losing -- like if they was
10  losing ten, if it was a lot more than ten before I started
11  catching, I would mark yes.
12  Q   And would you have a mortality chart with you?
13  A   No.
14  Q   How would you know what the mortality chart said?
15  A   It's placed somewhere inside the chicken house.
16  Q   Okay. So when you arrive at the farm, do you go
17  to look for the mortality chart?
18  A   At times. Not all the time.
19  Q   Okay. Now, you said -- when you were checking
20  this box -- I'm trying to understand your procedure. You
21  would go in yourself, you would walk around the house, see

Page 61

1   how many dead chickens there were, and then look at the
2   mortality chart to see if it was more than you would expect?
3   A   Yes.
4   Q   That's what you would do?
5   A   Yes.
6   Q   And then you would check this box?
7   A   Yes.
8   Q   And you said you don't check this box any longer,
9   correct?
10  A   Correct.
11  Q   Why not?
12  A   No reason.
13  Q   You just decided you didn't need to check it
14  anymore?
15  A   Yes.
16  Q   Okay. The next box says, firefan used. Do you
17  check that box?
18  A   Yes.
19  Q   Okay. And who decides whether a firefan should be
20  used?
21  A   We use it all the time now year round if -- in

16 (Pages 58 to 61)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 62

1  conventional houses. Houses that are not tunneled, we used
2  it. So automatically if there's no tunnel house, we use a
3  firefan.
4      Q   Who decides to use it? The crew leader does,
5  doesn't he?
6      A   Oh, yes.
7      Q   Okay.
8      A   I decide to use them, yes.
9      Q   That's fine. Chickens watered. Who checks that
10  box?
11     A   I check that box.
12     Q   And how do you decide whether the chickens -- how
13  do you decide whether to check the box yes or no?
14     A   If the chickens -- this only happened during the
15  summer months.
16     Q   Okay.
17     A   And if the chickens are watered, I mark yes. If
18  not, I mark no.
19     Q   How do you know that they have been watered is my
20  question?
21     A   The truck driver does it. Eventually I see him

Page 63

1  doing it.
2      Q   So the watering of the chickens that this box
3  refers to is after the chickens have been put in the cages
4  and loaded onto the truck?
5      A   Yes, that's correct.
6      Q   Okay. Who tells the driver to water the chickens?
7      A   Crew leaders.
8      Q   Okay. The next box says feeders up, do you check
9  that box?
10     A   Yes.
11     Q   And how do you decide whether to check yes or no?
12     A   If the feeders are raised so the chickens can't
13  eat the feed, I mark, yes. If they're still down where the
14  chickens are still feeding, I mark, no.
15     Q   And you fill that out by going into the house?
16     A   Yes.
17     Q   And looking to see whether the feeders are up or
18  down?
19     A   Yes.
20     Q   How about waters up, how do you decide which box
21  to check there?

Page 64

1      A   Same procedure. Going in the house and looking,
2  seeing if the water is up.
3      Q   Stoves up?
4      A   Same way.
5      Q   Again, you go into the house and you're observing.
6  So when you're going into the house, you're looking to see
7  if the feeders are up, if the water is up, if the stoves are
8  up?
9      A   Yes.
10     Q   Okay. And then you -- depending on what you find,
11  you check whatever box is appropriate?
12     A   Yes.
13     Q   The next item is farm damage, do you check that
14  box?
15     A   If there's farm damage, yes.
16     Q   Tell me, please, how you decide whether to check
17  the box yes or no, whether there's farm damage or not.
18     A   Most of the -- most of the farm damage is done by
19  the forklift operators, and he tells me if there's any
20  damage -- if he hit, like, a pole or running into the
21  chicken house. If he does, then I mark there's farm damage,

Page 65

1  I mark, yes.
2      Q   Before you start to catch, do you take a look at
3  the chicken house to see if there's any damage that's
4  already there?
5      A   No.
6      Q   You don't?
7      A   I don't inspect thoroughly, but most of the time
8  if there's damage, I can see it mostly. If there's damage,
9  I can see it most of the time.
10     Q   So before you start, you'll take a quick look at
11  the house to see if there's any damage done already?
12     A   When I'm walking through, yes, I'll be looking for
13  damage. Yes.
14     Q   Okay. And then if you see no damage, do you check
15  the box no?
16     A   Most of the time, I just leave that space empty
17  too. I don't mark yes or no. Unless there's farm damage.
18  If there's no farm damage, I don't mark no most of the time.
19     Q   Why did you decide not to check this box?
20     A   I don't know. Just --
21     Q   Okay. But you decided not to check it?

17 (Pages 62 to 65)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 70

1  you mentioned that something will -- somebody will come out
2  and somehow straighten out the entrance and the litter
3  condition, okay, if I understood you correctly?
4    A  Not right then. Later.
5    Q  Later?
6    A  Maybe possibly, yes.
7    Q  Right. That's later. And who is it, if you know,
8  that comes out and does that?
9    A  David Nuse -- when I find the situation
10 unacceptable, I call our assistant live haul manager, and
11 David Nuse comes out, and it's his responsibility then.
12    Q  So your responsibility is to let David Nuse
13 know --
14    A  Yes.
15    Q  -- when you see these things that are
16 unacceptable, and you do that?
17    A  Yes.
18    Q  All right. Take a look at this next document
19 which is Exhibit 2. This is Exhibit 2 to Mr. Garrison's
20 deposition. I want to ask you a couple questions. Let me
21 ask you this about the crew. Who determines the size of the

Page 71

1 crew?
2    A  Mountaire.
3    Q  Okay. And I think you testified, just to be sure,
4 you have eight catchers on your crew and one forklift
5 operator; am I remembering that correctly?
6    A  Yes.
7    Q  Thanks. Okay. Take a look at this document, and
8 look under item number two, Roman numeral two, and it talks
9 about the crew leader's general duties. The first one is to
10 arrive on the farm at the correct time. Would you agree
11 that's a responsibility that you, as a crew leader, have, to
12 be on time?
13    A  Yes.
14    Q  Second one talks about dividing the house, and --
15 into four sections, and then talks about various other
16 combinations that you might do. Is that your responsibility
17 as a crew leader to make sure that the house is set up to
18 catch the right way?
19    A  Yes.
20    Q  And I think you mentioned when you had a new
21 crew -- when you had a new catcher on your crew, one of the

Page 72

1 things that you would tell that person was how to set up the
2 house?
3    A  Yes.
4    Q  So it's up to you to decide how to set up the
5 house to catch?
6    A  Yes.
7    Q  You also tell the catchers the number of birds to
8 be placed in each cage in the compartment?
9    A  Yes.
10    Q  When catching the birds at night and the movement
11 here, is that your responsibility to make sure that this
12 guideline is carried out?
13    A  Yes.
14    Q  Okay. It talks about observing uncaught birds and
15 to prevent smothers; is that also your responsibility?
16    A  Yes.
17    Q  So as the crew is catching the birds in the house,
18 one of the things you're responsible for is watching them
19 making sure the uncaught birds don't smother themselves?
20    A  And we have one of the catchers, we call him the
21 house man. It's also his duty, too, to make sure that --

Page 73

1    Q  Okay. Who is your house man?
2    A  My catchers rotate. All of them take turns being
3 a house man.
4    Q  So you're ultimately responsible, but you have
5 somebody else that you delegate that or you give that
6 authority to, to watch also?
7    A  Yes.
8    Q  Making sure the cages are stacked uniformly on the
9 trailer, is that also one of your responsibilities?
10    A  Myself and the truck drivers also.
11    Q  Okay. But you have a responsibility to make sure
12 that's done?
13    A  Yes.
14    Q  And if it's not, can you tell the truck driver he
15 has to change something?
16    A  Tell the forklift operator.
17    Q  You tell the forklift operator. You instruct him
18 to make the change.
19    A  Yes.
20    Q  Okay. Item G talks about in the summer, making
21 sure that the fans are left hanging until the birds have

19 (Pages 70 to 73)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 74

1  been caught. Again, is that a responsibility that you have?
2  A  Yes.
3  Q  Okay. Not loading more than the specified number
4  of chickens per door?
5  A  That also, yes.
6  Q  So if some of the catchers are putting more
7  chickens in a hole than they should, it's your
8  responsibility to say, stop, that's too many?
9  A  Yes.
10  Q  And, of course, we went over filling out the farm
11  ticket. You already talked about that. And then it talks
12  about checking with the driver to make sure the load is
13  secure, that's one of your responsibilities also?
14  A  Yes.
15  Q  If we go down to item three, this talks about
16  various catching methods. There's listed in item A, a night
17  method. In item B, there's a day catching method. Take a
18  look at those, if you would, and tell me if it's your
19  responsibility to make sure what is written here you take
20  care of.
21  A  Yes. That's my responsibility also, yes.

Page 75

1  Q  Okay. Now, some of these things that are listed
2  here, I mean, they are -- let's talk about general duties --
3  may change depending on the house and the time of the year
4  and the number of birds and things like that. So, for
5  example, where it says in item C, it says, the house should
6  be divided into a minimum of four large pens. You might
7  decide that three is fine; isn't that true?
8  A  Yes.
9  Q  So it's up to you to make those calls. Okay.
10  A  Yes.
11  Q  Tunnel ventilation, again, is that the
12  responsibility of the crew leader and your responsibility?
13  A  In conventional houses, yes.
14  Q  Okay. Now, we go back to Roman numeral three on
15  this exhibit, and you'll see tunnel houses. Do you see
16  that? I think you need to turn the page. Next page. And
17  the page after that. Next page. There you go. See tunnel
18  houses?
19  A  Yes.
20  Q  Take a look at those things there and tell me if
21  that's your responsibility to make sure that these things

Page 76

1  occur as they should.
2  MR. MARTIN: Let's make sure we're on the same
3  page. Are you referring to Roman numeral three under
4  that?
5  MR. BREWER: That's correct.
6  MR. MARTIN: I think he's on the page before
7  that.
8  MR. BREWER: I think he's on --
9  MR. MARTIN: Let me direct him to the right
10  page, then.
11  MR. BREWER: Sure.
12  MR. MARTIN: This is what you're referring to
13  here, Mr. Brewer.
14  BY MR. BREWER:
15  Q  Roman numeral three says, tunnel houses. That's
16  where I want you to take a look at.
17  A  Yes.
18  Q  Okay. And you have discretion in some cases here
19  to follow this or not follow that. That would be up to you
20  to decide?
21  A  Yes.

Page 77

1  Q  Is the same also true of the two little things
2  that are mentioned here about walk-out houses?
3  A  Yes.
4  Q  Okay. Thank you. You have -- let me take a look
5  at this for just a second. You are, as a crew leader,
6  responsible for making sure that the chickens that your crew
7  catches get to the plant on time?
8  A  Yes.
9  Q  And I think we just went through this, but you are
10  responsible for making sure that those procedures and
11  guidelines that we just went through are followed?
12  A  Yes.
13  Q  Okay. You also have a role with respect to
14  maintaining a good relationship with the grower, don't you?
15  A  Yes.
16  Q  Okay. And I think we mentioned the safety of your
17  crew, you have responsibility for that also?
18  A  Yes.
19  Q  Okay. You are basically, then, when you're out
20  there catching, you're the one who's directing the crew?
21  A  Yes.

20 (Pages 74 to 77)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 78

1    Q    Directing -- okay. All right. From time to time,
2    new catchers have come on to your crew?
3    A    Yes.
4    Q    Okay. Have you ever suggested to anybody at
5    Mountaire that they hire a particular person as a catcher?
6    A    Yes.
7    Q    Okay. Who, if you can remember?
8    A    The last one was Arthur, Arthur Belfield.
9    Q    And was he hired?
10   A    Yes.
11   Q    Okay. And without -- and I don't mean to stretch
12   your memory, but have there been others like Mr. Belfield
13   that you recommended the company hire?
14   A    That's it. I think I said maybe two or three.
15   Q    Okay. And were they hired?
16   A    I think all but one, I think.
17   Q    Okay.
18   A    I think two out of the three, yes, I think they
19   were hired.
20   Q    Who was it -- do you remember the person who
21   wasn't?

Page 79

1    A    No, I can't remember him.
2    Q    Okay. There are other crew leaders employed at
3    Mountaire, we know, right?
4    A    Yes.
5    Q    Have other crew leaders asked you if you could
6    spare a member of your crew to come work on their crew
7    because they were short?
8    A    Yes.
9    Q    Okay. And when they've asked that, what have you
10   done?
11   A    If I have a catcher available, I let him go catch
12   with that crew leader.
13   Q    So you would tell someone from your crew to go
14   work for somebody's crew, for example, Mr. Garrison's crew,
15   if he needed it?
16   A    It would be up to him. I would ask him, would he
17   want to go work with Mr. Garrison or whoever. Then that
18   would be up to him whether he would go catch with that crew
19   or not.
20   Q    Okay. If you asked every one of the catchers and
21   they all said, no, what would you do?

Page 80

1    A    Nothing.
2    Q    You would leave Mr. Garrison without a catcher?
3    A    That's all I could do.
4    Q    Okay.
5    A    I tell him to contact Mr. Lynch or someone.
6    Q    Have you ever asked any of the other crew leaders
7    to supply you with a catcher?
8    A    Yes.
9    Q    And have they done so?
10   A    At times, yes.
11   Q    Do some catchers work a double shift from time to
12   time?
13   A    Yes.
14   Q    And how does that occur?
15   A    Like if -- if one of the catchers are working on
16   the first shift, and if I'm on, like, the third or fourth
17   shift, he would work with the first shift and then come work
18   on my shift also.
19   Q    Okay. And, again, that's only if he wants to?
20   A    That's correct.
21   Q    Let me ask you this question. Do you know Donna

Page 81

1    Mumford?
2    A    Donald Mumford?
3    Q    Uh-huh. He works for Mountaire.
4    A    You said Donald Mumford?
5    Q    Donna. I'm sorry.
6    A    Donna. Yes. I have met her before, yes.
7    Q    Do you have occasion to talk to her at all?
8    A    No, not anymore.
9    Q    I'm sorry. Not anymore?
10   A    Not anymore, no.
11   Q    So there was a time when you did?
12   A    (Witness nods.)
13   Q    What would you talk to her about?
14   A    Like, if one of my catchers had a problem with
15   the -- like say, a W-2 tax forms or something, then I would
16   ask Donna to help them out -- to help them.
17   Q    All right. When you say W-2 form, you mean if the
18   catcher did not get a W-2 form, he would come to you and you
19   would talk to Donna about that?
20   A    Yeah, something like that.
21   Q    Any other occasion?

21 (Pages 78 to 81)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 82

1  A  Only when we used to have a petty cash program,
2  and sometimes she would handle that for me.
3  Q  For whom?
4  A  For the catchers, like I would have to pick it up,
5  I would write out a petty cash slip and Donna would give me
6  the cash.
7  Q  And what would you do with the cash?
8  A  Give it to the catcher.
9  Q  Now, how would Donna -- who would deliver the slip
10  to Donna to get the cash?
11  A  I would.
12  Q  So the catcher would fill it out, give it to you?
13  A  I would fill it out.
14  Q  So the catcher would come to you and say, I need
15  some extra cash?
16  A  Yes.
17  Q  And you would then decide whether to fill out the
18  form or not?
19  A  Yes.
20  Q  And you would fill out the form, take it to Donna?
21  A  Yes.

Page 83

1  Q  She would give you money?
2  A  Yes.
3  Q  And you would give that money to the catcher?
4  A  To the catcher.
5  Q  As he requested.  Okay.  How about Cindy
6  Chatterton; do you know her?
7  A  I can't recall her, no.
8  Q  If I tell you she works in payroll, does that help
9  you?
10  A  I probably seen her, but I can't recall Cindy, no.
11  Q  You don't recall a Cindy?
12  A  I don't recall a Cindy, no.
13  Q  Okay.  Let's see.  We talked about Donna Mumford.
14  Was there anybody else in payroll that you might have talked
15  to or dealt with?
16  A  Yes.
17  Q  Who would that be?
18  A  I think Kim.  Kim Clark, I think that's her name.
19  Kim, yes.
20  Q  And why would you talk to Ms. Clark?
21  A  Same reason, same thing.

