Page 105

expect to be paid, I don't show up and you don't approve it, does anything happen to me?

A Repeat one more time.

Q Sure. If I ask you for Monday off, today being Friday, and I tell you, "Mr. Garrison," I'm a member of your crew, "I would like to be off on Monday."

A Yes.

Q "I don't expect to be paid, I don't want to be paid, but I just need the day off."

A Right.

Q And you tell me no, okay? You tell me no, I can't do that --

A Right.

Q -- okay? And I don't show up to work on Monday, does anything happen to me?

A Yeah, he's supposed to be written up.

Q Okay, who writes them up?

A I do.

Q Tell me what happens, to the best of your knowledge, based on your experience, what happens if a catcher is injured while working on a farm catching chickens, hurts himself?

A Well, we sends him in with a truck immediately.

Page 106

Q I'm sorry, which men do you send?

A If one of the catcher hurt theirself --

Q Yes.

A -- his hand, something like that, we would send them to the nurse.

Q Who will send him to the nurse?

A I would.

Q How do you do that?

A I let him go in with the truck driver.

Q Okay.

A Most of the times.

Q Go back to the plant?

A Yes.

Q Suppose it's a serious injury?

A Well, if it real serious, either I would have to take him or call the ambulance.

Q Call 911?

A Yes.

Q Somebody, God forbid, had a heart attack?

A Yes.

Q You wouldn't just wait for a truck, you'd take care of it yourself?

A Yes.

Q Okay. That's your decisions to make?

Page 107

A Yes.

Q I think we have covered this, but if there is damage to the farm caused by your crew --

A Yes.

Q -- that is information that you fill out on the farm report --

A Yes.

Q -- which is Exhibit 1 to your deposition?

A Yes.

Q That's where you make that notation?

A Yes.

Q And it is your responsibility to fill that out?

A Yes.

Q Now, we covered this a little bit before but I just want to make sure I completely understand it. I think I had asked you if a crew leader, another crew leader such as yourself, were short a man --

A Yes.

Q -- and he needed an extra man --

A Yes.

Q -- he could come to you and ask you could you spare a man from your crew?

Page 108

A Yes.

Q Okay. And if you could spare a man from your crew, you would?

A Yes.

Q And you would tell the man, whoever it is, "Don't come to work for me tomorrow, go to work for this other crew leader"?

A Yes.

Q All right. And the same would happen with the other crew leaders: If you were short, you could go to them and ask them if they had an extra catcher?

A Yes.

Q And if they did, they would assign that catcher to your crew?

A Yes.

Q Okay. Let me ask you this, sir: Have you ever recommended to anybody at the company that one of the people who's a catcher for you be given a forklift job?

A No.

Q You have never done that?

A No.

Q So the forklift people that you have worked with since you were a crew chief since 1999, I

Page 109

believe you said --

A Yes.

Q -- have always been the same?

A Yes.

Q Okay, let's go to the next -- before we get into the next area, when you are out there with your crews, catching, do the employees get a time to take a break?

A Yes.

Q All right. Who decides who gets to break when?

A I do.

Q Okay. Do the employees get a lunch period?

A Yes.

Q And who decides when that lunch period is going to be taken?

A I do.

Q This would be not quite as long as the other one, this will be Number 5, please.

(Garrison Exhibit 5, marked for identification.)

BY MR. BREWER:

Q Mr. Garrison, the court reporter has given you what's been marked for identification as

Page 110

Exhibit Number 5 to your deposition.

A Uh-huh.

Q Can you tell me on the first page whose handwriting this is?

A Mine's.

Q All right. First of all, there's a date and I believe the date is June 2nd, '03?

A Yes, it is.

Q What's the name of the person?

A Jasper Smith.

Q Who is Mr. Smith?

A He was one of my workers.

Q One of your catchers?

A Yes, he was.

Q On your crew?

A Yes.

Q And what does this document show?

A I was saying that he should let me know when he's going to take off or call.

Q Okay.

A That's what I was saying.

Q You're giving him disciplinary action, are you not?

A Yes.

Q If you go down just above the signature

Page 111

line, and I'll read this, it says, "I have read this warning and understand the above violation. I understand that disregard of company policies could result in disciplinary action up to and including discharge." And then it continues, but it continues in Spanish.

A Yes.

Q So this is a disciplinary write-up that you gave to Mr. Smith?

A Yes.

Q And the reason is it says here he was not home when you went to pick him up and he did not call you?

A Yes.

Q So if he's not going to be available, he's supposed to call you?

A Yes.

Q And he did not?

A Yes.

Q That's a violation of the company rules?

A Yes, it is.

Q Am I reading this correctly that this is the second violation --

A Yes.

Page 112

Q -- you circled? And Mr. Smith signed it --

A Yes.

Q -- correct? And that is your signature where it says supervisor?

A Yes.

Q Okay. Page 2 of this is Mr. Smith again; is this the same Mr. Smith that was on your crew?

A Yes.

Q All right. And is this again a disciplinary warning that you have given Mr. Smith?

A Yes.

Q And what did he do that he shouldn't have done?

A Repeat that question.

Q What did Mr. Smith do that he shouldn't have done?

A Didn't work.

Q Okay. Well, this is your handwriting, sir?

A Yes.

Q Does it say he should let you know when he takes off or call?

A Yes.

Page 113

Q And he was not at home when you went to pick him up?

A Yes.

Q And this is on May 30th of '03?

A Yes.

Q And the one we looked at before was June 2nd of '03?

A Yeah.

Q So this was his first violation?

A Yes.

Q And the one on June 30th was his second violation?

A Yes.

Q Now, going back to the next sheet, it's dated May 29, '03.

A Yes.

Q This is your handwriting?

A Yes, it is.

Q And this is Mr. Smith again?

A Yes.

Q This is the same Mr. Smith that we have talked about before in the other two documents?

A Yes.

Q What did he do here?

A The same thing.

Page 114

Q Okay. And this was an oral warning, though?

A Yes.

Q So you had first given him an oral warning about discipline?

A Yes.

Q Then you had given him a second warning?

A Yes.

Q A first warning and then a second warning?

A Yes.

Q Okay. Whatever happened to Mr. Smith?

A Still work.

Q Still working? So you were able to straighten him out?

MR. MARTIN: Objection to the form of the question.

MR. BREWER: Okay.

THE WITNESS: I mean --

BY MR. MARTIN:

Q He's still working?

A He still work, you know.

Q When did you leave the company?

A I left the company on my vacation. I

Page 115

left sometime the last of -- I think it was sometime in August.

Q Of '04?

A Yes.

Q Okay. So from the time of June 2nd, '03 when you gave Mr. Smith his second warning, he continued to work for you and your crew?

A Yes.

Q Okay. And you didn't have any problems with him about not calling in and being at home when you picked him up?

A No.

Q Okay. The next one is a Mr. Clarence Heath.

A Yes.

Q And tell me what this document is.

A Being work on time.

Q Okay. Is this your handwriting, sir, on this page?

A Yes, it is.

Q And read what the violation is.

A "Clarence was late for work. He came to the second stop but I told him that I did not need him, we went -- that we were just about done. Unexcused."

Page 116

Q And I see the third is circled?

A Yes.

Q And did you circle that?

A No, I didn't circle it.

Q You didn't circle the number 3?

A No.

Q Do you know who did?

A No, I don't. I didn't circle it.

Q But all the other writing on here is yours except where it says employee's signature?

A Yes.

Q Okay. And then I'm looking at another document, it's again Mr. Heath; is this your handwriting?

A Yes, it is.

Q Can you tell me what the violation reads?

A "Clarence did not work on the day because he say he has something to do. Unexcused."

Q And I see second is circled?

A Yes.

Q Did you circle that?

A No, I don't. No, I didn't.

Q Okay, do you have any idea who did?

A No, I don't.

Page 117

Q Is there any other writing on this page that is not your writing?
A No.
Q Okay. The next page, it says this is Mr. Heath again?
A Yes, it is.
Q Well, is all of the writing on this page yours?
A Yes, besides the circle, I don't think I circled it.
Q I was going to ask you --
A I can't recall that I circled it, no.
Q Okay. And the violation is because he was late for work, missed one load?
A Yes.
Q Okay. Let's just for a second go back to Mr. Smith on the very first page; I believe you testified -- and if you didn't, correct me now, please -- that you circled the second warning here?
A No, I didn't say that.
Q Okay, did you circle that?
A No, I didn't.
Q Okay. Do you have any idea who would?
A No, I didn't.
Q How about the next page, first warning?

Page 118

A No.
Q And the page after that, oral warning?
A No.
Q So the circles, you did not circle any of the --
A No, I didn't.
Q Okay. But all of the other writing, with the exception of Mr. Smith's signature and the date he wrote in, and with the exception of the Mr. Heath's third warning the line where he refused to sign 12-27-02, Willie Davis, with the exception of those two things, all the writing on these documents is yours?
A Yes.
Q Okay. Let me ask you this question, sir: Have you ever assigned a member of your crew to operate the forklift who was not a forklift operator?
A No.
Q No? Did you have people on your crew, when you were there, who where certified as forklift operators?
A No.
Q You didn't have any? Periodically, did you have occasion to operate the forklift?
A Yes, I did.

Page 119

Q And approximately how many times through the course of a month, would you say?
A I don't know, very seldom, maybe two, one, two.
Q Very seldom?
A Yes.
Q All right. If you have to catch more houses, can you authorize the people in your crew to work overtime?
A Repeat that one more time.
Q If you have to catch additional birds, can you authorize the people in your crew to work overtime?
A Can you be more specific?
Q Okay, let me try. Shall we say after you finished, you and your crew have finished catching the chickens that you have had to catch that day --
A Right.
Q -- if somebody asked you if you had somebody, a member of your crew, a catcher, that they needed help, could you assign a person to go over and help the other crew leader?
A I can ask.
Q I thought we talked about -- well, you can ask?

Page 120

A I can ask.
Q So even if you could spare him, you can't assign him over there?
A No.
Q Okay. Can you ever require the catchers in your crew to work more than eight hours in a day?
A Can you be more specific?
Q I tell you what, not at this time. Let me try to make myself more clear because I want you to understand the questions.
A Excuse me.
Q Sure.
A I do understand the question.
Q Oh, okay.
A But what I'm saying by being more specific, it's not an eight-hour job.
Q No, I understand that.
A Okay.
Q But if you want somebody to work beyond what they would normally work, my question is can you require people to do that? Do you have the authority to do that?
A I have authority for to get my job done that day; it may be more than eight hours.

Page 121

Q Okay, I guess that's the answer to the question.
A Yes.
Q So you have authority to get your job done, however long it takes?
A Right.
Q Whatever the conditions that you find yourself, that's what you were talking about the initiative you'd take to make the decisions and everything else?
A Yes.
Q Okay, thank you.
A Yes.
Q Let's go off the record a minute.
(Whereupon, there was a discussion held off the record.)
(Whereupon, a short recess was taken.)
MR. BREWER: If you will mark this.
(Garrison Exhibit 6, marked for identification.)
BY MR. BREWER:
Q Mr. Garrison, I'm handing you a document which has been marked as Exhibit Number 6 --
A Yes.
Q -- to your deposition. And what I'd

Page 122

like you to do, please, is to take a look at page 9 of the document. And, by the way, when you get there -- go ahead, I'll let you get there first.
A I'm there. Yes.
Q The title of the document says Agreement between Mountaire of Delmarva, Selbyville, and the International Brotherhood of Teamsters Local 355.
A Yes.
Q And it has an effective date of December 16, '01, through December 18, '04?
A Yes.
Q And if you look at the back of the document, hold on to page 9 for me, if you would, look near the back of the document, the next to last page.
A Yes.
Q It says Schedule B.
A Yes.
Q And it talks about catchers.
A Yes.
Q Those are the catchers that would have been in your crew? Let me maybe try to state it another way. We talked earlier that the catchers who worked in your crew --
A Yes.

Page 123

Q -- were members of a labor union.
A Yes.
Q The Teamsters Local 355 --
A Yes.
Q -- this group? Are the catchers that are listed or the catcher job classification that's listed in Schedule B, would those be some of the catchers who worked for you?
A Yes.
Q In other words, this contract covers the catchers?
A Oh, yes, yes.
Q It covers catchers, that's what I'm trying to get at.
A Yes, okay.
Q It also covers the forklift operators?
A Yes.
Q And it also covers live haul truck drivers?
A Yes.
Q Okay. Now go back to page 9, if you would, for me, and look at Article 10, Section 1.
A Yes.
Q This talks about a complaint of grievance or a dispute which arises out of the

Page 124

application or performance of the provisions of this contract. Do you see where I am?
A Yes.
Q Shall, in the first instance, be taken up with the aggrieved employee or employees, who shall first take the matter up with the shop steward.
A Yes.
Q Who in turn will take the grievance up to the foreman in charge. If one of your crew members had a grievance or a complaint about this contract being followed, would that person take that grievance up with you, in the first place, or with the shop stewart?
A He would mention it to me, yes.
Q Okay, okay, you are the person covered in the first step of the grievance procedure which is set out in the contract, okay, thank you.
A Yes.
MR. BREWER: Now, I'd like this packet marked as Number 7.
(Garrison Exhibit 7, marked for identification.)
BY MR. BREWER:
Q Mr. Garrison, in front of you is a document marked Exhibit 7 to your deposition.

Page 133

Q And it's 18 miles from where, from the plant in Selbyville?

A It could be 18 miles from the hatchery.

Q Do you know which it is?

A No, I don't.

Q So you don't know what the 18 miles means, it's 18 miles from where to where?

A No, I don't.

Q Okay. Now, the next page, I see Joe G. again, that's you?

A Yes, it is.

