Davis, et al.                      v.   Mountaire Farms, Inc., et al.
January 27, 2005    C.A. # 04-0414-KAJ Nathaniel Briddell

## Page 94

1   Q.   And is that your signature?
2   A.   Yes.
3   Q.   Mr. Foreman again is requesting, it
4   looks to me, like a floating holiday, personal
5   day?
6   A.   Yes.
7   Q.   And he only wants the money?
8   A.   Yes.
9   Q.   Is that your signature?
10  A.   Yes.
11  Q.   And you approved that?
12  A.   Yes.
13  Q.   Mr. Foreman again is requesting
14  another day. Is that your signature, sir?
15  A.   Yes.
16  Q.   And you approved that request?
17  A.   Yes.
18  Q.   Mr. Jackson, do you know Mr. Jackson?
19  A.   Yes.
20  Q.   How do you know him?
21  A.   He was one of my crew members.
22  Q.   And he is requesting a floating
23  holiday?
24  A.   Yes.

## Page 95

1   Q.   He only wants the money, though?
2   A.   Yes.
3   Q.   And is that your signature?
4   A.   Yes.
5   Q.   Again, Mr. Jackson is asking for
6   vacation, one week of vacation, but he only wants
7   money?
8   A.   Yes.
9   Q.   Is that your signature?
10  A.   Yes.
11  Q.   You approved that. Is this
12  Mr. Tarman, is that T-A-R-M-A-N?
13  A.   Jarman.
14  Q.   Jarman, J-A-R. Do you know a
15  Mr. Jarman?
16  A.   Yes.
17  Q.   How do you know him?
18  A.   He is one of my crew members.
19  Q.   And he is requesting a day off, a
20  floating holiday, an anniversary holiday of some
21  type?
22  A.   Yes.
23  Q.   And he only wants the money?
24  A.   Yes.

## Page 96

1   Q.   Is that your signature?
2   A.   No.
3   Q.   Let's go to the next one with
4   Mr. Jarman. Is that your signature at the
5   bottom?
6   A.   No.
7   Q.   Do you have any ideas whose that is?
8   A.   No.
9   Q.   All right, let's go to the next one,
10  Mr. Matthews. Is that your signature at the
11  bottom?
12  A.   No.
13  Q.   I'm sorry, I didn't hear you, sir.
14  A.   No.
15  Q.   Okay, let's go to the next one with
16  Mr. Matthews. Is that your signature?
17  A.   No.
18  Q.   And Mr. Matthews again, is that your
19  signature?
20  A.   Yes.
21  Q.   Okay, and do you know a Mr. Matthews?
22  A.   Yes.
23  Q.   How do you know him?
24  A.   He is another one of the crew members.

## Page 97

1   Q.   And he is requesting a day off, but he
2   only wants the money for it?
3   A.   Right, yes.
4   Q.   And you approved that?
5   A.   Yes.
6   Q.   How about Mr. Mitchell, is that your
7   signature at the bottom?
8   A.   No.
9   Q.   Okay. And the next one is
10  Mr. Phillips. Do you know Mr. Phillips?
11  A.   Phillips?
12  Q.   Phillips, yes. It should be the page
13  after Mitchell.
14  A.   Matthews, Phillips, okay.
15  Q.   Do you know him?
16  A.   Yes.
17  Q.   How do you know him?
18  A.   Well, he was my forklift driver.
19  Q.   He was your forklift driver?
20  A.   At one time.
21  Q.   Okay, and he is requesting -- Is that
22  your signature, by the way, at the bottom?
23  A.   Approved, but not my signature.
24  Q.   You approved it? Did you approve this

A-0201

25  (Pages 94 to 97)

7431ced2-5727-4bec-b77d-b03a444777d2

Davis, et al.                          v.  Mountaire Farms, Inc., et al.
January 27, 2005    C.A. # 04-0414-KAJ  Nathaniel Briddell

---

Page 98

1  but it's not your signature? Is that what you
2  are saying?
3      A.   Yes.
4      Q.   How about a Mr. Taylor?
5      A.   Yes.
6      Q.   Is that your signature at the bottom?
7      A.   Yes.
8      Q.   Okay, he wants a day off for money
9  only?
10     A.   Yes.
11     Q.   And, let's see, almost done here, a
12  Richard Foreman, do you know him?
13     A.   Yes.
14     Q.   How do you know him?
15     A.   One of my crew members.
16     Q.   And he is requesting vacation, and he
17  is also requesting a floating holiday?
18     A.   Yes.
19     Q.   And he is requesting only to be paid
20  for it, he will continue to work? Am I correct
21  in that?
22     A.   Yes.
23     Q.   Is that your signature?
24     A.   No.

---

Page 99

1      Q.   That's not your signature?
2      A.   No.
3      Q.   All right, and Mr. Foreman again, is
4  that your signature at the bottom?
5      A.   No.
6      Q.   Okay. Did you approve -- Do you know
7  about this? Did you approve this?
8      A.   I don't remember.
9      Q.   Okay, how about the one before with
10  Mr. Foreman, do you remember that, it was in
11  February of '02?
12     A.   I don't remember.
13     Q.   Okay, that's fine. Let me ask you
14  this question: If a member of your crew wanted
15  to take a day off without pay, can he do that?
16     A.   Yes.
17     Q.   Okay, what does he have to do to do
18  that?
19     A.   If he notifies me, if it's not too
20  late and within reasonable time, some of these
21  times I would notify my manager --
22     Q.   Uh-huh.
23     A.   -- and we would try to work something
24  out about getting somebody to replace him, but he

---

Page 100

1  could take that day off.
2      Q.   He could take that day off. Now, what
3  happens if he wants to take the day off and
4  doesn't tell you about it, just doesn't show up?
5      A.   He still don't get paid, and we follow
6  the same procedure as trying to get somebody.
7      Q.   Do you give him any disciplinary
8  action for not showing up?
9      A.   Yes, but I would sometimes give them a
10  verbal warning and notify my manager.
11     Q.   Okay.
12     A.   Whatever the case may be.
13     Q.   But if somebody asked for a day off
14  and you approved it, he wouldn't get a verbal
15  warning, would he?
16     A.   Could you repeat your question?
17     Q.   Sure. If a member of your crew wants
18  to have a day off and doesn't want to be paid for
19  it, I want to take a day off without pay, I
20  notify you, you say okay, I don't get a verbal
21  warning then?
22     A.   No.
23     Q.   Okay. The people who worked on your
24  crew, while we saw these in Garrison, in, I'm

---

Page 101

1  sorry, Briddell Exhibit Number 2, Number 1, I'm
2  sorry, you saw that a lot of people were
3  requesting to be paid instead of taking the time
4  off. People in your crew did take vacation,
5  didn't they?
6      A.   Sometimes.
7      Q.   Okay, and did you approve their
8  vacation?
9      A.   If I had the help, yes.
10     Q.   Okay, and, if you didn't, you
11  wouldn't?
12     A.   No.
13     Q.   Can you tell me this: What happens if
14  somebody who is working on your crew, when you
15  were a crew leader, if they got hurt? What would
16  you do?
17     A.   I would follow company policy. But
18  then, again, if I would be near a physician, I
19  would take them. But the company wants you to
20  see that they get to the processing plant. And,
21  if I could, I would get them to the processing
22  plant.
23     Q.   Okay.
24     A.   But if I was near a hospital, I would

---

Lorena J. Hartnett, R.P.R.        (302)426-1007 or 736-3661

7431ced2-5727-4bec-b77d-b03a444777d2

A-0202

Davis, et al.                          v.  Mountaire Farms, Inc., et al.
January 27, 2005    C.A. # 04-0414-KAJ Nathaniel Briddell

| Page 102 | |
|---|---|

1   proceed to the hospital.
2       Q.   You would take the person to the
3   hospital to get treated?
4       A.   Yes.
5       Q.   Okay.  Could you also call 911 if
6   something happened at a farm?
7       A.   Yes.
8       Q.   Let's go back for just a second,
9   because I want to see if I understand how you
10  worked it on your crew.
11          If one of your catchers wanted a day
12  off without pay and you only had seven and you
13  didn't think you could spare him, did you ever
14  call another crew leader, like Mr. Gibbs or
15  Mr. Garrison, and say, "Listen, one of my guys
16  wants a day off tomorrow or the next day, do you
17  have somebody you can send me?"  Would anything
18  like that ever happen?
19      A.   Yes.
20      Q.   Okay.  And if they said, "Yeah, I have
21  somebody I could send you," you could say to the
22  guy, "Okay, you can have the day off."
23      A.   Yes.
24      Q.   And would it be the reverse?  Did it

