Davis - Brewer

1    this is an Exhibit 2 to Mr. Garrison's deposition.

2    What I'd like you to do, sir, is just -- we'll go off

3    the record -- have you take a few moments to take a

4    look at this.  Do you see on the first page there's a

5    Roman Numeral II, it says Crew Leaders General Duties?

6            A    Yes, sir.

7            Q    And it goes on?  What I'd like you to

8    do is just take a quick look at this -- well, take as

9    much time as you want, it doesn't have to be a quick

10   look, and tell me basically are these the

11   responsibilities that you had as not only a crew

12   leader, but also a relief crew leader, okay?  Would

13   you do that for me?

14           A    Yes, sir.

15           Q    Thank you.

16               (Whereupon, there was a discussion held

17   off the record.)

18   BY MR. BREWER:

19           Q    Are you finished, sir?

20           A    Yes.

21           Q    Mr. Davis, you indicated to me that you

22   had an opportunity now to review Garrison Exhibit

23   Number 2?

24           A    Yes.

25           Q    The Crew Leader General Duties that you

A-0233

1    looked at, were those the general duties that you had

2    when you were a crew leader?

3              A    Yes.

4              Q    And a part-time leader?

5              A    Yes.

6              Q    And, I'm sorry, and a relief crew

7    leader?

8              A    Yes.

9              Q    Thanks.  Let's move along here.  I'm

10   going to also show you, sir, Exhibit Number 1 to

11   Mr. Garrison's situation; I'd ask you to do the same

12   thing, take a quick look at this and, when you finish,

13   let me know, please.

14             A    Yes, sir.

15             Q    When you were both a crew leader and a

16   relief crew leader, was it your responsibility to fill

17   out this form?

18             A    Yes, sir.

19             Q    Okay.  And to make whatever notations

20   were appropriate on it?

21             A    Yes, sir.

22             Q    Okay, thank you.  I'm going to again,

23   maybe to expedite things since I made a commitment to

24   your counsel that we'd try to be done within a certain

25   period of time, these are time off requests, this

A-0234

| 1 | would be Exhibit 1 to your deposition. |
|---|---|
| 2 | And, again, what I'd ask you to do, |
| 3 | sir, if you don't mind, what I'd like you to do is |
| 4 | this:  Look at the name of the employee, what they're |
| 5 | requesting, and tell me if that is your signature |
| 6 | approving the request for either vacation or for time |
| 7 | off. |
| 8 | A    Yes, sir. |
| 9 | Q    Would you mind taking a look off the |
| 10 | record?  We can go through each one individual; which |
| 11 | would you prefer me to do? |
| 12 | A    It doesn't matter to me. |
| 13 | Q    We'll take a few seconds, go off the |
| 14 | record, and take a look at these. |
| 15 | (Whereupon, there was a discussion held |
| 16 | off the record.) |
| 17 | THE WITNESS:  All of these are not my |
| 18 | handwritten signature. |
| 19 | BY MR. BREWER: |
| 20 | Q    Okay, maybe what we can do is can you |
| 21 | tell me which ones are not?  I'll tell you what, the |
| 22 | first one I have is Mr. Fosque. |
| 23 | A    That's mine. |
| 24 | Q    That's your signature? |
| 25 | A    Yes.                          A-0235 |

Davis - Brewer

1         Q     Okay.  The next one is again

2    Mr. Fosque.

3         A     That's mine.

4         Q     The next one is again Mr. Fosque.

5         A     That's mine.

6         Q     The next one is Mr. Fosque again.

7         A     That's mine.

8         Q     The next one is Mr. Tucker.

9         A     That's not mine.

10        Q     That is not your's?

11        A     I didn't -- no, I don't sign like that.

12        Q     Okay.  The next one is Mr. West,

13   Russell West.

14        A     I'm looking at it now.  I don't know, I

15   don't sign my name like that.  Not the d-a, I don't

16   think.

17        Q     Okay.  But on the first page,

18   Mr. Fosque, that is your's?

19        A     Yes.

20        Q     Okay.  Next one, Mr. West again.

21        A     It's possible it could be mine.

22        Q     Okay.  Mr. Antonio Walters?

23        A     That's not my signature.

24        Q     Mr. Foreman?

25        A     That's not mine.              **A-0236**

Davis - Brewer

| 1 | Q | That's not your's? |
| 2 | A | No, sir. |
| 3 | Q | Okay. Mr. Foreman again? |
| 4 | A | Could be mine, I don't know. |
| 5 | Q | Okay. A third time Mr. Foreman? |
| 6 | A | No, sir. |
| 7 | Q | That's not your's? |
| 8 | A | No. |
| 9 | Q | Mr. Major? |
| 10 | A | No. |

11        Q      Do you know Mr. Major?  It looks like
12    it's Thomas Major.

13        A      Yeah, I know him, yes.

14        Q      Was he on your crew?

15        A      He was on Roy Walter's crew.

16        Q      He was on Roy Walter's crew, okay.

17        A      But that's not my signature.

18        Q      Okay.  Let me just go back two to
19    Mr. Foreman, was he on your crew or whose crew was he
20    on?

21        A      Who?

22        Q      Mr. Wardell Foreman.

23        A      He was with -- yes, he was at one time
24    on one of the -- yes, my crew, yes.

25        Q      He was on your crew?                    **A-0237**

Davis - Brewer

```
1              A    Yes.

2              Q    Okay.  Then let's move along.  I have a

3   Richard Parker, is that your signature there?

4              A    Yes, that's mine.

5              Q    And Mr. Parker, was he on your crew?

6              A    Yes, sir.

7              Q    I have Mr. Parker again, is that your

8   signature?

9              A    It's possible, it's something similar

10  to mine.

11             Q    Okay.  And Mr. Parker a third time, is

12  that your signature there?

13             A    I don't think so.

14             Q    And the last one, Mr. Parker for a last

15  time?

16             A    That looks like my signature.

17             Q    Mr. Parker, I don't know if I asked

18  you, was he on your crew or someone else's crew?

19             A    He was on my crew.

20             Q    Okay, good, thanks.

21                  (Davis Exhibit 1, marked for

22  identification.)

23  BY MR. BREWER:

24             Q    Sir, let me show you Exhibit Number 8

25  to Mr. Garrison's deposition; have you ever seen that
```

A-0238

1   check.  And I had informed her that I should have, you

2   know, a pretty good check, and then she informed me

3   that it was no different, that's when I began to

4   notice it.

5             Q    That's when you went to Mr. Nuse?

6             A    I went to Dave Nuse and informed him

7   about it, and that's when he advised me that I don't

8   get paid for catching at all.

9             Q    Okay.  And from that time that he

10  informed you that you were not going to be getting

11  paid for catching or for operating the forklift while

12  you were a crew leader or a relief crew leader, did

13  you catch any more after that?

14            A    Yes, I did.

15            Q    You did?

16            A    Yes.

17            Q    Okay.  How long have you had your heart

18  condition, sir?

19            A    Since early childhood, I think.

20            Q    Okay.  Do you remember a man by the

21  name of Clarence Heath?

22            A    Yes, sir, I do.

23            Q    Do you remember testifying at an

24  arbitration proceeding when he was terminated?

