Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

```
0001
 1                  UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF DELAWARE
 3
 4      WILLIE DAVIS JR., et al.,)
                                 ) No. 04-CV-414
 5              Plaintiffs,      )
                                 )
 6        -vs-                   )
                                 )
 7      MOUNTAIRE FARMS, INC.,   )
        et al.,                  )
 8                               )
                Defendants.      )
 9
10
                   Videotaped deposition of DOUGLAS LYNCH
11      taken pursuant to notice at the Holiday Inn
        Express, 210 N. Dual Highway, Route 13, Seaford,
12      Delaware, beginning at 10:20 a.m. on July 23,
        2008, before Julianne LaBadia, Registered
13      Diplomate Reporter and Notary Public.
14      APPEARANCES:
15          JEFFREY K. MARTIN, ESQ.
            MARTIN & WILSON, P.A.
16           1508 Pennsylvania Ave.
             Wilmington, Delaware  19806
17           For the Plaintiffs
18          ERIC HEMMENDINGER, ESQ.
            SHAWE & ROSENTHAL, LLP
19           20 S. Charles Street - 11th Floor
             Baltimore, Maryland  21201
20           For the Defendants
21      ALSO PRESENT: Roy Walters
                       Nathaniel Briddell
22                     Cher Vink
23                  WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
24                  (302) 655-0477
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0002
1                    VIDEOGRAPHER:  This is the
2       videotaped deposition of Douglas Lynch, taken by
3       the defendant in the matter of Davis, et al.,
4       versus Mountaire Farms, Incorporated, civil
5       action number 04-414, held at the Holiday Inn,
6       210 Dual Highway, Route 13, Seaford, Delaware, on
7       July 23, 2008, at approximately 10:20 a.m.
8                    The court reporter is Juli LaBadia,
9       from the firm of Wilcox & Fetzer.  My name is
10      Randy Draper, a video specialist from Discovery
11      Video Services, Incorporated, in association with
12      Wilcox & Fetzer.
13                   Counsel will now introduce
14      themselves, and the reporter will swear in the
15      witness.
16                   MR. MARTIN:  Good morning, my name
17      is Jeff Martin, and I represent the plaintiffs in
18      this matter, Willie Davis, Jr., Nathaniel
19      Briddell, Joseph Garrison, Larry E. Gibbs and Roy
20      H. Walers.
21                   MR. HEMMENDINGER:  My name is Eric
22      Hemmendinger, and I represent the defendant
23      Mountaire Farms.
24                   DOUGLAS LYNCH

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0003
```
 1                  The deponent herein, having first been
 2                  duly sworn on oath, was examined and
 3                  testified as follows:
 4                       DIRECT EXAMINATION
 5       BY MR. HEMMENDINGER:
 6            Q.   Could you state your full name for the
 7       record, please.
 8            A.   William Douglas Lynch.
 9            Q.   And where are you employed?
10            A.   Mountaire Farms of Delmarva.
11            Q.   And where is that located?
12            A.   Selbyville, Delaware.
13            Q.   What is your job title?
14            A.   I'm the live hauling manager.
15            Q.   How long have you held that position?
16            A.   20 years.
17            Q.   When were you hired?
18            A.   June, 1988.
19            Q.   Could you give us a brief description of
20       your job duties.
21            A.   Yes.  I'm the manager of the live hauling
22       department, and basically, just manage the
23       department.  Everything it entails.
24            Q.   What is the function of the live haul
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0004
1        department?
2             A.  Basically what we do is we deliver all of
3        the live product to the processing plant for
4        processing, seven crews.
5             Q.  By live product, do you mean chickens?
6             A.  Yes.  Chickens.
7             Q.  And where do you get the chickens from?
8             A.  At the farms.  We have about 300 contract
9        farms that we go to.
10            Q.  And what is the job classification of the
11       employees who go to the farms and collect the
12       chickens?
13            A.  Crews, crew leaders.  Crew leader that has
14       seven, a seven-crew member.  Seven-member crew.
15            Q.  Are they sometimes called chicken
16       catchers?
17            A.  Chicken catchers.
18            Q.  And the supervisors of the chicken
19       catchers are known as what?
20            A.  Crew leaders.
21            Q.  Are you familiar with Joe Garrison?
22            A.  Yes.
23            Q.  What is his job title?
24            A.  Well, he was a crew leader.  He is no

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

```
0005
 1      longer employed.
 2          Q.  And Roy Walters?
 3          A.  Crew leader.
 4          Q.  Larry Gibbs?
 5          A.  Crew leader.
 6          Q.  Nathaniel Briddell?
 7          A.  Crew leader.
 8          Q.  Is he still a crew leader?
 9          A.  No.
10          Q.  And Willie Davis.
11          A.  Past crew leader.
12          Q.  To whom do the crew leaders report
13      directly?
14          A.  Report directly to the assistant live haul
15      manager, which is David Nuse.
16          Q.  And to whom does Mr. Nuse report?
17          A.  To me.
18          Q.  Is there any other employee in the live
19      haul office?
20          A.  Yes.
21          Q.  Who is that?
22          A.  We have an administrative assistant.
23          Q.  And who is the current administrative
24      assistant?
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

```
0006
  1          A.   Megan Bunting.
  2          Q.   How long has she been there?
  3          A.   Two weeks.
  4          Q.   And who was the prior administrative
  5     assistant?
  6          A.   Susie McCauley.
  7          Q.   How long was she there?
  8          A.   13 years.
  9          Q.   Could you give us a brief overview of the
 10     job responsibilities of the crew leaders.
 11          A.   Yeah.  Basically, the crew leader, he has
 12     a seven and crew member -- member crew, and he's
 13     responsible for maintaining that crew.  And he
 14     takes the crew to the farm, and they actually go
 15     to -- in the chicken house and gather the
 16     chickens and deliver the product to the
 17     processing plant.
 18          Q.   How much turnover is there on the chicken
 19     catcher crews?
 20          A.   There's about 30, 30 members per year.
 21          Q.   When there is a vacancy in a chicken
 22     catcher crew, what is the process that the crew
 23     leader goes through to fill that vacancy?
