IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WILLIE DAVIS, JR., NATHANIEL BRIDDELL, JOSEPH GARRISON, LARRY GIBBS, and ROY H. WALTERHS, <br><br>ALL SIMILARLY-SITUATED CURRENT AND FORMER EMLOYEES OF MOUNTAIRE FARMS, INC., MOUNTAIRE FARMS OF DELMARVA, INC., and MOUNTAIRE FARMS OF DELAWARE, INC., <br><br>      Plaintiffs, <br><br>    v. <br><br>MOUNTAIRE FARMS, INC., MOUNTAIRE FARMS OF DELMARVA, INC., and MOUNTAIRE FARMS OF DELAWARE, INC., all Delaware corporations, <br><br>      Defendants. | C. A. NO. 04-0414-SLR <br><br>JURY TRIAL DEMANDED <br><br>COLLECTIVE ACTION |

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR NEW TRIAL

*I.   STANDARD.*

"While Rule 59(a) does not expressly state the grounds on which a district court can grant a new trial, courts have found that a new trial may be appropriate in instances when a jury finding is against the weight of evidence or where an error occurs that makes the trial unfair." IPPV Enterprises, LLC v. Echostar Communications, Corp. 191 F. Supp.2d 530, 563 (D. Del. 2002). "When the district court commits a prejudicial error of law, it has wide discretion in deciding a motion for a new trial." Mycogen Plant Science, Inc. v. Monsanto Co., 61 F. Supp.2d 199, 260 (D. Del. 1999); see also, Klein v. Hollings, 992 F. 2d 1285, 1289-90 (3d Cir. 1993).

1

## II. THE FAILURE TO ADMIT ADMISSION OF A PARTY-OPPONENT REGARDING DEFENDANT MANAGER'S STATEMENT THAT THE COMPANY RECOGNIZED THAT OVERTIME BENEFITS WERE DUE PLAINTIFFS CONSTITUTES REVERSIBLE ERROR.

According to Federal Rule of Evidence 801(d)(2) if:

> The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship....

FRE 801(d)(2); see also. Meding v. Hurd, 607 F. Supp. 1088, 1107 n. 22 (D. Del. 1985).

In this case, Plaintiff Joseph Garrison's deposition was taken by defense counsel, Arthur Brewer, on January 14, 2005. A portion of this deposition transcript was admitted as a Court Exhibit as Plaintiffs' "Trial Exhibit 11." (attached hereto as "Exhibit 1"). Beginning at page 15 of the transcript, Garrison testified that his manager and Mountaire representative, Live Haul Manager Doug Lynch, told him that Mountaire owed them for overtime. At the deposition, Mr. Brewer specifically asked Mr. Garrison about the statement which prompted the following statements from Mr. Garrison:

> Well, at the chicken farm, he came out there and seen me, and asked me about the lawsuit. And he said that he did owe us some money of the lawsuit but he didn't know how much.
>
> ...
>
> Well, he asked me, said, "Joe, I heard about the lawsuit that is going on." He said, "I am asking you not to sign any papers," he said, "we can talk about it." He said, "I do know that we owe you all some money, but," he said, "I don't know how much."(Id. at 16).
>
> ...

> Then he said that, "Willie Davis is doing this but," he said, "He is a nobody and he is not getting any money, he is not getting anything." But he said, "We know we owe y'all some but," he said, "we don't know how much." (Id. at 16).

Mr. Brewer then asked Mr. Garrison who else was present during this discussion with Lynch and Garrison and said only he and Lynch. Further, he stated that he did not try to solicit this statement from Mr. Lynch. (Id. at 17).