Page 84

1  Q  For the --
2  A  Petty cash.
3  Q  -- petty cash?
4  A  Yes.
5  Q  If one of your catchers -- by the way, who pays
6  the catchers?
7  A  Who pays the catchers?
8  Q  Uh-huh.
9  A  Mountaire.
10  Q  Okay.  And they're paid by check?
11  A  Yes.
12  Q  Who delivers the check to the catchers?
13  A  It varies.  I do at times.  And at times, the
14  dispatcher.
15  Q  Or you do sometimes?
16  A  Yes.
17  Q  How often would you say you do that?
18  A  Most of the time, a couple weeks out of the month
19  when we're on the earlier shift.
20  Q  So about half the time, two weeks out of a month?
21  A  Yes.

Page 85

1  Q  If a catcher thinks that his check is wrong, does
2  he come to you to tell you he thinks his check is wrong?
3  A  No.
4  Q  He does not?
5  A  Let me rephrase.  He'll mention it to me, yes.
6  And then it goes to Susie McCall.
7  Q  And the catcher goes to Susie?
8  A  Yes.
9      (Off the record.)
10  BY MR. BREWER:
11  Q  Do you have any occasion to talk to the live haul
12  clerk?
13  A  The live haul clerk?
14  Q  Uh-huh.
15  A  I don't think we have a live haul clerk.
16  Q  Susie.
17  A  Yes, I do.
18  Q  What do you and Susie talk about when you talk to
19  her?
20  A  She gets the daily time sheets.  And like if --
21  most of the time, I'm pretty prompt with mine, but if I

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 86

1    don't turn one in, she'll call me.
2    Q    Okay.
3    A    Mostly just about the daily time sheets.
4    Q    So your conversations with her are about daily
5    time sheets?
6    A    Yes.
7    Q    Anything else?
8    A    Yes. We talk about something else.
9    Q    Okay. What is that?
10   A    Family, just general conversations.
11   Q    Personal type business?
12   A    Yes.
13   Q    But with respect to your dealings with her at
14   work, it just only deals with time sheets, nothing else?
15   A    That's all I can recall -- that's all I can recall
16   right now, most of the time sheets, yes.
17   Q    That's fine. During the course of a -- if -- let
18   me put the question this way. You can authorize your crew
19   to work overtime, can't you?
20   A    Can I authorize my crew to work overtime?
21   Q    You've got a number of houses that have to be

Page 87

1    caught during the course of the week, you're going to get
2    those houses caught whether it involves overtime or not?
3    A    I have to see if our catch total is -- caught for
4    each day. If that goes over, yes.
5    (Deposition Exhibit No. 1 marked.)
6    MR. BREWER: Okay. This is, I guess, Exhibit 1
7    to Mr. Gibbs' deposition.
8    MR. MARTIN: Let's go off the record for a
9    moment.
10   (Off the record.)
11   BY MR. BREWER:
12   Q    Mr. Gibbs, there's a document in front of you.
13   It's been marked as Exhibit 1. I'd like you to take a look
14   at this first page. It says, request for a vacation or
15   floating holiday; do you see that?
16   A    Yes.
17   Q    And there's a man by the name of Herman Jernigan?
18   A    Jernigan.
19   Q    Is he a catcher?
20   A    Yes.
21   Q    He did he work for your crew?

Page 88

1    A    Yes.
2    Q    Is he still working on your crew?
3    A    Yes.
4    Q    And he has requested a floating holiday?
5    A    Yes.
6    Q    And you have approved this?
7    A    Yes.
8    Q    That's your signature down there in the supervisor
9    approved, that's you?
10   A    Yes.
11   Q    And the writing that appears in section two, is
12   that your writing? Do you see where I'm referring to?
13   A    The date hired?
14   Q    No. It says, section two, halfway down the page.
15   A    Yes.
16   Q    The writing below that, is that all your writing?
17   MR. MARTIN: Wait a minute. Maybe we're looking
18   at something different.
19   THE WITNESS: There's no writing on this.
20   MR. MARTIN: I see no writing on mine either. I
21   have an 81 in the upper right corner. Do you have

Page 89

1    that?
2    MR. BREWER: Yes.
3    MR. LYNCH: Are you talking about writing in
4    section two or everything below section two?
5    MR. BREWER: Section two and below. That's what
6    I'm referring to.
7    MR. MARTIN: There is a section two and a
8    section three. And the only thing noted in section two
9    is the date of hire that's written in, correct?
10   MR. BREWER: Correct.
11   MR. MARTIN: So are you asking whether that's
12   his writing?
13   BY MR. BREWER:
14   Q    Yes. Do you understand what I'm asking you, sir?
15   A    Yes. I'm trying to think. I'm not sure.
16   Q    You're not sure if that's your writing or not?
17   A    I'm not sure if that's my writing or not.
18   Q    How about the signature, is that your signature?
19   A    Yes. I think that's -- yes.
20   Q    And did you check the box approved?
21   A    Yes.

23 (Pages 86 to 89)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 90

1    Q    The next page is talking about the same
2    individual, Mr. Jernigan?
3    A    Yes.
4    Q    And he's requesting -- see if I'm reading this
5    right, three weeks' vacation but he only wants money?
6    A    Yes.
7    Q    In other words, he'll work the three weeks but he
8    wants three weeks of pay?
9    A    Yes.
10   Q    And you approved that?
11   A    Yes.
12   Q    And that is your signature?
13   A    Yes.
14   Q    Now, going to section two, to make it clear, where
15   it says, date of hire, in section two, is that your writing
16   or no?
17   A    I'm still not sure if it's mine or someone in
18   human resources filled that out.  I'm not sure.
19        MR. BREWER:  If you can't tell whether it's your
20   own writing, that's fine.  Why don't we take a few
21   minutes and go off the record.

Page 91

1        (Off the record.)
2        MR. BREWER:  I believe Mr. Martin had suggested
3    on the record that Gibbs Exhibit Number 1 be looked at
4    by the deponent off the record so as to expedite the
5    deposition, and I think what we can agree to that.
6        The questions that I'm going to be asking on all
7    of these documents, sir, is, these are requests for
8    either vacation or floating holidays made by the people
9    that you supervised, and you are approving their time
10   off, whether it be for to receive vacation or a
11   holiday, or whether it is to receive pay and instead of
12   the actual time off, but pay for the time off, okay?
13   That's the question.  That's what I'm going to be
14   asking you to look at over the lunch break to see if
15   all of these things that are listed here, okay, are
16   things that you approved.
17       MR. MARTIN:  If I may, while we were talking,
18   Mr. Gibbs was looking through this, not at my request,
19   and it looks like he went through each page.  I don't
20   know if he's completed that review now.  But perhaps we
21   can ask him whether he has reviewed these and can

Page 92

1    answer those questions that you put to him.  If not, he
2    can certainly take a lunch break.  But it may help
3    expedite the process.
4    BY MR. BREWER:
5    Q    Had you had an opportunity to go through all of
6    those? .
7    A    Yes, I did.
8    Q    And did you approve all of the requests that are
9    in here?
10   A    Yes.
11   Q    For either time off or vacation or pay, okay?
12   A    Yes.
13   Q    Okay.  That solves that.  And maybe just one other
14   question before we break for lunch.  Do you approve time off
15   for members of your crew?
16   A    Yes.
17   Q    Okay.  So if one needs to leave early to go to a
18   doctor, you would approve that or not?
19   A    Yes.
20       MR. BREWER:  Okay.  I think at this point we can
21   break for lunch.

Page 93

1        (Lunch break held.)
2    BY MR. BREWER:
3    Q    I think, Mr. Gibbs, when we left, you had gone
4    through Exhibit 1 to your deposition and said that you had
5    approved all of those things that you see there?
6    A    Yes.
7    Q    Okay.  I'd like you to explain to me what happens
8    if a member of your crew is going to be absent?  Let me
9    rephrase the question this way.  I think we had talked about
10   before we broke for lunch that if a member of your crew
11   wanted time off for some reason, you could approve that?
12   A    Yes.
13   Q    What is the procedure in your crew if somebody
14   does want some time off?  How does that work?
15   A    I have a crew of eight catchers, but only seven
16   work each day, so I have a extra catcher.  So when someone
17   wants off, I still have a seven-man crew.
18   Q    Okay.  Do you rotate the catcher that's off every
19   day?  How do you decide which catcher is off which day?  Let
20   me ask the question this way.
21   A    They rotate.

24 (Pages 90 to 93)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 94

1  Q   So we might have somebody off on Monday, then
2  another person off on Tuesday?
3  A   Yes.
4  Q   And who decides who is off on Monday, who on
5  Tuesday, and so forth?
6  A   I do.
7  Q   Okay.  If someone is scheduled off, but another
8  crew member doesn't show up or is not there when you go to
9  pick him up, tell me what, if anything, you do then.
10  A   You mean the one is not his scheduled day off, the
11  catcher that show up --
12  Q   Right.
13  A   -- that's when I call another crew leader and see
14  does he have a man off.  I start there.
15  Q   Okay.  The fellow who's scheduled off that day, do
16  you call him up and ask him to come to work?
17  A   At times, yes.
18  Q   I'm sorry?  I'm going to -- I'm going to ask you
19  to repeat the answer.
20  A   At times, yes.
21  Q   Okay.  So you can either ask another crew leader

Page 95

1  or ask the fellow who's off to come to work because you're
2  going to be short?
3  A   Yes.
4  Q   If somebody is going to be absent, do they have to
5  let you know?
6  A   They are supposed to, yes.
7  Q   Okay.  And tell me what happens if they don't let
8  you know.
9  A   Then they'll get a warning, a write-up.
10  Q   From you?
11  A   Yes.
12  Q   Okay.  Let me see.  While you're on a farm
13  catching, do the catchers get a paid break?
14  A   Only the lunch break.
15  Q   That's not paid, is it?
16  A   They get paid per thousand.  So if they're not
17  catching any chickens, no, they're not getting paid.
18  Q   Okay.  So -- and how long is lunch?
19  A   Half an hour.
20  Q   When they take that half an hour, they're not paid
21  for that time because they're taking lunch?

Page 96

1  A   No.
2  Q   Okay.  Do you mean -- let me ask the question
3  again.  When the catchers take their half an hour -- and by
4  the way, who decides when that half an hour is?
5  A   Most of the time they do mostly because, like I
6  say, a lot of times we take our lunch break while we're
7  moving from one farm to the next.
8  Q   Okay.  So that's most of the time when you take
9  your breaks, when you're going from one farm to the next?
10  A   When we have two jobs to go on, yes.
11  Q   Okay.  Then let me see if I understand it.  You
12  finish a job at one farm, and on your way to the next farm,
13  you would stop someplace, take half an hour and have lunch?
14  A   Yes.
15  Q   When the catchers take that half an hour for
16  lunch, they don't receive pay for that, do they?
17  A   I'm not sure.
18  Q   You're not sure?
19  A   I'm not sure, no.
20  Q   Okay.  Let me take a second here.  Maybe this can
21  help you.  We'll come to it.  Okay.  If you're just going to

Page 97

1  be on farm, you're not going to have to travel to another,
2  do they receive a half an hour lunch break?
3  A   Yes, they do.
4  Q   And who decides when that is?
5  A   A lot of times, like we have to wait on the driver
6  to return to the farm, so we take our lunch break while
7  we're waiting.
8  Q   You basically decide that?
9  A   Yes.
10  Q   That's a good time to take a break, so we'll break
11  now?
12  A   Yes.
13  Q   Okay.  How about paid breaks, do they get paid
14  breaks while they're catching, get out of the house, go
15  outside and sit down, rest a minute, smoke a cigarette or
16  something?
17  A   No.
18  Q   So they just -- everybody works right through?
19  A   When you say a -- paid breaks, I'm not sure
20  whether they're getting paid for it or not.  But sure, if
21  they want to take a break, sometimes they get a little

25 (Pages 94 to 97)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 98

1  overheated, might have a ache or pain, yes, they can have a
2  break.
3     Q   You can tell them, okay, fine, go outside?
4     A   Yes.
5     Q   And you're not sure whether they get paid for that
6  or not?
7     A   I'm not sure.
8     Q   Okay. Let me just ask a very general question.
9  Since you've been the crew leader, you've testified that you
10  warned people if they didn't call you or didn't show up?
11     A   Yes.
12     Q   And for any other reasons?
13     A   I can't think of any other reason right now, no.
14        (Deposition Exhibit No. 2 marked.)
15  BY MR. BREWER:
16     Q   Okay. Let me have this marked as Gibbs 2, please.
17        Mr. Gibbs, I'm going to show you a document which
18  has been marked for identification as Exhibit No. 2 to your
19  deposition. Do you see that? This is a performance
20  evaluation for yourself. Have you seen this before?
21     A   Yes.

Page 99

1     Q   Okay. And, in fact, if we go to page four of the
2  document, that's your signature?
3     A   Yes.
4     Q   Okay. Going to the next page, this is annual
5  objectives. It says, third quarter, the fiscal year '02,
6  fiscal year '03. Have you seen this before?
7     A   This actual sheet, no, I haven't seen this before.
8     Q   Okay. Let's go to the next page. And, again, it
9  says, performance evaluation self-assessment at the top. Do
10  you see that?
11     A   Yes.
12     Q   Is that your writing on the top part of this page?
13     A   No.
14     Q   No. Okay. Do you know whose writing it is?
15     A   No, I don't.
16     Q   Okay. Let's go to the next page. I see writing
17  on the right-hand side of the page along with some numbers.
18  Do you see that?
19     A   Yes.
20     Q   Do you know whose writing that is?
21     A   Yes. That's my writing.

Page 100

1     Q   This is your writing, okay. And this is -- the
2  writing that appears there is your evaluation of yourself as
3  a crew leader?
4     A   Yes.
5     Q   Let's look at the first area. It says, commitment
6  to quality. And you've written produces quality product by
7  maintaining working guidelines and regulations?
8     A   Yes.
9     Q   Okay. What do you mean by that?
10     A   I mean, just -- some of the stuff we went over
11  earlier about how to set the chicken house up so getting the
12  chickens caught so there won't be many DOA and bruises.
13     Q   In other words, what you're saying is you're
14  following -- making sure the guidelines are followed by your
15  crew and everything else in order to achieve those
16  objectives?
17     A   Yes.
18     Q   That's what that means?
19     A   Yes.
20     Q   The next topic says, internal and external
21  customer satisfaction. And I believe you wrote works well

Page 101

1  with growers, drivers and others respectful of their
2  concerns and needs. Would you explain to me what that
3  means?
4     A   It means I get along with mostly all growers and
5  truck drivers, and I work well with them.
6     Q   Well, when you say respectful of their concerns,
7  what do you mean by that?
8     A   Just working with the drivers. A lot of drivers,
9  some of them got a lot of different attitudes and stuff, and
10  being respectful of some of them, and try to set the truck
11  in the right position so whatever -- so it won't annoy them.
12     Q   That's one of your responsibilities?
13     A   Yes.
14     Q   And that's what you meant by that?
15     A   Yes.
16     Q   Okay. The next item, it says, planning, and you
17  write, do well at organizing and planning to get what needs
18  to be done. What do you mean by that?
19     A   I mean setting up my schedule so I leave home on
20  time and have all my catchers picked up on time so we can be
21  on the job on time.