Q And this is the 27th --

A Yes.

Q -- of January, 2004. Again, the writing on the top where it says first man picks up 9:01 p.m., that's your writing?

A Yes, it is.

Q Last man home 9:47?

A Yes.

Q And you're saying its 12 hours and 48 minutes, is that what you're saying?

A Yes.

Q Okay. And the other information is the same as before with the weight of the chicken and so forth, and the total amount?

Page 134

A Yes.

Q If I go down on the lower left-hand portion of the page, I see names written with numbers.

A Yes.

Q And again is that the drivers?

A Yes, it is.

Q And the amount of birds on each truck?

A Yes.

Q And again, on the lower right-hand portion of the page, I see names written.

A Yeah.

Q Are those also the names of your catchers?

A Yes.

Q Okay. Now, what I would like you to try to explain to me, please, is if you look at the first page that you had, your crew caught 38,600 birds, right?

A Yes.

Q And on the second, at the Char-Lee farm, they caught 52,101 birds, correct?

A Yes.

Q The mileage from wherever it's measured, which I understand you don't know, is 18 miles on the first page, correct?

Page 135

A Yes.

Q And the miles on the second page, the Char-Lee farm, is 53 miles, okay?

A Yes.

Q I would like for you to explain to me how you were able to catch so many more birds at a place that is 53 miles away in less time than it took you to catch 38,000 from a farm that was only 18 miles.

A Okay. It was small birds, small chickens. The first bird, if you notice where it was number of doors, where it said number of doors?

Q Let me see, yes, I see that.

A Okay, 15 to a door. Look on your second page, numbers to door, 21 to a door.

Q Okay.

A Okay? Smaller chickens, you can catch them better than the big chickens and you get more on a truck. See, if you notice down the bottom, it says 6930, on the front page it said 4950; more chickens on the truck. Okay?

Q I see.

A And the time that we got started was on night shift, I got down here you see it's 11:34?

Q Oh, is that your writing there?

Page 136

A Yes.

Q Oh, maybe I misunderstood you, go to the first page, that isn't your writing?

A Yes, it is.

Q Oh. Oh, that is your writing 11:30?

A Yes.

Q I'm sorry, I misunderstood you. So that is your writing, okay, I see that, see what you're talking about, 11:34.

A Right. Okay?

Q Okay.

A So it makes a difference. When you got more chickens, look on your second page, where it said total of head count of number two house, 25,900.

Q I'm sorry, I'm not following, where are you?

A On the second page.

Q Second page, yes.

A Where it said 25,9-.

Q Where you said 25,9-? Oh, where it says 2589?

A Yes. That house is bigger than the first page.

Q Okay, I see that.

A Okay. So you just catch them, it's

A-0164

Page 173

A Yes.
Q And Harry's the driver who was broken down?
A Right.
Q Okay, thank you, that clears that up for me. I think we're done with this. Okay.
The catchers get paid by the thousand, do they not; it's a piece-work basis?
A Yes.
Q That's what the contract, the previous exhibit we talked about, shows?
A Yes.
Q You as a crew leader, you got paid a salary, did you not?
A Yes, I did.
Q Okay. Do you know approximately how much a catcher makes during the course of the year?
A Be specific for me.
Q All right. How much would a catcher who's basically working every day and so forth and so on, how much would they normally expect to make during the course of a year, do you have any idea? I mean you were a catcher, that's why I'm asking.
A Maybe 20,000 a year.
Q Okay.

Page 174

A Roughly.
Q And as a crew chief, sir, how much did you make?
A Roughly 40, 35.
Q Okay, I mean we have the records to show, I'm just asking you approximately. I believe you mentioned that you filled out the time sheets for the catchers --
A Yes.
Q -- correct? Every day?
A Yes.
Q Catchers on your crew, you filled that out every day?
A Yes.
Q Did you fill out any time sheet for yourself?
A We was getting paid by the thousand. When I had to catch, yes, I did.
Q No, no, when you became salary --
A Oh, no, no.
Q -- there was no time record kept of your time?
A No, I didn't do it.
Q No, right. And do you know of any record that was kept of your time?

Page 175

A No.
Q Let me just have a minute.
MR. MARTIN: You want to take a couple minutes? We have been --
MR. BREWER: Oh, is it 2:30? Yeah, that's fine.
(Whereupon, a short recess was taken.)
BY MR. BREWER:
Q Mr. Garrison, would you take Exhibit 7 again for a minute for me? I just have a couple of questions.
A Okay.
Q Included in the times that you have recorded, the first man pick up, last man home, when you're on your way to a farm, it's normal that you would stop at a convenience store someplace to get coffee, sandwiches, whatever?
A Yes.
Q Things like that?
A Yes.
Q And that would be included in this time, correct?
A Yes.
Q And it's also true that on the way home, you would also stop at a convenience store type

Page 176

thing and get coffee and whatever?
A Yes.
Q Okay. So that's included in this time, too, the stops for --
A That's in some cases. Some cases, you just keep on going, they're ready to go home.
Q How would we know from looking at these when you stop and when you didn't?
A Right.
Q I mean it is normal that you stop on the way to the farm and normal --
A Right, yes.
Q -- and normal that you stop on the way home?
A Yes.
Q All right. Can you tell me this: The last documents that were provided to us by your attorney, the last one on page OO46 has a date of March 15, '04, the last one in the pile.
A Yes.
Q Can you tell me why you stopped doing it on the 15th of March and you didn't do it in April, May, June, July?
A February and March? It ain't a reason I stopped in March, it just, just -- I was thinking

Page 177

that I ain't had to do all of them, you know, I just -- I just didn't.

Q Did you talk with Mr. Davis about stopping?

A No, no, I didn't.

Q Well, did you talk to Mr. Davis about combining records like this time, first man, last man?

A Yes.

Q All right. You just stopped on the 15th, the last one you filled out was the 15th of March and you stopped?

A I might have had some more but I throwed them away, you know, I just didn't keep them all, I guess. After I had a lot more, I really stopped -- it ain't really stopped on the 15th of March, I really didn't; it was more I just didn't give them all of them.

Q So you still have more in your possession?

A I probably do, if I don't throw them away. I probably throwed a lot of them away because it's so many of them.

Q Well, you're keeping these records, sir, because you're claiming this is time that you are owed money for?

Page 178

A Right.

Q And what you're telling me is after March, you may have some but you may have thrown them away; why would you throw them away?

A Because basically like I ain't think I need all of them, that's all, I ain't think I need all of them.

Q And you made that decision on your own?

A Yes, I did.

Q You didn't talk to anybody else about making that decision?

A No.

Q Okay.

MR. MARTIN: Let me state for the record that if he has more, I'll direct that he send them to me and we will forward them to you. It was our understanding we had all the records.

MR. BREWER: I'm sure it was, and we weren't insinuating anything at all. The next document, please.

(Garrison Exhibit 8, marked for identification.)

BY MR. BREWER:

Q This is Number 8, have you ever seen this before, Mr. Garrison?

Page 179

A Yes, I have.

Q Okay. And this is from Mr. Doug Lynch, and can you identify who he is?

A Yes, I can.

Q Who is he?

A My supervisor.

Q Do you know if he has a title?

A Live haul management.

Q And this is from him to crew leaders, and you were a crew leader at this time?

A Yes.

Q Okay. And this is telling you that you will not receive additional pay for performing jobs such as catching or forklift, correct?

A Repeat that again.

Q This is telling you that you will not receive any additional pay for performing other jobs, and in parenthesis it says catching, forklift?

A Yes.

Q When you received this, was it your understanding that the company did not want you catching or operating the forklift?

A Yeah, I understand that. But they also said do what you got to do to get the job done. You don't see it on here, no, you don't.

Page 180

Q Well, no, but I mean when you received this memo --

A Yeah, I understand, yes.

Q -- you understand that the company didn't want you catching or operating the forklift?

A Yes.

Q Right.

MR. MARTIN: I'm going to object to the form of that question as stated. But go ahead.

BY MR. BREWER:

Q And if you weren't doing these things, you'd obviously have more time available to you to be doing the things that we talked about earlier, making sure the birds are being caught properly, and pens were going right, and the growers, and all of those things, correct?

A Let me say this: It was my job, my responsibility to get the chickens in the plant.

Q That's correct.

A That was part of my job.

Q We understand that.

A And so that's what I was doing.

Q Correct. But my point is when you got this memo, you were told that they didn't want you to be doing these things so that you could have more time

Page 181

to get that job done, get the chickens to the plant?
A The job got done even if I was doing these things.
Q Okay. The employees who worked for you, the catchers, they don't evaluate themselves like you did, do they?
A No.
Q Okay. Do you evaluate them at all?
A No, I don't.
Q Okay.
MR. BREWER: Let me give you this.
(Garrison Exhibit 9, marked for identification.)
BY MR. BREWER:
Q The document in front of you, sir, which is Number 9 --
A Yes.
Q -- Exhibit 9 to your deposition, have you seen this before?
A Yes, I have.
Q If you look at the bottom of one of the pages, it will talk about salary benefits, orientation.
A Yes.
Q Does this list, without going through

Page 182

all of this -- and you can certainly take your time and review this if you would like -- does this describe the benefits that are available to the salaried work force at Mountaire?
A Let me say this -- excuse me -- let me say this.
Q Yes.
A When I got one of these, I wasn't on salary.
Q We're coming to that.
A Okay.
Q But you have seen this before? When you were salaried, you have seen this book before, have you not?
A Let me think about that for a minute.
Q Okay, take your time.
A No, I haven't.
Q You haven't?
A No, I haven't.
Q Okay.
A I can't recall of it, no, I haven't.
Q Do you remember what benefits you had as a salaried employee at Mountaire?
A Well ...
Q All right, we'll come to that.

Page 183

MR. BREWER: Let's have this marked as Number 10.
(Garrison Exhibit 10, marked for identification.)
BY MR. BREWER:
Q Just take a look at that and tell me if you have ever seen that before. Do you know what this is?
A No, I haven't.
Q If I told you that this was the benefits that the members of Local Union 355 had, including your crew members, would there be any reason for you to disagree with me?
A I didn't see one of them, I haven't seen one of them.
Q I understand you haven't seen this, I understand.
A No, I would remember if I did.
Q But if I suggest to you that these are the benefits that the members, the crew, the catchers --
A Yes.
Q -- the people that work for you had as part of 355, would you have any reason to disbelieve me?

Page 184

MR. MARTIN: I'm going to object to that question. He has already stated he is not familiar with this document.
MR. BREWER: Okay, that's fine, that's fair enough.
BY MR. BREWER:
Q Next, sir, let's go to this document; this may be the best thing to do here.
MR. BREWER: This is a document that we have prepared, make this Number 11.
(Garrison Exhibit 11, marked for identification.)
BY MR. MARTIN:
Q This is a document we prepared, and I'm going to try to go through this with you. If you can answer the questions, that's fine; if you can't, just let me know that you can't.
A Yes.
Q Catchers who worked for you --
A Yes.
Q -- over on the left-hand column of this document it talks about their vacation, one week after one year, two weeks after three years, and so forth.
A Yes.
Q Does that seem accurate to you?

Page 185

A Yes.

Q All right. And the salaried, it's two weeks after one year, three weeks after five, is that accurate when you were salaried, is that the vacation you were entitled to --

A No.

Q -- as a crew leader?

A No.

Q It's not?

A No.

Q All right. LTD, which stands for long-term disability --

A Yes.

Q -- it's one-half of the salary for five years for the hourly people, and after 90 days for the salaried people it's 60 percent of the salary until age 65 until totally disabled; were you aware that was a benefit you had?

A I can't quote on that, I don't know. I mean just -- I don't know.

Q Well, let's do the same thing on STD, which is short-term disability; you have no idea what your benefit was --

A No.

Q -- as a salaried crew leader?

Page 186

A No, I don't.

Q And you have no idea what kind of life insurance you were entitled to?

A No.

Q No? Do you have any idea how much you paid for dependent life insurance at all?

A Not right off, I don't.

Q And the catchers, the people who work for you were paid weekly, correct?

A Yes.

Q And you were paid every two weeks, correct; the 15th and the last day of the month?

A Yes.

Q Do you remember, is that accurate?

A Yes.

Q Okay. Now let's just go back to vacation for just a second. Are you saying that you don't know if this is true or not, or you're telling me this definitely is not correct?

A I know it ain't correct.

Q What?

A I say I know it's not.

Q You know this is not correct, okay.

A That's true, I'm sorry, I read it wrong for the salary thing.

Page 187

Q I'm sorry, I put the document away, what are you referring to, sir?

A For the salary thing, it says three weeks.

Q I'm sorry, salaried for what now?

A For the salary thing, it says three weeks for five years, yeah.

Q So the vacation then that's listed here for the salaried is correct?

A Salary, right, yeah.

Q Okay. And the vacation for the hourly that's listed there is correct?

A Yes.

Q Okay, thanks for clearing that up.

A I'm sorry.

Q That's all right. Let's see, you also receive as a crew leader an allowance for the van --

A Yes.

Q -- for your van, isn't that true?

A Yes.

Q And how much did you get for that?

A It will be 235.

Q $235?

A Yes.

Q How often did you get that?

Page 188

A Once a week.

Q So you get $235 a week for your van?

A Yes.

Q For 52 weeks of the year?

A Yes.

Q And what was that supposed to cover?

A It's supposed to cover my fuel and my expenses.

Q And your expenses?

A Yes.

Q For maintaining the vehicle?

A Yes.

MR. BREWER: Can I have the next document which is 12 marked for identification?

(Garrison Exhibit 12, marked for identification.)