| Page 103 | |
|---|---|

1   ever happen that you got a call from another crew
2   leader saying, "I have got a guy who would like a
3   day off, do you have somebody you could send me?"
4       A.   Yes.
5       Q.   And, if you could, you would?
6       A.   Yes.
7       Q.   Okay.  When you are out on the farm,
8   when you are catching, do catchers take a break?
9       A.   At times.
10      Q.   Okay.
11      A.   It wasn't a scheduled break.
12      Q.   Uh-huh, I understand that.  But I mean
13  if somebody is in there catching and all of a
14  sudden they need to stop, they have to go to the
15  bathroom --
16      A.   Yes.
17      Q.   -- they can take that break?
18      A.   Yes.
19      Q.   And they let you know that they are
20  doing that?
21      A.   Not all the time.
22      Q.   But they do sometimes?
23      A.   Yes.
24      Q.   Should they notify you that they are

| Page 104 | |
|---|---|

1   doing that?
2       A.   Yes.
3       Q.   Okay, and the same thing if somebody
4   wanted to have a smoke, same thing?
5       A.   Yes.
6       Q.   All right.  The catchers receive a one
7   half hour lunch break; correct?
8       A.   No.
9       Q.   No?
10      A.   No.
11      Q.   They are supposed to, aren't they?
12      A.   I don't know.
13      Q.   You don't know?
14      A.   No.
15      Q.   Well, from the time that you were
16  catching in '89 until '03, did your people ever
17  take a lunch break?
18      A.   Yes.
19      Q.   When did they take their lunch break?
20      A.   Whenever -- Say if I was catching
21  chickens in Crisfield --
22      Q.   Uh-huh.
23      A.   -- and my manager sent me three
24  trucks, it would take 45 minutes to load a truck.

| Page 105 | |
|---|---|

1   That first truck cannot travel from Crisfield to
2   Selbyville and back to Crisfield before they
3   catch the other two.  That's when they would take
4   their lunch break or some lunch of sort.
5       Q.   And who would tell them when to take
6   that break?
7       A.   You took it on your own because they
8   didn't have nothing to work with.  They didn't
9   have a truck there.
10      Q.   Okay, I see, so there was nothing that
11  they could do?
12      A.   There was nothing they could do.
13      Q.   Normally the trucks are backed up,
14  aren't they, one waiting for another?
15      A.   Starting off, yes, depending on how
16  far you are from the processing plant.
17      Q.   Uh-huh.
18      A.   And the working conditions.
19      Q.   Okay.  So, as long as there was a
20  truck there, they kept working?
21      A.   Kept working.
22      Q.   And when there wasn't a truck there
23  and they couldn't work, you are saying that's
24  when you told them to take lunch?

Lorena J. Hartnett, R.P.R.        (302)426-1007 or 736-3661

A-0203

7431ced2-5727-4bec-b77d-b03a444777d2

Davis, et al.                    v.  Mountaire Farms, Inc., et al.
January 27, 2005    C.A. # 04-0414-KAJ  Nathaniel Briddell

Page 106

1    A.  The majority of the time.
2    Q.  Okay. And is that how it worked from
3  all the time that you were a crew leader?
4    A.  Basically, yes.
5    Q.  Okay. Just to make sure that I
6  understand your testimony here, that is the only
7  half an hour -- Well, that's the only lunch break
8  your crew took?
9    A.  Sometimes it could happen two or three
10  times a day, waiting on trucks, and that's when
11  they would eat.
12    Q.  Okay.
13    A.  Travel time, that's when they would
14  eat. Most of the time they would bring their
15  lunch. A lot of times they would bring their
16  lunch.
17    Q.  Uh-huh. Well, when you began, when
18  you picked up your crew, you had an order that
19  you picked your people up in, didn't you?
20    A.  Yes.
21    Q.  And after you got pretty much all of
22  the crew together, let me ask you -- Let me
23  retract that statement and ask you this: Did any
24  members of your crew get themselves to the farms,

Page 107

1  transport themselves to the farms?
2    A.  Yes.
3    Q.  Okay, so how many people did you have
4  to pick up?
5    A.  Six, probably six every day.
6    Q.  Okay.
7    A.  There was times when I picked up the
8  whole, down through the years.
9    Q.  Okay, but mostly it was five or six?
10    A.  Or seven.
11    Q.  Five, six or seven?
12    A.  Yeah.
13    Q.  But seven was your entire crew?
14    A.  Chicken catchers.
15    Q.  Right. Okay, let's talk about when
16  you picked up the five -- After you got the five,
17  six or seven that you picked up and you are
18  traveling on the way to the farm, was it normal
19  to stop someplace to get a cup of coffee --
20    A.  Yes.
21    Q.  -- get cigarettes, get a sandwich --
22    A.  Yes.
23    Q.  -- do this, do that? And how long did
24  those stops take, approximately?

Page 108

1    A.  Ten to 15 minutes.
2    Q.  That's all? Did people ever eat there
3  at that point?
4    A.  No.
5    Q.  No? Okay. Then you would go to the
6  farm?
7    A.  Yes.
8    Q.  And when you would go from one farm to
9  another, did you ever -- It's normal to stop
10  again, isn't it, --
11    A.  Yes.
12    Q.  -- if a place is around? And how long
13  did those stops last generally?
14    A.  Ten, 15 minutes.
15    Q.  Ten, 15 minutes?
16        MR. BREWER: This would be a good time
17    for a break. It's three minutes of noon.
18    Your lawyer will tell you that during the
19    lunch break, obviously, you can chat about,
20    even she can chat about anything at all you
21    like except the deposition. Okay, so we
22    will take a break and see you back -- We
23    will take about an hour lunch break.
24        (A lunch recess was taken.)

Page 109

1  BY MR. BREWER:
2    Q.  Okay, let's go. Mr. Briddell, let me
3  ask you this question, if I may: Could you
4  recommend the promotion of one of the catchers to
5  be a forklift operator?
6    A.  No.
7    Q.  You couldn't do that?
8    A.  Could I? Oh, let me rephrase it. You
9  said could I recommend?
10    Q.  Yes.
11    A.  Yes, I could ask Doug about it, yes.
12    Q.  We had talked earlier about your
13  giving some oral reprimands to people for various
14  reasons. Did you ever give anybody anything more
15  than an oral reprimand?
16    A.  Yes.
17    Q.  Okay, do you remember who, by any
18  chance?
19    A.  Charles Hitchens.
20    Q.  Okay. Do you remember when that was?
21    A.  No.
22    Q.  Okay. Anybody else you can think of?
23  And I understand -- Again, I understand I am
24  asking you to go back in time. There may have

A-0204

28  (Pages 106 to 109)

Lorena J. Hartnett, R.P.R.        (302)426-1007 or 736-3661

7431ced2-5727-4bec-b77d-b03a444777d2

Davis, et al.                    v.  Mountaire Farms, Inc., et al.
January 27, 2005    C.A. # 04-0414-KAJ Nathaniel Briddell

| Page 110 |
|---|

1  been others and you can't remember their names,
2  and that's fine.
3      A.  No.
4      Q.  You can't remember anybody else?
5      A.  No.
6      Q.  Let me ask you this question: When
7  you finished one farm and you are assigned to go
8  to another farm, you have the authority to make
9  sure that the crew works to get all the chickens
10 caught that you are supposed to get caught that
11 day, don't you?
12     A.  Yes.
13     Q.  And if that involves overtime, you
14 have the right to make sure that they still get
15 caught; right?
16     A.  Yes.
17     Q.  Let me show you, this is Exhibit 6 to
18 Mr. Garrison's deposition. You have a copy of
19 that, I believe.
20         MR. MARTIN:  Yep.
21         MR. BREWER:  And take a look at page
22     nine.  Off the record a moment.
23         (An off-the-record discussion
24         was held.)

| Page 111 |
|---|

BY MR. BREWER:
1
2      Q.  We went off the record. Let's go back
3  on. Sir, I am showing you a document that's been
4  marked as Exhibit Number 6 to Mr. Garrison's
5  deposition, and you are at page nine of that
6  document?
7      A.  Yes.
8      Q.  First of all, do you recognize this
9  document?
10     A.  No.
11     Q.  Okay, look at the front cover. Keep
12 that page you are at and just take a look at the
13 front cover.
14     A.  Yes, yes.
15     Q.  It's a union contract?
16     A.  Yes, uh-huh.
17     Q.  Okay, and right now you are a shop
18 steward for Local 355; are you not?
19     A.  Yes.
20     Q.  Okay, take a look at the first
21 paragraph under Article 10. It says a complaint
22 or a grievance. Do you see where I am?
23     A.  Yes, uh-huh.
24     Q.  So these would apply to people who

| Page 112 |
|---|

1  were, for example, catchers, because when you
2  were a crew leader you weren't covered by this
3  contract, were you?
4      A.  No.
5      Q.  The catchers were, though?
6      A.  Yes.
7      Q.  All right. So it says here a
8  complaint or a grievance arising out of this
9  interpretation, and so forth, shall in the first
10 instance be taken up between the aggrieved
11 employee, which, in your case, would be a
12 catcher, right --
13     A.  Uh-huh.
14     Q.  -- or catchers, who take the matter up
15 with the shop steward, and then the shop steward
16 takes the matter up with the foreman in charge;
17 right?
18     A.  Yes.
19     Q.  So if one of your catchers had a
20 grievance, they would take it up with the
21 steward, and then the steward, in fact, an
22 employee, would take it up with you as a crew
23 leader?
24     A.  They were supposed to.