25            A    Yes.                              **A-0239**

```
 1          Q    Okay.  Do you remember telling me that
 2   you were unable to catch because of your heart
 3   condition?
 4          A    I said I'm unable to catch night after
 5   night, which I would tell anybody, you know.  But to
 6   get in there and catch some chickens, I had to do
 7   something to get the job done.  But I mean I'll tell
 8   anybody, and even at my age, I cannot catch chickens,
 9   you know, like a young --
10          Q    Well, forgetting the age, I mean it's
11   your physical condition, your heart condition that
12   stops you from catching?
13          A    Yes.
14          Q    Okay.  All right, let's move along.
15   Let me show you this exhibit, Mr. Davis, this is
16   Number 15 to Mr. Garrison's deposition, this is an
17   invitation to the supervisory Christmas party.  If you
18   look under Mr. Lynch, do you see your name there in
19   2003?  Its the last name there.
20          A    Oh, yes.  Yes.
21          Q    Did you receive an invitation to the
22   supervisory Christmas party?
23          A    I received an invitation to a Christmas
24   party to Ocean City.
25          Q    Did you go?                    A-0240
```

1         A    One of them, I went; the rest of them,

2    I didn't go.

3         Q    Okay.  The ones that you went to, did

4    you see any people there who were not supervisory

5    people?

6         A    Yes, I did.

7         Q    Who did you see that wasn't a

8    supervisor?

9         A    The switch board operator, and some

10   more but right offhand I can't recall their names.

11        Q    Okay.  Well, there are three

12   invitations here, one is for 2002, one is for 2003,

13   and one is for 2001; you went to one of them?

14        A    It was one of them that I went to.  I

15   know the last one or two or something like that, I did

16   not go.

17        Q    Okay, do you remember being invited to

18   all three?

19        A    I do remember being invited to the

20   first one, yes.

21        Q    The first one, that would be in `01?

22        A    I guess it must have been `01, yes.

23        Q    Okay.  But you don't remember being

24   invited to the second or the third?

25        A    I didn't -- if I was, you know, I

A-0241

1   didn't pay any attention.

2          Q    Okay.  So you might have been, but you

3   just don't remember?

4          A    No.

5          Q    Okay.

6          A    I wasn't interested in it.

7          Q    Okay, that's fine.  What I'm going to

8   ask you to do, sir, is look at the complaint in this

9   case.  Let's see, what time is it?  I'm almost

10  finished, so why don't we do this:  This is the

11  complaint that was filed in this case, sir, that's

12  Number 16 for Mr. Garrison's deposition.

13          I'd ask you to go to page 3, number 23,

14  and that says that the defendant, being Mountaire,

15  followed and continues to follow a corporate policy

16  and/or practice that requires/required plaintiffs to

17  submit a daily time sheet broken down for each day of

18  the week, okay?  Was the time sheet that's being

19  referred to here, if you know, the time sheet that you

20  kept for the catchers?

21          A    It was kept for the time that we would

22  start catching on the farm until the time that we

23  finished catching.

24          Q    Okay, and that was for the catchers'

25  time?  You were maintaining the time that the catchers

A-0242

```
 1    worked?

 2              A    Pretty much so, yes.

 3              Q    You weren't maintaining time that you

 4    worked?

 5              A    No.

 6              Q    Okay.  Go to the next page, please, and

 7    look at paragraph 26.  I'll let you take a minute and

 8    read that.  Just let me know when you have had a

 9    chance to read it.

10              A    Yes.

11              Q    Okay.  Did you ever take a half a day

12    or something less than a full day off from work from

13    the time you first became employed until the time you

14    quit?

15              A    From the time that I was employed to

16    the time I quit?

17              Q    Yes.

18              A    I was -- I had to go to the hospital

19    and I spent -- I was out of work there for about

20    pretty close to two weeks.

21              Q    Okay, that's a full day; did you ever

22    take any half days off?

23              A    No, no, no, sir.

24              Q    Okay, thank you.  Can you take a look

25    at the next page?  I'm sorry, the page after that.
```

A-0243

Davis - Brewer

1   When, by the way, did you quit working for Mountaire?

2   Do you remember when you quit?

3           A    Say that again.

4           Q    Do you remember when you quit for

5   Mountaire?  I'm sorry I meant to speak up.

6           A    It was the latter part of 2003.

7           Q    All right.  So does December of 2003

8   sound right?

9           A    Right around that, yes.

10          Q    Okay.

11          A    It was a little before Christmas -- no,

12  it was right at Christmastime.

13          Q    Right at Christmas?

14          A    Yes.

15          Q    Okay, so 12-25, approx, `03.  This

16  paragraph talks about when the company, the defendant,

17  learned of the plaintiffs', one of which would be you,

18  intention to seek counsel, that we retaliated against

19  plaintiffs by threatening them with termination of

20  their employment if they continued.

21               MR. MARTIN:  Excuse me, could you --

22               THE WITNESS:  I was not there.

23               MR. MARTIN:  Could you mention that

24  paragraph, I may have missed the number?

25               MR. BREWER:  Sure, paragraph 34.

A-0244

Davis - Brewer

1           Q      Okay.  Who was driving the car?

2           A      I could not -- well, I couldn't -- I'm

3    not going to sit here and say I know who was driving

4    the car.  I know it was Mountaire's car.

5           Q      How did you know that?

6           A      Because I know, I knew Mountaire's

7    cars.

8           Q      How do you know Mountaire's cars?

9           A      Because of their shape, the type of

10   vehicle they are.

11          Q      What type are they?

12          A      The Ford Crowns.

13          Q      Crown Victoria's?

14          A      Yeah.  And myself and Roy Walters, and

15   I don't recall whether it was Mr. Martin or Anthony

16   and one more of the crew leaders was standing in the

17   yard when I pointed it out.

18          Q      Mountaire isn't the only company that

19   has Crown Victoria's, are they?

20          A      I didn't say, but I'm just saying I

21   know Mountaire's car.  I knew that was Mountaire's

22   car, I know that.

23          Q      How did you know it?

24          A      Because I know it was Mountaire's car.

25   In other words, I know Mountaire's car when I see it.

A-0245

Davis - Brewer

| | |
|---|---|
| 1 | Q    I understand that; how do you know it, |
| 2 | is there -- |
| 3 | A    Because of antennas that was on it and |
| 4 | the way it, you know -- and it looked like I |
| 5 | recognized -- I knew it was not Mr. Edward Brown.  It |
| 6 | appeared to be Mr. Phil Owens, you know, that's who it |
| 7 | appeared to be. |
| 8 | Q    Okay.  Now, Mr. Phil Owen does not have |
| 9 | a company car, do you know that? |
| 10 | A    Well, that's -- that's Mountaire's car; |
| 11 | I said it appeared to be, I didn't say it was him. |
| 12 | But I know it was one of Mountaire's personnel driving |
| 13 | the car. |
| 14 | Q    You have been down on the shore and |
| 15 | working the poultry industry for a lot of years, |
| 16 | haven't you? |
| 17 | A    About 38, 39 years, something like |
| 18 | that. |
| 19 | Q    Do you know the kind of car that people |
| 20 | from Allen Food drive? |
| 21 | A    I never done any dealings with Allen |
| 22 | Foods, I never weighed any chickens for Allen Foods, |
| 23 | never caught their chickens. |
| 24 | Q    I'm not suggesting you did.  I'm just |
| 25 | suggesting people with Allen Foods drive Crown |

A-0246

Page 1

[ 1]                 IN THE UNITED STATES DISTRICT COURT
                  IN AND FOR THE DISTRICT OF DELAWARE
[ 2]