 24          A.   Well, he's -- he recruits a new member
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0007
```
 1        from many different sources.  Actually, sometimes
 2        comes from -- one of his crew members may have a
 3        friend or a relative that's looking for a job, or
 4        another crew leader from another company.
 5        Somewhere, he recruits another person, and sends
 6        those people in for processing.
 7             Q.  And can you describe what that -- what you
 8        mean by that?
 9             A.  As far as what?  The processing?
10             Q.  Yes.
11             A.  Well, again, he inter -- recruits the
12        person.  Does some interview.  Then he sends that
13        person in to the office, to the administrative
14        assistant typically.  And there's a form that we
15        have to fill out to send to human resources,
16        basically telling human resources that we've made
17        a job offer.  And we want to further process this
18        potential employee.
19             Q.  I'd like you to look at what's in front of
20        you as Lynch Exhibit 1.
21                  MR. MARTIN:  Objection.
22             A.  I don't see Exhibit 1.  6?
23             Q.  I'm sorry.  My mistake.  It's Exhibit 6.
24             A.  Okay.
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0008
```
1          Q.  Is there a standard, is there a standard
2     form which is used to -- by the live haul office
3     to refer an applicant to the personnel -- to the
4     HR department?
5          A.  Yes.
6          Q.  And who --
7          A.  That's this form.
8          Q.  Is that Exhibit 6?
9          A.  That's Exhibit 6.
10         Q.  And I'd like you to look at Exhibit 7.
11         A.  Okay.
12         Q.  Is that an -- what is that?
13         A.  That's the same form.  It's actually
14    titled live haul authorization form.  Which
15    again, is a form that goes to human resources
16    that says that the crew leader has made a job
17    offer to this potential employee, and that we
18    would like to continue the hiring process.
19         Q.  Now, who is authorized to sign off on the
20    live haul catcher authorization form?
21         A.  Typically, it's -- it would be myself,
22    David Nuse, Susie McCauley, the administrative
23    assistant, any one of those people.
24         Q.  And to sign off, before one of those
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0009
1          persons sign off on that form, do they interview
2          the applicant?
3               A.   No.
4               Q.   Do they make any decision concerning the
5          applicant?
6               A.   No.
7               Q.   Who makes the decision as to whether or
8          not the applicant should be sent to the HR
9          department for further processing?
10              A.   Crew leader.
11              Q.   After the live haul catcher authorization
12         form is signed, what happens to the applicant
13         for -- for employment?
14              A.   Well, he's sent to human resources with
15         his application.  And they'll -- they'll continue
16         the process of hiring, which is typically
17         checking IDs, make sure the person is who he says
18         he is.  There's also a TB testing, pre-employment
19         drug testing.
20              Q.   Does the HR department interview the
21         applicant?
22              A.   No.
23              Q.   Do they make any selection decision
24         concerning the applicant, other than the

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0010
1        screening that you mentioned?
2            A.  No.
3            Q.  If the applicant passes all the -- the
4        medical tests, the drug tests and the TB test,
5        what happens next?
6            A.  Well, he would be -- he would be hired.
7            Q.  Does it ever come -- happen that the live
8        haul department gets a walk-in applicant?
9        Somebody who's not been sent in by a crew leader?
10           A.  Yes.
11           Q.  What happens when that occurs?
12           A.  Well, if an individual comes in or is
13       referred into our office, the first question I'll
14       ask the -- the individual is, did one of our crew
15       leaders send you?  Have you had contact with one
16       of our crew leaders?  And if, in fact, they say
17       yes, then I'll contact the crew leader to verify
18       that they have talked with this individual and
19       they have sent this individual in for processing.
20           Q.  And if they say no?
21           A.  If they say no, then I'll tell them that,
22       you know, I'm not aware of any positions that we
23       have available.  That I'll talk with our crew
24       leaders.  If we do, in fact, have a position

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0011
```
 1        available, then I'll have one of those people
 2        contact you, the potential employee.
 3            Q.  Has it ever come about that the company
 4        has hired a -- a complete crew in one fell swoop?
 5            A.  Yes.
 6            Q.  And in the last -- since 2000, how many
 7        times has that occurred, to your knowledge?
 8            A.  Probably four times.
 9            Q.  And what would be the reason for hiring a
10        crew in a package?
11            A.  Well, the existing crew leader has, you
12        know, has terminated his employment, for whatever
13        reason, retirement, or some other reason.  And
14        that's just the process.  When we hire a crew, I
15        hire the crew leader, and the crew leader is
16        responsible for bringing the crew.
17            Q.  Do you, when you hire a crew leader, do
18        you interview the crew members?
19            A.  No.
20            Q.  Now, let's say that you've got in this
21        crew and it's working on a farm.  If there's some
22        problem with an employee's performance that
23        requires disciplinary action, how does that work?
24            A.  That's under -- that's under the crew
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0012
```
 1      leader, again.  He has -- he takes care of
 2      discipline problems with his crew.
 3           Q.  And what -- what kind of disciplinary
 4      actions can he take?
 5           A.  Well, he can give oral warnings, written
 6      warnings, all the way up to termination.  There's
 7      a procedure.
 8           Q.  What is that procedure?
 9           A.  Well, that procedure is progressive
10      discipline.  Oral warnings, a couple of written
11      warnings, final warning, and it can, like I say,
12      lead to termination.
13           Q.  Does a crew leader have to obtain any
14      approval from any higher-up in order to impose
15      any of those forms of disciplinary action?
16           A.  He doesn't have to.
17           Q.  Are there any promotions that are
18      available to members of a kitchen -- chicken
19      catcher crew?
20           A.  Yes.
21           Q.  What promotion would that be?
22           A.  Well, typically, it would be -- a catcher
23      would be promoted to a forklift driver.  We would
24      consider that a promotion.  It's more money.
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0013
```
 1        It's -- a little better job.
 2        Q.  When that, when there's a vacancy in a
 3   forklift driver position, who selects the
 4   employee to be promoted?