Approximately three months after Mr. Garrison's deposition, on March 15, 2005, undersigned counsel, Jeffrey K. Martin, took the deposition of William Douglas Lynch ("Mr. Lynch"). A copy of the portion of his deposition transcript has been admitted as a Court Exhibit as Plaintiffs' "Trial Exhibit 12." (attached hereto as "Exhibit 2"). Mr. Lynch was questioned about his conversation with Joe Garrison out on the farm before the lawsuit was filed. (Id. at 37). Mr. Lynch testified that he recalled speaking with Mr. Garrison about this litigation out on the farm. (Id.). Mr. Lynch testified that he spoke to Joe Garrison about the prospective litigation and asked Garrison whether there was anything that they could talk about or try to deal with in the company. (Id. at 38). Mr. Lynch questioned him about the bases for the lawsuit and stated that he believed that Mr. Garrison responded that the lawsuit was for back pay. (Id.). Mr. Lynch then denied that he told Mr. Garrison that the company would compensate them and further denied that he suggested to Mr. Garrison not to file a lawsuit. (Id.).

Two weeks prior to trial, Defendant noticed and took the videotaped trial testimony of Mr. Lynch based upon his alleged unavailability at trial.[1] Although Mr. Garrison's testimony about Lynch's admission was well known to Defendant's counsel at the time of Lynch's trial testimony in July of 2008 having questioned Mr. Garrison on that very subject, Defense counsel

---

[1] At trial, Defendant represented that Mr. Lynch was unavailable for trial without setting for the basis of his unavailability. Plaintiffs understand that Mr. Lynch was riding motorcycles in South Dakota during the week of trial.

3

chose not to question Mr. Lynch during his videotaped testimony about his conversation with Joseph Garrison.

Prior to trial, if Defendant had any concern about Mr. Garrison's testimony in this regard, it was incumbent on *Defendant* to either question Mr. Lynch about Mr. Garrison's testimony during his trial testimony or raise the issue by way of a Motion in Limine at or before the time of the Pretrial Conference. No such motion was filed by Defendant nor was there any mention of this testimony in the Pretrial Order.

On the second day of trial, Wednesday, August 6, 2008, Plaintiffs called Mr. Garrison as their third witness following the deposition read-in of Defendant's Human Resources Director, Philip Owen, and Plaintiff Roy Walters. Plaintiff Garrison began testifying consistent with his deposition testimony – that Mr. Lynch came out to the farm and said that he needed to talk to Mr. Garrison. As soon as Mr. Garrison mentioned that Mr. Lynch said, "I heard something about this lawsuit thing," Mr. Brewer stood up and objected to this testimony as being hearsay. (See, "Exhibit 3" at 91, attached hereto, an excerpted portion of the Garrison testimony elicited by Plaintiffs' counsel and the ensuing colloquy with the Court).

When the Court directed Plaintiffs' counsel to try to avoid the hearsay, Plaintiffs' counsel responded, "This is an admission from a party opponent." Mr. Brewer's response was that in addition to being hearsay it was not relevant. Brewer stated in front of the jury that, "the conversation has nothing to do with the lawsuit." (Id.). After Plaintiffs' counsel attempted to rephrase the questions to Mr. Garrison, Mr. Brewer again objected following Garrison's mention of the "lawsuit". (Id. at 92). A sidebar followed at the request of Plaintiffs' counsel which was prompted by Mr. Brewer's continued speaking objections to the jury.

At sidebar, Plaintiffs' counsel advised the Court that Mr. Brewer was well aware of Mr. Garrison's deposition testimony which was then paraphrased by Mr. Martin for the Court. The Court responded by stating that it was not aware of this admission.[2] The Court also advised that it did not know whether this was addressed in Mr. Lynch's deposition and asked how Defendant could possibly refute this. The Court then, Plaintiffs respectfully submit, erroneously, characterized this testimony as "classic hearsay." The Court went on to state that there should have been communication between counsel so that there would not be any surprises at trial. Plaintiffs' response was that, "this is not a surprise." (Id. at 93). Mr. Brewer's response was quite shocking and is quoted in its entirety:

> Your Honor, it is clearly a surprise. Mr. Martin never mentioned this to me. When he refers to this being on the record, the record he is referring to is depositions, which, as you know, are extremely – it's limited. There is no objection filed. It's classic hearsay. There is no way I can refute this.