26 (Pages 98 to 101)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 102

1    Q    And also planning how to catch the house and do
2    those other things?
3    A    Same, yes.
4    Q    Make sure the crew does what needs to be done?
5    A    Yes.
6    Q    And make sure the forklift operator places the
7    cage properly and things that we've talked about?
8    A    Yes.
9    Q    Make sure the driver in the summer waters the
10   chickens?
11   A    Yes.
12   Q    Okay. And do you -- when you're organizing your
13   planning, do you write any of this down or do you just do it
14   in your head?
15   A    Just -- mostly just do it in my head.
16   Q    All right. The next topic says, initiative. And
17   you write encourages and delegate work in a respectful
18   manner. Would you explain what you mean by that?
19   A    I mean, like when I have to tell one of my
20   catchers, do something, I do it in a respectful way. I
21   don't be hollering and cursing at them. And they seem to

Page 103

1    get a lot done that way by being respectful and getting
2    along with them.
3    Q    When you say, and delegate work, what work are you
4    talking about delegating?
5    A    Oh, like, chicken catchers, a different one might
6    not take the equipment off from the truck this day, and
7    things like that, telling them which one of them to take the
8    pens off or --
9    Q    Okay.
10   A    -- have them set up the house or something.
11   Q    Somebody might be better at taking the cages off
12   the truck than another member of your crew?
13   A    Taking the catch pens off the truck.
14   Q    Taking the catch pens off?
15   A    Yes.
16   Q    And so you would tell that person to take those
17   pens off because he does it better than somebody else?
18   A    In certain situations, yes.
19   Q    The next item, it talks about decision-making and
20   problem solving. And you write make sound and logical
21   decisions, solve problems effectively. Is that what you

Page 104

1    wrote?
2    A    Yes.
3    Q    Tell me what you mean by that.
4    A    In certain situations at work, I have to -- just
5    don't jump and do something dumb. I try to take my time and
6    make -- try to make the right decision.
7    Q    What kind of problems would you be solving
8    effectively when you say solve problems effectively? What
9    kind of problems are you referring to?
10   A    Oh, like a truck getting stuck at times. Forklift
11   not starting, firefan not starting.
12   Q    Okay. And how do you go about solving those
13   problems?
14   A    Most -- if it's critical, I call assistant live
15   haul manager, Dave Nuse or Doug. And something, like I need
16   a wrecker, I might call a dispatcher and get them to call me
17   a wrecker or call a mechanic forklift.
18   Q    Would there be other problems that might occur as
19   you're catching in a house that you would have to solve
20   effectively?
21   A    There are, yes.

Page 105

1    Q    And is that what you mean by this also?
2    A    Yes.
3    Q    If you'll turn to the next page, sir, it says,
4    business success and results. And I believe you wrote meet
5    goal on DOAs, head count and farm damage. And that's a
6    responsibility that you, as a crew leader, had?
7    A    Yes.
8    Q    And I can't see the number here. It's a little
9    faxed off, but that's all right. The next topic is
10   leadership and influence. And you've written continue good
11   leadership and lead by example. Can you explain what you
12   mean by that? Are you referring to your crew, for example,
13   continued good leadership, that's who you're talking about
14   leading?
15   A    Yes. Mostly referring to my crew, yes.
16   Q    And leading by example. And how -- when you say,
17   continue good leadership, I assume that means that you think
18   you were doing a good job as being a crew leader?
19   A    Yes, I do.
20   Q    Okay. And you were leading by example?
21   A    Uh-huh.

27 (Pages 102 to 105)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 110

1    Q    While -- well, you say this is not your writing,
2    you do agree with these things?
3    A    I agree with it, yes.
4    Q    That's fine. I'm going to show you what has been
5    marked as Exhibit No. 6 to Mr. Garrison's deposition. Turn
6    to page nine of the document, please.
7    A    The pages aren't numbered.
8    Q    Page nine. They're numbered at the bottom. Okay.
9    Are you there? Just hold that page for a second. I'll try
10   to compete with the siren here. The document is a -- an
11   agreement between Mountaire in Selbyville and Teamster's
12   Local 355. If you just hold that page and look at the front
13   cover, that's what the document purports to be.
14   A    Uh-huh. Yes.
15   Q    And this is the contract that covers the catching
16   crew, your crew?
17   A    Yes.
18   Q    Okay. And if you go back, now, to page nine where
19   you had your finger, the -- first, if you look under number
20   one; do you see where I am?
21   A    Yes.

Page 111

1    Q    Okay. It talks about a grievance being a dispute
2    over the interpretation, among other things, of this
3    contract. And it says, the employee, which in your case
4    would be a catcher or catchers, would take the matter up
5    with the shop steward who would in turn take the grievance
6    up to the foreman in charge. So if a member of your crew
7    had a grievance regarding the contract, the first thing they
8    do is take it up with you; is that correct?
9    A    With their contract?
10   Q    Yeah. This contract applies to the catchers, the
11   men who work for you?
12   A    Yes.
13   Q    This says, if they have a grievance or a dispute
14   arising out of an interpretation of this document, that they
15   take it up with the shop steward and the shop steward then
16   comes to you -- to the foreman in charge. And in the case
17   of a member of your crew, the foreman in charge would be
18   you; would it not?
19   A    Yes.
20        (Deposition Exhibit No. 3 marked.)
21   BY MR. BREWER:

Page 112

1    Q    Okay. I'm going to have -- I guess this would be
2    3. This will be No. 3. Mr. Gibbs, the document that is in
3    front of you has been marked as Exhibit 3 to your
4    attorney. This information came to us through your
5    deposition. And I'd like you to tell me what this is.
6    A    This is a record that I kept of time -- from the
7    time I pick my first catcher up until I dropped the last
8    catcher off.
9    Q    Okay. Who prepared this form?
10   A    The form?
11   Q    Yes.
12   A    My daughter prepared the form.
13   Q    Your daughter did?
14   A    Yes.
15   Q    And is that true for all of the pages I see after
16   this, she prepared this form?
17   A    Yes.
18   Q    Okay. Now, what it says on top, it says, first
19   catcher picked up, and then it says, first catcher dropped
20   off. You said, last catcher dropped off. Should this be
21   like the last catcher dropped off?

Page 113

1    A    It should be -- because the first catcher I pick
2    up is the last catcher that I drop off. So the first
3    catcher is the last catcher that I drop off.
4    Q    So if I'm interpreting this correctly, the first
5    catcher you picked up, if we look at page 1 on the 23rd, you
6    picked up the first catcher at 11:40 a.m.
7    A    Correct.
8    Q    And then that first catcher you dropped off at
9    10:00 p.m., but he was also the last catcher dropped off?
10   A    Yes, that's correct.
11   Q    So that's how this should be interpreted?
12        MR. MARTIN: Excuse me. The record actually
13   says 10:10 p.m.
14        MR. BREWER: I didn't say anything about --
15        MR. MARTIN: You said 10:00. I'm just trying to
16   correct your --
17   BY MR. BREWER:
18   Q    Excuse me. 10:10 p.m. And how is it that you
19   told your daughter to prepare this form for you?
20   A    Because I wanted to keep a record of my time, my
21   hours.

29 (Pages 110 to 113)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 130

1  me. There are two notations on it. I see Mr. Ayers is off
2  again, excused by you?
3  A  Yes.
4  Q  So that's the third day, I think, from him that
5  you excused him off. I see Mr. Peter Major is unexcused?
6  A  Yes.
7  Q  So he did not show up that day?
8  A  No, he didn't.
9  Q  Okay. Now, I believe we talked earlier that at
10  this time you might not have been picking him up?
11  A  That's correct.
12  Q  Okay. But he, nevertheless, didn't show up on the
13  farm on time?
14  A  No.
15  Q  And you had to catch with only six?
16  A  Yes.
17  Q  And you took no lunch?
18  A  No lunch again, that's correct.
19  Q  You decided that we didn't need lunch.
20  A  Only three hours.
21  Q  So that was your decision?

Page 131

1  A  Yes.
2  Q  Okay. All right. That's takes care of that.
3  Mr. Gibbs, you live in Frankford, Delaware, I believe?
4  A  Yes. That's my mailing address. I live in
5  Clarksville.
6  Q  Clarksville?
7  A  Yes.
8  Q  How far -- I'm not all that familiar with that.
9  How far is that from Frankford?
10  A  I think it's like four miles, four or five miles.
11  Q  So it's close by?
12  A  Yes.
13  Q  And the first person I think you said you picked
14  up was Mr. Belfield. He lives in Frankford?
15  A  He lives in Roxana.
16  Q  Where is that in relation to Frankford?
17  A  It's about -- I don't know, maybe five -- four or
18  five miles from Roxana to the east side of Frankford.
19  Q  From where you live to where Mr. Belfield lives,
20  how far is that?
21  A  About six miles.

Page 132

1  Q  Okay.
2  A  Something like that.
3  Q  And the next person you pick up is Mr. Jernigan,
4  and he lives also in Frankford?
5  A  No, Millsboro.
6  Q  He lives in Millsboro. How about Mr. James Gibbs,
7  does he live in Dagsboro?
8  A  He lives in -- because a lot of times their
9  mailing address are different from where they really live.
10  Millsboro. It's Millsboro.
11  Q  So James -- and this is your brother -- lives in
12  Millsboro. He does not live in Dagsboro?
13  A  That's correct.
14  Q  How about Donald, your other brother, does he live
15  in Frankford?
16  A  No. He lives in Selbyville.
17  Q  He lives in Selbyville?
18  A  Yes.
19  Q  And how about Mr. Ayers, does he live in
20  Frankford?
21  A  Yes.

Page 133

1  MR. BREWER:  Okay.
2  MR. MARTIN:  Off the record.
3  (Off the record.)
4  BY MR. BREWER:
5  Q  This is Exhibit 8, sir, to -- I'll give you the
6  official one. You don't want a copy. This is Exhibit 8 to
7  Mr. Garrison's deposition. Have you seen this before?
8  A  Yes.
9  Q  And it's dated November 1 of 2000?
10  A  Yes.
11  Q  And it basically says that you're not going to
12  receive any additional pay for performing jobs such as
13  catching or forklift?
14  A  That's correct.
15  Q  And that's so you would have more time to
16  supervise your crew; isn't that true?
17  A  That's true.
18  MR. BREWER:  Okay. All right. Why don't we
19  take a few minutes right now.
20  (Break held.)
21  (Deposition Exhibit No. 5 marked.)

34 (Pages 130 to 133)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 134

1  BY MR. BREWER:
2      Q    Sir, I'm going to show you Exhibit 9 and 10 to
3  Mr. Garrison's deposition. You can have those in front of
4  you. And I'm also going to have this marked 5.
5          Now, the first documents that you have, which is
6  No. 9 to Mr. Garrison's deposition, as you can see, is a
7  salaried benefit booklet. That's No. 9. The second one,
8  No. 10, is for the hourly people, which would be your crew
9  leader -- your crew, your catchers. This is the benefit
10  plan that pertains to them. And the other document that I
11  just gave you, which is No. 5 to your deposition, which is
12  this paper up here, sir, is a comparison of the benefits
13  that the salaried people -- and you are paid on a salary
14  basis; are you not?
15      A    Yes.
16      Q    The salaried people receive versus the benefits
17  that the hourly people, the catchers who work for you,
18  receive. Let's just go through this quickly. Vacation for
19  the salaried people, such as yourself, is listed under
20  salaried. So they get two weeks after one year, three weeks
21  after five, four after 15. So you are in this three week

Page 135

1  area because you just -- I guess '94, you would be coming up
2  on 11 years, right?
3      A    Yes.
4      Q    Okay. So right now you receive three weeks'
5  vacation, correct?
6      A    That's correct.
7      Q    And when you receive your vacation, that's the
8  same check -- you get the same check when you're on vacation
9  as you got when you weren't on vacation?
10      A    Yes.
11      Q    The crew people who work for you have to wait
12  until ten years to get their third week of vacation. You
13  know that to be true?
14      A    Yes.
15      Q    Because you approve the time off for vacation?
16      A    Yes.
17      Q    LTD, which stands for long-term disability, the
18  hourly people get half of their regular pay for five years,
19  but as a salaried person, you get -- after 90 days, you get
20  your first check -- you continue to get paid for 90 days,
21  and then after that, you get 60 percent of your salary until

Page 136

1  age 65 if you're totally disabled; does that sound right to
2  you?
3      A    Yes.
4      Q    Okay. STD, which is the next column, stands for
5  short-term disability. Their maximum is $200 a week for 26
6  weeks. And then you get your regular pay for 90 days if
7  you're employed over a year; does that sound correct?
8      A    Yes.
9      Q    And the rest of these -- just take a quick look.
10  I understand you may need to leave as quickly as you can.
11  Do these seem correct to you as to your benefits versus
12  those of the crew, the catchers, who work for you?
13      A    Yes, they do.
14      Q    Okay. Let's go to -- this is Exhibit No. 12 to
15  Mr. Garrison's deposition. I'll give that to you. Have you
16  seen this before, sir?
17      A    Yes.
18      Q    Okay. As to crew leaders, this memo is dated --
19  at the top it says, 3/27/01. That's when it was issued.
20  You became -- you began receiving a salary in June of 2002;
21  isn't that right?

Page 137

1      A    Yes.
2      Q    Okay. This says that, as a crew leader, you are
3  eligible for monthly and annual bonuses. Are you eligible
4  for those?
5      A    Yes.
6      Q    The catchers are not, are they?
7      A    No.
8      Q    Okay. Let's take a look at Exhibit 13 to
9  Mr. Garrison's deposition, and that's this paper here. You
10  have a lot of papers in front of you. If you want to move
11  them around, you can. I'm going to be asking you questions
12  on this Exhibit No. 13, this paper here.
13      A    Garrison 13.
14      Q    Yeah. That's the one. If you look at the top, I
15  see for the year 2001, Larry Gibbs, that's you, sir?
16      A    Yes.
17      Q    And that you received a bonus in that month of
18  November '00 of $107.93?
19      A    Yes, that's correct.
20      Q    And just to expedite this. If we go across, we're
21  looking from November of 2000 through, in this document,

35 (Pages 134 to 137)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 138

1  October of '01, underneath all of those months, there are
2  monies that are shown that you received with the exception
3  of one month, which was January of '01, and that was a bonus
4  that you earned, correct?
5      A   That's correct.
6      Q   And that year-to-date total at the end for you is
7  $2,190.45. Does that sound like the bonus that you received
8  for that year?
9      A   Yes.
10     Q   Okay. And that was your monthly bonus?
11     A   Yes.
12     Q   You also are entitled to an annual bonus on top of
13  that?
14     A   Yes.
15     Q   And the monthly bonus is based on your performance
16  as a crew leader?
17     A   That's correct.
18     Q   The better you and your crew perform, the more
19  money you stand to make?
20     A   Yes.
21     Q   If you don't perform well, then you're not going

Page 139

1  to make so much in the bonus?
2      A   That's correct.
3      Q   But the crew doesn't get that bonus at all?
4      A   That's correct.
5      Q   Going down to the next year 2002, I see that,
6  again, we can go all the way across the column, for that
7  year you earned $2,090.69 in monthly bonuses; does that
8  sound right to you?
9      A   That sounds right.
10     Q   And the next year, you received $2,126.66; does
11  that sound right?
12     A   That sounds right, yes.
13     Q   And then in 2004 to date, it hasn't been
14  completed. It ends in July of '04 on this document, but at
15  that time up to that point, you had received $1,740.23; does
16  that sound right?
17     A   Yes.
18     Q   If we go down to the very last block on the bottom
19  of the page, when I see you, Mr. Gibbs, it shows for 2001,
20  you see where it says, monthly, you received that?
21     A   Yes.

Page 140

1      Q   In 2001 you received $2,190.45 --
2      A   Yes.
3      Q   -- which we saw at the top. In addition, you
4  received another $4,368.64 as your annual bonus?
5      A   That's correct.
6      Q   For 2002, you received $2,090.69 as a bonus,
7  monthly bonus?
8      A   That sounds correct.
9      Q   But you did not get an annual bonus that year?
10     A   No, I didn't.
11     Q   Okay. In fact, none of the crew leaders did, did
12  they?
13     A   No.
14     Q   But the following year 2003, you made 2126.66 and
15  got an annual bonus of $1,672?
16     A   That's correct.
17     Q   And then for up until the time this is calculated
18  in 2004, you received $1,740.23. If we add those numbers up
19  from 2002 all the way through when this is calculated, which
20  is June of '04, this number shows that you've received
21  $14,188.67 in bonuses; does that sound right?