BY MR. BREWER:

Q Now again, sir, what I'd ask you to do is just take a look at this. I'm going to go through a couple of things and if you know the answer, please tell me; if you don't konw, you can just tell me you don't know.

A Okay.

Q This memo was dated, by the way, in the upper right-hand corner March 27, '01 --

Page 189

A Yes.

Q -- right? Catchers were receiving 260 for a thousand birds caught?

A Yes.

Q Does that sound right to you?

A Yes.

Q And the crew leaders were getting 510 per thousand birds caught?

A Yes.

Q Plus the transportation check which was issued at 215 at that time?

A Yes.

Q The vacations, personal days, and holidays for the catchers were based on eight hours and paid at $11.80 per hour?

A Yes.

Q That's how they were paid? When the catchers went on vacation, that's how they got paid?

A Yes.

Q So in those documents we looked at earlier, it said vacation money only; if a person wanted vacation money only, it would be paid at the basis of $11.80 an hour --

A Yes.

Q -- based on this? Your vacation, the

Page 190

crew leader's vacation, was based on your 52 week average?

A Yes.

Q Okay. They weren't paid on an hourly basis?

A No.

Q Holidays for the crew leaders were calculated at $15 per hour for eight-hour days?

A Yes.

Q Okay, a crew leader did not receive catching pay when working with a short crew, correct?

A Yes.

Q The catchers are eligible for overtime pay?

A Yes.

Q And of course the crew leaders were not. It says crew leaders are to list daily catcher names and head count on daily time sheets, is that what you were referring to earlier when we --

A Yes.

Q -- mentioned those gentlemen, that's what you were supposed to do?

A Yes.

Q It says crew leaders are eligible for monthly and an annual bonus, is that correct?

Page 191

A Yes.

Q You were eligible for that, weren't you?

A Yes.

Q And the catchers who worked for you were not, were they?

A No.

Q The rest deals with the live haul drivers and the forklift drivers, we don't need to get into those.

MR. BREWER: Mark this, please.

(Garrison Exhibit 13, marked for identification.)

BY MR. BREWER:

Q Mr. Garrison, this is a level of benefit levels --

A Yes.

Q -- that have been given, bonus levels that have been given to crew chiefs --

A Yes.

Q -- which we already know the catchers are not entitled to. If you go up at the top of the year 2001, I see Joseph Garrison is listed.

A Yes.

Page 192

Q And you earned a performance bonus of $309.05 for that month?

A Yes.

Q And so that we can sort of expedite this, since I'm told the office closes at 3:00 here, if we go out through the year, we'll see that you earned in 2001 a total of $2,282.98 for your year-end bonus in that year, correct?

A Yes.

Q And what is that based on, sir? How do you go about getting the bonus?

A Based on your DOAs and your head count, and farm damage.

Q That's all?

A Yes.

Q Only those three?

A Only those three.

Q So if you were supposed to catch let's say 30,000 chickens, and you were supposed to do that in 7 hours and it took you 10 hours, that wouldn't count?

A No, got nothing to do with that.

Q Just DOAs and everything else?

A Yes.

Q So it was your responsibility to make

Page 193

sure those things didn't happen?

A Yes.

Q Now, the bonus, it says processing level three, that benefit is for supervisory people, isn't that right?

A Yes.

Q Okay. Now, if we go to the next year, in 2002 the bonus benefit that's available for supervisory employees, your name is listed again. And for 2002, if I'm doing this correctly, I see that you made $902.69 --

A Yes.

Q -- in the form of bonuses? And then in the year 2003, you received it looks like $1657?

A Yes.

Q Okay. And, again, the same would be for 2004, the bonus amounts are there. So these are bonuses that you received pursuant to the company's bonus plans --

A Yes.

Q -- for salaried supervisory employees?

A Yes.

Q And you got that bonus? The catchers who worked for you did not get this, did they?

A No.

Page 194

Q Now, in addition to these monthly bonuses, you also got an annual bonus, did you not?

A A yearly bonus, you're talking about?

Q A yearly bonus, right.

A Twice.

Q But I mean you did get those bonuses?

A Yes, I did.

Q The annual bonus is basically based on how the plant did, correct --

A Yes.

Q -- over the course of the year?

A Yes.

Q The monthly bonuses are based on what you mentioned, the DOAs and things like that?

A Yes.

Q So in addition to these monthly bonuses, you also got an annual bonus --

A Yes.

Q -- as a crew leader?

A Yes.

Q That's part of the supervisory benefit?

A Yes.

Q Supervisory bonus thing?

A Yes.

Q And you got that twice, you said?

Page 195

A Only twice.

Q Only twice in four years; 50 percent.

(Garrison Exhibit 14, marked for identification.)

BY MR. BREWER:

Q On Number 14, you will see some writing in the upper left-hand corner that was done before this, that is my handwriting, just to clarify things. Did you receive this memo, sir?

A Yes, I did.

Q And it's a mandatory meeting for all management which says includes crew leaders, correct?

A Yes.

Q Did you attend that meeting?

A Yes, I did.

Q Okay. The company has Christmas parties, are you aware of that basically?

A Yes.

Q Do they have one for the hourly people?

A No.

Q No? Did they have one for the salaried people?

A Yes.

Q Have you been invited to a party?

A Yes.

Page 196

Q Have you gone?

A Yes.

Q You have?

(Garrison Exhibit 15, marked for identification.)

BY MR. BREWER:

Q This is the 2003 supervisory Christmas dinner?

A Yes.

Q Under Mr. Lynch, the Joe Garrison that's reflected, is that you?

A Yes, it is.

Q Did you go to this Christmas party?

A Yes, I did.

Q Take a quick look at the names on the list and see if you can tell me if there's anyone here who is not a supervisor.

A No.

Q Okay. The next page is the Christmas dinner for 2002, which apparently was held at the Holiday Inn in Ocean City.

A Yes.

Q It says 2002, it's 2001 I guess up here. Did you attend that meeting also?

A Yes, I did.

Page 197

Q You went to that party?

A Yes.

Q The next page is a list for the 2001 Christmas dinner invitation?

A Yes.

Q Again, under Mr. Lynch, your name, Joe Garrison, is that you?

A Yes, it is.

Q And did you go to that supervisory Christmas party?

A Yes, I did.

Q Is there anybody here on this list that you can tell me is not a salaried supervisor?

A No, no.

Q Okay. Did you have a good time, by the way?

A Yes, I did.

Q Good, all right. Now --

MR. MARTIN: Excuse me, I should have had him plead the 5th in Mr. Lynch's presence here.

BY MR. BREWER:

Q Okay, now, we have talked about this, I just want to be sure: On your crew, you have seven catchers and a forklift operator?

A Yes.

Page 198

Q You also carry sometimes an extra catcher, do you not?

A Yes.

Q And the reason you carry the extra catcher is so people can be given a day off?

A Not a day off, but a break.

Q A break?

A Yes.

Q When you say a break, what do you mean?

A One guy might sit down, take a break. You know, his hands hurt, sometimes their hands get hurt.

Q Oh, I see.

A You know, and then he'll fill in.

Q Okay.

A That's all.

Q And do you rotate, do you rotate that person?

A Yes.

Q So, for example, on one day if I were a member of your crew, I might be the extra man to be used to rotate, and the next day it might be somebody else?

A Sometime I do it that way.

Q How did you do it?

Page 199

A The way I did it, I would bring an extra man when we got a lot of chickens and big birds; I didn't do it all the time, you know.

Q But whether to rotate or not to rotate, that was your decision?

A Yes.

Q And how it was to be done, it was you decided how it was going to be done depending on the number of birds and size of the birds?

A Yes.

Q That was your decision?

A Yes.

Q Another crew leader might have done it differently?

A Yes.

Q Okay, let me just see now. The Complaint, sir, I don't know if you have it in front of you as an exhibit. Let me give you this, this is the Complaint, I think you have seen this.

A Yes, I have.

Q I have a copy for you if you want it, I figured you would have a copy.

MR. BREWER: I want it marked, please.

(Garrison Exhibit 16, marked for identification.)

Page 200

BY MR. BREWER:

Q Go to paragraph 23 of the Complaint is what I'm looking at, I'm not quite sure what page it's on.

MR. MARTIN: There's no page indicated; it's about the third or fourth one in, though.

MR. BREWER: Yes, paragraph 23

BY MR. BREWER:

Q It states that the defendant, which is the company, follows and continues to follow a corporate policy and/or practice that requires the plaintiffs, which is you, sir, to submit a daily time sheet broken down for each day of the week.

A Yes.

Q You're required to submit a time sheet?

A Yes.

Q I thought you said no record was kept of your time.

A For the men.

Q Oh, for the men, okay. So what this means is a daily time sheet is broken down for the men?

A For the men.

Q Okay, thank you. Let's go to number 24. This talks about the three-year period, and it

Page 209

Q And that's where you pick them up?
A Right.
Q And then when you do that, when you go the route that you gave us from your place to Selbyville to Mr. West, and then to Mr. Savage where you pick up at the place in Millsboro did you say?
A Yes.
Q And then you go to get Mr. Smith and that route, how long does that take you?
A Well, just picking them up?
Q Yes.
A Two hours.
Q Two hours? Now, I understand some of these are slightly different, but if you went on a computer, driving with Map Quest it's about an hour.
A Oh, no, it's impossible. It's impossible.
Q Okay.
A No.
Q You don't have to take my word for it, just MapQuest.com.
A It's impossible.
Q I understand. All right, let's see, I can put this back. Okay, go back to the Complaint, sir, the one that you have there.

Page 210

A Got you.
Q If you go to paragraph 26, please, which is on the next page.
A Yes.
Q It speaks to, in paragraph 26th, it says the defendant, which again is the company, followed and enforced and continued to follow and enforce a corporate policy and practice of partial day deduction in that any partial time taken off from normal working hours by any of the plaintiffs, such as yourself, okay, other than established holidays was deducted from their pay. All right, let's stop at that point.
A All right.
Q Can you tell me, this is a partial day, this is if you're going to take off a half a day, shall we say, okay?
A Yes.
Q You need to take off a half a day, and it's not a holiday and it's not a sick day.
A Right.
Q Is it your testimony that you do not receive your full salary for that week if you take half a day off?
A No.

Page 211

Q That's not your testimony?
A No.
Q You do receive your full salary if you take a half a day off?
A If I have to go to the doctor or something like that, yes.
Q You get your full salary?
A Yes.
Q Okay. And if you have to do something else, if it's not the doctor, if it's something else, if you take any less than a full day off, your salary for the week remains the same, does it not? Your paycheck for the two weeks that you get paid remains the same?
A Yes, yes.
Q Thank you. Okay. Let's see, let's go to the next one which would be paragraph 27 of the Complaint. This speaks to, and you can read it, I won't read it into the record, it's part of the record, this says that you would receive a reduction in the amount of your compensation because of violations in the quantity of the work performed.
Was your salary ever reduced because of the quantity of the work you performed?
A I'm trying to think. What are you on,

Page 212

27?
Q I'm on 27, yeah. Maybe we'll just read it together. It says, "Because of the Defendant's policy or practice as described in paragraph 24 super," which means in above, "the plaintiff," such as yourself, okay, "were subject to partial day deductions for partial time off from normal work hours."
Now, you already told me that if you took less than a day, a full day off, your pay wasn't docked, you get the same salary, correct?
A Right.
Q Okay. Then it says, "Whereby they directly received a reduction in the amount of compensation because of violations in the quantity of the work performed." Was your pay ever docked because of violations in the quantity of the work you performed?
A No.
Q Okay. Let's go off the record for a moment.
(Whereupon, there was a discussion held off the record.)
BY MR. BREWER:
Q Let's go to 32. This speaks to being

Page 213

forced to use your personal automobiles for pick-up, transport, and so forth?

A Yes.

Q I'll let you take a minute and read that, if you would, I just have a couple questions about that.

A Okay.

Q Okay? I think you mentioned to us you received a payment every week for your vehicle which covers your full expenses, correct?

A Yes.

Q And the last number you gave me was what, I forget?

A 235.

Q 235?

A Yes.

Q Do you know if it's more now or not?

A I'm not there.

Q Well, I understand you're not, I was just asking if you do know?

A No, I don't know.

Q The 235, when did you get that, in 2004?

A Yes, I did.

Q Was it somewhat less the year before?

Page 214

A I can't recall. I know it was in 2004.

Q What I'm trying to get at is it increases?

A Yes.

Q It increases every year?

A It increases not every year.

Q Okay, not every year?

A No.

Q But it does increase, okay. Now, when it comes to the vehicle, who chooses what vehicle to buy? If you're going to go out and buy a vehicle that you're going to use in work --

A I do.

Q -- you choose what vehicle you buy, right?

A Yes.

Q The kind of vehicle you can buy, the color?

A Yes.

Q You choose all that?

A Yes.

Q Whether you want leather or not, whether you want automatic windows or roll up, all of those decisions are made by you?

A Yes.

Page 215

Q And that's what you use?

A Yes.

Q Okay, that's fine. Now, the next item, and this is really just for purposes of the record, the Complaint says -- and I don't expect you to know anything about this; if you do, that's fine, if you don't, that's also fine -- the Complaint says in paragraph -- mark this.

(Garrison Exhibit 16, marked for identification.)

BY MR. BREWER:

Q The Complaint says that we were put on notice by your counsel, Mr. Martin, by a letter dated February 27, 2004 and, if I'm not mistaken, isn't that close to the day that you wrote Mr. Martin's name down on your time sheet? The record will speak for itself. And it says we have continued such policies. Have you seen this document that's in front of you now?

A No.

Q I didn't expect you to see it, okay. This is a letter from me to Mr. Martin, responding to his letter of February 27.

A Yes.