| Page 113 |
|---|

1      Q.  Yeah, they were supposed to. That's
2  what this contract says they are?
3      A.  Yes.
4      Q.  All right, let's see. You were
5  required to write down the time that your crew
6  started at a farm?
7      A.  Yes.
8      Q.  And you kept the time that the
9  catchers worked at the farm?
10     A.  Did I keep the time that the catchers
11 worked? Are you pertaining to the time they
12 start until the time they end for that day?
13     Q.  Yes, from the time they start --
14     A.  Yes.
15     Q.  -- and the number of chickens they
16 caught and everything else?
17     A.  Yes.
18     Q.  Thank you. Let me show you Exhibit
19 Number 8 to Mr. Garrison's deposition. Have you
20 ever seen this before?
21     A.  I don't remember.
22     Q.  Okay. You were a crew leader at this
23 time?
24     A.  Yes.

29  (Pages 110 to 113)

7431ced2-5727-4bec-b77d-b03a444777d2

A-0205

Davis, et al.                    v.  Mountaire Farms, Inc., et al.
January 27, 2005    C.A. # 04-0414-KAJ  Nathaniel Briddell

---

Page 114

1    Q.   Okay, so you may have gotten it and
2    you may not have; you just don't remember?
3       A.   I don't remember.
4       Q.   Okay, that's fine.  When you were a
5    crew leader and your crews were working at a
6    farm, did you have any responsibility for the
7    safety of the catchers, making sure that they
8    worked safely?
9       A.   Could you say that again?
10      Q.   Yeah, when you were a crew leader, did
11   you have any responsibility to make sure that the
12   catchers worked safely, that they did things in a
13   safe way?
14      A.   Yes.
15      Q.   Okay.  Now, let me show you what is
16   exhibit -- Oh, before I do that, let me ask you
17   this question:  When you went on salary, do you
18   remember when that was?
19      A.   No.
20      Q.   If I suggest to you it was June of
21   2002, would that seem correct to you?
22      A.   Yes.
23      Q.   All right, do you remember what salary
24   you were paid?

---

Page 115

1       A.   Per year?
2       Q.   Yes.
3       A.   Per week?
4       Q.   Per week, per year, what your salary
5    was?
6       A.   I would say 40,000, somewhere in that
7    neighborhood.
8       Q.   A week?
9       A.   No, a year.
10      Q.   Four-thousand a year?
11      A.   Forty-thousand.
12      Q.   Oh, 40,000 a year.  And do you
13   remember how much, when you were a catcher, how
14   much catchers made a year?
15      A.   Catchers made -- I don't remember.
16      Q.   Was it less than you?
17      A.   Yes.
18         MR. MARTIN:  I'm sorry, when you say
19   "less than you," you are talking about less
20   than a crew leader?
21         MR. BREWER:  Less than him, yes, less
22   than you as a crew leader.
23   BY MR. BREWER:
24      Q.   Did you ever have to account for your

---

Page 116

1    time at all in any way?
2       A.   What do you mean, prove to them?
3       Q.   Yeah.
4       A.   No.
5       Q.   Let me give you what has been marked
6    as Exhibit Number 9 to Mr. Garrison's deposition.
7    This is the benefit program that's available to
8    salaried employees.
9         Okay, and I will also give you this
10   document, which is Exhibit Number 10 to
11   Mr. Garrison's deposition, and this is for the
12   people who are hourly catchers, those covered by
13   the union contract that we just discussed.  Okay?
14         Just keep those in front of you.
15         Now I am going to give you this
16   document, and I guess we will make this number
17   three to your deposition.
18            (The reporter marked Briddell
19            Exhibit 3.)
20   BY MR. BREWER:
21      Q.   Keep those three documents in front of
22   you, but what this is, Mr. Briddell, is the
23   difference in the benefit plans for the salaried
24   people versus the hourly people.

---

Page 117

1         MR. MARTIN:  If I may ask a question,
2    is this different from the exhibit used in
3    Mr. Gibbs' deposition last time?
4         MR. BREWER:  No, it is not.
5         MR. MARTIN:  Okay.
6    BY MR. BREWER:
7       Q.   Okay, I'm sorry for the distraction.
8    This is the difference between the hourly
9    benefits --
10      A.   Uh-huh.
11      Q.   -- and the benefits that the salaried
12   people receive.  And I am just going to ask you,
13   if you wouldn't mind, take a look at it, okay,
14   and then take a look at, if you need to, Exhibit
15   Number 9 and this other one that I gave you.
16         MR. MARTIN:  Exhibit Number 10?
17         MR. BREWER:  Exhibit 10, that's right.
18         MR. MARTIN:  From the Garrett
19   depositions.
20         MR. BREWER:  That's right.
21         THE WITNESS:  This here?
22   BY MR. BREWER:
23      Q.   You can take a look at ten and nine,
24   and then take a look at number three to your

Lorena J. Hartnett, R.P.R.     (302)426-1007 or 736-3661

A-0206

7431ced2-5727-4bec-b77d-b03a444777d2

Davis, et al.                      v.  Mountaire Farms, Inc., et al.
January 27, 2005    C.A. # 04-0414-KAJ Nathaniel Briddell

Page 118

1   exhibit, and I would like you to tell me if you
2   think this is an accurate representation of the
3   difference?
4       A.   Wait a minute, now.  I don't
5   understand.  You said look at this, this.
6       Q.   All right, this, take a look at number
7   three.  This is this paper.
8       A.   Right.
9       Q.   Okay.  And, if you need to, you can
10  take a look at number nine --
11      A.   And ten.
12      Q.   -- and ten to Mr. Garrison's
13  deposition.  What I would like you to do is tell
14  me if you think this accurately represents the
15  differences that exist between the benefits that
16  you got when you were salaried versus the
17  benefits that you get now.
18          MR. MARTIN:  If he knows.
19  BY MR. BREWER:
20      Q.   If you know, yes, if you can compare
21  it or not.
22      A.   I don't know.
23      Q.   Okay, let me maybe try to ask you a
24  couple of straightforward questions.  We have

Page 119

1   been in renegotiations with Local 355; have we
2   not?
3       A.   Yes.
4       Q.   Thank you.  And we have been talking
5   about benefits?
6       A.   Yes.
7       Q.   If you look at, just take the LTD, the
8   second column down on the left, it says LTD, do
9   you see that?
10      A.   Yes.
11      Q.   That's long-term disability.  The
12  benefit level with 355 here shows that there is
13  no long-term disability.
14      A.   Right.
15      Q.   But it shows that there is long-term
16  disability for salaried people; right?
17      A.   Yes.
18      Q.   When you were a crew leader, you had
19  long-term disability, didn't you?
20      A.   For awhile.  Some parts of it, I did.
21  Some parts of it, I didn't.
22      Q.   All right.  STD, which is short-term
23  disability, the amounts that are shown for the
24  355 people, do those look like the amounts that

Page 120

1   are correct that we have been discussing?  And
2   when I say have been discussing, I mean have been
3   discussing in the renegotiations?
4       A.   Can you repeat that?
5       Q.   Sure.  Under the STD column, which is
6   short-term disability, there are various levels
7   of benefits listed for the people who are members
8   of Teamsters 355.  Do you see those?
9       A.   Yes.
10      Q.   And my question to you is we have been
11  discussing, we, meaning the company and the
12  union, have been discussing these benefits
13  recently.
14          Does this benefit that's listed here
15  look to be the benefit that the employees of 355,
16  the employees who are represented by 355 have?
17      A.   No.
18      Q.   This doesn't look like it?
19      A.   No.
20      Q.   Okay.  All right.  Now, let me show
21  you -- Well, before I move to that, let me just
22  go back to that piece of paper.  Maybe an easy
23  way to do it, look at the very first thing,
24  vacations.