[ 3]  WILLIE DAVIS, JR.,                )
      NATHANIEL BRIDDELL,               )
[ 4]  GEORGE W. FEDDIMAN,               )
      JOSEPH GARRISON,                  )
[ 5]  LARRY E. GIBBS,                   )
      ROY H. WALTERS,                   )
[ 6]  ALL SIMILARLY-SITUATED CURRENT    )
      AND FORMER EMPLOYEES OF           )
[ 7]  MOUNTAIRE FARMS, INC.,            )
      MOUNTAIRE FARMS OF DELMARVA,      )
[ 8]  INC., and MOUNTAIRE FARMS OF      )
      DELAWARE, INC.,                   )
[ 9]                 Plaintiffs,        )
                -vs-                    )  C.A. No. 04-0414
[10]                                    )
[11]  MOUNTAIRE FARMS, INC.,            )
      MOUNTAIRE FARMS OF                )
[12]  DELMARVA, INC., and               )
      MOUNTAIRE FARMS OF DELAWARE,      )
[13]  INC., all Delaware corporations)  )
                 Defendants.            )
[14]         Deposition of WILLIAM DOUGLAS LYNCH, taken
      before Pamela C. Washington, Registered Professional
[15]  Reporter and Notary Public, at the law offices of
      Young, Conaway, Stargatt & Taylor, 110 West Pine
[16]  Street, Georgetown, Delaware, on March 15, 2005,
      beginning at 11:30 a.m.       - - - - - - -
[17]

[18]  APPEARANCES:

[19]      On behalf of the Plaintiffs:
              Margolis Edelstein
[20]          BY:  JEFFREY K. MARTIN, ESQ.
              and  KERI WILLIAMS, ESQ.
[21]          1509 Gilpin Avenue
              Wilmington, Delaware 19806
[22]
          On behalf of the Defendant:
[23]          Shawe & Rosenthal
              BY:  ARTHUR M. BREWER, ESQ.
[24]          and  LAURA PIERSON SCHEINBERG, ESQ.
              20 South Charles Street
[25]          Baltimore, Maryland  21201

Page 2

                                    I-N-D-E-X

[ 2]  Witness:
             WILLIAM DOUGLAS LYNCH
[ 3]      Examination by Mr. Martin ............   3
          Examination by Mr. Brewer ..........  111
[ 4]

[ 5]

[ 6]

[ 7]

[ 8]

[ 9]  CERTIFICATE OF COURT REPORTER ................  117
[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 3

[ 1]  WHEREUPON:

[ 2]         WILLIAM DOUGLAS LYNCH,

[ 3]  having first been duly sworn by the court reporter,

[ 4]  thereupon testified upon his oath as follows:

[ 5]  BY MR. MARTIN:

[ 6]      Q    Please state your full name for the

[ 7]  record.

[ 8]      A    William Douglas Lynch.

[ 9]      Q    And what is your date of birth?

[10]      A    3-12-54.

[11]      Q    Happy birthday to you.

[12]      A    Saturday.

[13]         (Whereupon, there was a discussion held

[14]  off the record.)

[15]  BY MR. MARTIN:

[16]      Q    Now, Mr. Lynch, has your deposition

[17]  been taken before this date?

[18]      A    No.

[19]      Q    So this is the first time you have had

[20]  this process?

[21]      A    Yes.

[22]      Q    Okay.  You are, however, a veteran of

[23]  at least six depositions, are you not?

[24]      A    Yes.

[25]      Q    In fact, is it true that you have sat

Page 4

[ 1]  through the entire depositions of all six plaintiffs

[ 2]  in this matter?

[ 3]      A    Yes, I have.

[ 4]      Q    And also, for the record, we started

[ 5]  with six and we're down to five.

[ 6]      A    Yes.

[ 7]         MR. MARTIN:  Off the record.

[ 8]         (Whereupon, there was a discussion held

[ 9]  off the record.)

[10]  BY MR. MARTIN:

[11]      Q    Mr. Lynch, as you know, I'm going to be

[12]  asking you questions.  My intent will be to ask you

[13]  one question at a time; sometimes I may ask a couple

[14]  without trying to, and I'm sure your counsel will help

[15]  remind me if I'm doing that.  It's not my intent to

[16]  ask any trick questions.

[17]         Certainly if you do not understand my

[18]  question, please let me know and I'll be happy to

[19]  restate the question as best I can.  And if you need a

[20]  break, please feel free to say so.

[21]         We're starting at about 11:30 and it's

[22]  my assumption that we're going to probably stop the

[23]  deposition in approximately 45 minutes for a lunch

[24]  break.  If, however, you need time before that, please

[25]  say the word and I'll be happy to oblige, okay?

Page 45

[ 1] for the performance of their work as crew leaders,

[ 2] okay?

[ 3]      A    Yes.

[ 4]      Q    You're aware that each crew leader has

[ 5] usually a van for that purpose --

[ 6]      A    Yes.

[ 7]      Q    -- correct?  And do you know how long

[ 8] that has been the policy of Mountaire?

[ 9]      A    Ever since I have been there, over 17

[10] years.

[11]      Q    If a crew leader is not working for a

[12] week, let's assume for example that the crew leader is

[13] taking vacation --

[14]      A    Okay.

[15]      Q    -- what happens to that van?

[16]      A    Generally, they leave the van there;

[17] the individual that's taking his place uses his van.

[18]      Q    Is that company policy?

[19]      A    No, sir.

[20]      Q    It's not company policy?

[21]      A    No, sir.  It's voluntary.

[22]      Q    As I understand it, this van belongs to

[23] the crew leader and the crew leader could take that

[24] van on vacation?

[25]      A    That's correct.

Page 46

[ 1]      Q    And do you know whether that's ever

[ 2] happened?

[ 3]      A    Not that I recall.

[ 4]      Q    So I think I understand your answer,

[ 5] and please tell me if I am wrong, it's your

[ 6] understanding that when crew leaders do leave, they

[ 7] allow their vans to be used by the crew leaders who

[ 8] may be substituting for them?

[ 9]      A    Yes.

[10]      Q    But there's no policy to that effect?

[11]      A    No.

[12]      Q    Nothing that requires the crew leaders

[13] to leave their vans?

[14]      A    No.

[15]      Q    What was your understanding, if any, as

[16] to how the crew leaders were paid up until June or

[17] July of 2002?

[18]      A    They were paid on a piece rate, per

[19] thousand rate.

[20]      Q    And had they been paid on this piece

[21] rate per thousand from the time you started as the

[22] live haul manager?

[23]      A    Yes.

[24]      Q    What is your understanding, if any, as

[25] to the reason why that changed in June or July of

Page 47

[ 1] 2002?

[ 2]      A    I wasn't given a reason.

[ 3]      Q    So you were not part of the decision

[ 4] process in terms of changing that?

[ 5]      A    No, sir.

[ 6]      Q    Do you know who in the company made

[ 7] those decisions?

[ 8]      A    Probably at that time it was Mr. John

[ 9] Wise.

[10]      Q    And what was his position?

[11]      A    He was the acting director of

[12] processing operations.

[13]      Q    Why do you believe that Mr. Wise may

[14] have been involved in this decision?

[15]      A    I'm not sure, but he came from North

[16] Carolina, he was filling in after Mike Sebach left, I

[17] talked about Mike Sebach earlier.  When Mike Sebach

[18] left, Mr. Wise filled in, he was the acting processing

[19] operations manager in North Carolina, came to

[20] Selbyville.

[21]      And I can't verify this but I heard

[22] rumors that there was a DOL audit, Department of Labor

[23] audit, in North Carolina and it was a suggestion from

[24] the DOL that crew leaders should be exempt employees,

[25] and I assumed that he brought that with him.

Page 48

[ 1]      Q    All right.  Was it your understanding

[ 2] that up until that time of the change-over that the

[ 3] crew leaders were non-exempt employees?

[ 4]      A    I'm not sure how they were classified;

[ 5] they were supervising.