 5        A.  It's usually the crew leader.  There's
 6   usually some cross-training done prior to that.
 7        Q.  And who selects the employee for the
 8   cross-training?
 9        A.  It would be the crew leader.
10        Q.  Does it ever happen that crew members,
11   chicken catchers, are transferred from one crew
12   to another?
13        A.  Yes.
14        Q.  And when that occurs, who is involved in
15   making that decision?
16        A.  It would mostly be the crew leaders
17   themselves.  They would talk between theirselves,
18   and trade -- trade back and forth, if needed.
19        Q.  I'd like you to look at what's been
20   previously marked as Lynch Exhibit 10.
21        A.  Okay.
22        Q.  And is that a two-page document?
23        A.  Yes, it is.
24        Q.  And can you tell me what the first page
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0014
1        is.
2            A.   Exhibit 10, the first page is -- it's a
3        copy of Roy Walters' time sheet, dated December
4        30th, 2000.
5            Q.   And what is the second sheet?
6            A.   That would be Roy's time -- Roy Walters'
7        time sheet, dated June 7th, 2008.
8            Q.   Now, and does this list the number -- the
9        names of the chicken catchers that were in his
10       crew on those dates?
11           A.   Do they match?
12           Q.   No.  Does it list them?
13           A.   Yes, it does list them, yes.
14           Q.   So, I'd like you to look at the 2000 list.
15           A.   Okay.
16           Q.   And go down the names of the employees.
17           A.   Uh-huh.
18           Q.   And the first name I see is Walter Brown.
19           A.   Yes.
20           Q.   Where -- what is the current status of
21       Mr. Brown?
22           A.   Walter Brown is still a forklift driver.
23       Not with Roy's crew.  Actually he works with
24       Larry Gibbs' crew currently.

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

```
0015
  1              Q.   And the next name is Norman Manuel.
  2         What's his status?
  3              A.   No longer employed.
  4              Q.   Charles McCray is the next name.
  5              A.   No longer employed.
  6              Q.   Russell McCray?
  7              A.   No longer employed.
  8              Q.   Sylvester Mitchell?
  9              A.   No longer employed.  Retired.
 10              Q.   Russell West.
 11              A.   Russell is still employed with Roy's crew.
 12              Q.   Calvin Drummond.
 13              A.   No longer employed.
 14              Q.   Steven Abney.
 15              A.   No longer employed.
 16              Q.   Calvin Walker.
 17              A.   Calvin Walker is currently employed with
 18         Larry Gibbs' crew.
 19              Q.   Thomas Major.
 20              A.   No longer employed.
 21              Q.   And William Young.
 22              A.   No longer employed.
 23              Q.   Now, in each case where somebody is no
 24         longer employed, would that have resulted in a
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

```
0016
 1         vacancy that Roy would have to fill?
 2             A.  Yes.
 3             Q.  So, if you look at the next page of this
 4         exhibit, which is for the -- it's a time sheet
 5         for 2008 --
 6             A.  Yes.
 7             Q.  -- how many of the people on the 2008 list
 8         were on the 2000 list?
 9             A.  Russell West -- just Russell West.
10             Q.  And who selected all the others?
11             A.  That would have been the crew leader.
12         Roy.  At some point in time.
13             Q.  Now, I'd like you to look at Exhibit 11,
14         please.
15             A.  Yes.  I have it.
16             Q.  And what is the first page of this?
17             A.  The first page is a weekly time sheet of
18         Larry Gibbs, dated December 30th, 2000.
19             Q.  And what is the second page of this?
20             A.  The second sheet is a weekly time sheet
21         for Larry Gibbs dated June 7th, '08.
22             Q.  Now, if you go to the first page, I want
23         to do the same thing we did before.
24             A.  Okay.
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

```
0017
  1             Q.  The first name is Leonard Ayers.  What's
  2        his current status?
  3             A.  Still employed with Larry's crew.
  4             Q.  Danny Daniels.
  5             A.  No longer employed.
  6             Q.  Donald Gibbs.
  7             A.  Still employed by Larry's crew.
  8             Q.  James Gibbs.
  9             A.  Still employed.
 10             Q.  Herman Jernigan.
 11             A.  Still employed.
 12             Q.  Brantley Lewis.
 13             A.  No longer employed.
 14             Q.  Do you know why he was no longer employed?
 15             A.  Yes.  He was terminated.
 16             Q.  Ron Tingle.
 17             A.  Ron Tingle's still -- still employed with
 18        Larry -- with Roy's crew, actually, I believe.
 19        Yes.  With Roy's crew.
 20             Q.  If you look back at Exhibit 10, Roy's
 21        crew, we can see Mr. Tingle on that, correct?
 22             A.  Yes.
 23             Q.  Patrick Brannon -- Bratton.
 24             A.  No longer employed.  He was also
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0018
1        terminated.
2            Q.  Eugene Beaty?
3            A.  No longer employed.
4            Q.  Jose Turlington.
5            A.  No longer employed.
6            Q.  And Joe Morris.
7            A.  He's still employed.  Actually, he's a
8        truck driver.
9            Q.  Okay.  Was -- do you know why Turlington
10       was terminated?
11           A.  No.  I'm not sure.
12           Q.  Okay.  Do you know why Bratton was
13       terminated?
14           A.  Yes.
15           Q.  Why was he terminated?
16           A.  Violation of company policy.
17           Q.  What was he doing?
18           A.  Fighting.
19           Q.  And who was he fighting with?
20           A.  Brantley Lewis.
21           Q.  And what happened to Mr. Lewis?
22           A.  He was also termed.
23           Q.  So, if you look to the second page of
24       Exhibit 11, how many of these people were

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0019
1         selected by Larry Gibbs since 2000?
2             A.   Since 2000?
3             Q.   Since the first piece of paper.
4             A.   Yes.  It looks like four or five.
5             Q.   Well, let's go through it.  Do it by name.
6             A.   Okay.  Leonard Ayers was -- that's -- he
7      was with him in 2000.  Donald Gibbs has been with
8      Larry for some time.  James Gibbs is -- was
9      there.  Herman Jernigan has been with the crew.