(Id. at 93, 94). Mr. Brewer then stated that this information is "very prejudicial" to the Defendant. (Id. at 94).

The Court responded that it was unclear to the Court whether Garrison's deposition was taken before or after Lynch's deposition. The Court also questioned whether Defendant had a full and fair opportunity in discovery to refute this and to present contrary evidence. (Id. at 94). Plaintiffs' counsel advised the Court that he had expected that this issue would have been raised in Mr. Lynch's trial testimony. (Id.). Mr. Brewer's response was that Plaintiffs' counsel could

---

[2] Plaintiffs' counsel is unaware of any reason that this would have been brought to the Court's attention prior to this moment absent a pretrial attempt by Defendant to challenge this testimony. However, Plaintiffs' counsel is unaware of any legal grounds for challenging Lynch's statement through Garrison which clearly is "an admission by a party opponent", a non-hearsay statement governed by FRE 801(d)(2).

have raised this during Lynch's trial testimony.[3]  (Id.).  Mr. Brewer then, we submit, inaccurately, stated as follows:

> [T]here is absolutely no way that anybody could have foreseen that Mr. Martin is going to ask a question like this, which he should know is hearsay and highly prejudicial at this point in trial.

(Id. at 94, 95). Plaintiffs' counsel responded and advised the Court that Mr. Lynch did, in fact, have an opportunity to refute this statement because Lynch's deposition was taken after Joe Garrison's deposition in 2005. (Id. at 95). Notwithstanding Defense counsel's feigned ignorance of this admission prior to trial, it was certainly an issue that was addressed during discovery and if Defense counsel had forgotten about it, the ramifications of Defense counsel's lack of memory and error to address this issue prior to trial must be borne by Defendant in this case – not Plaintiffs.

The Court then ruled that this testimony was hearsay and not an admission, "because there is no way for me to determine whether it was actually said because there is no other evidence except this witness." After Defendant's objection to the testimony was sustained, Plaintiffs' counsel put a brief proffer on the record as to the testimony from Garrison that was ruled inadmissible. (Id. at 95, 96).

Clearly, according to FRE 801, the Lynch statement as presented through Mr. Garrison is not hearsay and should not have been excluded as such. This evidence was crucial to Plaintiffs' case in establishing that Defendant recognized that Plaintiffs were, in fact, owed overtime compensation and were not properly classified as exempt employees. Therefore, Plaintiffs respectfully submit that the Court erred as a matter of law and the significance of the excluded evidence is substantial to the extent that it warrants a new trial.

---

[3] As noted before, there was no reason for Plaintiffs' counsel to raise this at the time of Lynch's trial testimony.

### *III. PLAINTIFFS' "TRIAL EXHIBIT 1" WAS IMPROPERLY WITHHELD FROM THE JURY THEREBY PREJUDICING PLAINTIFFS.*

The issue of the overtime compensability during what was referred to during trial as year three (June 2001 to June 2002) received much attention from the Court out of the presence of the jury.[4] Plaintiffs' "Trial Exhibit 1" (attached hereto as "Exhibit 4") contained an admission by Defendants wherein it acknowledged: "Crew Leaders should also be paid OT [overtime] because they are not salary [sic]." However, this admission was ruled inadmissible by the Court to avoid introduction of year three issues at trial. (See, Plaintiffs' "Trial Exhibit 1", entitled, "DOL Audit Review" and dated March 21, 2001, attached hereto at "Exhibit 4").

Plaintiffs respectfully submit that keeping this document out of evidence substantially prejudiced Plaintiffs in this matter inasmuch as this document would establish that Defendants recognized Plaintiffs as nonexempt workers yet attempted to circumvent the law by simply reclassifying them as exempt employees. In essence, it is an admission by Mountaire that these workers were entitled to overtime compensation. The document was also very important to Plaintiffs to impeach the credibility of Mountaire as a company, but also to impeach the credibility of Mountaire's witnesses who played a part in the charade of attempting to legitimatize the Crew Leaders' standing as exempt employees.