Page 141

1      A   That sounds correct.
2      Q   That's fine. Next is Exhibit No. 14, and this is
3  to Mr. Garrison's deposition. Have you seen this document
4  before, sir?
5      A   Yes. I've seen this before, yes.
6      Q   And this is from Mr. Lynch to yourself --
7      A   Yes.
8      Q   -- to all the crew leaders and Mr. Nuse?
9      A   Yes.
10     Q   And this talks about a mandatory meeting for
11  management including the crew leaders?
12     A   Yes.
13     Q   Did you attend this meeting?
14     A   No.
15     Q   You did not go to this meeting?
16     A   No.
17     Q   Were you excused from this meeting?
18     A   No. I wasn't excused. But I forget what --
19  something happened. I can't recall exactly what, but I
20  didn't make that meeting.
21     Q   You didn't make this meeting?

36 (Pages 138 to 141)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 142

1   A   No, I didn't.
2   Q   But this was a meeting that you were invited to?
3   A   Yes.
4   Q   Next exhibit is 15 to -- again, this is to
5   Mr. Garrison's deposition, sir.  Just take a look at that
6   for a minute.  The first page is a 2003 Christmas dinner
7   invitation list, which is, the supervisors have a Christmas
8   party every year, don't they, at Mountaire?
9   A   Yes.
10  Q   Do the hourly people have a Christmas party?
11  A   Not that I know.  Not that I know of, no.
12  Q   Okay.  I see that your name is listed here under
13  Mr. Lynch; is that you?
14  A   Yes.
15  Q   Okay.  Did you attend the Christmas party?
16  A   No.
17  Q   Okay.  Take a look at the people who are on this
18  list, and see if you can tell me if there's anybody there
19  who is not a supervisor, any of your crew people, any of
20  your catchers listed there?
21  A   No.

Page 143

1   Q   They're all supervisory people?
2   A   All besides Susie.
3   Q   Okay.  How about the next page?  It's the 2002
4   Christmas party.  Were you invited to that?
5   A   Yes.
6   Q   Did you go?
7   A   I never attended any of the Christmas parties, no.
8   Q   Any particular reason?
9   A   My wife doesn't care for going out like that too
10  much, so I didn't want to go without her.
11  Q   That's fine.
12  A   So I never attended one.
13  Q   And then the next to the last page is 2001.
14  Again, your name is listed as somebody who was invited to
15  the party?
16  A   Yes.
17  Q   But again, you didn't go because of --
18  A   No.  I never attended any of them.
19      (Deposition Exhibit No. 6 marked.)
20  BY MR. BREWER:
21  Q   Okay.  That's fine.  Now, let me -- they have this

Page 144

1   marked as No. 6 to Mr. Gibb's deposition.  Just take a look
2   at that one.
3   A   Okay.
4   Q   Do you recognize this?
5   A   Yes.
6   Q   And who issued this warning to you?
7   A   Alan Z. and David Nuse, the assistant live haul
8   manager.
9   Q   And why did you receive this warning?
10  A   Because they said they wanted to make sure that
11  the catchers were getting a half hour lunch break.
12  Q   And were the people in your crew not getting a
13  half an hour lunch break?
14  A   Years ago, we didn't take a lunch break, but --
15  Q   Let me ask you this.  Are you -- do you know that
16  the catchers had filed a lawsuit against Mountaire?
17  A   I knew that, yes.
18  Q   Okay.  And did you know that they were claiming
19  that they were working through their lunch period and not
20  being paid for it, that that was the basis of their case?
21  A   I didn't know that.

Page 145

1   Q   You didn't know that?
2   A   No.
3   Q   Okay.  When Mr. Nuse and Mr. Al Z. talked to you
4   about this, can you recall why they were so insistent that
5   you take a half an hour lunch?
6   A   No, I didn't.
7   Q   Okay.  But this is your signature here?
8   A   Yes, it is.
9   Q   Okay.  And, of course, now you make sure your
10  people are taking a half an hour lunch; is that correct?
11  A   That's correct.
12  Q   Okay.  I'm not sure if I asked you this.  I may,
13  if -- I think you said there was a time when you didn't --
14  when these people did not take a half an hour lunch.  Can
15  you tell me when that time frame was?
16  A   When I was under contract and wasn't working
17  with -- well, right when I first started Mountaire, we
18  didn't.  And then years prior to that, we never did because
19  I was paying my catchers myself.  The company wasn't paying
20  them.
21  Q   Okay.  But was it shortly after you started at

37 (Pages 142 to 145)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 146

1    Mountaire that your crews started to get this half an hour?
2    A    I can't remember exactly when, no.
3    Q    Okay. At around this time in March of last year,
4    were your people getting a half an hour lunch, were you
5    making sure they got their half an hour lunch?
6    A    Yes, they were.
7    Q    So, really, this had no implication to you because
8    your people were getting half an hour lunch?
9    A    They were getting a half hour lunch, yes.
10   Q    So this really didn't have much impact on you? I
11   don't want to misinterpret your head movement, so I'll
12   just -- maybe I can help you by rephrasing what I'm trying
13   to get at. You were making sure that your people got their
14   half an hour lunch?
15   A    I was.
16   Q    So when this memo came out, they were getting the
17   half an hour lunch. This didn't concern you at all because
18   you were making sure that they got the half an hour lunch,
19   right?
20   A    It concerned me when they -- I would be terminated
21   if they didn't.

Page 147

1    Q    If they didn't. But you were giving them the half
2    an hour lunch?
3    A    I was.
4    Q    Do you know if the other crews were getting their
5    half an hour lunch?
6    A    I don't know.
7    Q    You have no idea?
8    A    No.
9    Q    Let's take a look at -- this is the complaint in
10   this case. It's an exhibit to Mr. Garrison's deposition.
11   And what I would like to do is to go to paragraph 23 of the
12   complaint. It's on the third page. Do you see paragraph
13   23?
14   A    Yes.
15   Q    And what this says is that the company is
16   following and continues to follow a policy which requires
17   you, being the Plaintiff, to submit a daily time sheet
18   broken down for each day of the week. Is the time sheet
19   that you're submitting for the time that your catchers work?
20   A    That's correct, yes.
21   Q    Is it not a time sheet for the hours that you

Page 148

1    work, is it?
2    A    No.
3    Q    Okay. Let's go to the next paragraph, and it says
4    that there's compensation -- you're only paid from the time
5    you start at the farm and you end at the farm. But you're
6    being paid for all the time; are you not? Your salary is
7    for everything that you do, picking up, going to the farm
8    and everything else, isn't it?
9    A    I don't know.
10   Q    Okay. What is your salary for?
11   A    It doesn't include my vehicle, buying gas and
12   insurance.
13   Q    But you receive a separate check for that every
14   week, don't you?
15   A    I receive a separate check every week, yes.
16   Q    You receive a separate check. How much is that
17   check?
18   A    Now it's 250. Could I -- excuse me a minute. I
19   think that's my daughter.
20        MR. MARTIN: Let's go off the record.
21        (Off the record.)

Page 149

1    BY MR. BREWER:
2    Q    Mr. Garrison, before we broke -- excuse me.
3    Mr. Gibbs, before we broke, we were talking about the monies
4    you receive for gas and stuff. And that check is $250 now?
5    A    Yes.
6    Q    And that's -- you receive that every week?
7    A    Yes.
8    Q    And that's not in your payroll check, is it?
9    A    It's not in my payroll check, no.
10   Q    It's a separate check --
11   A    Yes.
12   Q    -- for that? And what was it for 2004, if you
13   remember?
14   A    I think it was 235.
15   Q    And how about 2002?
16   A    I think it was the same, 235.
17   Q    Okay. And that check that you receive -- and you
18   receive that every week?
19   A    Yes.
20   Q    Fifty-two weeks of the year?
21   A    Yes.

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 150

1    Q    Okay. And that check is for your insurance on the
2    vehicle, your gas and maintenance and everything?
3    A    I don't understand. Are you saying it's like
4    Mountaire give us money for our gas, insurance?
5    Q    That's what the $250 or 235 that we're talking
6    about last year is supposed to cover?
7    A    Yes. But that's out of my -- before we went on
8    salary, that was deducted from our total pay each week.
9    Q    Okay.
10   A    That was really my money.
11   Q    That was before you went on salary. That was
12   deducted?
13   A    Yes.
14   Q    Okay. Since you went on salary, that's not
15   deducted from your pay, is it?
16   A    I'm not sure how they're doing it.
17   Q    Let me ask you this. Your salary that you get
18   paid, you get paid once every two weeks?
19   A    Yes.
20   Q    You get a check, and that's your salary. In
21   addition to that, every week you get another check?

Page 151

1    A    I do.
2    Q    Which is not a payroll check, is it?
3    A    No.
4    Q    No. And that's for the expenses that you incur
5    with your vehicle; isn't that right?
6    A    Yes.
7    Q    Okay. So in any given month, you receive two
8    checks for your salary and four checks to maintain your
9    vehicle at 250 bucks a pop, so it's a thousand dollars a
10   month?
11   A    Yes.
12   Q    Okay. Now, you're saying before 2002, you didn't
13   receive that separate check?
14   A    No. That's not what I'm saying. We did receive
15   that separate check.
16   Q    Okay.
17   A    But it was deducted from -- the crew leaders were
18   getting paid the same as the catchers then per thousand.
19   And whatever the total was, they would deduct that expense
20   check from it.
21   Q    Okay. I don't want you to misspeak. You just

Page 152

1    said to me that before June of 2002, when you went through a
2    salary basis, that the crew leaders were being paid the same
3    as the catchers?
4    A    We were getting paid per thousand just like the
5    catchers, the same. We were getting paid per thousand.
6    Q    How much were you getting paid per thousand; do
7    you remember?
8    A    Five hundred and ten per thousand.
9    Q    And the catchers, do you remember what they were
10   getting paid? You don't have to remember. It's in the
11   contract.
12   A    I'm not sure. Yeah, 260 or something like that.
13   Q    Or something like that. You were making about
14   twice as much as the catchers?
15   A    Just about.
16   Q    Okay. Let's see. Paragraph 26 of the complaint,
17   which you'll have to turn to the next page for. Okay. This
18   says that the company is following and enforcing a practice
19   of making a deduction from your salary if you take a partial
20   day off, part of a day off. Has your salary ever been
21   reduced because you took three or four hours off during the

Page 153

1    day?
2         MR. MARTIN: Object to the form of the question.
3         THE WITNESS: I never took a partial day off.
4    BY MR. BREWER:
5    Q    Okay. Well, let me ask the question this way. Is
6    the checks that you receive in your salary once every two
7    weeks, is that amount always the same?
8    A    Yes.
9    Q    Whether you're on vacation or not on vacation?
10   A    That's correct. Yes, it is.
11   Q    Whether you've been sick or not sick?
12   A    Yes.
13   Q    And that's the same. Okay. And while you may not
14   have a present recollection of taking a half a day off, if
15   that did happen, your check was the same?
16        MR. MARTIN: Objection.
17        THE WITNESS: Like I said, I'm quite sure I
18   didn't take a partial day off.
19   BY MR. BREWER:
20   Q    I understand, Mr. Gibbs. And I'm not trying to
21   trick you at all. And I understand that you -- it's

39 (Pages 150 to 153)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 154

1  difficult for you to go back now in 2005 to think back to
2  2002 and did you ever take part of the day off. I
3  understand that. All I'm simply trying to suggest or to
4  find out is, if you did, you're basically telling me your
5  checks have been the same since you've been salaried?
6     A   Yes.
7     Q   If you take it off -- and I'm not saying you did,
8  maybe you didn't, but if you did, there was no change in
9  your check?
10    A   No.
11    Q   That's all. Okay. Let's see. Let's go to
12 paragraph 27. And what paragraph 27 says is that the
13 company has a policy, which has been described earlier,
14 where your paycheck would be reduced because of the quantity
15 or quality of the work performed -- or quantity, I should
16 say, of the work performed. But you just basically said to
17 me that your checks are the same regardless?
18    A   They are.
19    Q   Okay. Thanks. Thanks. Now we go to paragraph
20 32. We've already had some discussion about this. The
21 vehicle that you use in -- to pick up the people, that is

Page 155

1  your vehicle; isn't it?
2     A   Yes, it is.
3     Q   It's titled in your name?
4     A   Yes.
5     Q   And who picked out the vehicle?
6     A   I did.
7     Q   Okay. And what kind of vehicle are you driving?
8     A   A '99 Ford van.
9     Q   Okay. And where did you buy it?
10    A   I bought it from Terry Morris.
11    Q   Did anybody in the company tell you to go to Terry
12 Morris to buy it?
13    A   Yes.
14    Q   Who told you to go to Mr. Morris to buy the
15 vehicle?
16    A   Doug Lynch.
17    Q   He told you that's where to go?
18    A   Yes.
19    Q   Could you have gone anyplace else as far as you
20 know?
21    A   And buy a vehicle?

Page 156

1     Q   Yes.
2     A   I could have, yes.
3     Q   The vehicle that you owned before this one, where
4  did you buy that one?
5     A   From Mountaire also.
6     Q   You bought the vehicle from Mountaire?
7     A   Yes.
8     Q   I'm confused. I didn't know that Mountaire sold
9  cars or vehicles.
10        MR. MARTIN: Is that a question?
11 BY MR. BREWER:
12    Q   Yes. When you said buy it from Mountaire --
13    A   Like when they, I guess, get a new fleet or
14 whatever, they sell the old ones, and I bought one of the
15 old ones.
16    Q   When was that?
17    A   1998. I think it was January of '98.
18    Q   And then you bought another one a year later?
19        MR. MARTIN: Objection.
20        THE WITNESS: No. I bought -- no, I didn't.
21 BY MR. BREWER:

Page 157

1     Q   Okay. Let me see if I can -- the questions I've
2  asked you -- what I understood you to say. The vehicle that
3  you're now using you purchased in 1999?
4         MR. MARTIN: Objection.
5         THE WITNESS: No.
6  BY MR. BREWER:
7     Q   When did you purchase the vehicle that you're now
8  using?
9     A   2004.
10    Q   2004. Where did you purchase that vehicle?
11    A   I just told you, Terry Morris.
12    Q   2004 you purchased the vehicle from Terry Morris
13 and that -- Mr. Lynch told you to go there?
14    A   Yes.
15    Q   You could have gone other places, but you went
16 there?
17    A   That's correct.
18    Q   Prior to the vehicle that you just purchased in
19 2004, what kind of a vehicle were you driving?
20    A   A 1990 Chevy.
21    Q   A 1990 Chevy?

40 (Pages 154 to 157)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 158

1    A    Chevy van, yes.
2    Q    And where did you get that vehicle?
3    A    I purchased that from Mountaire.
4    Q    Okay. So you had the same vehicle from 1990 until
5    2004?
6         MR. MARTIN: Objection. Excuse me. Because he
7    bought a 1990 Chevy van doesn't mean he purchased it in
8    1990. And to the contrary, he's already testified that
9    he purchased it in January of '98.
10        MR. BREWER: That's something that he can
11   explain to me. It's not following through to me.
12        MR. MARTIN: Okay.
13   BY MR. BREWER:
14   Q    You purchased the vehicle in '94?
15        MR. MARTIN: Objection.
16   BY MR. BREWER:
17   Q    Maybe I'm not making myself clear. You purchased
18   a vehicle in 2004; am I correct on that? Did you purchase a
19   vehicle in 2004?
20   A    Yes.
21   Q    Okay. So you bought a vehicle in 2004?

Page 159

1    A    Yes.
2    Q    When is the time before that that you bought a
3    vehicle, what year?
4    A    1998.
5    Q    1998?
6    A    Yes.
7    Q    Okay. And that's the vehicle that you talked
8    about purchasing from Mountaire?
9    A    Yes.
10   Q    Okay. When before 1998 did you purchase a
11   vehicle?
12   A    I can't remember. I can't remember exactly when I
13   purchased the one before that.
14   Q    Okay.
15   A    I think it was -- I can't remember. '94 I think.
16   I'm not sure.
17   Q    When you went to Mr. Morris to buy the vehicle,
18   did you have to buy any special kind of vehicle? Did the
19   company tell you to buy a special kind of vehicle?
20   A    No, they didn't.
21   Q    Tell you what color to buy?