Q Dated March 5. Let's see. Paragraph

Page 216

34 of the Complaint says that when the defendant learned of plaintiff's intentions to seek counsel, we immediately retaliated against plaintiffs, threatened plaintiffs with termination of their employment if they continued to pursue, okay?

A Yes.

Q Now, first of all, I want you to tell me when this occurred; what time are we talking about here?

A I don't know what time. You're on paragraph 34, right?

Q I'm on paragraph 34. Mr. Martin wrote a letter to the company on February 27th, I responded on March 5.

A I don't know exactly what time it was.

Q Was it in February, can you tell me? You may not be able to tell me the exact date, sir; can you tell me the month?

A I can't recall the month.

Q You can't even recall the month?

A No, I can't.

Q Okay, all right. Who is the one who retaliated against you and threatened you with termination?

A Al Z.

A-0173

Page 217

Q Al Z.

(Whereupon, there was a discussion held off the record.)

BY MR. BREWER:

Q We're talking about Mr. Al Z. is the person who threatened you?

A Yes.

Q What did Mr. Al Z. say to you, sir?

A Well, he came out on the farm and issued me this letter, saying that if I don't make them guys sit down and take a half-hour lunch, I would be terminated.

Q And he did this after you filed the lawsuit?

A Yes.

Q Well, let's talk about that for a minute, Mr. Garrison. You are aware, are you not, that the catchers, the people who worked for you, filed a lawsuit claiming that they were entitled to some overtime compensation, correct?

A Yes.

Q You know that?

A Yes.

Q All right. And you know the reason for their claim was that the time sheet that you, as the

Page 218

crew chief, crew leader, filled out, had an automatic deduction of one-half an hour for lunch, right?

A Yes.

Q And as a practical matter, the people weren't taking that half-an-hour for lunch, were they?

A Yes.

Q They were taking the half-hour for lunch?

A Well, yes, because if we waiting on a truck, we still taking the half-hour lunch.

Q Well, the lawsuit was settled on the basis that the people were working through their lunch and were never getting the half-hour paid lunch; are you aware of that?

A Yes, I am.

Q You're aware of that?

A Yes.

Q And isn't that what Mr. Al Z. made sure that you and every other crew leader understood, that these people are in fact to take time off for one-half hour for lunch, they're not to work through lunch?

A I understood that.

Q You understood that?

A Yes, I did.

Q All right. So when Mr. Al Z. reminded

Page 219

you of that, you took that as a threat because --

A Yes, I did, because he said it -- the reason why I took that as a threat because he said -- actually he told it on himself, he said it's not a threat. I mean it --

Q Okay.

A So that's telling me -- what it's telling me?

Q Well, I don't know.

A Okay. Good question.

Q I don't know. What it would tell you and what it would tell me might be different things. But you don't know when this is?

A I can't recall the month, no, I can't.

Q So you don't know if it was before the lawsuit or after?

A No; it was after the lawsuit, yes.

Q It was after the lawsuit?

A Yes.

Q So this occurred then in June, after June?

A Approximately.

MR. MARTIN: All right, let me interpose an objection.

MR. BREWER: Sure.

Page 220

MR. MARTIN: You keep mentioning the lawsuit. As you well understand, there was correspondence prior to actually filing suit.

MR. BREWER: Yes.

MR. MARTIN: You and I understand that, I'm not sure Mr. Garrison does.

MR. BREWER: Okay, I'll be more than happy to try to clear that up.

BY MR. BREWER:

Q What your counsel is saying is that in February, February 27th of '04, he wrote a letter to the company saying that he thought that you were not being properly compensated.

On March 5, I responded on behalf of the company, saying you were being properly compensated; you were supervisory and exempt under the Fair Labor Standards Act, okay? The lawsuit, this litigation, was filed on June 18, 2004, okay?

A Yes.

Q My question to you, sir, is in a time frame, you're claiming Mr. Al Z. threatened you --

A Yes.

Q -- with loss of your job, as it says in this Complaint, okay?

A Yes.

Page 221

Q It says when the defendant learned of plaintiff's intentions to seek counsel, we immediately retaliated and threatened plaintiffs; that's what this says.
A Yes.
Q Okay. Now I want you to tell me when that was, because that's important.
A Right off the hand, I don't know exact time or month, I just don't know right offhand.
Q So you can't tell me whether it was in February?
A I know it was said.
Q Okay, but you can't tell me whether it was February?
A No, I can't.
Q Or March?
A No, I can't.
Q Or April?
A No, I can't.
Q Or May, or June?
A No.
Q But you know it was threatened?
A Yes.
Q All right. And where did that occur?
A On the farm.

Page 222

Q Which farm?
A I was to -- I'm trying to think of the name of the farm. I know where I was at. What's the name of that farm? I can't think of the name of the farm. I know it's on a farm.
Q You took Mr. Al Z.'s comments seriously, did you not?
A Yeah.
Q I assume you did.
A Of course.
Q Yeah. But you don't know when it happened, and you can't tell me where it happened?
A I can't think of the name of the farm.
Q Okay.
A I can carry you to the farm, but I can't think of the name of the farm.
Q But how many farms are there in --
A I know that one, but I just can't think of the name of the farm. I know it was in Westover, out there to the landfill, I can't think of the name of the farm.
Q So the location of the farm is where?
A Is like you're going to the landfill on -- I'm trying to think, it's --
Q On Route 20?

Page 223

A It's in Maryland.
Q In Maryland?
A I can't think of the name of the farm, man.
Q Okay. Was anybody else present?
A David Nuse.
Q He was also present?
A Yes.
Q Did Mr. Nuse say anything to you?
A No.
Q He didn't say anything?
A Al Z. done the talking.
Q So it was just you, Mr. Nuse, and Mr. Al Z.?
A Yes.
Q No one else was present?
A No.
Q Okay. Did anybody else ever threaten you with termination?
A No.
Q And this occurred only one time?
A Yes.
Q All right. Did anybody threaten to retaliate against you? Because it says that they did.
A Be -- can you be specific with that?

Page 224

Q Well, all I'm reading is what's been alleged in the Complaint; it said we immediately retaliated against you. Did anything bad happen to you after, has anything bad happened to you outside of what you just told me?
A No, not bad, no. No.
Q Okay. So what we have then is the threat that you have just described?
A Yes.
Q Okay. Now, the next paragraph talks about receiving the final warning before termination; is that the warning that you referred to about making sure that the catchers received a 30-minute lunch break?
A Yes.
Q That's what that refers to?
A Yes.
Q So you and all other crew leaders were given that same warning?
A Yes. Yes.
Q At the same time?
A That, I don't know.
Q All right. Let me ask you this: After the catcher lawsuit was disposed of, did the people on your crew always take a half-an-hour for lunch, or did

Page 225

they sometimes work through their lunch?
A We always took a lunch.
Q You always took a lunch?
A Yes.
Q Let me just ask this question this way, Mr. Garrison, because this is interesting: Is it your testimony that the people on your crew from the time you became a crew leader always took a half-an-hour lunch each and every day they worked?
MR. MARTIN: I'm going to object to the question. You can go ahead and answer, though.
BY MR. BREWER:
Q That you never worked through lunch?
A We always ate.
Q Listen to my question. Did you and your crew always take one-half hour out, stop working, stop working for one-half hour, and eat lunch?
A Yes, we did.
Q Always?
A We always ate.
Q You always took the half-an-hour? I'm not saying you always ate.
A We always -- it might have been 35 minutes, could have been 40 minutes, but we always took a lunch.

Page 226

Q But you always took at least a half-an-hour, maybe sometimes more, stopped working and ate lunch?
A Yes.
Q And you never worked through lunch?
MR. MARTIN: Same objection.
BY MR. BREWER:
Q Okay.
A It's according on -- it's according on what shift that I'm on. Because if I only have -- if I'm on a 2:00 o'clock in the afternoon shift, if I only have three loads, you know, you're done before you even have lunch, so no on that deal. It according to what shift I was on.
You asking me a question that's not available because I could be on a different shift; and if you on a different shift, if you don't got but like four loads or five loads, the time you get them, it is lunch.
Q Okay. Well, then, let me ask you this: If you're telling me, which I understand you to be telling me, that your people, with the exception of the time you have just mentioned now, were always taking 30 or 40 minutes lunch, and you were told if the people don't take 30 or 40 minutes lunch you're

Page 227

going to be terminated, why would that be threatening to you? Your people were taking their lunch.
A Because it's a lawsuit that they did, is that what you're saying?
Q No, what I'm asking you is in paragraph 35 --
A I know what you're saying.
Q -- it says you received verbal harassment and/or were issued a final warning before termination in an attempt to threaten plaintiffs; I want to ask you the final warning, is that the final warning that you and all the other crew leaders got --
A Yes.
Q -- for making sure your people took one-half-an-hour lunch?
A Yes.
Q That's the one we're referring to?
A That's it.
Q And crew leaders who were not part of this lawsuit also got that letter, did they not?
A Not --
MR. MARTIN: I'm sorry, letter, what letter?
BY MR. BREWER:
Q The warning, the final warning.

Page 228

A I got the letter.
Q You got the letter?
A Not the catchers.
Q No, no, I'm saying the crew leaders --
A Right.
Q -- they all got them?
A Yes.
Q Even people who are not part of this lawsuit that we're here today about?
MR. MARTIN: Objection; he has no way of knowing that.
THE WITNESS: No, no, no.
MR. BREWER: Well, he knows --
THE WITNESS: No, no.
BY MR. BREWER:
Q So you're telling me it's only the people who are listed here that got that final warning, is that your testimony?
A All the crew leaders, yes, they did.
Q All the crew leaders?
A Yes.
Q Okay. I believe I was asking you about the final warning.
A Yes.
Q And you said you felt threatened by it.

Page 229

A Uh-huh.

MR. MARTIN: The answer is yes, right?

THE WITNESS: Yes.

BY MR. BREWER:

Q And my question is I don't understand why you would have felt threatened if, as you tell me, your people were always taking at least a half-an-hour off for lunch.

A Because how he was telling me, that's how. Ain't got nothing to do with my people, had something to do with how he's telling me, his actions.

Q All right. Okay, let's move on. The next paragraph talks about many of the plaintiffs have been cornered by management personnel and questioned regarding their discussions with counsel, which would be Mr. Martin; have you ever been cornered by anybody from management?

A No.

Q No?

A No.

Q Okay, so it doesn't apply to you. Next paragraph says that apparently there was a meeting between the plaintiffs and counsel on a Saturday morning, and that plaintiffs recognized vehicle or vehicles owned or operated by the defendant's upper

Page 230

management personnel circling in the parking lot of a diner.

A Yes.

Q This is the meeting that you talked about earlier --

A Yes.

Q -- with Mr. Martin?

A Yes.

Q And you were told to keep time sheets?

A Yes.

Q Okay. And that's when you mentioned the other gentlemen who were plaintiffs in this case were also at that diner?

A Yes.

Q Where is this diner located?

A Doyle's Restaurant.

Q And where is that?

A Selbyville.

Q That's in Selbyville?

A Yes.

Q Okay, is it close to the plant?

A Yes.

Q Okay. And when did you meet, in the morning?

A Yeah, Saturday morning.

Page 231

Q What time?

A I'm thinking it was 9:00 o'clock, I think.

Q Now, did you recognize a vehicle owned by the defendant's upper management circling the parking lot?

A Yes.

Q Did you see that?

A Yes.

Q Who was driving the vehicle?

A Phil Owens.

Q Phil Owens was driving the vehicle?

A Yes.

Q And you saw him circling in the parking lot?

A Yes.

Q Now, what makes you think it was about your lawsuit?

A I don't know, good question.

Q This is prior to Mr. Martin's letter, isn't it?

A Right.

Q Mr. Owens had no idea anything was going on?

A I don't know that.

Page 232

Q Well, it's prior to Mr. Martin's letter?

A Yes.

Q So what you see is Mr. Owens driving around --

A Yes.

Q -- at a diner that is open to the public? People can come in there and have breakfast, anybody?

A Yes.

Q Okay. So what you see is him driving around, and that's what you're referring to here?

A Yes.

Q You're sure it was Mr. Owens?

A I think it was Mr. Owens, yes.

Q Is that the only time that this is referring to?

A Yes.

Q Okay. What kind of car did you see Mr. Owens driving?

A I think it was a gray car.

Q What kind?

A Ford, Mountaire Ford.

Q A gray Mountaire Ford?

A Yes.