Page 121

1       A.   Uh-huh.  Wait a minute.
2       Q.   No, that's right, the paper that you
3   have there.
4       A.   I know.
5       Q.   Okay.
6       A.   Okay, go ahead.
7       Q.   Do the vacations look to be what you
8   recall salaried people getting and hourly people
9   getting, the 355 hourly people?
10          Let me try to maybe rephrase the
11  question this way:  After you have had 15 years
12  of service with the company, did you receive four
13  weeks of vacation?
14      A.   Yes.
15      Q.   Okay.  And it looks like you have to
16  be over 20 years to get four weeks if you are
17  hourly?
18      A.   Hourly, yes.
19      Q.   Okay, good.  That's fine.  This is
20  Exhibit Number 12 to Mr. Garrison's deposition.
21  Let me show you this.
22          MR. MARTIN:  Put these other things
23  away so we don't get confused here.
24  BY MR. BREWER:

31  (Pages 118 to 121)

Lorena J. Hartnett, R.P.R.        (302)426-1007 or 736-3661

7431ced2-5727-4bec-b77d-b03a444777d2

A-0207

Davis, et al.                    v.  Mountaire Farms, Inc., et al.
January 27, 2005    C.A. # 04-0414-KAJ Nathaniel Briddell

| Page 122 | Page 124 |
|---|---|

Page 122

1    Q.  Have you seen this before?  This goes
2  back to the time when you were still being paid
3  by the thousand?
4    A.  I don't remember.
5    Q.  Okay.  One of the things under
6  catchers, it says that the rate is 260 per
7  thousand, and the date at the top, by the way, is
8  March 27, 2001?
9    A.  Uh-huh.
10   Q.  Does that sound about right to you?
11     MR. MARTIN:  I'm sorry, does what
12   sound right?
13 BY MR. BREWER:
14   Q.  The fact the catchers were receiving
15 260 per thousand?
16   A.  I don't remember.
17   Q.  Okay.  Does it sound right that the
18 crew leaders, that you were making about 510 per
19 thousand?
20   A.  Yes.
21   Q.  Okay.  Down at the bottom it says the
22 crew leaders are eligible for monthly and annual
23 bonuses.  Were you eligible for monthly and
24 annual bonuses when you were a crew leader?

Page 123

1    A.  Yes.
2    Q.  Were the catchers eligible for
3  bonuses?
4    A.  No.
5    Q.  Let's take a look at Exhibit 13 to
6  Mr. Garrison's deposition.  If you look at the
7  top in the year 2001, it's Nathaniel Briddell.
8  Is that you, sir?
9    A.  Yes.
10   Q.  And this shows that in December of
11 2000 you received a $99.10 bonus; correct?  Do
12 you see where I am?
13   A.  Yes.
14   Q.  And you received a performance bonus
15 in January of '01 for $315.70?
16   A.  Say that again, now.
17   Q.  In January of '01 that you received a
18 performance bonus of $315.70?
19   A.  That's correct.
20   Q.  And you received another performance
21 bonus in February?
22   A.  Yes.
23     MR. MARTIN:  For the clarity of the
24   record, are you asking him whether this

Page 124

1    document says this or whether he recalls
2    having received this?
3  BY MR. BREWER:
4    Q.  Well, we know the document says it.
5    A.  Do I recall?
6    Q.  Getting a bonus?
7    A.  I recall getting a bonus, but I don't
8    recall the amount.
9    Q.  All right, well, there is an amount
10 listed here.  Does that amount seem to you to be
11 correct?
12   A.  I don't remember, sir.
13   Q.  You have no idea?
14   A.  No.
15   Q.  Any reason to think that this is not
16 correct?
17   A.  I just don't remember just what the
18 actual figure was.
19   Q.  I understand that.  My question is is
20 there any reason that you would think that the
21 figures that are listed here are not correct?
22   A.  I can't answer that question.  I
23 don't --
24   Q.  What do you mean you can't answer the

Page 125

1  question?
2    A.  I don't know.  Figures do get juggled
3  around, and I don't know.
4    Q.  Figures do get juggled around?
5    A.  Yes, they do, sir.
6    Q.  So these figures could get juggled
7  around?  Is that what you are suggesting?
8    A.  Yes, they could, sir.
9    Q.  Who would juggle them around?
10   A.  I don't know everybody in the company.
11   Q.  Everybody in the company?
12   A.  I don't know everybody that works with
13 figures in the company.  I just don't remember
14 the figures.  I remember getting bonuses.
15   Q.  Sir, I understand that, and I
16 understand that going back to January of 2001 --
17   A.  Uh-huh.
18   Q.  -- is awhile ago.
19   A.  Yes.
20   Q.  Okay, and what I am asking you is not
21 if you remember receiving that.  You say you
22 don't.  That's fine.
23   A.  Right.
24   Q.  But I am saying that this document

32 (Pages 122 to 125)

Lorena J. Hartnett, R.P.R.    (302)426-1007 or 736-3661

A-0208

7431ced2-5727-4bec-b77d-b03a444777d2

Davis, et al.                      v.  Mountaire Farms, Inc., et al.
January 27, 2005    C.A. # 04-0414-KAJ Nathaniel Briddell

| Page 126 | Page 128 |
|---|---|
| 1 says that's what you got.<br>2    A.  Yes.<br>3    Q.  And my question to you is is there any<br>4 reason that you can give me that we should not<br>5 believe that you got $315.70 as a performance<br>6 bonus?<br>7    A.  I just don't remember.<br>8    Q.  All right, that's not responsive. I<br>9 am going to do it again.<br>10       It shows in the year 2001 you received<br>11 a total of $1,423 bonus. Does that seem right to<br>12 you?<br>13    A.  That's 2000 what?<br>14    Q.  In the year 2001 --<br>15    A.  Uh-huh.<br>16    Q.  -- at the end of the year, it's the<br>17 last column on the right, it says year to date<br>18 earned, $1,423.60.<br>19    A.  I remember getting a bonus, yes.<br>20    Q.  Okay. And if we go to the year 2002,<br>21 and rather than go month by month, we go to the<br>22 year end, it shows $345.92. Does that seem right<br>23 to you?<br>24    A.  I do remember getting a bonus, sir. | 1 bonuses that we just discussed, but you didn't<br>2 get an annual bonus?<br>3    A.  No.<br>4    Q.  And you got monthly bonuses in 2003<br>5 but no annual bonus, because you left being a<br>6 crew leader in, what, I think you said April of<br>7 2003?<br>8    A.  Yes.<br>9    Q.  Okay, so you wouldn't have been<br>10 eligible for those.<br>11       Okay, let me show you what has been<br>12 identified as Exhibit 14 to Mr. Garrison's<br>13 deposition. Have you seen this before, sir?<br>14    A.  I don't remember seeing this.<br>15    Q.  You don't remember seeing this?<br>16    A.  No.<br>17    Q.  This talks about a management meeting<br>18 that was going to be held on a Saturday. Do you<br>19 remember going to a meeting in February of 2003?<br>20    A.  No.<br>21    Q.  You didn't go?<br>22    A.  I don't remember going to that<br>23 meeting.<br>24    Q.  You don't remember going? |

| Page 127 | Page 129 |
|---|---|
| 1    Q.  Okay. In 2003 it shows $313.54.<br>2    A.  I do remember getting a bonus.<br>3    Q.  Okay. Of course, in 2004 you are not<br>4 listed because you weren't a crew leader then?<br>5    A.  Right.<br>6    Q.  All right, so you didn't get any<br>7 bonuses in 2004 because you were back as an<br>8 hourly employee?<br>9    A.  Right.<br>10    Q.  And hourly employees don't get these<br>11 bonuses. Now, in addition to getting a monthly<br>12 bonus, you also got a bonus at the end of the<br>13 year; right?<br>14    A.  Yes.<br>15    Q.  If you go down to the very last<br>16 column, it shows the bonuses that you got<br>17 per month in 2001, which is that same number you<br>18 looked at the top. That's the $1,423.60.<br>19    A.  Uh-huh.<br>20    Q.  It shows, in addition to that, you got<br>21 another $4,425.97 as an annual bonus?<br>22    A.  I remember.<br>23    Q.  You remember that. You remember that,<br>24 okay. In 2002, of course you got the monthly | 1    A.  No.<br>2    Q.  But this was addressed to crew<br>3 leaders?<br>4    A.  Yes.<br>5    Q.  And you were a crew leader in January<br>6 of 2003?<br>7    A.  Yes.<br>8    Q.  Just to be sure, you don't have any<br>9 recollection of getting this or seeing this?<br>10    A.  No.<br>11    Q.  Let me show you what's been marked as<br>12 Exhibit 15 to Mr. Garrison's deposition. This is<br>13 the Christmas invitation list for supervisors in<br>14 2003.<br>15    A.  Yes.<br>16    Q.  Under Doug Lynch your name is not<br>17 mentioned, is it?<br>18    A.  No.<br>19    Q.  Do you know why it wasn't here?<br>20    A.  This was from Christmas dinner 2003?<br>21 I was -- I don't know why I didn't receive this.<br>22    Q.  You were hourly.<br>23    A.  Yes, that's correct.<br>24    Q.  And this is for supervisors. This |