[ 6]      Q    All right, let's talk about the duties

[ 7] of the crew leaders.  And let me try to understand if

[ 8] the duties and job responsibilities have changed any

[ 9] from the time before they were called exempt in June

[10] or July of 2002 and current?

[11]      A    Job duties, have they changed?

[12]      Q    Yes.

[13]      A    No.

[14]      Q    You joined the company in 1988 as live

[15] haul manager, is that correct?

[16]      A    Yes.

[17]      Q    Have there been any significant changes

[18] in the job duties and responsibilities in the crew

[19] leaders between 1988 and 2002?

[20]      A    No.

[21]      Q    Now, you mentioned a moment ago, I

[22] think you said words to the effect that they

[23] supervise --

[24]      A    That's what I consider them.

[25]      Q    -- is that correct?

Page 49

[1]  A  Yes.

[2]  Q  And what do you mean by that?

[3]  A  Manage the crew, supervise the crew on

[4] the farm, make sure the job's getting done properly,

[5] efficiently.

[6]  Q  All right, well, let's talk about some

[7] of the details that I'm sure you're familiar with

[8] after having sat through six depositions of the

[9] plaintiffs.  Do the crew leaders have the ability to

[10] hire their crew?

[11]  A  Yes.

[12]  Q  All right.  And how is it that they can

[13] hire the crew?

[14]  A  They do the recruiting, they bring

[15] the -- they recruit catchers, they send them in to go

[16] through the hiring process.

[17]  Q  Is there some type of a policy or

[18] procedure with regard to the recruiting of catchers?

[19]  A  Just it's part of their job

[20] description.

[21]  Q  It's part of their job description?

[22]  A  Yes; recruit, maintain a catching crew.

[23] To me, that's their primary responsibility.

[24]  Q  Is what?

[25]  A  To maintain the catching crew, maintain

Page 50

[1] and organize the catching crew, the group of people,

[2] catchers.

[3]  Q  And so that means to you that if they

[4] lost one or two, that the crew leaders are responsible

[5] for hiring replacements?

[6]  A  Yes.

[7]  Q  And what is the process by which the

[8] crew leader can hire somebody for his crew?

[9]  A  Like I said, he recruits the catcher,

[10] in other words, either from talking to another crew

[11] leader or talking to another crew leader from another

[12] company, another catcher gets a suggestion from

[13] another -- you know, someone's looking for a job, he

[14] recruits those people.  And then he sends them in to

[15] the processing plant to go through the hiring process,

[16] which is generally drug testing, TB testing, medical

[17] questionnaire.

[18]  Q  Just so that I'm clear on this, let's

[19] say a crew leader like Roy Walters, for example, just

[20] to give a real live example of a crew leader, was

[21] going to lose a catcher; it's your testimony that it

[22] would be Roy's responsibilities to find a replacement?

[23]  A  Yes.

[24]  Q  Okay.  Now, you have a human resources

[25] group within the plant, do you not?

Page 51

[1]  A  Yes, we do.

[2]  Q  In fact, Mr. Owen, your colleague right

[3] there, is in charge of that, correct?

[4]  A  Yes.

[5]  Q  Is it your testimony that Mr. Owen or

[6] the company through Mr. Owen or somebody else does not

[7] actually go out and advertise for catchers?

[8]  A  They do not.

[9]  Q  They do not?  Other than through the

[10] crew leader, are there any other sources for

[11] recruiting a catcher?

[12]  A  Not that I'm aware of.  We have just

[13] never needed the human resources department to do

[14] that.  Like I say, the crew leaders, they know all the

[15] crew leaders from our company, they know all the crew

[16] leaders from other companies, and its just always

[17] been -- it's a verbal thing, communication, and they

[18] have always been successful in recruiting someone; we

[19] have not needed HR.

[20]  Q  Okay.  But other than HR --

[21]  A  Yes.

[22]  Q  -- do I understand correctly that you

[23] don't have any sources for referral of these

[24] prospective catchers other than through the crew

[25] leaders themselves?

Page 52

[1]  A  That's all I'm aware of.

[2]  Q  Any idea today, as you're sitting here,

[3] how many catchers you have under your control?  And I

[4] realize that's not directly, but down through the

[5] hierarchy, how many catchers are there currently?

[6]  A  There's probably about 56 catchers.

[7]  Q  Okay.  What kind of turn-over did you

[8] have on catchers last year, if you can give us an

[9] approximation?

[10]  A  I don't know.  Very minimal.

[11]  Q  Minimal?

[12]  A  I'd say pretty minimal, yes.

[13]  Q  Less than five?

[14]  A  That would be a guess.

[15]  Q  All right, well, I'd like you to

[16] approximate as best you can, if you know.

[17]  A  I'd say five to ten.

[18]  Q  Okay.  Now, to what extent, if any, are

[19] you personally involved in the selection of new

[20] catchers?

[21]  A  I'm not.

[22]  Q  How about Dave Nuse?

[23]  A  He's not.

[24]  Q  Who is involved in the selection

[25] process?

A-0249

Page 53

[ 1]      A    The crew leader.

[ 2]      Q    All right.  You have testified that the

[ 3] crew leader has the responsibilities of going and

[ 4] recruiting a new or prospective person, correct?

[ 5]      A    Yes.

[ 6]      Q    And then I think I understood your

[ 7] testimony that person is referred in to the plant or

[ 8] the facility?

[ 9]      A    Yes.

[10]      Q    And then there is a process of drug

[11] testing?

[12]      A    Yes.

[13]      Q    What other type of screening methods

[14] are there?

[15]      A    TB, TB testing, drug testing, and I

[16] think there's a pretty extensive medical questionnaire

[17] they have to fill out and answer questions.  Besides

[18] that, unless you're an immigrant, then there's just

[19] the I-9 testing or the green cards or whatever.

[20]      Q    All right, what do you mean by I-9

[21] testing?

[22]      A    Green cards; identification.  Valid

[23] identification to be in the country.

[24]      Q    Producing the I-9?

[25]      A    Yes.

Page 54

[ 1]      Q    Okay.  Now, who is it in the plant that

[ 2] coordinates the testing that you have just described,

[ 3] the medical testing, the TB testing, the drug testing?

[ 4]      A    The medical facility.

[ 5]      Q    Okay.  Let's assume that this person

[ 6] passed each of those the forms of screening.

[ 7]      A    Yes.

[ 8]      Q    What happens to the person at that

[ 9] point?

[10]      A    They generally get hired.

[11]      Q    All right, and who makes that hiring

[12] decision?

[13]      A    It happens in HR, I guess.

[14]      Q    I'm sorry?

[15]      A    HR.

[16]      Q    HR?

[17]      A    Human resources.

[18]      Q    Okay.  Is the crew leader involved in

[19] that?

[20]      A    Well, he made the job offer, the job

[21] bid.  That's just to the extent that he is, you know,

[22] he's telling the medical facility and HR that he's

[23] making a job offer to this employee and, providing

[24] they pass all the testing, he wants them to be hired.

[25]      Q    And the job offer, so in other words,

Page 55

[ 1] if the person was successful in the screenings that

[ 2] you have indicated, that person would automatically

[ 3] have the position?

[ 4]      A    Yes.

[ 5]      Q    All right.  Well, I don't understand

[ 6] then the role of human resources.

[ 7]      A    Well, I say Mr. Owens doesn't usually

[ 8] get involved.  What happens is those guys go to

[ 9] medical, and they start with the medical

[10] questionnaire, and then they do the TB testing, they

[11] do the drug screen.  The employee's required to return

[12] back in two days to read the TB test to see if it's

[13] positive or negative.