10     Arthur Belfield would be a new addition since
11     2000.  Valentino Nocks would also be a new
12     addition to the crew.
13            Q.   Right.
14            A.   James Drummond is a new addition to the
15     crew.  And Calvin Walker is a new addition.
16            Q.   What about Walt Brown at the top?
17            A.   Walt Brown also is a new addition to the
18     crew, that's a forklift driver.
19            Q.   And did you mention Peter Major?
20            A.   And Pete Major.
21            Q.   Right in the middle.
22            A.   Yes.
23            Q.   Is he a new addition?
24            A.   To that crew, yes.

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0020
```
 1            Q.  Now, of the -- the plaintiffs in this
 2       case, were any -- were any of them crews that
 3       were hired as a complete crew?  You know, all at
 4       one time?
 5            A.  Yes.
 6            Q.  Who was that?
 7            A.  Larry Gibbs.
 8            Q.  And do you know when that was?
 9            A.  Not exactly.  I don't know the date.  More
10       than ten years ago.
11            Q.  I want to show you one other exhibit.  If
12       you look at what's been numbered as Number 29.
13            A.  Okay.
14            Q.  Do you recognize this document?
15            A.  Yes.
16            Q.  What is this document?
17            A.  It's a crew leader job analysis.  It's an
18       analysis of a crew leader's responsibilities.
19            Q.  And did you play a part in preparing this
20       document?
21            A.  Yes.
22            Q.  And is it an accurate list of what the --
23       well, I don't want to put words in your mouth.
24       What is it?
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0021

1          A.  It's as complete accurate list as we could
2     come up with, of the jobs that crew -- crew
3     leaders perform.
4                    MR. HEMMENDINGER:  Can we go off the
5     record for a second?
6                    VIDEOGRAPHER:  Going off the record
7     at approximately 10:44 a.m.
8                         (Brief discussion off the record)
9                         (Following off the video record):
10                   MR. MARTIN:  We've had a brief
11    discussion while we're off the video record.  I
12    interposed an objection to the first exhibit,
13    because I have shown it to my clients for the
14    first time today, and they have never seen this
15    document.
16                    So, I just want to make sure that my
17    objection has been preserved.  For that matter,
18    the second exhibit was never seen by my clients,
19    as well.  So, I just want to make the objections,
20    and we'll deal with them either at the pretrial
21    on Monday, or while we're at trial.
22                   MR. HEMMENDINGER:  Well, I
23    suppose -- while we're making a record, I'm going
24    to offer all the exhibits that have been used in

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0022
1          the deposition, and that would be Lynch Number --
2                    MR. MARTIN:  Do you want to offer
3          them as Lynch or Defendant's?
4                    MR. HEMMENDINGER:  Defendant's 6, 7,
5          11, 10, and 29.
6                    MR. MARTIN:  So when we go back on,
7          I'll just note an objection, without going
8          into --
9                    MR. HEMMENDINGER:  Well, we're not
10         on the video record right now.  We're on the
11         written record.  Why don't you just note it now
12         and go on?
13                   MR. MARTIN:  Okay.  Well, I will
14         make that objection to the first two items.  And
15         then we will put that before the Court at the
16         appropriate time.
17                   MR. HEMMENDINGER:  Okay.
18                   MR. MARTIN:  While we're off the
19         video, I think it would work better to do this in
20         open court, so the jury can see, you know,
21         your -- not just your motion, but the response to
22         the motion.  You know, if you just make the
23         motion here on videotape, you know, the Court is
24         not going to be responding, obviously, at this

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0023
    1        point.
    2                    MR. HEMMENDINGER:  Okay.  I have one
    3        other question for you.  One second.
    4                    MR. MARTIN:  I just am going to let
    5        you know, I'm going to start the examination of
    6        this witness, and I expect to be able to take a
    7        short break during the middle of that
    8        examination, and come back and complete it.
    9        Okay?  Is that all right with you, Eric?
   10                    MR. HEMMENDINGER:  Sure.
   11                    (Following on video record):
   12                    VIDEOGRAPHER:  Going back on the
   13        record at approximately 10:49 a.m.
   14                    MR. HEMMENDINGER:  I have no further
   15        questions of the -- the witness.
   16                    CROSS-EXAMINATION
   17        BY MR. MARTIN:
   18            Q.  Good morning, Mr. Lynch.  My name is Jeff
   19        Martin.  I believe you may recall that I took
   20        your deposition about a little more than three
   21        years ago.
   22            A.  Yes.
   23            Q.  March 15, 2005.
   24            A.  Good morning.

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0024
1            Q.  Did you have an opportunity to review that
2       before your testimony here today?
3            A.  Yes.
4            Q.  And when was it that you reviewed your
5       deposition?
6            A.  Yesterday.
7            Q.  Did -- did you do anything else to prepare
8       for today's deposition, or trial testimony,
9       rather?
10           A.  I met with the -- the lawyer.
11           Q.  You met with the lawyer?
12           A.  Last week.  Phone conversation.  Phone
13      conversation with the --
14           Q.  Okay.
15           A.  -- legal counsel.
16           Q.  Now, do you recall that I -- that you
17      attended each of the depositions of my clients,
18      the plaintiffs in this matter?
19           A.  Yes.
20           Q.  And do you recall that they all -- they
21      each denied that they were involved in the hiring
22      process of catchers?
23           A.  Yes.
24           Q.  All right.  Let me ask you, at the time of

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0025
1          your deposition, you indicated that the hiring
2          capabilities and responsibilities of the crew
3          leaders was, and quote, from page 49, "Just part
4          of their job description."  Do you recall having
5          said that?
6               A.  Yes.
7               Q.  All right.  What was it that you were
8          referring to, in terms of their job description?
9          Do you recall specifically?
10              A.  No.
11              Q.  All right.  Well, let me show you what's
12         been marked as Plaintiff's Exhibit Number 3.
13         And -- I'm sorry.  Make that -- yeah.
14         Plaintiff's Exhibit 3 is entitled "Mountaire live
15         haul guidelines."  And this was used during the
16         deposition of Mr. Garrison.  Will you take a
17         moment and look at that.