Testimony was elicited from Philip Owen, Human Resources Director.[5] Mr. Owen testified that he searched his predecessor's files and was unable to determine from a review of Mountaire's files, the basis for the alleged exemption of the Crew Leaders that began when they

---

[4] Remaining pending in this matter is the Court's ruling regarding the compensability for this year. After Defendant rested, Plaintiffs moved for judgment as a matter of undisputed law and fact. The Court reserved ruling on Plaintiffs' motion and the jury verdict and the subsequent entry of judgment in accordance with the jury verdict has no effect on this pending motion. Defendant through counsel essentially conceded compensability of this year based upon the admission contained in Plaintiffs' "Trial Exhibit 1" that, "Crew Leaders should also be OT [overtime] because they are not salary [sic]." It is undisputed that Plaintiffs remained paid on a piece basis (equivalent to hourly) until sometime in June or July 2002 when they became salaried.

[5] Mr. Owen's deposition testimony was read in by Plaintiffs' counsel because of Mr. Owen's untimely hospitalization.

7

became salaried in 2002 (Owen's deposition testimony in pertinent part (p. 112) is attached hereto as "Exhibit "5). Plaintiffs' "Trial Exhibit 1" which is attached as "Exhibit 4" simply acknowledges consistent with the law that an employee can not be exempt without being salaried. As we know, however, just because one is salaried does not make that person exempt.

There appears to be a total lack of analysis or recognition of the type of exemption that applied to Crew Leaders until 2004 when this claim was made to Defendant Mountaire. Within a week of the presentation of the claim, Mr. Owen and his boss, Everett Brown, uncovered a six-part test for the executive exemption which contained the identical "hire and fire" test that was at issue in trial. The record also reflects that prior to 2004, the concept of Crew Leaders hiring and firing authority was not set forth in writing. This was acknowledged by Mr. Lynch in his videotaped testimony.

## IV.   THE COURT COMMITTED REVERSIBLE ERROR BY EXCLUDING DEFENDANT'S RESPONSES TO PLAINTIFFS' REQUESTS FOR ADMISSIONS.

"A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." FRCP 36(b).

During the Pretrial Conference and during the early part of the trial in this matter, Plaintiffs' counsel sought and was granted permission from the Court to put before the jury various responses from Defendant's Answers to Plaintiffs' Request for Admissions ("Exhibit 6" at 32, 33 and 205, 206). Similarly, Plaintiffs' counsel sought permission to show the jury during Opening Statement by way of overhead projection through ELMO various Stipulations of Facts that had been agreed upon at the time of the Pretrial Conference. Plaintiffs' counsel did so during the Opening Statement citing several of the Stipulations of Fact without objection and with the Court's permission to do so.

While Plaintiffs' requests with regard to the Requests for Admissions were initially granted, the final ruling from the Court was that they would not be admitted. It had been the intention of Plaintiffs' counsel as expressed to the Court to show three denials to the Requests for Admission during Plaintiffs' Closing Argument. Just as with the Stipulations of Facts that were shown to the jury during the Opening, Plaintiffs' counsel believed that it was not necessary to admit the Requests for Admission, but rather that they could be shown to the jury during Closing Argument because they were deemed to be in the case as "admissions."

Immediately following Defendant's brief rebuttal evidence, the Court inquired as to whether Plaintiffs wanted to put the Requests for Admission evidence into evidence. Although, it had been the understanding of Plaintiffs' counsel that it would just be able to be used in Closing Argument, at the point of the Court's inquiry, Plaintiffs' counsel made an application for the admission of Admissions Numbers 3, 4 and 7. Plaintiffs' request drew strong objection from Defense counsel who acknowledged that these responses to the Requests for Admissions were "wrong." The Court ruled that these were inadmissible and would not be able to be used in the Closing Argument.