Page 160

1    A    No.
2    Q    What equipment to have on it?
3    A    No.
4    Q    Leather seats, radios, that was up to you to
5    decide?
6    A    They told me not to --
7    Q    So whatever you bought, you bought because that's
8    what you wanted to buy?
9    A    Yes.
10   Q    Okay. Now, you are responsible for maintaining
11   the vehicle and repairing it?
12   A    Yes.
13   Q    Okay. And I think we've gone over this, but just
14   to be sure, we'll tie it up with this point here. You are
15   receiving monies from the company every week to -- for those
16   expenses?
17   A    Yes.
18   Q    All right. Let's go to -- I need my letter at
19   this point. Final warning, we've covered that. Let's go to
20   paragraph 36 of the complaint, sir. Okay. Paragraph 36
21   says, many of the Plaintiffs have been cornered by various

Page 161

1    management personnel and questioned individually regarding
2    their discussions with counsel and the nature of this
3    action. Okay. That's what it says. Have you been cornered
4    by anybody from management?
5    A    I haven't been cornered, no. I haven't been
6    cornered by anyone from management.
7    Q    Okay. Have you been questioned by anybody from
8    management regarding your discussions with Mr. Martin?
9    A    I'm not -- I don't know exactly how to answer
10   that.
11   Q    Well, I'll see if I can rephrase it a little
12   differently. I'm not sure I know how to. This is
13   basically -- the claim here is that people from management,
14   and there are no names, so I can't give you a name because I
15   don't know the name, but the allegation here is that people
16   from management have questioned -- may have questioned you
17   individually about discussions you've had with your
18   attorney, Mr. Martin. And I guess I want to know, has
19   anybody from management asked you about any discussions
20   you've had with Mr. Martin?
21   A    Not about discussions I had with Mr. Martin.

41 (Pages 158 to 161)

Deposition of Larry E. Gibbs
Conducted on Thursday, January 20, 2005

Page 162

1    Q    Okay.  The next paragraph says that there was a --
2    you say not with Mr. Martin.  Did anybody question you
3    about -- anybody from management now, because I understand
4    you had conversations with Mr. Davis and others that we
5    talked about earlier.  Has anybody from management
6    questioned you about this lawsuit?
7    A    Yes.
8    Q    Who?
9    A    David Nuse.
10    Q    Okay.  And when did he question you about the
11    lawsuit?
12    A    I couldn't tell you.  I'm not sure what the date
13    was.  I'm not sure of the date.
14    Q    I don't need an exact date.  I understand that
15    would be difficult.  Would it be before, let's say -- do you
16    remember the time sheets that you were keeping that your
17    daughter drew up for you that started in February of '04?
18    Would it have been before you started keeping your time
19    sheets?
20    A    I think not because I think it was hot.  It was
21    during the summer months, I'm quite sure.

Page 163

1    Q    So it would have been, then, sometime after the
2    lawsuit was filed in June?
3    A    Yes.
4    Q    Okay.  And what did Mr. Nuse say to you?
5    A    Just asked me what was up with the lawsuit against
6    the company.
7    Q    Okay.  And what did you say?
8    A    I told him we're trying to get our overtime paid.
9    Q    Okay.  And what did Mr. Nuse say?
10    A    That was the end of the conversation.
11    Q    Okay.  So that's the entire conversation?
12    A    (Deponent nods.)
13    Q    Was anybody else present?
14    A    Yeah.  The catchers, forklift driver, yes, someone
15    else was present.
16    Q    So they were all in a group when he asked you this
17    question?
18    A    No, they were working.
19    Q    Was there anybody else who was part of the
20    conversation standing next to you or something?
21    A    No.

Page 164

1    Q    So you were working.  I gather you were on a farm
2    when this occurred?
3    A    Yes.
4    Q    Do you remember what farm offhand?
5    A    Yes.  But I can't recall the name.  I have to look
6    in my records.  I can't recall the name, but I know where it
7    was at, yes.
8    Q    Okay.  I'm going to ask you to do that for me,
9    please.  Anybody else besides Mr. Nuse have a conversation
10    with you about this case?
11    A    Anybody besides Mr. Nuse?
12    Q    Anyone outside of him, that's right.
13    A    You mean from Mountaire?
14    Q    Yes, from management.
15    A    No.
16    Q    Mr. Nuse is the only one?
17    A    Yes.
18    Q    And how many times did Mr. Nuse and you discuss
19    this lawsuit, just that one time?
20    A    Yes.
21    Q    Okay.  The next paragraph in the complaint says

Page 165

1    that apparently there was a meeting, and I think you
2    testified to this, on a Saturday morning at a restaurant,
3    and that Plaintiffs, which would include you, saw a vehicle
4    that was owned and operated by the company -- by upper
5    management of the company circling in the parking lot.  Do
6    you remember seeing that?
7    A    I didn't.  That happened before I arrived.
8    Q    Okay.  So you don't know anything about that?
9    A    No.
10         MR. BREWER:  Okay.  I think this might be a good
11    time to take a short break because we may be finished
12    or close to being finished.
13         {Break held.}
14         (Deposition Exhibit No. 7 marked.)
15    BY MR. BREWER:
16    Q    Now, sir, the documents that you have in front of
17    you is signed by your attorney and also by you.  If you
18    looked at the next to the last page, you'll see under
19    verification it says, Larry E. Gibbs, where you swore that
20    the answers to these questions are correct; do you see that?
21    That's the page.

42 (Pages 162 to 165)

Page 1

[ 1]                  IN THE UNITED STATES DISTRICT COURT
                      IN AND FOR THE DISTRICT OF DELAWARE
[ 2]

[ 3]   WILLIE DAVIS, JR.,            )
       NATHANIEL BRIDDELL,           )
[ 4]   GEORGE W. FEDDIMAN,           )
       JOSEPH GARRISON,              )
[ 5]           Plaintiffs,           )
         -vs-                        )   C.A. No. 04-0414
[ 6]                                 )
       MOUNTAIRE FARMS, INC.,        )
[ 7]   MOUNTAIRE FARMS OF            )
       DELMARVA, INC., and          )
[ 8]   MOUNTAIRE FARMS OF            )
              Defendants.            )   - - - - - -
[ 9]                          - - - - - - - -

[10]        Deposition of JOSEPH GARRISON, taken before

[11]   Pamela C. Washington, Registered Professional Reporter

[12]   and Notary Public, at the law offices of Young,

[13]   Conaway, Stargatt & Taylor, 110 West Pine Street,

[14]   Georgetown, Delaware, on January 14, 2005, beginning

[15]   at 10:00 a.m.

[16]                          - - - - - - -

[17]   APPEARANCES:

[18]        On behalf of the Plaintiffs:
              Margolis Edelstein
[19]          BY:  JEFFREY K. MARTIN
              and  KERI L. WILLIAMS, ESQ.
[20]          1509 Gilpin Avenue
              Wilmington, Delaware 19806
[21]
            On behalf of the Defendants:
[22]          Shawe Rosenthal
              BY:  ARTHUR M. BREWER, ESQ.
[23]          and  LAURA A. PIERSON SCHEINBERG, ESQ.
              20 South Charles Street   11th Floor
[24]          Baltimore, Maryland  21201

[25]

---

Page 2

[ 1]                          I-N-D-E-X

[ 2]   Witness:
              JOSEPH GARRISON
[ 3]          Examination by Mr. Brewer ...............   3

[ 4]   Exhibits Marked
              Garrison Exhibit 1 ......................   35
[ 5]          Garrison Exhibit 2 ......................   48
              Garrison Exhibit 3 ......................   65
[ 6]          Garrison Exhibit 4 ......................   91
              Garrison Exhibit 5 ......................  109
[ 7]          Garrison Exhibit 6 ......................  121
              Garrison Exhibit 7 ......................  121
[ 8]          Garrison Exhibit 8 ......................  178
              Garrison Exhibit 9 ......................  181
[ 9]          Garrison Exhibit 10 .....................  183
              Garrison Exhibit 11 .....................  184
[10]          Garrison Exhibit 12 .....................  188
              Garrison Exhibit 13 .....................  191
[11]          Garrison Exhibit 14 .....................  195
              Garrison Exhibit 15 .....................  196
[12]          Garrison Exhibit 16 .....................  199
              Garrison Exhibit 17 .....................  233
[13]

[14]

[15]   CERTIFICATE OF COURT REPORTER ...................  241

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

---

Page 3

[ 1]   WHEREUPON:

[ 2]              JOSEPH GARRISON,

[ 3]   having first been duly sworn by the court reporter,

[ 4]   thereupon testified upon his oath as follows:

[ 5]          MR. BREWER:  You have noted the

[ 6]   appearances for the record, Madame Reporter?

[ 7]          THE COURT REPORTER:  Yes.

[ 8]          MR. BREWER:  We have the standard

[ 9]   stipulation with respect to --

[10]          MR. MARTIN:  In Delaware, we don't have

[11]   any standard stipulations, but I'll be glad to

[12]   stipulate --

[13]          MR. BREWER:  As to the form of the

[14]   question, would be the objections.

[15]          MR. MARTIN:  Yes.

[16]          MR. BREWER:  Okay, that's fine.

[17]   BY MR. BREWER:

[18]        Q    All right.  Mr. Garrison, have you ever

[19]   been deposed before?

[20]        A    Yes.

[21]        Q    You have?  Can you tell me when?

[22]        A    No, not proposed, no, I haven't,

[23]   not ...

[24]        Q    Deposed like having a deposition like

[25]   we're doing today.

---

Page 4

[ 1]        A    No, no, no.

[ 2]        Q    Have you ever done this before?

[ 3]        A    No, no.

[ 4]        Q    Okay, thank you.  You understand that

[ 5]   you are under oath today, and that you have an

[ 6]   obligation to tell the truth?

[ 7]        A    Yes.

[ 8]        Q    All right.  This is obviously informal,

[ 9]   but it has the same significance and force as if you

[10]   were with a judge in a courtroom, do you understand

[11]   that, sir?

[12]        A    Yes.

[13]        Q    Okay.  I'll be asking you a series of

[14]   questions; the court reporter, as you can see, will be

[15]   taking down your answers.  At trial, if it comes to

[16]   trial, I will have an opportunity to bring to the

[17]   attention of the judge or jury any changes or

[18]   conflicts in your testimony here today and any future

[19]   proceedings, do you understand that?

[20]        A    Yes.

[21]        Q    Okay.  I would basically ask you this,

[22]   and that is not to answer any question that I ask that

[23]   you do not understand.  If you don't understand a

[24]   question, please ask me to rephrase it or to restate

[25]   it, okay?

A-0145

Page 21

[ 1]    Q    Okay.

[ 2]    A    Joseph Giddins.  Joseph Giddins.

[ 3]    Q    Giddins, okay.

[ 4]    A    He's 24.  And Yvonne Parker, she's

[ 5]  married.

[ 6]    Q    Okay, she's your daughter?

[ 7]    A    That's my daughter.

[ 8]    Q    Okay.

[ 9]    A    She's -- I'm trying to think how old

[10]  she is.

[11]    Q    Approximately, that's fine.

[12]    A    I'm going to say 28.

[13]    Q    Okay.

[14]    A    And Joann Richardson, she's 30.

[15]    Q    Also a daughter?

[16]    A    A daughter.  And Denita Giddins, she's

[17]  a daughter, she's approximately 32.

[18]    Q    Okay.  Sir, do you regularly attend a

[19]  church?

[20]    A    Yes.

[21]    Q    Which church, please?

[22]    A    Calvary Pentecostal in Bishopville,

[23]  Maryland.

[24]    Q    And do you attend that every week?

[25]    A    Yes.

Page 22

[ 1]          MR. MARTIN:  I'm going to object.

[ 2]  We're going way beyond -- I know that there's great

[ 3]  freedom in discovery, but church attendance is

[ 4]  certainly something that I cannot conceive would

[ 5]  provide any admissible evidence.

[ 6]  BY MR. BREWER:

[ 7]    Q    Your answer was what, sir?

[ 8]    A    Yes, Calvary Pentecostal.

[ 9]    Q    And you basically said you attended

[10]  every week, before the objection was filed?

[11]    A    Yes.

[12]    Q    Okay.  Have you discussed this case

[13]  with your pastor at all?

[14]    A    No.

[15]    Q    Okay.  Tell me what is your education?

[16]    A    Well, I went through 11th grade.

[17]    Q    Went through the 11th grade?  And when

[18]  did you complete the 11th grade?

[19]    A    I would say around '76, '77.

[20]    Q    Okay.  Have you received any training

[21]  or certifications for licenses such as forklifts?

[22]    A    Yes.

[23]    Q    And where did you receive the

[24]  certification for forklift?

[25]    A    At Mountaire.

Page 23

[ 1]    Q    At Mountaire?  When did you receive

[ 2]  that certification?

[ 3]    A    I guess its been like three years ago,

[ 4]  somewhere like that.

[ 5]    Q    How long have you worked for Mountaire?

[ 6]    A    Eight years.

[ 7]    Q    Eight years?

[ 8]    A    Eight.  I think it was eight.  Or

[ 9]  seven, I believe it -- it was going on eight, it was

[10]  going on eight.

[11]    Q    It was going on eight?

[12]    A    Yeah.

[13]    Q    And when you first became employed with

[14]  Mountaire, what job did you have?

[15]    A    I was catcher, I was a catcher.

[16]    Q    You were a catcher?  Approximately how

[17]  long after you became a catcher did you receive your

[18]  forklift certification?

[19]    A    After I was a catcher, I was -- after I

[20]  was a catcher, a senior catcher, I was a crew leader.

[21]    Q    Let me see if I understand what you're

[22]  telling me.  You were hired as a catcher?

[23]    A    Right.

[24]    Q    And then you went right from a catcher

[25]  to a crew leader?

Page 24

[ 1]    A    Yes.

[ 2]    Q    But you did receive a certification for

[ 3]  forklift operator?

[ 4]    A    After I be a crew leader, then I

[ 5]  started learning how to drive forklift, then I receive

[ 6]  a forklift license.

[ 7]    Q    Okay.  So you were a catcher, then you

[ 8]  became a crew leader, and you got your certification

[ 9]  for forklift after you became a crew leader?

[10]    A    Yes.

[11]    Q    Are you sure of that?

[12]    A    Yes.

[13]    Q    Okay.  I believe I asked you a series

[14]  of questions earlier, but just to be sure that I'm

[15]  understanding it, there's nothing about your current

[16]  state of physical health that's going to be a problem

[17]  with your deposition here today?

[18]    A    No.

[19]    Q    No?

[20]    A    No, it's not.

[21]    Q    All right.  Are you or have you been

[22]  under any treatment with a physician or a medical

[23]  health care provider in the last five years?

[24]    A    What do you mean?  Say that again one

[25]  more time.

Page 25

[ 1]    Q    Have you been under the care of a

[ 2]  physician or a health care provider --

[ 3]    A    No.

[ 4]    Q    -- in the last 5 years?

[ 5]    A    No.

[ 6]    Q    All right.  You became employed with

[ 7]  the company eight years ago?

[ 8]    A    Yes.

[ 9]    Q    And as a catcher.  Tell us for the

[10]  record, please, what you did as a catcher.

[11]    A    Catch chickens.

[12]    Q    Where?

[13]    A    Whatever I had to catch them at,

[14]  different farms.

[15]    Q    Okay.  How did you get from where you

[16]  were located to the farm?

[17]    A    From a crew leader that picked me up

[18]  from my house.

[19]    Q    And who was the crew leader that you

[20]  had when you first became employed?

[21]    A    Terry Morris.

[22]    Q    Terry Morris?

[23]    A    Yes.

[24]    Q    Were there any breaks in service with

[25]  the company from the time you first started until you

Page 26

[ 1]  resigned?