# EMPLOYEE WARNING NOTICE
## *NOTIFICACION DE ADVERTENCIA AL EMPLEADO*

DATE/ *FECHA*: 6 / 2 / 03

NAME/ *NOMBRE*: Jasper Smith

SOCIAL SECURITY NUMBER/ *NUMERO DE SEGURO SOCIAL*:

DEPARTMENT/ *DEPARTAMENTO*: Line Haul

DATE OF HIRE/ *FECHA DE CONTRATACION*: / /

COMPANY POLICY/ *POLITICA DE LA COMPANIA*: He should let me no when he take off or Call

VIOLATION/ *VIOLACION*: Jasper was not home when i went to Pick him up or he did not Call

ACTION/ *ACCION*: ORAL 1ST/ *PRIMERA* (2ND/ *SEGUNDA*) FINAL

I have read this warning and understand the above violation. I understand that disregard of company policies could result in disciplinary action up to and including discharge./ *He leido la violación mencionada. Entiendo que faltar a las políticas de la compañía puede resultar en acción disciplinaria que podría indlcuir el despido.*

Jasper Smith — Employee's Signature/ *Firma del empleado* — 6/3/03 Date/ *Fecha*

Joseph Gannon — Supervisor/ Foreman Signature — 6-2-03 Date

Human Resources Manager's Signature — Date

PENGAD 800-631-6989
Garrison
Ex # 5
pew 1/14/05

A-0178

# EMPLOYEE WARNING NOTICE
## *NOTIFICACION DE ADVERTENCIA AL EMPLEADO*

DATE/ *FECHA*: 5 / 30 / 03

NAME/ *NOMBRE*: Jasper Smith

SOCIAL SECURITY NUMBER/ *NUMERO DE SEGURO SOCIAL*:

DEPARTMENT/ *DEPARTAMENTO*: Line Haul

DATE OF HIRE/ *FECHA DE CONTRATACION*: / /

COMPANY POLICY/ *POLITICA DE LA COMPANIA*: He should let me no when he take off or Call

VIOLATION/ *VIOLACION*: Jasper was not home when i went to pick him up or he did not Call

ACTION/ *ACCION*: ORAL 1ST/ *PRIMERA* (circled) 2ND/ *SEGUNDA* FINAL

I have read this warning and understand the above violation. I understand that disregard of company policies could result in disciplinary action up to and including discharge./ *He leido la violación mencionada. Entiendo que faltar a las políticas de la compañía puede resultar en acción disciplinaria que podría indlcuir el despido.*

Jasper Smith Jr.
Employee's Signature/ *Firma del empleado*

6/3/03
Date/ *Fecha*

Joseph Gannon
Supervisor/ Foreman Signature

5-30-03
Date

Human Resources Manager's Signature

Date

A-0179



# EMPLOYEE WARNING NOTICE

NAME Clarence Heath DATE 12-23-02

DEPARTMENT Live Haul ID # ____________

DATE OF HIRE ____________

WORK RULE Be work on Time

VIOLATION

Clarence was late for work. He came to the Second Stop but I Told him that I did not need him We were just about done. unexcused

ACTION ORAL 1ST 2ND (3RD)

I HAVE READ AND UNDERSTAND THE ABOVE VIOLATION, I UNDERSTAND THAT DISREGARD OF COMPANY RULES COULD RESULT IN DISCIPLINARY ACTION OR DISCHARGE.

EMPLOYEE SIGNATURE Refused to Sign 12/27/02 [signature]

SUPERVISOR'S SIGNATURE Joseph Garrison.

HUMAN RESOURCES MANAGER ____________

Mountaire Farms of Delmarva, Inc.
P.O. Box 710, Selbyville, Delaware 19975-0710

A-0180



# EMPLOYEE WARNING NOTICE

NAME Clarence Heath DATE 10-21-02

DEPARTMENT Live Haul ID # ______

DATE OF HIRE ______

WORK RULE ______

VIOLATION

Clarence did not work on this day. Because he said he had ~~some~~ something to do. unxc

ACTION ORAL 1ST 2ND (circled) 3RD

I HAVE READ AND UNDERSTAND THE ABOVE VIOLATION, I UNDERSTAND THAT DISREGARD OF COMPANY RULES COULD RESULT IN DISCIPLINARY ACTION OR DISCHARGE.

EMPLOYEE SIGNATURE He Refuse to sign.

SUPERVISOR'S SIGNATURE Joseph G arriun.

HUMAN RESOURCES MANAGER ______

Mountaire Farms of Delmarva, Inc.
P.O. Box 710, Selbyville, Delaware 19975-0710



# EMPLOYEE WARNING NOTICE

NAME Clasence Heath DATE 10-18-02

DEPARTMENT Live Haul ID #

DATE OF HIRE

WORK RULE Be work on time

VIOLATION

Late for work Miss 1 load

ACTION ORAL (1ST) 2ND 3RD

I HAVE READ AND UNDERSTAND THE ABOVE VIOLATION, I UNDERSTAND THAT DISREGARD OF COMPANY RULES COULD RESULT IN DISCIPLINARY ACTION OR DISCHARGE.

EMPLOYEE SIGNATURE He Refuse sign.

SUPERVISOR'S SIGNATURE Joseph Garrison

HUMAN RESOURCES MANAGER

Mountaire Farms of Delmarva, Inc.
P.O. Box 710, Selbyville, Delaware 19975-0710

# EMPLOYEE WARNING NOTICE
## *NOTIFICACION DE ADVERTENCIA AL EMPLEADO*

DATE/ *FECHA*: 7 / 10 / 02

NAME/ *NOMBRE*: Clarence Heath

SOCIAL SECURITY NUMBER/ *NUMERO DE SEGURO SOCIAL*:

DEPARTMENT/ *DEPARTAMENTO*: Live Haul

DATE OF HIRE/ *FECHA DE CONTRATACION*: ____/____/____

COMPANY POLICY/ *POLITICA DE LA COMPANIA*:

VIOLATION/ *VIOLACION*: Clarence did not Come to the second stop. left the job unexcused

ACTION/ *ACCION*: ORAL (circled) 1ST/ *PRIMERA* 2ND/ *SEGUNDA* FINAL

I have read this warning and understand the above violation. I understand that disregard of company policies could result in disciplinary action up to and including discharge./ *He leido la violación mencionada. Entiendo que faltar a las políticas de la compañía puede resultar en acción disciplinaria que podría indlcuir el despido.*

Clarence Heath — Employee's Signature/ *Firma del empleado* — 7/11/02 Date/ *Fecha*

Joseph Garrison — Supervisor/ Foreman Signature — 7-10-02 Date

Human Resources Manager's Signature — Date

A-0183

Davis, et al. v. Mountaire Farms, Inc., et al.
January 27, 2005 C.A. # 04-0414-KAJ Nathaniel Briddell

Page 1

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

WILLIE DAVIS, JR., NATHANIEL BRIDDELL, GEORGE W. FEDDIMAN, JOSEPH GARRISON, LARRY E. GIBBS, ROY H. WALTERS,

ALL SIMILARLY-SITUATED CURRENT AND FORMER EMPLOYEES OF MOUNTAIRE FARMS, INC., MOUNTAIRE FARMS OF DELMARVA, INC., and MOUNTAIRE FARMS OF DELAWARE, INC.,

Plaintiffs,

v.

MOUNTAIRE FARMS, INC., MOUNTAIRE FARMS OF DELMARVA, INC., and MOUNTAIRE FARMS OF DELAWARE, INC., all Delaware corporations,

Defendants.

) CA No 04-0414-KAJ

.. .. .. .. .. ..

Deposition of NATHANIEL BRIDDELL, taken pursuant to notice, on Thursday, January 27, 2005 at 10:00 a.m. at Young, Conaway, Stargatt & Taylor, Georgetown, Delaware, reported by Lorena J. Hartnett, a Registered Professional Reporter and Notary Public.

.. .. .. .. .. ..

A-0184

Lorena J. Hartnett, R.P.R. (302)426-1007 or 736-3661

7431ced2-5727-4bec-b77d-b03a444777d2

Davis, et al. v. Mountaire Farms, Inc., et al.
January 27, 2005 C.A. # 04-0414-KAJ Nathaniel Briddell

Page 2

APPEARANCES:
JEFFREY MARTIN, ESQUIRE
KERRI L. WILLIAMS, ESQUIRE
Margolis, Edelstein
1509 Gilpin Avenue
Wilmington, DE 19806
Attorney for the Plaintiffs

ARTHUR M. BREWER, ESQUIRE
Shawe & Rosenthal, LLP
Sun Life Building, 11th Floor
20 South Charles Street
Baltimore, MD 21201
Attorney for the Defendants

ALSO PRESENT: Phil Owen and Doug Lynch

Page 3

TABLE OF CONTENTS

TESTIMONY OF NATHANIEL BRIDDELL:
Direct Examination by Mr. Brewer . . . . . . . . 3
Certificate of Reporter . . . . . . . . . . . . .155

INDEX TO EXHIBITS

1 - Pg. 77
2 - Pg. 77
3 - Pg. 116
4 - Pg. 148

Page 4

NATHANIEL BRIDDELL,
HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
DIRECT EXAMINATION ON BEHALF OF THE DEFENDANT

MR. BREWER: Mr. Briddell, you and I have met. I am Art Brewer, and I represent Mountaire in the case that you and some other crew leaders have filed against the company. I just have a couple of preliminary questions for you.

By the way, I assume we will have the same standards, the stipulations that we have had in the other two depositions?

MR. MARTIN: Yes, sir.

MR. BREWER: Okay.

BY MR. BREWER:

Q. Have you ever been deposed before?

A. Opposed?

Q. Deposed, like this, have you ever had your deposition taken before?

A. Yes.

Q. Okay, can you tell me in what case?

A. A divorce case.

Q. A divorce case?

A. Yes.

Page 5

Q. And whose divorce were you deposed in?

A. Mine.

Q. Oh, your own divorce. Okay, and how long ago was that?

A. 12/17/04.

Q. Okay, having been deposed before, then I assume you understand that you are under oath today and have an obligation to tell the truth?

A. True.

Q. Okay. This is informal, as I am sure the deposition that you gave in December of '04 was informal, but you realize that it has the same significance and force as if you were giving testimony before a judge in a courtroom?

A. Yes.

Q. I will be asking you a series of questions, and the court reporter, as you can see, will be taking down the questions that I ask, also the answers that you give to my questions.

At trial I will have an opportunity to bring to the attention of the judge or the jury any changes in your testimony from today and testimony that you may give in this trial. Do

A-0185

2 (Pages 2 to 5)

Lorena J. Hartnett, R.P.R. (302)426-1007 or 736-3661

7431ced2-5727-4bec-b77d-b03a444777d2

Page 6

you understand that, sir?
A. Yes.
Q. I am going to ask that you not answer any questions that I ask you if you don't understand them.
It's my job to make myself clear to you, so if you don't understand the question I have asked, don't answer it, just tell me that you don't understand it, and I will be more than happy to try to rephrase it so that you do understand it.
You will also have to, as I am sure you are familiar, having had a deposition taken before, when I ask you a question, you will have to answer, and a nod of the head isn't sufficient. You will have to answer yes or no. Okay? The court reporter can't take down a nod of your head.
A. Yes.
Q. Okay, good. Let me ask you this: Are there any physical problems or mental problems that you have that would interfere with your being able to answer my questions today?
A. No.

Page 7

Q. Are you on any medication today?
A. Yes.
Q. Can you tell me what the medication is, please?
A. Glucophage and Glucotrol for diabetes.
Q. Okay. The taking of that medication, in your opinion, is not going to interfere with your ability to answer my questions?
A. No.
Q. Okay. The only other thing before we get into it is to let you know that if there is a time that you need a break for any reason, just please let me know, and we will be more than happy to break. Okay?
A. I understand.
Q. Okay, can you tell me, please, how you came to contact Mr. Martin?
A. Willie Davis, Jr..
Q. Willie Davis?
A. Junior.
Q. All right, I don't -- Can you elaborate on that?
A. Yes, I got to know Mr. Martin through Willie Davis, a coworker who was doing the same

Page 8

type of work that I was doing.
Q. Okay, Mr. Davis was doing the same type of work that you were doing? What work was that?
A. Being a crew leader at Mountaire.
Q. Being a crew leader?
A. Uh-huh.
Q. And when did Mr. Davis contact you?
A. I don't remember the exact date.
Q. Was it this year or last year?
A. '03.
Q. '03, okay.
A. I believe.
Q. And when Mr. Davis -- Did he contact you in person, or did he telephone you?
A. Telephoned.
Q. Can you tell me what Mr. Davis said to you when he telephoned you?
A. He told me he had called the labor board of Delaware and they recommended Mr. Martin.
Q. Did he tell you why he called the labor board in Delaware?
A. I don't remember.

Page 9

Q. So, if I understand what you are saying, he calls you and says he has contacted the labor board in Delaware?
A. Yes.
Q. You don't remember what he said about why, but that they had recommended Mr. Martin --
A. Yeah, right.
Q. -- to him?
A. Right.
Q. Okay, and did you have any idea what it was about?
A. Yes, I had some idea what it was about, but he didn't go into detail.
Q. Okay, what idea did you have it was about, then?
A. About overtime.
Q. About overtime? And how did you get that idea?
A. I don't understand your question.
Q. Okay, how did you get the idea that it was about this overtime thing, as you say?
A. From Willie Davis.
Q. Okay, so he mentioned that to you when he talked to you?

A-0186

Davis, et al. v. Mountaire Farms, Inc., et al.
January 27, 2005 C.A. # 04-0414-KAJ Nathaniel Briddell

Page 38

Maryland, 21822.
Q. Okay, and how long have you been there?
A. Twenty months.
Q. Okay, and prior to that where did you live, sir?
A. 9545 Honeysuckle Road, Berlin, Maryland 21811.
Q. Okay, and how long did you live there?
A. Let's see. Twenty-five years.
Q. That's close enough. And how old are you, sir, and what's your birth date?
A. I am 55 years old. My birth date is 12/19/49.
Q. 12/19/1949, okay. Your father's name, please?
A. My father's name is Davison Spence, Sr..
Q. And his last name is Spence?
A. Yes.
Q. And your last name is Briddell?
A. Briddell.
Q. Can you explain that, please, to me?
A. I still carried my mother's maiden

Page 39

name.
Q. Okay, and what was your father's occupation?
A. My father worked -- A factory worker, and he worked at an ice plant in Berlin, and most of his life a factory worker.
Q. Okay. Is he alive or deceased?
A. He is alive.
Q. Okay, is he still working?
A. No.
Q. Okay, and your mother's maiden name is Briddell, you say?
A. Briddell.
Q. Okay, and is she working? Does she work?
A. Deceased. Deceased.
Q. Oh, I'm sorry. Thank you. Brothers or sisters?
A. Yes.
Q. How many?
A. I have four brothers and five sisters.
Q. And can you tell me what -- Let's start with your brothers. Can you tell me what they do, if you know?