A-0209

33 (Pages 126 to 129)

Lorena J. Hartnett, R.P.R.        (302)426-1007 or 736-3661

7431ced2-5727-4bec-b77d-b03a444777d2

Davis, et al.                        v.  Mountaire Farms, Inc., et al.
January 27, 2005     C.A. # 04-0414-KAJ  Nathaniel Briddell

---

Page 130

1    Christmas dinner is for supervisors, isn't it?
2        A.   Yes.
3        Q.   The hourly people don't have a
4    Christmas dinner, do they?  The hourly people
5    don't have Christmas dinner, do they?
6        A.   Not the hourly.
7        Q.   Okay, if you look at the last page of
8    this exhibit, Christmas 2001, under Mr. Lynch
9    your name is listed there, isn't it?
10       A.   Yes, it is.
11       Q.   And that's because you were a crew
12   leader at the time?
13       A.   That's correct.
14       Q.   Did you go to the dinner?
15       A.   Yes.
16       Q.   Okay.  Were there any people at the
17   dinner who were not supervisors, as far as you
18   know?
19       A.   I don't remember.
20       Q.   You don't remember.  Before we move
21   into another area, can you -- I would just like
22   to know this, what you would identify as your
23   strengths as a crew leader?  What do you think
24   you did the best when you were a crew leader?

---

Page 131

1        A.   Communicate with the people there.
2    Communicate with the people, the upper
3    management, the catchers, the drivers.  I had a
4    good relationship with them.
5        Q.   Okay, and what would you say was your
6    weakest point?
7        A.   My weakest point?
8        Q.   Uh-huh.
9        A.   I don't think I had any weak points in
10   that field.
11       Q.   Okay.  Okay.  Now, recently do you
12   remember coming to Mr. Lynch and asking him that
13   he should talk to the crew leaders about loose
14   items that were on the forklift trailer?
15       A.   Yes, trailer debris, yes.
16       Q.   And do you know a fellow by the name
17   of Mr. Al Z.?
18       A.   Yes.
19       Q.   What's his job at the company?
20       A.   As far as working, you have to go to
21   him about work-related things.  I very seldom
22   have to go to Mr. Al Z.
23       Q.   Do you remember him being part of this
24   conversation that you had with Mr. Lynch?

---

Page 132

1        A.   Yes, I do.
2        Q.   Okay, and did Mr. Al Z. tell you that
3    you should tell the crew leaders about leaving
4    these items?
5        A.   No, he said I should move it.
6        Q.   He said you should do it?
7        A.   Yes.
8        Q.   That you should tell the crew leaders?
9        A.   That I should do it.
10       Q.   You should do it?
11       A.   Yes, that I should take it off.
12       Q.   Oh, okay.  Do you ever remember
13   telling Mr. Z. that you couldn't do it, that you
14   were a driver?
15       A.   No, I don't remember saying that.
16       Q.   Do you remember Mr. Z. saying, "Well,
17   what did you do when you were a crew leader," and
18   you responded, "My job was to manage and direct
19   the crew."  Do you remember saying that to Mr. Al
20   Z.?
21       A.   I said I was supposed to do as my
22   manager told me to do.  That is managing,
23   directing a crew.
24       Q.   But my question is this, sir:  Did you

---

Page 133

1    say to Mr. Al Z. in the presence of Mr. Lynch
2    that when you were a crew leader, quote, "My job
3    was to manage and direct the crew."?
4        A.   To manage the crew.
5        Q.   And direct the crew?
6        A.   To manage the crew.
7        Q.   And to direct the crew?
8        A.   Manage the crew.
9        Q.   So you didn't say "and direct," then?
10       A.   No, I don't remember saying that.
11       Q.   But you did say to him that your job
12   was to manage the crew --
13       A.   Yes.
14       Q.   -- to Mr. Z. and to Mr. Lynch.
15       Okay, let's take a look at -- I will
16   give you Mr. Garrison's Exhibit Number 16 to
17   Mr. Garrison's deposition here, and this is also
18   the complaint that's been filed in this case, and
19   you may have seen this one.  I assume you
20   probably have.  And I would like you to go to
21   Paragraph 23.  Are you there, sir?
22       A.   Yes, right here.
23       Q.   Paragraph 23, it says, "At all
24   relevant times herein defendant followed and

---

34  (Pages 130 to 133)

7431ced2-5727-4bec-b77d-b03a444777d2

A-0210

Davis, et al.                    v.  Mountaire Farms, Inc., et al.
January 27, 2005    C.A. # 04-0414-KAJ Nathaniel Briddell

---

Page 134

1  continues to follow a corporate policy and/or
2  practice that requires/required plaintiffs to
3  submit a daily time sheet broken down for each
4  day of the week."
5      Were you required to keep a time sheet
6  of your time broken down for each day of the
7  week?
8      A.  At a point in time, yes, that I had to
9  turn in a time sheet ever day of each catcher.
10     Q.  Each catcher?
11     A.  Yes.
12     Q.  But it was for the catchers you were
13  keeping a time for?
14     A.  Yes.
15     Q.  You were not keeping a time for
16  yourself?
17     A.  No.
18     Q.  Okay, and you have never kept time for
19  yourself as a crew leader?
20     A.  No.
21     Q.  Go to the next paragraph, which is
22  Paragraph 26.  You can take a moment and read
23  that, if you want.
24     Okay, this basically says that the

---

Page 135

1  defendant, which is the company, follows a
2  practice of partial-day deductions, and it says
3  in that, "Any partial time taken off in working
4  hours by the plaintiffs," which is you, "was
5  deducted from their pay."
6      Were any deductions made from your pay
7  when you took less than one full day off?
8      A.  That depends.  Now, if I took off when
9  I got paid by the thousand --
10     Q.  Uh-huh.
11     A.  -- and I got somebody in my place, the
12  company did not pay.  I paid it out of my pocket.
13     Q.  Correct.  I am talking about -- Let's
14  talk about the times from June of '02 when you
15  became salary.  Okay?
16     A.  In June of '02?
17     Q.  In June of '02 when you first became
18  salaried until April of '03 when you stopped
19  being a crew leader?
20     A.  No.
21     Q.  There were no partial-day deductions
22  taken from your pay?
23     A.  No.
24     Q.  Okay.  Go to the next paragraph,

---

Page 136

1  Paragraph 27.  You can take a moment, sir, and
2  read that.  I just have a couple questions about
3  that for you.
4      Okay, what this paragraph basically
5  says is that the defendants have a policy,
6  defendants being the company, have a policy of
7  again the partial-day deductions, which you said
8  did not happen when you were salaried, whereby
9  your pay was reduced because of violations in the
10  quantity of the work performed or directly
11  received a reduction in the amount of
12  compensation in the event they chose to charge
13  time off from normal hours.
14     Was your compensation reduced because
15  of violations of the quantity of work performed
16  at all?
17     A.  No.
18     Q.  When you were salaried, there
19  basically weren't any deductions taken from your
20  work or anything else, were there?
21     A.  No.
22     Q.  Take a look, sir, at that same
23  document and turn to Paragraph 32, please.  Let
24  me know when you are finished.

---

Page 137

1      A.  Okay.
2      Q.  Go ahead and read it and just let me
3  know when you are finished.
4      A.  Finished.
5      Q.  Okay.  When you were a crew leader,
6  did you receive payment from the company for use
7  of your vehicle?
8      A.  No.
9      Q.  No?
10     A.  No, it was not mine.  That come right
11  off the top of my paycheck.
12     Q.  Let's talk about from the time you
13  were salaried?
14     A.  Oh, salaried?
15     Q.  Yes.
16     A.  Did I receive money from the company?
17     Q.  Did you receive money every week, a
18  check every week from the company for the use of
19  your vehicle?
20     A.  Not from the company.  It was my
21  money.
22     Q.  Okay, that's fine if that's what your
23  testimony is, but I just want you to think about
24  it for a second.

---

35  (Pages 134 to 137)

Lorena J. Hartnett, R.P.R.      (302)426-1007 or 736-3661

7431ced2-5727-4bec-b77d-b03a444777d2

A-0211

Davis, et al.                    v.  Mountaire Farms, Inc., et al.
January 27, 2005    C.A. # 04-0414-KAJ  Nathaniel Briddell

---

Page 138

1    A.  Every week we got $215, a $215 check.
2    Q.  Every week?
3    A.  An advance check from our salary.
4    Q.  From the company.  Oh, you think that
5    was part of your salary?
6    A.  Let me remember this.  It's been so
7    long.
8    Q.  The noise doesn't help either.
9    (Referring to fire whistle)
10    A.  I don't remember.  Let's see, we were
11    getting a $215 check.  That included the $235.
12    Q.  Uh-huh, that's correct.
13    A.  No, the company wasn't giving us no
14    $235 a week.
15    Q.  What was that?  You remember getting
16    checks for $235 a week?
17    A.  Yes.
18    Q.  What were they for, as far as you
19    know?
20    A.  They were advance checks from our pay.
21    Q.  Advance checks from your payroll, from
22    your pay?
23    A.  Yes, I think.  I don't remember.
24    Q.  Okay, and you got those every week?