[14]           If everything's okay in that point,

[15] they're sent over to another desk, so to speak, which

[16] is the human resources people, and they continue the

[17] process of hiring, like making an ID, getting them

[18] what they call signed up, signing up for their tax

[19] withholdings, signing up for their union, if they are

[20] in fact a union employee or going to be a union

[21] employee.  That's the process.  Once they got their

[22] ID, they're pretty much an employee and they start to

[23] work.

[24]      Q    You have heard the testimony from

[25] perhaps four to six of the plaintiffs who testified

Page 56

[ 1] that, upon questions from Mr. Brewer, they made

[ 2] recommendations for hiring but then in no case were

[ 3] all of their recommendations accepted; do you disagree

[ 4] with that testimony?

[ 5]      A    I don't recall any not -- any

[ 6] recommendations not being honored, not by me or by

[ 7] Mr. Nuse.  I mean the only thing that would allow them

[ 8] not to be honored would be the failure of the drug

[ 9] test or the failure of the TB test, I'm talking about

[10] providing the crew leader wants this employee.

[11]      Q    But now you have just said something a

[12] little bit different, if I may, Mr. Lynch.

[13]      A    Okay.

[14]      Q    Now you're telling me that you don't

[15] recall any of the recommendations not being honored by

[16] you or Mr. Nuse; now, I'm trying to understand your

[17] testimony based upon your earlier testimony that you

[18] had no involvement in the hiring process.

[19]      A    No.

[20]      Q    I mean you have no involvement in the

[21] process?

[22]      A    Not typically, no.

[23]      Q    Okay.  Let's take an atypical time, you

[24] said not typically; so when is it that you get

[25] involved in the hiring of a catcher?

A-0250

Page 57

[ 1]     A     The only time I have any involvement
[ 2] with a catcher being hired is if in fact a catcher
[ 3] called me directly, which happens occasionally.  In
[ 4] other words, a human resource person may have a
[ 5] catcher call in that's looking for a job, they may
[ 6] refer that call to me.
[ 7]     Q     Okay.  How often does that happen?
[ 8]     A     Not very often; once, twice a year,
[ 9] perhaps.
[10]     Q     All right.  And then what's your
[11] involvement at that point?
[12]     A     I'll talk to that individual on the
[13] telephone, and he will ask me if we need any catchers.
[14] And I'll say, "I'm not sure if we do or not, I'll talk
[15] with my crew leaders and see if anyone needs any help.
[16] if in fact they do, I'll have one of those guys call
[17] you."
[18]     Q     Okay.  So you have no knowledge or
[19] recollection of any times when a crew leader may have
[20] recommended someone to be hired and they were not
[21] hired if they passed their tests, is that correct?
[22]     A     There may have been an incident where a
[23] crew leader corresponded with me, talked to me about
[24] an individual that they wanted to hire that had worked
[25] with the company before, and actually had been

Page 58

[ 1] terminated from the company.
[ 2]     Q     And are you recalling a specific
[ 3] instance when you are testifying?
[ 4]     A     A specific individual.
[ 5]     Q     You are?
[ 6]     A     Yes.
[ 7]     Q     And who was that individual?
[ 8]     A     Name is Wardell Foreman.
[ 9]     Q     Okay, and he was on Mr. Walters' crew?
[10]     A     He may have been, I'm not sure what
[11] crew.
[12]     Q     And what is it that you recall about
[13] his --
[14]     A     He called me and said he -- you know,
[15] Wardell had called him and wanted to come to work for
[16] us as a catcher.
[17]     Q     And who was this that called you?
[18]     A     I'm thinking it -- I'm thinking it was
[19] Roy, Roy Walters.
[20]     Q     Okay.
[21]     A     And I just suggested to him that, you
[22] know, "this individual has worked here before and, you
[23] know, we had a lot of problems with absenteeism of
[24] this individual.  And, you know, I'm suggesting to you
[25] that it's probably not in the best interest of the

Page 59

[ 1] company to have him working here, but you make the
[ 2] decision."
[ 3]     Q     So was Mr. Foreman hired or not?
[ 4]     A     No.
[ 5]     Q     But you left it to Mr. Walters to make
[ 6] that ultimate decision?
[ 7]     A     Yes.
[ 8]     Q     Now, do the crew leaders have any
[ 9] authority to terminate any of their catchers?
[10]     A     Yes.
[11]     Q     And what authority do they have?
[12]     A     They can terminate an individual.
[13]     Q     Okay.  Do you recall any instances in
[14] the last three or four years where a crew leader has
[15] terminated a catcher?
[16]     A     Yes.
[17]     Q     Okay, how many circumstances do you
[18] recall?
[19]     A     Two.
[20]     Q     And who are the crew leaders?
[21]     A     Joe Garrison.
[22]     Q     And who was the catcher?
[23]     A     Clarence Heath.
[24]     Q     And was that Joe's decision to
[25] terminate Mr. Heath?

Page 60

[ 1]     A     Yes.
[ 2]     Q     Did he have to clear that with anyone
[ 3] else?
[ 4]     A     He went through human resources.
[ 5]     Q     Who is it that issued the termination
[ 6] of Mr. Heath?
[ 7]     A     Joe went to human resources and said
[ 8] that he wanted to terminate Clarence Heath; he
[ 9] discussed it with Al Z; I'm assuming that Joe made the
[10] decision.
[11]     Q     All right, you're assuming, but you
[12] don't know for sure?
[13]     A     I don't know for sure.
[14]     Q     All right.  What was the other instance
[15] of termination by a crew leader that you recall?
[16]     A     It's probably been more than three
[17] years ago.
[18]     Q     Who was that?
[19]     A     Nathaniel Briddell was the crew leader.
[20]     Q     And who was the catcher?
[21]     A     Charles Hitchens.
[22]     Q     Can you give us some idea as to how
[23] many years ago it was?  You think it was more than
[24] three?
[25]     A     I think it was more than three.

A-0251

Page 1

[ 1]          IN THE UNITED STATES DISTRICT COURT
                IN AND FOR DISTRICT OF DELAWARE
[ 2]

[ 3]  WILLIE DAVIS, JR.,              )
      NATHANIEL BRIDDELL,             )
[ 4]  GEORGE W. FEDDIMAN,             )
      JOSEPH GARRISON,                )
[ 5]  LARRY E. GIBBS,                 )
      ROY H. WALTERS,                 )
[ 6]                                  )
      ALL SIMILARLY SITUATED CURRENT )
[ 7]  AND FORMER EMPLOYEES OF         )
      MOUNTAIRE FARMS, INC.,          )
[ 8]  MOUNTAIRE FARMS OF DELMARVA,    )
      INC., and MOUNTAIRE FARMS OF    )
[ 9]  DELAWARE, INC.,                 )
                     Plaintiffs,      )
[10]        -vs-                      )  C.A. No. 04-0414
                                      )
[11]  MOUNTAIRE FARMS, INC.,          )
      MOUNTAIRE FARMS OF              )
[12]  DELMARVA, INC., and             )
      MOUNTAIRE FARMS OF              )
[13]  DELAWARE, INC., all Delaware    )
      corporations,                   )
[14]                 Defendants.      )
[15]                      Deposition of PHILLIP OWEN, taken before
      Pamela C. Washington, Registered Professional Reporter
[16]  and Notary Public, at the law offices of Young,
      Conaway, Stargatt & Taylor, 110 West Pine Street,
[17]  Georgetown, DE, on February 1, 2005, beginning at 1:00
      p.m.
[18]
      APPEARANCES:
[19]        On behalf of the Plaintiffs:
                Margolis Edelstein
[20]            BY:  JEFFREY K. MARTIN, ESQ.
                and  KERI L. WILLIAMS, ESQ.
[21]            1509 Gilpin Avenue
                Wilmington, Delaware 19806
[22]
            On behalf of the Defendants:
[23]            Shawe & Rosenthal
                BY:  ARTHUR M. BREWER, ESQ.
[24]            20 South Charles Street
                Baltimore, Maryland  21201
[25]