18              A.  Okay.
19              Q.  Are you familiar with that document?
20              A.  Yes.
21              Q.  On section 2 on the first page of that
22         document, sets forth crew leader's general
23         duties.
24              A.  Okay.

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0026
```
 1          Q.  Do you see that?
 2          A.  Yes.
 3          Q.  Can you tell the jury or show the jury
 4    where it is that the hiring responsibilities
 5    are -- are shown as one of the crew leader's
 6    general duties?
 7          A.  No.  It doesn't state that.  These --
 8          Q.  Okay.
 9          A.  It doesn't state that.
10          Q.  It doesn't state it on there?
11          A.  No.
12          Q.  Okay.  Let me show you another document
13    that's been marked as Plaintiff's Exhibit Number
14    4.  And is captioned "Mountaire Farms of Delmarva
15    position consent summary, evaluation request form
16    for exempt positions."
17                 And this has to do specifically with
18    Roy Walters.
19          A.  Okay.
20          Q.  Are you familiar with this document, sir?
21          A.  Yes.
22          Q.  Okay.  Can you show the jury where it is
23    on this document that the hiring responsibilities
24    of a crew leader are set forth.
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0027
```
 1          A.  Well, basically under position purposes,
 2     to maintain a catching crew of seven catchers.
 3     That's where it would be included.
 4          Q.  All right.  That term "maintain a catching
 5     crew"?
 6          A.  Yes.
 7          Q.  All right.  Well, let's look specifically
 8     on the third page of that -- that document.
 9     Might be the fourth page.  I think it is the
10     fourth page.  Where it says, decision-making
11     authority.  And I apologize, it looks like that
12     was --
13          A.  Yeah.
14          Q.  -- stapled at both ends.
15          A.  I got it.  Yeah.  I got it.  Fourth page?
16          Q.  Okay.  Well, on the bottom it says D00352.
17          A.  I don't see it yet.  What page are you on?
18     One, two --
19          Q.  It's, I believe, the fourth page in
20     that -- in that document.  And on the bottom it's
21     marked D00352.  Do you have that --
22          A.  Oh, okay.
23          Q.  -- in front of you?
24          A.  352?
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

```
0028
  1           Q.  Yes, sir.
  2           A.  Yes.
  3           Q.  All right.  If you look in the middle of
  4      that page 352, it says "decision-making
  5      authority."  Do you see that?
  6           A.  Yes.
  7           Q.  And then below that, it has decisions
  8      made, and it refers to reprimands.
  9           A.  Okay.
 10           Q.  Okay?  And that shows, in fact, that crew
 11      leaders are able to make reprimands of their
 12      catchers if they step out of line.  Is that fair
 13      to say?
 14           A.  Yes.
 15           Q.  On the right side, it says "decisions
 16      referred or governed."  And -- well, let's look
 17      at the language right above that, to make sure we
 18      understand what that means.  It says, "Decisions
 19      which you refer to others or are governed by
 20      objectives, policies, or procedures."  Do you see
 21      that?
 22           A.  Uh-huh.
 23           Q.  Yes?
 24           A.  Yes.
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0029
1            Q.   Okay.  And that says hiring or
2       terminations, correct?
3            A.   Yes.
4            Q.   All right.  Are you aware of any policies,
5       I'm sorry, or any type of position descriptions
6       that were in effect before the initiation of this
7       litigation, back in 2004, that set forth that --
8       that the crew leaders had responsibilities to
9       hire their -- their crew?
10           A.   Not in the writing, but that's always been
11      the -- the case.
12           Q.   All right.  Not in writing.  And let's ask
13      also about terminations.  Is there anything in
14      writing that gives the crew leaders the authority
15      to terminate their -- any of their crew members?
16           A.   Not that I'm aware of, but that's --
17      that's the case.
18           Q.   All right.  Let me turn your attention to
19      another issue.
20           A.   Uh-huh.
21           Q.   And that is, are you aware that there was
22      a -- an audit performed by the U.S. Department of
23      Labor back in the year 2000, with regard to the
24      operations of Mountaire Farms, which includes

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0030
```
 1          North Carolina, as well as Delaware?
 2                  MR. HEMMENDINGER:  Objection.  You
 3      can go on.
 4          A.  Yes.  I believe there was a DOL audit in
 5      North Carolina.
 6          Q.  Do you recall that Mountaire did what's
 7      called an audit review, dated March 21 of 2001?
 8                  MR. MARTIN:  Objection.  You can go
 9      on.
10          A.  I'm not sure I'm aware of that.
11          Q.  All right.  Well, let me provide to you a
12      document that has been pre-marked as
13      plaintiff's -- I believe that's Plaintiff's
14      Exhibit 2.  Will you take a moment to look at
15      that, please.
16          A.  Okay.  I'm not familiar with that
17      document.  I haven't seen it before.
18          Q.  There is a statement on the first page --
19          A.  Okay.
20          Q.  -- right in the center of the first page
21      it says, "Crew leaders should also be paid OT,
22      because they are not salaried."
23                  MR. HEMMENDINGER:  Objection.
24          Q.  Are you familiar with that finding by
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0031
```
 1          Mountaire back in 2001?
 2               A.  No, I wasn't.
 3                    MR. HEMMENDINGER:  Objection.
 4               Q.  You're not aware of that?
 5               A.  No.
 6                    MR. HEMMENDINGER:  Counselor, can we
 7          just take turns so I can get my objections on the
 8          record.
 9                    MR. MARTIN:  Certainly.
10                    MR. HEMMENDINGER:  Yeah.  I'm going
11          to object to examining on this one.  We'll --
12                    MR. MARTIN:  All right.  Let's go
13          off the record, please.
14                    VIDEOGRAPHER:  Going off the record
15          at approximately 10:57 a.m.
16                    (Following off the video record):
17                    MR. MARTIN:  I thought what we were
18          doing is avoiding speaking objections other than
19          just the phrase "objection," and I would
20          appreciate if we would do that.