The Responses to the Requests for Admissions sought to be introduced by Plaintiffs' counsel were as follows:

> **ADMISSION NUMBER 3:** Plaintiffs often worked more than forty (40) hours per work week.
>
> **RESPONSE:** Denied.
>
> **ADMISSION NUMBER 4:** The nature of Plaintiffs' jobs as crew leaders demanded the Plaintiffs work more than forty (40) hours per work week.
>
> **RESPONSE:** Denied.

**ADMISSION NUMBER 7:** Defendants were/are aware that Plaintiffs were/are working in excess of forty (40) hours per work week in their positions as crew leaders.

**RESPONSE:** Denied.

These were indeed "admissions" pursuant to the Federal Rules of Civil Procedure for which Defendants made no motion to withdraw or amend and therefore are conclusively established, thereby entitling Plaintiffs to introduce to the jury. The Third Circuit has ruled that, "admission or denials in response to a request for admissions stand in the same relation to the case that sworn testimony bears." Ark-Tenn Distributing Corp. v. Breidt, 209 F.2d 359, 360 (3d Cir. 1954).

The significance of these denials to Requests for Admissions is that Defendant took a position which is now declared to be "wrong" by Defendant's counsel wherein they denied that Plaintiff Crew Leaders worked more than forty (40) hours per week. Clearly, based upon the unrefuted evidence, this is wrong. Plaintiffs believe that this information should have been provided to the jury to show the bad faith of Defendant by failing to acknowledge that there was an overtime issue that pertained to Plaintiffs. If Defendant desired to amend these Answers, it was required to do so by motion prior to trial. Although Defendants again failed to raise this issue, Plaintiffs were unfairly prejudiced by their inability to show these "wrong" Answers to the jury showing that they denied that Plaintiffs worked overtime.

These responses along with Plaintiffs' "Trial Exhibit 1" which was also, we respectfully submit, was wrongfully excluded (See argument II, supra) shows the inherent inconsistencies of Defendant and would substantially impeach the credibility of Defendant.

## V. PLAINTIFFS WERE WRONGFULLY DENIED A BATSON CHALLENGE REGARDING AN AFRICAN AMERICAN JUROR.

The United States Supreme Court has held "that in order to maintain the dignity of persons and the integrity of the courts, the Equal Protection Clause must prevent [attorneys] from using peremptory strikes to remove jurors on the basis of race." U.S. v. DeJesus, 347 F.3d 500 (3d Cir. 2003). "The Supreme Court has outlined a three-part test for evaluating claims that a defendant used its peremptory challenges in violation of the Equal Protection Clause. First, the party challenging a peremptory strike must make a prima facie showing that the strike was based on race. Second, if a prima facie case is established, then the burden shifts to the striking party to articulate a race neutral explanation for the strike. Third, the trial court must decide whether the party challenging the strike has carried its burden of proving purposeful discrimination." Cuffee v. The Dover Wipes Co., 2005 WL 1026831 *1 (D. Del.,2005) (attached hereto as "Exhibit 7").

In this case, of the fourteen potential jurors were empanelled in the jury box prior to the preemptory challenges, two were African Americans. Defendant's first preemptory challenge struck Rachel Edwards, an African American female who is a financial analyst for ACE/INA Insurance Company. Following the peremptory challenges, Plaintiffs' counsel approached sidebar and made a *Batson* challenge contending that Ms. Edwards was removed primarily because of her race. Her challenge left one African American female on the panel.[6]

Plaintiffs' counsel made a *Batson* challenge as to the removal of juror number 11, Ms. Edwards. Plaintiffs' pretrial review of the jury list suggested that she would be a strong juror for the defense given that she was a financial analyst for an insurance company. The fact that she was the first preemptory strike was telling, we believe, of the racial motivation for her challenge.