[ 2]    A    What do you mean breaks?

[ 3]    Q    Well, in other words, were you employed

[ 4]  for Mountaire continuously for the eight years?

[ 5]    A    Yes.

[ 6]    Q    You didn't --

[ 7]    A    I didn't, no.

[ 8]    Q    You didn't leave and then come back or

[ 9]  anything else?

[10]    A    No.

[11]    Q    So you were continuously employed?

[12]    A    Yes.

[13]    Q    Okay.  And I believe you told me, just

[14]  to be sure, when about did you become a crew leader?

[15]    A    It was -- let me see.  I believe it was

[16]  in '99, 1999.

[17]    Q    Okay.  That's about six years ago then?

[18]    A    Uh-huh.

[19]    Q    When you became a crew leader, did you

[20]  consider that to be a promotion?

[21]    A    Yes.

[22]    Q    Now, you became a crew leader, you just

[23]  told me, in 1999, okay, I'll just make that note.

[24]  Would you tell us as a crew leader what you do?

[25]    A    Yes.  Well, I picked up the help, I

Page 27

[ 1]  picked up the help, stopping to the store, took them

[ 2]  to the farm, got the house ready.  I had to watch out

[ 3]  for the drivers.

[ 4]    Q    Now you say drivers, which drivers are

[ 5]  we talking about?

[ 6]    A    Truck drivers.

[ 7]    Q    Employed by whom?

[ 8]    A    Mountaire.

[ 9]    Q    And how were those drivers, how do you

[10]  describe those drivers?

[11]    A    Okay, I had to watch how they parked,

[12]  watch how -- backing them up.

[13]    Q    Let me rephrase the question to make

[14]  myself clear.  When you say watch out for the drivers,

[15]  are you talking about the live haul drivers?

[16]    A    Yes.

[17]    Q    And for the record, I'll state that

[18]  live haul drivers are drivers who are employed by the

[19]  company who are CDL qualified who bring live chickens

[20]  that are caught on a farm to the plant for processing.

[21]    A    Right.

[22]    Q    If you have anything you'd like to add,

[23]  you may.

[24]        MR. MARTIN:  No, that's fine.

[25]

Page 28

[ 1]  BY MR. BREWER:

[ 2]    Q    All right.  How many people are on your

[ 3]  crew?

[ 4]    A    Seven.

[ 5]    Q    Seven?  Sometimes are there more?

[ 6]    A    Well, at times we carry an extra man,

[ 7]  eight.

[ 8]    Q    And sometimes are there less?

[ 9]    A    Yes.

[10]    Q    And why is there sometimes less?

[11]    A    Because maybe sometimes you be

[12]  short-handed.

[13]    Q    Okay.  Do you manage that crew to catch

[14]  the chickens?

[15]    A    Yes.

[16]    Q    All right.  The catchers that you

[17]  manage to catch the chickens, do you know if they're

[18]  covered by a contract with the union?

[19]    A    Yes.

[20]    Q    And that's referred to as a collective

[21]  bargaining agreement, is that term familiar to you?

[22]    A    I don't understand.

[23]    Q    The people who you manage, the catchers

[24]  that catch the chickens --

[25]    A    Yeah.

A-0147

Page 29

[ 1]   Q   -- they are the members of a union, are

[ 2]  they not?

[ 3]   A   Yes.

[ 4]   Q   Okay.  And they're covered by a

[ 5]  contract that the company has with that union?

[ 6]   A   Yes.

[ 7]   Q   Have you heard the term collective

[ 8]  bargaining agreement, is that a term that's familiar

[ 9]  to you?  If it's not, you can just tell me.

[10]   A   I don't know.

[11]   Q   But you know they are covered by a

[12]  union contract?

[13]   A   Yeah, I do know that.

[14]   Q   And do you know what union that

[15]  contract is with?

[16]   A   355.

[17]   Q   Of what local?

[18]   A   Local 355.

[19]   Q   Of the Teamsters Union?

[20]   A   Teamsters, yeah.

[21]   Q   All right.  I don't want to put words

[22]  in your mouth.

[23]   A   Yeah, I know, you know what I'm saying.

[24]   Q   Now, in performing your duties as a

[25]  crew chief, have you ever had somebody who had very

Page 30

[ 1]  little experience catching chickens or no experience

[ 2]  working for you?

[ 3]   A   Yes.

[ 4]   Q   Okay.  Did you have any role in showing

[ 5]  them how to go about doing what they needed to do?

[ 6]   A   Yes.

[ 7]   Q   What did you do?

[ 8]   A   Well, I get down and show them how to

[ 9]  catch, how to use their hands, how to pick up the

[10]  chickens and how to put them in the cage.

[11]   Q   Okay.  When you get to a farm, do you

[12]  tell any of the catchers in your crew how to set the

[13]  farm up?

[14]   A   Yes, we all did it together.

[15]   Q   Okay.  But you will tell some people to

[16]  do certain things?

[17]   A   Yes.

[18]   Q   What kinds of things would you tell a

[19]  member of your crew to do as you're getting ready to

[20]  catch the chickens in a farm?

[21]   A   They have to crank up the waters.

[22]   Q   Crank up the waters?  Would you

[23]  describe for the purposes of this record that we're

[24]  making here today what that means?

[25]   A   In chicken houses you have water

Page 31

[ 1]  drinkers, and we had to crank them up before you be

[ 2]  able to catch the chickens.

[ 3]   Q   Okay, and would you tell somebody to do

[ 4]  that?

[ 5]   A   Yes.

[ 6]   Q   What else would you do?

[ 7]   A   We have to use the fire fan, we have to

[ 8]  go down to the end of the chicken house and open up

[ 9]  the door for to put the fan in there.  Then the --

[10]   Q   Let me just stop you for a second.

[11]  We're making a record here and the people who may be

[12]  reading this record might not be as familiar with

[13]  catching chickens as people in this room are.

[14]   A   Right.

[15]   Q   So when you say a fire fan, what is

[16]  that?

[17]   A   The fire fan is the fan that most of

[18]  the time we use it during the summers, it helps cools

[19]  off the chickens, helps cools the mens off.  But a lot

[20]  of times sometimes we use it during the winter, it

[21]  brings out the dust, brings out the dust.  And after

[22]  all that, after you do that, then we bring our pens

[23]  in.

[24]   Q   Let me just stop you at that point.

[25]  Who decides whether to use a fire fan or not?

Page 32

[ 1]   A   Well, most of the men mostly is, you

[ 2]  know, but sometime I decide to use it.

[ 3]   Q   So you will decide sometimes to use the

[ 4]  fan --

[ 5]   A   Yeah.

[ 6]   Q   -- or not?  If the men want the fan to

[ 7]  use --

[ 8]   A   Yeah, we'll bring it in.

[ 9]   Q   -- you put it in?

[10]   A   Yeah.

[11]   Q   If they don't want it and you don't

[12]  think it's necessary, you don't put it in?

[13]   A   If they don't want it and I feel it's

[14]  necessary, I'll put it in.

[15]   Q   So even if they don't want it and you

[16]  think it's necessary, you will put it in?

[17]   A   Yes.

[18]   Q   Where is the fire fan, how does it get

[19]  to the farm where the chickens are?

[20]   A   It gets by one of the drivers will

[21]  bring it.

[22]   Q   So one of the live haul drivers --

[23]   A   Yes.

[24]   Q   -- that we have identified earlier will

[25]  bring the fan to the farm?

A-0148

**Page 33**

[1]  A   Right.

[2]  Q   And then you will decide whether to use

[3]  it or not?

[4]  A   Right.

[5]  Q   Let's see, what else do you do?  We

[6]  have talked about the water, we have talked about

[7]  using the fan; what else do you do prior to starting

[8]  to catch chickens?

[9]  A   Then sometime I might have to fill in,

[10]  you know.

[11]  Q   Well, I'm not interested in that at

[12]  this point.  What I'm saying is if we have done just

[13]  the two things that you have mentioned, you have come

[14]  to the farm with the crew, okay, you have cranked up

[15]  the water and you have decided whether or not you're

[16]  going to use the fan, are we now ready to catch?

[17]  A   Yes.

[18]  Q   Don't we have to put pens in first?

[19]  A   Yeah, that's what I was saying a while

[20]  ago, put in pens.

[21]  Q   So after we put the fan in, now we put

[22]  pens in?

[23]  A   Pens in.

[24]  Q   Describe for the record what pens are.

[25]  A   Pens is something that you block the

**Page 34**

[1]  chickens off with for to be able to catch them so they

[2]  won't run, that's what calls pens.

[3]  Q   And that's also so they don't smother

[4]  themselves?

[5]  A   Right.

[6]  Q   Okay.  Who puts the pens up?

[7]  A   Well, we all do it together, the men,

[8]  sometime I do it.

[9]  Q   Okay.  Do you tell the men where to put

[10]  them?

[11]  A   Yes.

[12]  Q   Okay.  And placing of the pens is going

[13]  to change from house to house, isn't it?

[14]  A   Yes.

[15]  Q   Okay.  So who's the one who makes the

[16]  decision how the pens should be placed in a particular

[17]  house?

[18]  A   Well, the men put the pens on the

[19]  forklift or on top of the cage to transport them to

[20]  the next house.

[21]  Q   Okay, let me repeat the question.  You

[22]  have gotten to the house, cranked up the water, put

[23]  the fan in if you have needed it or not, now we're

[24]  going to put the pens up.  You can put pens in a house

[25]  in lots of different ways?

**Page 35**

[1]  A   Right.

[2]  Q   Who makes the decision as to where to

[3]  put the pens?

[4]  A   I make the decision.

[5]  Q   Okay.  As a crew leader, you have

[6]  responsibility for the safety of the people on your

[7]  crew, don't you?

[8]  A   Yes.

[9]  Q   Okay.  And you also have responsibility

[10]  for the safety of the property?

[11]  A   Yes.

[12]  Q   And the farmer's property?

[13]  A   Yes.

[14]  Q   Let me just have a minute, please.

[15]       MR. BREWER:  Would you mark this as

[16]  exhibit 1?

[17]       (Garrison Exhibit 1, marked for

[18]  identification.)

[19]       (Whereupon, there was a discussion held

[20]  off the record.)

[21]  BY MR. BREWER:

[22]  Q   Mr. Garrison, I'm showing you a

[23]  document which has been marked as Exhibit 1 to your

[24]  deposition; would you take a look at that for a moment

[25]  and tell me what it is when you're finished reviewing

**Page 36**

[1]  it?

[2]  A   Yes, it's a farm sheet, time sheet.

[3]  Q   Okay.

[4]  A   Farm ticket.

[5]  Q   All right.  And up at the top, it says

[6]  the date?

[7]  A   Uh-huh.

[8]  Q   Who fills that in?

[9]  A   I do.

[10]  Q   The next thing appears to be lot

[11]  number, what does that mean?

[12]  A   That means the lot of the farm.

[13]  Q   I'm sorry, it means what, sir?

[14]  A   The lot of the farm.

[15]  Q   Okay.  And who fills that in?

[16]  A   Dispatch.

[17]  Q   The dispatcher?  And it says load

[18]  number, what does that refer to?

[19]  A   The load, I mean the number of the

[20]  load.

[21]  Q   Okay, who fills that in?

[22]  A   Dispatcher.

[23]  Q   All right.  Next we see the grower and

[24]  there's a space there, does that identify the farm

[25]  that you're going to?

A-0149

## Page 37

[ 1]      A    Yes.

[ 2]      Q    Who fills that in?

[ 3]      A    I do.

[ 4]      Q    Then it says houses, and there are a

[ 5]  series of blanks with dashes.

[ 6]      A    Yeah, I fill that out, too.

[ 7]      Q    Okay. And what does that refer to, how

[ 8]  many houses are on the farm?

[ 9]      A    Yes, how many houses I been in, how

[10]  many houses I use.

[11]      Q    How many houses you used?

[12]      A    Yes.

[13]      Q    When you say how many houses you used,

[14]  does that mean how many houses you caught chickens in?

[15]      A    Right.

[16]      Q    Okay. So if the farmer had five houses

[17]  and you were only directed to pick up chickens from

[18]  three, would you only list the three that you went

[19]  into?

[20]      A    Yes.

[21]      Q    You would not list the other two?

[22]      A    No.

[23]      Q    Okay. I just want to make sure I

[24]  understand. And there's a time started, who finishes

[25]  that, who fills that in?

## Page 38

[ 1]      A    The must be the dispatcher.

[ 2]      Q    You don't fill that information in --

[ 3]      A    No.

[ 4]      Q    -- the time you start at the farm?

[ 5]      A    No.

[ 6]      Q    How about time finished?

[ 7]      A    Let me think. No, I don't fill that

[ 8]  out.

[ 9]      Q    Okay. Well, can you explain to me just

[10]  for my own identification how the dispatcher is going

[11]  to know when you started?

[12]      A    By the farms, by a time sheets, by the

[13]  time you should be on the farm.

[14]      Q    By the time you should be on the farm?

[15]  And how about time finished, how does the dispatcher

[16]  know that?

[17]      A    I puts that on the -- well, when the

[18]  last truck comes in, that's how you knows, when the

[19]  last ticket goes in.

[20]      Q    Okay. So he fills out time started and

[21]  time finished, not you?

[22]      A    Right.

[23]      Q    How about temperature, who fills that

[24]  out?

[25]      A    I don't fill that out neither.

## Page 39

[ 1]      Q    Okay. Let's go to the next series

[ 2]  below the line. It says sign present?

[ 3]      A    Yes.

[ 4]      Q    And there's a box to check yes or no?

[ 5]      A    Yes.

[ 6]      Q    Who checks that box?

[ 7]      A    I do.

[ 8]      Q    And what does the sign present mean?

[ 9]      A    The grower's sign, like might be a

[10]  Mountaire sign out there as to grower's name.

[11]      Q    All right, so it might be Garrison

[12]  Farm?

[13]      A    Right.

[14]      Q    And there would be a sign there?

[15]      A    Right.

[16]      Q    And you would check yes, that there was

[17]  a sign there?

[18]      A    Yes.

[19]      Q    And grower present, who checks that?

[20]      A    I do.

[21]      Q    What does that mean?

[22]      A    That means was the grower there, was

[23]  the grower there on the farm.

[24]      Q    When you came?

[25]      A    When I came.

## Page 40

[ 1]      Q    And while you were catching chickens?

[ 2]      A    Right.

[ 3]      Q    Okay. DAF's, what is a DAF, sir?

[ 4]      A    It's like deads, how many deads, that's

[ 5]  what it is, deads.

[ 6]      Q    How many dead chickens were in the

[ 7]  house?

[ 8]      A    Yes, deads prior to catch.

[ 9]      Q    Prior to the catch?

[10]      A    Prior to the catch.

[11]      Q    Right. Who determines that?

[12]      A    Well, I do.

[13]      Q    You do?

[14]      A    Yes.

[15]      Q    So you will physically then go into the

[16]  house prior to catching?

[17]      A    Yeah.

[18]      Q    And see --

[19]      A    Yes.

[20]      Q    -- to the best of your ability how many

[21]  chickens have died?

[22]      A    Yes.

[23]      Q    And will obviously not need to be

[24]  caught --

[25]      A    Right.

A-0150

Page 41

[ 1]        Q    -- because they ain't going anywhere?

[ 2]        A    Right.

[ 3]        Q    The fire fan, we have already talked

[ 4]    about that, and you will check whether it was used or

[ 5]    not --

[ 6]        A    Yes.

[ 7]        Q    -- correct?  And we talked about that's

[ 8]    your decision.  Chicken waters, can you tell me what

[ 9]    that means?

[10]        A    That means I have to make sure the

[11]    water is set up for the drivers to water the chickens

[12]    during hot weather for to cool the chickens off.

[13]        Q    Okay.

[14]        A    That's what that means.

[15]        Q    That's your responsibility to make sure

[16]    that's set up?

[17]        A    Yes.