Page 40

A. Well, my oldest, my brother Darcy Spence, he works at Mountaire and drives a school bus.
Q. Drives a school bus for Mountaire?
A. No, no, no, he works at Mountaire and drives a school bus.
Q. Oh, okay. What does he do at Mountaire?
A. Sanitation.
Q. Okay, your next brother?
A. My next brother lives in Aldelphi, Maryland.
Q. Okay, and what does he do?
A. I don't know.
Q. All right.
A. That's it. My other two brothers are deceased.
Q. Okay, how about your sisters?
A. Yes, Wanda, she works for -- Gosh, she is a seamstress is all I can say.
Q. Okay.
A. The next sister, Pojena, she teaches school. I have a sister in North Carolina, and I think she is a social worker, I think.

Page 41

Q. Uh-huh.
A. I got a sister who is a housewife in Salisbury, and one sister works at Home Depot in Salisbury.
Q. Okay, thank you. What is the highest level of education, sir, that you obtained?
A. I completed the twelfth grade.
Q. Okay, high school graduation?
A. Yes.
Q. What high school, please?
A. Worcester Junior-Senior High School, Newark, Maryland.
Q. Where was it, please?
A. Newark, Maryland.
Q. Newark, Maryland. Do you attend church regularly?
A. No.
Q. And I think we asked, I asked you this question quickly before, but there is no -- You don't have any mental problems that would interfere with your deposition?
A. No.
Q. Okay. When did you first become employed by the company, if you can tell me?

11 (Pages 38 to 41)

A-0187

Lorena J. Hartnett, R.P.R. (302)426-1007 or 736-3661

7431ced2-5727-4bec-b77d-b03a444777d2

Davis, et al. v. Mountaire Farms, Inc., et al.
January 27, 2005 C.A. # 04-0414-KAJ Nathaniel Briddell

Page 42

A. 11/5/83.
Q. And what position were you hired for?
A. Truck driver.
Q. What kind of truck driver?
A. Beg your pardon?
Q. What kind of truck driver?
A. Live haul.
Q. So did you have a CDL at that time?
A. I had a Maryland Class A at that time.
Q. Okay, and the CDL came later, as I recall?
A. Yes.
Q. Okay, and just briefly tell us what you did as a live haul truck driver?
A. Came in at night, weighed out a truck on Mountaire scales, and wherever was scheduled for me to go, that's where I went to receive a load of chickens and transport them back to the processing plant.
Q. And which processing plant was that?
A. It was Mountaire Poultry in Selbyville, Delaware.
Q. Okay, and is that the location that you were first employed by?

Page 43

A. Yes.
Q. And you are still employed at that location?
A. Yes.
Q. Who was your supervisor at the time?
A. At that time it was Don Hopkins, Donald Hopkins.
Q. Okay. When did you become a crew leader, sir?
A. September of '89.
Q. And did you consider that to be a promotion?
A. Yes.
Q. And who was your supervisor at that time?
A. Doug Lynch.
Q. Okay, can you tell me how you, how it is you became promoted to a crew leader's position?
A. Being a truck driver, I knew a lot of the employees, and Charles Showell was getting ready to retire, and I spoke with Mr. Showell and I spoke with Mr. Lynch, and they decided to put me as crew leader.

Page 44

Q. Okay, great. Now, as a crew leader, your primary role was to manage the crew that was catching chickens?
A. Yes, to the best of my knowledge.
Q. Okay. How many employees were on your crew?
A. Seven.
Q. Okay.
A. Seven chicken catchers, one forklift driver, and at that time three truck drivers.
Q. The three drivers were also part of your crew?
A. Yes.
Q. Okay, so that was seven catchers, one forklift driver, and three drivers. And the drivers we are referring to, again, are live haul drivers?
A. Yes.
Q. The employees who worked in your crew from 1989 till the time that you left -- By the way, you probably told me, but I didn't write it down. When did you stop becoming a crew leader?
A. April '03.
Q. April of '03?

Page 45

A. Yes.
Q. When you were a crew leader, did people, catchers who worked for you, they were covered by a union contract?
A. Yes.
Q. Okay, and do you know which union?
A. Local 355.
Q. Of the Teamsters?
A. Teamsters.
Q. Okay. And has that been true from '89 through April of '03?
A. Could you --
Q. Sure. For all the time that you were a crew leader, were they covered by, were they represented by the Local 355?
A. Yes.
Q. Okay, now, from the time you have been a crew leader, and I am talking about from 1989 through April of '03, that's the period of time that I am going to be referring to, did you have new catchers come onto your crew from time to time?
A. Yes.
Q. And were you responsible for making

A-0188

12 (Pages 42 to 45)

Lorena J. Hartnett, R.P.R. (302)426-1007 or 736-3661

7431ced2-5727-4bec-b77d-b03a444777d2

Davis, et al. v. Mountaire Farms, Inc., et al.
January 27, 2005 C.A. # 04-0414-KAJ Nathaniel Briddell

Page 46

sure they were trained properly?
A. Yes.
Q. Did you ever select any of these catchers to come onto your crew?
A. Yes.
Q. Okay, who did you select?
A. Zarina Bagwell.
Q. Okay. Now, I understand the period of time I am asking was a long time, so --
A. Yes.
Q. -- I wouldn't expect you to have perfect recall. Anybody else that you can think of?
A. Can you ask me that question again?
Q. Sure, from September of '89, again this is the timeframe, until April of '03, my question is did you select any employees to become part of your crew?
You have mentioned Mr. Bagwell, and I guess my question is anybody else you can remember?
A. Yes, Warren Purnell.
Q. Okay.
A. Leroy Taylor. Lawn Howell.

Page 47

Q. Is that Howell?
A. Howell, H-O-W-E-L-L.
Q. Okay, thank you.
A. That's about it, as far as I can remember.
Q. Okay. There may have been more, but you just can't remember?
A. I am sure.
Q. Okay, that's fine. Let me ask you this: This is a document. I don't have -- You have copies of these.
This is a document, sir, that has been introduced as an exhibit to Mr. Garrison's deposition. It's Garrison Exhibit 2. Okay, do you see that? I am just going to keep that in front of you so I can ask you a couple questions about this document.
Okay, it talks about, in roman numeral two on page one, the crew leader's general duties, and I am just going to go through some of these.
MR. MARTIN: Excuse me for a moment. Did you ask whether he was familiar with it, the document?

Page 48

MR. BREWER: Oh, no, I am sure you are.
BY MR. BREWER:
Q. Are you familiar with this document?
A. This is an old document, yes.
Q. Okay. And I am looking at the second roman numeral, roman numeral two. It says general crew leader's general duties.
The first one it says is you are supposed to arrive at the farm at the correct time. Is that one of the responsibilities as a crew leader that you had?
A. Yes.
Q. It also talks about how the house is to be divided. Is it your responsibility to make sure that that occurred?
A. Yes.
Q. Now, I would imagine, depending on the house, that sometimes there might have been more sections?
A. Correct.
Q. And sometimes there would have been less sections?
A. Yes.

Page 49

Q. Okay, and you would make that determination as to whether it should be more or less than four --
A. Yes.
Q. -- as the crew leader? Okay. It talks about instructing the catchers on the number of birds to be placed in each compartment. Was that one of the responsibilities you had as a crew leader?
A. Yes.
Q. And I think when they refer to each compartment, that's also known as the hole, isn't it?
A. Yes.
Q. All right. The next item down talks about catching birds in place at night and how you are supposed to move them. Was it your responsibility for making sure that this occurred?
A. Yes.
Q. And again, based on my experience in the industry, that didn't always happen, did it?
A. No.
Q. And, if it didn't happen, it was your

13 (Pages 46 to 49)

Lorena J. Hartnett, R.P.R. (302)426-1007 or 736-3661

7431ced2-5727-4bec-b77d-b03a444777d2

A-0189

Page 50

decision, based on what the house and the circumstances you were confronted with, to change it?
A. Depending.
Q. Right, exactly, depending on the kind of house you are in and what circumstances you found when you got there?
A. Right.
Q. Right. It talks about the responsibility of a crew leader to continue to observe the uncaught birds to prevent smothers?
A. Yes.
Q. Was that one of your responsibilities?
A. Yes.
Q. Make sure that the cages are air stacked uniformly on a trailer?
A. Yes.
Q. Now, let's talk about that for just a second. When we are talking about correctly air stacking them on the trailer, who stacks the cages on the trailer?
A. The forklift driver.
Q. Okay, and he is loading that trailer for transportation back to the plant?

Page 51

A. Yes.
Q. And, obviously, what's on that truck is live chickens. When it says appropriately air stack them, can you explain what that means?
A. They each -- Two cages are stacked where air can go through, through the houses.
Q. And you would have to make sure that the forklift driver was stacking those cages correctly?
A. Well, he had to, because there is devices on the trailer that says he have to or it won't go on there properly.
Q. Okay. But it could be off one of the devices, and you would have to make sure that it was correctly put on?
A. Right.
Q. And that's so that -- Part of the reason is so that the birds can continue to breathe, isn't it?
A. Yes.
Q. Okay, the next item, it talks about in the summer making sure that the fans are left hanging and so forth. Was that one of your responsibilities when you were a crew leader?

Page 52

A. Yes.
Q. Okay, and did that change from time to time? I mean, depending on the house, you might have to change that?
A. Yes.
Q. And that was your call to make that change?
A. Well, I got notification from my manager as to what to do.
Q. Okay. You would be responsible for making sure that the fans were taken down and stabilized?
A. Yes.
Q. Okay, and how they were stabilized was up to you?
A. No.
Q. Okay. Tell me how you stabilize a fan?
A. Doug would tell me how to do it. He would put on the order or call us in and say well, you are going to this farm, this should be done this way, or sometime he would come out there and say the fans should be turned this way or that way.

Page 53

Q. And you never made that decision yourself?
A. Sure, at times, yes.
Q. I guess that's what I meant, is you would make it?
A. Not all the time.
Q. Okay, but some of the time?
A. (Nodding head)
MR. MARTIN: Yes?
A. Yes.
Q. You were responsible for filling out the farm ticket accurately?
A. Yes.
Q. Okay, and you were also responsible for checking with the drivers to make sure that the loads are secure?
A. Yes.
Q. Item three, roman numeral number three, talks about various catching methods.
A. Number?
Q. Yeah, roman numeral, on page two of the document that you have --
A. Okay.
Q. -- it talks about night catching.

A-0190

Davis, et al. v. Mountaire Farms, Inc., et al.
January 27, 2005 C.A. # 04-0414-KAJ Nathaniel Briddell

Page 54

A. Okay.
Q. Do you see that? And then it talks about day catching.
A. Yes.
Q. And it takes about N's or A-frame houses and so forth. Is it your responsibility to make sure that these guidelines were followed?
A. Yes.
Q. Okay. And again, during this period of time that you were a crew leader, I would assume that you could not always follow these guidelines exactly the way they were because of changes in houses and stuff?
A. Yes.
Q. And if, in your view, it couldn't be done exactly the way it's set out here, you would make that change --
A. Yes.
Q. -- to get it done? Okay, and that's true for the day methods and night methods?
A. Uh-huh.
Q. How about tunnel ventilation, is that same also true there? There are some guidelines here that you are responsible for?

Page 55

A. Yes.
Q. And, again, it wasn't always possible to do this, to follow this precisely?
A. Yes.
Q. And if it had to be deviated from, you could deviate or you could do something different than what it says here, based on what you found in the house?
A. Yes.
MR. BREWER: All right. And that speaks to this whole notion of tunnel ventilation. Okay, I want to take a few minutes.
MR. MARTIN: Sure.
(A recess was taken.)
BY MR. BREWER:
Q. Mr. Briddell, I am going to show you a document that is marked as Exhibit Number 1 to Mr. Garrison's deposition. You have a copy of that?
MR. MARTIN: Yes, sir.
Q. And I am going to ask you to take a look at that and tell me if you are familiar with that document?

Page 56

A. Yes, I am, sir.
Q. Okay, and what is this?
A. It's a form we had to give to each driver as he left the chicken farm.
Q. Okay. And it says, up at the top, it says grower. Do you see where it says grower?
A. Yes.
Q. Who fills in that line?
A. Crew leader.
Q. Okay. And it says the houses, and there are various dots. Who fills in that information?
A. Crew leader.
Q. And that would be, for example, if you were going to the Brewer farm --
A. Yes.
Q. -- it would say to catch house number two and number six?
A. That's right.
Q. And that's what you would fill in?
A. Yes.
Q. Okay. And the time started, who fills that information?
A. Crew leader.

Page 57

Q. And the time finished?
A. Crew leader.
Q. Now, when you were talking about, if you remember earlier, the journal that you said you had and those documents, is this the kind of document that you are referring to?
A. Yes.
Q. Okay. There is a space, and it says truck. What information gets put in there?
A. The number of the truck that the driver is driving.
Q. The number of the truck?
A. Yes.
Q. Each truck has its own number?
A. Yes.
Q. And that's different than its license plate?
A. Yes.
Q. Okay, and who fills that information in?
A. Crew leader.
Q. How about it says trailer, who fills that information in?
A. Crew leader.

A-0191

15 (Pages 54 to 57)

Lorena J. Hartnett, R.P.R. (302)426-1007 or 736-3661

7431ced2-5727-4bec-b77d-b03a444777d2

Davis, et al. v. Mountaire Farms, Inc., et al.
January 27, 2005 C.A. # 04-0414-KAJ Nathaniel Briddell

Page 58

Q. And what would you write in there?
A. The number of the trailer, not the license plate, the number of the trailer.
Q. So each truck is numbered and each trailer is numbered, and you write down the number of the truck and the number of the trailer?
A. Yes.
Q. How about the driver?
A. Put the driver's name down.
Q. And who writes that in?
A. Crew leader.
Q. And it says N-O, period, which I assume stands for number of doors?
A. Yes.
Q. And the information that's required there, who puts that in?
A. Crew leader.
Q. All right. Let's go down to under the first line to the latter part of the document. There is a question that says, "Sign present, yes or no." Who fills in that box?
A. Crew leader.
Q. And what does that mean, sign present?