---

Page 139

1    A.  Yes.
2    Q.  Okay, now, we had asked you to produce
3    certain documents, one of which was your tax
4    returns, and those documents have not been
5    produced.  And I would assume the reason is
6    for the same reason we talked about before, the
7    divorce proceeding that you were involved with?
8    A.  Uh-huh.
9    Q.  I will ask you, because this now is
10    important, to produce your income tax returns for
11    the years 2001, 2002 and 2003.  Okay?
12    A.  If I can.
13    Q.  Okay.  You may not know the answer to
14    this, but let me ask it anyway.  That money, the
15    $235 you were getting every week, do you remember
16    when you filled out your tax forms how that money
17    was classified?  Was it considered regular
18    earnings, for example?
19    A.  I don't remember.
20    Q.  You don't remember.  All right.  But I
21    am going to ask you to search and produce your
22    tax returns.  That would be important for this
23    purpose here.
24    Let's look to the next item, which is

---

Page 140

1    Paragraph 34.  This says, "When the defendant,"
2    which is the company, "learned of plaintiff's
3    intention to seek counsel, defendant immediately
4    retaliated against plaintiffs, threatened them
5    with termination of employment if they continued
6    to pursue these issues."
7    Did anybody threaten you with
8    termination?
9    A.  No.
10    Q.  Did anybody retaliate against you,
11    sir?
12    A.  No.
13    Q.  Okay.  And I think I asked you, and
14    you said no one threatened you with termination
15    from employment?
16    A.  No.
17    Q.  Let's see.  Go to the next paragraph,
18    which I would like to read, Paragraph 36.  And
19    this says, "Many of the plaintiffs have been
20    cornered by various management personnel and
21    questioned individually regarding their
22    discussions with counsel and the nature of their
23    action."
24    Were you cornered by any member of

---

Page 141

1    management about this lawsuit?
2    A.  Cornered me and questioned me?
3    Q.  Cornered?  Well, this is what it says.
4    It says, "Many of the plaintiffs have been
5    cornered."
6    A.  No, I don't remember being cornered.
7    Q.  By anybody from management?
8    A.  No.
9    Q.  It also says they questioned many of
10    the plaintiffs, and it may not be you, "Many of
11    the plaintiffs have been questioned individually
12    regarding their discussions with counsel."
13    Have you been questioned by any member
14    of management regarding your discussions with
15    Mr. Martin?
16    A.  Yes.
17    Q.  Who?
18    A.  David Nuse said, "I heard your name
19    was on the lawsuit."
20    Q.  Uh-huh.  Okay.
21    A.  "And you won't receive anything."
22    That's all I got on that.
23    Q.  David Nuse said, "I heard your name
24    was on the lawsuit."

A-0212

36  (Pages 138 to 141)

Lorena J. Hartnett, R.P.R.    (302)426-1007 or 736-3661

7431ced2-5727-4bec-b77d-b03a444777d2

Davis, et al.                    v.  Mountaire Farms, Inc., et al.
January 27, 2005    C.A. # 04-0414-KAJ Nathaniel Briddell

---

Page 146

1  owned and operated by the defendant's upper
2  management personnel circling the parking lot of
3  the diner at which they were assembled for a
4  meeting.
5        Can you tell me anything about that?
6    A.  Yes, I do remember seeing that company
7  vehicle.
8    Q.  Which vehicle did you see?
9    A.  I seen a tan Crown Victoria.
10   Q.  And whose car was that?
11   A.  I don't remember.  I can't recall.  I
12 did not see that person.
13   Q.  You did not see the person?
14   A.  No.
15   Q.  But you are sure it was a company car?
16   A.  I know it was.
17   Q.  And what occurred?  The car, it said,
18 circled?
19   A.  Just circled around the parking lot
20 real slow and drove on off.
21   Q.  So the car came into the parking lot?
22   A.  Yes, it did.
23   Q.  Circled around slowly and drove off?
24   A.  Yes.

---

Page 147

1    Q.  That's what this refers to?  Nobody
2  got out of the car?
3    A.  No.
4    Q.  Nobody came into the restaurant that
5  you were in?
6    A.  No.
7    Q.  This complaint just says on a
8  Saturday.  Do you remember what Saturday morning
9  this was?
10   A.  No, I don't.
11   Q.  You had testified at a meeting in 2003
12 with Mr. Martin?
13   A.  Yes.
14   Q.  Would that be the time?
15   A.  Yes, it could very well be.
16   Q.  And basically that's what happened?
17   A.  Yes.
18   Q.  A car drove in and drove out?
19   A.  Yes.
20   Q.  Now, it is claimed in the answers to
21 the interrogatories that you gave to us --
22   A.  What, which paragraph is this?
23   Q.  Oh, no, no, I am not -- I am done with
24 this.  I'm sorry.  I think I am finished with

---

Page 148

1  this.  Let me give you this.  This would be
2  number four to your deposition.
3        (The reporter marked Briddell
4        Exhibit 4.)
5    A.  Okay.
6    Q.  These are, Mr. Briddell, these are
7  answers to what are called interrogatories that
8  we sent to you and you answered back.  These are
9  questions that we asked you.
10   A.  Uh-huh.
11   Q.  And you and your attorneys answered
12 them.
13   A.  Uh-huh.
14   Q.  What I would like you to do is to go
15 to the second question, or interrogatory, okay,
16 and that appears on page four.  Okay?
17   A.  Uh-huh.
18   Q.  And the question here is to give us
19 the factual basis for the claim that you worked
20 overtime without compensation, okay, the hours on
21 each of the days you contend you worked the
22 overtime, and documents, if there were any, that
23 would reflect this time.
24   A.  Uh-huh.

---

Page 149

1    Q.  All right.  The answer that's given is
2  the one that's here, and that's fine.
3        My question to you is can you tell me
4  how you arrived at that you worked an average of
5  25 hours per week?
6    A.  Yes.
7    Q.  Would you do so, please?
8    A.  Yes, sir.
9    Q.  Thank you.
10   A.  I started picking up help --
11   Q.  Uh-huh.
12   A.  -- three hours prior to farm time,
13 whatever the farm time was, as it rotated.
14   Q.  Uh-huh.
15   A.  My first man lived 15 minutes away
16 from me in Berlin.  I lived on Honeysuckle Road,
17 and he lived on Peach Lane.  I had to go wait for
18 him to get ready to come out.  Then I would
19 proceed --
20   Q.  Okay, I'm sorry, why would you have to
21 wait for him?
22   A.  He wasn't up and ready to go to work.
23   Q.  Well, he is supposed to be ready to go
24 to work.

A-0213

38  (Pages 146 to 149)

Lorena J. Hartnett, R.P.R.    (302)426-1007 or 736-3661

7431ced2-5727-4bec-b77d-b03a444777d2

COPY

1

```
 1            IN THE UNITED STATES DISTRICT COURT
              IN AND FOR THE DISTRICT OF DELAWARE
 2

 3   WILLIE DAVIS, JR.                    )
     NATHANIEL BRIDDELL,                  )
 4   GEORGE W. FEDDIMAN,                  )
     JOSEPH GARRISON,                     )
 5   LARRY E. GIBBS,                      )
     ROY H. WALTERS,                      )
 6   ALL SIMILARLY-SITUATED CURRENT       )
     AND FORMER EMPLOYEES OF              )
 7   MOUNTAIRE FARMS, INC.,               )
     MOUNTAIRE FARMS OF DELMARVA,         )
 8   INC., and MOUNTAIRE FARMS OF         )
     DELAWARE, INC.,                      )
 9               Plaintiffs,              )
                                          )   C.A. No. 04-0414
10       -vs-                             )
                                          )
11   MOUNTAIRE FARMS, INC.,               )
     MOUNTAIRE FARMS OF                   )
12   DELMARVA, INC., and                  )
     MOUNTAIRE FARMS OF DELAWARE,         )
13   INC., all Delaware corporations)
                 Defendants.              )
                                   - - - - - - -
14           Deposition of WILLIE DAVIS, taken before
     Pamela C. Washington, Registered Professional Reporter
15   and Notary Public, at the law offices of Young,
     Conaway, Stargatt & Taylor, 110 West Pine Street,
16   Georgetown, Delaware, on March 15, 2005, beginning at
     10:00 a.m.
17                                 - - - - - - -

18   APPEARANCES:

19       On behalf of the Plaintiffs:
             Margolis Edelstein
20           BY:  JEFFREY K. MARTIN, ESQ.
             and  KERI WILLIAMS, ESQ.
21           1509 Gilpin AVenue
             Wilmington, Delaware 19806
22
         On behalf of the Defendant:
23           Shawe & Rosenthal
             BY:  ARTHUR M. BREWER, ESQ.
24           and  LAURA PIERSON SCHEINBERG, ESQ.
             20 South Charles Street
25           Baltimore, Maryland  21201          A-0214
```