Page 2

[ 1]                      I-N-D-E-X

[ 2]  Witness:
         PHILLIP OWEN
[ 3]      Examination by Mr. Martin ..........    3
          Examination by Mr. Brewer ..........  113
[ 4]

[ 5]

[ 6]

[ 7]      CERTIFICATE OF COURT REPORTER ..............  115

[ 8]

[ 9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 43

[1]       A    I don't -- there wasn't a specific
[2]   location.  Probably -- I don't recall a specific
[3]   location where we were, other than in the plant.
[4]       Q    Okay.  I want to come back to this in
[5]   some detail in a little bit, but I'm still trying to
[6]   understand the process that you went through before
[7]   contacting Mr. Brewer sometime in mid to late February
[8]   of 2004.  I'm going back to the question about the two
[9]   categories under the executive exemption that you
[10]  looked at when you analyzed that.
[11]      A    Uh-huh.
[12]      Q    And I understand that you and Mr. Brown
[13]  and Mr. Al Z. all came to the same conclusion, that
[14]  these were exempt employees, correct?
[15]      A    Yes.
[16]      Q    Did you look, for example, at the
[17]  hiring and firing criteria for exemption?
[18]      A    Yes, we did.
[19]      Q    And what was your conclusion?
[20]      A    That they are in fact managerial
[21]  employees and not nonexempt -- not exempt -- they
[22]  were managers, executives.
[23]      Q    Why?
[24]      A    They have the -- one of their
[25]  responsibilities is to recruit and staff their crews.

Page 44

[1]   When the crew leaders make a recommendation to hire,
[2]   the catchers come to human resources where their
[3]   identification is checked, you know, they fill out an
[4]   application, they go through a medical process; there
[5]   is no interview as such.
[6]            So we take the recommendation of the
[7]   crew leader, and as long as they pass their
[8]   identification and the medical criteria, they become
[9]   catchers.  And to me, that's a pretty strong ability
[10]  to hire.
[11]      Q    Doug Lynch or Dave Nuse do not have any
[12]  say in this?
[13]      A    They probably at some point do, but
[14]  it's my sense that Dave and Doug rarely would say --
[15]  rarely if ever would say no to a recommendation from a
[16]  crew leader.
[17]      Q    Now, sir, you have been present for the
[18]  three depositions of crew leaders, and have you heard
[19]  the questions with regard to the recommendations for
[20]  catchers?
[21]      A    Yes.
[22]      Q    How is it that you would explain that
[23]  many of the recommendations were not accepted by
[24]  Mountaire?
[25]            MR. BREWER:  I'm going to object to

Page 45

[1]   that characterization.
[2]            THE WITNESS:  Would you repeat the
[3]   question?  I'll do my best to answer it.
[4]            MR. MARTIN:  All right, let me ask Pam
[5]   to read it back again, please.
[6]            (Whereupon, the last question of the
[7]   record was read.)
[8]            THE WITNESS:  I don't know that I would
[9]   explain it, because I don't believe there were many
[10]  recommendations that weren't accepted on hiring.
[11]  BY MR. MARTIN:
[12]      Q    It's true, isn't it, that any member of
[13]  the crew can make a recommendation for hire?
[14]      A    Any member of the crew?
[15]      Q    Yes, sir.
[16]      A    I wouldn't -- I wouldn't say that.
[17]      Q    You disagree with that?
[18]      A    Yes.
[19]      Q    You disagree that a catcher can
[20]  recommend another catcher for hiring?
[21]      A    I think that informally, they can make
[22]  the recommendation to the crew leader, and then it's
[23]  the crew leader's responsibilities to recommend for
[24]  hire a catcher.
[25]      Q    Other than the recommendations that you

Page 46

[1]   have testified to, do you believe that the crew
[2]   leaders have any part in disciplining their employees?
[3]       A    Absolutely, yes.
[4]       Q    And how is that?
[5]       A    Could be that one of their catchers is
[6]   not coming to work, they're not getting the job done,
[7]   they have the right and ability to assess corrective
[8]   action where they deem necessary.
[9]       Q    And who actually does the discipline?
[10]      A    The crew leaders have the
[11]  responsibility, and I would hope that much of the time
[12]  there's a consultation with their supervisor, David
[13]  Nuse, before they take action.  But they can do that
[14]  on their own, if they like.
[15]      Q    Mr. Owen, I'd like to distinguish
[16]  between doing a write-up and actually disciplining --
[17]      A    Yes, sir.
[18]      Q    -- okay?  Who does the write-up?
[19]      A    The write-up would be done probably by
[20]  the crew leader.
[21]      Q    Who does the actual disciplining?
[22]      A    I would say the crew leader.
[23]      Q    In what sense?
[24]      A    It's the same as with the hiring:  They
[25]  make the recommendation, it's discussed, maybe there's

A-0253

Page 47

[ 1]    some coaching or guidance that occurs, but it's the
[ 2]    crew leader's responsibility to maintain discipline
[ 3]    and order in the work group.
[ 4]        Q    Can a crew leader discipline a catcher
[ 5]    without any intervention from either Doug Lynch or
[ 6]    Dave Nuse?
[ 7]        A    Yes.
[ 8]        Q    In what sense?
[ 9]        A    If they want to issue a -- if they want
[10]    to have an informal discussion about work performance,
[11]    they can do that.  If they want to issue a verbal
[12]    warning, they can do that.  If they want to issue a
[13]    formal warning, they can do that.  And hopefully with
[14]    a suspension, there is discussion with their boss or
[15]    with human resources before there's time off the job
[16]    for corrective action, but they can do that.
[17]        Q    They can do that unilaterally without
[18]    the intervention of Dave Nuse or Doug Lynch?
[19]        A    They can.
[20]        Q    In other words, before some type of
[21]    corrective action is taken, Dave Nuse or Doug Lynch
[22]    does not have to sign off on it?
[23]        A    No.
[24]        Q    They do not?
[25]        A    I wouldn't expect them to, either.

Page 48

[ 1]        Q    Before being suspended, for example,
[ 2]    Dave or Doug would not have to sign off on that?
[ 3]        A    Not in my opinion.  And let me give you
[ 4]    an example why that would be so, especially if it's an
[ 5]    off-shift kind of occurrence or incident that might
[ 6]    happen, I would expect the crew leader to take the
[ 7]    initiative to send the employee home if it was
[ 8]    something, you know, egregious.
[ 9]            For instance, getting in a fight with
[10]    another employee, the crew leader might say, "I want
[11]    you to go home and then we'll come back tomorrow and
[12]    talk about it."  And that would be certainly something
[13]    I'd expect the crew leader to do without talking with
[14]    Dave or Doug.  Or in the case that they couldn't get
[15]    ahold of Dave or Doug, I would expect them to take
[16]    that step.
[17]        Q    Can a forklift operator or a truck
[18]    driver recommend hiring another employee?
[19]        A    Absolutely, he would say to the crew
[20]    leader.
[21]        Q    So it's your understanding that that
[22]    all has to go through the crew leader?
[23]        A    Yes.
[24]        Q    How about the grievance process, what
[25]    is your understanding, if any, as to the role of the

Page 49

[ 1]    crew leader in the grievance process?
[ 2]        A    Well, the crew leader is the management
[ 3]    representative to address informal or formal
[ 4]    grievances.  They would be presented with grievances,
[ 5]    they would investigate grievances, and they would
[ 6]    provide answers to grievances at the first step.
[ 7]        Q    When the grievance is filed, does it go
[ 8]    through the crew leader?
[ 9]        A    Yes.
[10]        Q    How so?
[11]        A    If the Union representative is unable
[12]    to work out the problem informally, he can formally
[13]    write up a grievance and present it to the crew
[14]    leader.
[15]            And it becomes the crew leader's
[16]    responsibilities to sign and accept and, you know,
[17]    process the homework behind the grievance, to write it
[18]    up, where did the problem come from, and insure that
[19]    Dave and/or Doug and possibly Al Z. or myself know
[20]    where this -- we don't get very many grievances, first
[21]    of all.  But they do go through the crew leader when
[22]    that occurs.
[23]        Q    You said Union representative, are you
[24]    talking about shop steward?
[25]        A    Yes.