21                    MR. HEMMENDINGER:  Well, I didn't
22          make a speaking objection, but I certainly agree
23          with that.  Just give me a chance to get my oar
24          in the water before you continue the question.
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0032
1           MR. MARTIN:  Well, certainly, I will
2    not -- I certainly didn't mean to cut you off.
3    But I would appreciate if we would just, if
4    there's an objection, just state the term
5    "objection," and we can deal with that at the
6    appropriate time.
7           MR. HEMMENDINGER:  Well, that's what
8    I've been doing, and I'll continue to do that.
9           MR. MARTIN:  Okay.  While we're off,
10   I'm going to take a few moments now.  It may take
11   me 10 or 15 minutes to complete this analysis.
12   Is there any way we can use this room?
13           MR. HEMMENDINGER:  Sure.
14           MR. MARTIN:  I would appreciate
15   that.  Thank you.
16              (Brief recess held)
17           VIDEOGRAPHER:  Going back on the
18   record at approximately 11:20 a.m.
19   BY MR. MARTIN:
20      Q.  Mr. Lynch, are you aware that this
21   litigation involves the issue of overtime that is
22   being sought by the crew leaders?
23      A.  Yes.
24      Q.  And you're aware that the crew leaders

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

```
0033
  1        spend a considerable amount of time, not just on
  2        the farm, but also in the transportation of the
  3        crew; is that right?
  4            A.  Not currently.
  5            Q.  Not currently?  Well, this goes back seven
  6        years, back to 2001, to -- let's look at from
  7        2001 on.  Your testimony was, part of the
  8        responsibilities of the crew leader was to take
  9        them to the farm, meaning the catchers, correct?
 10            A.  Yes.
 11            Q.  And is it also the case that their -- part
 12        of their responsibility is to take them from the
 13        farm back home?
 14            A.  Yes.
 15            Q.  And we're talking about the crew leader
 16        going to each crew leader's -- I'm sorry, each
 17        catcher's home, picking him up, and then dropping
 18        him off at the catcher's home, correct?
 19            A.  Yes.
 20            Q.  Okay.  Are you aware of whether at any
 21        time Mountaire gave overtime pay to the crew
 22        leaders for their hours in excess of 40 per week?
 23            A.  No, I'm not.
 24            Q.  No, you're not, meaning --
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0034
1          A.   Not aware of ever paying any overtime.
2          Q.   Okay.  To the best of your knowledge,
3     then, you're not aware that they paid -- that any
4     overtime has been paid?
5          A.   No.
6          Q.   Okay.  Are you aware, or let me ask you
7     this:  Do you agree with Phil Owens, who is your
8     human resources --
9          A.   Manager.
10         Q.   -- manager or director?
11         A.   Director, manager, yes.  Director.
12         Q.   Okay.  And you know he's been involved in
13    this case, through at least his deposition,
14    correct?
15         A.   Yes.
16         Q.   Do you agree with his statement that crew
17    leaders were considered non-exempt before being
18    salaried in June of 2002?
19              MR. HEMMENDINGER:  Objection.  Go
20    ahead.
21         A.   Am I aware -- no.  I'm not aware of that
22    statement.
23         Q.   Well, are you aware that, or did you
24    consider the crew leaders to be non-exempt,

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0035
1          before June of 2002?
2              A.  To be honest, I wasn't sure what their
3          status was.
4              Q.  Okay.  And but you know that if they were
5          non-exempt, they would be entitled to overtime,
6          correct?
7              A.  I do know that, yes.
8              Q.  Okay.  But at this point right now you're
9          saying you're not sure what their status was
10         before 2002?
11             A.  No.  No.
12             Q.  How about their status after 2002?
13                 MR. HEMMENDINGER:  Objection.
14             A.  Yes.  They are currently salaried
15         employees.
16             Q.  Okay.  They're salaried employees, but
17         does that make them exempt, to the best of your
18         knowledge?
19             A.  Yes.
20             Q.  Okay.  Now, you did, you testified that
21         you did a job analysis that you testified to, and
22         you put into evidence, as -- let me find the
23         exhibit number, so you can put it back in front
24         of you.  It's Defendant's Exhibit Number 29.

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0036
1              Will you take a moment and refer to
2      that, please.  And I believe that you said that
3      you helped create this; is that right?
4          A.  Yes.
5          Q.  And you helped create this analysis, along
6      with your assistant live haul manager Dave Nuse,
7      correct?
8          A.  Yes.
9          Q.  All right.  And the date shown on this
10     document is March 10, 2004.  Correct?
11         A.  Yes.
12         Q.  And do you agree that this was a couple
13     weeks after Mountaire got notice of a claim by
14     the crew leaders that they are seeking overtime?
15         A.  I'm not sure on that.
16         Q.  You're not -- you're not sure when this --
17     this occurred?
18         A.  In -- yes.  In reference to the other
19     date.  I'm not sure.
20         Q.  Okay.  Well, what was it that prompted
21     this crew leader job analysis, as best you can
22     recall?
23         A.  I don't recall.
24         Q.  You think it may have just been done just

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0037
1        to -- to have it on the records at Mountaire?
2            A.  Perhaps.
3            Q.  You don't think it had anything to do with
4        the overtime claim that was being made by the
5        crew leaders?
6            A.  It could have.
7            Q.  It could have?
8            A.  It could have.
9            Q.  Okay.  But you don't recall --
10           A.  But I'm not --
11           Q.  -- specifically --
12           A.  No.  I don't recall specifically, no.
13           Q.  All right.  Now, given that you did this
14       analysis on or about March 10, 2004 --
15           A.  Uh-huh.
16           Q.  -- is it fair to say that you did not
17       involve any of the crew leaders in this job
18       analysis?
19           A.  Not that I recall.
20           Q.  Wouldn't the crew leaders know even better
21       than the assistant and live haul managers as to
22       what their various jobs entitle -- involve?
23           A.  I wouldn't say they know any better, but
24       they should know as much.

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0038
1          Q.  Oh, you don't think they know any better
2     than the managers what they do day in and day
3     out?