---

[6] Unfortunately, this remaining African American juror, juror number 26, worked just prior to reporting for jury duty as a nurse. She fell asleep and slept through most of the first day of trial.

11

When questioned by the Court for the reason that she was stricken, Mr. Hemmendinger's response was as follows:

> Your Honor, the strike was based on her education. It says she is a financial--analyst here, but there is just high school education indicated, and we were looking for jurors who had some industrial experience rather than office experience to the extent we had any choices.

("Exhibit 8" at 79, 80). A review of the educational backgrounds of the jury reveals that of the eight empanelled, four of them, fully half of the jurors had only a high school and vocational education. Recognizing that Mr. Hemmendinger tried to qualify his educational rationale by also suggesting industrial experience, that does not explain the presence of seated juror number 7, Ms. Glass, who is unemployed and had a high school / vocational school education. Nor does Defendant's failure to strike seated juror number 3, Mr. Hollinger, who gave no indication of his employment other than he was employed at Dover Downs.

Most surprising was Defendant's failure to strike seated juror number 5, Andrew J. Dunn.[7] Mr. Dunn was an air belt sorter at UPS who prior to jury selection would be an excellent choice for Plaintiffs. Mr. Hemmendinger's statement that Mr. Dunn had "an industrial-type of occupation that "made him simpatico", we hope" is questionable at best and disingenuous at worst. Stated differently, it defies logic to suggest that a blue collar worker who is likely a non-exempt worker would be sympathetic to a large corporation such as Mountaire and not sympathetic to Plaintiffs, Mountaire's workers, who like him, carry out the "heavy lifting" of the company.

In this same regard is Defendant's lack of objection to the selection of juror number 1, Mr. Bodner, who is a retired pipefitter. Clearly, Mr. Bodner would be familiar with overtime principles and we again believe that he would be more likely to be sympathetic to the Plaintiffs

---

[7] Mr. Dunn did not subsequently serve due to a family tragedy that occurred immediately following jury selection.

than to the Defendant. These potential jurors were not stricken in favor of a financial analyst for an insurance company, who very likely qualifies as an exempt employee and is conservative and likely to favor Defendant corporation.

The reasons set forth by Defendant's counsel for the deselection of the African American juror just do not add up. It is clear that she was promptly and summarily removed because of her race. As such, upon review of the statements made by counsel at trial in conjunction with an analysis of the educational and vocational backgrounds of the jurors *not struck* as jurors, it is clear that Defendant's striking of Ms. Edwards as a juror was based upon her race and Defense counsel's justifications for moving to strike that juror were pretext.

## VI. *AFRICAN AMERICANS WERE UNDER REPRESENTED ON THE JURY VENIRE THUS CAUSING A CONSTITUTIONAL AND STATUTORY INFIRMITY NECESSITATING A NEW TRIAL.*

As noted on the record, of the thirty-six jurors who reported and constituted the venire from which the petit jury was selected, five appear to have been African Americans. This constitutes 13.88% of the venire. This is significantly less than the representation of African Americans in Delaware which is 20%. During jury selection, Plaintiffs' counsel objected to the under representation of African Americans in the jury venire.

The significance of the racial profile of the jury in this matter can not be understated. Each of the five Plaintiffs was African American. Credibility was very much at issue inasmuch as the selection process for chicken catchers (the "hiring and firing" issue presented at trial) differed markedly between Plaintiffs' testimony and the testimony of the Defendant's witnesses. Each of Defendant's witnesses was Caucasian. In view of the one African American juror's inability to stay awake on the first day, it is likely she did not contribute much, if at all, to the

13

jury deliberations. It is a logical assumption that a juror who has not heard all the testimony in the case can not significantly contribute to deliberating on a verdict.