[18]        Q    When you say the drivers, are we

[19]    talking again about the live haul drivers who are

[20]    watering the chickens?

[21]        A    Yes.

[22]        Q    That generally happens in the summer,

[23]    does it not?

[24]        A    Yes.

[25]        Q    Feeders up, what does that refer to?

Page 42

[ 1]        A    Well, once we -- once we gets to the

[ 2]    farm, we have to make sure the feeders is up.  If the

[ 3]    feeders are not up, if the chickens have been still

[ 4]    eating feed, that mean feed is in them and there

[ 5]    really ain't supposed to be no feed in them.  The

[ 6]    feeders supposed to be up a certain time before we

[ 7]    catch the chickens.

[ 8]        Q    Correct.

[ 9]        A    That's what that is.

[10]        Q    Okay.  What happens if the feeders are

[11]    not up?

[12]        A    Well, a lot of times the feed, the ones

[13]    that's not up, the trough be empty, you know, it just

[14]    happen the growers have never got them up.  That's

[15]    what that is.

[16]        Q    Well, do you go and catch those

[17]    chickens even if the feeders are not up?

[18]        A    No, I have to get up with the growers

[19]    and say get the feeders up.

[20]        Q    So you have to do that?

[21]        A    Yes.

[22]        Q    If you're out on a farm and the feeders

[23]    are not up, you have got to get to the grower?

[24]        A    Yes, immediately.

[25]        Q    All right.  How about the waters up, is

Page 43

[ 1]    that the cranking of the water that you talked about

[ 2]    earlier?

[ 3]        A    Yes.

[ 4]        Q    How about stoves up, what does that

[ 5]    mean?

[ 6]        A    That mean the stoves that they have in

[ 7]    the house, the round stoves, make sure they're up.

[ 8]    Most of the time, they are up.

[ 9]        Q    Okay.  Tell me what a stove is.

[10]        A    Like a heater, keeps them --

[11]        Q    For the chickens?

[12]        A    -- keeps them warm, yeah.

[13]        Q    And they have to be taken up?

[14]        A    Yes.

[15]        Q    Okay, and that's all prior to catching?

[16]        A    Yes.

[17]        Q    And if the stove is not up, what

[18]    happens?

[19]        A    I have to get them up.

[20]        Q    You contact the grower to get them up?

[21]        A    Contact the grower.  If I can't find

[22]    him, then I get them up.

[23]        Q    Then you get them up, but the first

[24]    thing is to go to the grower to get them up?

[25]        A    Yes.

Page 44

[ 1]        Q    The next item I see is farm damage, do

[ 2]    you check that also?

[ 3]        A    Yes.

[ 4]        Q    And tell me how you go about doing

[ 5]    that.  Before you check the box off, what do you do?

[ 6]        A    If anything damaged on a farm, I would

[ 7]    have to check it and I would have to write the --

[ 8]    explain what happened, you know.

[ 9]        Q    Well, let me give you a few situations.

[10]    You arrive at a farm, do you walk around the chicken

[11]    houses to see that there's no damage before you start?

[12]        A    Most of the time like the end of the

[13]    day, at the end of my day, the end of my work day, if

[14]    it's something that happened, then I document, I write

[15]    it down.

[16]        Q    Okay, so prior to starting catching the

[17]    chickens, you don't look to see whether there's any

[18]    damage?

[19]        A    Right.

[20]        Q    When you finish catching a particular

[21]    house, you then --

[22]        A    Right.

[23]        Q    -- take an inspection?

[24]        A    Yes.

[25]        Q    To see if there's damage?

A-0151

Page 45

[ 1]    A    Yes.

[ 2]    Q    And if there is, you write down what

[ 3]    that damage is?

[ 4]    A    Yes.

[ 5]    Q    Let me ask you this question:  If I

[ 6]    were a farmer and there had been damage to my house

[ 7]    before you started catching chickens but you didn't

[ 8]    see it because you didn't inspect before you started,

[ 9]    if I understand you, and now when you finish catching,

[10]    that same damage is there, how can the farmer prove

[11]    that you did the damage?

[12]    A    Repeat that one more time.

[13]    Q    Okay.  What I'm interested in is if you

[14]    come to a farm and you don't look at the house and the

[15]    surrounding area before you start catching, which I

[16]    understand you said you don't do that, right?

[17]    A    No.

[18]    Q    You don't?  But there's damage to the

[19]    farm, the chicken house has been somehow damaged, it's

[20]    damaged sitting there, but you didn't inspect it

[21]    beforehand so you didn't see it.

[22]    A    Right.

[23]    Q    Now when you finish, the farmer comes

[24]    out and says, "You damaged my house over here."  You

[25]    say, "I didn't," because you didn't, it was already

Page 46

[ 1]    damaged; how do you work that out?

[ 2]    A    What I would do, I would look at it and

[ 3]    I can tell whether its been damaged before, and I

[ 4]    would let him know.

[ 5]    Q    Okay.

[ 6]    A    And I would make sure I get up with my

[ 7]    supervisor, let him know what they had said, and let

[ 8]    him know what I told him.

[ 9]    Q    All right.  So that's why you don't

[10]    need to look at it beforehand, because you can tell

[11]    based on your experience?

[12]    A    Yes.

[13]    Q    All right.  There's another entry here

[14]    that says drive entrance, who fills that out?

[15]    A    I do.

[16]    Q    And it says accept/unaccept; I assume

[17]    unaccept means unacceptable?

[18]    A    Yes.

[19]    Q    So you will determine whether the

[20]    entrance to the farm was acceptable or not?

[21]    A    Yes.

[22]    Q    Okay.  The house entrances, again, the

[23]    same thing, acceptable or unacceptable?

[24]    A    Yes.

[25]    Q    That's your determination?

Page 47

[ 1]    A    Yes.

[ 2]    Q    And you fill that out?

[ 3]    A    Yes.

[ 4]    Q    Roads loading area, tell me what that

[ 5]    means.

[ 6]    A    Roads loading area, it's where we load

[ 7]    a truck at; if it's in good condition, if it's not in

[ 8]    good condition when I check it off.  If it needs to be

[ 9]    disbanded, needs to be wider, I'll complain about

[10]    that.

[11]    Q    And you make that determination?

[12]    A    Right.

[13]    Q    And you explain it?  If it's

[14]    unacceptable, you explain it?

[15]    A    Yes.

[16]    Q    Litter condition, I think we all know

[17]    what litter is.

[18]    A    Right.

[19]    Q    I don't think we need to describe that

[20]    any further.  The acceptable or unacceptable, who

[21]    makes that determination?

[22]    A    I do.

[23]    Q    And then you will check in a box, and

[24]    again there's a place for you to make an explanation?

[25]    A    Yes.

Page 48

[ 1]    Q    And then lastly there's a condition of

[ 2]    the birds, who fills that out?

[ 3]    A    I do.

[ 4]    Q    And you do that by obviously looking at

[ 5]    them?

[ 6]    A    Yes.

[ 7]    Q    Okay.  And then of course on the bottom

[ 8]    is the place for the crew leader's signature, and you

[ 9]    would sign that?

[10]    A    Yes.

[11]    Q    And I see that one copy, the top copy

[12]    of this exhibit, goes to the office; the yellow copy

[13]    or what's referred to as canary, goes to the live haul

[14]    office, and the last copy which is the pink copy goes

[15]    to the office?

[16]    A    Yes.

[17]         MR. BREWER:  Let me have this marked,

[18]    please, as Garrison 2.

[19]         (Garrison Exhibit 2, marked for

[20]    identification.)

[21]    BY MR. BREWER:

[22]    Q    Mr. Garrison, I'm going to ask you to

[23]    take a look at what's been marked as Exhibit Number 2

[24]    to your deposition; have you seen this document

[25]    before?

A-0152

Page 49

[ 1]    A    Yes.

[ 2]    Q    Let's take a look at the crew leader's

[ 3] general duties, and I'd like to review some of these

[ 4] with you and see if you agree these are the general

[ 5] duties. It is your responsibility to arrive at the

[ 6] farm on time with your crew?

[ 7]    MR. MARTIN: He needs to just follow

[ 8] where you are.

[ 9] BY MR. BREWER:

[10]    Q    Okay, sure. Where I am, let me -- if

[11] you want to take a moment to review the document --

[12]    A    Go ahead, I got you.

[13]    Q    You got me? All right, I'm on Roman

[14] Numeral II where it says, "Crew leader general

[15] duties," do you see that?

[16]    A    Uh-huh.

[17]    Q    The first item there is listed as it's

[18] the responsibility of the crew leader to arrive at the

[19] farm on time, and I assume that's with your crew?

[20]    A    Yes.

[21]    Q    That is a responsibility that the crew

[22] leader has?

[23]    A    Yes.

[24]    Q    Okay. It also talks about dividing the

[25] house into a minimum of four equal sections?

Page 50

[ 1]    A    Yes.

[ 2]    Q    Deciding how to catch the chickens,

[ 3] where to place the pens and stuff is the crew leader's

[ 4] responsibility?

[ 5]    A    Yes.

[ 6]    Q    You're supposed to tell the catchers

[ 7] the number of birds to be placed in each compartment?

[ 8]    A    Yes.

[ 9]    Q    That's your job, right?

[10]    A    Yes.

[11]    Q    You're also responsible for, as it says

[12] in item D, to catching birds in place at night, never

[13] move the birds into less than 70 percent of the normal

[14] floor space; that changes, I would assume, from time

[15] to time?

[16]    A    Excuse me.

[17]    Q    Sure.

[18]    A    I ain't never seen that before.

[19]    Q    You have never seen this document

[20] before?

[21]    A    No.

[22]    Q    Okay.

[23]    A    Not that, no, I haven't.

[24]    Q    All right.

[25]    A    No.

Page 51

[ 1]    Q    Well, when it comes to catching the

[ 2] birds, I think we talked about this a little bit

[ 3] before --

[ 4]    A    Yes.

[ 5]    Q    -- that's your decision as to how to

[ 6] set up the pens and how you're going to go about doing

[ 7] it?

[ 8]    A    Yes.

[ 9]    Q    On page 2 of the document at the top,

[10] item E, it says that a crew leader is to continually

[11] observe the uncaught birds and prevent smothers; would

[12] you agree that that's the responsibility of a crew

[13] leader?

[14]    A    Yes.

[15]    Q    Do you also agree that making sure the

[16] cages are air stacked uniformily on the trailer, is

[17] that your responsibility?

[18]    A    Yes.

[19]    Q    And when you say on the trailer, that's

[20] the live haul trailer that we were talking about

[21] before?

[22]    A    Yes.

[23]    Q    So you make sure the forklift operator

[24] is doing it the right way so they're air stacked

[25] appropriately?

Page 52

[ 1]    A    Yes.

[ 2]    Q    Just for purposes again for the record,

[ 3] when we're talking about smothers, we're talking about

[ 4] chickens who have died --

[ 5]    A    Right.

[ 6]    Q    -- because they have piled on top of

[ 7] each other and suffocated?

[ 8]    A    Yes.

[ 9]    Q    That's what smother refers to?

[10]    A    Yes.

[11]    Q    Item G talks about in the summer making

[12] sure the fans are left hanging and so forth, you can

[13] read that.

[14]    A    Uh-huh, yes.

[15]    Q    That's also a responsibility the crew

[16] leader has?

[17]    A    Yes.

[18]    Q    Okay. It's also the crew leader's

[19] responsibility not to load more than the specified

[20] number of chickens --

[21]    A    Yes.

[22]    Q    -- per hole or per cage?

[23]    A    Yes.

[24]    Q    All right. Fill out the farm ticket

[25] accurately, we just went through that; you agreed, I

A-0153

Page 53

[ 1]  believe, that was your responsibility to perform?
[ 2]       A    Yes.
[ 3]       Q    And then you're supposed to check with
[ 4]  the driver to make sure his load is secure?
[ 5]       A    Yes.
[ 6]       Q    Okay.  The document goes on to talk
[ 7]  about catching methods, talks about night catching,
[ 8]  day catching --
[ 9]       A    Yes.
[10]       Q    -- and so forth, tunnel ventilation and
[11]  all of those things --
[12]       A    Yes.
[13]       Q    -- these are all responsibilities the
[14]  crew leader has --
[15]       A    Yes.
[16]       Q    -- to make sure these things are done?
[17]       A    Yes.
[18]       Q    Okay, all right.  Now, let me ask you a
[19]  couple of questions, Mr. Garrison.  If I repeat
[20]  myself, please forgive me.  You mentioned before I
[21]  think that you maintain a crew of seven catchers?
[22]       A    Yes.
[23]       Q    There's also a forklift driver
[24]  associated with the crew, isn't there?
[25]       A    I don't pick him up.

Page 54

[ 1]       Q    No, no, I'm not asking you that, but
[ 2]  he's part of the crew?
[ 3]       A    Yes, he is.  Yes, he is.
[ 4]       Q    And the forklift driver gets to the
[ 5]  farm by himself?
[ 6]       A    Yes.
[ 7]       Q    So we have then seven catchers and a
[ 8]  forklift operator is on a normal catching crew?
[ 9]       A    Yes.
[10]       Q    Okay.  How is it determined who is on
[11]  your crew?
[12]       A    I picks them up and I writes the names
[13]  down on my time sheet.
[14]       Q    All right.  So in other words, you know
[15]  the people who are on your crew?
[16]       A    Yes.
[17]       Q    Okay.  Are employees ever assigned to
[18]  your crew that are not normally on your crew?
[19]       A    Repeat that question again.
[20]       Q    Sure.  You have a regular crew
[21]  generally?
[22]       A    Yes.
[23]       Q    Does there come a time when somebody
[24]  who's not on your crew gets assigned to your crew?
[25]       A    What do you mean assigned?  Just using

Page 55

[ 1]  that person that day, is that what you mean?
[ 2]       Q    Someone who's not normally a member of
[ 3]  your crew, have you ever worked with people who are
[ 4]  not normally members of your crew?
[ 5]       A    Yes.
[ 6]       Q    And how does that happen?
[ 7]       A    If I need somebody, if I'm
[ 8]  short-handed, I can get up with the dispatcher and I
[ 9]  would let him know that I need a man.  Or if not, I
[10]  can get up with my supervisor and let him know that I
[11]  need a man.  And what they would do, they would send
[12]  somebody out there with -- for me and help me catch
[13]  the chickens.
[14]       Q    Okay.  But sometimes you catch them
[15]  short?
[16]       A    Sometime I do.
[17]       Q    Okay.  Now, let me ask you this:  You
[18]  are responsible, we have Exhibit 2 there that you're
[19]  looking at, you're responsible for ensuring that the
[20]  catchers, drivers, and the forklift operators follow
[21]  the procedures that are outlined there?
[22]       A    Yes.
[23]       Q    Okay.  And I think you have already
[24]  talked about how you interact with the growers if the
[25]  feeders aren't up, and so you're responsible for that?

Page 56

[ 1]       A    Yes.
[ 2]       Q    Okay.  You're also responsible for
[ 3]  maintaining the full crew, aren't you?
[ 4]       A    Yes, I am.
[ 5]       Q    You also have responsibility for
[ 6]  maintaining a good relationship with the growers,
[ 7]  aren't you?
[ 8]       A    Yes.
[ 9]       Q    And you basically are telling the
[10]  catchers, we went through this, how to go about
[11]  setting up the house and catching them, and watching
[12]  for smothers and everything else, right?
[13]       A    Yes.
[14]       Q    Okay, that's fine.  All right, now, who
[15]  hires the catchers?
[16]       A    Doug Lynch.
[17]       Q    Doug Lynch?  Okay.  Have you ever
[18]  recommended to Mr. Lynch that a catcher he hired?
[19]       A    Yes.
[20]       Q    And has the catcher been hired?
[21]       A    Sometime.  Sometime he not.
[22]       Q    Can you give me the name of catchers
[23]  that you have recommended to Mr. Lynch who have not
[24]  been hired?
[25]       A    Yes.

A-0154

Page 57

[ 1]    Q    Okay.