Page 59

What do you look for to fill that in?
A. Every farm has an identification sign at the end of its driveway or somewhere on the chicken house to identify the farm.
Q. So, again, if you were talking about Brewer's farm, there would be a sign out there in front of the house that would say Brewer's farm?
A. With a Mountaire logo on it.
Q. And it's the crew leader's responsibility to see that that is there?
A. Yes.
Q. And, if it is, the box yes is checked, and, if it's not, the box no is checked?
A. Yes.
Q. "Grower present," who fills that information out?
A. Crew leader.
Q. And how do you decide whether to check the box yes or no?
A. Well, if you see the grower there doing what was said the grower would do there, if he is out there doing that prior to catching, you would see him and you would have to --
Q. Okay, when you say doing that, you are

Page 60

referring to Garrison Exhibit 2 where it says grower's responsibilities?
A. Yes.
Q. Okay. Now, suppose when you arrived there at night the grower is asleep, I mean he is just asleep, how do you check that? Do you check that he is present or not?
A. Not.
Q. Okay. DAF's prior to catch. What is a DAF?
A. Dead chickens.
Q. Dead at farm, is that what that stands for?
A. Uh-huh.
MR. MARTIN: Yes?
A. Yes.
Q. And who fills that box out?
A. Crew leader.
Q. How do you go about deciding whether to check yes or no?
A. If you go down through the chicken house and you see all these dead chickens laying around, you know how to check it yes or no.
Q. Okay, so, in other words, you walk in

Page 61

the house, the crew leader walks in the house and looks around and sees if there is a lot of dead chickens or one or two?
A. Right.
Q. And, depending on the amount of chickens that are dead, you would decide whether to check out yes --
A. Or no.
Q. -- or no. Okay, "fire fan used," who fills that information out?
A. Crew leader.
Q. And tell me what that means. How do you decide whether to check that box yes or no?
A. Well, we have documentation when you use the fire fan and how to use it, and it's up to the crew leader, according to the weather, as to whether to use the fire fan, when I was a crew leader. I don't know how they do it now.
Q. Okay, that's fine. And, depending on how that was used, you would check the box?
A. Yes.
Q. "Chickens watered," what does that mean?
A. That means if the driver is putting

A-0192

16 (Pages 58 to 61)

Lorena J. Hartnett, R.P.R. (302)426-1007 or 736-3661
7431ced2-5727-4bec-b77d-b03a444777d2

Davis, et al. v. Mountaire Farms, Inc., et al.
January 27, 2005 C.A. # 04-0414-KAJ Nathaniel Briddell

Page 62

water on chickens on a very hot day, all over 85 degrees, I think it is. It was when I was crew leader.
Q. Okay. And whose responsibility is it to water the chickens?
A. Truck driver.
Q. If he is not doing it, can the crew leader tell him to do it?
A. Yes.
Q. And who fills that out? Who fills that box out?
A. Crew leader.
Q. "Feeders up," what does that mean?
A. If the grower has the feeder up prior to catch time.
Q. Okay, and if he doesn't, you check the no box?
A. Yes.
Q. And what do you do?
A. If it's not up?
Q. Yes.
A. Do it myself, if the equipment is there to do it with.
Q. All right, and if it's not there?

Page 63

A. You have to call Doug or Nuse.
Q. Do you ever get in touch with the grower?
A. Sometimes you have to call the processing plant, and the processing plant will call people, and sometimes they still don't get them. Sometimes we do.
Q. Well, if you arrived on a farm and the feeders were not up but the grower was present, could you tell the grower to get the feeders up?
A. No.
Q. You couldn't?
A. No.
Q. Okay. How about the water up?
A. It applies the same thing as the feeder.
Q. Okay, so if you arrive and the water is not up and the grower is present, you can't tell the grower to get the water up?
A. No, that's his equipment.
Q. Okay, how about stoves up?
A. Grower's responsibility.
Q. Okay, but who checks the box?
A. I do.

Page 64

Q. "Farm damage, yes or no," how do you decide -- Who fills that out, first of all?
A. I do, the crew leader.
Q. Okay. And how do you know what box to check?
A. If I see my forklift driver or catchers break something.
Q. Okay, well, let's assume -- When you first get to the farm --
A. Yes.
Q. -- when you walk around the house to see if there were any DAF's, stuff like that, do you take a look at the houses and everything else to make sure that they are --
A. Yes.
Q. Okay, and if you see damage at the point before anybody started working, you would check the box that there was farm damage?
A. No, I would write it down on a separate piece of paper.
Q. Okay, and what would you do with that piece of paper?
A. At the end of the day, if I didn't see my forklift driver catch or break anything, I

Page 65

would mark no, we didn't do it.
Q. All right, but you would have a separate piece of paper which noted the fact that there was damage there before you started?
A. Yes.
Q. Okay. The next box, moving to the right, it says "The drive entrance, acceptable or unacceptable." Who checks that box?
A. Crew leader.
Q. How do you know, how do you decide whether to check the accept box or the unaccept box?
A. Well, we get the information from our manager, and he would tell us or ask us what to look for, and then I would have to determine it from there.
Q. What would your manager tell you?
A. If the drive entrance is level, enough footage for the trucks to get in and out, things of that sort.
Q. All right. Does the manager tell you this for every farm that you go to?
A. He would basically tell us what to expect or --

A-0193

17 (Pages 62 to 65)

Lorena J. Hartnett, R.P.R. (302)426-1007 or 736-3661
7431ced2-5727-4bec-b77d-b03a444777d2

Davis, et al. v. Mountaire Farms, Inc., et al.
January 27, 2005 C.A. # 04-0414-KAJ Nathaniel Briddell

Page 66

Q. You have to be -- I'm sorry, I didn't mean to interrupt you.
A. He would tell us what to look for.
Q. Okay, but after being a crew leader for awhile, you came to know what to look for?
A. Right.
Q. And, depending on whether it was level, whether it was potholes in it, or whether there was enough room to put the truck in, you would make a determination as to whether the drive entrance was acceptable or unacceptable?
A. Yes.
Q. And you would check that box?
A. Yes.
Q. How about the house entrances, who would fill that out?
A. Again, I would get information from my manager as to what to do and what not to do, what to look for, what not to look for, and then I would have to determine or sometimes get my manager out.
Q. Okay, but after being a crew leader for awhile, you generally know what is an acceptable house entrance and what isn't, don't

Page 67

you?
A. Yes.
Q. And you would then make a decision based on what you saw and based on your experience as to what box to check?
A. Yes.
Q. Okay, "roads loading area," what does that mean?
A. That's a loading zone. That's a loading zone, so many footage, I forget now, as to where the truck is supposed to be and where the forklift is supposed to be to run around to load it.
Q. Okay, and who fills that box out?
A. Crew leader.
Q. And this has "Explain." What, if anything, would you write in that box?
A. If there wasn't enough room to load a truck and we had to get onto the grower's lawn or into his crop field or something like that, somewhere we are not supposed to be, you got to call your manager or let him know, or when you got done that day let him know.
Q. And you would fill that information

Page 68

in?
A. Yes.
Q. Okay. "Leader condition," what does that refer to, please?
A. Houses not ventilated properly, such as wet houses, too tight, too dry.
Q. And who fills that out?
A. Crew leader.
Q. And how do you know whether to say that's acceptable or unacceptable?
A. Whether the forklift can run in there properly or not, if the forklift is in there getting stuck or the catchers are walking through mud when they are not supposed to.
Q. Okay, so you would observe that and then, based on what you observed, you would decide whether it's acceptable or unacceptable?
A. Yes.
Q. Okay, let's see. You mentioned on your crew you carried seven catchers. Did you ever have more than seven?
A. At times.
Q. How many more did you have?
A. Sometimes we would carry more than --

Page 69

We would carry catchers in the summertimes when catchers were scarce and the work was harder and the weather was hotter, the company would send out unexperienced Mexicans and they would send out three or four at a time.
Q. Okay, and they would be on your crew?
A. Every crew out there that needed them.
Q. Well, I am just talking about your crews, basically --
A. Yes.
Q. -- because those are the ones that you would know about, yours.
A. Yes.
Q. Okay, so let's begin. You normally had seven catchers. Now, are you saying in the summer --
A. Mostly in the summer, you know.
Q. All right, well, let me ask you this: Did you ever carry eight catchers?
A. Yes.
Q. Okay, and why would you carry the extra catcher?
A. If you had an unexperienced catcher.
Q. Okay. And when you carried eight

A-0194

18 (Pages 66 to 69)

Lorena J. Hartnett, R.P.R. (302)426-1007 or 736-3661
7431ced2-5727-4bec-b77d-b03a444777d2

Davis, et al. v. Mountaire Farms, Inc., et al.
January 27, 2005 C.A. # 04-0414-KAJ Nathaniel Briddell

Page 70

catchers, did you ever give one catcher a day off?
A. Depending on whether they wanted that day off or not, or whether they wanted to set out a load, or whether each man wanted to get in a load to make up for it.
Q. And how about somebody who basically said I would like next Tuesday off?
A. If they asked for next Tuesday off?
Q. Right.
A. Could you repeat your question?
Q. Let me rephrase the question this way: When you had eight catchers, Mr. Gibbs talked about he would give one man off on Monday, another man off on Tuesday, another man off on Wednesday.
A. Yes.
Q. He would rotate days, and I want to know if you did the same thing.
A. Yes, let me correct that. I did carry catchers and there were people who would have a day off.
Q. And you would decide the day off, whether somebody had Monday, somebody had

Page 71

Tuesday, somebody had Wednesday?
A. Yes.
Q. And that's why you had eight catchers. Okay. Now, you also mentioned that -- Did you ever have nine catchers?
A. Yes, during the summer.
Q. And these are the people that you said coming from the plant who were inexperienced?
A. Yes, who would fill in for people that was out that couldn't make it that day.
Q. Okay. And if these people hadn't caught before, you would sort of tell them what to do?
A. I would try to teach them.
Q. Yeah, sure, that's what I mean. Okay. Did you ever take over another crew leader's crew when that person was on vacation?
A. Yes. No, I am not going to say on vacation. I am going to say it was some kind of problem and my crew was working and we fell short a crew leader, yes, I have done that.
Q. Okay. And how many times would you say you did that, approximately? Again, I understand it's a difficult question.

Page 72

A. All I can say is it was several times.
Q. Several times?
A. Yes.
Q. Again, would that be several times a year?
A. Over a period of time.
Q. Over a period of time? Over this period of time that we are talking about, which is from '89 through '03?
A. Yes.
Q. Okay. Let me ask you do catchers ever change crews on a sort of a temporary basis?
A. Yes.
Q. Okay, and did people in your crew change crews on a temporary basis from time to time?
A. Yes.
Q. Okay. Explain to me how that happened.
A. When the chicken catchers, when I was crew chief --
Q. Right.
A. -- from time to time we would fall short, one crew or another would fall short, and

Page 73

we would have catchers voluntarily go to another crew or ask to go to another crew, yes.
Q. And did anybody on your crew ever ask to go to another crew?
A. From time to time.
Q. And would you approve that?
A. It wasn't for me to approve. It was for that catcher or my manager to approve.
Q. Well, let me ask the question this way: Let's assume you had seven catchers on your crew. And that's what you need to catch; correct?
A. Yes.
Q. And one of those catchers said, "I want to go to Mr. Garrison's crew."
A. After I got my work done.
Q. But I am talking about while your work is being done.
A. No, no, because that would leave me short.
Q. That's right. That's my point. That's my point.
A. Uh-huh.
Q. So if he wanted to go to

A-0195

19 (Pages 70 to 73)

Lorena J. Hartnett, R.P.R. (302)426-1007 or 736-3661
7431ced2-5727-4bec-b77d-b03a444777d2

Davis, et al. v. Mountaire Farms, Inc., et al.
January 27, 2005 C.A. # 04-0414-KAJ Nathaniel Briddell

Page 74

Mr. Garrison's crew while you were still working, you would tell him no?
A. If he was assigned to my crew, no.
Q. You would tell him no?
A. Right.
Q. Okay, that's fair enough. Now, after your work was finished, if he wanted to go, you would --
A. Yes.
Q. -- say fine, I assume, and you would let him go?
A. Yes.
Q. Because your work is done; right?
A. Right, but Doug still had to know about it.
Q. Oh, I am not saying he didn't have to know about it, but I am saying you could let him go, you could say, "Fine, we are finished. You can now go work for Mr. Garrison," and then you would tell Doug about it?
A. But I couldn't say no, he couldn't go.
Q. Okay, unless you were still working?
A. Right.
Q. Then you could. Okay, let's see. Let

Page 75

me ask you a couple of questions here.
I think we have already talked about the fact that as a crew leader you make sure the catchers, drivers and the forklift operators follow those guidelines that we talked about?
A. Yes.
Q. You also interact with the grower, don't you, you talk to the grower?
A. Yes.
Q. And you are supposed to, as a crew leader, keep a good relationship with the grower, aren't you?
A. Yes.
Q. As a crew leader, if one of your catchers did something that you told them not to do, you were able to give them an oral warning or a verbal warning?
A. Yes.
Q. Okay, and did you ever do that?
A. Yes.
Q. Okay. Did you ever have occasion, when you were a crew leader, to deal with the people in accounting?
A. Could you repeat that question?