2

I-N-D-E-X

Witness:
        WILLIE DAVIS
              Examination by Mr. Brewer . . . . . . . . . .    3

CERTIFICATE OF COURT REPORTER . . . . . . . . . . . . . .    52

A-0215

```
1    WHEREUPON:

2                        WILLIE DAVIS, JR.,

3    having first been duly sworn by the court reporter,

4    thereupon testified upon his oath as follows:

5                        MR. MARTIN:  Before we begin,

6    Mr. Brewer, let me advise you that Mr. Davis has some

7    type of a hearing impairment that he disclosed to me

8    this morning.  He most times does not have trouble

9    hearing, but he needs to see your lips as you are

10   talking.

11                       MR. BREWER:  Okay.

12                       MR. MARTIN:  So if you can try not to

13   obscure your lips, not that you do.  And I have asked

14   him to certainly let us know if he has any trouble

15   hearing what the question is.

16                       MR. BREWER:  Okay.

17   BY MR. BREWER:

18          Q      Should I try to keep my voice higher

19   than normal, would that help you?

20          A      Well, normal would be okay.

21          Q      Normal is okay?

22          A      Yes.

23          Q      Oh, all right.  As long as I look to

24   you then?

25          A      Yes.
```

A-0216

Davis - Brewer

1          Q    Okay.

2               MR. BREWER:  Do we have the same

3    stipulation that we had in the other depositions?

4               MR. MARTIN:  Yes, sir.

5               MR. BREWER:  Okay.

6    BY MR. BREWER:

7          Q    Mr. Davis, I know you and I have met

8    before, but just for purposes of a formal

9    introduction, my name is Art Brewer, I'm an attorney

10   and I'm representing Mountaire in a case called Davis

11   and there are several other plaintiffs versus

12   Mountaire, okay?

13         A    Yes.

14         Q    Have you ever been deposed before, sir?

15         A    No, sir.

16         Q    Do you understand that you are under

17   oath today and have an obligation to tell the truth?

18         A    Yes, sir.

19         Q    Do you understand that while this is

20   informal, it has the same significance as if you were

21   in a courtroom, testifying?

22         A    Yes, sir.

23         Q    Okay.  What's going to happen here is

24   I'm going to ask you a series of questions.  The court

25   reporter who you see here to my right is going to take

A-0217

Davis - Brewer

1    down my questions and your answers.  At trial, I will

2    have an opportunity to bring to the attention of the

3    judge or the jury any changes in your testimony here

4    today and what you might later testify in court, do

5    you understand that?

6            A    Yes, sir.

7            Q    All right.  If you do not understand a

8    question I ask or, as a result of what Mr. Martin

9    said, you can't hear me clearly, please ask me to

10    repeat the question or to rephrase the question, I'll

11    be happy to do that.

12            A    Yes, sir.

13            Q    If you answer a question, however, I'm

14    going to assume that you understood the question, do

15    you understand that, sir?

16            A    Yes, sir.

17            Q    All right.  Sir, let me ask you, do you

18    have any physical or mental problems that would

19    interfere with your ability to answer my questions

20    here today?

21            A    No, sir.

22            Q    Are you on any medication today?

23            A    None that would impair me.

24            Q    None that would affect your ability to

25    understand my questions and to answer them?

A-0218

FIRST STATE REPORTING SERVICE      (302) 424-4541
Pamela C. Washington, RPR
P.O. Box 99      Milford, Delaware  19963

```
1            A    No, sir.
2            Q    All right.  If at any time during the
3    proceedings here you need a break, just please let me
4    know.  We have normally been taking a break
5    approximately after two hours, I believe -- after one
6    hour, okay; I thought it was two, seems like two, so
7    we'll do that.  But in the meantime, if you need
8    another break earlier than that, just please let me
9    know, okay?
10           A    Yes, sir.
11           Q    All right.  Can you tell me, please,
12   how you came to contact Mr. Martin?
13           A    I contacted him by lawyer referral, by
14   the lawyer referral.
15           Q    Is that a lawyer referral service?
16           A    Yes.
17           Q    Okay, who did you talk to there?
18           A    I don't recall the name of the person I
19   talked to but I know I told them the problems that I
20   thought I had, and they in turn contacted me back and
21   gave me Mr. Martin's phone number.
22           Q    All right.  And did you subsequently
23   call Mr. Martin?
24           A    Yes, sir, I did.
25           Q    Can you tell me when, please?
```

A-0219

Davis - Brewer

1           A    I have one daughter born in 1968, one

2    was born in `67, one was born in `74, and one was born

3    in `70.

4           Q    Okay.  Do they live in the area here?

5           A    Yes, sir.

6           Q    Okay.  How about your son?

7           A    My son live in -- right now at the

8    present, he's residing with me and his sister, one of

9    his sisters, over Delmar.

10          Q    Okay, so you have one of the daughters

11   and your son is living with you now?

12          A    No, sir; none of my daughters are

13   living with me.

14          Q    I'm sorry, I misunderstood you then.

15   So it's your son that's living with you?

16          A    I said part-time with me and then

17   part-time with his sister over to Delmar.

18          Q    Oh, I see, okay.  And how old is your

19   son?

20          A    My son was born in `69, December 5th.

21          Q    Okay.  Is your son employed?

22          A    Yes, sir, he is.

23          Q    Who is he employed by?

24          A    Mountaire of Millsboro.

25          Q    And what does he do?

A-0220

Davis - Brewer

```
 1              A    Feed truck driver, drives a feed truck.

 2              Q    Feed truck?  Okay.  Do you know how

 3      long he has been at Millsboro?

 4              A    Not too long.  I think about a month or

 5      so, a couple months, something like that.

 6              Q    Oh, recently employed there?

 7              A    Yes.

 8              Q    Do you regularly attend church, sir?

 9              A    No, sir, I do not.

10              Q    Okay.  What is your highest level of

11      education?

12              A    About a year-and-a-half almost, about a

13      year, little over a year-and-a-half of college.

14              Q    Okay.  And where is that, what college

15      was that?

16              A    Delaware Tech.

17              Q    Del-Tech?  Okay.  Do you have any

18      certifications or licenses to drive, like a CDL or a

19      forklift or anything along those lines?

20              A    Not now, no.  I did have but not now.

21              Q    When did you --

22              A    I have a driver's license.

23              Q    Okay.  Did you ever have a CDL?

24              A    Yes, I did.

25              Q    Okay.  And when did you have your CDL?
```

A-0221

17

Davis - Brewer

```
 1            A    Just I first acquired my CDLs in 1967
 2   and up until 1990.
 3            Q    Okay.  I'm not trying to trick you, but
 4   CDLs didn't come into place until probably the very
 5   late `80s.
 6            A    Well, chauffer's license.
 7            Q    You had a Class A chauffer's license?
 8            A    Chauffer's license, and then they go
 9   right over to CDL.
10            Q    So you had a Class A chauffer's license
11   and you got that, when did you say again, please?
12            A    My chauffer's license?
13            Q    Yes.
14            A    1967.
15            Q    1967, okay.  And then after the
16   chauffer's license you needed a CDL, you got that?
17            A    No, I did not.  I did not change over
18   to the CDL.
19            Q    Oh, you did not change over?
20            A    No, I did not.
21            Q    So you do not have a CDL?
22            A    No.
23            Q    Okay, how about a forklift license?
24            A    I was certified through Mountaire.
25            Q    Okay.  And you currently under any
```

A-0222

Davis - Brewer

1    treatment with a physician or a mental health care

2    provider?

3              A    Not the mental health, no, sir.

4              Q    Physical?

5              A    Physical, yes.

6              Q    Okay, and what are you being treated

7    for, sir, if you don't mind my asking?

8              A    Degenerative heart condition --

9    degenerative heart condition.

10             Q    Okay.  Let's talk about your employment

11   with Mountaire; when did you first become employed

12   with Mountaire?

13             A    About April of -- it was either 2000 or

14   2001.

15             Q    Okay.  Prior to being employed with

16   Mountaire, for whom were you working?

17             A    I was independent weigh master for

18   Tyson Food.

19             Q    So you were a weigh master for Tyson

20   Foods?

21             A    Yes.

22             Q    And how long did you have that

23   position?