Page 50

[ 1]        Q    So when let's say a catcher files a
[ 2]    grievance, to whom does he give that grievance?
[ 3]        A    Well, it would go to the crew leader.
[ 4]        Q    Are you sure?
[ 5]        A    The catcher works with the shop steward
[ 6]    to write up the grievance, the grievance is presented
[ 7]    to the crew leader.
[ 8]        Q    Are you sure it's the shop leader --
[ 9]    not the shop leader --
[10]        A    Shop steward.
[11]        Q    -- the shop steward does not get the
[12]    grievance?
[13]        A    The shop steward is the one that
[14]    initiates the formal grievance.  Informally, he
[15]    receives the grievance, but the formal construction of
[16]    the grievance is done by the shop steward and
[17]    presented to the crew leader.
[18]        Q    How often are grievances filed, to the
[19]    best of your knowledge?
[20]        A    We might get two or three a year; it's
[21]    a rare occurrence because problems are handled
[22]    internally informally.
[23]        Q    Okay.  What is your understanding, if
[24]    any, as to why Mountaire converted the crew leaders to
[25]    salary in June or July of 2002?

A-0254

Page 51

[1]   A   I'm going to have to say I don't have a
[2]   thorough understanding of the reasoning.  If there was
[3]   an initiating event, it occurred before my time, and I
[4]   don't have a clear understanding of the initiating
[5]   mechanism.
[6]        Q   What is the company's position, if you
[7]   know, as to the status of the crew leaders before they
[8]   became salaried?
[9]        A   Could you repeat the question so I
[10]  can --
[11]       Q   Sure.
[12]          MR. MARTIN:  Pam, please read it back.
[13]          (Whereupon, the last question of the
[14]  record was read.)
[15]          THE WITNESS:  The status of the crew
[16]  leaders with respect to exempt or nonexempt?
[17]  BY MR. MARTIN:
[18]       Q   Yes.
[19]       A   That they were nonexempt prior to
[20]  becoming salaried, made exempt.
[21]       Q   They were nonexempt?
[22]       A   They were nonexempt prior to June of
[23]  '03, I believe it was -- '02, I'm sorry.
[24]       Q   Who was your predecessor, if you know?
[25]       A   His name is Dave Tanner.

Page 52

[1]   Q   And he was the HR director?
[2]   A   Correct.
[3]   Q   Is he still with the company?
[4]   A   He's no longer with the company.
[5]   Q   And do you know when he was HR
[6]   director?
[7]   A   I can't be certain.  I know
[8]   approximately when he transitioned out of the
[9]   position.
[10]       Q   When was that?
[11]       A   I would say in December of -- or
[12]  November of '03.  And I heard that he was with the
[13]  company about five years prior to that time; could
[14]  have been longer, I'm not sure.
[15]       Q   Did you have the advantage of looking
[16]  at some of his notes with regard to some of the issues
[17]  that had occurred?
[18]       A   Yes.
[19]       Q   Were you aware of any issues before
[20]  February of 2004 as to the crew leader's request for
[21]  overtime?
[22]       A   No, I was not.
[23]       Q   Given what you just told me, that the
[24]  company believes that the crew leaders were nonexempt
[25]  before June of 2002 or whenever they became salaried,

Page 53

[1]   why is it that they were not paid overtime?
[2]        A   I don't know that I'm -- let me hear
[3]   your question again, could you please repeat the
[4]   question?  I'm not certain I have understood the
[5]   question.
[6]        Q   I understand the company's position is
[7]   that before the crew leaders became salaried in or
[8]   around June of 2002, they were nonexempt.
[9]        A   Correct.
[10]       Q   Why is it that they were not eligible
[11]  for and paid overtime before that time?
[12]       A   Prior to June of '02?
[13]       Q   Yes.
[14]       A   I don't know that -- I don't know the
[15]  answer.  I don't know the answer.
[16]       Q   Does that concern you at all?
[17]       A   Not particularly.  I guess I have spent
[18]  most of my time looking at the issue of overtime with
[19]  respect to being exempt; I have not looked at the
[20]  issue of -- and I -- of nonpayment of overtime in a
[21]  nonexempt status.
[22]       Q   All right.  I understand the company's
[23]  position through your testimony, but let me try to
[24]  understand.  Please explain to me how it is that they
[25]  can become exempt just by virtue of being salaried.

Page 54

[1]   A   I don't know that I have a really good
[2]   answer for you, because everything did occur prior to
[3]   my getting here.  But I guess I could say that, you
[4]   know, a position can be reclassified in looking at the
[5]   responsibilities, and positions do change and
[6]   responsibilities over time.
[7]        Q   All right.
[8]        A   And that may well have been the
[9]   mechanism; I don't know that to be true.
[10]       Q   Do you have any understanding at all as
[11]  to how their job responsibilities may have changed
[12]  from the nonexempt days to the exempt days?
[13]       A   Well, this is probably more
[14]  philosophical than anything but, you know, once upon a
[15]  time, they were independent contractors, and I don't
[16]  know how much that played into the evolution, they
[17]  became company employees, and I haven't tracked that.
[18]  But, you know, there's an evolution of sorts.
[19]       Q   Do you believe they should still be
[20]  independent contractors?
[21]          MR. BREWER:  I'm going to object.
[22]          THE WITNESS:  I would say no.  I think
[23]  it's the best of all worlds if they're company
[24]  employees.
[25]

A-0255

Page 55

[ 1]    BY MR. MARTIN:

[ 2]        Q    Best of all worlds for whom?

[ 3]        A    I think for the employee and for the

[ 4]    company.

[ 5]        Q    Why for the employee?

[ 6]        A    It comes down to a lot of opinions, I

[ 7]    think, on that. But I sincerely believe that there's

[ 8]    a -- I think people are better off as an employee than

[ 9]    as an independent contractor; I think there's more of

[10]    a commitment from the company to the employee and

[11]    from -- and vice versa. I think it's a better loyalty

[12]    kind of situation.

[13]        Q    You have been present at the three

[14]    depositions that have occurred thus far in this case,

[15]    and you have heard testimony about the number of hours

[16]    that each of the employees has worked. First of all,

[17]    do you dispute any of the testimony you heard as to

[18]    the number of hours they have worked?

[19]        A    I don't know that I have a specific

[20]    number in mind on the hours that they have worked. So

[21]    if you have something specific, I could address that.

[22]        Q    That's fair, and perhaps that wasn't a

[23]    fair question; I certainly didn't mean it to be that

[24]    way. Were you aware in early to mid February, 2004,

[25]    that these crew leaders worked an average of five or

Page 56

[ 1]    six hours in addition to the eight hours a day of the

[ 2]    farm time?