4          A.  Not more than the assistant live haul
5     manager, who's out there with them every day.
6          Q.  Okay.  But you found -- you felt no reason
7     to seek any information from any of the crew
8     leaders with regard to this so-called job
9     analysis?
10         A.  No.
11         Q.  Okay.  Now, we've talked a little bit
12    about the HR role, human resources, and you
13    indicated that, a few moments ago, that Mr. Phil
14    Owen is your HR manager or director, correct?
15         A.  Director.  Director.
16         Q.  Okay.  And how long has Mr. Owen been
17    serving Mountaire Selbyville in that capacity?
18         A.  I'm not sure.  More than five years.  I'm
19    not sure when he was hired exactly.
20         Q.  If I were to tell you that his testimony
21    in his deposition was that he was hired somewhere
22    around December of 2003, would that refresh your
23    recollection?
24         A.  (Witness shakes head).  No.  I mean I'll

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0039
1    take your word for it.  I'm just not sure when he
2    was hired.  I said more than five years, so I
3    guess about 2003.
4        Q.  Now, you talked a little bit about the HR
5    function, and I keep saying HR.  I should
6    probably for the jury's benefit, just continue to
7    say human resources.  But their function, in
8    terms of catchers, hiring and et cetera.  They
9    play a pivotal role in that, do they not?
10       A.  Just in the -- in the sign-up procedure.
11   Not in the recruiting.
12       Q.  Okay.  They actually help do the
13   screening, where they check identifications and
14   then do tuberculosis tests?
15       A.  Yes.
16       Q.  Okay.  In the screening that they do, do
17   they also check immigration status?
18       A.  Yes.
19       Q.  Well, you say that a little hesitantly.
20   Do you know for sure?
21       A.  Well, I believe they do.
22       Q.  You don't know for sure?
23       A.  I don't know for sure.
24       Q.  Okay.  Has -- has Mountaire had problems

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0040
1        with illegal aliens working for -- as catchers
2        for the company?
3                    MR. HEMMENDINGER:  Objection.
4            A.  I heard there might have been some issues.
5            Q.  There may have been some issues?
6            A.  Yes.
7            Q.  Okay.  Now, further, with human resources,
8        do you recall testifying in your deposition about
9        three years ago that human resources is the one
10       that actually makes the hiring decision for the
11       catchers?
12           A.  No.  I don't recall saying that.
13           Q.  All right.  Well, let me refer you now to
14       page 54 of your deposition.  Okay.  And
15       unfortunately -- well, I may have an extra copy
16       here.  If you take a look at page 54 of your
17       deposition.
18                   Why don't you take a moment and
19       review that, and then respond to my question as
20       to whether human resources does -- makes the
21       hiring decision.
22           A.  Basically, I said, "It happens in HR, I
23       guess."
24           Q.  And the question was, "Who makes the

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0041
1          hiring decision?"
2                        And your response was, "It happens
3          in HR, I guess."
4               A.   Yes.
5               Q.   And question, "I'm sorry?"
6                        And answer was, "HR."
7                        "Question, "HR?"
8               A.   Uh-huh.
9               Q.   Answer, "Human resources."
10              A.   Okay.
11              Q.   Okay?  Does that refresh your recollection
12         now?
13              A.   Yes.
14              Q.   Okay.  Let me ask you, also, about human
15         resources' role with regard to discipline of the
16         crew.  I believe it was your testimony in
17         response, in your direct examination, that the
18         crew leaders could pretty much do whatever they
19         needed to do, up through -- up through
20         termination.  Was that -- is that fair to say?
21              A.   Yes.
22              Q.   And you did not reference the role of
23         human resources with regard to those decisions,
24         especially termination decisions, did you?

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0042
1          A.   No.
2          Q.   But at the time of your deposition, when I
3     asked you about that, you weren't sure, and you
4     said, "They possibly could be involved in those
5     decisions."  Is that -- is that fair to say?
6          A.   Yes.
7          Q.   Okay.  So, that helps refresh your
8     recollection that HR may very well be involved in
9     the decision, and that the decisions may not be
10    the decisions -- final decisions, at least, of
11    the crew leaders?
12                    MR. HEMMENDINGER:  Objection.  That
13    wasn't a question, was it?
14         Q.   All right.  Let me move on here for a
15    moment.  And let me ask you -- let's go off the
16    record for just a moment, please.
17                    VIDEOGRAPHER:  Going off the record
18    at approximately 11:32 a.m.
19                    (Brief discussion off the record)
20                    VIDEOGRAPHER:  Going back on the
21    record at approximately 11:35 a.m.
22    BY MR. MARTIN:
23         Q.   Mr. Lynch, are you aware that your
24    company, by way of an audit review in March 21 --

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0043
1          dated March 21, 2001, found, and I quote, "Crew
2          leaders should also be paid OT, because they are
3          not salaried"?
4                    MR. HEMMENDINGER:   Objection.
5             Q.  Are you aware of that?
6             A.  I just became aware of that, today, when
7          you showed me the document.
8             Q.  All right.  And you have no reason to
9          dispute that?
10                   MR. HEMMENDINGER:   Objection.
11            A.  Prior to that date?
12            Q.  Yeah.  I -- my question to you is, do you
13         have any reason to dispute that determination
14         made by your company in 2001?
15            A.  No.
16            Q.  Okay.
17                   MR. MARTIN:   Thank you, nothing
18         further.
19                   MR. HEMMENDINGER:   I have some
20         redirect.  Let me just go off the record for a
21         second.
22                   VIDEOGRAPHER:   Going off the record
23         at approximately 11:36 a.m.
24                   (Brief discussion off the record)

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0044
1                 VIDEOGRAPHER:  Going back on the
2      record at approximately 11:39 a.m.
3                 REDIRECT EXAMINATION
4      BY MR. HEMMENDINGER:
5         Q.  Mr. Lynch, Mr. Martin asked you a series
6      of questions, or asked you a question that --
7      concerning a point in your deposition testimony
8      where you gave the answer, "It happens in HR, I
9      guess."  Do you recall that?