The issue of the underrepresentation of African Americans in this Court's jury venire is currently before the United States Court of Appeals in the matter of <u>Boyd v. City of Wilmington</u>, C.A. Nos. 05-178 (SLR); 07-1731. The matter is scheduled for oral argument on October 24, 2008. In Boyd, there was one African American juror in a matter wherein Plaintiff claimed that he was passed over for promotions due to racial discrimination. The sole African American juror later testified by way of affidavit that she was totally excluded from the deliberations of the other Caucasian jurors who reached a determination opposite of hers. There is also the matter of <u>Turner v. City of Wilmington</u>, C.A. Nos. 05-716 (GMS); 07-1543 which involves the same issue, jury selection, and is another racial discrimination matter brought by an African American police officer, is pending before the U.S. Court of Appeals awaiting the disposition of the <u>Boyd</u> matter.

The U.S. Supreme Court has held that in order to establish a violation of the "fair cross-section requirement" of the Sixth Amendment:

> A plaintiff must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected are not fair and reasonable in relation to the number of such persons in the community; and, (3) that this underrepresentation is due to systematic exclusion of the group and the jury-selection process. <u>Duren v. Missouri</u>, 439 U.S. 357, 364 (1979).

The Jury Selection and Service Act of 1968 provides that this is the policy of the United States that, "all litigants in federal courts entitled to a trial by jury shall have the right to grand and petite juries selected at random by a fair cross-section of the community in the district or division where the court convene." 28 U.S.C. § 1861. Any claims pursuant to this Act are

analyzed using the same standard as the Sixth Amendment fair cross-section claim. United States v. Weaver, 267 F.3d 231, 236 (3d Cir. 2001).

The Duren elements establishing a violation of the fair cross-section requirement of the Sixth Amendment as well as the elements that underlie a violation of the Jury Selection and Service Action of 1968 have been established herein. The "distinctive" group here is the African-American community who, while representing 20% of Delaware's population, participates in District of Delaware jury venires in a much lower percentage than their population in the community and, in particular, for the Davis jury selection it appeared that African-American participation was a little more than half of the representation of African-Americans in the community. As such, the representation of African-Americans in the Davis venire could not be considered "fair and unreasonable."

## VII. CONCLUSION.

Defendant tried this case without any corporate officers or managers being present in the court room or at counsel table.[8] Most significantly, however, was the absence of the Live Haul Manager, Mr. Lynch, and the Human Resources Director, Mr. Owen. Mr. Lynch did not attend trial due to a scheduled vacation and Mr. Owen was reportedly ill and hospitalized.

Plaintiffs had no way to anticipate this or to do anything to effectively counter the absence of the Mountaire officials. Defendant, on the other hand, effectively utilized these crucial witnesses' absence to exclude evidence that could have been raised had they been present. Plaintiffs respectfully suggest that Defense counsel's arguments with the regard to the admission of these items enumerated in this Memorandum of Law as being incapable of response by Mountaire should not be countenanced by this Court. Instead, Mountaire's defense appears to

---

[8] Defendant specifically represented at the time of the Pretrial Conference that its Human Resources Director, Cher Vink, would sit at counsel table. While she appeared in the back of the courtroom for most of the trial, she never sat at counsel table.

15

have been a carefully orchestrated dance to avoid liability. Coupled with the jury issues as noted supra., this greatly prejudiced Plaintiffs in their presentation of their case.

For all the foregoing reasons, Plaintiffs respectfully request that based upon prejudicial and reversible errors of law, Plaintiffs' Motion for New Trial be granted.

**Respectfully submitted,**

**MARTIN & WILSON, P.A.**

_____
**JEFFREY K. MARTIN, ESQUIRE (#2407)**
**TIMOTHY J. WILSON, ESQUIRE (#4323)**
1508 Pennsylvania Ave
Wilmington, DE 19806
(302) 777-4681
jmartin@martinandwilson.com
twilson@martinandwilson.com
*Attorneys for Plaintiffs*

DATED: August 26, 2008

16