[ 2]    A    I'm trying to think.  I mean it's not

[ 3] that many I know of right off.  I know the only thing

[ 4] I know maybe one of them, one of them like Woodell

[ 5] Foreman, I recommend him one time, but it's -- he's

[ 6] just been there before and he just didn't hire him

[ 7] back, that's all.

[ 8]    Q    Let me sort of zero in on this now a

[ 9] little.  The time that I'm referring to about

[10] referring somebody, that's only since you have been a

[11] crew leader, I'm not interested in when you were a

[12] catcher, okay?  So since you have been a crew leader,

[13] you recommended Mr. Foreman?

[14]    A    At one time I have, yes.

[15]    Q    And he had worked at the company

[16] previously?

[17]    A    Before, yes.

[18]    Q    And how did he come not to be employed

[19] by the company, if you know?

[20]    A    Repeat that.

[21]    Q    Was he fired?

[22]    A    I don't know.

[23]    Q    But he worked before and Mr. Lynch said

[24] no?

[25]    A    Right, yes.

Page 58

[ 1]    Q    How many people have you recommended to

[ 2] Mr. Lynch be hired and he has hired them?

[ 3]    A    Rough guess, maybe three.

[ 4]    Q    Three?  Okay.  Three or four, something

[ 5] like that?

[ 6]    A    Yes.

[ 7]    MR. MARTIN:  For the record, he said

[ 8] three.

[ 9]    MR. BREWER:  He said three, all right.

[10] BY MR. BREWER:

[11]    Q    Is it three, or could it be more?

[12]    A    No, definitely couldn't be more.

[13]    Q    How did you go about making that

[14] recommendation to Mr. Lynch?

[15]    A    I just asked him that I probably needed

[16] another man, and I like you look to hire this guy.

[17]    Q    Okay.

[18]    A    And he asked me just bring him in, get

[19] him signed up.

[20]    Q    That's what he told you?

[21]    A    Yeah.

[22]    Q    So in the three cases that we have

[23] talked about, you have needed a man, gone to Mr. Lynch

[24] and said, "I need a man, and I have this fellow," and

[25] you have given him a name, and he has said, "Okay,

Page 59

[ 1] bring him in, sign him up"?

[ 2]    A    Uh-huh.  Yes.

[ 3]    Q    We tried to get some information on

[ 4] this before, but let me try this a little bit

[ 5] differently, Mr. Garrison.  If somebody in your crew

[ 6] needs to have a day off, okay?

[ 7]    A    Yes.

[ 8]    Q    They need to have tomorrow or let's say

[ 9] next Monday off?

[10]    A    Yes.

[11]    Q    And that would make you short a

[12] catcher?

[13]    A    Yes.

[14]    Q    How do you go about getting that man's

[15] position filled for the Monday, just for the one day?

[16]    A    I would probably try get somebody off

[17] another crew.

[18]    Q    Okay.  Describe what you would do to

[19] make that happen.

[20]    A    I would get up with the crew leader.

[21]    Q    The other crew leader?

[22]    A    Yes.  And I would ask him could I use

[23] somebody on his crew, if they were available.  And he

[24] would get back up with me and let me know whether they

[25] are or not.

Page 60

[ 1]    Q    All right.

[ 2]    A    You know, sometime I be able to use

[ 3] one, sometimes I can't.

[ 4]    Q    Okay.  And does it ever happen that a

[ 5] crew leader, another crew leader comes to you and

[ 6] says, "I need somebody; can you assign somebody to my

[ 7] crew for Monday?"

[ 8]    A    Yes.

[ 9]    Q    All right.  And you will make the

[10] decision as to whether you can or can't?

[11]    A    Yes.

[12]    Q    Do you decide which person you're going

[13] to assign to the other fellah's crew?

[14]    A    Yes.

[15]    Q    Okay.  Do catchers sometimes work

[16] double shifts?

[17]    A    Yes.

[18]    Q    Tell me how that happens.

[19]    A    It would have to be on the right shift

[20] for to be able to do it.  What I'm saying is, okay --

[21]    Q    Take your time.

[22]    A    If a catcher on night shift, he would

[23] be able to work with somebody on the 1:00 o'clock

[24] shift the next day he be off, that's the only way you

[25] can do it.

Page 61

[1]     Q    Okay. Can you tell a crew member to
[2]  work a double shift?
[3]     A    I can ask.
[4]     Q    Okay. But you're asking for a person
[5]  to work maybe 15 or 16 hours?
[6]     A    Yes.
[7]     Q    All right. You don't force them to do
[8]  that?
[9]     A    No.
[10]    Q    Okay.
[11]         (Whereupon, there was a discussion held
[12]  off the record.)
[13]         (Whereupon, a short recess was taken.)
[14]  BY MR. BREWER:
[15]    Q    Mr. Garrison, I just have a couple
[16]  quick questions before I move into another area. Do
[17]  you know a woman by the name of Donna Mumford?
[18]    A    Yes, I do.
[19]    Q    And whom does she work for?
[20]    A    Mountaire.
[21]    Q    Mountaire? And in what department, do
[22]  you know?
[23]    A    Accounting.
[24]    Q    All right. Have you ever had occasion
[25]  to contact her, talk to her?

Page 62

[1]     A    Yeah, if I need her, I'll talk to her.
[2]     Q    Okay. Why would you need to talk with
[3]  her?
[4]     A    Personal business of my own.
[5]     Q    That's the only reason?
[6]     A    Roughly, yes.
[7]     Q    Suppose one of your members of your
[8]  crew thought his paycheck was inappropriate, would you
[9]  call about that?
[10]    A    No.
[11]    Q    You would not?
[12]    A    No.
[13]    Q    You mentioned that you got promoted to
[14]  crew leader, who promoted you?
[15]    A    Doug Lynch.
[16]    Q    Doug Lynch? Okay. A couple of other
[17]  quick questions here. I think we already talked about
[18]  the fact that you were responsible as a crew leader to
[19]  interact with the grower --
[20]    A    Yes.
[21]    Q    -- maintain relations? And to maintain
[22]  a full staffing crew?
[23]    A    Yes.
[24]    Q    Okay. We have talked a little about
[25]  catching in the houses; there are a number of

Page 63

[1]  different kinds of houses that you have to catch in,
[2]  aren't there?
[3]     A    Yes.
[4]     Q    And depending on the type of house, you
[5]  will decide how it's to be caught?
[6]     A    Yes.
[7]     Q    Okay. Can you just give us off the top
[8]  of your head the kinds of houses that we're talking
[9]  about?
[10]    A    We could be talking about it's a house
[11]  called double decker, like a house on top of another
[12]  house.
[13]    Q    Yes.
[14]    A    That's a different way of doing that,
[15]  catching that house. Then you got another house with
[16]  poles in it, lines up right in the middle of the
[17]  house.
[18]    Q    Right.
[19]    A    And some of them poles, the length are
[20]  smaller than other pole houses so it's a different way
[21]  of going through that house. Then you got another
[22]  house called a wide span, clear span they call it, you
[23]  can just go right through them. That's the difference
[24]  in the houses.
[25]    Q    And those are basically the three you

Page 64

[1]  have?
[2]     A    Plus there's another house that we call
[3]  a walk-out, it's the narrow houses that forklifts
[4]  drivers can't go in, you had to catch them and walk
[5]  them outside and put them in the cage.
[6]     Q    Okay, that's four. You don't really
[7]  have any more triple deckers, do you?
[8]     A    No.
[9]     Q    You used to, though?
[10]    A    Years ago.
[11]    Q    Yeah, years ago. And with those
[12]  houses, you will decide how you want to go about
[13]  getting those chickens caught?
[14]    A    Yes.
[15]    Q    I think you mentioned this also, but I
[16]  just want to be clear: The live haul drivers, you
[17]  instruct them as to where to put the trucks so the
[18]  forklift guy can load them?
[19]    A    Yes.
[20]    Q    We'll get into this in a moment, but
[21]  you do approve vacations, don't you?
[22]    A    Repeat that again.
[23]    Q    You do approve vacations for the people
[24]  on your crew, don't you?
[25]    A    No, I don't.

A-0156

Page 65

[1]  Q   You don't?

[2]  A   Oh, you talking approve?  Yes, I do,

[3] yes, yes, I'm sorry.

[4]  Q   We'll go through some documents on

[5] that.

[6]  A   Yes.

[7]  Q   Okay.  Let me give you, and this is a

[8] stack, here's one for you, and there's one for you, it

[9] will be Number 3.

[10]     (Garrison Exhibit 3, marked for

[11] identification.)

[12] BY MR. BREWER:

[13]  Q   Mr. Garrison, I'm going to ask the

[14] court reporter give that to you, this is a series of

[15] pages, as you can see, and we'll try to go through

[16] these quickly.  The document at the first page says

[17] its a Mountaire Farms time off request form; are you

[18] familiar with this kind of a document?

[19]  A   Yes, I am.

[20]  Q   Okay.  The name on top in the first

[21] document is a Mr. Bagwell.

[22]  A   Yes.

[23]  Q   Okay.  Do you know him?

[24]  A   Yes, I do.

[25]  Q   Did he work for you?

Page 66

[1]  A   Yes.

[2]  Q   On your crew?

[3]  A   Yes.

[4]  Q   And I see you have a box checked union,

[5] and we already went over the fact that the catchers

[6] are members of the Teamsters Union.

[7]  A   Yes.

[8]  Q   And he is making a request here; what

[9] is the request he's making?

[10]  A   He wants vacation.

[11]  Q   He wants vacation?  Okay.  And you

[12] approved that?

[13]  A   Yes.

[14]  Q   Okay.  Next page, it's a Richard

[15] Foreman.

[16]  A   Yes.

[17]  Q   Do you know him?

[18]  A   Richard Foreman?  Yes, I do.  Yes, I

[19] know him.

[20]  Q   Was he a member of your crew?

[21]  A   Yes.

[22]  Q   And what is he requesting?

[23]  A   Anniversary vacation.

[24]  Q   For a floating holiday, is it?

[25]  A   Yes.

Page 67

[1]  Q   And it says money only, what does that

[2] mean?

[3]  A   He's not taking --- he's going to keep

[4] working, he just wants his money.

[5]  Q   He wants his money but he'll work for

[6] the day?

[7]  A   Still want to work.

[8]  Q   Down at the bottom, is that your

[9] signature where it says foreman approved?

[10]  A   Yes, it is.

[11]  Q   Okay.  The next page, it's a Donald

[12] Garrison.

[13]  A   Yes.

[14]  Q   Is he related to you?

[15]  A   Yes.

[16]  Q   How is he related?

[17]  A   Brother.

[18]  Q   Brother, okay.  And he's asking also

[19] for a floating holiday, money only?

[20]  A   Yes.

[21]  Q   And you approved that?

[22]  A   Yes, I did.

[23]  Q   Okay.  Next page is a Henry Harmon?

[24]  A   Yes.

[25]  Q   I'm sorry, on Garrison, the approval of

Page 68

[1] your brother's, it says supervisor's signature, is

[2] that your signature and you approved it?

[3]  A   Yes.

[4]  Q   Okay.  Next page is a Mr. Harmon, again

[5] union?

[6]  A   Yes.

[7]  Q   And what is he requesting?  Oh, I see,

[8] it says personal floating holiday, that box is

[9] checked?

[10]  A   Yes.

[11]  Q   And you approved that?

[12]  A   Yes.

[13]  Q   The supervisor's signature, that's your

[14] signature?

[15]  A   Yes.

[16]  Q   Mr. Harmon again on the next page?

[17]  A   Yes.

[18]  Q   Requesting personal floating holiday

[19] and the date?

[20]  A   Yes.

[21]  Q   He's requesting that date off, March

[22] 16th of 2001?

[23]  A   Yes.

[24]  Q   Okay.  And you approved that?

[25]  A   Yes.

A-0157

Page 101

[ 1]   handwriting on this page?

[ 2]        A    Yes, it is.

[ 3]        Q    Under A, Development Plan, can you tell

[ 4]   me what you have written, please?

[ 5]        A    To keep my DOAs down and head count

[ 6]   down, and to have a consistent crew.

[ 7]        Q    DOA refers to what?

[ 8]        A    Dead, dead chickens.

[ 9]        Q    Dead on arrival?

[10]        A    Yes.  Yes.

[11]        Q    And those are chickens that might have

[12]   been caught live at the farm but died on the way to

[13]   the plant?

[14]        A    Yes, yes, it is.

[15]        Q    How would you go about doing it?  Well,

[16]   I tell you what, let me rephrase that.

[17]        A    Yeah, right.

[18]        Q    I want you to understand my questions.

[19]   You had talked earlier about making sure the forklift

[20]   operator for loading the truck, the live haul truck

[21]   correctly, airways and everything else, that's a way

[22]   that you could prevent DOAs?

[23]        A    Yes.

[24]        Q    So in other words, to keep your DOAs

[25]   down, you'd have to make sure that you were handling

Page 102

[ 1]   that the right way?

[ 2]        A    Yes.

[ 3]        Q    That the forklift operator was doing

[ 4]   what you told him to do?

[ 5]        A    Yes.

[ 6]        Q    That the driver was doing what you told

[ 7]   him to do about watering?

[ 8]        A    Yes.

[ 9]        Q    Okay.  Can you tell us what you have

[10]   written here, please?

[11]        A    "Improve my crew and my plan has been

[12]   achieved."

[13]        Q    So you achieved it?

[14]        A    Yes.

[15]        Q    You did do that, you improved your DOAs

[16]   count and everything else?

[17]        A    Yes.

[18]        Q    Good, all right.  The next item talks

[19]   about being able to communicate with your Spanish

[20]   workers.  The next item down under 2 it says, "I do

[21]   believe that I will achieve everything that I'm

[22]   focused on by working hard in it, meet safety

[23]   standards, keep farm damage down, DOA count down,"

[24]   those are all your responsibilities as a crew chief?

[25]        A    Yes.

Page 103

[ 1]        Q    Okay.  And lastly you said you need

[ 2]   your cooperation, I assuming meaning the company --

[ 3]        A    Yes.

[ 4]        Q    -- when you need something for the job?

[ 5]        A    Yes.

[ 6]        Q    And that's all you have covered.  That

[ 7]   was your evaluation of yourself?

[ 8]        A    Yes.

[ 9]        Q    Okay.  And you gave yourself, unless I

[10]   missed one, all 4s?

[11]        A    Right.

[12]        Q    Which is fine.  And then of course the

[13]   evaluation that you were given by Mr. Lynch gave you

[14]   an overall rating of 3.5 and that is your signature?

[15]   I'm going to the front, on page 4, is that your

[16]   signature?

[17]        A    Page 4?

[18]        Q    Yes.  That's what I said 3.5 -- oh,

[19]   3.05.

[20]        A    Yes.

[21]        Q    All right, let's see, let me ask you a

[22]   couple of questions, Mr. Garrison.  Suppose an

[23]   employee, a member of your crew, wants to take a day

[24]   off but he doesn't want to be paid, can that happen?

[25]        A    Say it one more time.

Page 104

[ 1]        Q    Sure.  A member of your crew --

[ 2]        A    Yes.

[ 3]        Q    -- wants to take a day off --

[ 4]        A    Right.

[ 5]        Q    -- during the week.

[ 6]        A    Yes.

[ 7]        Q    But he doesn't want to be paid for it,

[ 8]   he just wants the day off without pay.

[ 9]        A    He's not going to get paid if you don't

[10]   work.

[11]        Q    No, no, I understand that.  What I'm

[12]   saying is let's assume I'm a member of your crew,

[13]        A    Yes.

[14]        Q    And I come to you and I say, "I would

[15]   like to be off on Monday, I don't want to be paid."

[16]        A    Right.

[17]        Q    "But I want the day off on Monday," can

[18]   that happen?

[19]        A    Yeah, he can take off.

[20]        Q    He can take off without being paid?

[21]        A    Right.

[22]        Q    Do you have to approve that?

[23]        A    Yes.

[24]        Q    Okay.  And if I just don't show up on

[25]   Monday, I tell you I want the day off and I don't