Page 76

Q. One, when you were a crew leader, did you ever have any occasion to deal with the people in accounting?
A. Yes.
Q. Okay, can you tell me what would cause you to deal with the people in accounting?
A. When I was crew leader, at the time they had something called petty cash. If a catcher worked that day, he would get partial pay, and I would have to go to the accounting office and deal with whoever was working on the, at the accounting office on that desk that handled that.
Q. All right. Let me make sure I understand what you just told me. If somebody on your crew wanted like advance, an advance in pay --
A. Yes.
Q. -- they would come to you --
A. Come to me.
Q. -- and you would go to accounting --
A. Yes.
Q. -- to get the money, and then you would give it back to them?

Page 77

A. At first, yes.
Q. Okay. Let me just see if I have copies of these. Let me just take a minute. I am going to need some copies.
(Mr. Owens out to get copies.)
While Mr. Owens is doing that, let me ask you a couple of questions.
A crew leader also has some responsibility to tell the driver how to position the truck, where to position the truck so it could be loaded?
A. Yes.
MR. BREWER: We will have this marked as Briddell 1.
(The reporter marked Briddell Exhibit 1.)
MR. BREWER: Sir, I have given you a packet of documents. Before we get to that, let's make this exhibit two to this deposition.
(The reporter marked Briddell Exhibit 2.)
BY MR. BREWER:
Q. Mr. Briddell, take a look at what's

A-0196

20 (Pages 74 to 77)

Lorena J. Hartnett, R.P.R. (302)426-1007 or 736-3661

7431ced2-5727-4bec-b77d-b03a444777d2

Davis, et al. v. Mountaire Farms, Inc., et al.
January 27, 2005 C.A. # 04-0414-KAJ Nathaniel Briddell

Page 78

been marked as Exhibit 2.
A. Okay.
Q. This is what you were -- Is this what you were referring to dealing with accounting?
A. Yes.
Q. I see there is a gentleman by the name of Freddy Matthews?
A. Yes.
Q. Is he a catcher from your crew?
A. Yes.
Q. And what, he wanted $60?
A. Yes, he wanted advance pay.
Q. Okay, and you approved it? Is that your signature there?
A. Yes, it is.
Q. And you are showing that Mr. Matthews received that money, the $60?
A. Yes.
Q. And that was in July of 2002?
A. I don't remember.
Q. Okay, that's what the date says there. Okay, can you tell me is that your writing where it says 7/3/2002?
A. Yes.

Page 79

Q. That is your writing?
A. Yes.
Q. Okay.
MR. MARTIN: We are looking on the front page; are we not?
MR. BREWER: Yes.
THE WITNESS: Yes.
BY MR. BREWER:
Q. All right, on page two, I can't pronounce the person's last name. Do you know who?
A. Collick.
Q. Mr. Collick?
A. Yeah.
Q. Do you know Mr. Collick?
A. Yes.
Q. How do you know him?
A. He worked on my chicken catching crew.
Q. And he is requesting an advance of $50?
A. That's correct.
Q. And that's basically on the same day, July 3 of 2002?
A. Yes.

Page 80

Q. And I see you approved that?
A. Yes.
Q. And then gave him, counted the money and gave it to him?
A. Yes.
Q. Okay, next page is Mr. Purnell?
A. Yes.
Q. Was he a member of your crew?
A. Yes.
Q. And he is requesting $60?
A. Yes.
Q. It looks like July 3, 2002 again?
A. Yes.
Q. And you are approving that?
A. Yes.
Q. Okay. I see he didn't sign where it says received. Did he get the money?
A. He signed on the wrong line.
Q. Oh, I see, I see where he signed. Okay, the next one I see is a Mr. --
A. Gerald Fuchs.
Q. Oh, is that Fuchs?
A. Fuchs.
Q. Fuchs, I see, and he is requesting

Page 81

$190.
A. Yes.
Q. And you approved -- It says received by you and approved by him?
A. Yes.
Q. Is it signed -- You guys signed in the wrong boxes? You didn't receive the money --
A. Right.
Q. -- and Mr. Fuchs didn't approve it, did he?
A. No.
Q. You approved it?
A. Yeah.
Q. And he would receive it, okay. The next one I see is where Mr. -- is it Finney?
A. Yes.
Q. Is Mr. Finney one of your crew members?
A. Was.
Q. Was, okay. By the way, was Mr. Fuchs one of your crew members?
A. Part time.
Q. Part time, okay. And Mr. Finney wanted $75?

A-0197

21 (Pages 78 to 81)

Lorena J. Hartnett, R.P.R. (302)426-1007 or 736-3661
7431ced2-5727-4bec-b77d-b03a444777d2

Davis, et al. v. Mountaire Farms, Inc., et al.
January 27, 2005 C.A. # 04-0414-KAJ Nathaniel Briddell

Page 82

A. Yes.
Q. And you approved that?
A. Yes.
Q. Okay. Next I see Mr. Mike Filipe, is it, or Phillip. Can you pronounce that last name?
A. Phillips.
Q. Phillips, okay, and he wants $95?
A. Yes.
Q. And you approved that?
A. Yes.
Q. And I see 5/21/2002. Is that the date that you approved it?
A. I guess.
Q. Okay. Next is a Mr. -- Is it Sturgis?
A. Sturgis, Sturgis, yes.
Q. And he wanted $125?
A. Yes.
Q. And you approved that?
A. Yes.
Q. And, lastly, we have Mr. -- Is it Fuchs again, Fuchs, Mr. Fuchs wanting $67. Is that what he wants? Are you looking at that last page with me?

Page 83

A. Yes, uh-huh.
Q. And it looks to be like $67?
A. Yes.
Q. And you approved that?
A. Yes.
Q. And you went and got the money and gave it to him. Okay, thanks.
All right, now, the next document that I would like you to take a look at, let's take a look at exhibit number one to your deposition, sir. Okay?
A. Yes.
Q. If you look at the first page, you see there is an employee name of Richard Foreman?
A. Yes.
Q. Do you know Mr. Foreman?
A. Yes.
Q. How do you know him?
A. He used to be one of my crew members.
Q. And Mr. Foreman is requesting, if I am reading this correctly, three weeks of vacation, but he only wants the money for it?
A. Yes.
Q. Okay, and you approved that down near

Page 84

the bottom?
A. Yes.
Q. Where it says supervisor, the box approved is checked?
A. Yes.
Q. That's your signature?
A. Yes.
Q. The next page is Mr. Foreman again, and he is requesting a floating holiday but he only wants -- Again, he doesn't want the day off here, does he?
A. Yes.
Q. He just wants the money, doesn't he?
A. Yes.
Q. And you approved -- Did you approve this or not? I don't see a box checked.
A. Yes, I approved it.
Q. Okay. Mr. Ray Leonard, do you know Mr. Leonard?
A. Yes, I do.
Q. How did you know him?
A. Working with him, a relative, but he wasn't on my crew.
Q. He wasn't on your crew?

Page 85

A. No.
Q. What did he do for the company, if you know?
A. Chicken catcher.
Q. Oh, he was a catcher?
A. Right.
Q. But not on your crew?
A. No.
Q. Okay, and he wanted, he wants a floating day, a calendar day, but money only?
A. Yes.
Q. And by money only, that means he doesn't want the day off, he just wants to be paid for the day and he will also work; correct?
A. Right.
Q. And you approved that?
A. No, that's not my signature.
Q. Okay. And again Mr. -- I see Mr. Leonard again. Is that your signature at the bottom approving it?
A. No.
Q. Okay. Do you know whose that is?
A. No.
Q. Let's go to Mr. Purnell. He is asking

A-0193

22 (Pages 82 to 85)

Lorena J. Hartnett, R.P.R. (302)426-1007 or 736-3661

7431ced2-5727-4bec-b77d-b03a444777d2

Davis, et al. v. Mountaire Farms, Inc., et al.
January 27, 2005 C.A. # 04-0414-KAJ Nathaniel Briddell

Page 86

for vacation. Do you know Mr. Purnell?
A. Yes.
Q. How do you know him?
A. He was one of my crew members.
Q. Okay, and he is asking for vacation?
A. Yes.
Q. And it looks like he wants two weeks vacation, but again he wants to be paid for them and he will continue to work?
A. Yes.
Q. And is that your signature?
A. Yes.
Q. Supervisor, okay, and you are approving that?
A. Yes.
Q. Again, Mr. Purnell is requesting two weeks of vacation for money only? Do you see where I am?
A. Yes, I am with you.
Q. And you approved that?
A. Yes.
Q. That's your signature?
A. That's my signature.
Q. Mr. Purnell again requesting a

Page 87

personal day, money only, and is that your signature? Did you approve that?
A. Yes.
Q. Next, Mr. Purnell again, he is requesting two weeks of vacation for money only. Is that your signature approving that?
A. No.
Q. That's not your signature approving that. Okay. Mr. Purnell again, requesting money only for a floating holiday. Did you approve that, sir?
A. Yes.
Q. Okay, because I didn't see a box checked. That's why I asked.
A. Right. What's the date on that? What's the --
Q. I'm sorry, which page are you referring to now?
A. Warren Purnell.
Q. What is the --
A. It's 4/26, what is that, '93?
Q. Yes, that's his date of hire.
A. Okay, yes.
Q. Okay. Mr. Purnell again requesting an

Page 88

anniversary day, money only, it looks like a calendar and an anniversary, although I guess it says both. Did you approve that, sir?
A. Yes.
Q. Again with Mr. Purnell, is that your signature on the bottom of this page?
A. No.
Q. You have no idea whose it is?
A. No.
Q. The next document, again dealing with Mr. Purnell, he is requesting a floating holiday, but he again just wants the money. And did you approve that?
A. Yes.
Q. Is that your signature?
A. Yes, it's my signature.
Q. Okay. The next document is a Ricky Sturgis, is it?
A. Yes.
Q. Do you know Mr. Sturgis?
A. Yes.
Q. How do you know him?
A. He is one of my crew members.
Q. Okay, and he is requesting a floating

Page 89

holiday but he only wants money?
A. Yes.
Q. And is that your signature approving it?
A. Yes.
Q. Mr. Sturgis again is requesting four weeks of vacation, to be paid for it, and he will continue to work those four weeks, I am gathering, where it says money only; correct?
A. That's correct.
Q. And is that your signature approving it?
A. Yes.
Q. Mr. Sturgis again is requesting a floating holiday. Is that your signature approving this?
A. Yes.
Q. Oh, I'm sorry, I shouldn't say approving it. I don't see a box checked. Did you approve it?
A. My signature is there.
Q. Okay. Mr. Sturgis again, he wants vacation all weeks due, he says, and he only wants the money, and is that your signature at

A-0199

23 (Pages 86 to 89)

Lorena J. Hartnett, R.P.R. (302)426-1007 or 736-3661

7431ced2-5727-4bec-b77d-b03a444777d2

Davis, et al. v. Mountaire Farms, Inc., et al.
January 27, 2005 C.A. # 04-0414-KAJ Nathaniel Briddell

Page 90

the bottom approving that?
A. Yes.
Q. Mr. Sturgis again is requesting two days off, the 20th and the 21st. Do you see that?
A. Yes.
Q. And is that your signature?
A. Yes.
Q. And did you approve it, because I don't see a box checked?
A. Yes.
Q. You approved those two days off for him. The next one is a Mr. Tindley, T-I-N-D-L-E-Y. Is that how you say his name, Tindley?
A. Yes.
Q. Do you know Mr. Tindley?
A. Yes.
Q. How do you know him?
A. He is one of my crew members.
Q. And he is requesting an anniversary day, but he only wants the money for it; is that right?
A. Yes.

Page 91

Q. And is that your signature?
A. No.
Q. Mr. Tindley again, down at the bottom, is that your signature?
A. No.
Q. Mr. Tindley again, is that your signature?
A. Yes.
Q. And he is requesting some vacation, he wants four weeks of vacation, but he only wants the money.
Okay, Mr. Tindley again is requesting an anniversary day. He only wants the money; is that right?
A. Yes.
Q. And is that your signature?
A. No.
Q. Okay. The next page for Mr. Tindley, four weeks vacation again. Is that your signature at the bottom?
A. Yes.
Q. And he again wants four weeks vacation, he only wants the money. And did you approve that?

Page 92

A. Yes.
Q. Okay. Mr. Robert Wise, is that your signature?
A. Yes.
Q. And he is asking for a floating holiday?
A. Yes.
Q. But only the money, okay. Mr. Wise, did you know Mr. Wise?
A. Yes.
Q. How do you know him?
A. Crew member.
Q. One of the members of your crew?
A. Yes.
Q. And Mr. Wise again is requesting a week vacation?
A. Yes.
Q. But he only wants the money?
A. Yes.
Q. Is that your signature, sir?
A. Yes.
Q. And you approved it. Mr. Finney, do you know Mr. Finney?
A. Yes.

Page 93

Q. And how do you know him?
A. He was one of my crew members.
Q. And he is requesting a, it looks like a week's vacation, but he only wants the money. Am I correct on that?
A. That's correct.
Q. And is that your signature?
A. Yes.
Q. Did you approve this or not?
A. Yes.
Q. You approved it?
A. Yes.
Q. Looking at Mr. Foreman, is that, Bardel Foreman?
A. Yes.
Q. Do you know Mr. Foreman?
A. Yes.
Q. How do you know him?
A. One of my crew members.
Q. And he is requesting a week's vacation?
A. Yes.
Q. And he only wants the money?
A. Right.

A-0200

24 (Pages 90 to 93)

Lorena J. Hartnett, R.P.R. (302)426-1007 or 736-3661

7431ced2-5727-4bec-b77d-b03a444777d2