24             A    From 1997 until -- from the time that I

25   went to Mountaire.

A-0223

Davis - Brewer

```
 1              Q    Okay.  And prior to that, by whom were
 2      you employed?
 3              A    I was working part-time for the --
 4      relief weigh master for Perdue at Showell Farms,
 5      Showell, Maryland.
 6              Q    You were a relief weigh master?
 7              A    Relief crew leader, yes.
 8              Q    Relief crew leader, okay.  What did you
 9      do as a relief crew leader?
10              A    When some of the crew leaders would
11      take off, I would take the crews out for them.
12              Q    Okay, so somebody wanted a day off,
13      you'd fill in for that day?
14              A    Yes.
15              Q    Somebody took a week's vacation, you'd
16      fill in for that week?
17              A    Something like that.
18              Q    And if no one was doing anything, you
19      just didn't work?
20              A    No.
21              Q    Okay.  And how long did you do that for
22      Perdue?
23              A    From the time that Perdue purchased
24      Showell.
25              Q    Okay.                          A-0224
```

```
 1              A    And then up until I went to Tyson
 2   Foods.
 3              Q    Okay.  So you went from Perdue when
 4   they purchased Showell to Tyson to Mountaire?
 5              A    Yes.
 6              Q    Prior to Perdue's acquisition of
 7   Showell what did you do?
 8              A    I was a truck driver, live haul driver
 9   for Showell, Cooking Good.
10              Q    Okay, and how long were you employed by
11   Showell?
12              A    Approximately three years.
13              Q    And you were a live haul driver for
14   Showell?
15              A    Yes.
16              Q    Okay.  And prior to Showell?
17              A    I drove live haul for Perdue in
18   Salisbury.
19              Q    So your first experience then as a
20   weigh master, if you will, would have been at Perdue
21   when you were a relief weigh master?
22              A    No, sir.
23              Q    Oh, all right.
24              A    My first weigh master experience began
25   back in 1968.
```

A-0225

Davis - Brewer

1      Q    All right, with whom?

2      A    German Trucking and -- what's the name

3  of the place -- Carolina Poultry, I was relief weigh

4  master for different crews over there to Carolina

5  Poultry in Federalsburg and Denton, Maryland.

6      Q    And when you weren't filling in as a

7  relief crew leader, what were you doing?

8      A    I was live haul truck driver.

9      Q    Okay.  Was that also true when you were

10  with Showell, were you also a relief crew leader

11  there?

12      A    I was relief crew leader for Perdue

13  when Perdue purchased Showell.  But when Showell

14  was -- I was at Showell Cooking Good, I was a live

15  haul truck driver.

16      Q    All right.  And you didn't fill in

17  for --

18      A    No, sir.

19      Q    Okay, I think that answers my

20  questions.  When you first became hired by Mountaire,

21  what position were you hired into?

22      A    As a crew leader.

23      Q    You were hired as a crew leader, okay.

24  And did there ever come a time when you worked for

25  Mountaire that you requested to go on a part-time

A-0226

Davis - Brewer

```
 1   basis?
 2             A    The latter part of when they gave me --
 3   when they laid my crew off, they offered me the
 4   position of a part-time position, you know, as a crew
 5   leader, and I accepted that.
 6             Q    Okay.  So my question is did you
 7   request to become part-time or not?
 8             A    Well, when they told me they was laying
 9   my crew off, I requested the part-time, you know, to
10   fill-in crew.
11             Q    Okay.  So it was because they were
12   laying your crew off that you made that request?
13             A    Yes.
14             Q    Okay.  And when you were operating as a
15   part-time crew, what time frame are we talking about?
16             A    Well, when they first laid me off, I
17   went in as a crew leader for about six -- five or six
18   months straight with no time off or anything like
19   that.
20             Q    Okay, I'm confused.  You testified that
21   you were laid off.
22             A    Yes.
23             Q    I thought you told me you --
24             A    As a full-time weigh master -- as a
25   full-time crew leader, I was laid off.  Then they
```

A-0227

Davis - Brewer

1    brought me in as a relief crew leader.

2              Q    Okay.

3              A    And I had to fill in, you know, the

4    other crew leaders spot.

5              Q    That's what I'm interested in, when did

6    that occur?  When did you go from being a full-time

7    crew leader to a relief crew leader?

8              A    From the time that they laid me off.

9              Q    When was that?

10             A    I cannot recall direct the date, the

11   exact date.

12             Q    Can you give me a year, what year that

13   might have happened?

14             A    It was one year after I was there for

15   the full-time position.

16             Q    So a year after you became employed,

17   that's when you became a part-time crew leader?

18             A    Yes.

19             Q    Okay, one year after employment.  And

20   as a part-time crew leader, what was your schedule?

21             A    Pretty much the same as it was when I

22   was full time.  In other words, I didn't get any time

23   off.

24             Q    So you were working the same amount of

25   hours?                                    A-0228

Davis - Brewer

```
 1              A     Pretty much the same amount of hours.
 2     In other words, I made the same -- almost the same
 3     amount of money when I went -- when they put me on
 4     part-time as I did a full-time, based on my W-2s.
 5              Q     Did you ever become a relief crew
 6     leader?
 7              A     That was what I was supposed to have
 8     been, relief crew leader.  But we had one crew that --
 9     one crew leader that was out, I think he was out
10     something like about six, seven months, something like
11     that, and I basically carried his crew out the whole
12     time.
13              Q     Who was that?
14              A     Roy Walters' crew.
15              Q     That's when he had his surgery for his
16     knees?
17              A     I think it was.
18              Q     During the time that you were a
19     part-time crew leader or a relief crew leader -- and I
20     understand we can use those terms interchangeably,
21     part-time crew leader is the same thing as a relief
22     crew leader?
23              A     Part-time relief is what they, you
24     know, had me down as relief crew leader.
25              Q     Okay.  So when you're talking about
```

A-0229

1    being a part-time crew leader a year after you became

2    employed, it's the same as relief crew leader?

3              A    I don't know how they would classify

4    that but I know that, you know, they had me down as

5    relief crew leader.  I was supposed to have been

6    relief for the other crew leaders for when they wanted

7    to take off.

8              Q    Is that what happened approximately a

9    year after you started with the company?

10             A    Yes, sir.

11             Q    Okay, that's what I want to know, all

12   right.  Now, during that time that you were a relief

13   crew leader, did you ever just operate the forklift

14   for another crew?

15             A    I never operated -- just operated the

16   forklift for another crew.  I was working as the crew

17   leader, you know, taking the catchers to work, picking

18   them up, taking them home, and basically doing the

19   same thing as I done when I was a full-time crew

20   leader.

21             Q    Okay.  So what you're saying to me then

22   is during this period of time that were you a relief

23   crew leader, that you never operated the forklift?

24             A    A lot of times, yes, I did; I had to.

25             Q    But were you also the crew leader when

A-0230

1    you were operating the forklift?

2         A    Yes, sir.

3         Q    All right.  So there was never a time

4    then when you worked for another crew leader and all

5    you did was operate the forklift?

6         A    That was occasion that like if a

7    forklift operator did not show up, they would call me

8    in occasionally, you know, to operate the forklift a

9    little bit.

10        Q    And that's all you would do, you would

11   just operate the forklift?

12        A    Sometimes, but not -- it didn't happen

13   but about two or three times.

14        Q    Okay.  And that's two or three times

15   over what period of time, sir?

16        A    During the remainder of the time that I

17   was down there.

18        Q    Just so I'm getting a time frame, and I

19   want to be sure of this, you believe you were employed

20   in April of either 2000 or 2001?

21        A    Right; at this time, I cannot recall.

22        Q    All right, that's fine, I understand

23   that.  From whatever that time was, one year later is

24   when you became a relief crew leader?

25        A    Yeah, I had got a vacation, I got my

A-0231

Davis - Brewer

1    first vacation and then they -- then they put me in as

2    relief crew leader, then I got my second vacation the

3    next year.  So I had two vacations while down there.

4              Q    Okay.  But during this time that you

5    were a relief crew leader, what I understood you to

6    tell me is from that period of time until the time you

7    left, that you only operated the forklift two or three

8    times?

9              A    For another crew other than, you know,

10   the crew that I was with.

11             Q    Right, for another crew, okay.  When

12   you were a crew leader, how many people were on your

13   crew?

14             A    There was seven catchers.

15             Q    Okay, did you ever carry eight?

16             A    Occasionally, like if an extra man went

17   along or something like that.  But you only worked

18   seven catchers at a time.

19             Q    Okay.  And were you responsible for

20   making sure they did what they were supposed to do?

21             A    We had to -- we had duties that we had

22   to, you know, perform.

23             Q    Okay.

24             A    You know, to get the job done.

25             Q    Okay.  Let me show you this document,

A-0232