[ 3]        A    I don't -- I haven't heard that number

[ 4]    of five or six hours a day.

[ 5]        Q    Did you do any investigation?

[ 6]        A    I did some investigation and, in our

[ 7]    investigation, it appeared to be around an hour of

[ 8]    travel time. And there were variations.

[ 9]        Q    All right, one hour total per day?

[10]        A    Each way.

[11]        Q    So we're talking about two extra hours

[12]    a day?

[13]        A    And that's not including stops to the

[14]    convenience store or those kind of things.

[15]        Q    And how did you do this investigation?

[16]        A    This was at the direction of Mr.

[17]    Brewer. I don't know how much I should talk about

[18]    that or not.

[19]        Q    Well, I don't want to hear what he has

[20]    advised you, but I think I have a right to ask if you

[21]    have done an investigation.

[22]        A    We have.

[23]        Q    And I'd like to know how that

[24]    investigation was conducted and what the results were.

[25]        A    We had -- I asked Al Z. to get with

Page 57

[ 1]    Dave Nuse and route -- can I wait until the siren is

[ 2]    over with?

[ 3]        Q    Sure.

[ 4]            (Whereupon, there was a discussion held

[ 5]    off the record.)

[ 6]    BY MR. MARTIN:

[ 7]        Q    All right, the siren has stopped, the

[ 8]    window is open, the heat is down. Let's see, we were

[ 9]    talking about the investigation.

[10]        A    Yes, okay. The investigation, I asked

[11]    Al Z. to get together with David Nuse and look at each

[12]    one of the crew leaders' crews and try and come up

[13]    with a good estimate of the route and the drive time,

[14]    which they did.

[15]        Q    Excuse me for a second. When you say

[16]    each one, you're talking each of the plaintiffs in

[17]    this matter?

[18]        A    Each crew leader.

[19]        Q    Okay.

[20]        A    Including the plaintiffs and aside from

[21]    the plaintiffs.

[22]        Q    Okay. And do you have some type of

[23]    written analysis someplace?

[24]        A    There was one that was performed.

[25]        Q    Okay, and when was it performed?

Page 58

[ 1]        A    Probably about -- I don't remember

[ 2]    exact time, but time frame February, March.

[ 3]        Q    Of '04?

[ 4]        A    Yes.

[ 5]        Q    I guess.

[ 6]        A    Yes, February, March, '04.

[ 7]        Q    Okay. And do you have that available,

[ 8]    we can request that?

[ 9]        A    I would say that it can be requested.

[10]        Q    Okay.

[11]            MR. BREWER:  Whether it's privileged or

[12]    not will be something else.

[13]            MR. MARTIN:  All right.

[14]    BY MR. MARTIN:

[15]        Q    And how is it that you actually did

[16]    this analysis?

[17]        A    We had all the crew leaders with their

[18]    crew members at the time and their addresses, and

[19]    locating the crew leader's home, looked for the best

[20]    route to pick up the catchers, and that time and

[21]    distance was collected.

[22]        Q    I take it that that was done all on

[23]    paper, so to speak, without actually going and doing

[24]    that?

[25]        A    No, that was done actually doing it,

A-0256

Page 59

[ 1]     driving to each site, each catcher's home.

[ 2]         Q    And what type of allowance did you make

[ 3]    for the catcher coming out late?

[ 4]         A    I do not recall if that was entered

[ 5]    into the analysis. It's like I'm not sure if there

[ 6]    was an allowance made for stops along the way.

[ 7]         Q    Have you heard testimony from the

[ 8]    witnesses about the crew members being late?

[ 9]         A    I have heard that.

[10]         Q    Do you have any reason to dispute that?

[11]         A    I do not.

[12]         Q    What is the current auto allowance for

[13]    the crew leaders?

[14]         A    It's $250 per week.

[15]         Q    And what is the understanding with the

[16]    crew leaders if they are going to be out a week, let's

[17]    say on vacation, do they just leave their van or truck

[18]    at home?

[19]         A    I don't have a clear consistent answer

[20]    for you; it could be in some cases. It could be -- I

[21]    think there's some variables involved, and I'm

[22]    probably not the best person to answer that question.

[23]         Q    Have you had an opportunity to review

[24]    the payroll records of the crew leaders to determine

[25]    how this auto allowance is given?

Page 60

[ 1]         A    To review the payroll records? I have

[ 2]    reviewed some of the payroll records.

[ 3]         Q    All right, well, let me be a little

[ 4]    more specific. The crew leaders are now on salary,

[ 5]    correct?

[ 6]         A    Yes.

[ 7]         Q    Do you know whether the $250 a week

[ 8]    comes off the top of that salary?

[ 9]         A    It is treated as a -- it's separate and

[10]    apart from normal income; a 1099 is issued at the end

[11]    of the year.

[12]         Q    All right, I understand that, but I'm

[13]    not sure that responds to my question.

[14]         A    Does it come off the top? It's -- go

[15]    ahead.

[16]         Q    Yeah, let's say for example a crew

[17]    leader earns $45,000 a year.

[18]         A    Uh-huh.

[19]         Q    That crew leader gets a $250 a week

[20]    auto allowance, correct?

[21]         A    Yes.

[22]         Q    Does that $250 a week come from the

[23]    $45,000?

[24]         A    No, it's separate.

[25]         Q    That's separate and apart?

Page 61

[ 1]         A    Yes, sir.

[ 2]         Q    And that's subject to a 1099 at the end

[ 3]    of the year?

[ 4]         A    Yes. That's my understanding.

[ 5]         Q    Do you know whether that's always been

[ 6]    the case?

[ 7]         A    I can't say for sure what has always

[ 8]    been the case. I have been there about a year, so ...

[ 9]         Q    All right.

[10]         A    I'm not sure.

[11]         Q    Do you understand that there are

[12]    different salary levels for the crew leaders?

[13]         A    Different salary -- well, there's --

[14]    yeah, crew leaders earn different amounts of salary,

[15]    yes.

[16]         Q    And how is it that that's established?

[17]         A    A lot of it has to do with the time in

[18]    the job, I'd say.

[19]         Q    Well, is that a guess on your part?

[20]         A    There's no magic -- I don't have a --

[21]    yes, there is differences in salary, but I'm trying to

[22]    think about where the differences came from and most

[23]    of the time it's time in job; that's probably the

[24]    major factor. There could be some difference that

[25]    comes in with performance evaluations.

Page 62

[ 1]         Q    All right. Do you know what the range

[ 2]    in salaries would be currently among the crew leaders?

[ 3]         A    I don't know it exactly; I could get

[ 4]    that information.

[ 5]         Q    Can you give me an approximation?

[ 6]         A    I have a general. I would say it's

[ 7]    generally upper 30s to upper 40s, maybe higher than

[ 8]    that.

[ 9]         Q    And who is it that does the performance

[10]    evaluations on the crew leaders?

[11]         A    That would be Dave Nuse, in combination

[12]    with Doug Lynch.

[13]         Q    Do you know whether there are any

[14]    performance evaluations done on the catchers?

[15]         A    I don't believe that there are.

[16]    They're unionized, and there's not really any reason

[17]    to do that other than feedback. So there's none done

[18]    for the catchers.

[19]         Q    All right, I guess I'm missing

[20]    something. You said there's no reason to do the

[21]    evaluations because they're unionized?

[22]         A    Well, because they wouldn't get them a

[23]    higher, you know, range in salary; everybody makes the

[24]    same rate. So there's typically a performance

[25]    evaluation not only gives feedback but might be cause

A-0257