10        A.  Yes.
11        Q.  I'd like you to look at page 53 of your
12     deposition.  And I'd like to enter into the
13     record the testimony that you gave that led up to
14     that answer that I just referred to, starting at
15     the top.  And what I thought I'd do is I'll read
16     the questions and you tell me what your answer
17     was at the time.
18                 So, the question was, by Mr. Martin,
19     "All right.  You have testified that the crew
20     leader has the responsibilities of going and
21     recruiting a new or prospective person, correct?"
22        A.  "Yes."
23        Q.  "And then I think I understood your
24     testimony that person is referred to the plant or

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0045
1      the facility?"
2          A.  "Yes."
3          Q.  "And then there is a process of drug
4      testing?"
5          A.  "Yes."
6          Q.  "What other types of screening methods are
7      there?"
8          A.  "A TB testing, drug testing, and I think
9      there is a pretty extensive medical questionnaire
10     they have to fill out and answer questions.
11     Besides that, unless you're an immigrant, then
12     there's just the I-9 testing with the green
13     cards, or whatever."
14         Q.  "All right.  What do you mean by I-9
15     testing?"
16         A.  "Green cards, identification, valid
17     identification to be in the country."
18         Q.  "Producing the I-9?"
19         A.  "Yes."
20         Q.  "Okay.  Who is it in the plant that
21     coordinates the testing that you have just
22     described, the medical testing, the TB testing
23     and the drug testing?"
24         A.  "The medical facility."

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0046
1          Q.  "Okay.  Let's assume this person passes
2      each of those type forms of screening."
3          A.  "Yes."
4          Q.  "What happens to the person after that --
5      at that point?"
6          A.  "They generally get hired."
7          Q.  "All right.  And who makes that hiring
8      decision?"
9          A.  "It happens in HR, I guess."
10         Q.  And then continue.  "I'm sorry?"
11         A.  "HR."
12         Q.  Question, "HR?"
13         A.  "Human resources."
14         Q.  Okay.  "Is the crew leader involved in
15     that?"
16         A.  "Well, he made the job offer.  The job
17     bid.  That's just to the extent that he is -- you
18     know, he's telling the medical facility and HR
19     that he's making a job offer to this employee,
20     and providing they pass all the testing, he wants
21     them to be hired."
22         Q.  "And the job offer -- so in other words,
23     if the person was successful in the screenings
24     that you have indicated, that person would

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0047
1        automatically have the position?"
2            A.  "Yes."
3            Q.  Now, I want to ask you about your
4        testimony on page 69, that Mr. Martin referred
5        to.
6            A.  Okay.
7            Q.  Mr. Martin asked you the question, "Does
8        human resources" -- this is in the deposition he
9        asked you -- "does human resources have any
10       authority to take any type of disciplinary action
11       against the person who was written up?"  What was
12       your answer?
13           A.  "Do they have any authority?"
14           Q.  "Yes."
15           A.  "They possibly could, again, through Al
16       Z."
17           Q.  Now, turning away from the deposition for
18       a second, normally who initiates disciplinary
19       action against a member of a chicken catching
20       crew?
21           A.  The supervisor.
22           Q.  And why would it be the supervisor who
23       does that?
24           A.  Because he's the one that's in contact

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

```
0048
 1          with the individual each day, and he knows the
 2          issues.  He's the crew leader.
 3                      MR. HEMMENDINGER:  I have no other
 4          questions.
 5                      MR. MARTIN:  I have nothing further.
 6                      VIDEOGRAPHER:  Going off the record
 7          at approximately 11:43 a.m.
 8                      (Deposition concluded at 11:43 a.m.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

```
0049
1                      I N D E X
2    DEPONENT:  DOUGLAS LYNCH              PAGE
3    Examination by Mr. Hemmendinger        2
     Examination by Mr. Martin             23
4    Examination by Mr. Hemmendinger       44
5
                    E X H I B I T S
6                              PAGE REFERENCED
7    PLAINTIFF'S DEPOSITION EXHIBITS
8    2.  DOL Audit Review, 3/21/02          30
9    3.  Mountaire live haul guidelines     25
10   4.  Position content summary, evaluation
11   request form for exempt positions      26
12   DEFENDANT'S DEPOSITION EXHIBITS
13   6.  Live haul catcher authorization
14   form                                    7
15   7.  Live haul authorization form        8
16   10.  2001/2008 payroll, Roy's crew     13
17   11.  2001/2008 payroll, Larry's crew   16
18   29.  Crew leader job analysis          20
19   ERRATA SHEET/DEPONENT'S SIGNATURE      50
20   CERTIFICATE OF REPORTER                51
21
22
23
24
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

```
0050
 1
 2
 3
 4
 5
 6                  REPLACE THIS PAGE
 7               WITH THE ERRATA SHEET
 8                 AFTER IT HAS BEEN
 9               COMPLETED AND SIGNED
10                 BY THE DEPONENT
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Davis, et al. v. Mountaire Farms, Inc., et al.
Douglas Lynch

0051
1          State of Delaware  )
                              )
2          New Castle County  )
3
4                    CERTIFICATE OF REPORTER
5               I, Julianne LaBadia, Registered Diplomate
           Reporter and Notary Public, do hereby certify that
6          there came before me on July 23, 2008, the deponent
           herein, DOUGLAS LYNCH who was duly sworn by me and
7          thereafter examined by counsel for the respective
           parties; that the questions asked of said deponent
8          and the answers given were taken down by me in
           Stenotype notes and thereafter transcribed by use of
9          computer-aided transcription and computer printer
           under my direction.
10
                I further certify that the foregoing is a true
11         and correct transcript of the testimony given at
           said examination of said witness.
12
                I further certify that reading and signing of
13         the deposition was required by the deponent and
           counsel.
14
                I further certify that I am not counsel,
15         attorney, or relative of either party, or other wise
           interested in the event of this suit.
16
17
18
19                          _____
20                              Julianne LaBadia, RDR, CRR
21                              Certification No. 267-RPR
22                              (Expires January 31, 2011)
23
24